IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED CENTRAL BANK,

    Plaintiff,

v.

KANAN FASHIONS, INC., CREATIVE
WAREHOUSING (CHICAGO), LLC, KANAN
CRUISES, INC., KANAN HOLDINGS, LLC,
VARSHA SHAH and MEHUL SHAH,

    Defendants.

KANAN FASHIONS, INC., CREATIVE
WAREHOUSING (CHICAGO), LLC, KANAN
CRUISES, INC., KANAN HOLDINGS, LLC,
VARSHA SHAH and MEHUL SHAH,

    Counterplaintiffs,

v.

UNITED CENTRAL BANK,

    Counterdefendant.

No. 10 C 00331

The Honorable Robert W. Gettleman
Magistrate Judge Michael T. Mason

FILED
JUNE 22, 2010
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## AFFIDAVIT OF DANIEL GARRIE

The undersigned, Daniel Garrie, Esq. being first duly sworn, deposes and states as follows:

1.    I am over the age of 21 and have personal knowledge of the matters in this Affidavit.

2.    I am the President of Focused Solution Recourse Delivery Group (FSRDG) and have substantial experience with ESI discovery in federal court and otherwise. I have acted both as ESI Liaison for parties in litigation and as a court-appointed Special Master and Discovery Referee, or party-selected Neutral, to assist with ESI disputes throughout the United States and

EXHIBIT 1

6. UCB's assertion that it has collected 30,300,000 pages of e-mails and attachments is simply of no use or value because the Motion and Affidavit pointedly fail to provide any indication that the collection of 303 gigabytes was limited to Kanan related matters, or any date ranges for the collection. Indeed, it is readily apparent that such collection encompasses the entire universe of the custodians' employment activities, not just Kanan-related matters. Otherwise, UCB would not be proposing an "initial culling of ESI using search terms of 'Kanan, Creative and/or Shah'". *Motion* ¶16

7. Moreover, if the 30,300,000 pages of emails and attachments that UCB says it has collected (*Motion* ¶12) had been properly limited to Kanan-related communications, then the absurd result follows that, on the average, there were 5 million pages of Kanan-related e-communications created during the six-year period (2004-2009) Kanan was involved with Mutual Bank. That would mean that each of the 40 custodians that UCB has listed generated Kanan communications totaling, on the average, 125,000 pages/year, 2,500 pages/week, 500 pages/day or 50 pages/hour based on a 10 hour day! Even if there is 3x duplication between active email and archive and back up, that's still a conservative but ridiculous 15+ emails per hour, or 1 page every 4 minutes, every single hour, of every week, of every month, of every year. I note that these absurd numbers follow if UCB in fact is using a 6-year date range (which it pointedly fails to tell us). If and to the extent UCB was using a lesser date range, the astounding numbers above only increase to more astounding heights.

8. Indeed, UCB's Motion also does not specify whether the 30,300,000 pages of emails and attachments are even limited by any date. If the ESI collection encompasses a particular UCB custodian's ESI for the entire period of such custodian's employment with MB/UCB, then UCB collected ESI without regards to any date range whatsoever. For example,

abroad, most recently in Los Angeles Superior Court as Special Master appointed by Judge Robert Hess. I am the founder and editor-in-chief of the Journal of Legal Technology Risk Management. I have published more than 60 articles in scholarly and industry legal journals worldwide, and my writings are widely cited in legal and technology publications. I am a lead editor of *"e-Discovery & Arbitration"*, a treatise to be published by Thomson Reuters in 2011.

3. I am the ESI Liaison for the defendants/counterplaintiffs Kanan Fashions, Inc., Creative Warehousing (Chicago), LLC, Kanan Cruises, Inc., Kanan Holdings, LLC, and defendants Varsha Shah and Mehul Shah (one or more of defendants or counterclaimants referred to as "defendants" or "Kanan" herein).

4. I have reviewed plaintiff United Central Bank's ("UCB") Corrected Motion for a Protective Order Limiting Discovery ("Motion") and the exhibits attached thereto, including Exhibit D, Affidavit of Thomas Bonk ("Bonk Aff."). The Motion's allegations as to the quantity of ESI that UCB says it has collected, the scenarios UCB proposes to both limit and then produce ESI in TIF format, and the ESI discovery costs UCB says it will incur, are of little, if any, use or value.

**Quantity of ESI Collected**

5. UCB says that it has collected 303.204 GB of ESI native data from six different ESI sources: "(i) Archived Email: 69.7 GB; (ii) Active Email extracted from Exchange Database: 66.904 GB; (iii) Personal Shares: 26.8 GB; (iv) Group Shares: 62.8 GB; (v) Journal (Archived of Personal & Group Shares: 37 GB; and (vi) Computer (John Benik): 40 GB." *Bonk Aff.* ¶5, *Bonk Aff. Ex. 1*. UCB's Motion asks this Court to "assume" there are 100,000 pages associated with each gigabyte it has collected, and then asserts that because it has collected 303 gigabytes, its has an astounding 30,300,000 pages of e-mails and attachments. *Motion*, ¶12.

UCB has informed in its custodian's list that John Benik was hired on 12/17/01, that Elizabeth Lally was hired on 9/22/97, and that Nasr Khan was hired 11/15/94, all hired long before the Kanan relationship began in 2004. Ex. 3. If UCB's collection encompasses the entire period of these custodians' employment, then UCB has collected enormous amounts of ESI that is useless on its face.

9. Even aside from these ESI "universe," and date range issues, UCB's "assumption" that each gigabyte it has collected equals 100,000 pages (*Motion* ¶12) is no more than self-serving speculation. UCB cites its Exhibit E (a LexisNexus research document) as the foundation of its "assumption." *Motion* ¶ 11, fn. 2. Exhibit E states, however, that "The secret to making a good page estimate is to evaluate the file types included in the dataset." But UCB pointedly fails to make any such evaluation of file types included in its 303 GB dataset.

10. In fact, UCB's own Exhibit E reflects that the number of pages per gigabyte will vary widely according to the file types, from 15,477 pages per gigabyte for "image" files, to 677,963 pages per gigabyte for "text" files. UCB apparently chooses "e-mail files," which Exhibit E lists as having 100,099 pages per gigabyte, to arrive at its assumption of 30 million pages of e-mails and attachments. But once again UCB fails to provide any estimated breakdown of the file type of the "source" material, which its own Exhibit E requires. In other words, UCB's Motion simply assumes that UCB's systems are entirely e-mails and attachments. Such assumption does not make sense and in fact, according to Mr. Bonk, e-mails comprise only 136 out of 303 GB. *Bonk Aff. Ex. 1*. As a result, without a breakdown of file types per Exhibit E, UCB's assumption of 100,000 pages per gigabyte is just that, a self-serving "assumption", and nothing more.

- 4 -

11. UCB also claims that "an initial limitation by timeframe and keyword culling will significantly reduce the universe of documents" and result in reducing ESI from 303 GB to 60.6408 GB, or 6,064,000 pages of documents. *Motion* ¶16, 18; *Bonk Aff.* ¶ 6. If in fact there were 6,064,000 pages, this would mean that on the average, **each of the 40 custodians generated 151,600 Kanan-related pages each year, or over 10,000 pages per month!** Such a preposterous result reflects that UCB's assumption of 100,000 pages per gigabyte fails to account in any way for ESI sources other than e-mail.

12. The fact that UCB does not provide file types for the datasets associated with each custodian, notwithstanding that it is required to do so by its own Exhibit E, also effectively prevents initial efforts to limit scope of ESI discovery. Without file type information, defendants are precluded from any effort to reasonably refine the scope of ESI discovery. For example, if a custodian has 40,000 image or powerpoint files -- equivalent to 2+ or more GB of data --, then defendants would suggest that UCB sample the files. If, for example, the majority of the sampling proves to unrelated marketing/advertising materials, or large powerpoint presentations, then those files might be excluded or otherwise limited.

### UCB's Proposal To Limit ESI

13. UCB proposes that its ESI production be completed using "Scenario 2," which will use "an initial limitation by timeframe and keyword culling." *Motion* ¶17. Its proposal, however, ignores the efforts by defendants to obtain sufficient understanding of UCB's Illinois and Texas ESI systems so as to determine how defendants' search terms might be reasonably refined to cull UCB's ESI to lower levels.

-5-

14. Defendants' ESI search terms were provided to UCB on March 22, 2010. However, as set forth below, it was not until days ago on June 11, 2010 that defendants obtained a sufficient understanding of UCB's Illinois and Texas ESI systems to now determine how their search terms might be refined to cull UCB's ESI.

15. As defendants' ESI Liaison, I have been privy to the following efforts of defendants to gain a necessary understanding of UCB's ESI systems:

   a. ESI discovery conference on April 23, 2010 at Kanan's Oak Brook office with Ms. Dedinas (UCB's counsel), Mr. Aberman (UCB's ESI Liaison), and Eric Grossman (defendants' counsel);

   b. Eric Grossman's April 28, 2010 letter to Ms. Dedinas confirming UCB's ESI matters discussed at the April 23, 2010 ESI discovery conference (Ex. 4);

   c. Ms. Dedinas' May 4, 2010 letter in response to Eric Grossman's April 28, 2010 letter (Ex. 5);

   d. The parties' May 17, 2010 Joint Status Report to the Court;

   e. The status hearing before the Court on May 19, 2010 in which I was a participant;

   f. Eric Grossman's May 12, 2010 letter in response to Ms. Dedinas' May 4, 2010 letter (Ex. 6);

   g. Eric Grossman's May 25, 2010 letter to Ms. Dedinas concerning UCB's ESI systems and efforts to obtain data map information (Ex. 7);

   h. ESI discovery teleconference on June 9, 2010 with Ms. Dedinas, UCB's ESI Liaison Mr. Aberman, and Eric Grossman, in which I was also a participant and during which the matters and questions raised in Eric Grossman's May 25, 2010 letter were discussed; and

   i. Ms. Dedinas' June 11, 2010 letter in response to Eric Grossman's May 25, 2010 letter, including additional custodian information that had not been previously provided (Ex. 8).

16. Defendants' efforts to gain a necessary understanding of UCB's ESI systems began with the aforementioned ESI discovery conference on April 23, 2010. At that time, UCB

- 6 -

did not have, nor was it able to provide, sufficient information about the custodians, structure and configuration of UCB's ESI systems in Illinois and in Texas.

17. As to UCB's ESI systems in Illinois, defendants continued to have unanswered questions and conflicting information until June 9/11, 2010. For example, defendants did not receive until the June 9, 2010 teleconference and Ms. Dedinas' June 11 letter complete and sufficient answers to their questions about UCB custodians (including employment status, employment termination, employment locations, and dates of same), the size of emails subject to archiving, specific archiving procedures, and most importantly, the specific systems where each custodian's ESI is stored.

18. As to UCB's Texas ESI systems, defendants did not receive information until the June 9 teleconference because, as Ms. Dedinas advised in a May 26, 2010 e-mail to defendants' counsel: "due to various travel and court conflicts, the earliest my team can get out [to Texas] is July [sic – June] 8th." Ex. 9. The parties and their ESI liaisons then conferred on June 9, 2010 (in compliance with the Court's May 20 Order: "The parties and their ESI liaisons must meet and confer by 06/09/10 regarding the configuration of Plaintiff's Illinois and Texas systems and the custodians who used each.")

19. In sum, UCB did not provide sufficient detailed information about its Illinois and Texas systems until the ESI discovery teleconference on June 9, 2010, and the receipt of Ms. Dedinas' June 11, 2010 letter, which letter both confirmed information provided at the June 9 teleconference and provided additional information as well.

20. In the absence of sufficient information about the structure and configuration of UCB's Illinois and Texas systems, which was not finally obtained until receipt of Ms. Dedinas'

June 11, 2010 letter, defendants did not have the ability to engage in any substantive discussions concerning use of keywords for culling ESI.

21. Defendants repeatedly informed UCB, including in my statements to the Court on May 19, 2010 (Ex. 10), that once sufficient information about UCB's systems was provided, defendants would attempt to narrow the search terms, the ESI systems to search, and the custodians in a collaborative and cooperative fashion. At the May 19, 2010 hearing, I advised the Court as follows (Ex. 10):

> MR. GARRY: Good morning, your Honor. The purpose and intent of the data map is to facilitate costly -- like cost effective discovery, because as of now there is -- we don't -- there is no understanding of what UCB's systems -- computer systems exist as it relates to custodians. So without having that knowledge, meaning I don't know -- we don't know what systems, for example, the CFO at UCB was using, so it is going to be really hard to write -- craft narrowly tailored and reasonable search if we don't know the world within we're searching. And that's the intent of the data map. I don't -- if they want to call or give it to us in some other fashion, we just need to know what systems they have and how they manage that information. [Tr. 4]
>
> * * *
>
> MR. GARRY: Well, I would assume the bank, because the FDIC requires them to have the mappings of their systems for compliance purposes, would be able to easily tell us that the CFO uses email and this is how long they have their archives in Texas. Because when we met with the liaison, they were unable to tell us how their systems work in Texas at all. So if they can provide in writing the CFO and these --whatever custodians that use these systems, and they keep on this -- these systems and they keep the information for how long, it shouldn't be -- it should be about 15 to 20 hours of discussion with their internal IT people at most to put that in writing and provide --
>
> THE COURT: And their liaison doesn't know that information?
>
> MR. GARRY: He only was able to speak to UCB Chicago. And he was supposed to provide clarification as to how the back up and archiving worked because there was some confusion as to how effective their -- and when the triggers actually happen. I -- specifically it wasn't clear when someone receives an email how big the attachments had to be for them to be archived versus backed up. And these other -- the nuance details make somewhat of a difference as to the world in which we're searching because we don't want to look to make it unduly burdensome for the bank or for us and want to be reasonable and also efficient, according to (unintelligible). [Tr. 5-6]
>
> * * *

- 8 -

MR. GARRY: We have been working -- your Honor, we invested a substantial amount of time, effort, and energy. When I say data map, I mean it in the most simple sense. These are the custodians. These are the e-mails, and these are the world of their (unintelligible) documents.

THE COURT: And that's what you want from the plaintiffs in the most simple sense.

MR. GARRY: Yeah. I mean, we're not looking to impose an undue burden, we're just looking to get clarity so that when we do make -- have a discussion about search terms and, etcetera, we're talking -- we're all on the same page. [Tr. 10]

22. Accordingly, with the receipt of Ms. Dedinas' June 11, 2010 letter defendants are now in a position to seek to narrow the search terms, ESI systems, and custodians, and confer with UCB.

### UCB's Estimate Of ESI Discovery Costs

23. UCB seriously inflates the ESI discovery costs that UCB claims it will incur (and seeks to shift to defendants). In my professional opinion based on my substantial experience with ESI and my knowledge of the current state of UCB's data collection efforts, UCB's price quotes in its Motion are likely significantly inflated. UCB lists a budget of $130,856.06 for its "Scenario 2" (*Motion* ¶¶16-18), and a budget of $401,745.30 for its "Scenario 1" (*Motion* ¶13, *Bonk Aff.* ¶10). UCB, however, only obtains price quotes from DTI, its own ESI Liaison. UCB does not provide quotes from any other vendors, including well known vendors such as Kroll, Iron Mountain, or PWC to suggest a few. As set forth below, Mr. Bonk's quotes are unreasonably and unacceptably high.

24. In fact, Mr. Bonk's Affidavit reflects that his "estimate" of costs is really nothing more than a guess. Mr. Bonk himself states that the costs provided "are merely estimates based upon the data collected to date... and are subject to revision based on a variety of factors." *Bonk Aff.* ¶11. Pointedly, he does not indicate what "variety of factors" would lead to revision to his "mere" estimate.

-9-

25. Mr. Bonk's position is otherwise confusing. He clearly states at the beginning of his affidavit that he knows that UCB has so far collected exactly 303.204GB of native data that it has broken down into six different evidence sources with exact GB numbers: "(i) Archived Email: 69.7 GB; (ii) Active Email extracted from Exchange Database: 66.904 GB; (iii) Personal Shares: 2.68 GB; (iv) Group Shares: 62.8 GB; (v) Journal (Archived of Personal & Group Shares): 37 GB; and (vi) Computer (John Benik): 40 GB." *Bonk Aff.* ¶5, *Bonk Aff. Ex. 1*. Mr. Bonk thus provides exact GB numbers. As a result, Mr. Bonk's Scenario 1 and Scenario 2 cost estimates could and should have been based on the specific file types of the data currently in UCB's possession, not gross GBs, in accord with UCB's own Exhibit E ("The number of pages in a given file varies widely based on different file types and characteristics...The secret to making a good page estimate is to evaluate the file types included in the dataset."). It is my opinion that a more accurate assessment of the file types in UCB's possession in accord with Exhibit E would have most likely led to a much lower cost estimate. The fact that they did not adopt this course of action itself undermines UCB's "merely estimates . . . subject to revision based on a variety of factors".

26. Notwithstanding UCB's professed concern about costs, UCB also asks this Court to permit it to provide ESI production in TIFF format instead of native format (*Motion*, ¶16). (Defendants on April 28, 2010 requested that UCB ESI production be in native format. Ex. 4.) But ESI production in TIFF format in fact substantially increases the cost of the production. Indeed, Mr. Bonk himself admits in his affidavit that TIFF is "a more costly procedure". *Bonk Aff.* ¶10. See *Covad Communications Co. v. Revonet, Inc.*, 254 F.R.D. 147, 150 (D.D.C. 2008) ("Obviously, printing them or converting them to TIFF files probably (and ironically) costs more

- 10 -

so Revonet is hard pressed to claim that producing them now in their native format is unfairly burdensome").

27. In fact, for comparison, the Bonk Affidavit quotes TIF imaging at $800/GB and metadata extraction at $200/GB. *Bonk Aff.* ¶10. In contrast, a well known vendor of which I am aware - Sfile SaaS - quotes native production (which would eliminate the need to perform metadata extraction) at $25 per gigabyte or $975/GB less--92.5% less--than what DTI proposes to charge for TIFF. Ex. 11.

28. Production in TIFF format is not only more costly, but also more difficult to search, as the court found in *Covad Communications Co. v. Revonet, Inc.* -- F.R.D. --, 2010 WL 1233501 at *2 (D.D.C. 2010) ("Revonet had taken the e-mails that could have been easily produced in native format and printed out all 35,000 pages for no apparent reason other than to make searching their content **much more difficult** than it would have been had they been produced in native format") (emph. added).

29. UCB asserts that production in TIFF format will "prevent data manipulation by either party which is possible when data is produced in native format." *Bonk Aff.* ¶12. Aside from the unsupported suggestion that either party might "manipulate data", the fact is that even data produced in TIFF format can be manipulated at a pixel level. With the proper technical resources, sentences and paragraphs can be modified by altering the content of a TIFF file.

30. In sum, the fact is that TIFF format substantially increases the cost of production and review without significant protection against any theoretical "manipulation".

- 11 -

Further affiant sayeth not.

_____
Daniel Garrie

Subscribed and sworn before me this 18th day of June, 2010.

_____
Notary Public

[Notary Seal: DENNIE A CARTER, NOTARY PUBLIC, STATE OF WASHINGTON, COMMISSION EXPIRES SEPTEMBER 16, 2012]