IN THE UNITED STATES DISTRICT COURT
F0R THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED CENTRAL BANK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-00331 |
| | ) | |
| KANAN FASHIONS, INC., et al., | ) | Judge Robert Gettleman |
| | ) | |
| Defendants. | ) | Magistrate Michael Mason |

**THE BANK'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR
PROTECTIVE ORDER LIMITING DISCOVERY**

The Kanan Defendants' response brief makes clear that the parties agree on two things. First, the core dispute here involves a series of events that occurred after July 31, 2009 (when United Central Bank acquired a substantial number of the assets of Mutual Bank from the FDIC) and second, that a collection of ESI that does not relate to the Kanan entities and the specific issues raised in this litigation has no current value until it is further refined. Having failed to reach agreement with Kanan's counsel on the particulars of how to limit the data by specific temporal and keyword parameters, the Bank had no choice but to bring this Motion. Because (a) the Kanan defendants concur that discovery for the period prior to 2009 is not relevant to their claims in this litigation; (b) production in TIF format with load files best serves the goals of providing relevant and useable information in an efficient manner; and (c) the extremely high cost of discovery for even the subset of documents that are the most likely to contain relevant documents demonstrates the undue burden of e-discovery on the Bank, the Bank's motion should be granted.

A. **THE RELIEF REQUESTED BY THE BANK IS NECESSARY AND THE BANK'S MOTION FOR PROTECTIVE ORDER LIMITING DISCOVERY SHOULD BE GRANTED.**

The parties are at an impasse with respect to ESI discovery. To limit the undue financial and staffing burdens on the Bank in producing ESI responsive to the Kanan defendants' discovery requests, the documents to be reviewed must be limited to the time period actually at issue in the litigation, and to "Kanan-related" documents.

1. **Due to the Manner In Which It Its ESI is Kept, UCB Could Only Limit Its Initial Collection of ESI By Custodian and Now Needs Court Direction To Further Limit the ESI to be Reviewed in an Economical and Feasible Manner.**

Kanan's ESI liaison, Daniel Garrie, correctly notes, albeit by injecting unnecessary doses of hyperbole and outrage throughout his affidavit, that a collection of ESI that is not related to Kanan is of no use or value. True. As has been explained to Kanan's counsel and Mr. Garrie during numerous in person and telephonic meetings, due to the manner in which the Bank's Chicago ESI if kept, (a system which it recently inherited from the defunct Mutual Bank),, the Bank's initial collection of ESI could only be limited by custodian. The Bank's ESI resides in active emails (current to 1 year), archived emails and a journaling system. Active emails larger than 1 MB are "stubbed" and the data in excess of 1 MB resides on the archived vault. None of these sources can serve as an effective platform for meaningful searches or culling for litigation purposes.[1] (See Affidavit of David Aberman, attached as Exhibit A.) The data must be collected and then manipulated on another platform with appropriate search functionality. The Bank's consultants are able, however, to bring over selected subsets of the collected ESI by date range, custodian, and basic keywords. More sophisticated searches and further refinements must occur on a searchable database platform.

---

[1] This is in contrast to the Bank's Texas databases, which will be searchable by counsel.

Kanan's liaison has been involved in over 5 hours of meetings in which the Bank's ESI systems have been detailed and outlined, and further followed up and confirmed in multiple pages of correspondence throughout April, May and June 2010. Due to constant pressures from Kanan's liaison, who repeatedly cautioned the Bank against insufficient preservation, incomplete collection and risk of spoliation[2], the Bank cast a wide net and collected ESI relating to a list of custodians who the Bank believed could have had some contact with the Kanan loans, and then expanded the custodian list to include additional names suggested by Kanan's counsel. The initial collection was only limited by custodian. (See further explanation in Aberman Affidavit, Exhibit A.) The Bank did not over-collect. It appropriately collected a universe of potentially relevant data acceding to Kanan's concerns for under-collection and missed data sources. However, the result today is a 303 gigabyte database of Chicago ESI (which does not include Texas ESI ) which needs to be limited in a reasonable way to include only data relating to the defendants, the transactions at issue and the relevant timeframe. In order for the ESI to be usable, and to allow discovery in this case to proceed in a reasonable and efficient manner, the 303 gigabytes of data needs to be reduced over several stages. The first stage is migrating to DTI's searchable databases only those documents which are most likely to relate to the Kanan defendants and the relevant timeframe, because the cost of processing ESI is so high. Once this smaller set of data is migrated to a searchable database, further cooperative keyword searches should be employed to get to documents which relate to specific issues in the case.

Kanan and its expert either do not grasp this concept or are being obstreperous. On March 22, 2010, Kanan's attorneys provided the Bank's counsel with a list of 260 search terms, with little further guidance. (Kanan's proposed search terms are attached hereto as Exhibit B.) The uselessness of this approach was made patently clear to Kanan's counsel on April 22, 2010,

---

[2] For examples, see Exhibits 4, 6 and 7 herein and Garrie Affidavit, pp. 6-9.

when the Bank's counsel advised them of the large scope of collected ESI, what it contained, why the individual search terms provided were not helpful in "creating a universe of documents that will be responsive to your document requests" and that "individual searches by each item will [not] be helpful in reducing the documents in a productive way." At that time the Bank requested collaboration on creating a universe of relevant Kanan-related ESI. (See email correspondence from V. Dedinas to E. Grossman dated April 22, 2010, attached as Exhibit C.) That correspondence specifically pointed out why Kanan's proposed search terms would not assist in furthering the discovery process at this stage..

Kanan responded immediately with an email showing their concern about the Bank's "patently incomplete" collection and delineating additional areas of imaging and collection which it thought was necessary.[3] No further cooperation on refining search terms was offered. (See email of E. Grossman to V. Dedinas of April 22, 2010, attached as Exhibit D.)

On May 4, 2010, the Bank again implored Kanan to cooperate in reducing the collected ESI: "Due to the sheer volume of UCB's ESI relating to these loans since 2004, limiting ESI discovery to a reasonable date range is the single most important factor in conducting efficient and cost effective electronic discovery in this case." And further, advising that the 260 search terms proposed by Kanan would do nothing to limit the universe of e-documents, the Bank stated that "if that is your intention [that the search terms be used in combination], you should provide us with the combinations you would like searched. It would be ill-advised and unproductive for us to choose combinations of search terms for you, only to learn that you do not find them acceptable." (Resp., Exhibit A, pp. 6-7.)

---

[3] As cautioned by the Seventh Circuit Electronic Discovery Pilot Program Phone One Report, p. 9, "[t]oo often these exchanges begin with unhelpful demands for the preservation of all data, which often are followed by exhaustive lists of types of storage devices . . . As a result, the parties often fail to focus on identifying specific sources of evidence that are likely to be sought in discovery but that may be problematic or unduly burdensome or costly to produce or preserve."

Further discussions on the same issue ensued after the Court ordered the parties to confer in a conference room on May 5, 2010. Despite numerous requests from the Bank that the parties come to an agreement on how to limit the universe of collected ESI, Kanan has repeatedly taken the position that it will not provide further keyword searches or agree to culling until it has a data map from the Bank.[4] (Resp., Exh. 4, ¶8 and Exh. 6, p. 4.)) And Kanan has further maintained that ESI date ranges should from anywhere from June 2004 to June 22, 2006 to the present or to January 19, 2010. (Resp. Exhs. 4, 6 and 10.)

At this time, the Bank's other option is to migrate and process 303 gigabytes of data to DTI's databases at enormous expense, with no time limitation, and before it begins any keyword searches or culling. Rather than using Mr. Garrie's expertise in e-discovery to put together a definitive counterproposal for narrowing the scope of the collected ESI, Kanan throws out obstacles, criticizes the Bank's vendors and their cost estimates, and worries about single documents that could be missed, and then asks the Court to defer ruling for further discussions between the parties. The parties have had hours of discussions regarding e-discovery and the Bank has made every effort to address all of the "concerns" raised by Defendants regarding the Bank's ESI. Rather than bringing the parties closer together on the e-discovery front, these discussions in the past have resulted in Mr. Garrie further expanding the search for ESI and inquiring about every possible way in which a document may or may not have been recorded or preserved rather than contributing to constructive solutions to complex and costly issues.[5] A prime example of Kanan's inability to commit to even the most reasonable of terms is its outright rejection of the Bank's proposed first cut – documents having the words "Kanan", "Shah" and

---

[4] Despite Defendants' claims that this information was delayed, it was provided at numerous conferences and in a series of correspondence, the last of which occurred on June 9th, as specifically promised by the Bank's counsel and ordered by this Court. (Resp., Ex. 10, p. 8.)

[5] Resp., Ex. 4, pp. 2-3.

5

"Creative," because some documents might be missed, notably e-mails to Kanan employees, which should reside within their own ESI database. That is why the Bank brought this Motion and seeks assistance from the Court.

**2. <u>UCB's Proposed Limiting Terms Are Reasonable and Appropriate.</u>**

      *a.    UCB's Proposed Time Frame Is Reasonable.*

The time frame proposed by the Bank – June 1, 2009 through November 19, 2009 is reasonable. Although Defendants' Response takes the Court on a trip down memory lane to explore the "depth and evolution" of the relationship between the Kanan entities and Mutual Bank, that past history is irrelevant to the issues in this dispute.[6] The claims and counterclaims at issue in this litigation all involved alleged breaches by a new entity – United Central Bank – that are alleged to have occurred after July 31, 2009. Defendants acknowledge as much by backing away from their original demand for documents going back to 2006, and agreeing – for the first time – that the date range for the Bank's ESI only needs to go back as far as 2009. Nevertheless, the Bank proposed date range of June 1, 2009 through November 19, 2009 remains adequate to capture the entire time period from initial discussions between Mutual Bank and Kanan Fashions regarding the renewal of Loan No. 1 through November 19, 2009, the date Defendants were notified of the last loan to be in default. Defendants have proposed moving the start of the time period back to February 1, 2009 to ensure that it receives copies of any reports on Wolf & Co.'s 2009 review of Kanan Fashions' operations. On the other end, Kanan seeks to expand ESI to January 19, 2010 – several months after Kanan defaulted on the loans, closed its accounts with United Central Bank and further, drained to zero its replacement bank accounts

---

[6] Specifically, issues relating to whether Mutual Bank had agreed to renew Kanan Fashion's loan ("Loan No. 1") coming due on August 22, 2009 is interesting, but irrelevant. A claim based on the Bank's alleged failure to renew a loan is expressly prohibited by the Illinois Credit Agreements Act, 815 ILCS 160/1 *et seq.* because any alleged agreement was not in a writing signed by both parties. This claim is the subject of the Bank's motion for partial judgment on the pleadings on Defendants' counterclaim, filed on June 23, 2010.

with Chase. The reason Defendants give for this enlargement on the back end is that the Bank hired a private investigator to find out what happened to the collateral that was supposed to secure the Bank's loan. First, this is information that Kanan already has, because it knows what it did with the collateral. Second, the Bank has already produced all unprivileged documents (paper and email) that relate to the private investigator's investigation which uncovered attempts by Kanan to sell off the secured collateral to liquidators. Given the huge volume of electronic documents, adding an additional 6 month window to the time frame would significantly increase the overall number of documents to be reviewed, and is unjustified. The Bank is certainly willing to locate and produce to Defendants any 2009 reports by Wolf & Co. regarding Kanan Fashions' operations and any further documents, if any, relating to the private investigator's investigation.

Defendants' reciprocal request, that their production of ESI likewise be limited to the 2009 time frame (requested in a brief rather than a corresponding motion for a protective order) is unreasonable in light of the claims at issue and should be denied. Defendants' counterclaims all involve actions allegedly taken after June 1, 2009. The Banks' affirmative defenses to the counterclaims, in contrast, cover a broader period of time. As Defendants pointed out, the Bank has raised the affirmative defense that Kanan Fashions provided materially incorrect or false information to Mutual Bank about the collateral securing the loans before any purported breach by the Bank. Accordingly, the Bank is seeking e-discovery from Defendants going back to August of 2007.[7]

Defendants also argue that any limitation as to the time frame for ESI be without prejudice so that Defendants can seek further modification of the time frame if necessary. As

---

[7] This was agreed to at the Court hearing of May 19, 2010. See Resp., Exh. 10, pp. 28-29. Note that Mr. Block's comments are erroneously attributed to Mr. Grossman.

7

discussed above, with respect to the Bank's ESI, June 1, 2009 through November 19, 2009 is the relevant time frame. If the Bank or Defendants come across a document or other information that leads them to believe that documents outside of the time frame set by the Court are relevant to the issues in this litigation, the parties should first meet and confer to see if they can come to an agreement regarding whether the time frame should be expanded. If the parties cannot come to an agreement, the party seeking to expand the time frame for ESI should raise the issue with the court.

### b. UCB's Proposed Initial Search Terms Are Appropriate.

The initial search terms proposed by the Bank – Kanan, Creative and/or Shah – were thought likely to reduce the yield of unresponsive documents and limit the documents to be migrated to the Bank's review platform to those documents most likely to contain "Kanan-related" documents. This smaller subset could then be subjected to additional searches, using agreed-upon terms/queries, to further limit the ESI to be reviewed to documents regarding the issues in the litigation. The Bank has been trying to achieve just this for months. It was not, however, until the Bank filed this Motion, that Defendants finally stepped up and are now agreeing to work with the Bank towards a collaborative solution to the ESI-related discovery issues in this case.

In their Response, Defendants suggest adding "KF!", "CW!", "KH!", "KC!" and "MS!" to the initial search terms.[8] The Bank agrees that adding some of these contractions (with the exception of "MS!", which in the Bank's experience is unlikely to locate documents related to Mehul Shah and will overinclude irrelevant documents) to the initial search terms may be

---

[8] The two documents Defendants hold up to argue that the Bank's proposed terms are insufficient are misleading. First, they are emails sent to Defendants' and pulled from Defendants' own documents, as shown by the bates numbers. Certainly Defendants should have copies of documents sent to them to begin with. Second, any similar documents would be pulled into the ESI documents to be reviewed by adding a couple of additional search terms. For example, adding "Paresh" or "Joshi" to the initial search terms would capture those documents.

reasonable. Furthermore, if Kanan Fashions provides the Bank with a list of the letters of credit they contend are at issue in this case, the identification numbers for those letters of credit can also be added to the initial search terms.

As the Bank has repeatedly told Defendants' counsel and their ESI liaison, the initial search terms proposed by the Bank are just that – initial terms designed to bring the number of documents loaded onto a searchable discovery platform down to a broad, but reasonable level. There is no need to hold up this initial culling. Once the initial culling is done, the Bank welcomes the opportunity to further problem solve with Defendants and come up with additional search terms and combinations that will help ensure that responsive ESI is reviewed and produced, while limiting as much as possible, the number of unresponsive documents to be reviewed.

**3. ESI Should Be Produced in TIF format.**

A key issue in this case which affects costs and the quality of the litigation over its duration is whether documents are to be produced in .tiff format or native format. The Bank has produced over 24,600 pages of paper documents to Defendants in TIF format without complaint by Defendants. Defendants are insisting on production of ESI in native format, with metadata, claiming that it is the only acceptable format for producing ESI. It is not, and due to the sheer volume of documents already produced and to be produced in this case, and other limitations to native production, production in TIF format is preferable in this case.

> *a. The Differences Between TIF and Native are Meaningful During the Lifecycle of Litigation.*

There are many reasons why production in native format is objectionable, particularly given the volume of ESI in this case. The reasons are outlined in depth in the Supplemental Affidavit of Thomas Bonk, attached as Exhibit E. First, documents in native format cannot be

9

branded with bates numbers. With over 24,000 pages of documents already produced and many more to follow, it would be impossible for the parties to reference documents in discovery discussions, depositions and at trial without a numbering system. Native format documents also cannot be redacted. Many of the Bank's documents include social security numbers, account numbers, and information regarding other customers which require redaction. Documents in native format can be easily manipulated and changed, whether intentionally or by the inadvertent slip of a finger or keystroke on a keyboard, and any such manipulation would be difficult to detect.[9] Without a numbering system, there is no efficient way for an opposing party to pull up the document to verify that the document being presented is, in fact, an identical version to that produced in discovery. Finally, the attorney review time is significantly increased for native documents because metadata also needs to be reviewed for privilege, but which at that point, cannot be redacted.

TIF production, on the other hand, allows for bates stamp numbers to be branded on the document, prevents easy or inadvertent manipulation of the document, and provides both sides with a consistent, searchable, usable product over the life cycle of the litigation.

Native production is also not as cheap as Kanan suggests. Kanan's reference to a $25/GB price for native production, which Defendants took from a printout of a pricelist off a Texas vendor's website, appears too good to be true, and it is. This pricelist is not an estimate for the data in this case, it is marketing material pulled off the internet.[10] Moreover, it completely leaves out numerous costs incurred prior to the final step of production in native format. One example

---

[9] Mr. Garrie's suggestion that even TIF documents can be maliciously altered through pixel manipulation irresponsibly attempts to equate a relatively unlikely risk to the very real likelihood of intentional or inadvertent data manipulation or inconsistent data presentation inherent in native production.

[10] Defendants made no effort to get an actual quote from Sfile, or from Kroll, PwC or Iron Mountain – the vendors suggested in Mr. Garrie's affidavit – for processing and production of the data in this case in either TIF or native format.

is the processing fee, which is required whether data is produced in TIF or native form. (See Bonk Affidavit, ¶8 .) Sfile Saas's processing fee varies from $100/GB to $400/GB to an <u>unknown number</u> (quote required) for all "non-standard processing." Sfile Saas's non-standard processing fee applies to extraction of PST files from Microsoft Exchange EDB databases, which accounts for over 136.6 gigabytes of the Bank's data. ( See Resp., Ex. 11; Bonk Affidavit ¶ 8) Garrie further ignores the cost to set up and host a database, the transactions costs of working with an out of state vendor on a daily basis, and the increased attorney review time that native production necessitates due to the required review of metadata.

Defendants take a snippet of Mr. Bonk's affidavit to argue that Mr. Bonk "himself admits in his affidavit that TIFF is 'a more costly procedure.'" Resp. p. 11. Mr. Bonk did no such thing. What Mr. Bonk actually said was that restoring and TIF imaging the entire 303.204 gigabytes of ESI gathered by the Bank prior to any attempt to limit it by date range or initial search terms (Scenario 1) "is a more costly procedure due to" the costs associated with "a much larger document set" than the set generated under Scenario 2. While TIF may appear to be more costly on paper, the savings in attorney review and production time and the litigation efficiency it enhances compensates for the additional "on paper" costs.

   b. *Native Format is Not, As Defendants Claim, The Standard For Producing ESI.*

Native format is not the only reasonable and acceptable form of production. See *Covad Communics. Co. v. Revonet, Inc.*, No. 06-1892 (CKK/JMF), 2010 U.S. Dist. LEXIS 31165, at *14 (Mar. 31, 2010) (refusing to hold that native production with metadata is the only reasonably usable form under Rule 34, and noting that "by its exact terms, the Rule provides an alternative to the native format, contradicting Covad's claim that native, electronic format, is absolutely obligatory."). Nor, given the specifics of this litigation, is it the best. Neither of the *Covad Communics. Co.* cases cited by Defendants discuss the merits of TIF versus native production.

11

Both opinions involve a situation where one party produced electronic documents in hard copy – a completely unsearchable format. The quote on page 12 of the Defendants' Response from *Covad Communics. Co. v. Revonet, Inc.*, 2010 U.S. Dist. LEXIS 31165 (Mar. 31, 2010), refers to the difficulty of searching <u>hard</u> copies (paper copies) of emails – a format which is unsearchable by nature – just to make it more difficult to search them. It does not address the searchability of TIF files versus native files.

When, as here, a document request does not specify that ESI be produced in a particular format, the producing party has the option of producing it either "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms." Fed. R. Civ. P. 34(b)(2)(E); *see also Autotech Technologies Ltd. Partnership v. Automationdirect.com*, 248 F.R.D. 556, 558 (N.D. Ill. 2008) (denying motion to compel production of documents in native format with metadata). TIF images are considered a "reasonably usable form" of ESI. *Wyeth v. Impax Labs., Inc.*, 248 F.R.D. 169, 171 (D. Del. 2006). In this particular case, TIF is far preferable to native.

    c.  *Metadata is Not Needed for Each Document and Can Be Produced When Essential*

Kanan complains that TIF production does not include the metadata for a document. Metadata is not something that is produced as a matter of course. In the vast majority of instances, production of metadata is neither required nor necessary. In fact, courts have found that "[m]ost metadata is of limited evidentiary value, and reviewing it can waste litigation resources." *Wyeth*, 248 F.R.D. at 171. Courts routinely deny motions to compel the production of metadata where, as is the case here, the requesting party did not specifically ask for metadata in its document requests, did not demonstrate that the metadata is relevant, and/or show a particularized need for the metadata. *See, e.g.*, *Kingsway Finan. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, 03 Civ. 5560 (RMB)(HBP), 2008 U.S. Dist. LEXIS 105222, at *19 (S.D.N.Y.

Dec. 31, 2008) (motion to compel production of metadata denied "in light of the dubious value of metadata and plaintiffs' total failure to explain its relevance to the claims and defenses in this action"); *Kentucky Speedway, LLC v. Nat'l Assoc. of Stock Car Auto Racing, Inc.*, Civ. Act. No. 05-138-WOB, 2006 U.S. Dist. LEXIS 92028, at *23 (E.D. KY Dec. 18, 2006) (denying motion to compel production of metadata where plaintiff "has not made any showing of a particularized need for the metadata"); *Wyeth*, 248 F.R.D. at 171. The Bank is offering to produce files in native format, with metadata, upon identification of the specific documents Defendants want in native format, and a particularized showing of need for the metadata. That is exactly the approach sanctioned by the courts.

4. *The Bank's proposed costs are reasonable.*

The Bank has procured a good faith estimate of production costs by a reliable and experienced vendor and should not be pressured to scuttle this relationship for spurious reasons. (DTI's experience in this industry is detailed in Bonk Supp. Aff., Exh. E, ¶ 3.) Mr. Garrie criticizes DTI for providing an estimate of e-discovery costs without offering the factors that would impact the cost. His criticism is unwarranted. DTI's cost of processing and production per gigabyte of data is not subject to variation. Bonk Supp. Aff. ¶ 11. The factors that affect the ultimate cost of e-discovery is the unknown quantity of data that will need to be processed. *Id*. DTI has provided an estimate of the enormous cost of processing the entire collected database of ESI before search terms are employed and compared it to the estimated reduced cost that would result if Kanan-related search terms are applied before the data is migrated to DTI's platform. (Bonk Aff., ¶¶ 6-10.) This continues to support reasonable pre-migration culling.

5. *Cost Shifting is Appropriate in This Case.*

A court may condition discovery on the requesting party paying all or part of the cost of obtaining the requested information from a source that is not reasonably accessible. FED.. R.

13

Civ. P. 26, Advisory Committee Note 2006 Amendment. See also, Seventh Circuit's Proposed Standing Order Relating to the Discovery of Electronically Stored Information, section 2.06(d) "counsel or the parties are encouraged to discuss cost sharing for optical character recognition (OCR) or other upgrades of paper documents or non-text searchable electronic images that may be contemplated by each party." In *Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 573 (7th Cir. 2004) (shifting 75% of cost to requesting party), the Seventh Circuit considered the following factors and ordered cost-shifting: "1) the likelihood of discovering critical information; 2) the availability of such information from other sources; 3) the amount in controversy as compared to the total cost of production; 4) the parties' resources as compared to the total cost of production; 5) the relative ability of each party to control costs and its incentive to do so; 6) the importance of the issues at stake in the litigation; 7) the importance of the requested discovery in resolving the issues at stake in the litigation; and 8) the relative benefits to the parties of obtaining the information."

      The Bank is attempting to control costs and provide a maximum amount of responsive documents. The fact that the Bank has more resources does not sanction one party's fishing expedition financed by another party's blood-letting. As the Bank explained in its Motion, even considering just the more limited set of documents left after implementing Scenario 2, the less costly of the available scenarios, loading, searching, processing and producing ESI will cost over $130,856.06 (Bonk Aff., ¶8) plus 60,640 hours of attorney review time at an additional cost of $9,096,000.00. *United States of America ex rel. Tyson v. Amerigroup Illinois, Inc.*, No. 02 C 6074, 2005 U.S. Dist. LEXIS 24929, at *13-14 (N. D. Ill. Oct. 21, 2005) (When determining the burden involved in responding to a request for electronic discovery, not just the costs incurred, but the required time, equipment and internal man-power required is considered.) The costs and time involved is unduly burdensome. Any expansion of the time frame at issue, or of the search

terms used for the initial searches, would further increase the already exorbitantly high cost in both time and money, of discovery in this case. In addition, Defendants have produced a very small number of documents to date, and given the representations they have made about certain of their servers being unrecoverable, have significantly less ESI of their own to review, and no incentive to work with the Bank to put together cost effective searches or otherwise streamline the discovery process. Shifting the cost of processing, reviewing, and producing ESI to Defendants is appropriate, and the only way to fairly allocate the burdens of e-discovery and provide an effective incentive to Defendants to cooperate in the e-discovery process.

   WHEREFORE, the Bank respectfully requests that this Court enter a Protective Order (a) limiting the discovery of the Bank's ESI to the time frame of June 1, 2009 through November 19, 2009; (b) further limiting the discovery of ESI to data containing the keywords "Kanan, Creative Warehousing, Shah, Paresh, Joshi, "KF!", "CW!", "KH!", "KC!" and the numbers of letters of credit at issue, (c) requiring that ESI be produced by both sides in TIF format unless a specific showing is made why native format and metadata for a particular document is needed; (d) shifting the cost of gathering, restoring, reviewing and producing the Bank's ESI to the Defendants.

               Respectfully submitted,

               UNITED CENTRAL BANK

Date: June 24, 2010        By:   s/ Vilia M. Dedinas/
                 One of its Attorneys

Alexander R. Domanskis
Vilia M. Dedinas
Boodell & Domanskis, LLC
205 North Michigan Avenue, Suite 4307
Chicago, IL 60601
Phone: (312) 540-1075
Fax: (312) 540-1162
e-mail: domanskis@boodlaw.com
   vdedinas@boodlaw.com