# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED CENTRAL BANK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Case No. 10-CV-00331 |
| | ) | |
| KANAN FASHIONS, INC., et al., | ) | Judge Robert Gettleman |
| | ) | |
| Defendants. | ) | Magistrate Michael Mason |

## SUPPLEMENTAL AFFIDAVIT OF THOMAS BONK

Thomas Bonk, duly sworn on oath and under the penalties of perjury, submits this supplemental affidavit in support of United Central Bank's Motion for Protective Order and hereby deposes as states:

1. I am over the age of 21 and have personal knowledge of the matters in this Affidavit.

2. I am a Director of Technology Services for Document Technologies, Inc. ("DTI").

3. Founded in 1998, DTI is the largest independent provider of litigation support and e-Discovery services in the industry. As a $100 million service provider with offices in 22 major markets nationwide, we support the majority of the AMLaw 100 Law Firms and the Legal Departments for many Fortune 500 Corporations. In 2009, Chicago Lawyer magazine published a survey of Illinois attorneys regarding their experience with electronic discovery. In response to the question "Have you ever hired an electronic discovery consultant or firm?", 21.5% of the respondents answered DTI, placing DTI second amongst the named consultants. (http://lextekreport.com/2009/04/01/ediscovery-survey-results-2nd-study-of-illinois-lawyers/ )

4. The ESI processing, attorney review software ("iCONECT), and document production workflow utilized by Plaintiff United Central Bank ("UCB") is designed using standard best practices and technology employed by the majority (66%+) of DTI's engagements to provide ESI services. After the

data is preserved and collected, (1) the data is "processed" by extracting the full text and encountered metadata using standard industry tools (IPRO eCapture software), (2) the data is culled via the use of keywords, duplicate document suppression ("de-duplication"), and date range. In this case, date range and keyword culling is recommended for the express purpose of isolating the "Kanan related" data, (3) the resultant data and rendered TIF files are loaded into a litigation review software ("iCONECT"), (4) attorneys review the documents to assess relevance, responsiveness, level of confidentiality and privilege, tag documents by issue and perform redactions if necessary or designate for production; (5) the responsive documents are presented for production to the Defendants.

5. It is my recommendation that the production submitted to and received from the Defendants is to be formatted as TIF files branded with bates numbers and confidentiality designations with accompanying full-text (which allows for keyword searching) and load files (which allows for use in standard litigation software review applications such as Summation, Concordance, iCONECT, Ringtail, Relativity, etc.). Documents in native format cannot be similarly branded with a production number and data on native documents can be intentionally or inadvertently manipulated by any viewer. The standardization of the TIF format eliminates inevitable confusion regarding the presentation of documents throughout the entire litigation cycle (conferences, depositions, hearings, trial, etc.)

6. Including all encountered metadata (aside from the document's full-text) for all documents in the standard production deliverable significantly increases the cost burden upon counsel to review the metadata for privileged content. It is my recommendation that in the event that the Defendants have a stated need to examine encountered metadata for a particular document or documents, Plaintiffs will be prepared to produce encountered metadata via a supplemental production deliverable that will contain a load file with the encountered metadata field values.

7. Producing files in native format does not allow for partial redactions of privileged material. Due to the nature of the documents to be produced (ie, financial/banking documents containing social security numbers, birth dates, and account numbers, for example) partial redactions will be required for a significant amount of documents prior to production to Defendants. It is my recommendation that in the event that the Defendants have a stated need to examine the original native file for a particular document or documents, Plaintiffs will be prepared to produce the native file via a supplemental production

8. I have reviewed the Affidavit of Daniel Garrie ("Garrie Aff"). The comparison made in paragraph 27 regarding estimated costs between DTI and another vendor draws a conclusion that DTI's estimated costs are 92.5% less than the other vendor. This comparison ignores the need to "process" the data by extracting the full text and encountered metadata for the express purpose performing keyword searches and other culling techniques that will allow Plaintiffs to narrow the universe to "Kanan related" data only and perform a standard attorney review on this narrowed repository of data using a standard and readily established litigation review software application ("iCONECT"). No price is provided at all (a quote is required) for "non-standard processing services", such as extraction of PST files from Microsoft Exchange databases, which accounts for 136.6 gigabytes of data. Regardless of the format of production (TIF/FullText vs. Native), this processing step is required and associated costs will be incurred.

9. In Exhibit 11 of the Garrie Aff, a screen shot of the web page containing a standard price list for ESI conversion services from a vendor named Sfile Technology Corporation is provided as the basis for the cost comparison discussed in Garrie Aff, paragraph 27. This cost comparison discussed in paragraph 27 does not include applicable fees such as "Project Setup fee", "Standard Processing Normal/Extended", "Productions-Load File" and other "Professional Services." It's been my experience

that price lists maintained on web sites are typically constructed for marketing purposes. Often a formal estimate of project fees will differ greatly from standard pricing lists once the scope of a project and designed workflow is defined.

10. In paragraphs 9 through 11 of Garrie Aff, Mr. Garrie disputes the validity of my estimate on the total number of pages to be produced and the use of the basis of 100,000 pages per gigabyte to formulate an estimate. Due to the nature of the Plaintiff's business (financial/banking) and my experience in presiding over 1000+ ESI processing engagements, it is very likely that the dominant file types to be found within the collection are email with attachments (estimate 100,099 pages/gigabyte) and Excel spreadsheets (165,791 pages/gigabyte). Accordingly, it is my opinion that the estimate of 100,000 pages per gigabyte is reasonable and conservative.

11. My estimate on the possible range of project costs uses a low-end range estimate that 20% of the data collection will be greatly impacted by the date range filter to be applied, the keyword list used, and the level of de-duplication—all variables still undefined. The primary purpose of the estimating exercise is to provide the parties a reasonable range of estimates to be used for budgeting purposes. Regardless of the final outcome on the variable outside of DTI's direct control, the stated unit pricing will still apply.

Further affiant sayeth naught.

_____
Thomas Bonk

Dated: June 24, 2010

Subscribed and sworn to before me this 24th day of June, 2010.

_____
Notary public

My commission expires: _____

"OFFICIAL SEAL"
Delphine Hayslett
Notary Public, State of Illinois
Cook County
My Commission Expires April 15, 2011