# EXHIBIT C

Page 65

1  with his companies needed to have access to the
2  warehouse, how would they go about obtaining it?
3      A.  **They would have had to contact me, I**
4  **would have had to contact U.S. Equities, U.S.**
5  **Equities would have had to supply a**
6  **representative.**
7      Q.  Did that ever happen?
8      A.  **I have had any number of people out**
9  **there.  I couldn't tell you if Mr. Shah ever**
10 **specifically visited, no.**
11     Q.  You can't recall if he ever called you
12 and said, I need to get into the warehouse?
13     A.  **No, ma'am, I can't.**
14     Q.  Did Mr. Shah or Mr. Joshi or anyone
15 acting on their behalf, including their counsel,
16 ever tell you that they were planning on moving
17 the computer system from the warehouse to their
18 Oak Brook Terrace location?
19     A.  **No, ma'am.  No one ever told me that.**
20     Q.  Are you aware that there were ever any
21 plans to do that in or around the April or May
22 time frame?
23     A.  **No, not to the best of my knowledge.**
24     Q.  In fact, at that time you had control

Page 66

1  over that equipment, isn't that correct?
2      A.   Yes.  Control.  I owned the building
3  that the computer was in, yes.
4      Q.   Who insured the computer at that time?
5      A.   I have no idea.  I hope Associated.
6  They owned it.
7      Q.   Do you remember paying a separate
8  premium on the --
9      A.   I did not insure the computer, no.
10     Q.   So you don't know if Mr. Shah ever
11 brought his computer consultants or any other
12 people to come and copy data from the computer
13 server or inspect the computer server?
14     A.   Again, if they did, it would have had
15 to have been done under the caring of U.S.
16 Equities.
17     Q.   And they would probably have a log
18 of --
19     A.   I --
20     Q.   You don't know?
21     A.   I don't know.
22                   (Whereupon, Exhibit No. 99 was
23                    marked for identification.)
24

Page 68

1   since those items will be relevant to the UCB
2   litigation and discovery.  Accordingly, until
3   the outside date by which we must reacquire the
4   items and repay the bank, I need the bank to
5   agree that they will preserve the items and
6   allow access to UCB or us in connection with the
7   litigation."
8       A.   I see that, yes.
9       Q.   Other than this e-mail, were you ever
10  told by anybody that the data on the computer
11  servers was evidence in a federal lawsuit?
12      A.   **I may have been told.  I think both**
13  **parties had informed me that they thought what**
14  **was on the computer might be part of their case,**
15  **yes.**
16      Q.   Who told you that?  You said both
17  parties, so who specifically?
18      A.   **I had a conversation at one time with**
19  **Mehul and his attorney, Alan Borlack, and I had**
20  **a conversation with Bob Hoholik and Nat Piggee.**
21      Q.   P-i-g-g-e-e?
22      A.   **That's it.**
23      Q.   So going to the conversation with
24  Mr. Shah and Mr. Borlack, do you recall when

Thompson Court Reporters, Inc.
312-421-3377

Page 71

1  THE WITNESS: As March goes by, I guess
2  I received this. It might be relevant. I don't
3  know.
4  BY MS. DEDINAS:
5    Q.  So other than this document, did you
6  receive anything else in writing from the Shah
7  defendants or their counsel asking you to
8  preserve the computer system?
9    A.  **Not to the best of my memory.**
10   Q.  Now, looking at this e-mail of March
11 16, what do you understand it to mean when they
12 say, "I need the bank to agree that they will
13 preserve the items"?
14   A.  **I have no idea, since apparently we**
15 **never responded.**
16   Q.  You are not aware that there was ever a
17 response to this e-mail?
18   A.  **I don't remember responding, no.**
19   Q.  Did you ever discuss this with any of
20 the other recipients?
21   A.  **I don't remember if I discussed this**
22 **with my attorney or not.**
23   Q.  Were you instructed by anybody else
24 that you needed to preserve the computer system?

Page 72

1  A. I don't remember why it came up in our
2  conversation when we sold the inventory, but I
3  remember discussing the computer system with Nat
4  and Bob. Other than that, no.
5  MR. LIPTON: Nonresponsive.
6  BY MS. DEDINAS:
7  Q. So you also had a conversation with Nat
8  Piggee, who is an attorney for United Central
9  Bank, is that right?
10  A. Yes.
11  Q. And Bob Hoholik, who is an officer at
12  United Central Bank?
13  A. Yes.
14  Q. Was that involving disposal of
15  inventory located at the warehouse?
16  A. That's where it started, yes.
17  Q. At that time did anybody mention the
18  computer system to you?
19  A. Yes.
20  Q. What did they say?
21  A. They said they would like to see the
22  computer system.
23  Q. They would like to see it?
24  A. That's what I remember.

1   Q.   And what did you respond?
2   A.   **Get me a court order.**
3   Q.   Did anybody at that time indicate to
4   you that the computer system contained data
5   which was evidence in a federal lawsuit?
6   A.   **Not that I remember, no.**
7   Q.   Do you have any idea why United Central
8   Bank was interested in seeing the computer?
9   A.   **No.**
10  Q.   Were you ever contacted by any computer
11  consultants for the defendants regarding the
12  computer?
13  A.   **The defendants?  I'm sorry, I'm**
14  **confused.**
15  Q.   I'm sorry, the Kanan defendants.  Did
16  their computer consultants come out or did you
17  get any letters from them about preserving the
18  evidence?
19  A.   **No.**
20  Q.   So going back to a question I'm not
21  sure we followed up on, they say, "I need the
22  bank to agree that they will preserve the
23  items."
24       What does that mean to you, "preserve

Page 81

1  that conversation?
2      A.   Yes.
3      Q.   When you got this phone call, where
4  were you in your negotiations with Associated
5  Bank?
6      A.   I believe I had structured a
7  transaction with Associated Bank.  I'm not sure.
8  This phone call came in on this date.  I believe
9  I structured the deal with Associated a week
10 earlier, but I can't remember exactly.
11     Q.   So a week earlier, you already had the
12 deal on the 15th to 17th of July and you had
13 agreement on price with Associated, is that
14 right?
15     A.   I believe so.
16     Q.   Did anybody ever tell you that they
17 referred this caller to you?
18     A.   Not that I'm aware of.
19     Q.   Does that mean you don't recall or you
20 don't know?
21     A.   I don't recall.
22               (Whereupon, Exhibit No. 101 was
23               marked for identification.)
24

1  UCB or Mr. Shah's entities or Mr. Shah be
2  permitted access to the computer system and the
3  hard drive?
4     A.   **That's what it says, yes.**
5     Q.   Would you have any reason to deny them
6  any access to the computer system or the hard
7  drive?
8     A.   **It didn't belong to them.**
9     Q.   Well, it didn't belong to you, either,
10 did it?
11    A.   **No.**
12    Q.   It didn't belong to the bank, did it?
13    A.   **No.**
14    Q.   Who did it belong to?
15    A.   **Associated Bank.**
16    Q.   So why couldn't they have access to
17 something that belonged to Associated Bank?
18    A.   **If Associated Bank told me to give them**
19 **access, I would.**
20    Q.   Well, did you ever ask Associated Bank
21 if they had a problem with either Mr. Shah or
22 UCB having access to the computer on the
23 warehouse property?
24    A.   **No. I told them to ask.**

Page 128

1   A.   Not that I am aware of.
2   Q.   Did you ever follow up with
3   Mr. Blumenthal about that?
4   A.   As I said, I would not have followed up
5   with Mr. Blumenthal.
6   Q.   Did you ever talk to Mr. Shah about
7   this being evidence in his UCB lawsuit?
8   A.   I believe at one point I told Mr. Shah
9   exactly what I told UCB, and that was if they
10  felt they needed it, they should send me a
11  subpoena.
12  Q.   Well, why did you have that discussion
13  with Mr. Shah; what brought that discussion
14  about?
15  A.   I don't recall the date we had it, nor
16  do I remember what brought it up, just that I
17  was not going to release Associated's computer
18  to anyone without a court order.
19  Q.   Are you sure that you had that
20  discussion with Mr. Shah?
21  A.   I do believe I did.
22  Q.   Who else do you believe was involved in
23  that conversation, if anybody?
24  A.   I don't know that anyone was.  I don't

Thompson Court Reporters, Inc.
312-421-3377

Page 129

1  remember.
2  Q. So the only person you remember having
3  that conversation with, meaning that you were
4  going to require a subpoena or a court order in
5  order to get access to the computer, was
6  Mr. Shah and who else?
7  A. I don't remember there being anyone
8  else at that time. I do remember having that
9  conversation with the attorney for UCB.
10 Q. Meaning?
11 A. Nat Piggee.
12 Q. And when did that conversation take
13 place?
14 A. Closing date on the inventory sale
15 date. I couldn't tell you the date.
16 Q. Was that in April?
17 A. Seems likely. I don't remember.
18 Q. What was it that -- to the best of your
19 recollection, explain what transpired in the
20 conversation between you and counsel for UCB
21 about having a subpoena or a court order to
22 access the computer?
23 A. Just that the computer was the only
24 thing left at the warehouse and that I was

1  suggesting that someone get a court order if
2  they wanted to take it out.
3      Q.   When you had this conversation with the
4  counsel for UCB, was anybody else a part of that
5  conversation?
6      A.   My counsel.
7      Q.   Mr. Serritella?
8      A.   Yes.
9      Q.   Anybody else?
10     A.   Mr. Hoholik.
11     Q.   Anybody else?
12     A.   I don't believe so.
13     Q.   Do you remember anything else about
14 that conversation between counsel for UCB and
15 your counsel and you with respect to getting a
16 subpoena or a court order to access the
17 computer?
18     A.   No, sir.
19     Q.   Would you take a look at Exhibit 91,
20 please?
21          Before we go to Exhibit 91, was there
22 any response to your insistence on a court order
23 or a subpoena to UCB's counsel when you told
24 them that they would need a court order to