UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED CENTRAL BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KANAN FASHIONS, INC., CREATIVE | ) | |
| WAREHOUSING (Chicago), LLC, KANAN | ) | |
| CRUISES, INC., KANAN HOLDINGS, LLC, | ) | |
| VARSHA SHAH and MEHUL SHAH, | ) | |
| | ) | 10 CV 00331 |
| Defendants. | ) | |
| | ) | Judge Mason |
| KANAN FASHIONS, INC., CREATIVE | ) | |
| WAREHOUSING (Chicago), LLC, KANAN | ) | |
| CRUISES, INC. and KANAN HOLDINGS, LLC, | ) | |
| | ) | |
| Counterplaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED CENTRAL BANK, | ) | |
| | ) | |
| Counterdefendant. | ) | |

## <u>DEFENDANTS' POST-HEARING CONCLUSIONS OF LAW</u>

Plaintiff United Central Bank ("UCB") filed a motion for discovery sanctions asking for

the following relief:

(1) that this Court dismiss Counts I and II of Defendants' counterclaim in their entirety and that portion of Count III that UCB's breach of Loan No. 1 constituted a breach of Loan No. 4;

(2) that this Court issue an adverse inference instruction with respect to all issues related to Kanan Fashions' inventory;

(3) that this Court bar Defendants from presenting any evidence related to Kanan Fashions' inventory;

(4) that the facts alleged in UCB's Third, Fourth and Seventh Affirmative Defenses be deem admitted; and

(5) that the Defendants and/or its former counsel Bailey Borlack Nadelhoffer and Carroll ("Respondents Bailey Borlack") pay all attorneys fees and costs incurred in opposing Defendants' Motion to Vacate Certain Part of this Court's Order of August 27, 2010 and bringing their motion for sanctions.

Pursuant to the Court's order dated January 26, 2011, Defendants hereby submit the following post-hearing conclusions of law for the Court's decision on Plaintiff UCB's motion for sanctions.

**A.      Dismissal Of Claims Or Entry Of A Default Is A Draconian Remedy And Should Only Be Employed In Extreme Circumstances.**

The interests of justice are best served by resolving cases on their merits, not by dismissal as a discovery sanction. *Long v. Steepro*, 213 F.3d 983, 985 (7th Cir. 2000). Dismissal of claims or entry of judgment as a discovery sanction is a draconian remedy. Where a discovery sanction deprives a party of a hearing on the merits of its claim, such a sanction should only be employed in extreme situations. *Banco Del Atlantico, S.A. v. Woods Indus., Inc.*, 519 F.3d 350, 354 (7th Cir. 2008); *Maynard v. Nygren*, 332 F.2d 462, 467 (7th Cir. 2003); *Danis v. USN Communications, Inc.*, 2000 WL 1694325 at * 31, 33 (N.D.Ill. Oct. 20, 2000) (Schenkier, J.).

The limits placed on a court's discretion have been fashioned in light of the recognition that dismissal under Rule 37 "is a sanction of the last resort, applicable only in extreme circumstances." *Emerick v. Fenick Industries, Inc.,* 539 F.2d 1379, 1381 (5th Cir. 1976).

**B.      Plaintiff UCB Must Prove By Clear And Convincing Evidence That Defendants Acted Willfully, In Bad Faith Or With Fault.**

A court must have clear and convincing evidence of willfulness, bad faith or fault before dismissing Defendants' counterclaims. *See Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003); *see also Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir.1989); *Pfizer, Inc. v. Int'l Rectifier Corp.,* 538 F.2d 180, 195 (8th Cir. 1976).

2

A finding of such extreme circumstances necessary to support the sanction of dismissal must, at a minimum, be based on evidence of the sanctioned party's willfulness, bad faith or fault in failing to comply with a discovery order. *E.E.O.C. v. Troy State University,* 693 F.2d 1353, 1354 (11th Cir. 1982).

A party's simple negligence or other action grounded in misunderstanding of a discovery order does not justify the "use of the Draconian remedy of dismissal." *E.E.O.C. v. Troy State University,* 693 F.2d 1353, 1357, *quoting Marshall v. Segona,* 621 F.2d 763, 767 (5th Cir. 1980); *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1985).

A court should not dismiss a party's claims or enter default against a party where a party's failure to comply with a pretrial production has been due to inability, and not to willfulness, bad faith or fault. *Societe Internationale v. Rogers,* 357 U.S. 197, 212 (1958); *see also National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639 (1976). In other words, when a non-complying party shows that his non-production was based on factors beyond his control, dismissal is not an appropriate remedy. *Emerick v. Fenick Industries, Inc.,* 539 F.2d 1379, 1381 (5th Cir. 1976).

Sanctions for spoliation are improper unless the party to be sanctioned destroyed the evidence at issue in bad faith. *See Trask-Morton v. Motel 6 Operating L.P.,* 534 F.3d 672, 681 (7th Cir. 2008). "Bad faith" means that evidence was destroyed for the purpose of hiding adverse information. *Diersen v. Walker,* 2003 WL 21317276 at *3 (N.D.Ill. June 6, 2003) *quoting Mathis v. John Morden Buick, Inc.,* 136 F.3d 1153, 1155 (7th Cir. 1998).

"The crucial element is not that evidence was destroyed but rather the reason for the destruction." *Faas v. Sears, Roebuck & Co.,* 532 F.3d 633, 644 (7th Cir. 2008) (*quoting Park v. City of Chicago,* 297 F.3d 606, 616 (7th Cir. 2002).

3

"Fault" is unconcerned with the non-complying party's subjective motivation, but rather describes the reasonableness of the conduct. *Langley v. Union Electric Co.,* 107 F.3d 510, 514 (7th Cir. 1997). Fault does not mean any minor blunder that a litigant or his counsel might make. Fault, in this context, suggests objectively unreasonable behavior; it does not include conduct that we would classify as a mere mistake or slight error in judgment. *Long v. Steepro,* 213 F.3d 983, 987 (7th Cir. 2000).

As Mr. Clark testified, as the hearing exhibits and testimony at hearing demonstrated, Defendants did not destroy the server. It was within the possession, custody and control of FMB at the time it was lost. Furthermore, Respondents Bailey Borlack were fully aware that the server was not within Defendants' possession, custody or control. Hrg. Exh. 135. Mr. Grossman also testified to this during the hearing. Finally, there is no evidence that Defendants believed the information on the server was harmful to their case. To the contrary, Mr. Shah, Mr. Joshi and Mr. Blumenthal testified that Defendants wanted the server for several reasons, including that it would help their case.

## C.    Following Advice Of Counsel Is A Defense To Motion For Sanctions.

A client that in good faith follows the advice and direction of his counsel cannot be held liable for discovery sanctions. *See Federal Chicago Corp. v. Kennedy*, 1989 WL 134498 *2 (N.D.Ill. Oct. 23, 1989) (Holderman, J.) (holding that a client is entitled to rely even on erroneous advice of counsel); *Keating v. Estate of Golding*, 277 Ill.App.3d 953, 958 (1st Dist. 1995).

From the onset of this lawsuit, Defendants themselves fully disclosed the existence and location of the warehouse server to Respondents Bailey Borlack which was disclosed to this Court and UCB. Hrg. Exhs. 23, 30. Respondents Bailey Borlack and UCB knew that the

4

warehouse was foreclosed upon by FMB and that Defendants had been evicted. Hrg. Exhs. 22, 28.

Respondents Bailey Borlack took responsibility for hiring computer experts to handle the ESI issues. Hrg. Exhs. 31, 34. Because there already had been a problem with a defunct server at Defendants' Oakbrook office, Respondents Bailey Borlack unequivocally told the Defendants not to do *anything* with the servers. Specifically, Respondents Bailey Borlack told them:

> Mehul and Paresh,
>
> Just a reminder that *nothing should be done with or to any of the computers, servers or related equipment. We are engaging independent computer experts to deal with the system* and possibly resolve the issue with the defective server. We may have to obtain a forensic image of that server. We have to advise plaintiff's counsel in the event any action is anticipated. *You are not to take any action.*

Hrg. Exh. 31 (emphasis added).

When the foreclosure of the warehouse occurred and Defendants were evicted, both Respondents Bailey Borlack and UCB received notice that this occurred. Defendants' corporate attorney Steven Blumenthal gave notice to FMB that it should preserve the server at the warehouse because it was necessary for this litigation. Hrg. Exh. 46.

**D.    Respondents Bailey Borlack Were Ultimately Responsible For ESI Discovery And Could Not Shift The Burden To Defendants.**

Counsel has the ultimate supervisory responsibility over discovery. *See Qualcomm, Inc. v. Broadcom Corp.*, 2008 U.S. Dist. LEXIS 911 (S.D.Cal. Jan. 7, 2008), *vacated in part on other grounds*, 2008 U.S.Dist. LEXIS 16897 (S.D.Cal. March 5, 2008); *Zubulake v. UBS Warburg, LLC*, 229 F.R.D. 422, 433 (S.D.N.Y. 2004) ("active supervision of counsel is of particular importance when ESI is involved").

Respondents Bailey Borlack advised Defendants to preserve ESI by ceasing all activity and further instructed Defendants to "take no action" with respect to the servers. Hrg. Exh. 31.

Respondents Bailey Borlack further advised Defendants that they would hire an ESI liaison to take charge of handling the delicate ESI matters. Hrg. Exhs. 31, 34.

Although Respondents Bailey Borlack were aware of the foreclosure and eviction, Hrg. Exh. 56, they gave no further direction to Defendants until April 26, 2010 after the server was in the possession and control of FMB. Hrg. Exh. 85. Thereafter, Respondents Bailey Borlack took no efforts themselves to secure the server.

**E.      Defendants Cannot Be Held Responsible For The Misstatements Of Daniel Garry, The ESI Liaison Retained By Respondents Bailey Borlack, At The Status Hearing On May 19, 2010.**

Defendants cannot be held liable for the misrepresentations of an expert hired by Respondents Bailey Borlack when Defendants had no knowledge of the misrepresentations. *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 833 (7th Cir. 1985) ("Expert witnesses such as Levy are free agents. Parties and counsel have an obligation not to deceive the court about the witness and to correct statements they know to be false, but they are not responsible for the details of the witness's testimony.").

The only misstatement made to this Court (and UCB) appears to have been made to this Court on May 19, 2010 when Daniel Garry, a long-time acquaintance of Mr. Borlack who was hired by Mr. Borlack to be Defendants' ESI liaison, misrepresented to the Court that

> And with regard to the servers, we have also verified all of them work. We have all of them under our custody and control, and we have identified all the applicable machines as they relate to the custodians and are prepared to do the production once we have the search terms and dates identified . . . .

*See* Transcript, May 19, 2010, p. 23, Exhibit A.

*Defendants were not present at this hearing and were unaware that this representation had been made to this Court.* *See* Transcript, May 19, 2010, p. 2, Exhibit A ("Good morning,

your Honor. Alan Borlack on behalf of the defendants. I have with me my partner Eric

Grossman and our ESI liaison Dan Garry.").

Both Mr. Borlack and Mr. Grossman were present before the Court and both knew or

should have known that this statement, if it applied to the warehouse server, was not true. Both

Mr. Grossman and Mr. Borlack testified at trial that Defendants had never told them that they

had been able to regain possession or control of the server once the foreclosure and eviction by

FMB had occurred. Mr. Grossman had been in regular contact with Mr. Joshi in April 2010 and

May 2010 to pressure him—though without offering any assistance—to somehow try and force

First Midwest Bank ("FMB") to turn over possession of the server. Hrg. Exhs. 95 (May 11,

2010), 111 (May 25, 2010), 122 (May 27, 2010), 125 (June 2, 2010), 152 (July 23, 2010). And

Mr. Joshi responded, truthfully, that they were working on it. Hrg. Exhs. 101 (May 13, 2010),

111 (May 25, 2010), 154 (July 23, 2010). Despite knowing that the server was still in the

possession and control of FMB, Respondents Bailey Borlack took no action to advise either the

Court or UCB's counsel that Mr. Garry's statement at the May 19, 2010 hearing was not true.

**F.     Party Cannot Be Held Liable For Loss Of Information In Possession And Control
Of Third Party.**

The burden of showing that a party is in control of requested documents falls upon the

party which brings the motion. *Technical Concepts, LP v. Continental Manufacturing Company*,

1994 WL 262119 *1 (N.D. Ill. June 10, 1994) (Williams, J.); *see also Sparks Tune-Up Ctrs., Inc.

v. Panchevre,* No. 90 C 4369, 1991 WL 101667, at *2, 1991 U.S.Dist. LEXIS 7441, at *5

(N.D.Ill. June 3, 1991).

A party seeking production of documents bears the burden of establishing the opposing

party's control over those documents. *Camden Iron & Metal v. Marubeni America Corp.,* 138

F.R.D. 438, 441 (D.N.J. 1991); *Norman v. Young,* 422 F.2d 470, 473 (10th Cir. 1970); *Sparks*

*Tune-up Centers, Inc. v. Panchevre,* No. 90 C 4369, slip op., 1991 WL 101667 (N.D.Ill. June 3, 1991) (1991 U.S.Dist. LEXIS 7441); *Burton Mechanical Contractors, Inc. v. Foreman*, 148 F.R.D. 230, 236 (N.D. Ind. 1992).

A party has control of something for discovery purposes where he has a legal right to obtain the documents on demand. *Burton Mechanical Contractors, Inc. v. Foreman*, 148 F.R.D. 230, 236 (N.D. Ind. 1992); *see also Searock v. Stripling,* 736 F.2d 650, 653 (11th Cir. 1984), *Technical Concepts, LP v. Continental Manufacturing Company*, 1994 WL 262119 *1 (N.D. Ill. June 10, 1994) (Williams, J.).

It is equally well established that a party's inability to comply with a discovery order will not support the sanction of dismissal. *Searock v. Stripling*, 736 F.2d 650 (11th Cir. 1984).

The evidence produced at hearing demonstrated that the warehouse server was not in Defendants' possession, custody and control at the time it was lost; it was in the possession, custody and control of FMB. Hrg. Exh. 135. Prior to that, Defendants had fully disclosed the location of the server and the pending foreclosure on the warehouse of which all parties were aware. Hrg. Exhs. 56, 57, 59.

**G.     Plaintiff UCB Must Show That It Made Reasonable Efforts To Obtain The Information If It Was Equally Available To It.**

A party seeking sanctions for the non-production of records must show that it made reasonable efforts to obtain the documents itself. *Searock v. Stripling*, 736 F.2d 650, 654 (11th Cir. 1984); *Allen Pen Company, Inc. v. Springfield Photo Mount Company*, 653 F2d 17, 23-24 (1st Cir. 1981). Under circumstances similar to those here, the *Searock* court held that sanctions were inappropriate for the loss of documents because the party seeking the documents failed to take any action to obtain them when it had an opportunity to do so. The court explained,

> We note that although the district court found that these documents were essential to Allied Marine's defense of counterclaim, the record in this case does not reflect that Allied Marine took any action to attempt to secure these crucial documents itself. Clearly, Allied Marine had the ability to subpoena these documents by taking the deposition of the custodians of the records of the companies concerned; however, the record does not reflect any such attempt by Allied Marine.

*Searock v. Stripling*, 736 F.2d 650, 654 (11th Cir. 1984).

In this instance, Plaintiff UCB had notice that the server was in the possession and control of FMB and had been told by FMB that if it wanted the server it would have to issue a subpoena for it. Although Plaintiff UCB said it would do so, it did not do so. *Cf. Allen Pen Company, Inc. v. Springfield Photo Mount Company*, 653 F2d 17, 23-24 (1st Cir. 1981).

On April 23, 2010, at an ESI meeting at Defendants' Oakbrook Terrace offices, counsel for UCB raised a question whether the warehouse server was still at the Aurora warehouse. (In fact, neither Defendants nor Respondents Bailey Borlack had ever told anyone otherwise.)

Thereafter, however, Mr. Clark testified at hearing that he had advised Defendants that they would not be given access to the server without a court order or subpoena. Mr. Clark and Mr. Serritella testified that in early May 2010, they advised UCB's counsel that the server was at the warehouse and that they would not be given access to the server without a subpoena. UCB's counsel told Mr. Serritella that UCB would issue a subpoena for the server. UCB failed to do so.

**H.    Plaintiff Must Show Prejudice, *i.e.*, That Evidence Destroyed Cannot Be Obtained Elsewhere.**

In order to prevail on its motion, Plaintiff UCB must show that the information on the server could not be obtained elsewhere. *Allen Pen Company, Inc. v. Springfield Photo Mount Company*, 653 F2d 17, 24 (1st Cir. 1981) ("Springfield's computer records, themselves, could not have established Allen Pen's competitors' sales or profits. Destruction of the computer records may have made it more difficult to develop evidence of loss of sales or profits. But it did not prevent Allen Pen from seeking to develop such evidence from third parties.").

9

At the hearing, the testimony of Plaintiff UCB's expert Susan Cheng revealed that the information regarding Defendants' sales could be obtained by subpoena to its customers. Ms. Cheng's testimony also established that an audit had been performed of Defendants' inventory and that Defendants had maintained regular inventory reports which had been produced to Plaintiff UCB. Accordingly, although not as convenient, Ms. Cheng's testimony establishes that the information Plaintiff UCB seeks in this matter can be obtained from other sources. *See also Langley by Langley v. Union Elec. Co.,* 107 F.3d 510, 515 (7th Cir.1997) ("To suffer substantive prejudice due to spoliation of evidence, the lost evidence must prevent the aggrieved party from using evidence essential to its underlying claim.").

**I.      Plaintiff UCB Must Show That The Server Was Destroyed While In Defendants' Possession, Custody And Control.**

Plaintiff UCB must show that the server was destroyed while in Defendants' possession, custody and control. *Reynolds v. Crown Equipment Corp.*, 2008 WL 2465032 * 8-9 (W.D.Va. June 16, 2008); *MacSteel, Inc. v. Eramet North America, Inc.*, 2006 WL 3334011 *1 (E.D. Mich. 2006) (holding that spoliation sanctions were not appropriate where evidence is lost while not in the party's possession, custody and control); *Townsend v. Am. Insulated Panel Corp.,* 174 F.R.D. 1, 4-5 (D. Mass. 1997) (same).

Although there is no evidence here that the server was destroyed, it is unquestionably missing. Nevertheless, the server was in the warehouse in the possession, custody and control of FMB until the end of July 2010. At the time the server was sold, it was not in Defendants' possession, custody or control, which Respondents Bailey Borlack knew. Hrg. Exh. 135.

**J.      Spoliation Of Evidence.**

A party claiming spoliation by its adversary must prove that the destruction was intentional or the result of fault, generally beyond mere negligence, and that the evidence was relevant to an issue at trial. *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir .2001); *Keller v. United States,* 58 F.3d 1194 (7th Cir.1995); *Coates v. Johnson & Johnson,* 756 F.2d 524, 550-51 (7th Cir. 1985); *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1407 (10th Cir. 1997).

Under Illinois law, spoliation requires Plaintiff UCB to prove the following by clear and convincing evidence:

> (1) was there a duty to preserve the specific documents/evidence?; (2) was that duty breached?; (3) was Ty harmed by the breach?; and (4) was there willfulness, bad faith or fault? Finally, the Court must determine whether the proposed sanction can ameliorate the prejudice from the breach or whether there is a lesser sanction available, which will accomplish that goal. For the Court to enter a default judgment on the Counterclaim as a sanction, it must be convinced by clear and convincing evidence not only that the violation occurred under the analysis outlined above, but that the loss of the evidence itself causes irreparable damage to the plaintiff's case.

*Ty, Inc. v. Suzhou Young Chang Plastic Products Co., Ltd.,* 2010 WL 680932 *2 (N.D.Ill. Feb. 22, 2010) (Cox, J.).

No adverse inference should be drawn where there is no evidence that the document destruction was in bad faith, flowed from the consciousness of a weak case, or that the party accused of spoliation believed the evidence would harm its case. *Allen Pen Company, Inc. v. Springfield Photo Mount Company*, 653 F2d 17, 23-24 (1st Cir. 1981).

As discussed herein above, Plaintiff UCB has not proven these elements.

KANAN FASHIONS, INC. CREATIVE
WAREHOUSING (Chicago), LLC, KANAN
CRUISES, INC., KANAN HOLDINGS, LLC,
VARSHA SHAH and MEHUL SHAH,

By: s/ Kevin P. McJessy
    One of Their Attorneys

Kevin P. McJessy
McJessy, Ching & Thompson, LLC
3759 North Ravenswood, Suite 231
Chicago, Illinois 60613
(773) 880-1260
(773) 880-1265 (facsimile)
mcjessy@mcandt.com

## CERTIFICATE OF SERVICE

I, Kevin P. McJessy, an attorney, certify that I caused the foregoing **Defendants' Post-Hearing Conclusions Of Law** to be served upon:

Alexander R. Domanskis
Nada Djordjevic
Vilia M. Dedinas
Boodell & Domanskis, LLC
205 N. Michigan Ave., Ste. 4307
Chicago, IL 60601

Don E. Glickman
James A. Flesch
Glickman Flesch & Rosenwein
230 W. Monroe St., Ste. 800
Chicago, IL 60606

Alan R. Borlack
David E. Muschler
Eric G. Grossman
Bailey Borlack Nadelhoffer and Carroll
135 S. LaSalle St., Ste. 3950
Chicago, IL 60603

Mark D. Belongia
Bruce E. de'Medici
John A. Benson, Jr.
Belongia Shapiro & Franklin, LLP
20 S. Clark St., Ste. 300
Chicago, IL 60603

Thomas P. McGarry
Alan R. Lipton
Hinshaw & Culbertson, LLP
222 N. LaSalle St., Ste. 300
Chicago, IL 60601

J. Michael Collins
55 W. Monroe St.
Suite 600
Chicago, IL 60603

via electronic delivery using the U.S. District Court's CM/ECF system on February 10, 2011.

_____
Kevin P. McJessy
One of Its Attorneys

# 10 CV 00331

# Exhibit A

```
 1    TRANSCRIBED FROM DIGITAL RECORDING

 2                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 3                         EASTERN DIVISION

 4    UNITED CENTRAL BANK,                 )
                                           )
 5              Plaintiff,                 )
                                           )
 6          vs.                            )  No. 10 C 331
                                           )
 7    KANAN FASHIONS, INC., et al.,        )  Chicago, Illinois
                                           )  May 19, 2010
 8          Defendants.                    )  8:57 A.M.

 9                  TRANSCRIPT OF PROCEEDINGS - Status
         BEFORE THE HONORABLE MICHAEL T. MASON, Magistrate Judge
10
      APPEARANCES:
11
      For the Plaintiff:        MS. VILIA MARGARET DEDINAS
12                              407 South Hill Avenue
                                Elmhurst, Illinois  60126
13
      For the Defendants:       BAILEY, BORLACK, NADELHOFFER
14                                and CARROLL
                                135 South LaSalle Street
15                              Suite 3950
                                Chicago, Illinois  60603
16                              BY:  MR. ALAN R. BORLACK
                                     MR. ERIC GUSTAV GROSSMAN
17

18

19                      PAMELA S. WARREN, CSR, RPR
                           Official Court Reporter
20                        219 South Dearborn Street
                                 Room 1928
21                        Chicago, Illinois    60604
                              (312) 294-8907
22

23    NOTE:  Please notify of correct speaker identification.
      FAILURE TO STAND NEAR MICROPHONES MAKES PORTIONS
24    UNINTELLIGIBLE.

25
```

2

```
1        (Proceedings held in open court:)

2        THE CLERK:  10 C 331, United Central Bank versus Kanan

3   Fashions Incorporated, et al.

4        MR. BORLACK:  Good morning, your Honor.  Alan Borlack

5   on behalf of the defendants.

6        I have with me my partner Eric Grossman and our ESI

7   liaison Dan Garry.

8        THE COURT:  Okay.

9        MS. DEDINAS:  Good morning, your Honor.

10       THE COURT:  Good morning.

11       MS. DEDINAS:  Vilia Dedinas for United Central Bank

12   and (unintelligible) as well.

13       THE COURT:  Good morning.

14       MR.      :  Good morning.

15       THE COURT:  Good morning.

16       I have several questions that I want to ask you.  And

17   if you want your expert to sit down, he's welcome to.  And if

18   you need to turn to him for any questions, you can ask him

19   about that.

20       MR.         :  Thank you, your Honor.

21       THE COURT:  All right.  We received some unsolicited

22   letters, if you will, on April 30th from the defendants that

23   were submitted directly to chambers.

24       You don't do that again.  All right?  Anything that

25   you submit to us needs to be filed.
```

3

1          Did you get a copy of those, by any chance?

2          MS. DEDINAS:  I did.

3          THE COURT:  All right.  Then we received the May 17th

4    joint status report.  You need to electronically file those as

5    well as filing a courtesy copy with chambers, if you file

6    anything in the future.  Okay?

7          MS. DEDINAS:  Your Honor, (unintelligible) we

8    electronically filed --

9          THE COURT:  No, no, I'm talking about the letters --

10         MS. DEDINAS:  Oh.

11         THE COURT:  -- that were sent by defendant.

12         MR. BORLACK:  Oh, I see, your Honor.  That was our

13   mistake.  We didn't know that you didn't want it --

14         THE COURT:  Okay.

15         MR. BORLACK:  -- and we will not do it again.

16         THE COURT:  Okay.  Just if there is something that you

17   feel that we need, call and ask us first.  Okay?

18         MR. BORLACK:  That's fine.

19         THE COURT:  All right.  Now also for the defendants,

20   why do you need a data map of the bank's computer systems in

21   Illinois and Texas?  And maybe you need to consult with your

22   expert on that.

23         MR. BORLACK:  I would appreciate, Judge, if I could

24   have my liaison --

25         THE COURT:  Okay.

1    MR. BORLACK:  -- address the Court --

2    THE COURT:  Okay.

3    MR. BORLACK:  -- because he's very knowledgeable about

4  this.

5    THE COURT:  All right.

6    MR. BORLACK:  Mr. Garry.

7    MR. GARRY:  Good morning, your Honor.

8    The purpose and intent of the data map is to

9  facilitate costly -- like cost effective discovery, because as

10  of now there is -- we don't -- there is no understanding of

11  what UCB's systems -- computer systems exist as it relates to

12  custodians.  So without having that knowledge, meaning I don't

13  know -- we don't know what systems, for example, the CFO at UCB

14  was using, so it is going to be really hard to write -- craft

15  narrowly tailored and reasonable search if we don't know the

16  world within we're searching.  And that's the intent of the

17  data map.  I don't -- if they want to call or give it to us in

18  some other fashion, we just need to know what systems they have

19  and how they manage that information.

20    THE COURT:  You don't have a data map.

21    MS. DEDINAS:  We don't have a data map.  And we have

22  met with them for hours.  We have made our liaison available.

23  We continue to make him available with our IT people.  And we

24  have explained where the data resides, what data we have

25  collected.

 1          THE COURT:  Uh-huh.

 2          MS. DEDINAS:  -- (unintelligible) to reach both

 3   custodian and (unintelligible) back ups and archives.  And we

 4   have, you know, like 300 gigabytes worth of data --

 5          THE COURT:  Uh-huh.

 6          MS. DEDINAS:  -- already available that we believe are

 7   responsive to the document requests.

 8          The bank is a huge institution, and to come up with an

 9   entire -- create a data map we think is unreasonable.

10          THE COURT:  And -- well, that was my next question.

11   So you think that.  And what would something like that cost?

12          MS. DEDINAS:  I would have to find out, your Honor.

13          THE COURT:  And would the defendants be willing to pay

14   for that?

15          MR. BORLACK:  We'd have to, first of all, know what it

16   costs before we would make the decision.

17          THE COURT:  Do you have any idea, as the expert here,

18   how much something like that would cost?

19          And we're talking about Illinois and Texas, right?

20          MS. DEDINAS:  Yes.  And those are two separate

21   businesses.

22          THE COURT:  Right.

23          MR. GARRY:  Well, I would assume the bank, because the

24   FDIC requires them to have the mappings of their systems for

25   compliance purposes, would be able to easily tell us that the

1    CFO uses email and this is how long they have their archives in

2    Texas.  Because when we met with the liaison, they were unable

3    to tell us how their systems work in Texas at all.

4         So if they can provide in writing the CFO and these --

5    whatever custodians that use these systems, and they keep on

6    this -- these systems and they keep the information for how

7    long, it shouldn't be -- it should be about 15 to 20 hours of

8    discussion with their internal IT people at most to put that in

9    writing and provide --

10         THE COURT:  And their liaison doesn't know that

11    information?

12         MR. GARRY:  He only was able to speak to UCB Chicago.

13    And he was supposed to provide clarification as to how the back

14    up and archiving worked because there was some confusion as to

15    how effective their -- and when the triggers actually happen.

16    I -- specifically it wasn't clear when someone receives an

17    email how big the attachments had to be for them to be archived

18    versus backed up.

19         And these other -- the nuance details make somewhat of

20    a difference as to the world in which we're searching because

21    we don't want to look to make it unduly burdensome for the bank

22    or for us and want to be reasonable and also efficient,

23    according to (unintelligible).

24         THE COURT:  Is your liaison able to find out the

25    information about the --

1    MS. DEDINAS: We will. What happened, your Honor, is

2 that there are people -- individuals which (unintelligible)

3 right at the transition --

4    THE COURT: Okay.

5    MS. DEDINAS: -- when we took over from the FDIC. In

6 order for them to work here in Illinois, they had to log into

7 the Illinois system. And whenever they need any access, they

8 log into the Illinois system, and the Illinois system

9 completely (unintelligible) their work, and they have their

10 active and archived emails. And we have explained the whole

11 back-up system and archiving system in Chicago.

12    They ran with the issue, and we can continue to --

13    THE COURT: And can you do the same thing with Texas?

14    MS. DEDINAS: And it turns out that if there were, if

15 there were any instances in which a person went back to Texas

16 and through the Texas log-in had communications with other

17 people in Texas --

18    THE COURT: Uh-huh.

19    MS. DEDINAS: -- he had communications in Illinois,

20 which would be the most likely scenario here, that would have

21 been backed up in Illinois.

22    But if there are some discrete conversations that are

23 emails between different Texas employees (unintelligible) for a

24 short period of time, my liaison has not been out to Texas to

25 talk to them about the back-up systems and their archiving

1   systems.  And we're happy to do that.  We'll plan a trip out to

2   Texas to do that.

3           THE COURT:  Can you tell me a time frame for that?

4           MS. DEDINAS:  I can do that in the next three weeks.

5           THE COURT:  Next three weeks?

6           MS. DEDINAS:  Yes.

7           THE COURT:  Okay.

8           MS. DEDINAS:  Because when we go out there and -- you

9   know, it just makes sense because it is a costly endeavor just

10  to go out and also interview those individuals that --

11          THE COURT:  But this might be a little short circuited

12  if we can get that resolved.  And what I'd like the liaisons to

13  do is meet before he goes to Texas and then meet begin after he

14  comes back and from Texas.

15          And then the attorneys are to meet and confer in

16  accordance with Local Rule 37.2.  And if you cannot come to an

17  agreement on the issue, and the defendants want to file a

18  motion, I'll give you two weeks after that time.

19          So what's that make it?

20          We're talking three weeks for you to have this

21  information gathered in Texas.

22          THE CLERK:  And that would be by June 9th.

23          THE COURT:  By June 9th.

24          And you need to confer.  The liaisons need to confer

25  about that.

1        And then counsel needs to confer right away.  And you

2  have two weeks after that to file any motions.  I'll give

3  you -- give them a day in two weeks if you don't mind.

4        THE CLERK:  June 23rd.

5        MS. DEDINAS:  Should we have some time after we get

6  back from June 9th to review those documents? --

7        THE COURT:  Well, I'm giving you June 9th because I

8  was getting you extra time --

9        MS. DEDINAS:  Okay.

10       THE COURT:  -- for that reason.  I don't want this

11  thing to go on and on.  And I realize that a lot of information

12  has to be gathered here, but, quite frankly, I'm very

13  disappointed in both sides that we have run into so many

14  roadblocks here in the discovery issues between you.  And

15  that's why we had you come in the last time and then go down to

16  the attorney/witness room and talk about this, hoping you could

17  get this resolved.  You evidently couldn't, so this is what

18  we're going to do now.

19       So that will be the time frame for that.

20       MR. BORLACK:  Judge, I didn't hear the July date.

21       THE COURT:  Rosa will give you that.

22       And we'll issue a minute order to that too.  Okay?

23       And now for defendants also, when will you produce a

24  data map for your computer system?

25       MR. GARRY:  We could get it to them by the end of the

1  week.

2       THE COURT:  All right.

3       MR. GARRY:  We have been working -- your Honor, we

4  invested a substantial amount of time, effort, and energy.

5  When I say data map, I mean it in the most simple sense.  These

6  are the custodians.  These are the e-mails, and these are the

7  world of their (unintelligible) documents.

8       THE COURT:  And that's what you want from the

9  plaintiffs in the most simple sense.

10       MR. GARRY:  Yeah.  I mean, we're not looking to impose

11  an undue burden, we're just looking to get clarity so that when

12  we do make -- have a discussion about search terms and, et

13  cetera, we're talking -- we're all on the same page.

14       THE COURT:  Okay.  Then when will you produce your

15  list of custodians.

16       MR. BORLACK:  We can have (unintelligible) this week.

17  I believe we can have them --

18       THE COURT:  This week also?

19       MR. BORLACK:  Yes.

20       THE COURT:  Okay.

21       MR. BORLACK:  If you would give us a deadline by

22  Friday, Judge, we'd be happy to --

23       THE COURT:  You have got it.

24       MR. BORLACK:  Okay.  Thank you.

25       THE COURT:  All right.  By the close of business on

1   Friday.  Okay?

2        MR. BORLACK:  Very well.

3        THE COURT:  And when will you -- you, being the

4   defendants, review your back-up tapes and confer with the bank

5   regarding discovery of those tapes?

6        MR. BORLACK:  We have now completed, as I understand

7   it, our review of the back-up tapes, and we are in a position

8   to meet with counsel.

9        THE COURT:  Is that your understanding also?

10        And I'm asking him because he's the expert on this.

11        MR. GARRY:  I appreciate that, your Honor.  We have

12   loaded all up the tapes and created indices of them.

13        THE COURT:  Okay.

14        MR. GARRY:  So we can sit down and have a discussion

15   about the tape, the back-up tapes.  But, again, once we

16   have -- we can -- it will be included in the data map as part

17   of these are the back ups that we have of these individuals and

18   these as it relates to custodians.

19        THE COURT:  Okay.

20        MR. GARRY:  (Unintelligible) and can provide that with

21   the Friday material.

22        THE COURT:  With the Friday material?

23        MR. GARRY:  Yes.

24        THE COURT:  Okay.

25        And then you have to have your liaison take a look at

1  all of that.

2      MR. GARRY:  Your Honor?

3      THE COURT:  Yes.

4      MR. GARRY:  It would be most helpful if their liaison

5  could in turn provide just the same sort of simple written

6  information so we're all on the same page.  Because what ended

7  up happening is that there -- when we met, we were told certain

8  things about their systems --

9      THE COURT:  Huh.

10     MR. GARRY:  -- and then their -- something got lost in

11  translation or et cetera, and things are a little different now

12  and --

13     THE COURT:  That's why lawyers should never be

14  involved in any of that kind of stuff.

15     MR. BORLACK:  Point taken, your Honor.

16     MR. GARRY:  So if we could just get that in writing so

17  we're all on the same page.

18     THE COURT:  Can you do that or can your liaison do

19  that?

20     MS. DEDINAS:  We provided the -- the -- what happened

21  was they asked for additional clarification in writing as to

22  the issues that came up in the conference (unintelligible)

23  provided them with responses, which I didn't copy your Honor

24  on.

25     THE COURT:  Okay.

13

```
1         MS. DEDINAS:  We did provide them with a list of
2   (unintelligible) quite a while ago.
3         THE COURT:  You did?
4         MS. DEDINAS:  Yes.  And what they wanted to know was
5   (unintelligible) was, which office each custodian had been
6   terminated and what the dates were, and I have that information
7   and I would be (unintelligible).
8         THE COURT:  By the end of the week?
9         MS. DEDINAS:  Yes.
10        THE COURT:  Okay.
11        All right.  In defendant's April 30th report, you,
12  discussed inoperable computer server.
13        MR. BORLACK:  Yes.  And --
14        THE COURT:  Do you want me to address your liaison?
15        MR. BORLACK:  At least that would be --
16        THE COURT:  What's the status of the repair efforts
17  for those two inoperable drives?
18        MR. GARRY:  So, your Honor, we took it one step
19  further, and we sent them to what they call a clean room --
20        THE COURT:  Uh-huh.
21        MR. GARRY:  -- a specialized room for recovering the
22  hardware.  And they were unable to recover the drive, but they
23  digitally inspected them and they issued a tentative finding
24  (unintelligible) that there had been no tampering
25  (unintelligible,) just normal wear and tear to the hard drive
```

1  heads, and that they were unrecoverable.

2       THE COURT:  And that's tentative you said.

3       MR. GARRY:  Well, I mean, we didn't -- they didn't

4  write an expert report per se.  That was their finding upon the

5  inspection, but it wasn't done using -- to make an official,

6  accurate finding they would need to use microscopes and the

7  whole -- but we're more than happy, your Honor

8  (unintelligible) --

9       THE COURT:  And have you submitted anything to the

10 plaintiffs regarding that?

11      MR. GARRY:  We did.  We did inform them when we

12 learned this last week.

13      THE COURT:  And how did you inform them?

14      MR. GARRY:  By email.

15      THE COURT:  By email?

16      MR. GARRY:  They are (unintelligible.)

17      THE COURT:  Okay.  So you have got a record of that.

18      MS. DEDINAS:  I didn't know about the tampering, but I

19 did know about the (unintelligible).  It did indicate that the

20 two servers, the two drives were inoperable (unintelligible)

21 and therefore the server could not be used (unintelligible).

22      THE COURT:  Okay.

23      MR. GARRY:  As a result of the hard drive, a hard

24 drive crash on both of those two disks, which basically erased

25 the (unintelligible.)

1       THE COURT:  Is that enough information for you and

2   your liaison or do you need anything else?

3       MS. DEDINAS:  Well, we --

4       THE COURT:  Or do you know?  And I am not -- I don't

5   mean any disrespect to you, I don't assume that you are an

6   expert on computers.  Maybe I'm wrong about that.

7       MS. DEDINAS:  (Unintelligible).

8       THE COURT:  Okay.

9       MS. DEDINAS:  Our issue, of course, is when these

10  drives stopped working.  Because our understanding was the

11  (unintelligible) the IT person that they were operable in

12  November and that they only recently became inoperable after

13  the (unintelligible).  So that is an issue for us.

14      MR. GARRY:  Your Honor, as (unintelligible) mentioned,

15  we are -- if they would like these two inoperable hard drives,

16  they can have them and do whatever forensics on those drives

17  that they'd like to do.

18      THE COURT:  Okay.

19      MR. GARRY:  We have kind of reached the end point of

20  our ability --

21      THE COURT:  That's your call on that, so --

22      MS. DEDINAS:  We're more interested in speaking to

23  their IT person to find out what the conditions of the drives

24  were at each of these times.

25      THE COURT:  And that's somebody different from you I

1  take it.

2      MS. DEDINAS:  Right.

3      MR.    :  Your Honor, this is -- if I could speak.

4  I --

5      THE COURT:  Briefly.

6      MR.    :  I'm not familiar specifically.  The

7  conditions of the drives, the drives themselves were actually

8  contained in the computer server box --

9      THE COURT:  Uh-huh.

10      MR.    :  So, I think, again we -- I should maybe

11  talk to their IT (unintelligible) on to establish specifically

12  the per se, not the condition of the drives, but when they

13  actually stopped working.

14      THE COURT:  Well, I'm sure that your liaison would

15  like to talk to their IT.

16      MS. DEDINAS:  We did.

17      THE COURT:  You did.

18      MS. DEDINAS:  We called them for the first time

19  (unintelligible) --

20      THE COURT:  Okay.

21      MS. DEDINAS:  -- conversation had was their IT person

22  who indicated that there was (unintelligible) and they were

23  working.

24      And the real issue here, your Honor, was their back-up

25  system is one that erases.  So, you know, the back ups that we

1  probably thought we would have now have probably erased all

2  (unintelligible) --

3          THE COURT:  Well, he's just saying that's not true,

4  so --

5          MR. GARRY:  Well, have --

6          THE COURT:  That's not correct maybe.

7          MR. GARRY:  That's not correct, your Honor.

8  (Unintelligible) correct me.

9          From what our initial inspection of the tapes are is

10  that they have snapshots and back up of their information

11  system.  The exact back-up policies that were being applied, we

12  have been trying to get in touch with the IT operation person,

13  but he has been stricken with a serious illness, grave illness,

14  and so it has been very difficult to actually --

15          THE COURT:  Is there a back-up person for him?

16          MR. GARRY:  I defer to counsel.  I have inquired, and

17  I haven't been able to identify him.

18          MR.      :  He's we don't think we'll be able to

19  produce him any longer.  He's very sick, Judge.  He is no

20  longer employed.  We brought him back just because he had been

21  the IT person.  We're going to have to find somebody else.

22          THE COURT:  Do it quickly.

23          MS. DEDINAS:  Your Honor, given that he is so ill and

24  he is the person with the most knowledge, we (unintelligible).

25          THE COURT:  What's his illness?  What's the nature?

```
 1          MR.        :  Prostate cancer.
 2          THE COURT:  And how long has he been diagnosed with
 3   this and where is he?
 4          MR.        :  He's somewhere -- he's in the Chicago
 5   area.
 6          THE COURT:  Okay.
 7          MR.        :  And I don't know -- I haven't brought it
 8   to (unintelligible) --
 9          THE COURT:  Okay.  Well --
10          MR.        :  He has made it clear to us, Judge, he's
11   in serious ill health, and it may be --
12          He did inform her that he has had radiation
13   treatment.  I don't know when or how long.
14          THE COURT:  I'm not a doctor so I can't Judge on that.
15          But you may need to get an affidavit from a doctor to
16   present it to them.  And I don't know if you can work out a
17   deposition good for you.  I don't know if you will be able to
18   do that or not, but you might want to video it also if you can
19   do that.
20          But can you make his whereabouts known to the
21   plaintiffs?
22          MR.        :  Oh, absolutely.
23          THE COURT:  Okay.  So do that.
24          Now, again, for the defense counsel, and this would be
25   to you, I think, as opposed to your liaison there.  Have you
```

1  produced any responsive documents for the three operable drives
2  of the server?
3          I guess it is you again.  And why don't you put your
4  name on the record just in case somebody wants a transcript of
5  this they will know who is talking.
6          MR. GARRY:  Daniel Garry.
7          THE COURT:  Okay.
8          MR. GARRY:  Unfortunately, the other two drives are
9  operable, but without at least one to two drives working, it is
10 virtually impossible to recover the information from the
11 server.
12         THE COURT:  Why is that?
13         MR. GARRY:  Okay.  It is on the -- this is going to be
14 technical so if there are questions or I'm talking too
15 technical, just tell me, and I will --
16         THE COURT:  Oh, I'm sure there will be questions.  I
17 don't know if I will have them today, but we'll get a
18 transcript of this.
19         MR. GARRY:  So the way a server works, this
20 (unintelligible) server, it requires a certain number of
21 operating drives to actually boot up and turn on.
22         THE COURT:  Uh-huh.
23         MR. GARRY:  What -- so it can work with as few as four
24 drives.
25         In this case because two drives have --

```
 1          THE COURT:  Are inoperable.

 2          MR. GARRY:   -- (unintelligible) effectively, it makes

 3    the ability for the server to rebuild itself near impossible

 4    until one of the drives are recoverable.  It is -- we can

 5    get -- if it is really -- if you can forensically image and

 6    take fragments of data off of the three drives, but without the

 7    total server built, you're actually not able to access the data

 8    on the drive, which (unintelligible) we actually informed their

 9    liaison.

10          He was actually -- your Honor, this all came about

11    because their liaison actually -- was actually present when we

12    were doing this work and imaging and --

13          THE COURT:  That's good.

14          MR. BORLACK:  (Unintelligible).

15          MR. GARRY:   -- and he -- they were fully aware of

16    this.  And we -- I have gone down the path of normal wear and

17    tear.  The server was four and a half years old.

18          THE COURT:  Next time you might want to bring your

19    liaison with you too in case there is any disagreement about

20    that.

21          MS. DEDINAS:  I apologize, your Honor.

22          THE COURT:  That's all right.

23          MS. DEDINAS:  (Unintelligible) we were here.

24          THE COURT:  Yeah.

25          MS. DEDINAS:  (Unintelligible).
```

1    THE COURT:  I think maybe while we're dealing with

2  these types of questions, it is a good idea for both sides to

3  bring their liaison.  I'm sorry for the extra expense, but

4  maybe we'll get things answered rather than guessing on some of

5  this stuff.  No disrespect --

6    MS. DEDINAS:  Your Honor --

7    THE COURT:  -- to the attorneys.

8    MS. DEDINAS:  I'm sorry.

9    THE COURT:  Go ahead.

10    MS. DEDINAS:  Just so -- just to make it clear, our --

11  our liaison does agree with what Mr. Garry is saying that this

12  was data deposited, and when one of -- you need four drives --

13    THE COURT:  Uh-huh.

14    MS. DEDINAS:  -- to repopulate the entire server.

15  (Unintelligible) and if two are gone, the whole thing is lost.

16    THE COURT:  Worthless?

17    MS. DEDINAS:  That's my (unintelligible).

18    THE COURT:  So what -- can anything be done?

19    MR. GARRY:  We sent it -- I mean, we -- it is normal

20  wear and tear.  We sent it to the clean room, which is a

21  special facility to actually -- they -- a lot of federal

22  agencies actually have worked with this place -- send their

23  drives there with the hopes of recovering the drive or the data

24  off of it so we can do it.  In all honesty there is not a whole

25  lot that can be done.  Normal wear and tear, and the drives

1  give out.

2          Again, (unintelligible) I'd be more than happy to

3  provide the drives to their liaison expert.  Perhaps they might

4  have --

5          THE COURT:  Some --

6          MR. GARRY:  -- some --

7          THE COURT:  -- ability to --

8          MR. GARRY:  Yeah.

9          THE COURT:  -- recover it?

10         Who knows.

11         MS. DEDINAS:  Your Honor, I would note that this was

12  only one of several of their servers.  So they do have data on

13  other servers.

14         My understanding is that the (unintelligible) in light

15  of (unintelligible) is just because by looking at the data

16  that's available on other servers, they might be able to figure

17  out what was on the server (unintelligible).

18         MR. GARRY:  Well, if they attempt the data map which

19  is simply so we could facilitate discovery and identify what we

20  have and where it is.

21         And with regards to identifying what's on the file

22  server or the server which we were informed by (unintelligible)

23  is the viewer, that it was a file server, we haven't been able

24  because we can't recover any of the information off the drive,

25  because they just died, that it is virtually -- there are

1  back-up tapes that we were going through that are like -- we're

2  in the process of, and I don't want to get -- make -- we're in

3  the process of verifying to determine what was backed up off

4  the file server, and that will, of course, be included when we

5  provide the data map as to what information we got from the

6  file server for these custodians.

7      THE COURT:  So there are back-up tapes.

8      MR. GARRY:  Yes, your Honor.

9      THE COURT:  Okay.

10     MR. GARRY:  There were -- their liaison expert

11 actually -- their liaison informed us that -- of the tapes,

12 actually, when we were there.  And we did find them, and we

13 have verified the tapes.  So we are in the process.

14     And with regards to the servers, we have also verified

15 all of them work.  We have them all under our custody and

16 control, and we have identified all the applicable machines as

17 they relate to the custodians and are prepared to do the

18 production once we have the search terms and dates identified

19 of the -- whatever the respective information that's -- they

20 requested when we search those machines.

21     THE COURT:  Onto another area.

22     MR. GARRY:  (Unintelligible).

23     THE COURT:  Okay.

24     Did you want to comment about that?

25     MS. DEDINAS:  Well --

1        THE COURT:  We don't have to have a big argument about

2   this.

3        MS. DEDINAS:  No, I know.  I was at the IT meeting,

4   and I did speak to my liaison, and I believe that what we

5   learned at the initial meeting with the IT guy was that there

6   were back ups but they were sporadic.  And they weren't there

7   (unintelligible), sure.  So I'm not sure.

8        Maybe you have new information now that everything is

9   backed up, but that wasn't the information from my initial --

10       MR. GROSSMAN:  My recollection on that, your Honor, is

11   that Dave Muchler's February 26th letter indicated that certain

12   picture files -- I have to look at the exact language in the

13   letter -- but certain picture files, .gif files, large

14   attachments were not included in the back-up tape.  That was

15   the only information that the IT person provided at that time.

16       THE COURT:  Get together and talk about this.  Okay?

17       Let's go on to another area then.  And this is for

18   both sides here.

19       What date range or ranges does each side contend is

20   relevant for paper documents?

21       MR. GARRY:  Your Honor, may I sit down?

22       THE COURT:  Sure.  Thank you.

23       MR. BORLACK:  Do you want to go first?

24       MS. DEDINAS:  Well, your Honor, I think that the

25   fundamental disagreement, at least from our side, is that the

1   allegations in each of the -- both the complaint and the

2   counterclaim (unintelligible) different, involve a difference.

3          We have been willing to provide documents going back

4   to paper documents related to the loan, and all the documents

5   which (unintelligible) going back to 2004 we have been

6   providing.

7          When it comes to electronic data from our side, the

8   allegations are that we refused to extend the loan that was

9   coming due on August 22nd and that we froze a line of credit

10  and letters to credit from a period of (unintelligible) at the

11  bank versus the date of July 31st to the day the loan would

12  have matured, which would have been August 22nd.

13         THE COURT:  Okay.

14         MS. DEDINAS:  So, you know, we believe that the

15  (unintelligible) the date range for e-discovery from our side

16  would have been this very narrow time frame of those, you know,

17  post allegations.

18         You know, I'm willing to go a little bit further

19  beyond that because there were emails, you know, during the due

20  diligence time frame, which was, and, you know, about two weeks

21  prior to the takeover.  If there were any considerations for

22  this, it is (unintelligible).

23         But the defendants terminated their banking

24  relationship and moved to a different bank we believe in the

25  middle of August.  And so, you know, there isn't a whole lot

26

1   that extends --

2         THE COURT:  What year is that again?  I'm sorry.

3         MS. DEDINAS:  2009.

4         THE COURT:  '9, okay.

5         MS. DEDINAS:  Well, as far as the --

6         THE COURT:  ESI --

7         MS. DEDINAS:  -- one of (unintelligible) the bank --

8         THE COURT:  Oh, okay.

9         MS. DEDINAS:  -- they claim a destruction of their

10  business.

11       THE COURT:  Yeah.

12       MS. DEDINAS:  (Unintelligible) destruction of their

13  business.  And we believe that there have been some overstated

14  inventories and other (unintelligible) based on the

15  (unintelligible) bank.

16       And since they are alleging a destruction of the

17  business, I think that we'd like to explore a little bit

18  further in a larger time frame, of course, not going back to

19  2004 or 2006, but the last couple of years of what exactly

20  their business was, how profitable it was, prior to the

21  (unintelligible) damage operations.

22       THE COURT:  So what is your request as far as the

23  range goes, date range?

24       MS. DEDINAS:  Well, with respect --

25       THE COURT:  For paper documents.

1        MS. DEDINAS:  Oh, for paper documents.  So that

2   (unintelligible).

3        MR. GROSSMAN:  Well, we have recovered -- we have

4   obtained paper documents basically and the entire history of

5   the loan.  So we already have those.

6        MS. DEDINAS:  (Unintelligible) but (unintelligible)

7   what we want done to the --

8        THE COURT:  Right.

9        MR. GROSSMAN:  Oh, what you want to -- oh, I'm sorry.

10  I misunderstood.

11       I think on our side we need at least a couple of years

12  of financial records, and we will be able to make a calculation

13  of -- if they want to claim their business was destroyed, we

14  need financial records going back at least a couple of years.

15       THE COURT:  All right.  So we're talking?

16       MR. GROSSMAN:  I would say, your Honor, we need

17  January 1st, 2007.

18       THE COURT:  To the present?

19       MR. GROSSMAN:  Yeah.  You know what, 2006.  I'm sorry,

20  I misspoke.  January 1st, 2006, to the present.

21       THE COURT:  So we're talking four years then?

22       MR. GROSSMAN:  Yes, your Honor.

23       THE COURT:  And what about the ESI?

24       MR. GROSSMAN:  Your Honor, I think the ESI would not

25  need to be able to go back as far (unintelligible).

```
 1          THE COURT:  Doesn't -- does it -- unless somebody can
 2   figure out the hard drives.
 3          MR. GROSSMAN:  You know, obviously --
 4          MS. DEDINAS:  Two years.
 5          MR. GROSSMAN:  Well, let me put it this way, Judge.
 6   Clearly we would like to go back to the January 1st, 2006,
 7   deadline; however, if it -- if that's going to impose some sort
 8   of burden, we could certainly talk to them and agree to a
 9   shorter time frame, a time frame, which is causing the burden.
10          THE COURT:  Which might be a first in this case if you
11   could talk to them and agree on that.
12          What's your position?
13          MR. BORLACK:  May I say just one thing, Judge?
14          THE COURT:  So you're talking two years then, right?
15          MR. GROSSMAN:  Well, in essence for ESI --
16          THE COURT:  For ESI.
17          MR. GROSSMAN:  -- two years would be --
18          THE COURT:  So --
19          MR. GROSSMAN:  So two years from the critical date
20   of -- not two years from now.
21          THE COURT:  When would that be?
22          MR. GROSSMAN:  It would be July 2007, July 31st, 2007.
23          THE COURT:  So August 1st.
24          MS. DEDINAS:  August 1st.
25          MR. GROSSMAN:  Yes.
```

1       THE COURT:  2007.

2       To the present?

3       MR. GROSSMAN:  To the present.

4       THE COURT:  All right.  Then for the defendants.

5       MR.     :  And if we can -- just let me preface by

6 saying, I realize that I can see your frustration, it doesn't

7 bug me.

8       I just want to say that we have been talking, Judge.

9 We -- we have tried.  They may be in intransitive positions,

10 but the parties have met repeatedly and talked and tried to

11 work things out.

12       It is not looking very good on these issues, but I

13 want you to know that we have not been hiding from these

14 issues.

15       Now we have some serious issues here on the date

16 range.  On paper documents every subpoena they put out has been

17 back to 2004 that they -- UCB has put out.  Their request for

18 us for documents goes back to 2004.

19       THE COURT:  Well, is it?  I thought you said 2006.

20       MR.     :  Well, we are willing to modify that,

21 Judge.

22       THE COURT:  Okay.

23       MR. BORLACK:  That's what -- they haven't modified

24 it.  They had -- these are what their subpoenas they request

25 for documents say.

1   THE COURT: Okay. Will you modify the subpoena?

2   MR.  : Absolutely.

3   MR. BORLACK: Then we have asked for documents, and

4 they limit it to January -- June 22, 2006. They have objected

5 to anything prior to that. That's on the hard documents.

6   Now --

7   THE COURT: So that's a six-month difference then.

8   MR. BORLACK: No, two-year difference.

9   THE COURT: 2006?

10   MR. BORLACK: Yeah.

11   THE COURT: June?

12   MR. BORLACK: June 22 --

13   THE COURT: He's talking about January of 2006.

14 Right?

15   Or am I misunderstanding you?

16   MR. BORLACK: No, his -- his request and subpoenas go

17 to back 2000 --

18   THE COURT: But he is going to modify those things.

19   MR. BORLACK: Okay. I see what you are saying.

20   THE COURT: He is going to modify those.

21   Am I correct?

22   MR.  : Yes.

23   MS. DEDINAS: Yes.

24   THE COURT: Okay. To January 1st of 2006.

25   So he's modified that by two years or he's about to.

31

1         MR. BORLACK:  All right.

2         THE COURT:  And you got that on the record.

3         MR. BORLACK:  Yeah.

4         And I assume then that if there is something narrow,

5 some narrow pattern going in which somebody has to go back and

6 fill that time, that can be addressed that claim.  It is narrow

7 and there is a reasonable basis to do that.  So it is a cutoff

8 date, but it is not (unintelligible) been (unintelligible) for

9 that reason, so --

10        THE COURT:  And I have a settlement conference, a very

11 big one --

12        MR. BORLACK:  So --

13        THE COURT:  -- that's starting here.

14        MR. BORLACK:  ESI, Judge --

15        THE COURT:  Yes.

16        MR. BORLACK:  We have --

17        THE COURT:  Can we agree on the same dates that they

18 proposed?

19        MR. BORLACK:  Not for ESI.

20        THE COURT:  What do you need?

21        MR. BORLACK:  Oh, yes, we can agree on that.

22        THE COURT:  All right.  So that's August 1st, 2007.

23        MR. BORLACK:  Oh, no.  No, June 22nd, 2006.

24        THE COURT:  I thought you were talking about the paper

25 for June 22nd.

1     MR. BORLACK:  I was, but I thought you just asked me
2  about ESI.
3           THE COURT:  I did.
4           MR. BORLACK:  And I -- and I say the (unintelligible)
5  date should be the same.  There shouldn't be a difference.
6           THE COURT:  All right.  So you're saying June
7  1st -- or 22nd, I'm sorry --
8           MR. BORLACK:  Or January 1st, whatever counsel
9  suggests -- I'm confused a little bit -- but I guess January 1
10 he wants to go with hard copies, and ESI should be the same.
11          MS. DEDINAS:  Your Honor, that ignores defense
12 (unintelligible) in the issues that are provided, complaint
13 versus counterclaims.  And the counterclaim is merely
14 (unintelligible) on their alleged -- they allege
15 (unintelligible) misconduct for about a three- or a four- week
16 period of time.  So to go back to --
17          THE COURT:  And what's the period of time?
18          MS. DEDINAS:  They claim that we have failed to renew
19 a loan, extend credit, and extend letters of credit from the
20 day you took over the bank, which was July 31st, through the
21 time the loan would have expired, which was in August 22nd of
22 2009.  It is a three-week period of time.
23          And to go back to the ESI from 2006, the loan
24 documents are the loan.  They -- you know, they are there.  ESI
25 related to all kinds of negotiations regarding documents in

33

1    2006.

2           THE COURT:  Okay.  And we have to -- I'm sorry.  I

3    have to kind of cut this short because I have a number of

4    people waiting for me.

5           MR. BORLACK:  (Unintelligible) to be heard.

6           THE COURT:  Well, make it brief.

7           MR. BORLACK:  I'll try, Judge.

8           Look, they have something like 14 affirmative

9    defenses, all which go back deep behind this cutoff date.  They

10   want to know about -- about, for example, they say, the letters

11   of the credit that they wrote had discrepancies.  Well, you

12   have to look at the discrepancies that were handled by Mutual

13   Bank and that were committed to --

14          THE COURT:  That's a predecessor?

15          MR. BORLACK:  That's a predecessor.  You can't -- you

16   have to have those benchmarks.  That's their affirmative

17   defense.

18          They also claim fraud.  And in the course of

19   performance here may be very important as establishing

20   benchmarks as well as adducing evidence for their affirmative

21   defenses.

22          THE COURT:  Okay.  I'm going to give the bank two

23   weeks to file any motion for a protective order regarding why

24   the date range for ESI should differ from the range for paper

25   documents.

1    That's what, June 2nd?

2    Okay.

3    And quickly here, did the bank complete its 30(b)(6)

4    deposition of Raven, Inc.?

5    MS. DEDINAS:  No.  We did subpoena them.  They are

6    supposed to -- they have -- their counsel has now

7    (unintelligible) represented them.  They had obtained new

8    counsel.  They have been in touch with me.  They are producing

9    documents on the 26th.  And then after that we're going to be

10   scheduling the deposition.

11   THE COURT:  Some time after May 26 then.

12   THE CLERK:  (Unintelligible).

13   THE COURT:  All right.

14   As to the close of written discovery, I'm going to set

15   a date of August 1st.  All written discovery requests must be

16   served sufficiently in advance of the cutoff date for responses

17   to be produced on or before that cutoff date.  So nothing the

18   night before.  Okay?

19   How many depositions do the parties anticipate?

20   Really?

21   MR. BORLACK:  You know, Judge, to be honest I hadn't

22   seen anything, critical emails and the like that go to the

23   heart of why the bank acted as it did.  When I see those

24   emails, I'll have a much better idea.  But now I'd say ten to

25   15.

1          MS. DEDINAS:  I would say (unintelligible).

2          MR.    :  For our side too.

3          THE COURT:  10 to 15?

4          Any deponents out of state?

5          MR. BORLACK:  I mean, there is going to be -- there

6    are Texas people who were involved.

7          THE COURT:  How much time is going to be needed to

8    complete those?

9          MR. BORLACK.  Judge, I -- if I say that I can tell you

10   this without having a reasonable production of the critical

11   documents that go to the heart of this case, I don't have it.

12   I have never seen it.  I'm not accusing anybody of anything

13   other than to say I have to have this critical mass in order to

14   make my discovery decisions.

15         THE COURT:  Then let's set another status.  When do

16   you suggest in order for you to have that information and you

17   to have your information so you can give me an answer.  So I'm

18   going to set deadlines at that time.

19         MS. DEDINAS:  Would it make sense once

20   (unintelligible) all written discovery in the case?

21         THE COURT:  I'm going to --

22         MS. DEDINAS:  (Unintelligible) all the documents

23   and -- I mean, obviously the (unintelligible) them all, but at

24   least (unintelligible).

25         THE CLERK:  August 3rd.

1      August 3rd, 9:00 o'clock.

2      THE COURT: Goodbye.

3      MS. DEDINAS: Thank you.

4      THE COURT: Thank you all very much.

5      MR. BORLACK: Sorry (unintelligible).

6      THE COURT: No problem.

7      (Which concluded the proceedings in the above-entitled

8  matter.)

9                  CERTIFICATE

10     I HEREBY (Unintelligible) that the foregoing is a

11  true, correct and complete transcript of the proceedings had at

12  the hearing of the aforementioned cause on the day and date

13  hereof.

14

15  /s/pamela S. warren       May 21, 2010
    Official Court Reporter         Date
16  United States District Court
    Northern District of Illinois
17  Eastern Division

18

19

20

21

22

23

24

25