IN THE UNITED STATES DISTRICT COURT
F0R THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED CENTRAL BANK | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 10-CV-00331 |
| | ) | |
| KANAN FASHIONS, INC., et al., | ) | Judge Gary Feinerman |
| | ) | |
| Defendants. | ) | Magistrate Michael Mason |

### UNITED CENTRAL BANK'S AMENDED POST-HEARING MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR DISCOVERY SANCTIONS

At the outset, the mysterious disappearance of the Defendants' warehouse server appeared to be attributable to a series of unfortunate events. But it was not. The evidence at the hearing established Defendants' voluntary abandonment of relevant ESI and other contumacious conduct. Respondents also failed to prevent the loss of the data on the server. They facilitated the spoliation by way of inadequate preservation instructions, failing to take affirmative steps to preserve the data, confusion, and lack of coordination between various counsel, their clients and third parties. The Defendants and Respondents demonstrated an unacceptable lack of candor with the Bank and this Court. Accordingly, the parties responsible for this preventable spoliation disaster should be sanctioned.

I.     The Relevant Standard of Proof.

The Bank seeks sanctions under both Rule 37(b)(2) for violations of the Court's Standing Order for Electronic Discovery (ESI), the Court's February 25, 2010 instruction that no spoliation of Defendants' computer servers occur, and the Court's August 27, 2010 order

requiring Defendants to obtain the CW server or a forensic image of the CW server.[1]  The Bank also seeks sanctions under the Court's inherent authority to sanction a party and the attorneys advising it for "willfully abusing the judicial process or otherwise conducting litigation in bad faith."  *Salmeron v. Enterprise Recovery Systems*, 579 F.3d 787, 793 (7th Cir. 2009), citing *Maynard v. Nygren*, 332 F.3d 462, 470-71 (7th Cir. 2003).

To impose Rule 37(b) sanctions, the court must find willfulness, bad faith or fault on the part of the party to be sanctioned.  *Maynard,* 332 F.3d at 468; *Marrocco v. Goodyear Tire and Rubber Co.*, 966 F.2d 220, 224 (7th Cir. 1992).  When the requested sanction is dismissal of a complaint or counterclaim, there must be clear and convincing evidence of willfulness, bad faith or fault.  *Maynard*, 332 F.3d at 468-69.  When non-dismissal sanctions such as an adverse inference, barring evidence, or monetary sanctions are sought, the quantum of proof is the lesser preponderance of the evidence standard.  *Id*. at 469; *Haynes v. Dart,* 2010 U.S. Dist. LEXIS 1901, at*9 (N.D. Ill. Jan. 10, 2010).

II.    The Defendants Engaged in Three Types of Spoliation.

A.  *Defendants Voluntarily Spoliated the Warehouse Server on March 24, 2010.*

Prior to March 24, 2010, the warehouse server was in the custody and control of the Defendants.  (Evidentiary Hearing Transcript ("TR") 1/27/11 P.M. pp. 22:21-23:18.)  By that time, Defendants had been advised on numerous occasions to preserve all relevant ESI and had understood those instructions. (Sanctions Hearing Exhibit ("SH") 6,7,31; TR 1/27/11 A.M. pp. 7:2-8, 13:12-24, 14:24-15:3.) On March 24, 2010, Defendants entered into an Agreed Order of Eviction from their warehouse at 1103 Butterfield Road and voluntarily abandoned the server

---

[1] The violation of a formal, written order to comply with discovery is not required, as courts can broadly interpret what constitutes an order for purposes of imposing sanctions. *Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 164 (7th Cir. 1994) (an unequivocal oral directive suffices).

and their inventory. (SH 57.) The loss of the data on the warehouse server, therefore, was not beyond the Defendants' control – it was intentional.[2]

Defendants and their counsel could and should have made a copy of the data on the server prior to the eviction, brought the server to Oak Brook, or made written contractual provisions with First Midwest Bank ("FMB") to guaranty access and secure preservation of the data, but they did not. Once Defendants handed over the keys to the warehouse to FMB, they lost their ability to control who had access to the server and the integrity of the data on it.

Defendants' and Respondents' disregard of their preservation responsibilities resulted in spoliation of the evidence. In *Phoenix Four Inc. v. Strategic Resources Corp.,* 206 U.S. Dist. LEXIS 32211 (S.D.N.Y. May 23, 2006), despite notice of pending litigation, defendants abandoned at least ten computer workstations without bothering to determine whether they contained relevant ESI. Their indifference constituted an inexcusable act of gross negligence. Similarly, in *Barsoum v. NYC Housing Authority, 202 F.R.D. 396, 400 (S.D.N.Y. 2001),* the Court found that leaving a tape responsive to discovery requests on a desk in area open to passers-by, resulting in its loss, was "at the very least grossly negligent" and awarded a sanction of evidence preclusion. In *Wiginton v. CB Richard Ellis*, 2003 U.S. Dist. LEXIS 19128 (N.D. Ill. 2003), a thoughtless mistake (failure to stop document destruction policy) was found to be an intentional and willful act of spoliation sufficient to merit sanctions.

B. *Defendants Failed to Obtain the Server or the Data After Abandonment.*

After abandoning the server at the warehouse, Defendants were told repeatedly by their counsel to get access to the server. Defendants have countless excuses why this could not be

---

[2] Defendants' predilection for abandonment was foreshadowed a month earlier when Defendants and their counsel, Steve Blumenthal, told Associated Bank to "make arrangements to pick up the Equipment." (SH 21.) By this time, Mr. Blumenthal had knowledge of the duty to preserve of by virtue of Mr. Borlack's email updates and copies of key orders. (SH6, 8, 17, 19-20; TR 2/1/11 A.M. pp. 15:18-25, 49:24-50:3)

done – it was too heavy to transport, they were not qualified to transport it, FMB was requiring a subpoena or they were negotiating a deal with Associated Bank that would happen any day. None of these excuses were insurmountable and they are inadequate in light of the serious duty Defendants had to preserve evidence. Before the server was sold, Defendants had almost four months to get access to the server, were repeatedly told to do it, and fumbled. This Court should sanction the Defendants and send a strong message to other litigants that such a casual attitude towards ESI will not be tolerated.

C. *The Evidence Reveals a Deliberate Scheme to Spoliate the Warehouse Server.*

As discovery progressed and Defendants were continually pressured to get access to the warehouse server, they apparently hatched a plot to have a foreign corporation purchase and remove the server. The transaction was structured so as to shield the identity of the perpetrator from the Court and to cover the tracks of the participants. All credible evidence points to Defendants as the masterminds of this scheme.

Shah's motives, opportunity and actions in this case are transparent. Facing financial ruin, he sought to evade the liabilities of KFI and to start a substantially similar business from the same warehouse he had financed and built for KFI. As part of the friendly foreclosure with FMB, he insisted on a six-month lease commitment to give him time to find another company to lease the warehouse. Shah planned to use the server to run the conveyor system at the warehouse. To seal the deal, FMB undertook the unorthodox task of negotiating with Associated Bank for the repurchase of the server, lease and guaranty that Shah demanded for his new business, hoping to get a much better sales price for the foreclosed warehouse if it came with a tenant. (TR 1/27/11 A.M. pp. 10:16-12:23; 1/27/11 P.M. pp. 126:22-134:15.)

The plan laid out in FMB's memo was for FMB to negotiate the purchase of the server, lease and guaranty with funds that would come from a foreign corporation unconnected to Shah.[3] (SH148.) Shah was continually apprised of these negotiations. (11/19/10 Clark Dep. Trans. pp. 186:20-187:7.) Shah was negotiating with a Hong Kong company to sign a lease for the warehouse for his new business venture the same week that FMB reached agreement with Associated Bank. (TR 1/31/11 A.M. pp. 58:17-59:3.)

The fact that a foreign corporation purchased the server for three times its appraised value as planned from a country with banking secrecy protection is no coincidence. (TR 1/27/11 P.M. pp. 143:15-22, 147:15-24.) Neither is the fact that Shah's and Joshi's next door neighbors own a company named Diagems – the same as the purchaser of the server. (*Id.* at 39:14-40:11.) Shah's father, who assured his son that he would find financing for the server, was staying at Joshi's house, right next door to the Bhansalis, when the server was sold to Diagems. (*Id.* at 29:21-30:13; Shah Dep. Trans. 81:11-23, 133:6-12.) The notion that this was the perfect coalescence of coincidental events is simply not credible.

III.  <u>Defendants and Respondents Discounted the Tradition of Candor in Our Courts.</u>

Defendants admit that when the Bank inquired whether a third party was seeking to repossess their computer equipment at the warehouse, and they answered "no," that this was a false statement. (TR 1/27/11 A.M. pp. 23:15-24:20.) They also admit that despite telling the Bank and this Court that they would be moving the warehouse server to the Oak Brook office, this was never done. (*Id.* at 28:6-20.) On May 19, 2010, their consultant advised the Bank and

---

[3] This arrangement was clearly to prevent any exposure for fraudulent conveyance if the insolvent Shah or the other Defendants paid for the server. This is also the most believable explanation for why there was no written agreement giving Defendants a right to repurchase the server – demonstrating yet again that Defendants' business interests took priority over their litigation preservation duties.

the Court that they had custody and control of all their servers. (TR 1/28/11 P.M. pp. 95:3-9.)[4] Finally, when confronted head on with the fact that they did not have access to the server, Defendants stood in silence while their counsel told this Court that Defendants had a deal to buy the server back, even though no such deal existed. (TR 1/27/11 A.M. pp. 36:15-37:18.)

Respondents also demonstrated a lack of candor with the Court and the Bank. Over a period of months, Respondents repetitively admonished their clients about the need to get access to the warehouse server. (SH 96, 100, 111, 122, 125, 140, 152, 169, 175.) They knew that they had represented to the Bank and this Court that their client had control over the warehouse server and was moving it to its Oak Brook location, that it would be included in their data map, and that it would be part of ESI production, all of which was not true. (TR 1/28/11 11 A.M. pp. 14:10-18, 17:6-29:3, 30:15-31:4.) As the months dragged by, the tone of the Respondents' emails to Defendants became more urgent, the font larger and text more colorful, as they realized that the more time passed, the worse this would look. By August, 2010, they cautioned Defendants that there would be "hell to pay" with the Court when it came to light that a component of Defendants' ESI system had slipped through their fingers. (SH179.) These misrepresentations were deliberately allowed to stand uncorrected during the months of June, July and August of 2010 with no explanation. (TR 1/28/11 A.M. pp. 26:24-29:3.) Only then did Respondents inform the Court and the Bank that Defendants did not have access to the warehouse server. (SH182, 185.) This conduct amounts to bad faith. *See Barsoum v. NYC Housing Auth.*, 202 F.R.D. 396, 400 (S.D.N.Y. 2001) (defendants' failure to disclose loss of responsive audio tape hoping the tape would be recovered at which time she intended to make full disclosure "was in violation of Barsoum's discovery obligations and, indeed, amounted to bad faith.")

---

[4] Regardless of whether this was intentional misrepresentation or just an oversight by the experienced Mr. Garrie, the statement remained uncorrected from May 19, 2010 through August 26, 2010, despite Respondents' access to the May 19th transcript.

Our judicial system is premised on the honesty and good faith of the parties involved. *Grubb v. Bd. of Trustees of the Univ. of Illinois,* 2010 U.S. Dist. LEXIS 78485 (N.D. Ill. Aug 4, 2010). "Given the extreme importance of accurate and truthful discovery, our court system must have zero tolerance for parties who seek to intentionally distort the discovery and trial process." *Quela v. Payco-Gen. Am. Credits, Inc.,* 2000 U.S. Dist. LEXIS 6932, at *21 (N.D. Ill. May 18, 2000). The same holds true for litigation counsel. The rules of conduct governing the profession prohibit lawyers from engaging in conduct that involves dishonesty and misrepresentation. Conduct that involves dishonesty and misrepresentation to opposing counsel and the Court is sanctionable under the Court's inherent authority. *See Salmeron,* 579 F.3d at 796 (sanctioning an attorney and dismissing plaintiff's lawsuit where attorney violated agreement with opposing counsel and leaked an attorney-eyes only designated document to unauthorized third parties). Sanctions "exist, in part, to remind attorneys that service to their clients must coexist with their responsibilities toward the court, toward the law and toward their brethren at the bar." *Thompson v. Fajerstein*, 2010 U.S. Dist. LEXIS 118271, at *4 (N.D. Ill. Nov. 8, 2010) (*quoting Devaney v. Continental Amer. Ins. Co.*, 989 F.2d 1154, 1161-62 (11th Cir. 1993)).

IV.     The Respondents' Conduct Violated This Court's Discovery Orders.

In *Qualcomm Inc. v. Broadcom Corp.,* 2010 U.S. Dist. LEXIS 33889 (S.D. Cal. April 2, 2010), defendants' intentional misconduct was exacerbated by significant mistakes, oversights, miscommunication and lack of coordination by their litigation and general counsel, but their counsel had not acted in bad faith. Unlike *Qualcomm*, however, Respondents in this case also violated this Court's orders that ESI not be lost, that all persons be instructed against spoliation, and that the data on the server be produced. Their conduct crossed the line into bad faith.

The evidence demonstrated that Respondents failed to adequately coordinate their preservation efforts with their clients and their other counsel, Steve Blumenthal. By late February, 2010, Respondents knew of the pending friendly foreclosure of the warehouse and that a server was located at the warehouse. (SH 20, 28, 30.) No inquiry or effort was made to make sure the server was not left there, either before the friendly foreclosure or after. (TR 1/27/11 P.M. 17:6-12, 18:9-19:5, 38:2-39:3, 39:21-40:7, 45:15-23.) The March 16, 2010 email from Blumenthal, a transactional attorney, was inadequate for preservation and there was no follow up to confirm FMB's agreement. (SH46; TR 2/1/11 pp. 97:19-99:8.) As such, it did nothing to preserve the data. More importantly, such an email should have come from the Respondents to FMB, followed by a decisive strategy to preserve the warehouse server and access to it. *See Devaney*, 989 F.2d at 1161-62 ("when an attorney advises a client in discovery matters, he assumes a responsibility for the professional disposition of that portion of the lawsuit and may be held accountable for the positions taken . . . during that process"). Instead, Respondents left it to their clients to preserve and monitor the server while it was at the warehouse. (TR 1/28/11 A.M. pp. 38:9-41:4.)

After Respondents were notified by the Bank that the server might have been left at the warehouse, immediate steps had to be taken to secure the server. Respondents admitted that they expected the server to be moved to Oak Brook within a week and the delay that ensued was beyond what they expected. (TR 1/28/11 A.M. pp. 17:6-17, 27:23-19.) An escalating and ever more colorful four-month email campaign was unreasonable and ineffective to address the situation. Defendants' prolonged stalling should have raised a red flag and prompted more intense intervention. Although both sides had "a lot going on," Respondents should not have waited until August to finally ask their clients what they meant when they said they "were working on getting access." (Id. at 26:5-15, 35:4-38:7.) They should have worked with Steve

Blumenthal to discuss and address the problems with access to the server. Or, they could have called their friendly witness David Clark at FMB and cut to the source of the problem. A simple subpoena to First Midwest Bank would have quickly provided access to the data on the warehouse server. Faced with abundant evidence of their clients' flagrant disregard of their instruction to preserve evidence, the Borlack firm could also have withdrawn.

Counsel has an obligation to press their clients, take supervisory responsibility over discovery and not accept unsubstantiated assurances that the client is producing discovery. *Qualcomm, Inc. v. Broadcom Corp.,* 2008 U.S. Dist LEXIS 911 (S. D. Cal. Jan. 7, 2008), vacated in part on other grounds, 2008 U.S. Dist LEXIS 16897 (S.D. Cal. March 5, 2008); *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 433 (S.D. N.Y. 2004) ("active supervision of counsel" is of particular importance when ESI is involved). In *Phoenix Four Inc.,* the Court found defendants' litigation counsel to be grossly negligent where their client abandoned their computers. The Court noted:

> [i]t appears that Mound Cotton never undertook the more methodical survey of the SRC Defendants' sources of information that Judge Scheindlin outlined in *Zubulake V.* Mound Cotton simply accepted the defendants' representation that, because SRC was no longer in operation, there were no computers or electronic collections to search. Had Mound Cotton been diligent, it might have asked--as it should have--what had happened to the computers SRC used at Carnegie Hall Towers. This question alone would have alerted Mound Cotton to the existence of the server that the defendants had taken with them from their former office.

2006 U.S. Dist. LEXIS 3221, at *17-18 (sanctions not awarded despite said conduct because spoliating party produced the missing evidence and there was a lack of prejudice to plaintiff).

Bad faith destruction of documents includes willful blindness by a party or its counsel that leads to the destruction of the documents. *Wiginton*, 2003 U.S. Dist. LEXIS 19128, at *24. Respondents let months go by doing nothing more than repeatedly insisting that Defendants obtain the server. They waited so long that the server was sold and its data lost. Their willful blindness crossed the line into sanctionable bad faith conduct.

V.     Acts of Defendants' Attorneys are Attributable to the Defendants.

Defendants' conduct is sanctionable.  Defendants are also liable for the conduct of their

counsel.  "The rule is that *all* of the attorney's misconduct . . . becomes the problem of the

client."  *Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc*., 570 F.3d 845, 848 (7th

Cir. 2009).[5]  Accordingly, Defendants should be sanctioned for their attorneys' (Respondents'

and Blumenthal's) misconduct, as well as their own.  See *Salmeron*, 579 F.3d at 797.

VI.    United Central Bank's Conduct Does Not Preclude Entering Sanctions.

The Defendants' argument that the Bank should have subpoenaed FMB for the server

essentially boils down to faulting the Bank's lawyers for not doing even more to protect their

client from an untrustworthy adversary.  This is absurd.  The duty to preserve, collect and

produce the Defendants' ESI was the Defendants', not the Bank's.[6]   In addition, a lawyer is

permitted to rely on opposing counsel's promises and agreements.  *See Salmeron,* 579 F.3d at

796 (refusing to reverse sanctions where movant relied on opposing counsel's representations but

could have done more to protect his client).  Defendants and Respondents repeatedly led the

Bank to believe they had the warehouse server in their custody.  On at least three occasions,

when the Bank had concerns about the Defendants' control over their ESI, it brought those

concerns to the Defendants' litigation counsel's attention.[7]  The Bank's reliance on the repeated

assurances provided by Respondents was reasonable and does not preclude sanctions in this case.

---

[5] Likewise, "deception of a client becomes the liability of the client's attorney and not the client's opponent." *Bakery Mach. & Fabrication,* 570 F.3d at 848.  Therefore, it is no excuse that Defendants misled Respondents.

[6] Indeed, defendants were always in control of the data on the server.  A party is in control of documents if it has a "legal right to obtain the documents upon demand." *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984).  The data – KFI's business records – belonged to KFI and  KFI had a legal right to its own property on demand.

[7] The first time, the Bank inquired whether rumors of a repossession of the warehouse server were true. (SH81.)  It received an unqualified denial of these rumors. (SH81.)  A second time the Bank inquired whether the Defendants left a server at the warehouse after the voluntary eviction and was assured that the server would be obtained and moved to a secure location.  (SH 91).  On May 19, 2010, the Bank and the Court were told that the defendants had secure control over all their servers. (TR 1/28/11 P.M. p. 95:3-9.)  Finally, the Bank inquired whether the May 19, 2010 data map included the warehouse server, and was told it would be included in the forthcoming revised rendition (SH 111.)

VII.    Why the Server Is Relevant and its Loss is Prejudicial to the Bank.

Prejudice to the movant is not required in order to impose sanctions. *Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993) ("We continue to eschew grafting a requirement of prejudice onto a district court's ability to dismiss or enter judgment as a sanction under its inherent power"). But it is an indicator of the severity of the spoliating party's misconduct and may be considered by the court. *China Ocean Shipping (Group) Co. v. Simone Metals*, 1999 U.S. Dist. LEXIS 16264, at *13 (N.D. Ill. Oct. 1, 1999). The Bank was and continues to be prejudiced by Defendants' and Respondents' failure to preserve data on the warehouse server and its loss.

United Central Bank brought a straightforward complaint for breach of promissory notes and accompanying guarantees. Defendants complicated this case by claiming that the Bank breached its obligations to the defendants first. (See Affirmative Defenses 1 and 2 and Counterclaim, Doc. 28.) To defend against these claims, the Bank alleged that the Defendants defrauded the Bank by filing false borrowing base certificates which overstated Defendants' inventory and accounts receivable. (Doc. 61.) Although Defendants voluntarily dismissed their Counterclaim while this motion for sanctions was pending, the dismissal was without prejudice and the threat of re-filing the claims against the Bank still looms.

The Defendants admitted that the ESI on the warehouse server was relevant to this litigation. (TR 1/27/11 A.M. p. 8:6-14.) The warehouse server contained data relating to KFI's inventory, purchase orders, invoices to customers, EDI (electronic data interchange) data and information about shipping to customers. (*Id*. pp. 41:8-42:15.) Defendants knew that none of this data was backed up or printed out. (*Id*. pp. 42:16-21, 43:10-16.) The loss of the server makes this data virtually irretrievable.

The Defendants also admitted that there were discrepancies on the warehouse server data and that in the Fall of 2009, they were unable to account for several million dollars of inventory.

(*Id.* pp. 43:17-45:12.) The Bank introduced evidence of gross discrepancies between KFI's reports of client receivables and the amounts paid to KFI. The instances of invoice discrepancies (such as raising and sliding) appear to be the result of accounting fraud. (SH 236.) The Bank's inability to access the data on the warehouse server will severely prejudice the Bank in its ability to investigate and defend against the Defendants' affirmative defenses and potential counterclaim.

The evidence of inventory movement and accounts receivable will also be relevant to the Bank's collection efforts if it prevails on its claims. Finally, United Central Bank is impaired in its ability to investigate the Defendants' bank fraud and the involvement of other accomplices, which may be a source of recovery for its damages.

VII.    <u>What Sanctions Are Appropriate.</u>

The court has both statutory and inherent authority to impose sanctions upon parties and their counsel for failure to preserve or produce electronically stored information ("ESI"). *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50-51 (1991); *China Ocean Shipping Co*, 1999 U.S. Dist. LEXIS 16229, at *12. To impose Rule 37(b) sanctions, the Court must find willfulness, bad faith or fault. *Marrocco*, 966 F.2d at 224. "Bad faith" is conduct "which is either intentional or in reckless disregard of a party's obligations to comply with a court order" and "fault" is unconcerned with the non-complying party's subjective motivation, but rather describes the reasonableness of the conduct. *Langley v. Union Electric Co., 107 F.3d 510, 514 (7th Cir. 1997)*. Fault may include "gross negligence" or "a flagrant disregard" of the duty to "preserve and monitor the condition" of material evidence. *Marrocco, 966 F.2d at 224*.

Here, Defendants' and Respondents' failure to preserve the data on the warehouse server, and Defendants' scheme to have a foreign corporation purchase the server, was willful and in bad faith and resulted in significant prejudice to the Bank. Respondents' misrepresentations to

the Bank and to the Court and their failure to correct those misrepresentations violated their duty of candor to the Court. Honesty would have allowed the Bank and the Court to take steps to prevent the unfortunate situation that came to pass. Several significant sanctions are warranted.

A. *This Court Should Sanction the Kanan Defendants by Barring a Re-filing of Defendants' Counterclaim and Dismissing their Affirmative Defenses Nos. 1 and 2.*

At the time the spoliation occurred, Defendants counterclaim was pending, and the Bank was prejudiced by Defendants' and Respondents' misconduct. As already discussed, the data on the warehouse server was vital to defending against the Counterclaim and Defendants' Affirmative Defenses Nos. 1 and 2 to the Bank's claims. Evidence that KFI committed fraud by overstating its collateral or furnishing the Bank with materially false statements regarding the collateral when it sought renewal of the loan and/or extensions of credit would be a complete defense to the Defendants' Affirmative Defenses Nos. 1 and 2. Accordingly, the Court should bar the Defendants from re-filing their Counterclaim against the Bank and dismiss their Affirmative Defenses Nos. 1 and 2.

B. *Alternatively, The Court Should Sanction the Defendants by Ordering Adverse Inferences on Issues Relating to Kanan's and Raven's Inventory and Barring the Defendants from Introducing Evidence Regarding Their Inventory.*

Alternatively, the Court should order that adverse inferences be drawn at trial and bar the Defendants from introducing any evidence relating to the data on the warehouse server. Rule 37 specifically provides that "[i]f a party fails to provide information . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *See also Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001) ("bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction").

The jury should be further instructed that evidence regarding KFI's and Raven's inventory was requested, that the requested evidence was stored on the warehouse server, which was voluntarily abandoned by Defendants, that the warehouse server is now lost, and that Defendants' failure to produce the data on the warehouse server means the evidence contained on it was not favorable to Defendants' position. *See, Ty Inc. v. Suzhou Young Chang Plastic Products Co.*, 2010 U.S. Dist. LEXIS 15887 (N.D. Ill. Feb. 22, 2010); *Langley*, 107 F.3d at 515.

C. *This Court Should Award Plaintiff Bank Its Attorneys' Fees and Costs Incurred in Connection with This Motion.*

Third, Defendants and Respondents should be ordered to pay the Bank's attorneys' fees and costs incurred in connection with the motion for sanctions, the discovery and briefing undertaken in conjunction with the motion, and the evidentiary hearing. Fed. R. Civ. P. 37 (b)(2)(C) provides that "instead of or in addition to the orders above, the court <u>must order</u> the disobedient party, the attorney advising the party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." (emphasis added). It is also within the court's inherent authority to assess the Bank's attorneys' fees and other expenses against Defendants and Respondents. *Rosenthal Collins Group, LLC v. Trading Technologies Int'l. Inc.*, 2010 U.S. Dist. LEXIS 64767 (N.D. Ill. June 29, 2010) (sanction of $289,234 awarded for fees and costs); *Spartan Tool, LLC v. Edwards*, 2010 U.S. Dist. LEXIS 13497 (N.D. Ill. Feb. 17, 2010) (fees awarded); *Carr v. Tillery*, 2010 U.S. Dist. LEXIS 48387 (S.D. Ill. May 17, 2010) (sanction of $635,171 awarded for fees and costs).

If sanctions are awarded, the Bank requests time to submit its detailed fees and expenses for a prove-up of costs incurred in connection with this motion, for further approval by this Court.

D. *The Court Should Sanction Defendants and Respondents For The Court's Time In Connection with this Motion.*

Defendants and Respondents violated of this Court's Orders and significantly burdened the resources of this Court. Defendants and Respondents should be held in civil and/or criminal contempt of court and fined. *Roadway, Inc.*, 447 U.S. at 764 (contempt is the most prominent of the court's inherent powers); s*ee also*; *Maynard,* 332 F.2d 462 (sanction of $500 per hour for court's time imposed); *Kearns v. Ford Motor Co*., 114 F.R.D. 57, 66-67 (E.D. Mich. 1987) ($10,000 sanction for Court's time imposed); *Xanphes v. Merrill Lynch, Pierce Fenner & Smith, Inc*., 102 F.R.D. 545, 550-552 (D. Me. 1984) (defendant sanctioned $10,000 for the burden placed on the Court).

Here, both Respondents and Defendants are responsible for the loss/destruction of the data on the warehouse server and should be jointly liable for the Bank's and the Court's expenses and costs.

Respectfully submitted,

UNITED CENTRAL BANK

Date: February 10, 2011                     By: ___ s/ Vilia M. Dedinas_____
                                                                            One of its Attorneys

Alexander R. Domanskis
Vilia M. Dedinas
Nada Djordjevic
Boodell & Domanskis, LLC
205 North Michigan Avenue, Suite 4307
Chicago, IL 60601
Phone: (312) 540-1075
Fax:    (312) 540-1162
e-mail: domanskis@boodlaw.com
        vdedinas@boodlaw.com
        ndjordjevic@boodlaw.com