IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED CENTRAL BANK | ) | |
| | ) | |
| Plaintiff, | ) | No.  10 CV 331 |
| | ) | |
| v. | ) | District Judge Gary Feinerman |
| | ) | |
| KANAN FASHIONS, INC., et al. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

Michael T. Mason, United States Magistrate Judge.

Plaintiff, United Central Bank ("UCB"), filed this action against defendants Kanan Fashions, Inc., Creative Warehousing (Chicago) LLC, Kanan Cruises, Inc., Kanan Holdings, LLC, Varsha Shah, and Mehul Shah ("Defendants") on January 18, 2010. UCB alleges that Defendants breached four loan agreements and seeks damages in excess of $26 million.  Defendants have denied UCB's material allegations.

Currently pending before this Court is a Motion for Sanctions (the "Motion") filed by UCB against Defendants and their former counsel ("Respondents") for spoliation of evidence [206].  UCB claims that Defendants and Respondents failed to preserve relevant electronically stored information ("ESI") on a computer server kept at a warehouse in Aurora, Illinois (the "warehouse server").  Throughout the discovery process, Defendants (through their counsel, Respondents) represented to both UCB

1

and this Court that they had taken appropriate actions to preserve all ESI, and that all of Defendants' computer servers were within Defendants' control. Despite these representations, on August 20, 2010, UCB was notified that Defendants did not, in fact, have access to the warehouse server because the warehouse was in foreclosure and Defendants failed to remove the server prior to their eviction. Defendants attempted to negotiate for the server, but before they could reach an agreement, the server was sold to a foreign company. Attempts to locate the server or to contact the purchaser have been unsuccessful. Defendants' explanation for the abrupt sale of the server is questionable and there is evidence to suggest that Defendants actually orchestrated this sale.

In response to UCB's Motion for Sanctions, Respondents claim that their clients deceived them, while Defendants argue that Respondents and/or UCB did not take appropriate measures to avoid the spoliation. The parties submitted extensive briefs on the issues raised in UCB's Motion [207, 272, 309, 320, 355, 369]. In addition, the Court held a five-day evidentiary hearing on the Motion, which included testimony from ten witnesses and 240 exhibits, and the parties submitted post-hearing briefs [407, 410, 412]. For the reasons set forth below, we respectfully recommend that the District Court grant UCB's Motion for Sanctions in part and deny it in part.

## I.     FACTUAL BACKGROUND

### A.  <u>The Parties and the Complaint</u>

Defendants are Kanan Fashions, Inc., Creative Warehousing (Chicago) LLC, Kanan Cruises, Inc., Kanan Holdings, LLC, Mehul Shah ("Shah") and his wife, Varsha Shah. Shah owns and controls all four of the corporate Defendants. Kanan Fashions is a clothing importer and wholesaler. It purchases fabric in China and India and other countries, and ships the fabric to Sri Lanka and China where it is made into garments to be sold in the United States. The garments were stored in Aurora at a warehouse owned by Creative Warehousing, and then sold to clothing retailers. Paresh Joshi ("Joshi") is the CFO, Secretary and Treasurer of Kanan Fashions. He is also Shah's brother-in-law. Although he is not named as a defendant in this case, he has played a significant role in the parties' dispute over the missing warehouse server.

As alleged in the Complaint [4], UCB entered into a purchase agreement with the FDIC on or around July 31, 2009 by which it acquired certain assets of Mutual Bank. Those assets include four loan agreements (the "Loans") extending funds and/or letters of credit to Defendants. Shah and his wife personally guaranteed the Loans. UCB alleges that the Loans are in default, and seeks damages in excess of $26 million, plus interest, attorneys' fees and costs. In their answer [28], Defendants denied UCB's material allegations and asserted two affirmative defenses to UCB's claims. Defendants' answer also included a three-count counterclaim asserting that UCB's failure to open, process or honor any existing or new letters of credit in favor of the Kanan entities was a material breach of the Loans, which led to the "destruction and collapse" of Kanan Fashions' business. On November 12, 2010, Defendants moved to

3

voluntarily dismiss their counterclaim without prejudice [278]. The District Court granted

that motion on November 19, 2010 [297]. On February 21, 2011, Defendants filed a

motion for leave to file an additional counterclaim [416], which is currently pending

before the District Court. UCB has objected to Defendants' motion for leave to file a

counterclaim [422].

Respondents are Alan Borlack, Eric Grossman and David Muschler of the law

firm Bailey, Borlack & Nadelhoffer LLC. Respondents served as defense counsel in this

case from the time Defendants were served with the Complaint in January, 2010 until

October 7, 2010.[1] After UCB filed its Motion seeking discovery sanctions against

Defendants *and* Respondents, Respondents moved to withdraw from further

representation of Defendants [210] because there was now a conflict of interest

between Respondents and Defendants in responding to the Motion. On October 7,

2010, this Court entered and continued the Motion to Withdraw [244]. The Court stated

that because Respondents would be responding to UCB's Motion for Sanctions, the

Court would not grant the Motion to Withdraw until after the Motion for Sanctions is

---

[1] Defendants were also represented by Don Glickman and James Flesch of the law firm Glickman, Flesch and Rosenwein. Glickman and Flesch filed a response to the Motion for Sanctions [272], stating that they were asked to provide assistance on specific projects or assignments as directed by lead counsel, Bailey, Borlack & Nadelhoffer, but they had no involvement regarding the preservation or production of Defendants' ESI and/or the warehouse server. Neither was called as a witness at the evidentiary hearing and it appears from the breifing on the Motion that all parties agree that they had no involvement in the events resulting in the spoliation. As a result, we recommend that UCB's Motion be denied to the extent that UCB seeks sanctions against Glickman and Flesch.

resolved.  The Court also ordered, however, that "[d]ue to the potential conflict of interest, defendants' former counsel are no longer required to act on defendants' behalf."  *Id.*  Defendants retained new counsel to represent them in both the underlying litigation, as well as in responding to the Motion for Sanctions.  Respondents also retained counsel to represent them in responding to the Motion for Sanctions.

### B.  The Aurora Warehouse and the Warehouse Server

In 2003, Shah decided to build a warehouse in Aurora, Illinois in order to store Kanan Fashions' inventory.  Creative Warehousing was formed to take ownership of the warehouse after construction.  To finance this project, Creative Warehousing took out a loan from Mutual Bank on June 23, 2004.  Ultimately, First Midwest Bank ("FMB") acquired a 100% interest in Mutual Bank's loan to Creative Warehousing.  The loan was secured by the warehouse and personally guaranteed by Shah.  FMB held a senior mortgage on the warehouse, and UCB held a junior mortgage.

Defendants maintained ESI on a number of different servers, one of which was located at the Aurora warehouse.  (SH 30.)[2]  The warehouse server was specifically designed to track Defendants' inventory at the warehouse.  The server also operated a racking system at the warehouse and maintained data regarding inventory, purchase orders and invoices.  Defendants leased the server and the accompanying software

---

[2]  Prior to the evidentiary hearing, the parties submitted a joint exhibit binder. These exhibits are referenced herein as "SH__."

from Associated Bank ("Associated"), and Shah personally guaranteed this lease as well. (*Id.*)

### C. **Respondents Inform Defendants of Litigation Hold**

The Complaint in this case was filed on January 18, 2010, and Defendants retained Respondents shortly thereafter. On a number of occasions, Respondents informed Joshi and Shah about the necessity of preserving electronic data. On January 21, 2010, Borlack emailed Shah and Joshi explaining the litigation hold. (SH 6.) The email stated: "[I]t is important as a matter of litigation rules and procedure that no emails related to UCB, Mutual Bank or the controversy be deleted from any computers. This applies not only to emails in particular, but any kind of data in any format." (*Id.*) Shah emailed Borlack in response, stating: "Understood." (SH 7.)

Respondents reminded Defendants of their obligations in subsequent emails. On February 18 and 19, 2010, Respondents sent Shah and Joshi three separate emails attaching draft and final versions of the parties' ESI agreement. (SH 17, 19, 20.) Paragraph 3 of the agreement [23] provides that "only two individuals have current access to the computer servers and each has been instructed to preserve relevant and discoverable ESI within their possession, custody and control." Also, on March 3, 2010, Muschler emailed Shah and Joshi, stating: "Just a reminder that nothing should be done with or to any of the computers, servers or related equipment.... We have to advise plaintiff's counsel in the event any action is anticipated. You are not to take any action."

(SH 31.)  Shah's transactional attorney, Steven Blumenthal ("Blumenthal"), was copied on each of these emails as well.

### D.  Defendants' Financial Problems and the Friendly Foreclosure

The complicated series of events leading up to the sale of the warehouse server started at the end of 2009 when Defendants began to experience significant financial problems.  In December, 2009, Defendants defaulted on the lease with Associated for the warehouse server.  At this time, Shah still owed Associated approximately $350,000 on this lease.  Associated sent Shah a notice of default letter on February 9, 2010, stating that failure to pay past due funds "may result in...repossession of the [server] and any other legal action Lessor deems appropriate."  (SH 12.)  Shah attempted to settle this matter with Associated, but was unsuccessful.

During this time, Shah also defaulted on the loan from FMB for the construction of the Aurora Warehouse.  As a result, in early 2010, FMB filed a foreclosure action against Creative Warehousing.  Shah and Creative Warehousing were represented in the foreclosure negotiations and proceedings by Blumenthal, who had represented Shah and his business entities for fifteen years.  Dave Clark ("Clark"), vice-president at FMB, handled the negotiations for FMB, and FMB was represented by attorney William Serritella ("Serritella").[3]

---

[3]  On February 26, 2010, Blumenthal, an attorney with the law firm Much Shelist, sent a letter to Dave Clark at FMB, Creative Warehousing and Kanan Fashions regarding Blumenthal's representation of the Shah entities in connection with the foreclosure proceedings.  Blumenthal noted that his firm had previously represented

On March 15, 2010, Shah and FMB agreed to a deed-in-lieu of foreclosure (the "friendly foreclosure"), and an agreed order of eviction was entered on March 24, 2010. (SH 36, 57.) As part of the friendly foreclosure, Clark, on FMB's behalf, agreed to two unusual terms. First, Clark agreed to give Shah six months to find (or form) a new company to lease the warehouse. This provision was beneficial to Clark because FMB intended to sell the Aurora warehouse and Clark was likely to receive a much higher price if a tenant already occupied the warehouse. (SH 138, 149.) This arrangement was also beneficial to Shah, who was hoping to operate a new company out of the warehouse. This provision was included in the closing documents. (SH 35.)

The second term involved the warehouse server and was not included in the closing documents. At Shah's insistence, Clark agreed to undertake the unusual task of negotiating with Associated for the purchase of Shah's lease on the warehouse server, which was now in default. Shah and Clark agreed that FMB would purchase the lease (which would include both the warehouse server and Shah's personal guaranty) from Associated, and, in turn, FMB would sell the server back to Shah. Shah testified that he wanted FMB to obtain the lease from Associated for three reasons: the server would be beneficial if he operated a new business out of the warehouse, the server included information that was relevant to the UCB litigation, and Shah wanted to eliminate his exposure under the personal guaranty.

---

both FMB and the Shah entities in other unrelated matters. Pursuant to the Rules of Professional Conduct, Blumenthal obtained a waiver of this conflict from both parties. (SH 39.)

In February, 2010, Respondents were made aware of the foreclosure proceedings and the agreed eviction, but they were not made aware of Shah and Clark's agreement regarding the purchase of the server lease from Associated. Shah and Blumenthal discussed the friendly foreclosure with Respondent Borlack in two separate phone calls in late February, 2010. (SH 22, 28.) During these conversations, however, Shah and Blumenthal never raised the issue of the warehouse server or Defendants' ESI.

UCB was also made aware of the friendly foreclosure because it had a security interest in Defendants' inventory of clothing at the warehouse. On March 24, 2010, FMB sent UCB counsel a letter regarding the foreclosure and informed UCB that if it sought to take possession of the clothing, it would have to advise FMB in order to gain access to the warehouse. (SH 59.) The letter also noted that UCB must act quickly because FMB intended to use the warehouse for other purposes beginning on April 1, 2010. The letter to UCB did not refer to the computer server at the warehouse.

Prior to the March 24, 2010 eviction, Shah and Joshi removed personal items, personal computers, documents and other belongings from the warehouse. They did not, however, remove the warehouse server, nor did they seek any advice from Respondents regarding the warehouse server prior to the eviction. An email dated March 15, 2010 indicates that Defendants decided against making a forensic copy of the server due to cost concerns. (SH 45.) Although Respondents were aware of the warehouse server and the eviction date, they also took no action to secure the server

prior to Defendants' eviction.  Borlack testified he assumed that Defendants would remove all of their personal and business possessions from the warehouse prior to the eviction date and that it never occurred to Respondents that Defendants would leave the server behind.

As we noted above, Blumenthal did not include in the closing documents the agreement between Shah and FMB regarding the purchase of the warehouse server lease.  Blumenthal also failed to include any provision allowing Defendants to access the server for purposes of discovery in the UCB litigation.  Blumenthal's only documentation of his clients' agreement with FMB regarding the server is an email to Serritella, FMB's attorney, dated March 16, 2010.  (SH 46.)  In this email, Blumenthal referred to "a few housekeeping matters" and stated: "[A]s part of FMB purchasing the Associated Bank lease, you will take title to the leased items which includes the warehouse computer system and its hard drive.  As part of documenting our right to reacquire those items, I need to make sure that the hard drive and system are accessible before we reacquire since those items will be relevant to the UCB litigation and discovery.  Accordingly, until the outside date by which we must reacquire the items and repay [FMB], I need [FMB] to agree that they will preserve the items and allow access to UCB or us in connection with the litigation." (*Id.*)  Clark and Shah were copied on this email; notably, Blumenthal did not send a copy of this email to any of the Respondents, who were handling the UCB litigation.

Serritella never responded to this email, and his testimony is that FMB and Shah

never agreed to these "housekeeping items." Serritella testified that he expected to receive an actual agreement from Blumenthal documenting these items, but Blumenthal never drafted any agreement. Blumenthal's testimony is that Serritella called him after receiving the email and confirmed FMB's agreement to these "housekeeping items." Serritella denies that this conversation occurred. As explained in more detail below, Blumenthal's failure to document any agreement for access to the server eventually became a significant problem for Respondents and Defendants, and is a key issue in the parties' dispute surrounding the server.

### E.  **Respondents' Efforts to Preserve ESI**

Throughout their representation of Defendants, Respondents repeatedly advised Shah and Joshi about the need to preserve electronic evidence. As stated above, the first notification was on January 21, 2010, in an email from Borlack to Shah and Joshi informing them of the need to preserve any kind of electronic data. (SH 6.) Shah responded that they "Understood." (SH 7.) Shortly thereafter, Shah and Joshi both received the draft and final versions of the parties' ESI agreement (SH 17, 19, 20), and on March 3, 2010, Respondent Muschler emailed Shah and Joshi, reminding them of their obligations to preserve all ESI. (SH 31.)

Early in the litigation, Respondents represented to the Court a number of times that Defendants had control of all computer servers and that appropriate procedures had been put in place to avoid any spoliation issues. The first was the parties' ESI agreement dated February 19, 2010 [23]. Subsequently, at a status hearing on

11

February 25, 2010, Respondent Muschler stated that he had informed Defendants in an email and in person approximately a week prior to the hearing that they were to preserve all ESI.  At that hearing, this Court reiterated that it was very important that there should be no spoliation and that this was to be conveyed to anyone with access to the computers, to which Muschler responded "absolutely."   Following this hearing, and pursuant to this Court's February 26, 2010 order, Muschler sent a letter to the Court providing certain information about Defendants' computer systems.  (SH 30.)  Among other things, Muschler informed the Court that Defendants had six servers, one of which was located at the Aurora warehouse (the other five were located at Defendants' Oak Brook office).

On April 14, 2010, counsel for UCB sent Respondents an email stating: "[UCB] has heard that there are third-parties who claim to have a secured interest in Creative Warehousing/Kanan Fashions' computer system and intend to seek repossession of it. Please advise if this is the case and what steps Kanan Fashions intends to take to preserve the computer system and/or electronic data while this lawsuit is pending."  (SH 75.)  After receiving no response to this inquiry, UCB counsel sent another email on April 16, 2010, stating: "You have not addressed our concern that a creditor is attempting to repossess your client's computer system.  Please provide assurances regarding this issue."  (SH 77.)  On that same day, Grossman forwarded this email to Shah and Joshi, inquiring: "How should I respond...? Has any suit been filed seeking possession? If not, have any creditors issued a notice or other demand for possession?"

12

(*Id.*)  Joshi responded: "We are not aware of any suit or notice about possession."  (SH 78.)  Later that day, Grossman sent Shah and Joshi another email, confirming: "So there have been no communications at all concerning default in payments and/or threats to repossess?"  (SH 79.)  Joshi responded: "As far as I remember, the demand for payment is in the form of monthly statements but I am not aware of the threat to repossess."  (SH 80.)  This, of course, was not accurate because Shah, Joshi and Blumenthal were all aware that Defendants had defaulted on their lease payments for the server; indeed, Associated had served Defendants with a Notice of Default in February and was attempting to repossess the server.  Nevertheless, based on his client's assurances and unaware of the Notice of Default and ongoing negotiations with Associated, Grossman responded to UCB counsel that there was "currently no creditor repossession effort by lawsuit or other demand."  (SH 81.)   Notably, Shah and Blumenthal were copied on the email exchange between Grossman and Joshi, and neither corrected or clarified Joshi's misstatements.  Shah, Joshi and Blumenthal also received a copy of Grossman's response to UCB counsel (SH 82); again, no one informed Grossman that his reponse was inaccurate.

On April 23, 2010, the parties met at Defendants' Oak Brook office to address some ESI issues.  Grossman attended the meeting on behalf of Defendants, along with their ESI consultant Daniel Garrie ("Garrie").  Vilia Dedinas ("Dedinas"), counsel for UCB, was also in attendance, with UCB's ESI liaison David Aberman.  During the meeting, Dedinas informed Grossman that Defendants' server was allegedly still at the

Aurora warehouse, which FMB now owned.  According to Grossman, this was the first time he learned that Defendants left the server behind.  In light of this new information, Grossman and Garrie met privately with Shah and Joshi and told them that they absolutely must obtain custody of the warehouse server.  Shah and Joshi repeatedly assured them that they could get the server from the warehouse.  Shah stated that Clark was their "internal source," their "friend" and their "biggest advocate," so there would be no issues with FMB.  At one point, Shah telephoned Clark to demonstrate to Grossman and Garrie that Clark was on their side.  When Clark called them back, Clark was put on speaker phone and assured them that the server was available and Defendants could pick it up anytime.  During this meeting, Garrie offered to provide assistance to Shah and Joshi in transporting the server from the Aurora warehouse to the Oak Brook office.  He suggested that he and his colleague Matt Denecke, a computer technician, could transport the server from the Aurora warehouse, but Defendants declined this offer.  After these private discussions, Garrie and Grossman both assured Dedinas that the server would soon be moved out of the Aurora warehouse and into Defendants' Oak Brook office.

On April 26, 2010, Grossman telephoned Joshi to reiterate his instructions about moving the warehouse server to Oak Brook.  After this conversation, Grossman emailed Joshi and Shah to confirm their understanding.  Grossman stated: "As we just discussed... You are to transport from the warehouse, the server located there, as well as any other personal computers.  All are to be brought to the Oak Brook office and

14

placed in a secure room." (SH 85.) On April 28, 2010, Grossman sent a follow up email to Joshi and Shah stating: "Where do we stand on these items?" (SH 86.) Joshi responded: "I am working on these items." (SH 87.) Based on these communications with Shah and Joshi, on April 29, 2010, Grossman advised Dedinas in a letter that "[a]ll computers from the warehouse are being moved to Kanan's Oak Brook office." (SH 91.) Joshi approved this letter before Grossman sent it out. (SH 89, 90.)

Over the course of the next four months, Respondents sent Defendants nine additional emails (in addition to having a number of telephone conversations) instructing Defendants to get the warehouse server out of the Aurora warehouse. (SH 95, 101, 111, 122, 125, 127, 140, 153, 169, emails dated 05/11/10, 05/13/10, 05/25/10, 05/27/10, 06/02/10, 06/04/10, 07/07/10, 07/23/10, and 08/04/10.) Over time, the emails became more urgent. (*See* SH 111, "This must be accomplished"; SH 125, "This is an absolute priority"; SH 153, "We simply must have access immediately and cannot afford further delay.") Joshi repeatedly put Grossman off on the issue with responses such as "we are working on [it]" and "will keep you posted." (*See, e.g.*, SH 87, 154, emails dated 4/28/10, 07/23/10.) In an email dated May 13, 2010, Defendants did advise Respondents: "First Midwest is working with Associated Bank (from whom we have leased the computers residing at the warehouse) to resolve the matter between them. The computers are still at the warehouse. I will update you today or tomorrow after getting more details." (SH 101.) No update followed.

Shah and Joshi both testified that at some point at the end of April or in early

15

May, they participated in a conference call with Respondents and Clark, in which Clark

told them and Respondents that FMB would require a court order or subpoena before

granting them access to the server at the warehouse.  There is no contemporaneous

document that reflects this conversation and Respondents flatly deny that it ever

occurred.  Instead, Respondents testified that Defendants repeatedly advised them that

based on the friendly nature of their relationship with Clark, they were certain that Clark

would allow them access to the server at any time, without limitation.  Respondents

insist that they were never informed that FMB was requiring a subpoena or court order.

Clark does not recall whether he had this conversation with Respondents.  Clark

testified that he does recall having a conference call about the need for a subpoena with

Shah and one of Shah's attorneys, but Clark does not know whether this attorney was

Blumenthal or Borlack.

Clark does recall discussing the warehouse server with UCB.  On May 9, 2010,

Clark and FMB's attorney, Serritella, met with Robert Hoholik, a UCB officer, and Nat

Piggee, counsel for UCB, to discuss issues related to Defendants' inventory at the

warehouse.  Clark testified that the subject of the server came up at this meeting

because Piggee and Hoholik told Clark and Serritella that UCB believed that Shah had

inflated his inventory numbers and that this claim would be substantiated by information

on the server.  Piggee and Hoholik told Clark that UCB would likely want access to the

server.  In response, Clark told him to send him a subpoena and UCB could have

16

access.  Clark never told UCB during this meeting that FMB would not release the server to Defendants or Respondents without a subpoena or court order.

At a status hearing before this Court on May 19, 2010, Respondents again represented that there were no issues with ESI preservation.  Respondents Borlack and Grossman appeared at the hearing with Garrie, their ESI liaison.  During the hearing, Garrie stated: "With respect to the servers... we have them all under our custody and control."  Respondents were well aware at this time that Defendants had not yet removed the server from the Aurora warehouse.  Nevertheless, Respondents did not correct or qualify Garrie's statement in any way.  Garrie testified that he was referring only to the servers at the Oak Brook office when he made this statement at the status hearing.  However, he was aware of the issue with the warehouse server because he attended the April 23, 2010 ESI meeting at which time it was discussed that the server was still at the Aurora warehouse.  During this meeting, he and Grossman advised Defendants that they must transport the server to the Oak Brook office.  Garrie also testified that he had "repeated conversations" with Grossman that access to the server was "absolutely critical."

On May 21, 2010, Defendants produced to UCB the first iteration of their data map, which identified Defendants' servers, custodian accounts, installed software, and other relevant information.  (SH 110.)  The data map, however, did not include the warehouse server.  UCB was aware of this omission, which became a growing concern for both UCB counsel and Respondents.  (*See, e.g.,* SH 111, 152, 154, 169, 176.)

17

On August 4, 2010, Borlack sent Shah a letter, emphasizing the importance of allowing access to the server so that they could produce a complete data map of Defendants' ESI systems. (SH 169.) In this letter, Borlack noted there was a status hearing before this Court on August 26, 2010, and the parties were expected to file a joint status report prior to the hearing. Borlack warned Shah and Joshi that if they did not provide this information before the hearing, "then opposing counsel will be sure to leverage this issue against us" and "it is likely that opposing counsel will use this to support its fraud claim and may raise an evidence spoliation claim." (*Id.*) Borlack stated: "I cannot stress enough that we must, absolutely must, be provided with access to the warehouse server as soon as possible." (*Id.*) On August 5, 2010, Shah telephoned Borlack in response to this email. For the first time, Shah informed Borlack of his plan with FMB to purchase the server from Associated, and explained that he needed to obtain the necessary funds before he would be able to access the server. Borlack memorialized this phone call in an email to Grossman, which stated: "This is how I understand today's conversation with Mehul. First Midwest will not give him access to the servers at the warehouse because Associated has a lien on them. Associated originally would not allow Mehul access except if he paid $300K+ but now have said ok if he pays $60K. (I presume this is for the sale of the servers back to Mehul). Mehul has said fine, but he needs time to get the money. He has a call into Dave Clark today." (SH 171.)

On August 13, 2010, Grossman emailed Shah and Joshi asking for an update on

the status of the warehouse server. (SH 175.) Grossman stated: "The bottom line here is that if we haven't obtained access in advance of the August 24 JSR [joint status report] due date, we will have to report this issue as part of the JSR. Indeed, we already owe UCB information about the Warehouse servers, and have delayed response to UCB while we await resolution of this issue. Please advise as to status." (*Id.*) Defendants never responded to this email.

On August 20, 2010, Respondents finally notified counsel for UCB that despite their previous assurances regarding the warehouse server, Defendants did not, in fact, have custody or control of the server because FMB would not allow them access. (SH 182.) Respondents explained to UCB that they were hopeful that FMB would permit Defendants access in the near future.

On August 24, 2010, the parties submitted their Joint Status Report to this Court [170], which stated: "Defendants are attempting to gain access to its server located at [the Aurora warehouse], which was foreclosed upon and is now owned by First Midwest Bank. The Kanan Defendants are negotiating with the third party lender, Associated Bank, which has asserted a lien on the server, to gain access."

On August 25, 2010, Borlack, Garrie, and Grossman had a conference call with Shah and Joshi in advance of the August 26, 2010 status hearing. Shah informed Respondents that on August 9, 2010, he emailed Clark to close the deal on the purchase of the server, but Clark had not yet responded. Shah's email to Clark stated: "Dave, I will be in a position to raise the funds necessary to buy back the lease & the

19

guarantee from FMB by early part of August 16 week.  I am sorry it took me longer than I anticipated to raise these funds contrary to the end of July as I mentioned on my last email dated June 28, 10.  Thank you."  (SH 187.)  There was no explanation for why Shah waited sixteen days to tell his attorneys about this email to Clark.  Shah did not inform Respondents that he, in fact, still had not come up with the necessary funds to purchase the server so he did not actually have a "deal" for the server.

At the status hearing on August 26, 2010, Respondents informed this Court that, despite previous representations to the contrary, Defendants did not have access to the warehouse server.  (SH 188.)  Respondents also informed the Court that Shah was very close to reaching a deal with FMB for the purchase of the server, and was awaiting a response to his August 9, 2010 email to Clark.  Shah and Joshi were present in Court and did not clarify Respondents' statements to add that they had not yet come up with the necessary funds.  After the status hearing, this Court entered an order directing, among other things, that Defendants obtain the warehouse server or a forensic copy of the server by September 15, 2010 [175].

On August 30, 2010, Shah called Borlack and told him that he had just received an email from Clark, in which Clark stated that FMB sold the warehouse server to a buyer located in Dubai.  Clark's email stated: "I am very sorry, but as I told you back in July, I was very anxious to sell the computer.  As I was entering into a contract to sell the warehouse, I had to find someone to take the computer.  I finalized the transaction with Associated for a buyer in Dubai.  The money was wired and they picked up the

20

computer the following day.  Again, I am sorry, but I waited through the end of July and could not wait any longer."  (SH 191.)[4]

Respondents attempted to gain additional information from Clark and Serritella about the purchaser of the server or the server's whereabouts, but were informed only that the server was sold to a company called "Bi Agems" located in Dubai.  Serritella also informed Borlack that an individual named "Jim" picked up the server from the warehouse and that the wire transfer came from Standard Charter Bank in Dubai.  UCB conducted its own discovery into the whereabouts of the server and learned that the name of the purchaser was actually "Diagems."  Attempts to locate the server have been unsuccessful.

In light of this development, a flurry of motions ensued.  Defendants filed a motion to vacate the portion of the Court's August 27, 2010 order requiring that they obtain the server (which this Court denied) [189, 247]; UCB filed its Motion for Sanctions [206]; and Respondents filed their Motion to Withdraw [210].  As set forth in more detail below, additional facts came to light about the arrangements between Shah and Clark, and the events leading up to the abrupt sale of the server.

## F.  FMB's Negotiations with Associated and the Abrupt Sale of the Server

---

[4]  Thirty minutes after sending this email, Clark sent Shah a second email worded exactly the same except that he stated "I was very anxious to sell the building," rather than "I was very anxious to sell the computer."  (SH 192.)

During the period from April to July, while Respondents were anxiously trying to get Defendants to move the server from the warehouse, Shah and Clark were working on FMB's purchase of the lease on the server from Associated and then Shah's purchase of the server from FMB. The understanding between Shah and FMB regarding Shah's payment to FMB for the server had changed over time due to Shah's financial difficulties. Initially, their agreement was that after FMB purchased the server from Associated, Shah would purchase the server from FMB within twenty-four hours. Subsequently, the time frame was extended to 30 days, and Clark drafted a 30-day promissory note for Shah's signature.

For months, FMB and Associated engaged in negotiations before reaching a deal for the purchase of the lease. None of the Respondents were made aware of these negotiations at the time. Initially, Associated offered to sell Clark the server alone for $38,000. (SH 49.) Clark would not agree to this offer because he knew Shah wanted the guaranty. (Shah testified that Blumenthal, his attorney, had advised him that they should not accept a deal from Associated that did not include the guaranty.) Clark then offered Associated just the hard drives in exchange for the release of the guaranty. (SH 83.) According to Clark, Shah did not care about reacquiring the server and his instructions from Shah and Blumenthal were to negotiate primarily for the guaranty. This contradicts Clark's prior testimony that Shah asked him to negotiate for the guaranty *and* the server.

On June 4, 2010, Associated demanded $370,000 for the assignment of the

22

entire lease, which would include both the server and the guaranty. (SH 126.) FMB counter-offered with $50,000. (SH 130.) On June 25, 2010, Associated dramatically lowered its demand to just $65,000. (SH 132.) Clark informed Shah of Associated's latest demand and recommended that they accept the deal. (SH 134.) In an email dated June 28, 2010, Shah stated that he would prefer to pay just $60,000 if it was possible to get Associated to come down any more. Shah also stated that he would be traveling overseas until mid-July and, he continued, "I would like to have FMB buy the lease and guaranty from Associated as quickly as Bill [Serritella] can arrange it and once I return to Chicago, I will arrange to repay FMB the $65,000 and repurchase the lease and guaranty from you at that time. You can assume I will be in a position to close on this aspect with you no later than July end, 2010." (*Id.*)

On July 15, 2010, Clark emailed Shah to inform him that the terms of the assignment had been worked out with Associated but that Clark will need a note from Shah before he can disburse the funds. (SH 143.) In a separate email on the same day, Clark sent Shah a copy of the assignment and stated that it had been sent to Associated for final approval and "[w]hen the lease is assigned, the guarantees come with." (SH 144.)

An FMB interoffice memorandum dated July 20, 2010 states that Associated agreed to sell the lease to FMB for $57,500 and reflects the structure of the financing of this purchase to be a single payment 30-day note. (SH 148.) FMB would charge Shah an additional $2,500 handling fee, bringing the total amount to be paid FMB to $60,000.

23

The memo states: "Repayment will come from a foreign corporation not controlled by the Shah's. The said payoff will transfer the ownership of the lease to the foreign corporation." (*Id.*) Clark testified that it was his understanding that Shah was traveling to Hong Kong to find a new tenant, who would lease the warehouse and finance the purchase of the lease for the server. It was also Clark's understanding that this foreign entity would be making the payment for the lease to FMB on Shah's behalf.

On July 22, 2010, Clark emailed Shah the 30-day note for his signature, but the note was never executed. (SH 150.) Clark testified that Shah told him sometime after July 22, 2010 that he would not be able to come up with the money within thirty days. There is nothing in writing to reflect this communication. Despite the fact that Shah would not have the funds, Clark went forward with the deal with Associated for the server. Clark had no explanation for why he opted to continue with the deal for the server, knowing that Shah would not have the money to repay him. The assignment was finalized on July 28, 2010 when FMB wired $57,500 to Associated. (SH 161, 163.)

On July 26, 2010, even before the assignment from Associated, Clark received a call on his business phone from an unidentified individual who inquired about purchasing the warehouse server. Clark is the only witness who claims to have knowledge about the unusual circumstances surrounding this call and the eventual sale of the server. According to Clark, the caller did not ask any questions about the server, did not ask to inspect the server, and did not indicate how he even came to know about the server at the warehouse. Similarly, Clark did not ask any questions of the caller.

Clark told the caller that he wanted $60,000 for the server via wire transfer, and the caller agreed. Although he does not recall specifically looking for the wire transfer instructions during the call, Clark testified that he must have done so and given them to the caller. Clark was told that the wire transfer would happen that day, and that upon receipt of the money, someone would come to pick up the server. Clark never got the name of the caller, although the caller did state that he represented a company called Bi Agems (as Clark heard it) and that it was located in Dubai. Clark also testified that the caller may have had a middle-eastern accent. FMB received the wire transfer two days later on July 28, 2010 (just *minutes* after Clark wired the money to Associated). (SH 164.) Clark testified that after he received the payment, an individual named "Jim" (who was accompanied by an unidentified man) met him at the warehouse and picked up the server. Prior to handing over the server to "Jim," Clark did not ask to see any identification, nor did he ask "Jim" any questions.

Although Clark had been negotiating with Associated on Shah's behalf for almost six months, his testimony (as well as Shah's) is that he did not tell Shah that he sold the server until August 30, 2010. (SH 191.) At one point in his testimony, Clark stated that he waited this long because "Mr. Shah didn't ask" - a fact that is contradicted by Shah's August 9, 2010 email to Clark about their deal for the server. (SH 187.) Later in his testimony, Clark stated that he delayed in telling Shah about the server because he needed Shah's cooperation with obtaining certain information about the warehouse for potential buyers, information Clark ultimately received from the city of Aurora.

25

Upon receiving the news from Clark on August 30, 2010 that the server was gone, Shah's first response was to inquire about who had the guaranty. (SH 196.) Shah testified that he was upset with Clark for breaking their deal but he never conveyed this to Clark. He never asked Clark for any information about the buyer or confronted Clark about the fact that the server contained important and confidential business information and evidence relevant to his lawsuit. Shah and Clark had numerous subsequent conversations about the sale of the warehouse, but according to Shah, the issue of the server never came up.

### G.  Evidence of Defendants' Participation in the Sale of the Server

Although Shah and Joshi testified that they had no involvement in the sale of the warehouse server, circumstantial evidence suggests otherwise. First, the company who purchased the server, Diagems (not Bi Agems, as Clark testified) is located in Dubai and the wire transfer came from Standard Charter Bank in Dubai. Shah testified that he has business connections in Dubai and, in the past, he or his business entities have had accounts with Standard Charter Bank. In addition, there is an Illinois company called Diagems, and the principals of this company are Parag Bhansali and Snehal Bhansali. Parag Bhansali, Snehal Bhansali and Shah and Joshi all reside in Oak Brook, Illinois. Parag Bhansali lives immediately next door to Joshi's residence and Snehal Bhansali lives immediately next door to Shah's residence. Shah testified that he and Joshi know the Bhansalis fairly well and that they all attend the same temple. (SH 40.)

26

In addition, between July 26, 2010 and July 28, 2010, the time period during which Clark orchestrated the sale of the server, there were 21 calls from Shah (from his home phone, office phone or cell phone) to Clark.[5] (SH 240.) Six of these calls occurred on July 26, 2010, the day on which Clark claims he received the phone call from the purchaser of the server. There were five calls from Shah to Clark on July 27, 2010, and another ten calls on July 28, 2010, the day the wire transfer took place. One call took place just thirty minutes after FMB received the wire transfer for the server and lasted twenty-one seconds. Clark and Shah testified that they only discussed other details about the warehouse during these calls, and that they never discussed the sale of the server. In other words, although they had worked together for months towards Shah's purchase of the server from FMB, Clark never informed Shah that he had another buyer and he never gave Shah the opportunity to match the buyer's price.

### H.  UCB's Motion for Sanctions

After UCB learned that the server was gone, it promptly filed this Motion for Sanctions against both Defendants and Respondents. In the Motion and subsequent briefing, UCB argues that Defendants' failure to preserve the server was wilful and intentional. They point to Defendants' failure to remove the server from the warehouse prior to the eviction or thereafter, Defendants' deceptive and evasive communications

---

[5]  On July 28, 2010, in two instances, three calls from Shah to Clark occurred at exactly the same time. There was no explanation for why these calls would appear this way on the phone records. Even ignoring these six calls, there were still fifteen calls from Shah to Clark in this three day time period.

with Respondents and UCB, and the evidence suggesting their involvement in the ultimate sale of the server.  UCB also argues that Respondents' conduct is sanctionable because they failed to take an adequately active role in supervising their clients' discovery obligations.  As a result, UCB requests the following sanctions: 1) awarding UCB all fees and expenses incurred in connection with the Motion; 2) holding Defendants and Respondents in civil and/or criminal contempt of court and imposing fines; 3) ordering adverse inferences on issues relating to Defendants' inventory and barring Defendants from introducing evidence regarding their inventory; and 4) barring Defendants from re-filing their counterclaim and dismissing their two affirmative defenses.

In response to UCB's motion, Defendants and Respondents essentially point the finger at each other.  Defendants argue that it was Respondents' responsibility to obtain the server through a subpoena or court order, and their failure to do so resulted in the spoliation.  Defendants also argue that UCB's attorneys are in part responsible for the spoliation because they too should have obtained a court order or subpoena for the server.  Respondents, for their part, argue that they acted in good faith at all times and that Defendants repeatedly and wilfully ignored their instructions to preserve and protect ESI.  Respondents also argue that, without their knowledge, Defendants engaged in a criminal spoliation scheme designed to obstruct justice, and therefore, they cannot be held accountable for their clients' acts.  The Court will address each of these arguments below.

28

II.     **LEGAL STANDARD**

A.     <u>**Duty to Preserve Evidence**</u>

Federal Rule of Civil Procedure 26 provides that "[p]arties may obtain discovery

regarding any nonprivileged matter that is relevant to any party's claim or defense," and

that "[r]elevant information need not be admissible at the trial if the discovery appears

reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P.

26(b)(1). "This broad duty of disclosure extends to all documents that fit the definition of

relevance for the purposes of discovery – whether the documents are good, bad, or

indifferent." *Danis v. USN Communications, Inc.*, No. 98 C 7482, 2000 WL 1694325, at

*1 (N.D. Ill. Oct. 20, 2000). This disclosure duty would be a "dead letter" if parties could

avoid it by simply failing to preserve documents they do not wish to produce. *Id.*

"Therefore, fundamental to the duty of production of information is the threshold duty to

preserve documents and other information that may be relevant in a case." *Id.* This

includes the duty to preserve electronic data. *Byers v. Illinois State Police*, No. 99 C

8105, 2002 WL 1264004, at *10 (N.D. Ill. June 3, 2002). "The duty to preserve

documents in the face of pending litigation is not a passive obligation. Rather, it must

be discharged actively." *Danis*, 2000 WL 1694325, at *32.

B.     <u>**Sanctions for Spoliation**</u>

Courts have the inherent power to impose sanctions against a party or counsel

for the failure to preserve or produce documents. *Chambers v. NASCO, Inc.*, 501 U.S.

32, 49 (1991); *Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993). Courts also have

29

the statutory authority, under Rule 37, to sanction a party for the failure to preserve

and/or produce documents where a court order or discovery ruling has been violated.

*China Ocean Shipping (Group) Co. v. Simone Metals Inc.,* No 97 C 2694, 1999 WL

966443, at *2 (N.D. Ill. Sept. 30, 1999). The analysis for imposing sanctions under Rule

37 or our inherent power is "essentially the same." *Danis*, 2000 WL 1694325, at *30

(*quoting Cobell v. Babbit*, 37 F. Supp. 2d 6, 18 (D.D.C. 1999).

Sanctions may be appropriate "where the noncomplying party acted *either* with

wilfulness, bad faith *or* fault." *Marrocco*, 966 F.2d 220, 224 (7th Cir. 1992); *Jones v.*

*Bremen High Sch. Dist.*, No. 09 C 3548, 2010 WL 2106640, at *5 (N.D. Ill. May 25,

2010). "Wilfulness" and "bad faith" are characterized by conduct done either

intentionally, for the purpose of hiding adverse or unfavorable information, or in reckless

disregard of a party's obligations to comply with a court order. *Marrocco,* 966 F.2d at

224. "Fault" describes "the reasonableness of the conduct – or lack thereof – which

eventually culminated in the violation." *Marrocco,* 966 F.2d at 224; *Langley v. Union*

*Elec. Co.*, 107 F.3d 510, 514 (7th Cir. 1997). "Fault may be evidenced by negligent

actions or a flagrant disregard of the duty to preserve potentially relevant evidence."

*Wiginton v. Ellis*, No. 02 C 6832, 2003 WL 22439865, at *6 (N.D. Ill. Oct. 27, 2003);

*Marrocco*, 966 F.2d at 224. A court can sanction legal counsel only based on a finding

of wilful disobedience or bad faith; mere negligence is not enough. *Maynard v. Nygren*,

332 F.3d 462, 470-71 (7th Cir. 2003).

Courts have broad discretion to choose an appropriate sanction for discovery misconduct based on the unique facts of every case. *Danis*, 2000 WL 1694325, at *31 (*citing National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642 (1976)). Any award of sanctions must be proportionate to the offending conduct. *Ty Inc. v. Suzhou Young Chang Plastic Prods.,* No. 08C 4217, 2010 WL 680932, at *2 (N.D. Ill. Feb. 22, 2010) (*citing Langley*, 107 F.3d at 515). We consider three factors in deciding on an appropriate sanction: (1) a breach of the duty to preserve or produce documents; (2) the level of culpability for the breach; and (3) the prejudice that results from the breach. *Danis*, 2000 WL 1694325, at *31.

Finally, although prejudice is not required to impose sanctions, the prejudice to the non-offending party should be considered by the court when determining the appropriate penalty for discovery misconduct. *Larson v. Bank One Corp.*, No. 00 C 2100, 2005 WL 4652509, at *13 (N.D. Ill. Aug. 18, 2005). In cases where spoliation is the result of "fault," as opposed to wilfulness or bad faith, courts often use prejudice as a "'balancing tool' to tip the scales in favor of or away from severe sanctions." *Id.* (*quoting Danis*, 2000 WL 1694325, at *34).

## III. ANALYSIS

### A. Defendants

There is no question that Defendants had a duty to preserve the server and that they breached this duty when they left it at the warehouse. In addition, Defendants have admitted that the server contained relevant evidence regarding their inventory and

accounting, thereby establishing that UCB suffered harm when the server was lost. The only remaining issue, then, is whether Defendants' breach was caused by Defendants' wilfulness, bad faith or fault.

### 1. Defendants' Conduct was Unreasonable and in Disregard of Their Duty to Preserve

As set forth above, "fault" describes the reasonableness of the conduct – or lack thereof – that led to the spoliation, and this may include "negligent actions or a flagrant disregard of the duty to preserve potentially relevant evidence." *Wiginton*, 2003 WL 22439865, at *6; *Marrocco*, 966 F.2d at 224. For the reasons outlined below, we find that Defendants acted with flagrant disregard of their obligation to preserve the server and therefore, at the very least, Defendants' conduct meets this "fault" standard.

First, there is no question that Defendants knowingly abandoned the server at the warehouse on March 24, 2010, the date of the eviction. Defendants argue that they should not be sanctioned because the server was not in their control when the spoliation occurred. This argument fails because Defendants did have control of the server when their discovery obligation arose. Long before the eviction, Defendants were advised of their duty to preserve all evidence related to ESI. Respondents sent them emails dated January 21, 2010, February 18, 2010, February 19, 2010, and March 3, 2010 advising them of their discovery obligations with respect to the server. Prior to the eviction, they removed other personal and business items, including several computers. Without consulting Respondents, Defendants made a conscious decision

not to make a copy of the server and to leave it behind when they vacated the warehouse. They cannot now argue that they are not responsible because they did not have control. *See China Ocean Shipping*, 1999 WL 966443, at *2 (sanctioning plaintiff for acting with poor judgment when it allowed its evidence to remain on another party's property after plaintiff's duty to preserve arose).

After the eviction, Defendants repeatedly ignored Respondents' instructions to regain custody and control of the warehouse server. Between April and August, Respondents sent Defendants eleven emails insisting that Defendants get the warehouse server out of the warehouse. Defendants either ignored Respondents' emails or put Respondents off with the vague response that they were "working on it." Defendants' delay in obtaining the server from the warehouse reflects their flagrant disregard for their discovery obligations. *Marrocco*, 966 F.2d at 224-25 (classifying defendants' conduct as "fault" when defendants stood idly for months before taking appropriate steps to preserve evidence).

Defendants have offered a number of excuses for their failure to remove the server from the warehouse, none of which we find credible. Shah and Joshi both testified that they did not promptly remove the server in April because they "weren't qualified" to move it or because it was "too heavy" for them to handle. But Grossman and Garrie testified that at the meeting on April 23, 2010 at Defendants' Oak Brook office, Garrie volunteered that his colleague, a computer consultant, could assist Defendants in transporting the server from the warehouse, and Defendants declined. In

33

addition, Joshi testified that he was able to move other personal computers out of the warehouse without a problem. Defendants never asked Respondents for any advice or assistance with transporting the server from the warehouse and, despite the many emails exchanged about the server, Defendants never explained to Respondents that this was the reason for their delay.

Defendants also claim that at the end of April or in early May, Clark, Joshi, Shah and Respondents participated in a conference call in which Respondents were notified that FMB would not allow Defendants access to the server without a subpoena or court order. Based on this conversation, Defendants claim that they were relying on Respondents to take care of regaining custody and control of the server. Respondents deny that this conversation ever occurred, and insist that they were never advised by Clark or Defendants that a subpeona or court order was necessary. Instead, Respondents assert that Defendants repeatedly advised them that there was no issue with accessing the warehouse for the server because of their friendly relationship with Clark.

For a number of reasons, we are inclined to believe Respondents' testimony on the issue of whether this conference call occurred. First, Defendants cannot point to a specific date for the call and it is not reflected in Respondents' billing records. The conversation is also never referred to in any of the email correspondence between Defendants and Respondents regarding the server. Respondents repeatedly emailed Defendants with instructions to remove the server from the warehouse, yet Defendants

34

never responded that it was up to Respondents to obtain a subpeona or court order.  If Respondents were on notice that FMB was requiring a subpeona, it is hard to believe that Defendants would not have replied to at least one of Respondents' emails with a reference to this conversation.  Defendants' story about this conference call simply does not add up.

For the reasons stated above, we find that Defendants were at "fault" for the spoliation of the server, such that sanctions are warranted.  Because the appropriate sanction depends, in part, on the level of culpability, our analysis does not end here and we next examine whether Defendants' conduct was wilful or in bad faith.

### 2.  Defendants' Conduct Was Wilful and in Bad Faith

Beyond Defendants' mere disregard for their obligations to preserve evidence, there is strong circumstantial evidence to suggest that Defendants actually orchestrated the disappearance of the warehouse server and then went to great efforts to cover their tracks.  Defendants also repeatedly withheld information from Respondents and allowed Respondents to misrepresent key facts to UCB regarding discovery.  As a result, we find that the evidence amply demonstrates Defendants acted wilfully and in bad faith.

### a)  Defendants Were Involved in the Sale of the Server

First, although Defendants have testified that they had no involvement in the sale of the server, the circumstances surrounding this sale suggest otherwise.  Most compelling is the fact that the wire transfer came from a Dubai company called Diagems, and Shah and Joshi live right next door to the principals of a U.S. company

with the same name.  We find it very difficult to believe Defendants' testimony that this is purely a coincidence.  Shah's prior business dealings with companies in Dubai, including Standard Charter Bank, from which the wire transfer came, only add to the suspicion surrounding this alleged "coincidence."

Clark's testimony about the actual sale of the server also gives the Court reason to question Defendants' version of events.  Clark is an experienced vice-president at FMB, a well-established bank.  According to Clark, he received an unsolicited offer from an unidentified caller for the sale of the server.  Clark did not question how the caller learned of the server's existence, or where the server was going.  The caller never asked a single question about the server (such as whether it even worked properly), and Clark never asked the caller for any additional information.  Clark never asked "Jim" for any identification when he came to pick up the server, and although the buyer had only asked to purchase the server alone, Clark gave "Jim" the original assignment of the lease and guaranty - documents that Shah wanted to have.  (SH 196.)

Finally, we find it inconceivable that Clark had been negotiating on Shah's behalf for the server for six months, and yet he never bothered to inform Shah that he had another buyer lined up to purchase the server.  This is particularly difficult to accept as true in light of the phone records and the number of times Shah and Clark spoke during the week that Clark sold the server.  There were ten calls from Shah to Clark on the day of the wire transfer, including one call just after the wire transfer was made.  We also find it curious that even after Shah told Clark he would not have the funds for the server,

Clark still proceeded with the deal with Associated, and Clark wired Associated the money for the server just mintues before he received the wire transfer from the Dubai purchaser.  Although Clark's motivation for assisting in Shah's scheme remains to be seen, it is simply impossible for this Court to believe that he was not involved in Defendants' efforts to get rid of the server.[6]  Putting all of these unusual facts together, we are led to believe that Shah and Clark either orchestrated or fabricated this "sale."

### b) Defendants Deliberately Withheld Relevant Information from Respondents and Allowed Respondents to Misrepresent Key Facts to UCB

The evidence also suggests that Defendants were intentionally concealing facts from Respondents throughout the course of Respondents' representation, adding to our suspicion that Defendants had an active role in the disappearance of the server.  It appears that Defendants' scheme dates back to the friendly foreclosure, when Shah asked Clark to agree to negotiate for the server lease from Associated.  Blumenthal kept this term out of the closing documents and, according to Respondents, Blumenthal and Shah never informed Respondents that Shah and FMB were engaged in negotiations to purchase the server from Associated.  Over the course of their dealings,

---

[6]  We find it worth noting that Clark was employed by UCB as recently as August of 2009.  He had been employed by Mutual Bank when, on August 1, 2009, the FDIC transferred Mutual Bank to UCB.  He was terminated by UCB on August 31, 2009 [416]. According to Respondents, Clark was involved in the events that were the subject of Defendants' defenses and counterclaims and he repeatedly volunteered information concerning the lawsuit.  These facts lead the Court to wonder whether Clark's termination was his motivation for assisting Shah in defending their suit (and destroying potentially adverse evidence) against UCB.

Borlack testified that he received 169 emails from Blumenthal, 670 emails from Joshi, and 248 emails from Shah, and not a single one of those emails referred to Shah's attempts to purchase the warehouse server. Borlack also testified that in the course of discovery related to UCB's Motion for Sanctions, he reviewed 65-70 emails between Shah, Clark, Blumenthal and others regarding their agreement for the server and the status of these negotiations. None of the Respondents were included on any of these emails. Despite their numerous inquiries to Defendants regarding the server, it wasn't until August 9, 2010 that Respondents came to know of these negotiations. Based on these facts, we find that Defendants were intentionally keeping this deal from Respondents.

Much like Clark's unusual sale of the server, Blumenthal's actions here lead this Court to question whether he was also involved in Defendants' scheme to get rid of the server and to keep Respondents in the dark. In a letter dated February 23, 2010, Blumenthal told Associated's attorney to direct any furture correspondence regarding the equipment to him. (SH 21.) Borlack was not copied on this letter. In addition, Shah and Blumenthal had no explanation for why Respondents were not included on the emails regarding the deal with FMB for the server, and we find it hard to believe this was due to mere inadvertence. Borlack routinely copied Blumenthal on emails regarding the litigation, and Borlack and Blumenthal had periodic conversations on ESI issues such as computer experts and the preservation of data. Blumenthal had been copied on some of the initial emails regarding Defendants' preservation obligations (SH

38

17, 19, 20), and his March 16, 2010 email to Serritella is evidence that he knew that preservation of the server was an issue relevant to the litigation.  (SH 46.)  Blumenthal testified that he believes he had two conversations with Borlack about Shah's plans to purchase the server, but these conversations are not documented anywhere, and Borlack insists that Blumenthal never told him anything about the deal.

Moreover, despite his 30 years of experience as a transactional attorney, Blumenthal failed to put anything in the closing documents about his clients' deal with FMB to purchase the server for Shah, or about the need for FMB to preserve the data on the server for Defendants.  According to Shah, the server included important and confidential business information and Blumenthal was aware that the data on the server was relevant to this lawsuit.  Yet when Clark informed Defendants that FMB would not allow them to remove the server from the warehouse without a subpoena, Blumenthal never contacted Serritella to insist that this was not their agreement.  He also did not contact Borlack to ask him to obtain a subpoena or court order so that Defendants could regain custody of the server.  It is hard to imagine that an experienced transactional attorney would take such a passive approach to protecting his clients' business interests.

Aside from keeping Respondents in the dark, Defendants also misrepresented key facts to Respondents.  For example, on September 2, 2010, Shah told Borlack that the first time he became aware of the assignment from Associated to FMB was in the email from Clark on August 30, 2010.  (SH 200.)  This is not true.  Clark sent Shah two

39

emails on July 15, 2010 regarding the assignment from Associated to FMB. (SH 143, 144.)

In addition, on a number of occasions, Defendants allowed Respondents to misrepresent certain key facts regarding the warehouse server to UCB. Defendants either approved or were copied on many emails from Respondents to Dedinas, UCB's counsel, assuring her that the warehouse server would be transported to the Oak Brook office and that there would be no issues with production. (SH 81, 89-91.) The most troubling example of this is the fact that the Defendants had been on notice of Associated's attempts to repossess the server since February; yet, when Dedinas sent an email to Respondents on April 14, 2010 inquiring as to whether there had been any attempts by third parties to repossess the server, Joshi unequivocally told Grossman that the response was "no." (SH 78-80.) Shah and Blumenthal were copied on this exchange between Grossman and Joshi. When Grossman then relayed this inaccurate information to Dedinas in an email, Shah, Joshi and Blumenthal also received a copy of this response. (SH 82.) Shah and Joshi had no explantion for misrepresenting the facts to Grossman, aside from stating that it was simply an inadvertant error on Joshi's part. In light of the February 9, 2010 notice of default letter from Associated and the ongoing negotiations between Shah, FMB and Associated, we do not find Defendants' testimony on this issue to be credible.

After reviewing the extensive evidence submitted on UCB's motion, it appears that Defendants concocted a scheme early on in the litigation related to the warehouse

server.  They made every effort to avoid producing the ESI on the warehouse server, and, in the end, it appears that they orchestrated this bizarre sale of the server so that its whereabouts are now unknown.  Accordingly, we have no doubt that Defendants acted wilfully and in bad faith and that this conduct warrants sanctions.

### 3.  UCB is Not Responsible for the Spoliation

Defendants argue that UCB is responsible for the spoliation because UCB's counsel failed to obtain a subpoena for the server.  Defendants assert that UCB had notice that the server was at the warehouse, UCB counsel knew that FMB had foreclosed on the warehouse, and Clark had informed UCB counsel that UCB could only access the server with a subpoena.  Therefore, according to Defendants, it is UCB who is to blame for the loss of the server.  We disagree.

In support of their argument, Defendants first rely on the March 24, 2010 letter from FMB to UCB advising UCB that FMB had foreclosed on the warehouse.  (SH 59.) In this letter, FMB stated that if UCB intended to take possession of the inventory at the warehouse, it must act quickly because FMB intended to use the warehouse for other purposes beginning April 1, 2010.  However, this letter only referred to the inventory left behind at the warehouse; there was no reference at all to the warehouse server.

Defendants also rely on the meeting on May 9, 2010 between FMB and UCB regarding Defendants' inventory.  At this meeting, the warehouse server was discussed when Nat Piggee and Robert Hoholik from UCB stated their belief that the information on the server would demonstrate that Defendants' inventory numbers were misstated.

41

After Piggee told Clark that UCB would likely want access to the server, Clark told Piggee to send him a subpoena and UCB could have access. However, Clark never informed Piggee or Hoholik that FMB would not release the server *to Defendants* without a subpoena or court order. Moreover, this conversation does not relieve Defendants of their burden to preserve their own evidence. Indeed, if anyone should have issued a subpoena for the warehouse server, it was Respondents, and not UCB.

Defendants also rely on *Searock v. Stripling*, 736 F.2d 650 (11th Cir. 1984), for the proposition that "a party seeking sanctions for the non-production of records must show that it made reasonable efforts to obtain the documents itself." Defendants' reliance on *Searock* is entirely misplaced. In that case, the plaintiff was seeking the production of certain invoices regarding repair work that had been done on the defendant's ship. *Id.* at 651. The defendant advised the plaintiff that his own copies of the invoices had been on board the ship when it caught fire and was destroyed; nevertheless, the defendant offered to ask the third parties who conducted the repair work for copies. *Id.* Ultimately, the defendant was not able to obtain all the invoices from these third parties and the plaintiff moved for sanctions. *Id.* at 652. The court held that sanctions were not appropriate under these circumstances because the defendant's failure to produce the documents was due to his inability to do so after a good faith effort, and the plaintiff failed to take any action to secure the documents itself. *Id.* at 654.

Relying on *Searock,* Defendants argue that this Court cannot impose sanctions on Defendants because UCB failed to take appropriate actions to secure the server. However, the facts in *Searock* are notably different from the facts before this Court. First, in *Searock,* the court noted that "[defendant] was diligently and in good faith seeking to obtain the documents....[and] [t]here was no evidence that [defendant] acted wilfully, in bad faith or was at fault in failing to produce the documents." *Id.* Here, as we explained in detail above, there is substantial evidence that Defendants acted wilfully and in bad faith. In addition, the *Searock* court noted that "[t]hroughout the course of this litigation, [defendant] continually represented to [plaintiff] and the court that he did not have possession of the documents because they went down with the vessel." *Id.* Here, Defendants waited months before advising anyone that there was an issue with their custody and control of the server. Finally, the court in *Searock* stated that the plaintiff took no action whatsoever to secure the documents itself (*id.*), whereas here UCB inquired several times as to the status of the server, and they were repeatedly advised that there were no problems with production.

Under the facts before this Court, Defendants cannot shift their own obligations to preserve evidence to UCB. Had Respondents and Defendants been forthcoming with UCB regarding their lack of control over the server, UCB might share some of the blame here. However, UCB contacted Respondents a number of times to inquire into the status of the warehouse server, and they were repeatedly assured that there was no attempt to repossess the server by third parties and that the server would be removed

from the warehouse and secured at the Oak Brook office.  UCB counsel acted diligently and it was reasonable for UCB to rely on Respondents' assurances.  As a result, we conclude that it was the responsibility of Defendants, and not UCB, to preserve the warehouse server.

### B.  Respondents

#### 1.  Respondents' Conduct is Not Sanctionable

In order to impose sanctions on the attorneys for Defendants' spoliation of evidence, this Court must find that Respondents acted wilfully or in bad faith.  *Maynard*, 332 F.3d at 470-71 ("[t]here is no authority under the Rules or under the inherent powers of the court to sanction attorneys for mere negligence").  In the Motion, UCB argues that Respondents acted in bad faith when they failed to adequately supervise discovery.  UCB asserts that as the months went by, Respondents should have done more than merely insisting over and over that Defendants move the server, and their failure to do so resulted in the loss of the server.  UCB states that Respondents should have been actively working with Blumenthal and Clark to address the issues regarding the server instead of simply accepting Defendants' unsubstantiated assurances regarding discovery.  UCB also argues that Respondents knowingly failed to correct or clarify certain misstatements that were made to this Court and UCB about the whereabouts of the server.

For their part, Respondents argue that they did not act in bad faith.  They state that they adequately informed Defendants of their duty to preserve the server and they

repeatedly urged Defendants to regain custody and control of the server. They also argue that, without their knowledge, Defendants ignored Respondents' instructions about preserving the server, and instead, relied on the advice of Blumenthal. Finally, they assert that Defendants deliberately kept relevant information from them about their arrangements with Clark and FMB in order to carry out a criminal spoliation scheme and obstruct justice. Therefore, according to Respondents, they cannot be held responsible for the fraudulent conduct on the part of Defendants, which ultimately led to the spoliation.

We agree with UCB that Respondents certainly could, and should, have done more to ensure the preservation of the server. They should not have accepted Defendants' assurances after four months, eleven urgent emails and a number of conversations. There were several easy additional steps they could have taken: they could have asked Defendants what they were "working on" that was causing such a delay in transporting the server; they could have called Blumenthal or Clark in order to arrange for access to the server; they could have served FMB with a subpoena or court order for the data on the server; or they could have withdrawn based on their clients' refusal to comply with their discovery obligations. Respondents have even admitted that during this time they were "overwhelmed" and "stretched beyond limits," and did not consider that additional steps might be necessary. They should have been more diligent in supervising Defendants' preservation and production of this server. Nevertheless, we do not believe that Respondents' actions (or lack thereof) warrant

45

sanctions.

In *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422 (S.D.N.Y. 2004), the district court addressed an attorney's obligations with respect to preserving evidence and supervising a client's discovery responsibilities. In that case, defendant wilfully destroyed certain emails relevant to plaintiff's discrimination claims, and plaintiff sought sanctions against both defendant and defense counsel. *Id.* at 424. Defense counsel notified defendant of a litigation hold prior to the destruction of the emails, and the issue before the court was whether defense counsel could be sanctioned for their failure to adequately supervise defendant's production. *Id.*

In reaching a decision, the *Zubulake* court stated that "[c]ounsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents." The court further stated: "The tricky question is ... [w]hat must a lawyer do to make certain that relevant information - especially electronic information - is being retained?" *Id.* at 422-23. The court explained that the lawyer must act reasonably, but "cannot be obliged to monitor her client like a parent watching a child. At some point, the client must bear responsibility for a failure to preserve." *Id.* at 433. Although the *Zubulake* court recognized a major lapse in communication between attorney and client, and certain other failings on the part of the lawyers, the court held:

> At the end of the day,... the duty to preserve and produce documents rests on the party. Once that duty is made clear to a party, either by court order or by instructions from counsel, that party is on notice of its obligations and acts at its own peril. Though more diligent action on the party of counsel would have mitigated some of the damage caused by UBS's

46

> deletion of emails, UBS deleted the emails in defiance of explicit
> instructions not to.

*Id.* at 436.  Accordingly, the court concluded that sanctions against the attorneys were

not warranted.

The decision in *Qualcomm, Inc. v. Broadcom Corp.,* No 05-cv-1958-B, 2010 WL

1336937 (S.D. Cal. Apr. 2, 2010), is also instructive on this issue.  In *Qualcomm*, the

plaintiff withheld critical documents from production, and the issue was whether

plaintiff's outside counsel should be sanctioned for their failure to conduct a reasonable

inquiry into the adequacy of the document production and for ignoring certain warning

signs that the production was not complete.  *Id.* at *1.  In reaching its decision, the court

highlighted "an incredible breakdown in communication" between Qualcomm and their

attorneys, which led to the discovery violations.  *Id.* at *2.  However, the court also

pointed to an "incredible lack of candor" by Qualcomm employees in communicating

with their attorneys.  *Id.* at *4.  The court noted that although the attorneys "could (and

should) have conducted a more thorough effort to collect and produce relevant

discovery," they did take some reasonable steps to ensure that their client was

complying with their discovery obligations, and they were misled by their client.  *Id.* at

*6.  Therefore, despite "significant mistakes, oversights and miscommunication on the

part of both outside counsel and Qualcomm employees," the court held that sanctions

against the attorneys were not warranted.  *Id.* at *2.

Like *Zubulake* and *Qualcomm*, we hold that although Respondents certainly

could have done more, the ultimate responsibility for the spoliation of the warehouse

server rests with Defendants.  Respondents issued the initial litigation hold, continuously

reminded Defendants of their discovery obligations, and repeatedly instructed

Defendants to move the warehouse server to the Oak Brook office.

Meanwhile, Defendants were working against them with their own scheme to avoid

producing the warehouse server.  Defendants repeatedly put Respondents off without

explaining their delay in transporting the server.  They deliberately kept Respondents

out of the loop regarding their agreement with FMB and their ongoing negotiations with

Associated to purchase the server.  They conferred more with Blumenthal than with

Respondents regarding the discovery of the server.  As we explained above, it appears

that Defendants even orchestrated the sale of the server to a foreign corporation in

order to eliminate whatever information is on the server.

UCB argues that Respondents should be sanctioned based on a "lack of candor"

because they informed the Court and UCB that the warehouse server would be moved

to the Oak Brook office, and yet months went by when this did not occur.  UCB asserts

that Respondents should not have "allowed these misrepresentations to stand during

the months of June, July and August of 2010 with no explanation."  While we agree that

Respondents could have been more forthcoming with the Court and with UCB about

their clients' prolonged stalling, they were relying on the assurances from Defendants

that there would be no issue with accessing the server and transporting it from the

warehouse.  As Respondents testified, in hindsight, it is clear that they should have

considered the possibility that there was something suspicious behind Defendants'

delay tactics.  However, we find that their failure to do more does not warrant sanctions.

There is no question that Respondents were repeatedly misled by their clients.

This is evidenced by the number of emails Respondents received from Shah, Joshi and

Blumenthal that neglected to mention the negotiations for the server, and the number of

emails among Shah, Joshi, Blumenthal and Clark (that Respondents notably did *not*

receive) in which the server was discussed in detail.  Clearly, this was an effort to keep

Respondents in the dark.  Respondents argue that Defendants' conduct was criminal in

nature, and that they were victims of Defendants' crime just as UCB was a victim.

Whether Defendants' spoliation amounts to a criminal act, as Respondents suggest, is a

question we will not address; however, we agree with Respondents that Defendants

concocted a deliberate scheme regarding the server.[7]  While Defendants may have had

help from other parties in carrying out this scheme, there is no evidence to suggest that

Respondents were at all aware of what was going on behind the scenes.  As a result,

we cannot hold that Respondents acted in bad faith and we recommend that the District

Court deny the portion of UCB's Motion seeking sanctions against Respondents.

## C.  <u>Appropriate Sanctions for Defendants</u>

---

[7]  Because we will not opine on whether Defendants' conduct was criminal, we recommend that the District Court deny Respondents' request for a Rule to Show Cause as to why Defendants should not be required to pay Respondents' expenses incurred in the defense of the Motion.

Finally, having determined that Defendants' conduct warrants sanctions, we must consider what sanctions are appropriate under the facts of this case. UCB requests the following: 1) awarding UCB all fees and expenses incurred in connection with the Motion; 2) holding Defendants in civil and/or criminal contempt of court and imposing fines; 3) ordering adverse inferences on issues relating to Defendants' inventory and barring Defendants from introducing evidence regarding their inventory; and 4) barring Defendants from re-filing their counterclaim and dismissing their two affirmative defenses.

The Court has broad discretion to fashion an appropriate sanction to remedy the prejudice suffered by a plaintiff as a result of spoliation of evidence. *Jones*, 2010 WL 2106640, at *9. UCB has established that it has suffered prejudice due to the loss of the server. Although only Defendants know exactly what information is on the server, Shah testified that the server contains data regarding Kanan Fashions' inventory, which was used as collateral to secure the Loans at issue in this litigation. UCB believes that the server also contains evidence regarding the Defendants' disposition of the inventory, which would otherwise have been recovered by UCB. UCB also believes that the server contains evidence that Defendants overstated their inventory (and collateral) and engaged in accounting fraud, which would be defenses to the affirmative defenses Defendants have raised.[8] With these considerations in mind, we will address UCB's

---

[8] At the evidentiary hearing, Susan Chang, a forensic accountant, testified that after reviewing accounting records of Kanan Fashions and one of its customers, she discovered significant discrepancies in the accounting. Kanan Fashions had reported over $4.1 million is sales to this customer, whereas the customer reported only $1.2

requests for specific sanctions.

### 1.  Fees and Expenses for Motion for Sanctions

We agree with UCB that it is entitled to all fees and expenses incurred in bringing the Motion for Sanctions.  This includes fees and expenses incurred in all discovery related to the Motion, as well as briefing the Motion and preparing for and participating in the five-day evidentiary hearing.  Rule 37(b)(2)(C) states: "[T]he court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure [to comply with a court order], unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Here, we have established that Defendants violated this Court's order that there be no spoliation of any ESI, and there is no basis on which Defendants can argue that their actions were justified or that the award of fees and expenses is unjust.  Accordingly, we direct UCB to submit a detailed fee petition listing the fees and expenses incurred in bringing the Motion by May 2, 2011.

### 2.  Civil and/or Criminal Contempt and Fines

UCB also asks this Court to hold Defendants in civil and/or criminal contempt of

---

million in purchases from Kanan Fashions.  Chang opined that this significant difference could not be due to an inadvertent mistake.  She attributed this to Kanan's use of two accounting techniques to alter invoice amounts: "decimal sliding," which is a way to increase the original amount by ten times or a hundred times to sliding the decimal place over (*i.e.*, $1,224 becomes $12,240); and "raising," which means adding digits in front of an actual amount (*i.e.*, by adding 25 in front of $100, the amount becomes $25,100).  Chang compared Kanan Fashions' invoices with the corresponding invoice of the customer, and her comparison reflected the use of these techniques.

court and impose fines. Because we believe that UCB's fees incurred in connection with the Motion for Sanctions will be substantial, we are not inclined to impose additional monetary fines on Defendants or to hold Defendants in contempt.

### 3. <u>Adverse Inference and Bar on Evidence Regarding Inventory</u>

UCB argues that Defendants should be barred from introducing any evidence regarding the data on the warehouse server. UCB also asserts that the Court should order that adverse inferences be drawn at trial on issues related to inventory on the server. In particular, UCB seeks an instruction to the jury that UCB requested evidence regarding Defendants' inventory, that this evidence was stored on the warehouse server, and that Defendants voluntarily abandoned the server, which is now lost. Further, UCB seeks a jury instruction that Defendants' failure to produce the data on the warehouse server demonstrates that the server contained evidence that was not favorable to Defendants' position.

We agree that Defendants should be precluded from introducing any evidence related to the data on the server that cannot be found elsewhere. *See, e.g.*, *Plunk v. Village of Elwood, Illinois,* No 07 C 88, 2009 WL 1444436, at *12-13 (N.D. Ill. May 20, 2009) (barring defendants from relying on discussion at Village meeting where there was evidence that defendants intentionally destroyed audiotape of meeting). We also agree with UCB that an adverse inference is warranted in this case. In order to impose an adverse inference sanction, a court must find that the evidence was destroyed in bad faith. *Wiginton*, 2003 WL 22439865, at *7. For purposes of this analysis, "the bad faith

destruction of documents means that the documents were destroyed for the purpose of hiding adverse information." *Id.* at *7 & n.6 (no evidence of bad faith where documents were destroyed in accordance with a routine document retention policy and prior to any litigation hold). We have already determined that the Defendants' destruction of the evidence in this case was in bad faith. We can infer from Defendants' role in the disappearance of the server that they intended to get rid of evidence that was not only damaging to their case, but possibly evidence of accounting fraud as well. Accordingly, we agree with UCB that the jury in this case should be informed of Defendants' abandoning of the server, and instructed that Defendants' failure to preserve the server may be considered evidence that the server contained information unfavorable to Defendants' position. *See Plunk*, 2009 WL 1444436, at *13 (imposing sanction that the jury be instructed that defendants' failure to preserve evidence may be evidence of defendants' wrongful conduct).

### 4. Barring Defendants from Re-Filing Counterclaims

In order to dismiss a claim or a counterclaim as a form of discovery sanctions, the Court must have clear and convincing evidence of that party's wilfulness, bad faith or fault in failing to comply with a discovery order. *Maynard v. Nygren,* 332 F.3d 462, 468 (7th Cir. 2003). This form of sanction is a drastic measure, and a court can impose dismissal for Rule 37 violations "as long as it first considers and explains why lesser sanctions would be inappropriate." *Id.* If a lesser sanction can ameliorate the prejudice that resulted from the spoliation of evidence, we must award the lesser sanction.

*Jones*, 2010 WL 2106640, at *5.

Here, we have evaluated the testimony of the witnesses and we believe that there is clear and convincing evidence that Defendants acted wilfully and in bad faith in destroying the server. However, we also find that the lesser sanctions outlined above are appropriate in this case to remedy the prejudice that UCB suffered as a result of the spoliation, and therefore, we are not inclined to recommend the "draconian" sanction of dismissal.

## IV.    CONCLUSION

Despite the contentious nature of the dispute among these three parties, we commend counsel of record for the civility, skill and professionalism they exhibited throughout these proceedings. We note that counsel for Defendants, Kevin McJessy, was brought into the case just three weeks prior to the evidentiary hearing on the Motion, yet managed to zealously represent his clients with a firm grasp of the complicated facts at issue here.

In conclusion, and for the reasons set forth above, we respectfully recommend that UCB's Motion for Sanctions be granted in part and denied in part. We recommend that the District Court grant UCB's request for sanctions against Defendants, and that Defendants be ordered to reimburse UCB for all expenses and fees incurred in connection with bringing the Motion for Sanctions. In the event the District Court approves this Report and Recommendation, UCB is to file a detailed fee petition by May 2, 2011. We also recommend that Defendants be barred from introducing any evidence

at trial regarding information on the server, and that the jury be instructed that Defendants' failure to preserve the server may be considered evidence that the server contained information unfavorable to Defendants' position.

We respectfully recommend that UCB's request for sanctions against Respondents be denied. We also recommend that Respondents' request for a Rule to Show Cause as to why Defendants should not be ordered to reimburse Respondents for fees and expenses incurred in defending the Motion for Sanctions also be denied.

Specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this order is served. Fed. R. Civ. P. 72. Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

It is so ordered.

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge

Dated: March 31, 2011