UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED CENTRAL BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KANAN FASHIONS, INC., CREATIVE | ) | |
| WAREHOUSING (Chicago), LLC, KANAN | ) | |
| CRUISES, INC., KANAN HOLDINGS, | ) | |
| LLC, VARSHA SHAH and MEHUL SHAH, | ) | |
| | ) | 10 CV 00331 |
| Defendants. | ) | |
| | ) | Judge Gary Feinerman |
| | ) | |
| KANAN FASHIONS, INC., CREATIVE | ) | Magistrate Judge Mason |
| WAREHOUSING (Chicago), LLC, KANAN | ) | |
| CRUISES, INC. and KANAN HOLDINGS, | ) | |
| LLC, | ) | |
| Counterplaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED CENTRAL BANK, | ) | |
| | ) | |
| Counterdefendant. | ) | |

## DEFENDANTS' NOTICE OF FILING

To:     See attached Service List

PLEASE TAKE NOTICE that on April 14, 2011, the undersigned filed the Hearing Transcript (January 27, 2011, January 28, 2011, January 31, 2011, February 1, 2011, February 3, 2011) electronically with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division.  A copy of this Hearing Transcript is hereby attached and served upon you.

Respectfully submitted,

KANAN FASHIONS, INC., et al.,

By:     Kevin P. McJessy
One of Their Attorneys

Kevin McJessy
McJessy, Ching & Thompson, LLC
3759 N. Ravenswood, Suite 231
Chicago, Illinois 60613
(773) 880-1260
(773) 880-1265  Fax
mcjessy@MCandT.com

## CERTIFICATE OF SERVICE

I, Kevin P. McJessy, an attorney, certify that I caused the foregoing **Defendants' Notice of Filing of Hearing Transcript** to be served upon:

Alexander R. Domanskis
Nada Djordjevic
Vilia M. Dedinas
Boodell & Domanskis, LLC
205 N. Michigan Ave., Ste. 4307
Chicago, IL 60601

Mark D. Belongia
Bruce E. de'Medici
John A. Benson, Jr.
Belongia Shapiro & Franklin, LLP
20 S. Clark St., Ste. 300
Chicago, IL 60603

Thomas P. McGarry
Alan R. Lipton
Hinshaw & Culbertson, LLP
222 N. LaSalle St., Ste. 300
Chicago, IL 60601

Don E. Glickman
James A. Flesch
Glickman Flesch & Rosenwein
230 W. Monroe St., Ste. 800
Chicago, IL 60606

J. Michael Collins
55 W. Monroe Street
Suite 600
Chicago, IL 60603

via electronic delivery using the U.S. District Court's CM/ECF system on April 14, 2011.

                           Kevin P. McJessy
                     One of Their Attorneys

### SERVICE LIST

***United Central Bank v. Kanan Fashions, Inc. et al.,*** **10 CV 00331**

Alexander R. Domanskis
Nada Djordjevic
Vilia M. Dedinas
Boodell & Domanskis, LLC
205 N. Michigan Ave., Ste. 4307
Chicago, IL 60601

Thomas P. McGarry
Alan R. Lipton
Hinshaw & Culbertson, LLP
222 N. LaSalle St., Ste. 300
Chicago, IL 60601

Mark D. Belongia
Bruce E. de'Medici
John A. Benson, Jr.
Belongia Shapiro & Franklin, LLP
20 S. Clark St., Ste. 300
Chicago, IL 60603

Don E. Glickman
James A. Flesch
Glickman Flesch & Rosenwein
230 W. Monroe St., Ste. 800
Chicago, IL 60606

J. Michael Collins
55 W. Monroe Street
Suite 600
Chicago, IL 60603

```
1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3

4    UNITED CENTRAL BANK,              )  Docket No. 10 C 331
                                       )
5                       Plaintiff,     )
                                       )
6              vs.                     )
                                       )
7    KANAN FASHIONS, INC., et al.,     )  Chicago, Illinois
                                       )  January 27, 2011
8                       Defendants.    )  9:30 o'clock a.m.

9
                   TRIAL TRANSCRIPT OF PROCEEDINGS
10            BEFORE THE HONORABLE MICHAEL T. MASON
                          VOLUME 1-A
11

12   APPEARANCES:

13
     For the Plaintiff:     BOODELL & DOMANSKIS LLC
14                          BY:  MS. VILIA M. DEDINAS
                                 MS. NADA DJORDJEVIC
15                               MR. DAVID WEST
                                 MS. AMY RYLKO
16                          205 North Michigan Avenue, Suite 4307
                            Chicago, IL  60601
17                          (312) 938-4070

18

19   For the Defendants:    McJESSY, CHING & THOMPSON
                            BY:  MR. KEVIN McJESSY
20                          3759 North Ravenswood, Suite 231
                            Chicago, IL  60613
21                          (773) 880-1260

22

23
     Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 1854-B
25                          Chicago, Illinois  60604
                            (312) 435-5639
```

1   APPEARANCES CONTINUED:

2

3   For Respondents
    Alan Borlack and
    Eric Grossman:          HINSHAW & CULBERTSON LLP
4                           BY:  MR. THOMAS P. McGARRY
                                 MR. ALAN R. LIPTON
5                           222 North LaSalle Street, Suite 300
                            Chicago, IL  60601
6                           (312) 704-3000

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I N D E X

2

3

4    DESCRIPTION                                      PAGE

5

6    MEHUL SHAH, DIRECT EXAMINATION                     6
     BY MS. DEDINAS:
7

8    MEHUL SHAH, CROSS-EXAMINATION                     50
     BY MR. McJESSY:
9

10   MEHUL SHAH, DIRECT EXAMINATION                    64
     BY MR. McJESSY:
11

12   MEHUL SHAH, CROSS-EXAMINATION                    121
     BY MR. LIPTON:
13

14   MEHUL SHAH, REDIRECT EXAMINATION                 139
     BY MS. DEDINAS:
15

16   MEHUL SHAH, RECROSS-EXAMINATION                  145
     BY MR. McJESSY:
17

18   MEHUL SHAH, RECROSS-EXAMINATION                  151
     BY MR. LIPTON:
19

20   PARESH JOSHI, DIRECT EXAMINATION                 158
     BY MS. DEDINAS:
21

22   PARESH JOSHI, CROSS-EXAMINATION                  196
     BY MR. McJESSY:
23

24   PARESH JOSHI, DIRECT EXAMINATION                 208
     BY MR. McJESSY:
25

PARESH JOSHI, CROSS-EXAMINATION                    213
BY MR. LIPTON:

PARESH JOSHI, RECROSS-EXAMINATION                  242
BY MR. McJESSY:

DAVID CLARK, DIRECT EXAMINATION                    245
BY MS. DEDINAS:

1    (The following proceedings were had in open court:)

09:46:42    2        THE COURT:  Before we begin, I would like to go

09:46:43    3    around each of the tables and have you all stand and introduce

09:46:46    4    yourselves and tell me what your position is, please.

09:46:47    5        MS. DEDINAS:  Vilia Dedinas, counsel for United

09:46:51    6    Central Bank.

09:46:51    7        THE COURT:  Thank you.

09:46:54    8        MR. WEST:  David West, paralegal for United Central

09:46:54    9    Bank.

09:46:56    10        MR. HOHOLIK:  Robert Hoholik, vice president, special

09:46:59    11    assets, United Central Bank.

09:47:00    12        THE COURT:  Thank you.

09:47:02    13        MS. RYLKO:  Amy Rylko, attorney at Boodell &

09:47:06    14    Domanskis.

09:47:07    15        MS. DJORDJEVIC:  Nada Djordjevic, on behalf of United

09:47:12    16    Central Bank.

09:47:12    17        MR. GROSSMAN:  Eric Grossman, respondent.

09:47:12    18        MR. MUSCHLER:  David Muschler, respondent.

09:47:12    19        THE COURT:  Thank you.

09:47:16    20        MR. BORLACK:  Alan Borlack, respondent.

09:47:22    21        MR. McGARRY:  Thomas McGarry, attorney for

09:47:24    22    respondent.

09:47:25    23        MR. LIPTON:  Alan Lipton, attorney for respondent.

09:47:31    24        MR. JOSHI:  Paresh Joshi, defendant

09:47:34    25        MR. McJESSY:  Kevin McJessy, your Honor, attorney for

09:47:36    1    the defendants.

09:47:39    2            MR. SHAH:  Mehul Shah, defendant.

09:48:29    3      (Witness sworn.)

09:48:29    4                          - - -

09:48:29    5                MEHUL SHAH, DIRECT EXAMINATION

09:48:29    6    BY MS. DEDINAS:

09:48:30    7    Q.  Good morning, Mr. Shah.

09:48:31    8    A.  Good morning.

09:48:31    9    Q.  Mr. Shah, you are a defendant in this lawsuit; is that

09:48:34   10    correct?

09:48:34   11    A.  Yes.

09:48:35   12    Q.  And you also own two of the other defendants; is that

09:48:38   13    correct?

09:48:38   14    A.  Yes.

09:48:38   15    Q.  And which defendants are those?

09:48:40   16    A.  Kanan Cruises and Creative Warehousing.  Kanan --

09:48:46   17    Q.  And what about --

09:48:47   18    A.  Go ahead.

09:48:49   19            Kanan Cruises and Kanan Holdings, which is one

09:48:52   20    company, and then Creative Warehousing and Kanan Fashions.

09:48:57   21    Q.  So you are an owner of Kanan Fashions?

09:48:59   22    A.  Yes.

09:48:59   23    Q.  And what about Creative Warehousing?

09:49:02   24    A.  Yes.

09:49:03   25    Q.  You are an owner --

09:49:04　1　A.　We were.

09:49:05　2　Q.　Okay.　And what is -- what was your position with Kanan

09:49:09　3　Fashions?

09:49:09　4　A.　I was the CEO.

09:49:11　5　Q.　And what was your position with Creative Warehousing?

09:49:14　6　A.　I was the manager.

09:49:15　7　Q.　Okay.　Now, Kanan Fashions was in the business of

09:49:19　8　manufacturing and selling clothing; isn't that right?

09:49:22　9　A.　Yes, ma'am.

09:49:22　10　Q.　And Creative Warehousing controlled the warehouse where

09:49:27　11　Kanan Fashions stored its inventory?

09:49:29　12　A.　Yes.

09:49:29　13　Q.　And Kanan Fashions leased the building from Creative

09:49:34　14　Warehousing; is that right?

09:49:35　15　A.　Yes.

09:49:35　16　Q.　Okay.　So in order to store Kanan Fashions' inventory, you

09:49:42　17　built a warehouse in Aurora?

09:49:45　18　A.　Yes.

09:49:45　19　Q.　And that's at 1103 Butterfield Road?

09:49:48　20　A.　Yes.

09:49:48　21　Q.　Okay.　And in order to finance the building of the

09:49:51　22　warehouse, you took out a loan from Mutual Bank in 2006; is

09:49:51　23　that right?

09:49:56　24　A.　I think it was 2004, if I'm not mistaken.

09:49:58　25　Q.　Okay.　And Mutual Bank then held a mortgage on the

| | | |
|---|---|---|
| 09:50:04 | 1 | warehouse to secure the loan? |
| 09:50:05 | 2 | A.  Yes. |
| 09:50:06 | 3 | Q.  And now you know that Mutual Bank is now owned by my |
| 09:50:11 | 4 | client, United Central Bank -- |
| 09:50:13 | 5 | A.  Yes. |
| 09:50:13 | 6 | Q.  -- after the FDIC shut down Mutual Bank; is that right? |
| 09:50:18 | 7 | A.  Yes. |
| 09:50:18 | 8 | Q.  And at some point, you became aware that First Midwest |
| 09:50:22 | 9 | Bank acquired a hundred percent participation interest in |
| 09:50:25 | 10 | Mutual Bank's loan to Creative Warehousing? |
| 09:50:29 | 11 | A.  Yes. |
| 09:50:29 | 12 | Q.  Okay.  And you learned that the participation was secured |
| 09:50:33 | 13 | by the property at the Aurora warehouse? |
| 09:50:36 | 14 | A.  Yes. |
| 09:50:36 | 15 | Q.  Okay.  Now, there was a computer server at the Aurora |
| 09:50:40 | 16 | warehouse; is that right? |
| 09:50:42 | 17 | A.  Yes. |
| 09:50:42 | 18 | Q.  And one of the things the warehouse server did was to |
| 09:50:47 | 19 | operate the racking system at the warehouse; is that right? |
| 09:50:51 | 20 | A.  Yes. |
| 09:50:51 | 21 | Q.  And it also kept track of the inventory of Kanan Fashions? |
| 09:50:56 | 22 | A.  Yes. |
| 09:50:56 | 23 | Q.  Now, another thing the server did was it was to keep all |
| 09:51:01 | 24 | the data relating to Kanan Fashions' inventory; is that right? |
| 09:51:09 | 25 | Strike that.  I just asked you that. |

09:51:11  1    Was another thing that it did was to keep Kanan

09:51:14  2  Fashions' data relating to purchase orders?

09:51:18  3  A.  To the best of my knowledge.

09:51:19  4  Q.  And what about invoices to customers, were those on that

09:51:24  5  server?

09:51:26  6  A.  Again, to the best of my knowledge, but I was -- I'm not

09:51:30  7  well-versed with the details of what exactly it contained

09:51:35  8  within itself.

09:51:35  9  Q.  Who would know that information?

09:51:37  10  A.  Probably Mr. Joshi.

09:51:41  11  Q.  And what about information about shipping to customers,

09:51:43  12  would that have been on that server?

09:51:45  13  A.  Probably; but, again, Mr. Joshi can give you a better

09:51:49  14  answer than myself.

09:51:50  15  Q.  Now, Creative Warehousing and Kanan Fashions leased that

09:51:56  16  computer server from Associated Bank; is that right?

09:52:01  17  A.  Yes, ma'am.

09:52:01  18  Q.  And they also leased the software that ran the server?

09:52:05  19  A.  Yes.

09:52:05  20  Q.  And if you -- do you recall that the lease payments were

09:52:10  21  about $13,000 a month for a 36-month term?

09:52:14  22  A.  Yes, thereabout, yes.

09:52:16  23  Q.  And you personally guaranteed that lease, right?

09:52:19  24  A.  Yes.

09:52:19  25  Q.  Okay.  Now, let's talk a little bit about some of the

09:52:24 1 defaults that your company's encountered.  Creative

09:52:30 2 Warehousing defaulted on its building loan in around September

09:52:34 3 of 2009; is that right?

09:52:36 4 A.  Yes.

09:52:36 5 Q.  Okay.  And then in December of 2009, they -- the

09:52:43 6 defendants defaulted on their lease with Associated Bank;

09:52:46 7 isn't that right?

09:52:48 8 A.  Yes.

09:52:48 9 Q.  Okay.  So with respect to the Associated Bank lease, you

09:52:54 10 tried to settle that matter directly with Associated Bank for

09:52:57 11 a period of time; is that right?

09:52:58 12 A.  Yes, I did.

09:52:59 13 Q.  And that didn't work out?

09:53:03 14 A.  No, it did not.

09:53:04 15 Q.  And at some point around January 28th, Associated Bank

09:53:11 16 told you that they had decided to pass on your offer to

09:53:13 17 settle?

09:53:13 18 A.  Yes.

09:53:13 19 Q.  So in early 2010, there were three things going on.

09:53:20 20 Number one, on January 18th, United Central Bank sued the

09:53:26 21 defendants to foreclose on some promissory notes and

09:53:30 22 guaranties; is that right?

09:53:31 23 A.  Yes.

09:53:31 24 Q.  In connection with that lawsuit, defendants retained

09:53:34 25 counsel, Bailey Borlack & Nadelhoffer, to represent them?

09:53:38   1   A.  Yes.

09:53:39   2   Q.  So that's number one.

09:53:40   3        Number two, you were negotiating with Associated Bank

09:53:43   4   over the default on the lease for the warehouse server; is

09:53:43   5   that right?

09:53:49   6   A.  Yes.

09:53:49   7   Q.  And number three, your counsel, Steven Blumenthal, was

09:53:56   8   negotiating with First Midwest Bank over the default on the

09:53:59   9   warehouse building loans?

09:54:00   10  A.  I think that was -- yes, you're right.

09:54:02   11  Q.  Right, in early 2010?

09:54:06   12  A.  Yes, yes.

09:54:06   13  Q.  So when Mr. Borlack got involved in this lawsuit brought

09:54:11   14  by United Central Bank, he advised you and Mr. Joshi of your

09:54:16   15  duty to preserve evidence.  Do you recall that?

09:54:19   16  A.  Yes.

09:54:19   17  Q.  And he mentioned that that was not only e-mails but data

09:54:25   18  in any format?

09:54:26   19  A.  Yes, ma'am.

09:54:27   20  Q.  Do you recall?

09:54:28   21        And do you recall that you sent him an e-mail that

09:54:31   22  said that you understood that?

09:54:32   23  A.  Yes, ma'am.

09:54:33   24  Q.  Okay.  Now, in February, your negotiations with Associated

09:54:39   25  Bank for the lease and the guaranty of the server failed; is

| | | |
|---|---|---|
| 09:54:39 | 1 | that right? |
| 09:54:45 | 2 | A.  Yes. |
| 09:54:45 | 3 | Q.  And do you recall that your counsel then sent Associated |
| 09:54:53 | 4 | Bank a letter instructing them to make arrangements to pick up |
| 09:54:56 | 5 | the equipment? |
| 09:54:57 | 6 | MR. LIPTON:  Objection.  Vague as to counsel. |
| 09:54:59 | 7 | THE COURT:  Do you want to try to be a little -- |
| 09:55:02 | 8 | MS. DEDINAS:  Let me restate that. |
| 09:55:03 | 9 | THE COURT:  -- more specific, if you will? |
| 09:55:04 | 10 | BY MS. DEDINAS: |
| 09:55:05 | 11 | Q.  Your counsel, Steven Blumenthal, instructed Associated |
| 09:55:09 | 12 | Bank to make arrangements to pick up the equipment? |
| 09:55:12 | 13 | A.  Yes. |
| 09:55:12 | 14 | Q.  And you were blind carbon copied on that letter.  Do you |
| 09:55:17 | 15 | recall that? |
| 09:55:18 | 16 | A.  Yes. |
| 09:55:18 | 17 | Q.  Okay.  And by "equipment," that meant the server in the |
| 09:55:21 | 18 | warehouse, as you understood it? |
| 09:55:23 | 19 | A.  Yes, ma'am. |
| 09:55:23 | 20 | Q.  And this was the server that had the data that you had |
| 09:55:27 | 21 | been told by Mr. Borlack to preserve? |
| 09:55:32 | 22 | A.  Yes. |
| 09:55:32 | 23 | Q.  And you also knew at that time that the server had data on |
| 09:55:38 | 24 | it that would be relevant to the litigation? |
| 09:55:39 | 25 | A.  Yes, ma'am. |

| | | |
|---|---|---|
| 09:55:40 | 1 | Q.  Now, did you tell Mr. Blumenthal at that time that you |
| 09:55:46 | 2 | couldn't give the server back to Associated Bank because you |
| 09:55:50 | 3 | needed to preserve the data on the server for litigation? |
| 09:55:54 | 4 | A.  As a matter of fact, Mr. Blumenthal sent an e-mail the day |
| 09:55:59 | 5 | after the deed in lieu was executed to the attorneys of First |
| 09:56:07 | 6 | Midwest Bank that we need to preserve the data. |
| 09:56:09 | 7 | Q.  Okay.  Well, we're going to get to that. |
| 09:56:12 | 8 | THE COURT:  You are not answering the question that |
| 09:56:13 | 9 | she asked. |
| 09:56:14 | 10 | MS. DEDINAS:  Okay. |
| 09:56:15 | 11 | BY MS. DEDINAS: |
| 09:56:15 | 12 | Q.  Let me just clarify.  The deed in lieu occurred in March, |
| 09:56:19 | 13 | right? |
| 09:56:19 | 14 | A.  Yes. |
| 09:56:19 | 15 | Q.  So right now I am talking about -- the time frame I'm |
| 09:56:22 | 16 | talking about is January -- sorry, in February? |
| 09:56:27 | 17 | A.  Yes. |
| 09:56:27 | 18 | Q.  And maybe you want to take a quick look at Exhibit 21. |
| 09:56:48 | 19 | THE COURT:  Why don't you identify Exhibit 21, would |
| 09:56:51 | 20 | you please, for the record. |
| 09:56:52 | 21 | MS. DEDINAS:  For the record, Exhibit 21 is a letter |
| 09:56:55 | 22 | by Steven Blumenthal to Ms. Tina Jacobs dated February 23rd, |
| 09:57:00 | 23 | 2010. |
| 09:57:00 | 24 | BY MS. DEDINAS: |
| 09:57:01 | 25 | Q.  Have you had a chance to take a look at that letter? |

14

| | | |
|---|---|---|
| 09:57:04 | 1 | A.  Go ahead.  Please, can you repeat the question. |
| 09:57:21 | 2 | THE COURT:  Mr. McJessy -- excuse me one second -- |
| 09:57:25 | 3 | can you see okay? |
| 09:57:26 | 4 | MR. McJESSY:  I can see fine. |
| 09:57:28 | 5 | THE COURT:  If you need to get up and move over here. |
| 09:57:29 | 6 | MR. McJESSY:  That's quite all right.  Thank you, |
| 09:57:30 | 7 | your Honor. |
| 09:57:30 | 8 | BY MS. DEDINAS: |
| 09:57:31 | 9 | Q.  So I am looking at the bottom of that letter that says, |
| 09:57:34 | 10 | Please contact me at your convenience to make arrangements to |
| 09:57:37 | 11 | pick up the equipment.  Do you see that? |
| 09:57:40 | 12 | A.  Yes. |
| 09:57:40 | 13 | Q.  And you were blind carbon copied on the second page? |
| 09:57:44 | 14 | A.  Correct. |
| 09:57:44 | 15 | Q.  So my question then that we wanted to get back to was, |
| 09:57:49 | 16 | around the time that Mr. Blumenthal sent this February 23rd |
| 09:57:53 | 17 | letter, did you tell Mr. Blumenthal that you couldn't give up |
| 09:58:00 | 18 | the server to Associated Bank because you needed to preserve |
| 09:58:02 | 19 | the data that was on it for litigation? |
| 09:58:04 | 20 | A.  Frankly, I don't recall. |
| 09:58:05 | 21 | Q.  Now, with respect to First Midwest Bank, in February, you |
| 09:58:13 | 22 | and your counsel reached an agreement in principle with First |
| 09:58:19 | 23 | Midwest Bank regarding the default on the building loan? |
| 09:58:23 | 24 | MR. LIPTON:  Objection.  Vague as to counsel. |
| 09:58:24 | 25 | THE COURT:  That's a good objection. |

09:58:27  1       MS. DEDINAS:  Okay.

09:58:27  2       THE COURT:  I know it's hard to remember, but it's

09:58:30  3   something that's very important.

09:58:31  4   BY MS. DEDINAS:

09:58:31  5   Q.  You and your counsel, Mr. Blumenthal, is that right,

09:58:34  6   reached an agreement with First Midwest Bank on working out

09:58:38  7   the Creative Warehousing building loan default?

09:58:42  8   A.  Yes.

09:58:42  9   Q.  And the agreement was that Creative Warehousing would

09:58:48  10  agree to a friendly foreclosure?

09:58:50  11  A.  Yes.

09:58:50  12  Q.  And that meant that Creative Warehousing would sign a deed

09:58:55  13  in lieu of foreclosure to First Midwest Bank and you and your

09:58:58  14  wife would be released from your personal guaranties on that

09:59:01  15  note; is that right?

09:59:01  16  A.  Yes.

09:59:01  17  Q.  And as part of the deal, First Midwest Bank would grant

09:59:05  18  Creative Warehousing a lease commitment which would give it a

09:59:10  19  six-month option to find a tenant to lease a portion of the

09:59:14  20  warehouse.

09:59:14  21  A.  Yes, ma'am.

09:59:15  22  Q.  Is that right?

09:59:15  23       And this arrangement would allow you to start or find

09:59:22  24  a new company like Kanan Fashions and keep the warehouse that

09:59:28  25  had been built for that kind of a business?

| | | |
|---|---|---|
| 09:59:31 | 1 | A.  Yes, ma'am. |
| 09:59:31 | 2 | Q.  Now, as an additional part of the deal, you asked David |
| 09:59:36 | 3 | Clark of First Midwest Bank to intercede on your behalf and |
| 09:59:40 | 4 | negotiate a purchase of the lease of the server from |
| 09:59:45 | 5 | Associated Bank, right? |
| 09:59:46 | 6 | A.  Yes, ma'am. |
| 09:59:47 | 7 | Q.  And this is because you believe the server would be |
| 09:59:51 | 8 | beneficial to the operations of a new clothing company? |
| 09:59:54 | 9 | A.  That, plus it would have been -- you would have been |
| 09:59:59 | 10 | needing the server for our lawsuit with UCB. |
| 10:00:05 | 11 | MR. McGARRY:  I'm sorry? |
| 10:00:06 | 12 | THE WITNESS:  The server would be used for the |
| 10:00:08 | 13 | litigation purposes.  Also it would be requiring for the |
| 10:00:11 | 14 | litigation purposes, plus it would be useful in future for if |
| 10:00:15 | 15 | we ever leased the building and if I were to work for |
| 10:00:18 | 16 | somebody, then that could be of help to run the conveyor |
| 10:00:21 | 17 | system over there. |
| 10:00:22 | 18 | BY MS. DEDINAS: |
| 10:00:23 | 19 | Q.  And you were going to try to find a company that would |
| 10:00:25 | 20 | lease the building that you could work for in the clothing |
| 10:00:28 | 21 | business? |
| 10:00:29 | 22 | A.  That was my wish, yes. |
| 10:00:30 | 23 | Q.  And in connection with your discussions with Mr. Clark, |
| 10:00:35 | 24 | you also asked him to try to buy back your personal guaranties |
| 10:00:39 | 25 | on that lease, right? |

| | | |
|---|---|---|
| 10:00:41 | 1 | A.  Yes, as per the advice of mine -- my attorney, |
| 10:00:45 | 2 | Mr. Blumenthal, that it is wiser to buy the whole thing |
| 10:00:49 | 3 | together so that we can preserve the server, the data, as well |
| 10:00:54 | 4 | as you can purchase your guaranty also.  That will release you |
| 10:00:58 | 5 | of that -- |
| 10:00:58 | 6 | THE COURT:  I will strike that as nonresponsive. |
| 10:00:59 | 7 | MS. DEDINAS:  Okay.  There was a yes, I believe. |
| 10:01:02 | 8 | THE COURT:  Yes, there was.  Do you want that read |
| 10:01:04 | 9 | back? |
| 10:01:04 | 10 | MS. DEDINAS:  No, as long as it stands. |
| 10:01:06 | 11 | THE COURT:  Okay. |
| 10:01:07 | 12 | BY MS. DEDINAS: |
| 10:01:10 | 13 | Q.  And Mr. Clark agreed to do this for you; is that right? |
| 10:01:12 | 14 | A.  Yes. |
| 10:01:12 | 15 | Q.  Now, once it obtained the lease from Associated Bank, |
| 10:01:19 | 16 | First Midwest Bank was going to give you an opportunity to buy |
| 10:01:23 | 17 | the server back? |
| 10:01:24 | 18 | A.  Can you repeat that question, please? |
| 10:01:27 | 19 | Q.  First Midwest Bank was going to try to negotiate to |
| 10:01:30 | 20 | purchase the lease, the server, and the guaranty from |
| 10:01:35 | 21 | Associated Bank? |
| 10:01:36 | 22 | A.  Yes. |
| 10:01:36 | 23 | Q.  And once they did that, they were going to give you an |
| 10:01:40 | 24 | opportunity to buy the server, the lease, and the guaranty |
| 10:01:44 | 25 | back -- |

10:01:44  1   A.  Yes.

10:01:45  2   Q.  -- from them, right?

10:01:46  3         And so on about February 26th, you provided Mr. Clark

10:01:51  4   with the information that he would need on who to contact at

10:01:55  5   Associated Bank?

10:01:56  6   A.  Yes.

10:01:56  7   Q.  Now, you're aware that there was an amended

10:02:02  8   electronically-stored information agreement filed on

10:02:05  9   February 19th in this court; is that right?

10:02:08  10  A.  Yes.

10:02:08  11  Q.  And in that agreement, the defendants represented that

10:02:16  12  they have two individuals with access to the computer servers

10:02:21  13  and each has been instructed to preserve evidence and

10:02:24  14  discoverable ESI within their possession, custody, and

10:02:28  15  control?

10:02:29  16  A.  Yes.

10:02:29  17  Q.  Do you recall that?

10:02:30  18        And you received a red-lined version of that before

10:02:32  19  it was filed with the court?

10:02:34  20  A.  I do remember looking back at the production here, but I

10:02:40  21  relied on my attorney at the time.

10:02:42  22        THE COURT:  That's not the question.  You need to

10:02:44  23  answer the question that's asked.

10:02:46  24        THE WITNESS:  Okay, your Honor.

10:02:47  25        THE COURT:  Do you want to repeat it, please.

10:02:49  1   BY MS. DEDINAS:

10:02:50  2   Q.  Did you get a copy of the version before it was filed with

10:02:55  3   the court?

10:02:56  4   A.  Yes.

10:02:56  5   Q.  Okay.  And then on February 26th, 2010, your former

10:03:08  6   counsel, Mr. Muschler, sent a letter to this court that

10:03:14  7   advised the court as to the number and the location of Kanan

10:03:17  8   Fashions and Creative Warehousing's computer servers.  Do you

10:03:21  9   recall that?

10:03:21  10  A.  Yes.

10:03:22  11  Q.  Now, on that very same day, you had a telephone

10:03:26  12  conversation with Alan Borlack and Steve Blumenthal in which

10:03:30  13  you told them that there would be a friendly foreclosure of

10:03:34  14  the Aurora warehouse; is that right?

10:03:36  15  A.  Yes.

10:03:36  16  Q.  Okay.  Now, do you recall that on March 3rd, 2010, David

10:03:44  17  Muschler again warned you and Mr. Joshi that nothing should be

10:03:48  18  done with or to any of the computers, servers, or related

10:03:53  19  equipment?

10:03:53  20  A.  Yes, ma'am.

10:03:53  21  Q.  So despite Mr. Muschler's March 3rd warnings, you actually

10:04:00  22  knew that something was going to happen to the server at the

10:04:03  23  warehouse, didn't you?

10:04:04  24  A.  No.

10:04:06  25  Q.  You didn't.

10:04:07   1    Did you understand that the friendly foreclosure was

10:04:11   2  an agreed transfer of the deed to the warehouse where the

10:04:15   3  server was located?

10:04:17   4  A.  Yes, but I thought that we would be able to access it.

10:04:22   5    MS. DEDINAS:  Move to strike.

10:04:23   6    THE COURT:  Sustained.  That will be stricken.

10:04:26   7    And I know you want to elaborate on here, but you are

10:04:29   8  going to get a chance to do that through your attorney.

10:04:31   9    THE WITNESS:  Understood, your Honor.  Sorry.

10:04:33   10  BY MS. DEDINAS:

10:04:35   11  Q.  And your counsel then entered into an agreed order of

10:04:38   12  eviction that evicted Kanan Fashions from the warehouse?

10:04:42   13  A.  Yes.

10:04:43   14    MR. LIPTON:  Your Honor, objection, vague as to

10:04:47   15  counsel.

10:04:48   16    MS. DEDINAS:  I'm sorry.

10:04:48   17    THE COURT:  I understand how that's difficult to do,

10:04:50   18  so just keep making your objections and we will get the record

10:04:53   19  straight on that.

10:04:54   20    MR. McGARRY:  Your Honor, in the discovery, we did

10:04:56   21  call Mr. Blumenthal counsel, and I know Ms. Dedinas is used to

10:05:02   22  that terminology, but the record --

10:05:07   23    THE COURT:  I understand.

10:05:07   24    MS. DEDINAS:  I will do my best to try to keep it

10:05:10   25  straight.

| | | |
|---|---|---|
| 10:05:10 | 1 | THE COURT:  Be listening to it and make the |
| 10:05:12 | 2 | objection. |
| 10:05:13 | 3 | MR. McGARRY:  Your Honor, and then maybe the answer |
| 10:05:14 | 4 | can be corrected. |
| 10:05:15 | 5 | MS. DEDINAS:  I am going to restate the question, |
| 10:05:17 | 6 | yes. |
| 10:05:17 | 7 | BY MS. DEDINAS: |
| 10:05:17 | 8 | Q.  So your counsel, Mr. Blumenthal, entered into an agreed |
| 10:05:21 | 9 | order of eviction that evicted Kanan Fashions from the |
| 10:05:24 | 10 | warehouse on or about March 24th; is that right? |
| 10:05:28 | 11 | A.  Yes. |
| 10:05:28 | 12 | Q.  And this meant you'd be turning the keys over to the |
| 10:05:31 | 13 | warehouse to First Midwest Bank? |
| 10:05:33 | 14 | A.  Yes. |
| 10:05:34 | 15 | Q.  And then if you wanted access to the warehouse later, |
| 10:05:38 | 16 | you'd have to ask them for it, right? |
| 10:05:40 | 17 | A.  Yes. |
| 10:05:41 | 18 | Q.  And they would be in control of everything in the |
| 10:05:45 | 19 | warehouse? |
| 10:05:46 | 20 | A.  Yes. |
| 10:05:46 | 21 | Q.  Including access to the server? |
| 10:05:49 | 22 | A.  Yes. |
| 10:05:49 | 23 | Q.  And before the friendly foreclosure, you didn't make any |
| 10:05:56 | 24 | plans in advance to move the server to another location; is |
| 10:05:56 | 25 | that right? |

10:06:02   1   A.  No.

10:06:02   2   Q.  But you did move some of your other personal belongings;

10:06:02   3   is that right?

10:06:09   4   A.  Yes.

10:06:09   5   Q.  And was there a decision that was made not to copy the

10:06:16   6   data on the warehouse server before the warehouse was turned

10:06:20   7   over to First Midwest Bank?

10:06:22   8   A.  I don't recall that.

10:06:24   9   Q.  Okay.  I'd like you to take a quick look at Exhibit 45.

10:06:41   10         For the record, this is an e-mail dated March 15th --

10:06:44   11         MS. DEDINAS:  I will wait until you get to it.

10:06:55   12         THE COURT:  Go ahead.

10:06:57   13   BY MS. DEDINAS:

10:06:58   14   Q.  For the record, this is an e-mail dated March 15th, 2010,

10:07:02   15   from you to Mr. Blumenthal and Mr. Joshi.  And in it says --

10:07:09   16   and I'm reading on the second line -- We do not need to make a

10:07:13   17   copy which I just found out will be very expensive and time

10:07:19   18   consuming.

10:07:19   19         Do you see that?

10:07:19   20   A.  Yes.

10:07:20   21   Q.  So my question was, do you recall that there was a

10:07:23   22   decision made on or around March 15th to not copy the data on

10:07:29   23   the server?

10:07:31   24   A.  I think Mr. Joshi had inquired on the cost --

10:07:38   25   Q.  I believe it's a yes-or-no question.

10:07:40    1    A.  Yes.

10:07:41    2    Q.  Thank you.

10:07:43    3    A.  I'm sorry.

10:07:44    4         THE COURT:  That's fine.

10:07:45    5    BY MS. DEDINAS:

10:07:46    6    Q.  Now, the friendly foreclosure occurred -- or the papers

10:07:50    7    were signed on February -- on March 15th, 2010; is that right?

10:07:54    8    A.  Yes.  Yes.

10:07:54    9    Q.  And in connection with that, you signed a deed in lieu of

10:07:57   10    foreclosure, a deed, a bill of sale, an assignment of lease,

10:08:03   11    and security deposit; is that right?

10:08:03   12    A.  Yes.

10:08:05   13    Q.  And then you entered into this commitment for lease

10:08:07   14    arrangement that we had previously talked about?

10:08:09   15    A.  Yes.

10:08:10   16    Q.  And you signed a consent foreclosure stipulation at some

10:08:14   17    point; is that right?

10:08:14   18    A.  Yes.

10:08:14   19    Q.  Okay.  And on March 24th, there was an agreed order of

10:08:20   20    eviction that was entered into by Kanan Fashions and First

10:08:24   21    Midwest Bank, right?

10:08:25   22    A.  Yes.

10:08:25   23    Q.  Now, was there anything in any of the documents of the

10:08:35   24    closing that would require First Midwest Bank to preserve the

10:08:38   25    data on the server?

| | | |
|---|---|---|
| 10:08:42 | 1 | A. I think there was an e-mail by Mr. Blumenthal. |
| 10:08:45 | 2 | Q. Okay. I guess I'm asking about the closing documents. |
| 10:08:48 | 3 | A. I have not read the documents personally. |
| 10:08:50 | 4 | Q. You're not aware of any contract that would require First |
| 10:08:56 | 5 | Midwest Bank to preserve the data on the -- |
| 10:08:58 | 6 | A. Not that I know of. |
| 10:08:59 | 7 | Q. And what about any kind of a written contract that would |
| 10:09:02 | 8 | require First Midwest Bank to give you access to the server |
| 10:09:06 | 9 | whenever you needed it? |
| 10:09:07 | 10 | A. I don't recall that either. |
| 10:09:09 | 11 | Q. And you're not aware of any written document that would |
| 10:09:16 | 12 | ensure that nobody tampered with the computer or accessed it |
| 10:09:20 | 13 | without your permission? |
| 10:09:21 | 14 | A. No, except that e-mail which I remember. |
| 10:09:24 | 15 | Q. Okay. In fact, there was no written contract about the |
| 10:09:28 | 16 | server at all, was there? |
| 10:09:30 | 17 | A. No. |
| 10:09:31 | 18 | Q. Now, right after the foreclosure, Kanan Fashions moved |
| 10:09:37 | 19 | some personal computers from the warehouse. Do you recall |
| 10:09:40 | 20 | that? |
| 10:09:41 | 21 | A. Yes. |
| 10:09:41 | 22 | Q. And it also moved some documents and some belongings over |
| 10:09:46 | 23 | to the Oak Brook offices? |
| 10:09:47 | 24 | A. Yes. |
| 10:09:48 | 25 | Q. But you left the server behind? |

| | | |
|---|---|---|
| 10:09:51 | 1 | A.  Yes. |
| 10:09:51 | 2 | Q.  And you don't know why you left the server behind? |
| 10:09:55 | 3 | A.  It was handled by Mr. Joshi.  I don't know. |
| 10:09:58 | 4 | Q.  But you don't know why that was done? |
| 10:09:59 | 5 | A.  No. |
| 10:10:00 | 6 | Q.  And you knew that the server had data that was subject to |
| 10:10:05 | 7 | the data preservation duty in the litigation? |
| 10:10:07 | 8 | A.  Yes, ma'am. |
| 10:10:08 | 9 | Q.  Okay.  Now, I'd like to turn to April and ask you, on |
| 10:10:18 | 10 | April 16th, did you learn that I had asked your counsel, |
| 10:10:24 | 11 | Bailey Borlack and Nadelhoffer, whether a creditor was trying |
| 10:10:29 | 12 | to repossess the Creative Warehousing computer system? |
| 10:10:34 | 13 | A.  I read that e-mail in the production, yes. |
| 10:10:37 | 14 | Q.  And your lawyer, Eric Grossman, forwarded that inquiry to |
| 10:10:41 | 15 | Mr. Paresh and asked how he should respond, "he" meaning |
| 10:10:46 | 16 | Mr. Grossman, right? |
| 10:10:47 | 17 | A.  Yes. |
| 10:10:48 | 18 | Q.  And you were copied on that inquiry to Mr. Paresh, right? |
| 10:10:52 | 19 | A.  Yes. |
| 10:10:52 | 20 | Q.  I'm sorry, Mr. Joshi. |
| 10:10:54 | 21 | And on April 16th, Mr. Joshi sent an e-mail to |
| 10:11:02 | 22 | Mr. Grossman that there was no effort by any third party to |
| 10:11:07 | 23 | repossess the server? |
| 10:11:09 | 24 | A.  There was a letter of -- notice of delinquent payment, but |
| 10:11:16 | 25 | it did not say that it's a notice of repossession. |

| | | |
|---|---|---|
| 10:11:18 | 1 | Q.  Okay. |
| 10:11:19 | 2 | MR. LIPTON:  Objection.  Move to strike, |
| 10:11:21 | 3 | nonresponsive. |
| 10:11:22 | 4 | THE COURT:  It will be stricken as nonresponsive. |
| 10:11:24 | 5 | BY MS. DEDINAS: |
| 10:11:24 | 6 | Q.  I'd like you to take a look at Exhibit SH 80. |
| 10:11:29 | 7 | THE COURT:  I'm sorry, 80? |
| 10:11:32 | 8 | MS. DEDINAS:  80. |
| 10:11:43 | 9 | THE COURT:  Do you have that? |
| 10:11:44 | 10 | THE WITNESS:  Yes. |
| 10:11:44 | 11 | BY MS. DEDINAS: |
| 10:11:45 | 12 | Q.  For the record, this is an e-mail dated April 16th, 2010, |
| 10:11:48 | 13 | from Paresh Joshi to Eric Grossman, with a copy to Mehul Shah |
| 10:11:54 | 14 | and Alan -- Alan Borlack and Steven Blumenthal. |
| 10:12:01 | 15 | It says, Eric, as far as I remember, the demand for |
| 10:12:03 | 16 | payment is in the form of monthly payments, but I am not aware |
| 10:12:07 | 17 | of the threat to repossess. |
| 10:12:11 | 18 | MR. LIPTON:  Monthly statements.  Mischaracterizes |
| 10:12:14 | 19 | the evidence.  The demand for payment is in the form of |
| 10:12:17 | 20 | monthly statements. |
| 10:12:18 | 21 | MS. DEDINAS:  Statements. |
| 10:12:19 | 22 | MR. LIPTON:  Not payments. |
| 10:12:20 | 23 | MS. DEDINAS:  I'm sorry. |
| 10:12:21 | 24 | MR. LIPTON:  It's okay. |
| 10:12:22 | 25 | BY MS. DEDINAS: |

| | | |
|---|---|---|
| 10:12:23 | 1 | Q. But I'm not aware of a threat to repossess. |
| 10:12:26 | 2 | A. Yes. |
| 10:12:27 | 3 | Q. Do you see that? |
| 10:12:27 | 4 | And you received a copy of that? |
| 10:12:29 | 5 | A. Yes, I did. |
| 10:12:32 | 6 | Q. And you didn't disagree with that statement? |
| 10:12:34 | 7 | A. No, I didn't disagree. |
| 10:12:35 | 8 | Q. You thought that was an accurate statement? |
| 10:12:37 | 9 | A. No, I think, looking back, it's an error. How it |
| 10:12:41 | 10 | happened, I don't know, but it was an error. It should have |
| 10:12:46 | 11 | been said, yes, that there has been a letter that was received |
| 10:12:49 | 12 | because he was copied on the letter. |
| 10:12:50 | 13 | Q. And the letter was a demand for repossession; isn't that |
| 10:12:53 | 14 | right? |
| 10:12:53 | 15 | A. And it did say that it may result in repossession. |
| 10:12:56 | 16 | Q. So the letter said that you were in default and if you |
| 10:12:58 | 17 | didn't cure the default -- |
| 10:13:01 | 18 | A. Yes. |
| 10:13:01 | 19 | Q. -- it could result in repossession? |
| 10:13:04 | 20 | A. Yes, ma'am. |
| 10:13:05 | 21 | Q. So as a result, on April 19th, 2010, Mr. Grossman sent me |
| 10:13:11 | 22 | an e-mail in which he advised me that there is currently no |
| 10:13:16 | 23 | creditor repossession effort by lawsuit or other demand. |
| 10:13:21 | 24 | And you received a copy of that response; is that |
| 10:13:27 | 25 | right? |

10:13:27    1    THE COURT:  Well, he is looking in the book right

10:13:30    2   now.

10:13:30    3    MS. DEDINAS:  Oh, I can point you at Exhibit 82.

10:13:34    4    THE COURT:  Unless they direct your attention to a

10:13:36    5   particular part of the book, you don't need to look at it.

10:13:39    6    THE WITNESS:  Okay.

10:13:40    7   BY MS. DEDINAS:

10:13:40    8   Q.  Why don't we look at Exhibit 82.

10:13:42    9   A.  All right.

10:13:51   10   Q.  For the record, this is an e-mail chain dated April 19th,

10:13:56   11   2010, from Eric Grossman to Paresh Joshi and Mehul Shah, with

10:14:02   12   a cc to Scott Schreiber, Steven Blumenthal, and Alan Borlack.

10:14:06   13    Now, in this e-mail, Mr. Grossman is forwarding to

10:14:09   14   you his response of April 19th to me.  And Mr. Grossman's

10:14:16   15   statement is, Vilia, there is currently no creditor

10:14:20   16   repossession effort by lawsuit or other demand.  Do you see

10:14:23   17   that?

10:14:23   18    THE COURT:  He is lost.

10:14:25   19    MS. DEDINAS:  I'm sorry.

10:14:25   20    THE WITNESS:  I do not see the copy came to me or

10:14:28   21   anybody.  I see from Mr. Grossman --

10:14:30   22    THE COURT:  If you want to approach and point it out

10:14:33   23   to him, that would be just fine.

10:14:35   24    MS. DEDINAS:  Are we on 82?

10:14:40   25    THE WITNESS:  Yes.

| | | |
|---|---|---|
| 10:14:41 | 1 | BY MS. DEDINAS: |
| 10:14:50 | 2 | Q. So you see that you were copied on Mr. Grossman's response |
| 10:14:55 | 3 | to me? |
| 10:14:56 | 4 | A. Yes. |
| 10:14:56 | 5 | Q. And you didn't clarify or disagree with Mr. Grossman's |
| 10:15:04 | 6 | representation to me? |
| 10:15:04 | 7 | A. No. |
| 10:15:04 | 8 | Q. Now, as a matter of fact, on that date, you knew that the |
| 10:15:13 | 9 | server was already in the physical possession of First Midwest |
| 10:15:17 | 10 | Bank? |
| 10:15:17 | 11 | A. Yes, ma'am. |
| 10:15:17 | 12 | Q. And, second, you knew, as we just discussed, that |
| 10:15:22 | 13 | Associated Bank had actually sent a demand indicating that if |
| 10:15:25 | 14 | payment wasn't made, they would be repossessing? |
| 10:15:28 | 15 | A. Yes. |
| 10:15:28 | 16 | Q. You can close the book so you don't get confused with |
| 10:15:40 | 17 | other exhibits. |
| 10:15:40 | 18 | Do you recall having a conversation by telephone with |
| 10:15:48 | 19 | your attorneys at Bailey Borlack and Nadelhoffer on April |
| 10:15:52 | 20 | 26th, 2010? |
| 10:15:54 | 21 | A. There was an e-mail. |
| 10:15:57 | 22 | Q. No, I'm asking about a telephone conversation. |
| 10:15:59 | 23 | A. I had several conversations, so I don't recall |
| 10:16:04 | 24 | specifically on that. |
| 10:16:05 | 25 | Q. Okay. Do you recall that there was an e-mail in which |

| | | |
|---|---|---|
| 10:16:10 | 1 | they instructed you -- |
| 10:16:12 | 2 | THE COURT: When? |
| 10:16:13 | 3 | BY MS. DEDINAS: |
| 10:16:14 | 4 | Q. April 26th, 2010. |
| 10:16:15 | 5 | -- (continuing) in which they instructed you to |
| 10:16:23 | 6 | transport from the warehouse the server located there, as well |
| 10:16:28 | 7 | as any personal computers? |
| 10:16:29 | 8 | A. Yes. |
| 10:16:30 | 9 | Q. And they also instructed you to bring them all to the Oak |
| 10:16:34 | 10 | Brook office and place them in a secure room? |
| 10:16:36 | 11 | A. Yes, ma'am. |
| 10:16:37 | 12 | Q. And you understood that this was part of your counsel's -- |
| 10:16:43 | 13 | at that time, Bailey Borlack and Nadelhoffer's -- efforts to |
| 10:16:46 | 14 | inventory all of Kanan Fashions' electronic information |
| 10:16:51 | 15 | systems and to prepare a data map? |
| 10:16:54 | 16 | A. Yes. |
| 10:16:54 | 17 | Q. So on April 28th, 2010, Mr. Grossman followed up with |
| 10:17:03 | 18 | Mr. Joshi and you on that instruction, that the server be |
| 10:17:07 | 19 | brought from the warehouse to Kanan's Oak Brook offices and |
| 10:17:11 | 20 | kept securely; is that right? |
| 10:17:14 | 21 | A. Yes. |
| 10:17:14 | 22 | Q. And the day after, your former counsel represented to me |
| 10:17:21 | 23 | in correspondence that all computers from the warehouse are |
| 10:17:25 | 24 | being moved to Kanan's Oak Brook offices; is that right? |
| 10:17:30 | 25 | A. Yes. |

10:17:30   1   Q.  And before sending this letter to me, your former counsel

10:17:34   2   actually sent you a draft of this letter first, right?

10:17:39   3   A.  I don't recall that, ma'am.

10:17:41   4   Q.  Okay.

10:17:42   5   A.  But he must have.

10:17:43   6   Q.  Let's take a look at Exhibit 89.

10:18:03   7        Do you have that in front of you?

10:18:04   8   A.  Yes.

10:18:04   9   Q.  That is, for the record, an e-mail dated April 29th, 2010,

10:18:09  10   from Eric Grossman to Paresh Joshi with copies to David

10:18:15  11   Muschler, Alan Borlack, and Mehul Shah.  And the person I'm

10:18:22  12   referring to says, Paresh, please see for your review and

10:18:24  13   approval the attached draft letters re:  Kanan's ESI and

10:18:29  14   document production.  Per our conversation, please expedite

10:18:33  15   your review as we need to send this to Vilia today.  And it's

10:18:33  16   from Eric Grossman.

10:18:36  17        Do you see that?

10:18:36  18   A.  Yes.

10:18:36  19   Q.  And you received a copy of this?

10:18:38  20   A.  Yes.

10:18:38  21   Q.  And the second page of this is an actual draft letter to

10:18:43  22   me.  And in paragraph 6 on page 2 of that letter, it says, All

10:18:59  23   Kanan ex-employees' computers have been kept in a secure

10:19:02  24   location in either Kanan's Oak Brook office or at the

10:19:05  25   warehouse.  All computers from the warehouse are being moved

10:19:08  1  to Kanan's Oak Brook office.

10:19:11  2  A.  Yes, I see that.

10:19:12  3  Q.  So it would be fair to say that you saw this letter before

10:19:17  4  Mr. Grossman sent it to me?

10:19:18  5  A.  No, I did not, because Mr. Joshi was handling this, so I

10:19:24  6  was letting him make the decision on moving whatever needed to

10:19:27  7  be moved from the warehouse as well as answering to this.

10:19:31  8          MS. DEDINAS:  I am going to move to strike and ask

10:19:32  9  for an instruction.

10:19:33  10          THE COURT:  It will be granted.

10:19:35  11          Now, you really can't elaborate.  I know you want to.

10:19:40  12          THE WITNESS:  Okay, Judge.

10:19:41  13          THE COURT:  We all want to.  But you just can't do

10:19:43  14  that.

10:19:44  15          THE WITNESS:  I'm so sorry.

10:19:45  16          THE COURT:  Your attorney is going to give you a

10:19:47  17  chance to elaborate on this.

10:19:48  18          THE WITNESS:  Okay.

10:19:49  19          MS. DEDINAS:  Can we reread the question?

10:19:49  20          THE COURT:  Sure.

10:20:02  21    (Record read. )

10:20:03  22          THE WITNESS:  No.

10:20:04  23  BY MS. DEDINAS:

10:20:10  24  Q.  Do you recall -- do you know that you got the e-mail?

10:20:13  25          THE COURT:  That's on the previous page now.

| | | |
|---|---|---|
| 10:20:15 | 1 | THE WITNESS:  Yes. |
| 10:20:25 | 2 | BY MS. DEDINAS: |
| 10:20:25 | 3 | Q.  You got the e-mail? |
| 10:20:26 | 4 | A.  Yes. |
| 10:20:26 | 5 | Q.  Now, was the warehouse server moved out of the Aurora |
| 10:20:29 | 6 | warehouse to Kanan Fashions' corporate headquarters in Oak |
| 10:20:33 | 7 | Brook anytime in April? |
| 10:20:34 | 8 | A.  No. |
| 10:20:34 | 9 | Q.  How about in May? |
| 10:20:36 | 10 | A.  No. |
| 10:20:36 | 11 | Q.  How about in June? |
| 10:20:38 | 12 | A.  No. |
| 10:20:39 | 13 | Q.  How about in July? |
| 10:20:40 | 14 | A.  No. |
| 10:20:41 | 15 | Q.  In fact, it was moved in July, but not because you moved |
| 10:20:46 | 16 | it; is that right? |
| 10:20:48 | 17 | A.  Correct. |
| 10:20:48 | 18 | Q.  It moved because First Midwest Bank sold it? |
| 10:20:51 | 19 | A.  Correct. |
| 10:20:51 | 20 | Q.  Now, over the course of a number of months, your attorneys |
| 10:20:59 | 21 | at Bailey Borlack and Nadelhoffer sent you and Mr. Joshi |
| 10:21:03 | 22 | numerous e-mails advising you that you had to get control over |
| 10:21:06 | 23 | that warehouse server? |
| 10:21:08 | 24 | A.  Yes. |
| 10:21:08 | 25 | Q.  Do you recall that? |

10:21:09  1  A.  Yes.

10:21:09  2  Q.  And do you recall you got e-mails on May 11th?

10:21:15  3  A.  Yes.

10:21:15  4  Q.  May 13th?

10:21:17  5  A.  Yes.

10:21:17  6  Q.  May 25th?

10:21:19  7  A.  Yes.  If it's in production, yes.

10:21:22  8       THE COURT:  But she has the right to ask you each

10:21:25  9  question.

10:21:25  10      THE WITNESS:  Yes.

10:21:26  11 BY MS. DEDINAS:

10:21:26  12 Q.  May 27th?

10:21:27  13 A.  Yes.

10:21:27  14 Q.  June 2nd?

10:21:29  15 A.  Yes.

10:21:29  16 Q.  July 7th?

10:21:31  17 A.  Yes.

10:21:32  18 Q.  June 23rd -- sorry, July 23rd?

10:21:39  19 A.  Yes.

10:21:39  20 Q.  And your response to all these inquiries were that you

10:21:44  21 were working on it?

10:21:44  22 A.  We were trying to negotiate -- yes.  The answer is yes.

10:21:49  23 Sorry.

10:21:49  24 Q.  And, in fact, you had asked your father to try to help you

10:21:56  25 find somebody to lend you the money to buy the server back,

10:22:01 1   right?

10:22:02 2   A.  Yes.

10:22:02 3   Q.  Now, your father lives with you in your home in Oak Brook

10:22:07 4   for half the year?

10:22:08 5   A.  At my sister's home, yes.

10:22:10 6   Q.  In your sister's home?

10:22:11 7   A.  Yes.

10:22:11 8   Q.  And that's a few blocks from you?

10:22:13 9   A.  Yes.

10:22:14 10  Q.  And your father has lent you money in the past; is that

10:22:14 11  right?

10:22:18 12  A.  Yes.

10:22:18 13  Q.  And isn't it true that at least on one occasion, instead

10:22:23 14  of repaying your father directly on a loan, you repaid a Hong

10:22:29 15  Kong company at your father's direction?

10:22:31 16  A.  Yes.

10:22:31 17          MR. McJESSY:  Objection.  Relevance.

10:22:32 18          THE COURT:  No, he can answer that.

10:22:36 19  BY MS. DEDINAS:

10:22:37 20  Q.  And at some point in your negotiations with Mr. Clark for

10:22:40 21  repurchasing this server, did you tell Mr. Clark that a

10:22:44 22  foreign corporation would repay First Midwest Bank for the

10:22:47 23  server?

10:22:48 24  A.  No.

10:22:48 25  Q.  Never told him that?

| | | |
|---|---|---|
| 10:22:50 | 1 | A.  No. |
| 10:22:50 | 2 | Q.  Okay.  Now, on August 4th, Mr. Borlack sent and e-mailed |
| 10:22:59 | 3 | you a letter asking for your immediate attention to Kanan's |
| 10:23:02 | 4 | I.T. systems, do you recall that? |
| 10:23:04 | 5 | A.  Yes. |
| 10:23:04 | 6 | Q.  I'm going to have you take a look at Exhibit 169. |
| 10:23:13 | 7 | THE COURT:  It's in the other binder. |
| 10:23:18 | 8 | Are we going to be finished with this first book at |
| 10:23:23 | 9 | this time?  I am just trying to figure whether I need to put |
| 10:23:25 | 10 | it away or not. |
| 10:23:26 | 11 | It's all right.  Don't worry about it. |
| 10:23:28 | 12 | MS. DEDINAS:  What does the first one go to, 150, |
| 10:23:31 | 13 | 149? |
| 10:23:33 | 14 | THE COURT:  Yes. |
| 10:23:33 | 15 | MS. DEDINAS:  Yes, we are done. |
| 10:23:34 | 16 | THE COURT:  We are not going to come back to that? |
| 10:23:40 | 17 | Do you want to repeat the number? |
| 10:23:43 | 18 | BY MS. DEDINAS: |
| 10:23:44 | 19 | Q.  It's 169. |
| 10:23:54 | 20 | Now, in this letter, Mr. Borlack says that there are |
| 10:23:57 | 21 | serious matters that require your immediate attention; is that |
| 10:23:57 | 22 | right? |
| 10:24:01 | 23 | A.  Yes. |
| 10:24:01 | 24 | Q.  He devotes an entire section to the warehouse server.  And |
| 10:24:10 | 25 | he says, Since April 26th, 2010, we have advised that we must |

10:24:15   1    have access to the warehouse server, but there has been no

10:24:19   2    access.

10:24:22   3          Do you see that?

10:24:22   4    A. Yes.

10:24:23   5    Q. Please see Eric's July 23rd, 2010, e-mail, as well as the

10:24:28   6    attached e-mail threads, indicating that this issue was raised

10:24:33   7    April 26th, April 28th, May 11th, May 13th, May 27th,

10:24:39   8    June 2nd, June 4th, July 7th, and July 23rd.

10:24:44   9    A. Yes.

10:24:44   10    Q. And then he further says, If we are not provided with

10:24:49   11    access to the warehouse server, then we are unable to complete

10:24:52   12    data mapping of Kanan's ESI systems, much less provide any ESI

10:24:59   13    that evidences Kanan's inventory.

10:25:05   14          Mr. Borlack further says, In fact, we are due to go

10:25:09   15    back to court on August 26th with ESI liaisons, and you can be

10:25:16   16    sure if this issue is not closed out by that time, meaning

10:25:20   17    that we have had access and sufficient time to review this

10:25:23   18    data map system, then opposing counsel will be sure to

10:25:29   19    leverage this issue against us. It is likely that opposing

10:25:32   20    counsel will use this to support its fraud claim and may raise

10:25:35   21    an evidence spoliation claim. I cannot stress enough that we

10:25:40   22    must, absolutely must, be provided with access to the

10:25:43   23    warehouse server as soon as possible.

10:25:47   24          Did you receive that letter?

10:25:48   25    A. Yes.

10:25:48  1  Q.  And what was your reaction to Mr. Borlack upon receiving

10:25:58  2  that letter?

10:25:59  3  A.  We had a phone conversation.  I tried -- can I explain?

10:26:05  4  Q.  Yes.

10:26:05  5  A.  And I tried to reach Mr. Clark and was not able to reach

10:26:10  6  him.  At times, I have called him probably two or three times

10:26:14  7  a day and left messages and could not.

10:26:17  8        And then on August 9th, I sent him an e-mail out.  I

10:26:21  9  was still trying to raise the money to buy the server.

10:26:24  10  Q.  To your knowledge, at any time between April 26th to the

10:26:29  11  third week of August, did your attorneys, Bailey Borlack and

10:26:34  12  Nadelhoffer, ever advise me or the court that you didn't have

10:26:38  13  control over or access to the data of the warehouse server?

10:26:43  14        MR. LIPTON:  Objection.  Foundation.  Assumes facts

10:26:50  15  not in evidence.

10:26:50  16        THE COURT:  Go ahead and try to lay a foundation for

10:26:53  17  it.  I think you can.

10:26:56  18  BY MS. DEDINAS:

10:26:57  19  Q.  Mr. Shah, you received communications from your attorneys

10:26:59  20  on a regular basis; isn't that correct?

10:27:01  21  A.  Yes.

10:27:02  22  Q.  And whenever they file something or send copies of letters

10:27:06  23  to me, they send you a copy; isn't that right?

10:27:09  24  A.  Yes.

10:27:09  25  Q.  So from your review of what your attorneys had filed and

| | |
|---|---|
| 10:27:14 | 1 |
| 10:27:19 | 2 |
| 10:27:23 | 3 |
| 10:27:26 | 4 |
| 10:27:27 | 5 |
| 10:27:28 | 6 |
| 10:27:32 | 7 |
| 10:27:35 | 8 |
| 10:27:37 | 9 |
| 10:27:40 | 10 |
| 10:27:41 | 11 |
| 10:27:42 | 12 |
| 10:27:46 | 13 |
| 10:27:50 | 14 |
| 10:27:51 | 15 |
| 10:27:51 | 16 |
| 10:27:55 | 17 |
| 10:27:55 | 18 |
| 10:27:58 | 19 |
| 10:27:59 | 20 |
| 10:28:02 | 21 |
| 10:28:02 | 22 |
| 10:28:19 | 23 |
| 10:28:23 | 24 |
| 10:28:26 | 25 |

sent in correspondence, are you aware that at any time between April 26th through the third week of August, your prior counsel advised me or the court --

THE COURT: Again, prior counsel.

BY MS. DEDINAS:

Q. Prior counsel, Bailey Borlack and Nadelhoffer, advised me or the court that you didn't have control or access to the warehouse server?

A. From what I understood --

MR. LIPTON: Objection, hearsay.

THE COURT: No, no, he can answer that.

THE WITNESS: I think they may have if we don't have control over the server, and they did inform you at some point in some e-mail format.

BY MS. DEDINAS:

Q. And that would have been on August 20th; is that right?

A. I don't recall the date.

Q. Okay.

MR. McGARRY: Your Honor, before she asks another question, I just -- I want to confer with counsel on something.

THE COURT: Sure. Sure.

MR. McGARRY: Your Honor, may I please? Two questions ago, never mind the last one, the witness testified that he sent an e-mail to "him" on August 9th, but the "him"

10:28:30  1   was never clarified.

10:28:31  2            THE COURT:  Clarified.

10:28:31  3            MR. McGARRY:  And it was left out as if it might be

10:28:34  4   Mr. Borlack or Mr. Clark or other persons.

10:28:37  5            THE COURT:  Well, we will find out.

10:28:38  6            MR. McGARRY:  Can we please?

10:28:39  7            THE COURT:  Do you want to have that question read

10:28:41  8   back?

10:28:42  9            MR. McGARRY:  May I please, your Honor?

10:29:43  10           THE COURT:  Do you mind if I read back what we think

10:29:45  11  this is?

10:29:45  12           MR. McGARRY:  Thank you.

10:29:46  13           THE COURT:  Here is -- the question is, and what was

10:29:48  14  your reaction to Mr. Borlack upon receiving that letter?  He

10:29:54  15  answers, we had a phone conversation.  I tried, and then he

10:29:58  16  asked, can I explain that?  And Dedinas said yes.  And I tried

10:30:03  17  to reach Mr. Clark and was not able to reach him.  At times, I

10:30:09  18  have called him probably two or three times.

10:30:14  19           And I had a question about that also.  I agree with

10:30:16  20  you about that.  Who are you referring to, Mr. Borlack or

10:30:20  21  Mr. Clark?

10:30:20  22           THE WITNESS:  Mr. Clark.

10:30:22  23           MS. DEDINAS:  Okay.

10:30:23  24           THE COURT:  That was a good catch.

10:30:24  25  BY MS. DEDINAS:

| | | |
|---|---|---|
| 10:30:24 | 1 | Q. Let me actually back up because my question had been what |
| 10:30:28 | 2 | was your reaction to Mr. Borlack. So I'm interested in |
| 10:30:33 | 3 | knowing what you told Mr. Borlack about the August -- |
| 10:30:36 | 4 | A. I told Mr. Borlack that we are in the process of |
| 10:30:39 | 5 | purchasing the server from First Midwest Bank. However, I am |
| 10:30:44 | 6 | trying to raise the money to buy the servers back. |
| 10:30:49 | 7 | Q. So you made it clear to him that you didn't have the money |
| 10:30:51 | 8 | yet? |
| 10:30:52 | 9 | A. I don't recall that. |
| 10:30:54 | 10 | Q. Now, on August 26th of 2010, we appeared before this court |
| 10:31:03 | 11 | for a status hearing. Do you recall that? |
| 10:31:05 | 12 | A. Yes. Yes. |
| 10:31:07 | 13 | Q. And you were present, right? |
| 10:31:08 | 14 | A. Yes. |
| 10:31:08 | 15 | THE COURT: Could I interrupt you one second? |
| 10:33:00 | 16 | (Whereupon, a discussion was had off the record.) |
| 10:33:00 | 17 | THE COURT: We are back on. |
| 10:33:05 | 18 | BY MS. DEDINAS: |
| 10:33:05 | 19 | Q. So let me back up. On August 26th, there was a status |
| 10:33:08 | 20 | before this court, and you recall that you were there, right? |
| 10:33:11 | 21 | A. Yes, ma'am. |
| 10:33:11 | 22 | Q. And that's the status in which we discussed the fact that |
| 10:33:16 | 23 | the warehouse server -- that you didn't have control over the |
| 10:33:20 | 24 | warehouse server; is that right? |
| 10:33:21 | 25 | A. Yes. |

| | | |
|---|---|---|
| 10:33:21 | 1 | Q. And Mr. Borlack then advised the court that Associated |
| 10:33:27 | 2 | Bank had a lien on the server and that you had been |
| 10:33:30 | 3 | negotiating to purchase the server from Associated Bank for |
| 10:33:33 | 4 | months and you now think you have a deal; is that right? |
| 10:33:36 | 5 | A. Yes. |
| 10:33:36 | 6 | Q. Now, you had just said you didn't have the money to buy |
| 10:33:43 | 7 | the server; is that right? |
| 10:33:45 | 8 | A. Yes, ma'am. |
| 10:33:45 | 9 | Q. So you didn't really have a deal to buy the server back, |
| 10:33:48 | 10 | did you? |
| 10:33:49 | 11 | A. No. |
| 10:33:50 | 12 | Q. And you didn't say anything when you were in court about |
| 10:33:55 | 13 | Mr. Borlack's representation? |
| 10:33:58 | 14 | A. I didn't know what to say. I was in court. |
| 10:34:04 | 15 | THE COURT: That's fine. That's fine. |
| 10:34:05 | 16 | BY MS. DEDINAS: |
| 10:34:05 | 17 | Q. And so you knew that the court had been told something |
| 10:34:09 | 18 | that wasn't entirely true? |
| 10:34:11 | 19 | A. True. |
| 10:34:11 | 20 | Q. And, in fact, as it turns out, the server had already been |
| 10:34:19 | 21 | sold for more than a month; isn't that right? |
| 10:34:21 | 22 | A. Yes, ma'am. |
| 10:34:21 | 23 | Q. And -- okay. |
| 10:34:25 | 24 | Now, you say that you only learned later that David |
| 10:34:29 | 25 | Clark had sold the server back in July? |

10:34:32  1  A.  Yes.

10:34:33  2  Q.  Is that right?

10:34:34  3          And you found out by getting an e-mail from

10:34:39  4  Mr. Clark; is that right?

10:34:39  5  A.  Yes.

10:34:39  6  Q.  And I'd like you to look at Exhibit 191.  For the record,

10:34:54  7  this is an e-mail from David Clark to Mehul Shah dated

10:34:59  8  August 30th, 2010.  It says, Mehul, I am very sorry, but as I

10:35:03  9  told you back in July, I was very anxious to sell the

10:35:07  10  computer, and as I was entering into a contract to sell the

10:35:10  11  warehouse, I had to find someone to take the computer.  I

10:35:15  12  finalized the transaction with Associated Bank for a buyer in

10:35:18  13  Dubai.  The money was wired, and they picked up the computer

10:35:21  14  the following day.  Again, I am sorry, but I waited through

10:35:27  15  the end of July and could not wait any longer.

10:35:30  16  A.  Yes.

10:35:30  17  Q.  Is this the e-mail that first informed you --

10:35:32  18  A.  Yes, ma'am.

10:35:32  19  Q.  You got to let me finish the question.

10:35:35  20          -- (continued) that first informed you that the

10:35:37  21  server had been sold?

10:35:38  22  A.  Yes.

10:35:38  23  Q.  Now, it just so happens that at one time, Kanan Fashions

10:35:46  24  had an office in Dubai; isn't that right?

10:35:50  25  A.  Yes.

| | | |
|---|---|---|
| 10:35:51 | 1 | Q.  And in connection with business for your -- for Kanan |
| 10:35:55 | 2 | Fashions, you traveled to those offices in Dubai as well? |
| 10:36:02 | 3 | A.  About 11 years ago. |
| 10:36:03 | 4 | Q.  Yes.  And the company that you had was Capital |
| 10:36:07 | 5 | Consolidated; isn't that right? |
| 10:36:09 | 6 | A.  Yes. |
| 10:36:09 | 7 | Q.  And they used Standard Charter Bank for its banking |
| 10:36:13 | 8 | services; isn't that right? |
| 10:36:14 | 9 | A.  Yes. |
| 10:36:14 | 10 | Q.  And it just so happens that that's the same bank that |
| 10:36:18 | 11 | wired the funds from Diagems to First Midwest Bank? |
| 10:36:24 | 12 | A.  Yes. |
| 10:36:24 | 13 | Q.  And it just so happens that Kanan Fashions also has |
| 10:36:28 | 14 | suppliers in Dubai; isn't that right? |
| 10:36:31 | 15 | A.  No. |
| 10:36:32 | 16 | Q.  No suppliers -- none of your suppliers have offices in |
| 10:36:39 | 17 | Dubai? |
| 10:36:39 | 18 | A.  No. |
| 10:36:40 | 19 | Q.  And then it just so happens that there's a company named |
| 10:36:45 | 20 | Diagems in Illinois? |
| 10:36:46 | 21 | A.  Yes. |
| 10:36:46 | 22 | Q.  And it also just so happens that the owner of Diagems, |
| 10:36:55 | 23 | Snehal Bhansali, is your next-door neighbor? |
| 10:36:56 | 24 | THE COURT:  Do you want to spell that for the court |
| 10:36:58 | 25 | reporter, please? |

| | | |
|---|---|---|
| 10:36:58 | 1 | MS. DEDINAS: S-n-e-h-a-l, B-h-a-n-s-a-l-i. |
| 10:37:04 | 2 | THE COURT: Thank you. |
| 10:37:05 | 3 | BY MS. DEDINAS: |
| 10:37:05 | 4 | Q. Do you remember the question? |
| 10:37:06 | 5 | A. Yes. |
| 10:37:07 | 6 | Q. Okay. |
| 10:37:08 | 7 | A. He is my neighbor, yes. |
| 10:37:09 | 8 | Q. Yes. |
| 10:37:10 | 9 | And it also just so happens that the other owner of |
| 10:37:14 | 10 | Diagems, Barag Bhansali, B-a-r-a-g, is Mr. Joshi's next door |
| 10:37:22 | 11 | neighbor? |
| 10:37:22 | 12 | A. Yes. |
| 10:37:22 | 13 | Q. And it just so happens that you know each other fairly |
| 10:37:26 | 14 | well? |
| 10:37:26 | 15 | A. Yes. |
| 10:37:26 | 16 | Q. And that you all belonged to the same temple? |
| 10:37:30 | 17 | A. Yes. |
| 10:37:31 | 18 | Q. Where is the server, Mr. Shah? |
| 10:37:35 | 19 | A. Where is the? |
| 10:37:37 | 20 | Q. The server. |
| 10:37:38 | 21 | A. I don't know. |
| 10:37:39 | 22 | Q. You don't know? |
| 10:37:39 | 23 | A. No, ma'am. |
| 10:37:40 | 24 | Q. And do you know who paid for the server? |
| 10:37:43 | 25 | A. Diagems, from the information that was produced. |

| | | |
|---|---|---|
| 10:37:48 | 1 | Q.  And you don't know where -- who Diagems is or where they |
| 10:37:52 | 2 | got the money? |
| 10:37:52 | 3 | A.  No, ma'am. |
| 10:37:53 | 4 | Q.  So -- |
| 10:37:55 | 5 | THE WITNESS:  May I say something, Judge? |
| 10:37:57 | 6 | THE COURT:  No. |
| 10:37:57 | 7 | BY MS. DEDINAS: |
| 10:37:57 | 8 | Q.  So it's just a coincidence that the server that was paid |
| 10:38:01 | 9 | for by a Dubai company named Diagems and your and Mr. Joshi's |
| 10:38:11 | 10 | neighbors also own a company named Diagems?  That's just a |
| 10:38:15 | 11 | coincidence in your mind, right? |
| 10:38:17 | 12 | A.  Yes, ma'am.  And they are two different names of the |
| 10:38:20 | 13 | companies.  One is FCC, one is Inc. |
| 10:38:24 | 14 | Q.  Now, let's talk about after you found out the server had |
| 10:38:32 | 15 | been purchased.  On August -- you indicated here in |
| 10:38:38 | 16 | Exhibit 191, it seems that you learned about the server being |
| 10:38:42 | 17 | sold on August 30th? |
| 10:38:44 | 18 | A.  Yes. |
| 10:38:44 | 19 | Q.  So, now, the next day, you e-mailed Mr. Clark to inquire |
| 10:38:51 | 20 | who had the personal guaranty for the lease? |
| 10:38:53 | 21 | A.  Yes. |
| 10:38:53 | 22 | Q.  Is that right? |
| 10:38:54 | 23 | And that's Exhibit 196.  Do you see that? |
| 10:39:06 | 24 | A.  Yes. |
| 10:39:07 | 25 | Q.  For the record, this is an e-mail from you to David Clark |

10:39:09  1  dated August 31st, 2010.

10:39:12  2  A.  Yes.

10:39:13  3  Q.  It says, Dave, who has the guaranties on the master lease,

10:39:17  4  thanks, Mehul Shah.

10:39:20  5  A.  Yes.

10:39:20  6  Q.  What you didn't ask him in the e-mail was who bought the

10:39:23  7  server, right?

10:39:25  8  A.  Correct.

10:39:25  9  Q.  And you didn't ask him any information about the buyer,

10:39:30  10  did you?

10:39:30  11  A.  No.

10:39:30  12  Q.  And you didn't confront him with the fact that he got rid

10:39:34  13  of a server that had data from your company that you might

10:39:38  14  need, right?

10:39:39  15  A.  I wanted to, but my attorney was handling communication

10:39:42  16  with their attorney.

10:39:43  17           THE COURT:  That will be stricken as nonresponsive.

10:39:45  18           THE WITNESS:  Okay.

10:39:46  19  BY MS. DEDINAS:

10:39:46  20  Q.  It's a yes-or-no question.  Did you confront him with that

10:39:49  21  fact?

10:39:50  22  A.  No.

10:39:50  23  Q.  And you didn't confront him with the fact that he got rid

10:39:53  24  of a server that might have confidential business information

10:39:57  25  about your company or of other companies; isn't that right?

10:40:01  1  A.  Yes.

10:40:02  2  Q.  And you didn't confront him with the fact that you got rid

10:40:06  3  of -- that he got rid of evidence that you might need in a

10:40:09  4  federal lawsuit?

10:40:10  5  A.  Absolutely.

10:40:10  6  Q.  Now, since you've learned that Clark sold the server, you

10:40:16  7  have had numerous discussions with him on other subjects;

10:40:20  8  isn't that right?

10:40:21  9  A.  A few.

10:40:22  10  Q.  Okay.  And those were regarding the possibility of still

10:40:28  11  leasing the building that Mr. Clark was trying to sell?

10:40:32  12  A.  No, he needed information on the building blueprints and

10:40:36  13  the roof.

10:40:37  14  Q.  So it related to the building; is that right?

10:40:40  15  A.  Yes.  Yes.

10:40:41  16  Q.  And in all of these conversations that you had with

10:40:46  17  Mr. Clark after Mr. Clark sold the server, you didn't bring up

10:40:49  18  any of those things about the server with him?

10:40:51  19  A.  No, ma'am.

10:40:51  20  Q.  And you made no further attempts to discuss the sale of

10:40:56  21  the server with Mr. Clark?

10:40:59  22  A.  Then I stopped calling him.  I don't even talk to him.

10:41:03  23          MS. DEDINAS:  Move to strike.

10:41:04  24          THE COURT:  Stricken.

10:41:05  25  BY MS. DEDINAS:

10:41:05  1  Q.  The answer is yes or no.

10:41:06  2  A.  No.

10:41:08  3       THE COURT:  Well, you are not -- I have to make

10:41:10  4  something clear, and I understand that this is difficult for

10:41:13  5  you.  You're not limited to a yes or no all the time, but you

10:41:19  6  have to be very careful about what you say beyond that.  Okay?

10:41:22  7       THE WITNESS:  Okay, your Honor.

10:41:23  8  BY MS. DEDINAS:

10:41:24  9  Q.  And you made no further attempts to locate the buyer of

10:41:27  10  the server with Mr. Clark?

10:41:29  11  A.  Yes, I did.

10:41:30  12  Q.  You asked Mr. Clark?

10:41:34  13  A.  No, not with him.

10:41:35  14  Q.  I mean with Mr. Clark.

10:41:36  15  A.  No.

10:41:37  16  Q.  And you've never learned who bought the server from First

10:41:42  17  Midwest?

10:41:42  18  A.  No.

10:41:43  19  Q.  And you don't know where the server is?

10:41:44  20  A.  No, ma'am.

10:41:45  21  Q.  And you don't know who paid for it?

10:41:47  22  A.  No.

10:41:48  23  Q.  Now, in all the time since the server was sold, from

10:41:52  24  July 28th or 29th to the present, has anybody contacted you

10:41:57  25  about your liability on the guaranty for the lease?

| | | |
|---|---|---|
| 10:42:00 | 1 | A.  No, ma'am. |
| 10:42:01 | 2 | Q.  So whoever has the server and whoever has your personal |
| 10:42:05 | 3 | guaranty has made no effort to collect from you? |
| 10:42:08 | 4 | A.  Not yet. |
| 10:42:11 | 5 | MS. DEDINAS:  No further questions. |
| 10:42:12 | 6 | THE COURT:  Thank you very much. |
| 10:42:36 | 7 | - - - |
| 10:42:36 | 8 | MEHUL SHAH, CROSS-EXAMINATION |
| 10:42:36 | 9 | BY MR. McJESSY: |
| 10:42:52 | 10 | Q.  Mr. Shah, let me pick up where UCB's counsel left off. |
| 10:43:02 | 11 | Counsel asked you whether you had asked Dave Clark |
| 10:43:05 | 12 | about what happened to the server.  Do you recall that? |
| 10:43:06 | 13 | A.  Yes. |
| 10:43:07 | 14 | Q.  And you said you did not; is that right? |
| 10:43:10 | 15 | A.  Yes. |
| 10:43:10 | 16 | Q.  Why not? |
| 10:43:11 | 17 | A.  I was very angry, plus Mr. Borlack was handling right from |
| 10:43:18 | 18 | the time when we received that e-mail on August 30th he was |
| 10:43:21 | 19 | communicating with Mr. Serritella.  And I was too angry and |
| 10:43:26 | 20 | too disappointed to talk to Dave about anything, and I kept my |
| 10:43:30 | 21 | distance on it. |
| 10:43:31 | 22 | Q.  All right.  Now, you had communications with Mr. Clark |
| 10:43:36 | 23 | about the roof and the plans I think you said; is that right? |
| 10:43:41 | 24 | A.  Yes.  Just a couple of more times after the 30th, I may |
| 10:43:44 | 25 | have spoken to him briefly. |

| | | |
|---|---|---|
| 10:43:45 | 1 | Q. Why did you have communications with him about the plans? |
| 10:43:49 | 2 | A. I owed him some information on the building for his buyer. |
| 10:43:53 | 3 | Q. Okay. What was Mr. Clark doing that he needed that |
| 10:43:57 | 4 | information? |
| 10:43:57 | 5 | A. I don't know. |
| 10:43:58 | 6 | Q. All right. |
| 10:44:02 | 7 | A. From what I remember, the buyer was KTR, who had asked him |
| 10:44:06 | 8 | some questions. |
| 10:44:07 | 9 | Q. So he was selling the building? |
| 10:44:08 | 10 | A. Yes. |
| 10:44:08 | 11 | Q. All right. And as a part of that process, he requested |
| 10:44:14 | 12 | information from you? |
| 10:44:14 | 13 | A. Yes. |
| 10:44:15 | 14 | THE COURT: Could I ask you to stop just for one |
| 10:44:18 | 15 | second? We have Mr. Clark here. Which room should we put him |
| 10:44:22 | 16 | in? |
| 10:44:24 | 17 | MS. DJORDJEVIC: He should be in Mr. Hart's room. I |
| 10:44:26 | 18 | apologize. We told his counsel that he didn't need to be here |
| 10:44:29 | 19 | yet. |
| 10:44:29 | 20 | BY MR. McJESSY: |
| 10:44:42 | 21 | Q. Mr. Shah, when you received notice from Mr. Clark that the |
| 10:44:47 | 22 | server had been sold, did you immediately advise your |
| 10:44:49 | 23 | attorneys of that fact? |
| 10:44:50 | 24 | A. Immediately. |
| 10:44:50 | 25 | Q. And, thereafter, they took over -- |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:44:52 | 1  | THE COURT:  Who do you mean by "attorneys"?                  |
| 10:44:55 | 2  | MR. McJESSY:  Very good.                                     |
| 10:44:56 | 3  | THE WITNESS:  Mr. Borlack and Mr. Steve Blumenthal.          |
| 10:44:56 | 4  | BY MR. McJESSY:                                              |
| 10:45:00 | 5  | Q.  Both attorneys?                                          |
| 10:45:01 | 6  | A.  Yes.                                                     |
| 10:45:01 | 7  | Q.  And, thereafter, it's your understanding that one or the |
| 10:45:04 | 8  | other of them or both handled the communications with counsel |
| 10:45:08 | 9  | for First Midwest Bank; is that right?                       |
| 10:45:10 | 10 | MR. LIPTON:  Objection.  Leading.                            |
| 10:45:11 | 11 | THE WITNESS:  I think Mr. Borlack --                         |
| 10:45:13 | 12 | THE COURT:  Well, he can lead on this.  He is on             |
| 10:45:15 | 13 | cross-examination right now, so he can lead on this.  And I'm |
| 10:45:20 | 14 | sorry we didn't let him answer that question.  So you want   |
| 10:45:23 | 15 | that question repeated or can you repeat it?                 |
| 10:45:26 | 16 | BY MS. DEDINAS:                                              |
| 10:45:26 | 17 | Q.  Do you recall the question, sir?                         |
| 10:45:27 | 18 | A.  Yes.  Who handled the handling of that matter, and       |
| 10:45:32 | 19 | Mr. Borlack did.                                             |
| 10:45:33 | 20 | Q.  All right.  And you mentioned Mr. Serritella.  Who is    |
| 10:45:37 | 21 | Mr. Serritella?                                              |
| 10:45:37 | 22 | A.  He is the attorney for First Midwest Bank.               |
| 10:45:40 | 23 | Q.  All right.  Now, I want to take you back to the start of |
| 10:45:48 | 24 | UCB's counsel's questions regarding Kanan Fashions.          |
| 10:45:51 | 25 | How long has Kanan Fashions been in business?                |

| | | |
|---|---|---|
| 10:45:53 | 1 | A. Eighteen years. |
| 10:45:55 | 2 | Q. All right. And what does it do? |
| 10:45:57 | 3 | A. We manufacture and distribute apparel to department stores |
| 10:46:02 | 4 | in the USA. |
| 10:46:03 | 5 | Q. Does Kanan Fashions itself manufacture the apparel? |
| 10:46:08 | 6 | A. Yes. |
| 10:46:08 | 7 | Q. And where does it do that? |
| 10:46:10 | 8 | A. Most recently was in Sri Lanka. |
| 10:46:14 | 9 | Q. Overseas? |
| 10:46:14 | 10 | A. Overseas, right. |
| 10:46:16 | 11 | Q. And then the apparel is shipped in to the United States? |
| 10:46:18 | 12 | A. Yes. |
| 10:46:18 | 13 | Q. All right. And the company's been in business you said 18 |
| 10:46:26 | 14 | years? |
| 10:46:26 | 15 | A. Yes. |
| 10:46:26 | 16 | Q. And what kind of sales has the company had over the last |
| 10:46:31 | 17 | several years? |
| 10:46:32 | 18 | A. Close to $50 million. |
| 10:46:34 | 19 | Q. And who are its customers? |
| 10:46:36 | 20 | A. Kohl's, Sears, K-Mart over the period of the last few |
| 10:46:43 | 21 | years, J.C. Penny. |
| 10:46:45 | 22 | Q. And in order to engage in its business, it maintained a |
| 10:46:49 | 23 | line of credit; is that right? |
| 10:46:50 | 24 | A. Yes. |
| 10:46:50 | 25 | Q. Who did it most recently maintain that line of credit |

10:46:53   1   with?

10:46:53   2   A.  With Mutual Bank.

10:46:55   3   Q.  And how long did it have its line of credit with Mutual

10:47:00   4   Bank?

10:47:00   5   A.  Kanan Fashions had line of credit with Mutual Bank since

10:47:03   6   2006.

10:47:03   7   Q.  All right.  And who did it have its line of credit with

10:47:06   8   prior to that?

10:47:07   9   A.  Prior to that was -- it was Bank One.

10:47:10   10   Q.  All right.  How long did it have its line of credit with

10:47:13   11   Bank One?

10:47:14   12   A.  It was two or three years prior to that.

10:47:16   13   Q.  All right.  Now, I don't want to go back through the

10:47:20   14   history of its line of credit --

10:47:21   15         THE COURT:  Thank you.

10:47:21   16   BY MR. McJESSY:

10:47:23   17   Q.  -- but it's been in business 18 years.  Has it maintained

10:47:26   18   a line of credit during that entire period of time?

10:47:28   19   A.  Yes.

10:47:28   20         MS. DEDINAS:  Objection, your Honor.

10:47:29   21         THE COURT:  Sustained the objection.

10:47:34   22         MR. McJESSY:  Judge, I think it's important --

10:47:35   23         THE COURT:  Well, are you going into direct

10:47:36   24   examination now?  That's what you're doing.

10:47:39   25         MR. McJESSY:  Well, she asked about the corporation.

10:47:41  1    THE COURT:  They did, but you are going far beyond
10:47:44  2  that as far as the court is concerned.
10:47:45  3    MR. McJESSY:  Just so I'm clear, your Honor, can I
10:47:47  4  reserve -- I had thought that we were going to sort of handle
10:47:51  5  the witness once and then call him back on -- not call him
10:47:53  6  back --
10:47:53  7    THE COURT:  What you were going to do, as I recall,
10:47:55  8  and lawyers please correct me on this, is I was going to give
10:47:58  9  you a chance to do cross-examination and then you were going
10:48:01  10  to go into direct examination.  Am I right about that?
10:48:06  11    MR. McJESSY:  Fair enough.
10:48:06  12    MS. DEDINAS:  Yes.
10:48:07  13    MR. LIPTON:  Yes, your Honor.
10:48:08  14    THE COURT:  So now should I assume that you are in
10:48:11  15  direct examination or cross-examination?
10:48:13  16    MR. McJESSY:  I will go back on cross-examination,
10:48:15  17  your Honor.
10:48:19  18    THE COURT:  And I realize it's awkward.
10:48:23  19    MR. McJESSY:  Thank you, your Honor.
10:48:23  20  BY MR. McJESSY:
10:48:27  21  Q.  So what were your responsibilities with Kanan Fashions?
10:48:31  22  A.  I was the CEO.  My job was to bring orders and sales.
10:48:37  23  Q.  Counsel for UCB asked you several questions, and you
10:48:43  24  answered them with that would be Mr. Joshi's responsibility.
10:48:47  25  Do you recall those questions?

| | | |
|---|---|---|
| 10:48:47 | 1 | A.  Yes. |
| 10:48:48 | 2 | Q.  All right.  And they were questions concerning the |
| 10:48:52 | 3 | information that would be stored on the server at the |
| 10:48:55 | 4 | warehouse.  Do you recall that? |
| 10:48:56 | 5 | A.  Yes. |
| 10:48:57 | 6 | Q.  All right.  Why is it that you didn't have knowledge of |
| 10:49:01 | 7 | the information that's on the server at the warehouse? |
| 10:49:03 | 8 | A.  I am not an I.T. person, and I never involved myself in |
| 10:49:07 | 9 | that end of the business. |
| 10:49:09 | 10 | Q.  All right.  And when you say "that end of the business," |
| 10:49:12 | 11 | what are you referring to? |
| 10:49:13 | 12 | A.  Referring to the I.T., the warehouse, or the accounting |
| 10:49:19 | 13 | part. |
| 10:49:20 | 14 | Q.  All right.  Your job is to bring in customers? |
| 10:49:23 | 15 | A.  Yes. |
| 10:49:23 | 16 | Q.  All right.  Counsel for UCB also asked you if you had |
| 10:49:36 | 17 | inquired of Mr. Clark to buy back the guaranty as part of the |
| 10:49:46 | 18 | repurchase of the server.  Do you recall that? |
| 10:49:48 | 19 | A.  Yes. |
| 10:49:48 | 20 | Q.  At whose recommendation did you ask for that? |
| 10:49:56 | 21 | A.  Steve Blumenthal's. |
| 10:49:57 | 22 | Q.  Do you know why he recommended that? |
| 10:49:58 | 23 | A.  Mr. Blumenthal has been my corporate attorney for the last |
| 10:50:03 | 24 | 16 or 17 years, and he said, Mehul, if you're going to -- if |
| 10:50:09 | 25 | you ever get a chance to lease the building, you will leave |

| | | |
|---|---|---|
| 10:50:12 | 1 | the servers, but then while negotiating, it's better to |
| 10:50:15 | 2 | negotiate for the guaranty also because it's easier between |
| 10:50:18 | 3 | bank to bank to negotiate this. |
| 10:50:20 | 4 | Q.  Okay.  And which -- what banks are you referring to? |
| 10:50:22 | 5 | A.  First Midwest Bank and Associated Bank. |
| 10:50:25 | 6 | Q.  All right.  And counsel asked you if you were -- counsel |
| 10:50:56 | 7 | for UCB asked you if you were aware of the ESI order that was |
| 10:51:01 | 8 | entered.  Do you recall those questions? |
| 10:51:02 | 9 | A.  Yes. |
| 10:51:02 | 10 | Q.  And were you aware of that order? |
| 10:51:03 | 11 | A.  It was in February of 2010. |
| 10:51:06 | 12 | Q.  All right.  And did you receive a copy of that order? |
| 10:51:09 | 13 | A.  Yes. |
| 10:51:09 | 14 | Q.  Okay.  Did you review that letter -- order when you |
| 10:51:15 | 15 | received it? |
| 10:51:15 | 16 | A.  No, I relied on Mr. Borlack to handle it. |
| 10:51:18 | 17 | Q.  Okay.  He was your counsel at the time? |
| 10:51:21 | 18 | A.  Yes. |
| 10:51:21 | 19 | Q.  All right.  Did you discuss the order with him at the |
| 10:51:23 | 20 | time? |
| 10:51:23 | 21 | A.  We were told to preserve the computers, servers, and all |
| 10:51:29 | 22 | the data and e-mails. |
| 10:51:31 | 23 | Q.  And how many attorneys did you have working for you in |
| 10:51:38 | 24 | the -- in early 2010, January, February, the time frame we are |
| 10:51:42 | 25 | talking about? |

| | |
|---|---|
| 10:51:43 | 1 |
| 10:51:48 | 2 |
| 10:51:48 | 3 |
| 10:51:50 | 4 |
| 10:51:51 | 5 |
| 10:51:53 | 6 |
| 10:51:57 | 7 |
| 10:51:57 | 8 |
| 10:52:00 | 9 |
| 10:52:03 | 10 |
| 10:52:07 | 11 |
| 10:52:15 | 12 |
| 10:52:18 | 13 |
| 10:52:24 | 14 |
| 10:52:28 | 15 |
| 10:52:28 | 16 |
| 10:52:32 | 17 |
| 10:52:37 | 18 |
| 10:52:41 | 19 |
| 10:52:42 | 20 |
| 10:52:42 | 21 |
| 10:52:46 | 22 |
| 10:52:46 | 23 |
| 10:52:50 | 24 |
| 10:52:50 | 25 |

THE COURT:  Regarding what?

MR. McJESSY:  Any matters at all.

THE WITNESS:  Steve Blumenthal was a corporate attorney who I knew before.

THE COURT:  Let's have him identify what each attorney did then, if that's what you want.

MR. McJESSY:  Yes.

THE WITNESS:  Steve Blumenthal and Scott Schreiber were the two attorneys who assisted me trying to reach United Central Bank after their default of our agreement with them since August of 2009 until the January of 2010 when we were -- when there was a suit filed against Kanan Fashions and the rest of the entities.  At that time, we hired Mr. Borlack on the recommendation of Mr. Schreiber, and Mr. Borlack, Steve, has been the one who has been working from that point.

BY MR. McJESSY:

Q.  All right.  Counsel asked you if you understood you had an obligation to preserve electronically-stored information.  Do you recall that question?

A.  Yes.

Q.  What -- and you testified you did understand you had an obligation to preserve electronically-stored information; is that right?

A.  Yes, sir.

Q.  All right.  And what does that mean to you?  What did you

| | | |
|---|---|---|
| 10:52:56 | 1 | understand that to mean? |
| 10:52:57 | 2 | A.  Do not destroy anything. |
| 10:52:58 | 3 | Q.  Okay.  So it was your understanding that preserve ESI |
| 10:53:02 | 4 | information meant don't destroy anything? |
| 10:53:05 | 5 | A.  Don't delete any e-mails and don't do anything with |
| 10:53:08 | 6 | anything. |
| 10:53:08 | 7 | Q.  All right.  Now, I'd like you to open the first binder |
| 10:53:15 | 8 | there, if you would. |
| 10:53:26 | 9 | THE COURT:  Where to? |
| 10:53:30 | 10 | BY MR. McJESSY: |
| 10:53:31 | 11 | Q.  Turn to Exhibit 15. |
| 10:53:32 | 12 | A.  Yes. |
| 10:53:33 | 13 | Q.  I'd like you to take a look at -- there's two e-mails on |
| 10:53:44 | 14 | this page.  I'd like you to take a look at the one on the |
| 10:53:46 | 15 | bottom that's dated February 18th at 1:59 p.m.  Do you see |
| 10:53:51 | 16 | that? |
| 10:53:51 | 17 | A.  Yes. |
| 10:53:52 | 18 | MR. LIPTON:  I'm sorry.  What exhibit are we on? |
| 10:53:54 | 19 | THE COURT:  That's No. 15. |
| 10:53:55 | 20 | MR. LIPTON:  Thank you, your Honor. |
| 10:53:58 | 21 | THE COURT:  Let him find it before you ask the |
| 10:54:00 | 22 | question. |
| 10:54:07 | 23 | BY MR. McJESSY: |
| 10:54:08 | 24 | Q.  Now, this is an e-mail to you and Mehul (sic) from David |
| 10:54:14 | 25 | Muschler; is that right? |

10:54:15   1   A.  Yes, sir.

10:54:17   2   Q.  And it began, At the computer meeting yesterday.  Do you

10:54:19   3   see that?

10:54:19   4   A.  Yes, sir.

10:54:20   5   Q.  What is that referring to?

10:54:21   6   A.  The meeting that Mr. Joshi and Ray had with Mr. Muschler

10:54:27   7   and Ms. Dedinas, if I'm not mistaken, to shut down the backup

10:54:32   8   system of the computers.

10:54:33   9   Q.  Okay.  Do you know why that was being done?

10:54:36  10   A.  To preserve what was on the computer and not to -- to stop

10:54:42  11   -- from what my understanding is to stop -- freeze in time

10:54:45  12   from that point on, not to do any further alteration to the

10:54:50  13   system.

10:54:50  14   Q.  Okay.  So --

10:54:51  15         MS. DEDINAS:  Your Honor, I have an objection.  I'm

10:54:53  16   sorry that I'm late with this, but he is introducing a new

10:54:57  17   exhibit in his --

10:54:58  18         THE COURT:  He is.

10:54:59  19         MS. DEDINAS:  -- direct.

10:55:01  20         THE COURT:  You are shifting back and forth.  I

10:55:03  21   understand it's hard to do this.  So that's -- that should be

10:55:09  22   through your direct examination because it really has nothing

10:55:12  23   to do with the cross-examination.

10:55:14  24         MR. McJESSY:  Well, it does, though, your Honor.  She

10:55:17  25   asked him questions about whether he believed he had an

10:55:20  1   obligation to preserve information and what that meant.  And I

10:55:24  2   think this is exactly -- I mean, I'm not asking the questions

10:55:27  3   in a leading fashion, which I could certainly do --

10:55:29  4            THE COURT:  Yes, you could.

10:55:31  5            MR. McJESSY:  -- but I think I can ask cross with

10:55:32  6   open-ended questions.  And it really -- she went through the

10:55:35  7   whole history --

10:55:35  8            THE COURT:  That's where it's confusing.  If you

10:55:38  9   don't ask questions in a leading manner, it looks as though

10:55:41 10   you're going into direct examination.  So you have to tailor

10:55:45 11   your questioning.  Again, I know it's difficult to do this,

10:55:48 12   and I am going to give you some leeway on this, and that's

10:55:51 13   true of all sides because we don't want to have -- to keep

10:55:56 14   bringing these people back and back.

10:55:58 15            So I will overrule your objection and let him ask

10:56:01 16   that.  But don't go too far afield on this, all right?

10:56:06 17            MR. McJESSY:  And, Judge, perhaps if I do, you can

10:56:08 18   advise me.

10:56:10 19            THE COURT:  You know, I will if they object.

10:56:15 20            MR. McJESSY:  Very good, your Honor.

10:56:17 21   BY MR. McJESSY:

10:56:18 22   Q.  All right.  Mr. Shah, this was part of your understanding

10:56:23 23   of what it meant to preserve evidence; is that right?

10:56:25 24   A.  Yes.

10:56:25 25   Q.  All right.  And, in fact, this e-mail says at the top then

| | | |
|---|---|---|
| 10:56:32 | 1 | that the backup system was shut off at the Aurora warehouse; |
| 10:56:35 | 2 | is that right? |
| 10:56:37 | 3 | A.  There is no backup system. |
| 10:56:39 | 4 | THE COURT:  No, you are misreading it. |
| 10:56:41 | 5 | BY MR. McJESSY: |
| 10:56:41 | 6 | Q.  I'm sorry.  In fact, what it says is there is no backup |
| 10:56:44 | 7 | system at the Aurora warehouse; is that right? |
| 10:56:46 | 8 | A.  Correct. |
| 10:56:46 | 9 | Q.  And the Aurora warehouse, that's the server that we're |
| 10:56:49 | 10 | here on today; is that right? |
| 10:56:50 | 11 | A.  Yes. |
| 10:56:50 | 12 | Q.  That we've been discussing? |
| 10:56:51 | 13 | A.  Yes. |
| 10:56:52 | 14 | THE COURT:  And I'm sorry to interrupt you, but |
| 10:56:55 | 15 | Mr. McJessy, I think you need to point out that that is a |
| 10:56:59 | 16 | separate e-mail and it's at a different time. |
| 10:57:02 | 17 | BY MR. McJESSY: |
| 10:57:02 | 18 | Q.  And that e-mail, your Honor -- or that e-mail, Mr. Shah, |
| 10:57:06 | 19 | is dated February 18th at 1414, which would be I believe 2:14 |
| 10:57:14 | 20 | p.m.; is that right? |
| 10:57:15 | 21 | A.  Yes. |
| 10:57:15 | 22 | Q.  Now, Mr. Shah, counsel had asked you about -- |
| 10:57:28 | 23 | THE COURT:  Is he going to need the book anymore? |
| 10:57:30 | 24 | MR. McJESSY:  Yes. |
| 10:57:31 | 25 | BY MR. McJESSY: |

10:57:32   1   Q.  -- (continuing) about there being a friendly foreclosure.
10:57:34   2   Do you remember that?
10:57:34   3   A.  Yes.
10:57:35   4   Q.  And if could you turn to Exhibit 22.
10:57:43   5   A.  Yes.
10:57:46   6   Q.  And this is an e-mail to you --
10:57:47   7          MS. DEDINAS:  Objection, again, your Honor.  This is
10:57:48   8   a new exhibit that wasn't used in direct.
10:57:52   9          THE COURT:  Yeah, what is --
10:57:53  10          MR. McJESSY:  Judge, she asked him about the friendly
10:57:56  11   foreclosure and asked for details on that.  The whole point,
10:57:59  12   I'm assuming, of her examination was to show that the
10:58:03  13   warehouse was being turned over.
10:58:05  14          THE COURT:  What is your point, though, with going to
10:58:07  15   this e-mail?
10:58:08  16          MR. McJESSY:  My point, your Honor, is that Mr. Shah,
10:58:12  17   his counsel, they were all discussing this at this time and
10:58:19  18   that all parties were aware on the defendant's side, at least,
10:58:22  19   at this point that this friendly foreclosure was going to
10:58:27  20   occur.
10:58:33  21          You know, your Honor, maybe -- I will offer this up
10:58:36  22   as an alternative to avoid sort of the repeated objections.
10:58:43  23   One option here may be just to allow me to present direct
10:58:47  24   testimony as opposed to calling it cross-examination.  I am
10:58:50  25   going to cover many of the same points counsel covered.  In

| | | |
|---|---|---|
| 10:58:54 | 1 | addition to that, I will cover topics she did not cover.  But |
| 10:58:58 | 2 | it may make sense to present his testimony then as direct |
| 10:59:01 | 3 | examination. |
| 10:59:02 | 4 | THE COURT:  If I was opposing counsel, I'd love that. |
| 10:59:08 | 5 | But what's your position on that from you, Ms. Dedinas and |
| 10:59:14 | 6 | Mr. Lipton?  I see no problem with it. |
| 10:59:18 | 7 | MS. DEDINAS:  That's fine.  But when I hear a leading |
| 10:59:20 | 8 | question, I would object. |
| 10:59:21 | 9 | THE COURT:  I understand that. |
| 10:59:23 | 10 | MR. McJESSY:  I will try to use only leading |
| 10:59:25 | 11 | objections (sic) just to make the most basic of -- to set the |
| 10:59:28 | 12 | stage. |
| 10:59:28 | 13 | THE COURT:  That's fine.  That's fine. |
| 10:59:30 | 14 | Mr. Lipton? |
| 10:59:32 | 15 | MR. LIPTON:  That's fine, your Honor. |
| 10:59:33 | 16 | THE COURT:  So you are going into direct examination. |
| 10:59:34 | 17 | You are finished with your cross-examination. |
| 10:59:37 | 18 | MR. McJESSY:  Thank you, your Honor. |
| 10:59:39 | 19 | - - - |
| 10:59:39 | 20 | MEHUL SHAH, DIRECT EXAMINATION |
| 10:59:39 | 21 | BY MR. McJESSY: |
| 10:59:44 | 22 | Q.  Mr. Shah, do you have Exhibit 22 in front of you? |
| 10:59:47 | 23 | A.  Yes. |
| 10:59:47 | 24 | Q.  And that is an e-mail to you, Mr. Joshi, and Steve |
| 10:59:52 | 25 | Blumenthal from Alan Borlack; is that right? |

10:59:54  1   A.  Yes.

10:59:54  2   Q.  And it's an e-mail that begins, This will confirm my

10:59:58  3   understanding of our telecon today.  Do you see that?

11:00:01  4   A.  Yes, sir.

11:00:02  5   Q.  Did you have a teleconference on this date with Mr. Joshi,

11:00:09  6   Mr. Blumenthal, and Mr. Borlack?

11:00:11  7   A.  Yes.

11:00:11  8   Q.  What was the purpose of that teleconference?

11:00:14  9   A.  That there is a possibility of deed in lieu with First

11:00:22  10  Midwest Bank -- there is going to be a friendly foreclosure

11:00:25  11  that might happen on Creative Warehouse with First Midwest

11:00:30  12  Bank and Kanan Fashions.

11:00:31  13          THE COURT:  But you had said?

11:00:34  14          THE WITNESS:  Deed in lieu.

11:00:37  15  BY MR. McJESSY:

11:00:39  16  Q.  All right.  You were in discussions -- when I say "you,"

11:00:47  17  you or your counsel, Mr. Blumenthal, were in discussions with

11:00:51  18  First Midwest Bank at this time regarding the foreclosure on

11:00:54  19  the warehouse?

11:00:55  20  A.  Yes.

11:00:55  21  Q.  To your knowledge, did United Central Bank have a security

11:01:00  22  interest in the warehouse?

11:01:01  23  A.  Yes.

11:01:01  24  Q.  What was your understanding of that security interest?

11:01:04  25  A.  That they had a junior mortgage or the lien on the

| | | |
|---|---|---|
| 11:01:09 | 1 | building. |
| 11:01:10 | 2 | Q.  All right.  Did they have any security interest in the |
| 11:01:13 | 3 | contents of the building, to your knowledge? |
| 11:01:14 | 4 | A.  I think so, yes. |
| 11:01:19 | 5 | THE COURT:  That will be stricken.  He thinks so. |
| 11:01:22 | 6 | BY MR. McJESSY: |
| 11:01:23 | 7 | Q.  All right.  Sir, if you could turn to Exhibit 1.  If you |
| 11:01:47 | 8 | can tell me what that document is. |
| 11:01:49 | 9 | A.  Yes, this is a promissory note. |
| 11:01:54 | 10 | Q.  Is that to Kanan Fashions from Mutual Bank? |
| 11:01:57 | 11 | A.  Yes. |
| 11:01:58 | 12 | Q.  All right.  And was that the promissory note to which |
| 11:02:05 | 13 | United Central Bank had succeeded as part of its takeover of |
| 11:02:18 | 14 | Mutual Bank? |
| 11:02:18 | 15 | A.  Yes. |
| 11:02:18 | 16 | Q.  If you turn to the fourth page of that note, and if you |
| 11:02:27 | 17 | look at the fifth paragraph down. |
| 11:02:32 | 18 | THE COURT:  Well, the paragraphs are numbered.  At |
| 11:02:36 | 19 | least mine are. |
| 11:02:37 | 20 | BY MR. McJESSY: |
| 11:02:38 | 21 | Q.  If you could look at paragraph 15, which continues on to |
| 11:02:41 | 22 | page 4. |
| 11:02:42 | 23 | A.  Yes. |
| 11:02:42 | 24 | Q.  And it's actually -- |
| 11:02:46 | 25 | A.  It starts with? |

| | | |
|---|---|---|
| 11:02:47 | 1 | Q.  It starts with, Junior mortgages dated. |
| 11:02:49 | 2 | A.  Yes. |
| 11:02:49 | 3 | Q.  All right.  It says -- and this is a grant -- or this is |
| 11:02:54 | 4 | providing that Mutual Bank has a security interest in the |
| 11:02:57 | 5 | warehouse; is that right? |
| 11:02:59 | 6 | A.  Yes. |
| 11:02:59 | 7 | Q.  And where is the warehouse referenced there? |
| 11:03:01 | 8 | A.  1103 Butterfield Road. |
| 11:03:07 | 9 | Q.  Okay.  So that's the warehouse that has the junior |
| 11:03:11 | 10 | mortgage? |
| 11:03:12 | 11 | A.  Yes. |
| 11:03:12 | 12 | Q.  Now, if you go down three more paragraphs, there is a line |
| 11:03:15 | 13 | that begins, Commercial security agreement.  Do you see that? |
| 11:03:17 | 14 | A.  Yes. |
| 11:03:18 | 15 | Q.  The line says, Commercial security agreement dated |
| 11:03:21 | 16 | June 22nd, 2006, and FCC financing statement creating a lien |
| 11:03:26 | 17 | of all accounts receivable fixtures, inventory, and other |
| 11:03:30 | 18 | property of borrower described therein. |
| 11:03:32 | 19 | Do you see that? |
| 11:03:33 | 20 | MR. LIPTON:  Objection.  Mischaracterizing the |
| 11:03:35 | 21 | evidence. |
| 11:03:35 | 22 | THE WITNESS:  Yes. |
| 11:03:36 | 23 | THE COURT:  Sustained. |
| 11:03:38 | 24 | MR. McJESSY:  Did I misread that? |
| 11:03:40 | 25 | MR. LIPTON:  FCC. |

11:03:43   1        MR. McJESSY:  Oh, I'm sorry.

11:03:43   2   BY MR. McJESSY:

11:03:44   3   Q.  UC- -- commercial security agreement dated June 22nd,

11:03:48   4   2006, and UCC financing statement creating a lien of all

11:03:51   5   accounts receivable fixtures, inventory, and other property of

11:03:55   6   borrower described therein?

11:03:57   7        Do you see that?

11:03:57   8   A.  Yes.

11:03:58   9   Q.  Does that refresh your recollection as to whether UCB had

11:04:03  10   a security interest in the contents of the warehouse?

11:04:06  11   A.  Yes, sir.

11:04:06  12   Q.  And they did; is that right?

11:04:08  13   A.  Yes.

11:04:08  14   Q.  Now, going back to Exhibit 22 -- let me ask you first, why

11:04:21  15   was Mr. Borlack party to this conversation regarding the

11:04:24  16   potential foreclosure of the warehouse?

11:04:26  17   A.  Mr. Borlack was part of it because he was handling my case

11:04:33  18   against UCB, and UCB had a security interest in the building.

11:04:39  19   Q.  All right.  And this e-mail advises, FMB wants a friendly

11:04:44  20   foreclosure and in exchange to release Mr. and Mrs. Shah from

11:04:49  21   their guaranties re:  the note, you are in favor of that.

11:04:53  22        Do you see that?

11:04:54  23   A.  Yes.

11:04:54  24   Q.  And that was generally the terms that Mr. Blumenthal had

11:04:57  25   agreed -- strike that.

11:04:59  1    Those were generally the terms that Mr. Blumenthal

11:05:01  2  had negotiated with First Midwest Bank; is that right?

11:05:05  3  A.  Yes.

11:05:05  4  Q.  Mr. Borlack wasn't handling that?

11:05:07  5  A.  No.

11:05:07  6  Q.  Okay.  It goes on to say, That means UCB will have to be

11:05:16  7  given the choice of either paying the warehouse rent if they

11:05:19  8  want the inventory to stay there or we will have to transfer

11:05:22  9  the inventory to somewhere else.

11:05:25  10    Do you see that?

11:05:26  11  A.  Yes.

11:05:26  12  Q.  What does that mean?

11:05:27  13  A.  From what I understand, if the building is handed over to

11:05:33  14  First Midwest Bank and deed in lieu, all the contents within

11:05:37  15  the building after eviction has to probably move to a

11:05:39  16  different location.

11:05:39  17  Q.  All right.  So UCB is going to have to be made aware of

11:05:46  18  this?

11:05:46  19  A.  Yes.

11:05:47  20  Q.  And the e-mail goes on to say at point 3, I will compose

11:06:01  21  this e-mail for to you send to UCB about this.

11:06:06  22    Do you see that?

11:06:07  23  A.  Yes.

11:06:07  24  Q.  Do you know what that's referring to?

11:06:09  25  A.  In regards to probably moving of the inventory if this

11:06:15    1    were to happen.

11:06:16    2    Q.  All right.  What's a friendly foreclosure?

11:06:22    3    A.  From what I understood, it releases the liability that I

11:06:33    4    would have on myself.  By doing the friendly foreclosure, I am

11:06:36    5    handing over the property to whoever has the first right on

11:06:41    6    it, and they release me of my liabilities on it even if it is

11:06:49    7    valued less than what it is, what I owe.

11:06:52    8    Q.  Okay.  Now, if you could turn to Exhibit 28.  That's an

11:07:12    9    e-mail from Alan Borlack to Steve Blumenthal on which you are

11:07:16    10   copied in February 26th, 2010.  Do you see that?

11:07:21    11   A.  Yes.

11:07:21    12   Q.  And it says, Steve, confirming your and Mehul's call to me

11:07:26    13   today, and then it has bullet points or numbered paragraphs

11:07:32    14   describing the substance of the conversation.

11:07:34    15          Do you see that?

11:07:34    16   A.  Yes.

11:07:34    17   Q.  Do you recall having another conversation with Mr. Borlack

11:07:39    18   and Mr. Blumenthal regarding the foreclosure on the FMB

11:07:44    19   warehouse?

11:07:44    20   A.  Yes.

11:07:44    21   Q.  And it says at paragraph 3, Dave Clark, parens, why do I

11:08:01    22   always think of The Dave Clark Five, close parens, told you

11:08:05    23   and Mehul yesterday that FDIC wrote at least one letter or

11:08:09    24   e-mail saying that the KFI loan was performing and that

11:08:13    25   letters of credit had to be honored.

| | | |
|---|---|---|
| 11:08:15 | 1 | Do you see that? |
| 11:08:16 | 2 | A.  Yes. |
| 11:08:16 | 3 | Q.  And it goes on to say, UCB came to Clark to ask him if UCB |
| 11:08:22 | 4 | could freeze the loan and LOCs, and Clark said no. |
| 11:08:27 | 5 | MS. DEDINAS:  Objection. |
| 11:08:27 | 6 | BY MR. McJESSY: |
| 11:08:27 | 7 | Q.  Now, "LOCs" means -- |
| 11:08:29 | 8 | MS. DEDINAS:  Sorry. |
| 11:08:30 | 9 | THE COURT:  LOC means. |
| 11:08:30 | 10 | BY MR. McJESSY: |
| 11:08:33 | 11 | Q.  LOCs mean line of credit; is that right? |
| 11:08:35 | 12 | A.  Letter of credit. |
| 11:08:37 | 13 | MS. DEDINAS:  Objection. |
| 11:08:37 | 14 | BY MR. McJESSY: |
| 11:08:37 | 15 | Q.  Letter of credit. |
| 11:08:37 | 16 | THE COURT:  What is the relevance? |
| 11:08:39 | 17 | MR. McJESSY:  Well, Judge, what I'm trying to |
| 11:08:42 | 18 | establish is what the discussions were at the time -- |
| 11:08:44 | 19 | THE COURT:  We don't need to go through every one of |
| 11:08:46 | 20 | them.  You're highlighting what you're trying to get at, but I |
| 11:08:51 | 21 | don't think we need to go through every line.  And I am not |
| 11:08:53 | 22 | trying to prevent you from putting on your case, but let's try |
| 11:08:58 | 23 | to get to the point, if we can. |
| 11:09:00 | 24 | MR. McJESSY:  All right. |
| 11:09:01 | 25 | BY MR. McJESSY: |

11:09:01  1   Q.  So you had a second discussion with Mr. Blumenthal and

11:09:05  2   Mr. Borlack about the foreclosure two days after the first; is

11:09:05  3   that right?

11:09:10  4   A.  Yes.

11:09:10  5   Q.  All right.  So at the end of September -- strike that.

11:09:26  6          When were you served with the complaint in this

11:09:29  7   lawsuit?

11:09:29  8   A.  Middle of January 2010.

11:09:34  9   Q.  All right.  And this is about -- it's six weeks after you

11:09:40  10  have been served with the complaint; is that right?

11:09:42  11  A.  Yes.

11:09:42  12  Q.  All right.  And at the same time that you're dealing with

11:09:46  13  this lawsuit, you're also handling the foreclosure on the

11:09:49  14  warehouse; is that right?

11:09:50  15  A.  Yes.

11:09:50  16  Q.  All right.  Are there -- is Mr. Borlack or Mr. Blumenthal

11:09:55  17  handling other -- any other matters for you at this time?

11:09:58  18  A.  I think there was a letter that was received from Tina

11:10:05  19  Jacobs which Mr. Blumenthal was handling for us.

11:10:09  20  Q.  And that's the letter we discussed previously --

11:10:11  21  A.  Yes.

11:10:11  22  Q.  -- from Associated Bank regarding the claim for the

11:10:15  23  computer equipment; is that right?

11:10:16  24  A.  Correct.

11:10:16  25  Q.  All right.

| | | |
|---|---|---|
| 11:10:17 | 1 | THE COURT:  Could I stop you just one second? |
| 11:10:19 | 2 | MR. McJESSY:  Yes. |
| 11:10:20 | 3 | THE COURT:  Mr. Shah? |
| 11:10:24 | 4 | THE WITNESS:  Yes. |
| 11:10:25 | 5 | THE COURT:  You have to be careful about saying what |
| 11:10:27 | 6 | you think about this.  We want to know -- everybody here wants |
| 11:10:30 | 7 | to know what you know about this.  You cannot speculate on |
| 11:10:34 | 8 | things, and you have just got to be careful about doing that |
| 11:10:39 | 9 | because the weight of that is not going to be very strong at |
| 11:10:42 | 10 | all. |
| 11:10:42 | 11 | THE WITNESS:  Okay, your Honor. |
| 11:10:44 | 12 | BY MR. McJESSY: |
| 11:10:45 | 13 | Q.  All right.  You believe Mr. Blumenthal was also handling a |
| 11:10:49 | 14 | letter that you had received from Jacobs and Jacobs, right? |
| 11:10:53 | 15 | A.  Yes. |
| 11:10:54 | 16 | Q.  And that was the notice of the overdue payments on the |
| 11:10:58 | 17 | computer equipment? |
| 11:10:59 | 18 | A.  Yes, sir. |
| 11:10:59 | 19 | Q.  Was he handling anything else for you at that time? |
| 11:11:02 | 20 | A.  No. |
| 11:11:02 | 21 | Q.  Now, if you could turn to what's been marked as |
| 11:11:07 | 22 | Exhibit 30.  This is a letter dated February 26th, 2010, to |
| 11:11:21 | 23 | Ms. Elizabeth Pendleton, law clerk, for the Honorable Michael |
| 11:11:27 | 24 | T. Mason, and it's from David Muschler.  Do you see that? |
| 11:11:30 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:11:30 | 1 | Q. And copied on this letter are the attorneys for UCB: |
| 11:11:33 | 2 | Mr. Domanskis, Ms. Dedinas, and Mr. Block. Do you see that? |
| 11:11:39 | 3 | A. Yes. |
| 11:11:39 | 4 | Q. Did you receive a copy of this letter? |
| 11:11:41 | 5 | A. Yes, sir. |
| 11:11:41 | 6 | Q. Now, on the second paragraph of the letter, it describes |
| 11:11:45 | 7 | the whereabouts of six servers. Do you see that? |
| 11:11:48 | 8 | A. Yes. |
| 11:11:48 | 9 | Q. And the last sentence in that letter says, The six servers |
| 11:11:52 | 10 | located at 103 Butterfield Road, Aurora, Illinois, 60504. Do |
| 11:11:58 | 11 | you see that? |
| 11:11:58 | 12 | MR. LIPTON: Objection. Mischaracterizes the |
| 11:12:00 | 13 | evidence. |
| 11:12:00 | 14 | THE COURT: Okay. |
| 11:12:02 | 15 | MR. LIPTON: 1103, not 103. |
| 11:12:06 | 16 | BY MR. McJESSY: |
| 11:12:06 | 17 | Q. The server is located at 1103 Butterfield Road, Aurora, |
| 11:12:11 | 18 | Illinois, 60504; is that right? |
| 11:12:14 | 19 | A. Yes. |
| 11:12:14 | 20 | THE COURT: Their job is to drive you crazy with |
| 11:12:17 | 21 | this. |
| 11:12:17 | 22 | MR. McJESSY: I think I need to get glasses. |
| 11:12:23 | 23 | BY MR. McJESSY: |
| 11:12:24 | 24 | Q. Was this letter accurate? |
| 11:12:25 | 25 | A. Yes. |

11:12:26  1   Q.  It was.  That's where the server was at that time.

11:12:39  2       Now, did your attorney subsequently give you --

11:12:40  3       THE COURT:  Which attorney?

11:12:41  4       MR. McJESSY:  I'm sorry.

11:12:41  5  BY MR. McJESSY:

11:12:42  6   Q.  Did your attorney, Mr. Borlack or the attorneys at his

11:12:45  7  firm, subsequently give you direction on what should be done

11:12:47  8  with that sixth server?

11:12:50  9   A.  Yes.

11:12:50  10  Q.  They gave you direction on what should be done with all

11:12:53  11  the computer equipment?

11:12:53  12  A.  Yes.

11:12:54  13  Q.  Okay.  And what did -- well, let's turn to Exhibit 31.

11:13:06  14  Ms. Dedinas showed you this e-mail previously.  Do you

11:13:10  15  remember that?

11:13:10  16  A.  Yes.

11:13:10  17  Q.  Now, this is an e-mail from Mr. Muschler to you and

11:13:16  18  Mr. Joshi, and it says, Just a reminder that nothing should be

11:13:23  19  done with or to any of the computers, servers, or related

11:13:28  20  equipment.

11:13:29  21       Do you see that?

11:13:29  22  A.  Yes.

11:13:30  23  Q.  What did you understand that to mean?

11:13:34  24  A.  That this should not be tampered with or handled with;

11:13:40  25  nothing should be done with it because they were handling

| | | |
|---|---|---|
| 11:13:42 | 1 | everything. |
| 11:13:43 | 2 | Q. All right. And it goes on to say, We are engaging |
| 11:13:46 | 3 | independent computer experts to deal with the system and |
| 11:13:49 | 4 | possibly resolve the issue with the defective server. |
| 11:13:53 | 5 | Do you see that sentence? |
| 11:13:53 | 6 | A. Yes. |
| 11:13:54 | 7 | Q. Okay. That defective server that's referred to there, |
| 11:13:58 | 8 | that's not the one at the warehouse? |
| 11:14:00 | 9 | A. No. |
| 11:14:00 | 10 | Q. Okay. And at this time, was it your understanding that |
| 11:14:05 | 11 | they were engaging expert computer -- engaging independent |
| 11:14:09 | 12 | computer experts? |
| 11:14:10 | 13 | A. Yes. |
| 11:14:10 | 14 | Q. What was your understanding of the purpose of those |
| 11:14:13 | 15 | independent computer experts? |
| 11:14:14 | 16 | A. To handle the entire ESI responsibility that we have, that |
| 11:14:23 | 17 | Kanan Fashions would have. |
| 11:14:23 | 18 | Q. In this lawsuit? |
| 11:14:27 | 19 | A. In this lawsuit, yes. |
| 11:14:28 | 20 | Q. It says, We may have to obtain a forensic image of that |
| 11:14:28 | 21 | server. |
| 11:14:28 | 22 | Now, again, that's not referring to the server at the |
| 11:14:34 | 23 | warehouse, right? |
| 11:14:34 | 24 | A. No. |
| 11:14:34 | 25 | Q. And it says, We have to advise plaintiff's counsel in the |

11:14:38  1  event any action is anticipated.

11:14:39  2       Do you see that?

11:14:39  3  A.  Yes.

11:14:40  4  Q.  All right.  And it says, the final sentence is, you are

11:14:42  5  not to take any action?

11:14:44  6  A.  Yes.

11:14:44  7  Q.  Okay.  And, again, what did you understand that to mean?

11:14:47  8  A.  That it will be handled by Mr. Borlack's office and the

11:14:52  9  experts that they would hire.

11:14:54  10  Q.  All right.  Let me ask you, the server at the warehouse,

11:14:57  11  where was it physically located?

11:14:59  12  A.  In a computer room.

11:15:00  13  Q.  Okay.  Is that like a temperature-controlled room?

11:15:03  14  A.  I think so, yes.

11:15:05  15  Q.  All right.  Do you know whether it's a --

11:15:07  16  A.  Yeah, I do remember, there is an air-conditioning unit in

11:15:10  17  there.  That's why.

11:15:11  18  Q.  And can you describe the server for the court, tell the

11:15:17  19  judge what it looks like, how big it is, how much it weighs?

11:15:20  20  A.  The only time that I have seen the server most recently

11:15:24  21  was last February or March when somebody from Associated Bank

11:15:30  22  visited to see it to take pictures.  And all I remember is

11:15:33  23  it's on a racking system.

11:15:35  24  Q.  All right.  Have you ever lifted it?

11:15:37  25  A.  No.

| | | |
|---|---|---|
| 11:15:38 | 1 | Q.  Could you carry it by yourself? |
| 11:15:40 | 2 | MR. LIPTON:  Objection.  Speculation, foundation. |
| 11:15:42 | 3 | THE COURT:  But we -- don't we have information that |
| 11:15:45 | 4 | he testified that he thought it was 400 pounds? |
| 11:15:49 | 5 | MR. LIPTON:  No. |
| 11:15:49 | 6 | MS. DEDINAS:  That was Mr. Joshi. |
| 11:15:51 | 7 | MR. LIPTON:  That was Mr. Joshi. |
| 11:15:52 | 8 | THE COURT:  Okay.  I stand corrected. |
| 11:15:54 | 9 | THE WITNESS:  From what I have learned as of today, |
| 11:15:57 | 10 | it is very heavy. |
| 11:15:58 | 11 | THE COURT:  No, you can't answer that.  Stricken. |
| 11:16:01 | 12 | BY MR. McJESSY: |
| 11:16:05 | 13 | Q.  At the time that this e-mail was written on March 3rd, did |
| 11:16:08 | 14 | you have an ESI consultant employed on your behalf, as far as |
| 11:16:11 | 15 | you know? |
| 11:16:11 | 16 | A.  No. |
| 11:16:12 | 17 | Q.  But you understood counsel was going to hire one? |
| 11:16:14 | 18 | A.  Yes. |
| 11:16:14 | 19 | Q.  Why did you think that you shouldn't touch or move the |
| 11:16:22 | 20 | server? |
| 11:16:23 | 21 | A.  We were in the lawsuit, and I didn't want to do anything |
| 11:16:27 | 22 | that is not proper.  And I am not an I.T. person, so whatever |
| 11:16:34 | 23 | my lawyer advised, Mr. Borlack advised, I followed that. |
| 11:16:42 | 24 | MR. WEST:  I couldn't hear that. |
| 11:16:44 | 25 | THE WITNESS:  Whatever Mr. Borlack advised, I |

| | | |
|---|---|---|
| 11:16:49 | 1 | followed that. |
| 11:16:49 | 2 | BY MR. McJESSY: |
| 11:16:50 | 3 | Q.  And the server isn't similar to a small desktop computer |
| 11:16:54 | 4 | that we are all familiar with, is it? |
| 11:16:56 | 5 | A.  I don't think so, no. |
| 11:16:57 | 6 | Q.  Okay.  Are you qualified to move computer equipment? |
| 11:17:00 | 7 | A.  No. |
| 11:17:12 | 8 | Q.  Sir, if you could take a look at what's been marked as |
| 11:17:15 | 9 | Exhibit 32, and this is an e-mail from -- to Dave Clark from |
| 11:17:25 | 10 | you? |
| 11:17:25 | 11 | A.  Yes. |
| 11:17:25 | 12 | Q.  And it says, Just wanted to inform you that Ira Lauter, |
| 11:17:31 | 13 | L-a-u-t-e-r, is coming at 12:00 o'clock p.m. to see the |
| 11:17:35 | 14 | Associated equipment instead of 11:00 o'clock a.m. |
| 11:17:40 | 15 | Do you see that? |
| 11:17:40 | 16 | A.  Yes. |
| 11:17:41 | 17 | Q.  All right.  What is this referring to? |
| 11:17:44 | 18 | A.  I had -- I was advised by Mr. Clark in his conversation |
| 11:17:49 | 19 | with Jim Dieterich at Associated Bank that somebody |
| 11:17:56 | 20 | representing Associated Bank would want to come to the |
| 11:17:58 | 21 | warehouse to take the pictures of the servers at the |
| 11:18:01 | 22 | warehouse. |
| 11:18:01 | 23 | Q.  Who did you discuss that with? |
| 11:18:04 | 24 | A.  Dave Clark. |
| 11:18:04 | 25 | Q.  All right.  And he said he was going to take pictures of |

| | | |
|---|---|---|
| 11:18:08 | 1 | the server? |
| 11:18:09 | 2 | A.  Yes. |
| 11:18:09 | 3 | Q.  Did he say he was going to do anything else with it? |
| 11:18:11 | 4 | A.  No. |
| 11:18:12 | 5 | Q.  All right.  Did you meet him at the warehouse? |
| 11:18:16 | 6 | A.  Yes. |
| 11:18:16 | 7 | Q.  Do you know who Mr. Lauter is? |
| 11:18:18 | 8 | A.  I don't remember what he looks like, but, yes, I have met |
| 11:18:22 | 9 | him, yes. |
| 11:18:22 | 10 | Q.  And do you know, what was the purpose of his coming to the |
| 11:18:26 | 11 | warehouse to take pictures of the server? |
| 11:18:28 | 12 | A.  To take the pictures of the servers. |
| 11:18:29 | 13 | Q.  For what purpose? |
| 11:18:32 | 14 | A.  For the valuation for Associated Bank. |
| 11:18:34 | 15 | Q.  All right.  So -- and you met him there? |
| 11:18:40 | 16 | A.  Yes, sir. |
| 11:18:40 | 17 | Q.  You don't recall what he looks like? |
| 11:18:42 | 18 | A.  If I see him, I would, yes. |
| 11:18:51 | 19 | He came with one more person.  There were two men. |
| 11:18:53 | 20 | THE COURT:  There is no question pending. |
| 11:18:55 | 21 | THE WITNESS:  Okay.  Sorry. |
| 11:18:56 | 22 | BY MR. McJESSY: |
| 11:18:57 | 23 | Q.  Did he come by himself? |
| 11:18:58 | 24 | A.  No. |
| 11:18:58 | 25 | Q.  Who was he with? |

| | | |
|---|---|---|
| 11:18:59 | 1 | A. There was another gentleman with him. |
| 11:19:01 | 2 | Q. And do you know who that individual was? |
| 11:19:03 | 3 | A. No. |
| 11:19:03 | 4 | Q. Now, at this time, you still had the keys to the |
| 11:19:15 | 5 | warehouse; is that right? |
| 11:19:16 | 6 | A. Yes, sir. |
| 11:19:16 | 7 | Q. All right. Did you eventually consummate the deed in lieu |
| 11:19:23 | 8 | transaction with First Midwest Bank? |
| 11:19:25 | 9 | A. Yes. |
| 11:19:25 | 10 | Q. When was that? |
| 11:19:26 | 11 | A. 15th of March. |
| 11:19:29 | 12 | Q. And who handled that transaction, who -- strike that. |
| 11:19:33 | 13 | Who represented you in that -- |
| 11:19:34 | 14 | A. Mr. Blumenthal. |
| 11:19:38 | 15 | Q. You have to let me finish asking the question. |
| 11:19:40 | 16 | Who represented you in that transaction? |
| 11:19:41 | 17 | A. Mr. Steven Blumenthal. |
| 11:19:43 | 18 | Q. And Mr. Borlack, he didn't handle any part of that |
| 11:19:47 | 19 | transaction; is that right? |
| 11:19:47 | 20 | A. No. |
| 11:19:48 | 21 | Q. And did you lose legal possession of the warehouse at that |
| 11:19:51 | 22 | time? |
| 11:19:51 | 23 | MR. LIPTON: Objection. Calls for a legal |
| 11:19:53 | 24 | conclusion. |
| 11:19:53 | 25 | THE COURT: Sustained. |

11:19:54  1  BY MR. McJESSY:

11:19:54  2  Q.  Did you lose actual possession of the warehouse at that

11:19:57  3  time?

11:19:57  4  A.  Yes.

11:19:57  5  Q.  All right.  And was the server still in the warehouse at

11:20:00  6  that time?

11:20:00  7  A.  Yes, sir.

11:20:01  8  Q.  Okay.  And you hadn't moved it as of that date?

11:20:03  9  A.  No.

11:20:04  10  Q.  Okay.  Now, if you could turn to Exhibit 46.  This is an

11:20:38  11  e-mail from Steve Blumenthal to William Serritella, and you

11:20:46  12  are copied on it; is that right?

11:20:47  13  A.  Yes.

11:20:47  14  Q.  And Dave Clark is also copied on this e-mail; is that

11:20:50  15  right?

11:20:50  16  A.  Correct.

11:20:50  17  Q.  Did you receive a copy of this e-mail?

11:20:52  18  A.  Yes, sir.

11:20:53  19  Q.  All right.  Now, the e-mail says --

11:20:59  20      THE COURT:  We can all read what it says.

11:21:02  21      MR. McJESSY:  All right.  Well, I am going to draw

11:21:03  22  his attention to a particular section of the e-mail, if I may,

11:21:06  23  your Honor.

11:21:07  24  BY MR. McJESSY:

11:21:10  25  Q.  It says, As part of documenting our right to reacquire

11:21:13 1    those items.

11:21:14 2          Do you see that language?

11:21:15 3    A.  Yes.

11:21:16 4    Q.  What is he referring to when he says, our right to

11:21:20 5    reacquire?

11:21:21 6          MS. DEDINAS:  Objection.

11:21:22 7          THE COURT:  Sustained.

11:21:25 8          MR. McJESSY:  Judge, I think it's relevant --

11:21:27 9          THE COURT:  He didn't write this.  It wasn't an

11:21:31 10   e-mail between he and -- Mr. Shah and anybody else.  It

11:21:36 11   involved Mr. Blumenthal and Mr. Serritella.  He is not part of

11:21:41 12   that.

11:21:42 13   BY MR. McJESSY:

11:21:43 14   Q.  Sir, did Mr. Blumenthal take any action on your behalf to

11:21:46 15   preserve the server that was in the warehouse?

11:21:48 16   A.  Yes.

11:21:49 17   Q.  Okay.  And what action did he take?

11:21:51 18   A.  He sent this e-mail out to Mr. Serritella.

11:21:54 19   Q.  Was this something that you had discussed with

11:21:57 20   Mr. Blumenthal?

11:21:58 21   A.  Yeah, he advised me that we have to send this e-mail out.

11:22:01 22   Q.  All right.  And he sent it out on your behalf?

11:22:03 23   A.  Yes.

11:22:03 24   Q.  All right.  Did you have -- now, it mentions in this

11:22:08 25   e-mail, it says, You will take title to the leased items,

11:22:11    1    which includes the warehouse computer system and its hard

11:22:14    2    drive.

11:22:15    3        Do you see that?

11:22:15    4    A. Yes.

11:22:21    5    Q. Did you have a right to reacquire those items?

11:22:25    6    A. No.

11:22:26    7    Q. Okay. Did you have a right to release the warehouse?

11:22:31    8    A. Yes.

11:22:31    9    Q. What was your right -- what rights did you have with

11:22:36   10    respect to reletting the warehouse?

11:22:38   11    A. There was an agreement, a lease agreement, which was

11:22:41   12    signed, to lease the agreement within a six-month period from

11:22:47   13    the date of deed in lieu.

11:22:48   14    Q. And did that ever come to pass?

11:22:50   15    A. No, sir.

11:22:51   16    Q. And it does say -- it goes on to say, I need to make sure

11:22:55   17    that the hard drive and system are accessible before we

11:22:58   18    reacquire since those items will be relevant to the UCB

11:23:06   19    litigation and discovery.

11:23:07   20        Was that something that you had told Mr. Blumenthal?

11:23:08   21    A. We both discussed it.

11:23:10   22    Q. Who is "we both"?

11:23:11   23    A. Steve Blumenthal and I discussed it.

11:23:13   24    Q. Do you know whether Mr. Blumenthal had discussed that with

11:23:16   25    Mr. Borlack?

11:23:16  1  A.  I don't know.

11:23:19  2  Q.  Okay.  It says, Accordingly, until the outside date by

11:23:24  3  which we must reacquire the items and repay the bank, I need

11:23:29  4  the bank to agree that they will preserve the items and allow

11:23:32  5  access to UCB or us in connection with the litigation.

11:23:36  6         Do you see that?

11:23:37  7  A.  Yes.

11:23:38  8  Q.  Had you discussed with Mr. Blumenthal UCB's need to access

11:23:44  9  the server?

11:23:45  10  A.  I don't remember.

11:23:48  11  Q.  Okay.  You don't recall that?

11:23:51  12  A.  No.

11:23:51  13  Q.  Okay.  And at this time, this is March of 2010, were you

11:24:04  14  trying to negotiate at this time to reacquire the server from

11:24:12  15  Associated Bank?

11:24:12  16  A.  Through First Midwest Bank, yes.

11:24:15  17  Q.  And what do you mean by that?

11:24:16  18  A.  As a part of our deed in lieu, there was a discussion by

11:24:21  19  Steve Blumenthal, myself, and the boss of Mr. Clark, and

11:24:28  20  Mr. Clark that as a bank, they would help us out negotiating

11:24:35  21  the server, buying of the server, as well as the guaranty and

11:24:38  22  the lease from Associated Bank.

11:24:40  23  Q.  Okay.  And was it your understanding that as a result of

11:24:44  24  this e-mail, the server would be preserved?

11:24:47  25  A.  Yes.

11:24:48  1   Q.  As of March 16th, had anybody told you to move the server?

11:25:13  2   A.  No.

11:25:16  3   Q.  Was the e-mail of March 3rd, 2010, that we looked at

11:25:29  4   previously the last direction that you had received up until

11:25:32  5   this time with respect to the server?

11:25:34  6   A.  Yes.

11:25:35  7   Q.  And that e-mail had said to essentially take no action; is

11:25:35  8   that right?

11:25:41  9   A.  Yes.

11:25:41  10  Q.  Was it your --

11:25:47  11       THE COURT:  That was Exhibit 31.

11:25:51  12  BY MR. McJESSY:

11:25:52  13  Q.  Was it your understanding that you -- strike that.

11:25:54  14       Did you know that First Midwest Bank was going to

11:25:56  15  change the locks on the building upon completion of the deed

11:26:02  16  in lieu?

11:26:03  17  A.  Yes.

11:26:03  18  Q.  All right.  And -- so you knew that you would not be able

11:26:16  19  to gain access to the warehouse after that point; is that

11:26:16  20  right?

11:26:21  21  A.  Yes.

11:26:21  22       MR. McGARRY:  Objection.  Leading, your Honor.

11:26:23  23       THE COURT:  Well, it's also speculative, if you ask

11:26:27  24  me.  No foundation for it or anything.

11:26:31  25  BY MR. McJESSY:

11:26:32  1  Q.  Sir --

11:26:32  2       THE COURT:  We are not going to have tag-team

11:26:34  3  objections over here.  Mr. Lipton, I believe, is the one who

11:26:38  4  is doing the objections, so we are not going to allow both of

11:26:42  5  you to be objecting.  One will do the objections.

11:26:47  6  BY MR. McJESSY:

11:26:47  7  Q.  Do you know, did First Midwest Bank change the locks on

11:26:49  8  the warehouse?

11:26:51  9  A.  Yes.

11:26:51  10  Q.  After that, were you able to access the warehouse on your

11:26:57  11  own?

11:26:57  12  A.  Never tried to.

11:26:59  13  Q.  Okay.  Were you aware that any demands had been made by

11:27:12  14  Associated Bank to take possession of the server?

11:27:15  15  A.  Yes.

11:27:16  16  Q.  Okay.  And do you recall when you became aware of that?

11:27:19  17  A.  Sometime in middle of March.

11:27:23  18  Q.  Okay.  And do you know what the result of that demand was?

11:27:27  19  A.  There was a demand from Associated Bank to First Midwest

11:27:31  20  Bank after the deed in lieu, and it was denied by First

11:27:37  21  Midwest Bank.

11:27:37  22  Q.  All right.  And did you receive notice -- did you receive

11:27:40  23  an e-mail to that effect?

11:27:41  24  A.  Yes, I was copied on an e-mail -- I was forwarded an

11:27:44  25  e-mail by Mr. Blumenthal.

11:27:45  1  Q.  All right.  So you knew at that point that an attempt had

11:27:55  2  been made to take the server and it had been refused?

11:27:59  3  A.  Yes.

11:27:59  4  Q.  Sir, I'd like you to turn to Exhibit 56.  Now, this is an

11:28:56  5  e-mail string that spans several pages, but, ultimately, the

11:29:04  6  top e-mail on the first page of this exhibit is dated

11:29:06  7  Wednesday, March 24th, 2010, at 2:48 p.m.  It's from Steve

11:29:13  8  Blumenthal to you and Mr. Paresh, and it's copied to Alan

11:29:21  9  Borlack.  Do you see that?

11:29:23  10  A.  Yes.

11:29:23  11  Q.  And it's also copied to Mr. Schreiber, who you mentioned

11:29:26  12  earlier was also one of your attorneys; is that right?

11:29:28  13  A.  Yes.

11:29:28  14  Q.  And did you receive a copy of this letter?

11:29:30  15  A.  Yes.

11:29:31  16  Q.  All right.  The letter says at the bottom of the first

11:29:40  17  page, there is a paragraph that begins, in addition, and that

11:29:45  18  paragraph talks about the fact that First Midwest Bank has

11:29:48  19  accepted a deed in lieu of foreclosure and that Kanan Fashions

11:29:52  20  has been -- had been evicted from the property.  Do you see

11:29:54  21  that?

11:29:55  22  A.  Yes.

11:29:55  23  Q.  Okay.  Was Kanan Fashions evicted from the property?

11:30:00  24  A.  Yes.

11:30:00  25  Q.  All right.  And was that a consent eviction?

| | | |
|---|---|---|
| 11:30:08 | 1 | A.  Yes. |
| 11:30:08 | 2 | Q.  Why didn't Kanan Fashions fight the eviction? |
| 11:30:10 | 3 | A.  Because I was getting relieved of my liability. |
| 11:30:16 | 4 | Q.  All right. |
| 11:30:17 | 5 | A.  That's why. |
| 11:30:17 | 6 | Q.  And this is a letter to counsel for UCB in this case, |
| 11:30:22 | 7 | Alexander Domanskis; is that right? |
| 11:30:36 | 8 | A.  Yes. |
| 11:30:36 | 9 | Q.  And just so there's no confusion, the warehouse that's |
| 11:30:40 | 10 | being referred to in this letter is the warehouse where the |
| 11:30:43 | 11 | server is being maintained; is that right? |
| 11:30:44 | 12 | A.  Yes. |
| 11:30:44 | 13 | Q.  Now, counsel for United Central Bank asked you to look at |
| 11:31:02 | 14 | Exhibit 85.  I'd like you to turn there as well. |
| 11:31:26 | 15 | Now, that's an e-mail dated April 26, 2010, and it's |
| 11:31:32 | 16 | from Eric Grossman, it's to -- actually to Paresh, but you're |
| 11:31:37 | 17 | copied on it.  Do you see that? |
| 11:31:39 | 18 | A.  Yes. |
| 11:31:39 | 19 | Q.  Do you recall receiving this? |
| 11:31:43 | 20 | A.  Yes. |
| 11:31:43 | 21 | Q.  And is this the first notice that you received that you |
| 11:31:46 | 22 | should move the server from the warehouse to the Oak Brook |
| 11:31:50 | 23 | offices? |
| 11:31:50 | 24 | A.  Yes. |
| 11:31:51 | 25 | Q.  And on April 26th, did you still have access to the |

11:31:57   1   warehouse?

11:31:57   2   A.  No.

11:31:58   3   Q.  But at this time, were you negotiating to try to purchase

11:32:06   4   the server?

11:32:07   5   A.  Yes, sir.

11:32:08   6   Q.  All right.  When did those negotiations start?

11:32:11   7   A.  The month of February, right around when the deed in lieu

11:32:16   8   was done.

11:32:16   9   Q.  And you continued to try to negotiate for the purchase of

11:32:19   10   the server; is that right?

11:32:21   11   A.  Yes.  Actually, First Midwest Bank negotiated with

11:32:27   12   Associated Bank on our request or on our behalf.

11:32:30   13   Q.  All right.  But it was your understanding that if they

11:32:32   14   were able to reach an agreement -- "they" meaning First

11:32:35   15   Midwest Bank was able to reach an agreement with Associated

11:32:38   16   Bank, you would purchase the computer server from First

11:32:42   17   Midwest Bank?

11:32:42   18   A.  Yes.

11:32:43   19   Q.  All right.  And did you reach -- counsel for UCB had asked

11:32:51   20   you if you had a deal for the purchase of the equipment.  Do

11:32:55   21   you remember that?

11:32:55   22   A.  Yes.

11:32:55   23   Q.  Did you reach an agreement on price with First Midwest

11:32:59   24   Bank?

11:32:59   25   A.  Yes.

11:32:59  1  Q.  Okay.  Did you reach an agreement on what the terms of the

11:33:04  2  sale would be?

11:33:04  3  A.  Yes.

11:33:05  4  Q.  All right.  Both parties had agreed on the price and what

11:33:09  5  the terms of the sale would be?

11:33:10  6  A.  On the price, I was overseas, and I was looking for

11:33:17  7  $65,000; but later I realized on August 30th that it was sold

11:33:22  8  for $60,000.

11:33:23  9  Q.  All right.  Oh, you thought you would be able to buy it --

11:33:27  10  bad question.  Let me start over.

11:33:29  11      Did you reach an agreement on price?

11:33:31  12  A.  Yes.

11:33:32  13  Q.  What was the price that you had agreed to pay?

11:33:35  14  A.  $65,000.

11:33:36  15  Q.  Okay.  You had agreed to pay that price?

11:33:38  16  A.  Yes.

11:33:39  17  Q.  All right.  Was the only thing that stopped the

11:33:42  18  transaction from being completed the fact that you couldn't

11:33:44  19  obtain the money?

11:33:45  20  A.  Yes, sir.

11:33:46  21  Q.  All right.  But other than that, you did have an

11:33:49  22  agreed-upon term for the purchase of the server?

11:33:51  23  A.  Yes.

11:33:52  24  Q.  All right.  Now, when you received this e-mail, did you

11:34:02  25  take any action in response to the e-mail?

| | | |
|---|---|---|
| 11:34:04 | 1 | A.  Yes. |
| 11:34:06 | 2 | MS. DEDINAS:  Objection.  Which e-mail? |
| 11:34:09 | 3 | MR. McJESSY:  I'm sorry.  Exhibit 85. |
| 11:34:12 | 4 | THE WITNESS:  We tried to reach out to Dave Clark.  I |
| 11:34:17 | 5 | called him first, I don't remember exact date, but I spoke |
| 11:34:20 | 6 | with him, and we were told to get the court order. |
| 11:34:26 | 7 | BY MR. McJESSY: |
| 11:34:27 | 8 | Q.  Okay.  You had a conversation with Mr. Clark? |
| 11:34:29 | 9 | A.  Yes. |
| 11:34:29 | 10 | Q.  All right.  And what did you ask him or what did you tell |
| 11:34:32 | 11 | him? |
| 11:34:33 | 12 | A.  That we would like to have the servers removed from the |
| 11:34:36 | 13 | warehouse as a part of our litigation.  And he said that he |
| 11:34:41 | 14 | doesn't own it, Kanan doesn't own it, it is owned by |
| 11:34:46 | 15 | Associated Bank, so if you get a court order, he will let you |
| 11:34:50 | 16 | have access. |
| 11:34:51 | 17 | Q.  All right.  Do you recall when that conversation occurred? |
| 11:35:01 | 18 | A.  Sometime end of April, beginning of May. |
| 11:35:04 | 19 | Q.  Okay.  But it was after this e-mail, after you received |
| 11:35:07 | 20 | this e-mail? |
| 11:35:07 | 21 | A.  Yes. |
| 11:35:08 | 22 | Q.  Sir, did you ever own the server? |
| 11:35:24 | 23 | A.  No. |
| 11:35:24 | 24 | Q.  And when was the last day that you had physical possession |
| 11:35:32 | 25 | of the server? |

11:35:32   1    A.  The day before we did deed in lieu.

11:35:39   2    Q.  Do you recall what date that would be?

11:35:41   3    A.  We did it on March 15th of 2010 was the deed in lieu date,

11:35:47   4    so it would be the day before that or morning of that.

11:35:50   5    Q.  So as of the date of this e-mail, April 26th, 2010, the

11:36:04   6    server is still in the warehouse?

11:36:06   7    A.  Yes.

11:36:06   8    Q.  Now, if you could turn to what is marked as Exhibit 101.

11:36:34   9    Before I ask you a question about that, was Mr. Joshi

11:36:38   10    at all involved in the negotiations for the purchase of the

11:36:39   11    server from First Midwest Bank?

11:36:42   12    A.  No.

11:36:43   13    Q.  That was strictly your -- you handled that?

11:36:47   14    A.  Yes.  Even I was not negotiating.  It was First Midwest

11:36:50   15    Bank that was negotiating at that point.

11:36:52   16    Q.  With Associated Bank?

11:36:53   17    A.  Correct.

11:36:54   18    Q.  From Kanan Fashions, you were the person, though, who was

11:36:59   19    speaking with First Midwest Bank regarding your interest in

11:37:04   20    acquiring the server if First Midwest Bank could reach an

11:37:07   21    agreement with Associated Bank, right?

11:37:11   22    A.  Yes, myself and Mr. Blumenthal.

11:37:14   23    MS. DEDINAS:  Objection.  Leading.

11:37:15   24    THE COURT:  Sustained.  That will be stricken.

11:37:20   25    BY MR. McJESSY:

11:37:21    1    Q.  Somebody from Kanan Fashions was responsible for dealing

11:37:23    2    with First Midwest Bank to convey Kanan Fashions' interest in

11:37:27    3    acquiring the server; is that right?

11:37:28    4    A.  It would be myself.

11:37:29    5    Q.  Did Mr. Joshi have any responsibility for that?

11:37:32    6    A.  No.

11:37:32    7    Q.  And you were working with Mr. Blumenthal on that as well;

11:37:37    8    is that right?

11:37:37    9    A.  Yes.

11:37:37   10         MS. DEDINAS:  Objection.  Leading.

11:37:39   11         THE COURT:  That's all right.  Watch it, though,

11:37:43   12    Mr. McJessy.

11:37:45   13    BY MR. McJESSY:

11:37:53   14    Q.  Did you -- looking at Exhibit 101, did you receive a copy

11:38:03   15    of this?

11:38:03   16    A.  Yes.

11:38:04   17    Q.  It's an e-mail from Paresh Joshi to Eric Grossman, and

11:38:10   18    you're copied on this, as is Alan Borlack; is that right?

11:38:15   19    A.  Correct.

11:38:15   20    Q.  And it's an e-mail that says, Eric, currently, First

11:38:19   21    Midwest is working with Associated Bank from whom we have

11:38:21   22    leased the computers residing at the warehouse to resolve the

11:38:27   23    matter between them.  There is a paren that begins with the

11:38:29   24    word "from" and ends with the word "warehouse."

11:38:32   25         Do you see that?

11:38:33  1  A.  Yes, sir.

11:38:33  2  Q.  Do you have -- now, Mr. Joshi isn't the person who is

11:38:41  3  working with Dave Clark; is that right?

11:38:43  4  A.  Yes.

11:38:43  5  Q.  That's just you?

11:38:45  6  A.  Correct.

11:38:45  7  Q.  So any information about what was being worked on must

11:38:50  8  have come from you?

11:38:51  9  A.  Yes.

11:38:51  10      MS. DEDINAS:  Objection.

11:38:52  11      THE COURT:  Sustained.

11:38:53  12  BY MR. McJESSY:

11:38:53  13  Q.  All right.  It says there, First Midwest is working with

11:38:59  14  Associated Bank.

11:39:00  15      Do you know what that means?

11:39:01  16  A.  Yes, that they are negotiating with Associated Bank.

11:39:05  17  First Midwest Bank is negotiating with First Midwest Bank --

11:39:11  18  Associated Bank about the warehouse server.

11:39:13  19  Q.  All right.  It says, To resolve the matter between them.

11:39:16  20      Is that the matter?

11:39:17  21  A.  Yes.

11:39:17  22  Q.  All right.  And it says, The computers are still at the

11:39:20  23  warehouse.

11:39:21  24      Do you see that?

11:39:21  25  A.  Yes, sir.

| | | |
|---|---|---|
| 11:39:22 | 1 | Q.  Is that an accurate statement as of May 13th, 2010? |
| 11:39:26 | 2 | A.  Yes.  Yes. |
| 11:39:27 | 3 | Q.  To the best of your knowledge? |
| 11:39:28 | 4 | A.  Yes. |
| 11:39:29 | 5 | Q.  All right.  And it says -- all right. |
| 11:40:00 | 6 | Now, if you could turn to -- well, before I ask you. |
| 11:40:03 | 7 | Are you aware -- you mentioned you were aware of a |
| 11:40:06 | 8 | demand for payment letter that had been received from |
| 11:40:11 | 9 | attorneys for Associated Bank; is that right? |
| 11:40:13 | 10 | A.  Yes. |
| 11:40:13 | 11 | Q.  And when was that? |
| 11:40:14 | 12 | A.  Sometime in February. |
| 11:40:16 | 13 | Q.  Did you receive any further demands from the attorneys for |
| 11:40:20 | 14 | Associated Bank? |
| 11:40:21 | 15 | A.  Yes. |
| 11:40:21 | 16 | Q.  Do you remember when that was? |
| 11:40:23 | 17 | A.  Sometime in May. |
| 11:40:25 | 18 | Q.  If you can turn to Exhibit 103.  Is that the demand you're |
| 11:40:33 | 19 | referring to? |
| 11:40:34 | 20 | A.  Yes. |
| 11:40:34 | 21 | Q.  All right.  And at the bottom of that -- that's a letter |
| 11:40:42 | 22 | to you, in part, correct? |
| 11:40:45 | 23 | A.  Yes, sir. |
| 11:40:46 | 24 | Q.  And it's from Tina Jacobs; is that right? |
| 11:40:50 | 25 | A.  Yes.  Yes. |

| | | |
|---|---|---|
| 11:40:51 | 1 | Q. And you're copied -- you're a recipient of the letter, and |
| 11:40:56 | 2 | a copy goes to your attorney, Mr. Blumenthal? |
| 11:40:58 | 3 | THE COURT: Among others. |
| 11:40:59 | 4 | BY MR. McJESSY: |
| 11:41:00 | 5 | Q. Among others. Do you see that? |
| 11:41:01 | 6 | A. Yes, sir. |
| 11:41:02 | 7 | Q. Now, at the bottom of this letter, it says, Lessor was |
| 11:41:09 | 8 | subsequently informed that the lease -- lessee has vacated -- |
| 11:41:14 | 9 | strike that. |
| 11:41:14 | 10 | THE COURT: You're on the first page. |
| 11:41:14 | 11 | BY MR. McJESSY: |
| 11:41:16 | 12 | Q. I'm on the first page, the bottom paragraph, sir. |
| 11:41:19 | 13 | A. Yes. |
| 11:41:19 | 14 | Q. It says, Lessor was subsequently informed that the lessee |
| 11:41:23 | 15 | has vacated the property where the equipment is stored, and |
| 11:41:26 | 16 | First Midwest Bank has taken over possession and control of |
| 11:41:29 | 17 | the equipment. |
| 11:41:30 | 18 | Do you see that? |
| 11:41:31 | 19 | A. Yes. |
| 11:41:31 | 20 | Q. Is that an accurate statement as of this time? |
| 11:41:34 | 21 | A. Yes. |
| 11:41:34 | 22 | Q. Okay. It says, Demand was made upon First Midwest Bank to |
| 11:41:38 | 23 | provide access to the equipment for its removal by Associated |
| 11:41:43 | 24 | Bank, which demand has been refused. |
| 11:41:45 | 25 | Do you see that? |

| | | |
|---|---|---|
| 11:41:45 | 1 | A.  Yes, sir. |
| 11:41:46 | 2 | Q.  All right.  Were you aware that demand had been made by |
| 11:41:49 | 3 | First Midwest Bank to provide access so the equipment could be |
| 11:41:55 | 4 | removed? |
| 11:41:55 | 5 | MS. DEDINAS:  Objection. |
| 11:41:56 | 6 | THE COURT:  Sustained. |
| 11:41:57 | 7 | THE WITNESS:  Yes. |
| 11:41:58 | 8 | THE COURT:  Sustained.  It will be stricken. |
| 11:42:01 | 9 | MR. McJESSY:  What's the objection? |
| 11:42:05 | 10 | MS. DEDINAS:  It's not what it says. |
| 11:42:07 | 11 | THE COURT:  It isn't.  And you continuously misread. |
| 11:42:11 | 12 | So if you need to pick it up. |
| 11:42:13 | 13 | MR. McJESSY:  I think so. |
| 11:42:13 | 14 | BY MR. McJESSY: |
| 11:42:14 | 15 | Q.  It says there, Demand was made upon First Midwest Bank to |
| 11:42:17 | 16 | provide access to the equipment for its removal by Associated |
| 11:42:22 | 17 | Bank, which demand has been refused. |
| 11:42:24 | 18 | Do you see that? |
| 11:42:25 | 19 | A.  Yes. |
| 11:42:25 | 20 | Q.  Okay.  And you said you were aware that demand had been |
| 11:42:28 | 21 | made by First Midwest Bank to remove the equipment by this |
| 11:42:31 | 22 | time? |
| 11:42:33 | 23 | MS. DEDINAS:  Objection. |
| 11:42:33 | 24 | THE WITNESS:  No, by Associated Bank to First Midwest |
| 11:42:33 | 25 | Bank. |

| | | |
|---|---|---|
| 11:42:33 | 1 | BY MR. McJESSY: |
| 11:42:39 | 2 | Q.  I'm sorry.  Demand had been made by -- |
| 11:42:39 | 3 | THE COURT:  Wait, wait, wait, wait.  There is an |
| 11:42:41 | 4 | objection pending here.  What's your objection?  And remember |
| 11:42:44 | 5 | I asked you, and I know it's hard to remember all this stuff, |
| 11:42:47 | 6 | but when there is an objection made -- |
| 11:42:48 | 7 | THE WITNESS:  Not to say anything. |
| 11:42:49 | 8 | THE COURT:  -- please don't answer anything until I |
| 11:42:53 | 9 | rule. |
| 11:42:53 | 10 | What's your objection? |
| 11:42:53 | 11 | MS. DEDINAS:  The demand was not by First Midwest |
| 11:42:55 | 12 | Bank. |
| 11:42:55 | 13 | THE COURT:  Do you want to correct that? |
| 11:42:58 | 14 | MR. McJESSY:  Yes, I'd like to, your Honor. |
| 11:43:00 | 15 | BY MR. McJESSY: |
| 11:43:00 | 16 | Q.  There was a demand made by Associated Bank to remove the |
| 11:43:03 | 17 | equipment; is that right? |
| 11:43:04 | 18 | A.  Yes. |
| 11:43:04 | 19 | Q.  And you were aware of that? |
| 11:43:05 | 20 | A.  Yes. |
| 11:43:05 | 21 | Q.  All right.  And were you also aware that First Midwest |
| 11:43:08 | 22 | Bank had refused that demand? |
| 11:43:10 | 23 | A.  Yes. |
| 11:43:10 | 24 | Q.  So as of May 13th, you still believed that the equipment |
| 11:43:18 | 25 | was at the warehouse? |

11:43:20    1    A.  Yes, sir.

11:43:20    2    Q.  And that any demands to remove it had been refused?

11:43:24    3    A.  Yes.

11:43:24    4    Q.  And you were still trying to purchase the equipment

11:43:33    5    through First Midwest Bank; is that right?

11:43:35    6    A.  Yes, sir.

11:43:36    7    Q.  Now, counsel had asked you --

11:43:52    8            THE COURT:  No, no, no.  You are on direct now.

11:43:55    9            MR. McJESSY:  I am on direct.

11:43:56   10    BY MR. McJESSY:

11:43:56   11    Q.  You testified previously that you were aware that numerous

11:44:03   12    requests had been made to Mr. Joshi to get the server to the

11:44:08   13    Oak Brook warehouse.  Do you recall those questions and your

11:44:11   14    answers?

11:44:11   15    A.  Yes, sir.

11:44:12   16    Q.  All right.  And --

11:44:19   17            THE COURT:  You are going into cross again.  You are

11:44:25   18    in direct now.  This is what you agreed to.

11:44:29   19            MR. McJESSY:  I understand.

11:44:30   20    BY MR. McJESSY:

11:44:31   21    Q.  During that period of time, from May through August of

11:44:35   22    2010, did you have access to the warehouse?

11:44:41   23    A.  No.

11:44:41   24    Q.  You had -- had you requested access to the warehouse?

11:44:47   25    A.  Yes.

| | | |
|---|---|---|
| 11:44:47 | 1 | Q.  And that access had been refused? |
| 11:44:49 | 2 | A.  Yes. |
| 11:44:49 | 3 | Q.  You were unable to get the server and remove it from the |
| 11:44:54 | 4 | warehouse? |
| 11:44:54 | 5 | A.  Yes. |
| 11:44:54 | 6 | Q.  You were trying to get the server, though; is that right? |
| 11:45:01 | 7 | A.  Yes. |
| 11:45:01 | 8 | Q.  And you were trying to obtain it by purchasing it; is that |
| 11:45:01 | 9 | right? |
| 11:45:05 | 10 | A.  Yes. |
| 11:45:05 | 11 | Q.  Did you -- did you have any other means to obtain the |
| 11:45:11 | 12 | server besides that? |
| 11:45:12 | 13 | A.  No. |
| 11:45:21 | 14 | THE COURT:  Break.  Ten minutes. |
| 11:45:28 | 15 | THE WITNESS:  Thank you, your Honor. |
| 11:45:30 | 16 | (Short break.) |
| 11:57:56 | 17 | THE COURT:  You're still under oath. |
| 11:57:57 | 18 | THE WITNESS:  Yes, sir. |
| 11:57:59 | 19 | BY MR. McJESSY: |
| 11:58:14 | 20 | Q.  Mr. Shah, if you could turn to Exhibit 135.  This is an |
| 11:58:42 | 21 | e-mail from your counsel, Eric Grossman, to Louis Smalley, |
| 11:58:47 | 22 | Daniel Garrie, and Bill Spernow.  Do you know who those three |
| 11:58:51 | 23 | individuals are? |
| 11:58:55 | 24 | A.  They were the computer experts hired by Mr. Borlack. |
| 11:58:58 | 25 | Q.  All three -- were all three of them computer experts, to |

11:59:01   1   your knowledge?

11:59:01   2   A.  Yes, sir.

11:59:03   3   Q.  Okay.  And they were hired on your behalf; is that right?

11:59:06   4   A.  Yes.

11:59:06   5   Q.  Okay.  And in the e-mail, it says -- and I'm reading the

11:59:12   6   second to the last sentence, It is currently at the former

11:59:14   7   Aurora warehouse, and we don't have control over the premises

11:59:18   8   or machine.  So Paresh --

11:59:21   9            THE COURT:  One of the reasons we are going so slowly

11:59:23  10   is you read these all the time.  You can point him to the

11:59:27  11   sentence that you want to have read, he can read it to

11:59:31  12   himself, and then ask him the question.

11:59:32  13            MR. McJESSY:  Very good, your Honor.

11:59:32  14   BY MR. McJESSY:

11:59:34  15   Q.  Sir, if you could read the second to the last sentence of

11:59:38  16   this e-mail.

11:59:39  17            THE COURT:  Starting with?

11:59:39  18   BY MR. McJESSY:

11:59:41  19   Q.  Starting with, It is currently.

11:59:42  20   A.  Yes.

11:59:42  21   Q.  Is that an accurate statement as of July 1st as to the

11:59:45  22   location of the server, to the best of your knowledge?

11:59:47  23   A.  Yes.

11:59:48  24   Q.  And is it also accurate that you don't have control over

11:59:51  25   the premises or the machine at this time?

11:59:53  1  A.  Yes.

11:59:53  2  Q.  And if you could turn to Exhibit 152.

12:00:06  3      Now, before do you that, you mentioned that you were

12:00:09  4  traveling during the summer of 2010 while this is going on; is

12:00:09  5  that right?

12:00:17  6  A.  Yes.

12:00:17  7  Q.  What period of time were you traveling?

12:00:19  8  A.  About a month.

12:00:20  9      THE COURT:  Period of time, from when to when?

12:00:23  10     THE WITNESS:  Oh, from July 19th until 15th or 16th

12:00:26  11 of July -- June 19th through the middle of July.

12:00:31  12 BY MR. McJESSY:

12:00:31  13 Q.  So okay.  So you were out of the country from middle of

12:00:34  14 June to the middle of July, roughly?

12:00:36  15 A.  Yes, sir.

12:00:37  16 Q.  All right.  Was that business travel?

12:00:39  17 A.  No, it was a family time, family vacation.

12:00:41  18 Q.  Okay.  And where were you?

12:00:42  19 A.  We were in Europe, in Italy, and then to here.

12:00:46  20 Q.  You weren't in Dubai?

12:00:50  21 A.  No.

12:00:50  22 Q.  Now, if you could take a look at Exhibit 152.

12:01:01  23 A.  Just one minute.  That's a different book.

12:01:21  24     Yes.

12:01:21  25 Q.  Now, I am going to turn your attention to the e-mail on

12:01:23   1   the first page which is dated July 23rd, 2010, from Eric

12:01:27   2   Grossman to Mr. Joshi on which you are copied.  I am going to

12:01:33   3   draw your attention to paragraph number 3 in the second set of

12:01:37   4   numbered paragraphs.  Do you see that?

12:01:37   5   A.  Yes.

12:01:38   6   Q.  And if you could read that for me.

12:01:40   7   A.  Warehouse --

12:01:40   8   Q.  No, if you could read it to yourself and let me know when

12:01:43   9   you have had an opportunity to do so.

12:02:08  10   A.  Yes.

12:02:08  11   Q.  And do you understand that to be a request by Mr. Grossman

12:02:11  12   to know about the server?

12:02:16  13   A.  Yes, sir.

12:02:16  14   Q.  What is your understanding that he is asking for?

12:02:21  15   A.  That we should reach out to First Midwest and see if we

12:02:27  16   can work out the access to the server.

12:02:30  17   Q.  All right.  And when you say "access," do you mean --

12:02:33  18   A.  Purchase of the server.

12:02:34  19   Q.  And if you could turn to the last two pages of that

12:02:39  20   exhibit, and let me know when you've reached that second to

12:02:43  21   last page.

12:02:44  22            THE COURT:  They are numbered on the bottom and on

12:02:47  23   the top.

12:02:47  24            MR. McJESSY:  Page 91.

12:02:49  25            THE WITNESS:  Yes.

12:02:50   1   BY MR. McJESSY:

12:02:53   2   Q.  And there is an e-mail there from Mr. Joshi to

12:02:58   3   Mr. Grossman, and, again, you are copied on it, it's dated

12:03:00   4   Friday, July 23rd, 2010.  Do you see that?

12:03:02   5   A.  Yes.

12:03:02   6   Q.  And if you turn to the last paragraph of that e-mail,

12:03:05   7   which is on the next page, let me know when you have had a

12:03:09   8   chance to read that last paragraph.

12:03:14   9         MR. LIPTON:  The one that starts, I do not have?

12:03:14   10   BY MR. McJESSY:

12:03:17   11   Q.  The one that starts, I do not have any update.

12:03:26   12   A.  Yes.

12:03:26   13   Q.  Do you see that?

12:03:27   14   A.  Yes, sir.

12:03:27   15   Q.  It says, I do not have any update on the warehouse issue.

12:03:30   16         What is that referring to?

12:03:31   17   A.  To the server at the warehouse.

12:03:34   18   Q.  Okay.  And it says, Mehul was to arrive on Monday.

12:03:40   19         Is this the vacation that you were on at the time?

12:03:41   20   A.  Yes, sir.

12:03:42   21   Q.  All right.  And were you negotiating for the purchase of

12:03:46   22   the server from First Midwest Bank while you were overseas?

12:03:49   23   A.  Yes, sir.

12:03:49   24   Q.  Okay.  You were still trying to communicate with

12:03:52   25   Mr. Clark?

12:03:52    1   A.  Via e-mail, yes.

12:03:53    2   Q.  Okay.  Via e-mail?

12:03:57    3   A.  Yes.

12:03:57    4   Q.  And is it your understanding then that -- what is your

12:03:59    5   understanding of what Mr. Joshi was relaying to your attorneys

12:04:03    6   at this time?

12:04:03    7   A.  Paresh was relying on my negotiations with Dave Clark, who

12:04:13    8   was working to purchase the servers, and he did not have any

12:04:17    9   information as I did not have any information.

12:04:18   10          MS. DEDINAS:  Objection.  That's not responsive.

12:04:20   11          THE COURT:  No.  We will let that stand.

12:04:23   12   BY MR. McJESSY:

12:04:23   13   Q.  So he was -- he needed to convey what was the status of

12:04:27   14   the negotiations to purchase the server?

12:04:29   15   A.  Right.

12:04:29   16   Q.  Now, if you could turn to Exhibit 174.

12:04:48   17          THE COURT:  What number one more time?

12:04:50   18          MR. McJESSY:  174, your Honor.

12:04:52   19          THE COURT:  Thank you.

12:05:02   20   BY MR. McJESSY:

12:05:03   21   Q.  There's two e-mails here.  I want you to focus on the one

12:05:06   22   dated Monday, August 9th, 2010, from you to Dave Clark.  And

12:05:09   23   it begins, I will be in a position.

12:05:11   24          Do you see that?

12:05:11   25   A.  Yes.

12:05:12   1   Q.  If you could read that and let me know when you have had

12:05:14   2   an opportunity to do so.

12:05:20   3   A.  Yes.

12:05:20   4   Q.  Was it -- did you believe on August 9th that you were

12:05:24   5   going to be able to raise the funds to buy the server by

12:05:28   6   August 16th?

12:05:29   7   A.  Yes, I believed that.

12:05:31   8   Q.  All right.  And as of August 9th, did you still believe

12:05:34   9   that the server was in the warehouse?

12:05:35   10  A.  Yes.

12:05:35   11  Q.  All right.  Now, you gave some testimony earlier that you

12:05:42   12  had used some money to pay off creditors in Hong Kong.  Do you

12:05:47   13  recall that testimony?

12:05:47   14  A.  Yes.

12:05:48   15  Q.  All right.  Did you have the money that you used to pay

12:05:53   16  those creditors in August of 2010?

12:05:57   17  A.  No.

12:05:57   18  Q.  Okay.  When were those creditors paid?

12:06:01   19  A.  Sometime in September of 2010.

12:06:03   20  Q.  All right.  And they were paid with funds that you

12:06:06   21  received after August 9th, 2010?

12:06:09   22  A.  Yes, sir.

12:06:10   23  Q.  All right.  What was the source of those funds?

12:06:12   24  A.  It was a tax refund that I received.

12:06:14   25  Q.  All right.  And you didn't receive -- so you didn't have

| | | |
|---|---|---|
| 12:06:18 | 1 | the money yourself at this time -- |
| 12:06:21 | 2 | A.  No. |
| 12:06:21 | 3 | Q.  -- still to purchase the server? |
| 12:06:23 | 4 | A.  No, sir. |
| 12:06:24 | 5 | Q.  Now, you also gave some testimony about the fact that |
| 12:06:41 | 6 | First Midwest Bank didn't have the server on August 9th, 2010; |
| 12:06:41 | 7 | is that right? |
| 12:06:48 | 8 | A.  Later on, that's what we learned. |
| 12:06:50 | 9 | Q.  Well, that's my question.  When did you first learn that |
| 12:06:53 | 10 | First Midwest Bank no longer had the server? |
| 12:06:55 | 11 | A.  On August 30th. |
| 12:06:56 | 12 | Q.  Okay.  And that was a communication from Dave Clark? |
| 12:07:00 | 13 | A.  Yes, sir. |
| 12:07:01 | 14 | Q.  What did you do in response to that? |
| 12:07:02 | 15 | A.  I immediately forwarded that e-mail to Mr. Alan Borlack, I |
| 12:07:08 | 16 | called him up immediately, and we were all panicking.  And he |
| 12:07:12 | 17 | called up Mr. Serritella, and then he started communicating |
| 12:07:17 | 18 | with him. |
| 12:07:18 | 19 | Q.  And he handled all of the communications with respect to |
| 12:07:22 | 20 | that thereafter; is that right? |
| 12:07:23 | 21 | A.  Yes. |
| 12:07:24 | 22 | Q.  All right.  You did not personally immediately start |
| 12:07:37 | 23 | making calls to locate the server; is that right? |
| 12:07:40 | 24 | A.  No. |
| 12:07:40 | 25 | Q.  Okay.  Why not? |

12:07:42  1  A.  I didn't want it to be construed that I'm trying to reach

12:07:47  2  somebody.  Because we went on Internet.  I was looking for --

12:07:52  3  first the name came Piagamay (phonetic).  It was a different

12:07:56  4  name than the company that actually bought it.  So we were

12:07:59  5  looking for that name, and then later on we found out that the

12:08:02  6  name was different, then we were looking for that company's

12:08:05  7  name.

12:08:05  8  Q.  So you did initially start to make some effort to find the

12:08:08  9  company?

12:08:08  10  A.  Right.

12:08:09  11  Q.  All right.  And did you stop?

12:08:11  12  A.  Yes.

12:08:11  13  Q.  Why?

12:08:11  14  A.  I think when Mr. Roche came in the picture, he advised me

12:08:18  15  not to do anything because it would be misconstrued.

12:08:21  16  Q.  What do you mean "misconstrued"?

12:08:23  17        MS. DEDINAS:  Objection.

12:08:24  18        THE WITNESS:  It would be misconstrued --

12:08:26  19        THE COURT:  He can explain what he --

12:08:27  20        THE WITNESS:  -- that we were reaching out to a

12:08:29  21  possible buyer wherever, we don't want you to be misconstrued

12:08:33  22  in anything.

12:08:34  23  BY MR. McJESSY:

12:08:34  24  Q.  Okay.  The motion that we're here before the court on

12:08:37  25  today had been filed by that point; is that right?

| | | |
|---|---|---|
| 12:08:40 | 1 | A.  Yes. |
| 12:08:40 | 2 | Q.  So you were advised not to do anything? |
| 12:08:42 | 3 | A.  Yes. |
| 12:08:42 | 4 | Q.  Do you believe that the information on the server would be |
| 12:08:58 | 5 | helpful to your defense of the claims in this lawsuit and your |
| 12:09:05 | 6 | counterclaims? |
| 12:09:05 | 7 | A.  Yes, sir. |
| 12:09:06 | 8 | Q.  And why is that? |
| 12:09:07 | 9 | A.  Because it has got all the inventory data on it and as |
| 12:09:11 | 10 | well as all the relevant data that is needed to prove our |
| 12:09:15 | 11 | case. |
| 12:09:15 | 12 | Q.  So from your point of view, you believe the information on |
| 12:09:18 | 13 | the server would be helpful? |
| 12:09:20 | 14 | A.  Yes, sir. |
| 12:09:20 | 15 | Q.  You want the server back yourself? |
| 12:09:22 | 16 | A.  Oh, yes. |
| 12:09:23 | 17 | Q.  Sir, there was a meeting at your Oak Brook office on |
| 12:09:37 | 18 | April 23rd, 2010.  Do you recall that? |
| 12:09:40 | 19 | A.  Yes. |
| 12:09:41 | 20 | Q.  Okay.  And what was the purpose of that meeting? |
| 12:09:43 | 21 | A.  It was in regard to -- Ms. Dedinas was supposed to be |
| 12:09:52 | 22 | there and Eric Grossman.  They were going to discuss ESI at |
| 12:09:57 | 23 | our offices. |
| 12:09:57 | 24 | Q.  All right.  And was Ms. Dedinas there? |
| 12:10:00 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:10:00 | 1 | Q. All right. And did they view the computers that were at |
| 12:10:05 | 2 | the Oak Brook offices at that time? |
| 12:10:06 | 3 | A. I think so. I was not a part of the meeting, but from |
| 12:10:10 | 4 | what -- whatever time that I was there briefly, yes, that's |
| 12:10:13 | 5 | what they were doing. |
| 12:10:13 | 6 | Q. You weren't part of the meeting -- did you -- how long did |
| 12:10:17 | 7 | the meeting last? |
| 12:10:17 | 8 | A. I think it was the entire day. |
| 12:10:20 | 9 | Q. Okay. Were you there for any portion of the meeting? |
| 12:10:25 | 10 | A. Yeah, I was -- I came in the morning, and then I left, and |
| 12:10:29 | 11 | then I came later on for a little bit and then left. |
| 12:10:31 | 12 | Q. Was there -- can you explain to the court where the |
| 12:10:35 | 13 | meeting took place. |
| 12:10:35 | 14 | A. Yeah. The meeting took place, your Honor, in the |
| 12:10:38 | 15 | conference room. |
| 12:10:40 | 16 | Q. Were the computers there? |
| 12:10:41 | 17 | A. The server was in the conference room, which was supposed |
| 12:10:44 | 18 | to be discussed on that day. |
| 12:10:45 | 19 | Q. All right. And that's not the server from the warehouse, |
| 12:10:48 | 20 | though? |
| 12:10:49 | 21 | A. No. |
| 12:10:49 | 22 | Q. All right. And the server from the warehouse, anybody at |
| 12:10:57 | 23 | the meeting can see the server at the warehouse, from the |
| 12:11:00 | 24 | warehouse, wasn't there; is that right? |
| 12:11:01 | 25 | MR. LIPTON: Objection. Leading. |

12:11:02  1   MS. DEDINAS:  Objection.

12:11:03  2   THE COURT:  Sustained.

12:11:11  3   MR. LIPTON:  Your Honor, could we have an instruction

12:11:13  4   to counsel not to lead in this area, please?

12:11:16  5   THE COURT:  Yes.

12:11:19  6   BY MR. McJESSY:

12:11:22  7   Q.  Other than the warehouse, sir, did Kanan have any other

12:11:27  8   facilities besides the Oak Brook offices?

12:11:29  9   A.  No.

12:11:29  10  Q.  And so all of the computers that Kanan had were either at

12:11:38  11  the warehouse, which it no longer had possession of, or at the

12:11:43  12  Oak Brook office?

12:11:44  13  A.  Yes.

12:11:45  14  Q.  What computers were there in the office at that time?

12:12:12  15  A.  The computers that was in the office to begin with.  And

12:12:18  16  if there is any computers that were moved from the warehouse,

12:12:21  17  they were in the office.

12:12:21  18  Q.  Okay.  Do you know whether any computers had been moved

12:12:24  19  from the warehouse as of April 26 -- April 23rd, 2010?

12:12:28  20  A.  I don't know.

12:12:28  21  Q.  All right.  But whatever computers were at the office were

12:12:34  22  there for the participants of the meeting to view?

12:12:37  23  A.  Yes.

12:12:37  24  Q.  So the parties could see what computers were there and

12:12:40  25  what computers were not there?

12:12:41    1   A.  Yes.

12:12:43    2           MS. DEDINAS:  Objection.  Foundation.

12:12:44    3           THE COURT:  Sustained.  I'm not sure why you keep

12:12:47    4   spinning your wheels on this.

12:12:47    5   BY MR. McJESSY:

12:13:00    6   Q.  Sir, did you actually hire the computer ESI liaison for

12:13:06    7   the defendants?

12:13:06    8   A.  Mr. Borlack did.

12:13:07    9   Q.  So you did not?

12:13:08   10   A.  No.

12:13:08   11   Q.  Sir, one other question I wanted to ask you -- one other

12:13:33   12   exhibit I wanted to ask you about.  If you could look at

12:13:37   13   Exhibit 145.

12:13:38   14   A.  The first book?

12:13:39   15   Q.  Yes.

12:13:53   16   A.  Yes.

12:13:53   17   Q.  And this was an e-mail that you looked at previously.

12:13:57   18   It's an e-mail dated March 15th, 2010, from you to Steve

12:14:03   19   Blumenthal.  And if you could look at the -- well, if you can

12:14:11   20   look at the whole e-mail, actually, and tell me when you have

12:14:14   21   had a chance to read it.

12:14:50   22   A.  Yes.

12:14:51   23   Q.  And this e-mail talks about making a copy of the hard

12:14:54   24   drive from the warehouse server.  Who wanted the copy of the

12:14:57   25   hard drive?

12:14:57   1    A.  We wanted to make a copy.

12:15:00   2    Q.  All right.  And you had called about -- to find out how

12:15:06   3    much it would cost to do that -- strike that.

12:15:08   4           What efforts were made to do that?

12:15:09   5    A.  I think Mr. Joshi looked into the cost of making the

12:15:13   6    copies of the hard drive.

12:15:14   7    Q.  Okay.  And it was never copied; is that right?

12:15:17   8    A.  No.

12:15:17   9    Q.  And why not?

12:15:18   10    A.  It was very expensive, from what I remember.

12:15:21   11    Q.  Do you remember how much it was going to cost?

12:15:25   12    A.  No, but it was a lot of money.

12:15:26   13    Q.  All right.  And did you think it was necessary at this

12:15:29   14    time to do that?

12:15:29   15    A.  No.

12:15:30   16    Q.  Okay.  Now, this e-mail is dated March 15th.  That's the

12:15:34   17    date of the consent foreclosure; is that right?

12:15:38   18    A.  Yes.

12:15:38   19    Q.  All right.  And so was this being discussed in connection

12:15:43   20    with the fact that the server was going to remain at the

12:15:46   21    warehouse?

12:15:47   22    A.  Yes.

12:15:47   23    Q.  All right.  And did you understand at this time that even

12:15:55   24    after the consent foreclosure, if you wanted to, you could

12:16:00   25    still have access to the server?

| | | |
|---|---|---|
| 12:16:02 | 1 | MS. DEDINAS:  Objection -- |
| 12:16:03 | 2 | THE WITNESS:  Yes. |
| 12:16:04 | 3 | MS. DEDINAS:  -- leading. |
| 12:16:04 | 4 | THE COURT:  Sustained. |
| 12:16:05 | 5 | BY MR. McJESSY: |
| 12:16:07 | 6 | Q.  What was your understanding of your ability to access the |
| 12:16:11 | 7 | server after the consent foreclosure? |
| 12:16:14 | 8 | A.  That we will have access whenever we would like to. |
| 12:16:17 | 9 | Q.  Who told you that? |
| 12:16:18 | 10 | A.  Dave Clark in this e-mail. |
| 12:16:20 | 11 | Q.  All right.  And did that change at some point? |
| 12:16:22 | 12 | A.  Yes. |
| 12:16:23 | 13 | Q.  Okay.  And did Mr. Clark change his position at some |
| 12:16:28 | 14 | point? |
| 12:16:29 | 15 | A.  He said bring the court order.  He is willing to |
| 12:16:32 | 16 | corporate, but get me the court order. |
| 12:16:33 | 17 | Q.  And that was the subsequent conversation? |
| 12:16:35 | 18 | A.  Yes. |
| 12:16:35 | 19 | Q.  You've already testified about that? |
| 12:16:36 | 20 | A.  Yes. |
| 12:16:37 | 21 | Q.  Okay.  Sir, counsel asked you, your next door neighbors |
| 12:16:51 | 22 | own a company called Diagems? |
| 12:16:54 | 23 | A.  Yes, Diagems. |
| 12:16:56 | 24 | Q.  Did you have any involvement with them in trying to |
| 12:17:00 | 25 | procure the server from the Aurora warehouse? |

12:17:03  1   A.  No.

12:17:03  2   Q.  Did -- do you know whether they have been asked about

12:17:08  3   whether they purchased the server from the Aurora warehouse?

12:17:11  4   A.  Yeah, they were deposed.

12:17:12  5   Q.  And to your knowledge, is there any information that they

12:17:17  6   did purchase the server from the warehouse?

12:17:19  7   A.  Not that I know of.

12:17:20  8   Q.  Okay.  You also testified that you knew -- you were

12:17:27  9   familiar with the company that purchased the server; is that

12:17:31  10  right?

12:17:31  11  A.  Correct.

12:17:31  12  Q.  You know the name of it --

12:17:33  13  A.  The name of it.

12:17:34  14  Q.  -- is that right?

12:17:35  15  A.  Yes.

12:17:35  16  Q.  You're only knowledgeable about that because you've

12:17:38  17  reviewed -- strike that.

12:17:39  18       Why do you -- how do you know the name of the

12:17:41  19  company?

12:17:41  20  A.  Because it was informed to Mr. Borlack, and then in the

12:17:46  21  deposition, I was shown the buyer receipt that came from that

12:17:51  22  company.

12:17:51  23  Q.  Okay.  But as of August 2010, you had no knowledge of who

12:17:58  24  purchased the server?

12:17:59  25  A.  No, sir.

12:17:59   1   Q.  All right.  And when -- you mentioned that you had a Dubai
12:18:06   2   company at one point; is that right?
12:18:08   3   A.  Yes, sir.
12:18:08   4   Q.  And what was the name of that company?
12:18:10   5   A.  Capital Consolidated.
12:18:13   6   Q.  When did it go out of business?  Strike that.
12:18:15   7        Is it still in business?
12:18:16   8   A.  No, we shut it down in 2005, 2006, thereabout.
12:18:20   9   Q.  Does it maintain any bank accounts?
12:18:23  10   A.  No.
12:18:23  11   Q.  It doesn't have a bank account with Standard Charter Bank?
12:18:27  12   A.  It used to at the time when they were in operation.
12:18:29  13   Q.  Okay.  Has it had an account there since 2005?
12:18:32  14   A.  I think it shut down in 2006, so 2006 or 2007.  Early,
12:18:38  15   everything was shut down there.
12:18:39  16   Q.  Were the accounts closed?
12:18:41  17   A.  Oh, yes.  Account has been closed since 2005, 2006.
12:18:45  18   Q.  Okay.  And was Mr. Blumenthal, did he handle that
12:18:49  19   corporate matter?
12:18:51  20   A.  I wouldn't know.  Mr. Joshi would be able to answer that.
12:18:55  21        MR. McJESSY:  I don't have any other questions, your
12:18:57  22   Honor.
12:18:57  23        THE COURT:  Half hour.  See you back.
12:19:05  24        MR. LIPTON:  Your Honor, what will be the order --
12:19:10  25        THE COURT:  You.  You're next.  And then you can

12:19:14  1    cross.

12:19:16  2            MR. LIPTON:  Fine.  Thank you.

12:19:17  3            THE COURT:  All right.  See you in a half hour.

12:19:19  4    Please be on time.  We are going to move quicker this

12:19:22  5    afternoon, I promise everybody.

12:19:26  6            MR. LIPTON:  Thanks, Judge.

          7      (The trial was adjourned at 12:15 p.m. until 12:45 p.m. of

          8    this same day and date.)

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

119

|1| IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
|2| EASTERN DIVISION

|3|

|4| UNITED CENTRAL BANK,                    )    Docket No. 10 C 331
                                           )
|5|                      Plaintiff,         )
                                           )
|6|           vs.                           )
                                           )
|7| KANAN FASHIONS, INC., et al.,           )    Chicago, Illinois
                                           )    January 27, 2011
|8|                      Defendants.        )    12:45 o'clock p.m.

|9|

|10|              TRIAL TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MICHAEL T. MASON
|11|                     VOLUME 1-B

|12| APPEARANCES:

|13|

|14| For the Plaintiff:      BOODELL & DOMANSKIS LLC
                            BY:  MS. VILIA M. DEDINAS
|15|                             MS. NADA DJORDJEVIC
                                MR. DAVID WEST
|16|                             MS. AMY RYLKO
                            205 North Michigan Avenue, Suite 4307
|17|                         Chicago, IL  60601
                            (312) 938-4070

|18|

|19| For the Defendants:     McJESSY, CHING & THOMPSON
                            BY:  MR. KEVIN McJESSY
|20|                         3759 North Ravenswood, Suite 231
                            Chicago, IL  60613
|21|                         (773) 880-1260

|22|

|23|

|24| Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                            Official Court Reporter
|25|                         219 S. Dearborn Street, Suite 1854-B
                            Chicago, Illinois  60604
                            (312) 435-5639

1    APPEARANCES CONTINUED:

2

3    For Respondents
     Alan Borlack and
4    Eric Grossman:              HINSHAW & CULBERTSON LLP
                                  BY:  MR. THOMAS P. McGARRY
5                                      MR. ALAN R. LIPTON
                                  222 North LaSalle Street, Suite 300
6                                 Chicago, IL  60601
                                  (312) 704-3000

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:46:41 | 1 | (The following proceedings were had in open court:) |
| 12:59:29 | 2 | THE COURT:  You are still under oath. |
| 12:59:31 | 3 | THE WITNESS:  Yes, your Honor. |
| 12:59:42 | 4 | THE COURT:  This is cross; is that correct? |
| 12:59:44 | 5 | MR. LIPTON:  It is, your Honor. |
| 12:59:45 | 6 | - - - |
| 12:59:45 | 7 | MEHUL SHAH, CROSS-EXAMINATION |
| 12:59:45 | 8 | BY MR. LIPTON: |
| 01:00:04 | 9 | Q.  Mr. Shah, we are going to go over some of the questions |
| 01:00:08 | 10 | and answers that you gave this morning.  First, I want to |
| 01:00:10 | 11 | direct your attention to Exhibit 45, please. |
| 01:00:12 | 12 | A.  Yes. |
| 01:00:12 | 13 | Q.  Now, that is an e-mail from you to Mr. Blumenthal copied |
| 01:00:19 | 14 | to Mr. Joshi dated March 15, 2010, correct? |
| 01:00:23 | 15 | A.  Yes. |
| 01:00:23 | 16 | Q.  You know the contents of that e-mail, don't you? |
| 01:00:31 | 17 | A.  Yes. |
| 01:00:31 | 18 | Q.  Why was -- why was Bailey Borlack not copied on this |
| 01:00:40 | 19 | e-mail? |
| 01:00:40 | 20 | A.  I don't know. |
| 01:00:42 | 21 | Q.  Well, you knew the server had to do with the litigation, |
| 01:00:48 | 22 | correct? |
| 01:00:48 | 23 | A.  Yes. |
| 01:00:49 | 24 | Q.  You knew the contents of the server had to do with |
| 01:00:51 | 25 | litigation, correct? |

| | | |
|---|---|---|
| 01:00:52 | 1 | A.  Yes. |
| 01:00:52 | 2 | Q.  You knew that the hard drive had, in effect, the books and |
| 01:00:59 | 3 | records of your corporations on it, didn't you? |
| 01:01:02 | 4 | A.  Yes. |
| 01:01:03 | 5 | Q.  And yet you were discussing whether or not to make a copy |
| 01:01:06 | 6 | of the hard drive with Mr. Clark instead of your litigation |
| 01:01:09 | 7 | counsel; is that right? |
| 01:01:12 | 8 | A.  Yes. |
| 01:01:12 | 9 | Q.  Why? |
| 01:01:13 | 10 | A.  I don't remember. |
| 01:01:15 | 11 | Q.  Well, think about it. |
| 01:01:22 | 12 | A.  I was discussing with Mr. Blumenthal. |
| 01:01:24 | 13 | Q.  And Mr. Blumenthal wasn't your litigation counsel, was he? |
| 01:01:30 | 14 | A.  No. |
| 01:01:30 | 15 | Q.  Bailey Borlack was your litigation counsel, weren't they? |
| 01:01:33 | 16 | A.  Yes. |
| 01:01:33 | 17 | Q.  Why were you discussing the preservation of evidence in |
| 01:01:37 | 18 | this litigation with someone who was not your litigation |
| 01:01:42 | 19 | counsel? |
| 01:01:44 | 20 | MR. McJESSY:  Objection.  Misstates the document that |
| 01:01:46 | 21 | they are discussing. |
| 01:01:46 | 22 | THE COURT:  He is asking a question.  I will allow |
| 01:01:49 | 23 | the question. |
| 01:01:51 | 24 | THE WITNESS:  Because in my mind, we had an access to |
| 01:01:53 | 25 | the warehouse whenever we do need it, and I should have sent |

01:01:57   1   it to Mr. Borlack, yes.

01:01:59   2   BY MR. LIPTON:

01:01:59   3   Q.  Well, what does having access to the warehouse whenever

01:02:02   4   you need it have to do with having -- with making a copy?

01:02:06   5   A.  Because we wanted to make a copy to have it for our

01:02:13   6   lawsuit.

01:02:14   7   Q.  But you decided not to because it was too expensive?

01:02:17   8   A.  Yes, sir.

01:02:17   9   Q.  Now, at this time, Bailey Borlack had retained some

01:02:21   10  computer experts to work on electronic discovery with you,

01:02:24   11  correct?

01:02:25   12  A.  Yes.

01:02:25   13  Q.  And you asked Mr. Joshi to get information about the cost

01:02:29   14  of copying the hard drive, correct?

01:02:31   15  A.  Yes.

01:02:32   16  Q.  Did -- Mr. Joshi didn't consult the ESI experts that

01:02:38   17  Bailey Borlack had retained to get those estimates, did he?

01:02:41   18  A.  I don't know that.

01:02:41   19  Q.  Who did he consult?

01:02:45   20  A.  I don't know that either.

01:02:46   21  Q.  Now, essentially, you took Mr. Clark's advice that there

01:03:02   22  was no reason to copy the hard drive of the server, correct?

01:03:07   23  A.  No, I took Mr. Joshi's advice that we don't need to, we

01:03:11   24  have access to the warehouse whenever we need to, access to

01:03:15   25  the server, since we were told so by Mr. Clark.

01:03:17  1   Q.  But that decision was taken without consulting the Bailey

01:03:21  2   Borlack firm, correct?

01:03:23  3   A.  From this e-mail?  Yes.

01:03:24  4   Q.  Well, at any time.  You never consulted the Bailey Borlack

01:03:30  5   firm as to whether or not to copy the hard drive on the

01:03:33  6   server, did you?

01:03:34  7   A.  They were aware of the fact that the warehouse is in the

01:03:39  8   control of the First Midwest Bank.

01:03:43  9           MR. LIPTON:  Objection.  Nonresponsive.

01:03:44  10          THE COURT:  Sustained.

01:03:45  11          MR. LIPTON:  Move to strike.

01:03:46  12          THE COURT:  Stricken.

01:03:47  13  BY MR. LIPTON:

01:03:49  14  Q.  You've never had Bailey Borlack involved in the decision

01:03:54  15  not to copy the hard drive, did you?

01:03:57  16          MR. McJESSY:  Objection.  Form.

01:03:58  17          THE COURT:  He can ask that question.  Overruled.

01:04:01  18          THE WITNESS:  No.

01:04:03  19  BY MR. LIPTON:

01:04:04  20  Q.  Why not?

01:04:05  21  A.  I don't know.

01:04:06  22  Q.  Turn to Exhibit 85, please.  This is an April 26, 2010,

01:04:32  23  e-mail from Eric Grossman?

01:04:34  24  A.  Yes.

01:04:34  25  Q.  To Paresh Joshi, copied to you, copied to Mr. Borlack,

01:04:40  1  copied to Mr. Muschler.  You are familiar with this e-mail,

01:04:45  2  aren't you?

01:04:45  3  A.  Yes.

01:04:45  4  Q.  This is the e-mail where on April 26 you were told to

01:04:47  5  transport the computers to the warehouse, correct?

01:04:49  6  A.  Yes.

01:04:49  7  Q.  There was no response to this e-mail that said we can't do

01:04:55  8  it because we don't have a subpoena or court order to get the

01:04:59  9  server, was there?

01:05:00  10  A.  There was a phone conversation.

01:05:02  11  Q.  There was --

01:05:04  12  A.  No e-mail response, no.

01:05:06  13        THE COURT:  We will strike the prior part as

01:05:08  14  nonresponsive regarding the phone call.

01:05:11  15        MR. LIPTON:  Thank you, your Honor.

01:05:18  16        MR. McJESSY:  Your Honor, I think the answer was

01:05:20  17  responsive to the question that was asked.

01:05:24  18        THE COURT:  I don't believe that it was.

01:05:28  19        MR. McJESSY:  Was the question was there an e-mail

01:05:31  20  response or was there no response?

01:05:33  21        MR. LIPTON:  E-mail.

01:05:33  22        THE COURT:  That's right.  That's my recollection.

01:05:37  23  BY MR. LIPTON:

01:05:42  24  Q.  And there was no -- strike that.

01:05:47  25        Turn to Exhibit 87, please, Mr. Shah.  In response to

01:06:04 1   Exhibit 85, I think you testified that Mr. Paresh wrote this

01:06:09 2   e-mail dated April 28th -- Mr. Joshi, I mean, to Eric Grossman

01:06:19 3   copied to you and Alan Borlack in which he said, I'm working

01:06:25 4   on these items, correct?

01:06:26 5   A.  Yes.

01:06:26 6   Q.  So Mr. Joshi was responding to Mr. Grossman's e-mails

01:06:34 7   saying, I'm working on these items, correct?

01:06:37 8   A.  Yes.

01:06:37 9   Q.  I'm going to turn to Exhibit 88, please.  The very same

01:06:52 10  day, Mr. Grossman wrote in an e-mail to Mr. Joshi copied to

01:06:59 11  you, copied to Mr. Borlack and Mr. Muschler, Remember, it is

01:07:04 12  not just the servers but all computers, so this would include

01:07:08 13  all laptops and PCs.  I will wait to hear from you.

01:07:11 14      Correct?

01:07:11 15  A.  Yes.

01:07:11 16  Q.  Now, did anybody write an e-mail back to Mr. Grossman or

01:07:20 17  anybody at the Bailey Borlack firm saying that the servers and

01:07:23 18  the computers could not be moved?

01:07:24 19  A.  Not that I see.

01:07:27 20  Q.  Okay.  And Mr. Grossman's April 26th e-mail occurred right

01:07:36 21  after the April 23rd meeting, didn't it?

01:07:38 22  A.  Yes.

01:07:38 23  Q.  The April 23rd meeting was the meeting where there's the

01:07:42 24  disputed telephone conversation about who was on the phone or

01:07:46 25  whether a conversation even occurred where Mr. Garrie was

| | | |
|---|---|---|
| 01:07:52 | 1 | supposed to be on the phone call? |
| 01:07:54 | 2 | THE COURT: Sustained. You need to I think make a |
| 01:07:57 | 3 | little foundation there so we can find out who was there, |
| 01:08:01 | 4 | where it took place, what time. |
| 01:08:02 | 5 | MR. LIPTON: I will do that. |
| 01:08:04 | 6 | BY MR. LIPTON: |
| 01:08:06 | 7 | Q. There's been testimony in this case about a phone call |
| 01:08:09 | 8 | that may or may not have occurred on April 23rd during the |
| 01:08:12 | 9 | time of the ESI conference that was held at the Oak Brook |
| 01:08:15 | 10 | office, correct? |
| 01:08:16 | 11 | A. Yes. |
| 01:08:16 | 12 | Q. Okay. Your position is that no such telephone call |
| 01:08:21 | 13 | occurred that included Mr. Grossman, Mr. Garrie, you, and |
| 01:08:26 | 14 | Mr. Joshi -- and Mr. Clark; is that correct? |
| 01:08:29 | 15 | A. I don't think I was supposed to be on that phone call. |
| 01:08:31 | 16 | Q. Did that phone call occur? |
| 01:08:33 | 17 | A. No, I don't think so. From what I have read, no. |
| 01:08:37 | 18 | THE COURT: It's not from what you have read. It's |
| 01:08:39 | 19 | what you know. |
| 01:08:40 | 20 | THE WITNESS: No. |
| 01:08:40 | 21 | BY MR. LIPTON: |
| 01:08:41 | 22 | Q. All right. I'm sorry. There was a phone call that |
| 01:08:45 | 23 | allegedly took place with Mr. Grossman, Mr. Joshi, Mr. Clark, |
| 01:08:52 | 24 | and Mr. Garrie. And you were present for that phone call? |
| 01:09:07 | 25 | A. No. |

128

| | | |
|---|---|---|
| 01:09:08 | 1 | MR. McJESSY:  Objection.  Assumes facts not in |
| 01:09:09 | 2 | evidence. |
| 01:09:10 | 3 | THE COURT:  He just said he wasn't present for that |
| 01:09:12 | 4 | phone call. |
| 01:09:12 | 5 | MR. McJESSY:  He said there was a phone call.  The |
| 01:09:15 | 6 | witness just testified that he wasn't sure if a phone call |
| 01:09:19 | 7 | took place. |
| 01:09:20 | 8 | MR. LIPTON:  The evidence from the depositions and so |
| 01:09:21 | 9 | forth -- |
| 01:09:22 | 10 | THE COURT:  Lay a foundation if you can. |
| 01:09:23 | 11 | MR. LIPTON:  You know what?  I will just move on. |
| 01:09:25 | 12 | THE COURT:  Okay.  Thank you. |
| 01:09:26 | 13 | BY MR. LIPTON: |
| 01:09:41 | 14 | Q.  Please turn to Exhibit 171. |
| 01:09:47 | 15 | THE COURT:  That's the other book. |
| 01:09:49 | 16 | BY MR. LIPTON: |
| 01:10:06 | 17 | Q.  This is an August 5 e-mail to Eric Grossman from Alan |
| 01:10:12 | 18 | Borlack re:  the computers.  And it purports to be an |
| 01:10:22 | 19 | understanding of a conversation with you. |
| 01:10:26 | 20 | A.  Yes. |
| 01:10:26 | 21 | Q.  Do you recall the conversation? |
| 01:10:31 | 22 | A.  Yes. |
| 01:10:31 | 23 | Q.  And what was discussed in that conversation? |
| 01:10:34 | 24 | A.  Well, Mr. Borlack was concerned about access to the |
| 01:10:41 | 25 | Creative Warehouse server, and I explained to him that I'm |

01:10:45  1  trying to raise the money for that server.

01:10:49  2  Q.  Anything else?

01:10:53  3  A.  No.

01:10:55  4  Q.  So there was no discussion in that telephone conversation

01:11:05  5  about anything other than the fact that you were trying to

01:11:09  6  raise money for the server; is that right?

01:11:11  7  A.  Yes.  So that we can access the server.

01:11:13  8  Q.  Didn't you tell him that First Midwest would not give you

01:11:17  9  access to the servers at the warehouse because Associated had

01:11:20  10  a lien on them?

01:11:21  11  A.  He knew that a while ago.

01:11:27  12  Q.  Okay.  And you discussed that, correct?

01:11:29  13  A.  I don't remember.

01:11:29  14  Q.  Okay.  And then you see in parentheses, it says, I presume

01:11:42  15  this is for a sale of the servers back to Mehul?

01:11:46  16  A.  Yes.

01:11:46  17  Q.  Did you specifically tell him that you were trying to

01:11:49  18  raise money to purchase the servers?

01:11:50  19  A.  Yes.

01:11:51  20  Q.  You didn't tell him to go get a subpoena or a court order

01:12:07  21  during that telephone conversation, did you?

01:12:09  22  A.  I would leave it to his judgment.  I am not an attorney.

01:12:12  23  Q.  Well, you didn't discuss a subpoena or a court order in

01:12:15  24  that telephone conversation?

01:12:16  25  A.  Not in that conversation, no.

01:12:18  1  Q.  In fact, you never discussed with Mr. Borlack getting a

01:12:21  2  subpoena or a court order to access anything, did you?

01:12:24  3  A.  No.

01:12:25  4  Q.  Okay.  Why not?

01:12:28  5  A.  Because I don't understand the legal part of this

01:12:33  6  litigation.  That is what I relied on him for.

01:12:37  7  Q.  Okay.  So were you told that you had to get a subpoena or

01:12:42  8  a court order to gain access to the server?

01:12:44  9  A.  We were both told that.

01:12:45  10  Q.  Both who?

01:12:46  11  A.  Me and Mr. Borlack and Mr. Joshi.

01:12:49  12  Q.  And when were you told that?

01:12:50  13  A.  Sometime in the month of May or end of April.

01:12:54  14  Q.  Do you have any way that you can pinpoint those dates

01:12:59  15  back?

01:12:59  16  A.  No, sir.

01:13:00  17  Q.  Well, this was an important telephone conversation because

01:13:06  18  you were being told all of a sudden by Dave Clark, according

01:13:09  19  to you, that you had access to the server and now that was

01:13:15  20  being taken away unless you had a subpoena or court order,

01:13:21  21  correct?

01:13:22  22  A.  Correct.

01:13:22  23  Q.  That was a pretty important thing?

01:13:24  24  A.  Yes, but at the time when I was told that, I thought it's

01:13:27  25  the routine.  I got Mr. Joshi and Mr. Borlack on the phone,

01:13:30   1   and Dave Clark conveyed the same message to all of us.

01:13:34   2   Q. Well, do you recall Ms. Dedinas calling your attention to

01:13:44   3   a bunch of e-mails on which you were copied throughout the

01:13:48   4   months of June and July, I believe, that increasingly applied

01:13:51   5   pressure to you --

01:13:52   6   A. Yes.

01:13:52   7   Q. -- to get access to the server?

01:13:53   8   A. Yes.

01:13:53   9   Q. Why didn't you mention getting a subpoena or a court order

01:13:59  10   in response to those e-mails?

01:14:00  11   A. I thought Mr. Borlack would do what he needs to do, and

01:14:07  12   Mr. Joshi was handling the ESI.

01:14:11  13   Q. Right. And you saw Mr. Joshi's responses, and in each and

01:14:13  14   every response to all of those e-mails that Ms. Dedinas

01:14:19  15   raised, he said, I am working on it, didn't he?

01:14:21  16   A. Yes.

01:14:21  17   Q. Every single one of them always had the same response, I'm

01:14:24  18   working on it, wasn't it?

01:14:26  19   A. Yes. Yes, sir.

01:14:27  20   Q. It never said, why don't you go get the court order you're

01:14:30  21   supposed to get, did it?

01:14:31  22   A. No.

01:14:32  23   Q. It never said, why don't you issue the subpoena you're

01:14:34  24   supposed to issue, did it?

01:14:35  25   A. No.

01:14:36  1   Q.  Why not?

01:14:38  2   A.  Because I relied on Mr. Borlack to do what a lawyer would

01:14:41  3   do.

01:14:41  4   Q.  So you allowed him to pressure you and you allowed him to

01:14:47  5   send you e-mails and you allowed him to do all these things

01:14:51  6   demanding that you do something that he thought he was

01:14:54  7   supposed to do?

01:14:55  8   A.  Yes, sir.

01:14:56  9   Q.  Then why didn't you tell him to do it?

01:14:57  10  A.  Because I thought that I am relying on him to do what

01:15:02  11  legally needs to be done.

01:15:03  12  Q.  Did you tell him that?

01:15:08  13  A.  No.

01:15:11  14  Q.  Why not?

01:15:12  15  A.  Because I was -- I paid the bills, the kind of invoices

01:15:17  16  that was coming to us.  We were taking care of that.

01:15:20  17  Q.  So you were taking care of bills and invoices and you

01:15:26  18  weren't taking care of the ESI in this litigation; is that

01:15:31  19  your testimony?

01:15:31  20  A.  Because Mr. Borlack was handling it.

01:15:34  21  Q.  And Mr. Borlack in handling it was asking you to take

01:15:41  22  certain actions through Mr. Joshi, and Mr. Joshi was

01:15:48  23  responding, I'm working on it, and you were satisfied with

01:15:50  24  those answers, correct?

01:15:51  25  A.  Yes.

01:15:51  1   Q.  And you knew he wasn't working on anything, correct?

01:15:53  2   A.  Sir, we are not lawyers.  We don't know when to send court

01:15:57  3   orders.

01:15:58  4   Q.  But if your lawyer hasn't done something that you think he

01:16:08  5   should have done, wouldn't you tell him to do it or at least

01:16:11  6   ask him why he hadn't?

01:16:13  7        MR. McJESSY:  Objection.  Hypothetical and also

01:16:16  8   compound.

01:16:18  9        THE COURT:  Well, split it up, if you want to.  You

01:16:20  10  can ask the question, but break it up.

01:16:24  11  BY MR. LIPTON:

01:16:24  12  Q.  If your lawyer wasn't doing something that you wanted him

01:16:26  13  to do, wouldn't you tell him to do it?

01:16:28  14  A.  Yes, I was perhaps not in state of mind.  I had too much

01:16:32  15  confidence in Mr. Borlack to do the right thing.

01:16:34  16  Q.  So you did it because of your tremendous confidence in

01:16:39  17  Mr. Borlack; is that right?

01:16:41  18  A.  At the time, yes.

01:16:41  19  Q.  Now, you had been attempting to purchase the warehouse

01:17:03  20  server from Associated Bank since January of 2010, correct?

01:17:06  21  A.  Yes.

01:17:06  22  Q.  And when was the first time that you told Mr. Borlack or

01:17:10  23  anybody at Bailey Borlack that you were attempting to purchase

01:17:13  24  the warehouse server?

01:17:14  25  A.  I think sometime in March.

01:17:20　1　Q.　March?

01:17:22　2　A.　Yes, in one of the conversations perhaps with Steve

01:17:26　3　Blumenthal and Mr. Borlack.  From what I remember, Mr. Borlack

01:17:29　4　was aware of our attempt to purchase that from First Midwest

01:17:35　5　right from month of February or March.

01:17:37　6　Q.　There is nothing in writing --

01:17:38　7　A.　No.

01:17:39　8　Q.　-- that you've seen --

01:17:40　9　A.　No.

01:17:40　10　Q.　-- that shows that Mr. Borlack was aware that you were

01:17:42　11　attempting to purchase a computer server, is there?

01:17:44　12　A.　No.

01:17:45　13　Q.　And Mr. Blumenthal never copied him on any e-mails

01:17:49　14　regarding your attempted purchase of the computer server,

01:17:53　15　correct?

01:17:53　16　A.　Right.

01:17:54　17　Q.　And Mr. Clark didn't copy him or anybody at his firm on

01:17:58　18　the attempted purchase of the server, correct?

01:18:01　19　　　　　MR. McJESSY:  Objection.  Foundation.

01:18:03　20　BY MR. LIPTON:

01:18:03　21　Q.　Well, have you seen any e-mails?

01:18:04　22　A.　No.

01:18:05　23　　　　　THE COURT:  Your objection is sustained.

01:18:07　24　BY MR. LIPTON:

01:18:08　25　Q.　So you haven't seen any e-mails from any source that

01:18:10  1   informed Mr. Borlack or any of the attorneys at his firm that

01:18:14  2   you were attempting to purchase the server until after the

01:18:17  3   server had actually been sold, correct?

01:18:20  4   A.  Right, not that I remember, no.

01:18:22  5   Q.  Now, I believe -- strike that.

01:18:35  6        You mentioned that Mr. Schreiber suggested that you

01:19:08  7   go to Mr. Borlack to be your litigation counsel in this case?

01:19:13  8   A.  Yes.

01:19:13  9   Q.  Mr. Schreiber is not at Mr. Blumenthal's firm, is he?

01:19:16  10  A.  No.

01:19:18  11  Q.  He is in another firm, isn't he?

01:19:20  12  A.  Right.

01:19:20  13  Q.  Let's go back to Exhibit No. 22 for a minute, please.

01:20:01  14  A.  22?

01:20:02  15  Q.  Yes.

01:20:03  16  A.  One second, please.

01:20:21  17  Q.  Is that the e-mail where -- strike that.

01:20:26  18        That's the -- Exhibit 22 is the e-mail to Mehul Shah

01:20:31  19  from Alan Borlack copied to Steve Blumenthal, copied to Dave

01:20:37  20  Muschler that in paragraph 2 says, That means UCB will have to

01:20:44  21  be given the choice of either paying the warehouse rent if it

01:20:48  22  wants the inventory to stay there or we will have to transfer

01:20:50  23  the inventory to somewhere else.

01:20:52  24        Correct?

01:20:53  25  A.  Yes.

| | | |
|---|---|---|
| 01:20:53 | 1 | Q. That e-mail and those discussions didn't have anything to |
| 01:20:56 | 2 | do with the server in this case, did it? |
| 01:20:58 | 3 | A. No. |
| 01:20:59 | 4 | Q. It only had to do with the inventory in the warehouse, |
| 01:21:02 | 5 | correct? |
| 01:21:02 | 6 | A. Right. |
| 01:21:03 | 7 | Q. And, in fact, throughout the course of this litigation, |
| 01:21:08 | 8 | whenever there was discovery about the inventory -- strike |
| 01:21:11 | 9 | that. |
| 01:21:12 | 10 | Throughout the course of this litigation, whenever |
| 01:21:14 | 11 | there was discussion about the inventory, there was not also |
| 01:21:24 | 12 | simultaneously discussion about the warehouse server, was it? |
| 01:21:26 | 13 | The two were separate, correct? |
| 01:21:29 | 14 | A. Yes. Yes. |
| 01:21:30 | 15 | Q. And the reason that Mr. Borlack was sending you this and |
| 01:21:36 | 16 | was concerned about the inventory was because the inventory |
| 01:21:40 | 17 | secured the notes that UCB held, correct? |
| 01:21:44 | 18 | A. Yes. |
| 01:21:44 | 19 | Q. And nobody thought that the computer server had anything |
| 01:21:50 | 20 | to do with part of the foreclosure, did they? |
| 01:21:52 | 21 | A. Perhaps not. |
| 01:21:54 | 22 | Q. What do you mean "perhaps not"? |
| 01:21:55 | 23 | A. No. Nobody thought. |
| 01:21:57 | 24 | Q. So there was no discussion among the parties that the |
| 01:22:01 | 25 | computer server had any relationship to the foreclosure, was |

01:22:06  1  there?

01:22:06  2         MR. McJESSY:  Objection.  Vague, relationship to?

01:22:09  3         THE COURT:  Lay a foundation.

01:22:10  4  BY MR. LIPTON:

01:22:12  5  Q.  As I said before, the servers and the foreclosure were two

01:22:15  6  distinct, separate issues, they were not intermingled,

01:22:19  7  correct?

01:22:22  8  A.  Correct.

01:22:22  9  Q.  And so when the attorneys were discussing the foreclosure,

01:22:25  10  they weren't also discussing anything having to do with the

01:22:28  11  server, were they?

01:22:29  12  A.  Which attorneys are you talking about?

01:22:33  13  Q.  Bailey Borlack attorneys.  Thank you.

01:22:36  14  A.  No.

01:22:37  15  Q.  That was only Mr. Blumenthal's province, correct?

01:22:41  16  A.  Yes.

01:22:41  17  Q.  Okay.  Now, I believe counsel -- Ms. Dedinas asked you a

01:23:04  18  question and you said that you weren't qualified to move the

01:23:07  19  computer server?

01:23:08  20  A.  Right.

01:23:08  21  Q.  Do you know if Jim was qualified to move the computer

01:23:11  22  server?

01:23:12  23  A.  Who?

01:23:13  24  Q.  Jim.

01:23:14  25  A.  Who is Jim?

01:23:15   1   Q. Jim -- never mind.

01:23:16   2      Let me direct your attention to Exhibit 85, please.

01:23:28   3   Exhibit 85 is an April -- is the April 26th e-mail --

01:23:33   4   A. Yes.

01:23:33   5   Q. -- from Mr. Grossman.

01:23:37   6      You testified that was the first time you were told

01:23:41   7   to move the server, correct?

01:23:43   8   A. Yes.

01:23:43   9   Q. And that was shortly after the April 23rd meeting at the

01:23:46  10   Oak Brook office, correct?

01:23:47  11   A. Yes.

01:23:47  12   Q. And nobody -- strike that.

01:23:51  13      Mr. Joshi didn't object to moving the server as a

01:23:54  14   result of getting this e-mail, did he?

01:23:57  15   A. I don't remember.

01:23:58  16   Q. Did you object to moving the server as a result of getting

01:24:02  17   this e-mail?

01:24:03  18   A. No.

01:24:03  19   Q. Mr. Joshi -- nobody told Bailey Borlack that the server

01:24:11  20   couldn't be moved, did they?

01:24:16  21   A. No.

01:24:16  22   Q. Nobody told Bailey Borlack that they needed a court order

01:24:20  23   or a subpoena before the server could be moved, did they?

01:24:24  24   A. On that day, no.

01:24:25  25   Q. Meaning April 26th.

| | | |
|---|---|---|
| 01:24:28 | 1 | A.  Right. |
| 01:24:29 | 2 | Q.  Are you suggesting that there was another day when Bailey |
| 01:24:35 | 3 | Borlack was told that? |
| 01:24:35 | 4 | A.  When Mr. Borlack, myself, Mr. Joshi were told by |
| 01:24:41 | 5 | Mr. Clark, that's the day it was told. |
| 01:24:43 | 6 | Q.  And you don't know what day that was, do you? |
| 01:24:45 | 7 | A.  No, sir. |
| 01:24:45 | 8 | Q.  And there is nothing in writing to confirm that, is there? |
| 01:24:48 | 9 | A.  No, sir. |
| 01:24:48 | 10 | Q.  And it's never been referred to subsequently in any |
| 01:24:51 | 11 | writing that's been produced in this case, has it? |
| 01:24:53 | 12 | A.  No, sir.  I said no. |
| 01:25:31 | 13 | MR. LIPTON:  May I have a second, your Honor? |
| 01:25:35 | 14 | THE COURT:  Sure. |
| 01:25:39 | 15 | MR. LIPTON:  Nothing further. |
| 01:25:40 | 16 | THE COURT:  Thank you.  Cross? |
| 01:25:42 | 17 | MS. DEDINAS:  Briefly. |
| 01:25:43 | 18 | - - - |
| 01:25:43 | 19 | MEHUL SHAH, REDIRECT EXAMINATION |
| 01:25:43 | 20 | BY MS. DEDINAS: |
| 01:25:52 | 21 | Q.  Sir, you were told that you didn't look for the server |
| 01:25:55 | 22 | because the Borlack firm was handling it and they told you not |
| 01:25:57 | 23 | to look for it; is that correct? |
| 01:25:59 | 24 | A.  No, I was told by Mr. Roche not to look for it. |
| 01:26:05 | 25 | Q.  Didn't the Borlack firm tell you to look for that server? |

| | | |
|---|---|---|
| 01:26:08 | 1 | A. Oh, yeah -- |
| 01:26:09 | 2 | Q. -- ASAP? |
| 01:26:10 | 3 | A. -- and we did. |
| 01:26:10 | 4 | Q. And how did you go about looking for it? |
| 01:26:13 | 5 | A. Well, the name that was given at the time to us by |
| 01:26:16 | 6 | Mr. Borlack was Diagems, D-i, dash, G-e- -- g-a-m-e-s (sic). |
| 01:26:25 | 7 | And that's what we were chasing after. |
| 01:26:27 | 8 | Q. So what did you do to look at them? |
| 01:26:33 | 9 | A. Well, we went on the Internet looking -- trying to look |
| 01:26:36 | 10 | for the company with that name. |
| 01:26:38 | 11 | Q. And other than an Internet search for them or a company |
| 01:26:41 | 12 | named Diagems, did you do anything else? |
| 01:26:45 | 13 | A. No. |
| 01:26:45 | 14 | Q. And then you told -- said that Mr. Roche told you not to |
| 01:26:48 | 15 | look for the server? |
| 01:26:49 | 16 | A. Yes, once Mr. Roche was hired, he said that, I don't want |
| 01:26:53 | 17 | you to do anything, I don't want this to be misconstrued. |
| 01:26:55 | 18 | Q. Did he explain what that meant, that it would be |
| 01:26:58 | 19 | misconstrued if you actually found the server? |
| 01:27:00 | 20 | A. No, that if you are going to start calling people, then it |
| 01:27:04 | 21 | will be looked at in a negative way. And that's the reason |
| 01:27:07 | 22 | why on January 6th, my new counsel requested Judge Mason that |
| 01:27:15 | 23 | if we can start looking for it ourselves. |
| 01:27:18 | 24 | THE COURT: That's January 6th of this year? |
| 01:27:22 | 25 | THE WITNESS: Yes, sir, 2011. |

01:27:25   1   BY MS. DEDINAS:

01:27:25   2   Q.  Now, you testified that you were very angry and

01:27:27   3   disappointed with Mr. Clark upon learning that he had sold the

01:27:31   4   server?

01:27:31   5   A.  Yes.

01:27:32   6   Q.  Is that right?

01:27:33   7        And that that's the reason you didn't speak to him

01:27:35   8   any further about the server?

01:27:37   9   A.  Right.

01:27:37  10   Q.  But you did have other conversations with him about the

01:27:42  11   lease and the building itself; isn't that right?

01:27:45  12   A.  No.  The only conversation I had after that finding out of

01:27:50  13   loss of server was the information that he needed, and I

01:27:54  14   provided him that I don't know what type of roof it is, he

01:27:58  15   will have to figure it out himself, and the blueprints were

01:28:01  16   sent to him way back by Mr. Joshi.  And that was the only

01:28:04  17   conversation that we had.

01:28:04  18   Q.  So you only had one conversation with Mr. Clark?

01:28:07  19   A.  One or two conversations because we exchanged phone calls

01:28:10  20   back and forth, and that's it.

01:28:11  21   Q.  Didn't you also ask Mr. Clark to help you find a new

01:28:15  22   attorney to help you in this litigation?

01:28:17  23   A.  Yeah, that was back in the month of May under the

01:28:20  24   advisement of Mr. Borlack.  We had reached out to Mr. Clark.

01:28:24  25   Q.  Now, you were asked some questions by Mr. McJessy about

01:28:31 | 1 | UCB having a security interest in the contents of the
01:28:34 | 2 | warehouse in connection with the promissory note.
01:28:36 | 3 | A.  Yes.
01:28:36 | 4 | Q.  Do you recall that?
01:28:37 | 5 |     Now, do you have a firm understanding of what
01:28:42 | 6 | exactly -- what items exactly United Central Bank had a
01:28:48 | 7 | security interest in?
01:28:49 | 8 | A.  Well, it was the building and all the contents within the
01:28:52 | 9 | building that it contained.
01:28:55 | 10 | Q.  Well, now, isn't that reflected in a UCC filing?
01:28:59 | 11 | A.  Yes, but I had not read it until the (inaudible).
01:29:03 | 12 | Q.  Have you read it?  Do you know what's in the UCC filing?
01:29:06 | 13 | A.  No, I have not.
01:29:07 | 14 | Q.  You're aware that there is a security interest in
01:29:10 | 15 | clothing --
01:29:11 | 16 | A.  Yes.
01:29:11 | 17 | Q.  -- and inventory, right?
01:29:13 | 18 | A.  Yes.  Yes.
01:29:13 | 19 | Q.  And accounts receivable?
01:29:14 | 20 | A.  Yes, ma'am.
01:29:15 | 21 | Q.  But as far as equipment goes, do you know what equipment
01:29:19 | 22 | is covered by the UCC filing?
01:29:22 | 23 | A.  I wouldn't know.
01:29:23 | 24 | Q.  It would have to be something that you owned, right?
01:29:25 | 25 | A.  Yes.

01:29:26   1   Q.  So do you know whether United Central Bank had a perfected

01:29:30   2   security interest in the computer server that was leased to

01:29:34   3   you by Associated Bank?

01:29:34   4   A.  I wouldn't know about that.

01:29:36   5   Q.  Okay.  Now, you indicated that the keys were handed over

01:29:42   6   to First Midwest Bank on the date of the deed in lieu; is that

01:29:42   7   right?

01:29:49   8   A.  No, I think we requested for an extra week.

01:29:52   9   Q.  Okay.

01:29:52  10   A.  And during that week, it was handed over.

01:29:55  11   Q.  And you indicated that at that time is when you lost

01:29:58  12   possession of the warehouse?

01:29:59  13   A.  Yes.

01:30:00  14   Q.  Do you recall that Kanan Fashions was actually a tenant in

01:30:04  15   the building?

01:30:05  16   A.  Yes.

01:30:05  17   Q.  And that the deed in lieu of foreclosure -- under the deed

01:30:11  18   in lieu of foreclosure, Creative Warehousing -- strike that --

01:30:16  19   under the deed in lieu of foreclosure, First Midwest Bank took

01:30:19  20   the deed with the tenant subject to the lease; isn't that

01:30:25  21   right?

01:30:25  22   A.  Correct.  Correct.

01:30:26  23   Q.  So, actually, you didn't turn over control of the

01:30:30  24   warehouse until the agreed order of eviction; isn't that

01:30:30  25   right?

01:30:33  1    A.  Correct, yes.

01:30:34  2    Q.  That would be March 24th?

01:30:36  3    A.  Correct.

01:30:36  4    Q.  Okay.  Now, in Exhibit 45, you indicated --

01:30:43  5    A.  Can I open it?

01:30:44  6    Q.  Yes, please do.

01:30:54  7    A.  Yes.

01:30:54  8    Q.  This is the e-mail in which you indicated that a decision

01:30:57  9    was made not to copy the data on the warehouse server because

01:31:04  10   you were relying on the fact that you could get the data

01:31:07  11   whenever you needed it from First Midwest Bank.  Do you recall

01:31:10  12   that?

01:31:11  13   A.  Yes.

01:31:11  14   Q.  And now you also testified that at some point, that

01:31:15  15   arrangement with First Midwest Bank changed and they told you

01:31:20  16   that you could no longer get access to the server without a

01:31:26  17   court order.  Do you recall that?

01:31:28  18   A.  Correct.

01:31:28  19   Q.  Did you at that time revisit the issue of whether you

01:31:33  20   ought to try to get a copy of the data?

01:31:36  21   A.  We did not.

01:31:37  22   Q.  Okay.  Why didn't you revisit that issue?

01:31:43  23   A.  Because there was a negotiation that was going on between

01:31:48  24   First Midwest and Associated Bank, the repurchase of the

01:31:52  25   entire server.

| | | |
|---|---|---|
| 01:31:52 | 1 | Q.  And did you ever contemplate, sir, what would happen if |
| 01:31:57 | 2 | those negotiations were not successful? |
| 01:31:58 | 3 | A.  No, I didn't contemplate that. |
| 01:32:03 | 4 | MS. DEDINAS:  Thank you. |
| 01:32:11 | 5 | MR. McJESSY:  Judge, I just have a few questions. |
| 01:32:13 | 6 | THE COURT:  I take it you are finished? |
| 01:32:14 | 7 | MS. DEDINAS:  I am done, yes. |
| 01:32:20 | 8 | - - - |
| 01:32:20 | 9 | MEHUL SHAH, RECROSS-EXAMINATION |
| 01:32:20 | 10 | BY MR. McJESSY: |
| 01:32:23 | 11 | Q.  Mr. Shah, you were asked several questions by both counsel |
| 01:32:26 | 12 | regarding Exhibit 45.  I would like you to turn to Exhibit 44, |
| 01:32:34 | 13 | which is an e-mail from Dave Clark to Steve Blumenthal that is |
| 01:32:53 | 14 | dated also March 15th and just a few minutes before Exhibit |
| 01:32:57 | 15 | 45. |
| 01:32:57 | 16 | THE COURT:  4:45 p.m. |
| 01:32:59 | 17 | MR. McJESSY:  Correct. |
| 01:33:00 | 18 | THE COURT:  In case you can't read that. |
| 01:33:02 | 19 | BY MR. McJESSY: |
| 01:33:03 | 20 | Q.  The e-mail of -- Exhibit 44 is March 15th, 2010, at 4:45 |
| 01:33:11 | 21 | p.m.? |
| 01:33:12 | 22 | A.  Yes. |
| 01:33:12 | 23 | Q.  Exhibit 45 is March 15th, 2010, at 4:53 p.m., about eight |
| 01:33:19 | 24 | minutes later. |
| 01:33:20 | 25 | Did you receive -- have you seen the e-mail that's |

01:33:25    1    Exhibit 44?

01:33:25    2    A.  Yes.

01:33:27    3    Q.  This is an e-mail from Dave Clark, and he's concerned --

01:33:34    4    he's expressing concern about his access to the hard drive; is

01:33:37    5    that right?

01:33:37    6    A.  Correct.

01:33:37    7    Q.  This is the hard drive of the server?

01:33:42    8    A.  Correct.

01:33:42    9    Q.  Do you know why he was concerned with having access to the

01:33:44    10    hard drive of the server?

01:33:46    11           MS. DEDINAS:  Objection, your Honor.

01:33:46    12           THE COURT:  Sustained.

01:33:48    13    BY MR. McJESSY:

01:33:49    14    Q.  Do you have any understanding of -- did you discuss with

01:33:51    15    Dave Clark the hard drive for the server at the warehouse

01:33:55    16    around this time?

01:33:56    17    A.  Yes, that we requested them to negotiate.

01:33:59    18    Q.  All right.  But, specifically, he's expressing an interest

01:34:03    19    in the hard drive in this e-mail; is that right?

01:34:05    20           MS. DEDINAS:  Objection, your Honor.

01:34:07    21           THE WITNESS:  Yes.

01:34:07    22           THE COURT:  Sustained.

01:34:08    23    BY MR. McJESSY:

01:34:14    24    Q.  Did you receive a copy of this e-mail?

01:34:16    25           MS. DEDINAS:  Objection.

01:34:18    1            THE COURT:  No, he can answer that.

01:34:19    2            THE WITNESS:  No.

01:34:20    3   BY MR. McJESSY:

01:34:20    4   Q.  You weren't copied on it?

01:34:22    5   A.  No.

01:34:22    6   Q.  Did you discuss with Mr. Clark around this time the

01:34:26    7   substance of this e-mail?

01:34:28    8   A.  No.

01:34:29    9   Q.  Now, counsel asked you numerous questions about the fact

01:34:37   10   that Bailey Borlack's firm kept sending e-mails to Mr. Joshi

01:34:45   11   asking about the status of the server.  Do you remember those

01:34:48   12   questions?

01:34:48   13   A.  Yes.

01:34:48   14   Q.  All right.  At no point did you ever advise Bailey Borlack

01:34:54   15   that you had the server; is that right?

01:34:56   16   A.  Right.

01:34:56   17   Q.  Counsel also asked you if you had ever sent an e-mail

01:35:05   18   saying you were negotiating for the purchase of the server.

01:35:08   19   Do you remember that?

01:35:09   20   A.  Correct.

01:35:09   21   Q.  Did you ever convey to Mr. Borlack or any of the attorneys

01:35:11   22   at his firm in any fashion that you were negotiating for the

01:35:14   23   purchase of the server?

01:35:16   24   A.  Absolutely.

01:35:16   25   Q.  All right.  When did you do that?

01:35:17   1   A.  More than one occasion.  During common conversations with

01:35:25   2   Steven Blumenthal and Mr. Borlack, it was conveyed that we are

01:35:28   3   in the process of purchasing it through negotiations.

01:35:31   4   Q.  All right.  So your understanding is -- so you believe

01:35:34   5   they were aware of that?

01:35:34   6   A.  Yes.

01:35:37   7   Q.  All right.  And when Mr. Paresh responded I'm working on

01:35:44   8   it in his e-mails with respect to the procurement of the

01:35:46   9   server, what do you understand that to mean?

01:35:49   10   A.  Same thing, that they are aware of it and we are working

01:35:52   11   on -- waiting to hear back from First Midwest Bank to

01:35:57   12   negotiate the server with Associated.

01:35:59   13   Q.  All right.  Counsel asked you a great number of questions

01:36:07   14   about issuing subpoenas.  Do you know how attorneys go about

01:36:12   15   issuing subpoenas?

01:36:12   16   A.  No.

01:36:13   17   Q.  Okay.  Have you ever instructed an attorney before to

01:36:16   18   issue a subpoena for any purpose?

01:36:18   19   A.  No.

01:36:18   20   Q.  Counsel also showed you Exhibit 85.  If you could take a

01:36:30   21   look at that.

01:36:49   22        Did you provide any response to the e-mail that's

01:36:52   23   Exhibit 85?

01:36:53   24   A.  Mr. Joshi was communicating that.

01:36:57   25   Q.  All right.  Now, they're directing you to obtain the

01:37:01    1   server, right?

01:37:04    2   A.  Correct.

01:37:04    3   Q.  And counsel asked whether there were any e-mail responses

01:37:07    4   to this saying that we don't have access to the server?

01:37:17    5   A.  Correct.

01:37:17    6   Q.  Were there conversations -- was there any conversation

01:37:21    7   with your counsel wherein your counsel was told that you

01:37:25    8   didn't have access to the server?

01:37:27    9   A.  Yes.

01:37:27   10   Q.  And when was that?

01:37:28   11   A.  With Mr. Blumenthal at times, like I just mentioned a few

01:37:33   12   minutes ago, they were aware that we are in negotiations and

01:37:38   13   we didn't have access to the server.

01:37:39   14   Q.  All right.  Lastly, I'd like you to take a look at

01:37:51   15   Exhibit 101.  This is an e-mail that you're copied on to

01:38:05   16   Mr. Grossman from Mr. Joshi; is that right?

01:38:07   17   A.  Yes.

01:38:07   18   Q.  Is this a response as to the status of your efforts with

01:38:12   19   regard to obtaining the server?

01:38:14   20   A.  Yes.

01:38:15   21            THE COURT:  Which one?  Which one?

01:38:18   22            MR. McJESSY:  I'm sorry.

01:38:18   23   BY MR. McJESSY:

01:38:19   24   Q.  The e-mail at the top dated Thursday, 13th of May, 2010,

01:38:24   25   at 9:38 a.m.

01:38:26   1        THE COURT:  Thank you.

01:38:26   2        THE WITNESS:  Yes.

01:38:27   3   BY MR. McJESSY:

01:38:28   4   Q.  And it says, Currently, First Midwest is working with

01:38:31   5   Associated Bank.

01:38:33   6        What you're referring to are the negotiations to

01:38:35   7   obtain the server so that you can purchase it?

01:38:37   8   A.  Yes, sir.

01:38:38   9   Q.  And they were aware of what that meant; is that right?

01:38:40   10  A.  Yes, sir.

01:38:40   11  Q.  Did you receive a response to this e-mail asking what this

01:38:43   12  e-mail meant?

01:38:44   13  A.  No.

01:38:45   14  Q.  To your knowledge, nobody ever called you and said, what

01:38:48   15  do you mean by this, we don't understand?

01:38:50   16  A.  No, sir.

01:38:50   17        MS. DEDINAS:  Objection.

01:38:51   18        THE COURT:  First of all, it's not his e-mail.

01:38:54   19        MR. McJESSY:  Fine.  Fine.

01:38:55   20  BY MR. McJESSY:

01:38:56   21  Q.  But nobody --

01:38:59   22        THE COURT:  It wasn't directed from him.

01:39:02   23        MR. McJESSY:  I understand.

01:39:03   24  BY MR. McJESSY:

01:39:03   25  Q.  To your knowledge, did anybody call either you or

01:39:06    1    Mr. Paresh in response to this e-mail and say that they didn't

01:39:09    2    understand it?

01:39:09    3    A.  Not to my knowledge.

01:39:10    4    Q.  Okay.

01:39:11    5           MR. McJESSY:  I have no other questions, your Honor.

01:39:13    6           THE COURT:  Any recross?

01:39:15    7           MR. LIPTON:  Just briefly, your Honor.

01:39:16    8           THE COURT:  Quickly.

01:39:17    9                              - - -

01:39:17   10              MEHUL SHAH, RECROSS-EXAMINATION

01:39:17   11    BY MR. LIPTON:

01:39:21   12    Q.  Mr. Shah, you say that there were several conversations

01:39:23   13    with Steve Blumenthal in which the subject of your purchasing

01:39:29   14    this server came up with members of the Bailey Borlack firm

01:39:34   15    present; is that right?

01:39:35   16    A.  Yes.

01:39:35   17    Q.  What dates were those conversations?

01:39:37   18    A.  I don't remember.

01:39:37   19    Q.  How many were there?

01:39:38   20    A.  A few.

01:39:39   21    Q.  How many is a few?

01:39:40   22    A.  Well, because Mr. Borlack --

01:39:43   23    Q.  No, how many is a few?

01:39:44   24    A.  Two or three.

01:39:45   25    Q.  Okay.  Was it two or is it three?

01:39:47   1   A.  It's more than one, sir.

01:39:49   2   Q.  It's more than one?

01:39:51   3   A.  Yes, sir.

01:39:51   4   Q.  Okay.  Do you have a specific recollection of any

01:39:55   5   particular conversation that you had with them on this

01:40:01   6   subject?

01:40:05   7          MR. McJESSY:  Objection.  "Them," vague as to them.

01:40:06   8          THE COURT:  He's asking him if he has a particular

01:40:09   9   recollection.

01:40:10  10          MR. McJESSY:  No, as to who "them" is.

01:40:12  11          THE WITNESS:  The conversation would be --

01:40:13  12          THE COURT:  Wait.  Wait.  That's a good question.

01:40:15  13   Who is "them"?

01:40:15  14   BY MR. LIPTON:

01:40:17  15   Q.  Well, "them" was Mr. Borlack or somebody from BBM,

01:40:22  16   Mr. Blumenthal, and yourself?

01:40:23  17   A.  Yes.  The discussion would be in regards to Western

01:40:27  18   Springs Bank subject, and then part of that would be a

01:40:30  19   conversation to this.

01:40:31  20   Q.  Okay.  And so that is the specific time that you're

01:40:35  21   thinking of?

01:40:35  22   A.  That's what I remember.

01:40:36  23   Q.  When did that discussion with Western Springs occur --

01:40:40  24   about Western Springs occur?

01:40:42  25   A.  Sometime in May or June.

01:40:43  1   Q.  And where were you?

01:40:48  2   A.  On the phone.

01:40:49  3   Q.  And who had placed the call?

01:40:53  4   A.  I don't remember.  Usually it is me who places the call.

01:40:57  5   Q.  What were you placing the call about if this was a

01:41:02  6   conversation about Western Springs Bank?  What was the subject

01:41:05  7   that you were placing the call about?

01:41:06  8   A.  I just gave you that as an example.

01:41:08  9   Q.  I don't want an example, Mr. Shah.  I want a specific

01:41:11  10  recollection.  Do you have a specific recollection?

01:41:13  11  A.  No, sir.

01:41:14  12  Q.  Thank you.

01:41:15  13        Now, you said that Bailey Borlack or members of that

01:41:34  14  firm were aware of those negotiations.  When you said that

01:41:38  15  they were aware of those negotiations, were you talking about

01:41:41  16  the specific phone conversation that you can no longer recall?

01:41:48  17  A.  Like I said, it was more than one time that Mr. Borlack

01:41:54  18  and myself may have talked about the negotiations about trying

01:42:00  19  to acquire the server through First Midwest Bank.

01:42:03  20        So I cannot recall exactly what date, but, yes, he

01:42:06  21  was aware of the fact that there has been a negotiation going

01:42:09  22  on on the behalf of us by First Midwest Bank with Associated

01:42:13  23  Bank.

01:42:13  24  Q.  And the only reason he was aware of that was because of

01:42:15  25  these conversations that you are talking about now?

01:42:17  1  A. Yes, the part of the conversation of something else that
01:42:21  2  was discussed.
01:42:22  3       And why I brought up Western Springs Bank is because
01:42:26  4  Steve Blumenthal was handling Western Springs, so that's what
01:42:30  5  brings him on the phone conversation.
01:42:33  6  Q. Well, did Mr. Borlack have anything to do with Western
01:42:36  7  Springs?
01:42:36  8  A. Yes.
01:42:36  9  Q. What was that?
01:42:37  10  A. He was involved in part of it for -- part of the case with
01:42:44  11  Western Springs.
01:42:44  12  Q. But Western Springs had nothing to do with the inventory
01:42:48  13  or with the server, did it?
01:42:50  14  A. No.
01:42:50  15  Q. Then how did it become a part of a telephone call where
01:42:54  16  you were discussing something having to do with Western
01:42:57  17  Springs?
01:42:57  18  A. It was a general conversation, so one subject leads to the
01:43:00  19  other.
01:43:00  20  Q. And how did it lead from one to the other when they had
01:43:03  21  nothing to do with each other?
01:43:04  22  A. I don't recall. It was the same attorney handling two
01:43:11  23  things because Mr. Borlack did handle Western Springs' portion
01:43:14  24  of the litigation as well as the United Central Bank.
01:43:17  25  Q. Okay. So let's say you did have one of these

01:43:20    1    conversations or more than one of these conversations with

01:43:24    2    Mr. Blumenthal and Mr. Borlack.  Mr. Blumenthal never

01:43:26    3    mentioned to Mr. Borlack that he had to get a subpoena or a

01:43:28    4    court order to access the server, did he?

01:43:30    5    A.  I don't remember.

01:43:31    6    Q.  You don't remember that?

01:43:32    7    A.  No.

01:43:33    8    Q.  But you do remember discussion about the server, correct?

01:43:36    9    A.  I do remember that he was aware of the fact that the

01:43:40   10    purchase is being done by First Midwest Bank from Associated

01:43:43   11    Bank.

01:43:43   12    Q.  Okay.  Take a look again at Exhibit 101 dated May 13th,

01:43:57   13    2010, an e-mail from Mr. Joshi to Mr. Grossman copied to you

01:44:01   14    and Mr. Borlack.

01:44:03   15    A.  Yes.

01:44:03   16    Q.  It doesn't say in there --

01:44:06   17         THE COURT:  And you're referring to the top?  It is

01:44:09   18    the only one dated May 13th.

01:44:11   19         MR. LIPTON:  Yes, I am.  I am referring to the top

01:44:13   20    one, your Honor.  Thank you.

01:44:14   21    BY MR. LIPTON:

01:44:15   22    Q.  There is nothing in that e-mail about getting a subpoena

01:44:17   23    or a court order, is there?

01:44:18   24    A.  No.

01:44:18   25    Q.  And there's nothing in there about needing a subpoena or

| | | |
|---|---|---|
| 01:44:22 | 1 | court order, is there? |
| 01:44:23 | 2 | A.  No. |
| 01:44:23 | 3 | Q.  And there's nothing in there about the fact that you were |
| 01:44:31 | 4 | attempting to purchase the server lease from Associated Bank? |
| 01:44:37 | 5 | A.  Mr. Borlack was aware of what was going on.  That's the |
| 01:44:41 | 6 | reason Mr. Joshi is mentioning that.  Midwest bank is working |
| 01:44:47 | 7 | with Associated Bank. |
| 01:44:48 | 8 | MR. LIPTON:  Objection.  Nonresponsive, move to |
| 01:44:50 | 9 | strike. |
| 01:44:50 | 10 | THE COURT:  Sustained, and it should be stricken. |
| 01:44:53 | 11 | BY MR. LIPTON: |
| 01:44:54 | 12 | Q.  Mr. Shah, listen to the question, please. |
| 01:44:55 | 13 | A.  Okay. |
| 01:44:56 | 14 | Q.  There is nothing in this e-mail that discusses the fact |
| 01:45:00 | 15 | that you were attempting to purchase the computer server or |
| 01:45:07 | 16 | the lease for the computer server from Associated Bank, is |
| 01:45:10 | 17 | there? |
| 01:45:10 | 18 | A.  No. |
| 01:45:11 | 19 | Q.  And, in fact, as of the date of this e-mail, you didn't |
| 01:45:25 | 20 | even get Bailey Borlack's assistance to get access to the |
| 01:45:29 | 21 | computer, did you? |
| 01:45:30 | 22 | A.  I didn't understand the question. |
| 01:45:33 | 23 | Q.  You didn't ask for their assistance, you didn't ask for |
| 01:45:36 | 24 | Bailey Borlack's assistance, to get access to the server so |
| 01:45:42 | 25 | that work could be done for it for ESI purposes? |

01:45:47  1  A. Like I said earlier, I relied on Mr. Borlack's judgment to

01:45:50  2  do what he needs to do.

01:45:51  3  Q. So you didn't make the request?

01:45:53  4  A. Because it was clearly discussed on that conference call

01:45:57  5  with Mr. Clark, and after that, whatever Mr. Borlack chose

01:46:02  6  necessary to do because I was paying for three different

01:46:06  7  experts to handle the ESI for us.

01:46:09  8         MR. LIPTON: Objection. Move to strike.

01:46:10  9         THE COURT: It will be granted.

01:46:12  10        MR. McJESSY: I think the response was responsive,

01:46:14  11  your Honor.

01:46:15  12        THE COURT: No.

01:46:20  13        Much longer, Mr. Lipton?

01:46:22  14        MR. LIPTON: No, your Honor.

01:46:29  15        In fact, you read my mind.

01:46:31  16        THE COURT: Thank you. Any recross?

01:46:32  17        MS. DEDINAS: No.

01:46:33  18        THE COURT: Good. Okay. You may step down, sir.

01:46:40  19        THE WITNESS: Thank you, your Honor.

01:46:41  20    (Witness leaves the stand.)

01:46:41  21        THE COURT: Call your next witness, please.

01:46:44  22        MS. DEDINAS: Mr. Clark.

01:46:44  23        THE COURT: You can call in any order you want. Call

01:46:47  24  in the order you want. Go ahead with Mr. Joshi.

01:46:54  25        MS. DEDINAS: I would prefer to go with Mr. Joshi.

| | | |
|---|---|---|
| 01:47:41 | 1 | (Witness sworn.) |
| 01:47:41 | 2 | THE COURT:  Tell everybody in the courtroom here so |
| 01:47:43 | 3 | they don't think we are keeping secrets here. |
| 01:47:45 | 4 | THE WITNESS:  I have a lisp, so if anybody does not |
| 01:47:47 | 5 | understand my response, please ask me again. |
| 01:47:52 | 6 | - - - |
| 01:47:52 | 7 | PARESH JOSHI, DIRECT EXAMINATION |
| 01:47:52 | 8 | BY MS. DEDINAS: |
| 01:47:53 | 9 | Q.  Mr. Joshi, would you please tell us what your position is |
| 01:47:57 | 10 | with the defendant company, Kanan Fashions. |
| 01:47:58 | 11 | A.  I am the chief financial officer. |
| 01:48:00 | 12 | Q.  And what is your position with Creative Warehousing? |
| 01:48:05 | 13 | A.  I am manager. |
| 01:48:06 | 14 | Q.  And are you familiar with a company called Raven Inc.? |
| 01:48:14 | 15 | A.  Yes. |
| 01:48:14 | 16 | Q.  What is Raven? |
| 01:48:15 | 17 | A.  Raven is an incorporated company, order fulfilling |
| 01:48:22 | 18 | company. |
| 01:48:22 | 19 | Q.  And so was Raven a company that fulfilled orders that |
| 01:48:29 | 20 | Kanan had to its customers when Kanan failed? |
| 01:48:35 | 21 | A.  Yes.  When the bank defaulted on the loan for Kanan, there |
| 01:48:42 | 22 | was no financing available to Kanan or any company that is |
| 01:48:47 | 23 | related with Mr. Shah.  The only the way the financing could |
| 01:48:56 | 24 | be made available is through the purchase order financing |
| 01:48:59 | 25 | company, and they say that if it was a different company not |

01:49:03  1   related to Mr. Shah, then they would give -- then they would

01:49:08  2   finance the company.

01:49:09  3           MS. DEDINAS:  Objection.  Nonresponsive and move to

01:49:11  4   strike.

01:49:12  5           THE COURT:  Sustained.

01:49:14  6           MR. LIPTON:  I couldn't hear that, your Honor.  If he

01:49:16  7   could speak up.

01:49:16  8           THE COURT:  It's been stricken anyway.  You do need

01:49:19  9   to speak up.  Try to speak a little slower, and I think

01:49:22 10   hopefully people will be able to understand you.

01:49:25 11   BY MS. DEDINAS:

01:49:25 12   Q.  So my very specific question is, was Raven a company that

01:49:30 13   fulfilled orders that Kanan had to its customers?

01:49:32 14   A.  Yes.

01:49:34 15   Q.  Okay.  And what was your position with Raven?

01:49:37 16   A.  I am -- I was the chief executive officer, CEO.

01:49:43 17   Q.  And you also have an accounting background, don't you?

01:49:46 18   A.  Yes, I do.

01:49:47 19   Q.  Do you have a certificate?

01:49:51 20   A.  No, I do not.

01:49:52 21   Q.  Now, during the course of this litigation, were you in

01:49:57 22   charge of responding to discovery on behalf of the defendants?

01:50:01 23   A.  Yes.

01:50:01 24   Q.  So you were the main interface between the defendants and

01:50:05 25   the lawyers on electronic discovery issues; isn't that right?

01:50:09   1   A.  Yes, ma'am.

01:50:09   2   Q.  Okay.  And on February 26th, your counsel submitted a

01:50:16   3   letter to the court regarding the nature of the defendant's

01:50:19   4   ESI systems?

01:50:20   5           MR. LIPTON:  Objection.  Vague.

01:50:22   6           MS. DEDINAS:  I'm sorry.

01:50:23   7   BY MS. DEDINAS:

01:50:23   8   Q.  Your former counsel, Bailey Borlack, submitted a letter to

01:50:28   9   the court describing the nature of the defendant's ESI

01:50:32  10   systems; is that correct?

01:50:32  11   A.  Yes.

01:50:32  12   Q.  Okay.  And I'm going to have you take a quick look at

01:50:38  13   Exhibit 23.  You reviewed that letter --

01:50:54  14           THE COURT:  Give him a moment.  Do you have that?

01:50:57  15           THE WITNESS:  Yes.

01:51:05  16           THE COURT:  Do you want him to read this first?

01:51:10  17   BY MS. DEDINAS:

01:51:11  18   Q.  No.  I want you to just take a look at the second page of

01:51:14  19   Exhibit 23, which, for the record, is the February 25th letter

01:51:21  20   to Ms. Elizabeth Pendleton by David Muschler.

01:51:28  21   A.  Do I need to read the letter?

01:51:30  22   Q.  You can take a quick glance at it.

01:51:45  23   A.  Yes.

01:51:46  24   Q.  Okay.  Do you recall having an opportunity to review this

01:51:54  25   letter?

01:51:55   1   A.  Yes, I did.

01:51:55   2   Q.  Okay.  And did you approve it?

01:51:57   3   A.  Yes, I did.

01:51:58   4   Q.  And are you aware that a final letter was filed with the

01:52:03   5   court, and that would be Exhibit 30?

01:52:12   6   A.  Yes.

01:52:17   7   Q.  And to your knowledge, does Exhibit 30, which is the

01:52:22   8   February 26th letter from Mr. Muschler to Ms. Elizabeth

01:52:27   9   Pendleton, does that letter accurately summarize the status of

01:52:32  10   the defendant's ESI systems?

01:52:35  11   A.  Yes.

01:52:36  12   Q.  Okay.  So you knew that there was a server at the Aurora

01:52:43  13   warehouse?

01:52:43  14   A.  Yes, I did.

01:52:44  15   Q.  And that's the one that we're all talking about now?

01:52:48  16   A.  Yes.

01:52:49  17   Q.  So I want to ask you a few questions about what is -- what

01:52:54  18   would be on that server --

01:52:56  19   A.  Okay.

01:52:56  20   Q.  -- because Mr. Shah indicated you probably have more

01:53:00  21   familiarity with that.

01:53:01  22          So we understand that the server was used to operate

01:53:05  23   the racking system at the warehouse; is that correct?

01:53:08  24   A.  Yes.

01:53:08  25   Q.  Okay.  And it also kept track of Kanan Fashions'

01:53:12  1  inventory, right?

01:53:13  2  A.  That is correct.

01:53:14  3  Q.  Now, I want to talk about some of the data that might be

01:53:18  4  on that server.  Would there be purchase orders on that

01:53:21  5  server?

01:53:21  6  A.  Yes.

01:53:22  7  Q.  Okay.  And what about invoices to customers?

01:53:24  8  A.  That would be there too, yes.

01:53:28  9  Q.  Okay.  Billing information to customers?

01:53:32  10  A.  Yes.

01:53:32  11  Q.  What about electronic data interchange data, also known as

01:53:37  12  EDI?

01:53:38  13  A.  Yes.

01:53:38  14  Q.  And what about information about shipping to customers?

01:53:44  15  A.  That would be on the server too, yeah.

01:53:47  16  Q.  Okay.  And if somebody wanted to look at your levels of

01:53:51  17  inventory at any given time, that would be on that server as

01:53:55  18  well, right?

01:53:56  19  A.  Yes.

01:54:04  20  Q.  And did you tell -- did you or Mr. Shah tell your former

01:54:07  21  counsel, Bailey Borlack, what data was on the warehouse

01:54:11  22  server?

01:54:12  23  A.  Yes.

01:54:19  24  Q.  Okay.  And did you tell the ESI liaisons you were working

01:54:24  25  with what was on that server?

| | | |
|---|---|---|
| 01:54:26 | 1 | A. Yes. |
| 01:54:26 | 2 | Q. Okay. Now, with respect to invoices, there weren't any |
| 01:54:33 | 3 | paper copies kept of your invoices to customers; isn't that |
| 01:54:37 | 4 | right? |
| 01:54:37 | 5 | A. That is correct. |
| 01:54:37 | 6 | Q. And that's because those were all electronic, right? |
| 01:54:40 | 7 | A. That is correct. |
| 01:54:41 | 8 | Q. Okay. Now, without the warehouse server, we don't have |
| 01:54:45 | 9 | any way of getting copies of the invoices to customers; is |
| 01:54:45 | 10 | that right? |
| 01:54:50 | 11 | A. That is right. |
| 01:54:50 | 12 | Q. Okay. Now, the EDI data that was on the server, that |
| 01:54:55 | 13 | wasn't printed out anywhere either? |
| 01:54:58 | 14 | A. No. |
| 01:54:58 | 15 | Q. Okay. So that data would be unaccessible if we don't have |
| 01:55:05 | 16 | the warehouse server, right? |
| 01:55:07 | 17 | A. That is correct. |
| 01:55:07 | 18 | Q. So isn't it true that also later after Kanan Fashions |
| 01:55:12 | 19 | ceased doing business and Raven took over as the procurement |
| 01:55:16 | 20 | company, the purchase orders, invoices, and inventory held and |
| 01:55:21 | 21 | sold by Raven was also put on that warehouse server; isn't |
| 01:55:26 | 22 | that right? |
| 01:55:26 | 23 | A. Yes. |
| 01:55:26 | 24 | Q. So all of Raven's information relating to the business |
| 01:55:31 | 25 | that it did when it took over from Kanan Fashions, that would |

| | | |
|---|---|---|
| 01:55:36 | 1 | be all on the warehouse server that we now don't have? |
| 01:55:40 | 2 | A. Yes. |
| 01:55:45 | 3 | Q. Okay. And you think you might have told your former |
| 01:55:49 | 4 | counsel about the Raven data being on there as well? |
| 01:55:53 | 5 | A. Yes. |
| 01:55:54 | 6 | Q. And you would admit that the data on this server is |
| 01:56:02 | 7 | relevant for the litigation, right? |
| 01:56:04 | 8 | A. Yes. |
| 01:56:04 | 9 | Q. And I believe that you have indicated in documents that we |
| 01:56:10 | 10 | have seen that there was no backup for the data on the |
| 01:56:14 | 11 | warehouse server, correct? |
| 01:56:15 | 12 | A. Yes. That is correct. |
| 01:56:17 | 13 | Q. Okay. You've admitted that the data relating to the |
| 01:56:23 | 14 | number of pieces of inventory on the warehouse server had some |
| 01:56:27 | 15 | discrepancies? |
| 01:56:28 | 16 | A. Yes. |
| 01:56:29 | 17 | Q. Do you recall that? |
| 01:56:30 | 18 | And do you recall that in a prior deposition, you |
| 01:56:35 | 19 | admitted that there was some discrepancies in the inventory |
| 01:56:39 | 20 | records that you could not explain? |
| 01:56:41 | 21 | A. Yes. |
| 01:56:42 | 22 | Q. In fact, you testified that there was complete chaos in |
| 01:56:47 | 23 | the inventory after August or September of 2009. Do you |
| 01:56:52 | 24 | recall that? |
| 01:56:52 | 25 | A. I would like to correct that statement. |

01:56:57 1 Q. Well, do you recall that you testified to that?

01:57:00 2 A. Because the question is wrong.

01:57:02 3 Q. Okay. Why don't you give me the correct statement.

01:57:05 4 A. There was Gail (phonetic) in the warehouse, and she had

01:57:12 5 mentioned chaos.

01:57:12 6 Q. I see. So there was chaos in the warehouse.

01:57:16 7 Now, do you recall that you testified that there was

01:57:19 8 a decrease of about $12 million of inventory in the warehouse

01:57:25 9 from August to September of 2009 that nobody could account

01:57:28 10 for?

01:57:30 11 A. I cannot (inaudible).

01:57:44 12 THE COURT REPORTER: I cannot?

01:57:44 13 THE COURT: He can't answer it yes or no.

01:57:46 14 BY MS. DEDINAS:

01:57:46 15 Q. Are you aware that there was a decrease in inventory at

01:57:53 16 the warehouse in 2009 that is unaccounted for?

01:57:57 17 A. Yes.

01:58:01 18 Q. And do you know -- what do you think the magnitude is of

01:58:06 19 the amount that's unaccounted for?

01:58:08 20 A. I do not have any idea of the magnitude.

01:58:12 21 THE COURT: Do you not know what that word means?

01:58:15 22 THE WITNESS: No, I don't recall that. I do not know

01:58:19 23 the amount.

01:58:20 24 BY MS. DEDINAS:

01:58:21 25 Q. How large is the -- how large is the discrepancy in the

01:58:23  1  inventory that can't be accounted for for 2009?

01:58:29  2  A.  I cannot give you the specific number.  I do not have any

01:58:39  3  number in mind for that.

01:58:41  4  Q.  Is it over --

01:58:45  5  A.  But it would be a couple of million dollars, I would say.

01:58:47  6  Q.  A couple of million dollars.

01:58:48  7  A.  Yes.

01:58:49  8  Q.  And without the data on the warehouse server, is there any

01:58:52  9  way to resolve those discrepancies?

01:58:54  10  A.  No.

01:58:56  11  Q.  And the inventory and the data -- strike that.

01:59:03  12        The inventory and the accounts receivable of Kanan

01:59:07  13  Fashions were things that secured United Central Bank's loan;

01:59:13  14  is that right?

01:59:14  15  A.  That is right.

01:59:14  16  Q.  And the representations of what the levels of inventory

01:59:18  17  and accounts receivable were presented to the bank in

01:59:22  18  borrowing base certificates in order to secure the loan; isn't

01:59:26  19  that right?

01:59:26  20  A.  Yes, ma'am.

01:59:27  21  Q.  Now, we've -- you heard some of the testimony about the

01:59:35  22  duty to preserve evidence; is that right?

01:59:39  23  A.  Yes.  Yes.

01:59:39  24  Q.  And without going through all of it in detail, I just

01:59:44  25  wanted to ask you whether you agreed that you had been

01:59:47  1  instructed in January by your attorneys, Bailey Borlack, to

01:59:51  2  preserve evidence, not only e-mails but data in any format; is

01:59:58  3  that correct?

01:59:58  4  A.  Yes.

01:59:58  5  Q.  And you also got that March 3rd e-mail from Mr. Muschler

02:00:05  6  that nothing should be done with any of the computer servers

02:00:07  7  or related equipment, right?

02:00:09  8  A.  Yes.

02:00:10  9  Q.  And are you aware of the decision in March that we

02:00:15  10  discussed with Mr. Shah that there was no need to copy the

02:00:22  11  equipment on the -- the data on the server that we discussed?

02:00:29  12  A.  Yes.

02:00:33  13  Q.  Okay.  And just if you want to refresh your -- if you want

02:00:37  14  to take a look at it, it's Exhibit 45 that I am talking about.

02:00:54  15         Do you recall seeing this e-mail?

02:01:02  16  A.  I am copied on it.

02:01:08  17         Yeah.

02:01:09  18  Q.  And do you recall there being a decision not to copy the

02:01:12  19  data on the warehouse server?

02:01:14  20  A.  In fact, I would say, no, that was not a decision.

02:01:22  21         MR. LIPTON:  I'm sorry.  I didn't hear it.

02:01:23  22         THE COURT:  I didn't hear it either.  I'm sorry.

02:01:26  23  Speak up so everybody can hear.

02:01:26  24         THE WITNESS:  No, it was not a decision.

02:01:28  25         THE COURT:  It was not a decision?

| | | |
|---|---|---|
| 02:01:29 | 1 | THE WITNESS: Yes. |
| 02:01:30 | 2 | THE COURT: Okay. |
| 02:01:31 | 3 | BY MS. DEDINAS: |
| 02:01:34 | 4 | Q. Well, it says, we do not need to make a copy? |
| 02:01:39 | 5 | A. A suggestion. |
| 02:01:44 | 6 | THE COURT: A suggestion. |
| 02:01:45 | 7 | BY MS. DEDINAS: |
| 02:01:46 | 8 | Q. So do you recall that somebody decided not to act on that |
| 02:01:50 | 9 | suggestion? |
| 02:01:51 | 10 | A. I do not recall. |
| 02:01:54 | 11 | Q. Okay. Do you recall any discussions one way or the other |
| 02:02:00 | 12 | on whether the defendants should make a copy of the data on |
| 02:02:06 | 13 | the warehouse server in mid March? |
| 02:02:10 | 14 | MR. LIPTON: Objection. Vague. Discussion with |
| 02:02:12 | 15 | whom? |
| 02:02:12 | 16 | MS. DEDINAS: I am asking if he recalls any to begin |
| 02:02:17 | 17 | with. |
| 02:02:19 | 18 | MR. LIPTON: I'm sorry. |
| 02:02:22 | 19 | THE WITNESS: Can you repeat the question? |
| 02:02:22 | 20 | BY MS. DEDINAS: |
| 02:02:23 | 21 | Q. Do you recall any discussions with anybody about whether |
| 02:02:26 | 22 | or not to make a copy of the data on the warehouse server in |
| 02:02:32 | 23 | mid March? |
| 02:02:33 | 24 | A. No. |
| 02:02:33 | 25 | Q. And you then do not recall any discussions with anybody |

02:02:40  1   that a copy shouldn't be made because it would be too

02:02:44  2   expensive?

02:02:45  3   A.  No.

02:02:46  4   Q.  And so then you wouldn't know, would you, about how

02:02:53  5   expensive it would be to copy this data?

02:02:56  6   A.  I would know part of it, not full.

02:03:01  7   Q.  What do you know about how much it would cost?

02:03:03  8   A.  Can I elaborate?

02:03:08  9   Q.  Yes.

02:03:11  10  A.  The warehouse that had that warehouse management system,

02:03:18  11  and by the time 2010, license of that warehouse management

02:03:27  12  system had expired, so it was like doing everything, getting

02:03:33  13  the license, getting that server operated through -- I think

02:03:40  14  when this e-mail was drafted, that was the thinking, that it

02:03:43  15  will be.

02:03:45  16      And, secondly, it was also having the program for

02:03:48  17  running the conveyor system.  So all that put together, this

02:03:54  18  was the e-mail I think that had been drafted.

02:03:58  19      And at the same time, the company which gave us the

02:04:01  20  warehouse management system, we were owing them money for that

02:04:05  21  outstanding bill.

02:04:09  22      So all put together, that's how it became like it

02:04:12  23  will be very expensive.

02:04:19  24  Q.  So is this e-mail a consideration of whether it will be

02:04:24  25  better to buy the server and the lease and guaranty, or renew

| | |
|---|---|
| 02:04:30 | 1 |
| 02:04:34 | 2 |
| 02:04:38 | 3 |
| 02:04:42 | 4 |
| 02:04:43 | 5 |
| 02:04:48 | 6 |
| 02:04:48 | 7 |
| 02:04:48 | 8 |
| 02:04:51 | 9 |
| 02:04:57 | 10 |
| 02:05:04 | 11 |
| 02:05:08 | 12 |
| 02:05:14 | 13 |
| 02:05:16 | 14 |
| 02:05:24 | 15 |
| 02:05:35 | 16 |
| 02:05:36 | 17 |
| 02:05:36 | 18 |
| 02:05:40 | 19 |
| 02:05:44 | 20 |
| 02:05:47 | 21 |
| 02:05:50 | 22 |
| 02:05:51 | 23 |
| 02:05:58 | 24 |
| 02:06:03 | 25 |

the licenses and come up to date on the lease payments and
then make a copy?

A.  Can I elaborate?  It is not a yes or no.  I can go ahead
and --

Q.  Was that what the decision was, between those two options,
or no?

A.  No.

Q.  What were the options that were being considered?

A.  The options were that we will get their -- we will be
needing the data.  And at that point of time, this had not
become an issue that we are talking about.  At that time, the
thinking was that we will get the server, we will do whatever
needs to be done.

Q.  Now, you are aware that there was a friendly foreclosure
on March 15th, 2010, whereby Creative Warehousing gave up the
deed to the warehouse to First Midwest Bank, right?

A.  Yes.

Q.  And before Kanan Fashions lost possession of the building,
Kanan Fashions moved some personal computers from Creative
Warehousing to the Oak Brook offices; is that right?

A.  I would like to correct on that.

Q.  Sure.

A.  It was done even before the personal computers that were
being taken out were even being done before even the lease or
the deed in lieu was started.  I think we got it somewhere in

| | | |
|---|---|---|
| 02:06:09 | 1 | February, whatever the personal computers were left. |
| 02:06:11 | 2 | Q. So that was my question, that you moved -- you moved the |
| 02:06:14 | 3 | stuff before the deed in lieu? |
| 02:06:17 | 4 | A. Yes. Sorry. |
| 02:06:18 | 5 | Q. Good. |
| 02:06:19 | 6 | MR. LIPTON: "The stuff," meaning? |
| 02:06:22 | 7 | MS. DEDINAS: The computers. |
| 02:06:23 | 8 | THE COURT: Computers. |
| 02:06:23 | 9 | MS. DEDINAS: Computers and personal items. |
| 02:06:24 | 10 | THE COURT: Personal. |
| 02:06:25 | 11 | MS. DEDINAS: Right. |
| 02:06:26 | 12 | BY MS. DEDINAS: |
| 02:06:27 | 13 | Q. Now, do you know if all the computers have been moved from |
| 02:06:31 | 14 | the warehouse? |
| 02:06:32 | 15 | A. To my knowledge, yes. |
| 02:06:33 | 16 | Q. To your knowledge, all the computers were moved? |
| 02:06:36 | 17 | A. Whatever was operating computers for that. |
| 02:06:38 | 18 | Q. Except for the server? |
| 02:06:39 | 19 | A. Except for the server. |
| 02:06:44 | 20 | Q. And do you know who supervised the move of all the |
| 02:06:46 | 21 | computers? |
| 02:06:47 | 22 | A. In fact, I did it personally. |
| 02:06:48 | 23 | Q. You personally supervised -- |
| 02:06:50 | 24 | A. No, I did it personally. I pulled the computer plugs out |
| 02:06:55 | 25 | and took it to the Oak Brook office. |

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 02:06:57 | 1  | THE COURT:  He didn't supervise it, he did it. |
| 02:07:00 | 2  | BY MS. DEDINAS: |
| 02:07:00 | 3  | Q.  You did it? |
| 02:07:01 | 4  | A.  I did it. |
| 02:07:01 | 5  | Q.  And you're aware, Mr. Joshi, aren't you, that bad things |
| 02:07:05 | 6  | can sometimes happen when computers get moved? |
| 02:07:10 | 7  | A.  Now I have become wiser; but at that point of time, I |
| 02:07:13 | 8  | never thought about it. |
| 02:07:14 | 9  | Q.  And you know that when computers get moved or dropped or |
| 02:07:19 | 10 | -- that there can be data deletion that happens, right? |
| 02:07:23 | 11 | A.  Yes.  I mean, at that point of time, I never thought about |
| 02:07:27 | 12 | all those things, but I was told to move the computers, and I |
| 02:07:30 | 13 | had to move all the computers, so I moved it. |
| 02:07:32 | 14 | Q.  Did anybody instruct you in any way on what kind of |
| 02:07:36 | 15 | protocol one needs to follow when they move computers from one |
| 02:07:41 | 16 | location to another? |
| 02:07:42 | 17 | A.  No. |
| 02:07:43 | 18 | Q.  What did you move them in, in a car or an SUV? |
| 02:07:51 | 19 | A.  I moved them in the car. |
| 02:07:53 | 20 | Q.  And these were all the personal computers, right? |
| 02:07:58 | 21 | A.  Yes, the small form computers. |
| 02:08:01 | 22 | Q.  And then were there computers moved within the Oak Brook |
| 02:08:05 | 23 | offices as well? |
| 02:08:08 | 24 | A.  The Oak -- |
| 02:08:10 | 25 | Q.  Like from people's desks to maybe a storage room? |

02:08:14    1   A.  Yes.

02:08:15    2   Q.  And who did that?

02:08:16    3   A.  I did that.  And at that point of time -- I did it.

02:08:24    4   Q.  So you personally picked up the computers off of people's

02:08:28    5   desks and moved them --

02:08:30    6   A.  Into the storage room.

02:08:32    7   Q.  -- into a storage room.

02:08:35    8           Did you drop any of the computers?

02:08:38    9   A.  No.

02:08:39   10   Q.  Good.

02:08:41   11           Now, when we had the friendly foreclosure, do you

02:08:53   12   know whether there were any written provisions that would

02:08:57   13   guarantee Kanan Fashions access to the server or the data at

02:09:02   14   First Midwest Bank?

02:09:02   15   A.  When the friendly foreclosure happened, at that time, I

02:09:08   16   was not aware because I was not involved in that thing, but

02:09:12   17   later on as a part of the production, I did see that.

02:09:15   18   Q.  Now, when you did the friendly foreclosure, you were

02:09:20   19   aware, weren't you, that as soon as you guys were out, First

02:09:25   20   Midwest Bank was going to come in and store things in that

02:09:28   21   building, right?

02:09:30   22   A.  Again, I would like --

02:09:33   23           MR. McJESSY:  Objection.  Foundation.

02:09:35   24           THE WITNESS:  I cannot answer yes or no to this

02:09:38   25   question.

02:09:38  1    THE COURT:  Sustained.  Sustained.  Lay a foundation.

02:09:42  2  BY MS. DEDINAS:

02:09:43  3  Q.  Do you know why First Midwest Bank was eager to have Kanan

02:09:52  4  Fashions evicted right after the friendly foreclosure?

02:09:54  5  A.  I do not know the details of it.

02:10:02  6  Q.  Do you know any of the reasons?

02:10:03  7  A.  The only thing I recollect is that First Midwest had filed

02:10:11  8  a lawsuit against UCB for taking the possession of the

02:10:15  9  warehouse, and this was one of the first steps for getting the

02:10:22  10  possession.

02:10:22  11  Q.  Did anybody ever tell you that First Midwest Bank was

02:10:26  12  going to be storing anything in the warehouse after you

02:10:31  13  vacated?

02:10:32  14  A.  To me personally?  No.

02:10:35  15    And, again, I would like to repeat that I was not

02:10:38  16  involved with the foreclosure or this matter.

02:10:42  17    At that point of time, if you remember, it was

02:10:45  18  expedited discovery that was taking precedence, so I was more

02:10:48  19  involved --

02:10:49  20    MS. DEDINAS:  I will move to strike that.

02:10:51  21    THE COURT:  It will be stricken as nonresponsive.

02:10:54  22  BY MS. DEDINAS:

02:10:55  23  Q.  Now, while the server was under the control of First

02:10:59  24  Midwest Bank after you lost possession, do you have any idea

02:11:02  25  whether anybody ever turned it on?

```
02:11:04   1   A.  No, I do not.
02:11:06   2   Q.  Do you know if anybody accessed the data in any way?
02:11:09   3   A.  No, I do not.
02:11:11   4   Q.  Do you know if anybody was messing around with it while
02:11:17   5   they were at the warehouse?
02:11:18   6   A.  I am not aware of it.
02:11:20   7   Q.  Okay.  And you probably wouldn't know if somebody had
02:11:25   8   taken a sledgehammer to the server after First Midwest took
02:11:29   9   the keys to the warehouse?
02:11:30  10   A.  I wouldn't know that.
02:11:32  11   Q.  So we have no idea what condition the server was in, or
02:11:35  12   you have no idea what condition the server was in, when it was
02:11:40  13   sold by First Midwest; is that right?
02:11:42  14   A.  I did not have any knowledge.
02:11:43  15   Q.  And during the time from the time that you left it at the
02:11:46  16   warehouse and turned over the keys, there was nobody from the
02:11:50  17   defendants that was checking up on the equipment to make sure
02:11:54  18   that it was still off, it was still there, it was still in one
02:11:58  19   piece; is that right?
02:12:00  20   A.  Yes, I did not go to the warehouse.
02:12:03  21   Q.  And you're not aware that anybody else did?
02:12:05  22   A.  No, I am not aware.
02:12:07  23   Q.  Okay.  Now, you recall that on April 16th, you learned
02:12:17  24   that I had asked your counsel, Mr. Grossman, whether a
02:12:20  25   creditor was trying to repossess the Creative Warehousing
```

| | | |
|---|---|---|
| 02:12:24 | 1 | computer system.  Do you recall that? |
| 02:12:25 | 2 | A.  Yes, I do. |
| 02:12:26 | 3 | Q.  And Mr. Grossman forwarded that inquiry to you to ask you |
| 02:12:31 | 4 | how he should respond; is that right? |
| 02:12:36 | 5 | A.  Yes, ma'am. |
| 02:12:36 | 6 | Q.  Now, he asked you not just once but twice to clarify what |
| 02:12:43 | 7 | the status was of the server.  Do you recall that? |
| 02:12:45 | 8 | A.  Yes, I do recall. |
| 02:12:45 | 9 | Q.  And do you recall that you told him both times that there |
| 02:12:49 | 10 | were no demands, lawsuits, or creditor repossessions; is that |
| 02:12:56 | 11 | right? |
| 02:12:56 | 12 | A.  No, I told him that there was only the demand letter, the |
| 02:13:02 | 13 | statement that I get, but to my knowledge, there were no |
| 02:13:04 | 14 | threat of repossession. |
| 02:13:07 | 15 | Q.  So you didn't think the fact that you hadn't paid your |
| 02:13:10 | 16 | lease payments and you had gotten letters from the lessor |
| 02:13:16 | 17 | demanding that you pay them, you didn't consider that to be a |
| 02:13:20 | 18 | threat of repossession? |
| 02:13:21 | 19 | MR. McJESSY:  Objection.  Assumes facts not in |
| 02:13:24 | 20 | evidence.  Letters, more than one. |
| 02:13:32 | 21 | THE COURT:  Sustained.  Re-ask your question. |
| 02:13:35 | 22 | BY MS. DEDINAS: |
| 02:13:36 | 23 | Q.  Were you aware, sir, that there had been letters that had |
| 02:13:41 | 24 | been sent to Mr. Shah indicating that the lease on the |
| 02:13:46 | 25 | warehouse server was in default? |

| | | |
|---|---|---|
| 02:13:48 | 1 | A.  I was copied on that. |
| 02:13:52 | 2 | Q.  You were copied on that.  So you saw that.  And were you |
| 02:13:54 | 3 | aware that in those letters, Associated Bank took the position |
| 02:13:58 | 4 | that if you didn't make the payments that were due, they would |
| 02:14:02 | 5 | seek repossession without any further notice to you? |
| 02:14:06 | 6 | A.  I would like to elaborate on that? |
| 02:14:08 | 7 | Q.  It's a yes-or-no question, sir. |
| 02:14:10 | 8 | A.  I came to know in the later part of production. |
| 02:14:18 | 9 | Q.  Say that again? |
| 02:14:19 | 10 | A.  I became aware in the later part of production. |
| 02:14:22 | 11 | Q.  As a result of the production? |
| 02:14:23 | 12 | A.  As a part of it. |
| 02:14:24 | 13 | Q.  You don't -- you weren't aware of it contemporaneously? |
| 02:14:28 | 14 | A.  That is what I wanted to say. |
| 02:14:32 | 15 | Q.  So would you agree that the statement that you made to |
| 02:14:36 | 16 | Mr. Grossman -- on Exhibit SH 80, there's several |
| 02:15:00 | 17 | representations there.  On 4/16/10 at 2:48 p.m., you indicate, |
| 02:15:08 | 18 | Eric, we are not aware of any suit or notice about possession. |
| 02:15:14 | 19 | A.  Yes.  After I looked at the production of the letter and |
| 02:15:22 | 20 | made my mistake.  If I would have known, I would not have -- |
| 02:15:26 | 21 | Q.  So your testimony is that at the time you wrote this -- |
| 02:15:28 | 22 | A.  Yes. |
| 02:15:28 | 23 | Q.  -- you thought that was correct? |
| 02:15:29 | 24 | A.  That is correct. |
| 02:15:30 | 25 | Q.  But later you came to learn that it wasn't correct? |

02:15:33　1　A.　That is correct.

02:15:33　2　Q.　And when was it that you came to learn that it wasn't

02:15:36　3　correct?

02:15:36　4　A.　As a part of the binder that we got.

02:15:41　5　Q.　Okay.　And then your further statement that says that I'm

02:15:46　6　not aware of a threat to repossess, is it -- would you agree

02:15:52　7　that that was not a correct statement?

02:15:54　8　A.　I agree.

02:15:55　9　Q.　If you can take a look at Exhibit 12.

02:16:36　10　A.　12?

02:16:37　11　Q.　Yes.

02:16:38　12　　　THE COURT:　Yes.

02:16:39　13　BY MS. DEDINAS:

02:16:48　14　Q.　This is a letter dated February 9th from Tina Jacobs to

02:16:54　15　Mehul Shah, Kanan Fashions, and Creative Warehousing, and it's

02:17:00　16　to your attention on behalf of Creative Warehousing.　Do you

02:17:02　17　see that?

02:17:03　18　A.　Yes, I do.

02:17:03　19　Q.　And in that letter, it says in the second paragraph that,

02:17:06　20　a default has occurred and exists under the terms of the lease

02:17:09　21　and that the lessor has failed to pay the December 20th, 2009,

02:17:14　22　and subsequent monthly lease payments due under the lease.

02:17:19　23　　　And on the second page, in the second to last

02:17:23　24　paragraph, it says that, your failure to reinstate the lease

02:17:26　25　as provided above may result in lessor's acceleration of all

02:17:31  1  amounts due under the lease, repossession of the equipment,

02:17:34  2  and any other legal action lessor deems appropriate without

02:17:39  3  further notice or demand.

02:17:40  4       So is it your testimony that you did not see this

02:17:42  5  letter when it was sent to your attention on February 9th or

02:17:46  6  thereabouts?

02:17:46  7  A.  Yes, that is correct.

02:17:47  8  Q.  And you never discussed this -- you never discussed this

02:17:54  9  with Mr. Shah?

02:17:55  10  A.  Because I was not aware of when I called for the

02:18:02  11  production that Mr. Shah sent an e-mail to me which had

02:18:06  12  handled to Mr. Blumenthal.  And I don't want to go into the

02:18:09  13  reason, but I think if it was done through Mr. Blumenthal, I

02:18:13  14  may not have seen that.

02:18:13  15       And then in February I was more consumed with the

02:18:17  16  expedited discovery.  But when I saw the letter as a part of

02:18:22  17  the production, yeah.

02:18:25  18  Q.  Okay.  And so when somebody from Associated Bank's

02:18:30  19  repossessors came to take pictures of the equipment at the

02:18:34  20  warehouse, you were not aware that they were doing that?

02:18:36  21  A.  No, I wasn't.  I was not involved in that at all.

02:18:40  22  Q.  Now, you were at Kanan Fashions' offices on April 23rd

02:18:46  23  when we had our ESI meeting; isn't that correct?

02:18:49  24  A.  Yes, I was.

02:18:49  25  Q.  And are you aware that at that meeting, I raised the issue

02:18:58    1    that there may have been a problem with the server being left

02:19:02    2    at the warehouse after the friendly foreclosure?  Did you

02:19:08    3    become -- were you aware of that at the time?

02:19:10    4    A.  No.  In fact, I do recollect I was not a part of the

02:19:14    5    meeting.

02:19:14    6    Q.  I see.  Okay.  So you weren't part of the meeting at all?

02:19:18    7    A.  I just came to ask if anybody needs more coffee.

02:19:21    8    Q.  That was very kind of you.

02:19:24    9         At some point, you received an instruction from your

02:19:30   10    counsel, Bailey Borlack, to transport from the warehouse the

02:19:35   11    server located there as well as any other personal computers.

02:19:38   12    Do you recall that?

02:19:39   13    A.  Yes, I do recall that.

02:19:40   14    Q.  Okay.  And what did you do as a result of that

02:19:43   15    instruction?

02:19:44   16    A.  I had already moved the computers, and I had told them

02:19:51   17    that I moved the computers.

02:19:52   18    Q.  You had moved the computers before you received that

02:19:55   19    instruction?

02:19:56   20    A.  Right.

02:19:56   21    Q.  Okay.  So all that was really left was the server, right?

02:20:00   22    A.  That is correct.

02:20:00   23    Q.  And what did you tell them you would do with respect to

02:20:03   24    the server?

02:20:04   25    A.  I think I -- I don't recollect, but I didn't do anything

02:20:14  1  or I -- can you reference the time, please?  Can you reference

02:20:19  2  the date?

02:20:20  3  Q.  Right, after you got the April 26th instruction from

02:20:25  4  Bailey Borlack, what did you tell them you would be doing?

02:20:27  5  A.  I don't understand.  I do not understand.

02:20:36  6  Q.  Did you say, okay, I'll do it?

02:20:37  7  A.  Oh, yes.

02:20:38  8  Q.  You said you would do it?

02:20:40  9  A.  I said, yeah, I would do it.

02:20:42  10  Q.  You certainly didn't say, I'm not going to do it?

02:20:45  11  A.  No, I didn't say that.

02:20:45  12  Q.  Did you say to them, we can't do it?

02:20:47  13  A.  No, I didn't say that.

02:20:48  14  Q.  So as far as you recall, you told them you would do it?

02:20:51  15  A.  Yes.

02:20:51  16  Q.  And what next steps did you take then to proceed to

02:20:56  17  transfer the server from the warehouse to the Oak Brook

02:21:02  18  offices?

02:21:03  19  A.  I think for a few days, I was not able to do anything.

02:21:21  20  Q.  Why not?

02:21:22  21  A.  I do not know why, but I think I was involved in some

02:21:25  22  other things.

02:21:26  23  Q.  So you were busy?

02:21:27  24  A.  I was busy.

02:21:28  25  Q.  Okay.  So then a few days went by.  What happened next?

| | | |
|---|---|---|
| 02:21:31 | 1 | A. I don't recollect. |
| 02:21:39 | 2 | Q. Did you ever make any arrangements to transport the server |
| 02:21:45 | 3 | from the warehouse to the Oak Brook offices? |
| 02:21:47 | 4 | A. I did not make any arrangement. |
| 02:21:51 | 5 | Q. Did you discuss making arrangements with Mr. Shah? |
| 02:21:54 | 6 | A. I did inform him that -- I did tell them that we need to |
| 02:22:06 | 7 | bring the server. |
| 02:22:06 | 8 | Q. And what did Mr. Shah say to you about that? |
| 02:22:09 | 9 | A. He said, okay, that's fine. |
| 02:22:12 | 10 | Q. Said, okay, we'll do it? |
| 02:22:14 | 11 | A. Yes. |
| 02:22:14 | 12 | Q. And do you know whether he made any arrangements to move |
| 02:22:18 | 13 | the warehouse server to the Oak Brook offices? |
| 02:22:20 | 14 | A. At that point of time, no. |
| 02:22:23 | 15 | Q. Okay. So you both said you were going to do it, but |
| 02:22:28 | 16 | neither one of you said which one of you is going to do it; is |
| 02:22:32 | 17 | that right? |
| 02:22:32 | 18 | A. Correct. |
| 02:22:34 | 19 | Q. Now, at some point, the server never got moved and your |
| 02:22:43 | 20 | counsel, Bailey Borlack, began to pressure you about the |
| 02:22:46 | 21 | server. Do you recall that? |
| 02:22:48 | 22 | A. Yes. Mr. Grossman did send me an e-mail saying that we |
| 02:22:52 | 23 | need to access the data on the computer. |
| 02:22:58 | 24 | Q. Now, at that point, you had both -- you and Mr. Shah had |
| 02:23:01 | 25 | agreed that you would move the server, so why didn't you? |

02:23:06  1  A.  At that point of time, I do not know why we did not.  But

02:23:15  2  at that point of time, we could have, but I do not recollect

02:23:22  3  why -- why it was, what came in between that.

02:23:27  4  Q.  Didn't you feel increasingly pressured when you got e-mail

02:23:33  5  after e-mail after e-mail by -- from Mr. Grossman?  Didn't you

02:23:38  6  feel that you ought to take greater steps to move the

02:23:43  7  warehouse server?

02:23:44  8  A.  In fact, after the first e-mail that came around -- yeah,

02:23:51  9  I do not exactly remember it, but after the first e-mail came

02:23:54  10  which said basically we need to access the server, at that

02:23:58  11  point of time, I did go to Mr. Shah, and that is the reason

02:24:02  12  why he called up Mr. Clark, and then Mr. Borlack was on line,

02:24:08  13  and then we had a conversation that we need a court order.

02:24:12  14  And, thereafter, it was more of a negotiation of buying the

02:24:16  15  server.  And that's what we were trying to get possession of

02:24:22  16  the server, by buying it.

02:24:23  17          MR. LIPTON:  Your Honor, I couldn't understand any of

02:24:25  18  that.  Could I have that answer read back, please?

02:24:27  19          THE COURT:  Sure, if you can.

02:25:09  20    (Record read.)

02:25:11  21          THE COURT:  Did you get everything or do you want it

02:25:13  22  read again?

02:25:14  23          MR. LIPTON:  I got everything.

02:25:15  24  BY MS. DEDINAS:

02:25:15  25  Q.  How hard would it have been at that point, sir, to just

| | | |
|---|---|---|
| 02:25:18 | 1 | rent a truck and get two guys to move it? |
| 02:25:22 | 2 | A.  When Mr. Clark said that he needed a court order, that |
| 02:25:35 | 3 | question was a moot point at that point. |
| 02:25:37 | 4 | Q.  I see.  So it's your position that you were willing to |
| 02:25:49 | 5 | move the server and the only reason you didn't was that when |
| 02:25:53 | 6 | you got on the phone with Mr. Clark to ask for access to the |
| 02:25:57 | 7 | server, he told you, no, you need a court order? |
| 02:26:02 | 8 | A.  You need a court order. |
| 02:26:03 | 9 | Q.  And it's your testimony that Mr. Borlack was on that phone |
| 02:26:07 | 10 | call, and that was made very clear to him as well? |
| 02:26:11 | 11 | A.  Yes. |
| 02:26:11 | 12 | Q.  So when you got all these e-mails from the Borlack firm |
| 02:26:24 | 13 | on -- |
| 02:26:29 | 14 | A.  Can I go back? |
| 02:26:30 | 15 | THE COURT:  No, there is a question that's being |
| 02:26:32 | 16 | posed right now. |
| 02:26:33 | 17 | BY MS. DEDINAS: |
| 02:26:34 | 18 | Q.  When you got all those e-mails from the Borlack firm in |
| 02:26:39 | 19 | April and May and June and July, and each one of them pressed |
| 02:26:47 | 20 | you for access to the server, did you say to the Borlack firm, |
| 02:26:53 | 21 | what are you talking about, you already know we can't get |
| 02:26:57 | 22 | access to the server without a court order? |
| 02:27:01 | 23 | A.  I did not say that in specific language, but I said that |
| 02:27:05 | 24 | we are working on it and because of the phone communication, |
| 02:27:10 | 25 | they knew about it, that we need order. |

| | | |
|---|---|---|
| 02:27:11 | 1 | And then, again, we also knew about it, that we were |
| 02:27:14 | 2 | in negotiation, we were negotiating with the Associated Bank |
| 02:27:20 | 3 | to buy back. |
| 02:27:21 | 4 | Q. So you didn't say -- |
| 02:27:23 | 5 | MR. LIPTON: Your Honor, may I have that back again, |
| 02:27:25 | 6 | please? |
| 02:27:25 | 7 | THE COURT: Sure. I did not say that in specific |
| 02:27:31 | 8 | language, but I said that we were negotiating -- no, I'm |
| 02:27:37 | 9 | sorry, that we need -- would you read it? Thank you. |
| 02:28:02 | 10 | (Record read.) |
| 02:28:02 | 11 | THE WITNESS: They also knew about it. They also |
| 02:28:05 | 12 | knew about it, that we were buying -- |
| 02:28:06 | 13 | THE COURT: No, wait, you can't be talking to her. |
| 02:28:09 | 14 | You got to wait and see if there is a question that's posed. |
| 02:28:12 | 15 | THE WITNESS: I was correcting. |
| 02:28:13 | 16 | THE COURT: Well, you need to correct it so everybody |
| 02:28:15 | 17 | can hear it if that's what you're going to do. |
| 02:28:18 | 18 | BY MS. DEDINAS: |
| 02:28:18 | 19 | Q. Is there an answer that you need to correct? |
| 02:28:20 | 20 | A. Yeah. |
| 02:28:21 | 21 | Q. Could you do so? |
| 02:28:24 | 22 | THE COURT: She is asking you to do so now. |
| 02:28:27 | 23 | Is that correct? |
| 02:28:27 | 24 | MS. DEDINAS: Yes. |
| 02:28:28 | 25 | THE WITNESS: I just need to change one word. |

02:28:30  1   THE COURT:  Change it so everybody can hear it, if
02:28:32  2   you would.
02:28:33  3        THE WITNESS:  That they also knew that we were
02:28:35  4   negotiating.
02:28:36  5   BY MS. DEDINAS:
02:28:37  6   Q.  They also knew that we were negotiating?
02:28:39  7   A.  Yes.
02:28:39  8   Q.  Okay.  And then "they," you mean Bailey Borlack?
02:28:42  9   A.  Yes.
02:28:43  10  Q.  So my question really was, all the time that they were
02:28:48  11  pressuring you, you didn't say to them, hey, why are you
02:28:54  12  hassling us?  You already know we need to get a court order.
02:28:59  13  Get a court order and then we can have access.
02:29:02  14       You never said that to them, did you?
02:29:03  15  A.  Not in that specific language.
02:29:06  16  Q.  How about in any language?
02:29:08  17  A.  I didn't tell them that you do your job.  I didn't say
02:29:13  18  that.
02:29:14  19  Q.  Weren't you annoyed that they kept asking you for
02:29:17  20  something that they ought to be able to get themselves?
02:29:21  21  A.  I was annoyed, yes.
02:29:22  22  Q.  You were annoyed?
02:29:23  23  A.  I was annoyed, but because we were negotiating the server
02:29:28  24  to buy back, I think at that point of time, it was going to
02:29:31  25  happen, so I am going to give it to them.

| | | |
|---|---|---|
| 02:29:33 | 1 | Q.  You didn't want to express your annoyance with your |
| 02:29:36 | 2 | lawyers that they kept bothering you over something that they |
| 02:29:39 | 3 | didn't need to bother you about? |
| 02:29:43 | 4 | A.  There were a lot of things going on at that time. |
| 02:29:45 | 5 | Q.  Now, all this time, did you tell your lawyers that Mehul |
| 02:30:04 | 6 | was still working on obtaining the funds that Associated wants |
| 02:30:09 | 7 | in order to release its lien? |
| 02:30:10 | 8 | A.  I think Mehul was working on it. |
| 02:30:15 | 9 | Q.  You said he was working on it. |
| 02:30:17 | 10 | And did you tell them when they were pressing you |
| 02:30:19 | 11 | that you mentioned this to Mehul on practically a daily basis |
| 02:30:23 | 12 | but you don't know how the issue is going to be resolved? |
| 02:30:26 | 13 | A.  I mentioned that to him. |
| 02:30:28 | 14 | Q.  You have mentioned that to them? |
| 02:30:30 | 15 | A.  Yes. |
| 02:30:30 | 16 | Q.  Weren't you concerned that you had no idea if and when you |
| 02:30:35 | 17 | would get control over the data that you needed to produce and |
| 02:30:39 | 18 | preserve in this lawsuit? |
| 02:30:40 | 19 | A.  At that point of time, it didn't occur to me. |
| 02:30:45 | 20 | Q.  It didn't occur to you? |
| 02:30:47 | 21 | A.  At that point of time, that kind of thing didn't occur to |
| 02:30:52 | 22 | me. |
| 02:30:52 | 23 | Q.  And did you ever bring this up with Mr. Shah that you were |
| 02:30:57 | 24 | concerned about this? |
| 02:30:58 | 25 | A.  I had told him that -- I had told Mr. Shah that we need to |

| | | |
|---|---|---|
| 02:31:03 | 1 | get access to that warehouse server and all the data. |
| 02:31:09 | 2 | Q.  And isn't it true that you didn't get a satisfactory |
| 02:31:11 | 3 | response from Mr. Shah as to when you'd get control or access |
| 02:31:15 | 4 | to the server? |
| 02:31:16 | 5 | A.  He basically agreed that I'm working to buy back the |
| 02:31:23 | 6 | server. |
| 02:31:24 | 7 | Q.  Did you ask him for any -- did you press him for any |
| 02:31:28 | 8 | details? |
| 02:31:28 | 9 | A.  No, I didn't. |
| 02:31:29 | 10 | Q.  Why not? |
| 02:31:29 | 11 | A.  Because I think they were -- at that point of time, there |
| 02:31:34 | 12 | were a lot of things going on, and I kept myself to be more |
| 02:31:38 | 13 | focused into whatever the department for that, because we are |
| 02:31:43 | 14 | the only two people in the office and the people are -- |
| 02:31:51 | 15 | whatever paper documents needed to be done, that was done by |
| 02:31:55 | 16 | me.  So it was part of my time doing things. |
| 02:32:00 | 17 | Q.  So Mr. Shah didn't give you any details about his efforts |
| 02:32:03 | 18 | to get the money to buy the server? |
| 02:32:05 | 19 | A.  No. |
| 02:32:06 | 20 | Q.  And he didn't give you any details about the negotiations |
| 02:32:13 | 21 | to buy the server? |
| 02:32:14 | 22 | A.  No. |
| 02:32:14 | 23 | Q.  And when you weren't getting satisfactory answers from |
| 02:32:22 | 24 | Mr. Shah about the negotiations for the server, you didn't |
| 02:32:26 | 25 | press him for more details, did you? |

| | | |
|---|---|---|
| 02:32:29 | 1 | A. I did not. |
| 02:32:30 | 2 | Q. And when you weren't getting satisfactory answers from |
| 02:32:33 | 3 | Mr. Shah, you didn't pick up the phone and call Mr. Clark |
| 02:32:38 | 4 | either to ask him what's the status of the negotiations? |
| 02:32:42 | 5 | A. When Mr. Shah was working with him, I have not -- I didn't |
| 02:32:48 | 6 | call Mr. Clark. |
| 02:32:48 | 7 | Q. And you didn't call Mr. Clark because that was something |
| 02:32:52 | 8 | that Mr. Shah was doing and you didn't think it was your |
| 02:32:55 | 9 | business to be dealing with Mr. Clark, right? |
| 02:32:58 | 10 | A. I would not say it was not my business, but I was not |
| 02:33:02 | 11 | involved in that point in time. I was involved with -- for |
| 02:33:06 | 12 | me, it was more important for me to reply to the question or |
| 02:33:09 | 13 | the interrogatories that were being posed to me. So I was |
| 02:33:14 | 14 | basically compartmentalizing. |
| 02:33:17 | 15 | Q. So you chose not to get involved in the negotiations with |
| 02:33:20 | 16 | Mr. Clark? |
| 02:33:20 | 17 | A. That is correct. |
| 02:33:20 | 18 | Q. And did you then at that point consider contacting your |
| 02:33:25 | 19 | company attorney, Mr. Blumenthal, to ask for his help in |
| 02:33:32 | 20 | finding out what the status of these negotiations were because |
| 02:33:36 | 21 | of how pressing a matter it was for the federal lawsuit? |
| 02:33:39 | 22 | A. As I said, I didn't contact anybody because of the -- I |
| 02:33:44 | 23 | was not involved, and I didn't take any part into that. |
| 02:33:47 | 24 | Q. And Mr. Shah was -- when you were copied on a lot of |
| 02:33:54 | 25 | e-mails with Mr. Shah from your counsel, you didn't raise |

02:34:03　1　these issues with Mr. Shah because you figured he was being

02:34:06　2　copied on the e-mails, right?

02:34:08　3　A.　That is correct.

02:34:08　4　Q.　And you weren't worried at all that Mr. Shah was perhaps

02:34:11　5　ignoring the issue?

02:34:12　6　A.　That didn't -- it was not like that, that he was ignoring

02:34:17　7　the issue.　To me, it was he was working on the issue, but I

02:34:23　8　think he was not -- he was very delayed on it.

02:34:26　9　Q.　And you weren't concerned that perhaps he wasn't able to

02:34:29　10　get the money to purchase the server?

02:34:31　11　A.　It didn't occur to me at that point in time.

02:34:36　12　Q.　It didn't.　Okay.

02:34:37　13　　　　　Did you suspect, however, that Mr. Shah was having

02:34:46　14　trouble getting the money to repurchase the server?

02:34:48　15　A.　It was getting delayed, but I -- the thought never came to

02:34:54　16　my mind that he would not be able to do that.

02:34:56　17　Q.　Do you recall giving a deposition on December 1st of 2010?

02:35:16　18　A.　Yes, I do.

02:35:18　19　Q.　I am going to ask you --

02:35:28　20　　　　　"QUESTION:" --

02:35:29　21　　　　　I'm on page 71 of the deposition, line 20.

02:35:37　22　A.　Do you have an exhibit number?

02:35:39　23　Q.　I am going to read it to you.

02:35:41　24　　　　　Line 20, the question is -- let me go to line 16.

02:35:50　25　　　　　MS. DEDINAS:　Do I need to wait for anybody?

02:35:52  1          MR. LIPTON:  No.  Go ahead.

02:35:53  2  BY MS. DEDINAS:

02:35:54  3  Q.    "QUESTION:  Did Mr. Shah ever tell you that he didn't

02:35:56  4  have the money to purchase the server or the lease and the

02:35:58  5  guaranty?

02:35:59  6          "ANSWER:  Did he tell me?  No.

02:36:01  7          "QUESTION:  Did you know he was having problems raising

02:36:05  8  the money?

02:36:06  9          "ANSWER:  Yes

02:36:09  10          "QUESTION:  What did he tell you about that?

02:36:11  11          "ANSWER:  He didn't tell me anything, but he was having

02:36:14  12  a problem.  That's why it was taking time for Mr. Clark

02:36:20  13          "QUESTION:  Do you know who he was seeking financing

02:36:23  14  from?

02:36:23  15          "ANSWER:  No, I do not.

02:36:25  16          "QUESTION:  Did he ever tell you what his plan was for

02:36:29  17  how he would raise the money?

02:36:31  18          "ANSWER:  No.

02:36:31  19          "QUESTION:  But it was your impression that he was

02:36:33  20  stalling or trying to buy time from Mr. Clark?

02:36:36  21          "ANSWER:  Yes."

02:36:38  22          Do you recall that testimony?

02:36:39  23  A.  Yes, I do.

02:36:40  24  Q.  And is that the testimony you gave in your deposition?

02:36:43  25  A.  Yes, I did.

02:36:44    1    Q.  And is that testimony true?

02:36:46    2    A.  Yes.

02:36:46    3    Q.  Okay.

02:36:49    4         MR. McJESSY:  Objection, Judge.  That doesn't

02:36:50    5    contradict what he was testifying to on the stand.

02:36:53    6         THE COURT:  Sustained.

02:36:54    7         MR. McJESSY:  Thank you.

02:36:55    8    BY MS. DEDINAS:

02:37:02    9    Q.  Do you recall that we had an August 26th status before

02:37:06   10    this court and Mr. Borlack advised the court that Mr. Shah had

02:37:11   11    been negotiating to purchase the server from Associated Bank

02:37:14   12    for months and now he thinks he has a deal?

02:37:18   13    A.  Yes.

02:37:19   14    Q.  And you were in court at that time; is that right?

02:37:25   15    A.  Yes, ma'am.

02:37:25   16    Q.  Now, you knew, didn't you, that Mr. Shah didn't have a

02:37:29   17    deal because he didn't have the money; isn't that right?

02:37:32   18         MR. McJESSY:  Objection.  Compound, two different

02:37:34   19    questions.

02:37:35   20         THE COURT:  Break it up into two questions.

02:37:37   21    BY MS. DEDINAS:

02:37:38   22    Q.  Did you know that Mr. Shah had not raised the money yet to

02:37:43   23    buy the server from Associated Bank?

02:37:45   24    A.  Yes.

02:37:47   25    Q.  You did.

02:37:48  1    And yet you didn't say anything while you were in
02:37:51  2  court?
02:37:52  3  A.  I was not aware that I am allowed to speak because I was
02:37:55  4  not a defendant or -- I was not aware that I can speak or not
02:38:00  5  speak.
02:38:00  6  Q.  And you didn't tell your attorney that, hold on, this
02:38:05  7  isn't completely accurate, right?
02:38:06  8  A.  No, I didn't.
02:38:07  9  Q.  Okay.  So at some point, you learned that David Clark had
02:38:12  10  sold the server to a company named Diagems in Dubai; is that
02:38:12  11  right?
02:38:19  12  A.  Yes.
02:38:19  13  Q.  Now, after you found out the server had been sold, you
02:38:23  14  discussed it the very same day with Mr. Shah, right?
02:38:26  15  A.  Yes.
02:38:28  16  Q.  Okay.  And Mr. Shah seemed surprised and mad to you?
02:38:32  17  A.  Yes.
02:38:32  18  Q.  And you never discussed with Mr. Shah -- oh, strike that.
02:38:38  19    You don't know if Mr. Shah ever called David Clark to
02:38:41  20  confront him about the sale, do you?
02:38:44  21  A.  I am not aware of that.
02:38:46  22  Q.  Okay.  And you never discussed with Mr. Shah that one of
02:38:49  23  you should call Mr. Clark and find out why he sold the
02:38:53  24  computer?
02:38:53  25  A.  Can you repeat the question, please?

| | | |
|---|---|---|
| 02:38:58 | 1 | Q. You and Mr. Shah never discussed the fact that one of you |
| 02:39:02 | 2 | should call Mr. Clark and confront him about why he sold that |
| 02:39:06 | 3 | computer? |
| 02:39:07 | 4 | A. I never called Mr. Clark, and I was not a contact point. |
| 02:39:12 | 5 | I don't know whether Mr. Clark would know about me or I should |
| 02:39:17 | 6 | call. |
| 02:39:18 | 7 | Q. My question is you didn't say -- you didn't talk with |
| 02:39:21 | 8 | Mr. Shah and you didn't say to Mr. Shah, hey, why don't -- why |
| 02:39:25 | 9 | doesn't one of us call Mr. Clark and find out why he did this? |
| 02:39:28 | 10 | A. Yeah, that was kind of -- I mean, it was not exactly like |
| 02:39:34 | 11 | that, but, I mean, I don't know what we were thinking, that |
| 02:39:37 | 12 | kind of thing. |
| 02:39:38 | 13 | Q. Okay. And so you never had any further discussions with |
| 02:39:47 | 14 | Mr. Shah about the server being sold, did you? |
| 02:39:49 | 15 | A. The system was -- only told him now what to do. |
| 02:40:03 | 16 | MS. REPORTER: I'm sorry? |
| 02:40:03 | 17 | THE COURT: Now what to do. |
| 02:40:06 | 18 | BY MS. DEDINAS: |
| 02:40:06 | 19 | Q. Now, you said you did some Internet research on Diagems; |
| 02:40:06 | 20 | is that right? |
| 02:40:10 | 21 | A. Originally, the name -- |
| 02:40:12 | 22 | Q. Diagems. |
| 02:40:13 | 23 | A. D-i-a, dash, Holding? |
| 02:40:16 | 24 | Q. I am asking you about the company Diagems. |
| 02:40:19 | 25 | A. Yes. When that actual name came up, Diagems, we did do |

02:40:23    1    the research.

02:40:24    2    Q.  And did you find an address and a phone number?

02:40:26    3    A.  Yes, I did.

02:40:27    4    Q.  Did you make any effort to call the phone number?

02:40:29    5    A.  At that point of time, no, because we were being told not

02:40:35    6    to.  And thereafter, after January 6th, we had made the phone

02:40:41    7    call.

02:40:42    8    Q.  And what happened with the phone call?

02:40:43    9    A.  After January 6th?

02:40:46   10    Q.  Yes.

02:40:47   11    A.  We had specifically called them at a different time of the

02:40:53   12    date, and one time it was a company -- when I tried to talk,

02:40:57   13    they said wrong number and put it down.  And two or three

02:41:01   14    times, it went into the fax machine.

02:41:09   15    Q.  So from the time -- from the day you found out the server

02:41:12   16    was sold, which was August 30th, until January 6th, you never

02:41:16   17    made any effort to call the phone number that you had

02:41:20   18    identified for Diagems in Dubai; is that correct?

02:41:24   19    A.  We were told not to.

02:41:25   20    Q.  I'm just asking the question.

02:41:26   21    A.  No, I didn't.

02:41:27   22         MS. DEDINAS:  Move to strike.

02:41:28   23         THE COURT:  It will be granted.

02:41:30   24         THE WITNESS:  No.

02:41:30   25    BY MS. DEDINAS:

02:41:34 1  Q.  Have you ever learned who bought the server from First

02:41:37 2  Midwest?

02:41:37 3  A.  No.

02:41:37 4  Q.  And do you know where the server is?

02:41:40 5  A.  I don't.

02:41:41 6  Q.  And do you know who might have paid for the server?

02:41:45 7  A.  I have no idea.

02:41:48 8         MS. DEDINAS:  Thank you.

02:41:52 9         THE COURT:  Mr. McJessy?

02:41:54 10        MR. McJESSY:  Yes, your Honor.  I am going to limit

02:42:21 11  my questions to cross-examination at this point, your Honor.

02:42:23 12        THE COURT:  Okay.

02:42:24 13                        - - -

02:42:24 14             PARESH JOSHI, CROSS-EXAMINATION

02:42:25 15  BY MR. McJESSY:

02:42:25 16  Q.  Mr. Joshi, you were asked questions about Raven.  Do you

02:42:28 17  recall those questions?

02:42:29 18  A.  Yes, I do recall.

02:42:30 19  Q.  And counsel asked you whether Raven fulfilled orders on

02:42:36 20  behalf of Kanan.  Do you recall those questions?

02:42:39 21  A.  I do not remember the word "on behalf."

02:42:43 22  Q.  Okay.  Ravenswood (sic) filled orders -- strike that.

02:42:49 23        You are an officer of Raven; is that right?

02:42:54 24  A.  Yes.

02:42:54 25  Q.  All right.  You formed Raven?

02:42:56   1   A.  Yes.

02:42:56   2   Q.  All right.  Why was Raven formed?

02:42:59   3   A.  Raven was formed to fulfill the orders.  It was an

02:43:03   4   order-fulfilling company.

02:43:04   5   Q.  Okay.  And what does that mean?

02:43:06   6   A.  It means that there were certain orders which we were not

02:43:12   7   -- we had a commitment from the customer, but we were not able

02:43:14   8   to fulfill.  And to fulfill that order or to deliver the

02:43:19   9   orders to customers and to meet our commitment, we had to form

02:43:24   10  this company.

02:43:24   11  Q.  Okay.  So you had -- who were the orders from?

02:43:27   12  A.  They were from Kohl's.

02:43:29   13  Q.  Kohl's Department Stores?

02:43:30   14  A.  Kohl's Department Stores.

02:43:32   15  Q.  K-o-h-l?

02:43:34   16  A.  That is correct.

02:43:34   17  Q.  Okay.  And this is -- when was this?

02:43:40   18  A.  This was sometime in September of '09.

02:43:46   19  Q.  September of 2009?

02:43:48   20  A.  Yes.

02:43:48   21  Q.  All right.  That's back-to-school time and the beginning

02:43:52   22  of the Christmas season for the apparel industry; is that

02:43:52   23  right?

02:43:55   24  A.  That is correct.

02:43:56   25  Q.  And you said "we" could not fulfill these orders.  You

02:44:00 1 meant Kanan could not fulfill the orders?

02:44:02 2 A. Kanan could not fulfill the orders.

02:44:04 3 Q. Why not?

02:44:05 4 A. Because of the bank default, the lines were frozen, the

02:44:08 5 lines of credit, the letters of credit were not available, and

02:44:14 6 there was no financing available to Kanan. So in order to

02:44:17 7 bring those goods over here, we needed the money, so we had

02:44:21 8 approached the purchase order financing company.

02:44:24 9 Q. Okay. And so Kanan was unable to get its suppliers to

02:44:30 10 ship the goods to fulfill the order that it had for Kohl's; is

02:44:30 11 that right?

02:44:34 12 A. That is correct.

02:44:34 13 Q. Because Kanan had no financing, its suppliers had no way

02:44:38 14 to get paid?

02:44:38 15 A. That is correct.

02:44:39 16 Q. And nobody would lend Kanan money because it was in

02:44:41 17 default of its loan?

02:44:43 18 A. That is correct.

02:44:44 19 Q. And so Raven was formed. Was it able to get financing?

02:44:49 20 A. Can you repeat that question?

02:44:51 21 Q. Was Raven able to get financing?

02:44:53 22 A. Yes, it was.

02:44:54 23 Q. And who provided the financing to Raven?

02:44:56 24 A. Franklin Capital. That is the name of the company,

02:45:00 25 Franklin Capital.

| | | |
|---|---|---|
| 02:45:01 | 1 | Q.  All right.  And so Franklin Capital paid the suppliers to |
| 02:45:05 | 2 | ship the goods; is that right? |
| 02:45:06 | 3 | A.  They opened the letter of credit on the supplier. |
| 02:45:08 | 4 | Q.  Okay.  And -- |
| 02:45:09 | 5 | A.  And they paid. |
| 02:45:10 | 6 | Q.  Okay.  And then the supplier was willing to ship the goods |
| 02:45:15 | 7 | because a letter of credit had been obtained by Raven? |
| 02:45:20 | 8 | A.  That is correct. |
| 02:45:20 | 9 | Q.  All right.  Who -- Raven had no assets, right? |
| 02:45:25 | 10 | A.  No. |
| 02:45:25 | 11 | Q.  Why was Franklin Capital willing to extend the line -- a |
| 02:45:30 | 12 | letter of credit to your suppliers, meaning Raven's suppliers, |
| 02:45:34 | 13 | when it had no assets? |
| 02:45:37 | 14 | MS. DEDINAS:  Objection. |
| 02:45:38 | 15 | THE COURT:  Sustained. |
| 02:45:40 | 16 | BY MR. McJESSY: |
| 02:45:42 | 17 | Q.  Was there some arrangement put in place to allow Franklin |
| 02:45:46 | 18 | Capital to issue the letter of credit to your suppliers? |
| 02:45:49 | 19 | A.  Yes, they were being -- |
| 02:45:53 | 20 | Q.  What was that arrangement? |
| 02:45:54 | 21 | A.  It was an arrangement between Kohl's, Raven, and Franklin |
| 02:45:59 | 22 | Capital where Kohl's facilitated the transaction, so, |
| 02:46:05 | 23 | therefore, they can get the goods for back to school and |
| 02:46:10 | 24 | Christmas season.  They had to clear the purchase order, which |
| 02:46:17 | 25 | was out of the norm.  And based on those purchase orders from |

02:46:21  1  Kohl's, Franklin Capital was able to open the letter of

02:46:25  2  credit.

02:46:25  3  Q.  Okay.  Was this just -- was this company started just to

02:46:28  4  fulfill this one transaction?

02:46:30  5  A.  Yes.

02:46:30  6  Q.  All right.  And it was -- was Kohl's a big customer of

02:46:36  7  Kanan?

02:46:37  8  A.  Yes.

02:46:37  9  Q.  So then the goods are shipped from the supplier.  Do they

02:46:41  10  have the name Raven on the boxes?

02:46:43  11  A.  Yes.

02:46:43  12  Q.  Okay.  And the boxes are shipped into the Kanan -- to the

02:46:49  13  Creative Warehouse, Inc., facility; is that right?

02:46:51  14  A.  That is correct.

02:46:51  15  Q.  And was there a lease between Raven and Creative

02:46:55  16  Warehouse?

02:46:55  17  A.  Yes, there was a lease.

02:46:57  18  Q.  And were the goods segregated to show what were the Raven

02:47:00  19  goods that were being financed by Franklin Capital?

02:47:03  20  A.  Yes, there was an agreement of Franklin.

02:47:07  21  Q.  Franklin Capital required that?

02:47:09  22  A.  Yes.

02:47:09  23  Q.  They weren't going to ship the goods unless Raven agreed

02:47:13  24  to keep them separate from any other goods?

02:47:15  25  A.  That is correct.

02:47:16  1   Q.  And so there was -- and then the goods are shipped in, and

02:47:19  2   then they are shipped out to Kohl's; is that right?

02:47:21  3   A.  That is correct.

02:47:21  4   Q.  And did Kohl's pay Raven for those goods?

02:47:25  5   A.  The arrangement was that Franklin Capital can get their

02:47:31  6   money first and the balance will come to Raven.

02:47:33  7   Q.  So Franklin Capital got paid back, and then whatever was

02:47:38  8   left over went to Raven?

02:47:39  9   A.  That is correct.

02:47:40  10  Q.  And what did Raven do with those funds?

02:47:42  11  A.  We paid the expenses and also some of the liability of

02:47:49  12  Kanan Fashions.

02:47:49  13  Q.  So they'd get paid the expenses of Kanan Fashions?

02:47:50  14  A.  Yes, because in the arrangement with Kohl's, we had

02:47:53  15  committed to them whatever profits come, then we will pay it

02:47:56  16  back.

02:47:56  17  Q.  To?

02:47:57  18  A.  To Kanan.

02:47:57  19  Q.  So Kohl's actually required that whatever profits were

02:48:01  20  left over would be paid to Kanan?

02:48:03  21  A.  It was not required, but we -- out of the gesture that

02:48:09  22  they have offered to us, we had committed to them that we will

02:48:13  23  not put you in trouble, and if you have any doubt, the money

02:48:17  24  will go back to Kanan.

02:48:18  25  Q.  Okay.  And you did that -- Kohl's did all this just to

| | | |
|---|---|---|
| 02:48:22 | 1 | make sure that its orders could be fulfilled; is that right? |
| 02:48:25 | 2 | A.  Yes. |
| 02:48:25 | 3 | MS. DEDINAS:  Objection. |
| 02:48:26 | 4 | THE COURT:  Sustained. |
| 02:48:27 | 5 | MR. LIPTON:  Your Honor, would this be a convenient |
| 02:48:29 | 6 | time for the court perhaps to take a recess?  I have that |
| 02:48:33 | 7 | personal matter to address. |
| 02:48:34 | 8 | THE COURT:  Sure.  We will take 10 minutes. |
| 02:48:37 | 9 | MR. LIPTON:  Thank you. |
| 02:48:38 | 10 | (Short break.) |
| 03:04:18 | 11 | THE COURT:  Mr. McJessy, go ahead.  We are back on |
| 03:04:27 | 12 | the record now. |
| 03:04:28 | 13 | You're still under oath, sir. |
| 03:04:28 | 14 | BY MR. McJESSY: |
| 03:04:35 | 15 | Q.  Mr. Joshi, was Raven created in any way for the purpose of |
| 03:04:38 | 16 | trying to hide the assets of Kanan? |
| 03:04:40 | 17 | A.  No. |
| 03:04:41 | 18 | Q.  Did it hide any assets of Kanan? |
| 03:04:43 | 19 | A.  No. |
| 03:04:43 | 20 | Q.  Was it used to sell any assets that belonged to Kanan? |
| 03:04:46 | 21 | A.  No. |
| 03:04:47 | 22 | Q.  Would the goods that were designated with the Raven tags |
| 03:04:54 | 23 | on the boxes that were stored in Creative Warehousing's |
| 03:04:59 | 24 | facility, would those goods have ever arrived at that facility |
| 03:05:03 | 25 | if not for the financing from Franklin Capital? |

| 03:05:07 | 1 | A. I am not understanding the question. |

03:05:07  1  A.  I am not understanding the question.

03:05:10  2  Q.  Would the goods that were labeled as Raven and that were

03:05:13  3  put in the warehouse, would those goods have ever been shipped

03:05:16  4  to the warehouse if not for the financing by Franklin Capital?

03:05:21  5  A.  No.

03:05:21  6  Q.  Okay.  The only reason those goods arrived is because of

03:05:26  7  this one-time arrangement with Kohl's Department Store?

03:05:28  8  A.  That is correct.

03:05:32  9        THE COURT:  Can everybody hear okay?

03:05:35  10  BY MR. McJESSY:

03:05:36  11  Q.  Sir, did Kanan send invoices to its customers?

03:05:39  12  A.  Yes.

03:05:39  13  Q.  All right.  So its customers should have copies of those

03:05:42  14  invoices?

03:05:43  15  A.  Yes.

03:05:43  16  Q.  Counsel for UCB had asked you about information on Kanan's

03:05:59  17  inventory; is that right?

03:06:00  18  A.  Yes.

03:06:00  19  Q.  Was Kanan's inventory ever audited?

03:06:02  20  A.  Yes.

03:06:02  21  Q.  Okay.  And should there be -- should there be records from

03:06:05  22  that audit?

03:06:07  23  A.  Yes.

03:06:08  24  Q.  Counsel had asked you questions about moving the server.

03:06:14  25  Was the server something you could move?

03:06:17    1    A.  Not me personally.  It was very heavy.

03:06:21    2    Q.  Do you know how big it was?  Well, strike that.

03:06:27    3            You've seen the server, right?

03:06:29    4    A.  I have seen the server.

03:06:30    5    Q.  How big was it physically?

03:06:32    6    A.  I am just guesstimating, but it would be around 1 by 1 and

03:06:40    7    a half by 1 and a half foot.

03:06:41    8    Q.  Okay.  And when you say it's very heavy, it's too heavy

03:06:45    9    for you to lift?

03:06:46   10    A.  Yes.  And I checked --

03:06:51   11            THE COURT:  There is not a question pending.

03:06:53   12            MR. McJESSY:  That's all right.

03:06:55   13    BY MR. McJESSY:

03:07:00   14    Q.  Sir, you also were asked some questions about the letter

03:07:05   15    that came from Jacobs and Jacobs.  And during your testimony,

03:07:09   16    you referenced a binder, you said, I saw it in the binder.  Do

03:07:13   17    you remember that testimony?

03:07:13   18    A.  Yes, I do.

03:07:14   19    Q.  What binder -- just so the record is clear, what binder

03:07:18   20    were you referring to?

03:07:19   21    A.  The binder that was being handed out for the -- for

03:07:26   22    today's hearing.

03:07:26   23    Q.  So it's the binder that was assembled of exhibits for

03:07:30   24    today's hearing?

03:07:30   25    A.  Exactly.

03:07:31  1   Q.  It wasn't a binder that you saw back in -- or in 2010?

03:07:34  2   A.  No.

03:07:35  3   Q.  Okay.  Sir, if Kanan had purchased -- counsel asked you a

03:07:43  4   great number of questions about having access to the server.

03:07:47  5   Now, you were originally told not to do anything with any of

03:07:53  6   the computer equipment; is that right?

03:07:54  7   A.  That is correct.

03:07:54  8   Q.  Okay.  And who told you that?

03:07:56  9   A.  That was the office of the Bailey Borlack.

03:08:00  10  Q.  And did you abide by those instructions?

03:08:02  11  A.  Yes.

03:08:02  12  Q.  All right.  And then later you were told to get the

03:08:06  13  server; is that right?

03:08:07  14  A.  That is correct.

03:08:08  15  Q.  And you said you would have been willing to do that; is

03:08:12  16  that right?

03:08:12  17  A.  Yes, sir.

03:08:12  18  Q.  All right.  And there was some effort made -- well, strike

03:08:20  19  that.

03:08:20  20         You told -- you testified that you told Mr. Shah that

03:08:24  21  you needed to get the server; is that right?

03:08:26  22  A.  We needed to get access to the data in the server, yes.

03:08:29  23  Q.  Let me ask you about that.  You said you needed to get

03:08:32  24  access to the data.  Does that mean -- what did you understand

03:08:36  25  the instructions to mean, that you needed to get access to the

| | | |
|---|---|---|
| 03:08:39 | 1 | server or that you needed to take possession of the server? |
| 03:08:42 | 2 | A.  Can you repeat the question, please? |
| 03:08:47 | 3 | MR. LIPTON:  Objection. |
| 03:08:48 | 4 | BY MR. McJESSY: |
| 03:08:48 | 5 | Q.  You were given instruction -- |
| 03:08:49 | 6 | THE COURT:  Basis?  Basis? |
| 03:08:53 | 7 | You don't know, do you? |
| 03:08:55 | 8 | MR. LIPTON:  Speculation. |
| 03:08:56 | 9 | THE COURT:  Let him answer the question. |
| 03:08:57 | 10 | BY MR. McJESSY: |
| 03:08:58 | 11 | Q.  Go ahead and answer the question. |
| 03:08:59 | 12 | THE COURT:  Good try. |
| 03:09:00 | 13 | THE WITNESS:  Can you repeat the question. |
| 03:09:21 | 14 | (Record read.) |
| 03:09:22 | 15 | THE COURT:  He's asking him what he understood that |
| 03:09:25 | 16 | to mean. |
| 03:09:25 | 17 | MR. LIPTON:  But he's only giving him two prongs. |
| 03:09:27 | 18 | THE COURT:  I will let him answer the question. |
| 03:09:29 | 19 | THE WITNESS:  In the April e-mail, we were being |
| 03:09:37 | 20 | asked to get access to the data or to the server.  And in the |
| 03:09:44 | 21 | earlier e-mail, there was being that you needed to transport |
| 03:09:49 | 22 | it.  It was the actual possession of the server. |
| 03:09:53 | 23 | BY MR. McJESSY: |
| 03:09:53 | 24 | Q.  And that word was April e-mail; is that right? |
| 03:09:57 | 25 | A.  Yes.  I cannot exactly remember the date, but around that |

03:10:00  1   time, yeah.

03:10:00  2   Q.  All right.  I'm just trying to make sure that the court

03:10:03  3   reporter caught the words correctly.

03:10:05  4        All right.  So at that time, at what time did you

03:10:12  5   think you were being instructed to get possession of the

03:10:14  6   server?

03:10:15  7   A.  Originally, it was to transport the server, meaning to get

03:10:25  8   the possession.  And then it didn't happen, and I think they

03:10:32  9   -- in the e-mail, it said we needed to recover the data from

03:10:37  10  the server.

03:10:38  11  Q.  I see.

03:10:38  12       And Mr. Shah, you're aware, did make a call to

03:10:42  13  Mr. Clark to gain access to the server; is that right?

03:10:44  14  A.  Yes.

03:10:44  15  Q.  All right.  And you testified that he was told he couldn't

03:10:48  16  have access without a court order; is that right?

03:10:50  17  A.  That is correct.

03:10:53  18       MR. McJESSY:  Judge, that's all the questions I have

03:10:55  19  on cross-examination.

03:10:56  20       THE COURT:  Okay.  Do you want to start your direct

03:10:58  21  then?

03:10:58  22       MR. McJESSY:  I would actually like to reserve direct

03:11:01  23  at this point.

03:11:01  24       THE COURT:  No.

03:11:02  25       MR. McJESSY:  No?  All right.

208

|   |   |   |
|---|---|---|
| 03:11:02 | 1 | - - - |
| 03:11:02 | 2 | PARESH JOSHI, DIRECT EXAMINATION |
| 03:11:02 | 3 | BY MR. McJESSY: |
| 03:11:09 | 4 | Q. Sir, I'd like to start back with you a little bit earlier, |
| 03:11:12 | 5 | in the beginning. You received notice from your counsel in -- |
| 03:11:18 | 6 | strike that. |
| 03:11:18 | 7 | When was the first notice you received from your |
| 03:11:21 | 8 | counsel as to take any action with respect to any |
| 03:11:25 | 9 | electronically-stored information? |
| 03:11:27 | 10 | MR. LIPTON: Vague as to "counsel." |
| 03:11:29 | 11 | BY MR. McJESSY: |
| 03:11:29 | 12 | Q. Counsel, Bailey Borlack. |
| 03:11:31 | 13 | A. Not to do anything or to do anything? |
| 03:11:37 | 14 | Q. Fair question. Fair point. I withdraw the question. |
| 03:11:42 | 15 | When was the first time you received any instruction |
| 03:11:45 | 16 | from Bailey Borlack as to electronically-stored information? |
| 03:11:49 | 17 | A. I think in February. |
| 03:11:51 | 18 | Q. Okay. And what was that instruction? |
| 03:11:53 | 19 | A. That you need to preserve and do not delete e-mails. |
| 03:11:59 | 20 | Q. Okay. |
| 03:12:00 | 21 | A. From the server. |
| 03:12:01 | 22 | Q. And was that verbal, or was that in writing? |
| 03:12:05 | 23 | A. That was an e-mail for that. |
| 03:12:08 | 24 | Q. All right. And you think that was in February? |
| 03:12:11 | 25 | A. Yes, I think so. |

03:12:11  1  Q.  All right.  Now, if you could turn to the -- Exhibit 15 in
03:12:18  2  the binder.
03:12:32  3      Is that the e-mail you're referring to?  And by
03:12:41  4  "that" e-mail, I'm referring to the e-mail dated February 18th
03:12:44  5  at 1:59 p.m.
03:12:52  6  A.  No, there was an e-mail which stated not to delete e-mail.
03:12:57  7  Q.  So there was a communication other than this one?
03:12:59  8  A.  Yes.
03:12:59  9  Q.  And it said, to the best of your recollection, do not
03:13:04  10  delete e-mails?
03:13:05  11  A.  Right.  You need to preserve.
03:13:07  12  Q.  And then did this e-mail come after or before?
03:13:10  13  A.  After.
03:13:13  14  Q.  Okay.  And then this e-mail says to shut off the backup;
03:13:13  15  is that right?
03:13:21  16  A.  Yes.
03:13:21  17  Q.  And how quickly upon receiving this did you do that?
03:13:30  18      THE COURT:  I think you are talking about the one
03:13:33  19  that the time is 2:14?
03:13:36  20      MR. McJESSY:  I am still talking about the one that's
03:13:38  21  at 1:59 and how quickly did he respond to the request.
03:13:46  22      THE WITNESS:  The original request was made on
03:13:50  23  February 17th's meeting, which was memorialized by a
03:13:56  24  February 18th e-mail, and then he had come on that day and he
03:14:01  25  had cut it off.

03:14:02　1　BY MR. McJESSY:

03:14:02　2　Q.　So actually the request was made first at a meeting?

03:14:05　3　A.　Yes.

03:14:05　4　Q.　And then this -- it's confirmed in this e-mail, which is

03:14:08　5　Exhibit 15, February 18th, at 1:59 p.m.?

03:14:11　6　A.　That is correct.

03:14:11　7　Q.　And then either that had already been done or it's done

03:14:16　8　immediately thereafter; is that right?

03:14:18　9　A.　Yes.

03:14:18　10　Q.　Was it -- had it already been done by the time you

03:14:23　11　received this e-mail?

03:14:24　12　　　　　MS. DEDINAS:　Objection.

03:14:25　13　　　　　THE COURT:　If he knows.

03:14:27　14　　　　　MS. DEDINAS:　He is leading.

03:14:29　15　　　　　THE COURT:　He can answer.

03:14:30　16　　　　　THE WITNESS:　Yes, that's why I am telling that he

03:14:33　17　already done that.

03:14:34　18　　　　　THE COURT:　Okay.　You are on notice.

03:14:39　19　　　　　MR. McJESSY:　Thank you, your Honor.

03:14:40　20　BY MR. McJESSY:

03:14:41　21　Q.　And then what was the next notice you received from Bailey

03:14:46　22　Borlack regarding preservation of electronically-stored

03:14:49　23　information?

03:14:49　24　A.　In March we received an e-mail that do not do anything

03:14:56　25　with the computer because they had been engaging a computer

03:14:59   1   expert.

03:15:00   2   Q. And did they?

03:15:00   3   A. Yes. They had forwarded the contract with the company

03:15:05   4   called FSRDG.

03:15:08   5   Q. And what did you understand their instructions to be prior

03:15:13   6   to their engagement of the ESI expert -- strike that.

03:15:18   7           What did you understand their instructions to be in

03:15:20   8   early March?

03:15:21   9   A. That we don't do anything until you get instructions.

03:15:24   10   Q. Okay. And to you, did that mean don't move any of the

03:15:29   11   computers?

03:15:30   12   A. Yes, that was part of it.

03:15:32   13   Q. Okay. Now, sir, you received a number of e-mails between

03:15:55   14   May and July asking you as to your status of your efforts to

03:16:04   15   obtain -- to physically obtain possession of the server; is

03:16:04   16   that right?

03:16:09   17   A. Yes.

03:16:09   18   Q. All right. And do you know how you were supposed to do

03:16:14   19   that?

03:16:14   20   A. The instruction was to get the server.

03:16:23   21   Q. How?

03:16:23   22   A. How? That was never told to me. It was left to me, I

03:16:26   23   think.

03:16:26   24   Q. Okay. It was left to you to decide how to do it?

03:16:29   25   A. Yeah, because I was not being instructed on how to do it.

| | | |
|---|---|---|
| 03:16:33 | 1 | Q.  Okay.  And did any of the experts that were hired by the |
| 03:16:37 | 2 | Bailey Borlack firm make any effort to obtain the server, to |
| 03:16:43 | 3 | your knowledge? |
| 03:16:43 | 4 | A.  No, not to my knowledge. |
| 03:16:45 | 5 | Q.  Okay.  And you were trying to -- you, meaning Kanan, was |
| 03:16:51 | 6 | trying to acquire the server during this period of time; is |
| 03:16:51 | 7 | that right? |
| 03:16:55 | 8 | A.  That is correct. |
| 03:16:55 | 9 | Q.  And were you involved in those negotiations? |
| 03:16:59 | 10 | A.  I was not involved in the negotiations. |
| 03:17:01 | 11 | Q.  But you understood they were going on? |
| 03:17:02 | 12 | A.  From the exchange of e-mail, yes. |
| 03:17:06 | 13 | Q.  And you had -- did you advise Bailey Borlack of that fact? |
| 03:17:09 | 14 | A.  Yeah. |
| 03:17:11 | 15 | Q.  All right.  And you did that in an e-mail; is that right? |
| 03:17:33 | 16 | A.  Yes. |
| 03:17:33 | 17 | MR. McJESSY:  Just a moment, your Honor. |
| 03:17:35 | 18 | THE COURT:  Sure. |
| 03:17:36 | 19 | (Brief pause.) |
| 03:17:49 | 20 | BY MR. McJESSY: |
| 03:17:49 | 21 | Q.  Sir, I just have a couple of additional questions.  Did |
| 03:17:53 | 22 | Associated Bank ever sue Kanan to repossess the server, to |
| 03:17:53 | 23 | your knowledge? |
| 03:17:59 | 24 | THE COURT:  I'm sorry, what was that? |
| 03:18:01 | 25 | THE WITNESS:  I didn't hear that. |

03:18:02  1  BY MR. McJESSY:

03:18:03  2  Q.  Did Associated Bank ever sue Kanan to repossess the

03:18:06  3  server?

03:18:06  4  A.  No.

03:18:07  5  Q.  To your knowledge, did anyone ever sue Kanan to repossess

03:18:13  6  the server?

03:18:14  7  A.  No.

03:18:15  8  Q.  Did anyone ever sue -- Associated Bank or anyone else ever

03:18:19  9  sue to repossess the server, so far as you know?

03:18:22  10  A.  No.

03:18:29  11       MR. McJESSY:  I don't have any other questions, your

03:18:30  12  Honor.

03:18:30  13       THE COURT:  Thank you very much.

03:18:33  14       Mr. Lipton?

03:18:36  15                        - - -

03:18:36  16            PARESH JOSHI, CROSS-EXAMINATION

03:18:36  17  BY MR. LIPTON:

03:18:52  18  Q.  Mr. Joshi, you and Mr. Shah are brothers-in-law?

03:18:56  19  A.  Yes, sir.

03:18:56  20  Q.  And you live in the same gated community?

03:18:58  21  A.  Yes, sir.

03:18:59  22  Q.  How far apart do you live?

03:19:00  23  A.  I don't know the exact mileage, but one lane apart.  One

03:19:08  24  lane apart.

03:19:08  25  Q.  One lane?  One street?

03:19:10　1　A.  One street apart.

03:19:11　2　Q.  Okay.  When you received the -- strike that.

03:19:20　3　　　　　You understood after some inquiry that a wire

03:19:28　4　transfer had been made from a bank in Dubai that had been sent

03:19:31　5　by a company called Diagems, correct?

03:19:33　6　A.  Yes, sir.

03:19:34　7　Q.  Your neighbors own a company called Diagems, correct?

03:19:40　8　A.  Yes, sir.

03:19:40　9　Q.  When you saw that a company in Dubai had purchased the

03:19:46　10　server and it was named Diagems, did you think that was a

03:19:49　11　little strange?

03:19:50　12　A.  When I came to know that my neighbor had a company named

03:19:57　13　Diagems, it was a surprise to me.

03:19:59　14　Q.  When did you come to know that your neighbor had a company

03:20:01　15　called Diagems?

03:20:02　16　A.  When the subpoena or the court order was issued to them,

03:20:13　17　to the owner.

03:20:13　18　Q.  Haven't you previously testified that you were close

03:20:16　19　friends with those neighbors?

03:20:17　20　A.  I am not close friends.

03:20:18　21　Q.  You don't -- they don't come to your house?

03:20:20　22　A.  No.

03:20:20　23　Q.  You don't go to theirs?

03:20:22　24　A.  No.

03:20:22　25　Q.  Mr. Shah goes to their house, doesn't he?

03:20:25    1    A. Yeah.

03:20:26    2    Q. And they come to his, correct?

03:20:29    3    A. Pardon me?

03:20:30    4    Q. And the Bhansalis come to his house?

03:20:32    5    A. As far as I know, yes.

03:20:34    6    Q. Did Mr. Shah ever express any surprise to you that the

03:20:37    7    name on the wire transfer was from a company called Diagems?

03:20:42    8    A. Sure, yeah.

03:20:43    9    Q. What did he say?

03:20:44    10    A. What is that? He said, look at this, our attorney is

03:20:51    11    talking about Diagems, and now the subpoena is in the name of

03:20:55    12    Diagems over here, and that belongs to our neighbor.

03:20:57    13    Q. So he thought that Diagems belonged to your neighbor too?

03:21:03    14    A. When the subpoena was issued, yes.

03:21:05    15    Q. And was he surprised?

03:21:06    16    A. Yes.

03:21:07    17    Q. Did he talk to the Bhansalis about the issue?

03:21:10    18    A. I am not aware of that.

03:21:11    19    Q. Early on in your testimony to Ms. Dedinas, you said that

03:21:43    20    you would do whatever needed to be done to get the data. Do

03:21:46    21    you recall that?

03:21:46    22    A. Yes.

03:21:47    23    Q. In fact, you didn't do anything to get the data, did you?

03:21:50    24    A. I was not able to.

03:21:52    25    Q. And why weren't you able to?

03:21:55   1   A.  Because when the data was being requested at that point of
03:21:59   2   time, we were being told that Mr. Clark needed a court order.
03:22:04   3   Q.  And you learned that you needed a court order in late
03:22:07   4   April or early May, correct?
03:22:09   5   A.  Correct.
03:22:11   6   Q.  Okay.  Turn to Exhibit 217, if you would, please.
03:22:54   7   A.  Yes, sir.
03:22:55   8   Q.  You participated in the preparation of this document,
03:22:57   9   didn't you?
03:22:58  10   A.  Yes, sir.
03:22:58  11   Q.  What is this document?
03:23:00  12   A.  This is the chronology that was being requested by the
03:23:05  13   court.
03:23:05  14   Q.  The amended chronology that was requested by the court.
03:23:08  15        And it was a chronology of ESI, correct?
03:23:11  16   A.  That is correct.
03:23:12  17   Q.  And what is ESI?
03:23:13  18   A.  Electronically-stored information.
03:23:16  19   Q.  Okay.  So it was supposed to be a chronology of the
03:23:20  20   information that was stored electronically, correct?
03:23:23  21   A.  That is correct.
03:23:23  22   Q.  Okay.  Now, do you recall the testimony where you and
03:23:33  23   Mr. Shah have suggested that there was a telephone call where
03:23:36  24   Mr. Borlack was involved and Mr. Clark indicated to Mr. Shah
03:23:43  25   and Mr. Borlack that there was a need for a subpoena or court

03:23:50  1  order to access the server?

03:23:51  2  A.  What is your question, sir?

03:23:55  3  Q.  Do you recall that the testimony is that that conversation

03:24:00  4  occurred in late April or early May?

03:24:03  5  A.  Yes, I do recall that.

03:24:04  6  Q.  Okay.  Would you turn to page -- the second page of

03:24:11  7  Exhibit 217.  Look down near the bottom, three entries up from

03:24:18  8  the bottom where it says, end 4/10-early 5/10.  Do you see

03:24:26  9  that?

03:24:26  10  A.  I do see that.

03:24:28  11  Q.  And what does it say opposite that entry?

03:24:31  12  A.  It says, Telephone communication with defendant, former

03:24:36  13  counsel and bank regarding access to server and need for

03:24:39  14  subpoena.

03:24:40  15  Q.  Okay.  Now, all the other entries on this document are for

03:24:43  16  a specific date, aren't they?

03:24:45  17  A.  Yes, they are.

03:24:46  18  Q.  And that's because they refer to specific

03:24:51  19  electronically-stored information; is that correct?

03:24:52  20  A.  That is correct.

03:24:52  21  Q.  In fact, they refer to specific e-mails, correct?

03:24:56  22  A.  That is correct.

03:24:56  23  Q.  But the one that's third up from the bottom that says end

03:25:01  24  4/10 through early 5/10 doesn't refer to a specific electronic

03:25:06  25  communication, does it?

03:25:06   1   A.  It does not.

03:25:08   2   Q.  How did you come up with that date, end 4/10 through early

03:25:14   3   5/10?

03:25:15   4   A.  I need to explain.

03:25:18   5   Q.  I'm sorry?

03:25:19   6           THE COURT:  He needs to explain.

03:25:20   7           THE WITNESS:  Elaborate.

03:25:21   8   BY MR. LIPTON:

03:25:22   9   Q.  I asked you, how did you come up with it?

03:25:25   10   A.  We had already gone through this in my deposition.  At

03:25:27   11   that point of time also, I had mentioned that there was an

03:25:31   12   e-mail, and in this particular case, internal writing.  The

03:25:36   13   date of that e-mail, I had actually kept that thing over here

03:25:41   14   which got moved up, so then I sort it out by the date.  So

03:25:45   15   that is the reason why, but, in fact, it had a date over

03:25:50   16   there, and that could come -- end April to early May, it could

03:25:56   17   come as a part of the e-mail -- I mean as a part of the

03:25:59   18   description or the summary.

03:26:02   19           MR. LIPTON:  Can I have that read back, please.

03:26:04   20           THE COURT:  Sure.

03:26:36   21     (Record read.)

03:26:38   22   BY MR. LIPTON:

03:26:38   23   Q.  Did the court reporter read your answer back accurately?

03:26:40   24   A.  Yes.

03:26:42   25   Q.  I'm not sure I got it.  Let me ask you again.

03:26:53  1    How did you -- well, let me ask you first.  There is
03:26:58  2  no specific electronically-stored piece of information that
03:27:03  3  refers to a telephone communication with defendants, former
03:27:08  4  counsel, and bank re:  access to server and need for subpoena,
03:27:13  5  is there?
03:27:13  6  A.  I am not understanding your question.  Can you please
03:27:18  7  repeat that?
03:27:18  8  Q.  I will try it again.
03:27:19  9    Take a look at the entry adjacent to end 4/10-early
03:27:31 10  5/10.  It says, Telephone communication with defendants,
03:27:37 11  former counsel, and bank re:  access to server and need for
03:27:41 12  subpoena.
03:27:45 13    Do you see that?
03:27:46 14  A.  I see that.
03:27:46 15  Q.  That description does not describe any specific piece of
03:27:50 16  electronically-stored information, does it?
03:27:52 17  A.  It does.
03:27:57 18  Q.  And what specific piece of electronically-stored
03:28:02 19  information does it refer to?
03:28:03 20  A.  For accessing to the server.
03:28:09 21  Q.  For what?
03:28:10 22  A.  Accessing to the server.  Access to the server.
03:28:13 23    THE COURT:  Accessing to the server.
03:28:14 24  BY MR. LIPTON:
03:28:15 25  Q.  Is there an e-mail that contains the contents that is

03:28:20　1　described there, telephone communication with defendants,

03:28:24　2　former counsel, and bank re:  access to server and need for

03:28:29　3　subpoena?

03:28:29　4　A.　There was an e-mail that was being sent out by Mr. Shah in

03:28:36　5　the later part of the -- I don't remember the date, but that

03:28:38　6　was the e-mail that I am referring it over here.  And in that

03:28:42　7　e-mail, the period in April, end April, beginning May, and

03:28:52　8　that is what I was telling you, that this e-mail, this

03:28:56　9　particular entry could have happened at a later point in time.

03:28:59　10　However, it moved up.

03:29:01　11　Q.　So what you're saying is there is no e-mail dated between

03:29:07　12　the end of 4/10 and early 5/10; is that right?

03:29:11　13　A.　That is correct.

03:29:12　14　Q.　There is an e-mail that's much later, correct?

03:29:15　15　A.　Yes, sir.

03:29:15　16　Q.　And that e-mail much later was an e-mail from Mr. Shah to

03:29:19　17　Mr. Roche explaining Mr. Shah's position, correct?  Explaining

03:29:27　18　that Mr. Shah was saying that there had been a telephone

03:29:29　19　conversation with defendants, former counsel, and bank re:

03:29:34　20　access to server and need for subpoena, correct?

03:29:37　21　A.　I think so, yes.

03:29:37　22　Q.　All right.  So this doesn't -- this entry doesn't describe

03:29:41　23　something that happened at the time between early 4/10 and

03:29:46　24　early 5/10.  It describes an e-mail that was sent by Mr. Shah

03:29:51　25　when he was represented by Mr. Roche just a few weeks ago,

| | | |
|---|---|---|
| 03:29:55 | 1 | correct? |
| 03:29:56 | 2 | A.  I do not remember that, but, yes, it described that |
| 03:30:03 | 3 | e-mail. |
| 03:30:03 | 4 | Q.  Now, if that e-mail was sent while Mr. Shah and you were |
| 03:30:11 | 5 | represented in this litigation by Mr. Roche, that e-mail had |
| 03:30:16 | 6 | to have been dated sometime in the latter part of 2009, |
| 03:30:22 | 7 | correct -- I'm sorry, 2010, correct? |
| 03:30:25 | 8 | A.  That is correct. |
| 03:30:26 | 9 | Q.  So why is it that it is, on Exhibit 217, shown as early |
| 03:30:38 | 10 | April, end of May -- early May -- I'm sorry, end of April, |
| 03:30:41 | 11 | early May, and not -- |
| 03:30:43 | 12 | THE COURT:  Why don't you start over your question, |
| 03:30:46 | 13 | please. |
| 03:30:47 | 14 | MR. LIPTON:  All right.  Thank you, your Honor. |
| 03:30:48 | 15 | BY MR. LIPTON: |
| 03:30:49 | 16 | Q.  So why is it, Mr. Joshi, that in Exhibit 217, the entry |
| 03:30:56 | 17 | says that the electronically-stored information was end of |
| 03:31:04 | 18 | April '10, early May '10, why does it say that when the |
| 03:31:11 | 19 | electronically-stored information was actually created toward |
| 03:31:13 | 20 | the end of the year 2010 instead of in April or May? |
| 03:31:17 | 21 | A.  Maybe what I tried to explain, that this particular time |
| 03:31:23 | 22 | April, beginning of May, could have been part of the summary |
| 03:31:26 | 23 | of intent.  It could have been. |
| 03:31:28 | 24 | However, when I took that e-mail and I did not write |
| 03:31:30 | 25 | the date, and then when I sorted this thing, because it was |

03:31:39    1    prepared -- then I sorted it, it moved up, and I didn't know
03:31:41    2    the exact date.
03:31:43    3    Q.  It moved up but it was an accident?
03:31:45    4    A.  Yeah, it could have in the actual date of the e-mail.
03:31:49    5    Q.  So this was just a coincidence, an accident?
03:31:52    6    A.  Yes.
03:31:52    7    Q.  Okay.  Do you remember your testimony to Ms. Dedinas that
03:32:29    8    said that you had responded to the Bailey Borlack Nadelhoffer
03:32:40    9    e-mails by saying we are working on it and --
03:32:43   10          THE COURT:  You have lost me already.
03:32:44   11          MR. LIPTON:  Okay.
03:32:45   12          THE COURT:  Break it up if you can, please.
03:32:47   13    BY MR. LIPTON:
03:32:47   14    Q.  All right.  Do you recall your testimony to Ms. Dedinas
03:32:49   15    discussing Bailey Borlack Nadelhoffer e-mails where you
03:32:55   16    responded, we are working on it?
03:32:56   17    A.  Yes, I do.
03:32:57   18    Q.  Okay.  And do you recall your testimony where you said you
03:33:01   19    didn't say in specific language what it was that you were
03:33:06   20    doing?
03:33:06   21    A.  Yes, I do.
03:33:07   22    Q.  Okay.  There's nothing in writing that shows that you've
03:33:13   23    seen -- strike that.
03:33:14   24          There's nothing that you've seen that's in writing
03:33:18   25    that shows that Bailey Borlack Nadelhoffer knew of the need

03:33:23   1   for a court order or a subpoena, is there?

03:33:25   2   A.  Not in my recollection.

03:33:26   3   Q.  And there is nothing in writing that shows that Bailey

03:33:33   4   Borlack Nadelhoffer or anybody there knew that a subpoena was

03:33:42   5   required and that you were annoyed that Bailey Borlack

03:33:48   6   Nadelhoffer kept asking for you to get access to the server;

03:33:48   7   is that right?

03:33:56   8   A.  Yes.

03:34:06   9        THE COURT:  I know it's difficult, but if you can

03:34:07  10   shorten your questions.

03:34:09  11        MR. LIPTON:  I will.  Usually, I do, your Honor,

03:34:13  12   but...

03:34:15  13   BY MR. LIPTON:

03:34:22  14   Q.  Were you in attendance at the August 26th status

03:34:26  15   conference before the court?

03:34:27  16   A.  Yes, I was.

03:34:28  17   Q.  And at that time, Mr. Borlack informed the court that Mr.

03:34:39  18   Shah was negotiating to purchase the server with Associated

03:34:41  19   Bank or Mr. Clark was doing it on his behalf, correct?

03:34:45  20   A.  I do not remember exactly.  I do not remember exactly.

03:34:50  21   Q.  Okay.  Did -- at the same time that Mr. Shah was

03:35:11  22   negotiating to purchase the server, you also had an invitation

03:35:16  23   from Mr. Clark to either get a court order or subpoena to

03:35:20  24   access the server, correct?

03:35:22  25   A.  I am not understanding your question.  Can you repeat

03:35:25　1　that?

03:35:25　2　Q.  Well, there were two things going on at the same time?

03:35:28　3　A.  Yes.

03:35:28　4　Q.  Mr. Shah was trying to buy the server, correct?

03:35:30　5　A.  Yes.

03:35:31　6　Q.  And at the same time, Mr. Clark was saying, if you want

03:35:33　7　access to the server, you need a court order or subpoena,

03:35:36　8　correct?

03:35:37　9　A.  Yes.

03:35:37　10　Q.  So Mr. Borlack only told the court about the purchase of

03:35:43　11　the server, correct?

03:35:45　12　A.  Yes.

03:35:45　13　Q.  But he didn't tell the court that Mr. Clark was requiring

03:35:53　14　a subpoena or a court order to access the server, correct?

03:36:03　15　A.  Yes.

03:36:03　16　Q.  Now, if that was true, if Mr. Borlack knew that Mr. Clark

03:36:11　17　was requiring a subpoena or a court order to access the

03:36:14　18　server, it would have been very easy for Mr. Borlack to just

03:36:18　19　ask the court for an order on August 26th to access the

03:36:25　20　server, wouldn't it?

03:36:25　21　A.  I would give it to Mr. Borlack.

03:36:27　22　Q.  But it would have been real easy for him to do that,

03:36:30　23　wouldn't it?

03:36:30　24　A.  I don't know the court's procedure, but, yes, if you are

03:36:33　25　saying so.

03:36:33 1  Q.  And you didn't ask Mr. Borlack to ask the court to get a

03:36:38 2  subpoena or court order during the August 26th hearing, did

03:36:43 3  you?

03:36:43 4  A.  I didn't talk to him.

03:36:46 5  Q.  About that.

03:36:46 6  A.  I didn't talk to him at all about that.

03:36:49 7  Q.  And Mr. Shah didn't ask Mr. Borlack to request the court

03:36:54 8  to order access to the server on August 26th, did he?

03:36:58 9  A.  I am not aware of.

03:37:00 10 Q.  You didn't hear him do that, did you?

03:37:02 11 A.  I did not.

03:37:03 12 Q.  Now, you said that you were told to get possession of the

03:37:18 13 server and that you believed by getting possession, it meant

03:37:22 14 physical possession, correct?

03:37:23 15 A.  Yes.

03:37:23 16 Q.  And you were told that by Bailey Borlack, correct?

03:37:26 17 A.  Yes.

03:37:26 18 Q.  Didn't the Bailey Borlack firm also tell you that you

03:37:30 19 could either get physical possession of the server or you

03:37:34 20 could get a copy of it made?

03:37:37 21 A.  That was done in April, end, that we had access to the

03:37:44 22 data.

03:37:44 23 Q.  Let me direct your attention to Exhibit No. 111, please.

03:37:54 24         THE COURT:  I'm sorry, your number again?

03:37:56 25         MR. LIPTON:  No. 111, your Honor.

| 03:37:58 | 1 | THE COURT:  Thank you. |
| 03:38:00 | 2 | BY MR. LIPTON: |
| 03:38:12 | 3 | Q.  Do you have it there? |
| 03:38:13 | 4 | A.  Yeah. |
| 03:38:15 | 5 | Q.  Now, this is an e-mail dated May 25, sent at 11:15 a.m., |
| 03:38:24 | 6 | subject, e-discovery/United Central Bank, the Kanan ESI data, |
| 03:38:32 | 7 | map/Creative Warehousing server, from Eric Grossman to Paresh |
| 03:38:39 | 8 | Joshi, copy Mehul Shah, copy Alan Borlack. |
| 03:38:45 | 9 | Did you receive this e-mail? |
| 03:38:47 | 10 | A.  Yes, I did. |
| 03:38:48 | 11 | Q.  Did you read this e-mail? |
| 03:38:49 | 12 | A.  I must have. |
| 03:38:50 | 13 | Q.  It says in the beginning of the second paragraph, When we |
| 03:38:56 | 14 | discussed this a month ago on 4/26, see below, you did not |
| 03:39:00 | 15 | indicate there were any issues in getting control and you said |
| 03:39:03 | 16 | you would be transporting the server from the warehouse. |
| 03:39:08 | 17 | Now, that's a true statement, isn't it? |
| 03:39:09 | 18 | A.  Yes. |
| 03:39:10 | 19 | Q.  Okay.  In fact, Vilia had raised the issue on April 14th |
| 03:39:17 | 20 | that finally, my client has heard that there are third parties |
| 03:39:23 | 21 | who claim to have a secured interest in Creative |
| 03:39:27 | 22 | Warehousing/Kanan Fashions computer system and intend to seek |
| 03:39:33 | 23 | repossession of it.  Please advise if this is the case and |
| 03:39:35 | 24 | what steps Kanan Fashions intends to take to preserve the |
| 03:39:40 | 25 | computer system and/or electronic data while this lawsuit is |

03:39:42  1   pending.

03:39:44  2       It goes on to say, I asked you about this on 4/16 and

03:39:47  3   your response was that you were not aware of any suit or

03:39:49  4   notice about possession.

03:39:50  5       Correct?  Is that what it says?

03:39:53  6   A.  Yes.

03:39:53  7   Q.  And is that a true statement?

03:39:54  8   A.  On that day, yes.

03:39:56  9   Q.  Okay.  Now, down below it says, the last paragraph, One

03:40:05  10  way or another, we have to have information about the server

03:40:09  11  and as soon as possible, but one of two things must happen.

03:40:14  12  Either get control of the server or have a copy of the server

03:40:20  13  contents made by the I.T. person will will be hired.  If the

03:40:25  14  latter, let's discuss the proper process.

03:40:27  15      Now, do you remember receiving that information from

03:40:31  16  Mr. Grossman?

03:40:32  17  A.  I did receive the e-mail, yes.

03:40:34  18  Q.  And did you ever discuss a proper process for making a

03:40:38  19  copy of the contents of the server with Mr. Grossman?

03:40:41  20  A.  No, I would not propose to do that because now I think I

03:40:48  21  was appointed by that time.  They had already appointed the

03:40:51  22  FSRDG people.

03:40:53  23      I am not an I.T. person, so I was not knowing all the

03:40:57  24  technicalities of it, and that is the reason why they had

03:41:00  25  appointed the liaison.

03:41:02  1   Q.  Well, you testified earlier that your understanding was

03:41:07  2   that when you were told not to do anything with the server and

03:41:11  3   you were told to get the server, that you thought that just

03:41:15  4   meant possession, correct?

03:41:16  5   A.  To get to the data to transport the server to the Oak

03:41:21  6   Brook office.

03:41:21  7   Q.  And if you couldn't get possession, you were supposed to

03:41:24  8   have a copy made, correct?

03:41:25  9   A.  That was clear on the May e-mail.

03:41:26  10  Q.  Okay.  And it was never clear before?

03:41:29  11  A.  In one of the e-mails that they say which was the

03:41:35  12  triggering point to Mr. Clark's call, that it was that we

03:41:40  13  needed to get access to the data.  And at that point of time,

03:41:43  14  that was the prior e-mail, which triggered the phone call to

03:41:48  15  Mr. Clark.

03:41:48  16  Q.  So your understanding was that you didn't just need

03:41:50  17  access -- possession of this server, you could also just get a

03:41:56  18  copy of the hard drive contents, correct?

03:41:58  19  A.  That was the phone -- that was the reason of the phone

03:42:01  20  call, to get access to the data.

03:42:05  21  Q.  So are you saying that Mr. Clark would not permit Kanan to

03:42:12  22  come on the premises to obtain the data that was on the server

03:42:18  23  that constituted Kanan's books and records regarding

03:42:24  24  inventory?

03:42:25  25  A.  The conversation that I was part of, it said that get the

03:42:28    1  court order or the subpoena, and that was the understanding

03:42:33    2  that I had, that he not give access if we don't give him the

03:42:36    3  court order.

03:42:37    4  Q.  Well, did anybody say, well, Mr. Clark, that's our

03:42:41    5  inventory data, that's our books and records, why do we need a

03:42:44    6  subpoena to get a copy of our books and records?  Did anybody

03:42:48    7  say anything like that?

03:42:50    8  A.  Not in that exact fashion, but -- not in that exact

03:42:54    9  fashion, but it was being told to us that the server belongs

03:42:59   10  to Associated Bank and the warehouse belongs to First Midwest

03:43:04   11  Bank, and so therefore he wouldn't give access until you get

03:43:08   12  the court order.

03:43:09   13  Q.  Now, this was your friend the banker, Mr. Clark, who just

03:43:11   14  wouldn't give access to allow you to copy your own books and

03:43:15   15  records off the server?

03:43:17   16  A.  Pardon me, sir.

03:43:18   17  Q.  This was your friend --

03:43:19   18  A.  What is my friend?  Mr. Clark is not my friend, and I

03:43:23   19  don't know whether he knows me or not.

03:43:24   20  Q.  Okay.  You were present at times when Mr. Shah referred to

03:43:31   21  Mr. Clark as our good friend and our close associate and

03:43:34   22  things of that nature, our insider in the bank, weren't you?

03:43:38   23  A.  Which part are you talking about?

03:43:40   24  Q.  I'm asking you about ever hearing Mr. Shah describe

03:43:44   25  Mr. Clark in those glowing terms?

03:43:48　1　A.　No, sir.

03:43:48　2　Q.　You never heard Mr. Shah describe Mr. Clark in those

03:43:51　3　terms?

03:43:52　4　A.　No.

03:43:52　5　Q.　All right.　But getting back to Mr. Clark and you having

03:43:59　6　access to your own personal -- strike that.

03:44:03　7　　　　　Getting back to Mr. Clark and the ability of you to

03:44:05　8　get access to Kanan's books and records that were stored on

03:44:10　9　the computer, was the issue ever brought up that what was on

03:44:14　10　the computer was Kanan's books and records regarding the

03:44:18　11　inventory?

03:44:19　12　A.　That was not made very specific to them, no.　That

03:44:23　13　argument was not being made by me, at least.

03:44:25　14　Q.　Okay.　Now, you said in response to some testimony earlier

03:44:31　15　that your first preservation instruction from the Bailey

03:44:37　16　Borlack firm was in February of 2010.　Do you recall that?

03:44:41　17　A.　Yes, I do.

03:44:42　18　Q.　Okay.　Take a look at Exhibit No. 6, please.

03:45:08　19　　　　　Are you there?

03:45:09　20　A.　Yes.

03:45:09　21　　　　　THE COURT:　I am not.　Please, one second.

03:45:11　22　　　　　MR. LIPTON:　Certainly, your Honor.

03:45:26　23　　　　　THE COURT:　Thank you.

03:45:27　24　BY MR. LIPTON:

03:45:29　25　Q.　Do you see the date of this e-mail is January 21st, 2010,

03:45:34  1  and it is to you, and it's from Alan Borlack, subject, United

03:45:45  2  Central Bank v. Kanan, copy Mehul Shah and Scott Schreiber as

03:45:51  3  well as Steve Blumenthal, correct?

03:45:52  4  A.  Yes, sir.

03:45:53  5  Q.  Okay.  It says, By the way, Mehul and Paresh, this goes

03:45:58  6  without saying, but it is important as a matter of litigation

03:46:01  7  rules and procedures that no e-mails related to UCB, Mutual

03:46:06  8  Bank, or the controversy be deleted from any computers.  This

03:46:11  9  applies to not only e-mails in particular but any kind of data

03:46:15  10  in any format.

03:46:16  11        Do you see that?

03:46:17  12  A.  Yes, sir.

03:46:21  13  Q.  Wasn't that a litigation hold e-mail?

03:46:24  14  A.  Yes, sir.

03:46:24  15  Q.  Okay.  So Mr. Borlack was hired on January 20th, 2010,

03:46:32  16  correct?

03:46:35  17  A.  I don't remember the date, but around January 17th or

03:46:38  18  18th.

03:46:40  19  Q.  All right.  So as soon as January 21st, Mr. Borlack sends

03:46:43  20  out this preservation e-mail?

03:46:44  21  A.  Yes.

03:46:45  22  Q.  And you understood it to be an e-mail to preserve whatever

03:46:49  23  information you had, correct?

03:46:50  24  A.  Yeah, I am not supposed to delete anything.

03:46:55  25        And you have to correct in February -- well,

03:46:59  1  correction, I was referring to the same e-mail when I said

03:47:03  2  February.

03:47:03  3  Q.  When you said "February," you meant this January e-mail?

03:47:05  4  A.  I meant this January e-mail, because I mentioned not to

03:47:10  5  delete anything.

03:47:10  6  Q.  Okay.  Now, I think you testified that in or about

03:47:25  7  March 15th, it was your understanding that you were not to do

03:47:29  8  anything with anything in the warehouse unless you had

03:47:35  9  instructions to do so, correct?

03:47:37  10  A.  That is correct.

03:47:37  11  Q.  Okay.  And you understood that that meant that you weren't

03:47:43  12  to delete anything that was on any of the computers in the

03:47:46  13  warehouse, correct?

03:47:48  14  A.  No, that was the first e-mail that we just went through.

03:47:50  15  Q.  No, I am just talking about in or about March 15th

03:47:56  16  generally.  You understood that you were not to delete

03:47:59  17  anything on any of the computers?

03:47:59  18  A.  And not to do anything with the computers.

03:48:01  19  Q.  Right.  As of March 15th, you had already moved all of the

03:48:05  20  computers out of the warehouse except for the server, correct?

03:48:09  21  A.  Yes.  I moved it somewhere in February.

03:48:14  22  Q.  When you moved all the computers in February, why didn't

03:48:17  23  you move the server too?

03:48:20  24  A.  First of all, it was too heavy of equipment; and the

03:48:26  25  understanding is that we will be able to get the data whenever

03:48:30  1   we need to.

03:48:30  2   Q.  Now, when you say -- well, which was the problem?  Was it
03:48:45  3   that you didn't move it because it was too heavy or you didn't
03:48:49  4   move it because you could get the data whenever you wanted to?
03:48:53  5   A.  Both.
03:48:55  6   Q.  So it was a conscious decision that you weren't going to
03:48:57  7   take the server --
03:48:59  8   A.  I was not able to.
03:49:01  9   Q.  Now, did you tell -- you didn't tell anybody at Bailey
03:49:04  10  Borlack that you weren't going to take the server then, did
03:49:07  11  you?
03:49:07  12  A.  I didn't say specifically, no.
03:49:10  13  Q.  You told everybody at Bailey Borlack that all the
03:49:13  14  computers had been moved out of the warehouse, didn't you?
03:49:16  15  A.  Yes, I did.
03:49:17  16  Q.  Why did you say that when you left the server behind?
03:49:21  17  A.  I said the computers, and I -- at that point of time,
03:49:26  18  computers to me was meaning the personal computers.  And --
03:49:30  19  Q.  So in your mind -- I'm sorry.  Go ahead.
03:49:33  20  A.  Yeah, to my mind, it was the computers.  When I was
03:49:35  21  talking, I said that day, I had moved the computers, I meant
03:49:40  22  the personal computers.
03:49:40  23  Q.  But you didn't bother to tell anybody that you left the
03:49:44  24  server behind -- and when I say "anybody," I mean anybody at
03:49:47  25  Bailey Borlack -- correct?

03:49:48 1  A.  In fact, they knew about it.  If you look at the trail of

03:49:50 2  e-mails, it does specifically mention, I think, that you need

03:49:54 3  to transport the server, you need to -- but later on, they did

03:49:59 4  come through.

03:49:59 5  Q.  Much later on, correct?

03:50:00 6  A.  Not much later.  In March.

03:50:02 7  Q.  After the April 23rd ESI meeting, correct?

03:50:08 8  A.  I am not remembering the date, but Dave knew about it.

03:50:12 9  Q.  Do me a favor.  Find the e-mail that you are referring to

03:50:15 10  in the exhibits which are all in chronological order.

03:50:32 11       THE COURT:  Do you have a copy of the directory in

03:50:35 12  these?  That might save some time.

03:50:40 13       MR. LIPTON:  May I approach?

03:50:41 14       THE COURT:  Sure.

03:50:42 15  BY MR. LIPTON:

03:50:43 16  Q.  Here is a copy of the index to the exhibits, if that will

03:50:45 17  help you locate the e-mail that you are talking about.

03:50:59 18       THE COURT:  Do you have much more?

03:51:01 19       MR. LIPTON:  You always know when I am coming to an

03:51:03 20  end.

03:51:34 21    (Brief pause.)

03:53:19 22       THE WITNESS:  Counsel, can you refer me to the e-mail

03:53:23 23  which is from Mr. Grossman to me asking about the transporting

03:53:30 24  of the server?

03:53:31 25  BY MR. LIPTON:

| | | |
|---|---|---|
| 03:53:32 | 1 | Q.  Well, there were several. |
| 03:53:33 | 2 | A.  Do you have the date?  The very first one. |
| 03:53:36 | 3 | Q.  That would have been April 26th. |
| 03:54:06 | 4 | THE COURT:  I want the record to reflect that the |
| 03:54:08 | 5 | exhibit list that you've tendered to the witness is eight |
| 03:54:12 | 6 | pages long. |
| 03:54:17 | 7 | MR. LIPTON:  Sorry, your Honor. |
| 03:54:18 | 8 | THE COURT:  No, it's fine. |
| 03:55:34 | 9 | You know, if you don't mind, if he should discover |
| 03:55:36 | 10 | this e-mail, we will let him recall it. |
| 03:55:38 | 11 | MR. LIPTON:  Thank you, your Honor. |
| 03:55:39 | 12 | THE COURT:  He can't seem to find it at this time; is |
| 03:55:42 | 13 | that correct? |
| 03:55:42 | 14 | THE WITNESS:  I am not able to, but I would like to |
| 03:55:44 | 15 | draw your attention to this particular Exhibit No. 84. |
| 03:55:49 | 16 | BY MR. LIPTON: |
| 03:55:49 | 17 | Q.  Does it have anything to do with the question that I |
| 03:55:52 | 18 | asked? |
| 03:55:53 | 19 | A.  Yes.  In fact, it is -- a majority of the part of the |
| 03:56:02 | 20 | e-mail is redacted. |
| 03:56:03 | 21 | Q.  I'm sorry? |
| 03:56:03 | 22 | A.  A majority of the e-mail is redacted, but if you look at |
| 03:56:08 | 23 | the second page of that exhibit, 84. |
| 03:56:14 | 24 | Q.  Let me see if I can get a complete copy of that. |
| 03:56:22 | 25 | THE COURT:  Do you think it's in the redacted |

03:56:23  1   portion?

03:56:26  2          THE WITNESS:  I do not recall.

03:56:31  3   BY MR. LIPTON:

03:56:32  4   Q.  Okay.  I have Exhibit 84.  It's a four-page exhibit.

03:56:35  5   A.  Yes, second page --

03:56:37  6   Q.  Yes.

03:56:37  7   A.  -- there is a part.  C as in Charlie, Paresh is collecting

03:56:46  8   all the machines from the warehouse.  Paresh then to provide

03:56:51  9   list of server and machines and keep everything in a secure

03:56:54  10  location.  That was one thing.

03:56:56  11         And then around that time we had the meeting in my

03:57:01  12  office, in our office, Kanan Fashions, where it was being

03:57:09  13  verified that the server is still at the warehouse.

03:57:12  14  Q.  All right.  And also the last page -- strike that.

03:57:16  15         I believe it's the following exhibit, which is 85, is

03:57:22  16  an e-mail from Mr. Grossman to you dated April 26th at 1621

03:57:31  17  hours, which is just about an hour later than the e-mail you

03:57:35  18  referenced, and it says, Paresh, you are to transport from the

03:57:39  19  warehouse the server located there, as well as any other

03:57:43  20  personal computers.  All are to be brought to the Oak Brook

03:57:47  21  office and placed in a secure room.

03:57:49  22         Correct?

03:57:49  23  A.  That is correct.

03:57:49  24  Q.  And Mr. Grossman specifically referenced the server being

03:57:53  25  brought to Oak Brook and placed in a secure room, correct?

| | | |
|---|---|---|
| 03:57:57 | 1 | A. Yes. |
| 03:57:57 | 2 | Q. And you never got back to him and told him you couldn't do |
| 03:58:00 | 3 | it, did you? |
| 03:58:01 | 4 | A. I told them that we are working on that. |
| 03:58:05 | 5 | Q. Yeah, you said, we are working on it. |
| 03:58:07 | 6 | A. Yes. |
| 03:58:07 | 7 | Q. And, in fact, when you said you were working on it, you |
| 03:58:10 | 8 | weren't working on it at all, were you? |
| 03:58:11 | 9 | A. No, I was in Chicago working to buy the server. |
| 03:58:16 | 10 | Q. But you never told him that at the time, did you? |
| 03:58:18 | 11 | A. I do not recollect. |
| 03:58:19 | 12 | Q. I'm sorry? |
| 03:58:20 | 13 | A. I do not recollect. |
| 03:58:21 | 14 | Q. Okay. Let's take a look at Exhibit 78, please. Exhibit |
| 03:58:42 | 15 | 78 is an e-mail dated April 16. We've seen it before. The |
| 03:58:46 | 16 | time is 1448. It says -- it is from you to Eric Grossman, |
| 03:58:54 | 17 | copy Mehul, Shah, and Alan Borlack. |
| 03:58:59 | 18 | Eric, we are not aware of any suit or notice of |
| 03:59:02 | 19 | possession. Signed, Paresh. |
| 03:59:04 | 20 | Correct? |
| 03:59:05 | 21 | A. Yes. |
| 03:59:05 | 22 | Q. Okay. And then Exhibit 79, the following exhibit, is, |
| 03:59:11 | 23 | essentially, Mr. Grossman following up on April 16 at 1553. |
| 03:59:18 | 24 | And it's an e-mail to you, copied to Mr. Shah and Mr. Borlack, |
| 03:59:23 | 25 | and he concludes, So there have been no communications at all |

| | |
|---|---|
| 03:59:28 | 1 |
| 03:59:32 | 2 |
| 03:59:36 | 3 |
| 03:59:36 | 4 |
| 03:59:36 | 5 |
| 03:59:37 | 6 |
| 03:59:39 | 7 |
| 03:59:41 | 8 |
| 03:59:46 | 9 |
| 03:59:47 | 10 |
| 03:59:49 | 11 |
| 03:59:51 | 12 |
| 03:59:51 | 13 |
| 03:59:56 | 14 |
| 04:00:04 | 15 |
| 04:00:05 | 16 |
| 04:00:06 | 17 |
| 04:00:10 | 18 |
| 04:00:18 | 19 |
| 04:00:20 | 20 |
| 04:00:22 | 21 |
| 04:00:27 | 22 |
| 04:00:35 | 23 |
| 04:00:45 | 24 |
| 04:00:48 | 25 |

concerning default and payments and/or threats to repossess. And you respond, We are not aware of any suit or notice about possession.

Correct?

A. Yes.

Q. Okay.

MR. McJESSY: Judge, I'd like to object to this line of questioning. It's cumulative. Counsel already went through this previously.

MR. LIPTON: This is foundational, your Honor.

THE COURT: That's fine. Objection is overruled.

BY MR. LIPTON:

Q. Getting to Exhibit 80, and then Exhibit 80 is an e-mail dated April 16, 2010, time 1619, same string --

THE COURT: That's the top.

BY MR. LIPTON:

Q. Yes. That's correct. Same string, but this time it's from Paresh Joshi to Eric Grossman, copy Mehul Shah, Alan Borlack, and Steve Blumenthal.

Now, Steve Blumenthal hadn't been copied on any of those prior e-mails, had he, the two that I drew your attention to, Exhibits Nos. 78 and 79?

A. No, I don't see it.

Q. And all of a sudden, you are sending this entire string of e-mails to Steve Blumenthal dealing with repossession of the

04:00:51   1    server and demand for payment, correct?

04:00:54   2    A.  The only explanation that I have is that if the e-mail --

04:00:58   3    Q.  I'm sorry?

04:00:58   4    A.  The only explanation that I have is that if the e-mail

04:01:02   5    from Eric would have contained Mr. Blumenthal's name, then the

04:01:06   6    reply all, I would have -- it would have gone to

04:01:11   7    Mr. Blumenthal.

04:01:12   8    Q.  By "Eric," you mean Eric Grossman?

04:01:14   9    A.  Eric Grossman.

04:01:14   10    Q.  Well, look at the e-mail from Eric Grossman and see if it

04:01:19   11    contains Mr. Blumenthal's name.  It doesn't, does it?

04:01:22   12    A.  What date are you referring to?

04:01:29   13           THE COURT:  Are you referring to 78, 79?

04:01:33   14    BY MR. LIPTON:

04:01:35   15    Q.  78, 79, the bottom of 80.

04:01:37   16    A.  If you would look at the top of Exhibit 79, the Exhibit

04:01:43   17    79.

04:01:43   18    Q.  The top of Exhibit 79?

04:01:45   19    A.  Yes.

04:01:46   20    Q.  Yes, sir.

04:01:46   21    A.  Dated April 15th.

04:01:49   22    Q.  Yes.

04:01:50   23    A.  From Mr. Eric Grossman, and it does not copy to

04:01:54   24    Mr. Blumenthal.

04:01:55   25    Q.  That's right.

04:01:56  1   A.  And that's why when the reply went back, it did not go to

04:02:00  2   Mr. Blumenthal.

04:02:01  3   Q.  I'm sorry.

04:02:02  4   A.  Then when the reply went back, it did not copy to

04:02:07  5   Mr. Blumenthal.

04:02:07  6   Q.  But when you typed your e-mail --

04:02:11  7          THE COURT:  Which is No. 80.

04:02:11  8   BY MR. LIPTON:

04:02:12  9   Q.  -- which is No. 80, later that day, you included

04:02:16  10  Mr. Blumenthal.  Now, why did you do that?

04:02:17  11  A.  From here I cannot reply to you because I need to look at

04:02:47  12  the actual trail.

04:02:48  13  Q.  Well, you are looking at the actual trail.  These are the

04:02:50  14  exhibits, these are the e-mails, all three of them in line.

04:02:54  15  A.  Because to my understanding, normally, I would hit reply

04:02:57  16  all and that would do that.

04:02:59  17  Q.  Normally you would what?  I'm sorry.

04:03:01  18  A.  Reply all.  When I'm replying to e-mail, I would just hit

04:03:04  19  reply all.

04:03:05  20  Q.  Well, there is no indication on any of the prior e-mails

04:03:10  21  that Mr. Blumenthal was on there.  So are you telling me that

04:03:12  22  you didn't intentionally include Mr. Blumenthal on that

04:03:14  23  e-mail?

04:03:15  24  A.  That's what my understanding is.

04:03:17  25  Q.  Did you ever talk to Mr. Blumenthal about the fact that he

04:03:26   1   had received an e-mail from you on April 16; that is,

04:03:30   2   Exhibit 80?

04:03:31   3   A.  I am not talking about an e-mail.  I haven't talked with

04:03:36   4   Mr. Blumenthal.

04:03:36   5   Q.  But it's fair to surmise that based on Exhibit 80,

04:03:41   6   Mr. Blumenthal had notice of the repossession of the

04:03:44   7   computers, correct?

04:03:46   8   A.  I am not --

04:03:48   9          MR. McJESSY:  Objection, your Honor.

04:03:50  10          MR. LIPTON:  I'm sorry, your Honor.  Of the default.

04:03:52  11          THE COURT:  Sustained.

04:03:52  12   BY MR. LIPTON:

04:03:53  13   Q.  It's fair to surmise that as a result of your sending this

04:03:56  14   e-mail, No. 80, to Mr. Blumenthal, that he had notice that you

04:04:00  15   were in default of payments on the server, and he knew that,

04:04:07  16   correct?

04:04:08  17   A.  He noted on the e-mail, yes.

04:04:16  18          MR. LIPTON:  Nothing further.

04:04:16  19          THE COURT:  Thank you very much.

04:04:17  20          MR. LIPTON:  Thank you, your Honor.

04:04:18  21          THE COURT:  Do you have anything?

04:04:19  22          MS. DEDINAS:  No.

04:04:21  23          MR. McJESSY:  Judge, I actually have some follow-up.

04:04:23  24          THE COURT:  You have five minutes.

04:04:26  25          MR. McJESSY:  All right.

| | | |
|---|---|---|
| 04:04:40 | 1 | - - - |
| 04:04:40 | 2 | PARESH JOSHI, RECROSS-EXAMINATION |
| 04:04:42 | 3 | BY MR. McJESSY: |
| 04:04:42 | 4 | Q.  Mr. Joshi, you were asked about whether Bailey Borlack had |
| 04:04:46 | 5 | noticed at the end of February that the servers were still at |
| 04:04:48 | 6 | the warehouse. |
| 04:04:49 | 7 | A.  Yes. |
| 04:04:49 | 8 | Q.  Do you remember those questions? |
| 04:04:50 | 9 | A.  Yes. |
| 04:04:51 | 10 | Q.  If you could take a look at Exhibit 20.  Actually, I have |
| 04:04:51 | 11 | the wrong one. |
| 04:05:03 | 12 | If you could take a look at Exhibit 30. |
| 04:05:13 | 13 | A.  Yes, sir. |
| 04:05:14 | 14 | Q.  That's a letter, again, to Ms. Elizabeth Pendleton, the |
| 04:05:17 | 15 | law clerk to Judge Mason.  Did you receive a copy of that |
| 04:05:21 | 16 | letter? |
| 04:05:21 | 17 | A.  Yes, sir. |
| 04:05:22 | 18 | Q.  All right.  And the letter states at the end of the second |
| 04:05:26 | 19 | paragraph, The sixth server is located at 1103 Butterfield |
| 04:05:33 | 20 | Road, Aurora, IL, 60504.  Do you see that? |
| 04:05:35 | 21 | A.  I do see that. |
| 04:05:36 | 22 | Q.  Was that accurate as of February 26th? |
| 04:05:38 | 23 | A.  Yes, sir. |
| 04:05:39 | 24 | Q.  And this letter came from Bailey Borlack? |
| 04:05:40 | 25 | A.  Yes, sir. |

| | | |
|---|---|---|
| 04:05:42 | 1 | Q. So they were aware, at least as of February 26th, that the |
| 04:05:45 | 2 | server was still at the warehouse? |
| 04:05:47 | 3 | A. Yes, sir. |
| 04:05:47 | 4 | Q. All right. And then if you could turn back to the exhibit |
| 04:05:53 | 5 | that counsel had you look at, Exhibit 111, SH 111. |
| 04:06:19 | 6 | MR. LIPTON: What exhibit? |
| 04:06:21 | 7 | MR. McJESSY: 111. |
| 04:06:23 | 8 | BY MR. McJESSY: |
| 04:06:24 | 9 | Q. That's an e-mail to you from Eric Grossman; is that right? |
| 04:06:26 | 10 | A. Yes, sir. |
| 04:06:28 | 11 | Q. And it begins, in our telephone conversation, you |
| 04:06:29 | 12 | indicated you are still working on getting control of the |
| 04:06:31 | 13 | warehouse server. |
| 04:06:32 | 14 | As of May, Bailey Borlack still understood that the |
| 04:06:35 | 15 | server was at the warehouse; is that right? |
| 04:06:37 | 16 | A. That is correct. |
| 04:06:38 | 17 | Q. All right. And at the bottom of the letter, there is a |
| 04:06:41 | 18 | paragraph that begins, one way another. Do you see that? |
| 04:06:46 | 19 | A. Yes. |
| 04:06:47 | 20 | Q. This is the paragraph that counsel had you draw your |
| 04:06:49 | 21 | attention to. One way or another, we have to have information |
| 04:06:53 | 22 | about the server and as soon as possible. But one of two |
| 04:06:59 | 23 | things must happen: either get control of the server or have |
| 04:07:02 | 24 | a copy of the server contents made, and then it goes on from |
| 04:07:07 | 25 | there. |

04:07:07  1   At this time, your attorneys were aware that you

04:07:10  2  didn't have control of the server; is that right?

04:07:12  3  A.  That is correct.

04:07:12  4  Q.  Were they aware of the foreclosure and eviction?

04:07:20  5  A.  Yes.

04:07:20  6   THE COURT:  And that's an e-mail, not a letter.

04:07:22  7   MR. McJESSY:  I'm sorry.  It is an e-mail.  Thank

04:07:24  8  you, your Honor.

04:07:25  9  BY MR. McJESSY:

04:07:35  10  Q.  Do you know whether your attorneys issued subpoenas in

04:07:37  11  this lawsuit?

04:07:37  12  A.  Are you referring to a particular subpoena?

04:07:44  13  Q.  They have issued subpoenas in this lawsuit?

04:07:47  14   MS. DEDINAS:  Objection.

04:07:48  15   THE COURT:  When you say their attorneys.

04:07:49  16   MR. McJESSY:  I'm sorry.

04:07:52  17  BY MR. McJESSY:

04:07:52  18  Q.  Do you know whether Bailey Borlack and Nadelhoffer issued

04:07:55  19  subpoenas in this case?

04:07:55  20  A.  I think.

04:07:56  21  Q.  Did you tell them to do that?

04:07:57  22  A.  No.

04:07:58  23  Q.  They just did that?

04:07:59  24  A.  Yes.

04:08:01  25   MR. McJESSY:  I don't have any other questions, your

| | | |
|---|---|---|
| 04:08:02 | 1 | Honor. |
| 04:08:02 | 2 | THE COURT:  Thank you. |
| 04:08:06 | 3 | MR. LIPTON:  Nothing further. |
| 04:08:09 | 4 | THE COURT:  You may step down. |
| 04:08:09 | 5 | (Witness leaves the stand.) |
| 04:08:09 | 6 | THE COURT:  Call your next witness. |
| 04:08:10 | 7 | MS. DEDINAS:  Yes, Mr. Clark. |
| 04:08:12 | 8 | THE COURT:  What did you say?  I'm sorry. |
| 04:08:14 | 9 | MS. DEDINAS:  Mr. Clark. |
| 04:08:17 | 10 | MR. McJESSY:  Your Honor, could we have two minutes? |
| 04:08:20 | 11 | THE COURT:  If you have to go to the restroom, go |
| 04:08:22 | 12 | ahead.  We will wait for you. |
| 04:08:51 | 13 | (Brief pause.) |
| 04:11:24 | 14 | (Witness sworn.) |
| 04:11:24 | 15 | THE COURT:  Mr. Clark, just make sure that you -- you |
| 04:11:27 | 16 | don't have to lean up towards it, but speak up so everybody |
| 04:11:30 | 17 | can hear you.  If there is an objection made, please wait |
| 04:11:32 | 18 | until I rule before you try to answer. |
| 04:11:35 | 19 | THE WITNESS:  Thank you. |
| 04:11:35 | 20 | - - - |
| 04:11:35 | 21 | DAVID CLARK, DIRECT EXAMINATION |
| 04:11:35 | 22 | BY MS. DEDINAS: |
| 04:11:38 | 23 | Q.  Good afternoon, Mr. Clark.  Thanks for waiting. |
| 04:11:40 | 24 | A.  Good afternoon. |
| 04:11:40 | 25 | Q.  Who are you employed by? |

04:11:44　1　A.　First Midwest Bank.

04:11:45　2　Q.　And what's your position there?

04:11:47　3　A.　Vice president.

04:11:47　4　Q.　And prior to that, you were employed by my client, United

04:11:53　5　Central Bank; is that correct?

04:11:53　6　A.　Yes, ma'am.

04:11:55　7　　　　MS. DEDINAS:　Your Honor, I should ask before I

04:11:56　8　begin, if I may have permission to lead.　He is a hostile

04:12:01　9　witness.

04:12:01　10　　　　THE COURT:　Sure.

04:12:02　11　BY MS. DEDINAS:

04:12:03　12　Q.　Now, you were fired from that position at United Central

04:12:06　13　Bank, weren't you?

04:12:07　14　A.　I was terminated, yes, ma'am.

04:12:08　15　Q.　Okay.　Before you got there, First Midwest Bank had

04:12:14　16　acquired a 100 percent participation interest in Mutual Bank's

04:12:19　17　loans to Kanan Fashions and Creative Warehousing to build

04:12:22　18　their warehouse.　Were you aware of that?

04:12:24　19　A.　I'm sorry.　Before I got where?

04:12:26　20　Q.　Before you got to First Midwest Bank.

04:12:31　21　A.　Yes.

04:12:31　22　Q.　And you learned that when you arrived there; is that

04:12:31　23　right?

04:12:35　24　A.　No.

04:12:35　25　Q.　When did you learn that?

04:12:36    1   A.  While I was at United Central.

04:12:39    2   Q.  I see.  Okay.

04:12:40    3           And you're aware that the loan to Creative

04:12:46    4   Warehousing that First Midwest has the participation in was

04:12:49    5   secured by the actual warehouse in Aurora; is that right?

04:12:59    6   A.  Considerable more than the warehouse; but, yes, it was,

04:13:01    7   yes.

04:13:02    8   Q.  And there's also a UCC filing, right?

04:13:04    9   A.  Yes.

04:13:04   10   Q.  Now, do you recall when the Creative Warehousing loan went

04:13:08   11   into default?

04:13:09   12   A.  It went into default in August.

04:13:17   13           THE COURT:  Of what year?

04:13:20   14           THE WITNESS:  2009.

04:13:21   15   BY MS. DEDINAS:

04:13:21   16   Q.  And in November of 2009, did you contact Mr. Shah's

04:13:26   17   attorney, Steven Blumenthal, to attempt to work out of that

04:13:30   18   default?

04:13:31   19   A.  Yes, I did.

04:13:32   20   Q.  And did you eventually work out a deal?

04:13:34   21   A.  Not after that conversation, no.

04:13:36   22   Q.  Eventually.

04:13:37   23   A.  Eventually, yes.

04:13:38   24   Q.  And I just want to briefly describe the deal so you and I

04:13:44   25   are on the same page.  The deal would be that First Midwest

| | | |
|---|---|---|
| 04:13:48 | 1 | Bank would obtain title to the property at 1103 Butterfield |
| 04:13:53 | 2 | Road in Aurora, taking subject to a preexisting lease with |
| 04:13:57 | 3 | Kanan Fashions and Creative Warehousing in exchange for a |
| 04:14:02 | 4 | release of the note -- the entire indebtedness and the |
| 04:14:06 | 5 | personal guaranty of Mr. Shah.  Is that a fair summary? |
| 04:14:10 | 6 | A.  It sounds about as close as it could get.  We took a deed |
| 04:14:16 | 7 | subject to our release of the mortgage, yes. |
| 04:14:21 | 8 | Q.  And you also then released Mr. Shah's personal guaranty on |
| 04:14:26 | 9 | the note? |
| 04:14:28 | 10 | A.  As part of the transaction, yes, we did. |
| 04:14:29 | 11 | Q.  Yes.  So to the extent that there would have been any |
| 04:14:33 | 12 | deficiency when you sold the building, you were releasing your |
| 04:14:36 | 13 | ability to go after Mr. Shah personally for the deficiency, |
| 04:14:39 | 14 | right? |
| 04:14:40 | 15 | A.  Yes, ma'am. |
| 04:14:40 | 16 | Q.  Now, there was also a license agreement, wasn't there? |
| 04:14:51 | 17 | You don't recall? |
| 04:14:51 | 18 | A.  I don't recall a license agreement. |
| 04:14:53 | 19 | Q.  Okay.  Do you recall any kind of an agreement which gave |
| 04:14:57 | 20 | First Midwest Bank a right to possession to the building while |
| 04:15:03 | 21 | Kanan Fashions was still a tenant so that First Midwest Bank |
| 04:15:07 | 22 | could store things in the building? |
| 04:15:09 | 23 | A.  There may have been since the building was taken as bank |
| 04:15:18 | 24 | property and it was taken for storage, a licensing agreement |
| 04:15:22 | 25 | may have been worked on, yes.  I couldn't recall that, no. |

04:15:25  1  Q.  And was it the bank's intention to use the building to

04:15:31  2  store its own property there until it was able to sell the

04:15:36  3  building?

04:15:36  4  A.  It is still the bank's intention of that.

04:15:38  5  Q.  I just want an answer to my question.  Was that the

04:15:41  6  intention?

04:15:42  7  A.  Yes.

04:15:42  8  Q.  And did the bank eventually do that?

04:15:45  9  A.  Yes.

04:15:46  10  Q.  And does it still continue to store property there?

04:15:50  11  A.  Yes.

04:15:50  12  Q.  What kind of property does it store there?

04:15:51  13  A.  Records.

04:15:52  14  Q.  Okay.  And did it begin storing records there immediately

04:15:57  15  after the deed in lieu transaction?

04:16:00  16  A.  I have no idea of when they began.

04:16:02  17  Q.  But shortly thereafter, right?

04:16:04  18  A.  I believe so.

04:16:05  19  Q.  Okay.  Now, there was also an agreement whereby First

04:16:13  20  Midwest Bank granted Creative Warehousing a lease commitment.

04:16:16  21  Do you recall that?

04:16:16  22  A.  A lease commitment?

04:16:21  23  Q.  Um-hmm.

04:16:22  24  A.  We offered them first option to lease, yes.

04:16:26  25  Q.  So by that, do you mean that you would have given them an

04:16:31 1 option to find a tenant to lease a portion of the warehouse

04:16:35 2 from First Midwest Bank?

04:16:36 3 A.  Yes.

04:16:36 4 Q.  And do you remember who was the entity that it was going

04:16:40 5 to lease the building?

04:16:42 6 A.  I don't remember that.

04:16:43 7 Q.  Do you recall that the contemplated tenant was Creative or

04:16:48 8 its permitted assignee?

04:16:50 9 A.  That sounds correct.

04:16:52 10 Q.  Okay.  So now when you had this building, the deed in lieu

04:16:58 11 of foreclosure transaction occurred on or about March 15th; is

04:16:58 12 that right?

04:17:02 13 A.  March 24th, if I remember correctly.

04:17:05 14 Q.  Okay.  24th for the eviction, right?

04:17:07 15 A.  Yes.

04:17:07 16 Q.  And this is 2010?

04:17:09 17 A.  Yes.

04:17:09 18 Q.  You had two choices, right?  You could sell the building

04:17:15 19 with a tenant, or you could sell the building empty.  Is

04:17:20 20 that --

04:17:20 21 A.  No.

04:17:21 22 Q.  Or you could hold it?

04:17:22 23 A.  Yes.

04:17:22 24 Q.  Okay.  And was it the bank's intention to attempt to sell

04:17:27 25 the building?

| | | |
|---|---|---|
| 04:17:28 | 1 | A.  No. |
| 04:17:28 | 2 | Q.  What was the bank's intention? |
| 04:17:30 | 3 | A.  To hold the building. |
| 04:17:31 | 4 | Q.  Okay.  You had no intention to market the building for |
| 04:17:35 | 5 | sale? |
| 04:17:35 | 6 | A.  The building is in bank property.  It's not up for sale. |
| 04:17:38 | 7 | Q.  Was it up for sale at any time? |
| 04:17:41 | 8 | A.  It's never been listed. |
| 04:17:42 | 9 | Q.  Did you ever engage a broker to try to sell the property? |
| 04:17:46 | 10 | A.  I have discussed with a broker and have an agreement that |
| 04:17:49 | 11 | if he finds a buyer at the right price, the bank would |
| 04:17:52 | 12 | consider selling, but it is not, in essence, listed for sale, |
| 04:17:57 | 13 | no. |
| 04:17:57 | 14 | Q.  So it's not formally listed for sale and it's not on the |
| 04:18:01 | 15 | multiple listing service, correct? |
| 04:18:03 | 16 | A.  If the right buyer came along, we would sell the building, |
| 04:18:06 | 17 | yes. |
| 04:18:06 | 18 | Q.  And, in fact, there is a brokerage, Darwin Realty, that |
| 04:18:11 | 19 | has been working with you in order to try to find a buyer for |
| 04:18:14 | 20 | the building; isn't that right? |
| 04:18:16 | 21 | A.  That's correct. |
| 04:18:16 | 22 | Q.  Okay.  Now, do you have an idea of what difference in |
| 04:18:24 | 23 | price the bank could get if it were to sell the building with |
| 04:18:29 | 24 | a tenant in it as opposed to vacant? |
| 04:18:35 | 25 | A.  It depends on the per square foot lease, so if you're |

04:18:44 1  referring to the potential contract I got, yes, I know, but

04:18:48 2  that's based on a lease that was prepared at a certain price

04:18:52 3  per square foot.  If that price goes down, the price of the

04:18:56 4  building goes down.

04:18:56 5  Q.  Would it be fair to say that if the bank were to sell the

04:19:02 6  building with a tenant in it, it would get significantly more

04:19:06 7  money on sale?

04:19:08 8  A.  I don't know that that's -- if I sold it with a retail

04:19:19 9  client in it, it would get significantly more money since the

04:19:22 10  rents are higher.  But if the rents were on today's basis, no,

04:19:26 11  I would not get a higher sale price.

04:19:28 12  Q.  So it would depend on the kind of tenant?

04:19:31 13  A.  Yes, ma'am.

04:19:31 14  Q.  Okay.  Now, isn't it a fact that you have received offers

04:19:36 15  on the building in which you would get one price for the

04:19:39 16  building if you had a tenant in it and a lower price if you

04:19:43 17  did not?

04:19:43 18  A.  Yes.

04:19:45 19  Q.  And some of these higher offers -- do you remember how

04:19:51 20  many of these you got, by the way?

04:19:53 21  A.  At least two.  I couldn't tell you if I had more.

04:19:56 22  Q.  Could it be as many as four?

04:19:59 23  A.  It might.  I, sitting here, can't remember.

04:20:05 24  Q.  Okay.  Well, let's refresh that then.

04:20:07 25       Do you recall that some of the higher offers were

04:20:15   1    specifically contingent upon Kanan Fashions or Mehul Shah's

04:20:22   2    company being a tenant in the building?

04:20:23   3    A.  There was an offer at one time that I rejected because of

04:20:28   4    that.

04:20:30   5          MS. DEDINAS:  I am going to object as nonresponsive

04:20:31   6    and move to strike.

04:20:33   7          THE COURT:  Sustained.  I will grant your move to

04:20:38   8    strike.

04:20:42   9    BY MS. DEDINAS:

04:20:42  10    Q.  I need a yes-or-no answer to my question.

04:20:44  11    A.  I believe there was.

04:20:45  12    Q.  So I'd like you to take a look at the exhibit books that

04:20:52  13    we have at Exhibit -- let's start with 138.  Now, the first

04:21:09  14    page is a transmittal which is redacted, so I'd actually like

04:21:14  15    you to take a look at the second page of that exhibit.  And

04:21:18  16    that is a letter from Sitex Realty Group dated July 7th, 2010,

04:21:23  17    to you regarding 1103 Butterfield Road, Aurora.  I will wait

04:21:30  18    until you find the page.

04:21:31  19    A.  Yes, it is.

04:21:32  20    Q.  Do you see that?

04:21:32  21    A.  Yes.

04:21:32  22    Q.  And is that an offer to purchase the Aurora Creative

04:21:36  23    Warehousing warehouse?

04:21:36  24    A.  It's a letter of intent, yes.

04:21:38  25    Q.  It's a letter of intent.

04:21:40  1     And what's the purchase price that's being offered?

04:21:43  2  A.  Seller -- the purchaser would request a sale price of 6.5

04:21:51  3  million if there was a tenant at $3.60 per square foot, and

04:22:02  4  that's it.

04:22:02  5  Q.  Okay.  Now, do you see under scenario one, revised

04:22:07  6  scenario one, under purchase price?

04:22:09  7  A.  Yes.

04:22:09  8  Q.  Where it says, If a full building lease is executed with

04:22:13  9  Mehul Shah or related entity on or about closing, then buyer

04:22:18  10  shall pay the seller purchase price of $6,500,000, do you see

04:22:23  11  that?

04:22:24  12  A.  Yes, I do.

04:22:24  13  Q.  And do you see under scenario two, it says, If building is

04:22:28  14  delivered vacant with no lease in place at time of closing,

04:22:32  15  then the purchase price shall be $4 million?  Do you see that?

04:22:36  16  A.  Yes, I do.

04:22:37  17  Q.  So under this specific offer, the bank would have got $2.5

04:22:43  18  million more if there had been a lease to go with the sale of

04:22:49  19  the building, specifically with either Mehul Shah or one of

04:22:55  20  his related entities; isn't that correct?

04:23:00  21  A.  Yes.

04:23:00  22  Q.  Let's take a look at Exhibit 149.  Again, the first page

04:23:14  23  is redacted.  And what I am interested in is the third page of

04:23:19  24  that exhibit.  Do you see that?

04:23:33  25  A.  Yes, ma'am.

04:23:34 1 Q. And that is a letter from HCR Capital Partners dated

04:23:37 2 July 21st, 2010, to George and Anthony regarding 1103

04:23:42 3 Butterfield Road. And this is a letter of intent again -- is

04:23:45 4 this a letter of intent to purchase the Aurora Creative

04:23:50 5 Warehousing property?

04:23:51 6 A. Yes, it is.

04:23:54 7 Q. And can you tell me what the -- whether there are two

04:23:58 8 possible purchase prices in this offer.

04:24:03 9 A. Yes, there are.

04:24:04 10 Q. And what are they?

04:24:05 11 A. 6.5 million on a leased up and 4.1 if it's vacant.

04:24:11 12 Q. Okay. And do you see here under purchase price, it says,

04:24:18 13 The seller shall have until a mutually-agreeable predetermined

04:24:22 14 date to negotiate a lease with Kanan Group subject to basic

04:24:27 15 economic terms outlined below?

04:24:29 16 A. Yes.

04:24:29 17 Q. Now, these are two examples. Are you aware that there are

04:24:34 18 also offers that came in from Bridge Development Partners and

04:24:39 19 DCT Industrial Trust?

04:24:43 20 A. I am not aware of those as I sit here, but I knew I had

04:24:48 21 other offers, yes.

04:24:49 22 Q. And do you know whether they also separated out two

04:24:58 23 different price points --

04:25:00 24 A. I don't recall that.

04:25:01 25 Q. You don't recall. Okay.

04:25:03   1        So in short, Mr. Clark, would you agree with me that

04:25:09   2 the bank stood to get in the range of $2 million more if there

04:25:18   3 was a lease with the building with Mr. Shah or one of

04:25:21   4 Mr. Shah's entities?

04:25:24   5 A. If the bank had agreed to sell, yes.

04:25:28   6 Q. Okay. Now, as part of this deal, and I mean the whole

04:25:40   7 deed in lieu and the lease commitment, Mr. Shah asked First

04:25:47   8 Midwest Bank to intercede on his behalf and negotiate a

04:25:51   9 purchase of the lease and the corresponding personal guaranty

04:25:56  10 from Associated Bank for the warehouse server; is that

04:26:00  11 correct?

04:26:00  12 A. That's correct.

04:26:01  13 Q. And you know what the warehouse server is what we're

04:26:04  14 referring to?

04:26:04  15 A. I believe I do.

04:26:06  16 Q. Okay. What is it?

04:26:07  17 A. The server that was at the warehouse.

04:26:10  18 Q. It's a computer, correct?

04:26:12  19 A. Yes.

04:26:12  20 Q. Okay. And First Midwest Bank isn't in the business of

04:26:19  21 buying and selling used computer equipment, is it?

04:26:21  22 A. Not that I know of.

04:26:24  23 Q. Or leases for used computer equipment, right?

04:26:28  24 A. I don't know what other leases the bank may or may not

04:26:32  25 have purchased. I am not.

04:26:33  1  Q.  Not in your experience, right?

04:26:35  2  A.  No.

04:26:35  3  Q.  So you were doing this simply as an accommodation for

04:26:39  4  Mr. Shah, or was it because there was also some financial

04:26:45  5  advantage to the bank?

04:26:45  6  A.  I was doing it so I could get the transaction completed to

04:26:52  7  own the warehouse.

04:26:52  8  Q.  And how is that going to help you accomplish that goal?

04:26:57  9  A.  I was to agree to that negotiation to complete the

04:27:03  10  transaction for the deed in lieu.

04:27:04  11  Q.  So it's because Mr. Shah wanted it so much that if you

04:27:09  12  were to accede to that demand, the deed in lieu transaction

04:27:14  13  would go smoothly?

04:27:15  14  A.  That's what my attorney told me, yes.

04:27:17  15  Q.  And did you understand that Mr. Shah wanted to keep the

04:27:21  16  server to use in a new business that would be the lessee in

04:27:24  17  the warehouse?

04:27:25  18  A.  No, ma'am, I did not.

04:27:26  19  Q.  You didn't have any understanding of that?

04:27:27  20  A.  No.

04:27:28  21  Q.  So why do you think all these other purchasers kept

04:27:34  22  referring to a lease with Mr. Shah or Mr. Shah's group?

04:27:36  23  A.  Part of the deed in lieu transaction also included a

04:27:42  24  six-month option to Kanan and Creative to allow them to lease

04:27:50  25  the building.  This was during that six-month period.

| | | |
|---|---|---|
| 04:27:53 | 1 | Q. So it was contemplated that there would be another |
| 04:27:56 | 2 | business by Mr. Shah that would lease the warehouse, wasn't |
| 04:27:58 | 3 | that the plan? |
| 04:27:59 | 4 | A. That's part of the transaction -- it was written into the |
| 04:28:01 | 5 | transaction that we had to have a six-month time to lease it |
| 04:28:05 | 6 | out, yes. |
| 04:28:05 | 7 | Q. To let them start a new business, right? |
| 04:28:08 | 8 | A. Yes. |
| 04:28:08 | 9 | Q. And you understood that they wanted to have this server |
| 04:28:11 | 10 | for their new business? |
| 04:28:13 | 11 | A. No, ma'am. |
| 04:28:13 | 12 | Q. You didn't? |
| 04:28:14 | 13 | A. No. |
| 04:28:14 | 14 | Q. Why -- did anybody tell you why they wanted the server? |
| 04:28:19 | 15 | A. No one told me they wanted the server at all. They wanted |
| 04:28:23 | 16 | the guaranty. |
| 04:28:24 | 17 | Q. I see. So Mr. Shah's focus was entirely on the guaranty |
| 04:28:27 | 18 | as you understood it? |
| 04:28:28 | 19 | A. Yes, ma'am. |
| 04:28:29 | 20 | Q. And why is that? |
| 04:28:29 | 21 | A. Associated Bank was -- had a remaining balance over |
| 04:28:38 | 22 | 300,000, if I remember correct, on their lease. Their lease |
| 04:28:41 | 23 | was basically a software lease. And Mr. Shah did not have |
| 04:28:46 | 24 | $300,000 to give them. |
| 04:28:48 | 25 | Q. Okay. Now, let's see if I understand how this was going |

| | | |
|---|---|---|
| 04:29:03 | 1 | to work.  You were going to negotiate, you, First Midwest |
| 04:29:07 | 2 | Bank, was going to negotiate with Associated Bank for the |
| 04:29:11 | 3 | purchase of the guaranty, the lease, and the server.  And then |
| 04:29:16 | 4 | Mr. Shah was going to pay you back; is that right? |
| 04:29:20 | 5 | A.  No, ma'am.  I was only going to negotiate for the purchase |
| 04:29:22 | 6 | of the lease. |
| 04:29:22 | 7 | Q.  You were only going to negotiate for the purchase of the |
| 04:29:25 | 8 | lease? |
| 04:29:26 | 9 | A.  Yes. |
| 04:29:26 | 10 | Q.  Not the server? |
| 04:29:27 | 11 | A.  Whoever owned the lease owned the server. |
| 04:29:30 | 12 | Q.  Okay.  So you were going to negotiate for the purchase of |
| 04:29:34 | 13 | the lease? |
| 04:29:35 | 14 | A.  Yes. |
| 04:29:35 | 15 | Q.  And was that going to include the guaranty? |
| 04:29:37 | 16 | A.  Yes. |
| 04:29:37 | 17 | Q.  Okay.  And then having accomplished that, Mr. Shah was |
| 04:29:42 | 18 | going to pay you back? |
| 04:29:43 | 19 | A.  That was the proposition, yes. |
| 04:29:45 | 20 | Q.  Okay.  And based on that, did you begin negotiations with |
| 04:29:54 | 21 | Associated Bank? |
| 04:29:55 | 22 | A.  Yes, I did. |
| 04:29:56 | 23 | Q.  Let me switch gears a little bit right now and just talk |
| 04:30:05 | 24 | about the server at the warehouse.  After signing the deed in |
| 04:30:09 | 25 | lieu, the bank received keys to the warehouse, right? |

04:30:13  1   A.  That's correct.

04:30:14  2   Q.  And then you became the only holder of the keys to the

04:30:18  3   doors to the warehouse; is that correct?

04:30:20  4   A.  We immediately changed the locks on the warehouse.

04:30:23  5   Q.  So nobody else could get in except for you?

04:30:26  6   A.  Bank properties are managed by U.S. Equities, so U.S.

04:30:31  7   Equities is the only party that can get into the warehouse,

04:30:33  8   yes.

04:30:33  9   Q.  So did First Midwest Bank also have keys?

04:30:36  10  A.  Not to the best of my knowledge.

04:30:39  11  Q.  Just U.S. Equities?

04:30:40  12  A.  Yes.

04:30:40  13  Q.  And so if you wanted to get into the building, you had to

04:30:43  14  contact U.S. Equities?

04:30:44  15  A.  I called U.S. Equities.

04:30:46  16  Q.  Okay.

04:30:47  17          THE COURT:  That didn't answer the question.

04:30:48  18          THE WITNESS:  Yes, you had to call U.S. Equities.

04:30:51  19  BY MS. DEDINAS:

04:30:51  20  Q.  But my question is, were they the only ones with the keys

04:30:54  21  to the building?

04:30:55  22  A.  Again, to the best of my knowledge.

04:30:57  23  Q.  On March 16th, 2010, after the deed in lieu of foreclosure

04:31:04  24  transaction had closed, you were copied on an e-mail from

04:31:08  25  Steve Blumenthal to William Serritella and Mehul Shah.  And

| | | |
|---|---|---|
| 04:31:14 | 1 | that is Exhibit 46.  Take a look at that. |
| 04:31:30 | 2 | A.  Yes, ma'am, I see that. |
| 04:31:31 | 3 | Q.  Do you recall getting that e-mail? |
| 04:31:33 | 4 | A.  I don't recall getting it.  I recall seeing it through my |
| 04:31:39 | 5 | deposition, yes. |
| 04:31:40 | 6 | Q.  And in your deposition, did you admit that you received |
| 04:31:44 | 7 | the e-mail? |
| 04:31:45 | 8 | A.  Yes. |
| 04:31:45 | 9 | Q.  Now, it says here that, As part of documenting our right |
| 04:32:02 | 10 | to reacquire those items, I need to make sure that the hard |
| 04:32:06 | 11 | drive and the system are accessible before we reacquire since |
| 04:32:08 | 12 | those items will be relevant to the UCB litigation and |
| 04:32:13 | 13 | discovery.  Accordingly, until the outside date by which we |
| 04:32:14 | 14 | must reacquire the items and repay the bank, I need the bank |
| 04:32:17 | 15 | to agree that they will preserve the items and allow access to |
| 04:32:25 | 16 | UCB or us in connection with the litigation. |
| 04:32:28 | 17 |         Do you see that? |
| 04:32:28 | 18 | A.  Yes, ma'am. |
| 04:32:29 | 19 | Q.  What did that language mean to you? |
| 04:32:31 | 20 | A.  He was making a request of our attorney. |
| 04:32:35 | 21 | Q.  Did you discuss this request with your attorney? |
| 04:32:38 | 22 | A.  No, ma'am. |
| 04:32:38 | 23 | Q.  Never? |
| 04:32:39 | 24 | A.  No. |
| 04:32:40 | 25 | Q.  Did anybody advise you that you were to abide by this |

04:32:45   1    request?

04:32:45   2    A.  No, ma'am.

04:32:46   3    Q.  And, in your opinion, were you bound by this request in

04:32:50   4    any way?

04:32:50   5    A.  No, ma'am.

04:32:51   6    Q.  Why not?

04:32:52   7    A.  It was just a request.  I never agreed.

04:32:59   8    Q.  And you did know that the server did have data on them

04:33:08   9    that were relevant to the litigation?

04:33:10   10    A.  I have no idea what was on the server.

04:33:11   11    Q.  Okay.  But in this e-mail, you are being told that

04:33:16   12    there's -- there are items that are relevant to the

04:33:19   13    litigation?

04:33:21   14    A.  That's what that e-mail says.

04:33:23   15    Q.  Okay.  And so you didn't feel like you ought to pause

04:33:28   16    before -- and ask somebody about what that meant?

04:33:32   17    A.  Well, that was March 16th.  I did pause.  I sold it late

04:33:39   18    July.

04:33:42   19    Q.  And did you discuss with anybody at First Midwest Bank or

04:33:47   20    your counsel about whether or not you should sell the computer

04:33:51   21    in light of this admonition?

04:33:54   22    A.  I don't know that anyone other than myself at First

04:33:59   23    Midwest would have seen this e-mail.

04:34:00   24            THE COURT:  That doesn't answer the question.

04:34:02   25            THE WITNESS:  No, no one at First Midwest.  I did

04:34:06  1  discuss it with my counsel.

04:34:08  2  BY MS. DEDINAS:

04:34:08  3  Q.  You did discuss it with your counsel?

04:34:09  4  A.  Yes.

04:34:09  5  Q.  And were you satisfied that you had no obligation to hold

04:34:15  6  the computer?

04:34:16  7  A.  Yes, I was.

04:34:17  8  Q.  Now, there's been some talk today that you were requiring

04:34:39  9  a court order for anybody to have access to this server; is

04:34:44  10  that -- you're aware of that, right?

04:34:46  11  A.  Yes, I am.

04:34:47  12  Q.  Okay.  Now, you weren't requiring a court order because

04:34:50  13  you felt First Midwest Bank had a duty to preserve data that

04:34:55  14  was relevant to litigation, were you?

04:34:57  15  A.  The bank -- the building now contains very private bank

04:35:03  16  records from bank acquisitions.  To allow anyone into the

04:35:08  17  building, I would need a subpoena or a court order, as I refer

04:35:11  18  to it.

04:35:12  19  Q.  And how would a court order help protect the bank's

04:35:16  20  confidentiality?

04:35:17  21  A.  I would then go to my bank properties people and say, they

04:35:22  22  have to get in.  Otherwise, why would my bank properties

04:35:26  23  people say, Dave, we have private records there.

04:35:30  24  Q.  And that couldn't be solved by somebody accompanying and

04:35:32  25  supervising somebody who came to look at the server?

04:35:36  1  A.  I have no idea.  My bank properties people wanted a court

04:35:39  2  order.

04:35:39  3  Q.  Who at your bank instructed you that you needed a court

04:35:43  4  order?

04:35:43  5  A.  I don't think it was anyone at my bank.  My counsel did.

04:35:47  6  Q.  Your counsel told you that you needed to get a court order

04:35:51  7  before you allowed anybody to look at the server?

04:35:55  8  A.  Yes.

04:35:55  9  Q.  And that counsel was Mr. Serritella?

04:36:02  10  A.  Yes.

04:36:02  11  Q.  And when did he tell you that?

04:36:15  12  A.  I couldn't recall, ma'am.

04:36:17  13  Q.  Well --

04:36:20  14  A.  Sometime after I took possession of the building.

04:36:22  15  Q.  Was it before the summer?

04:36:24  16  A.  I don't know that.

04:36:25  17  Q.  Nothing -- you can't remember whether it was in April,

04:36:31  18  May?

04:36:32  19  A.  I can't remember that, no.

04:36:34  20  Q.  Okay.  Now, when you were entertaining buyers for the

04:36:48  21  building, did you have people that came to the building to

04:36:52  22  look at it for purposes of giving an offer to purchase it?

04:36:57  23  A.  Under the guard of bank properties, yes.

04:36:59  24  Q.  So you did have -- you had people that came onto the

04:37:03  25  property to look at the building, right?

| | | |
|---|---|---|
| 04:37:05 | 1 | A.  With bank properties, yes, ma'am. |
| 04:37:07 | 2 | Q.  But they didn't have a court order? |
| 04:37:09 | 3 | A.  They were only looking at the property itself -- |
| 04:37:12 | 4 | THE COURT:  That's not answering the question. |
| 04:37:13 | 5 | THE WITNESS:  Yes, they did not have a court order. |
| 04:37:16 | 6 | BY MS. DEDINAS: |
| 04:37:16 | 7 | Q.  They were, in fact, your invitees, weren't they?  You |
| 04:37:21 | 8 | invited them onto the property in order to look at the |
| 04:37:25 | 9 | building itself for purposes of making an offer to purchase |
| 04:37:28 | 10 | it? |
| 04:37:29 | 11 | A.  Yes. |
| 04:37:30 | 12 | Q.  And who escorted them when they came to the building? |
| 04:37:35 | 13 | A.  U.S. Equities. |
| 04:37:36 | 14 | Q.  You did not? |
| 04:37:37 | 15 | A.  No, ma'am. |
| 04:37:38 | 16 | Q.  Okay.  And did U.S. Equities keep a log of who came and |
| 04:37:50 | 17 | left the building because of the sensitive nature of the |
| 04:37:53 | 18 | documents stored there? |
| 04:37:54 | 19 | A.  Not to the best of my knowledge. |
| 04:37:55 | 20 | Q.  You didn't require them to do that? |
| 04:37:58 | 21 | A.  No, ma'am, I don't work in bank properties. |
| 04:38:01 | 22 | Q.  Now, when you were negotiating to buy the server from |
| 04:38:21 | 23 | Associated Bank, did you have an opinion as to what the server |
| 04:38:29 | 24 | itself was worth? |
| 04:38:30 | 25 | A.  Did I personally?  No. |

| | | |
|---|---|---|
| 04:38:32 | 1 | Q. Well, had anybody told you what the server was worth? |
| 04:38:38 | 2 | A. A gentleman by the name of Ira Lauter. |
| 04:38:40 | 3 | Q. Who is Ira Lauter? |
| 04:38:42 | 4 | A. To the best of my knowledge, he is a computer person that |
| 04:38:48 | 5 | works outside for Associated Bank. |
| 04:38:50 | 6 | Q. Is he involved in repossession of equipment? |
| 04:38:53 | 7 | A. He called me at one time in an attempt to repossess it, so |
| 04:38:59 | 8 | I suppose, yes. |
| 04:38:59 | 9 | Q. And did he come out and look at the server and the |
| 04:39:05 | 10 | software at some point? |
| 04:39:05 | 11 | A. Not during the time we owned the building. |
| 04:39:07 | 12 | Q. At some point. |
| 04:39:08 | 13 | A. That, I don't know. |
| 04:39:09 | 14 | Q. Okay. Did Mr. Lauter ever tell you what he thought the |
| 04:39:16 | 15 | building was worth? |
| 04:39:17 | 16 | A. No, ma'am. |
| 04:39:18 | 17 | Q. You never got any idea of the value -- I'm sorry. I |
| 04:39:23 | 18 | didn't mean the building. I meant the server. |
| 04:39:26 | 19 | A. Yes, ma'am. |
| 04:39:27 | 20 | THE COURT: Did he ever tell you what the building |
| 04:39:29 | 21 | was worth? |
| 04:39:30 | 22 | BY MS. DEDINAS: |
| 04:39:31 | 23 | Q. What did he tell you it was worth? |
| 04:39:32 | 24 | A. $25,000. |
| 04:39:33 | 25 | Q. So initially you reached an agreement with Associated Bank |

04:39:39    1   for a sum of $38,000?

04:39:42    2   A.  Yes, ma'am.

04:39:42    3   Q.  Now, before that deal closed, you learned that that deal

04:39:48    4   wasn't what you thought it was going to be; is that right?

04:39:53    5   A.  Yes, ma'am.

04:39:53    6   Q.  Okay.  And is it because you learned that Associated Bank

04:39:57    7   was only going to be selling you the equipment and not the

04:40:01    8   lease?

04:40:01    9   A.  Yes.

04:40:03   10   Q.  So the first go-around of negotiations, Associated Bank

04:40:09   11   was proposing to sell you equipment worth about $22,000 for a

04:40:15   12   price of $38,000 that didn't include the lease and the

04:40:18   13   guaranty; is that right?

04:40:20   14   A.  Yes.

04:40:20   15   Q.  And you found that unacceptable?

04:40:22   16   A.  Yes.

04:40:22   17   Q.  And when you and Mr. Shah realized that the price would

04:40:26   18   not include the lease and the guaranty, the deal fell apart,

04:40:31   19   right?

04:40:31   20   A.  I couldn't tell you that Mr. Shah was involved in that

04:40:35   21   decision, but --

04:40:36   22   Q.  But you --

04:40:37   23   A.  -- the outcome is correct.

04:40:38   24   Q.  Okay.  So were there further negotiations after that deal

04:40:43   25   fell apart?

| | | |
|---|---|---|
| 04:40:44 | 1 | A. Yes, ma'am. |
| 04:40:44 | 2 | Q. Okay. And were those in about April of 2010? |
| 04:40:47 | 3 | A. No, I believe it was late June and July. |
| 04:40:54 | 4 | Q. Okay. So do you recall that in June of 2010, Associated |
| 04:41:05 | 5 | Bank was still demanding $370,000 for the lease? |
| 04:41:10 | 6 | A. That figure sounds correct, yes. |
| 04:41:12 | 7 | Q. And do you remember telling Mr. Shah that under that |
| 04:41:20 | 8 | scenario, the deal probably wouldn't work out? |
| 04:41:22 | 9 | A. That's correct. |
| 04:41:23 | 10 | Q. Now, on June 25th, a little bit later, 2010, Associated |
| 04:41:31 | 11 | Bank offered to sell the lease and the guaranty to you for |
| 04:41:36 | 12 | $65,000. Do you recall that? |
| 04:41:38 | 13 | A. Yes, ma'am. |
| 04:41:38 | 14 | Q. And you knew that Mr. Shah would be willing to pay $65,000 |
| 04:41:45 | 15 | for the guaranty and the lease, right? |
| 04:41:47 | 16 | A. I believe that was within the budget I had originally been |
| 04:41:53 | 17 | given, yes. |
| 04:41:54 | 18 | Q. So when you were negotiating with Associated Bank, did you |
| 04:41:58 | 19 | keep Mr. Shah in the loop on what the price might be? |
| 04:42:02 | 20 | A. No, ma'am. |
| 04:42:03 | 21 | Q. Did you have a budget in mind that he would be willing to |
| 04:42:07 | 22 | pay? |
| 04:42:07 | 23 | A. If I remember correctly, there was a budget determined as |
| 04:42:14 | 24 | to what it is they would pay for that lease when we took the |
| 04:42:19 | 25 | deed to the property back in March, yes. |

04:42:21   1   Q.  And when you say "they," who do you mean?

04:42:23   2   A.  I believe that was Mr. Shah and Mr. Blumenthal at that

04:42:26   3   time.

04:42:26   4   Q.  Because it would make no sense to negotiate a price for

04:42:31   5   the lease and the guaranty that Mr. Shah wasn't willing to

04:42:36   6   pay?

04:42:36   7   A.  That's correct.

04:42:37   8   Q.  Okay.  So, in fact, Mr. Shah told you in an e-mail that he

04:42:47   9   would pay $65,000, but he asked you if you could to try to

04:42:53   10  get 60.  Do you remember that?

04:42:55   11  A.  I remember an e-mail like that.  I can't tell you I

04:43:02   12  remember that exact dialog.  But, yes, ma'am.

04:43:06   13  Q.  Okay.  If you can take a look at Exhibit 134.

04:43:24   14          THE COURT:  Why don't you identify that.

04:43:25   15          MS. DEDINAS:  Okay.

04:43:27   16  BY MS. DEDINAS:

04:43:27   17  Q.  Do you have it in hand?

04:43:28   18  A.  Yes, ma'am.

04:43:29   19  Q.  For the record, this is an e-mail from Mehul Shah to David

04:43:33   20  Clark dated Monday, June 28th, 2010, regarding Kanan Fashions'

04:43:38   21  lease.

04:43:39   22          THE COURT:  Thank you.

04:43:40   23  BY MS. DEDINAS:

04:43:41   24  Q.  And it says on the first sentence, As discussed over the

04:43:45   25  phone, I would appreciate it if Associated can be settled at

04:43:50  1  $60,000.  If you feel it's not working out, then we should

04:43:54  2  accept this offer from Associated at 65,000 and proceed to

04:43:57  3  purchase the lease and the guaranty.

04:44:00  4       Do you recall that?

04:44:00  5  A.  Yes, ma'am.

04:44:01  6  Q.  So you had authority for 65 with the hopes that maybe you

04:44:05  7  could get it for 60; is that right?

04:44:08  8  A.  Yes, ma'am.

04:44:08  9  Q.  Okay.  And then he later says, If possible -- and I am on

04:44:17  10  the second sort of paragraph there -- I would like to have FMB

04:44:22  11  buy the lease and guaranty from Associated as quickly as Bill

04:44:24  12  can arrange it, and once I return to Chicago, I will arrange

04:44:27  13  to repay FMB the 65,000 and repurchase the lease and guaranty

04:44:33  14  from you at that time.  You can assume I will be in a position

04:44:36  15  to close on this aspect with you no later than July end, 2010.

04:44:42  16       Do you see that?

04:44:42  17  A.  Yes, ma'am.

04:44:43  18  Q.  And then soon thereafter, did you, in fact, reach an

04:44:48  19  agreement to purchase the lease and the guaranty for $60,000?

04:44:59  20  A.  No, ma'am.

04:45:02  21  Q.  What did you reach the agreement for?

04:45:06  22  A.  $57,500.

04:45:08  23  Q.  Okay.  And you were going to add -- what was the 2500

04:45:15  24  going to be for?

04:45:16  25  A.  The legal fees.  My charge.

04:45:18 1 Q. Your charge, right?

04:45:20 2 A. Yes.

04:45:20 3 Q. Okay. And so based on that, you had a $60,000 promissory

04:45:25 4 note drawn up for Mr. Shah to execute, and you sent it to him;

04:45:25 5 is that right?

04:45:29 6 A. That's correct.

04:45:29 7 Q. And how did you send it to him?

04:45:35 8 A. I sent it to him by an e-mail transfer.

04:45:39 9 Q. And do you recall that you had to do that several times?

04:45:42 10 A. More than once, yes.

04:45:44 11 Q. More than once because -- okay.

04:45:47 12 A. I don't -- I'm not even sure it went through a second

04:45:51 13 time; but, yes, I did send it more than once.

04:45:53 14 Q. At some point after you sent it, did you have a telephone

04:45:57 15 conversation with him about the promissory note?

04:45:59 16 A. Yes, ma'am.

04:46:00 17 Q. And what did he tell you?

04:46:02 18 A. He did not have the money to pay me.

04:46:04 19 Q. Okay. Now, I'd like you to take a look at Exhibit 148.

04:46:20 20 A. Yes, ma'am.

04:46:28 21 Q. For the record, this is an interoffice memorandum from Tom

04:46:31 22 Driver (phonetic) -- to Tom Driver and David Clark from Carl

04:46:36 23 Stankowitz (phonetic), subject: Mehul Shah, date 7/20/2010.

04:46:44 24 Is that your signature at the bottom indicating

04:46:46 25 approval?

| | | |
|---|---|---|
| 04:46:46 | 1 | A. Yes, it is. |
| 04:46:48 | 2 | Q. So who is Mr. Stankowitz? |
| 04:46:59 | 3 | A. He is a credit analyst used by the special asset group. |
| 04:47:01 | 4 | Q. Do you know why he drafted this internal memorandum? |
| 04:47:04 | 5 | A. I requested him to. |
| 04:47:06 | 6 | Q. And where did Mr. Stankowitz get the information that is |
| 04:47:11 | 7 | in this memorandum? |
| 04:47:12 | 8 | A. From me. |
| 04:47:13 | 9 | Q. Okay. So this is a request for a basically $60,000 note, |
| 04:47:24 | 10 | $57,500 for the note, and the fee for the note would be $2500; |
| 04:47:24 | 11 | is that right? |
| 04:47:33 | 12 | A. That's correct. |
| 04:47:33 | 13 | Q. And who is going to be taking the note out? |
| 04:47:36 | 14 | A. Mehul and his wife. |
| 04:47:41 | 15 | Q. Marcia Shah? |
| 04:47:43 | 16 | A. Yes. |
| 04:47:43 | 17 | Q. Okay. Now, this is going to be a 30-day, zero-coupon |
| 04:47:52 | 18 | note, right? |
| 04:47:52 | 19 | A. That's correct. |
| 04:47:53 | 20 | Q. And it says here at the bottom, Repayment will come from a |
| 04:47:59 | 21 | foreign corporation not controlled by the Shahs; is that |
| 04:47:59 | 22 | right? |
| 04:48:04 | 23 | A. That's correct. |
| 04:48:04 | 24 | Q. Where did you get that information from? |
| 04:48:07 | 25 | A. To the best of my knowledge, from Mr. Shah. |

04:48:10  1  Q.  Mr. Shah told you that a foreign corporation would repay
04:48:13  2  the note?
04:48:14  3  A.  Yes.
04:48:14  4  Q.  When did he tell you that?
04:48:16  5  A.  I don't know.
04:48:18  6  Q.  Was it contemporaneous with this transaction?
04:48:23  7  A.  More than likely, it was at the time I had that written,
04:48:27  8  yes.
04:48:27  9  Q.  At the time, okay.
04:48:28  10        So it wasn't way back when you had first talked about
04:48:31  11  the concept of this deal?
04:48:32  12  A.  No, ma'am.
04:48:32  13  Q.  Okay.  Then it says, The said payoff will transfer the
04:48:38  14  ownership of the lease to the foreign corporation.
04:48:42  15        Do you see that?
04:48:43  16  A.  Yes.
04:48:43  17  Q.  And that was the intent, that the actual ownership and the
04:48:49  18  title to the lease would be transferred not to the borrower,
04:48:53  19  Mr. Shah, but to the foreign corporation?
04:48:56  20  A.  That's what I was told, yes.
04:48:58  21  Q.  And who told you that?
04:48:59  22  A.  Mr. Shah.
04:49:00  23  Q.  Okay.  Now, he told you that he wouldn't have the money to
04:49:07  24  repay you, but a foreign corporation would; is that pretty
04:49:11  25  much right?

| | | |
|---|---|---|
| 04:49:12 | 1 | A.  Yes. |
| 04:49:12 | 2 | Q.  And you had no information about what foreign corporation |
| 04:49:18 | 3 | it would be, did you? |
| 04:49:19 | 4 | A.  No, ma'am. |
| 04:49:19 | 5 | Q.  And you didn't inquire as to who it would be? |
| 04:49:24 | 6 | A.  No, ma'am. |
| 04:49:24 | 7 | Q.  The fact is, you didn't really care who it was or why, so |
| 04:49:30 | 8 | long as you got paid; isn't that right? |
| 04:49:32 | 9 | A.  That's correct. |
| 04:49:32 | 10 | Q.  And you made no further inquiry to find out if it was true |
| 04:49:38 | 11 | that there would actually be a foreign corporation to pay off |
| 04:49:41 | 12 | the note? |
| 04:49:41 | 13 | A.  I made no further inquiry, no. |
| 04:49:44 | 14 | Q.  So you were, in essence, going to take the risk that |
| 04:49:47 | 15 | Mr. Shah could be stuck with the note without a foreign |
| 04:49:52 | 16 | corporation coming and repaying; isn't that right? |
| 04:49:54 | 17 | A.  That's correct. |
| 04:49:55 | 18 | Q.  Now, you had not asked Mr. Shah to provide any personal |
| 04:50:07 | 19 | financial information with respect to this note, did you? |
| 04:50:11 | 20 | A.  No, ma'am. |
| 04:50:11 | 21 | Q.  You didn't? |
| 04:50:12 | 22 | A.  No. |
| 04:50:12 | 23 | Q.  And you knew that Mr. Shah was in default on the building |
| 04:50:18 | 24 | loan because you were foreclosing on that, right? |
| 04:50:22 | 25 | A.  No, ma'am. |

| | | |
|---|---|---|
| 04:50:25 | 1 | Q. You knew that Mr. Shah's company had been in default on |
| 04:50:31 | 2 | the building loan? |
| 04:50:32 | 3 | A. Had been in default, yes, ma'am. |
| 04:50:33 | 4 | Q. Had been in default? |
| 04:50:35 | 5 | A. Yes. |
| 04:50:35 | 6 | Q. And you had to do a workout? |
| 04:50:37 | 7 | A. Took a deed in lieu, yes, ma'am. |
| 04:50:40 | 8 | Q. And were you going to have -- did you anticipate having a |
| 04:50:46 | 9 | deficiency on the building after it was sold? |
| 04:50:51 | 10 | A. I don't know. |
| 04:50:55 | 11 | Q. But it's possible? |
| 04:50:57 | 12 | A. Yes, ma'am. |
| 04:50:58 | 13 | Q. And you waived that deficiency to Mr. Shah? |
| 04:51:02 | 14 | A. Yes, ma'am. |
| 04:51:11 | 15 | Q. And did you have any other kind of information about |
| 04:51:13 | 16 | Mr. Shah's current business or income sources or anything like |
| 04:51:17 | 17 | that? |
| 04:51:18 | 18 | A. No, ma'am. |
| 04:51:18 | 19 | Q. So you were willing to execute a $60,000 note to Mr. Shah |
| 04:51:32 | 20 | despite the fact that you had no financial statement from him, |
| 04:51:35 | 21 | you knew his businesses had failed, and the fact that you had |
| 04:51:38 | 22 | no information whatsoever about the foreign corporation that |
| 04:51:42 | 23 | was going to be repaying the note; is that about right? |
| 04:51:44 | 24 | A. That's correct. |
| 04:51:45 | 25 | Q. And then you sent the proposed promissory note to him, and |

04:51:52  1  he told you that he didn't have the money to pay it, to take

04:51:55  2  out the loan; is that right?

04:51:56  3  A.  That's correct.

04:51:57  4  Q.  Okay.  So what did you do -- why did you even proceed to

04:52:08  5  negotiate for the server?

04:52:09  6  A.  I had already finalized the negotiations.

04:52:13  7  Q.  I see.  Okay.

04:52:16  8       So what did you do next with respect to the server,

04:52:22  9  with the negotiations with the server?

04:52:24  10  A.  What did I do?  Nothing.

04:52:26  11  Q.  Nothing.

04:52:27  12       Now, I just want you to take a look at the promissory

04:52:31  13  note real quick.  Take a look at Exhibit 150.

04:52:46  14       Actually, I might make this easier.  If you look

04:52:55  15  at 148, there is a promissory note that's the second page.

04:53:04  16  A.  Yes, ma'am.

04:53:04  17  Q.  Do you see that?

04:53:05  18       Is this promissory note substantially the same note

04:53:10  19  that you sent to Mr. Shah for execution?

04:53:11  20  A.  Yes, ma'am.

04:53:12  21  Q.  Okay.  And the note has a loan date of July 25th, 2010; is

04:53:30  22  that right?

04:53:30  23  A.  That's correct.

04:53:30  24  Q.  And you know now that that date is a Sunday; is that

04:53:37  25  right?

04:53:37   1   A.  That's correct.

04:53:37   2   Q.  Now, the bank doesn't usually issue loans on Sundays, does

04:53:44   3   it?

04:53:44   4   A.  No, ma'am.

04:53:44   5   Q.  So within several days of negotiating the sale of the

04:53:56   6   lease and the guaranty, on July 25th, or you say the 26th, of

04:54:06   7   2010, you received a telephone call out of the blue from a man

04:54:10   8   who wanted to buy the server; is that correct?

04:54:13   9   A.  Yes, ma'am.

04:54:14   10  Q.  Did you take notes when you took the call?

04:54:18   11  A.  I believe there were two or three jottings on a piece of

04:54:24   12  paper, yes, ma'am.

04:54:24   13  Q.  Now, where were you when the call came in?

04:54:28   14  A.  At my desk.

04:54:29   15  Q.  At your desk in the office?

04:54:30   16  A.  Yes.

04:54:31   17  Q.  Okay.  Let's take a look at your notes on 156.  It's

04:54:36   18  Exhibit 156.  These are handwritten notes, for the record.

04:54:52   19        Is this your handwriting?

04:54:53   20  A.  Yes, ma'am.

04:54:53   21  Q.  And do you see at the -- sort of at the top right-hand

04:55:02   22  corner, it says 7/25, is that a date?

04:55:05   23  A.  Yes, it is.

04:55:05   24  Q.  And is it your custom to usually put the date down when

04:55:08   25  you take notes?

04:55:09    1    A.  Yes.

04:55:09    2    Q.  And are these notes of yours from July 25th?

04:55:14    3    A.  No.

04:55:15    4    Q.  No?

04:55:16    5    A.  No, they are not.

04:55:17    6    Q.  Why not?

04:55:17    7    A.  Because July the 25th was a Sunday, and I know I wasn't in

04:55:20    8    my office on a Sunday.

04:55:21    9    Q.  And you're sure you didn't take these notes somewhere

04:55:24   10    else?

04:55:25   11    A.  No, ma'am.

04:55:26   12    Q.  Okay.  So is it reasonable to believe that it happened

04:55:31   13    either before or after the 25th?

04:55:33   14    A.  Yes, ma'am.

04:55:34   15    Q.  So do you know if it was a Monday or a Friday?

04:55:37   16    A.  I believe it would be Monday, but I can't tell that for

04:55:40   17    sure.

04:55:40   18    Q.  Okay.  Now, you weren't having a UCC sale of the server,

04:55:46   19    were you?

04:55:46   20    A.  Not that I'm aware of.  I didn't own the server.

04:55:50   21    Q.  Okay.  But you had an -- you had negotiated for a

04:55:56   22    possibility to purchase it?

04:55:58   23    A.  To purchase the lease, yes.

04:55:59   24    Q.  To purchase the lease, and the server would come with it,

04:56:04   25    right?

04:56:04   1   A.  Yes, ma'am.

04:56:04   2   Q.  And had you taken any steps to advertise the sale of a

04:56:09   3   lease or a server?

04:56:10   4   A.  No, ma'am.

04:56:11   5   Q.  So you had -- do you have any idea how the caller knew

04:56:18   6   that you would have a server for sale?

04:56:20   7   A.  No, ma'am.

04:56:20   8   Q.  And you didn't ask him, right?

04:56:23   9   A.  No, ma'am.

04:56:24  10   Q.  Was the caller a man or a woman?

04:56:31  11   A.  A man.

04:56:32  12   Q.  And can you estimate the age?

04:56:33  13   A.  No, ma'am.

04:56:35  14         MR. McJESSY:  Objection.  Foundation.

04:56:36  15         THE COURT:  That's all right.  He took the call.  He

04:56:38  16   should be able to estimate it if he could.  He says he can't.

04:56:42  17   BY MS. DEDINAS:

04:56:44  18   Q.  Did the man speak with any kind of an accent?

04:56:47  19   A.  I can't recall today.  I believe he did.  It was very

04:56:54  20   difficult to understand the name of the company.

04:56:56  21   Q.  So you had some trouble understanding him?

04:56:59  22   A.  Yes, because I wrote the name of the company in multiple

04:57:04  23   ways.

04:57:04  24   Q.  And to your recollection, was it because he had a speech

04:57:11  25   impediment, or was it because he spoke in a different dialect

04:57:14   1   or --
04:57:16   2   A.  I believe it was an accent.
04:57:17   3   Q.  And could you place the accent?
04:57:19   4   A.  No, ma'am.
04:57:19   5   Q.  Did the man say who he was?
04:57:20   6   A.  I don't believe so.
04:57:21   7   Q.  And you didn't ask his name?
04:57:24   8   A.  No, ma'am.
04:57:24   9   Q.  You didn't -- you didn't even ask who you were speaking
04:57:28   10  to?
04:57:28   11  A.  No, ma'am.
04:57:28   12  Q.  Did he say what company he was with?
04:57:30   13  A.  Yes, ma'am, that's the name of the company spelled
04:57:37   14  multiple ways as I thought he said them.
04:57:41   15  Q.  Can you pronounce for us how he pronounced it to you in
04:57:45   16  the call?
04:57:45   17  A.  I believe it was Diagems, but I wrote it down as Biagems.
04:57:51   18  Q.  And you didn't take down a phone number?
04:57:54   19  A.  No, ma'am.
04:57:55   20  Q.  And did you ask any information about the buyer?
04:58:00   21  A.  No, ma'am.
04:58:01   22  Q.  Now, you were half expecting a foreign corporation to make
04:58:08   23  a payment for the server, weren't you?
04:58:10   24  A.  I had been told that a foreign corporation would make a
04:58:13   25  payment on the server, yes.

04:58:15  1  Q.  So you weren't all that surprised to get a phone call from

04:58:19  2  a foreign corporation looking to buy the server, were you?

04:58:22  3  A.  No, ma'am.

04:58:23  4  Q.  And that's because this is the plan you had discussed with

04:58:28  5  Mr. Shah; isn't that right?

04:58:29  6  A.  No, ma'am.

04:58:30  7  Q.  Didn't Mr. Shah tell you that a foreign corporation would

04:58:34  8  make the payment for the server?

04:58:35  9  A.  Would make the payment to him for the server?  Yes.

04:58:39  10  Q.  Is that what he said specifically --

04:58:40  11  A.  Yes.

04:58:40  12  Q.  -- that the corporation would be paying him?

04:58:42  13  A.  Yes.

04:58:42  14  Q.  Okay.  So you were only -- you were only surprised that

04:58:48  15  the payment -- that the foreign corporation was seeking to pay

04:58:52  16  you directly; is that right?

04:58:54  17  A.  Yes, ma'am.

04:58:54  18  Q.  But in all other respects, this was pretty much what had

04:58:58  19  been the plan; isn't that right?

04:59:00  20  A.  That a foreign corporation would pay?  Yes.

04:59:03  21  Q.  And then would end up with title to the server and the

04:59:08  22  lease?

04:59:09  23  A.  Yes.

04:59:09  24  Q.  Now, what did you tell the caller that the server would

04:59:15  25  cost?

04:59:15    1    A.  $60,000.

04:59:16    2    Q.  And that's because that's what you had agreed with

04:59:20    3    Mr. Shah?

04:59:21    4    A.  No, that's because that's what I agreed with the bank to

04:59:25    5    get.

04:59:25    6    Q.  I see.  And did the --

04:59:28    7            MR. LIPTON:  What did he say?

04:59:33    8            THE COURT:  Because that's what I agreed with the

04:59:37    9    bank to get.

04:59:37   10            MR. LIPTON:  Thank you.

04:59:38   11    BY MS. DEDINAS:

04:59:39   12    Q.  Now, did the caller try and negotiate with you?

04:59:42   13    A.  Yes.

04:59:42   14    Q.  And what happened?

04:59:43   15    A.  I told him I wasn't interested.

04:59:45   16    Q.  And did the caller then accept your offer to sell for --

04:59:52   17    to sell for 60,000?

04:59:56   18    A.  Yes, he did.

04:59:56   19    Q.  What arrangements did you make for the form of payment?

05:00:02   20    A.  Wire transfer.

05:00:04   21    Q.  And the buyer agreed to this?

05:00:06   22    A.  Yes.

05:00:06   23    Q.  And do you know how you transmitted wire transfer

05:00:11   24    instructions to the buyer?

05:00:12   25    A.  I believe I gave them to him right there on the phone.

05:00:18 1 Q. You actually know the wire transfer instructions from

05:00:22 2 memory?

05:00:22 3 A. I have them on my desk.

05:00:25 4 Q. So you would have read them to him and instructed him how

05:00:28 5 to wire money to your bank?

05:00:29 6 A. Yes.

05:00:30 7 Q. And what did the caller say he was going to do?

05:00:32 8 A. He would wire transfer me the funds.

05:00:34 9 Q. Okay. What arrangements did you make for picking up the

05:00:38 10 server?

05:00:38 11 A. He said someone would come to the warehouse and pick up

05:00:41 12 the server.

05:00:42 13 Q. Now, didn't you need to make arrangements with U.S.

05:00:46 14 Equities to let them in?

05:00:47 15 A. I was going to the warehouse that Friday, I believe it was

05:00:50 16 Friday, again, it could have been that Thursday, to meet with

05:00:55 17 KTR, who was entering into a contract to buy the warehouse

05:01:00 18 with me, and I told him I would be there that day, and if

05:01:03 19 someone wanted to come and pick up the server, they could get

05:01:06 20 in the warehouse with U.S. Equities and myself that day.

05:01:09 21 Q. And did the buyer agree to that?

05:01:11 22 A. Yes.

05:01:11 23 Q. Did the buyer tell you who would be coming to pick up the

05:01:16 24 server?

05:01:17 25 A. Yes.

| | | |
|---|---|---|
| 05:01:17 | 1 | Q. What did he say? |
| 05:01:17 | 2 | A. A gentleman named Jim. |
| 05:01:19 | 3 | Q. A gentleman named Jim. |
| 05:01:21 | 4 | And that's it, no further name, nothing? |
| 05:01:23 | 5 | A. No. |
| 05:01:24 | 6 | Q. Now, you didn't write down Jim on your notes here? |
| 05:01:31 | 7 | A. No, ma'am. |
| 05:01:32 | 8 | Q. Is there a reason you didn't do that? |
| 05:01:33 | 9 | A. I don't remember why. |
| 05:01:36 | 10 | Q. Did you obtain the funds from this foreign corporation? |
| 05:01:54 | 11 | A. Yes, ma'am. |
| 05:01:55 | 12 | Q. Let me ask you to take a look at -- |
| 05:02:11 | 13 | MS. DEDINAS: I'm sorry. |
| 05:02:12 | 14 | THE COURT: Take your time. |
| 05:02:13 | 15 | BY MS. DEDINAS: |
| 05:02:26 | 16 | Q. Can you take a look at 163 -- 164. |
| 05:02:34 | 17 | THE COURT: Which one? |
| 05:02:36 | 18 | MS. DEDINAS: 164. |
| 05:02:39 | 19 | THE WITNESS: Yes, ma'am. |
| 05:02:40 | 20 | BY MS. DEDINAS: |
| 05:02:43 | 21 | Q. Is that a copy of an incoming wire transfer to your bank? |
| 05:02:48 | 22 | A. Yes, ma'am. |
| 05:02:49 | 23 | Q. And who did it come from? Do you see the originator down |
| 05:03:01 | 24 | there? |
| 05:03:03 | 25 | A. The originator, as in the -- yes. |

| | | |
|---|---|---|
| 05:03:07 | 1 | Q. The originator is Diagems FZC? |
| 05:03:13 | 2 | A. Yes, ma'am. |
| 05:03:13 | 3 | Q. And that's in the United Arab Emirates in charge; is that |
| 05:03:13 | 4 | right? |
| 05:03:19 | 5 | A. Yes, ma'am. |
| 05:03:20 | 6 | Q. And the originator bank is Standard Charter Bank, is that |
| 05:03:24 | 7 | right, in Dubai? |
| 05:03:25 | 8 | A. Yes, ma'am. |
| 05:03:26 | 9 | Q. And this is the wire transfer for the money -- for the |
| 05:03:30 | 10 | purchase of the server; is that correct? |
| 05:03:31 | 11 | A. Yes, ma'am. |
| 05:03:32 | 12 | Q. And did you do anything after receiving this wire? |
| 05:03:38 | 13 | A. I wired 57,500 directly to Associated Bank. |
| 05:03:42 | 14 | Q. And then arrangements were made for the assignment of |
| 05:03:47 | 15 | lease to be transferred to you; is that right? |
| 05:03:50 | 16 | A. Yes. |
| 05:03:50 | 17 | Q. And did you get the signed assignment of lease from |
| 05:03:57 | 18 | Associated Bank? |
| 05:03:57 | 19 | A. Yes. |
| 05:03:58 | 20 | Q. And you picked them up? |
| 05:03:59 | 21 | A. No. |
| 05:04:00 | 22 | Q. Didn't they end up coming to your office at some point? |
| 05:04:06 | 23 | A. Yes, ma'am, they did. |
| 05:04:07 | 24 | Q. And you picked them up from your office, right? |
| 05:04:08 | 25 | A. Yes, ma'am. |

| | | |
|---|---|---|
| 05:04:09 | 1 | Q. And you went out to the warehouse? |
| 05:04:11 | 2 | A. Yes, ma'am. |
| 05:04:12 | 3 | Q. Let's talk a little bit about what happened when the |
| 05:04:15 | 4 | server got picked up. You were there at the warehouse; is |
| 05:04:15 | 5 | that right? |
| 05:04:18 | 6 | A. Yes, ma'am. |
| 05:04:18 | 7 | Q. And you were there showing the warehouse to a potential |
| 05:04:21 | 8 | buyer? |
| 05:04:22 | 9 | A. Yes, ma'am. |
| 05:04:23 | 10 | Q. Who came to pick up the server? |
| 05:04:28 | 11 | A. A gentleman named Jim. |
| 05:04:30 | 12 | Q. And how did Jim get into the building? |
| 05:04:33 | 13 | A. He was let in by U.S. Equities. |
| 05:04:36 | 14 | Q. Okay. And do you know if they kept a log of the people |
| 05:04:39 | 15 | that came in that day? |
| 05:04:41 | 16 | A. No, ma'am, I don't. |
| 05:04:42 | 17 | Q. Is it their regular practice, do you know? |
| 05:04:45 | 18 | A. I don't believe so. |
| 05:04:46 | 19 | Q. Okay. And then how were you introduced to Jim? |
| 05:04:52 | 20 | A. The gentleman from U.S. Equities came and found me and |
| 05:04:57 | 21 | said, Jim is here. |
| 05:04:59 | 22 | Q. What did you do next? |
| 05:05:01 | 23 | A. I went over and I shook the gentleman's hand and gave him |
| 05:05:05 | 24 | the paperwork. |
| 05:05:06 | 25 | Q. What paperwork? |

| | | |
|---|---|---|
| 05:05:09 | 1 | A.  The assignment of the lease. |
| 05:05:11 | 2 | Q.  Okay.  And you had executed the assignment of the lease, |
| 05:05:15 | 3 | right? |
| 05:05:15 | 4 | A.  Yes. |
| 05:05:15 | 5 | Q.  Did you ask Jim for any identification? |
| 05:05:19 | 6 | A.  No, I did not. |
| 05:05:23 | 7 | Q.  So he just said, I'm Jim, and that's it? |
| 05:05:25 | 8 | A.  He must have -- I thought perhaps he had given it to U.S. |
| 05:05:30 | 9 | Equities, but if he didn't, he's Jim. |
| 05:05:32 | 10 | Q.  How did you know that he was the Jim that bought the |
| 05:05:35 | 11 | server? |
| 05:05:36 | 12 | A.  I did not. |
| 05:05:37 | 13 | Q.  Weren't you concerned that you might be handing over a |
| 05:05:41 | 14 | $60,000 server to somebody who wasn't the actual purchaser? |
| 05:05:44 | 15 | A.  No, ma'am, I wasn't. |
| 05:05:45 | 16 | Q.  Why not? |
| 05:05:46 | 17 | A.  Well, the likelihood of someone showing up on that day |
| 05:05:52 | 18 | knowing they were going to get the paperwork and the server |
| 05:05:56 | 19 | and not being the person that was sent by the company that |
| 05:06:00 | 20 | gave me the money seemed very slim. |
| 05:06:01 | 21 | Q.  So the circumstances seemed too much to be coincidence? |
| 05:06:07 | 22 | A.  Yes. |
| 05:06:07 | 23 | Q.  Did you show Jim where the computer was? |
| 05:06:20 | 24 | A.  No, ma'am. |
| 05:06:21 | 25 | Q.  How did he find it? |

| | | |
|---|---|---|
| 05:06:23 | 1 | A. U.S. Equities showed him. |
| 05:06:24 | 2 | Q. He showed him where the server was? |
| 05:06:29 | 3 | A. U.S. Equities, yes. |
| 05:06:30 | 4 | Q. Was Jim accompanied by anybody? |
| 05:06:33 | 5 | A. There was a gentleman with him, yes. |
| 05:06:34 | 6 | Q. And do you remember his name? |
| 05:06:35 | 7 | A. I didn't ask, no. |
| 05:06:36 | 8 | Q. Okay. Did you observe Jim removing the equipment? |
| 05:06:40 | 9 | A. No, ma'am. |
| 05:06:40 | 10 | Q. How do you know that he removed it? |
| 05:06:43 | 11 | A. It's not there. |
| 05:06:47 | 12 | Q. Okay. Do you remember Jim asking to borrow a forklift to |
| 05:06:54 | 13 | remove the server? |
| 05:06:55 | 14 | A. No, ma'am. |
| 05:06:57 | 15 | Q. No. |
| 05:06:58 | 16 | So as far as you know, Jim and his assistant managed |
| 05:07:03 | 17 | picking up the server themselves without additional machinery? |
| 05:07:07 | 18 | MR. McJESSY: Objection. Foundation. |
| 05:07:10 | 19 | THE COURT: No, she can ask the question. |
| 05:07:12 | 20 | THE WITNESS: To the best of my knowledge, yes, |
| 05:07:14 | 21 | ma'am. |
| 05:07:14 | 22 | BY MS. DEDINAS: |
| 05:07:19 | 23 | Q. Did you give him any kind of a bill of sale? |
| 05:07:21 | 24 | A. Just the assignment of the lease. |
| 05:07:22 | 25 | Q. Did you get a receipt from them -- |

| | | |
|---|---|---|
| 05:07:25 | 1 | A. No. |
| 05:07:25 | 2 | Q. -- indicating that they had received this equipment? |
| 05:07:28 | 3 | A. No, ma'am. |
| 05:07:28 | 4 | Q. So the only documents you exchanged was the assignment, |
| 05:07:36 | 5 | the executed assignment documents, with the lease, the |
| 05:07:39 | 6 | guaranty, and the description of the equipment; is that right? |
| 05:07:43 | 7 | A. Yes, ma'am. |
| 05:07:44 | 8 | Q. So let me just make sure we are looking at the same thing. |
| 05:07:49 | 9 | Take a look at Exhibit 147. |
| 05:08:22 | 10 | A. Yes. |
| 05:08:23 | 11 | Q. And is this a complete set of the -- a copy of all the |
| 05:08:28 | 12 | documents that you turned over to Jim? |
| 05:08:31 | 13 | A. To the best of my memory. |
| 05:08:33 | 14 | Q. And did you keep a copy of the documents that you gave |
| 05:08:37 | 15 | him? |
| 05:08:37 | 16 | A. No, ma'am. |
| 05:08:38 | 17 | Q. You gave him the originals? |
| 05:08:40 | 18 | A. Yes. |
| 05:08:40 | 19 | Q. Do you know how it is that we have copies of these |
| 05:08:43 | 20 | documents? |
| 05:08:43 | 21 | A. No, ma'am. |
| 05:08:45 | 22 | Q. Okay. Now, after the sale of the server, you didn't say |
| 05:08:58 | 23 | anything to Mr. Shah about it, did you? |
| 05:09:00 | 24 | A. No, ma'am. |
| 05:09:00 | 25 | Q. And you and Mr. Shah had numerous conversations in late |

05:09:05  1   July and early August after the server was sold to Jim?

05:09:12  2   A.  Yes, ma'am.

05:09:13  3   Q.  In fact, the first week of August, Mr. Shah was calling

05:09:18  4   you up to three times a day regarding the lease transaction;

05:09:22  5   isn't that right?

05:09:23  6   A.  Yes, ma'am.

05:09:23  7   Q.  And these conversations related to Mr. Shah's efforts to

05:09:29  8   find a tenant for the warehouse, right?

05:09:32  9   A.  That's correct.

05:09:32  10  Q.  And you had quite a number of conversations with him in

05:09:35  11  August?

05:09:36  12  A.  Yes.

05:09:36  13  Q.  And during none of these conversations did you ever

05:09:39  14  mention to him that you had sold the server?

05:09:42  15  A.  No.

05:09:43  16  Q.  And during none of these conversations did he ever ask you

05:09:48  17  about the server?

05:09:49  18  A.  Not to the best of my memory.

05:09:51  19  Q.  And he didn't tell you anything about how he was working

05:09:54  20  on getting financing for the server or anything like that,

05:09:57  21  right?

05:09:57  22  A.  No, ma'am.

05:09:58  23  Q.  Okay.  So finally on August 30th, you informed Mr. Shah by

05:10:07  24  e-mail that you had sold the server to a third party; is that

05:10:07  25  right?

05:10:15  1   A.  I'd have to say yes.  August 30th, I...

05:10:20  2   Q.  Let's take a look at Exhibit 191.  For the record, this is

05:10:33  3   an e-mail dated August 30th, 2010, from David Clark to Mehul

05:10:33  4   Shah.

05:10:39  5       Do you have it in front of you?

05:10:40  6   A.  Yes, ma'am.

05:10:41  7   Q.  And it says, Mehul, I'm very sorry, but as I told you back

05:10:45  8   in July, I was very anxious to sell the computer.

05:10:49  9       Is this the e-mail in which you first tell him for

05:10:51  10  the first time that you've sold the server?

05:10:53  11  A.  Yes, ma'am.

05:10:53  12  Q.  Okay.  Now, you were anxious to sell the computer because

05:10:59  13  you wanted to sell the building.  How are those related?

05:11:04  14  A.  The computer did not belong with the building, so I was

05:11:08  15  selling the building to a company named KTR.  They didn't have

05:11:13  16  any concept of what the computer was, nor did they care.

05:11:16  17  Q.  After -- now, weren't you concerned, by the way, when you

05:11:26  18  sold the server that you might be selling proprietary or

05:11:33  19  confidential business information to somebody else?

05:11:36  20  A.  No, ma'am.

05:11:38  21  Q.  That didn't occur to you?

05:11:41  22  A.  No, ma'am.

05:11:42  23  Q.  Okay.  Were there any other items that were left at the

05:11:48  24  building other than the server?

05:11:50  25  A.  There are some other computers.

05:11:53   1    Q.  There are other computers?

05:11:54   2    A.  Yes.

05:11:55   3    Q.  And how did you find that out?

05:12:00   4    A.  They have always been there.

05:12:04   5    Q.  The other computers have always been there?

05:12:06   6    A.  Yes, ma'am.

05:12:06   7    Q.  And you've never mentioned it to anybody?

05:12:09   8    A.  No, ma'am.

05:12:10   9    Q.  Even though you know that there's been this contentious

05:12:19  10    litigation about there being a computer left at the warehouse,

05:12:23  11    you never mentioned to anybody that there were other computers

05:12:26  12    there as well?

05:12:26  13    A.  No, ma'am.

05:12:28  14    Q.  Now, after you told Mr. Shah that you sold the server, did

05:12:43  15    Mr. Shah ever confront you on the phone or in person to ask

05:12:47  16    you why you sold the server?

05:12:49  17    A.  I don't recall.

05:12:52  18    Q.  Did you ever have any confrontations with him?

05:12:56  19    A.  I don't believe so.

05:13:00  20    Q.  Did he express his shock and dismay at your selling the

05:13:06  21    server to somebody else?

05:13:08  22    A.  I don't recall ever hearing that, no.

05:13:11  23    Q.  In fact, all Mr. Shah did was send you an e-mail asking

05:13:15  24    you who has the personal guaranty; isn't that right?

05:13:19  25    A.  Again, if you could refresh my memory, I believe I saw

05:13:27  1   that e-mail, yes.

05:13:28  2   Q.  Can you take a look at Exhibit 196, please.

05:13:45  3   A.  I'm sorry?

05:13:46  4   Q.  196.

05:13:47  5   A.  Thank you.

05:13:52  6   Q.  For the record, this is an e-mail from Mehul Shah to David

05:13:56  7   Clark, August 31st, 2010.

05:14:01  8        Now, this reprints your August 30th e-mail, the first

05:14:08  9   chain, informing Mr. Shah that you've sold the computer.  And

05:14:17  10  then the chain right above it is, Dave, who has the guaranties

05:14:21  11  and the master lease.

05:14:22  12       Do you recall that?

05:14:23  13  A.  Yes.

05:14:23  14  Q.  And then the following exhibit is 197.  And I'm looking at

05:14:34  15  the second e-mail chain from the top, which is from you to

05:14:40  16  Mehul Shah dated August 31st, 2010.

05:14:45  17       It says, Mehul, the purchaser purchased the master

05:14:48  18  lease and the guaranties that went with it, so they own

05:14:52  19  computer, the lease, and the guaranties.

05:14:54  20       Do you see that?

05:14:55  21  A.  Yes.

05:14:55  22  Q.  Other than that exchange with Mr. Shah, did you have any

05:14:58  23  other exchanges with him, by e-mail or otherwise, about your

05:15:03  24  selling the server to a third party?

05:15:06  25  A.  Not to the best of my memory.

05:15:07   1          THE COURT:  Time frame?

05:15:09   2          MS. DEDINAS:  I said ever -- ever after purchase --

05:15:12   3   after purchasing the server.

05:15:16   4          Maybe I should reread the question?

05:15:18   5          THE COURT:  No, I was not paying attention.  That's

05:15:20   6   why I asked you to repeat it.

05:15:22   7          MS. DEDINAS:  Okay.

05:15:23   8          THE COURT:  Thank you.

05:15:29   9          Cross.

05:15:48   10          MR. LIPTON:  I was just going to be concerned about

05:15:50   11   the time.

05:15:50   12          THE COURT:  All right.  We will begin tomorrow

05:15:51   13   morning.

05:15:53   14          THE WITNESS:  I can't be back tomorrow.

05:15:54   15          MR. LIPTON:  I can give you 15 minutes.

05:15:56   16          THE WITNESS:  I just committed to being in a

05:16:00   17   bankruptcy situation tomorrow morning.

05:16:02   18          THE COURT:  Where?

05:16:03   19          THE WITNESS:  Out in Frankfort, for a trial.  I am

05:16:08   20   involved in the McHenry city bankruptcy as the loan officer on

05:16:12   21   that account.

05:16:15   22          MR. McJESSY:  May I make a suggestion, your Honor?

05:16:17   23          THE COURT:  Sure.

05:16:18   24          MR. McJESSY:  We are going to go most of the day

05:16:20   25   tomorrow, and I am not familiar with where exactly he is

05:16:23 1 heading, but if it's a morning appointment, we are going to be

05:16:27 2 here all day tomorrow.

05:16:29 3       THE WITNESS:  When I committed to my attorney as I

05:16:31 4 stood out there, I can't tell you how long it is.  These

05:16:33 5 negotiations have been very lengthy.

05:16:37 6       THE COURT:  So have these.

05:16:38 7       THE WITNESS:  I know.  But I have 17 banks involved

05:16:40 8 in mine.  I can stay here.

05:16:50 9       MS. DEDINAS:  Mr. Lipton, can you take care of your

05:16:52 10 car problem?

05:16:53 11       THE COURT:  No.  That's why he stood up.

05:16:54 12       MR. LIPTON:  Actually --

05:16:55 13       MS. DEDINAS:  You can do it now and come back.

05:16:57 14       MR. LIPTON:  -- if the court wanted to recess, I

05:16:59 15 could go pick up the car.

05:17:00 16       THE COURT:  We have a court reporter here who has a

05:17:02 17 baby.

05:17:03 18       MR. LIPTON:  Oh, I'm sorry.

05:17:04 19       THE COURT:  And she was doing us a favor by staying

05:17:07 20 after 5:00 o'clock.

05:17:08 21       MR. LIPTON:  Far more important than the car.

05:17:10 22       THE COURT:  We have a law clerk who is pregnant and

05:17:12 23 has children at home.

05:17:15 24       MR. LIPTON:  Fine with me.  I was just trying to

05:17:17 25 accommodate the court.

| | | |
|---|---|---|
| 05:17:24 | 1 | THE COURT: I know. I appreciate that. |
| 05:17:26 | 2 | MR. McJESSY: The only other suggestion I could make, |
| 05:17:26 | 3 | your Honor, is that we are going to be back here for |
| 05:17:29 | 4 | Mr. Blumenthal's deposition (sic). It's a big gap between now |
| 05:17:31 | 5 | and then, but we are going to be back here at that time |
| 05:17:35 | 6 | anyway. |
| 05:17:35 | 7 | THE COURT: I want to see counsel in chambers. |
| 05:19:01 | 8 | (Whereupon, a sidebar was had in chambers:) |
| 05:19:59 | 9 | THE COURT: Okay. Other suggestions? |
| 05:20:04 | 10 | MR. McGARRY: Discharge the lawyers from the sanction |
| 05:20:09 | 11 | motion and shorten it up, and I ask Vilia seriously if she |
| 05:20:13 | 12 | would not oppose a motion. I will make them available as |
| 05:20:17 | 13 | witnesses, if needed. |
| 05:20:17 | 14 | MS. DEDINAS: I think we have to finish what we |
| 05:20:22 | 15 | started. |
| 05:20:22 | 16 | THE COURT: I do too. I think we have to finish what |
| 05:20:24 | 17 | we started. I think it's very important that we do that. I |
| 05:20:31 | 18 | don't know if this man is telling the truth, do you? |
| 05:20:35 | 19 | MR. LIPTON: It's a new story. |
| 05:20:38 | 20 | THE COURT: Are you aware of anything about this |
| 05:20:41 | 21 | appointment in Frankfort? Is there a bankruptcy court in |
| 05:20:45 | 22 | Frankfort? |
| 05:20:46 | 23 | MR. McJESSY: I don't know, Judge. |
| 05:20:48 | 24 | THE COURT: Any of you? |
| 05:20:49 | 25 | MR. McGARRY: They do have bankruptcy courts in some |

| | | |
|---|---|---|
| 05:20:51 | 1 | of the suburbs. |
| 05:20:52 | 2 | MR. McJESSY: They are in odd places. I know there |
| 05:20:54 | 3 | is one in Lake County. |
| 05:20:56 | 4 | THE COURT: Where is Frankfort? How far away is it? |
| 05:21:00 | 5 | MS. DJORDJEVIC: It's a southwest suburb. |
| 05:21:03 | 6 | MR. McGARRY: Is it Cook County? |
| 05:21:05 | 7 | THE COURT: I don't think so. |
| 05:21:07 | 8 | MS. DJORDJEVIC: He lives in Mokena, which I think is |
| 05:21:11 | 9 | close by. |
| 05:21:12 | 10 | MR. McGARRY: Because DuPage County covers the whole |
| 05:21:15 | 11 | territory for bankruptcy. |
| 05:21:19 | 12 | MS. DEDINAS: It might be Kane or Will. |
| 05:21:21 | 13 | THE COURT: How about Monday morning? |
| 05:21:33 | 14 | MR. McGARRY: Just for Mr. Clark? |
| 05:21:35 | 15 | THE COURT: Yes. Depends on how far we get tomorrow. |
| 05:21:40 | 16 | MR. McGARRY: I am willing to do that. I have to |
| 05:21:42 | 17 | then leave. |
| 05:21:44 | 18 | MS. DEDINAS: Would it be a big inconvenience to |
| 05:21:45 | 19 | start at 10:00 instead of 9:30? |
| 05:21:48 | 20 | THE COURT: Tomorrow? |
| 05:21:48 | 21 | MS. DEDINAS: On Monday. |
| 05:21:49 | 22 | THE COURT: No, that wouldn't be a big inconvenience. |
| 05:21:51 | 23 | We can do that. Does that work for you? I don't want to keep |
| 05:21:55 | 24 | stretching this thing out, and I want to hear the rest of his |
| 05:22:05 | 25 | testimony for sure. |

| | | |
|---|---|---|
| 05:22:05 | 1 | MR. McJESSY:  I just wondered if it made sense to |
| 05:22:09 | 2 | come back once instead of twice.  We are already going to |
| 05:22:14 | 3 | be -- |
| 05:22:14 | 4 | THE COURT:  I think we may be back on Monday anyway, |
| 05:22:14 | 5 | the way things are going.  It depends on how quickly the |
| 05:22:16 | 6 | respondents go tomorrow. |
| 05:22:19 | 7 | MS. DEDINAS:  Well, I will spend some time trying to |
| 05:22:23 | 8 | streamline it now that we've brought so much in already. |
| 05:22:31 | 9 | THE COURT:  Well, do we know if he's got plans for |
| 05:22:31 | 10 | Monday? |
| 05:22:31 | 11 | MR. McJESSY:  We do not. |
| 05:23:25 | 12 | THE COURT:  Well, I tell you what. |
| 05:23:25 | 13 | MS. DJORDJEVIC:  But we do know he's under trial |
| 05:23:25 | 14 | subpoena. |
| 05:23:25 | 15 | THE COURT:  He is.  And this gives him enough advance |
| 05:23:25 | 16 | notice to change any plans he has for Monday. |
| 05:23:25 | 17 | MR. McGARRY:  Is it possible his attorney is here? |
| 05:23:25 | 18 | Is Mr. Serritella here? |
| 05:23:25 | 19 | THE COURT:  I have no idea. |
| 05:23:25 | 20 | MR. LIPTON:  He is on the witness list, so he |
| 05:23:25 | 21 | wouldn't be in the courtroom. |
| 05:23:25 | 22 | THE COURT:  Who did he talk to in the hall?  I think |
| 05:23:25 | 23 | he said he left his attorney in the hall. |
| 05:23:25 | 24 | MR. McJESSY:  I think he said he was talking to his |
| 05:23:25 | 25 | attorney in the hall, on the phone. |

| | | |
|---|---|---|
| 05:23:25 | 1 | MS. DEDINAS: So his attorney is available. |
| 05:23:25 | 2 | THE COURT: 10:00 o'clock Monday morning. |
| 05:23:25 | 3 | All right. Let's go back out. Thank you, Carolyn. |
| 05:23:29 | 4 | MR. McGARRY: Judge, while you are here with the |
| 05:23:29 | 5 | record, maybe it would be good to put your motion in limine on |
| 05:23:29 | 6 | the record instead of doing it out in the courtroom. |
| 05:23:29 | 7 | THE COURT: Before we started, I had you come in here |
| 05:23:29 | 8 | and I told you that I didn't want any of you addressing the |
| 05:23:29 | 9 | issue regarding the alleged phone conversation, I think it was |
| 05:23:32 | 10 | with Mr. Clark, that Mr. Shah had. And according to the |
| 05:23:37 | 11 | information that you submitted in Mr. Borlack's affidavit, he |
| 05:23:42 | 12 | evidently recorded that phone call unbeknownst to Mr. Clark. |
| 05:23:47 | 13 | And I told you to stay away from that because I don't see the |
| 05:23:51 | 14 | benefit of going into that. I don't see the relevance in |
| 05:23:54 | 15 | that. You can tell me what you feel the relevance is. |
| 05:23:58 | 16 | MR. McGARRY: The relevance is that my client does |
| 05:24:01 | 17 | the right thing when he is confronted with some -- a |
| 05:24:05 | 18 | violation -- he is stronger than his clients, and he will tell |
| 05:24:08 | 19 | him what has to be done properly, and he did in that instance. |
| 05:24:11 | 20 | Therefore -- and then the client has an appreciation of the |
| 05:24:14 | 21 | lawyer's seriousness when it comes to such matters. |
| 05:24:19 | 22 | MS. DJORDJEVIC: Your Honor, I don't believe that |
| 05:24:20 | 23 | evidence of character to prove one acted properly now is |
| 05:24:24 | 24 | actually admissible. |
| 05:24:25 | 25 | MR. McGARRY: It's not evidence of character, though. |

05:24:27  1        THE COURT:  What is it evidence of?

05:24:28  2        MR. McGARRY:  It's conduct by the lawyer who is being

05:24:31  3 accused of basically reckless conduct in this case with

05:24:35  4 respect to the same client.

05:24:36  5        THE COURT:  Prior conduct by the lawyer who has

05:24:40  6 subsequently been accused of reckless conduct.

05:24:43  7        MR. McGARRY:  Right.  Why it's important to

05:24:45  8 Mr. Borlack is that --

05:24:46  9        THE COURT:  I can understand why it's important.

05:24:47  10        MR. McGARRY:  He feels it shows that when he's

05:24:50  11 confronted with an ethical dilemma, he acts properly and he

05:24:57  12 instructs his client to do the right thing.

05:24:59  13        THE COURT:  Why can't you argue that post hearing?

05:25:00  14        MR. McGARRY:  I would be happy to.  I'm okay with

05:25:03  15 that, Judge.  I understand.

05:25:04  16        THE COURT:  I will let you do that.  You can do that

05:25:05  17 because that affidavit is in evidence.

05:25:08  18        MR. McGARRY:  Yes.

05:25:08  19        THE COURT:  So do it that way.

05:25:10  20        MR. McGARRY:  I appreciate it very much.  I am okay

05:25:13  21 with it.

05:25:13  22        THE COURT:  Let's go back out.

05:26:28  23   (The following proceedings were had in open court:)

05:26:29  24        THE COURT:  We are going to wrap up tonight, and, Mr.

05:26:31  25 Clark, you cannot be available tomorrow; is that correct?

| | | |
|---|---|---|
| 05:26:31 | 1 | THE WITNESS:  Right. |
| 05:26:33 | 2 | THE COURT:  Okay.  You're directed to be here Monday |
| 05:26:36 | 3 | morning, and if you have prior commitments, you change those |
| 05:26:39 | 4 | commitments. |
| 05:26:39 | 5 | THE WITNESS:  I don't believe Monday I have a prior |
| 05:26:41 | 6 | commitment. |
| 05:26:41 | 7 | THE COURT:  Well, if you do, you need to change them. |
| 05:26:43 | 8 | Okay?  And you need to be here at 9:30. |
| 05:26:46 | 9 | THE WITNESS:  Yes, sir. |
| 05:26:50 | 10 | THE COURT:  Are we finished for the day then? |
| 05:26:53 | 11 | MR. LIPTON:  Yes, your Honor. |
| 05:26:54 | 12 | THE COURT:  You may step down, and you are not to |
| 05:26:56 | 13 | discuss this with your attorney prior to coming in here on |
| 05:27:01 | 14 | Monday. |
| 05:27:02 | 15 | THE WITNESS:  Yes, sir. |
| 05:27:03 | 16 | THE COURT:  As far as your testimony goes.  Do you |
| 05:27:04 | 17 | understand that? |
| 05:27:05 | 18 | THE WITNESS:  Yes, sir. |
| 05:27:05 | 19 | THE COURT:  Okay. |
| 05:27:07 | 20 | MS. DJORDJEVIC:  Actually, your Honor, his attorney |
| 05:27:09 | 21 | is a witness, so he actually can't discuss this with his |
| 05:27:12 | 22 | attorney at all. |
| 05:27:12 | 23 | THE COURT:  Period. |
| 05:27:13 | 24 | Do you understand that? |
| 05:27:13 | 25 | THE WITNESS:  Yes, sir. |

05:27:14　1　　　　THE COURT:  Okay.  We will see you.

05:27:24　2　　　　Who is going to be your first witness tomorrow?

05:27:28　3　　　　MS. DEDINAS:  Mr. Grossman.

05:27:30　4　　　　THE COURT:  And it will be at 9:00 o'clock, so if you

05:27:34　5　could be here a little before, and the reason, we have to get

05:27:36　6　this done.  All right?  Thank you all very much.

7　　　(The hearing was adjourned at 5:30 p.m. on January 27, 2011,

8　until 9:00 a.m. on January 28, 2011.)

## $

**$12** [1] - 165:8
**$13,000** [1] - 9:21
**$22,000** [1] - 267:11
**$25,000** [1] - 266:24
**$2500** [1] - 272:10
**$3.60** [1] - 254:3
**$300,000** [1] - 258:24
**$370,000** [1] - 268:5
**$38,000** [2] - 267:1, 267:12
**$50** [1] - 53:18
**$57,500** [2] - 270:22, 272:10
**$6,500,000** [1] - 254:10
**$60,000** [8] - 91:8, 270:1, 270:19, 271:3, 272:9, 275:19, 282:1, 287:14
**$65,000** [5] - 91:7, 91:14, 268:12, 268:14, 269:9

## '

**'09** [1] - 197:18
**'10** [2] - 221:18

## 1

**1** [4] - 66:7, 204:6, 204:7
**1-B** [1] - 119:10
**10** [2] - 119:4, 202:8
**100** [1] - 246:16
**101** [4] - 93:8, 94:14, 149:15, 155:12
**103** [3] - 74:10, 74:15, 96:18
**10:00** [2] - 297:19, 299:2
**11** [1] - 44:3
**1103** [8] - 7:19, 67:8, 74:15, 74:17, 242:19, 248:1, 253:17, 255:2
**111** [5] - 225:23, 225:25, 243:5, 243:7
**11:00** [1] - 79:14
**11:15** [1] - 226:5
**11th** [2] - 34:2, 37:7
**12** [2] - 178:9, 178:10
**121** [1] - 3:12
**12:00** [1] - 79:13
**12:15** [1] - 118:7
**12:45** [2] - 118:7, 119:8
**134** [1] - 269:13
**135** [1] - 101:20
**138** [1] - 253:13
**139** [1] - 3:14
**13th** [7] - 34:4, 37:7, 96:1, 99:24, 149:24, 155:12, 155:18
**1414** [1] - 62:19
**1448** [1] - 237:16
**145** [2] - 3:16, 113:13
**147** [1] - 289:9
**148** [2] - 271:19, 276:15
**149** [2] - 36:13, 254:22
**14th** [1] - 226:19
**15** [7] - 59:11, 59:19, 66:21, 121:14,

209:1, 210:5, 294:15
**150** [2] - 36:12, 276:13
**151** [1] - 3:18
**152** [2] - 103:2, 103:22
**1553** [1] - 237:23
**156** [2] - 277:17, 277:18
**158** [1] - 3:20
**15th** [18] - 22:10, 22:14, 22:22, 23:7, 81:11, 93:3, 103:10, 113:18, 114:16, 145:14, 145:20, 145:23, 170:15, 232:7, 232:15, 232:19, 239:21, 250:11
**16** [6] - 56:24, 190:24, 237:15, 237:23, 238:14, 241:1
**1619** [1] - 238:14
**1621** [1] - 236:16
**163** [1] - 284:16
**164** [2] - 284:16, 284:18
**169** [2] - 36:6, 36:19
**16th** [9] - 25:10, 25:21, 26:12, 86:1, 103:10, 107:6, 175:23, 260:23, 262:17
**17** [2] - 56:24, 295:7
**171** [1] - 128:14
**174** [2] - 106:16, 106:18
**17th** [1] - 231:17
**17th's** [1] - 209:23
**18** [2] - 53:13, 54:17
**1854-B** [1] - 119:24
**18th** [7] - 10:20, 59:15, 62:19, 209:4, 209:24, 210:5, 231:18
**191** [3] - 43:6, 46:16, 291:2
**196** [4] - 3:22, 46:23, 293:2, 293:4
**197** [1] - 293:14
**19th** [6] - 18:9, 27:21, 28:10, 28:14, 103:10, 103:11
**1:59** [4] - 59:15, 209:5, 209:21, 210:5
**1st** [2] - 102:21, 190:17

## 2

**2** [3] - 31:22, 135:20, 256:2
**2.5** [1] - 254:17
**20** [3] - 190:21, 190:24, 242:10
**2004** [1] - 7:24
**2005** [3] - 117:8, 117:13, 117:17
**2006** [8] - 7:22, 54:6, 67:16, 68:4, 117:8, 117:14, 117:17
**2007** [1] - 117:14
**2009** [12] - 10:3, 10:5, 58:11, 164:23, 165:9, 165:16, 166:1, 178:21, 197:19, 221:6, 247:14, 247:16
**2010** [76] - 10:19, 11:11, 13:23, 19:5, 19:16, 22:14, 23:7, 26:12, 27:21, 28:11, 29:20, 30:4, 30:17, 31:9, 36:25, 37:5, 41:10, 43:8, 47:1, 57:11, 57:24, 58:11, 70:10, 72:8, 73:22, 85:13, 86:3, 88:7, 89:15, 93:3, 93:5, 96:1, 100:22, 103:4, 104:1, 105:4, 106:22, 107:16, 107:19, 107:21, 108:6, 110:18, 112:19, 113:18, 116:23, 121:14, 124:22, 133:20, 145:20, 145:23, 149:24, 155:13,

169:11, 170:15, 190:17, 205:1, 221:7, 221:20, 230:16, 230:25, 231:15, 238:14, 250:16, 253:16, 255:2, 260:23, 268:2, 268:4, 268:10, 269:20, 270:15, 276:21, 277:7, 291:3, 293:7, 293:16
**2011** [4] - 119:7, 140:25, 302:7, 302:8
**205** [1] - 119:16
**208** [1] - 3:24
**20th** [3] - 39:16, 178:21, 231:15
**21** [3] - 13:18, 13:19, 13:21
**213** [1] - 4:1
**217** [4] - 216:6, 217:7, 221:9, 221:16
**219** [1] - 119:24
**21st** [3] - 230:25, 231:19, 255:2
**22** [6] - 63:4, 64:22, 68:14, 135:13, 135:14, 135:18
**222** [2] - 2:5, 120:5
**22nd** [2] - 67:16, 68:3
**23** [2] - 160:13, 160:19
**231** [1] - 119:20
**23rd** [16] - 13:22, 14:16, 34:18, 37:5, 37:8, 104:1, 105:4, 110:18, 112:19, 126:21, 126:23, 127:8, 138:9, 179:22, 234:7
**242** [1] - 4:3
**245** [1] - 4:5
**24th** [6] - 21:10, 23:19, 88:7, 144:2, 250:13, 250:14
**25** [1] - 226:5
**2500** [1] - 270:23
**25th** [8] - 34:6, 160:19, 268:10, 276:21, 277:6, 278:2, 278:7, 278:13
**26** [4] - 89:15, 112:19, 124:22, 125:4
**26th** [31] - 18:3, 19:5, 29:20, 30:4, 36:25, 37:7, 37:15, 38:10, 39:2, 41:10, 41:19, 70:10, 73:22, 89:25, 93:5, 126:20, 138:3, 138:25, 160:2, 161:8, 181:3, 192:9, 223:14, 224:19, 225:2, 225:8, 235:3, 236:16, 242:22, 243:1, 277:6
**27** [2] - 119:7, 302:7
**27th** [2] - 34:12, 37:7
**28** [2] - 70:8, 302:8
**28th** [6] - 10:15, 30:17, 37:7, 49:24, 126:2, 269:20
**29th** [2] - 31:9, 49:24
**2:14** [2] - 62:19, 209:19
**2:48** [2] - 88:7, 177:17
**2nd** [2] - 34:14, 37:8

## 3

**3** [3] - 69:20, 70:21, 104:3
**30** [4] - 73:22, 161:5, 161:7, 242:12
**30-day** [1] - 272:17
**300** [2] - 2:5, 120:5
**300,000** [1] - 258:22
**30th** [11] - 43:8, 46:17, 50:18, 50:24, 91:7, 108:11, 195:16, 290:23, 291:1, 291:3, 293:8

**31** [2] - 75:13, 86:11
**312** [4] - 2:6, 119:17, 119:25, 120:6
**31st** [3] - 47:1, 293:7, 293:16
**32** [1] - 79:9
**3331** [1] - 119:4
**36-month** [1] - 9:21
**3759** [1] - 119:20
**3rd** [5] - 19:16, 19:21, 78:13, 86:3, 167:5

## 4

**4** [2] - 66:22, 254:15
**4.1** [1] - 255:11
**4/10** [4] - 217:24, 218:2, 220:12, 220:23
**4/10-early** [1] - 217:8, 219:9
**4/16** [1] - 227:2
**4/16/10** [1] - 177:17
**4/26** [1] - 226:14
**400** [1] - 78:4
**4307** [1] - 119:16
**435-5639** [1] - 119:25
**44** [3] - 145:12, 145:20, 146:1
**45** [7] - 22:9, 121:11, 144:4, 145:12, 145:15, 145:23, 167:14
**46** [2] - 82:10, 261:1
**4:45** [2] - 145:16, 145:20
**4:53** [1] - 145:23
**4th** [2] - 36:2, 37:8

## 5

**5** [1] - 128:17
**5/10** [6] - 217:8, 217:24, 218:3, 219:10, 220:12, 220:24
**50** [1] - 3:8
**56** [1] - 88:4
**57,500** [1] - 285:13
**5:00** [1] - 295:20
**5:30** [1] - 302:7

## 6

**6** [3] - 3:6, 31:22, 230:18
**6.5** [2] - 254:2, 255:11
**60** [2] - 269:10, 270:7
**60,000** [1] - 282:17
**60504** [3] - 74:10, 74:18, 242:20
**60601** [3] - 2:5, 119:16, 120:5
**60604** [1] - 119:25
**60613** [1] - 119:20
**64** [1] - 3:10
**65** [1] - 270:6
**65,000** [2] - 270:2, 270:13
**6th** [5] - 140:22, 140:24, 195:6, 195:9, 195:16

## 7

**7/20/2010** [1] - 271:23
**7/25** [1] - 277:22
**704-3000** [2] - 2:6, 120:6
**71** [1] - 190:21
**773** [1] - 119:21
**78** [5] - 237:14, 237:15, 238:22, 239:13, 239:15
**79** [7] - 237:22, 238:22, 239:13, 239:15, 239:16, 239:17, 239:18
**7th** [3] - 34:16, 37:8, 253:16

## 8

**80** [12] - 26:6, 26:7, 26:8, 177:16, 238:13, 239:15, 240:7, 240:9, 241:2, 241:5, 241:14
**82** [3] - 28:3, 28:8, 28:24
**84** [3] - 235:15, 235:23, 236:4
**85** [5] - 89:14, 92:3, 124:22, 126:1, 138:2, 138:3, 148:20, 148:23, 236:15
**87** [1] - 125:25
**88** [1] - 126:9
**880-1260** [1] - 119:21
**89** [1] - 31:6

## 9

**91** [1] - 104:24
**938-4070** [1] - 119:17
**9:00** [2] - 302:4, 302:8
**9:30** [2] - 297:19, 301:8
**9:38** [1] - 149:25
**9th** [9] - 38:8, 39:25, 106:22, 107:4, 107:8, 107:21, 108:6, 178:14, 179:5

## A

**a.m** [4] - 79:14, 149:25, 226:5, 302:8
**abide** [2] - 205:10, 261:25
**ability** [3] - 115:6, 230:7, 248:13
**able** [26] - 20:4, 38:5, 40:17, 86:18, 87:10, 90:14, 90:15, 91:9, 107:5, 117:20, 159:10, 181:19, 186:20, 190:9, 190:16, 197:7, 198:19, 198:21, 200:1, 215:24, 215:25, 232:25, 233:8, 235:14, 249:2, 279:16
**absolutely** [3] - 37:22, 48:5, 147:24
**accede** [1] - 257:12
**acceleration** [1] - 178:25
**accent** [3] - 279:18, 280:2, 280:3
**accept** [2] - 270:2, 282:16
**accepted** [1] - 88:19
**access** [90] - 18:12, 20:4, 21:15, 21:21, 24:8, 37:1, 37:2, 37:11, 37:17, 37:22, 38:13, 39:7, 85:5, 85:8, 86:19, 87:10, 89:25, 92:16, 97:23, 98:3, 98:16,

100:22, 100:24, 101:1, 104:16, 104:17, 114:25, 115:6, 115:8, 122:24, 123:3, 123:24, 128:24, 129:7, 129:9, 130:2, 130:8, 130:19, 131:7, 144:16, 146:4, 146:9, 149:4, 149:8, 149:13, 155:4, 156:20, 156:24, 173:13, 182:23, 183:10, 184:6, 184:20, 184:22, 186:13, 188:1, 188:3, 205:4, 205:22, 205:24, 205:25, 206:20, 207:13, 207:16, 217:1, 217:13, 219:4, 219:11, 219:22, 220:2, 220:20, 223:6, 223:24, 224:7, 224:14, 224:17, 224:19, 225:8, 225:21, 228:13, 228:17, 228:20, 229:2, 229:11, 229:14, 230:6, 230:8, 261:15, 263:9
**accessed** [2] - 24:12, 175:2
**accessible** [2] - 84:17, 261:11
**accessing** [3] - 219:20, 219:22, 219:23
**accident** [2] - 222:3, 222:5
**accommodate** [1] - 295:25
**accommodation** [1] - 257:3
**accompanied** [1] - 288:4
**accompanying** [1] - 263:24
**accomplish** [1] - 257:8
**accomplished** [1] - 259:17
**according** [2] - 130:18, 299:10
**Accordingly** [1] - 85:2
**accordingly** [1] - 261:13
**account** [5] - 117:11, 117:13, 117:17, 165:9, 294:21
**accounted** [1] - 166:1
**accounting** [2] - 56:12, 159:17
**accounts** [7] - 67:17, 68:5, 117:9, 117:16, 142:19, 166:12, 166:17
**accurate** [8] - 27:8, 74:24, 96:1, 97:20, 102:21, 102:24, 193:7, 242:22
**accurately** [2] - 161:9, 218:23
**accused** [2] - 300:3, 300:6
**acquire** [2] - 153:19, 212:6
**acquired** [2] - 8:9, 246:16
**acquiring** [2] - 93:20, 94:3
**acquisitions** [1] - 263:16
**act** [1] - 168:8
**acted** [1] - 299:23
**action** [8] - 77:1, 77:5, 83:14, 83:17, 86:7, 91:25, 179:2, 208:8
**actions** [1] - 132:22
**acts** [1] - 300:11
**actual** [10] - 31:21, 82:2, 194:25, 206:22, 222:4, 240:12, 240:13, 247:5, 273:17, 287:14
**add** [1] - 270:23
**addition** [2] - 64:1, 88:17
**additional** [3] - 16:2, 212:21, 288:17
**address** [2] - 195:2, 202:7
**addressing** [1] - 299:8
**adjacent** [1] - 219:9
**adjourned** [2] - 118:7, 302:7
**admissible** [1] - 299:24
**admit** [2] - 164:6, 261:6
**admitted** [2] - 164:13, 164:19
**admonition** [1] - 262:21

**advance** [2] - 21:24, 298:15
**advantage** [1] - 257:5
**advertise** [1] - 279:2
**advice** [3] - 17:1, 123:21, 123:23
**advise** [8] - 38:12, 51:22, 61:18, 76:25, 147:14, 212:13, 226:23, 261:25
**advised** [15] - 11:14, 19:7, 27:22, 36:25, 39:3, 39:6, 42:1, 78:23, 78:25, 79:18, 83:21, 109:14, 110:2, 192:10
**advisement** [1] - 141:24
**advises** [1] - 68:19
**advising** [1] - 33:22
**affidavit** [2] - 299:11, 300:17
**afield** [1] - 61:16
**afternoon** [3] - 118:5, 245:23, 245:24
**age** [1] - 279:12
**ago** [6] - 39:24, 44:3, 129:11, 149:12, 220:25, 226:14
**agree** [10] - 15:10, 40:19, 85:4, 177:15, 178:6, 178:8, 256:1, 257:9, 261:15, 283:21
**agreeable** [1] - 255:13
**agreed** [22] - 17:13, 20:2, 20:11, 21:8, 23:19, 68:25, 91:4, 91:13, 91:15, 91:22, 100:18, 143:24, 166:25, 182:25, 188:5, 200:23, 256:5, 262:7, 282:2, 282:4, 282:8, 282:21
**agreed-upon** [1] - 91:22
**agreement** [28] - 14:22, 15:6, 15:9, 18:8, 18:11, 58:10, 67:13, 67:15, 68:3, 84:11, 84:12, 90:14, 90:15, 90:23, 91:1, 91:11, 93:21, 200:20, 248:16, 248:18, 248:19, 248:24, 249:19, 251:10, 266:25, 270:19, 270:21
**ahead** [11] - 6:18, 14:1, 22:12, 38:16, 157:24, 170:3, 191:1, 202:11, 206:11, 233:19, 245:12
**air** [1] - 77:16
**air-conditioning** [1] - 77:16
**al** [1] - 119:7
**Alan** [21] - 2:3, 5:20, 5:23, 19:12, 26:14, 28:12, 31:11, 64:25, 70:9, 88:8, 94:18, 108:15, 120:3, 126:3, 128:17, 135:19, 226:8, 231:1, 237:17, 238:18
**ALAN** [2] - 2:4, 120:4
**Alexander** [1] - 89:7
**alleged** [1] - 299:9
**allegedly** [1] - 127:23
**allow** [10] - 15:23, 63:23, 85:4, 87:4, 122:22, 199:17, 229:14, 257:24, 261:15, 263:16
**allowed** [5] - 132:4, 132:5, 193:3, 264:7
**alteration** [1] - 60:12
**alternative** [1] - 63:22
**amended** [2] - 18:7, 216:14
**amount** [2] - 165:19, 165:23
**amounts** [1] - 179:1
**AMY** [1] - 119:15
**Amy** [1] - 5:13
**analyst** [1] - 272:3

**angry** [3] - 50:17, 50:19, 141:2
**annoyance** [1] - 187:1
**annoyed** [5] - 186:19, 186:21, 186:22, 186:23, 223:5
**answer** [27] - 9:14, 18:23, 21:3, 34:22, 35:18, 39:11, 49:1, 52:14, 78:11, 99:8, 117:20, 125:16, 147:1, 165:13, 173:24, 183:18, 185:19, 206:9, 206:11, 206:18, 210:15, 218:23, 245:18, 249:5, 253:10, 260:17, 262:24
**ANSWER** [6] - 191:6, 191:9, 191:11, 191:15, 191:18, 191:21
**answered** [1] - 55:24
**answering** [3] - 13:8, 32:7, 265:4
**answers** [6] - 40:15, 100:14, 121:10, 132:24, 188:23, 189:2
**Anthony** [1] - 255:2
**anticipate** [1] - 275:8
**anticipated** [1] - 77:1
**anxious** [3] - 43:9, 291:8, 291:12
**anytime** [1] - 33:7
**anyway** [3] - 159:8, 296:6, 298:4
**apart** [6] - 213:22, 213:23, 213:24, 214:1, 267:18, 267:25
**apologize** [1] - 51:18
**apparel** [4] - 53:3, 53:5, 53:11, 197:22
**APPEARANCES** [3] - 2:1, 119:12, 120:1
**appeared** [1] - 41:10
**applied** [1] - 131:4
**applies** [1] - 231:9
**appointed** [3] - 227:21, 227:25
**appointment** [2] - 295:1, 296:21
**appreciate** [3] - 269:25, 296:1, 300:20
**appreciation** [1] - 299:20
**approach** [2] - 28:22, 234:13
**approached** [1] - 198:8
**appropriate** [1] - 179:2
**approval** [2] - 31:13, 271:25
**approve** [1] - 161:2
**April** [64] - 25:9, 25:10, 25:21, 26:12, 27:21, 28:10, 28:14, 29:19, 30:4, 30:17, 31:9, 33:7, 36:25, 37:7, 38:10, 39:2, 89:15, 89:25, 92:18, 93:5, 110:18, 112:19, 124:22, 125:4, 126:2, 126:20, 126:21, 126:23, 127:8, 130:13, 138:3, 138:9, 138:25, 175:23, 179:22, 181:3, 184:19, 206:19, 206:24, 216:4, 217:4, 218:16, 220:7, 221:10, 221:18, 221:20, 221:22, 225:21, 226:19, 234:7, 235:3, 236:16, 237:15, 237:23, 238:14, 239:21, 241:1, 264:17, 268:2
**Arab** [1] - 285:3
**area** [1] - 112:4
**argue** [1] - 300:13
**argument** [1] - 230:13
**arrange** [2] - 270:12
**arrangement** [15] - 15:23, 23:14, 144:15, 182:4, 199:17, 199:20, 199:21, 201:5, 201:14, 203:7
**arrangements** [10] - 12:4, 12:12,

14:10, 182:2, 182:5, 182:12, 282:19, 283:9, 283:13, 285:14
**arrive** [1] - 105:18
**arrived** [3] - 202:24, 203:6, 246:22
**ASAP** [1] - 140:2
**aspect** [1] - 270:15
**assembled** [1] - 204:23
**asset** [1] - 272:3
**assets** [6] - 5:11, 199:9, 199:13, 202:16, 202:18, 202:20
**assignee** [1] - 250:8
**assignment** [8] - 23:10, 285:14, 285:17, 287:1, 287:2, 288:24, 289:4, 289:5
**assistance** [3] - 156:20, 156:23, 156:24
**assistant** [1] - 288:16
**assisted** [1] - 58:9
**associate** [1] - 229:21
**Associated** [84] - 9:16, 10:6, 10:9, 10:10, 10:15, 11:3, 11:24, 12:3, 12:11, 13:2, 14:18, 16:5, 17:16, 17:21, 18:5, 29:13, 42:1, 42:3, 43:12, 57:5, 72:22, 77:21, 79:14, 79:19, 79:20, 80:14, 85:15, 85:22, 87:14, 87:19, 90:12, 90:15, 92:15, 93:16, 93:21, 94:21, 95:14, 95:16, 95:18, 96:9, 96:14, 97:23, 98:16, 98:24, 99:16, 129:9, 133:20, 143:3, 144:24, 148:12, 150:5, 153:22, 155:10, 156:4, 156:7, 156:16, 177:3, 179:18, 185:2, 187:6, 192:11, 192:23, 212:22, 213:2, 213:8, 223:18, 229:10, 256:10, 258:21, 259:2, 259:21, 265:23, 266:5, 266:25, 267:6, 267:10, 268:4, 268:10, 268:18, 269:25, 270:2, 270:11, 285:13, 285:18
**assume** [2] - 55:14, 270:14
**assumes** [3] - 38:14, 128:1, 176:19
**assuming** [1] - 63:12
**attached** [2] - 31:13, 37:6
**attempt** [5] - 88:1, 134:4, 247:17, 250:24, 266:7
**attempted** [2] - 134:14, 134:18
**attempting** [6] - 133:19, 133:23, 134:11, 135:2, 156:4, 156:15
**attempts** [2] - 48:20, 49:9
**attendance** [1] - 223:14
**attention** [16] - 28:4, 36:3, 36:21, 82:22, 103:25, 104:3, 121:11, 131:2, 138:2, 178:16, 179:5, 225:23, 235:15, 238:22, 243:21, 294:5
**attorney** [37] - 5:13, 5:21, 5:23, 5:25, 17:1, 18:21, 20:8, 32:16, 47:15, 47:16, 52:22, 56:23, 58:4, 58:6, 75:2, 75:3, 75:6, 97:2, 129:22, 141:22, 148:17, 154:22, 189:19, 193:6, 215:10, 247:17, 257:14, 261:20, 261:21, 295:3, 298:17, 298:23, 298:25, 299:1, 301:13, 301:20, 301:22
**attorneys** [27] - 13:5, 29:19, 33:20, 38:11, 38:19, 38:25, 51:23, 52:1, 52:5,

57:23, 58:9, 74:1, 75:6, 88:12, 96:9, 96:13, 106:5, 135:1, 137:9, 137:12, 137:13, 147:21, 148:14, 167:1, 244:1, 244:10, 244:15

**audit** [1] - 203:22

**audited** [1] - 203:19

**August** [46] - 36:2, 37:15, 38:8, 38:11, 39:2, 39:16, 39:25, 41:3, 41:10, 41:19, 43:8, 46:15, 46:17, 47:1, 50:18, 58:11, 91:7, 100:21, 106:22, 107:4, 107:6, 107:8, 107:16, 107:21, 108:6, 108:11, 116:23, 128:17, 164:23, 165:9, 192:9, 195:16, 223:14, 224:19, 225:2, 225:8, 247:12, 290:1, 290:3, 290:11, 290:23, 291:1, 291:3, 293:7, 293:8, 293:16

**Aurora** [20] - 7:17, 8:13, 8:15, 19:14, 33:5, 62:1, 62:7, 62:9, 74:10, 74:17, 102:7, 115:25, 116:3, 161:12, 242:20, 247:5, 248:2, 253:17, 253:22, 255:4

**authority** [1] - 270:6

**available** [7] - 158:22, 158:24, 198:5, 198:6, 296:12, 299:1, 300:25

**Avenue** [1] - 119:16

**avoid** [1] - 63:22

**aware** [73] - 8:8, 18:7, 24:4, 24:11, 26:16, 27:1, 39:1, 57:7, 57:10, 63:18, 69:17, 87:13, 87:16, 96:7, 98:2, 98:20, 99:19, 99:21, 100:11, 124:7, 134:4, 134:10, 142:14, 148:5, 148:10, 149:12, 150:9, 153:14, 153:15, 153:21, 153:24, 155:9, 156:5, 161:4, 165:15, 167:9, 170:14, 172:5, 173:16, 173:19, 175:6, 175:21, 175:22, 176:23, 177:3, 177:10, 177:13, 177:18, 178:6, 179:10, 179:20, 179:25, 180:3, 193:3, 193:4, 193:21, 207:12, 215:18, 225:9, 227:3, 237:18, 238:2, 243:1, 244:1, 244:4, 246:18, 247:3, 255:17, 255:20, 263:10, 278:20, 296:20

**awkward** [1] - 55:18

**B**

**B-h-a-n-s-a-l-i** [1] - 45:1

**baby** [1] - 295:17

**back-to-school** [1] - 197:21

**background** [1] - 159:17

**backup** [6] - 60:7, 62:1, 62:3, 62:6, 164:10, 209:14

**bad** [2] - 91:10, 172:5

**Bailey** [54] - 10:25, 25:11, 29:19, 30:13, 33:21, 38:11, 39:6, 121:18, 122:15, 123:9, 123:17, 124:1, 124:4, 124:14, 126:17, 133:23, 137:13, 138:19, 138:22, 139:2, 147:10, 147:14, 151:14, 153:13, 156:20, 156:24, 160:8, 162:21, 167:1, 180:10, 181:4, 182:20, 186:8, 205:9, 208:12, 208:16, 210:21, 212:2, 212:13, 222:8, 222:15, 222:25, 223:3, 223:5, 225:16, 225:18, 230:15, 233:9, 233:13, 233:25, 242:4, 242:24,

**balance** [2] - 201:6, 258:21

**Bank** [203] - 5:6, 5:9, 5:11, 5:16, 7:22, 7:25, 8:3, 8:4, 8:6, 8:9, 9:16, 10:6, 10:9, 10:10, 10:15, 10:20, 11:3, 11:8, 11:14, 11:25, 12:4, 12:12, 13:2, 13:6, 14:18, 14:21, 14:23, 15:6, 15:13, 15:17, 16:3, 16:5, 17:15, 17:16, 17:19, 17:21, 18:5, 21:13, 22:7, 23:21, 23:24, 24:5, 24:8, 29:10, 29:13, 33:18, 35:22, 41:5, 42:2, 42:3, 43:12, 44:7, 44:11, 52:9, 52:22, 54:2, 54:4, 54:5, 54:9, 54:11, 57:5, 58:10, 65:10, 65:12, 65:18, 65:21, 66:10, 66:13, 66:14, 67:4, 69:2, 69:14, 72:22, 77:21, 79:19, 79:20, 80:14, 81:8, 85:15, 85:16, 85:22, 86:14, 87:7, 87:14, 87:19, 87:20, 87:21, 88:18, 89:13, 90:11, 90:12, 90:15, 90:16, 90:17, 90:24, 92:15, 93:11, 93:15, 93:16, 93:19, 93:20, 93:21, 94:2, 94:21, 95:14, 95:16, 95:17, 95:18, 96:9, 96:14, 97:16, 97:22, 97:24, 98:3, 98:15, 98:17, 98:21, 98:24, 98:25, 99:12, 99:16, 99:22, 100:5, 105:22, 108:6, 108:10, 117:11, 124:8, 133:20, 142:6, 143:1, 143:3, 143:6, 143:19, 144:11, 144:15, 144:24, 148:11, 150:5, 152:18, 153:6, 153:19, 153:22, 153:23, 154:3, 154:24, 155:10, 155:11, 156:4, 156:7, 156:16, 170:16, 173:14, 173:20, 174:3, 174:11, 174:24, 177:3, 185:2, 192:11, 192:23, 212:22, 213:2, 213:8, 223:19, 226:6, 229:10, 229:11, 231:2, 231:8, 246:1, 246:5, 246:13, 246:15, 246:20, 248:1, 248:20, 248:21, 249:20, 250:2, 256:8, 256:10, 256:20, 258:21, 259:2, 259:21, 260:9, 262:19, 263:13, 265:23, 266:5, 266:25, 267:6, 267:10, 268:5, 268:11, 268:18, 285:6, 285:13, 285:18

**BANK** [1] - 119:4

**bank** [51] - 44:10, 57:3, 85:3, 85:4, 85:20, 117:9, 117:11, 156:6, 158:21, 166:17, 198:4, 214:4, 217:13, 219:4, 219:11, 220:2, 220:19, 229:22, 248:23, 249:8, 251:6, 251:11, 251:23, 252:5, 254:17, 256:2, 256:5, 256:24, 257:5, 259:25, 260:6, 261:14, 263:15, 263:16, 263:21, 263:22, 264:1, 264:3, 264:5, 264:23, 265:1, 265:21, 277:2, 282:4, 282:9, 283:5, 284:21, 285:6

**Bank's** [4] - 8:10, 166:13, 179:18, 246:16

**bank's** [5] - 249:1, 249:4, 250:24, 251:2, 263:19

**banker** [1] - 229:13

**banking** [1] - 44:7

**bankruptcy** [5] - 294:17, 294:20, 296:21, 296:25, 297:11

**banks** [2] - 57:4, 295:7

**Barag** [1] - 45:10

**BARAG** [1] - 45:10

**base** [1] - 166:18

**based** [5] - 199:25, 241:5, 252:2, 259:20, 271:3

**basic** [2] - 64:11, 255:14

**basis** [5] - 38:20, 187:11, 206:6, 252:10

**BBM** [1] - 152:15

**became** [5] - 8:8, 87:16, 169:22, 177:10, 260:2

**become** [4] - 154:15, 170:11, 172:7, 180:3

**BEFORE** [1] - 119:10

**began** [3] - 60:2, 182:20, 249:16

**begin** [7] - 5:2, 112:15, 168:16, 246:8, 249:14, 259:20, 294:12

**beginning** [6] - 92:18, 197:21, 208:5, 220:7, 221:22, 226:13

**begins** [7] - 65:2, 67:13, 88:17, 94:23, 106:23, 243:11, 243:18

**behalf** [14] - 5:15, 16:3, 78:14, 83:14, 83:22, 90:12, 102:3, 153:22, 159:22, 178:16, 196:20, 196:21, 223:19, 256:8

**behind** [4] - 24:25, 25:2, 233:16, 233:24

**belong** [1] - 291:14

**belonged** [3] - 45:16, 202:20, 215:13

**belongings** [2] - 22:2, 24:22

**belongs** [3] - 215:12, 229:9, 229:10

**below** [3] - 226:14, 227:9, 255:15

**beneficial** [1] - 16:8

**benefit** [1] - 299:14

**best** [15] - 9:3, 9:6, 20:24, 96:3, 102:22, 209:9, 260:10, 260:22, 265:19, 266:4, 272:25, 288:20, 289:13, 290:18, 293:25

**better** [3] - 9:13, 57:1, 169:25

**between** [16] - 38:10, 39:1, 57:2, 83:10, 94:23, 95:19, 144:23, 159:24, 170:5, 183:3, 199:21, 200:15, 211:13, 220:11, 220:23, 296:4

**beyond** [2] - 49:6, 55:1

**Bhansali** [2] - 44:23, 45:10

**Bhansalis** [2] - 215:4, 215:17

**Biagems** [1] - 280:17

**big** [7] - 77:19, 200:6, 204:2, 204:5, 296:4, 297:18, 297:22

**Bill** [2] - 101:22, 270:11

**bill** [3] - 23:10, 169:21, 288:23

**billing** [1] - 162:9

**bills** [2] - 132:15, 132:17

**binder** [5] - 36:7, 59:7, 178:4, 204:16, 204:19, 204:21, 204:23, 205:1, 209:2

**bit** [6] - 9:25, 111:11, 208:4, 259:23, 268:10, 286:3

**blind** [2] - 12:14, 14:13

**block** [1] - 74:2

**blocks** [1] - 35:8

**blue** [1] - 277:7

**blueprints** [2] - 48:12, 141:15

**Blumenthal** [84] - 11:7, 12:11, 13:1, 13:4, 13:22, 14:16, 14:17, 15:5, 17:2, 19:12, 20:21, 21:8, 22:15, 24:1, 26:14,

28:12, 52:3, 56:23, 58:3, 58:8, 64:25, 65:6, 65:17, 68:24, 69:1, 70:9, 70:18, 72:1, 72:16, 72:19, 73:13, 81:14, 81:17, 82:11, 83:11, 83:14, 83:20, 84:20, 84:23, 84:24, 85:8, 85:19, 87:25, 88:8, 93:22, 94:7, 97:2, 113:19, 117:18, 121:13, 122:12, 122:13, 134:3, 134:13, 135:19, 145:13, 148:2, 149:11, 151:13, 152:16, 154:4, 155:2, 179:12, 179:13, 189:19, 231:3, 238:19, 238:20, 238:25, 239:7, 239:24, 240:2, 240:5, 240:10, 240:21, 240:22, 240:25, 241:4, 241:6, 241:14, 247:17, 260:25, 269:2

**Blumenthal's** [6] - 56:21, 135:9, 137:15, 239:5, 239:11, 296:4
**Boodell** [1] - 5:13
**BOODELL** [1] - 119:13
**book** [8] - 28:1, 28:5, 29:16, 36:8, 62:23, 103:23, 113:14, 128:15
**books** [8] - 122:2, 228:23, 229:5, 229:6, 229:14, 230:8, 230:10, 253:12
**Borlack** [161] - 2:3, 5:20, 10:25, 11:13, 12:21, 19:12, 25:11, 26:14, 28:12, 29:19, 30:13, 31:11, 33:21, 36:2, 36:20, 37:14, 38:1, 38:11, 39:6, 40:4, 40:14, 40:20, 41:2, 41:3, 41:4, 42:1, 50:17, 52:3, 52:11, 52:19, 57:16, 58:13, 58:14, 64:25, 65:6, 68:15, 68:17, 69:4, 70:9, 70:17, 72:2, 72:16, 75:6, 78:23, 78:25, 81:18, 84:25, 88:9, 94:18, 101:24, 108:15, 113:8, 116:20, 120:3, 121:18, 122:15, 123:1, 123:9, 123:17, 124:2, 124:4, 124:14, 124:25, 126:3, 126:11, 126:17, 128:18, 128:24, 130:1, 130:11, 130:25, 131:11, 132:2, 132:20, 132:21, 133:15, 133:17, 133:22, 133:23, 134:3, 134:10, 135:1, 135:7, 135:19, 136:15, 137:13, 138:19, 138:22, 139:3, 139:4, 139:22, 139:25, 140:6, 141:24, 147:14, 147:21, 148:2, 151:14, 151:22, 152:15, 153:13, 153:17, 154:6, 154:23, 155:2, 155:3, 155:14, 156:5, 157:5, 160:8, 162:21, 167:1, 180:10, 181:4, 182:20, 183:12, 184:9, 184:12, 184:18, 184:20, 186:8, 192:10, 205:9, 208:12, 208:16, 210:22, 212:2, 212:13, 216:24, 216:25, 222:8, 222:15, 222:25, 223:4, 223:5, 223:17, 224:10, 224:16, 224:18, 224:21, 225:1, 225:7, 225:16, 225:18, 226:8, 230:16, 231:1, 231:15, 231:19, 233:10, 233:13, 233:25, 237:17, 237:24, 238:19, 242:4, 242:24, 243:14, 244:18, 300:8
**BORLACK** [1] - 5:20
**Borlack's** [7] - 42:13, 77:8, 147:10, 156:20, 156:24, 157:1, 299:11
**borrow** [1] - 288:12
**borrower** [3] - 67:18, 68:6, 273:18
**borrowing** [1] - 166:18
**boss** [1] - 85:19
**bother** [2] - 187:3, 233:23
**bothering** [1] - 187:2

**bottom** [14] - 14:9, 59:15, 88:16, 96:21, 97:7, 97:12, 104:22, 217:7, 217:8, 217:23, 239:15, 243:17, 271:24, 272:20
**bought** [5] - 47:6, 49:16, 109:4, 196:1, 287:10
**bound** [1] - 262:3
**boxes** [3] - 200:10, 200:12, 202:23
**break** [6] - 101:14, 101:16, 133:10, 192:20, 202:10, 222:12
**Bridge** [1] - 255:18
**Brief** [2] - 212:19, 245:13
**brief** [1] - 234:21
**briefly** [5] - 50:25, 111:4, 139:17, 151:7, 247:24
**bring** [8] - 30:9, 48:17, 55:22, 56:14, 115:15, 182:7, 187:23, 198:7
**bringing** [1] - 61:14
**brings** [1] - 154:5
**broker** [2] - 251:9, 251:10
**brokerage** [1] - 251:18
**Brook** [25] - 24:23, 30:10, 30:19, 30:24, 31:24, 32:1, 33:7, 35:3, 89:22, 100:13, 110:17, 111:2, 112:8, 112:12, 127:9, 138:10, 170:20, 171:25, 172:22, 181:17, 182:3, 182:13, 228:6, 236:20, 236:25
**brothers** [1] - 213:18
**brothers-in-law** [1] - 213:18
**brought** [7] - 11:13, 30:19, 154:3, 230:9, 236:20, 236:25, 298:8
**budget** [3] - 268:16, 268:21, 268:23
**build** [1] - 246:17
**building** [76] - 7:13, 7:21, 10:2, 11:9, 14:23, 15:7, 16:15, 16:20, 48:11, 48:12, 48:14, 51:2, 51:9, 56:25, 66:1, 66:3, 68:18, 69:13, 69:15, 86:15, 141:11, 142:8, 142:9, 143:15, 170:18, 173:21, 248:12, 248:20, 248:22, 248:23, 249:1, 249:3, 250:5, 250:10, 250:18, 250:19, 250:25, 251:3, 251:4, 251:6, 251:16, 251:20, 251:23, 252:4, 252:6, 252:15, 252:16, 253:2, 254:8, 254:13, 254:19, 256:3, 257:25, 260:13, 260:21, 263:15, 263:17, 264:14, 264:21, 264:25, 265:9, 265:12, 265:17, 266:11, 266:15, 266:18, 266:20, 274:23, 275:2, 275:9, 286:12, 291:13, 291:14, 291:15, 291:24
**built** [2] - 7:17, 15:25
**bullet** [1] - 70:13
**bunch** [1] - 131:3
**business** [25] - 7:7, 15:25, 16:21, 44:1, 47:24, 52:25, 53:13, 53:22, 54:17, 56:9, 56:10, 103:16, 117:6, 117:7, 163:19, 163:24, 189:9, 189:10, 256:20, 257:16, 258:2, 258:7, 258:10, 275:16, 291:19
**businesses** [1] - 275:21
**busy** [2] - 181:23, 181:24
**but..** [1] - 223:12
**Butterfield** [8] - 7:19, 67:8, 74:10, 74:17, 242:19, 248:1, 253:17, 255:3

**buy** [27] - 16:24, 17:2, 17:16, 17:24, 34:25, 38:9, 41:6, 42:6, 42:9, 56:17, 91:9, 107:5, 169:25, 185:3, 186:24, 188:5, 188:18, 188:21, 191:20, 192:23, 224:4, 237:9, 265:22, 270:11, 277:8, 281:2, 283:17
**buyer** [17] - 43:12, 47:9, 49:9, 51:2, 51:7, 109:21, 116:21, 251:11, 251:16, 251:19, 254:9, 280:20, 282:21, 282:24, 283:21, 283:23, 286:8
**buyers** [1] - 264:20
**buying** [5] - 85:21, 183:14, 183:16, 185:12, 256:21
**BY** [213] - 2:4, 3:6, 3:8, 3:10, 3:12, 3:14, 3:16, 3:18, 3:20, 3:22, 3:24, 4:1, 4:3, 4:5, 6:6, 12:10, 13:11, 13:24, 14:8, 15:4, 16:18, 17:12, 19:1, 20:10, 21:7, 22:13, 23:5, 26:5, 26:11, 26:25, 28:7, 29:1, 30:3, 32:23, 33:2, 34:11, 35:19, 36:18, 38:18, 39:5, 39:15, 40:25, 41:18, 42:16, 45:3, 46:7, 47:19, 48:25, 49:8, 50:9, 51:20, 52:4, 52:16, 54:16, 55:20, 58:16, 59:10, 59:23, 61:21, 62:5, 62:17, 62:25, 64:21, 65:15, 66:6, 66:20, 68:2, 71:6, 71:10, 71:14, 71:25, 73:12, 74:16, 74:23, 75:5, 78:12, 79:2, 80:22, 82:1, 82:24, 83:13, 86:12, 86:25, 87:6, 92:7, 93:25, 94:13, 95:12, 97:4, 97:11, 98:14, 99:1, 99:15, 100:10, 100:20, 101:19, 102:14, 102:18, 103:12, 105:1, 105:10, 106:12, 106:20, 109:23, 112:6, 113:5, 115:5, 119:14, 119:19, 120:4, 121:8, 123:2, 124:13, 124:19, 125:23, 127:6, 127:21, 128:13, 128:16, 133:11, 134:20, 134:24, 137:4, 139:20, 141:1, 145:10, 145:19, 146:13, 146:23, 147:3, 149:23, 150:3, 150:20, 150:24, 151:11, 152:14, 155:21, 156:11, 158:8, 159:11, 160:7, 160:17, 165:14, 165:24, 168:3, 168:7, 168:20, 171:12, 172:2, 174:2, 174:22, 176:22, 178:13, 183:24, 184:17, 185:18, 186:5, 191:2, 192:8, 192:21, 194:18, 195:25, 196:15, 199:16, 202:14, 203:10, 204:13, 206:4, 206:10, 206:23, 208:3, 208:11, 210:1, 210:20, 212:20, 213:1, 213:17, 218:8, 218:22, 219:24, 221:15, 222:13, 223:13, 226:2, 230:24, 234:15, 234:25, 235:16, 236:3, 238:12, 238:16, 239:14, 240:8, 241:12, 242:3, 243:8, 244:9, 244:17, 245:22, 246:11, 247:15, 253:9, 260:19, 263:2, 265:6, 266:22, 269:16, 269:23, 279:17, 282:11, 284:15, 284:20, 288:22

## C

**caller** [6] - 279:5, 279:10, 281:24, 282:12, 282:16, 283:7
**cannot** [10] - 37:21, 73:7, 153:20, 165:11, 165:12, 166:2, 173:24, 206:25,

240:11, 300:25

**Capital** [15] - 44:4, 198:24, 198:25, 199:1, 199:11, 199:18, 199:22, 200:1, 200:19, 200:21, 201:5, 201:7, 202:25, 203:4, 255:1

**capital** [1] - 117:5

**car** [5] - 172:18, 172:19, 295:10, 295:15, 295:21

**carbon** [2] - 12:14, 14:13

**care** [6] - 132:16, 132:17, 132:18, 274:7, 291:16, 295:9

**careful** [3] - 49:6, 73:5, 73:8

**Carl** [1] - 271:22

**Carolyn** [1] - 299:3

**CAROLYN** [1] - 119:23

**carry** [1] - 78:1

**case** [14] - 68:17, 71:22, 89:6, 110:11, 127:7, 135:7, 136:2, 139:11, 145:18, 154:10, 218:12, 226:23, 244:19, 300:3

**catch** [1] - 40:24

**caught** [1] - 207:3

**cc** [1] - 28:12

**ceased** [1] - 163:19

**CENTRAL** [1] - 119:4

**Central** [20] - 5:6, 5:8, 5:11, 5:16, 8:4, 10:20, 11:14, 58:10, 65:21, 66:13, 89:13, 142:6, 143:1, 154:24, 166:13, 226:6, 231:2, 246:5, 246:12, 247:1

**CEO** [3] - 7:4, 55:22, 159:16

**certain** [3] - 132:22, 197:6, 252:2

**certainly** [3] - 61:3, 181:10, 230:22

**certificate** [1] - 159:19

**certificates** [1] - 166:18

**chain** [4] - 28:10, 293:9, 293:10, 293:15

**chambers** [2] - 296:7, 296:8

**chance** [7] - 13:25, 20:8, 32:17, 55:9, 56:25, 105:8, 113:21

**change** [9] - 86:15, 87:7, 115:11, 115:13, 185:25, 186:1, 298:16, 301:3, 301:7

**changed** [2] - 144:15, 260:4

**chaos** [3] - 164:22, 165:5, 165:6

**character** [2] - 299:23, 299:25

**charge** [4] - 159:22, 270:25, 271:1, 285:3

**Charlie** [1] - 236:7

**Charter** [3] - 44:7, 117:11, 285:6

**chasing** [1] - 140:7

**checked** [1] - 204:10

**checking** [1] - 175:17

**Chicago** [8] - 2:5, 119:7, 119:16, 119:20, 119:25, 120:5, 237:9, 270:12

**chief** [2] - 158:11, 159:16

**children** [1] - 295:23

**CHING** [1] - 119:19

**choice** [2] - 69:7, 135:21

**choices** [1] - 250:18

**chose** [2] - 157:5, 189:15

**Christmas** [2] - 197:22, 199:24

**chronological** [1] - 234:10

**chronology** [4] - 216:12, 216:14, 216:15, 216:19

**circumstances** [1] - 287:21

**city** [1] - 294:20

**claim** [4] - 37:20, 37:21, 72:22, 226:21

**claims** [1] - 110:5

**clarified** [2] - 40:1, 40:2

**clarify** [3] - 13:12, 22:5, 176:6

**CLARK** [2] - 4:5, 245:21

**Clark** [115] - 16:3, 16:23, 17:13, 18:3, 35:20, 35:21, 38:5, 40:4, 40:17, 40:21, 40:22, 42:25, 43:4, 43:7, 46:19, 46:25, 48:6, 48:11, 48:17, 48:21, 49:10, 49:12, 49:14, 50:11, 50:22, 51:3, 51:15, 51:21, 56:17, 70:21, 70:22, 71:3, 71:4, 79:9, 79:18, 79:24, 82:14, 85:19, 85:20, 92:4, 92:8, 95:3, 105:25, 106:7, 106:22, 108:12, 115:10, 115:13, 122:6, 123:25, 127:14, 127:23, 130:18, 131:1, 134:17, 139:5, 141:3, 141:18, 141:21, 141:24, 145:13, 146:3, 146:15, 147:6, 157:5, 157:22, 183:12, 184:2, 184:6, 189:3, 189:6, 189:7, 189:9, 189:16, 191:12, 191:20, 193:9, 193:19, 193:23, 194:2, 194:4, 194:5, 194:9, 207:13, 216:2, 216:24, 223:19, 223:23, 224:6, 224:13, 224:16, 228:15, 228:21, 229:4, 229:13, 229:18, 229:21, 229:25, 230:2, 230:5, 230:7, 245:7, 245:9, 245:15, 245:23, 256:1, 269:20, 271:22, 291:3, 293:7, 297:14, 299:10, 299:12, 300:25

**Clark's** [2] - 123:21, 228:12

**clear** [8] - 41:7, 49:4, 55:3, 184:10, 199:24, 204:19, 228:9, 228:10

**clearly** [1] - 157:4

**clerk** [3] - 73:23, 242:15, 295:22

**client** [8] - 8:4, 226:20, 246:4, 252:9, 299:16, 299:20, 300:4, 300:12

**clients** [1] - 299:18

**close** [9] - 29:16, 53:18, 70:22, 214:18, 214:20, 229:21, 248:6, 270:15, 297:9

**closed** [5] - 37:16, 117:16, 117:17, 260:24, 267:3

**closing** [4] - 23:24, 24:2, 254:9, 254:14

**clothing** [4] - 7:8, 16:8, 16:20, 142:15

**coffee** [1] - 180:7

**coincidence** [4] - 46:8, 46:11, 222:5, 287:21

**collect** [1] - 50:3

**collecting** [1] - 236:7

**coming** [6] - 79:13, 80:10, 132:16, 234:19, 274:16, 283:23, 285:22, 301:13

**Commercial** [2] - 67:13, 67:15

**commercial** [1] - 68:3

**commitment** [8] - 15:18, 23:13, 197:7, 197:9, 249:20, 249:22, 256:7, 301:6

**commitments** [2] - 301:3, 301:4

**committed** [4] - 201:15, 201:22, 294:16, 295:3

**common** [1] - 148:1

**communicate** [1] - 105:24

**communicating** [3] - 50:19, 108:17, 148:24

**communication** [9] - 47:15, 108:12, 184:24, 209:7, 217:12, 217:25, 219:3, 219:10, 220:1

**communications** [6] - 38:19, 50:22, 51:1, 52:8, 108:19, 237:25

**community** [1] - 213:20

**companies** [2] - 46:13, 47:25

**company** [58] - 6:20, 15:24, 16:8, 16:19, 35:15, 44:4, 44:19, 46:9, 46:10, 47:13, 47:25, 53:16, 109:4, 109:9, 115:22, 116:9, 116:19, 116:22, 117:2, 117:4, 140:10, 140:11, 158:10, 158:14, 158:17, 158:18, 158:19, 158:22, 158:25, 159:2, 159:12, 163:20, 169:19, 189:19, 193:10, 194:24, 195:12, 197:4, 197:10, 198:8, 198:24, 200:3, 211:3, 214:5, 214:7, 214:9, 214:12, 214:14, 215:7, 253:2, 275:1, 279:20, 279:22, 280:12, 280:13, 287:19, 291:15

**company's** [3] - 10:1, 53:13, 109:6

**compartmentalizing** [1] - 189:14

**complaint** [2] - 72:6, 72:10

**complete** [5] - 37:11, 164:22, 235:24, 257:9, 289:11

**completed** [2] - 91:18, 257:6

**completely** [1] - 193:7

**completion** [1] - 86:15

**compose** [1] - 69:20

**compound** [2] - 133:8, 192:18

**computer** [64] - 8:15, 9:16, 18:12, 19:8, 24:12, 25:12, 43:10, 43:11, 43:13, 60:2, 60:10, 72:23, 73:17, 75:11, 76:3, 76:11, 76:12, 76:15, 77:12, 79:3, 79:6, 84:1, 90:16, 101:24, 101:25, 113:6, 123:10, 134:11, 134:14, 136:19, 136:25, 137:19, 137:21, 143:2, 156:15, 156:16, 156:21, 167:6, 171:24, 176:1, 182:23, 193:24, 194:3, 205:6, 210:25, 226:22, 226:25, 230:9, 230:10, 256:18, 256:21, 256:23, 262:20, 263:6, 266:4, 287:23, 291:8, 291:12, 291:14, 291:16, 292:10, 292:9, 293:9, 293:19

**computers** [69] - 19:18, 24:19, 30:7, 30:23, 31:23, 31:25, 57:21, 60:8, 75:19, 94:22, 95:22, 111:1, 111:16, 112:10, 112:14, 112:15, 112:16, 112:18, 112:21, 112:24, 112:25, 125:5, 126:12, 126:18, 128:18, 170:19, 170:23, 171:1, 171:7, 171:8, 171:9, 171:13, 171:16, 171:17, 171:21, 172:6, 172:9, 172:12, 172:13, 172:15, 172:20, 172:21, 172:22, 173:4, 173:8, 180:11, 180:16, 180:17, 180:18, 211:11, 231:8, 232:12, 232:17, 232:18, 232:20, 232:22, 233:14, 233:17, 233:18, 233:20, 233:21, 233:22, 236:20, 241:7, 291:25, 292:1, 292:5, 292:11

**concept** [2] - 273:11, 291:16

**concern** [1] - 146:4
**concerned** [11] - 55:2, 128:24, 136:16, 146:3, 146:9, 187:16, 187:24, 190:9, 287:13, 291:17, 294:10
**concerning** [2] - 56:2, 238:1
**concludes** [1] - 237:25
**conclusion** [1] - 81:24
**condition** [2] - 175:11, 175:12
**conditioning** [1] - 77:16
**conduct** [4] - 300:2, 300:3, 300:5, 300:6
**confer** [1] - 39:20
**conference** [5] - 111:15, 111:17, 127:9, 157:4, 223:15
**confidence** [2] - 133:15, 133:16
**confidential** [2] - 47:24, 291:19
**confidentiality** [1] - 263:20
**confirm** [2] - 65:2, 139:8
**confirmed** [1] - 210:4
**confirming** [1] - 70:12
**confront** [7] - 47:12, 47:20, 47:23, 48:2, 193:20, 194:2, 292:15
**confrontations** [1] - 292:18
**confronted** [2] - 299:17, 300:11
**confused** [1] - 29:16
**confusing** [1] - 61:8
**confusion** [1] - 89:9
**connection** [8] - 10:24, 16:23, 23:9, 44:1, 85:5, 114:19, 142:2, 261:16
**conscious** [1] - 233:6
**consent** [5] - 23:16, 88:25, 114:17, 114:24, 115:7
**consider** [3] - 176:17, 189:18, 251:12
**considerable** [1] - 247:6
**consideration** [1] - 169:24
**considered** [1] - 170:8
**Consolidated** [2] - 44:5, 117:5
**constituted** [1] - 228:23
**construed** [1] - 109:1
**consult** [2] - 123:16, 123:19
**consultant** [1] - 78:14
**consulted** [1] - 124:4
**consulting** [1] - 124:1
**consumed** [1] - 179:15
**consuming** [1] - 22:18
**consummate** [1] - 81:7
**contact** [6] - 14:10, 18:4, 189:22, 194:4, 247:16, 260:14
**contacted** [1] - 49:24
**contacting** [1] - 189:18
**contained** [3] - 9:7, 142:9, 239:5
**contains** [3] - 219:25, 239:11, 263:15
**contemplate** [2] - 145:1, 145:3
**contemplated** [2] - 250:7, 258:1
**contemporaneous** [1] - 273:6
**contemporaneously** [1] - 177:13
**contentious** [1] - 292:9
**contents** [12] - 66:3, 68:10, 69:14, 121:16, 121:24, 142:1, 142:8, 219:25, 227:13, 227:19, 228:18, 243:24
**contingent** [1] - 253:1

**continue** [1] - 249:10
**CONTINUED** [2] - 2:1, 120:1
**continued** [2] - 43:20, 90:9
**continues** [1] - 66:21
**continuing** [2] - 30:5, 63:1
**continuously** [1] - 98:11
**contract** [7] - 24:4, 24:7, 24:15, 43:10, 211:3, 252:1, 283:17
**contradict** [1] - 192:5
**control** [20] - 18:15, 21:18, 33:22, 38:13, 39:7, 39:13, 41:23, 97:16, 102:7, 102:24, 124:8, 143:23, 174:23, 187:17, 188:3, 226:15, 227:12, 243:12, 243:23, 244:2
**controlled** [3] - 7:10, 77:13, 272:21
**controversy** [1] - 231:8
**convenience** [1] - 14:10
**convenient** [1] - 202:5
**conversation** [44] - 19:12, 29:18, 29:22, 31:14, 38:3, 40:15, 68:15, 70:14, 70:17, 79:18, 92:8, 92:17, 115:17, 125:10, 126:24, 126:25, 128:19, 128:21, 128:23, 129:4, 129:21, 129:24, 129:25, 130:17, 141:12, 141:17, 141:18, 149:6, 152:5, 152:11, 152:19, 153:6, 153:16, 154:1, 154:5, 154:18, 183:13, 217:3, 220:19, 228:25, 243:11, 247:21, 271:15, 299:9
**conversations** [17] - 29:23, 48:16, 134:2, 141:10, 141:19, 148:1, 149:6, 151:12, 151:17, 153:25, 155:1, 289:25, 290:7, 290:10, 290:13, 290:16
**convey** [3] - 94:2, 106:13, 147:21
**conveyed** [2] - 131:1, 148:2
**conveyor** [2] - 16:16, 169:17
**Cook** [1] - 297:6
**copied** [41] - 12:14, 14:13, 25:18, 27:12, 29:2, 70:10, 74:1, 82:12, 82:14, 87:24, 88:8, 88:11, 89:17, 94:18, 97:1, 104:2, 105:3, 114:7, 121:13, 121:18, 124:25, 125:1, 126:3, 126:10, 126:11, 131:3, 134:13, 135:19, 147:4, 149:15, 155:13, 167:16, 177:1, 177:2, 189:24, 190:2, 237:24, 238:20, 260:24
**copies** [7] - 31:10, 38:22, 114:6, 163:3, 163:9, 203:13, 289:19
**copy** [59] - 19:2, 22:5, 22:17, 22:22, 26:13, 27:4, 27:24, 28:20, 31:19, 38:23, 57:12, 74:4, 82:17, 88:14, 94:14, 97:2, 113:23, 113:24, 114:1, 122:5, 123:4, 123:5, 123:22, 124:5, 124:15, 134:17, 144:9, 144:20, 146:24, 167:10, 167:18, 168:4, 168:12, 168:22, 169:1, 169:5, 170:2, 225:20, 226:8, 227:12, 227:19, 228:8, 228:18, 229:6, 229:14, 231:2, 234:11, 234:16, 235:24, 237:17, 238:18, 239:23, 240:4, 242:15, 243:24, 284:21, 289:11, 289:14
**copying** [1] - 123:14
**corner** [1] - 277:22
**corporate** [5] - 33:6, 56:23, 58:3,

115:16, 117:19
**corporation** [19] - 35:22, 54:25, 272:21, 273:1, 273:14, 273:19, 273:24, 274:2, 274:11, 274:16, 275:22, 280:22, 280:24, 281:2, 281:7, 281:12, 281:15, 281:20, 284:10
**corporations** [1] - 122:3
**correct** [191] - 6:10, 6:13, 14:14, 33:17, 33:19, 38:20, 47:8, 55:8, 62:8, 72:24, 82:16, 93:17, 94:19, 95:6, 96:22, 99:13, 116:11, 121:4, 121:14, 121:22, 121:25, 123:11, 123:14, 123:22, 124:2, 125:5, 126:4, 126:7, 126:14, 127:10, 127:14, 129:12, 130:21, 130:22, 132:24, 133:1, 133:20, 134:15, 134:18, 135:3, 135:24, 136:5, 136:13, 136:17, 137:7, 137:8, 137:15, 138:7, 138:10, 139:23, 143:22, 144:1, 144:3, 144:18, 145:17, 146:6, 146:8, 147:20, 149:2, 149:5, 155:8, 160:10, 161:23, 162:2, 163:5, 163:7, 163:17, 164:11, 164:12, 164:25, 165:3, 167:3, 170:21, 177:23, 177:24, 177:25, 178:1, 178:3, 178:7, 179:7, 179:23, 180:22, 182:18, 185:16, 185:19, 185:23, 189:17, 190:3, 195:18, 197:16, 197:24, 198:12, 198:15, 198:18, 199:8, 200:14, 200:25, 201:3, 201:9, 203:8, 205:7, 205:14, 207:17, 210:6, 212:8, 214:5, 214:7, 215:2, 216:4, 216:5, 216:15, 216:16, 216:20, 216:21, 217:19, 217:20, 217:21, 217:22, 220:13, 220:14, 220:17, 220:20, 221:1, 221:7, 221:8, 223:19, 223:24, 224:4, 224:8, 224:11, 224:14, 225:14, 225:16, 227:5, 228:4, 228:8, 228:18, 231:3, 231:16, 231:23, 231:25, 232:9, 232:10, 232:13, 232:20, 233:25, 234:5, 234:7, 235:13, 236:22, 236:23, 236:25, 237:20, 238:4, 238:17, 239:1, 241:7, 241:16, 243:16, 244:3, 246:5, 250:9, 251:15, 251:21, 254:20, 256:11, 256:12, 256:18, 258:22, 260:1, 260:3, 267:23, 268:6, 268:9, 269:7, 271:6, 272:12, 272:19, 272:23, 274:9, 274:17, 275:24, 276:3, 276:23, 277:1, 277:8, 285:10, 290:9, 300:25
**corrected** [2] - 21:4, 78:8
**correcting** [1] - 185:15
**correction** [1] - 232:1
**correctly** [3] - 207:3, 250:13, 268:23
**correspondence** [2] - 30:23, 39:1
**corresponding** [1] - 256:9
**cost** [7] - 22:24, 114:3, 114:5, 114:11, 123:13, 169:7, 281:25
**counsel** [94] - 5:5, 10:25, 11:7, 12:3, 12:6, 12:11, 14:22, 14:24, 15:5, 19:6, 20:11, 20:15, 20:21, 21:8, 25:10, 30:22, 31:1, 37:18, 37:20, 39:3, 39:4, 39:6, 39:20, 50:10, 50:11, 51:18, 52:8, 55:23, 56:16, 57:6, 57:17, 58:17, 62:22, 63:17, 63:25, 64:4, 65:17, 76:25, 78:17, 89:6, 89:13, 90:19, 100:7, 101:21, 112:4,

115:21, 122:7, 122:13, 122:15, 122:19, 135:7, 137:17, 140:22, 145:11, 147:9, 147:17, 148:13, 148:20, 149:3, 149:7, 160:2, 160:8, 162:21, 164:4, 175:24, 180:10, 182:20, 189:25, 196:19, 203:16, 203:24, 205:3, 208:5, 208:8, 208:10, 208:12, 217:13, 219:4, 219:11, 220:2, 220:19, 234:22, 238:8, 243:5, 243:20, 262:20, 263:1, 263:3, 264:5, 264:6, 264:9, 296:7
  **counsel's** [2] - 30:12, 52:24
  **counterclaims** [1] - 110:6
  **country** [1] - 103:13
  **County** [3] - 297:3, 297:6, 297:10
  **couple** [4] - 50:24, 166:5, 166:6, 212:21
  **coupon** [1] - 272:17
  **course** [4] - 33:20, 136:7, 136:10, 159:21
  **court** [94] - 5:1, 18:9, 18:19, 19:3, 19:6, 19:7, 37:15, 38:12, 39:3, 39:7, 41:10, 41:20, 42:1, 42:12, 42:14, 42:17, 44:24, 55:2, 77:18, 92:6, 92:15, 109:24, 111:12, 115:15, 115:16, 121:1, 125:8, 129:20, 129:23, 130:2, 130:8, 130:20, 131:9, 131:20, 133:2, 138:22, 144:17, 155:4, 155:23, 156:1, 160:3, 160:9, 161:5, 183:13, 184:2, 184:7, 184:8, 184:22, 186:12, 186:13, 192:10, 192:14, 193:2, 202:6, 207:2, 207:16, 214:16, 216:2, 216:3, 216:13, 216:14, 216:25, 218:23, 223:1, 223:15, 223:17, 223:23, 224:7, 224:10, 224:13, 224:14, 224:17, 224:19, 225:1, 225:2, 225:7, 229:1, 229:3, 229:12, 263:9, 263:12, 263:17, 263:19, 264:1, 264:3, 264:6, 265:2, 265:5, 295:14, 295:16, 295:25, 296:21, 300:23
  **Court** [2] - 119:23, 119:24
  **COURT** [337] - 5:2, 5:7, 5:12, 5:19, 12:7, 12:9, 13:8, 13:19, 14:2, 14:5, 14:25, 15:2, 17:6, 17:8, 17:11, 18:22, 18:25, 20:6, 20:17, 20:23, 21:1, 22:12, 23:4, 26:4, 26:7, 26:9, 28:1, 28:4, 28:18, 28:22, 30:2, 32:10, 32:13, 32:16, 32:20, 32:25, 34:8, 35:18, 36:7, 36:14, 36:16, 38:16, 39:4, 39:11, 39:22, 40:2, 40:5, 40:7, 40:10, 40:13, 40:24, 41:15, 41:17, 42:15, 44:24, 45:2, 46:6, 47:17, 48:24, 49:3, 50:6, 51:14, 52:1, 52:12, 54:15, 54:21, 54:23, 55:1, 55:7, 55:14, 55:18, 58:1, 58:5, 59:9, 59:19, 59:21, 60:18, 60:20, 61:4, 61:8, 61:19, 62:4, 62:14, 62:23, 63:9, 63:14, 64:4, 64:9, 64:13, 64:16, 65:13, 66:5, 66:18, 67:23, 71:9, 71:16, 71:19, 73:1, 73:3, 73:5, 74:14, 74:20, 75:3, 78:3, 78:8, 78:11, 80:20, 81:25, 82:20, 83:7, 83:9, 86:11, 86:23, 87:2, 93:24, 94:11, 95:11, 97:3, 97:10, 98:6, 98:8, 98:11, 99:3, 99:8, 99:13, 100:8, 100:17, 101:14, 101:17, 102:9, 102:17, 103:9, 104:22, 106:11,

106:17, 106:19, 109:19, 112:2, 112:5, 113:3, 115:4, 117:23, 117:25, 118:3, 119:1, 121:2, 121:4, 122:22, 124:10, 124:12, 124:17, 125:13, 125:18, 125:22, 127:2, 127:18, 128:3, 128:10, 128:12, 128:15, 133:9, 134:23, 137:3, 139:14, 139:16, 140:24, 145:6, 145:16, 145:18, 146:12, 146:22, 147:1, 149:21, 150:1, 150:18, 150:22, 151:6, 151:8, 152:8, 152:12, 155:17, 156:10, 157:9, 157:12, 157:16, 157:18, 157:21, 157:23, 158:2, 159:5, 159:8, 160:14, 160:16, 165:12, 165:13, 165:21, 167:22, 167:25, 168:2, 168:6, 171:8, 171:10, 172:1, 174:1, 174:21, 176:21, 178:12, 183:19, 183:21, 184:15, 185:7, 185:13, 185:16, 185:22, 186:1, 192:6, 192:20, 194:17, 195:23, 196:9, 196:12, 199:15, 202:4, 202:8, 202:11, 203:9, 204:11, 206:6, 206:9, 206:12, 206:15, 206:18, 207:20, 207:24, 209:18, 210:13, 210:15, 210:18, 212:18, 212:24, 213:13, 218:6, 218:20, 219:23, 221:12, 222:10, 222:12, 223:9, 225:24, 226:1, 230:21, 230:23, 234:11, 234:14, 234:18, 235:4, 235:8, 235:12, 235:25, 238:11, 238:15, 239:13, 240:7, 241:11, 241:19, 241:21, 241:24, 244:6, 244:15, 245:2, 245:4, 245:6, 245:8, 245:11, 245:15, 246:10, 247:13, 253:7, 260:17, 262:24, 265:4, 266:20, 269:14, 269:22, 279:15, 282:8, 284:14, 284:17, 288:19, 294:1, 294:5, 294:8, 294:12, 294:18, 294:23, 295:6, 295:11, 295:16, 295:19, 295:22, 296:1, 296:7, 296:9, 296:16, 296:20, 296:24, 297:4, 297:7, 297:13, 297:15, 297:20, 297:22, 298:4, 298:9, 298:12, 298:15, 298:19, 298:22, 299:2, 299:7, 300:1, 300:5, 300:9, 300:13, 300:16, 300:19, 300:22, 300:24, 301:2, 301:7, 301:10, 301:12, 301:16, 301:19, 301:23, 302:1, 302:4
  **court's** [1] - 224:24
  **courtroom** [3] - 158:2, 298:21, 299:6
  **courts** [1] - 296:25
  **cover** [3] - 63:25, 64:1
  **covered** [2] - 63:25, 142:22
  **covers** [1] - 297:10
  **COX** [1] - 119:23
  **crazy** [1] - 74:20
  **created** [2] - 202:15, 221:19
  **creating** [2] - 67:16, 68:4
  **Creative** [37] - 6:16, 6:20, 6:23, 7:5, 7:10, 7:13, 8:10, 9:15, 10:1, 15:7, 15:9, 15:12, 15:18, 19:8, 25:12, 65:11, 128:25, 143:18, 158:12, 170:15, 170:19, 175:25, 178:15, 178:16, 200:13, 200:15, 202:23, 226:21, 246:17, 247:3, 247:10, 248:3, 249:20, 250:7, 253:22, 255:4, 257:24
  **credit** [20] - 53:23, 53:25, 54:3, 54:5, 54:7, 54:10, 54:14, 54:18, 70:25, 71:11,

71:12, 71:15, 198:5, 199:3, 199:7, 199:12, 199:18, 200:2, 272:3
  **creditor** [5] - 25:11, 27:23, 28:15, 175:25, 176:10
  **creditors** [3] - 107:12, 107:16, 107:18
  **CROSS** [8] - 3:8, 3:12, 3:22, 4:1, 50:8, 121:7, 196:14, 213:16
  **cross** [15] - 52:13, 55:9, 55:15, 55:16, 60:23, 61:5, 63:24, 64:17, 100:17, 118:1, 121:4, 139:16, 196:11, 207:19, 294:9
  **CROSS-EXAMINATION** [8] - 3:8, 3:12, 3:22, 4:1, 50:8, 121:7, 196:14, 213:16
  **cross-examination** [9] - 52:13, 55:9, 55:15, 55:16, 60:23, 63:24, 64:17, 196:11, 207:19
  **CRR** [1] - 119:23
  **Cruises** [2] - 6:16, 6:19
  **CSR** [1] - 119:23
  **CULBERTSON** [2] - 2:3, 120:3
  **cumulative** [1] - 238:8
  **cure** [1] - 27:17
  **current** [1] - 275:16
  **custody** [1] - 18:14
  **custom** [1] - 277:24
  **customer** [2] - 197:7, 200:6
  **customers** [14] - 9:4, 9:11, 53:19, 56:14, 158:20, 159:13, 162:7, 162:9, 162:14, 163:3, 163:9, 197:9, 203:11, 203:13
  **cut** [1] - 209:25

**D**

  **daily** [1] - 187:11
  **Daniel** [1] - 101:22
  **Darwin** [1] - 251:18
  **dash** [2] - 140:6, 194:23
  **data** [71] - 8:24, 9:2, 11:17, 12:20, 12:23, 13:3, 13:6, 14:19, 17:3, 22:6, 22:22, 23:25, 24:5, 25:6, 25:7, 30:15, 37:12, 37:18, 38:13, 47:13, 57:22, 110:9, 110:10, 144:9, 144:10, 144:20, 162:3, 162:11, 162:21, 163:12, 163:15, 164:4, 164:6, 164:10, 164:13, 166:8, 166:11, 167:2, 167:11, 167:19, 168:12, 168:22, 169:5, 170:10, 172:10, 173:13, 175:2, 182:23, 187:17, 188:1, 205:22, 205:24, 206:20, 207:9, 215:20, 215:23, 216:1, 225:22, 226:6, 226:25, 228:5, 228:13, 228:22, 228:22, 229:5, 231:9, 232:25, 233:4, 262:8, 263:13
  **date** [40] - 29:8, 39:17, 65:5, 82:8, 84:13, 85:2, 92:5, 93:2, 93:3, 93:5, 114:17, 118:8, 143:6, 153:20, 156:19, 170:1, 181:2, 195:12, 206:25, 217:16, 218:2, 218:13, 218:14, 218:15, 220:5, 221:25, 222:2, 222:4, 230:25, 231:17, 234:8, 235:2, 239:12, 255:14, 261:13, 271:23, 276:21, 276:24, 277:22, 277:24
  **dated** [41] - 13:22, 22:10, 22:14, 26:12,

28:10, 31:9, 43:7, 47:1, 59:15, 62:19, 67:1, 67:15, 68:3, 73:22, 88:6, 89:15, 104:1, 105:3, 106:22, 113:18, 114:16, 121:14, 126:2, 145:14, 149:24, 155:12, 155:18, 178:14, 209:4, 220:11, 221:6, 226:5, 236:16, 237:15, 238:14, 239:21, 253:16, 255:1, 269:20, 291:3, 293:16

**dates** [2] - 130:14, 151:17

**Dave** [23] - 47:3, 50:11, 50:20, 70:21, 70:22, 79:9, 79:24, 82:14, 92:4, 95:3, 106:7, 106:22, 108:12, 115:10, 130:18, 131:1, 135:19, 145:13, 146:3, 146:15, 234:8, 263:23, 293:10

**DAVID** [3] - 4:5, 119:15, 245:21

**David** [17] - 5:8, 5:18, 16:2, 19:16, 31:10, 42:24, 43:7, 46:25, 59:24, 73:24, 160:20, 193:9, 193:19, 269:19, 271:22, 291:3, 293:6

**days** [4] - 72:2, 181:19, 181:25, 277:5

**DCT** [1] - 255:19

**deal** [18] - 15:17, 16:2, 42:4, 42:9, 76:3, 90:20, 192:12, 192:17, 247:20, 247:24, 247:25, 256:6, 267:3, 267:18, 267:24, 268:8, 273:11

**dealing** [4] - 72:12, 94:1, 189:9, 238:25

**Dearborn** [1] - 119:24

**December** [3] - 10:5, 178:21, 190:17

**decide** [1] - 211:24

**decided** [3] - 10:16, 123:7, 168:8

**decision** [14] - 22:5, 22:22, 32:6, 124:1, 124:14, 144:8, 167:9, 167:18, 167:20, 167:24, 167:25, 170:5, 233:6, 267:21

**decrease** [2] - 165:8, 165:15

**DEDINAS** [178] - 3:6, 3:14, 3:20, 4:5, 5:5, 6:6, 12:8, 12:10, 13:10, 13:11, 13:21, 13:24, 14:8, 15:1, 15:4, 16:18, 17:7, 17:10, 17:12, 19:1, 20:5, 20:10, 20:16, 20:24, 21:5, 21:7, 22:11, 22:13, 23:5, 26:5, 26:8, 26:11, 26:21, 26:23, 26:25, 28:3, 28:7, 28:19, 28:24, 29:1, 30:3, 32:8, 32:19, 32:23, 33:2, 34:11, 35:19, 36:12, 36:15, 36:18, 38:18, 39:5, 39:15, 40:23, 40:25, 41:18, 42:16, 45:1, 45:3, 46:7, 47:19, 48:23, 48:25, 49:8, 50:5, 52:16, 54:20, 55:12, 60:15, 60:19, 63:7, 64:7, 71:5, 71:8, 71:13, 78:6, 83:6, 92:2, 93:23, 94:10, 95:10, 98:5, 98:10, 98:23, 99:11, 106:10, 109:17, 112:1, 113:2, 115:1, 115:3, 119:14, 139:17, 139:20, 141:1, 145:4, 145:7, 146:11, 146:20, 146:25, 150:17, 157:17, 157:22, 157:25, 158:8, 159:3, 159:11, 160:6, 160:7, 160:17, 165:14, 165:24, 168:3, 168:7, 168:16, 168:20, 171:7, 171:9, 171:11, 171:12, 172:2, 174:2, 174:20, 174:22, 176:22, 178:13, 183:24, 184:17, 185:18, 185:24, 186:5, 190:25, 191:2, 192:8, 192:21, 194:18, 195:22, 195:25, 196:8, 199:14, 202:3, 210:12, 210:14, 241:22, 244:14, 245:7,

245:9, 245:22, 246:7, 246:11, 247:15, 253:5, 253:9, 260:19, 263:2, 265:6, 266:22, 269:15, 269:16, 269:23, 279:17, 282:11, 284:13, 284:15, 284:18, 284:20, 288:22, 294:2, 294:7, 295:9, 295:13, 296:14, 297:12, 297:18, 297:21, 298:7, 299:1, 302:3

**Dedinas** [15] - 5:5, 20:21, 40:16, 60:7, 64:5, 74:2, 75:14, 110:21, 110:24, 131:2, 131:14, 137:17, 215:19, 222:7, 222:14

**Deed** [1] - 65:14

**deed** [36] - 13:5, 13:12, 15:12, 20:2, 23:9, 23:10, 65:9, 69:14, 81:7, 84:13, 85:18, 86:15, 87:20, 88:19, 90:7, 93:1, 93:3, 143:6, 143:17, 143:19, 143:20, 170:16, 170:25, 171:3, 248:6, 249:15, 250:10, 256:7, 257:10, 257:12, 257:23, 259:24, 260:23, 268:25, 275:7

**deems** [1] - 179:2

**default** [21] - 11:4, 11:8, 14:23, 15:7, 27:16, 27:17, 58:10, 176:25, 178:20, 198:4, 198:17, 238:1, 241:10, 241:15, 247:11, 247:12, 247:18, 274:23, 275:1, 275:3, 275:4

**defaulted** [3] - 10:2, 10:6, 158:21

**defaults** [1] - 10:1

**defective** [2] - 76:4, 76:7

**defendant** [6] - 5:24, 6:2, 6:9, 158:10, 193:4, 217:12

**defendant's** [2] - 63:18, 160:3, 160:9, 161:10

**Defendants** [2] - 119:8, 119:19

**defendants** [16] - 6:1, 6:12, 6:15, 10:6, 10:21, 10:24, 18:11, 113:7, 159:22, 159:24, 168:12, 175:17, 219:3, 219:10, 220:1, 220:19

**defense** [1] - 110:5

**deficiency** [4] - 248:12, 248:13, 275:9, 275:13

**delayed** [2] - 190:8, 190:15

**delete** [8] - 59:5, 208:19, 209:6, 209:10, 231:24, 232:5, 232:12, 232:16

**deleted** [1] - 231:8

**deletion** [1] - 172:10

**delinquent** [1] - 25:24

**deliver** [1] - 197:8

**delivered** [1] - 254:14

**demand** [21] - 26:15, 26:19, 27:13, 27:23, 28:16, 29:13, 87:18, 87:19, 96:8, 96:18, 97:24, 98:2, 98:17, 98:20, 99:11, 99:16, 99:22, 176:12, 179:3, 239:1, 257:12

**Demand** [3] - 97:22, 98:15, 99:2

**demanding** [2] - 132:6, 176:17, 268:5

**demands** [4] - 87:13, 96:13, 100:2, 176:10

**denied** [1] - 87:20

**Department** [3] - 197:13, 197:14, 203:7

**department** [2] - 53:3, 188:13

**deposed** [1] - 116:4

**deposit** [1] - 23:11

**deposition** [9] - 116:21, 164:18, 190:17, 190:21, 191:24, 218:10, 261:5, 261:6, 296:4

**depositions** [1] - 128:8

**describe** [6] - 77:18, 219:15, 220:22, 229:24, 230:2, 247:24

**described** [4] - 67:18, 68:6, 220:1, 221:2

**describes** [2] - 74:6, 220:24

**describing** [2] - 70:14, 160:9

**description** [3] - 218:18, 219:15, 289:6

**DESCRIPTION** [1] - 3:4

**designated** [1] - 202:22

**desk** [3] - 277:14, 277:15, 283:3

**desks** [2] - 172:25, 173:5

**desktop** [1] - 79:3

**despite** [2] - 19:21, 275:20

**destroy** [2] - 59:2, 59:4

**detail** [1] - 166:24

**details** [7] - 9:7, 63:11, 174:5, 188:8, 188:17, 188:20, 188:25

**determined** [1] - 268:23

**Development** [1] - 255:18

**devotes** [1] - 36:24

**DI** [1] - 140:6

**DIA** [1] - 194:23

**Diagems** [29] - 44:11, 44:20, 44:22, 45:10, 45:25, 46:1, 46:9, 46:10, 115:22, 115:23, 140:6, 140:12, 193:10, 194:19, 194:22, 194:24, 194:25, 195:18, 214:5, 214:7, 214:10, 214:13, 214:15, 215:7, 215:11, 215:12, 215:13, 280:17, 285:1

**dialect** [1] - 279:25

**dialog** [1] - 269:12

**Dieterich** [1] - 79:19

**difference** [1] - 251:22

**different** [12] - 46:12, 62:16, 69:16, 103:23, 109:3, 109:6, 157:6, 158:25, 192:18, 195:11, 255:23, 279:25

**difficult** [5] - 20:17, 49:4, 61:11, 223:9, 279:20

**dilemma** [1] - 300:11

**direct** [19] - 28:4, 54:23, 55:10, 55:15, 60:19, 60:22, 61:10, 63:8, 63:23, 64:2, 64:16, 100:8, 100:9, 100:18, 121:11, 138:2, 207:20, 207:22, 225:23

**DIRECT** [10] - 3:6, 3:10, 3:20, 3:24, 4:5, 6:5, 64:20, 158:7, 208:2, 245:21

**directed** [2] - 150:22, 301:2

**directing** [1] - 148:25

**direction** [4] - 35:15, 75:7, 75:10, 86:4

**directly** [4] - 10:10, 35:14, 281:16, 285:13

**directory** [1] - 234:11

**disagree** [3] - 27:6, 27:7, 29:5

**disappointed** [2] - 50:20, 141:3

**discharge** [1] - 296:10

**discover** [1] - 235:9

**discoverable** [1] - 18:14

**discovery** [9] - 20:20, 84:19, 123:10, 136:8, 159:22, 159:25, 174:18, 179:16, 261:13

**discovery/United** [1] - 226:6

**discrepancies** [3] - 164:15, 164:19, 166:9

**discrepancy** [1] - 165:25

**discuss** [16] - 48:20, 57:19, 79:23, 110:22, 129:23, 146:14, 147:6, 182:5, 227:14, 227:18, 261:21, 262:19, 263:1, 263:3, 301:13, 301:21

**discussed** [27] - 29:12, 41:22, 72:20, 83:19, 84:21, 84:23, 84:24, 85:8, 111:18, 114:19, 128:23, 129:12, 130:1, 154:2, 157:4, 167:10, 167:11, 179:8, 193:14, 193:18, 193:22, 194:1, 226:14, 251:10, 269:24, 281:4

**discusses** [1] - 156:14

**discussing** [10] - 62:12, 63:17, 122:5, 122:12, 122:17, 122:21, 137:9, 137:10, 154:16, 222:15

**discussion** [11] - 41:16, 72:1, 85:18, 129:4, 136:11, 136:12, 136:24, 152:17, 152:23, 155:8, 168:14

**discussions** [10] - 16:23, 48:7, 65:16, 65:17, 71:18, 136:1, 168:11, 168:21, 168:25, 194:13

**dismay** [1] - 292:20

**disputed** [1] - 126:24

**distance** [1] - 50:21

**distinct** [1] - 137:6

**distribute** [1] - 53:3

**DISTRICT** [2] - 119:1, 119:1

**DIVISION** [1] - 119:2

**DJORDJEVIC** [8] - 5:15, 51:17, 119:14, 297:5, 297:8, 298:13, 299:22, 301:20

**Djordjevic** [1] - 5:15

**Docket** [1] - 119:4

**document** [7] - 24:11, 31:14, 66:8, 122:20, 216:8, 216:11, 217:15

**documenting** [2] - 82:25, 261:9

**documents** [12] - 23:23, 24:2, 24:3, 24:22, 164:9, 188:15, 265:18, 289:4, 289:5, 289:12, 289:14, 289:20

**dollars** [2] - 166:5, 166:6

**DOMANSKIS** [1] - 119:13

**Domanskis** [3] - 5:14, 74:2, 89:7

**done** [30] - 19:18, 25:4, 36:15, 60:9, 75:7, 75:10, 75:19, 75:25, 90:8, 132:11, 133:4, 133:5, 145:7, 155:10, 156:25, 167:6, 170:13, 170:23, 170:24, 179:13, 188:15, 210:7, 210:10, 210:17, 215:20, 225:21, 299:19, 302:6

**door** [3] - 44:23, 45:10, 115:21

**doors** [1] - 260:3

**doubt** [1] - 201:23

**down** [20] - 8:6, 60:7, 66:17, 67:12, 117:8, 117:14, 117:15, 157:18, 195:13, 217:7, 227:9, 245:4, 252:3, 252:4, 277:24, 280:17, 280:18, 284:6, 284:23,

301:12

**draft** [1] - 31:2, 31:13, 31:21

**drafted** [3] - 169:14, 169:18, 272:4

**draw** [4] - 82:21, 104:3, 235:15, 243:20

**drawn** [1] - 271:4

**drew** [1] - 238:21

**drive** [19] - 74:20, 84:2, 84:17, 113:24, 113:25, 114:6, 122:2, 122:6, 123:14, 123:22, 124:5, 124:15, 146:4, 146:7, 146:10, 146:15, 146:19, 228:18, 261:11

**Driver** [2] - 271:22

**drop** [1] - 173:8

**dropped** [1] - 172:9

**Dubai** [13] - 43:13, 43:24, 44:2, 44:14, 44:17, 46:9, 103:20, 117:1, 193:10, 195:18, 214:4, 214:9, 285:7

**due** [4] - 37:14, 177:4, 178:22, 179:1

**DuPage** [1] - 297:10

**during** [16] - 54:18, 100:21, 103:4, 127:8, 129:21, 143:10, 148:1, 159:21, 175:15, 204:15, 212:6, 225:2, 257:25, 266:11, 290:13, 290:16

**duty** [4] - 11:15, 25:7, 166:22, 263:13

**E**

**e-discovery/United** [1] - 226:6

**e-mail** [235] - 11:21, 13:4, 22:10, 22:14, 24:1, 24:14, 25:13, 25:21, 26:12, 27:22, 28:10, 28:13, 29:21, 29:25, 31:9, 32:24, 33:3, 37:5, 37:6, 38:8, 39:14, 39:25, 43:3, 43:7, 43:17, 46:25, 47:6, 50:18, 59:24, 61:25, 62:16, 62:18, 63:6, 63:15, 64:24, 65:2, 68:19, 69:20, 69:21, 70:9, 70:24, 75:14, 75:17, 78:13, 79:9, 82:11, 82:14, 82:17, 82:19, 82:22, 83:10, 83:18, 83:21, 83:25, 85:24, 86:3, 86:7, 87:23, 87:24, 87:25, 88:5, 88:6, 89:15, 91:24, 91:25, 92:2, 92:19, 92:20, 93:5, 94:17, 94:20, 101:21, 102:5, 102:16, 103:25, 105:2, 105:6, 106:1, 106:2, 108:15, 113:17, 113:18, 113:20, 113:23, 114:16, 115:10, 121:13, 121:16, 121:19, 124:3, 124:23, 125:1, 125:4, 125:7, 125:12, 125:19, 125:21, 126:2, 126:10, 126:16, 126:20, 128:17, 135:17, 135:18, 136:1, 138:3, 138:14, 138:17, 144:8, 145:13, 145:20, 145:25, 146:3, 146:19, 146:24, 147:7, 147:17, 148:22, 149:3, 149:15, 149:24, 150:11, 150:12, 150:18, 151:1, 155:13, 155:22, 156:14, 156:19, 167:5, 167:15, 169:14, 169:18, 169:24, 179:11, 182:22, 183:4, 183:5, 183:8, 183:9, 206:19, 206:21, 206:24, 207:9, 208:23, 209:3, 209:4, 209:6, 209:12, 209:14, 209:24, 210:4, 210:11, 210:24, 212:12, 212:15, 218:12, 218:13, 218:17, 219:25, 220:4, 220:6, 220:7, 220:8, 220:11, 220:14, 220:16, 220:24, 221:3, 221:4, 221:5, 221:24, 222:4, 226:5, 226:9, 226:11,

227:17, 228:14, 230:25, 231:13, 231:20, 231:22, 232:1, 232:3, 232:4, 232:14, 234:9, 234:17, 234:22, 235:10, 235:20, 235:22, 236:16, 236:17, 237:15, 237:24, 238:13, 239:2, 239:4, 239:10, 240:6, 240:18, 240:23, 241:1, 241:3, 241:14, 241:17, 243:9, 244:6, 244:7, 260:24, 261:3, 261:7, 262:11, 262:14, 262:23, 269:8, 269:11, 269:19, 271:8, 290:24, 291:3, 291:9, 291:22, 293:1, 293:6, 293:8, 293:15, 293:23

**e-mailed** [2] - 36:2, 46:19

**e-mails** [36] - 11:17, 33:22, 34:2, 57:22, 59:5, 59:13, 106:21, 126:6, 131:3, 131:10, 131:14, 132:5, 134:13, 134:21, 134:25, 147:10, 148:8, 167:2, 184:12, 184:18, 189:25, 190:2, 208:19, 209:10, 211:13, 217:21, 222:9, 222:15, 228:11, 231:7, 231:9, 234:2, 238:21, 238:25, 240:14, 240:20

**eager** [1] - 174:3

**early** [12] - 10:19, 11:11, 57:24, 117:14, 211:8, 215:19, 216:4, 217:4, 217:24, 218:2, 218:16, 220:12, 220:23, 220:24, 221:9, 221:10, 221:11, 221:18, 290:1

**easier** [2] - 57:2, 276:14

**EASTERN** [1] - 119:2

**easy** [2] - 224:18, 224:22

**economic** [1] - 255:15

**EDI** [2] - 162:12, 163:12

**effect** [2] - 87:23, 122:2

**effort** [9] - 25:22, 27:23, 28:16, 50:3, 109:8, 195:4, 195:17, 205:18, 212:2

**efforts** [6] - 30:13, 114:4, 149:18, 188:17, 211:14, 290:7

**eight** [2] - 145:23, 235:5

**eighteen** [1] - 53:1

**either** [17] - 24:10, 31:24, 69:7, 112:10, 123:20, 135:21, 150:25, 163:13, 167:22, 189:4, 210:7, 223:23, 225:19, 227:12, 243:23, 254:19, 278:13

**elaborate** [7] - 20:7, 32:11, 32:17, 169:8, 170:3, 177:6, 218:7

**electronic** [7] - 30:14, 123:10, 159:25, 162:11, 163:6, 217:24, 226:25

**electronically** [14] - 18:8, 58:18, 58:22, 208:9, 208:16, 210:22, 216:18, 216:20, 217:19, 219:2, 219:16, 219:18, 221:17, 221:19

**electronically-stored** [13] - 18:8, 58:18, 58:22, 208:9, 208:16, 210:22, 216:18, 217:19, 219:2, 219:16, 219:18, 221:17, 221:19

**Elizabeth** [4] - 73:23, 160:20, 161:8, 242:14

**Emirates** [1] - 285:3

**employed** [3] - 78:14, 245:25, 246:4

**employees'** [1] - 31:23

**empty** [1] - 250:19

**encountered** [1] - 10:1

**end** [24] - 43:15, 56:9, 56:10, 72:5, 92:18, 130:13, 217:8, 217:23, 218:2, 218:16, 219:9, 220:7, 220:12, 221:10, 221:17, 221:20, 225:21, 234:20, 242:5, 242:18, 270:15, 281:21, 285:22

**ended** [1] - 61:6

**ends** [1] - 94:24

**engage** [2] - 53:22, 251:9

**engagement** [1] - 211:6

**engaging** [4] - 76:2, 76:11, 210:25

**ensure** [1] - 24:12

**entered** [5] - 20:11, 21:8, 23:13, 23:20, 57:8

**entering** [2] - 43:10, 283:17

**entertaining** [1] - 264:20

**entire** [7] - 36:24, 54:18, 76:16, 111:8, 144:25, 238:24, 248:4

**entirely** [2] - 42:18, 258:17

**entities** [3] - 58:13, 254:20, 256:4

**entity** [2] - 250:4, 254:9

**entries** [2] - 217:7, 217:15

**entry** [5] - 217:11, 219:9, 220:9, 220:22, 221:16

**equipment** [38] - 12:5, 12:12, 12:17, 14:11, 19:19, 72:23, 73:17, 75:11, 75:20, 79:6, 79:14, 90:20, 97:15, 97:17, 97:23, 98:3, 98:16, 98:21, 99:17, 99:24, 100:4, 142:21, 167:7, 167:11, 175:17, 179:1, 179:19, 205:6, 232:24, 256:21, 256:23, 266:6, 267:7, 267:11, 288:8, 289:2, 289:6

**Equities** [15] - 260:6, 260:7, 260:11, 260:14, 260:15, 260:18, 265:13, 265:16, 283:14, 283:20, 286:13, 286:20, 287:9, 288:1, 288:3

**Eric** [30] - 2:3, 5:17, 25:14, 26:13, 26:15, 28:11, 31:10, 31:16, 89:16, 94:17, 94:20, 101:21, 104:1, 110:22, 120:3, 124:23, 126:2, 128:17, 177:18, 226:7, 237:16, 237:18, 238:18, 239:5, 239:8, 239:9, 239:10, 239:23, 243:9

**Eric's** [1] - 37:5

**error** [2] - 27:9, 27:10

**escorted** [1] - 265:12

**ESI** [27] - 18:14, 31:13, 37:12, 37:15, 57:7, 59:3, 76:16, 78:14, 110:22, 113:6, 123:16, 127:9, 131:12, 132:18, 156:25, 157:7, 160:4, 160:9, 161:10, 162:24, 179:23, 211:6, 216:15, 216:17, 226:6, 234:7

**essence** [2] - 251:12, 274:14

**essentially** [3] - 86:7, 123:21, 237:23

**establish** [1] - 71:18

**estimate** [2] - 279:12, 279:16

**estimates** [1] - 123:17

**et** [1] - 119:7

**ethical** [1] - 300:11

**Europe** [1] - 103:19

**event** [1] - 77:1

**eventually** [5] - 81:7, 247:20, 247:22, 247:23, 249:8

**evicted** [5] - 20:12, 21:9, 88:20, 88:23, 174:4

**eviction** [9] - 20:12, 21:9, 23:20, 69:15, 88:25, 89:2, 143:24, 244:4, 250:14

**evidence** [19] - 11:15, 18:13, 26:19, 37:21, 38:15, 48:3, 61:23, 67:21, 74:13, 122:17, 128:2, 128:8, 166:22, 167:2, 176:20, 299:23, 299:25, 300:1, 300:17

**evidences** [1] - 37:13

**evidently** [1] - 299:12

**ex** [1] - 31:23

**ex-employees'** [1] - 31:23

**exact** [6] - 92:5, 213:23, 222:2, 229:8, 269:12

**exactly** [12] - 9:7, 61:2, 142:6, 153:20, 183:9, 194:10, 204:25, 206:25, 223:20, 294:25

**examination** [17] - 52:13, 54:24, 55:9, 55:10, 55:15, 55:16, 60:22, 60:23, 61:10, 63:12, 63:24, 64:3, 64:16, 64:17, 196:11, 207:19

**EXAMINATION** [26] - 3:6, 3:8, 3:10, 3:12, 3:14, 3:16, 3:18, 3:20, 3:22, 3:24, 4:1, 4:3, 4:5, 6:5, 50:8, 64:20, 121:7, 139:19, 145:9, 151:10, 158:7, 196:14, 208:2, 213:16, 242:2, 245:21

**example** [2] - 153:8, 153:9

**examples** [1] - 255:17

**except** [5] - 24:14, 171:18, 171:19, 232:20, 260:5

**exchange** [4] - 68:20, 212:12, 248:3, 293:22

**exchanged** [2] - 141:19, 289:4

**exchanges** [1] - 293:23

**excuse** [1] - 14:2

**execute** [2] - 271:4, 275:19

**executed** [4] - 13:5, 254:8, 287:2, 289:5

**execution** [1] - 276:19

**executive** [1] - 159:16

**Exhibit** [95] - 13:18, 13:19, 13:21, 22:9, 26:6, 28:3, 28:8, 31:6, 36:6, 43:6, 46:16, 46:23, 59:11, 63:4, 64:22, 66:7, 68:14, 70:8, 73:22, 75:13, 79:9, 82:10, 86:11, 88:4, 89:14, 92:3, 93:8, 94:14, 96:18, 101:20, 103:2, 103:22, 106:16, 113:13, 121:11, 124:22, 125:25, 126:1, 126:9, 128:14, 135:13, 135:18, 138:2, 138:3, 144:4, 145:12, 145:14, 145:20, 145:23, 146:1, 148:20, 148:23, 149:15, 155:12, 160:13, 160:19, 161:5, 161:7, 167:14, 177:16, 178:9, 209:1, 210:5, 216:6, 217:7, 221:9, 221:16, 225:23, 230:18, 235:15, 236:4, 237:14, 237:22, 238:13, 239:16, 239:18, 241:2, 241:5, 242:10, 242:12, 243:5, 253:13, 254:22, 261:1, 269:13, 271:19, 276:13, 277:18, 289:9, 291:2, 293:2

**exhibit** [18] - 59:18, 60:17, 63:8, 88:6, 104:20, 113:12, 190:22, 235:5, 235:23,

236:4, 236:15, 237:22, 243:4, 243:6, 253:12, 253:15, 254:24, 293:14

**exhibits** [5] - 29:17, 204:23, 234:10, 234:16, 240:14

**Exhibits** [1] - 238:22

**exists** [1] - 178:20

**expecting** [1] - 280:22

**expedite** [1] - 31:14

**expedited** [2] - 174:18, 179:16

**expenses** [2] - 201:11, 201:13

**expensive** [6] - 22:17, 114:10, 123:7, 169:2, 169:5, 169:23

**experience** [1] - 257:1

**expert** [3] - 76:11, 211:1, 211:6

**experts** [10] - 76:3, 76:12, 76:15, 77:9, 101:24, 101:25, 123:10, 123:16, 157:7, 212:1

**expired** [1] - 169:12

**explain** [9] - 38:3, 40:16, 109:19, 111:12, 140:18, 164:20, 218:4, 218:6, 221:21

**explained** [1] - 128:25

**explaining** [2] - 220:17

**explanation** [2] - 239:2, 239:4

**express** [3] - 187:1, 215:6, 292:20

**expressing** [2] - 146:4, 146:18

**extend** [1] - 199:11

**extent** [1] - 248:11

**extra** [1] - 143:8

## F

**facilitated** [1] - 199:22

**facilities** [1] - 112:8

**facility** [3] - 200:13, 202:24

**fact** [57] - 13:4, 24:15, 29:8, 33:15, 34:24, 37:14, 41:22, 42:20, 47:12, 47:21, 47:23, 48:2, 51:23, 61:25, 62:6, 88:18, 91:18, 108:5, 114:20, 124:7, 129:5, 130:1, 136:7, 144:10, 147:9, 152:21, 155:9, 156:3, 156:14, 156:19, 157:15, 164:22, 167:20, 171:22, 176:15, 180:4, 183:8, 194:1, 212:13, 215:23, 217:21, 218:15, 226:19, 234:1, 235:19, 237:7, 240:25, 251:18, 252:14, 265:7, 269:8, 270:18, 274:7, 275:20, 275:21, 290:3, 292:23

**facts** [3] - 38:14, 128:1, 176:19

**failed** [4] - 11:25, 158:20, 178:21, 275:21

**failure** [1] - 178:24

**Fair** [1] - 55:11

**fair** [7] - 32:3, 208:14, 241:5, 241:13, 248:5, 252:5

**fairly** [1] - 45:13

**familiar** [5] - 79:4, 116:9, 125:1, 158:14, 294:25

**familiarity** [1] - 161:21

**family** [2] - 103:17

**far** [15] - 26:15, 55:1, 55:2, 61:16,

78:14, 142:21, 181:14, 213:9, 213:22, 215:5, 288:16, 295:21, 297:4, 297:15, 301:16

**fashion** [4] - 61:3, 147:22, 229:8, 229:9

**FASHIONS** [1] - 119:7

**Fashions** [50] - 6:20, 6:21, 7:3, 7:7, 7:11, 7:13, 8:21, 9:15, 15:24, 19:8, 20:12, 21:9, 23:20, 24:18, 43:23, 44:2, 44:13, 52:24, 52:25, 53:5, 54:5, 55:21, 58:12, 65:12, 66:10, 76:17, 88:19, 88:23, 89:2, 93:18, 94:3, 143:14, 158:10, 163:18, 163:25, 166:13, 170:18, 170:19, 173:13, 174:4, 178:15, 201:12, 201:13, 226:22, 226:24, 236:12, 246:17, 248:3, 248:21, 253:1

**Fashions'** [9] - 7:16, 8:24, 9:2, 30:14, 33:6, 94:2, 161:25, 179:22, 269:20

**father** [4] - 34:24, 35:3, 35:10, 35:14

**father's** [1] - 35:15

**favor** [3] - 68:21, 234:9, 295:19

**fax** [1] - 195:14

**FCC** [3] - 46:13, 67:16, 67:25

**FCRR** [1] - 119:23

**FDIC** [2] - 8:6, 70:23

**February** [41] - 11:24, 13:16, 13:22, 14:16, 14:21, 18:3, 18:9, 19:5, 23:7, 57:11, 57:24, 59:15, 62:19, 70:10, 73:22, 77:21, 90:7, 96:12, 134:5, 160:2, 160:19, 161:8, 171:1, 178:14, 179:5, 179:15, 208:17, 208:24, 209:4, 209:23, 209:24, 210:5, 230:16, 231:25, 232:2, 232:3, 232:21, 232:22, 242:5, 242:22, 243:1

**federal** [2] - 48:4, 189:21

**fee** [1] - 272:10

**fees** [1] - 270:25

**fell** [2] - 267:18, 267:25

**felt** [1] - 263:13

**few** [13] - 35:8, 48:9, 53:20, 145:5, 145:14, 149:11, 151:20, 151:21, 151:23, 161:17, 181:19, 181:25, 220:25

**fifth** [1] - 66:17

**fight** [1] - 89:2

**figure** [3] - 36:9, 141:15, 268:6

**figured** [1] - 190:1

**file** [1] - 38:22

**filed** [8] - 18:8, 18:19, 19:2, 38:25, 58:12, 109:25, 161:4, 174:7

**filing** [4] - 142:10, 142:12, 142:22, 247:8

**filled** [1] - 196:22

**final** [2] - 77:4, 161:4

**finalized** [2] - 43:12, 276:6

**finally** [2] - 226:20, 290:23

**finance** [2] - 7:21, 159:2

**financed** [1] - 200:19

**financial** [4] - 158:11, 257:4, 274:19, 275:20

**financing** [15] - 67:16, 68:4, 158:22, 158:23, 158:24, 191:13, 198:6, 198:8,

198:13, 198:19, 198:21, 198:23, 202:25, 203:4, 290:20

**fine** [16] - 14:4, 23:4, 28:23, 42:15, 64:7, 64:13, 64:15, 118:2, 150:19, 182:9, 235:8, 238:11, 295:24

**finish** [4] - 43:19, 81:15, 296:14, 296:16

**finished** [4] - 36:8, 64:17, 145:6, 301:10

**fired** [1] - 246:12

**firm** [21] - 75:7, 124:2, 124:5, 126:17, 134:17, 135:1, 135:9, 135:11, 139:22, 139:25, 142:5, 147:10, 147:22, 151:14, 153:14, 184:12, 184:18, 184:20, 212:2, 225:18, 230:16

**first** [47] - 31:2, 36:8, 36:12, 43:17, 43:20, 59:7, 68:14, 70:5, 72:2, 88:6, 88:16, 89:21, 92:5, 97:10, 97:12, 104:1, 108:9, 109:3, 113:14, 121:10, 133:22, 138:6, 150:18, 160:16, 174:9, 183:8, 183:9, 201:6, 208:7, 208:15, 210:2, 219:1, 230:15, 232:14, 232:24, 235:2, 249:24, 253:13, 254:22, 267:10, 269:24, 273:10, 290:3, 291:9, 291:10, 293:8, 302:2

**First** [105] - 8:8, 11:8, 13:5, 14:21, 14:22, 15:6, 15:13, 15:17, 16:3, 17:16, 17:19, 21:13, 22:7, 23:20, 23:24, 24:4, 24:8, 29:9, 33:18, 35:22, 41:5, 44:11, 49:16, 52:9, 52:22, 57:5, 65:9, 65:11, 65:18, 69:2, 69:14, 81:8, 85:16, 86:14, 87:7, 87:19, 87:20, 88:18, 90:11, 90:14, 90:16, 90:23, 93:11, 93:14, 93:19, 93:20, 94:2, 94:20, 95:13, 95:17, 97:16, 97:22, 98:3, 98:15, 98:21, 98:24, 99:11, 99:21, 100:5, 104:15, 105:22, 108:6, 108:10, 124:8, 129:8, 134:4, 143:6, 143:19, 144:11, 144:15, 144:24, 148:11, 150:4, 153:19, 153:22, 155:10, 170:16, 173:14, 173:19, 174:3, 174:7, 174:11, 174:23, 175:8, 175:13, 196:1, 229:10, 246:1, 246:15, 246:20, 247:4, 247:25, 248:20, 248:21, 249:19, 250:2, 256:7, 256:20, 259:1, 260:9, 262:19, 262:22, 262:25, 263:13

**Five** [1] - 70:22

**five** [1] - 241:24

**fixtures** [2] - 67:17, 68:5

**FMB** [4] - 68:19, 70:18, 270:10, 270:13

**focus** [2] - 106:21, 258:17

**focused** [1] - 188:13

**follow** [2] - 172:15, 241:23

**follow-up** [1] - 241:23

**followed** [3] - 30:17, 78:23, 79:1

**following** [8] - 5:1, 43:14, 121:1, 236:15, 237:22, 237:23, 293:14, 300:23

**foot** [4] - 204:7, 251:25, 252:3, 254:3

**foreclose** [1] - 10:21

**foreclosing** [1] - 274:24

**foreclosure** [42] - 15:10, 15:13, 19:13, 20:1, 21:23, 23:6, 23:10, 23:16, 24:18,

63:1, 63:11, 63:19, 65:10, 65:18, 68:16, 68:20, 70:2, 70:4, 70:18, 72:2, 72:13, 88:19, 114:17, 114:24, 115:7, 136:20, 136:25, 137:5, 137:9, 143:17, 143:18, 143:19, 170:14, 173:11, 173:15, 173:18, 174:4, 174:16, 180:2, 244:4, 250:11, 260:23

**foreign** [37] - 35:22, 272:21, 273:1, 273:14, 273:19, 273:24, 274:2, 274:11, 274:15, 275:22, 280:22, 280:24, 281:2, 281:7, 281:15, 281:20, 284:10

**forensic** [1] - 76:20

**forklift** [1] - 288:12

**form** [6] - 26:16, 26:19, 124:16, 172:21, 197:9, 282:19

**formally** [1] - 251:14

**format** [4] - 11:18, 39:14, 167:2, 231:10

**formed** [4] - 196:25, 197:2, 197:3, 198:19

**former** [12] - 19:5, 30:22, 31:1, 102:6, 160:8, 162:20, 164:3, 217:12, 219:3, 219:11, 220:2, 220:19

**forth** [3] - 60:20, 128:9, 141:20

**forwarded** [5] - 25:14, 87:24, 108:15, 176:3, 211:3

**forwarding** [1] - 28:13

**foundation** [13] - 38:14, 38:16, 78:2, 86:24, 113:2, 127:3, 128:10, 134:19, 137:3, 173:23, 174:1, 279:14, 288:18

**foundational** [1] - 238:10

**four** [2] - 236:4, 252:22

**four-page** [1] - 236:4

**fourth** [1] - 66:16

**frame** [3] - 13:15, 57:24, 294:1

**Frankfort** [4] - 294:19, 296:21, 296:22, 297:4

**Franklin** [14] - 198:24, 198:25, 199:1, 199:11, 199:17, 199:21, 200:1, 200:19, 200:20, 200:21, 201:5, 201:7, 202:25, 203:4

**frankly** [1] - 14:20

**fraud** [1] - 37:20

**freeze** [2] - 60:11, 71:4

**Friday** [4] - 105:4, 278:15, 283:15, 283:16

**friend** [5] - 229:13, 229:17, 229:18, 229:21

**friendly** [18] - 15:10, 19:13, 20:1, 21:23, 23:6, 63:1, 63:10, 63:19, 65:10, 68:19, 70:2, 70:4, 170:14, 173:11, 173:15, 173:18, 174:4, 180:2

**friends** [2] - 214:19, 214:20

**front** [3] - 31:7, 64:22, 291:5

**frozen** [1] - 198:4

**FSRDG** [2] - 211:4, 227:22

**fulfill** [7] - 197:3, 197:8, 197:25, 198:1, 198:2, 198:10, 200:4

**fulfilled** [4] - 158:19, 159:13, 196:19, 202:1

**fulfilling** [2] - 158:17, 197:4

**full** [2] - 169:6, 254:8
**funds** [8] - 44:11, 107:5, 107:20, 107:23, 187:6, 201:10, 283:8, 284:10
**future** [1] - 16:14
**FZC** [1] - 285:1

## G

**Gail** [1] - 165:4
**gain** [3] - 86:19, 130:8, 207:13
**GAMES** [1] - 140:6
**gap** [1] - 296:4
**Garrie** [4] - 101:22, 126:25, 127:13, 127:24
**gated** [1] - 213:20
**GE** [1] - 140:6
**gears** [1] - 259:23
**general** [1] - 154:18
**generally** [3] - 68:24, 69:1, 232:16
**gentleman** [7] - 81:1, 266:2, 284:2, 284:3, 286:11, 286:20, 288:5
**gentleman's** [1] - 286:23
**George** [1] - 255:2
**gesture** [1] - 201:21
**given** [8] - 69:7, 135:21, 140:5, 162:17, 206:5, 249:25, 268:17, 287:8
**glance** [1] - 160:22
**glasses** [1] - 74:22
**glowing** [1] - 229:25
**go-around** [1] - 267:10
**goal** [1] - 257:8
**goods** [17] - 198:7, 198:10, 199:2, 199:6, 199:23, 200:9, 200:18, 200:19, 200:23, 200:24, 201:1, 201:4, 202:22, 202:24, 203:2, 203:3, 203:6
**grant** [3] - 15:17, 67:3, 253:7
**granted** [4] - 32:10, 157:9, 195:23, 249:20
**great** [2] - 148:13, 205:4
**greater** [1] - 183:6
**GROSSMAN** [1] - 5:17
**Grossman** [52] - 2:3, 5:17, 25:14, 25:16, 25:22, 26:13, 27:21, 28:11, 28:13, 28:21, 30:17, 31:10, 31:16, 32:4, 89:16, 94:17, 101:21, 104:2, 104:11, 105:3, 110:22, 120:3, 124:23, 126:2, 126:10, 126:16, 127:13, 127:23, 128:17, 138:5, 149:16, 155:13, 175:24, 176:3, 177:16, 182:22, 183:5, 226:7, 227:16, 227:19, 234:23, 236:16, 236:24, 237:16, 237:23, 238:18, 239:8, 239:9, 239:10, 239:23, 243:9, 302:3
**Grossman's** [5] - 28:14, 29:2, 29:5, 126:6, 126:20
**Group** [2] - 253:16, 255:14
**group** [2] - 257:22, 272:3
**guarantee** [1] - 173:13
**guaranteed** [1] - 9:23
**guaranties** [8] - 10:22, 15:14, 16:24, 47:3, 68:21, 293:10, 293:18, 293:19

**guaranty** [31] - 11:25, 17:4, 17:20, 17:24, 46:20, 49:25, 50:3, 56:17, 57:2, 85:21, 169:25, 191:5, 248:5, 248:8, 256:9, 258:16, 258:17, 259:3, 259:15, 267:13, 267:18, 268:11, 268:15, 269:5, 270:3, 270:11, 270:13, 270:19, 277:6, 289:6, 292:24
**guard** [1] - 264:23
**guess** [1] - 24:2
**guesstimating** [1] - 204:6
**guys** [2] - 173:19, 184:1

## H

**half** [6] - 35:4, 117:23, 118:3, 204:7, 280:22
**hall** [3] - 298:22, 298:23, 298:25
**hand** [3] - 269:17, 277:21, 286:23
**handed** [4] - 69:13, 143:5, 143:10, 204:21
**handing** [2] - 70:5, 287:13
**handle** [7] - 55:4, 57:16, 76:16, 81:18, 117:18, 154:23, 157:7
**handled** [9] - 25:3, 52:8, 52:18, 75:24, 77:8, 81:12, 93:13, 108:19, 179:12
**handling** [18] - 32:5, 47:15, 50:17, 52:18, 68:17, 69:4, 72:13, 72:17, 72:19, 73:13, 73:19, 75:25, 131:12, 132:20, 132:21, 139:22, 154:4, 154:22
**handwriting** [1] - 277:19
**handwritten** [1] - 277:18
**happy** [1] - 300:14
**hard** [22] - 15:2, 60:21, 84:1, 84:17, 99:5, 113:23, 113:25, 114:6, 122:2, 122:6, 123:14, 123:22, 124:5, 124:15, 146:4, 146:7, 146:10, 146:15, 146:19, 183:25, 228:18, 261:10
**Hart's** [1] - 51:17
**hassling** [1] - 186:12
**HCR** [1] - 255:1
**heading** [1] - 295:1
**headquarters** [1] - 33:6
**hear** [15] - 64:7, 78:24, 126:13, 148:11, 159:6, 167:21, 167:22, 167:23, 185:17, 186:1, 203:9, 212:25, 225:10, 245:17, 297:24
**heard** [3] - 166:21, 226:20, 230:2
**hearing** [4] - 41:11, 204:22, 204:24, 225:2, 229:24, 292:22, 300:13, 302:7
**hearsay** [1] - 39:10
**heavy** [6] - 78:10, 204:1, 204:8, 232:24, 233:3
**held** [4] - 7:25, 127:9, 136:17, 163:20
**help** [9] - 16:16, 34:24, 85:20, 141:21, 141:22, 189:19, 234:17, 257:8, 263:19
**helpful** [2] - 110:5, 110:13
**hide** [2] - 202:16, 202:18
**higher** [4] - 252:10, 252:11, 252:19, 252:25
**highlighting** [1] - 71:20

**himself** [3] - 80:23, 102:12, 141:15
**HINSHAW** [2] - 2:3, 120:3
**hire** [2] - 77:9, 78:17, 113:6
**hired** [7] - 58:13, 101:24, 102:3, 140:16, 212:1, 227:13, 231:15
**history** [2] - 54:14, 61:7
**hit** [2] - 240:15, 240:18
**hmm** [1] - 249:23
**HOHOLIK** [1] - 5:10
**Hoholik** [1] - 5:10
**hold** [5] - 193:6, 231:13, 250:22, 251:3, 263:5
**holder** [1] - 260:2
**Holding** [1] - 194:23
**Holdings** [1] - 6:19
**home** [4] - 35:3, 35:5, 35:6, 295:23
**Hong** [2] - 35:14, 107:12
**Honor** [78] - 5:25, 14:7, 18:24, 20:9, 20:14, 20:20, 21:3, 39:19, 39:23, 40:9, 49:7, 54:20, 55:3, 55:13, 55:17, 55:19, 59:20, 60:15, 60:24, 61:20, 62:18, 63:7, 63:16, 63:21, 64:15, 64:18, 73:11, 82:23, 86:22, 99:14, 101:15, 102:13, 106:18, 111:14, 112:3, 117:22, 117:24, 121:3, 121:5, 125:15, 125:16, 139:13, 146:11, 146:20, 151:5, 151:7, 155:20, 157:11, 157:14, 157:19, 159:6, 183:17, 185:5, 196:10, 196:11, 202:5, 210:19, 212:17, 213:12, 221:14, 223:11, 225:25, 230:22, 235:7, 235:11, 238:10, 241:9, 241:10, 241:20, 244:8, 245:1, 245:10, 246:7, 294:22, 296:3, 299:22, 301:11, 301:20
**HONORABLE** [1] - 119:10
**Honorable** [1] - 73:23
**honored** [1] - 70:25
**hopefully** [1] - 159:10
**hopes** [1] - 270:6
**hostile** [1] - 246:8
**hour** [3] - 117:23, 118:3, 236:17
**hours** [1] - 236:17
**house** [3] - 214:21, 214:25, 215:4
**hundred** [1] - 8:9
**hypothetical** [1] - 133:7

## I

**I..** [1] - 291:1
**I.T** [6] - 36:4, 56:8, 56:12, 78:22, 227:13, 227:23
**idea** [13] - 165:20, 174:24, 175:11, 175:12, 187:16, 196:7, 249:16, 251:22, 262:10, 264:1, 266:17, 279:5, 298:19
**identification** [1] - 287:5
**identified** [1] - 195:18
**identify** [3] - 13:19, 58:5, 269:14
**ignoring** [2] - 190:5, 190:6
**IL** [5] - 2:5, 119:16, 119:20, 120:5, 242:20
**Illinois** [5] - 44:20, 74:10, 74:18,

119:7, 119:25

**ILLINOIS** [1] - 119:1
**image** [1] - 76:20
**immediate** [2] - 36:3, 36:21
**immediately** [8] - 51:22, 51:24, 108:15, 108:16, 108:22, 210:8, 249:14, 260:4
**impediment** [1] - 279:25
**important** [10] - 15:3, 54:22, 130:17, 130:23, 189:12, 231:6, 295:21, 296:17, 300:7, 300:9
**impression** [1] - 191:19
**IN** [1] - 119:1
**inaudible)** [2] - 142:11, 165:11
**Inc** [3] - 46:13, 158:14, 200:13
**INC** [1] - 119:7
**include** [5] - 126:12, 240:22, 259:15, 267:12, 267:18
**included** [3] - 127:13, 240:9, 257:23
**includes** [1] - 84:1
**including** [1] - 21:21
**income** [1] - 275:16
**incoming** [1] - 284:21
**inconvenience** [2] - 297:18, 297:22
**incorporated** [1] - 158:17
**increasingly** [2] - 131:4, 183:4
**indebtedness** [1] - 248:4
**independent** [3] - 76:3, 76:11, 76:15
**index** [1] - 234:16
**indicate** [2] - 177:17, 226:15
**indicated** [9] - 46:15, 143:5, 143:11, 144:4, 144:8, 161:20, 164:9, 216:24, 243:12
**indicating** [5] - 29:13, 37:6, 176:24, 271:24, 289:2
**indication** [1] - 240:20
**individual** [1] - 81:2
**individuals** [2] - 18:12, 101:23
**Industrial** [1] - 255:19
**industry** [1] - 197:22
**inform** [3] - 39:13, 79:12, 182:6
**information** [55] - 9:9, 9:11, 18:4, 18:8, 30:14, 45:25, 47:9, 47:24, 48:12, 51:2, 51:4, 51:12, 56:3, 56:7, 58:18, 58:22, 59:4, 61:1, 78:3, 95:7, 106:9, 110:4, 110:12, 116:5, 123:13, 141:13, 162:9, 162:14, 163:24, 203:16, 208:9, 208:16, 210:23, 216:18, 216:20, 217:19, 219:2, 219:16, 219:19, 221:17, 221:19, 227:10, 227:15, 231:23, 243:21, 272:6, 272:24, 274:2, 274:19, 275:15, 275:22, 280:20, 291:19, 299:11
**informed** [8] - 43:17, 43:20, 97:8, 97:14, 116:20, 135:1, 223:17, 290:23
**informing** [1] - 293:9
**inquire** [2] - 46:19, 274:5
**inquired** [2] - 42:24, 56:17
**inquiries** [1] - 34:20
**inquiry** [6] - 25:14, 25:18, 176:3, 214:3, 274:10, 274:13
**insider** [1] - 229:22

**instance** [1] - 299:19
**instead** [7] - 35:13, 79:14, 122:6, 221:20, 297:19, 298:2, 299:6
**instruct** [1] - 172:14
**instructed** [11] - 12:11, 18:13, 30:1, 30:5, 30:9, 148:17, 167:1, 207:5, 211:25, 264:3, 283:4
**instructing** [1] - 12:4
**instruction** [12] - 30:18, 32:9, 112:3, 180:9, 180:15, 180:19, 181:3, 206:5, 208:15, 208:18, 211:20, 230:15
**instructions** [8] - 205:10, 205:25, 211:5, 211:7, 211:9, 232:9, 282:24, 283:1
**instructs** [1] - 300:12
**intend** [1] - 226:22
**intends** [1] - 226:24
**intent** [6] - 221:23, 253:24, 253:25, 255:3, 255:4, 273:17
**intention** [6] - 249:1, 249:4, 249:6, 250:24, 251:2, 251:4
**intentionally** [1] - 240:22
**intercede** [2] - 16:3, 256:8
**interchange** [1] - 162:11
**interest** [16] - 8:9, 65:22, 65:24, 66:2, 67:4, 68:10, 68:18, 93:19, 94:2, 142:1, 142:7, 142:14, 143:2, 146:18, 226:21, 246:16
**interested** [3] - 41:2, 254:23, 282:15
**interface** [1] - 159:24
**intermingled** [1] - 137:6
**internal** [2] - 218:12, 272:4
**Internet** [4] - 109:2, 140:9, 140:11, 194:19
**interoffice** [1] - 271:21
**interrogatories** [1] - 189:13
**interrupt** [2] - 41:15, 62:14
**introduce** [1] - 5:3
**introduced** [1] - 286:19
**introducing** [1] - 60:16
**inventory** [38] - 7:11, 7:16, 8:21, 8:24, 30:14, 37:13, 67:17, 68:5, 69:8, 69:9, 69:25, 110:9, 135:22, 135:23, 136:4, 136:8, 136:11, 136:16, 142:17, 154:12, 162:1, 162:17, 163:20, 164:14, 164:19, 164:23, 165:8, 165:15, 166:1, 166:11, 166:12, 166:16, 203:17, 203:19, 228:24, 229:5, 230:11
**invitation** [1] - 223:22
**invited** [1] - 265:8
**invitees** [1] - 265:7
**invoices** [10] - 9:4, 132:15, 132:17, 162:7, 163:2, 163:3, 163:9, 163:20, 203:11, 203:14
**involved** [22] - 11:13, 56:8, 83:11, 93:10, 124:14, 154:10, 173:16, 174:16, 174:19, 179:21, 181:21, 189:11, 189:15, 189:23, 212:9, 212:10, 216:24, 266:6, 267:20, 294:20, 295:7
**involvement** [1] - 115:24
**Ira** [1] - 79:12, 266:2, 266:3

**issue** [22] - 37:6, 37:16, 37:19, 76:4, 105:15, 131:23, 131:24, 144:19, 144:22, 148:18, 170:11, 179:25, 187:12, 190:5, 190:7, 199:18, 215:17, 226:19, 230:9, 277:2, 299:9
**issued** [5] - 214:16, 215:14, 240:10, 244:13, 244:18
**issues** [4] - 137:6, 159:25, 190:1, 226:15
**issuing** [2] - 148:14, 148:15
**Italy** [1] - 103:19
**items** [16] - 83:1, 83:25, 84:5, 84:18, 85:3, 85:4, 126:4, 126:7, 142:6, 171:9, 261:10, 261:12, 261:14, 261:15, 262:12, 291:23
**itself** [6] - 9:8, 53:5, 141:11, 265:3, 265:9, 265:24

# J

**J.C** [1] - 53:21
**Jacobs** [8] - 13:22, 72:19, 73:14, 96:24, 178:14, 204:15
**January** [22] - 10:15, 10:20, 13:16, 57:24, 58:11, 72:8, 119:7, 133:20, 140:22, 140:24, 167:1, 195:6, 195:9, 195:16, 230:25, 231:15, 231:17, 231:19, 232:3, 232:4, 302:7, 302:8
**Jim** [23] - 79:19, 137:21, 137:24, 137:25, 138:1, 284:2, 284:3, 284:6, 286:11, 286:12, 286:19, 286:21, 287:5, 287:7, 287:9, 287:10, 287:23, 288:4, 288:8, 288:12, 288:16, 289:12, 290:1
**job** [4] - 55:22, 56:14, 74:20, 186:17
**JOSHI** [11] - 3:20, 3:22, 3:24, 4:1, 4:3, 5:24, 158:7, 196:14, 208:2, 213:16, 242:2
**Joshi** [66] - 5:24, 9:10, 9:13, 11:14, 19:17, 22:15, 22:24, 25:3, 25:20, 25:21, 26:13, 28:11, 30:18, 31:10, 32:5, 33:21, 60:6, 64:24, 65:5, 75:18, 78:6, 78:7, 93:9, 94:5, 94:17, 95:2, 100:12, 104:2, 105:2, 106:5, 114:5, 117:20, 121:14, 123:13, 123:16, 124:25, 126:2, 126:6, 126:10, 127:14, 127:23, 130:11, 130:25, 131:12, 132:22, 138:13, 138:19, 139:4, 141:16, 147:10, 148:24, 149:16, 155:13, 156:6, 157:24, 157:25, 158:9, 172:5, 196:16, 202:15, 213:18, 221:16, 226:8, 238:18, 242:4
**Joshi's** [5] - 45:10, 46:9, 55:24, 123:23, 131:13
**jottings** [1] - 277:11
**Judge** [10] - 32:12, 46:5, 61:17, 71:17, 118:6, 140:22, 192:4, 242:15, 296:23, 300:15
**judge** [9] - 54:22, 63:10, 77:19, 83:8, 145:5, 207:18, 238:7, 241:23, 299:4
**judgment** [2] - 129:22, 157:1
**July** [32] - 33:13, 33:15, 34:16, 34:18, 37:5, 37:8, 42:25, 43:9, 43:15, 49:24,

102:21, 103:10, 103:11, 103:14, 104:1, 105:4, 131:4, 184:19, 211:14, 253:16, 255:2, 262:18, 268:3, 270:15, 276:21, 277:6, 278:2, 278:7, 290:1, 291:8

**June** [16] - 33:11, 34:14, 34:18, 37:8, 67:16, 68:3, 103:11, 103:14, 131:4, 152:25, 184:19, 268:3, 268:4, 268:10, 269:20

**junior** [2] - 65:25, 67:9

**Junior** [1] - 67:1

# K

**K-Mart** [1] - 53:20

**Kanan** [97] - 6:16, 6:19, 6:20, 6:21, 7:2, 7:7, 7:11, 7:13, 7:16, 8:21, 8:24, 9:1, 9:15, 15:24, 19:7, 20:12, 21:9, 23:20, 24:18, 30:14, 31:23, 33:6, 43:23, 44:1, 44:13, 52:24, 52:25, 53:5, 54:5, 55:21, 58:12, 65:12, 66:10, 76:17, 88:19, 88:23, 89:2, 92:14, 93:18, 94:1, 94:2, 112:7, 112:10, 143:14, 158:10, 158:20, 158:21, 158:22, 159:13, 161:25, 163:18, 163:25, 166:12, 170:18, 170:19, 173:13, 174:3, 178:15, 179:22, 196:20, 198:1, 198:2, 198:6, 198:9, 198:13, 198:16, 200:7, 200:12, 201:12, 201:13, 201:18, 201:20, 201:24, 202:16, 202:18, 202:20, 203:11, 205:3, 212:5, 212:22, 213:2, 213:5, 226:6, 226:24, 228:21, 231:2, 236:12, 246:17, 248:3, 248:21, 253:1, 255:14, 257:24, 269:20

**KANAN** [1] - 119:7

**Kanan's** [13] - 30:19, 30:24, 31:13, 31:24, 32:1, 36:3, 37:12, 37:13, 203:16, 203:19, 228:23, 230:8, 230:10

**Kane** [1] - 297:12

**keep** [14] - 8:23, 9:1, 15:24, 20:18, 20:24, 61:13, 113:3, 200:24, 236:9, 257:15, 265:16, 268:19, 289:14, 297:23

**keeping** [1] - 158:3

**kept** [14] - 8:21, 30:20, 31:23, 50:20, 147:10, 161:25, 163:3, 186:19, 187:2, 188:12, 218:13, 223:6, 257:21, 286:14

**KEVIN** [1] - 119:19

**Kevin** [1] - 5:25

**keys** [9] - 21:12, 81:4, 143:5, 175:9, 175:16, 259:25, 260:2, 260:9, 260:20

**KFI** [1] - 70:24

**kind** [16] - 15:25, 24:7, 53:16, 132:15, 172:14, 180:8, 187:21, 194:10, 194:12, 231:9, 248:19, 249:12, 252:12, 275:15, 279:18, 288:23

**knowing** [3] - 41:3, 227:23, 287:18

**knowledge** [29] - 9:3, 9:6, 38:10, 56:6, 65:21, 66:3, 96:3, 102:1, 102:22, 116:5, 116:23, 150:14, 150:25, 151:3, 161:7, 171:15, 171:16, 175:14, 176:13, 212:3, 212:4, 212:23, 213:5, 260:10, 260:22, 265:19, 266:4, 272:25, 288:20

**knowledgeable** [1] - 116:16

**known** [2] - 162:11, 177:20

**knows** [2] - 210:13, 229:19

**KOHL** [1] - 197:15

**Kohl's** [15] - 53:20, 197:12, 197:13, 197:14, 198:10, 199:21, 199:22, 200:1, 200:6, 201:2, 201:4, 201:14, 201:19, 201:25, 203:7

**Kong** [2] - 35:15, 107:12

**KTR** [3] - 51:7, 283:17, 291:15

# L

**labeled** [1] - 203:2

**Lake** [1] - 297:3

**lane** [2] - 213:23, 213:24, 213:25

**language** [7] - 83:2, 184:23, 185:8, 186:15, 186:16, 222:19, 261:19

**Lanka** [1] - 53:8

**laptops** [1] - 126:13

**large** [2] - 165:25

**LaSalle** [2] - 2:5, 120:5

**last** [18] - 39:24, 53:16, 53:20, 56:23, 74:9, 77:21, 86:4, 92:24, 102:6, 102:15, 104:19, 104:21, 105:6, 105:8, 111:7, 178:23, 227:9, 236:14

**lastly** [1] - 149:14

**late** [6] - 60:16, 216:3, 217:4, 262:17, 268:3, 289:25

**latter** [2] - 221:6, 227:14

**Lauter** [5] - 79:12, 80:7, 266:2, 266:3, 266:14

**LAUTER** [1] - 79:13

**law** [4] - 73:23, 213:18, 242:15, 295:22

**lawsuit** [20] - 6:9, 10:24, 11:13, 16:10, 27:23, 28:16, 48:4, 72:7, 72:13, 76:18, 76:19, 78:21, 110:5, 123:6, 174:8, 187:18, 189:21, 226:25, 244:11, 244:13

**lawsuits** [1] - 176:10

**lawyer** [7] - 25:14, 78:23, 132:2, 133:4, 133:12, 300:2, 300:5

**lawyer's** [1] - 299:21

**lawyers** [6] - 55:8, 133:2, 159:25, 187:2, 187:5, 296:10

**lay** [4] - 38:16, 128:10, 137:3, 174:1

**lead** [5] - 52:12, 52:13, 112:4, 154:20, 246:8

**Leading** [1] - 111:25

**leading** [10] - 52:10, 61:3, 61:9, 64:7, 64:10, 86:22, 93:23, 94:10, 115:3, 210:14

**leads** [1] - 154:18

**lean** [1] - 245:16

**learn** [5] - 25:10, 108:9, 177:25, 178:2, 246:25

**learned** [14] - 8:12, 42:24, 46:16, 48:6, 49:16, 78:9, 108:8, 175:23, 193:9, 196:1, 216:3, 246:22, 267:3, 267:6

**learning** [1] - 141:3

**lease** [98] - 9:20, 9:23, 10:6, 10:9,

11:4, 11:25, 15:18, 15:19, 16:4, 16:20, 16:25, 17:15, 17:20, 17:24, 23:10, 23:13, 46:20, 47:3, 49:25, 56:25, 84:11, 84:12, 85:22, 97:8, 141:11, 143:20, 156:4, 156:16, 169:25, 170:1, 170:24, 176:16, 176:24, 178:20, 178:22, 178:24, 179:1, 191:4, 200:15, 200:17, 248:2, 249:20, 249:22, 249:24, 250:1, 250:5, 251:25, 252:2, 254:8, 254:14, 254:18, 255:14, 256:3, 256:7, 256:9, 257:22, 257:24, 258:2, 258:5, 258:22, 258:23, 259:3, 259:6, 259:8, 259:11, 259:13, 267:8, 267:12, 267:18, 268:5, 268:11, 268:15, 268:24, 269:5, 269:21, 270:3, 270:11, 270:13, 270:19, 273:14, 273:18, 277:6, 278:23, 278:24, 279:3, 281:22, 285:15, 285:17, 287:1, 287:2, 288:24, 289:5, 290:4, 293:11, 293:18, 293:19

**leased** [8] - 7:13, 9:15, 9:18, 16:15, 83:25, 94:22, 143:2, 255:11

**leases** [2] - 256:23, 256:24

**leasing** [1] - 48:11

**least** [8] - 35:13, 63:18, 66:19, 70:23, 133:5, 230:13, 243:1, 252:21

**leave** [3] - 56:25, 129:22, 297:17

**leaves** [2] - 157:20, 245:5

**leeway** [1] - 61:12

**left** [21] - 24:25, 25:2, 38:7, 40:3, 50:10, 111:10, 111:11, 171:1, 175:15, 180:1, 180:21, 201:8, 201:20, 211:22, 211:24, 233:16, 233:23, 265:17, 291:23, 292:10, 298:23

**legal** [5] - 81:21, 81:23, 130:5, 179:2, 270:25

**legally** [1] - 132:11

**lend** [2] - 34:25, 198:16

**lengthy** [1] - 295:5

**lent** [1] - 35:10

**less** [2] - 37:12, 70:7

**lessee** [3] - 97:8, 97:14, 257:16

**lessor** [3] - 176:16, 178:21, 179:2

**Lessor** [2] - 97:7, 97:14

**lessor's** [1] - 178:25

**letter** [76] - 12:4, 12:14, 13:21, 13:25, 14:9, 14:17, 19:6, 25:24, 27:11, 27:12, 27:13, 27:16, 31:1, 31:2, 31:21, 31:22, 32:3, 36:3, 36:20, 37:24, 38:2, 40:14, 57:14, 70:23, 71:12, 71:15, 72:18, 72:20, 73:14, 73:22, 74:1, 74:4, 74:6, 74:9, 74:24, 88:14, 88:16, 89:6, 89:10, 96:8, 96:21, 97:1, 97:7, 160:3, 160:8, 160:13, 160:19, 160:21, 160:25, 161:4, 161:8, 161:9, 176:12, 177:19, 178:14, 178:19, 179:5, 179:16, 199:3, 199:7, 199:12, 199:18, 200:1, 204:14, 242:14, 242:16, 242:18, 242:24, 243:17, 244:6, 253:16, 253:24, 253:25, 255:1, 255:3, 255:4

**letters** [8] - 31:13, 38:22, 70:25, 176:16, 176:20, 176:23, 177:3, 198:5

.. 

**letting** [1] - 32:6
**levels** [2] - 162:16, 166:16
**leverage** [1] - 37:19
**liabilities** [1] - 70:6
**liability** [4] - 49:25, 70:3, 89:3, 201:11
**liaison** [2] - 113:6, 227:25
**liaisons** [2] - 37:15, 162:24
**license** [4] - 169:11, 169:13, 248:16, 248:18
**licenses** [1] - 170:1
**licensing** [1] - 248:24
**lien** [6] - 42:2, 65:25, 67:16, 68:4, 129:10, 187:7
**lieu** [31] - 13:5, 13:12, 15:13, 23:9, 65:9, 65:14, 69:14, 81:7, 84:13, 85:18, 86:16, 87:20, 88:19, 90:7, 93:1, 93:3, 143:6, 143:17, 143:18, 143:19, 170:25, 171:3, 249:15, 250:10, 256:7, 257:10, 257:12, 257:23, 259:25, 260:23, 275:7
**lift** [1] - 204:9
**lifted** [1] - 77:24
**light** [1] - 262:21
**likelihood** [1] - 287:17
**likely** [2] - 37:19, 273:7
**limine** [1] - 299:5
**limit** [1] - 196:10
**limited** [1] - 49:5
**line** [20] - 22:16, 53:23, 53:25, 54:3, 54:5, 54:7, 54:10, 54:14, 54:18, 67:12, 67:15, 71:11, 71:21, 183:12, 190:21, 190:24, 199:11, 238:7, 240:14
**lined** [1] - 18:18
**lines** [2] - 198:4, 198:5
**LIPTON** [128] - 2:4, 3:12, 3:18, 4:1, 5:23, 12:6, 14:24, 20:14, 26:2, 26:18, 26:22, 26:24, 38:14, 39:10, 52:10, 55:13, 59:18, 59:20, 64:15, 67:20, 67:25, 74:12, 74:15, 78:2, 78:5, 78:7, 81:23, 105:9, 111:25, 112:3, 117:24, 118:2, 118:6, 120:4, 121:5, 121:8, 123:2, 124:9, 124:11, 124:13, 124:19, 125:15, 125:21, 125:23, 127:5, 127:6, 127:21, 128:8, 128:11, 128:13, 128:16, 133:11, 134:20, 134:24, 137:4, 139:13, 139:15, 151:7, 151:11, 152:14, 155:19, 155:21, 156:8, 156:11, 157:8, 157:14, 159:6, 160:5, 167:21, 168:14, 168:18, 171:6, 183:17, 183:23, 185:5, 191:1, 202:5, 202:9, 206:3, 206:8, 206:17, 208:10, 213:17, 218:8, 218:19, 218:22, 219:24, 221:14, 221:15, 222:11, 222:13, 223:11, 223:13, 225:25, 226:2, 230:22, 230:24, 234:13, 234:15, 234:19, 234:25, 235:7, 235:11, 235:16, 236:3, 238:10, 238:12, 238:16, 239:14, 240:8, 241:10, 241:12, 241:18, 241:20, 243:6, 245:3, 282:7, 282:10, 294:10, 294:15, 295:12, 295:14, 295:18, 295:21, 295:24, 296:19, 298:20, 301:11
   **Lipton** [7] - 5:23, 64:6, 64:14, 87:3, 157:13, 213:14, 295:9

**lisp** [1] - 158:4
**list** [3] - 235:5, 236:9, 298:20
**listed** [3] - 251:8, 251:12, 251:14
**listen** [1] - 156:12
**listening** [1] - 21:1
**listing** [1] - 251:15
**litigation** [34] - 12:24, 13:3, 14:19, 16:13, 16:14, 25:7, 84:19, 85:5, 92:13, 121:21, 121:25, 122:6, 122:13, 122:15, 122:18, 130:6, 132:18, 135:7, 136:7, 136:10, 141:22, 154:24, 159:21, 164:7, 221:5, 231:6, 231:13, 261:12, 261:16, 262:9, 262:13, 263:14, 292:10
   **live** [2] - 213:20, 213:22
   **lives** [2] - 35:3, 297:8
   **LLC** [1] - 119:13
   **LLP** [2] - 2:3, 120:3
   **loan** [20] - 7:22, 8:1, 8:10, 10:2, 14:23, 15:7, 35:14, 70:24, 71:4, 158:21, 166:13, 166:18, 198:17, 247:3, 247:10, 274:24, 275:2, 276:2, 276:21, 294:20
   **loans** [3] - 11:9, 246:17, 277:2
   **LOC** [1] - 71:9
   **locate** [3] - 49:9, 108:23, 234:17
   **located** [8] - 20:3, 30:6, 74:10, 74:17, 77:11, 180:11, 236:19, 242:19
   **location** [7] - 19:7, 21:24, 31:24, 69:16, 102:22, 172:16, 236:10
   **locks** [3] - 86:15, 87:7, 260:4
   **LOCs** [3] - 71:4, 71:7, 71:11
   **log** [2] - 265:16, 286:14
   **look** [68] - 13:18, 13:25, 22:9, 26:6, 28:5, 28:8, 31:6, 36:6, 43:6, 59:13, 59:14, 66:17, 66:21, 79:8, 89:13, 103:22, 113:12, 113:19, 113:20, 139:21, 139:23, 139:24, 139:25, 140:8, 140:9, 140:15, 148:21, 149:14, 155:12, 160:12, 160:18, 162:16, 167:14, 178:9, 215:10, 217:7, 219:9, 230:18, 234:1, 235:22, 237:14, 239:10, 239:16, 240:11, 242:10, 242:12, 243:5, 253:12, 253:15, 254:22, 261:1, 263:25, 264:7, 264:22, 264:25, 265:8, 266:9, 269:13, 271:19, 276:12, 276:13, 276:14, 277:17, 284:12, 284:16, 289:9, 291:2, 293:2
   **looked** [5] - 86:3, 113:17, 114:5, 140:21, 177:19
   **looking** [17] - 14:9, 18:20, 27:9, 28:1, 91:6, 94:14, 109:2, 109:5, 109:6, 140:4, 140:9, 140:23, 240:13, 265:3, 281:2, 289:8, 293:14
   **looks** [4] - 61:9, 77:19, 80:8, 80:17
   **loop** [1] - 268:19
   **lose** [2] - 81:21, 82:2
   **loss** [1] - 141:13
   **lost** [5] - 28:18, 143:11, 170:18, 174:24, 222:10
   **Louis** [1] - 101:21
   **love** [1] - 64:4
   **lower** [1] - 252:16

## M

   **ma'am** [129] - 7:9, 9:17, 11:19, 11:23, 12:19, 12:25, 15:21, 16:1, 16:6, 19:20, 25:8, 27:20, 29:11, 30:11, 31:3, 41:21, 42:8, 42:22, 43:18, 45:23, 46:3, 46:12, 48:19, 49:20, 50:1, 142:20, 160:1, 166:20, 176:5, 192:15, 246:6, 246:14, 248:15, 252:13, 254:25, 257:18, 258:11, 258:19, 259:5, 261:2, 261:18, 261:22, 262:2, 262:5, 264:12, 265:1, 265:15, 265:21, 266:16, 266:19, 267:2, 267:5, 268:1, 268:13, 268:20, 269:12, 269:18, 270:5, 270:8, 270:17, 270:20, 271:16, 271:20, 273:12, 274:4, 274:6, 274:20, 274:25, 275:3, 275:7, 275:12, 275:14, 275:18, 276:16, 276:20, 277:4, 277:9, 277:12, 277:20, 278:11, 278:14, 279:1, 279:4, 279:7, 279:9, 279:13, 280:4, 280:8, 280:11, 280:13, 280:19, 280:21, 281:3, 281:6, 281:17, 284:7, 284:11, 284:19, 284:22, 285:2, 285:5, 285:8, 285:11, 285:23, 285:25, 286:2, 286:6, 286:9, 286:16, 287:15, 287:24, 288:9, 288:14, 288:21, 289:3, 289:7, 289:16, 289:21, 289:24, 290:2, 290:6, 290:22, 291:6, 291:11, 291:20, 291:22, 292:6, 292:8, 292:13
   **machine** [3] - 102:8, 102:25, 195:14
   **machinery** [1] - 288:17
   **machines** [2] - 236:8, 236:9
   **mad** [1] - 193:16
   **magnitude** [2] - 165:18, 165:20
   **mail** [235] - 11:21, 13:4, 22:10, 22:14, 24:1, 24:14, 25:13, 25:21, 26:12, 27:22, 28:10, 28:13, 29:21, 29:25, 31:9, 32:24, 33:3, 37:5, 37:6, 38:8, 39:14, 39:25, 43:3, 43:7, 43:17, 46:25, 47:6, 50:18, 59:24, 61:25, 62:16, 62:18, 63:6, 63:15, 64:24, 65:2, 68:19, 69:20, 69:21, 70:9, 70:24, 75:14, 75:17, 78:13, 79:9, 82:11, 82:14, 82:17, 82:19, 82:22, 83:10, 83:18, 83:21, 83:25, 85:24, 86:3, 86:7, 87:23, 87:24, 87:25, 88:5, 88:6, 89:15, 91:24, 91:25, 92:2, 92:19, 92:20, 93:5, 94:17, 94:20, 101:21, 102:5, 102:16, 103:25, 105:2, 105:6, 106:1, 106:2, 108:15, 113:17, 113:18, 113:20, 113:23, 114:16, 115:10, 121:13, 121:16, 121:19, 124:3, 124:23, 125:1, 125:4, 125:7, 125:12, 125:19, 125:21, 126:2, 126:10, 126:16, 126:20, 128:17, 135:17, 135:18, 136:1, 138:3, 138:14, 138:17, 144:8, 145:13, 145:20, 145:25, 146:3, 146:19, 146:24, 147:7, 147:17, 148:22, 149:3, 149:15, 149:24, 150:11, 150:12, 150:18, 151:1, 155:13, 155:22, 156:14, 156:19, 167:5, 167:15, 169:14, 169:18, 169:24, 179:11, 182:22, 183:4, 183:5, 183:8, 183:9, 206:19, 206:21, 206:24, 207:9, 208:23, 209:3, 209:4,

209:6, 209:12, 209:14, 209:24, 210:4, 210:11, 210:24, 212:12, 212:15, 218:12, 218:13, 218:17, 219:25, 220:4, 220:6, 220:7, 220:8, 220:11, 220:14, 220:16, 220:24, 221:3, 221:4, 221:5, 221:24, 222:4, 226:5, 226:9, 226:11, 227:17, 228:9, 228:14, 230:25, 231:13, 231:20, 231:22, 232:1, 232:3, 232:4, 232:14, 234:9, 234:17, 234:22, 235:10, 235:20, 235:22, 236:16, 236:17, 237:15, 237:24, 238:13, 239:2, 239:4, 239:10, 240:6, 240:18, 240:23, 241:1, 241:3, 241:14, 241:17, 243:9, 244:6, 244:7, 260:24, 261:3, 261:7, 262:11, 262:14, 262:23, 269:8, 269:11, 269:19, 271:8, 290:24, 291:3, 291:9, 292:23, 293:1, 293:6, 293:8, 293:15, 293:23
  **mailed** [2] - 36:2, 46:19
  **mails** [36] - 11:17, 33:22, 34:2, 57:22, 59:5, 59:13, 106:21, 126:6, 131:3, 131:10, 131:14, 132:5, 134:13, 134:21, 134:25, 147:10, 148:8, 167:2, 184:12, 184:18, 189:25, 190:2, 208:19, 209:10, 211:13, 217:21, 222:9, 222:15, 228:11, 231:7, 231:9, 234:2, 238:21, 238:25, 240:14, 240:20
  **main** [1] - 159:24
  **maintain** [2] - 53:25, 117:9
  **maintained** [3] - 53:22, 54:17, 89:11
  **majority** [2] - 235:19, 235:22
  **man** [6] - 277:7, 279:10, 279:11, 279:18, 280:5, 296:18
  **managed** [2] - 260:6, 288:16
  **management** [3] - 169:10, 169:11, 169:20
  **manager** [2] - 7:6, 158:13
  **manner** [1] - 61:9
  **manufacture** [2] - 53:3, 53:5
  **manufacturing** [1] - 7:8
  **map** [2] - 30:15, 37:18
  **map/Creative** [1] - 226:7
  **mapping** [1] - 37:12
  **March** [44] - 13:12, 19:16, 19:21, 21:10, 22:10, 22:14, 22:22, 23:7, 23:19, 77:21, 78:13, 81:11, 85:13, 86:1, 86:3, 87:17, 88:7, 93:3, 113:18, 114:16, 121:14, 133:25, 134:1, 134:5, 144:2, 145:14, 145:20, 145:23, 167:5, 167:9, 168:13, 168:23, 170:15, 210:24, 211:8, 232:7, 232:15, 232:19, 234:6, 250:11, 250:13, 260:23, 262:17, 268:25
  **Marcia** [1] - 272:15
  **marked** [3] - 73:21, 79:8, 93:8
  **market** [1] - 251:4
  **Mart** [1] - 53:20
  **MASON** [1] - 119:10
  **Mason** [3] - 73:24, 140:22, 242:15
  **master** [3] - 47:3, 293:11, 293:17
  **matter** [12] - 10:10, 13:4, 29:8, 52:18, 94:23, 95:19, 95:20, 117:19, 174:16, 189:21, 202:7, 231:6

  **matters** [4] - 36:21, 58:2, 72:17, 299:21
  **McGarry** [30] - 2:4, 5:21, 16:11, 20:20, 21:3, 39:19, 39:23, 40:3, 40:6, 40:9, 40:12, 86:22, 120:4, 296:10, 296:25, 297:6, 297:10, 297:14, 297:16, 298:17, 299:4, 299:16, 299:25, 300:2, 300:7, 300:10, 300:14, 300:18, 300:20
  **McHenry** [1] - 294:20
  **McJessy** [190] - 3:8, 3:10, 3:16, 3:22, 3:24, 4:3, 5:25, 14:2, 14:4, 14:6, 35:17, 50:9, 51:20, 52:2, 52:4, 54:16, 54:22, 54:25, 55:3, 55:11, 55:16, 55:19, 55:20, 58:2, 58:7, 58:16, 59:10, 59:23, 60:24, 61:5, 61:17, 61:20, 61:21, 62:5, 62:15, 62:17, 62:24, 62:25, 63:10, 63:16, 64:10, 64:18, 64:21, 65:15, 66:6, 66:20, 67:24, 68:1, 68:2, 71:6, 71:10, 71:14, 71:17, 71:24, 71:25, 73:2, 73:12, 74:16, 74:22, 74:23, 75:4, 75:5, 78:12, 79:2, 80:22, 82:1, 82:21, 82:24, 83:8, 83:13, 86:12, 86:25, 87:6, 92:3, 92:7, 93:25, 94:12, 94:13, 95:12, 97:4, 97:11, 98:9, 98:13, 98:14, 99:1, 99:14, 99:15, 100:9, 100:10, 100:19, 100:20, 101:19, 102:13, 102:14, 102:18, 103:12, 104:24, 105:1, 105:10, 106:12, 106:18, 106:20, 109:23, 112:6, 113:5, 115:5, 117:21, 119:19, 122:20, 124:16, 125:16, 125:19, 128:1, 128:5, 133:7, 134:19, 137:2, 141:25, 145:5, 145:10, 145:17, 145:19, 146:13, 146:23, 147:3, 149:22, 149:23, 150:3, 150:19, 150:20, 150:23, 150:24, 151:5, 152:7, 152:10, 157:10, 173:23, 176:19, 192:4, 192:7, 192:18, 196:9, 196:10, 196:15, 199:16, 202:11, 202:14, 203:10, 204:12, 204:13, 206:4, 206:10, 206:23, 207:18, 207:22, 207:25, 208:3, 208:11, 209:20, 210:1, 210:19, 210:20, 212:17, 212:20, 213:1, 213:11, 238:7, 241:9, 241:23, 241:25, 242:3, 243:7, 243:8, 244:7, 244:9, 244:16, 244:17, 244:25, 245:10, 279:14, 288:18, 294:22, 294:24, 296:2, 296:23, 297:2, 298:1, 298:11, 298:24
  **mcJESSY** [1] - 119:19
  **mean** [49] - 49:14, 52:1, 58:25, 59:1, 61:2, 69:12, 71:11, 75:23, 77:7, 85:17, 104:17, 109:16, 126:2, 136:22, 148:9, 150:15, 172:11, 186:8, 194:10, 194:11, 197:5, 205:24, 205:25, 206:16, 211:10, 218:17, 233:24, 239:8, 249:25, 256:6, 261:19, 266:18, 269:1
  **meaning** [9] - 25:15, 37:16, 90:14, 138:25, 171:6, 199:12, 207:7, 212:5, 233:18
  **means** [8] - 69:6, 71:7, 71:9, 95:15, 101:11, 135:20, 165:21, 197:6
  **meant** [18] - 12:17, 15:12, 21:12, 59:4, 61:1, 61:23, 140:18, 150:9, 150:12, 198:1, 225:13, 228:4, 232:3, 232:4, 232:11, 233:21, 262:16, 266:18

  **meet** [3] - 80:5, 197:9, 283:16
  **meeting** [24] - 60:2, 60:6, 110:17, 110:20, 111:3, 111:6, 111:7, 111:9, 111:13, 111:14, 111:23, 112:22, 126:21, 126:23, 138:9, 179:23, 179:25, 180:5, 180:6, 209:23, 210:2, 234:7, 236:11
  **Mehul** [34] - 6:2, 26:13, 28:11, 31:11, 43:7, 43:8, 47:4, 56:24, 59:24, 70:23, 105:18, 129:15, 135:18, 178:15, 187:5, 187:8, 187:11, 226:8, 231:2, 231:5, 237:17, 238:18, 253:1, 254:9, 254:19, 260:25, 269:19, 271:23, 272:14, 291:3, 291:7, 293:6, 293:16, 293:17
  **MEHUL** [14] - 3:6, 3:8, 3:10, 3:12, 3:14, 3:16, 3:18, 6:5, 50:8, 64:20, 121:7, 139:19, 145:9, 151:10
  **Mehul's** [1] - 70:12
  **members** [2] - 151:14, 153:13
  **memorandum** [3] - 271:21, 272:4, 272:7
  **memorialized** [1] - 209:23
  **memory** [6] - 283:2, 289:13, 290:18, 292:25, 293:25
  **men** [1] - 80:19
  **mention** [3] - 131:9, 234:2, 290:14
  **mentioned** [17] - 11:17, 52:20, 88:11, 96:7, 103:3, 117:1, 135:6, 149:11, 155:3, 165:5, 187:11, 187:13, 187:14, 218:11, 232:4, 292:7, 292:11
  **mentioning** [1] - 156:6
  **mentions** [1] - 83:24
  **message** [1] - 131:1
  **messages** [1] - 38:7
  **messing** [1] - 175:4
  **met** [2] - 80:8, 80:15
  **Michael** [1] - 73:23
  **MICHAEL** [1] - 119:10
  **Michigan** [1] - 119:16
  **mid** [2] - 168:13, 168:23
  **middle** [5] - 72:8, 87:17, 103:11, 103:13, 103:14
  **Midwest** [106] - 8:8, 11:8, 13:6, 14:21, 14:23, 15:6, 15:13, 15:17, 16:3, 17:16, 17:19, 21:13, 22:7, 23:21, 23:24, 24:5, 24:8, 29:9, 33:18, 35:22, 41:5, 44:11, 49:17, 52:9, 52:22, 57:5, 65:10, 65:11, 65:18, 69:2, 69:14, 81:8, 85:16, 86:14, 87:7, 87:19, 87:21, 88:18, 90:11, 90:15, 90:17, 90:23, 93:11, 93:14, 93:19, 93:20, 94:2, 94:21, 95:13, 95:17, 97:16, 97:22, 98:3, 98:15, 98:21, 98:24, 99:11, 99:21, 100:5, 104:15, 105:22, 108:6, 108:10, 124:8, 129:8, 134:4, 143:6, 143:19, 144:11, 144:15, 144:24, 148:11, 150:4, 153:19, 153:22, 155:10, 156:6, 170:16, 173:14, 173:20, 174:3, 174:7, 174:11, 174:24, 175:8, 175:13, 196:2, 229:10, 246:1, 246:15, 246:20, 247:4, 247:25, 248:20, 248:21, 249:20, 250:2, 256:8, 256:20, 259:1, 260:9,

262:19, 262:23, 262:25, 263:13
**might** [15] - 40:3, 47:13, 47:24, 48:3, 65:11, 162:3, 164:3, 196:6, 234:12, 252:23, 268:19, 276:14, 287:13, 291:18, 297:12
**mileage** [1] - 213:23
**million** [9] - 53:18, 165:8, 166:5, 166:6, 254:3, 254:15, 254:18, 255:11, 256:2
**mind** [13] - 39:24, 40:10, 46:11, 122:24, 133:14, 138:1, 157:15, 166:3, 190:16, 233:19, 233:20, 235:9, 268:21
**mine** [3] - 17:1, 66:19, 295:8
**minute** [2] - 103:23, 135:13
**minutes** [8] - 101:14, 145:14, 145:24, 149:12, 202:8, 241:24, 245:10, 294:15
**mischaracterizes** [2] - 26:18, 74:12
**mischaracterizing** [1] - 67:20
**misconstrued** [6] - 109:15, 109:16, 109:18, 109:21, 140:17, 140:19
**misread** [2] - 67:24, 98:11
**misreading** [1] - 62:4
**misstates** [1] - 122:20
**mistake** [1] - 177:20
**mistaken** [2] - 7:24, 60:7
**Mokena** [1] - 297:8
**moment** [2] - 160:14, 212:17
**Monday** [14] - 105:18, 106:22, 269:20, 278:15, 278:16, 297:13, 297:21, 298:4, 298:10, 298:16, 299:2, 301:2, 301:5, 301:14
**money** [37] - 34:25, 35:10, 38:9, 41:6, 41:7, 42:6, 43:13, 46:2, 91:19, 107:12, 107:15, 108:1, 114:12, 129:1, 129:6, 129:18, 169:20, 188:18, 190:10, 190:14, 191:4, 191:8, 191:17, 192:17, 192:22, 198:7, 198:16, 201:6, 201:23, 252:7, 252:9, 271:18, 273:23, 276:1, 283:5, 285:9, 287:20
**month** [13] - 9:21, 15:19, 42:21, 84:12, 90:7, 103:8, 130:13, 134:5, 141:23, 226:14, 257:24, 257:25, 258:5
**monthly** [4] - 26:16, 26:18, 26:20, 178:22
**months** [4] - 33:20, 42:4, 131:4, 192:12
**moot** [1] - 184:3
**morning** [11] - 6:7, 6:8, 93:4, 111:10, 121:10, 294:13, 294:17, 295:1, 297:13, 299:2, 301:3
**mortgage** [4] - 7:25, 65:25, 67:10, 248:7
**mortgages** [1] - 67:1
**most** [5] - 53:8, 53:25, 64:11, 77:20, 294:24
**motion** [4] - 109:24, 296:11, 296:12, 299:5
**move** [40] - 14:5, 20:5, 21:24, 22:2, 26:2, 32:8, 48:23, 69:15, 78:19, 79:6, 86:1, 89:22, 118:4, 124:11, 128:11, 137:18, 137:21, 138:7, 156:8, 157:8,

159:3, 171:20, 172:12, 172:13, 172:15, 172:18, 174:20, 182:12, 182:25, 183:6, 184:1, 184:5, 195:22, 203:25, 211:10, 232:23, 233:3, 233:4, 253:6, 253:7
**moved** [39] - 24:18, 24:22, 30:24, 31:25, 32:7, 33:5, 33:15, 33:18, 82:8, 112:16, 112:18, 126:18, 138:20, 138:23, 170:19, 171:2, 171:13, 171:16, 172:6, 172:9, 172:13, 172:19, 172:22, 173:5, 180:16, 180:17, 180:18, 182:19, 218:14, 220:10, 222:1, 222:3, 232:19, 232:21, 232:22, 233:14, 233:21
**moving** [5] - 32:6, 69:25, 138:13, 138:16, 203:24
**MR** [348] - 2:4, 2:4, 3:8, 3:10, 3:12, 3:16, 3:18, 3:22, 3:24, 4:1, 4:3, 5:8, 5:10, 5:17, 5:18, 5:20, 5:21, 5:23, 5:24, 5:25, 12:6, 14:4, 14:6, 14:24, 16:11, 20:14, 20:20, 21:3, 26:2, 26:18, 26:22, 26:24, 35:17, 38:14, 39:10, 39:19, 39:23, 40:3, 40:6, 40:9, 40:12, 50:9, 51:20, 52:2, 52:4, 52:10, 54:16, 54:22, 54:25, 55:3, 55:11, 55:13, 55:16, 55:19, 55:20, 58:2, 58:7, 58:16, 59:10, 59:18, 59:20, 59:23, 60:24, 61:5, 61:17, 61:20, 61:21, 62:5, 62:17, 62:24, 62:25, 63:10, 63:16, 64:10, 64:15, 64:18, 64:21, 65:15, 66:6, 66:20, 67:20, 67:24, 67:25, 68:1, 68:2, 71:6, 71:10, 71:14, 71:17, 71:24, 71:25, 73:2, 73:12, 74:12, 74:15, 74:16, 74:22, 74:23, 75:4, 75:5, 78:2, 78:5, 78:7, 78:12, 78:24, 79:2, 80:22, 81:23, 82:1, 82:21, 82:24, 83:8, 83:13, 86:12, 86:22, 86:25, 87:6, 92:3, 92:7, 93:25, 94:13, 95:12, 97:4, 97:11, 98:9, 98:13, 98:14, 99:1, 99:14, 99:15, 100:9, 100:10, 100:19, 100:20, 101:19, 102:13, 102:14, 102:18, 103:12, 104:24, 105:1, 105:9, 105:10, 106:12, 106:18, 106:20, 109:23, 111:25, 112:3, 112:6, 113:5, 115:5, 117:21, 117:24, 118:2, 118:6, 119:15, 119:19, 120:4, 120:4, 121:5, 121:8, 122:20, 123:2, 124:9, 124:11, 124:13, 124:16, 124:19, 125:15, 125:16, 125:19, 125:21, 125:23, 127:5, 127:6, 127:21, 128:1, 128:5, 128:8, 128:11, 128:13, 128:16, 133:7, 133:11, 134:19, 134:20, 134:24, 137:2, 137:4, 139:13, 139:15, 145:5, 145:10, 145:17, 145:19, 146:13, 146:23, 147:3, 149:22, 149:23, 150:3, 150:19, 150:20, 150:23, 150:24, 151:5, 151:7, 151:11, 152:7, 152:10, 152:14, 155:19, 155:21, 156:8, 156:11, 157:8, 157:10, 157:14, 159:6, 160:5, 167:21, 168:14, 168:18, 171:6, 173:23, 176:19, 183:17, 183:23, 185:5, 191:1, 192:4, 192:7, 192:18, 196:10, 196:15, 199:16, 202:5, 202:9, 202:14, 203:10, 204:12, 204:13, 206:3, 206:4, 206:8, 206:10, 206:17, 206:23, 207:18, 207:22, 207:25, 208:3, 208:10, 208:11, 209:20,

210:1, 210:19, 210:20, 212:17, 212:20, 213:1, 213:11, 213:17, 218:8, 218:19, 218:22, 219:24, 221:14, 221:15, 222:11, 222:13, 223:11, 223:13, 225:25, 226:2, 230:22, 230:24, 234:13, 234:15, 234:19, 234:25, 235:7, 235:11, 235:16, 236:3, 238:7, 238:10, 238:12, 238:16, 239:14, 240:8, 241:9, 241:10, 241:12, 241:18, 241:20, 241:23, 241:25, 242:3, 243:6, 243:7, 243:8, 244:7, 244:9, 244:16, 244:17, 244:25, 245:3, 245:10, 279:14, 282:7, 282:10, 288:18, 294:10, 294:15, 294:22, 294:24, 295:12, 295:14, 295:18, 295:21, 295:24, 296:2, 296:10, 296:19, 296:23, 296:25, 297:2, 297:6, 297:10, 297:14, 297:16, 298:1, 298:11, 298:17, 298:20, 298:24, 299:4, 299:16, 299:25, 300:2, 300:7, 300:10, 300:14, 300:18, 300:20, 301:11
**MS** [190] - 3:6, 3:14, 3:20, 4:5, 5:5, 5:13, 5:15, 6:6, 12:8, 12:10, 13:10, 13:11, 13:21, 13:24, 14:8, 15:1, 15:4, 16:18, 17:7, 17:10, 17:12, 19:1, 20:5, 20:10, 20:16, 20:24, 21:5, 21:7, 22:11, 22:13, 23:5, 26:5, 26:8, 26:11, 26:21, 26:23, 26:25, 28:3, 28:7, 28:19, 28:24, 29:1, 30:3, 32:8, 32:19, 32:23, 33:2, 34:11, 35:19, 36:12, 36:15, 36:18, 38:18, 39:5, 39:15, 40:23, 40:25, 41:18, 42:16, 45:1, 45:3, 46:7, 47:19, 48:23, 48:25, 49:8, 50:5, 51:17, 52:16, 54:20, 55:12, 60:15, 60:19, 63:7, 64:7, 71:5, 71:8, 71:13, 78:6, 83:6, 92:2, 93:23, 94:10, 95:10, 98:5, 98:10, 98:23, 99:11, 106:10, 109:17, 112:1, 113:2, 115:1, 115:3, 119:14, 119:18, 119:19, 119:23, 139:17, 139:20, 141:1, 145:4, 145:7, 146:11, 146:20, 146:25, 150:17, 157:17, 157:22, 157:25, 158:8, 159:3, 159:11, 160:6, 160:7, 160:17, 165:14, 165:24, 168:3, 168:7, 168:16, 168:20, 171:7, 171:9, 171:11, 171:12, 172:2, 174:2, 174:20, 174:22, 176:22, 178:13, 183:24, 184:17, 185:18, 185:24, 186:5, 190:25, 191:2, 192:8, 192:21, 194:16, 194:18, 195:22, 195:25, 196:8, 199:14, 202:3, 210:12, 210:14, 241:22, 244:14, 245:7, 245:9, 245:22, 246:7, 246:11, 247:15, 253:5, 253:9, 260:19, 263:2, 265:6, 266:22, 269:15, 269:16, 269:23, 279:17, 282:11, 284:13, 284:15, 284:18, 284:20, 288:22, 294:2, 294:7, 295:9, 295:13, 296:14, 297:5, 297:8, 297:12, 297:18, 297:21, 298:7, 298:13, 299:1, 299:22, 301:20, 302:3
**multiple** [3] - 251:15, 279:22, 280:14
**MUSCHLER** [1] - 5:18
**Muschler** [14] - 5:18, 19:6, 19:17, 31:11, 59:25, 60:6, 73:24, 75:17, 125:1, 126:11, 135:20, 160:20, 161:8, 167:5
**Muschler's** [1] - 19:21

**must** [11] - 31:5, 36:25, 37:22, 85:3, 95:7, 226:12, 227:11, 243:23, 261:14, 287:8
**Mutual** [13] - 7:22, 7:25, 8:3, 8:6, 8:10, 54:2, 54:3, 54:5, 66:10, 66:14, 67:4, 231:7, 246:16
**mutually** [1] - 255:13
**mutually-agreeable** [1] - 255:13

## N

**NADA** [1] - 119:14
**Nada** [1] - 5:15
**Nadelhoffer** [12] - 10:25, 25:11, 29:19, 33:21, 38:12, 39:6, 222:8, 222:15, 222:25, 223:4, 223:6, 244:18
**Nadelhoffer's** [1] - 30:13
**name** [26] - 109:3, 109:4, 109:5, 109:6, 109:7, 116:12, 116:13, 116:18, 117:4, 140:5, 140:10, 194:21, 194:25, 198:24, 200:10, 215:7, 215:11, 239:5, 239:11, 266:2, 279:20, 279:22, 280:7, 280:13, 284:4, 288:6
**named** [11] - 44:19, 46:9, 46:10, 140:12, 193:10, 214:10, 214:12, 284:2, 284:3, 286:11, 291:15
**names** [1] - 46:12
**nature** [4] - 160:3, 160:9, 229:22, 265:17
**near** [1] - 217:7
**necessary** [2] - 114:13, 157:6
**need** [68] - 13:6, 14:5, 18:4, 18:22, 22:16, 28:5, 31:15, 36:9, 47:14, 48:3, 51:18, 62:15, 62:23, 71:19, 71:21, 74:22, 84:16, 85:3, 85:8, 98:12, 122:25, 123:4, 123:23, 123:24, 127:2, 159:8, 160:21, 167:10, 168:4, 182:6, 182:23, 183:10, 183:13, 184:7, 184:8, 184:25, 185:9, 185:16, 185:19, 185:25, 186:12, 187:3, 187:25, 190:25, 208:19, 209:11, 216:25, 217:13, 218:4, 219:4, 219:11, 220:2, 220:20, 222:25, 224:7, 228:16, 229:5, 233:1, 234:2, 234:3, 240:11, 253:10, 261:10, 261:14, 263:17, 283:13, 301:7, 301:8
**needed** [29] - 13:3, 14:18, 24:9, 32:6, 48:12, 51:3, 106:13, 110:10, 138:22, 141:13, 144:11, 184:2, 187:17, 188:15, 198:7, 205:21, 205:22, 205:23, 205:25, 206:1, 206:21, 207:9, 215:20, 216:2, 216:3, 228:13, 264:3, 264:6, 296:13
**needing** [3] - 16:10, 155:25, 170:10
**needs** [7] - 131:11, 132:11, 157:2, 170:13, 172:15, 180:7, 218:6
**negative** [1] - 140:21
**negotiate** [19] - 16:4, 17:19, 34:22, 57:2, 57:3, 85:14, 90:9, 146:17, 148:12, 255:14, 256:8, 259:1, 259:2, 259:5, 259:7, 259:12, 269:4, 276:5, 282:12
**negotiated** [3] - 69:2, 90:11, 278:21
**negotiating** [24] - 11:3, 11:8, 42:3,

57:1, 85:20, 90:3, 93:14, 93:15, 95:16, 95:17, 105:21, 147:18, 147:22, 185:2, 185:8, 186:4, 186:6, 186:23, 192:11, 223:18, 223:22, 265:22, 268:18, 277:5
**negotiation** [5] - 144:23, 153:21, 183:14, 185:2, 257:9
**negotiations** [26] - 11:24, 35:20, 90:6, 93:10, 106:7, 106:14, 145:2, 148:3, 149:12, 150:6, 153:14, 153:15, 153:18, 188:20, 188:24, 189:4, 189:15, 189:20, 212:9, 212:10, 259:20, 267:10, 267:24, 276:6, 276:9, 295:5
**neighbor** [7] - 44:23, 45:7, 45:11, 214:12, 214:14, 215:12, 215:13
**neighbors** [4] - 46:10, 115:21, 214:7, 214:19
**never** [40] - 35:25, 39:24, 40:1, 49:16, 56:8, 87:12, 114:7, 124:4, 124:14, 130:1, 131:20, 131:23, 134:13, 138:1, 139:10, 155:2, 172:8, 172:11, 179:8, 182:19, 186:14, 190:15, 193:18, 193:22, 194:1, 194:4, 194:13, 195:16, 211:22, 228:10, 230:2, 237:2, 237:10, 251:8, 261:23, 262:7, 266:17, 292:7, 292:11
**new** [10] - 15:24, 16:8, 60:16, 63:8, 140:22, 141:21, 257:16, 258:7, 258:10, 296:19
**next** [13] - 44:23, 45:10, 46:19, 105:7, 115:21, 117:25, 157:21, 181:16, 181:25, 210:21, 245:6, 276:8, 286:22
**next-door** [1] - 44:23
**nobody** [12] - 24:12, 136:19, 136:23, 138:12, 138:19, 138:22, 150:14, 150:21, 165:9, 175:16, 198:16, 260:5
**none** [3] - 44:16, 290:13, 290:16
**nonresponsive** [10] - 17:6, 26:3, 26:4, 47:17, 124:9, 125:14, 156:8, 159:3, 174:21, 253:5
**norm** [1] - 199:25
**normally** [2] - 240:15, 240:17
**North** [4] - 2:5, 119:16, 119:20, 120:5
**NORTHERN** [1] - 119:1
**Nos** [1] - 238:22
**note** [27] - 15:15, 66:9, 66:12, 66:16, 68:21, 142:2, 248:4, 248:9, 271:4, 271:15, 272:9, 272:10, 272:13, 272:18, 273:2, 274:12, 274:15, 274:19, 275:19, 275:23, 275:25, 276:13, 276:15, 276:18, 276:21
**noted** [1] - 241:17
**notes** [9] - 10:21, 136:17, 277:10, 277:17, 277:18, 277:25, 278:2, 278:9, 284:6
**nothing** [23] - 19:17, 60:22, 75:18, 75:25, 134:6, 139:8, 139:15, 154:12, 154:21, 155:22, 155:25, 156:3, 156:14, 167:6, 222:22, 222:24, 223:3, 241:18, 245:3, 264:17, 276:10, 277:16, 284:4
**notice** [19] - 25:24, 25:25, 51:21, 73:16, 87:22, 89:21, 177:5, 177:18,

179:3, 208:5, 208:7, 210:18, 210:21, 227:4, 237:18, 238:2, 241:6, 241:14, 298:16
**noticed** [1] - 242:5
**November** [1] - 247:16
**number** [23] - 10:20, 11:2, 11:3, 11:7, 19:7, 33:20, 36:17, 104:3, 106:17, 148:13, 164:14, 166:2, 166:3, 190:22, 195:2, 195:4, 195:13, 195:17, 205:4, 211:13, 225:24, 280:18, 290:10
**numbered** [4] - 66:18, 70:13, 104:4, 104:22
**numerous** [5] - 33:22, 48:7, 100:11, 147:9, 289:25

## O

**o'clock** [6] - 79:13, 79:14, 119:8, 295:20, 299:2, 302:4
**Oak** [26] - 24:23, 30:9, 30:19, 30:24, 31:24, 32:1, 33:6, 35:3, 89:22, 100:13, 110:17, 111:2, 112:8, 112:12, 127:9, 138:10, 170:20, 171:25, 172:22, 172:24, 181:17, 182:3, 182:13, 228:5, 236:20, 236:25
**oath** [3] - 101:17, 121:2, 202:13
**object** [6] - 61:19, 64:8, 138:13, 138:16, 238:7, 253:5
**objecting** [1] - 87:5
**objection** [72] - 12:6, 14:24, 14:25, 20:14, 21:2, 26:2, 35:17, 38:14, 39:10, 52:10, 54:20, 54:21, 60:15, 61:15, 63:7, 67:20, 71:5, 71:13, 74:12, 78:2, 81:23, 83:6, 86:22, 92:2, 93:23, 94:10, 95:10, 98:5, 98:9, 98:23, 99:4, 99:6, 99:10, 106:10, 109:17, 111:25, 112:1, 113:2, 115:1, 122:20, 124:9, 124:16, 128:1, 133:7, 134:19, 134:23, 137:2, 146:11, 146:20, 146:25, 150:17, 152:7, 156:8, 157:8, 159:3, 160:5, 168:14, 173:23, 176:19, 192:4, 192:18, 199:14, 202:3, 206:3, 210:12, 238:11, 241:9, 244:14, 245:17, 279:14, 288:18
**objections** [6] - 20:18, 63:22, 64:11, 87:3, 87:4, 87:5
**obligation** [4] - 58:18, 58:22, 61:1, 263:5
**observe** [1] - 288:8
**obtain** [12] - 76:20, 91:19, 101:8, 101:11, 148:25, 150:7, 211:15, 212:2, 228:22, 248:1, 284:10
**obtained** [2] - 17:15, 199:7
**obtaining** [2] - 149:19, 187:6
**occasion** [2] - 35:13, 148:1
**occur** [9] - 63:20, 127:16, 152:23, 152:24, 187:19, 187:20, 187:21, 190:11, 291:21
**occurred** [10] - 13:12, 23:6, 92:17, 126:20, 126:25, 127:8, 127:13, 178:20, 217:4, 250:11
**odd** [1] - 297:2

**OF** [2] - 119:1, 119:9

**offer** [10] - 10:16, 63:21, 253:3, 253:22, 254:17, 255:8, 264:22, 265:9, 270:2, 282:16

**offered** [4] - 201:22, 249:24, 254:1, 268:11

**offers** [5] - 252:14, 252:19, 252:25, 255:18, 255:21

**office** [24] - 30:10, 31:24, 32:1, 43:24, 77:8, 110:17, 112:12, 112:14, 112:15, 112:17, 112:21, 127:10, 138:10, 171:25, 188:14, 205:9, 228:6, 236:12, 236:21, 277:15, 278:8, 285:22, 285:24

**officer** [4] - 158:11, 159:16, 196:23, 294:20

**offices** [15] - 24:23, 30:19, 30:24, 44:2, 44:16, 89:23, 110:23, 111:2, 112:8, 170:20, 172:23, 179:22, 181:18, 182:3, 182:13

**Official** [1] - 119:24

**once** [17] - 17:15, 17:23, 55:5, 140:16, 176:6, 270:12, 271:10, 271:11, 271:13, 298:2

**One** [3] - 54:9, 54:11, 227:9

**one** [99] - 6:19, 8:18, 10:20, 11:2, 14:2, 35:13, 36:12, 39:24, 41:15, 43:23, 46:13, 51:14, 52:7, 58:15, 59:14, 63:23, 70:23, 71:19, 73:1, 76:8, 78:17, 80:19, 87:3, 87:5, 88:12, 102:9, 103:23, 105:9, 105:11, 106:17, 106:21, 113:11, 117:2, 131:17, 134:2, 135:16, 141:18, 141:19, 148:1, 149:21, 152:1, 152:2, 153:17, 154:18, 154:20, 154:25, 155:1, 155:18, 155:20, 161:15, 168:11, 172:15, 174:9, 175:18, 176:20, 182:16, 184:19, 185:25, 193:22, 194:1, 194:9, 195:12, 200:4, 203:7, 209:7, 209:18, 209:20, 213:23, 213:25, 214:1, 217:23, 227:11, 228:11, 230:21, 235:2, 236:10, 242:11, 243:18, 243:21, 243:22, 252:15, 253:3, 254:5, 254:6, 254:19, 256:3, 258:15, 262:25, 266:7, 284:17, 297:3, 299:23

**one-time** [1] - 203:7

**ones** [1] - 260:20

**open** [7] - 5:1, 59:7, 61:6, 121:1, 144:5, 200:1, 300:23

**open-ended** [1] - 61:6

**opened** [1] - 199:3

**operate** [2] - 8:19, 161:22

**operated** [1] - 169:13

**operating** [1] - 171:17

**operation** [1] - 117:12

**operations** [1] - 16:8

**opinion** [2] - 262:3, 265:23

**opportunity** [5] - 17:16, 17:24, 104:9, 107:2, 160:24

**oppose** [1] - 296:12

**opposed** [2] - 63:24, 251:24

**opposing** [3] - 37:18, 37:19, 64:4

**opposite** [1] - 217:11

**option** [5] - 15:19, 63:23, 249:24,

**options** [3] - 170:5, 170:8, 170:9

**order** [78] - 7:16, 7:21, 20:11, 21:9, 23:19, 53:22, 57:7, 57:10, 57:12, 57:14, 57:19, 92:6, 92:15, 115:15, 115:16, 117:24, 125:8, 129:20, 129:23, 130:2, 130:8, 130:20, 131:9, 131:20, 138:22, 143:24, 144:17, 155:4, 155:23, 156:1, 157:23, 157:24, 158:17, 158:24, 166:18, 183:13, 184:2, 184:7, 184:8, 184:22, 184:25, 186:12, 186:13, 187:7, 197:4, 197:8, 198:6, 198:8, 198:10, 199:24, 207:16, 214:16, 216:2, 216:3, 217:1, 223:1, 223:23, 224:7, 224:14, 224:17, 224:19, 225:2, 225:8, 229:1, 229:3, 229:12, 234:10, 251:19, 263:9, 263:12, 263:17, 263:19, 264:2, 264:4, 264:6, 265:2, 265:5, 265:8

**order-fulfilling** [1] - 197:4

**orders** [18] - 9:2, 55:22, 133:3, 158:19, 159:13, 162:4, 163:20, 196:19, 196:22, 197:3, 197:6, 197:9, 197:11, 197:25, 198:1, 198:2, 199:25, 202:1

**original** [1] - 209:22

**originally** [4] - 194:21, 205:5, 207:7, 268:16

**originals** [1] - 289:17

**originator** [4] - 284:23, 284:25, 285:1, 285:6

**otherwise** [2] - 263:22, 293:23

**ought** [4] - 144:20, 183:6, 186:20, 262:15

**ourselves** [1] - 140:23

**outcome** [1] - 267:23

**outlined** [1] - 255:15

**outside** [3] - 85:2, 261:13, 266:5

**outstanding** [1] - 169:21

**overdue** [1] - 73:16

**overrule** [1] - 61:15

**overruled** [2] - 124:17, 238:11

**overseas** [4] - 53:9, 53:10, 91:6, 105:22

**owe** [1] - 70:7

**owed** [1] - 51:2

**owing** [1] - 169:20

**own** [14] - 6:12, 46:10, 87:11, 92:14, 92:22, 115:22, 214:7, 229:14, 230:6, 249:2, 257:7, 278:20, 293:18

**owned** [6] - 8:3, 92:14, 142:24, 259:11, 266:11

**owner** [5] - 6:21, 6:25, 44:22, 45:9, 214:17

**ownership** [2] - 273:14, 273:17

## P

**p.m** [14] - 59:15, 62:20, 79:13, 88:7, 118:7, 119:8, 145:16, 145:21, 145:23, 177:17, 209:5, 210:5, 302:7

**Page** [1] - 104:24

**page** [30] - 14:13, 31:21, 31:22, 32:25,

59:14, 66:16, 66:22, 88:6, 88:17, 97:10, 97:12, 104:1, 104:21, 105:7, 160:18, 178:23, 190:21, 217:6, 235:23, 236:4, 236:5, 236:14, 247:25, 253:14, 253:15, 253:18, 254:22, 254:23, 276:15

**PAGE** [1] - 3:4

**pages** [3] - 88:5, 104:19, 235:6

**paid** [16] - 45:24, 46:8, 49:21, 107:18, 107:20, 132:15, 176:15, 196:6, 198:14, 199:1, 199:5, 201:7, 201:11, 201:13, 201:20, 274:8

**panicking** [1] - 108:16

**paper** [3] - 163:3, 188:15, 277:12

**papers** [1] - 23:6

**paperwork** [3] - 286:24, 286:25, 287:18

**paragraph** [20] - 31:22, 66:17, 66:21, 70:21, 74:6, 88:17, 88:18, 97:12, 104:3, 105:6, 105:8, 135:20, 178:19, 178:24, 226:13, 227:9, 242:19, 243:18, 243:20, 270:10

**paragraphs** [4] - 66:18, 67:12, 70:13, 104:4

**paralegal** [1] - 5:8

**pardon** [2] - 215:3, 229:16

**paren** [1] - 94:23

**parens** [2] - 70:21, 70:22

**parentheses** [1] - 129:14

**PARESH** [10] - 3:20, 3:22, 3:24, 4:1, 4:3, 158:7, 196:14, 208:2, 213:16, 242:2

**Paresh** [23] - 5:24, 25:15, 25:18, 26:13, 28:11, 31:10, 31:12, 88:8, 89:16, 94:17, 102:8, 106:7, 124:25, 126:1, 148:7, 151:1, 226:7, 231:5, 236:7, 236:8, 236:18, 237:19, 238:18

**part** [52] - 15:17, 16:2, 28:5, 30:12, 51:11, 56:13, 56:17, 61:22, 66:13, 68:17, 81:18, 82:25, 83:11, 85:18, 92:13, 96:22, 111:3, 111:6, 125:13, 130:5, 136:20, 152:18, 154:1, 154:10, 154:15, 169:6, 173:17, 177:8, 177:10, 177:12, 178:4, 179:16, 180:4, 180:6, 188:16, 189:23, 211:12, 218:17, 220:5, 221:6, 221:22, 228:25, 229:23, 235:19, 236:7, 248:10, 256:6, 257:23, 258:4, 261:9

**participants** [1] - 112:22

**participated** [1] - 216:8

**participation** [4] - 8:9, 8:12, 246:16, 247:4

**particular** [10] - 28:5, 82:22, 152:5, 152:8, 218:12, 220:9, 221:21, 231:9, 235:15, 244:12

**parties** [5] - 63:18, 91:4, 112:24, 136:24, 226:20

**Partners** [2] - 255:1, 255:18

**party** [5] - 25:22, 68:15, 260:7, 290:24, 293:24

**pass** [2] - 10:16, 84:14

**past** [1] - 35:10

**pause** [5] - 212:19, 234:21, 245:13, 262:15, 262:17

**pay** [21] - 91:13, 91:15, 107:12, 107:15, 176:17, 178:21, 201:4, 201:15, 254:10, 259:4, 259:18, 268:14, 268:22, 268:24, 269:6, 269:9, 271:18, 274:11, 276:1, 281:15, 281:20

**paying** [5] - 69:7, 135:21, 157:6, 281:12, 294:5

**payment** [12] - 25:24, 26:16, 26:19, 29:14, 96:8, 239:1, 280:23, 280:25, 281:8, 281:9, 281:15, 282:19

**payments** [10] - 9:20, 26:16, 26:22, 73:16, 170:1, 176:16, 177:4, 178:22, 238:1, 241:15

**payoff** [1] - 273:13

**PCs** [1] - 126:13

**pending** [4] - 80:20, 99:4, 204:11, 227:1

**Pendleton** [4] - 73:23, 160:20, 161:9, 242:14

**Penny** [1] - 53:21

**people** [12] - 61:14, 140:20, 159:10, 188:14, 227:22, 263:21, 263:23, 264:1, 264:21, 264:24, 286:14

**people's** [2] - 172:25, 173:4

**per** [5] - 17:1, 31:14, 251:25, 252:3, 254:3

**percent** [2] - 8:9, 246:16

**perfected** [1] - 143:1

**performing** [1] - 70:24

**perhaps** [9] - 61:17, 133:14, 134:2, 136:21, 136:22, 190:4, 190:9, 202:6, 287:8

**period** [11] - 10:11, 53:20, 54:18, 84:12, 100:21, 103:7, 103:9, 212:6, 220:7, 257:25, 301:23

**permission** [2] - 24:13, 246:8

**permit** [1] - 228:21

**permitted** [1] - 250:8

**person** [11] - 31:11, 56:8, 78:22, 80:19, 93:18, 95:2, 227:13, 227:23, 266:4, 287:19, 292:15

**personal** [24] - 15:14, 16:24, 22:2, 24:19, 30:7, 46:20, 50:2, 170:19, 170:23, 171:1, 171:9, 171:10, 172:20, 180:11, 202:7, 230:6, 233:18, 233:22, 236:20, 248:5, 248:8, 256:9, 274:18, 292:24

**personally** [11] - 9:23, 24:3, 108:22, 171:22, 171:23, 171:24, 173:4, 174:14, 204:1, 248:13, 265:25

**persons** [1] - 40:4

**phone** [39] - 38:3, 40:15, 125:10, 125:14, 126:24, 127:1, 127:7, 127:15, 127:16, 127:22, 127:24, 128:4, 128:5, 128:6, 130:25, 141:19, 153:2, 153:16, 154:5, 184:6, 184:9, 184:24, 189:3, 195:2, 195:4, 195:6, 195:8, 195:17, 228:14, 228:19, 269:25, 280:18, 281:1, 282:25, 292:15, 298:25, 299:9, 299:12

**phonetic** [3] - 165:4, 271:22, 271:23

**phonetic)** [1] - 109:3

**physical** [4] - 29:9, 92:24, 225:14, 225:19

**physically** [3] - 77:11, 204:5, 211:15

**Piagamay** [1] - 109:3

**pick** [11] - 12:4, 12:12, 14:11, 50:10, 98:12, 189:3, 283:11, 283:19, 283:23, 286:10, 295:15

**picked** [5] - 43:13, 173:4, 285:20, 285:24, 286:4

**picking** [2] - 283:9, 288:17

**picture** [1] - 109:14

**pictures** [6] - 77:22, 79:21, 79:25, 80:11, 80:12, 179:19

**piece** [5] - 175:19, 219:2, 219:15, 219:18, 277:11

**pieces** [1] - 164:14

**pinpoint** [1] - 130:14

**place** [9] - 30:10, 111:13, 111:14, 127:4, 127:23, 128:7, 199:17, 254:14, 280:3

**placed** [3] - 153:3, 236:21, 236:25

**places** [2] - 153:4, 297:2

**placing** [2] - 153:5, 153:7

**Plaintiff** [2] - 119:5, 119:13

**plaintiff's** [1] - 76:25

**plan** [4] - 191:16, 258:3, 281:4, 281:19

**plans** [5] - 21:24, 50:23, 51:1, 298:9, 298:16

**plugs** [1] - 171:24

**plus** [3] - 16:9, 16:14, 50:17

**point** [65] - 8:8, 10:15, 23:17, 28:3, 28:22, 35:20, 39:13, 58:15, 60:12, 62:15, 63:11, 63:14, 63:16, 63:19, 69:20, 71:23, 86:19, 88:1, 93:15, 102:10, 109:25, 110:12, 115:11, 115:14, 117:2, 144:14, 147:14, 170:10, 172:7, 172:11, 173:3, 174:17, 180:9, 182:14, 182:19, 182:24, 183:1, 183:2, 183:11, 183:25, 184:3, 186:24, 187:19, 187:21, 188:11, 189:11, 189:18, 190:11, 193:9, 194:4, 195:5, 196:11, 207:23, 208:14, 216:1, 218:11, 220:9, 228:12, 228:13, 233:17, 266:10, 266:12, 271:14, 285:22

**points** [3] - 63:25, 70:13, 255:23

**portion** [5] - 15:19, 111:9, 154:23, 236:1, 250:1

**posed** [3] - 184:16, 185:14, 189:13

**position** [16] - 5:4, 7:2, 7:5, 64:5, 106:23, 115:13, 127:12, 158:9, 158:12, 159:15, 177:3, 184:4, 220:17, 246:2, 246:12, 270:14

**possession** [32] - 18:14, 29:9, 81:21, 82:2, 87:14, 92:24, 97:16, 112:11, 143:12, 170:18, 174:8, 174:10, 174:24, 177:18, 183:15, 206:1, 206:22, 207:5, 207:8, 211:15, 225:12, 225:13, 225:14, 225:19, 227:4, 228:4, 228:7, 228:17, 237:19, 238:3, 248:20, 264:14

**possibility** [3] - 48:10, 65:9, 278:22

**possible** [8] - 37:23, 109:21, 227:11, 243:22, 255:8, 270:9, 275:11, 298:17

**possibly** [1] - 76:4

**post** [1] - 300:13

**potential** [3] - 68:16, 252:1, 286:7

**pounds** [1] - 78:4

**practically** [1] - 187:11

**practice** [1] - 286:17

**precedence** [1] - 174:18

**predetermined** [1] - 255:13

**preexisting** [1] - 248:2

**prefer** [1] - 157:25

**pregnant** [1] - 295:22

**premises** [3] - 102:7, 102:25, 228:22

**preparation** [1] - 216:8

**prepare** [1] - 30:15

**prepared** [2] - 222:1, 252:2

**present** [8] - 41:13, 49:24, 63:23, 64:2, 127:24, 128:3, 151:15, 229:20

**presented** [1] - 166:17

**preservation** [5] - 25:7, 122:17, 210:22, 230:15, 231:20

**preserve** [27] - 11:15, 12:21, 13:3, 13:6, 14:18, 17:3, 18:13, 23:24, 24:5, 57:21, 58:18, 58:22, 59:3, 60:10, 61:1, 61:23, 83:15, 85:4, 166:22, 167:2, 187:18, 208:19, 209:11, 226:24, 231:22, 261:15, 263:13

**preserved** [1] - 85:24

**president** [2] - 5:10, 246:3

**press** [2] - 188:7, 188:25

**pressed** [1] - 184:19

**pressing** [2] - 187:10, 189:21

**pressure** [3] - 131:5, 132:4, 182:20

**pressured** [1] - 183:4

**pressuring** [1] - 186:11

**presume** [1] - 129:14

**pretty** [3] - 130:23, 273:24, 281:18

**prevent** [1] - 71:22

**previous** [1] - 32:25

**previously** [8] - 23:14, 72:20, 75:14, 86:4, 100:11, 113:17, 214:18, 238:9

**price** [25] - 90:23, 91:4, 91:6, 91:11, 91:13, 91:15, 251:11, 251:23, 252:2, 252:3, 252:11, 252:15, 252:16, 254:1, 254:2, 254:6, 254:10, 254:15, 255:12, 255:23, 267:12, 267:17, 268:19, 269:4

**prices** [1] - 255:8

**principle** [1] - 14:22

**printed** [1] - 163:13

**private** [2] - 263:15, 263:23

**problem** [6] - 64:6, 180:1, 191:12, 233:2, 295:10

**problems** [1] - 191:7

**procedure** [1] - 224:24

**procedures** [1] - 231:7

**proceed** [3] - 181:16, 270:2, 276:4

**proceedings** [3] - 5:1, 121:1, 300:23

**PROCEEDINGS** [1] - 119:9

**process** [5] - 41:4, 51:11, 148:3,

227:14, 227:18
**procure** [1] - 115:25
**procurement** [2] - 148:8, 163:19
**produce** [1] - 187:17
**produced** [2] - 45:25, 139:11
**production** [11] - 18:20, 25:13, 31:14, 34:7, 173:17, 177:8, 177:10, 177:11, 177:19, 179:11, 179:17
**profits** [2] - 201:15, 201:19
**program** [1] - 169:16
**promise** [1] - 118:5
**promissory** [10] - 10:21, 66:9, 66:12, 142:2, 271:3, 271:15, 275:25, 276:12, 276:15, 276:18
**prongs** [1] - 206:17
**pronounce** [1] - 280:15
**pronounced** [1] - 280:15
**proper** [3] - 78:22, 227:14, 227:18
**properly** [3] - 299:19, 299:23, 300:11
**properties** [7] - 260:6, 263:21, 263:22, 264:1, 264:23, 265:1, 265:21
**property** [19] - 8:13, 67:18, 68:5, 70:5, 88:20, 88:23, 97:15, 248:1, 248:24, 249:2, 249:10, 249:12, 251:6, 251:9, 255:5, 264:25, 265:3, 265:8, 268:25
**propose** [1] - 227:20
**proposed** [1] - 275:25
**proposing** [1] - 267:11
**proposition** [1] - 259:19
**proprietary** [1] - 291:18
**protect** [1] - 263:19
**protocol** [1] - 172:15
**prove** [2] - 110:10, 299:23
**provide** [7] - 37:12, 97:23, 98:3, 98:16, 148:22, 236:8, 274:18
**provided** [6] - 18:3, 37:10, 37:22, 141:14, 178:25, 198:23
**providing** [1] - 67:4
**province** [1] - 137:15
**provisions** [1] - 173:12
**pulled** [1] - 171:24
**purchase** [66] - 9:2, 16:4, 17:4, 17:20, 42:3, 90:3, 90:9, 90:16, 90:20, 91:22, 93:10, 100:4, 104:18, 105:21, 106:8, 106:14, 108:3, 116:6, 129:18, 133:19, 133:23, 134:4, 134:11, 134:14, 134:18, 135:2, 147:18, 147:23, 150:7, 155:10, 156:4, 156:15, 158:24, 162:4, 163:20, 190:10, 191:4, 192:11, 198:8, 199:24, 199:25, 223:18, 223:22, 224:10, 253:22, 254:1, 254:6, 254:10, 254:15, 255:4, 255:8, 255:12, 256:9, 259:3, 259:5, 259:7, 259:12, 264:22, 265:9, 270:3, 270:19, 278:22, 278:23, 278:24, 285:10, 294:2
**purchased** [8] - 46:15, 116:3, 116:9, 116:24, 205:3, 214:9, 256:25, 293:17
**purchaser** [3] - 254:2, 287:14, 293:17
**purchasers** [1] - 257:21
**purchasing** [5] - 41:5, 101:8, 148:3, 151:13, 294:3

**purports** [1] - 128:18
**purpose** [7] - 65:8, 76:14, 80:10, 80:13, 110:20, 148:18, 202:15
**purposes** [5] - 16:13, 16:14, 156:25, 264:22, 265:9
**put** [11] - 36:9, 51:15, 163:21, 169:17, 169:22, 195:13, 199:17, 201:23, 203:3, 277:24, 299:5
**putting** [1] - 71:22

**Q**

**qualified** [3] - 79:6, 137:18, 137:21
**QUESTION** [7] - 190:20, 191:3, 191:7, 191:10, 191:13, 191:16, 191:19
**questioning** [2] - 61:11, 238:8
**questions** [38] - 39:24, 50:5, 51:8, 52:24, 55:23, 55:25, 56:2, 57:8, 60:25, 61:2, 61:6, 61:9, 100:13, 117:21, 121:9, 141:25, 145:5, 145:11, 147:9, 147:12, 148:13, 151:5, 161:17, 192:19, 192:20, 196:11, 196:16, 196:17, 196:20, 203:24, 204:14, 205:4, 207:18, 212:21, 213:11, 223:10, 242:8, 244:25
**quick** [5] - 13:18, 22:9, 160:12, 160:22, 276:13
**quicker** [1] - 118:4
**quickly** [5] - 151:8, 209:17, 209:21, 270:11, 298:5
**quite** [2] - 14:6, 290:10

**R**

**racking** [3] - 8:19, 77:23, 161:23
**raise** [9] - 37:20, 38:9, 41:6, 107:5, 129:1, 129:6, 129:18, 189:25, 191:17
**raised** [5] - 37:6, 131:15, 179:25, 192:22, 226:19
**raising** [1] - 191:7
**ran** [1] - 9:18
**range** [1] - 256:2
**Raven** [32] - 154:18, 158:16, 158:17, 158:19, 159:12, 159:15, 163:19, 163:21, 164:4, 196:16, 196:19, 196:23, 196:25, 197:2, 197:3, 198:19, 198:21, 198:23, 199:7, 199:9, 199:21, 200:10, 200:15, 200:18, 200:23, 201:4, 201:6, 201:8, 201:10, 202:15, 202:22, 203:2
**Raven's** [2] - 163:24, 199:12
**Ravenswood** [2] - 119:20, 196:22
**Ray** [1] - 60:6
**re** [8] - 31:13, 68:21, 128:18, 176:21, 219:4, 219:11, 220:2, 220:19
**re-ask** [1] - 176:21
**reach** [17] - 38:5, 40:17, 58:9, 90:14, 90:15, 90:19, 90:23, 91:1, 91:11, 92:4, 93:20, 104:15, 109:1, 270:18, 270:21
**reached** [5] - 14:22, 15:6, 104:20, 141:24, 266:25
**reaching** [1] - 109:20

**reacquire** [9] - 82:25, 83:5, 84:5, 84:18, 85:3, 85:14, 261:10, 261:11, 261:14
**reaction** [3] - 38:1, 40:14, 41:2
**read** [36] - 17:8, 24:3, 25:13, 32:21, 40:7, 40:10, 82:20, 102:10, 102:11, 102:15, 104:6, 104:8, 105:8, 107:1, 113:21, 127:17, 127:18, 142:11, 142:12, 145:18, 157:15, 160:16, 160:21, 183:18, 183:20, 183:22, 185:9, 185:10, 190:23, 206:14, 218:19, 218:21, 218:23, 226:11, 283:4
**reading** [2] - 22:16, 102:5
**real** [2] - 224:22, 276:13
**realize** [1] - 55:18
**realized** [2] - 91:7, 267:17
**really** [7] - 32:11, 42:9, 60:22, 61:6, 180:21, 186:10, 274:7
**Realty** [2] - 251:18, 253:16
**reason** [15] - 123:22, 136:15, 140:21, 141:7, 153:24, 156:6, 179:13, 183:11, 184:5, 203:6, 218:15, 227:24, 228:19, 284:8, 302:5
**reasonable** [1] - 278:12
**reasons** [2] - 102:9, 174:6
**receipt** [2] - 116:21, 288:25
**receivable** [3] - 67:17, 68:5, 142:19, 166:12, 166:17
**receive** [16] - 37:24, 57:12, 74:4, 82:17, 87:22, 88:14, 94:14, 96:13, 107:25, 145:25, 146:24, 150:11, 226:9, 227:17, 242:15
**received** [34] - 18:18, 27:4, 27:11, 27:24, 31:19, 38:19, 50:18, 51:21, 57:15, 72:18, 73:14, 86:4, 89:21, 91:24, 92:19, 96:8, 107:21, 107:24, 180:9, 180:18, 208:5, 208:7, 208:15, 210:11, 210:21, 210:24, 211:13, 214:2, 241:1, 252:14, 259:25, 261:6, 277:7, 289:2
**receiving** [6] - 38:1, 40:14, 89:19, 209:17, 227:15, 285:12
**recently** [2] - 53:8, 53:25, 77:20
**recess** [2] - 202:6, 295:14
**recipient** [1] - 97:1
**reckless** [2] - 300:3, 300:6
**recollect** [7] - 174:7, 180:4, 180:25, 182:1, 183:2, 237:11, 237:13
**recollection** [9] - 68:9, 125:22, 152:4, 152:9, 153:10, 209:9, 223:2, 279:24
**recommendation** [2] - 56:20, 58:14
**recommended** [1] - 56:22
**record** [27] - 13:20, 13:21, 20:18, 20:22, 22:10, 22:14, 26:12, 28:10, 31:9, 32:21, 41:16, 43:6, 46:25, 160:19, 183:20, 202:12, 204:19, 206:14, 218:21, 235:4, 269:19, 271:21, 277:18, 291:2, 293:6, 299:5, 299:6
**Record** [1] - 185:10
**recorded** [1] - 299:12
**records** [13] - 122:3, 164:20, 203:21, 228:23, 229:5, 229:6, 229:15, 230:8,

230:10, 249:13, 249:14, 263:16, 263:23
**recover** [1] - 207:9
**recross** [2] - 151:6, 157:16
**RECROSS** [6] - 3:16, 3:18, 4:3, 145:9, 151:10, 242:2
**RECROSS-EXAMINATION** [6] - 3:16, 3:18, 4:3, 145:9, 151:10, 242:2
**red** [1] - 18:18
**red-lined** [1] - 18:18
**redacted** [5] - 235:20, 235:22, 235:25, 253:14, 254:23
**REDIRECT** [2] - 3:14, 139:19
**refer** [6] - 217:18, 217:21, 217:24, 219:19, 234:22, 263:17
**reference** [1] - 181:1
**referenced** [4] - 67:7, 204:16, 236:18, 236:24
**referred** [4] - 76:7, 89:10, 139:10, 229:20
**referring** [27] - 31:12, 40:20, 56:11, 56:12, 57:4, 60:5, 69:24, 76:22, 79:17, 83:4, 96:19, 105:16, 150:6, 155:17, 155:19, 204:20, 209:3, 209:4, 220:6, 232:1, 234:9, 239:12, 239:13, 244:12, 252:1, 256:14, 257:22
**refers** [1] - 219:3
**reflect** [1] - 235:4
**reflected** [1] - 142:10
**refresh** [4] - 68:9, 167:13, 252:24, 292:25
**refund** [1] - 107:24
**refused** [6] - 88:2, 97:24, 98:17, 99:22, 100:2, 101:1
**regard** [2] - 110:21, 149:19
**regarding** [22] - 14:23, 48:10, 52:24, 58:1, 65:18, 68:15, 70:18, 72:22, 93:19, 125:14, 134:14, 145:12, 160:3, 210:22, 217:13, 228:23, 230:10, 253:17, 255:2, 269:20, 290:4, 299:9
**regards** [2] - 69:25, 152:17
**regular** [2] - 38:20, 286:17
**reinstate** [1] - 178:24
**rejected** [1] - 253:3
**related** [11] - 19:18, 48:14, 75:19, 158:23, 159:1, 167:7, 231:7, 254:9, 254:20, 290:7, 291:13
**relating** [4] - 8:24, 9:2, 163:24, 164:13
**relationship** [2] - 136:25, 137:2
**relaying** [1] - 106:5
**release** [7] - 17:4, 68:20, 70:6, 84:7, 187:7, 248:4, 248:7
**released** [2] - 15:14, 248:8
**releases** [1] - 70:3
**releasing** [1] - 248:12
**reletting** [1] - 84:10
**relevance** [5] - 35:17, 71:16, 299:14, 299:15, 299:16
**relevant** [9] - 12:24, 83:8, 84:18, 110:10, 164:7, 261:12, 262:9, 262:12, 263:14
**relied** [5] - 18:21, 57:16, 130:6, 132:2,

157:1
**relieved** [1] - 89:3
**relying** [3] - 106:7, 132:10, 144:10
**remain** [1] - 114:20
**remaining** [1] - 258:21
**Remember** [1] - 126:11
**remember** [62] - 15:2, 18:20, 24:14, 26:15, 45:4, 51:7, 63:2, 75:15, 77:16, 77:22, 80:8, 85:10, 90:21, 92:5, 96:16, 99:4, 99:5, 114:10, 114:11, 122:10, 129:13, 134:3, 135:4, 138:15, 147:11, 147:19, 151:18, 152:22, 153:4, 155:5, 155:6, 155:8, 155:9, 174:17, 183:9, 196:21, 204:17, 206:25, 220:5, 221:2, 222:7, 223:20, 227:15, 231:17, 242:8, 250:4, 250:6, 250:13, 252:19, 252:23, 258:22, 264:17, 264:19, 268:7, 268:23, 269:10, 269:11, 269:12, 284:9, 288:6, 288:12
**remembering** [1] - 234:8
**reminder** [1] - 75:18
**removal** [2] - 97:23, 98:16
**remove** [5] - 98:21, 99:16, 100:2, 101:3, 288:13
**removed** [3] - 92:12, 98:4, 288:10
**removing** [1] - 288:8
**renew** [1] - 169:25
**rent** [3] - 69:7, 135:21, 184:1
**rents** [2] - 252:10
**repaid** [1] - 35:14
**repay** [6] - 35:22, 85:3, 261:14, 270:13, 273:1, 273:24
**repaying** [3] - 35:14, 274:16, 275:23
**Repayment** [1] - 272:20
**repeat** [14] - 14:1, 17:18, 18:25, 36:17, 52:15, 168:19, 174:15, 193:25, 198:20, 206:2, 206:13, 219:7, 223:25, 294:6
**repeated** [2] - 52:15, 63:22
**reply** [8] - 189:12, 239:6, 240:1, 240:4, 240:11, 240:15, 240:18, 240:19
**replying** [1] - 240:18
**REPORTER** [2] - 165:12, 194:16
**Reporter** [2] - 119:23, 119:24
**reporter** [4] - 44:25, 207:3, 218:23, 295:16
**repossess** [12] - 25:12, 25:23, 26:17, 27:1, 175:25, 178:6, 212:22, 213:2, 213:5, 213:9, 238:1, 266:7
**repossessing** [1] - 29:14
**repossession** [14] - 25:25, 27:13, 27:15, 27:19, 27:23, 28:16, 176:14, 176:18, 177:5, 179:1, 226:23, 238:25, 241:6, 266:6
**repossessions** [1] - 176:10
**repossessors** [1] - 179:19
**represent** [1] - 10:25
**representation** [2] - 29:6, 42:13
**representations** [2] - 166:16, 177:17
**represented** [6] - 18:11, 30:22, 81:13, 81:16, 220:25, 221:5
**representing** [1] - 79:20

**reprints** [1] - 293:8
**repurchase** [4] - 56:18, 144:24, 190:14, 270:13
**repurchasing** [1] - 35:21
**request** [14] - 90:12, 104:11, 157:3, 209:21, 209:22, 210:2, 225:7, 254:2, 261:20, 261:21, 262:1, 262:3, 262:7, 272:9
**requested** [9] - 51:11, 100:24, 140:22, 143:8, 146:17, 216:1, 216:12, 216:14, 272:5
**requests** [1] - 100:12
**require** [5] - 23:24, 24:4, 24:8, 36:21, 265:20
**required** [4] - 200:21, 201:19, 201:21, 223:5
**requiring** [5] - 16:13, 224:13, 224:17, 263:8, 263:12
**reread** [2] - 32:19, 294:4
**research** [2] - 194:19, 195:1
**reserve** [2] - 55:4, 207:22
**residing** [1] - 94:22
**resolve** [4] - 76:4, 94:22, 95:19, 166:9
**resolved** [1] - 187:12
**respect** [12] - 10:9, 14:21, 84:10, 86:5, 108:19, 148:8, 163:2, 180:23, 208:8, 274:19, 276:8, 300:4
**respects** [1] - 281:18
**respond** [4] - 25:15, 176:4, 209:21, 238:2
**responded** [3] - 148:7, 222:8, 222:16
**respondent** [5] - 5:17, 5:18, 5:20, 5:22, 5:23
**Respondents** [2] - 2:2, 120:2
**respondents** [1] - 298:6
**responding** [3] - 126:6, 132:23, 159:22
**response** [23] - 27:24, 28:14, 29:2, 34:20, 91:25, 108:14, 125:7, 125:12, 125:20, 125:25, 131:10, 131:14, 131:17, 148:22, 149:18, 150:11, 151:1, 157:10, 158:5, 188:3, 227:3, 230:14
**responses** [2] - 131:13, 149:3
**responsibilities** [1] - 55:21
**responsibility** [3] - 55:24, 76:16, 94:5
**responsible** [1] - 94:1
**responsive** [3] - 106:10, 125:17, 157:10
**rest** [2] - 58:13, 297:24
**restate** [2] - 12:8, 21:5
**restroom** [1] - 245:11
**result** [11] - 27:15, 27:19, 27:21, 85:23, 87:18, 138:14, 138:16, 177:11, 178:25, 180:14, 241:13
**retail** [1] - 252:8
**retained** [3] - 10:24, 123:9, 123:17
**return** [1] - 270:12
**review** [6] - 31:12, 31:15, 37:17, 38:25, 57:14, 160:24
**reviewed** [2] - 116:17, 160:13
**revised** [1] - 254:5

**revisit** [2] - 144:19, 144:22
**rid** [4] - 47:12, 47:23, 48:2, 48:3
**right-hand** [1] - 277:21
**rights** [1] - 84:9
**risk** [1] - 274:14
**Road** [8] - 7:19, 67:8, 74:10, 74:17, 242:20, 248:2, 253:17, 255:3
**Robert** [1] - 5:10
**Roche** [7] - 109:14, 139:24, 140:14, 140:16, 220:17, 220:25, 221:5
**roof** [3] - 48:13, 50:23, 141:14
**room** [12] - 30:10, 51:15, 51:17, 77:12, 77:13, 111:15, 111:17, 172:25, 173:6, 173:7, 236:21, 236:25
**roughly** [1] - 103:14
**routine** [1] - 130:25
**RPR** [1] - 119:23
**rule** [2] - 99:9, 245:18
**rules** [1] - 231:7
**run** [1] - 16:16
**running** [1] - 169:17
**RYLKO** [2] - 5:13, 119:15
**Rylko** [1] - 5:13

**S**

**sale** [21] - 23:10, 48:20, 91:2, 91:5, 129:15, 193:20, 251:5, 251:6, 251:7, 251:12, 251:14, 252:7, 252:11, 254:2, 254:18, 277:5, 278:18, 279:2, 279:6, 288:23, 289:22
**sales** [2] - 53:16, 55:22
**sanction** [1] - 296:10
**satisfactory** [3] - 188:2, 188:23, 189:2
**satisfied** [2] - 132:23, 263:5
**save** [1] - 234:12
**saw** [8] - 32:3, 131:13, 177:2, 179:16, 204:16, 205:1, 214:9, 292:25
**scenario** [4] - 254:5, 254:6, 254:13, 268:8
**school** [2] - 197:21, 199:23
**Schreiber** [7] - 28:12, 58:8, 58:14, 88:11, 135:6, 135:9, 231:2
**Scott** [3] - 28:12, 58:8, 231:2
**search** [1] - 140:11
**Sears** [1] - 53:20
**season** [2] - 197:22, 199:24
**second** [31] - 14:2, 14:13, 22:16, 29:12, 31:21, 41:15, 51:15, 72:1, 73:1, 74:6, 102:6, 102:15, 104:3, 104:20, 135:16, 139:13, 160:18, 178:19, 178:23, 217:6, 226:13, 230:21, 235:23, 236:5, 242:18, 253:15, 270:10, 271:12, 276:15, 293:15
**secondly** [1] - 169:16
**secrets** [1] - 158:3
**section** [2] - 36:24, 82:22
**secure** [7] - 8:1, 30:10, 31:23, 166:18, 236:9, 236:21, 236:25
**secured** [5] - 8:12, 136:17, 166:13,

226:21, 247:5
**securely** [1] - 30:20
**security** [14] - 23:11, 65:21, 65:24, 66:2, 67:4, 67:13, 67:15, 68:3, 68:10, 68:18, 142:1, 142:7, 142:14, 143:2
**see** [107] - 14:3, 14:4, 14:11, 22:19, 27:3, 28:16, 28:20, 28:21, 29:2, 31:12, 31:17, 32:2, 37:3, 37:5, 46:23, 59:15, 60:3, 64:6, 65:3, 67:13, 67:19, 68:7, 68:22, 69:10, 69:22, 70:10, 70:15, 71:1, 73:24, 74:2, 74:7, 74:11, 75:21, 76:5, 77:2, 77:22, 79:13, 79:15, 80:18, 83:2, 84:3, 85:6, 88:9, 88:20, 89:17, 94:25, 95:24, 97:5, 97:18, 97:25, 98:18, 104:4, 104:15, 105:4, 105:13, 106:24, 111:23, 112:24, 117:23, 118:3, 126:19, 129:14, 165:6, 173:17, 178:17, 179:4, 180:6, 184:4, 185:14, 207:11, 217:8, 217:10, 219:13, 219:14, 226:14, 230:25, 231:11, 235:24, 238:23, 239:10, 242:20, 242:21, 243:18, 247:2, 253:20, 254:5, 254:10, 254:13, 254:15, 254:24, 255:12, 258:17, 258:25, 261:2, 261:17, 270:16, 273:15, 276:17, 276:17, 277:21, 282:6, 284:23, 293:20, 296:7, 299:13, 299:14, 302:1
**seeing** [2] - 167:15, 261:4
**seek** [2] - 177:5, 226:22
**seeking** [2] - 191:13, 281:15
**seem** [1] - 235:12
**segregated** [1] - 200:18
**sell** [21] - 43:9, 43:10, 48:11, 202:20, 249:2, 250:18, 250:19, 250:24, 251:9, 251:16, 251:23, 252:5, 256:5, 262:20, 267:11, 268:11, 282:16, 282:17, 291:8, 291:12, 291:13
**seller** [3] - 254:2, 254:10, 255:13
**selling** [9] - 7:8, 51:9, 251:12, 256:21, 267:7, 291:15, 291:18, 292:20, 293:24
**send** [12] - 31:15, 38:22, 38:23, 69:21, 83:21, 132:5, 133:2, 182:22, 203:11, 271:7, 271:13, 292:23
**sending** [5] - 31:1, 136:15, 147:10, 238:24, 241:13
**sends** [1] - 231:19
**sense** [3] - 64:2, 269:4, 298:1
**sensitive** [1] - 265:17
**sent** [34] - 11:21, 12:3, 13:4, 14:16, 19:6, 25:21, 27:21, 29:13, 31:2, 32:4, 33:21, 36:2, 38:8, 39:1, 39:25, 83:18, 83:22, 122:25, 141:16, 147:17, 176:24, 179:5, 179:11, 214:4, 220:4, 220:24, 221:4, 226:5, 271:4, 271:8, 271:14, 275:25, 276:19, 287:19
**sentence** [7] - 74:9, 76:5, 77:4, 102:6, 102:11, 102:15, 269:24
**separate** [4] - 62:16, 136:13, 137:6, 200:24
**separated** [1] - 255:22
**September** [7] - 10:2, 72:5, 107:19, 164:23, 165:9, 197:18, 197:19

**serious** [1] - 36:21
**seriously** [1] - 296:11
**seriousness** [1] - 299:21
**Serritella** [10] - 50:19, 52:20, 52:21, 82:11, 83:11, 83:18, 108:17, 260:25, 264:9, 298:18
**served** [2] - 72:6, 72:10
**server** [445] - 8:15, 8:18, 8:23, 9:5, 9:12, 9:16, 9:18, 11:4, 11:25, 12:17, 12:20, 12:23, 13:2, 13:3, 14:18, 16:4, 16:7, 16:10, 16:12, 17:3, 17:17, 17:20, 17:24, 19:22, 20:3, 21:21, 21:24, 22:6, 22:23, 23:25, 24:8, 24:16, 24:25, 25:2, 25:6, 25:23, 29:9, 30:6, 30:18, 33:5, 33:23, 34:25, 35:21, 35:23, 36:24, 37:1, 37:11, 37:23, 38:9, 38:13, 39:8, 39:13, 41:5, 41:23, 41:24, 42:2, 42:3, 42:7, 42:9, 42:20, 42:25, 43:21, 45:18, 45:20, 45:24, 46:8, 46:14, 46:16, 47:7, 47:13, 47:24, 48:6, 48:17, 48:18, 48:21, 49:10, 49:16, 49:19, 49:23, 50:2, 50:12, 51:22, 56:3, 56:7, 56:18, 62:9, 74:17, 75:1, 75:8, 76:4, 76:7, 76:21, 76:22, 77:10, 77:18, 77:20, 78:20, 79:3, 80:1, 80:11, 82:5, 83:15, 85:9, 85:14, 85:21, 85:24, 86:1, 86:5, 87:14, 88:2, 89:11, 89:22, 90:4, 90:10, 90:16, 91:22, 92:22, 92:25, 93:6, 93:11, 93:20, 94:3, 95:18, 100:12, 101:3, 101:6, 101:12, 102:22, 104:12, 104:16, 104:18, 105:17, 105:22, 106:14, 107:5, 107:9, 108:3, 108:6, 108:10, 108:23, 110:4, 110:13, 110:15, 111:17, 111:19, 111:22, 111:23, 113:24, 114:20, 114:25, 115:7, 115:25, 116:3, 116:6, 116:9, 116:24, 121:21, 121:24, 123:22, 123:25, 124:6, 125:9, 128:25, 129:1, 129:6, 129:7, 130:8, 130:19, 131:7, 133:20, 133:24, 134:11, 134:14, 134:18, 135:2, 135:3, 136:2, 136:12, 136:19, 136:25, 137:11, 137:19, 137:22, 138:7, 138:13, 138:16, 138:19, 138:23, 139:21, 139:25, 140:15, 140:19, 141:4, 141:8, 141:13, 143:2, 144:9, 144:16, 144:25, 146:7, 146:10, 146:15, 147:11, 147:15, 147:18, 147:23, 148:9, 148:12, 149:1, 149:4, 149:8, 149:13, 149:19, 150:7, 151:14, 153:19, 154:13, 154:5, 155:8, 156:4, 156:15, 156:16, 156:24, 161:12, 161:18, 161:22, 162:4, 162:5, 162:15, 162:17, 162:22, 162:25, 163:8, 163:12, 163:16, 163:21, 164:1, 164:6, 164:11, 164:14, 166:8, 167:11, 167:19, 168:13, 168:22, 169:13, 169:25, 170:12, 171:18, 171:19, 173:13, 174:23, 175:8, 175:11, 175:12, 176:7, 176:25, 180:1, 180:11, 180:21, 180:24, 181:17, 182:2, 182:7, 182:13, 182:19, 182:21, 182:25, 183:7, 183:10, 183:15, 183:16, 184:5, 184:7, 184:20, 184:22, 186:23, 188:1, 188:4, 188:6, 188:18, 188:21, 188:24, 190:10, 190:14, 191:4, 192:11, 192:23,

193:10, 193:13, 194:14, 195:15, 196:1, 196:4, 196:6, 203:24, 203:25, 204:3, 204:4, 205:4, 205:13, 205:21, 205:22, 206:1, 206:20, 206:22, 207:6, 207:7, 207:10, 207:13, 208:21, 211:15, 211:20, 212:2, 212:6, 212:22, 213:3, 213:6, 213:9, 214:10, 217:1, 217:13, 219:4, 219:11, 219:20, 219:22, 219:23, 220:2, 220:20, 223:6, 223:18, 223:22, 223:24, 224:4, 224:7, 224:11, 224:14, 224:18, 224:20, 225:8, 225:13, 225:19, 226:7, 226:16, 227:10, 227:12, 227:19, 228:2, 228:3, 228:5, 228:17, 228:22, 229:9, 229:15, 232:20, 232:23, 233:7, 233:10, 233:16, 233:24, 234:3, 234:24, 236:9, 236:13, 236:19, 236:24, 237:9, 239:1, 241:15, 242:19, 243:2, 243:13, 243:15, 243:22, 243:23, 243:24, 244:2, 256:10, 256:13, 256:17, 257:16, 258:9, 258:14, 258:15, 259:3, 259:10, 259:11, 259:24, 262:8, 262:10, 263:9, 263:25, 264:7, 265:22, 265:23, 266:1, 266:9, 266:18, 276:5, 276:8, 276:9, 277:8, 278:18, 278:20, 278:24, 279:3, 279:6, 280:23, 280:25, 281:2, 281:8, 281:9, 281:21, 281:24, 283:10, 283:12, 283:19, 283:24, 285:10, 286:4, 286:10, 287:11, 287:14, 287:18, 288:2, 288:13, 288:17, 289:22, 290:1, 290:14, 290:17, 290:20, 290:24, 291:10, 291:18, 291:24, 292:14, 292:16, 292:21, 293:24, 294:3

**servers** [21] - 18:12, 19:8, 19:18, 41:6, 57:1, 57:21, 74:7, 74:9, 75:19, 79:21, 80:12, 92:12, 106:8, 126:12, 126:17, 129:9, 129:15, 129:18, 137:5, 167:6, 242:5

**service** [1] - 251:15

**services** [1] - 44:8

**set** [3] - 64:11, 104:3, 289:11

**settle** [2] - 10:10, 10:17

**settled** [1] - 269:25

**several** [10] - 29:23, 53:17, 55:23, 88:5, 145:11, 151:12, 177:16, 235:1, 271:9, 277:5

**SH** [3] - 26:6, 177:16, 243:5

**SHAH** [15] - 3:6, 3:8, 3:10, 3:12, 3:14, 3:16, 3:18, 6:2, 6:5, 50:8, 64:20, 121:7, 139:19, 145:9, 151:10

**Shah** [144] - 6:2, 6:7, 6:9, 26:13, 28:11, 31:11, 38:19, 43:7, 45:18, 47:4, 50:10, 51:21, 61:22, 62:18, 62:22, 63:16, 64:22, 68:20, 73:3, 83:10, 101:20, 121:9, 125:25, 135:18, 145:11, 151:12, 153:9, 156:12, 158:23, 159:1, 161:20, 162:20, 167:10, 176:24, 178:15, 179:9, 179:11, 182:5, 182:8, 182:24, 183:11, 187:23, 187:25, 188:3, 188:17, 188:24, 189:3, 189:5, 189:8, 189:24, 189:25, 190:1, 190:4, 190:13, 191:3, 192:10, 192:16, 192:22, 193:14, 193:16, 193:18, 193:19, 193:22, 194:1, 194:8,

194:14, 205:20, 207:12, 213:18, 214:25, 215:6, 216:23, 216:24, 220:4, 220:16, 220:18, 220:24, 221:4, 223:18, 223:21, 224:4, 225:7, 226:8, 229:20, 229:24, 230:2, 231:2, 237:17, 237:24, 238:18, 248:5, 248:13, 254:9, 254:19, 256:3, 256:7, 257:4, 257:11, 257:15, 257:22, 258:2, 258:23, 259:4, 259:17, 260:25, 267:17, 267:20, 268:7, 268:14, 268:19, 269:2, 269:5, 269:8, 269:19, 271:4, 271:23, 272:15, 272:25, 273:1, 273:19, 273:22, 274:15, 274:18, 274:23, 275:13, 275:19, 276:19, 281:5, 281:7, 282:3, 289:23, 289:25, 290:3, 290:23, 291:4, 292:14, 292:15, 292:23, 293:6, 293:9, 293:16, 293:22, 299:10

**Shah's** [20] - 220:17, 247:16, 248:8, 253:1, 256:4, 257:22, 258:17, 275:1, 275:16, 290:7

**Shahs** [1] - 272:21

**shall** [3] - 254:10, 254:15, 255:13

**shifting** [1] - 60:20

**ship** [4] - 198:10, 199:2, 199:6, 200:23

**shipped** [6] - 53:11, 200:9, 200:12, 201:1, 201:2, 203:3

**shipping** [2] - 9:11, 162:14

**shock** [1] - 292:20

**shook** [1] - 286:23

**Short** [2] - 101:16, 202:10

**short** [1] - 256:1

**shorten** [2] - 223:10, 296:11

**shortly** [2] - 138:9, 249:17

**show** [3] - 63:12, 200:18, 287:23

**showed** [4] - 75:14, 148:20, 288:1, 288:2

**showing** [2] - 286:7, 287:17

**shown** [2] - 116:21, 217:9

**shows** [5] - 134:10, 222:22, 222:25, 223:3, 300:10

**shut** [7] - 8:6, 60:7, 62:1, 117:8, 117:14, 117:15, 209:14

**sic** [3] - 59:24, 64:11, 196:22

**sic)** [2] - 140:6, 296:4

**side** [1] - 63:18

**sidebar** [1] - 296:8

**sides** [1] - 61:13

**sign** [1] - 15:12

**signature** [1] - 271:24

**signed** [6] - 23:7, 23:9, 23:16, 84:12, 237:19, 285:17

**significantly** [2] - 252:6, 252:9

**signing** [1] - 259:24

**similar** [1] - 79:3

**simply** [1] - 257:3

**simultaneously** [1] - 136:12

**single** [1] - 131:17

**sister's** [2] - 35:5, 35:6

**sit** [1] - 255:20

**Sitex** [1] - 253:16

**sitting** [1] - 252:23

**situation** [1] - 294:17

**six** [8] - 15:19, 72:9, 74:7, 74:9, 84:12, 257:24, 257:25, 258:5

**six-month** [5] - 15:19, 84:12, 257:24, 257:25, 258:5

**sixth** [2] - 75:8, 242:19

**sledgehammer** [1] - 175:8

**slim** [1] - 287:20

**slower** [1] - 159:9

**slowly** [1] - 102:9

**small** [2] - 79:3, 172:21

**Smalley** [1] - 101:21

**smoothly** [1] - 257:13

**Snehal** [1] - 44:23

**SNEHAL** [1] - 45:1

**software** [3] - 9:18, 258:23, 266:10

**sold** [32] - 33:18, 42:21, 42:25, 43:21, 46:17, 48:6, 48:17, 49:23, 51:22, 91:7, 135:3, 141:3, 163:21, 175:13, 193:10, 193:13, 193:23, 194:2, 194:14, 195:16, 248:12, 252:8, 262:17, 275:9, 290:1, 290:14, 290:24, 291:10, 291:18, 292:14, 292:16, 293:9

**solved** [1] - 263:24

**someone** [5] - 43:11, 122:18, 283:11, 283:19, 287:17

**sometime** [11] - 87:17, 92:18, 96:12, 96:17, 107:19, 130:13, 133:25, 152:25, 197:18, 221:6, 264:14

**sometimes** [1] - 172:6

**somewhere** [5] - 69:9, 135:23, 170:25, 232:21, 278:9

**soon** [5] - 37:23, 173:19, 227:11, 231:19, 243:22, 270:18

**sorry** [56] - 13:16, 16:11, 20:9, 20:16, 23:3, 25:20, 26:7, 26:23, 28:19, 32:15, 34:18, 34:23, 43:8, 43:14, 52:14, 59:18, 60:16, 62:6, 62:14, 68:1, 71:8, 75:4, 80:21, 92:3, 99:2, 127:22, 149:22, 160:6, 167:21, 167:22, 168:18, 171:4, 185:9, 194:16, 212:24, 218:5, 221:7, 221:10, 225:24, 233:19, 235:7, 235:21, 237:12, 239:3, 240:3, 240:17, 241:10, 244:7, 244:16, 245:8, 246:19, 266:17, 284:13, 291:7, 293:3, 295:18

**sort** [5] - 55:4, 63:22, 218:14, 270:10, 277:21

**sorted** [2] - 221:25, 222:1

**sounds** [3] - 248:6, 250:9, 268:6

**source** [2] - 107:23, 134:25

**sources** [1] - 275:16

**southwest** [1] - 297:5

**spans** [1] - 88:5

**speaking** [2] - 93:19, 280:9

**special** [2] - 5:10, 272:3

**specific** [21] - 12:9, 152:4, 152:20, 153:9, 153:10, 153:16, 159:12, 166:2, 184:23, 185:7, 186:15, 217:16, 217:18, 217:21, 217:24, 219:2, 219:15, 219:18, 222:19, 230:12, 254:17

**specifically** [10] - 29:24, 129:17, 146:18, 195:11, 233:12, 234:2, 236:24,

253:1, 254:19, 281:10
  **speculate** [1] - 73:7
  **speculation** [2] - 78:2, 206:8
  **speculative** [1] - 86:23
  **speech** [1] - 279:24
  **spell** [1] - 44:24
  **spelled** [1] - 280:13
  **spend** [1] - 298:7
  **Spernow** [1] - 101:22
  **spinning** [1] - 113:4
  **split** [1] - 133:9
  **spoken** [1] - 50:25
  **spoliation** [1] - 37:21
  **Springs** [10] - 152:18, 152:23, 152:24, 153:6, 154:3, 154:4, 154:7, 154:11, 154:12, 154:17
  **Springs'** [1] - 154:23
  **square** [3] - 251:25, 252:3, 254:3
  **Sri** [1] - 53:8
  **stage** [1] - 64:12
  **stalling** [1] - 191:20
  **stand** [6] - 5:3, 78:8, 106:11, 157:20, 192:5, 245:5
  **Standard** [3] - 44:7, 117:11, 285:6
  **stands** [1] - 17:10
  **Stankowitz** [3] - 271:23, 272:2, 272:6
  **start** [14] - 15:23, 52:23, 90:6, 91:10, 108:22, 109:8, 140:20, 140:23, 207:20, 208:4, 221:12, 253:13, 258:7, 297:19
  **started** [6] - 108:17, 170:25, 200:3, 296:15, 296:17, 299:7
  **starting** [2] - 102:17, 102:19
  **starts** [4] - 66:25, 67:1, 105:9, 105:11
  **state** [1] - 133:14
  **statement** [17] - 27:6, 27:8, 28:15, 67:16, 68:4, 96:1, 97:20, 102:21, 164:25, 165:3, 176:13, 177:15, 178:5, 178:7, 226:17, 227:7, 275:20
  **statements** [3] - 26:18, 26:20, 26:21
  **STATES** [1] - 119:1
  **states** [1] - 242:18
  **States** [1] - 53:11
  **status** [13] - 41:11, 41:19, 41:22, 106:13, 147:11, 149:18, 161:9, 176:7, 189:4, 189:20, 192:9, 211:14, 223:14
  **stay** [4] - 69:8, 135:22, 295:8, 299:13
  **staying** [1] - 295:19
  **step** [3] - 157:18, 245:4, 301:12
  **steps** [5] - 174:9, 181:16, 183:6, 226:24, 279:2
  **Steve** [24] - 19:12, 52:3, 56:21, 58:3, 58:8, 58:14, 64:24, 70:9, 70:12, 82:11, 84:23, 85:19, 88:7, 113:18, 134:2, 135:19, 145:13, 151:13, 154:4, 231:3, 238:19, 238:20, 238:25, 260:25
  **Steven** [8] - 11:7, 12:11, 13:22, 26:14, 28:12, 81:17, 148:2, 247:17
  **still** [31] - 38:9, 48:10, 81:4, 82:5, 89:25, 93:6, 95:22, 99:24, 100:4, 101:17, 105:24, 107:8, 108:3, 114:25, 117:7, 121:2, 175:18, 187:6, 202:13,

209:20, 236:13, 242:5, 243:2, 243:12, 243:14, 248:21, 249:4, 249:10, 268:5
  **stipulation** [1] - 23:16
  **stood** [3] - 256:2, 295:4, 295:11
  **stop** [5] - 51:14, 60:10, 60:11, 73:1, 109:11
  **stopped** [2] - 48:22, 91:17
  **storage** [4] - 172:25, 173:6, 173:7, 248:24
  **store** [6] - 7:16, 173:20, 248:22, 249:2, 249:10, 249:12
  **Store** [1] - 203:7
  **stored** [20] - 7:11, 18:8, 56:3, 58:18, 58:22, 97:15, 202:23, 208:9, 208:16, 210:22, 216:18, 216:20, 217:19, 219:2, 219:16, 219:18, 221:17, 221:19, 230:8, 265:18
  **Stores** [2] - 197:13, 197:14
  **stores** [1] - 53:3
  **storing** [2] - 174:12, 249:14
  **story** [1] - 296:19
  **straight** [2] - 20:19, 20:25
  **strange** [1] - 214:11
  **streamline** [1] - 298:8
  **street** [2] - 213:25, 214:1
  **Street** [3] - 2:5, 119:24, 120:5
  **stress** [1] - 37:21
  **stretching** [1] - 297:24
  **stricken** [12] - 20:6, 26:4, 47:17, 48:24, 66:5, 78:11, 93:24, 98:8, 124:12, 156:10, 159:8, 174:21
  **strictly** [1] - 93:13
  **strike** [40] - 8:25, 17:6, 20:5, 26:2, 32:8, 48:23, 68:25, 72:5, 81:12, 86:13, 97:9, 114:3, 116:17, 117:6, 124:11, 125:13, 125:24, 135:5, 135:17, 136:8, 138:12, 143:18, 156:9, 157:8, 159:4, 166:11, 174:20, 193:18, 195:22, 196:22, 204:2, 205:18, 208:6, 211:6, 214:2, 222:23, 230:6, 236:14, 253:6, 253:8
  **string** [4] - 88:5, 238:14, 238:17, 238:24
  **strong** [1] - 73:9
  **stronger** [1] - 299:18
  **stuck** [1] - 274:15
  **stuff** [3] - 99:5, 171:3, 171:6
  **subject** [13] - 25:6, 143:20, 151:13, 152:6, 152:18, 153:6, 154:18, 226:6, 231:1, 248:2, 248:7, 255:14, 271:23
  **subjects** [1] - 48:7
  **submitted** [3] - 160:2, 160:8, 299:11
  **subpoena** [34] - 125:8, 129:20, 129:23, 130:2, 130:7, 130:20, 131:9, 131:23, 138:23, 148:18, 155:3, 155:22, 155:25, 214:16, 215:11, 215:14, 216:25, 217:14, 219:4, 219:12, 220:3, 220:20, 223:1, 223:4, 223:23, 224:7, 224:14, 224:17, 225:2, 229:1, 229:6, 244:12, 263:17, 298:14
  **subpoenas** [5] - 148:14, 148:15,

244:10, 244:13, 244:19
  **subsequent** [2] - 115:17, 178:22
  **subsequently** [6] - 75:2, 75:7, 97:8, 97:14, 139:10, 300:6
  **substance** [2] - 70:14, 147:7
  **substantially** [1] - 276:18
  **suburb** [1] - 297:5
  **suburbs** [1] - 297:1
  **succeeded** [1] - 66:13
  **successful** [1] - 145:2
  **sudden** [2] - 130:18, 238:24
  **sue** [5] - 212:22, 213:2, 213:5, 213:8, 213:9
  **sued** [1] - 10:20
  **sufficient** [1] - 37:17
  **suggested** [2] - 135:6, 216:23
  **suggesting** [1] - 139:2
  **suggestion** [5] - 168:5, 168:6, 168:9, 294:22, 296:2
  **suggestions** [1] - 296:9
  **suit** [5] - 58:12, 177:18, 227:3, 237:18, 238:2
  **Suite** [5] - 2:5, 119:16, 119:20, 119:24, 120:5
  **sum** [1] - 267:1
  **summarize** [1] - 161:9
  **summary** [3] - 218:18, 221:22, 248:5
  **summer** [2] - 103:4, 264:15
  **Sunday** [3] - 276:24, 278:7, 278:8
  **Sundays** [1] - 277:2
  **supervise** [1] - 172:1
  **supervised** [2] - 171:20, 171:23
  **supervising** [1] - 263:25
  **supplier** [3] - 199:3, 199:6, 200:9
  **suppliers** [9] - 44:14, 44:16, 198:9, 198:13, 199:1, 199:12, 199:18
  **support** [1] - 37:20
  **suppose** [1] - 266:8
  **supposed** [11] - 110:21, 111:17, 127:1, 127:15, 131:21, 131:24, 132:7, 211:18, 216:19, 228:7, 231:24
  **surmise** [2] - 241:5, 241:13
  **surprise** [2] - 214:13, 215:6
  **surprised** [4] - 193:16, 215:15, 281:1, 281:14
  **suspect** [1] - 190:13
  **sustained** [27] - 20:6, 54:21, 67:23, 81:25, 83:7, 93:24, 95:11, 98:6, 98:8, 112:2, 113:3, 115:4, 124:10, 127:2, 134:23, 146:12, 146:22, 156:10, 159:5, 174:1, 176:21, 192:6, 199:15, 202:4, 241:11, 253:7
  **SUV** [1] - 172:18
  **switch** [1] - 259:23
  **sworn** [3] - 6:3, 158:1, 245:14
  **system** [23] - 8:19, 16:17, 25:12, 37:18, 60:8, 60:13, 62:1, 62:3, 62:7, 76:3, 77:23, 84:1, 84:17, 161:23, 169:10, 169:12, 169:17, 169:20, 176:1, 194:15, 226:22, 226:25, 261:11
  **systems** [6] - 30:15, 36:4, 37:12,

160:4, 160:10, 161:10

## T

**tables** [1] - 5:3
**tag** [1] - 87:2
**tag-team** [1] - 87:2
**tags** [1] - 202:22
**tailor** [1] - 61:10
**takeover** [1] - 66:13
**talks** [2] - 88:18, 113:23
**tampered** [2] - 24:12, 75:24
**tax** [1] - 107:24
**team** [1] - 87:2
**technicalities** [1] - 227:24
**telecon** [1] - 65:3
**teleconference** [2] - 65:5, 65:8
**Telephone** [2] - 217:12, 219:10
**telephone** [17] - 19:11, 29:18, 29:22, 126:24, 127:12, 129:4, 129:21, 129:24, 130:17, 154:15, 216:23, 219:3, 220:1, 220:18, 243:11, 271:14, 277:7
**temperature** [1] - 77:13
**temperature-controlled** [1] - 77:13
**temple** [1] - 45:16
**ten** [1] - 101:14
**tenant** [14] - 15:19, 143:14, 143:20, 248:21, 250:1, 250:7, 250:19, 251:24, 252:6, 252:12, 252:16, 253:2, 254:3, 290:8
**tendered** [1] - 235:5
**term** [2] - 9:21, 91:22
**terminated** [1] - 246:14
**terminology** [1] - 20:22
**terms** [8] - 68:24, 69:1, 91:1, 91:5, 178:20, 229:25, 230:3, 255:15
**territory** [1] - 297:11
**testified** [19] - 39:24, 58:21, 78:4, 100:11, 115:19, 116:8, 126:1, 128:6, 138:6, 141:2, 144:14, 164:22, 165:1, 165:7, 205:20, 207:15, 214:18, 228:1, 232:6
**testifying** [1] - 192:5
**testimony** [25] - 63:24, 64:2, 107:11, 107:13, 108:5, 127:7, 132:19, 166:21, 177:21, 179:4, 184:9, 191:22, 191:24, 192:1, 204:15, 204:17, 215:19, 216:22, 217:3, 222:7, 222:14, 222:18, 230:14, 297:25, 301:16
**THE** [427] - 5:2, 5:7, 5:12, 5:19, 12:7, 12:9, 13:8, 13:19, 14:2, 14:5, 14:25, 15:2, 16:12, 17:6, 17:8, 17:11, 18:22, 18:24, 18:25, 20:6, 20:9, 20:17, 20:23, 21:1, 22:12, 23:4, 26:4, 26:7, 26:9, 26:10, 28:1, 28:4, 28:6, 28:18, 28:20, 28:22, 28:25, 30:2, 32:10, 32:12, 32:13, 32:15, 32:16, 32:18, 32:20, 32:22, 32:25, 33:1, 34:8, 34:10, 35:18, 36:7, 36:14, 36:16, 38:16, 39:4, 39:11, 39:12, 39:22, 40:2, 40:5, 40:7, 40:10, 40:13, 40:22, 40:24, 41:15, 41:17, 42:15,

44:24, 45:2, 46:5, 46:6, 47:17, 47:18, 48:24, 49:3, 49:7, 50:6, 51:14, 52:1, 52:3, 52:11, 52:12, 54:15, 54:21, 54:23, 55:1, 55:7, 55:14, 55:18, 58:1, 58:3, 58:5, 58:8, 59:9, 59:19, 59:21, 60:18, 60:20, 61:4, 61:8, 61:19, 62:4, 62:14, 62:23, 63:9, 63:14, 64:4, 64:9, 64:13, 64:16, 65:13, 65:14, 66:5, 66:18, 67:22, 67:23, 71:9, 71:16, 71:19, 73:1, 73:3, 73:4, 73:5, 73:11, 74:14, 74:20, 75:3, 78:3, 78:8, 78:9, 78:11, 78:25, 80:20, 80:21, 81:25, 82:20, 83:7, 83:9, 86:11, 86:23, 87:2, 92:4, 93:24, 94:11, 95:11, 97:3, 97:10, 98:6, 98:7, 98:8, 98:11, 98:24, 99:3, 99:7, 99:8, 99:13, 100:8, 100:17, 101:14, 101:15, 101:17, 101:18, 102:9, 102:17, 103:9, 103:10, 104:22, 104:25, 106:11, 106:17, 106:19, 109:18, 109:19, 109:20, 112:2, 112:5, 113:3, 115:2, 115:4, 117:23, 117:25, 118:3, 119:1, 119:10, 121:2, 121:3, 121:4, 122:22, 122:24, 124:10, 124:12, 124:17, 124:18, 125:13, 125:18, 125:22, 127:2, 127:18, 127:20, 128:3, 128:10, 128:12, 128:15, 133:9, 134:23, 137:3, 139:14, 139:16, 140:24, 140:25, 145:6, 145:16, 145:18, 146:12, 146:21, 146:22, 147:1, 147:2, 149:21, 150:1, 150:2, 150:18, 150:22, 151:6, 151:8, 152:8, 152:11, 152:12, 155:17, 156:10, 157:9, 157:12, 157:16, 157:18, 157:19, 157:21, 157:23, 158:2, 158:4, 159:5, 159:8, 160:14, 160:15, 160:16, 165:12, 165:13, 165:21, 165:22, 167:22, 167:24, 167:25, 168:1, 168:2, 168:6, 168:19, 171:8, 171:10, 172:1, 173:24, 174:1, 174:21, 176:21, 178:12, 183:19, 183:21, 184:15, 185:7, 185:11, 185:13, 185:15, 185:16, 185:22, 185:25, 186:1, 186:3, 192:6, 192:20, 194:17, 195:23, 195:24, 196:9, 196:12, 199:15, 202:4, 202:8, 202:11, 203:9, 204:11, 206:6, 206:9, 206:12, 206:13, 206:15, 206:18, 206:19, 207:20, 207:24, 209:18, 209:22, 210:13, 210:15, 210:16, 210:18, 212:18, 212:24, 212:25, 213:13, 218:6, 218:7, 218:20, 219:23, 221:12, 222:10, 222:12, 223:9, 225:24, 226:1, 230:21, 230:23, 234:11, 234:14, 234:18, 234:22, 235:4, 235:8, 235:12, 235:14, 235:25, 236:2, 238:11, 238:15, 239:13, 240:7, 241:11, 241:19, 241:21, 241:24, 244:6, 244:15, 245:2, 245:4, 245:6, 245:8, 245:11, 245:15, 245:19, 246:10, 247:13, 247:14, 253:7, 260:17, 260:18, 262:24, 262:25, 265:4, 265:5, 266:20, 269:14, 269:22, 279:15, 282:8, 284:14, 284:17, 284:19, 288:19, 288:20, 294:1, 294:5, 294:8, 294:12, 294:14, 294:16, 294:18, 294:19, 294:23, 295:3, 295:6, 295:7, 295:11, 295:16, 295:19, 295:22,

296:1, 296:7, 296:9, 296:16, 296:20, 296:24, 297:4, 297:7, 297:13, 297:15, 297:20, 297:22, 298:4, 298:9, 298:12, 298:15, 298:19, 298:22, 299:2, 299:7, 300:1, 300:5, 300:9, 300:13, 300:16, 300:19, 300:22, 300:24, 301:1, 301:2, 301:5, 301:7, 301:9, 301:10, 301:12, 301:15, 301:16, 301:18, 301:19, 301:23, 301:25, 302:1, 302:4
**theirs** [1] - 214:23
**themselves** [2] - 186:20, 288:17
**thereabout** [2] - 9:22, 117:8
**thereabouts** [1] - 179:6
**thereafter** [8] - 51:25, 52:7, 108:20, 183:14, 195:6, 210:8, 249:17, 270:18
**therefore** [3] - 199:23, 229:11, 299:20
**therein** [2] - 67:18, 68:6
**thinking** [4] - 152:21, 169:14, 170:12, 194:11
**thinks** [2] - 66:5, 192:12
**third** [8] - 25:22, 38:11, 39:2, 217:23, 226:20, 254:23, 290:24, 293:24
**Thomas** [1] - 5:21
**THOMAS** [2] - 2:4, 120:4
**THOMPSON** [1] - 119:19
**threads** [1] - 37:6
**threat** [5] - 26:17, 27:1, 176:14, 176:18, 178:6
**threats** [1] - 238:1
**three** [17] - 10:19, 11:7, 38:6, 40:18, 54:12, 67:12, 101:22, 101:25, 151:24, 151:25, 157:6, 195:13, 217:7, 240:14, 277:11, 290:4
**throughout** [3] - 131:3, 136:7, 136:10
**Thursday** [2] - 149:24, 283:16
**Tina** [4] - 13:22, 72:18, 96:24, 178:14
**title** [4] - 83:25, 248:1, 273:18, 281:21
**today** [3] - 31:15, 62:10, 65:3, 70:13, 78:9, 109:25, 263:8, 279:19
**today's** [3] - 204:22, 204:24, 252:10
**together** [3] - 17:3, 169:17, 169:22
**Tom** [2] - 271:21, 271:22
**tomorrow** [10] - 294:12, 294:14, 294:17, 294:25, 295:2, 297:15, 297:20, 298:6, 300:25, 302:2
**tonight** [1] - 300:24
**took** [22] - 7:22, 51:25, 111:13, 111:14, 123:21, 123:23, 127:4, 127:23, 128:7, 143:19, 163:19, 163:25, 171:25, 175:8, 177:3, 221:24, 248:6, 264:14, 268:24, 275:7, 277:10, 279:15
**top** [11] - 61:25, 88:6, 104:23, 149:24, 155:17, 155:19, 238:15, 239:16, 239:18, 277:21, 293:15
**topics** [1] - 64:1
**touch** [1] - 78:19
**toward** [1] - 221:19
**towards** [1] - 245:16
**track** [2] - 8:21, 161:25
**trail** [3] - 234:1, 240:12, 240:13
**transaction** [20] - 43:12, 81:8, 81:12,

81:16, 81:19, 91:18, 199:22, 200:4, 248:10, 249:15, 250:11, 257:6, 257:10, 257:12, 257:23, 258:4, 258:5, 260:24, 273:6, 290:4

**TRANSCRIPT** [1] - 119:9

**transfer** [14] - 20:2, 69:8, 135:22, 181:17, 214:4, 215:7, 271:8, 273:13, 282:20, 282:23, 283:1, 283:8, 284:21, 285:9

**transferred** [2] - 273:18, 285:15

**transmittal** [1] - 253:14

**transmitted** [1] - 282:23

**transport** [9] - 30:6, 125:5, 180:10, 182:2, 206:21, 207:7, 228:5, 234:3, 236:18

**transporting** [2] - 226:16, 234:23

**travel** [1] - 103:16

**traveled** [1] - 44:2

**traveling** [2] - 103:4, 103:7

**tremendous** [1] - 133:16

**trial** [4] - 118:7, 119:9, 294:19, 298:13

**tried** [9] - 10:10, 38:3, 38:5, 40:15, 40:16, 87:12, 92:4, 195:12, 221:21

**triggered** [1] - 228:14

**triggering** [1] - 228:12

**trouble** [3] - 190:14, 201:23, 279:21

**truck** [1] - 184:1

**true** [11] - 35:13, 42:18, 42:19, 61:13, 163:18, 188:2, 192:1, 224:16, 226:17, 227:7, 274:10

**Trust** [1] - 255:19

**truth** [1] - 296:18

**try** [20] - 12:7, 16:19, 16:24, 17:19, 20:24, 34:24, 38:16, 64:10, 71:22, 90:3, 90:9, 144:20, 159:9, 206:12, 219:8, 245:18, 251:9, 251:19, 269:9, 282:12

**trying** [32] - 25:11, 34:22, 36:9, 38:9, 41:6, 48:11, 58:9, 71:17, 71:20, 71:22, 85:14, 100:4, 101:6, 101:8, 105:24, 109:1, 115:24, 129:1, 129:5, 129:17, 140:9, 153:18, 175:25, 183:15, 191:20, 202:16, 207:2, 212:5, 212:6, 224:4, 295:24, 298:7

**turn** [30] - 25:9, 59:11, 63:4, 66:7, 66:16, 70:8, 73:21, 75:13, 82:10, 88:4, 89:14, 93:8, 96:6, 96:18, 101:20, 103:2, 103:25, 104:19, 105:6, 106:16, 124:22, 125:25, 126:9, 128:14, 143:23, 145:12, 209:1, 216:6, 217:6, 243:4

**turned** [5] - 22:6, 63:13, 174:25, 175:16, 289:12

**turning** [1] - 21:12

**turns** [1] - 42:20

**twice** [2] - 176:6, 298:2

**two** [39] - 6:12, 11:3, 18:12, 38:6, 39:23, 40:18, 46:12, 54:12, 58:9, 59:13, 72:2, 80:19, 104:19, 106:21, 136:13, 137:5, 141:19, 151:24, 151:25, 154:22, 170:5, 184:1, 188:14, 192:18, 192:20, 195:13, 206:17, 224:2, 227:11, 238:21, 243:22, 245:10, 250:18, 252:21,

254:13, 255:7, 255:17, 255:22, 277:11

**type** [1] - 141:14

**typed** [1] - 240:6

## U

**U.S** [15] - 260:6, 260:11, 260:14, 260:15, 260:18, 265:13, 265:16, 283:13, 283:20, 286:13, 286:20, 287:8, 288:1, 288:3

**UC** [1] - 68:3

**UCB** [25] - 16:10, 55:23, 56:16, 57:7, 68:9, 68:18, 69:6, 69:17, 69:21, 71:3, 74:1, 84:18, 85:5, 89:6, 90:19, 135:20, 136:17, 142:1, 174:8, 203:16, 231:7, 261:12, 261:16

**UCB's** [4] - 50:10, 52:24, 85:8

**UCC** [6] - 68:4, 142:10, 142:12, 142:22, 247:8, 278:18

**ultimately** [1] - 88:5

**um-hmm** [1] - 249:23

**unable** [3] - 37:11, 101:3, 198:9

**unacceptable** [1] - 267:15

**unaccessible** [1] - 163:15

**unaccounted** [2] - 165:16, 165:19

**unbeknownst** [1] - 299:12

**under** [18] - 101:17, 121:2, 141:23, 143:17, 143:19, 174:23, 178:20, 178:22, 179:1, 202:13, 254:5, 254:6, 254:13, 254:17, 255:12, 264:23, 268:7, 298:13

**understood** [17] - 11:22, 12:18, 20:9, 30:12, 39:9, 58:17, 70:3, 78:17, 206:15, 212:11, 214:3, 231:22, 232:11, 232:16, 243:14, 258:9, 258:18

**unit** [1] - 77:16

**United** [21] - 5:5, 5:8, 5:11, 5:15, 8:4, 10:20, 11:14, 53:11, 58:9, 65:21, 66:13, 89:13, 142:6, 143:1, 154:24, 166:13, 231:1, 246:4, 246:12, 247:1, 285:3

**UNITED** [2] - 119:1, 119:4

**unless** [4] - 28:4, 130:20, 200:23, 232:8

**up** [67] - 12:4, 12:12, 14:5, 14:11, 14:17, 30:17, 41:1, 41:19, 43:13, 48:17, 50:10, 63:21, 86:4, 98:12, 108:16, 108:17, 133:9, 133:10, 151:14, 154:3, 159:7, 159:9, 167:23, 170:1, 170:15, 173:4, 175:17, 183:12, 187:23, 189:3, 192:20, 194:25, 217:7, 217:23, 218:2, 218:9, 218:14, 220:10, 222:1, 222:3, 222:12, 230:9, 237:23, 241:23, 245:16, 251:6, 251:7, 255:11, 271:4, 281:21, 283:9, 283:11, 283:19, 283:23, 285:20, 285:22, 285:24, 286:4, 286:10, 287:17, 288:17, 290:4, 295:11, 295:15, 296:11, 300:24

**update** [2] - 105:11, 105:15

**USA** [1] - 53:4

**useful** [1] - 16:14

## V

**vacant** [3] - 251:24, 254:14, 255:11

**vacated** [3] - 97:8, 97:15, 174:13

**vacation** [2] - 103:17, 105:19

**vague** [7] - 12:6, 14:24, 20:14, 137:2, 152:7, 160:5, 168:14, 208:10

**valuation** [1] - 80:14

**value** [1] - 266:17

**valued** [1] - 70:7

**verbal** [1] - 208:22

**verified** [1] - 236:13

**versed** [1] - 9:7

**version** [2] - 18:18, 19:2

**via** [2] - 106:1, 106:2

**vice** [2] - 5:10, 246:3

**view** [3] - 110:12, 111:1, 112:22

**VILIA** [1] - 119:14

**Vilia** [5] - 5:5, 28:15, 31:15, 226:19, 296:11

**violation** [1] - 299:18

**visited** [1] - 77:22

**VOLUME** [1] - 119:10

**vs** [1] - 119:6

## W

**wait** [15] - 22:11, 43:15, 99:3, 126:13, 152:12, 185:13, 185:14, 190:25, 245:12, 245:17, 253:17

**waited** [1] - 43:14

**waiting** [2] - 148:11, 245:23

**waived** [1] - 275:13

**wants** [4] - 68:19, 73:6, 135:22, 187:6

**Warehouse** [4] - 65:11, 128:25, 200:13, 200:16

**warehouse** [204] - 7:10, 7:17, 7:22, 8:1, 8:13, 8:16, 8:18, 8:19, 11:4, 11:9, 12:18, 15:20, 15:24, 19:14, 19:23, 20:2, 20:12, 21:10, 21:13, 21:15, 21:19, 22:6, 24:19, 30:6, 30:19, 30:23, 31:25, 32:7, 33:5, 33:6, 33:23, 36:24, 37:1, 37:11, 37:23, 38:13, 39:8, 41:23, 41:24, 43:11, 56:4, 56:7, 56:12, 62:1, 62:7, 62:9, 63:13, 65:19, 65:22, 67:5, 67:7, 67:9, 68:10, 68:16, 69:7, 70:19, 72:14, 76:8, 76:23, 77:10, 79:21, 79:22, 80:5, 80:11, 81:5, 81:21, 82:2, 82:5, 83:15, 84:1, 84:7, 84:10, 86:19, 87:8, 87:10, 89:9, 89:10, 89:22, 90:1, 92:13, 93:6, 94:22, 94:24, 95:18, 95:23, 99:25, 100:13, 100:22, 100:24, 101:4, 102:7, 104:7, 105:15, 105:17, 107:9, 111:19, 111:22, 111:23, 111:24, 112:7, 112:11, 112:16, 112:19, 113:24, 114:21, 115:25, 116:3, 116:6, 122:25, 123:3, 123:24, 124:7, 125:5, 129:9, 133:19, 133:24, 135:21, 136:4, 136:12, 142:2, 143:12, 143:24, 144:9, 146:15, 161:13, 161:23, 162:21, 163:8, 163:16, 163:21, 164:1, 164:11,

164:14, 165:4, 165:6, 165:8, 165:16, 166:8, 167:19, 168:13, 168:22, 169:10, 169:11, 169:20, 170:16, 171:14, 174:9, 174:12, 175:5, 175:9, 175:16, 175:20, 176:25, 179:20, 180:2, 180:10, 181:17, 182:3, 182:13, 183:7, 188:1, 203:3, 203:4, 226:16, 229:10, 232:8, 232:13, 232:20, 233:14, 236:8, 236:13, 236:19, 242:6, 243:2, 243:13, 243:15, 246:18, 247:5, 247:6, 250:1, 253:23, 256:10, 256:13, 256:17, 257:7, 257:17, 258:2, 259:24, 259:25, 260:3, 260:4, 260:7, 283:11, 283:15, 283:17, 283:20, 286:1, 286:4, 286:7, 290:8, 292:10

**Warehousing** [29] - 6:16, 6:20, 6:23, 7:5, 7:10, 7:14, 8:10, 9:15, 10:2, 15:7, 15:9, 15:12, 15:18, 25:12, 143:18, 158:12, 170:15, 170:20, 175:25, 178:15, 178:16, 226:7, 246:17, 247:4, 247:10, 248:3, 249:20, 253:23, 255:5

**Warehousing's** [2] - 19:8, 202:23
**Warehousing/Kanan** [1] - 226:22
**warned** [1] - 19:17
**warnings** [1] - 19:21
**watch** [1] - 94:11
**ways** [2] - 279:23, 280:14
**Wednesday** [1] - 88:7
**week** [5] - 38:11, 39:2, 143:8, 143:10, 290:3
**weeks** [2] - 72:9, 220:25
**weighs** [1] - 77:19
**weight** [1] - 73:9
**well-versed** [1] - 9:7
**WEST** [3] - 5:8, 78:24, 119:15
**West** [1] - 5:8
**Western** [11] - 152:17, 152:23, 152:24, 153:6, 154:3, 154:4, 154:6, 154:11, 154:12, 154:16, 154:23
**whatsoever** [1] - 275:22
**wheels** [1] - 113:4
**whereabouts** [1] - 74:7
**whereby** [2] - 170:15, 249:19
**wherein** [1] - 149:7
**whole** [6] - 17:2, 61:7, 63:11, 113:20, 256:6, 297:10
**wife** [2] - 15:14, 272:14
**William** [2] - 82:11, 260:25
**willing** [10] - 115:15, 184:4, 199:6, 199:11, 205:15, 268:14, 268:21, 269:5, 275:19, 297:16
**wire** [10] - 214:3, 215:7, 282:20, 282:23, 283:1, 283:5, 283:8, 284:21, 285:9, 285:12
**wired** [3] - 43:13, 44:11, 285:13
**wiser** [2] - 17:2, 172:7
**wish** [1] - 16:22
**withdraw** [1] - 208:14
**witness** [10] - 39:24, 55:5, 128:6, 157:21, 235:5, 245:6, 246:9, 298:20, 301:21, 302:2
**Witness** [5] - 6:3, 157:20, 158:1, 245:5, 245:14

**WITNESS** [89] - 16:12, 18:24, 20:9, 26:10, 28:6, 28:20, 28:25, 32:12, 32:15, 32:18, 32:22, 33:1, 34:10, 39:12, 40:22, 46:5, 47:18, 49:7, 52:3, 52:11, 58:3, 58:8, 65:14, 67:22, 73:4, 73:11, 78:9, 78:25, 80:21, 92:4, 98:7, 98:24, 99:7, 101:15, 101:18, 103:10, 104:25, 109:18, 109:20, 115:2, 121:3, 122:24, 124:18, 127:20, 140:25, 146:21, 147:2, 150:2, 152:11, 157:19, 158:4, 160:15, 165:22, 167:24, 168:1, 168:19, 173:24, 185:11, 185:15, 185:25, 186:3, 195:24, 206:13, 206:19, 209:22, 210:16, 212:25, 218:7, 234:22, 235:14, 236:2, 245:19, 247:14, 260:18, 262:25, 265:5, 284:19, 288:20, 294:14, 294:16, 294:19, 295:3, 295:7, 301:1, 301:5, 301:9, 301:15, 301:18, 301:25
**witnesses** [1] - 296:13
**woman** [1] - 279:10
**wondered** [1] - 298:1
**word** [6] - 94:24, 165:21, 185:25, 196:21, 206:24
**words** [1] - 207:3
**workout** [1] - 275:6
**works** [1] - 266:5
**worried** [1] - 190:4
**worry** [1] - 36:11
**worth** [6] - 265:24, 266:1, 266:15, 266:21, 266:23, 267:11
**wrap** [1] - 300:24
**write** [4] - 83:9, 126:16, 221:24, 284:6
**writing** [8] - 134:6, 139:8, 139:11, 208:22, 218:12, 222:22, 222:24, 223:3
**written** [5] - 24:7, 24:11, 24:15, 78:13, 173:12, 258:4, 273:7
**wrote** [6] - 70:23, 126:1, 126:10, 177:21, 279:22, 280:17

## Y

**year** [4] - 35:4, 140:24, 221:20, 247:13
**years** [8] - 44:3, 53:1, 53:14, 53:17, 53:21, 54:12, 54:17, 56:24
**yes-or-no** [4] - 22:25, 47:20, 177:7, 253:10
**yesterday** [2] - 60:2, 70:23
**yourself** [5] - 78:1, 104:8, 108:1, 110:15, 152:16
**yourselves** [1] - 5:4

## Z

**zero** [1] - 272:17
**zero-coupon** [1] - 272:17

```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4   UNITED CENTRAL BANK,              )   Docket No. 10 C 331
                                       )
 5                     Plaintiff,      )
                                       )
 6            vs.                      )
                                       )
 7   KANAN FASHIONS, INC., et al.,     )   Chicago, Illinois
                                       )   January 28, 2011
 8                     Defendants.     )   9:00 o'clock a.m.

 9
                TRIAL TRANSCRIPT OF PROCEEDINGS
10           BEFORE THE HONORABLE MICHAEL T. MASON
                      VOLUME 2-A
11

12   APPEARANCES:

13

14   For the Plaintiff:    BOODELL & DOMANSKIS LLC
                           BY:  MS. VILIA M. DEDINAS
15                              MS. NADA DJORDJEVIC
                                MR. DAVID WEST
16                              MS. AMY RYLKO
                           205 North Michigan Avenue, Suite 4307
17                         Chicago, IL  60601
                           (312) 938-4070
18

19   For the Defendants:   McJESSY, CHING & THOMPSON
                           BY:  MR. KEVIN McJESSY
20                         3759 North Ravenswood, Suite 231
                           Chicago, IL  60613
21                         (773) 880-1260

22

23
     Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                         Official Court Reporter
                           219 S. Dearborn Street, Suite 1854-B
25                         Chicago, Illinois  60604
                           (312) 435-5639
```

304

1    APPEARANCES CONTINUED:

2

3    For Respondents
     Alan Borlack and
     Eric Grossman:                HINSHAW & CULBERTSON LLP
4                                   BY:   MR. THOMAS P. McGARRY
                                          MR. ALAN R. LIPTON
5                                   222 North LaSalle Street, Suite 300
                                    Chicago, IL  60601
6                                   (312) 704-3000

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                I N D E X

2   DESCRIPTION                                                    PAGE
3

4
5   ERIC GROSSMAN, DIRECT EXAMINATION                              307
    BY MS. DEDINAS:

6
7   ERIC GROSSMAN, CROSS-EXAMINATION                               348
    BY MR. McJESSY:

8
9   ERIC GROSSMAN, CROSS-EXAMINATION                               393
    BY MR. McGARRY:

10
11  ERIC GROSSMAN, REDIRECT EXAMINATION                            403
    BY MS. DEDINAS:

12
13  ERIC GROSSMAN, RECROSS-EXAMINATION                             404
    BY MR. McJESSY:

14
15  ERIC GROSSMAN, RECROSS-EXAMINATION                             408
    BY MR. McGARRY:

16
17  ERIC GROSSMAN, RECROSS-EXAMINATION                             414
    BY MR. McJESSY:

18
19  ERIC GROSSMAN, RECROSS-EXAMINATION                             415
    BY MR. McGARRY:

20
21  ALAN BORLACK, DIRECT EXAMINATION                               419
    BY MS. DEDINAS:

22
23  ALAN BORLACK, CROSS-EXAMINATION                                450
    BY MR. McJESSY:

24
25  ALAN BORLACK, CROSS-EXAMINATION                                476
    BY MR. McGARRY:

1

ALAN BORLACK, RECROSS-EXAMINATION                    483
2   BY MR. McJESSY:

3

ALAN BORLACK, RECROSS-EXAMINATION                    491
4   BY MR. McGARRY:

5

DANIEL GARRIE, DIRECT EXAMINATION                    495
6   BY MR. McGARRY:

7

DANIEL GARRIE, CROSS-EXAMINATION                     512
8   BY MS. DJORDJEVIC:

9

DANIEL GARRIE, CROSS-EXAMINATION                     527
10  BY MR. McJESSY:

11

WILLIAM J. SERRITELLA, DIRECT EXAMINATION            537
12  BY MS. DJORDJEVIC:

13

WILLIAM J. SERRITELLA, CROSS-EXAMINATION             573
14  BY MR. McJESSY:

15

WILLIAM J. SERRITELLA, CROSS-EXAMINATION             589
16  BY MR. LIPTON:

17

18

19

20

21

22

23

24

25

09:46:41   1   (The following proceedings were had in open court:)

10:04:42   2       THE CLERK:  10 C 331, United Central Bank v. Kanan

10:04:58   3   Fashions, Incorporated, et al.

10:05:02   4       THE COURT:  Do you want to call your first witness?

10:05:02   5       MS. DEDINAS:  Yes.  Mr. Grossman.

10:05:52   6   (Witness sworn.)

10:05:52   7       THE COURT:  You have heard my admonishment before.

10:05:56   8             - - -

10:05:56   9       ERIC GROSSMAN, DIRECT EXAMINATION

10:05:56  10   BY MS. DEDINAS:

10:05:58  11   Q.  Could you state your name for the record.

10:05:58  12   A.  Eric Grossman.

10:06:00  13   Q.  Good morning.

10:06:00  14   A.  Good morning.

10:06:00  15   Q.  Mr. Grossman, you became involved in this case on or about

10:06:04  16   April 7th, 2010; is that right?

10:06:08  17   A.  No.

10:06:08  18   Q.  When did you get involved?

10:06:10  19   A.  Soon after the case came into the office.

10:06:14  20   Q.  Okay.

10:06:14  21   A.  Towards the end of January, beginning of February.

10:06:18  22   Q.  Okay.  So you were involved -- you were involved before

10:06:20  23   Mr. Muschler went on vacation?

10:06:24  24   A.  Yes.

10:06:24  25   Q.  Okay.  And were you involved in all aspects of the case or

| | | |
|---|---|---|
| 10:06:28 | 1 | just the discovery? |
| 10:06:30 | 2 | A.  No. |
| 10:06:34 | 3 | Q.  What were you involved in specifically? |
| 10:06:36 | 4 | A.  I began assisting Alan with research on various legal |
| 10:06:44 | 5 | issues which were raised by the complaint and the TRO. |
| 10:06:48 | 6 | Q.  And at some point, were you the main person dealing with |
| 10:06:52 | 7 | ESI issues? |
| 10:06:54 | 8 | A.  Yes. |
| 10:06:56 | 9 | Q.  And you were the primary contact with me in interacting on |
| 10:07:02 | 10 | ESI issues; is that right? |
| 10:07:02 | 11 | A.  That's correct. |
| 10:07:02 | 12 | Q.  And, generally speaking, we had a fairly candid and |
| 10:07:08 | 13 | forthcoming relationship in that regard; isn't that right? |
| 10:07:16 | 14 | THE COURT:  Is that right? |
| 10:07:18 | 15 | THE WITNESS:  We got along, yes. |
| 10:07:22 | 16 | BY MS. DEDINAS: |
| 10:07:22 | 17 | Q.  Now, by the time you got involved in the case, had the |
| 10:07:26 | 18 | clients been advised of their duty to preserve evidence? |
| 10:07:28 | 19 | A.  Yes. |
| 10:07:28 | 20 | Q.  Did you make any additional admonitions or instructions to |
| 10:07:34 | 21 | your clients on their duty to preserve evidence? |
| 10:07:36 | 22 | A.  Specifically, yes, yes. |
| 10:07:52 | 23 | Q.  And do you know what would be the first date you did that? |
| 10:07:56 | 24 | A.  It occurred generally throughout the representation of the |
| 10:07:58 | 25 | client. |

| | | |
|---|---|---|
| 10:07:58 | 1 | Q. So you had -- you had continuing discussions with your |
| 10:08:04 | 2 | clients about their duty to preserve evidence; is that |
| 10:08:06 | 3 | correct? |
| 10:08:06 | 4 | A. We had to produce ESI, yes, and in that regard, |
| 10:08:12 | 5 | preservation efforts had to be undertaken. |
| 10:08:14 | 6 | Q. And you discussed those and instructed your clients with |
| 10:08:18 | 7 | respect to their duty to preserve ESI on an ongoing basis? |
| 10:08:20 | 8 | A. They had already been instructed a couple of times in |
| 10:08:24 | 9 | January as well as in March. |
| 10:08:28 | 10 | MR. McJESSY: Objection. Nonresponsive. Move that |
| 10:08:30 | 11 | it be stricken. |
| 10:08:30 | 12 | THE COURT: No. We will let it stand. |
| 10:08:34 | 13 | BY MS. DEDINAS: |
| 10:08:34 | 14 | Q. Did you continue to instruct your clients after the |
| 10:08:36 | 15 | initial instructions in January and in March about their duty |
| 10:08:38 | 16 | to preserve ESI? |
| 10:08:40 | 17 | A. I don't believe I ever specifically sent an e-mail or used |
| 10:08:44 | 18 | the words about a duty to preserve ESI, but in general and as |
| 10:08:50 | 19 | part of my ongoing activities and efforts to come to an |
| 10:08:54 | 20 | understanding of the status of the ESI on Kanan's side, I sent |
| 10:09:04 | 21 | a lot of e-mails, and I think, generally speaking, those |
| 10:09:10 | 22 | e-mails and our efforts with respect to Kanan's ESI all could |
| 10:09:12 | 23 | be construed as efforts to preserve ESI. |
| 10:09:24 | 24 | Q. Now, on April 19th, if you could take a look at Exhibit |
| 10:09:28 | 25 | SH 81. |

10:09:40    1    While you look at that, for the record, that's an

10:09:40    2    e-mail from you to me dated April 19th. It's a very short

10:09:50    3    e-mail, and it says, Vilia, there's currently no creditor

10:09:52    4    repossession effort by lawsuit or other demand.

10:09:54    5    Do you recall that?

10:09:56    6    A. I sure do.

10:09:56    7    Q. You sent that to me?

10:09:58    8    A. I sure did.

10:10:00    9    Q. And you made diligent efforts to determine whether that

10:10:04   10    representation was true, didn't you?

10:10:04   11    A. Yes.

10:10:06   12    Q. In fact, you followed up and clarified with your clients

10:10:08   13    several times to make sure that that representation would be

10:10:14   14    true; isn't that right?

10:10:14   15    A. Twice.

10:10:16   16    Q. Okay. And at that time that up wrote this e-mail, did you

10:10:24   17    know that your client's server was leased from Associated

10:10:28   18    Bank?

10:10:28   19    A. No.

10:10:28   20    Q. When did you first find that out?

10:10:30   21    A. That would have been about May 13th.

10:10:40   22    Q. Now, you recall that we had a lengthy ESI meeting at

10:10:50   23    Kanan's offices on April 23rd; is that right?

10:10:52   24    A. Yes.

10:10:52   25    Q. Okay. Do you recall who else was present?

| | | |
|---|---|---|
| 10:10:56 | 1 | A.  Yes. |
| 10:10:56 | 2 | Q.  Who? |
| 10:10:58 | 3 | A.  You were there, your ESI liaison, David Aberman, was |
| 10:11:04 | 4 | there, I was there, Daniel Garrie, our ESI liaison was there, |
| 10:11:10 | 5 | Bill Spernow, another representative with Daniel Garrie, from |
| 10:11:14 | 6 | Daniel Garrie's firm, was there.  We also had brought in an |
| 10:11:22 | 7 | authorized Dell repair technician by the name of Matt Denecke; |
| 10:11:26 | 8 | however, he did not participate in any of the meetings that we |
| 10:11:28 | 9 | had in a conference room.  Also Mehul Shah and Paresh Joshi |
| 10:11:36 | 10 | were also present on site but didn't participate in the ESI |
| 10:11:40 | 11 | meeting, which obviously also included attempted repair of the |
| 10:11:44 | 12 | inoperable hard drives. |
| 10:11:48 | 13 | Q.  That was going to be my next question.  And I ask you, |
| 10:11:50 | 14 | wasn't the purpose of the meeting to attempt to repair that |
| 10:11:52 | 15 | one other server that wasn't working?  Isn't that right? |
| 10:11:56 | 16 | A.  Yes. |
| 10:11:58 | 17 | Q.  And we were going to try to make a forensic image of that |
| 10:12:04 | 18 | server; is that right? |
| 10:12:04 | 19 | A.  Yes.  In fact, that was why -- that was the original |
| 10:12:08 | 20 | reason that we were going to travel to the -- Kanan's offices |
| 10:12:14 | 21 | in Oak Brook was to have counsel present while ESI liaisons |
| 10:12:18 | 22 | attempted the repair of the inoperable server. |
| 10:12:20 | 23 | Q.  And make an image of it, if possible? |
| 10:12:24 | 24 | A.  And make an image of it, if possible. |
| 10:12:28 | 25 | Q.  And in that meeting, we also had lengthy discussions about |

| | | |
|---|---|---|
| 10:12:30 | 1 | the bank's ESI systems; is that right? |
| 10:12:32 | 2 | A. We did. |
| 10:12:34 | 3 | Q. Do you recall that towards the end of the meeting, I asked |
| 10:12:36 | 4 | you whether Kanan had left a server at the warehouse that had |
| 10:12:42 | 5 | been foreclosed upon? |
| 10:12:46 | 6 | A. My recollection is that that was prior to when we broke |
| 10:12:50 | 7 | for lunch. |
| 10:12:50 | 8 | Q. Okay. |
| 10:12:52 | 9 | A. And you did ask the question, yes. |
| 10:12:54 | 10 | Q. And do you remember I asked you what efforts were being |
| 10:12:56 | 11 | made to preserve that server? |
| 10:12:58 | 12 | A. I don't specifically recall that statement. I do recall |
| 10:13:06 | 13 | that you asked about the server that had been left at the |
| 10:13:10 | 14 | warehouse in Oak Brook. |
| 10:13:12 | 15 | Q. Okay. Now, in your ESI chronology that you filed and that |
| 10:13:20 | 16 | the Exhibit 218 -- for the record, this is former counsel's |
| 10:13:32 | 17 | ESI chronology in response to the 8/27/2010 order. |
| 10:13:42 | 18 | I'd like to actually skip over to page 8. And in the |
| 10:14:02 | 19 | very last paragraph under the entry of April 23rd, 2010, it |
| 10:14:06 | 20 | says, During the meeting, Ms. Dedinas advises Mr. Grossman |
| 10:14:10 | 21 | that defendants have left a server at the warehouse. This is |
| 10:14:12 | 22 | defendants' counsel's first notice of same. |
| 10:14:18 | 23 | Do you see that? |
| 10:14:18 | 24 | A. Yes. |
| 10:14:20 | 25 | Q. Was that an accurate statement? |

10:14:24  1  A.  Yes.

10:14:26  2  Q.  And soon thereafter, you, and Mr. Garrie, and Mr. Spernow,

10:14:34  3  Mr. Shah, and Mr. Joshi left the room.  Do you recall that?

10:14:38  4  A.  I don't believe Mr. Shah and Mr. Joshi were in the room to

10:14:44  5  begin with; but Daniel Garrie, Bill Spernow, and I did leave

10:14:52  6  the room.

10:14:52  7  Q.  What did you discuss?

10:14:52  8  A.  With?

10:14:54  9  Q.  With -- the three of you, what did you discuss?

10:14:56  10  A.  My recollection is that we broke for lunch at that point,

10:15:02  11  or it was shortly before.  We may have taken a break during

10:15:06  12  the midpoint of the morning meeting.  I'm not exactly sure.

10:15:10  13  But when we went into Mr. Shah's office, we discussed what had

10:15:16  14  been going on in the conference room, both with respect to the

10:15:20  15  repair of the inoperable server hard drives and the attempted

10:15:28  16  imaging of that, as well as the information that you had

10:15:30  17  been -- that you and your ESI liaison had been talking about

10:15:36  18  with respect to production -- with respect to the bank's ESI

10:15:40  19  systems.

10:15:40  20       And we also began to engage with them in a discussion

10:15:46  21  about gathering data and information about Kanan's ESI,

10:15:50  22  including the fact that the warehouse server was in Aurora,

10:15:54  23  the Aurora warehouse, and it needed to be moved to -- and that

10:16:02  24  it needed to be moved to the Oak Brook offices and kept in a

10:16:04  25  secure location.

| | |
|---|---|
| 10:16:06 | 1 |
| 10:16:08 | 2 |
| 10:16:10 | 3 |
| 10:16:14 | 4 |
| 10:16:24 | 5 |
| 10:16:24 | 6 |
| 10:16:28 | 7 |
| 10:16:34 | 8 |
| 10:16:40 | 9 |
| 10:16:50 | 10 |
| 10:16:54 | 11 |
| 10:16:58 | 12 |
| 10:17:04 | 13 |
| 10:17:10 | 14 |
| 10:17:14 | 15 |
| 10:17:14 | 16 |
| 10:17:16 | 17 |
| 10:17:16 | 18 |
| 10:17:18 | 19 |
| 10:17:20 | 20 |
| 10:17:24 | 21 |
| 10:17:26 | 22 |
| 10:17:32 | 23 |
| 10:17:36 | 24 |
| 10:17:40 | 25 |

1  Q.  Were there any discussions at that time about how that

2  could happen given that the warehouse had already been

3  foreclosed upon by First Midwest Bank?

4  A.  Not specifically, no, but we did place a call --

5          THE COURT:  Who is "we"?

6          THE WITNESS:  I'm sorry.  Mr. Shah and Mr. Joshi did

7  mention that Dave Clark, who was the bank representative for

8  First Midwest Bank that had also provided us with an affidavit

9  already in opposition to your motion for TRO, was their

10  friend, that they had a relationship with him, and that it

11  should be no problem to get the warehouse server moved from

12  Aurora to Oak Brook.  And Mr. Shah, I believe, or Mr. Joshi

13  offered to place a call to Mr. Clark to confirm this for

14  Daniel and myself, for Mr. Garrie and myself.

15  BY MS. DEDINAS:

16  Q.  And did that call take place on that day?

17  A.  Yes, it did.

18  Q.  Were you in on that call?

19  A.  Was I in on that call?  Yes.

20  Q.  Okay.  And what did -- what did you ask -- what did

21  anybody ask Mr. Clark to do?

22  A.  Well, Mr. Shah placed the call, Mr. Clark -- got

23  Mr. Clark's voice mail, left him a message to call back, he

24  called back within about five or 10 minutes or so.  At that

25  point, Mr. Shah introduced me, as well as Mr. Garrie as our

| | |
|---|---|
| 10:17:50 | 1 |
| 10:17:52 | 2 |
| 10:17:54 | 3 |
| 10:17:58 | 4 |
| 10:18:02 | 5 |
| 10:18:06 | 6 |
| 10:18:10 | 7 |
| 10:18:12 | 8 |
| 10:18:14 | 9 |
| 10:18:18 | 10 |
| 10:18:20 | 11 |
| 10:18:22 | 12 |
| 10:18:28 | 13 |
| 10:18:30 | 14 |
| 10:18:34 | 15 |
| 10:18:36 | 16 |
| 10:18:46 | 17 |
| 10:18:50 | 18 |
| 10:18:52 | 19 |
| 10:19:02 | 20 |
| 10:19:04 | 21 |
| 10:19:14 | 22 |
| 10:19:18 | 23 |
| 10:19:22 | 24 |
| 10:19:26 | 25 |

1  ESI liaison, mentioned that we were assisting in the case with

2  respect to electronically-stored information, and that we

3  needed to get -- Mr. Shah or Mr. Joshi mentioned that we

4  needed -- it may have been Mr. Garrie, that we needed to get

5  the warehouse server back from the Oak Brook office -- or back

6  from the Aurora warehouse and move it to the Oak Brook office.

7        Mr. Clark indicated -- at that point indicated that

8  that would be no problem, that we could have access to it.

9  Q.  So at that point, Mr. Clark didn't say anything about

10 needing a court order or subpoena to do that?

11 A.  Well, no, absolutely not.

12 Q.  Okay.  And just to be clear, Mr. Shah and Mr. Joshi were

13 both in on that phone call?

14 A.  The call was -- they were in the room, and the call -- and

15 the conversation took place on a speakerphone.

16 Q.  Okay.  Now, you know that moving a computer improperly

17 could result in damage to a computer or the data that's on it,

18 right, generally?

19 A.  I'm really not sure how to answer that question.  I carry

20 my laptop with me daily.

21 Q.  Okay.  Did you or your ESI liaison give your clients any

22 instruction regarding procedures or protocols they should

23 follow for safely removing the server from the warehouse to

24 prevent any data deletion or damage?

25 A.  No, not specifically.

10:19:28    1    Q.  Was there any discussion about how exactly they were going

10:19:34    2    to move the server to the warehouse -- to the Oak Brook

10:19:40    3    offices?

10:19:40    4    A.  We discussed that they would have to pick it up and

10:19:44    5    transport it.

10:19:44    6    Q.  And who did you understand would be physically doing the

10:19:48    7    transport?

10:19:50    8    A.  I left that up to the client.

10:19:54    9    Q.  So, thereafter, on -- and that conversation occurred on

10:20:04   10    the 23rd; is that right?

10:20:06   11    A.  The conversation with Mr. Clark?

10:20:08   12    Q.  The one that we are talking about --

10:20:10   13    A.  Yes.

10:20:10   14    Q.  -- with the clients and Mr. Clark.

10:20:10   15    A.  Yes, it did.

10:20:12   16    Q.  And your first instruction to your clients to move the

10:20:14   17    server to the Oak Brook office, that occurred in person on

10:20:20   18    April 23rd; is that right?

10:20:22   19    A.  Yes, it did.

10:20:22   20    Q.  And then did you follow up with those instructions in

10:20:26   21    writing?

10:20:26   22    A.  Yes, I did.

10:20:32   23    Q.  And I'd like you to look at Exhibit 85.  That, for the

10:20:48   24    record, is an e-mail dated April 26, 2010, from Eric Grossman

10:20:52   25    to Paresh Joshi, copies to Mehul Shah, Alan Borlack, and David

10:20:58  1  Muschler.

10:21:00  2         Do you have the exhibit?

10:21:00  3  A.  I do.

10:21:00  4  Q.  And is this exhibit the --

10:21:04  5         MR. McJESSY:  I'm sorry.  Could we have that exhibit,

10:21:06  6  your Honor?

10:21:06  7         THE COURT:  85.

10:21:08  8  BY MS. DEDINAS:

10:21:08  9  Q.  And is this the written confirmation that you gave your

10:21:12  10  clients of the instruction to move the server to the Oak Brook

10:21:20  11  office?

10:21:20  12  A.  It is, because I had also followed up with Mr. Joshi

10:21:26  13  Monday morning after our Friday meeting, and so that's why I

10:21:30  14  say, as we just discussed.

10:21:32  15  Q.  So in addition to the April 23rd verbal instruction, you

10:21:40  16  had another conversation in which you verbally instructed him

10:21:44  17  to move the server on the morning of April 26th?

10:21:50  18  A.  That's correct.

10:21:50  19  Q.  And then you put those instructions and confirmed them in

10:21:56  20  writing?

10:21:56  21  A.  At some time during the day on April 26th.  I'm not sure

10:21:58  22  if I called Mr. Joshi in the morning, but I did speak again

10:22:02  23  with Mr. Joshi because the meeting was very lengthy, as you

10:22:04  24  know, and there were a lot of issues and matters discussed,

10:22:08  25  and I needed to follow up on a few things with Mr. Joshi.  And

10:22:10  1  I did reiterate again on Monday morning what he had told me he
10:22:16  2  was going to do.  And then, yes, this e-mail on the afternoon
10:22:20  3  of the 26th is a record of that conversation.
10:22:24  4  Q.  Did Mr. Joshi or Mr. Shah indicate to you at any time on
10:22:30  5  the 23rd or the 26th that it wouldn't be feasible to move the
10:22:36  6  server because it was very heavy?
10:22:38  7  A.  No.
10:22:38  8  Q.  Did they indicate that there was any impediment to moving
10:22:44  9  the server to the Oak Brook office?
10:22:46  10  A.  No.
10:22:46  11  Q.  So as far as you knew, that was something that they were
10:22:50  12  willing and capable of doing?
10:22:52  13  A.  Sure, they were -- they're sophisticated business people
10:22:58  14  that were running a multimillion-dollar global business
10:23:02  15  operation involving the transport of -- and manufacture of
10:23:08  16  clothing beginning in China to Sri Lanka to Aurora and then
10:23:14  17  out to various customers, obviously all of which involves
10:23:16  18  logistics, and I had no reason to think that they would not be
10:23:22  19  able to determine or figure out the means or the methods for
10:23:30  20  moving a server from Aurora to Oak Brook.
10:23:32  21  Q.  Was there any consideration at that time of making a
10:23:50  22  forensic image of the server?
10:23:52  23  A.  Well, I believe the intent was that once we got control of
10:24:02  24  the server into the Oak Brook offices, once it was moved, that
10:24:06  25  it would then be up to our ESI liaison at FSRDG to direct what

10:24:12  1  next needed to be done with the server, which would have been

10:24:16  2  an image of the server, yes. And I believe that was what was

10:24:24  3  mentioned to the clients, to Mr. Shah and Mr. Joshi, during

10:24:28  4  the meeting on April 23rd by Mr. Garrie.

10:24:30  5         THE COURT:  Can I ask a follow-up?

10:24:32  6         MS. DEDINAS:  Yes.

10:24:32  7         THE COURT:  Who was present when that direction was

10:24:34  8  made?

10:24:34  9         THE WITNESS:  When the direction?

10:24:36  10        THE COURT:  Was made about the -- what do you call it

10:24:40  11  when you make a copy --

10:24:44  12        MS. DEDINAS:  An image?

10:24:44  13        THE COURT:  -- (continuing) imaging.  Thank you.

10:24:46  14        THE WITNESS:  I believe it would have been myself,

10:24:48  15  Mr. Garrie, Mr. Spernow may have been in the room, he may not

10:24:52  16  have because he was in and out working on the repair of the

10:24:56  17  inoperable server, and Mr. Shah, and Mr. Joshi.

10:24:58  18        THE COURT:  Mr. Shah and Mr. Joshi.

10:25:00  19        THE WITNESS:  Yes.

10:25:02  20        THE COURT:  Thank you.

10:25:02  21  BY MS. DEDINAS:

10:25:02  22  Q.  Had there been any efforts prior to April 26th to do

10:25:08  23  anything to preserve the data on the warehouse server?

10:25:10  24  A.  Not that I'm aware of.

10:25:18  25  Q.  And did your clients ever --

10:25:28  1  A.  Well, excuse me.  Let me take that back.

10:25:30  2       You asked whether there had been any efforts.  And,

10:25:32  3  yes, there had, because there had been at least two litigation

10:25:36  4  hold communications as those efforts were directed

10:25:40  5  specifically to preserve data.

10:25:40  6  Q.  Okay.  But were there any specific efforts taken to image

10:25:48  7  or index the data that was on the server prior to the

10:25:54  8  foreclosure?

10:25:54  9  A.  No, not that I'm aware of.

10:26:00  10 Q.  All right.  So then on April 29th, do you recall that you

10:26:04  11 wrote me an e-mail in which you told me that all the computers

10:26:08  12 from the warehouse are being moved to Kanan's Oak Brook

10:26:14  13 office?

10:26:14  14 A.  Yes.

10:26:14  15 Q.  And I'd like you to take a look at Exhibit 91.  For the

10:26:22  16 record, that's a letter dated April 29th to me from you, with

10:26:28  17 copies to Alan Borlack and David Muschler.

10:26:36  18      I'd like to direct your attention to the second page,

10:26:40  19 paragraph 6.  It says, all Kanan's ex-employees' computers

10:26:46  20 have been kept in a secure location in either Kanan's Oak

10:26:50  21 Brook office or at the warehouse.  All computers from the

10:26:54  22 warehouse are being moved to Kanan's Oak Brook office.

10:26:58  23      Is that right?

10:26:58  24 A.  That's what the letter says, yes.

10:27:00  25 Q.  Okay.  Now, what kind of a secure location was being used

| | | |
|---|---|---|
| 10:27:06 | 1 | to keep the computers at the Oak Brook office? |
| 10:27:10 | 2 | A.  They were in a locked office. |
| 10:27:12 | 3 | Q.  And do you know who was in charge of securing them? |
| 10:27:16 | 4 | A.  That would have been Mr. Joshi. |
| 10:27:22 | 5 | Q.  Okay.  And what about the computers at the warehouse, |
| 10:27:26 | 6 | where were they kept?  What was the secure location for those |
| 10:27:30 | 7 | computers? |
| 10:27:30 | 8 | A.  At the warehouse. |
| 10:27:34 | 9 | Q.  So just the fact that they were at the warehouse was the |
| 10:27:38 | 10 | fact that they were secure? |
| 10:27:38 | 11 | A.  As far as I understood it, yes. |
| 10:27:44 | 12 | Q.  And at that time, did you know that there had been a |
| 10:27:48 | 13 | friendly foreclosure of the warehouse? |
| 10:27:50 | 14 | A.  Yes. |
| 10:27:56 | 15 | Q.  So what was your understanding as to who was holding those |
| 10:28:02 | 16 | computers securely at the warehouse? |
| 10:28:04 | 17 | A.  My understanding was that Kanan would still be permitted |
| 10:28:14 | 18 | access to the warehouse via Dave Clark, with whom they had a |
| 10:28:20 | 19 | close relationship, as I understood it and was told. |
| 10:28:22 | 20 | Q.  But you understood at that point that First Midwest Bank |
| 10:28:26 | 21 | actually had control over this secure location at the |
| 10:28:32 | 22 | warehouse? |
| 10:28:32 | 23 | A.  I'm not sure that I ever considered it to be an issue. |
| 10:28:50 | 24 | MR. McJESSY:  Objection.  Move the answer be stricken |
| 10:28:52 | 25 | as nonresponsive. |

| | | |
|---|---|---|
| 10:28:54 | 1 | THE COURT:  It will be sustained, and that will be |
| 10:28:58 | 2 | stricken. |
| 10:28:58 | 3 | MS. DEDINAS:  Can I get the question read back? |
| 10:29:00 | 4 | THE COURT:  Sure. |
| 10:29:12 | 5 | (Record read.) |
| 10:29:14 | 6 | MR. McGARRY:  I will object on lack of foundation. |
| 10:29:16 | 7 | THE COURT:  And are you going to be doing the |
| 10:29:18 | 8 | objections for this witness? |
| 10:29:20 | 9 | MR. McGARRY:  Yes, yes. |
| 10:29:22 | 10 | THE COURT:  Lay a foundation. |
| 10:29:24 | 11 | MS. DEDINAS:  Your Honor, he's already established |
| 10:29:24 | 12 | that he knew there was a friendly foreclosure. |
| 10:29:28 | 13 | THE COURT:  He did.  Go ahead with your question. |
| 10:29:30 | 14 | MS. DEDINAS:  So the question was again? |
| 10:29:42 | 15 | THE COURT:  Your objection is overruled. |
| 10:29:46 | 16 | (Record read.) |
| 10:29:46 | 17 | THE WITNESS:  Personally, I wasn't specifically aware |
| 10:29:56 | 18 | of that until the meeting on April 23rd. |
| 10:30:04 | 19 | BY MS. DEDINAS: |
| 10:30:04 | 20 | Q.  But you were aware of it by the time you wrote this letter |
| 10:30:08 | 21 | on the 29th? |
| 10:30:08 | 22 | A.  Yes. |
| 10:30:10 | 23 | Q.  And you were relying on First Midwest Bank and the |
| 10:30:18 | 24 | friendly relationship that your clients had with First Midwest |
| 10:30:22 | 25 | Bank to ensure that the computers at the warehouse would, in |

| | | |
|---|---|---|
| 10:30:26 | 1 | fact, be kept secure; isn't that right? |
| 10:30:30 | 2 | A.  I was relying on my client. |
| 10:30:34 | 3 | MS. DEDINAS:  Objection.  I am going to move to |
| 10:30:38 | 4 | strike -- |
| 10:30:38 | 5 | THE WITNESS:  Then I will answer no. |
| 10:30:42 | 6 | THE COURT:  Beat you to it.  Strike his previous |
| 10:30:44 | 7 | response. |
| 10:30:44 | 8 | BY MS. DEDINAS: |
| 10:30:44 | 9 | Q.  You were not relying on them?  You were not relying on |
| 10:30:48 | 10 | First Midwest Bank to keep the warehouse secure? |
| 10:30:52 | 11 | A.  The answer would be, yes, I was relying on First Midwest |
| 10:31:20 | 12 | Bank to keep the warehouse secure. |
| 10:31:22 | 13 | Q.  Now, when you said that all computers from the warehouse |
| 10:31:30 | 14 | are being moved to Kanan's Oak Brook office, you don't mention |
| 10:31:36 | 15 | in the letter what the anticipated time frame would be for |
| 10:31:40 | 16 | that; is that right? |
| 10:31:42 | 17 | A.  That's right. |
| 10:31:42 | 18 | Q.  Had you discussed with your client over what time frame |
| 10:31:46 | 19 | you expected those computers to be moved? |
| 10:31:48 | 20 | A.  Yes. |
| 10:31:52 | 21 | Q.  And what was that time frame? |
| 10:31:54 | 22 | A.  Right away. |
| 10:31:56 | 23 | Q.  And "right away," you would mean within a week? |
| 10:32:00 | 24 | A.  Sure. |
| 10:32:02 | 25 | Q.  Did you express that to them? |

10:32:06  1   A.  Not specifically, no.

10:32:14  2   Q.  Now, on May 11th, two weeks later, approximately, you

10:32:32  3   inquired of defendants as to the status of moving the server

10:32:38  4   to the warehouse; is that right?

10:32:40  5   A.  That's correct.

10:32:40  6   Q.  And you indicated to them that this needs to be done?

10:32:44  7   A.  Yes.

10:32:44  8   Q.  So it's fair to assume that by May 11th, you knew that the

10:32:50  9   warehouse server had not been moved to the Oak Brook office,

10:32:54  10  right?

10:32:54  11  A.  That's correct.

10:32:54  12  Q.  And that's longer than the one week that you would have

10:32:58  13  anticipated that this would have been done; is that right?

10:33:02  14  A.  Yes.

10:33:02  15  Q.  Did your clients give you any explanation for why it

10:33:06  16  hadn't been moved yet?

10:33:08  17  A.  Not at that time, no.

10:33:10  18  Q.  Did you ask them?

10:33:14  19  A.  No.

10:33:16  20  Q.  Now on May 13th, again, you told your clients that they

10:33:26  21  needed to have control of the server immediately so that

10:33:30  22  Kanan's ESI data map could be completed to show the court on

10:33:34  23  May 19th of 2010.  Do you recall that?

10:33:36  24  A.  Yes.

10:33:36  25  Q.  How did you learn on May 13th that the computers had not

10:33:44　1　been moved to the Oak Brook office?

10:33:46　2　A.　I believe I hadn't received a response to my May 11 e-mail

10:33:52　3　and was following up two days later with my May 13 e-mail to

10:33:56　4　again ask about the status.

10:33:58　5　Q.　So on May 13th, you again knew that the warehouse server

10:34:02　6　hadn't been moved?

10:34:02　7　A.　That was my assumption, yes.

10:34:06　8　Q.　Okay.　And by that time, you didn't say anything to us

10:34:12　9　about that, that they hadn't, in fact, been moved, right?

10:34:16　10　A.　No.

10:34:16　11　Q.　Did you ask your client why they hadn't moved the servers

10:34:22　12　yet?　And I am talking about May 13.

10:34:26　13　A.　No.

10:34:26　14　Q.　Now, on May 14th, you told us that you were in the process

10:34:42　15　of preparing a data map and custodian list and expect to have

10:34:44　16　that by the next week so that we could confer about it.　Do

10:34:48　17　you recall that?

10:34:50　18　A.　Yes.

10:34:50　19　Q.　And did you contemplate that the warehouse server would be

10:34:52　20　part of that data map?

10:34:54　21　A.　That's what I had hoped, yes.

10:34:56　22　Q.　All right.　Now, on May 19th, we all appeared in court at

10:35:02　23　a status hearing.　Do you recall that?

10:35:04　24　A.　Yes.

10:35:04　25　Q.　And do you recall that Mr. Garrie represented to the court

10:35:10  1  that you have control over all of the servers?

10:35:14  2  A.  I recall that that statement was made as part of a

10:35:22  3  discussion about the activities of April 23rd at Kanan's Oak

10:35:28  4  Brook offices.

10:35:30  5  Q.  And when he said "all the servers," did you understand

10:35:34  6  that to mean all the servers?

10:35:34  7  A.  I understood that to mean all the servers at the Oak Brook

10:35:40  8  office.

10:35:40  9  Q.  So when he said all the servers, you thought that meant

10:35:42  10  all the servers except for the warehouse server?

10:35:44  11  A.  As I remember -- as I remember the -- yes.

10:35:50  12  Q.  Okay.  So you didn't think that was an incorrect statement

10:35:54  13  by Mr. Garrie?

10:35:56  14  A.  No, I didn't.  I would have said something if at the time

10:36:00  15  I had thought that was an incorrect statement.

10:36:02  16  Q.  Now, on May 21st, you provided us with your first

10:36:12  17  iteration of Kanan's data map.  Do you recall that?

10:36:14  18  A.  Yes.

10:36:16  19  Q.  And did that data map include data or detail regarding the

10:36:22  20  warehouse server?

10:36:22  21  A.  No.

10:36:22  22  Q.  And that's because you didn't have access to it yet,

10:36:26  23  right?

10:36:26  24  A.  Yes.

10:36:26  25  Q.  And the data map I believe that you provided is

| | | |
|---|---|---|
| 10:36:34 | 1 | Exhibit 110.  Take a look at that.  For the record, it's an |
| 10:36:44 | 2 | e-mail from Eric Grossman to Vilia Dedinas dated Friday, |
| 10:36:48 | 3 | May 21st. |
| 10:36:50 | 4 | And attached to it are the submissions that you |
| 10:36:56 | 5 | represented were the first iteration of Kanan's data map; is |
| 10:37:02 | 6 | that correct? |
| 10:37:02 | 7 | A.  Yes. |
| 10:37:02 | 8 | Q.  Now, in that e-mail, is there anywhere that you indicate |
| 10:37:08 | 9 | that it is incomplete? |
| 10:37:12 | 10 | A.  By my reference to first iteration. |
| 10:37:18 | 11 | Q.  And -- |
| 10:37:18 | 12 | A.  I expected that we would supplement the data map. |
| 10:37:22 | 13 | Q.  Is there any way that a reader of your e-mail could |
| 10:37:28 | 14 | reasonably infer that it did not include a component of your |
| 10:37:34 | 15 | client's ESI data? |
| 10:37:36 | 16 | A.  Yes, I think there is some way that a reader could |
| 10:37:46 | 17 | conclude that this did not include the warehouse server. |
| 10:37:54 | 18 | Q.  And how would somebody conclude that? |
| 10:37:58 | 19 | A.  Because of the reference to the first iteration of the |
| 10:38:00 | 20 | data map. |
| 10:38:02 | 21 | Q.  I see. |
| 10:38:02 | 22 | So now after receiving the -- after receiving the |
| 10:38:12 | 23 | data map, do you recall that I specifically asked you whether |
| 10:38:16 | 24 | the data map included the Creative Warehousing server? |
| 10:38:18 | 25 | A.  No. |

328

| | | |
|---|---|---|
| 10:38:22 | 1 | Q.  You don't recall that? |
| 10:38:24 | 2 | A.  No. |
| 10:38:24 | 3 | THE COURT:  Do you have a time frame? |
| 10:38:26 | 4 | MS. DEDINAS:  Between May 21st and May 25th. |
| 10:38:36 | 5 | THE WITNESS:  If we could look at the e-mail that you |
| 10:38:40 | 6 | sent, at the exact language, I think that would clarify the |
| 10:38:44 | 7 | question. |
| 10:38:46 | 8 | BY MS. DEDINAS: |
| 10:38:46 | 9 | Q.  Do you recall that we had a -- do you recall that we had a |
| 10:38:52 | 10 | telephone conversation with you and Mr. Borlack about the data |
| 10:38:58 | 11 | map on the Friday after you submitted the data map to us? |
| 10:39:08 | 12 | A.  Not specifically. |
| 10:39:12 | 13 | Q.  Let me see if I can ask a few more questions about that. |
| 10:39:14 | 14 | Do you remember there was an issue about whether you |
| 10:39:18 | 15 | were supposed to include the indices to the backup tapes as |
| 10:39:24 | 16 | part of the data map? |
| 10:39:26 | 17 | A.  Yes. |
| 10:39:26 | 18 | Q.  Do you remember we had that conversation -- that was a |
| 10:39:30 | 19 | telephone conversation? |
| 10:39:32 | 20 | A.  Yes. |
| 10:39:38 | 21 | Q.  And there was some dispute between us as to whether the |
| 10:39:40 | 22 | court order had required you to provide the indices to the |
| 10:39:44 | 23 | backup tapes with the data map or at some other time? |
| 10:39:48 | 24 | A.  Well, the court order was a little confusing, and that was |
| 10:39:54 | 25 | the main issue that we had because the court's order |

10:39:56  1  referenced backup tapes, indices of the inoperable server

10:40:04  2  drives.  And we were confused by the court order because we

10:40:10  3  didn't remember that on the record we had said anything about

10:40:14  4  producing indices of the inoperable server.  We had talked

10:40:18  5  about indices of the backup tapes at the status hearing on

10:40:24  6  the 18th.  And that was part of the reason for our phone call

10:40:30  7  to you was to try to get some clarification as to what you

10:40:38  8  recollected.  And as part of that conversation, you said that

10:40:40  9  your notes indicated that we would be producing backup tape --

10:40:42  10  indices of the backup tapes, and that also was what our

10:40:48  11  understanding was.

10:40:50  12       We weren't sure that we had committed to produce them

10:40:52  13  by the 21st, and, indeed, we were not ready to produce them by

10:40:58  14  the 21st, so I believe that that's why we had the telephone

10:41:00  15  conversation.

10:41:00  16  Q.  And then we agreed at that conversation that what we would

10:41:04  17  do is get a copy of the transcript and come to an agreement on

10:41:08  18  what it was that you exactly were supposed to produce; is that

10:41:08  19  right?

10:41:12  20  A.  That's correct.

10:41:12  21  Q.  Okay.  And you don't recall that in that conversation, I

10:41:16  22  asked you whether the data map included the Creative

10:41:20  23  Warehousing server?

10:41:20  24  A.  I don't recall that, no.

10:41:22  25  Q.  Let's take a look at Exhibit SH 111.  For the record, this

| | | |
|---|---|---|
| 10:41:38 | 1 | is an e-mail dated May 25th of 2010 from you to Mr. Joshi and |
| 10:41:42 | 2 | Mr. Shah and Mr. Borlack. |
| 10:41:50 | 3 | I'd like to take your attention to the third |
| 10:41:52 | 4 | paragraph, where it says, Now that we have produced on 5/19 |
| 10:41:58 | 5 | the first iteration of the data map, Vilia has asked whether |
| 10:42:02 | 6 | this includes Creative Warehousing. |
| 10:42:06 | 7 | Do you recall that? |
| 10:42:06 | 8 | A. Yes. |
| 10:42:06 | 9 | Q. Does that refresh your recollection at all about any kind |
| 10:42:10 | 10 | of conversation that we may have had where I asked you that? |
| 10:42:14 | 11 | A. You sent me an e-mail. |
| 10:42:16 | 12 | Q. So it was in an e-mail? |
| 10:42:16 | 13 | A. That's what I had said I believe a while ago. |
| 10:42:20 | 14 | Q. Okay. I must have had trouble locating. |
| 10:42:26 | 15 | Now, further, you said, it is of course -- strike |
| 10:42:28 | 16 | that. |
| 10:42:28 | 17 | It, of course, does not, because the warehouse server |
| 10:42:32 | 18 | has not been made available for review. I can only respond at |
| 10:42:36 | 19 | this point to Vilia that the server at the warehouse is not |
| 10:42:40 | 20 | yet included in the data map but will be included with the |
| 10:42:42 | 21 | next iteration, which we anticipate we will have in the next |
| 10:42:46 | 22 | week or so. |
| 10:42:48 | 23 | Do you recall that? |
| 10:42:48 | 24 | A. I do. |
| 10:42:48 | 25 | Q. So now your intention was to supplement the data -- the |

| | | |
|---|---|---|
| 10:42:54 | 1 | data -- the data map to include the warehouse server? |
| 10:42:58 | 2 | A.  It always was my intention. |
| 10:43:00 | 3 | Q.  Okay.  And you made it clear to your clients that for the |
| 10:43:04 | 4 | second iteration of the data map, they really needed to get |
| 10:43:08 | 5 | control or access to that server, right? |
| 10:43:10 | 6 | A.  That's correct. |
| 10:43:10 | 7 | Q.  And on May 25th, you knew that the server was still at the |
| 10:43:18 | 8 | warehouse? |
| 10:43:20 | 9 | A.  That's correct. |
| 10:43:20 | 10 | Q.  So at that point, you told your client that, one way or |
| 10:43:28 | 11 | another, we have to have information about the server and as |
| 10:43:34 | 12 | soon as possible.  But one of the two things must happen: |
| 10:43:36 | 13 | either get control of the server or have a copy of the server |
| 10:43:40 | 14 | contents made by the I.T. person that will be hired. |
| 10:43:42 | 15 | Do you recall that? |
| 10:43:44 | 16 | A.  Yes. |
| 10:43:44 | 17 | Q.  Did your clients respond to this e-mail? |
| 10:43:46 | 18 | A.  Not specifically to this e-mail, no, I don't believe so. |
| 10:44:06 | 19 | Q.  This is a time frame where you were also pressing United |
| 10:44:14 | 20 | Central Bank to provide a complete data map of United Central |
| 10:44:16 | 21 | Bank's ESI systems; isn't that right? |
| 10:44:18 | 22 | A.  No, I don't think so. |
| 10:44:20 | 23 | Q.  Didn't you -- didn't you in court make a request the court |
| 10:44:28 | 24 | order United Central Bank to produce a data map? |
| 10:44:32 | 25 | A.  We did discuss, I believe, at the May 18th hearing about |

10:44:46  1  UCB producing a data map, and then there was discussion at the

10:44:48  2  May 18th hearing about what that might cost.  The way we

10:44:56  3  resolved the issue between us, I believe, is that you

10:44:58  4  responded to our various questions concerning ESI and that we

10:45:02  5  no longer did require a data map from UCB.

10:45:10  6          So I think it's a little bit of a mischaracterization

10:45:12  7  to say that we were pressing for a data map from UCB when we

10:45:16  8  had agreed ultimately and, in fact, accepted I think something

10:45:20  9  less than what I would call a data map.

10:45:22  10 Q.  Didn't Judge Mason on May 19th actually give you a date by

10:45:30  11 which you could bring a motion to require us to produce a data

10:45:36  12 map if, in fact, what information we gave you would not be to

10:45:40  13 your satisfaction?

10:45:40  14 A.  I think that's correct, right.

10:45:42  15 Q.  Now, on May 26th, you again asked your clients about the

10:45:50  16 status of obtaining control of the warehouse server or a copy

10:45:56  17 of its contents.  Do you recall that?

10:45:58  18 A.  I do.

10:45:58  19 Q.  And that was because you knew on May 26th that the server

10:46:02  20 was still at the warehouse; is that right?

10:46:06  21 A.  That's correct.

10:46:06  22 Q.  Do you recall that your clients told you that they were

10:46:08  23 working on it?

10:46:10  24 A.  That is correct.

10:46:10  25 Q.  Did you ask them what they meant about they were working

| | | |
|---|---|---|
| 10:46:16 | 1 | on it? |
| 10:46:16 | 2 | A.  No. |
| 10:46:22 | 3 | Q.  Why not? |
| 10:46:24 | 4 | A.  Because they told me they were working on it. |
| 10:46:28 | 5 | Q.  And what did you understand that to mean? |
| 10:46:30 | 6 | A.  I understood that to mean that Paresh was handling it. |
| 10:46:36 | 7 | Q.  And by "handling it," you meant making arrangements to |
| 10:46:40 | 8 | move the server? |
| 10:46:42 | 9 | A.  Correct. |
| 10:46:42 | 10 | Q.  You didn't understand that they were actually engaged in |
| 10:46:44 | 11 | some kind of negotiations to buy back the server? |
| 10:46:48 | 12 | A.  No, I did not. |
| 10:46:50 | 13 | Q.  Now, on June 2nd, you again told your clients that they |
| 10:46:54 | 14 | needed to get control of the server or a copy of the contents. |
| 10:46:58 | 15 | And you indicated, this is an absolute priority. |
| 10:47:04 | 16 | Do you recall that? |
| 10:47:04 | 17 | A.  I do. |
| 10:47:04 | 18 | Q.  And again you said, We must secure either possession or a |
| 10:47:10 | 19 | copy of its contents. |
| 10:47:12 | 20 | Do you recall that? |
| 10:47:12 | 21 | A.  I do. |
| 10:47:12 | 22 | Q.  Did you discuss with them the possibility that if they |
| 10:47:20 | 23 | were having trouble getting the server over to the Oak Brook |
| 10:47:24 | 24 | offices, that a copy could be made? |
| 10:47:26 | 25 | A.  Well, I mentioned it in the e-mail. |

10:47:30  1  Q.  And did they ever respond to you about that suggestion?

10:47:32  2  A.  No, other than they were working on it.

10:47:38  3  Q.  Now, by this time, six weeks had passed since you had

10:47:44  4  represented that the warehouse server would be moved to the

10:47:48  5  Oak Brook office; is that right?

10:47:54  6  A.  I believe so, yes.

10:47:54  7  Q.  And that's quite a bit longer than what you would have

10:47:58  8  anticipated?

10:48:02  9  A.  Much longer.

10:48:02  10  Q.  And by early July, you knew that the promise that the

10:48:10  11  warehouse server would be moved to the Oak Brook offices had

10:48:12  12  not been fulfilled; is that right?

10:48:22  13  A.  If we are characterizing my client's representations to me

10:48:26  14  as a promise, that's correct.

10:48:28  15  Q.  Okay.  And you also knew that the data map did not include

10:48:30  16  the warehouse server?

10:48:32  17  A.  Correct.

10:48:32  18  Q.  Now, again, in early July, July 7th, your firm told

10:48:44  19  Mr. Joshi that, access to or possession of the warehouse

10:48:46  20  server remains an issue.

10:48:48  21       Do you recall that?

10:48:50  22  A.  I do.

10:48:50  23  Q.  And, a week later, on July 14th, I inquired more about

10:49:00  24  Kanan's data map.

10:49:02  25       Do you recall that?

10:49:02  1  A.  You sent me a letter, yes.

10:49:04  2  Q.  Okay.  And specifically I asked you, for each server you

10:49:08  3  identify, please state what each is used for, what types of

10:49:14  4  files or data is on it, and who had access to it.

10:49:22  5       Do you recall that?

10:49:22  6  A.  Yes, you did.

10:49:24  7  Q.  And soon thereafter, on July 23rd, you warned your clients

10:49:26  8  that you were not able to respond to my July 14th inquiry

10:49:30  9  until the warehouse server was made available for review and

10:49:34  10  analysis; isn't that right?

10:49:36  11  A.  That's right.

10:49:36  12  Q.  So at that point, in response to my July 14th inquiry, why

10:49:44  13  didn't you tell me that you didn't have control over the

10:49:48  14  server?

10:49:48  15  A.  I did.

10:49:50  16  Q.  When did you tell me that?

10:49:54  17  A.  On August 20th.

10:49:56  18  Q.  So six weeks later?

10:50:00  19  A.  Five, six weeks, when I responded to both your July 14

10:50:08  20  letter as well as your follow-up August 17 questions.

10:50:14  21  Q.  Why didn't you respond to me right after receiving my

10:50:18  22  July 14th letter?

10:50:18  23  A.  Because I wanted to respond to your -- every question that

10:50:26  24  you had asked and all 18 or 17 of the questions you had raised

10:50:30  25  in your July 17th letter, or July 14th letter.

10:50:56    1    Q.  Could you turn to Exhibit 142.  So, for the record, this

10:51:38    2    is my July 14th letter to you and Mr. Borlack.  Is that the

10:51:44    3    one you're referring to?

10:51:44    4    A.  Right, 23 questions.

10:51:46    5    Q.  And it was your position that you were only going to

10:51:48    6    respond to this letter when you had answers to all 23

10:51:54    7    questions; is that right?

10:52:00    8    A.  I wanted to provide as complete a response as possible,

10:52:02    9    yes.

10:52:02    10    Q.  You didn't consider that you could just respond to a

10:52:08    11    specific portion of it?

10:52:10    12    A.  No, I wanted to respond to your letter.

10:52:20    13    Q.  Okay.  And so you were going to wait until you had

10:52:22    14    responses to everything before you told me that you didn't

10:52:26    15    have control over the server?

10:52:36    16         MR. McGARRY:  Objection to the form of the question.

10:52:36    17    It assumes that he had control or didn't have control.

10:52:40    18         THE COURT:  No, he can answer.

10:52:40    19         THE WITNESS:  Could you ask the question again.

10:52:44    20         MS. DEDINAS:  Would you read it back, please.

10:52:56    21    (Record read.)

10:52:58    22         THE WITNESS:  I was going to wait until I had

10:53:20    23    responses to provide you with -- I was -- I wanted to provide

10:53:28    24    you with a complete response as possible.

10:53:34    25    BY MS. DEDINAS:

10:53:34  1   Q.  And isn't it also true that you were hoping that by the
10:53:36  2   time you had responses to 23 of my questions, your clients
10:53:42  3   might have also managed to get control over the server?
10:53:44  4   A.  Exactly.
10:53:46  5   Q.  So this wouldn't have been an issue?
10:53:48  6   A.  Exactly.
10:53:48  7   Q.  Now, on August 13th, you warned Mr. Shah that if they did
10:54:02  8   not have access to the warehouse server before the joint
10:54:04  9   status report was due on August 24th, the situation would have
10:54:08  10  to be reported to the court; is that right?
10:54:10  11  A.  Correct.
10:54:10  12  Q.  Why did you feel like it would have to be reported to the
10:54:14  13  court?
10:54:14  14  A.  Because we didn't have control over an ESI component that
10:54:18  15  we needed, was important.
10:54:20  16  Q.  Now, you also indicated that, we already owe UCB
10:54:32  17  information about the warehouse servers and have delayed
10:54:36  18  responses to UCB while we await resolution of this issue;
10:54:40  19  isn't that right?
10:54:40  20  A.  That's correct.
10:54:40  21  Q.  So you knew that you owed me that information?
10:54:42  22  A.  Of course.
10:54:42  23  Q.  Okay.  Would you describe your actions as stalling, sir?
10:54:52  24  A.  No.
10:54:52  25  Q.  Now, on August 17th, I asked you why I hadn't received a

10:55:04  1  response to my July 14th letter about the ESI system.  Do you

10:55:08  2  recall that?

10:55:08  3  A.  I do.

10:55:08  4  Q.  And then you immediately e-mailed the defendants and told

10:55:14  5  them, The below request from Vilia for additional information

10:55:20  6  makes my 8/13 e-mail attached regarding the warehouse server

10:55:24  7  and the digital brief proposal all the more critical.

10:55:28  8      Do you recall that?

10:55:28  9  A.  Correct.

10:55:28 10  Q.  And you asked them to review the e-mail and respond and

10:55:36 11  that, Response to Vilia on these items as well as the below is

10:55:40 12  now critical and must be completed by the end of the week.

10:55:44 13      MR. McGARRY:  Excuse me, your Honor.  She is reading

10:55:46 14  from an exhibit.  May I know the number, please?

10:55:48 15      THE COURT:  I was just looking for the same thing.

10:55:50 16      MS. DEDINAS:  178.

10:55:50 17      THE COURT:  And if you would do that for everybody,

10:55:52 18  please.

10:55:52 19      MS. DEDINAS:  Sure.  178.  It's an e-mail from Eric

10:55:56 20  Grossman to Paresh Joshi.

10:55:58 21      THE COURT:  It's on 8/17.

10:56:00 22      MS. DEDINAS:  Yes, 8/17.

10:56:04 23      THE WITNESS:  Correct.

10:56:12 24  BY MS. DEDINAS:

10:56:12 25  Q.  So on 8/17, you again knew that you didn't have control

10:56:16  1  over the warehouse server?

10:56:18  2  A.  Correct.

10:56:22  3  Q.  Did you have a telephone conversation with your clients

10:56:26  4  soon after sending this e-mail?

10:56:28  5  A.  I believe we did.

10:56:34  6          THE COURT:  We?

10:56:36  7          THE WITNESS:  I believe I did.

10:56:38  8  BY MS. DEDINAS:

10:56:38  9  Q.  Okay.  And I'd like you to take a look at Exhibit 179.

10:56:48  10  For the record, this is an e-mail dated August 19th, 2010,

10:56:54  11  from Eric Grossman to Alan (sic) Borlack.

10:57:00  12          Does this e-mail commemorate your telephone

10:57:04  13  conversation with Mr. Joshi?

10:57:06  14  A.  Yes.

10:57:08  15  Q.  During that telephone conversation, did you inquire as to

10:57:16  16  Mr. Shah's efforts to obtain access to or control of the

10:57:22  17  warehouse server?

10:57:22  18  A.  That's what the -- that's what the e-mail indicates.

10:57:30  19  Q.  Okay.  But I'm asking whether you have an independent

10:57:34  20  recollection of that telephone conversation.

10:57:36  21  A.  Yes.

10:57:36  22  Q.  And what did -- and the conversation was between you and

10:57:44  23  Mr. Joshi?

10:57:44  24  A.  Correct.

10:57:44  25  Q.  Was anybody else on the phone call?

| | | |
|---|---|---|
| 10:57:46 | 1 | A. Alan Borlack, Mr. Borlack was. |
| 10:57:48 | 2 | THE COURT: And just set the record straight. Before |
| 10:57:52 | 3 | you referred to an e-mail going from Eric Grossman to Eric |
| 10:57:56 | 4 | Borlack. |
| 10:57:58 | 5 | MS. DEDINAS: I'm sorry, Alan Borlack. Thank you. |
| 10:58:00 | 6 | BY MS. DEDINAS: |
| 10:58:02 | 7 | Q. So you were both on the phone call? You and Mr. Borlack |
| 10:58:06 | 8 | were both on the phone call? |
| 10:58:08 | 9 | A. Correct. |
| 10:58:08 | 10 | Q. And what did Mr. Paresh tell you about the efforts to |
| 10:58:16 | 11 | obtain the warehouse server? |
| 10:58:18 | 12 | A. Exactly what's reflected in the e-mail. |
| 10:58:22 | 13 | THE COURT: Well, why don't you answer that question. |
| 10:58:26 | 14 | THE WITNESS: All right. Paresh said that Mehul was |
| 10:58:30 | 15 | still working on obtaining access to it and that he mentions |
| 10:58:34 | 16 | it to Mehul on practically a daily basis. |
| 10:58:36 | 17 | BY MS. DEDINAS: |
| 10:58:36 | 18 | Q. Now, the e-mail says that Mehul was working on obtaining |
| 10:58:40 | 19 | the funds that Associated wants in order to release its lien. |
| 10:58:44 | 20 | Do you recall that? |
| 10:58:46 | 21 | A. Yes. |
| 10:58:46 | 22 | Q. Now, when did you find out that there was an issue with |
| 10:59:00 | 23 | Associated Bank involved in getting access to the server? |
| 10:59:04 | 24 | A. After Alan sent a letter to Mehul on August 4th, and then |
| 10:59:14 | 25 | Mehul called us, I believe, the following day, on August 5th. |

| | |
|---|---|
| 10:59:18 | 1 |
| 10:59:26 | 2 |
| 10:59:28 | 3 |
| 10:59:30 | 4 |
| 10:59:34 | 5 |
| 10:59:36 | 6 |
| 10:59:36 | 7 |
| 10:59:40 | 8 |
| 10:59:40 | 9 |
| 10:59:56 | 10 |
| 11:00:00 | 11 |
| 11:00:00 | 12 |
| 11:00:02 | 13 |
| 11:00:04 | 14 |
| 11:00:10 | 15 |
| 11:00:14 | 16 |
| 11:00:18 | 17 |
| 11:00:20 | 18 |
| 11:00:24 | 19 |
| 11:00:26 | 20 |
| 11:00:28 | 21 |
| 11:00:34 | 22 |
| 11:00:36 | 23 |
| 11:00:36 | 24 |
| 11:00:46 | 25 |

Q.  So prior to August 5th, you didn't know anything about
negotiations with Associated Bank?
A.  We had been kept in the dark.
Q.  The answer is no, right?
A.  Yes.
         MR. McGARRY:  Can you --
         THE WITNESS:  I'm sorry.  I'm sorry.  Please ask the
question again.
         MS. DEDINAS:  What was the question?
   (Record read.)
         THE WITNESS:  That is correct.
BY MS. DEDINAS:
Q.  And prior to that date when your client had said they were
working on it, again, you had assumed all that time that they
were just trying to work out the physical logistics of moving
the server to the Oak Brook offices?
A.  That's correct.
Q.  And you didn't know that there were any negotiations going
on with Associated Bank?
A.  That's correct.
Q.  And you didn't know that there was a problem with First
Midwest Bank getting access to the building?
A.  That's correct.
Q.  And when they said that they were working on it, did you
press them at all to find out what were they doing and why it

| | | |
|---|---|---|
| 11:00:50 | 1 | took so long to move a server to Oak Brook? |
| 11:00:54 | 2 | A.  Well, the way I pressed it was by either bolding or |
| 11:01:00 | 3 | highlighting or changing the font or color in my numerous |
| 11:01:04 | 4 | e-mails sent on the subject so that I could -- essentially was |
| 11:01:10 | 5 | trying to give them a kick in the pants to get it |
| 11:01:14 | 6 | accomplished.  I never had any reason to believe it wouldn't |
| 11:01:16 | 7 | get accomplished. |
| 11:01:18 | 8 | Q.  So by pressing, you just sent more e-mails saying you got |
| 11:01:22 | 9 | to get this done? |
| 11:01:22 | 10 | A.  And had conversations as well that are documented in the |
| 11:01:26 | 11 | e-mails. |
| 11:01:28 | 12 | Q.  Did you ever have a conversation or an e-mail in which you |
| 11:01:30 | 13 | asked, what is the problem as to why this is taking so long? |
| 11:01:38 | 14 | A.  No. |
| 11:01:40 | 15 | Q.  Why didn't you ask them that? |
| 11:01:44 | 16 | A.  I had no reason -- I had no reason to believe that the |
| 11:01:54 | 17 | relationship that they had with Dave Clark would do anything |
| 11:01:58 | 18 | other than permit them to access the warehouse server or allow |
| 11:02:04 | 19 | us in the door so that we could make a copy.  I thought it was |
| 11:02:10 | 20 | just foot-dragging on my clients' part.  We were dealing with |
| 11:02:14 | 21 | a lot of issues on the litigation.  This wasn't the only one, |
| 11:02:16 | 22 | I think as our chronology reflects. |
| 11:02:18 | 23 | There was a whole lot of activity going on.  When -- |
| 11:02:24 | 24 | I wanted to keep this obviously on the radar to find out what |
| 11:02:34 | 25 | was going on because it was an issue that, yes, it was |

343

| | | |
|---|---|---|
| 11:02:36 | 1 | festering.  There was no doubt about it.  I was doing what I |
| 11:02:38 | 2 | could do along with everything else that was going on in the |
| 11:02:42 | 3 | litigation, which was including production of hard copy |
| 11:02:44 | 4 | documents by both sides as well as yours. |
| 11:02:48 | 5 | There was no discovery cut at this point.  You and I |
| 11:02:54 | 6 | were still engaged in discussions concerning productions of |
| 11:02:58 | 7 | UCB ESI, as well as production of Kanan ESI.  And so I've done |
| 11:03:10 | 8 | a bit of a narrative here, and I am not even sure I remember |
| 11:03:12 | 9 | the question.  But the question was -- |
| 11:03:14 | 10 | MR. McGARRY:  The question was why -- |
| 11:03:16 | 11 | THE COURT:  Wait, wait, wait. |
| 11:03:16 | 12 | MR. McGARRY:  Sorry, your Honor. |
| 11:03:18 | 13 | THE COURT:  Go ahead. |
| 11:03:22 | 14 | THE WITNESS:  So you asked why I never asked |
| 11:03:26 | 15 | specifically. |
| 11:03:26 | 16 | BY MS. DEDINAS: |
| 11:03:28 | 17 | Q.  The question was specifically, why didn't you ask them, |
| 11:03:30 | 18 | what are you doing and what is the problem with getting this |
| 11:03:34 | 19 | server moved? |
| 11:03:34 | 20 | A.  That's correct. |
| 11:03:36 | 21 | Q.  And your answer as to why you didn't ask them that |
| 11:03:42 | 22 | specific question is? |
| 11:03:42 | 23 | A.  Because I didn't understand that there would be any issue |
| 11:03:56 | 24 | whatsoever during the 12-week period that I kept raising the |
| 11:04:04 | 25 | issue.  Based on the relationship, I was understood was -- |

11:04:16　1　they had with Mr. Clark, based on the fact that there was no

11:04:18　2　ESI cutoff but we needed to get moving and continuing to work

11:04:22　3　on it, and based on the representations from the client who

11:04:26　4　never responded that there was any issue, despite these

11:04:28　5　e-mails, which continually escalated and pressured them to get

11:04:32　6　something done that they told me that would be done.

11:04:36　7　Q.  So when you ask somebody to do something and they don't do

11:04:38　8　it for 12 weeks, you don't go and say to them, hey, what's the

11:04:46　9　problem, why aren't you getting this done?

11:04:48　10　　　　　　MR. McGARRY:  Objection.  It's just an argumentative

11:04:50　11　question.

11:04:52　12　　　　　　THE COURT:  No, it's a hypothetical.

11:04:54　13　　　　　　MR. McGARRY:  It's hypothetical.

11:04:56　14　　　　　　THE COURT:  You can answer that, if you can.

11:04:58　15　　　　　　THE WITNESS:  Could you read the question back?

11:05:02　16　　　　　　MS. DEDINAS:  Sure.  Could you read it back.

11:05:16　17　　(Record read. )

11:05:18　18　　　　　　MR. McGARRY:  I further object.  It's not related to

11:05:20　19　this case, the circumstances of this case.

11:05:22　20　　　　　　THE COURT:  I disagree with you.  It is related to

11:05:26　21　this case.

11:05:26　22　　　　　　You can answer that question.  And if you want it

11:05:28　23　repeated, I understand, and we will have it repeated.  Do you

11:05:32　24　want it repeated?

11:05:34　25　　　　　　THE WITNESS:  Yes, please.

| | | |
|---|---|---|
| 11:05:34 | 1 | THE COURT:  Would you please repeat it.  The |
| 11:05:38 | 2 | objection is overruled. |
| 11:05:54 | 3 | (Record read.) |
| 11:05:56 | 4 | THE WITNESS:  I can't answer that without having |
| 11:06:02 | 5 | context.  If it's in the context of this case, I believe I've |
| 11:06:08 | 6 | already answered that question. |
| 11:06:10 | 7 | BY MS. DEDINAS: |
| 11:06:10 | 8 | Q.  Okay.  Now, during the period when First Midwest had |
| 11:06:24 | 9 | ownership of the building, what was your understanding of who |
| 11:06:28 | 10 | else had access to the building? |
| 11:06:28 | 11 | A.  I believed that Kanan would be permitted to have access to |
| 11:06:38 | 12 | the building. |
| 11:06:38 | 13 | Q.  Who else would have access to the building? |
| 11:06:40 | 14 | A.  Mr. Joshi and Mr. Shah. |
| 11:06:48 | 15 | Q.  What about people at First Midwest Bank? |
| 11:06:52 | 16 | A.  I don't know. |
| 11:06:54 | 17 | Q.  Would you -- would it be reasonable to assume that they've |
| 11:07:00 | 18 | got access to the building? |
| 11:07:02 | 19 | A.  It would be reasonable to assume that, yes. |
| 11:07:04 | 20 | Q.  And did you -- would it be reasonable to assume that since |
| 11:07:08 | 21 | they had foreclosed on the building, that they might be trying |
| 11:07:12 | 22 | to sell the building? |
| 11:07:12 | 23 | A.  I suppose that would be reasonable to assume. |
| 11:07:20 | 24 | Q.  And do you think it would be reasonable to assume that |
| 11:07:22 | 25 | they might be showing it to prospective buyers? |

11:07:26    1   A.  Yes.

11:07:26    2   Q.  And it would be reasonable to assume that there would be

11:07:30    3   any number of people that would have access to this building

11:07:34    4   where the server was supposedly being kept securely?

11:07:38    5   A.  Yes.

11:07:42    6   Q.  And you wouldn't know who those people were, right?

11:07:44    7   A.  No.

11:07:46    8   Q.  And it certainly wasn't as secure as the computers that

11:07:50    9   were locked in Kanan's Oak Brook offices, right?

11:07:54   10           MR. McGARRY:  Objection, relevancy.  There is no

11:07:56   11   issue --

11:07:56   12           THE COURT:  Sustained.  Sustained.

11:07:58   13   BY MS. DEDINAS:

11:08:02   14   Q.  Did you or anybody in your office make any arrangements

11:08:04   15   with First Midwest Bank to make sure that nobody touched the

11:08:08   16   computer, the server, or did anything to it, even

11:08:14   17   inadvertently?

11:08:16   18   A.  No.

11:08:16   19   Q.  Do you know if your clients made any such arrangements?

11:08:20   20   A.  Specific arrangements, no, I do not know.

11:08:28   21   Q.  You're not aware that there was anything in writing to

11:08:30   22   that effect, are you?

11:08:30   23   A.  Correct.

11:08:34   24   Q.  How were you or your liaisons or the defendants monitoring

11:08:42   25   that the computer was -- that the computer at the warehouse

347

11:08:44   1   was, in fact, secured?

11:08:50   2        MR. McGARRY:  I'm sorry, can I have the question read

11:08:52   3   back, your Honor?

11:09:02   4        THE COURT:  Sure.

11:09:04   5     (Record read. )

11:09:06   6        MR. McGARRY:  Your Honor, it's irrelevant.  This is

11:09:06   7   going on a tangent as to something happened other than the

11:09:10   8   computer was sold.  It's not related -- I don't think that

11:09:14   9   this is fair questioning on a sanction motion against

11:09:18   10  attorneys here.

11:09:18   11       MS. DEDINAS:  Your Honor, this goes --

11:09:18   12       MR. McGARRY:  As to what might have happened in some

11:09:22   13  fictional world.

11:09:22   14       MS. DEDINAS:  Your Honor, this goes directly to duty

11:09:26   15  to preserve, and that involves giving instructions --

11:09:28   16       THE COURT:  Overruled.

11:09:32   17       THE WITNESS:  We had informed our clients of the duty

11:09:32   18  to preserve the evidence, and so I left it up to them.

11:09:38   19       THE COURT:  Thank you for not answering before I have

11:09:40   20  made a decision.

11:09:42   21       THE WITNESS:  Sorry.

11:09:42   22       THE COURT:  No, no.  I appreciate the fact that you

11:09:46   23  are not trying to respond before I can make a ruling.

11:09:48   24  BY MS. DEDINAS:

11:09:48   25  Q.  So, in fact, nobody other than the defendants, your

| | | |
|---|---|---|
| 11:09:52 | 1 | clients, were responsible for monitoring the computer while it |
| 11:10:00 | 2 | was at the warehouse? |
| 11:10:00 | 3 | A.  That's correct. |
| 11:10:16 | 4 | MS. DEDINAS:  No further questions. |
| 11:10:28 | 5 | THE COURT:  Are you finished? |
| 11:10:28 | 6 | MS. DEDINAS:  Yes. |
| 11:10:30 | 7 | THE COURT:  Is it getting warm in here, or is it just |
| 11:10:34 | 8 | me? |
| 11:10:56 | 9 | - - - |
| 11:10:56 | 10 | ERIC GROSSMAN, CROSS-EXAMINATION |
| 11:10:56 | 11 | BY MR. McJESSY: |
| 11:11:08 | 12 | Q.  Good morning, Mr. Grossman. |
| 11:11:08 | 13 | Mr. Grossman, Mr. Blumenthal took efforts to preserve |
| 11:11:12 | 14 | the server; is that right? |
| 11:11:12 | 15 | MS. DEDINAS:  Objection. |
| 11:11:14 | 16 | THE COURT:  Well, if he knows, he can answer. |
| 11:11:16 | 17 | MS. DEDINAS:  Foundation. |
| 11:11:18 | 18 | MS. DJORDJEVIC:  And scope.  This is cross.  He |
| 11:11:18 | 19 | didn't call Mr. Grossman as a witness. |
| 11:11:22 | 20 | MR. McJESSY:  Judge -- |
| 11:11:22 | 21 | THE COURT:  Wait a second. |
| 11:11:32 | 22 | MR. McJESSY:  I'm sure we reserved the right to call |
| 11:11:36 | 23 | anybody as a witness. |
| 11:11:36 | 24 | THE COURT:  That's a decision for the court to make. |
| 11:11:38 | 25 | You didn't.  I'll sustain that objection. |

| | | |
|---|---|---|
| 11:11:44 | 1 | MR. McJESSY:  Judge, she just asked him whether |
| 11:11:46 | 2 | anybody had engaged -- and this is directly on point as to the |
| 11:11:50 | 3 | question that was just asked, which is:  Was anybody |
| 11:11:52 | 4 | responsible for ensuring that the server was preserved?  And |
| 11:11:58 | 5 | it's the question she just finished with. |
| 11:12:02 | 6 | MS. DEDINAS:  Your Honor, my question was relating |
| 11:12:04 | 7 | specifically to the defendants. |
| 11:12:04 | 8 | THE COURT:  Well, you didn't say that.  So you can |
| 11:12:06 | 9 | answer that question. |
| 11:12:10 | 10 | Do you want it repeated? |
| 11:12:12 | 11 | THE WITNESS:  Please. |
| 11:12:14 | 12 | (Record read.) |
| 11:12:28 | 13 | THE WITNESS:  I believe there are e-mails to that |
| 11:12:36 | 14 | effect, yes. |
| 11:12:38 | 15 | BY MR. McJESSY: |
| 11:12:38 | 16 | Q.  All right.  You have seen those? |
| 11:12:38 | 17 | A.  I did see those.  Not at the time they were written. |
| 11:12:40 | 18 | Q.  All right.  But you're aware of that? |
| 11:12:44 | 19 | A.  I am now aware of it. |
| 11:12:46 | 20 | Q.  All right.  And you testified that you knew that on |
| 11:12:50 | 21 | May 13th that the server was leased; is that right? |
| 11:12:56 | 22 | A.  Correct. |
| 11:12:56 | 23 | Q.  How did you know that? |
| 11:12:56 | 24 | A.  There was a reference in Mr. Joshi's e-mail to me. |
| 11:13:02 | 25 | Q.  All right.  And if you could take a look at Exhibit 101. |

11:13:40　1　Is that the e-mail you're referring to at the top of the page

11:13:42　2　dated May 13th, 2010, at 9:38 a.m.?

11:13:46　3　A.　That's correct.

11:13:48　4　Q.　All right.　What did you understand that e-mail to be

11:13:50　5　telling you?

11:13:50　6　A.　That First Midwest and Associated Bank are working to

11:14:02　7　resolve a matter between them, and he mentioned that

11:14:04　8　Associated Bank is the party whom they had leased the server.

11:14:08　9　Q.　And it says the computers are still at the warehouse; is

11:14:10　10　that correct?

11:14:10　11　A.　That's right.

11:14:12　12　Q.　And what was your understanding of why First Midwest Bank

11:14:14　13　was negotiating with Associated Bank?

11:14:16　14　A.　I didn't have understanding -- any understanding, nor did

11:14:20　15　I see it as an issue.

11:14:20　16　Q.　Did you ask about it?

11:14:22　17　A.　No, I did not.

11:14:24　18　Q.　Did you understand this e-mail when you received it?

11:14:26　19　A.　Yes.

11:14:32　20　Q.　Now, did you ever tell United Central Bank's counsel that

11:14:40　21　you or the defendants had possession and control of the server

11:14:44　22　after March 25th, 2010?

11:14:48　23　A.　No, I don't believe so.

11:14:50　24　Q.　Okay.　They asked you repeatedly about the server though;

11:14:50　25　is that right?

| | | |
|---|---|---|
| 11:15:00 | 1 | A.  A couple of times. |
| 11:15:00 | 2 | Q.  All right.  And you never told them that the defendants or |
| 11:15:04 | 3 | your firm had possession and control over the server? |
| 11:15:06 | 4 | A.  Correct. |
| 11:15:08 | 5 | Q.  Now, there's no dispute that on April 23rd, you knew the |
| 11:15:14 | 6 | server was still at the warehouse; is that right? |
| 11:15:24 | 7 | A.  That's right.  That's when -- that's right. |
| 11:15:26 | 8 | Q.  All right.  And were you aware that there was a report |
| 11:15:30 | 9 | submitted to this court on February 28th saying that there was |
| 11:15:32 | 10 | a server at the warehouse? |
| 11:15:34 | 11 | MS. DEDINAS:  Objection. |
| 11:15:34 | 12 | THE WITNESS:  Yes. |
| 11:15:38 | 13 | MS. DEDINAS:  That's not the date. |
| 11:15:40 | 14 | MR. McJESSY:  I'm sorry. |
| 11:15:40 | 15 | BY MR. McJESSY: |
| 11:15:42 | 16 | Q.  Were you aware that there was a report to this court on |
| 11:15:44 | 17 | February 26th that the server was still -- that there was a |
| 11:15:46 | 18 | server at the warehouse? |
| 11:15:48 | 19 | A.  Yes. |
| 11:15:48 | 20 | Q.  All right.  At any time between February 26th and |
| 11:15:56 | 21 | April 23rd of 2010, were you advised that the server had been |
| 11:16:02 | 22 | moved from the warehouse to anywhere? |
| 11:16:06 | 23 | A.  No. |
| 11:16:06 | 24 | Q.  And there's no dispute that on April 23rd, Ms. Dedinas was |
| 11:16:28 | 25 | aware that the server was still at the warehouse; is that |

| | | |
|---|---|---|
| 11:16:32 | 1 | right? |
| 11:16:32 | 2 | A.  That's right. |
| 11:16:32 | 3 | Q.  This is First Midwest Bank's warehouse at this time; is |
| 11:16:38 | 4 | that right? |
| 11:16:38 | 5 | A.  That's correct. |
| 11:16:38 | 6 | Q.  You were aware of the friendly foreclosure that had |
| 11:16:42 | 7 | occurred in March of 2010? |
| 11:16:44 | 8 | A.  Correct. |
| 11:16:44 | 9 | Q.  Okay.  So you understood that First Midwest Bank owned |
| 11:16:46 | 10 | that warehouse? |
| 11:16:48 | 11 | A.  Correct. |
| 11:16:48 | 12 | Q.  All right.  And do you know whether plaintiff's counsel in |
| 11:16:54 | 13 | this case was aware that First Midwest Bank owned that |
| 11:16:56 | 14 | warehouse? |
| 11:16:56 | 15 | A.  I believe they were. |
| 11:17:02 | 16 | Q.  Okay.  Why do you believe that? |
| 11:17:04 | 17 | A.  Because there was an -- there were -- there were issues |
| 11:17:10 | 18 | with respect to physical clothing inventory that was still at |
| 11:17:16 | 19 | the warehouse that UCB claimed a lien on. |
| 11:17:20 | 20 | Q.  So as a result of the negotiations over the inventory, |
| 11:17:26 | 21 | United Central Bank was aware that First Midwest Bank had |
| 11:17:28 | 22 | taken ownership of the warehouse? |
| 11:17:32 | 23 | MS. DEDINAS:  Objection. |
| 11:17:32 | 24 | THE COURT:  Sustained. |
| 11:17:34 | 25 | BY MR. McJESSY: |

11:17:34  1   Q.  It's your understanding -- were there negotiations between

11:17:40  2   Bailey Borlack and Boodell & Domanskis regarding the inventory

11:17:46  3   that was stored at the warehouse?

11:17:48  4   A.  I believe there were, yes.

11:17:48  5   Q.  And were the negotiations about taking possession of the

11:17:52  6   inventory?

11:17:54  7   A.  Generally, I believe, yes.

11:17:58  8   Q.  All right.  And as part of those negotiations, was it

11:18:04  9   discussed that First Midwest Bank had taken over ownership of

11:18:08  10  the warehouse?

11:18:10  11          MS. DEDINAS:  Objection.  Foundation.

11:18:10  12          THE COURT:  Sustained.

11:18:12  13  BY MR. McJESSY:

11:18:12  14  Q.  Were you part of the negotiations?

11:18:14  15  A.  I was not.

11:18:16  16  Q.  Okay.  Were you informed of the negotiations in any way by

11:18:20  17  Mr. Borlack?

11:18:22  18  A.  I believe I was copied on some e-mails.

11:18:26  19  Q.  So you received communications about the discussions that

11:18:30  20  were going on between Bailey Borlack and Boodell & Domanskis

11:18:34  21  to work out possession of the inventory at the warehouse?

11:18:36  22  A.  I believe I did.

11:18:38  23  Q.  Okay.  As part of those communications, did you learn

11:18:42  24  that -- as part of those communications, did they include

11:18:48  25  discussions that the warehouse was owned by First Midwest

| | | |
|---|---|---|
| 11:18:52 | 1 | Bank? |
| 11:18:52 | 2 | MS. DEDINAS: Objection. Foundation. |
| 11:18:52 | 3 | THE COURT: Sustained. |
| 11:18:54 | 4 | BY MR. McJESSY: |
| 11:18:56 | 5 | Q. As part of those negotiations, was there discussion that |
| 11:19:00 | 6 | United Central Bank was going to negotiate a lease for the |
| 11:19:02 | 7 | warehouse? |
| 11:19:04 | 8 | MS. DEDINAS: Objection. Foundation. |
| 11:19:04 | 9 | THE COURT: Sustained. |
| 11:19:06 | 10 | BY MR. McJESSY: |
| 11:19:06 | 11 | Q. Do you have knowledge of what those negotiations entailed? |
| 11:19:12 | 12 | A. Yes. |
| 11:19:20 | 13 | Q. What did those negotiations entail? |
| 11:19:22 | 14 | MS. DEDINAS: Objection. Calls for hearsay. |
| 11:19:24 | 15 | THE COURT: No. If he is aware of what they |
| 11:19:28 | 16 | entailed, he can answer that. |
| 11:19:30 | 17 | THE WITNESS: There were discussions concerning what |
| 11:19:40 | 18 | was going to happen to the inventory that was at the |
| 11:19:46 | 19 | warehouse. Without reviewing the specific e-mails, I can only |
| 11:19:50 | 20 | provide my general recollection. |
| 11:19:52 | 21 | BY MR. McJESSY: |
| 11:19:52 | 22 | Q. Can you tell me anything beyond that? You said you could |
| 11:19:54 | 23 | provide your general recollection -- strike that. |
| 11:19:58 | 24 | You just mentioned you could provide your general |
| 11:20:00 | 25 | recollection. Did you just provide your entire general |

11:20:04   1   recollection, or is there something more that you know?

11:20:06   2   A.  There were discussions about whether UCB would enter into

11:20:16   3   a lease with FMB.  There were discussions about FMB's need to

11:20:30   4   utilize, use the space in the warehouse so that the inventory

11:20:34   5   needed to be removed on a fairly expedited basis.

11:20:44   6          Specifically, that's about it.

11:20:44   7   Q.  Based on that, was it your understanding at this time that

11:20:50   8   United Central Bank was aware that the warehouse was owned by

11:20:54   9   First Midwest Bank?  And by "this time," I'm specifically

11:20:58  10   referring to April of 2010.

11:21:00  11          MS. DEDINAS:  Objection.

11:21:02  12          THE COURT:  Sustained.

11:21:02  13   BY MR. McJESSY:

11:21:06  14   Q.  Sir, Ms. Dedinas, you testified, asked you about whether

11:21:10  15   the server was still at the warehouse during your April 23rd

11:21:14  16   meeting.  Do you remember that testimony?

11:21:14  17   A.  Correct.

11:21:16  18   Q.  How is it that she knew to ask you that question?

11:21:18  19          MS. DEDINAS:  Objection.

11:21:20  20          THE COURT:  Sustained.

11:21:22  21   BY MR. McJESSY:

11:21:24  22   Q.  Do you have any understanding of how she believed that the

11:21:26  23   server was even at the warehouse?

11:21:28  24   A.  Yes.

11:21:30  25   Q.  What is your understanding?

11:21:32   1   A.   It was referenced in Dave Muschler's letter of

11:21:38   2   February 26th to Ms. Pendleton here at the court, I believe.

11:21:44   3   Q.   All right.  And to your knowledge, between the February

11:21:48   4   26th letter and the April 23rd letter -- or meeting, had there

11:21:54   5   been any notice to Boodell & Domanskis that the server had

11:22:00   6   been moved from the warehouse?

11:22:00   7   A.   No.

11:22:02   8   Q.   And on April 23rd, did you make Ms. Dedinas aware that the

11:22:12   9   server was still at the warehouse?

11:22:16  10   A.   Yes.

11:22:26  11   Q.   What did you tell her?

11:22:32  12   A.   I told her that all computers were going to be moved from

11:22:38  13   the warehouse to Oak Brook.

11:22:40  14   Q.   Now, you testified previously that on April 23rd, that was

11:23:00  15   the first notice you had that the servers were still at the

11:23:04  16   warehouse; is that right?

11:23:10  17   A.   Yes.

11:23:10  18   Q.   Now, you just testified a short while ago that you had

11:23:14  19   notice on February 26th that the servers were at the

11:23:18  20   warehouse; is that right?

11:23:30  21   A.   Personally, I did not see the February 26th letter until

11:23:34  22   prior to the meeting in April.

11:23:36  23   Q.   Okay.  Prior to April 23rd, did you have any knowledge of

11:23:42  24   where the warehouse server was located?

11:23:44  25   A.   No.

| | |
|---|---|
| 11:23:46 | 1 |
| 11:23:58 | 2 |
| 11:24:00 | 3 |
| 11:24:04 | 4 |
| 11:24:14 | 5 |
| 11:24:20 | 6 |
| 11:24:26 | 7 |
| 11:24:26 | 8 |
| 11:24:30 | 9 |
| 11:24:36 | 10 |
| 11:24:46 | 11 |
| 11:24:50 | 12 |
| 11:24:56 | 13 |
| 11:25:02 | 14 |
| 11:25:02 | 15 |
| 11:25:02 | 16 |
| 11:25:06 | 17 |
| 11:25:08 | 18 |
| 11:25:14 | 19 |
| 11:25:18 | 20 |
| 11:25:18 | 21 |
| 11:25:20 | 22 |
| 11:25:26 | 23 |
| 11:25:26 | 24 |
| 11:25:28 | 25 |

1  Q.  So April 23rd is the first time you are notified -- do you

2  know the exist- -- did you know about the existence of the

3  warehouse server on April -- prior to April 23rd?

4  A.  Personally, at that point, no.

5  Q.  As of April 23rd, you were not aware that there was a

6  server at First Midwest Bank's warehouse?

7          MS. DEDINAS:  Objection.

8          THE COURT:  No, he can answer that.

9          THE WITNESS:  I would have reviewed the February 26th

10  letter prior to meeting on April 23rd.  So you would have to

11  say that based on that review -- based on my review of that

12  letter, at some point when I was just becoming involved with

13  ESI production, I would have been aware of the contents of the

14  letter.

15  BY MR. McJESSY:

16  Q.  When were you just becoming involved with ESI production?

17  A.  About April 7th, April 8th, or so.

18  Q.  Okay.  And you would have read the letter as part of your

19  preparation to handle ESI production; is that what your

20  testimony is?

21  A.  Yes.

22  Q.  And that letter clearly states that the server is at the

23  warehouse; is that right?

24  A.  It does.

25  Q.  So you would have known prior to April 23rd that the

| | | |
|---|---|---|
| 11:25:30 | 1 | server was at the warehouse, correct? |
| 11:25:32 | 2 | A.  Correct. |
| 11:25:32 | 3 | Q.  Were you told at any time prior -- between the time that |
| 11:25:38 | 4 | you read that letter and learned for the very first time the |
| 11:25:42 | 5 | existence of this server at the warehouse and your meeting on |
| 11:25:46 | 6 | April 23rd that the server had somehow been moved from First |
| 11:25:52 | 7 | Midwest Bank's warehouse? |
| 11:25:52 | 8 | A.  I was not told, no. |
| 11:25:54 | 9 | Q.  And your testimony earlier that April 23rd was the first |
| 11:26:02 | 10 | notice you had that the server was at the warehouse is not |
| 11:26:10 | 11 | completely accurate; is that right? |
| 11:26:14 | 12 | A.  April 23rd was the first time that I focused on the issue, |
| 11:26:20 | 13 | if I could clarify my testimony that way. |
| 11:26:22 | 14 | Q.  And it's my understanding of your testimony, based on |
| 11:26:40 | 15 | Ms. Dedinas' questions, that it was your understanding that |
| 11:26:44 | 16 | you had a meeting with Mr. Garrie, yourself, Mr. Joshi, and |
| 11:26:48 | 17 | Mr. Shah to discuss imaging of the warehouse server, that that |
| 11:26:54 | 18 | would be done after the server was moved to the Oak Brook |
| 11:26:58 | 19 | offices; is that right? |
| 11:27:06 | 20 | A.  That's my recollection. |
| 11:27:06 | 21 | Q.  Now, you testified that you never told any of the |
| 11:27:34 | 22 | attorneys for United Central Bank that you had the server; is |
| 11:27:34 | 23 | that right? |
| 11:27:38 | 24 | A.  That's correct. |
| 11:27:38 | 25 | Q.  And you never told any of the attorneys for United Central |

| | | |
|---|---|---|
| 11:27:40 | 1 | Bank that defendants had the server in their possession and |
| 11:27:44 | 2 | control; is that right? |
| 11:27:46 | 3 | A.  That's right. |
| 11:27:46 | 4 | Q.  Why not? |
| 11:27:46 | 5 | A.  Because they didn't. |
| 11:27:48 | 6 | Q.  Now, you testified that Mr. Joshi had told you numerous |
| 11:27:58 | 7 | times that the defendants were, quote, working on it, working |
| 11:28:04 | 8 | on bringing -- working on gaining access or getting the |
| 11:28:08 | 9 | server; is that right? |
| 11:28:10 | 10 | A.  That's right. |
| 11:28:10 | 11 | Q.  Did you ever convey that to any of the attorneys for |
| 11:28:14 | 12 | United Central Bank? |
| 11:28:14 | 13 | A.  No. |
| 11:28:16 | 14 | Q.  Why not? |
| 11:28:18 | 15 | A.  Because it was my hope that when -- that I would be able |
| 11:28:28 | 16 | to -- be able to include the warehouse server and its contents |
| 11:28:40 | 17 | in my communication to them when we obtained control, which I |
| 11:28:48 | 18 | had no reason to believe we would not. |
| 11:28:50 | 19 | Q.  But you knew you didn't have control; is that right? |
| 11:28:54 | 20 | A.  That's right. |
| 11:28:54 | 21 | Q.  And Ms. Dedinas asked you about your April 29th letter, |
| 11:29:02 | 22 | Exhibit 91, wherein you say, All computers from the warehouse |
| 11:29:06 | 23 | are being moved to Kanan's Oak Brook warehouse. |
| 11:29:10 | 24 | Do you recall that e-mail? |
| 11:29:10 | 25 | A.  I do. |

11:29:10    1   Q.  You did not say that the computers have been moved to the

11:29:14    2   Oak Brook warehouse; is that right?

11:29:16    3   A.  That's right.

11:29:16    4   Q.  Why not?

11:29:18    5   A.  Because it was in -- I wanted to indicate that it was in

11:29:22    6   process, that they are being moved.  And, as a matter of fact,

11:29:30    7   they had not been moved, so I wasn't going to represent that

11:29:34    8   they had been moved to Oak Brook when, in fact, they had not

11:29:36    9   been moved to Oak Brook.

11:29:38   10   Q.  All right.  So your letter of April 29th is accurate?

11:29:42   11   A.  That's correct.

11:29:42   12   Q.  Were you aware that Mr. Muschler had originally told the

11:29:48   13   defendants to take no action with respect to the computer

11:29:52   14   equipment?

11:29:52   15   A.  Yes.

11:29:52   16   Q.  And was your e-mail of April 26th that Ms. Dedinas asked

11:30:02   17   you about the first notice that you had given the defendants

11:30:06   18   to move the server?

11:30:08   19   A.  The first written notice, yes.

11:30:14   20   Q.  Okay.  And when was the first notice of any other sort

11:30:18   21   that you had given to them?

11:30:18   22   A.  April 23rd.

11:30:20   23   Q.  Okay.  This was at the meeting that we discussed?

11:30:22   24   A.  Correct.

11:30:22   25   Q.  All right.  Now, this was -- that was six weeks after the

11:30:26   1   foreclosure; is that right?

11:30:30   2   A.  Yes.

11:30:30   3   Q.  All right.  And that was four weeks after the eviction; is

11:30:30   4   that right?

11:30:44   5   A.  I believe that's approximately right, yes.

11:30:46   6   Q.  How did you believe that Mr. Shah or Mr. Joshi would

11:30:54   7   obtain control over the server?

11:30:56   8   A.  By being allowed into the warehouse to pick it up.

11:31:08   9   Q.  And how were they to do that?

11:31:12   10   A.  By calling Mr. Clark and arranging to do so.

11:31:18   11   Q.  At some point, you knew they were having trouble doing so;

11:31:18   12   is that right?

11:31:22   13   A.  I didn't -- I was never made aware of any trouble.

11:31:26   14   Q.  You knew there were delays, right?

11:31:28   15   A.  I knew it hadn't been done.

11:31:34   16   Q.  Well, counsel asked you several questions about the

11:31:40   17   passage of 12 weeks, a 12-week delay in the server being moved

11:31:50   18   from First Midwest Bank's warehouse to the Oak Brook offices;

11:31:54   19   is that right?  Do you remember those questions?

11:31:56   20   A.  Yes.

11:31:56   21   Q.  It was actually -- by the end of August, it was closer

11:32:00   22   to 16 weeks, right?

11:32:02   23   A.  Correct.

11:32:04   24   Q.  Did you offer to help Mr. Shah or Mr. Joshi obtain the

11:32:18   25   server?

| | | |
|---|---|---|
| 11:32:20 | 1 | A. I didn't see any need to offer any help. |
| 11:32:38 | 2 | MR. McJESSY: Judge, I move the answer be stricken as |
| 11:32:40 | 3 | nonresponsive. |
| 11:32:42 | 4 | THE WITNESS: No. |
| 11:32:42 | 5 | BY MR. McJESSY: |
| 11:32:42 | 6 | Q. To your knowledge, did anyone at Bailey Borlack offer to |
| 11:32:46 | 7 | help Mr. Shah or Mr. Joshi obtain control of the server? |
| 11:32:52 | 8 | A. No. |
| 11:32:56 | 9 | Q. Wasn't part of your job to gather evidence in this |
| 11:33:02 | 10 | lawsuit? |
| 11:33:10 | 11 | MR. LIPTON: Objection; on his behalf, your Honor. |
| 11:33:12 | 12 | THE COURT: What is the basis for the objection? |
| 11:33:14 | 13 | MR. LIPTON: Calls for a legal conclusion. |
| 11:33:18 | 14 | THE COURT: No. He can answer that question. |
| 11:33:22 | 15 | THE WITNESS: Yes. |
| 11:33:26 | 16 | BY MR. McJESSY: |
| 11:33:26 | 17 | Q. Was the server going to be evidence in this lawsuit? |
| 11:33:30 | 18 | A. Yes. |
| 11:33:30 | 19 | Q. Isn't it true that the defendants believed that the server |
| 11:33:36 | 20 | had information on it that would be helpful in this lawsuit to |
| 11:33:38 | 21 | their counterclaim? |
| 11:33:40 | 22 | A. Yes. |
| 11:33:44 | 23 | Q. And as an attorney, could you have issued a subpoena to |
| 11:33:50 | 24 | First Midwest Bank for the server; is that right? |
| 11:33:54 | 25 | A. Yes. |

11:33:54   1   Q.  And you didn't do so; is that right?

11:33:58   2   A.  That's correct.

11:34:00   3   Q.  Why not?

11:34:00   4   A.  Because I was never informed that there was any need to

11:34:06   5   issue a subpoena.

11:34:08   6   Q.  Sixteen-week delay didn't cause you any concerns?

11:34:14   7   A.  It did cause concern, which is why I sent the letter to

11:34:20   8   Mehul Shah on August 5th.

11:34:22   9   Q.  And a letter or an e-mail in May and a letter or e-mail in

11:34:26   10  June and a letter or e-mail in July; is that right?

11:34:30   11  A.  That's correct.

11:34:30   12  Q.  And you were repeatedly told they were working on it, but

11:34:36   13  they didn't tell you they had it; is that right?

11:34:38   14  A.  That's right.

11:34:38   15  Q.  Did United Central Bank issue a subpoena in this lawsuit

11:34:44   16  for the server?

11:34:46   17  A.  No.

11:34:46   18  Q.  But to the best of your knowledge, they knew that the

11:34:50   19  server was in First Midwest Bank's warehouse also?

11:34:54   20          MS. DEDINAS:  Objection.

11:34:54   21          THE WITNESS:  Correct.

11:34:56   22          THE COURT:  Sustained, to the best of his knowledge.

11:35:00   23          And that's sustained -- overruled.  I'm sorry.

11:35:06   24  BY MR. McJESSY:

11:35:06   25  Q.  Did Bailey Borlack instruct either Mr. Smalley,

11:35:10  1   Mr. Garrie, or Mr. Spernow to assist the defendants in

11:35:14  2   obtaining control of the server?

11:35:16  3   A.  No.

11:35:18  4   Q.  Those were three computer experts that were engaged on

11:35:24  5   their behalf; is that right?

11:35:24  6   A.  Correct.

11:35:24  7   Q.  They were paid tens of thousands of dollars for their

11:35:28  8   services; is that right?

11:35:30  9   A.  I never saw the billing to Mr. Smalley specifically.

11:35:38  10  Q.  They have been paid a lot of money when they were working

11:35:42  11  this case; is that right?

11:35:44  12  A.  They have been paid money and they have worked, yes.

11:35:46  13  Q.  And they were engaged by Bailey Borlack?

11:35:50  14  A.  FSRDG was.

11:35:52  15  Q.  Why didn't you instruct any of those individuals to assist

11:35:58  16  Mr. Shah and Mr. Joshi in obtaining control of the server?

11:36:00  17  A.  Because I had no reason to believe that Mr. Shah and

11:36:02  18  Mr. Joshi would not obtain control of the server.

11:36:06  19  Q.  Even in August, you still weren't concerned that they

11:36:14  20  weren't going to be able to obtain control of the server?

11:36:16  21  A.  Mr. Shah told us in August that he had a deal to obtain

11:36:20  22  control of the server.

11:36:20  23  Q.  And did you have an understanding of what "had a deal"

11:36:24  24  meant?

11:36:26  25  A.  Yes.

11:36:26 | 1 | Q.  What did that mean?

11:36:26 | 2 | A.  That meant that Mr. Shah was purchasing the server.

11:36:42 | 3 | Q.  Prior to August and July, you still -- were you concerned

11:36:48 | 4 | that he was having difficulty getting control of the server?

11:36:52 | 5 | A.  No.

11:36:52 | 6 | Q.  Why not?  By then, it had been 12 weeks.

11:36:56 | 7 | A.  What part of July?

11:37:00 | 8 | Q.  The end of July.

11:37:02 | 9 | A.  Yes, I was concerned at the end of July, which is at that

11:37:08 | 10 | point when I drafted the letter that Alan Borlack sent on

11:37:10 | 11 | August 4th.

11:37:12 | 12 | Q.  Now, in April 26th, you testified -- strike that.

11:37:22 | 13 | You testified today that on April 26th, you had given

11:37:24 | 14 | notice to the defendants to move the server to the Oak Brook

11:37:28 | 15 | warehouse, correct?  Strike that.

11:37:32 | 16 | On April -- you testified today that on April 26th,

11:37:36 | 17 | you gave direction to the defendants to move the server from

11:37:40 | 18 | First Midwest Bank's warehouse to the Oak Brook offices; is

11:37:44 | 19 | that correct?

11:37:44 | 20 | A.  Yes.

11:37:48 | 21 | Q.  Did you have any concern about it being damaged in that

11:37:52 | 22 | move?

11:37:52 | 23 | A.  No, I did not.

11:37:54 | 24 | Q.  Did you care about how they went about -- did you care

11:37:58 | 25 | about how they went about moving it?

11:38:00  1  A.  I assumed that they would move it with whatever means they

11:38:04  2  needed to do it with.

11:38:08  3  Q.  Now, you were already dealing with a defunct server in the

11:38:10  4  Oak Brook warehouse; is that right?

11:38:12  5  A.  That's correct.

11:38:12  6  Q.  In fact, that was the purpose of your April 23rd meeting

11:38:16  7  with Ms. Dedinas?

11:38:18  8  A.  Correct.

11:38:18  9  Q.  And that didn't cause you any concern about how the server

11:38:22  10  in First Midwest Bank's warehouse was being handled?

11:38:26  11  A.  No.

11:38:26  12  Q.  You had a whole barn of experts engaged at this point.

11:38:38  13  Did you ask any of them to consult with the defendants on how

11:38:40  14  to move the server?

11:38:42  15        MR. McGARRY:  Object to the form, your Honor.

11:38:44  16        THE COURT:  Sustained.

11:38:46  17  BY MR. McJESSY:

11:38:46  18  Q.  You had three --

11:38:46  19        THE COURT:  A barn of experts.

11:38:50  20  BY MR. McJESSY:

11:38:50  21  Q.  You had a number of experts engaged at this point.  Did

11:38:54  22  you contact any of them with respect to assisting the

11:38:56  23  defendants in moving the server?

11:38:58  24  A.  No.

11:39:06  25  Q.  And you didn't ask any of them to provide any instructions

11:39:08   1   to the defendants on how the server should be moved, did you?

11:39:10   2   A.  No.

11:39:12   3   Q.  Now, the May 13th e-mail that says First Midwest Bank is

11:39:26   4   working with Associated Bank, you didn't understand that --

11:39:32   5   those discussions to be part of Mr. Shah's effort to purchase

11:39:36   6   the server?

11:39:36   7   A.  No, I did not.

11:39:38   8   Q.  But you knew at some point that that's what he was trying

11:39:40   9   to do; is that right?

11:39:46  10   A.  At some point, yes.

11:39:48  11   Q.  Why -- what did you think it meant that First Midwest Bank

11:39:54  12   is working with Associated Bank with regard to the server?

11:39:58  13   A.  Just what -- just what that says.

11:40:04  14   Q.  Well, neither of those two parties negotiating or working

11:40:08  15   things out about the server are Mr. Shah or Mr. Joshi or Kanan

11:40:12  16   or any of the defendants in this case.  It's two separate

11:40:14  17   parties, right?

11:40:14  18   A.  That's correct.

11:40:14  19   Q.  All right.  And you -- did you know what that meant?

11:40:20  20   A.  That Associated Bank is working with First Midwest Bank to

11:40:26  21   resolve an issue between them.

11:40:28  22   Q.  Did you know at that point that Associated Bank had a

11:40:30  23   lease on the server?

11:40:32  24   A.  A lease is referenced in the e-mail, yes.

11:40:36  25   Q.  So did you understand that they owned the server?

11:40:38  1   A.  Yes.

11:40:40  2   Q.  So on May 13th, you know that Associated Bank owns the

11:40:46  3   server and you know that the server is located in First

11:40:50  4   Midwest Bank's warehouse; is that right?

11:40:52  5   A.  That's correct.

11:41:50  6           THE COURT:  Would this be a good time to take a

11:41:52  7   little break?

11:41:54  8           MR. McJESSY:  It would be fine, your Honor.

11:41:56  9           THE COURT:  How much more do you have?

11:41:58  10          MR. McJESSY:  Not too much, actually.  Probably 20

11:42:02  11  minutes, maybe.  I'm guessing, but that would be my estimate.

11:42:10  12          THE COURT:  Let's take a break.  Five minutes.

11:52:20  13    (Short break.)

11:52:24  14  BY MR. McJESSY:

11:54:30  15  Q.  Just before we broke, I asked you whether you were aware

11:54:34  16  as of May 13th that the server was owned by Associated Bank

11:54:42  17  and was located at First Midwest Bank's warehouse.  Do you

11:54:44  18  remember that?

11:54:44  19  A.  Yes.

11:54:44  20  Q.  And you said that you were as of May 13th; is that right?

11:54:50  21  A.  As of May 13th because there was a reference in the

11:54:52  22  e-mail, yes.

11:54:52  23  Q.  All right.  Now, counsel for United Central Bank asked you

11:55:00  24  a number of questions about there being an effort to repossess

11:55:06  25  the server.  Do you remember those questions?

11:55:10    1    A.  One question, yes.

11:55:14    2    Q.  All right.  She asked you about I think an e-mail exchange

11:55:18    3    that you and she had; is that right?

11:55:20    4    A.  Correct.

11:55:20    5    Q.  All right.  And you had sent an e-mail to Mr. Joshi and

11:55:26    6    asked him about that, he had responded, and then you responded

11:55:28    7    to UCB's counsel; is that right?

11:55:32    8    A.  In fact, I sent an e-mail back to Mr. Joshi, and Mr. Joshi

11:55:36    9    responded.  And then at that point, in reliance on what I was

11:55:40   10    being told, I sent an e-mail to Ms. Dedinas, yes.

11:55:44   11    Q.  Right.  So Ms. Dedinas was raising an issue about the

11:55:52   12    control of the server as well, is that right, with regard to

11:55:56   13    her communications to you?

11:55:56   14    A.  I don't believe her communications specifically used the

11:56:00   15    word "server."

11:56:02   16    Q.  Okay.  Is that what you understood her to be referring to?

11:56:04   17    A.  No, as a matter of fact, I read that e-mail to be

11:56:14   18    referencing in general Kanan's computers.

11:56:18   19    Q.  All of the computers?

11:56:18   20    A.  Anything.

11:56:20   21    Q.  All right.  So you understood her request to -- when you

11:56:24   22    responded to it then, you were responding not specifically

11:56:28   23    with respect to the warehouse server but with respect to all

11:56:30   24    of the computers?

11:56:32   25    A.  Yes.

| | | |
|---|---|---|
| 11:56:40 | 1 | Q. All right. |
| 11:56:42 | 2 | A. Yes, generally speaking, any Kanan computer systems. |
| 11:56:48 | 3 | Q. All right. Is that what you understood Mr. Joshi's |
| 11:56:50 | 4 | response to mean also then? |
| 11:56:52 | 5 | A. That there were no demands or requests or threats to |
| 11:57:00 | 6 | repossess with respect to any Kanan ESI, yes. |
| 11:57:04 | 7 | Q. All right. And the threat to repossess, meaning that |
| 11:57:08 | 8 | somebody else who has an ownership interest in it, is going to |
| 11:57:10 | 9 | take it back; is that right? |
| 11:57:12 | 10 | A. Correct. |
| 11:57:12 | 11 | Q. So you understood that -- strike that. |
| 11:57:16 | 12 | You understood that UCB's counsel also had an |
| 11:57:20 | 13 | understanding that Kanan's computers, whatever those may be, |
| 11:57:24 | 14 | were owned by somebody else; is that right? |
| 11:57:26 | 15 | MS. DEDINAS: Objection. |
| 11:57:28 | 16 | THE COURT: Sustained. |
| 11:57:30 | 17 | BY MR. McJESSY: |
| 11:57:38 | 18 | Q. What did you understand UCB's counsel's request to be |
| 11:57:44 | 19 | about? |
| 11:57:44 | 20 | A. Whether there were any third-party claims against Kanan's |
| 11:58:00 | 21 | computer systems. |
| 11:58:00 | 22 | Q. Do you know -- |
| 11:58:02 | 23 | A. Exactly what the e-mail states. |
| 11:58:04 | 24 | Q. Did any of UCB's counsel ever advise you as to how they |
| 11:58:08 | 25 | were -- why they were even raising that as an issue? |

| | | |
|---|---|---|
| 11:58:12 | 1 | A.  No. |
| 11:58:12 | 2 | Q.  They never disclosed to you how it is that they became |
| 11:58:16 | 3 | aware that maybe there had been a demand by somebody to |
| 11:58:20 | 4 | repossess the computer equipment? |
| 11:58:24 | 5 | A.  No. |
| 11:58:24 | 6 | Q.  Did you ever ask them that? |
| 11:58:24 | 7 | A.  No. |
| 11:58:26 | 8 | Q.  But as of May 13th, they had raised that issue with you |
| 11:58:32 | 9 | and they also knew that the server that's the subject of these |
| 11:58:36 | 10 | proceedings was still at the First Midwest Bank warehouse; is |
| 11:58:42 | 11 | that right? |
| 11:58:42 | 12 | MS. DEDINAS:  Objection. |
| 11:58:42 | 13 | THE COURT:  Sustained. |
| 11:58:44 | 14 | BY MR. McJESSY: |
| 11:58:46 | 15 | Q.  By May 13th, you had communications with UCB's counsel |
| 11:58:52 | 16 | regarding the repossession of computer equipment, and UCB's |
| 11:58:58 | 17 | counsel had been advised that the server was still at Midwest |
| 11:59:06 | 18 | Bank's warehouse; is that right? |
| 11:59:08 | 19 | A.  Well, correct to the second part of your question. |
| 11:59:10 | 20 | As to the first part of your question -- which |
| 11:59:16 | 21 | involves something about repossession.  I'm not sure.  I guess |
| 11:59:20 | 22 | I need the question read back.  I'm sorry. |
| 11:59:22 | 23 | (Record read.) |
| 11:59:46 | 24 | THE WITNESS:  I never had any communications with |
| 11:59:48 | 25 | UCB's counsel about repossession of a computer system, no. |

11:59:54   1   BY MR. McJESSY:

11:59:58   2   Q.  You didn't have any communications with UCB's counsel

12:00:00   3   about whether there had been a -- a demand had been made to

12:00:04   4   repossess any computer equipment?

12:00:06   5   A.  I wish I had known that there had been a demand made, but

12:00:12   6   I didn't know, so the answer is no.

12:00:14   7   Q.  Maybe my question wasn't completely clear.

12:00:18   8   A.  Then I'm sorry if I don't understand your question.

12:00:20   9   Q.  That's all right.

12:00:20   10          THE COURT:  With all due respect, you're asking

12:00:22   11  compound questions.  Cut them up.

12:00:24   12  BY MR. McJESSY:

12:00:26   13  Q.  All right.  Did UCB's counsel ever inquire to you whether

12:00:30   14  there had been any action or effort made to repossess UCB's

12:00:36   15  computers -- or, I'm sorry, to -- did UCB's counsel ever ask

12:00:44   16  you in any way whether there had been an action or effort to

12:00:48   17  repossess Kanan's computers?

12:00:50   18  A.  Yes.

12:00:54   19  Q.  Okay.  Do you recall when that was, approximately?

12:00:58   20  A.  Yes.

12:00:58   21  Q.  When was that?

12:01:00   22  A.  In Ms. Dedinas' April 13th or April 12th e-mail to me,

12:01:08   23  which was actually a second e-mail.  I believe she had

12:01:12   24  e-mailed the question to Mr. Muschler, and then I began to

12:01:16   25  engage with Ms. Dedinas in scheduling the ESI liaisons to

12:01:22   1   attend.  And she said, but you hadn't responded to my question
12:01:26   2   about -- about whether there are any threats to repossess, and
12:01:30   3   that's when I forwarded it to the client.
12:01:32   4           So, yes, the answer to your question is that in that
12:01:36   5   e-mail, she asked me about threats to repossess.
12:01:38   6   Q.  And that was in April.
12:01:40   7   A.  That was in April.
12:01:42   8   Q.  So by May 13th, there had at least been some inquiry by
12:01:48   9   UCB's counsel regarding the ownership and the right to take
12:01:52   10  possession of the computers that Kanan owned?
12:01:54   11  A.  As I just testified, yes.
12:01:56   12  Q.  All right.  So by May 13th, counsel for United Central
12:02:00   13  Bank and the attorneys at Bailey Borlack, at least yourself,
12:02:06   14  knew that the server in question was at the First Midwest Bank
12:02:10   15  warehouse in Aurora; is that right?
12:02:12   16  A.  Correct.
12:02:12   17  Q.  And questions had been raised about the ownership of that
12:02:16   18  equipment; is that right?
12:02:20   19  A.  A question had been raised by Ms. Dedinas about the
12:02:24   20  ownership of that equipment.
12:02:24   21  Q.  Now, on May 24th, you had a telephone call with
12:02:56   22  Mr. Paresh --
12:02:58   23          THE COURT:  It's Mr. Joshi.
12:03:00   24          MR. McJESSY:  I'm sorry.  Thank you, your Honor.
12:03:04   25  BY MR. McJESSY:

| | | |
|---|---|---|
| 12:03:04 | 1 | Q.  On May 24th, you had a telephone call with Mr. Joshi |
| 12:03:06 | 2 | regarding the computer equipment; is that right? |
| 12:03:16 | 3 | A.  Yes. |
| 12:03:16 | 4 | Q.  And during that telephone call, it was disclosed to you |
| 12:03:20 | 5 | that the defendants still did not have possession or control |
| 12:03:24 | 6 | of the server; is that right? |
| 12:03:24 | 7 | A.  I believe so, yes. |
| 12:03:26 | 8 | Q.  All right.  And then you memorialized that in a letter |
| 12:03:28 | 9 | dated -- strike that. |
| 12:03:30 | 10 | You memorialized that in an e-mail dated May 25th, |
| 12:03:36 | 11 | 2010, which is Exhibit 111; is that right? |
| 12:03:56 | 12 | A.  Yes. |
| 12:03:56 | 13 | Q.  In fact, this e-mail references Ms. Dedinas' e-mail in the |
| 12:04:02 | 14 | second paragraph where it says, In fact, Vilia had raised the |
| 12:04:06 | 15 | issue on April 14 that, quote, finally, my client has heard |
| 12:04:12 | 16 | that there are third, hyphen, parties who claim to have a |
| 12:04:14 | 17 | secured interest in Creative Warehousing/Kanan Fashions' |
| 12:04:22 | 18 | computer system and intend to seek possession of it. |
| 12:04:26 | 19 | Do you see that? |
| 12:04:26 | 20 | A.  I do. |
| 12:04:26 | 21 | Q.  And then you go on to say at the bottom of that e-mail, |
| 12:04:30 | 22 | One way or another, we have to have information about the |
| 12:04:34 | 23 | server as soon as possible. |
| 12:04:36 | 24 | Do you see that? |
| 12:04:36 | 25 | A.  I do. |

12:04:38  1  Q.  What does that mean, that you need to have information

12:04:40  2  about the server?

12:04:42  3  A.  Its contents, its data, what was in the server.

12:04:50  4  Q.  And then you go on to say, but one of two things must

12:04:54  5  happen, either get control of the server or have a copy of the

12:04:58  6  server contents made by the I.T. person that will be hired.

12:05:04  7          So at this point, you knew there was no control of

12:05:06  8  the server by the defendants; is that right?

12:05:10  9  A.  We had not gotten access, so, yes.

12:05:12  10  Q.  Did you advise UCB's counsel on or about May 25th that

12:05:34  11  defendants still did not have control of the server?

12:05:36  12  A.  Could you repeat the question?

12:05:48  13  Q.  Yes.

12:05:48  14          Did you advise UCB's counsel on or before --

12:05:56  15          THE COURT:  On or about.

12:05:56  16          MR. McJESSY:  Strike that.

12:05:58  17  BY MR. McJESSY:

12:05:58  18  Q.  Did you advise UCB's counsel on or about May 25th that

12:06:02  19  defendants still did not have control of the server?

12:06:04  20  A.  I don't recall.  I don't recall making -- communicating

12:06:16  21  with UCB's counsel about that on May 25th specifically, no.

12:06:20  22  Q.  Okay.  Do you think it's possible that you may have done

12:06:24  23  that?

12:06:24  24  A.  I don't think so.

12:06:24  25  Q.  Okay.  Now, I'd like you to turn to Exhibit 122.  And at

| | | |
|---|---|---|
| 12:07:08 | 1 | one point, I am going to ask you to refer back and forth |
| 12:07:10 | 2 | between Exhibit 122 and 125; but at this point, I just want to |
| 12:07:18 | 3 | ask you about Exhibit 122. |
| 12:07:20 | 4 | Now, this is an e-mail from you to Mr. Joshi dated |
| 12:07:24 | 5 | May 27th, 2010; is that right? |
| 12:07:26 | 6 | A.  Correct. |
| 12:07:28 | 7 | Q.  And this is just a few days later, is that right, from the |
| 12:07:36 | 8 | e-mail that we were just discussing? |
| 12:07:38 | 9 | A.  Correct. |
| 12:07:38 | 10 | Q.  All right.  Now, on the second page of that exhibit, which |
| 12:07:50 | 11 | has a 136 at the bottom, and at paragraph number 6 on that |
| 12:07:56 | 12 | page, there is a paragraph 6A.  And it says, I again asked you |
| 12:08:06 | 13 | about the status of obtaining the warehouse server or a copy |
| 12:08:12 | 14 | of its contents.  You indicated that you were working on it |
| 12:08:14 | 15 | and should know more today.  Please advise. |
| 12:08:16 | 16 | Do you see that? |
| 12:08:16 | 17 | A.  Yes. |
| 12:08:16 | 18 | Q.  Did you on or about May 27th convey to UCB's counsel that |
| 12:08:26 | 19 | defendants were working on obtaining control of the server? |
| 12:08:30 | 20 | A.  Not that I recall. |
| 12:08:36 | 21 | Q.  Why not? |
| 12:08:36 | 22 | A.  Why don't I recall? |
| 12:08:42 | 23 | Q.  No, why didn't you advise them -- oh, you don't recall? |
| 12:08:46 | 24 | You may have advised them of that? |
| 12:08:48 | 25 | A.  I do not recall advising UCB's counsel on May 27th of the |

377

| | |
|---|---|
| 12:08:56 | 1 |
| 12:08:58 | 2 |
| 12:09:04 | 3 |
| 12:09:10 | 4 |
| 12:09:10 | 5 |

1  statement about obtaining control of the warehouse server.

2  Q.  Okay.  Do you remember conveying any response to UCB's

3  counsel that Mr. Joshi was working on obtaining control of the

4  server?

5  A.  No, I do not.

6  Q.  Now, if you could turn to Exhibit 125.  And if you could

7  place mark where we're at on Exhibit 122, that would be

8  helpful.  And when you turn to Exhibit 125, if you could turn

9  to the page that has a 140 on the bottom right-hand corner.

10       And what I'm going to ask you to do is look at

11  paragraph 6 on Exhibit 122 and paragraph 6 in Exhibit 125.

12  And you will note that it appears that what you're doing in

13  Exhibit 125 is reforwarding your prior e-mail, but now you've

14  changed paragraph 6; is that right?

15  A.  I've added to it, correct.

16  Q.  Okay.  So this is your way of adding some additional

17  information into the same subject matter that you were just

18  previously discussing in your prior e-mail, Exhibit 122; is

19  that right?

20  A.  Well, as my -- as my cover e-mail states, Paresh, please

21  advise us that the status of the following action items from

22  the below, paren, now bolded, close paren, my additional notes

23  are in red, Eric.

24       So, yes, you're correct.

25  Q.  All right.  So part of paragraph 6 in Exhibit 125 is what

| | | |
|---|---|---|
| 12:10:54 | 1 | you had written on May 27th, but now you've added additional |
| 12:10:58 | 2 | language.  And that additional language is, This is also an |
| 12:11:04 | 3 | absolute priority.  We must secure either possession or a copy |
| 12:11:08 | 4 | of contents.  We must gain some knowledge of what is on the |
| 12:11:12 | 5 | server so it could be added to the data map. |
| 12:11:14 | 6 | Do you see that? |
| 12:11:14 | 7 | A.  Yes. |
| 12:11:16 | 8 | Q.  All right.  And why is it an absolute priority? |
| 12:11:24 | 9 | A.  Because it's part of Kanan's ESI. |
| 12:11:26 | 10 | Q.  At this time, did you still understand that the server was |
| 12:11:30 | 11 | at the warehouse? |
| 12:11:32 | 12 | A.  Yes. |
| 12:11:32 | 13 | Q.  And that's First Midwest Bank's warehouse; is that right? |
| 12:11:36 | 14 | A.  Right. |
| 12:11:38 | 15 | Q.  Now, these e-mails are only a few days apart, May 27th, |
| 12:11:46 | 16 | 2010, and June 2nd, 2010; is that right? |
| 12:11:52 | 17 | A.  Yes, I was following up. |
| 12:11:54 | 18 | Q.  All right.  And then the prior e-mail we discussed where |
| 12:11:58 | 19 | you raised this was May 25th; is that right? |
| 12:12:02 | 20 | A.  Yes. |
| 12:12:02 | 21 | Q.  And then you had a conversation about this on May 24th; is |
| 12:12:02 | 22 | that right? |
| 12:12:08 | 23 | A.  Yes. |
| 12:12:08 | 24 | Q.  So -- |
| 12:12:10 | 25 | A.  And also on May 2- -- and also on May 25th. |

12:12:18    1         May 26th.

12:12:20    2   Q.  All right.  So that's several conversations and several

12:12:24    3   e-mails within a very short period of time; is that right?

12:12:26    4   A.  You are correct.

12:12:28    5   Q.  And this is, in your mind, very important at this time; is

12:12:34    6   that right?

12:12:34    7   A.  Among everything else that's in this e-mail, yes.

12:12:38    8   Q.  And the server contains information that you've testified

12:12:40    9   would be helpful to defendants' case; is that right?

12:12:44   10   A.  I don't know.

12:12:46   11   Q.  You didn't previously testify that defendants believed

12:12:48   12   that there was evidence on that server that would be helpful

12:12:50   13   to their counterclaims?

12:12:54   14   A.  I testified as to my understanding of the defendants'

12:12:56   15   belief, not what I know, because I obviously don't know what

12:12:58   16   was on that server.  I have never had any personal contact

12:13:02   17   with it whatsoever.

12:13:04   18   Q.  Fair point.  The defendants had conveyed to you that they

12:13:06   19   believed that the information on that server would be helpful

12:13:10   20   to their counterclaim; is that right?

12:13:10   21   A.  At some point.  I don't specifically recall when.  It

12:13:14   22   might have been in Mr. Shah's and Mr. Joshi's testimony,

12:13:16   23   actually.

12:13:16   24         But I think it's a fair assumption that at some

12:13:18   25   point, they had mentioned that the ware- -- that they needed

12:13:22  1  the warehouse server for their new business and it was

12:13:26  2  obviously important to them.

12:13:28  3  Q.  All right.  Why didn't you issue a subpoena to First

12:13:34  4  Midwest Bank or Associated Bank in the beginning of June to

12:13:38  5  obtain control of the server?

12:13:40  6  A.  Because I was still acting in reliance on the April 16th

12:13:46  7  e-mail where Mr. Joshi had told me that there were no issues

12:13:50  8  with any third-party claims with respect to any of Kanan's

12:13:52  9  computer systems.

12:13:54  10        THE COURT:  And we've covered that area pretty

12:13:56  11  thoroughly, I believe.

12:13:58  12        MR. McJESSY:  All right.

12:14:00  13  BY MR. McJESSY:

12:14:06  14  Q.  No third-party claims, but the server was in First Midwest

12:14:10  15  Bank's warehouse, right?

12:14:10  16  A.  Correct.

12:14:10  17  Q.  Were you aware that First Midwest Bank had refused to give

12:14:14  18  access to defendants to the warehouse absent a court order?

12:14:20  19  A.  No.

12:14:20  20  Q.  Now, there is a July 1st e-mail wherein you acknowledge

12:14:24  21  that the server is still in First Midwest Bank's warehouse; is

12:14:24  22  that right?

12:14:32  23  A.  I presume there is, but if you could direct me to it.

12:14:38  24  Q.  Sure.

12:14:44  25  A.  I did actually follow up on the May 27th e-mail one more

| | | |
|---|---|---|
| 12:14:50 | 1 | time, and I don't know if that's part of that. |
| 12:14:52 | 2 | Q. It's Exhibit 135. |
| 12:15:16 | 3 | A. Yes. Got it. |
| 12:15:18 | 4 | Q. Does that refresh your recollection? |
| 12:15:28 | 5 | A. Yes, it does. |
| 12:15:28 | 6 | Q. All right. And -- now, this e-mail is copied to |
| 12:15:38 | 7 | Mr. Joshi, but it's not to him; is that right? |
| 12:15:42 | 8 | A. Correct. |
| 12:15:42 | 9 | Q. In fact, Mr. Shah isn't copied on this e-mail either; is |
| 12:15:42 | 10 | that right? |
| 12:15:50 | 11 | A. Correct. |
| 12:15:52 | 12 | MR. McGARRY: Your Honor, may I just know the exhibit |
| 12:15:54 | 13 | number again? |
| 12:15:56 | 14 | THE COURT: Sure. It's 135. |
| 12:15:56 | 15 | BY MR. McJESSY: |
| 12:15:58 | 16 | Q. Typically when you send out e-mails to Mr. Joshi, you copy |
| 12:16:02 | 17 | Mr. Shah; is that right? |
| 12:16:04 | 18 | A. Yes. |
| 12:16:04 | 19 | Q. Is there a reason that Mr. Shah wasn't copied on this |
| 12:16:08 | 20 | e-mail? |
| 12:16:08 | 21 | A. The only reason I believe he wasn't copied on this e-mail |
| 12:16:14 | 22 | was because it concerned an issue that Lou had raised to |
| 12:16:22 | 23 | Daniel that I wanted to forward on to reply to Lou with a cc |
| 12:16:28 | 24 | to Paresh on it. And I think it was probably the only time |
| 12:16:32 | 25 | when I had not included Mr. Shah on any e-mail as this e-mail |

12:16:38  1  -- I -- well --

12:16:40  2  Q.  All right.  And this e-mail states, It is currently at the

12:16:44  3  former Aurora warehouse and we don't have control over the

12:16:48  4  premises or machine.

12:16:50  5       Do you see that?

12:16:50  6  A.  Correct.

12:16:50  7  Q.  All right.  Is that an accurate -- was it your

12:16:56  8  understanding at this time that defendants did not have

12:16:58  9  access -- strike that.

12:17:00  10      Was it your understanding at this time that the

12:17:02  11  defendants didn't have control over the warehouse?

12:17:06  12  A.  Yes.

12:17:06  13  Q.  Was it also your understanding that the defendants didn't

12:17:10  14  have control over the machine?

12:17:10  15  A.  Yes.

12:17:12  16  Q.  If they didn't have possession or control, what was there

12:17:28  17  to stop somebody from damaging the machine?

12:17:30  18       MR. McGARRY:  Objection.  Irrelevant.

12:17:32  19       THE COURT:  Sustained.

12:17:34  20  BY MR. McJESSY:

12:17:38  21  Q.  As of July 1st, did you advise any of UCB's attorneys that

12:17:44  22  the defendants didn't have control over the warehouse or the

12:17:48  23  machine?

12:17:48  24  A.  No.

12:17:50  25  Q.  Why not?

12:17:52    1    A.  Because I expected, as I indicate in that July 1st e-mail,

12:17:58    2    that Paresh needs to coordinate Lou Smalley's access to the

12:18:02    3    warehouse and that that's what would happen.

12:18:04    4    Q.  Had UCB's counsel made any inquiries to you about the

12:18:08    5    status of the server at that time?

12:18:08    6    A.  Other than the e-mail that Ms. Dedinas wrote to me within

12:18:20    7    a few days after the data map where she asked whether our data

12:18:24    8    map included, and I believe the quote is Kanan

12:18:32    9    Holdings/Creative Warehousing/Kanan Cruises, question marks,

12:18:40   10    no.

12:18:40   11    Q.  Do you know whether -- do you have any knowledge of

12:18:42   12    whether United Central Bank's counsel was aware at this time,

12:18:48   13    meaning around July 1st, that the server was still at First

12:18:54   14    Midwest Bank's warehouse?

12:18:54   15    A.  I don't know what they knew.

12:18:56   16    Q.  Okay.  At any time --

12:18:58   17            THE COURT:  Excuse me.

11:23:39   18      (Brief pause.)

11:23:39   19            THE COURT:  And your time is rapidly approaching what

11:23:42   20    you expected you would need.

11:23:43   21            MR. McJESSY:  I appreciate that, your Honor.  It's

11:23:45   22    taking me a little bit longer than I expected.  I will do my

11:23:46   23    best.

11:23:47   24    BY MR. McJESSY:

11:23:47   25    Q.  Sir, at any time between April 23rd and July 1st, had you

11:23:50  1   conveyed to UCB's counsel that the server had been moved from

11:23:54  2   First Midwest Bank's warehouse?

11:23:56  3   A.  No.

11:23:59  4   Q.  So they had no reason to believe as of July 1st that the

11:24:02  5   server was anywhere other than at that warehouse?

11:24:05  6           MS. DJORDJEVIC:  Objection.  Foundation for our

11:24:07  7   belief or anything.

11:24:09  8           THE COURT:  Wait a second here.  Who is going to do

11:24:11  9   the objection?

11:24:13  10          MS. DJORDJEVIC:  Sorry.

11:24:14  11          THE COURT:  I am distracted.

11:25:56  12     (Brief pause.)

11:26:15  13          THE COURT:  Your objection is sustained.

11:26:18  14   BY MR. McJESSY:

11:26:18  15   Q.  Between April --

11:26:19  16          THE COURT:  You should make them.

11:26:19  17   BY MR. McJESSY:

11:26:22  18   Q.  Between April 23rd and July 1st, to your knowledge, had

11:26:25  19   anybody at Bailey Borlack conveyed any message to the

11:26:31  20   attorneys for UCB that the server had been moved from First

11:26:37  21   Midwest Bank's warehouse?

11:26:37  22   A.  No.

11:26:41  23   Q.  Sir, if you could look at Exhibit 179, which Ms. Dedinas

11:26:56  24   asked you about.  And at the same time, and I know this might

11:27:10  25   be difficult because it's in a separate binder, but I would

11:27:14  1    also like you to take a look at Exhibit 101.

11:27:39  2             Do you have those two e-mails there?

11:27:41  3    A.  Yes, I do.

11:27:42  4    Q.  And the e-mail that's Exhibit 101 is dated May 13th, 2010,

11:27:49  5    at 9:38 a.m., and an e-mail that is Exhibit 179 is dated

11:27:52  6    August 19th, at 4:56 p.m.

11:27:56  7             And drawing your attention to Exhibit 179, that

11:28:03  8    exhibit references a conversation that Mr. Shah is working to

11:28:10  9    purchase the lease on the computers, right?

11:28:13  10   A.  Correct.

11:28:14  11   Q.  All right.  Specifically, the server; is that right?

11:28:17  12   A.  Correct.

11:28:17  13   Q.  And it mentions that he's trying to do that in conjunction

11:28:25  14   with Associated, right?

11:28:26  15   A.  Correct.

11:28:26  16   Q.  And you understood that to be Associated Bank; is that

11:28:30  17   right?

11:28:30  18   A.  Correct.

11:28:30  19   Q.  Now, going back to the e-mail of May 13th, that e-mail

11:28:34  20   also references Associated Bank, correct?

11:28:37  21   A.  Correct.

11:28:37  22   Q.  And it also references negotiations to resolve the matter;

11:28:42  23   is that right?

11:28:45  24             THE COURT:  And we have two e-mails of May 13th.

11:28:49  25             MR. McJESSY:  But I am referring to the one that's

| | | |
|---|---|---|
| 11:28:50 | 1 | time stamped 9:38 a.m., your Honor.  That was the one I had |
| 11:28:54 | 2 | mentioned. |
| 11:28:55 | 3 | THE COURT:  Thank you. |
| 11:29:07 | 4 | THE WITNESS:  I'm sorry, you're going to have to ask |
| 11:29:10 | 5 | me the question again.  If you are asking me what's stated in |
| 11:29:12 | 6 | the May 13th e-mail, it says, Currently, First Midwest is |
| 11:29:17 | 7 | working with Associated Bank to resolve the matter. |
| 11:29:19 | 8 | BY MR. McJESSY: |
| 11:29:19 | 9 | Q.  All right.  And you understood that to be the lease also; |
| 11:29:19 | 10 | is that right? |
| 11:29:23 | 11 | A.  I don't understand the question. |
| 11:29:23 | 12 | Q.  Well, you understood that to mean the lease of the |
| 11:29:27 | 13 | computers? |
| 11:29:27 | 14 | A.  I did not. |
| 11:29:31 | 15 | Q.  You didn't just testify half an hour ago that you learned |
| 11:29:35 | 16 | on May 13th that the computers were leased? |
| 11:29:39 | 17 | MR. McGARRY:  Objection, your Honor.  That was a |
| 11:29:41 | 18 | mischaracterization. |
| 11:29:41 | 19 | THE COURT:  Sustained. |
| 11:29:44 | 20 | BY MR. McJESSY: |
| 11:29:44 | 21 | Q.  Did you understand on May 13th that the computers were |
| 11:29:47 | 22 | leased? |
| 11:29:47 | 23 | A.  There is a reference in the May 13 letter from whom we |
| 11:29:54 | 24 | have leased the computers in regards to Associated. |
| 11:29:57 | 25 | So the answer to your question, on May 13, is, yes, |

11:30:01  1   based on what is stated in that e-mail, I certainly was aware

11:30:05  2   of what the e-mail said.

11:30:06  3   Q.  All right.  So isn't it true between May 13th and

11:30:12  4   August 19th, you were aware that the efforts to gain control

11:30:16  5   of the server were the efforts by Mr. Shah to acquire

11:30:22  6   ownership of the server?

11:30:23  7   A.  What was the end date?  August what?

11:30:28  8   Q.  19th.

11:30:29  9   A.  The answer would be no.

11:30:39  10  Q.  You were not aware of that?

11:30:41  11  A.  Not until about August 6th.

11:30:43  12  Q.  Okay.  You had had communications with Mr. Joshi between

11:30:48  13  May 13th and August 6th on a regular basis; isn't that true?

11:30:54  14  A.  Sure did.

11:30:54  15  Q.  And you discussed the server; isn't that right?

11:30:59  16  A.  A handful of times, yes.

11:31:00  17  Q.  And you discussed the efforts to obtain control over the

11:31:04  18  server; is that right?

11:31:05  19  A.  I reiterated that we needed to get control of the server,

11:31:11  20  yes.

11:31:12  21  Q.  And you understand that involved negotiating with

11:31:16  22  Associated Bank and First Midwest Bank; is that right?

11:31:18  23  A.  No, I did not.

11:31:19  24  Q.  Isn't that what the e-mail of May 13th says?

11:31:22  25  A.  The e-mail references an issue between First Midwest Bank

| | | |
|---|---|---|
| 11:31:28 | 1 | and Associated Bank, paren, from whom we have leased the |
| 11:31:33 | 2 | computer, close paren.  I will update you today or tomorrow |
| 11:31:39 | 3 | after getting more details. |
| 11:31:41 | 4 | I never was updated. |
| 11:31:42 | 5 | Q.  Okay.  Did you understand that that was in conjunction |
| 11:31:45 | 6 | with Mr. Joshi's efforts to obtain control of the server? |
| 11:31:50 | 7 | A.  Did I understand that what was in conjunction with his |
| 11:31:52 | 8 | efforts to obtain control of the server? |
| 11:31:55 | 9 | Q.  Did you understand that the negotiations between First |
| 11:31:57 | 10 | Midwest Bank and Associated Bank were part of Mr. Joshi's |
| 11:32:01 | 11 | efforts to obtain control of the server? |
| 11:32:04 | 12 | A.  No, I did not. |
| 11:32:05 | 13 | THE COURT:  You have five minutes. |
| 11:32:07 | 14 | BY MR. McJESSY: |
| 11:32:12 | 15 | Q.  You knew Mr. Joshi was never able to obtain control of the |
| 11:32:16 | 16 | server; is that correct? |
| 11:32:18 | 17 | A.  It certainly is now. |
| 11:32:22 | 18 | Q.  Was that your understanding as of August 19th? |
| 11:32:25 | 19 | A.  No. |
| 11:32:25 | 20 | Q.  As of August 19th, did you believe Mr. Joshi had obtained |
| 11:32:30 | 21 | control of the server? |
| 11:32:31 | 22 | A.  No. |
| 11:32:32 | 23 | Q.  As of August 19th, what was your understanding of whether |
| 11:32:39 | 24 | Mr. Joshi had obtained control of the server? |
| 11:32:41 | 25 | A.  Well, as of August 19th, he clearly had not. |

11:32:57    1    Q. It was your understanding that as of August 19th that the

11:32:59    2    defendants did not have control over the server; is that

11:33:04    3    right?

11:33:04    4    A. Correct.

11:33:04    5    Q. Did you ever recommend to the defendants that you should

11:33:08    6    issue a subpoena for the server?

11:33:09    7    A. No.

11:33:10    8    Q. Why not?

11:33:11    9    A. Because beginning on April 14th when I sent an e-mail to

11:33:25    10    Mr. Joshi -- I'm sorry, let me back up even a little bit

11:33:30    11    further than that.

11:33:31    12         We informed our clients of their litigation hold

11:33:36    13    responsibilities in January and in March. In April, I

11:33:41    14    forwarded Ms. Dedinas' e-mail to Mr. Joshi asking if there

11:33:44    15    were any issues about third-party claims of repossession or

11:33:47    16    demand for possession or notices of default, and the response

11:33:51    17    from Mr. Joshi was, no, there was not.

11:33:54    18         We then subsequently had a conversation with Mr. Dave

11:33:57    19    Clark on April 23rd during our lengthy ESI meetings.

11:34:03    20    Mr. Clark was their friend. He was the inside guy, as far as

11:34:06    21    I understood. He had already provided us with an affidavit in

11:34:09    22    support of the defendants' motion -- the defendants' defense

11:34:18    23    against the plaintiff's motion for a TRO. Mr. Clark indicated

11:34:23    24    that there are no issues with access to the computer and that

11:34:27    25    we could get it at any time.

11:34:30  1    There were myriad other details that I was dealing

11:34:33  2  with, so over the next 12 weeks, I kept bringing it to my

11:34:39  3  clients' attention.  I was never informed that there were any

11:34:41  4  issues, specific issues, whatsoever with getting control over

11:34:43  5  the server.  As a matter of fact, there are at least 50 or 60

11:34:47  6  e-mails between Mr. Shah and Paresh Joshi was cc'd on and

11:34:55  7  Mr. Blumenthal and Mr. Serritella and Mr. Clark all involving

11:34:58  8  the purchase of this server of which we were never made aware.

11:35:01  9  And had we ever been made aware at one point or another during

11:35:05  10  this time that there were significant negotiations going on

11:35:08  11  for the purchase of the server and that they had left it at

11:35:11  12  the warehouse and that they were not going to be able to get

11:35:14  13  control of it, we may well have taken different action.

11:35:17  14    But based on what I knew at the time, the answer is

11:35:20  15  no.  In hindsight looking at it, sure, the answer is

11:35:23  16  different.  But when 50 or so or 60 e-mails are kept hidden

11:35:28  17  from us and we are not included on any of those

11:35:31  18  communications, what am I supposed to do besides keep bringing

11:35:35  19  the issue up, sir?

11:35:37  20    THE COURT:  You cannot ask him a question.

11:35:39  21  BY MR. McJESSY:

11:35:40  22  Q.  You went 16 weeks knowing that they could not gain control

11:35:43  23  of the server; is that right?

11:35:45  24  A.  I believe it was closer to 12 weeks.

11:35:47  25  Q.  Okay.  From April 23rd until August 19th, they did not

11:35:51   1   have control of the server, and you knew that; isn't that

11:35:54   2   right?

11:35:54   3   A.  Mr. Shah on August 5th indicated that he had a deal cut to

11:35:59   4   obtain possession of the server, and we relied on that

11:36:03   5   information.  We had not been included on any of the e-mails

11:36:06   6   that Mr. Shah had sent to his corporate counsel concerning

11:36:10   7   this or his communications with Mr. Clark, and you heard the

11:36:13   8   testimony of Mr. Clark yesterday.

11:36:16   9         MR. McJESSY:  Move that the testimony be stricken as

11:36:18  10   nonresponsive, your Honor.

11:36:19  11         THE COURT:  It will be stricken as nonresponsive.

11:36:21  12   BY MR. McJESSY:

11:36:22  13   Q.  Counsel, between --

11:36:24  14         THE COURT:  You have one minute.

11:36:25  15         MR. McJESSY:  Judge, I need a few more minutes beyond

11:36:29  16   that.

11:36:29  17         THE COURT:  You have one minute.

11:36:31  18   BY MR. McJESSY:

11:36:33  19   Q.  As of August 19th, you knew that they didn't have

11:36:37  20   possession and control of the server; isn't that right, sir?

11:36:39  21   A.  That's my testimony, yes.

11:36:41  22   Q.  All right.  And, in fact, you were never told that they

11:36:45  23   had possession and control of the server; isn't that right?

11:36:47  24   A.  Correct.

11:36:50  25   Q.  And you never told United Central Bank that defendants had

| | | |
|---|---|---|
| 11:36:55 | 1 | possession and control of the server; is that right? |
| 11:36:59 | 2 | A.  Correct. |
| 11:37:00 | 3 | Q.  And you knew possession and control of the server was with |
| 11:37:02 | 4 | First Midwest Bank; is that right? |
| 11:37:07 | 5 | A.  Correct. |
| 11:37:07 | 6 | Q.  When Mr. Shah advised Mr. Borlack that the server had been |
| 11:37:14 | 7 | sold by First Midwest Bank, were you advised of that? |
| 11:37:18 | 8 | A.  Yes. |
| 11:37:19 | 9 | Q.  And what, if anything, did you do or Mr. Borlack do to |
| 11:37:23 | 10 | locate the server after you were advised of that? |
| 11:37:25 | 11 | MS. DEDINAS:  Objection. |
| 11:37:26 | 12 | THE COURT:  Sustained. |
| 11:37:27 | 13 | Time is up.  Mr. McGarry? |
| 11:37:58 | 14 | (Brief pause.) |
| 11:39:13 | 15 | MR. McGARRY:  Judge, just a housekeeping matter, |
| 11:39:17 | 16 | Mr. Garrie is here and he is in your attorney room back there |
| 11:39:20 | 17 | just waiting to testify.  For me, he's only going to be on the |
| 11:39:24 | 18 | stand for a very short time, but I explained to the parties |
| 11:39:26 | 19 | and the court what his purpose was testifying. |
| 11:39:30 | 20 | But he's got a flight back to Seattle at around 6:00 |
| 11:39:34 | 21 | o'clock, in that time frame, so with getting to the airport on |
| 11:39:42 | 22 | a Friday and so forth, I would like to take him out of order. |
| 11:39:44 | 23 | THE COURT:  I don't have a problem with this.  Do you |
| 11:39:47 | 24 | have a problem? |
| 11:39:47 | 25 | MS. DEDINAS:  I haven't heard of this before, but I |

| | | |
|---|---|---|
| 11:39:50 | 1 | don't have a problem. |
| 11:39:51 | 2 | THE COURT: I don't see any problem. |
| 11:39:53 | 3 | MR. McGARRY: I would have told counsel, but we have |
| 11:39:56 | 4 | been going since 9:00 and we haven't had a chance to speak. |
| 11:39:59 | 5 | THE COURT: Go ahead. |
| 11:40:01 | 6 | - - - |
| 11:40:01 | 7 | ERIC GROSSMAN, CROSS-EXAMINATION |
| 11:40:01 | 8 | BY MR. McGARRY: |
| 11:40:07 | 9 | Q. You know, you were asked about timing, 12 or 16 weeks. |
| 11:40:11 | 10 | What was -- what was the imperative -- what was the problem -- |
| 11:40:15 | 11 | what rush were you in in terms of ESI discovery during those |
| 11:40:18 | 12 | 12 or 16 weeks? |
| 11:40:20 | 13 | A. Well, there was no specific rush. There had been no |
| 11:40:25 | 14 | specific deadlines. As I think our ESI chronology reflects, |
| 11:40:28 | 15 | we were working on a lot of issues beginning in the April -- |
| 11:40:34 | 16 | beginning in April, continuing through May, June, July, and |
| 11:40:38 | 17 | August, both on -- both with respect from the production of |
| 11:40:42 | 18 | Kanan ESI as well as with respect to the production of UCB |
| 11:40:49 | 19 | ESI. |
| 11:40:51 | 20 | Q. You were asked about why it was that you trusted your |
| 11:40:57 | 21 | clients. You did trust your clients, didn't you? |
| 11:41:02 | 22 | A. I had no reason not to. |
| 11:41:03 | 23 | Q. What was your understanding of their background and |
| 11:41:07 | 24 | sophistication as businessmen? |
| 11:41:12 | 25 | THE COURT: He went through that, I thought. |

11:41:14  1  BY MR. McGARRY:

11:41:15  2  Q.  Let me just refer you to Exhibits SH 79, please.

11:41:34  3  A.  Yes, sir.

11:41:35  4  Q.  How important was this representation by your clients to

11:41:38  5  you in terms of how you responded to Ms. Dedinas' request and

11:41:41  6  so forth?

11:41:41  7  A.  Well, it was critical.  If something -- if information --

11:41:45  8  if I had gotten accurate information, we probably wouldn't be

11:41:51  9  sitting here today.

11:41:52  10  Q.  Do you feel that your clients were truthful with you?

11:41:54  11  A.  No.

11:41:54  12  Q.  Do you feel that you were deceived?

11:41:56  13  A.  Yes.

11:41:56  14  Q.  How so?

11:41:57  15  A.  Well, certainly they kept us out of the loop.  I don't

11:42:07  16  believe -- and I believe it was designed to do that rather

11:42:12  17  than a mere omission, because there were any number of

11:42:16  18  communications, as I mentioned earlier, at least 50 or 60

11:42:20  19  e-mails that litigation counsel was not included on, yet which

11:42:26  20  concerned matters that obviously now are the very heart of

11:42:29  21  this litigation.

11:42:30  22  Q.  Such as?

11:42:31  23  A.  Well, I think it would probably begin with Mehul Shah's

11:42:41  24  negotiations with Associated Bank back in January, and then I

11:42:46  25  believe there was a February 9 letter from Associated Bank to

11:42:50   1   Mehul Shah discussing the warehouse server and that it was
11:42:54   2   going to be repossessed.  And then Mr. Shah, which we
11:42:57   3   subsequently came to learn, turned the whole matter over to
11:43:00   4   Mr. Clark to negotiate on his behalf because there was some
11:43:03   5   sort of scheme involved with Mr. Shah releasing the warehouse
11:43:08   6   eventually and needing that warehouse server there so that it
11:43:13   7   could be useful for his business going forward.  There might
11:43:16   8   have been something on that warehouse server that nobody
11:43:19   9   wanted to see the light of day.  I really don't know.
11:43:21   10         THE COURT:  Okay.  We are not going to have these
11:43:23   11   long narratives.
11:43:23   12         THE WITNESS:  I'm sorry.
11:43:25   13         MR. McGARRY:  Thank you, Judge.
11:43:27   14   BY MR. McGARRY:
11:43:27   15   Q.  Let me ask you, you were asked by Mr. McJessy many
11:43:30   16   questions that sounded very similar, did you -- for the period
11:43:36   17   May, June, July, through August, you did not tell UCB that
11:43:41   18   Kanan did not have control over the server, and you answered
11:43:44   19   those questions.  Did you tell Ms. Dedinas or UCB that your
11:43:47   20   clients were out trying to buy the server or the lease that
11:43:51   21   leased the server?
11:43:52   22   A.  No.
11:43:53   23   Q.  Why not?
11:43:56   24   A.  Because I didn't know.
11:43:57   25   Q.  And why didn't you know?

| | |
|---|---|
| 11:43:58 | 1 |
| 11:44:03 | 2 |
| 11:44:07 | 3 |
| 11:44:09 | 4 |
| 11:44:11 | 5 |
| 11:44:15 | 6 |
| 11:44:17 | 7 |
| 11:44:17 | 8 |
| 11:44:20 | 9 |
| 11:44:22 | 10 |
| 11:44:27 | 11 |
| 11:44:29 | 12 |
| 11:44:30 | 13 |
| 11:44:41 | 14 |
| 11:44:44 | 15 |
| 11:44:44 | 16 |
| 11:44:46 | 17 |
| 11:44:47 | 18 |
| 11:44:58 | 19 |
| 11:45:01 | 20 |
| 11:45:06 | 21 |
| 11:45:08 | 22 |
| 11:45:16 | 23 |
| 11:45:21 | 24 |
| 11:45:24 | 25 |

A.  Because I wasn't included -- neither I nor Mr. Borlack
were included on any of the e-mails concerning those
negotiations and those efforts.

Q.  Would that have been material information to you as a
lawyer in making disclosures to your opponent, to the court,
and instructing your clients on how to proceed?

A.  It certainly would have.

Q.  Would that have been material information that you wanted
to know if you're going to decide whether to come to the court
to get an order to stop a sale, to preserve evidence, to seek
other remedies such as a subpoena?

A.  Yes, it would have.

Q.  But, you know, just taking the other side of the coin, you
were a lawyer representing clients, correct?

A.  Correct.

Q.  And you tried to protect them, didn't you?

A.  I certainly did.

Q.  And so when maybe that 12 weeks passed, would it be fair
to say you were trying your utmost to protect your clients?

A.  Yes, and I was not -- it was -- nor was it my intention to
mislead anyone either.

Q.  And Mr. McJessy asked you about the e-mails that you sent
repeatedly requesting with a heightened sort of italics and
emphasis in the e-mails and additional information from the
period May, June, July, through August that they were to get

| | | |
|---|---|---|
| 11:45:26 | 1 | control of that server and report to you, correct? |
| 11:45:28 | 2 | A.  Yes. |
| 11:45:29 | 3 | Q.  Now, do you have your laptop here in the courtroom? |
| 11:45:33 | 4 | A.  Yes. |
| 11:45:33 | 5 | Q.  And can you tell the court those -- those e-mails had |
| 11:45:37 | 6 | changing colors, didn't they? |
| 11:45:39 | 7 | A.  They did. |
| 11:45:39 | 8 | Q.  It wasn't just black and white.  It was in red and blue, |
| 11:45:43 | 9 | right? |
| 11:45:43 | 10 | A.  Correct. |
| 11:45:43 | 11 | Q.  And those e-mails are available to anyone here who wants |
| 11:45:47 | 12 | to inspect those, aren't they? |
| 11:45:50 | 13 | A.  They are. |
| 11:45:53 | 14 | THE COURT:  And are those e-mails that he sent? |
| 11:45:56 | 15 | MR. McGARRY:  Yes, your Honor, the ones he sent -- |
| 11:46:00 | 16 | THE COURT:  I'm just curious about this. |
| 11:46:01 | 17 | MR. McGARRY:  -- in May, June, July -- |
| 11:46:02 | 18 | THE COURT:  The recipient, the person that they are |
| 11:46:09 | 19 | sent to -- mainly, Mr. Shah and Mr. Joshi -- do they get them |
| 11:46:12 | 20 | in color too? |
| 11:46:13 | 21 | MR. McGARRY:  They are transmitted in color.  If you |
| 11:46:16 | 22 | send a color e-mail, it's received in color. |
| 11:46:20 | 23 | MR. McJESSY:  I'm going to object. |
| 11:46:20 | 24 | MR. McGARRY:  Well, the court can take -- |
| 11:46:22 | 25 | MR. McJESSY:  The court can take judicial notice, but |

11:46:24  1  testimony I think by Mr. McGarry is inappropriate.

11:46:28  2  THE COURT:  No, that's a question that I asked.  I
11:46:31  3  understand your objection.

11:46:31  4  MR. McGARRY:  I will be more careful when I represent
11:46:33  5  what I know and I don't know about that, but I think the court
11:46:35  6  can take judicial notice.

11:46:36  7  THE COURT:  That's fine.

11:46:38  8  BY MR. McGARRY:

11:46:39  9  Q.  Now, I want to go back to April 23rd.  Ms. Dedinas asked
11:46:44  10 you questions.  Ms. Dedinas was there for most of the day, and
11:46:49  11 you were dealing with her in a professional manner, I take it?

11:46:52  12 A.  Yes.

11:46:52  13 Q.  Now, during the lunch break, Ms. Dedinas wasn't there.
11:46:58  14 And you were asked questions as to whether or not you
11:47:00  15 instructed your -- whether you instructed Mr. Garrie or ESI
11:47:06  16 expert, I think it was a barnful, whether you instructed them
11:47:13  17 to assist these clients, your clients, with getting the
11:47:16  18 warehouse server out.  Do you recall that?

11:47:18  19 A.  Yeah, yes, I do.  As a matter of fact, Mr. Garrie and I,
11:47:29  20 as part of our discussions with Mr. Shah and Mr. Joshi,
11:47:35  21 offered that Matt Denecke, who was there, a Dell service
11:47:41  22 repair technician, could accomplish the transfer, could go to
11:47:44  23 the warehouse.  They said, no, no, we'll take care of it,
11:47:47  24 we'll do it, which is why subsequently my communications with
11:47:52  25 Mr. Joshi were to the effect that, you are to transport,

| | | |
|---|---|---|
| 11:47:56 | 1 | meaning he would personally undertake the acts and activity |
| 11:48:02 | 2 | needed to get the warehouse server to the Oak Brook office. |
| 11:48:07 | 3 | Q.  Okay.  This face-to-face meeting took place on a Friday, |
| 11:48:10 | 4 | April 23rd? |
| 11:48:11 | 5 | A.  Correct. |
| 11:48:11 | 6 | Q.  Are we all sure of that?  Okay. |
| 11:48:13 | 7 | And so there was a weekend subsequent, and Mr. Garrie |
| 11:48:17 | 8 | had flown in from Seattle? |
| 11:48:18 | 9 | A.  I believe Seattle. |
| 11:48:20 | 10 | Q.  Where is Mr. Denecke from? |
| 11:48:23 | 11 | A.  Mr. Denecke is Antioch, Illinois, somewhere in the far |
| 11:48:31 | 12 | northern suburbs. |
| 11:48:31 | 13 | Q.  Do you recall Mr. Garrie specifically asking your clients |
| 11:48:36 | 14 | in your presence if he could come over and accomplish the |
| 11:48:40 | 15 | taking of the thing with these experts over the weekend, the |
| 11:48:43 | 16 | very weekend after this face-to-face meeting? |
| 11:48:45 | 17 | A.  I do.  I do recall that, yes. |
| 11:48:47 | 18 | Q.  And what was said to whom and about what? |
| 11:48:49 | 19 | A.  Well, as I just indicated, that Mr. Garrie said to |
| 11:48:52 | 20 | Mr. Shah and Mr. Joshi that we could do just that; we could |
| 11:48:56 | 21 | have Matt Denecke get over to the Aurora warehouse server -- |
| 11:49:01 | 22 | or get over to the Aurora warehouse to pick the server up and |
| 11:49:04 | 23 | bring it back to the Oak Brook offices.  And the offer of |
| 11:49:10 | 24 | assistance was denied either by Mr. Shah or Mr. Joshi, I don't |
| 11:49:14 | 25 | remember who, one of the two, which is why that led to my |

11:49:19   1   subsequent conversation with Mr. Joshi on Monday morning,

11:49:22   2   August 26th, that he was going to do it.

11:49:24   3           THE COURT:  Was it denied or rejected?

11:49:26   4           THE WITNESS:  Rejected I think would be a better

11:49:28   5   word.

11:49:29   6           MR. McGARRY:  I represent to the court that I will

11:49:31   7   have Mr. Garrie testify today also to those effects.

11:50:08   8           Shortening things up, your Honor.

11:50:12   9           THE COURT:  Thank you.

11:50:12  10   BY MR. McGARRY:

11:50:16  11   Q.  I just want to clarify.  When you first got involved in

11:50:20  12   the case, you were asked some questions, you got involved in

11:50:23  13   ESI in April, correct?

11:50:25  14   A.  Yes, about the first week in April, April 7th or 10th or

11:50:30  15   so.

11:50:30  16   Q.  You were helping Mr. Borlack with pleadings, correct,

11:50:33  17   early in the case?

11:50:33  18   A.  Early on in the case, pleadings and research and things of

11:50:36  19   that nature.

11:50:37  20   Q.  And do you recall helping prepare an affirmative defense?

11:50:40  21   A.  Yes.

11:50:40  22   Q.  Tell us about the affirmative defense that you were

11:50:43  23   preparing.

11:50:43  24   A.  The affirmative defense involved guaranties that would

11:50:48  25   have been released because of UCB's release of its interest in

| | | |
|---|---|---|
| 11:50:57 | 1 | the warehouse loan to First Midwest Bank. |
| 11:50:59 | 2 | Q.  Okay.  So those matters, those business matters, were |
| 11:51:04 | 3 | important to your pleadings; am I correct? |
| 11:51:07 | 4 | A.  Correct. |
| 11:51:07 | 5 | Q.  Now, it turns out -- when was your firm retained? |
| 11:51:21 | 6 | A.  I believe it was about January 17th or 18th, somewhere |
| 11:51:26 | 7 | around there. |
| 11:51:27 | 8 | Q.  And do you know from the records that Mr. Shah started to |
| 11:51:31 | 9 | negotiate to buy his computer lease sometime in January, right |
| 11:51:36 | 10 | after you were retained? |
| 11:51:37 | 11 | A.  I do know now that that occurred about January -- began, |
| 11:51:41 | 12 | at least, according to the e-mail, about January 27th or 8th. |
| 11:51:46 | 13 | Q.  And when was the first time you learned of those facts? |
| 11:51:48 | 14 | A.  Production in this litigation -- production in this |
| 11:51:52 | 15 | hearing, so not until well and long after the fact. |
| 11:51:59 | 16 | Q.  And as far as the friendly foreclosure is concerned, did |
| 11:52:13 | 17 | you know that included anything to do with computers or the |
| 11:52:17 | 18 | servers? |
| 11:52:18 | 19 | A.  At the time not specifically, no. |
| 11:52:21 | 20 | Q.  During that time that you're accused of having some delay, |
| 11:52:44 | 21 | the 12 or 16 weeks, depending on how you measure things, was |
| 11:52:47 | 22 | Mr. Shah available to you?  Well, I will put it differently. |
| 11:52:54 | 23 | Did he leave the country? |
| 11:52:55 | 24 | A.  We were informed that Mr. Shah was out of the country. |
| 11:52:59 | 25 | Q.  For what period of time? |

11:53:01　1　A.  Well, it began -- it was sometime in the end of June,

11:53:08　2　beginning of July, first few weeks of July time period.  I am

11:53:14　3　still uncertain as to when he returned.  I sent an e-mail to

11:53:18　4　Mr. Joshi about Friday, July 23rd, I think, asking about the

11:53:28　5　status because Mehul was supposed to be addressing the

11:53:31　6　warehouse issue when he returned from overseas and Paresh's

11:53:35　7　response to me on July 23rd was that he was delayed and he is

11:53:38　8　not back yet.

11:53:41　9　　　　　So he either was or wasn't back at that standpoint.

11:53:45　10　And at that point, we then on August 4th sent our letter to

11:53:51　11　Mehul.

11:53:52　12　Q.  When you told Ms. Dedinas -- she raised a very important

11:53:56　13　question about defaults, threats of repossess with you.

11:53:59　14　A.  Yes.

11:53:59　15　Q.  And you asked your clients and then you double-checked.

11:54:01　16　Why did you do that?

11:54:05　17　A.  Because I wanted to be sure of the information that I was

11:54:07　18　going to give back to Ms. Dedinas was correct.

11:54:20　19　　　　　And it was obviously important.

11:54:23　20　　　　　MR. McGARRY:  I just want to confer with my counsel

11:54:25　21　for one second.

11:54:26　22　　　　　THE COURT:  Sure.  Sure.

11:54:44　23　　　(Brief pause.)

11:54:44　24　　　　　MR. McGARRY:  I have nothing further, Judge.  Thank

11:54:46　25　you.

| | | |
|---|---|---|
| 11:54:46 | 1 | THE COURT:  Thank you.  Anything?  Redirect? |
| 11:54:49 | 2 | MS. DEDINAS:  Yes, very shortly. |
| 11:54:51 | 3 | - - - |
| 11:54:51 | 4 | ERIC GROSSMAN, REDIRECT EXAMINATION |
| 11:54:51 | 5 | BY MS. DEDINAS: |
| 11:54:53 | 6 | Q.  Mr. Grossman, you testified that you felt that your |
| 11:54:55 | 7 | clients had deceived you in a number of ways; is that correct? |
| 11:54:58 | 8 | A.  Yes. |
| 11:54:58 | 9 | Q.  And you also testified that you believed that your clients |
| 11:55:03 | 10 | wanted the server in order to start a new business; is that |
| 11:55:08 | 11 | correct? |
| 11:55:08 | 12 | A.  Yes. |
| 11:55:08 | 13 | Q.  Did your clients discuss with you their plans to start a |
| 11:55:14 | 14 | new business? |
| 11:55:15 | 15 | A.  No. |
| 11:55:17 | 16 | Q.  Did they discuss them with anybody in your firm? |
| 11:55:20 | 17 | A.  At my firm. |
| 11:55:26 | 18 | At some point, they must have because I believe it |
| 11:55:32 | 19 | was our understanding generally that Mr. Shah did intend to |
| 11:55:38 | 20 | get back into the business that he knew. |
| 11:55:39 | 21 | Q.  Did you have any reason to know that he was actively |
| 11:55:46 | 22 | working in starting or -- starting a new company that would be |
| 11:55:52 | 23 | like Kanan Fashions? |
| 11:55:53 | 24 | A.  We handled no legal matters in that respect. |
| 11:55:58 | 25 | Q.  Did you subsequently learn that he had been working with |

| | | |
|---|---|---|
| 11:56:01 | 1 | other counsel in order to start a new company that would be a |
| 11:56:05 | 2 | successor to Kanan Fashions? |
| 11:56:06 | 3 | A.  Yes. |
| 11:56:15 | 4 | Q.  And who was that counsel? |
| 11:56:18 | 5 | A.  That would have been Mr. Blumenthal. |
| 11:56:21 | 6 | Q.  And were you kept in the dark about those plans? |
| 11:56:24 | 7 | A.  Yes, because the only -- the reason I know about whatever |
| 11:56:31 | 8 | plans they were, and I don't know anything in detail, is from |
| 11:56:34 | 9 | the e-mail production that occurred as part of this hearing. |
| 11:56:37 | 10 | MS. DEDINAS:  Thank you. |
| 11:56:39 | 11 | THE COURT:  Thank you. |
| 11:56:45 | 12 | - - - |
| 11:56:45 | 13 | ERIC GROSSMAN, RECROSS-EXAMINATION |
| 11:56:45 | 14 | BY MR. McJESSY: |
| 11:56:58 | 15 | Q.  Sir, you weren't Mr. Shah's business counsel; is that |
| 11:57:01 | 16 | right? |
| 11:57:01 | 17 | A.  Correct. |
| 11:57:02 | 18 | Q.  You weren't his corporate counsel? |
| 11:57:03 | 19 | A.  Correct. |
| 11:57:03 | 20 | Q.  So whatever his business plans may have been, he wouldn't |
| 11:57:07 | 21 | necessarily have been discussing -- have reason to discuss |
| 11:57:10 | 22 | those with you; is that right? |
| 11:57:12 | 23 | A.  That's correct. |
| 11:57:12 | 24 | Q.  All right.  You understood Mr. Blumenthal was his |
| 11:57:14 | 25 | corporate counsel? |

11:57:15    1    A.  That's correct.

11:57:16    2    Q.  All right.  And you were aware that the foreclosure, the

11:57:22    3    friendly foreclosure that was negotiated, did involve as part

11:57:26    4    of that an option to re-lease the warehouse?

11:57:30    5    A.  I'm not sure at the time that I specifically understood

11:57:43    6    that.

11:57:43    7    Q.  You at some point became aware that there were discussions

11:57:50    8    that would allow Mr. Shah the option to relet the warehouse?

11:57:57    9    A.  At some point, yes.

11:57:58   10    Q.  All right.  There's nothing nefarious about Mr. Shah

11:58:11   11    wanting to start up a new business and relet the warehouse, is

11:58:15   12    there?

11:58:15   13    A.  Not that I know of.

11:58:17   14    Q.  All right.  And did you understand that the server ran the

11:58:23   15    racking system in the warehouse?

11:58:24   16    A.  I subsequently --

11:58:30   17            MR. McGARRY:  Your Honor, this is well beyond my

11:58:33   18    cross.

11:58:33   19            THE COURT:  It is.

11:58:35   20            MR. McGARRY:  It's beyond Ms. Dedinas' redirect.

11:58:38   21            THE COURT:  Sustained.

11:58:41   22            MR. McJESSY:  Well, the questions that were asked

11:58:44   23    were, did you know -- did you believe the clients needed the

11:58:46   24    server to start a new business.  I'm picking up directly on

11:58:49   25    that, your Honor.  They exactly asked those questions

| | | |
|---|---|---|
| 11:58:50 | 1 | THE COURT: Who is "they"? |
| 11:58:52 | 2 | MR. McJESSY: Counsel, counsel for Bailey Borlack and |
| 11:58:55 | 3 | I don't remember Ms. Dedinas -- oh, Ms. Dedinas asked the |
| 11:58:57 | 4 | question. She asked the question do you believe that the |
| 11:59:02 | 5 | clients wanted -- |
| 11:59:03 | 6 | THE COURT: Go ahead and ask your question. |
| 11:59:05 | 7 | MR. McJESSY: All right. |
| 11:59:07 | 8 | THE COURT: You are overruled. |
| 11:59:14 | 9 | THE WITNESS: I subsequently learned of that |
| 11:59:17 | 10 | functionality; but at the time, no. |
| 11:59:22 | 11 | BY MR. McJESSY: |
| 11:59:22 | 12 | Q. At the time, you didn't know that? |
| 11:59:23 | 13 | A. No. |
| 11:59:23 | 14 | Q. Okay. Were you aware that the warehouse was custom |
| 11:59:26 | 15 | designed to work with this racking system for the kind of |
| 11:59:29 | 16 | business that Mr. Shah operated there? |
| 11:59:31 | 17 | MS. DEDINAS: Objection. |
| 11:59:32 | 18 | THE WITNESS: No. |
| 11:59:34 | 19 | MS. DEDINAS: That goes beyond the scope. |
| 11:59:36 | 20 | THE COURT: It does. Sustained. |
| 11:59:43 | 21 | BY MR. McJESSY: |
| 11:59:44 | 22 | Q. You mentioned -- you testified in response to questions by |
| 11:59:48 | 23 | your counsel that the guaranties were released as part of the |
| 11:59:52 | 24 | friendly foreclosure process. Do you recall those questions? |
| 11:59:55 | 25 | A. Yes. |

11:59:55　1　Q.  You were involved -- were you involved at all in the

11:59:59　2　friendly foreclosure process?

12:00:01　3　A.  No.

12:00:01　4　Q.  Are you aware of whether it's unusual for personal

12:00:05　5　guarantees to be released as part of a friendly foreclosure

12:00:08　6　process?

12:00:09　7　　　　　MS. DEDINAS:  Objection.

12:00:10　8　　　　　THE COURT:  Sustained.

12:00:12　9　BY MR. McJESSY:

12:00:18　10　Q.  Was -- you mentioned there was a representative from Dell

12:00:22　11　computer that came to the Oak Brook office on April 23rd; is

12:00:27　12　that right?

12:00:27　13　A.  To be precise, a Dell-authorized repair technician.  Did

12:00:34　14　not work for Dell.

12:00:35　15　Q.  All right.  Do you know whether the server that was in the

12:00:38　16　warehouse was a Dell computer?

12:00:41　17　A.  At the time, no.

12:00:45　18　Q.  Do you know now as you sit here --

12:00:48　19　A.  Yes.

12:00:48　20　Q.  -- whether it was a Dell computer?

12:00:50　21　A.  Yes.

12:00:50　22　Q.  Was it?

12:00:50　23　A.  No.

12:00:51　24　Q.  What was it?

12:00:52　25　A.  It was a highly-technical description, and I'd have to

| | |
|---|---|
| 12:00:59 | 1 |
| 12:01:04 | 2 |
| 12:01:11 | 3 |
| 12:01:14 | 4 |
| 12:01:18 | 5 |
| 12:01:23 | 6 |
| 12:01:23 | 7 |
| 12:01:26 | 8 |
| 12:01:28 | 9 |
| 12:01:28 | 10 |
| 12:01:30 | 11 |
| 12:01:32 | 12 |
| 12:01:34 | 13 |
| 12:01:34 | 14 |
| 12:01:36 | 15 |
| 12:01:37 | 16 |
| 12:01:37 | 17 |
| 12:01:37 | 18 |
| 12:01:39 | 19 |
| 12:01:42 | 20 |
| 12:01:48 | 21 |
| 12:01:48 | 22 |
| 12:01:52 | 23 |
| 12:01:55 | 24 |
| 12:01:56 | 25 |

1 look at the entry in the lease equipment document to be able
2 to tell you what brand and what make it was, and I can't -- I
3 just can't recall that off the top of my head right now.  I
4 know it's a five-blade server, meaning a large machine.
5 Q.  If I told you it was a Hewlitt Packard machine, would that
6 refresh your recollection?
7         THE COURT:  He just said he didn't know.
8         THE WITNESS:  It might be HP.
9 BY MR. McJESSY:
10 Q.  But you know it wasn't a Dell computer?
11 A.  It certainly wasn't a Dell computer.
12         MR. McJESSY:  Thank you.  No other questions, your
13 Honor.
14         THE COURT:  Mr. McGarry.
15         MR. McGARRY:  May I ask one follow-up.
16                        - - -
17            ERIC GROSSMAN, RECROSS-EXAMINATION
18 BY MR. McGARRY:
19 Q.  Was Mr. Denecke qualified with respect to this server in
20 question, if you happen to know?  Was he a qualified
21 repairman?
22         MS. DEDINAS:  Objection.  What is "this server"?
23         MR. McGARRY:  Well, if it was a Hewlitt Packard,
24 assume that it was.
25         THE COURT:  You mean the server in the warehouse?

| | | |
|---|---|---|
| 12:01:57 | 1 | MR. McGARRY:  In the warehouse. |
| 12:01:57 | 2 | MS. DEDINAS:  I don't know that that's what he's |
| 12:01:59 | 3 | talking about. |
| 12:02:00 | 4 | MR. McGARRY:  Yes. |
| 12:02:00 | 5 | MS. DEDINAS:  Are you talking about the server in the |
| 12:02:02 | 6 | warehouse? |
| 12:02:03 | 7 | MR. McGARRY:  Yes. |
| 12:02:03 | 8 | MS. DEDINAS:  Because I understood the questions |
| 12:02:05 | 9 | about whether it was a Dell or not was about the server at the |
| 12:02:09 | 10 | Oak Brook offices. |
| 12:02:12 | 11 | MR. McGARRY:  No. |
| 12:02:12 | 12 | THE COURT:  No, I didn't think so.  I thought it was |
| 12:02:14 | 13 | about the warehouse. |
| 12:02:15 | 14 | MS. DEDINAS:  I apologize. |
| 12:02:16 | 15 | THE COURT:  Accepted. |
| 12:02:18 | 16 | BY MR. McGARRY: |
| 12:02:19 | 17 | Q.  Were Mr. Denecke's qualifications as a computer expert |
| 12:02:26 | 18 | disclosed either in the court or to your clients? |
| 12:02:30 | 19 | A.  His specific qualifications, no. |
| 12:02:31 | 20 | Q.  Okay.  Did you determine that he was qualified? |
| 12:02:36 | 21 | MR. McJESSY:  Objection.  Foundation. |
| 12:02:39 | 22 | MR. McGARRY:  Well, Judge, the inference is made -- |
| 12:02:42 | 23 | THE COURT:  He can answer.  He can answer. |
| 12:02:43 | 24 | THE WITNESS:  Mr. Denecke was brought in by |
| 12:02:46 | 25 | Mr. Garrie, who I believe -- |

| | | |
|---|---|---|
| 12:02:50 | 1 | THE COURT: That's a question you can ask of |
| 12:02:51 | 2 | Mr. Garrie. |
| 12:02:53 | 3 | MR. McGARRY: Yes. Thank you. |
| 12:02:53 | 4 | I have nothing further. |
| 12:02:55 | 5 | THE COURT: I have a couple of questions that I'd |
| 12:02:58 | 6 | like to ask you. I want you to refer to Exhibit 182, please. |
| 12:03:13 | 7 | Tell me when you are there, please. |
| 12:03:14 | 8 | THE WITNESS: Yes. |
| 12:03:15 | 9 | THE COURT: That's an August 20th, 2010, letter to |
| 12:03:18 | 10 | Ms. Dedinas and I believe it's from you; is that correct? |
| 12:03:22 | 11 | THE WITNESS: That's correct. |
| 12:03:23 | 12 | THE COURT: All right. And I'd like you to turn to |
| 12:03:28 | 13 | page 3, and I'd like to direct your attention to the letters, |
| 12:03:38 | 14 | here's the second group here, you can see where I'm talking |
| 12:03:43 | 15 | about right there. What I am talking about is the KGAUFS 01. |
| 12:03:52 | 16 | THE WITNESS: Right. |
| 12:03:52 | 17 | THE COURT: Where did you get that information from? |
| 12:04:05 | 18 | Is that the warehouse server? |
| 12:04:06 | 19 | THE WITNESS: That is my understanding -- it's my |
| 12:04:09 | 20 | understanding that, yes, that does identify the warehouse |
| 12:04:12 | 21 | server. |
| 12:04:13 | 22 | THE COURT: Where did you get that information from? |
| 12:04:15 | 23 | THE WITNESS: I would have gotten this from -- I |
| 12:04:29 | 24 | would have received this information from Mr. Smalley, I |
| 12:04:34 | 25 | believe. |

12:04:36　1　　　　　THE COURT:  You believe but you are not sure.

12:04:38　2　　　　　If you know, where would he have gotten the

12:04:41　3　information from?

12:04:41　4　　　　　THE WITNESS:  Well, he would have gotten the

12:04:43　5　information from reviewing the ESI resources at Kanan's Oak

12:04:50　6　Brook offices.

12:04:51　7　　　　　THE COURT:  As opposed to actually seeing the machine

12:04:53　8　itself and taking the number off of it?

12:04:56　9　　　　　THE WITNESS:  Correct, but it would have been

12:04:58　10　identified -- yes.  It would not have taken the number off

12:05:01　11　that machine directly.

12:05:03　12　　　　　THE COURT:  Okay.  But it's your belief that he got

12:05:05　13　the information from Mr. Smalley?

12:05:09　14　　　　　THE WITNESS:  I obtained the information --

12:05:12　15　　　　　THE COURT:  That you got the information from

12:05:13　16　Mr. Smalley.

12:05:14　17　　　　　THE WITNESS:  -- from Mr. Smalley.

12:05:16　18　　　　　THE COURT:  And tell me one more time, please, where

12:05:18　19　he got the information.

12:05:19　20　　　　　THE WITNESS:  He would have obtained the information

12:05:21　21　as part of his on-site activities at -- his on-site ESI

12:05:28　22　activities at Kanan's Oak Brook offices.

12:05:31　23　　　　　THE COURT:  And would that have been on April 23rd?

12:05:33　24　　　　　THE WITNESS:  No, because Mr. Smalley wasn't retained

12:05:39　25　until about July 2nd or 3rd.

| | | |
|---|---|---|
| 12:05:46 | 1 | THE COURT:  Okay.  Now, I'd like to direct your |
| 12:05:50 | 2 | attention to Exhibit 85, please.  This is one that's been |
| 12:06:07 | 3 | referred to numerous times.  It's an e-mail from you to Mr. |
| 12:06:12 | 4 | Joshi on April 26th.  And you're writing this to him, I take |
| 12:06:19 | 5 | it; is that correct? |
| 12:06:20 | 6 | THE WITNESS:  Correct. |
| 12:06:20 | 7 | THE COURT:  All right.  And this is just information |
| 12:06:24 | 8 | that I have been curious about, and I don't know the answer, |
| 12:06:27 | 9 | so that's why I'm asking you. |
| 12:06:35 | 10 | You told him in paragraph 2, number 2 down there, you |
| 12:06:38 | 11 | are to place a stick pad numbered one, et cetera, and then |
| 12:06:42 | 12 | take a photograph of each computer component. |
| 12:06:47 | 13 | Does that include the computer components at the |
| 12:06:50 | 14 | warehouse? |
| 12:06:51 | 15 | THE WITNESS:  It was intended to. |
| 12:06:56 | 16 | THE COURT:  Okay.  That's good.  That's all I want |
| 12:07:00 | 17 | from you on that.  Did you ever get photographs? |
| 12:07:03 | 18 | THE WITNESS:  I did. |
| 12:07:04 | 19 | THE COURT:  From the warehouse? |
| 12:07:06 | 20 | THE WITNESS:  No. |
| 12:07:09 | 21 | THE COURT:  What were the photographs from? |
| 12:07:10 | 22 | THE WITNESS:  The computers at the Oak Brook office. |
| 12:07:14 | 23 | THE COURT:  So you never got any photographs from the |
| 12:07:18 | 24 | Creative Warehouse in Aurora? |
| 12:07:21 | 25 | THE WITNESS:  No, I did not. |

| | | |
|---|---|---|
| 12:07:23 | 1 | THE COURT:  I have one more question, I think, to ask |
| 12:07:25 | 2 | you.  It doesn't require you to look at the exhibits at all. |
| 12:07:31 | 3 | During this time when you were badgering or you were |
| 12:07:39 | 4 | after the defendants to get access or control of this server, |
| 12:07:46 | 5 | you know, the time frame that we have been talking about here |
| 12:07:51 | 6 | today, did you ever call Mr. Clark yourself? |
| 12:07:54 | 7 | THE WITNESS:  No. |
| 12:07:56 | 8 | THE COURT:  Why not? |
| 12:07:57 | 9 | THE WITNESS:  Because at the time, I didn't see that |
| 12:08:08 | 10 | there was any need to do it given the assurances from my |
| 12:08:11 | 11 | client that they were working on it. |
| 12:08:12 | 12 | THE COURT:  Even though you were constantly sending |
| 12:08:15 | 13 | them e-mails and really getting put off by them all this time? |
| 12:08:19 | 14 | THE WITNESS:  In hindsight, yes, your Honor. |
| 12:08:23 | 15 | THE COURT:  Okay. |
| 12:08:23 | 16 | THE WITNESS:  But at the time, it didn't appear |
| 12:08:26 | 17 | necessary to me. |
| 12:08:27 | 18 | THE COURT:  Okay. |
| 12:08:28 | 19 | THE WITNESS:  Because I didn't believe that what |
| 12:08:31 | 20 | actually happened could ever have happened. |
| 12:08:35 | 21 | THE COURT:  Thank you very much.  You can step down. |
| 12:08:38 | 22 | MR. McJESSY:  Judge, can I ask a follow-up question |
| 12:08:40 | 23 | to yours? |
| 12:08:41 | 24 | THE COURT:  Sure. |
| 12:08:42 | 25 | MR. McJESSY:  And really just one. |

|            |    |                                                              |
|------------|----|--------------------------------------------------------------|
| 12:08:44   | 1  | - - -                                                        |
| 12:08:44   | 2  | ERIC GROSSMAN, RECROSS-EXAMINATION                           |
| 12:08:44   | 3  | BY MR. McJESSY:                                              |
| 12:08:45   | 4  | Q.  Regarding the e-mail SH 85, the Court asked you whether -- |
| 12:08:53   | 5  | I guess I have two questions -- about the photographs of the |
| 12:08:55   | 6  | computer equipment.                                          |
| 12:08:56   | 7  | One, do you know whether the defendants were ever            |
| 12:08:58   | 8  | able to gain access to First Midwest Bank's warehouse after  |
| 12:09:04   | 9  | April 26th of 2010?                                          |
| 12:09:06   | 10 | A.  At one point, I am pretty sure there's some reference to |
| 12:09:19   | 11 | Mr. Shah picking up some personal items and boxes from the   |
| 12:09:22   | 12 | warehouse.                                                   |
| 12:09:23   | 13 | Q.  Okay.  If I represented -- I don't want to go back to the |
| 12:09:26   | 14 | e-mails, but if I represented to you that that was in March, |
| 12:09:28   | 15 | does that sound like it could be right?                      |
| 12:09:30   | 16 | A.  I don't know.                                            |
| 12:09:33   | 17 | Q.  You don't remember?                                      |
| 12:09:34   | 18 | A.  It could.  I just don't remember.                        |
| 12:09:36   | 19 | Q.  So it's fair to say you don't remember whether they were |
| 12:09:39   | 20 | able to gain access to the warehouse after April 26th?       |
| 12:09:42   | 21 | A.  Yes.                                                     |
| 12:09:42   | 22 | Q.  Okay.  And the second thing, did you get the photographs |
| 12:09:47   | 23 | of the -- did you get photographs of the computer equipment? |
| 12:09:50   | 24 | A.  Yes.                                                     |
| 12:09:50   | 25 | Q.  And was the server one of those photographs?             |

12:09:53   1   A.  Not that I know of, no.

12:09:54   2   Q.  Do you remember when you got the photographs?

12:10:09   3         THE COURT:  There is an e-mail to that too, at least

12:10:11   4   an e-mail to that saying that he had taken it.

12:10:11   5   BY MR. McJESSY:

12:10:15   6   Q.  Do you remember when you received the photographs?

12:10:16   7   A.  It would have been sometime in May, I believe.  I don't

12:10:18   8   remember the exact date, whether it was early part of May or

12:10:22   9   the later part of May.  I could check right now to see.

12:10:26   10  Q.  Last question.  Did you follow up to ask about where the

12:10:30   11  photographs of the server were if they weren't in there?

12:10:33   12  A.  No.

12:10:33   13        MR. McGARRY:  Objection, your Honor.  There is no

12:10:35   14  foundation that they took a picture of the server.

12:10:37   15        THE COURT:  Well, he asked that question, and I

12:10:42   16  didn't, and he said he wasn't sure.

12:10:44   17        MR. McGARRY:  May I follow up on that one?

12:10:46   18        THE COURT:  Sure.

12:10:47   19                        - - -

12:10:47   20        ERIC GROSSMAN, RECROSS-EXAMINATION

12:10:47   21  BY MR. McGARRY:

12:10:48   22  Q.  Did your clients tell you they were going to take pictures

12:10:51   23  of the server?

12:10:51   24  A.  It was my understanding that Mr. Joshi took pictures of

12:10:54   25  everything that was on site at the Oak Brook office.

12:10:56  1   Q.  How about the warehouse?

12:10:58  2   A.  No.

12:10:58  3   Q.  And the pictures that you have that may be in your file,

12:11:01  4   there's no pictures of the warehouse server?

12:11:03  5   A.  To my knowledge, no.

12:11:05  6        MR. McGARRY:  Thank you, your Honor.

12:11:06  7        THE COURT:  That's it.  You're done.  Thanks.

          8     (The hearing was adjourned at 12:10 p.m. until 12:40 p.m. of

          9   this same day and date.)

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4   UNITED CENTRAL BANK,                )   Docket No. 10 C 331
                                         )
 5                       Plaintiff,      )
                                         )
 6            vs.                        )
                                         )
 7   KANAN FASHIONS, INC., et al.,       )   Chicago, Illinois
                                         )   January 28, 2011
 8                       Defendants.     )   12:40 o'clock p.m.

 9
                  TRIAL TRANSCRIPT OF PROCEEDINGS
10             BEFORE THE HONORABLE MICHAEL T. MASON
                          VOLUME 2-B
11

12   APPEARANCES:

13
     For the Plaintiff:      BOODELL & DOMANSKIS LLC
14                           BY:  MS. VILIA M. DEDINAS
                                  MS. NADA DJORDJEVIC
15                                MR. DAVID WEST
                                  MS. AMY RYLKO
16                           205 North Michigan Avenue, Suite 4307
                             Chicago, IL  60601
17                           (312) 938-4070

18

19   For the Defendants:     McJESSY, CHING & THOMPSON
                             BY:  MR. KEVIN McJESSY
20                           3759 North Ravenswood, Suite 231
                             Chicago, IL  60613
21                           (773) 880-1260

22

23
     Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                           Official Court Reporter
                             219 S. Dearborn Street, Suite 1854-B
25                           Chicago, Illinois  60604
                             (312) 435-5639
```

1    APPEARANCES CONTINUED:

2
     For Respondents
3    Alan Borlack and
     Eric Grossman:            HINSHAW & CULBERTSON LLP
4                              BY:   MR. THOMAS P. McGARRY
                                     MR. ALAN R. LIPTON
5                              222 North LaSalle Street, Suite 300
                               Chicago, IL  60601
6                              (312) 704-3000

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:46:41 | 1 | (The following proceedings were had in open court:) |
| 12:50:53 | 2 | THE COURT:  Call your next witness, if you would, |
| 12:50:55 | 3 | please. |
| 12:50:56 | 4 | MS. DEDINAS:  Mr. Borlack. |
| 12:50:57 | 5 | THE COURT:  And I would ask counsel that we try to |
| 12:51:00 | 6 | refrain from going over the same area every time because I |
| 12:51:07 | 7 | think that really slows us down here. |
| 12:51:19 | 8 | (Witness sworn.) |
| 12:51:19 | 9 | - - - |
| 12:51:19 | 10 | ALAN BORLACK, DIRECT EXAMINATION |
| 12:51:19 | 11 | BY MS. DEDINAS: |
| 12:51:21 | 12 | Q.  State your name, please. |
| 12:51:22 | 13 | A.  Alan Borlack. |
| 12:51:23 | 14 | Q.  Mr. Borlack, you have been involved in this case since its |
| 12:51:41 | 15 | inception; is that correct? |
| 12:51:41 | 16 | A.  Yes.  Yes, Counsel. |
| 12:51:43 | 17 | Q.  And you're lead counsel in the case? |
| 12:51:44 | 18 | A.  I am. |
| 12:51:45 | 19 | Q.  For the defendants? |
| 12:51:46 | 20 | A.  For the defendants.  I was. |
| 12:51:47 | 21 | Q.  Correct. |
| 12:51:49 | 22 | And who were the other attorneys that were working |
| 12:51:52 | 23 | with you on this case? |
| 12:51:53 | 24 | A.  Dave Muschler was with me and Eric Grossman, although |
| 12:51:58 | 25 | Dave's role was reduced later on to virtually nothing.  After |

| | | |
|---|---|---|
| 12:52:06 | 1 | he went on vacation, it was really Eric and me.  And then, |
| 12:52:12 | 2 | because there was so much going on, I brought in with |
| 12:52:20 | 3 | defendants' consent another firm to help us, and that was Jim |
| 12:52:25 | 4 | Flesch's firm, and they were separately paid and made their |
| 12:52:29 | 5 | own separate arrangements with defendants. |
| 12:52:32 | 6 | Q.  And did you delegate to -- did you supervise their work? |
| 12:52:36 | 7 | A.  I -- |
| 12:52:37 | 8 | Q.  Or coordinate their work? |
| 12:52:38 | 9 | A.  I coordinated their work. |
| 12:52:40 | 10 | Q.  Was there a particular area that they were responsible |
| 12:52:42 | 11 | for? |
| 12:52:42 | 12 | A.  Yes. |
| 12:52:44 | 13 | Q.  What was that? |
| 12:52:45 | 14 | A.  For one, they were responsible for the hard copy |
| 12:52:52 | 15 | production.  They were not responsible for ESI. |
| 12:52:56 | 16 | Q.  Now, you were in charge of instructing your clients of |
| 12:53:03 | 17 | their duty to preserve relevant evidence? |
| 12:53:05 | 18 | A.  Yes, Counsel. |
| 12:53:05 | 19 | Q.  Okay.  So, now, would it be fair to say that preservation |
| 12:53:09 | 20 | means to take reasonable steps to prevent the partial or full |
| 12:53:13 | 21 | destruction, alteration, testing, deletion, shredding, |
| 12:53:19 | 22 | incineration, wiping, delocation, migration, theft, or |
| 12:53:24 | 23 | mutation of such material? |
| 12:53:25 | 24 | A.  Well, I would think so.  I mean, it means keep it intact. |
| 12:53:29 | 25 | Q.  Okay.  And would that also include instructing your client |

12:53:33  1  to prevent the negligent or intentional handling that would

12:53:37  2  make material incomplete or inaccessible?

12:53:39  3  A.  I guess so.  I mean, I never thought that somebody would

12:53:49  4  drop a computer.  It never came to my mind.  But I assume that

12:53:55  5  you can be under the definition.

12:53:56  6  Q.  Okay.  And what about -- would it also include

12:54:00  7  sequestering and keeping in a secure custody any computers

12:54:04  8  that would contain relevant data?

12:54:06  9  A.  Yes, I would think so.

12:54:08  10  Q.  Okay.  And you advised your clients of generally their

12:54:12  11  duties to preserve?

12:54:12  12  A.  Yes, we did, on several occasions.

12:54:14  13  Q.  Okay.

12:54:15  14       MS. DEDINAS:  Your Honor, if it might be helpful, at

12:54:18  15  this point, we have a time line for a demonstrative exhibit

12:54:21  16  that we might want to put up.

12:54:23  17       THE COURT:  Fine.

12:54:23  18       MS. DEDINAS:  Just to make sure that we've got

12:54:25  19  everything.

12:54:29  20       THE COURT:  Have you shown it to opposing counsel?

12:54:31  21       MS. DEDINAS:  Yes.

12:54:31  22       MR. McGARRY:  Yes, and I don't like it.

12:54:35  23       MR. McJESSY:  Judge, I haven't seen it.

12:54:36  24       MR. McGARRY:  Because if it's the one I saw, it's a

12:54:38  25  preprinted board that just highlights certain things that --

422

| | | |
|---|---|---|
| 12:54:41 | 1 | THE COURT: We don't have a jury. |
| 12:54:43 | 2 | MR. McGARRY: I know, and the parties went through so |
| 12:54:46 | 3 | much effort to provide time lines. |
| 12:54:48 | 4 | THE COURT: Put it up. Maybe it will be helpful. |
| 12:54:50 | 5 | MS. DEDINAS: It's just a visual. |
| 12:54:52 | 6 | THE COURT: Can you see that? |
| 12:54:53 | 7 | THE WITNESS: No, I really can't. |
| 12:54:54 | 8 | THE COURT: You can get down off the -- if you need |
| 12:54:58 | 9 | him to point anything out, he can get down from the -- |
| 12:55:00 | 10 | MS. DEDINAS: Well, I will try to read it to you. |
| 12:55:03 | 11 | MR. LIPTON: We can't see the time line. |
| 12:55:06 | 12 | MR. McJESSY: Do you have a smaller copy? It was not |
| 12:55:09 | 13 | shown to me previous to this, Judge. They showed it to |
| 12:55:13 | 14 | respondents' counsel. I don't know why we weren't shown -- |
| 12:55:14 | 15 | MR. McGARRY: I asked to see it because I saw it |
| 12:55:16 | 16 | going down the hallway. |
| 12:55:17 | 17 | MS. DEDINAS: Sorry. It's an oversight. |
| 12:55:20 | 18 | MR. McJESSY: An accident. |
| 12:55:21 | 19 | MR. LIPTON: Why don't we just hold it until he needs |
| 12:55:25 | 20 | a time line? He may not need a time line. |
| 12:55:25 | 21 | THE COURT: She feels that she needs it right now, I |
| 12:55:29 | 22 | think. Counsel? |
| 12:55:31 | 23 | MR. McJESSY: I'm looking at it, your Honor. |
| 12:55:36 | 24 | THE COURT: Mr. McGarry, are you going to be doing |
| 12:55:38 | 25 | the cross on this one? |

| | | |
|---|---|---|
| 12:55:39 | 1 | MR. McGARRY:  Yes. |
| 12:55:40 | 2 | THE COURT:  Do you want to come over -- you have seen |
| 12:55:43 | 3 | it, I know that. |
| 12:55:43 | 4 | MR. McGARRY:  I saw it, and it just highlights |
| 12:55:45 | 5 | certain events, and it's not full representations.  So in my |
| 12:55:49 | 6 | opinion, it's argument.  And it isn't a jury trial, and I |
| 12:55:52 | 7 | don't think the court needs to have such a simplified time |
| 12:55:55 | 8 | line when there is a lot of issues that were omitted from |
| 12:56:00 | 9 | there. |
| 12:56:00 | 10 | MS. DEDINAS:  I think that's precisely the problem is |
| 12:56:02 | 11 | that there are so many facts that this really just narrows it |
| 12:56:05 | 12 | down to the key events in the case. |
| 12:56:09 | 13 | MR. McGARRY:  Judge, it is their argument on why all |
| 12:56:14 | 14 | the parties here should be sanctioned, rolled into an exhibit. |
| 12:56:18 | 15 | That's all. |
| 12:56:19 | 16 | THE COURT:  You're going to have a chance to question |
| 12:56:23 | 17 | your client about this, and anything about this, as far as I'm |
| 12:56:29 | 18 | concerned.  Let's see where it goes. |
| 12:56:31 | 19 | BY MS. DEDINAS: |
| 12:56:31 | 20 | Q.  I will ask you to identify and I will read for you if you |
| 12:56:33 | 21 | can't see. |
| 12:56:34 | 22 | THE COURT:  He can step down.  Whatever is |
| 12:56:42 | 23 | comfortable. |
| 12:56:43 | 24 | THE WITNESS:  I really can't read it from here. |
| 12:56:44 | 25 | THE COURT:  Do you want to step down? |

| | | |
|---|---|---|
| 12:56:47 | 1 | THE WITNESS: Yes, your Honor. |
| 12:56:47 | 2 | THE COURT: Sure. Go ahead. Just speak up, if you |
| 12:56:49 | 3 | would. Just don't get in my way. |
| 12:56:49 | 4 | MS. DEDINAS: I thought this would be a good way to |
| 12:56:51 | 5 | summarize. |
| 12:56:53 | 6 | BY MS. DEDINAS: |
| 12:56:54 | 7 | Q. So we have a time line here that runs from January 18th |
| 12:56:59 | 8 | through August 24th of 2010. And the first event that we have |
| 12:57:04 | 9 | here is January 18th, the complaint is filed. Do you recall |
| 12:57:08 | 10 | that? |
| 12:57:08 | 11 | A. Yes, I do. That was on Martin Luther King holiday, I |
| 12:57:13 | 12 | believe. |
| 12:57:13 | 13 | Q. Okay. |
| 12:57:14 | 14 | A. And so it was electronically filed but it was not |
| 12:57:17 | 15 | physically filed. |
| 12:57:18 | 16 | Q. And then the day that you contend that you sent your |
| 12:57:23 | 17 | preservation e-mail to the defendants is soon thereafter, on |
| 12:57:27 | 18 | January 21st? |
| 12:57:28 | 19 | A. The first -- the first one, yes, ma'am. |
| 12:57:30 | 20 | Q. Okay. And then the first time we file a joint agreement |
| 12:57:35 | 21 | on electronic discovery is February 19th with the court? |
| 12:57:39 | 22 | A. Well, actually, there was a February 18 filing, if you |
| 12:57:42 | 23 | recall, and it was amended because there was something |
| 12:57:45 | 24 | inadvertently left out. |
| 12:57:46 | 25 | Q. You're correct. Okay. |

| | | |
|---|---|---|
| 12:57:49 | 1 | And then I was going to ask you again that there was |
| 12:57:53 | 2 | another preservation e-mail to the defendants on March 3rd. |
| 12:57:56 | 3 | Do you recall that? |
| 12:57:57 | 4 | A. Yes, I do, Counsel. |
| 12:57:58 | 5 | Q. Okay. And then we have a March 15th friendly foreclosure |
| 12:58:06 | 6 | of the Creative Warehousing. Do you recall that? |
| 12:58:11 | 7 | A. I did not know the March 15 date. |
| 12:58:13 | 8 | Q. You didn't? |
| 12:58:13 | 9 | A. I didn't know that. |
| 12:58:14 | 10 | Q. But, to your knowledge, that's -- |
| 12:58:16 | 11 | A. I mean, that makes sense, yeah. I had seen a later e-mail |
| 12:58:19 | 12 | in discovery which confirms the March 15 date. |
| 12:58:21 | 13 | Q. And we will talk about it later, but you're aware that |
| 12:58:24 | 14 | there is a March 16th letter, e-mail, from Mr. Blumenthal |
| 12:58:28 | 15 | regarding preservation -- |
| 12:58:29 | 16 | A. Only after I was discharged as counsel did I become so |
| 12:58:32 | 17 | aware. |
| 12:58:33 | 18 | Q. Okay. And then there is a March 24th agreed order of |
| 12:58:38 | 19 | eviction, which you have seen? |
| 12:58:39 | 20 | A. Yes. I didn't see the agreed order, but I saw in the |
| 12:58:42 | 21 | letter of Serritella dated March 24 where he says this has |
| 12:58:47 | 22 | happened. |
| 12:58:47 | 23 | Q. Okay. So that's all we're going to cover for now. Let me |
| 12:58:51 | 24 | go back to some questions. Thank you. |
| 12:58:56 | 25 | Now, when you issued your January 21st e-mail of |

12:59:08  1  preservation to the defendants, you had copied Mr. Blumenthal

12:59:13  2  on that, didn't you?

12:59:14  3  A.  Yes, I did.

12:59:15  4  Q.  And why did you do that?

12:59:16  5  A.  Mr. Blumenthal I had not yet met or talked to, but when I

12:59:21  6  came into the case shortly before that, which I think was on

12:59:24  7  the 18th or the 19th that Schreiber called me and said we want

12:59:31  8  you to work on this, somewhere in that time, I was told that

12:59:35  9  Steve Blumenthal was an important lawyer for Mr. Shah.

12:59:41  10       Now, he was not at the TRO on January 20th I was told

12:59:45  11  because he was out of town.  And so that's why I included him

12:59:50  12  because -- I believe I also included Scott Schreiber, who was

12:59:54  13  also at the TRO hearing on January 20 and represented the

12:59:59  14  defendants.

12:59:59  15       So I'm getting everybody that I know of, you know, in

01:00:04  16  the loop.

01:00:04  17  Q.  So it was Mr. Schreiber that got you involved in this

01:00:07  18  litigation?

01:00:08  19  A.  Yes.  Scott Schreiber called me up and asked me if I would

01:00:12  20  represent his clients.

01:00:13  21  Q.  And you copied Mr. Blumenthal because you understood that

01:00:15  22  he was their -- Kanan's general corporate counsel?

01:00:18  23  A.  Well, I don't know if I knew corporate counsel.  I knew he

01:00:22  24  was an important lawyer.  And I also, by the way, by that time

01:00:27  25  had read the important correspondence, and I saw he was

01:00:30　　1　involved, along with Schreiber, in dealing with United Central

01:00:35　　2　Bank after the alleged default in early August.  So I know

01:00:39　　3　this is a guy who is clearly involved with these issues.

01:00:43　　4　Q.  So, in fact, you copied him on lots of e-mails that you

01:00:48　　5　sent to the defendant?

01:00:49　　6　A.  I believe I did, yes.

01:00:50　　7　Q.  And you kept him generally apprised of the goings on in

01:00:55　　8　the litigation?

01:00:56　　9　A.  I -- generally, yes, generally.

01:00:59　　10　Q.  In fact, you provided him with some key pleadings as they

01:01:02　　11　were filed; isn't that right?

01:01:03　　12　A.  I'm sure I did.  I'm sure I did.

01:01:05　　13　Q.  And, in fact, he attended some of the meetings that were

01:01:07　　14　related to this litigation?

01:01:08　　15　A.  The first meeting I ever had with Steve Blumenthal where I

01:01:13　　16　met him for the first time was June 11.  I remember saying to

01:01:16　　17　him we finally met because we had talked and we had e-mailed.

01:01:20　　18　But I never met him until June 11.

01:01:22　　19　Q.  So from the time the lawsuit was filed all the way through

01:01:27　　20　June, you had kept Mr. Blumenthal fairly thoroughly apprised

01:01:33　　21　of the status of the litigation; isn't that right?

01:01:35　　22　A.  I think that's the case.  I can't say every e-mail to

01:01:38　　23　Mehul and Paresh went to him, but, generally speaking, they

01:01:41　　24　did.  And you can see that from whatever.

01:01:44　　25　Q.  And so, in your mind, Mr. Blumenthal had also been advised

01:01:48    1   of the defendants' duty to preserve evidence in this case?

01:01:52    2   A.  Sure, he was part of that e-mail.

01:01:54    3   Q.  I'd like you to recall now the February 19th hearing that

01:01:57    4   we had before this court.  Do you remember that?

01:01:59    5   A.  February 19th or May 19th?

01:02:01    6   Q.  February 19th.

01:02:03    7   A.  Oh, yes, yes.  Now I think I recall that, yes.

01:02:07    8   Q.  And you talked a little about the fact that your clients

01:02:14    9   had shut down their computer system.  This was right after the

01:02:17   10   February 17th meeting that we had with Mr. Fugiel for the

01:02:23   11   first time.

01:02:24   12           I'm sorry.  You know what?  I'm wrong.  It's

01:02:27   13   February 25th.

01:02:28   14   A.  25th, that sounds better.  Now --

01:02:31   15           THE COURT:  Wait, wait, wait.  Is there a question

01:02:33   16   pending?

01:02:34   17           MS. DEDINAS:  Not yet.

01:02:35   18   BY MS. DEDINAS:

01:02:39   19   Q.  Now, do you recall that Magistrate Mason asked you whether

01:02:48   20   you had instructed your clients of the duty to preserve?

01:02:50   21   A.  The judge did not ask me.  He asked my partner, Dave

01:02:54   22   Muschler.

01:02:54   23   Q.  I see.

01:02:56   24   A.  He is the unidentified speaker in the transcript.

01:02:58   25   Q.  I see.

| | | |
|---|---|---|
| 01:02:59 | 1 | THE COURT:  We already talked about that a long time |
| 01:03:02 | 2 | ago, as I recall. |
| 01:03:08 | 3 | BY MS. DEDINAS: |
| 01:03:08 | 4 | Q.  Okay.  So at one point -- but you were at that hearing, |
| 01:03:11 | 5 | right? |
| 01:03:11 | 6 | A.  I was at the hearing. |
| 01:03:12 | 7 | Q.  At one point, Magistrate Mason said -- the unidentified |
| 01:03:16 | 8 | speaker says that the system has been shut down.  And the |
| 01:03:19 | 9 | Court said, We've heard that, that the system has been shut |
| 01:03:22 | 10 | down, but I'm not -- I want to make sure that it doesn't |
| 01:03:25 | 11 | reopen and there isn't any spoliation that occurs.  That's |
| 01:03:30 | 12 | very important.  And the unidentified speaker says, |
| 01:03:34 | 13 | Absolutely. |
| 01:03:35 | 14 | And then the Court says, And you make sure that you |
| 01:03:39 | 15 | convey that to those two employees or anybody else who might |
| 01:03:45 | 16 | have access to those computers.  Okay? |
| 01:03:49 | 17 | MR. McGARRY:  Your Honor, I'm sorry, we don't know |
| 01:03:51 | 18 | what's being quoted here. |
| 01:03:52 | 19 | THE COURT:  This is the February 25th transcript. |
| 01:03:54 | 20 | MS. DEDINAS:  Page 11. |
| 01:03:55 | 21 | THE COURT:  Proceeding before me. |
| 01:03:57 | 22 | MR. LIPTON:  Is there an exhibit number? |
| 01:04:00 | 23 | MS. DEDINAS:  No, this is a matter of record before |
| 01:04:02 | 24 | the court.  Would you like to see it? |
| 01:04:06 | 25 | MR. McGARRY:  As long as counsel is reading it |

01:04:09    1   accurately.

01:04:09    2          THE COURT:  I have my own copy right in front of me,

01:04:11    3   and she's read everything accurately.

01:04:13    4          MS. DEDINAS:  Okay.

01:04:15    5          THE COURT:  So far.

01:04:17    6   BY MS. DEDINAS:

01:04:18    7   Q.  And the answer -- by the unidentified speaker is, uh-huh,

01:04:22    8   which assuming is okay, right?

01:04:24    9   A.  That was David.

01:04:27   10   Q.  Okay.

01:04:27   11   A.  Yes.  And I think he was agreeing with the court and, you

01:04:31   12   know, acknowledging what the court was saying.

01:04:33   13   Q.  So now you understood when you were there that that

01:04:38   14   instruction applied to all people who might have access to

01:04:41   15   your clients' computer systems; isn't that right?

01:04:43   16   A.  I'm sorry.  I can't -- I have to hear the language that

01:04:51   17   you're referring to.

01:04:52   18   Q.  He wants to make sure that the system is shut down but

01:04:56   19   doesn't reopen and there is no spoliation and that that's

01:04:59   20   conveyed to not only the two employees that currently have

01:05:02   21   access but to anyone else who might have access to the

01:05:06   22   computers?

01:05:06   23   A.  Those words would say more than anybody who has access for

01:05:10   24   the inoperable server.  Isn't that what's being referred to is

01:05:15   25   the inoperable server?

01:05:17  1   Q.  Now, did you understand that that was referring only to

01:05:19  2   the inoperable server?

01:05:21  3   A.  The language I'm hearing is.

01:05:23  4   Q.  And why is that?

01:05:24  5   A.  Didn't I just hear -- isn't that referring to the server?

01:05:29  6   The issue that was before the court that day, one of the

01:05:32  7   issues, was the inoperable server, and that's what the

01:05:35  8   language that you've read says to me.

01:05:39  9       Now, I'm not disagreeing with you in a way, but this

01:05:43  10  is what I understood the judge to be saying.

01:05:47  11      THE COURT:  Try not to give such a narrative if you

01:05:52  12  can help it.

01:05:55  13  BY MS. DEDINAS:

01:05:56  14  Q.  I believe that the representation that this section refers

01:05:58  15  to was a representation that all of the defendants' computer

01:06:03  16  systems have been shut down?

01:06:06  17      MR. McJESSY:  Object to the characterization of what

01:06:08  18  the testimony is about or what the transcript purports to be.

01:06:13  19      THE COURT:  No, she can state her opinion, and you

01:06:18  20  can state your -- answer the way you feel.

01:06:20  21      THE WITNESS:  I mean, I don't know if that was -- if

01:06:27  22  that's a fair characterization.  My recollection is it was the

01:06:31  23  inoperable server.  And this was for David to handle.

01:06:38  24  BY MS. DEDINAS:

01:06:39  25  Q.  Okay.  So let me just read to you the sentence that's

01:06:42  1    right before the Court's admonition.

01:06:45  2              THE COURT:  And why don't you put the page number and

01:06:47  3    the line number on the record, if you would, please.

01:06:53  4              MR. McGARRY:  Can we give the witness a copy so he

01:06:55  5    can see --

01:06:55  6              MS. DEDINAS:  Do we have an extra copy?

01:06:58  7              THE COURT:  I'm not giving him my copy because I have

01:07:00  8    written all over it.

01:07:02  9              MS. DEDINAS:  Let me read it and I'll give it to him.

01:07:02  10   Can I read it and I'll give it to him?

01:07:06  11             THE COURT:  Okay.

01:07:06  12   BY MS. DEDINAS:

01:07:07  13   Q.  Page 11, line 16.

01:07:09  14             Right.  That's when I got involved in the matter, and

01:07:11  15   that's when I spoke to Mr. Joshi, when we had the meeting in

01:07:15  16   connection with discovery.  And he got, unintelligible, in

01:07:20  17   discovery, and they were advised -- and they were also -- they

01:07:23  18   advised me, Judge, that the system had been shut down.

01:07:28  19   A.  That sounds to me like the entire system.

01:07:30  20   Q.  The entire system?

01:07:31  21   A.  That's what it sounds like to me, yes.

01:07:33  22   Q.  Okay.  So you would understand that when the Court said,

01:07:40  23   Make sure you convey that to those two employees or anybody

01:07:44  24   else who might have access to those computers, okay, that that

01:07:49  25   would mean that you had an obligation to convey the duty to

| | | |
|---|---|---|
| 01:07:54 | 1 | preserve to anybody who would have access to your client's |
| 01:07:59 | 2 | computer systems? |
| 01:08:00 | 3 | A.  At that time, no, I had no knowledge that any of the |
| 01:08:06 | 4 | computers were outside their control, so it just wouldn't have |
| 01:08:10 | 5 | registered with me.  They're all -- under my clients' control |
| 01:08:17 | 6 | was all I knew. |
| 01:08:18 | 7 | Q.  And would it have been reasonable for you to believe that |
| 01:08:22 | 8 | in the event somebody else would have access to your clients' |
| 01:08:27 | 9 | computer system in the future, there would be an obligation to |
| 01:08:31 | 10 | tell them to preserve that as well? |
| 01:08:33 | 11 | MR. McGARRY:  Objection.  It's argumentative. |
| 01:08:35 | 12 | THE COURT:  Sustained. |
| 01:08:36 | 13 | BY MS. DEDINAS: |
| 01:08:37 | 14 | Q.  Did you understand that the Court's instruction would |
| 01:08:40 | 15 | apply to anybody who might get access to your clients' |
| 01:08:44 | 16 | computer systems in the future? |
| 01:08:46 | 17 | A.  Theoretically, I guess so, but it did not -- I did not |
| 01:08:54 | 18 | think it.  I did not focus on that. |
| 01:08:56 | 19 | Q.  Now, if somebody else had access to your clients' computer |
| 01:09:01 | 20 | systems, would you have an obligation to advise them to |
| 01:09:05 | 21 | preserve the system or to leave it alone? |
| 01:09:20 | 22 | MR. McGARRY:  Can I have a clarification on the word |
| 01:09:22 | 23 | "access" because that's a very broad term.  Do they mean |
| 01:09:25 | 24 | someone using the computer or just being in the space? |
| 01:09:30 | 25 | MS. DEDINAS:  I think it could apply to either one. |

01:09:33  1    It's a broad term.

01:09:35  2              THE COURT:  I agree.  Objection overruled.

01:09:38  3              Or you didn't make an objection.

01:09:41  4              MR. McGARRY:  Objection, yes.

01:09:43  5              THE WITNESS:  I never thought of that.  My litigation

01:09:50  6    holds that everything was directed at my client to preserve

01:09:52  7    the evidence, and I frankly and honestly never thought about

01:09:55  8    somebody else having control of their computers.  I just

01:09:59  9    didn't.

01:09:59  10   BY MS. DEDINAS:

01:10:04  11   Q.  Now, when you appeared in court on February 25th, you

01:10:06  12   knew, didn't you, that your client was in default on their

01:10:09  13   building loan?

01:10:10  14   A.  Yes, yes, I guess.

01:10:14  15   Q.  And you knew this because the day before the court

01:10:17  16   hearing, on February 24th, you were made aware of the fact

01:10:23  17   that your clients were in favor of a friendly foreclosure for

01:10:29  18   the warehouse?

01:10:30  19   A.  Yes.

01:10:30  20   Q.  Isn't that right?

01:10:31  21   A.  Yes.

01:10:31  22   Q.  And in Exhibit 22, you can take a quick look at that.  For

01:10:42  23   the record, it's an e-mail to Mehul Shaw, Scott Schreiber,

01:10:48  24   Paresh Joshi, Steve Blumenthal, from Alan Borlack, copied to

01:10:56  25   David Muschler.

| | | |
|---|---|---|
| 01:10:57 | 1 | And it indicates your understanding of a telephone |
| 01:11:00 | 2 | conversation that FMB wants a friendly foreclosure and in |
| 01:11:04 | 3 | exchange to release Mr. and Mrs. Shah from their guaranty of |
| 01:11:10 | 4 | the note and you are in favor of that? |
| 01:11:11 | 5 | A. I wasn't in favor of that. Shah was in favor of that. |
| 01:11:14 | 6 | Q. Right. |
| 01:11:14 | 7 | So you were documenting the fact that -- your |
| 01:11:17 | 8 | knowledge that this is something that your clients' in favor |
| 01:11:20 | 9 | of doing? |
| 01:11:20 | 10 | A. Correct. |
| 01:11:21 | 11 | Q. Okay. So you knew this on February 24th, right? |
| 01:11:25 | 12 | A. Yes. |
| 01:11:25 | 13 | Q. And then this was confirmed to you as the plan on |
| 01:11:29 | 14 | February 26th; isn't that right? |
| 01:11:32 | 15 | A. May I have the e-mail number? |
| 01:11:35 | 16 | Q. Yeah, Exhibit SH 28. |
| 01:11:39 | 17 | For the record, it's an e-mail from Alan Borlack to |
| 01:11:43 | 18 | Steven Blumenthal with copies to Mehul Shah and David Muschler |
| 01:11:47 | 19 | and Paresh Joshi dated February 26th. |
| 01:11:53 | 20 | A. Yes, this was confirmed that morning, in effect. I guess |
| 01:11:56 | 21 | it was confirmation. |
| 01:11:57 | 22 | Q. So you knew that your client was going to lose the |
| 01:12:00 | 23 | warehouse? |
| 01:12:01 | 24 | A. Yes. |
| 01:12:01 | 25 | Q. Okay. And on that very same day, February 26th, that's |

01:12:07  1   the day that Mr. Muschler wrote to the court and advised the

01:12:10  2   court that there was a server at the warehouse?

01:12:12  3   A.  Yes.

01:12:13  4   Q.  Okay.  And that's when he told the court there was no

01:12:18  5   backup for the warehouse server?

01:12:20  6   A.  I don't recall that, but, you know, the letter -- it was a

01:12:23  7   letter to the judge's clerk.

01:12:25  8   Q.  Okay.  So on February 26th, you knew two things.  You knew

01:12:30  9   that your clients had a computer at the warehouse; is that

01:12:30  10  right?

01:12:33  11  A.  Yes.

01:12:33  12  Q.  And you knew that they were about to lose title to the

01:12:37  13  warehouse through a friendly foreclosure that was going to

01:12:39  14  happen in the future?

01:12:40  15  A.  Yes.  I mean, it was planned.  I couldn't know that it

01:12:44  16  would close.  There is no way I could know that.

01:12:47  17  Q.  Right.  I understand.

01:12:47  18  A.  That wasn't my area.

01:12:49  19  Q.  Now, did you realize that your clients need to do

01:12:53  20  something to get their computers out of the warehouse before

01:12:56  21  the friendly foreclosure?

01:12:57  22  A.  It never occurred to me that this would not be handled in

01:13:00  23  the ordinary course like everything else at that warehouse.  I

01:13:03  24  simply assumed that everything, their books, their records,

01:13:06  25  all that would be taken back.

| | | |
|---|---|---|
| 01:13:08 | 1 | Q.  And it would be reasonable to assume, wouldn't it, that a |
| 01:13:13 | 2 | party that is going to lose or be evicted from the premises |
| 01:13:18 | 3 | would actually move their possessions out of the facility |
| 01:13:22 | 4 | before they were evicted? |
| 01:13:23 | 5 | A.  Yes. |
| 01:13:24 | 6 | Q.  And that's what you assumed; isn't that right? |
| 01:13:26 | 7 | A.  Yes, that's what I assumed. |
| 01:13:28 | 8 | Q.  Now, the friendly foreclosure occurred on March 15th, |
| 01:13:33 | 9 | which I think we might have covered here.  Okay.  And did you |
| 01:13:40 | 10 | specifically give any instructions to your clients to remove |
| 01:13:44 | 11 | the computer from the warehouse prior to the friendly |
| 01:13:47 | 12 | foreclosure? |
| 01:13:47 | 13 | A.  No. |
| 01:13:48 | 14 | Q.  And were there any arrangements made to copy the data? |
| 01:13:54 | 15 | A.  No. |
| 01:13:54 | 16 | Q.  Okay.  Did you give any directions or instructions to |
| 01:14:02 | 17 | First Midwest Bank to preserve the warehouse server -- you |
| 01:14:05 | 18 | know, let me strike that. |
| 01:14:06 | 19 | When did you first learn that the warehouse -- that |
| 01:14:14 | 20 | the server had been left at the warehouse after the friendly |
| 01:14:18 | 21 | foreclosure? |
| 01:14:18 | 22 | A.  After the April 23 ESI meeting that I did not attend. |
| 01:14:22 | 23 | Q.  So when I brought it to your attention, that was the first |
| 01:14:26 | 24 | time -- |
| 01:14:26 | 25 | A.  When you brought it to Eric's attention. |

01:14:29    1   Q.  To Eric's attention.

01:14:31    2        That was the first time that somebody had realized

01:14:37    3   that the client had left the server at the warehouse?

01:14:39    4   A.  Right.  Right.

01:14:40    5   Q.  Now, at some point, you learned that your clients leased

01:14:44    6   the warehouse server from Associated Bank; isn't that right?

01:14:46    7   A.  Yeah, the May 13 e-mail from Paresh said there was a

01:14:53    8   lease, I think referred to a lease of some sort.

01:14:56    9   Q.  And is that the first time you recall learning about that?

01:15:00   10   A.  Yes.  I mean -- yes.

01:15:02   11   Q.  Now --

01:15:04   12   A.  But except this -- his e-mail to Eric on April 16

01:15:10   13   mentioned invoices.  So, you know, I mean, from the fact

01:15:17   14   there's invoices, he could have purchased it and paying it on

01:15:21   15   time, he could have been leasing it.  I didn't think one way

01:15:23   16   or another about it.

01:15:24   17   Q.  Now, we're going to hear from Mr. Blumenthal later, but

01:15:30   18   you might recall that -- and I am just going to characterize

01:15:35   19   this so that you can agree or disagree with it -- you might

01:15:39   20   recall that Mr. Blumenthal testified that somewhere around the

01:15:41   21   time that the deal closed on March 15th, he advised you by

01:15:46   22   telephone that the defendants were attempting to obtain title

01:15:49   23   to the computer at the warehouse as part of the lease

01:15:53   24   commitment and deed in lieu of foreclosure?

01:15:55   25   A.  That is not so.

01:15:56  1  Q.  Okay.  So that would not be true?

01:15:59  2  A.  That would not be true.

01:16:00  3  Q.  Okay.

01:16:09  4      MR. McJESSY:  Your Honor, can I have that question

01:16:11  5  and answer read back, please.

01:16:12  6      THE COURT:  Sure.

01:16:43  7    (Record read.)

01:16:45  8      MR. McJESSY:  Thank you.

01:16:46  9  BY MS. DEDINAS:

01:16:49  10  Q.  Now, you recall --

01:16:51  11      THE WITNESS:  Judge, may I hear the answer again, and

01:16:54  12  the question?

01:16:55  13      THE COURT:  Sure.

01:17:28  14    (Record read.)

01:17:28  15      THE WITNESS:  I stand by my answer.

01:17:30  16      THE COURT:  Now I have a question for you.  You read

01:17:32  17  that question from, I assume, the transcript?

01:17:36  18      MS. DEDINAS:  I may have -- as closely as I can

01:17:42  19  recall.

01:17:42  20      THE COURT:  That's fine.  Which deposition was it?

01:17:49  21      MS. DEDINAS:  Blumenthal deposition, page 28, line 6

01:17:54  22  through 14.

01:17:55  23      THE COURT:  And what date?  There were two, remember?

01:17:59  24      MS. DJORDJEVIC:  I believe it was -- I don't remember

01:18:04  25  the exact date, but it was the first deposition.  It was the

440

| | | |
|---|---|---|
| 01:18:07 | 1 | first one. |
| 01:18:08 | 2 | MS. DEDINAS:  What's the date of the first |
| 01:18:10 | 3 | deposition? |
| 01:18:12 | 4 | THE WITNESS:  November 22nd, your Honor. |
| 01:18:13 | 5 | THE COURT:  Mr. Borlack is saying November 22. |
| 01:18:16 | 6 | MS. DJORDJEVIC:  November 22nd sounds right to me |
| 01:18:19 | 7 | too. |
| 01:18:19 | 8 | MR. McGARRY:  Page and line again, please? |
| 01:18:21 | 9 | THE COURT:  Page 27, line 6 through 14. |
| 01:18:24 | 10 | MS. DEDINAS:  28. |
| 01:18:28 | 11 | THE COURT:  And what was the date one more time? |
| 01:18:31 | 12 | THE WITNESS:  November 22nd. |
| 01:18:40 | 13 | THE COURT:  Thank you. |
| 01:18:40 | 14 | MS. DEDINAS:  And, like I said, we will hear from |
| 01:18:41 | 15 | Mr. Blumenthal.  I just wanted to clarify that up front. |
| 01:18:43 | 16 | THE COURT:  But you're denying that? |
| 01:18:46 | 17 | THE WITNESS:  I absolutely am. |
| 01:18:47 | 18 | MR. LIPTON:  Your Honor, just for the record, we do |
| 01:18:49 | 19 | have a copy -- |
| 01:18:50 | 20 | THE COURT:  So do I. |
| 01:18:51 | 21 | MR. LIPTON:  -- but we don't have a page 28. |
| 01:18:55 | 22 | THE COURT:  I have a copy. |
| 01:19:16 | 23 | You know what?  I have a November 9th. |
| 01:19:20 | 24 | THE WITNESS:  It's November 9th. |
| 01:19:21 | 25 | MS. DEDINAS:  Well, we are relying on Mr. Borlack's |

| | | |
|---|---|---|
| 01:19:24 | 1 | -- what does it say on the document? |
| 01:19:25 | 2 | MS. DJORDJEVIC:  It is November 9th. |
| 01:19:27 | 3 | MS. DEDINAS:  November 9th. |
| 01:19:33 | 4 | THE COURT:  Thank you. |
| 01:19:33 | 5 | BY MS. DEDINAS: |
| 01:19:34 | 6 | Q.  Okay.  Let me move on to -- |
| 01:19:36 | 7 | MR. McGARRY:  Your Honor, I will -- now that I have |
| 01:19:39 | 8 | seen it, I make an objection on the basis that I don't think |
| 01:19:41 | 9 | it fairly summarizes -- |
| 01:19:43 | 10 | THE COURT:  Characterizes. |
| 01:19:44 | 11 | MR. McGARRY:  It doesn't.  It was a very short |
| 01:19:47 | 12 | statement of his belief, but it wasn't as detailed as |
| 01:19:51 | 13 | Ms. Dedinas represented. |
| 01:19:54 | 14 | MR. LIPTON:  In other words, he doesn't remember -- |
| 01:19:56 | 15 | THE COURT:  Wait, wait, wait a second here, fellows. |
| 01:20:17 | 16 | So it really probably should go from lines 8 to 14. |
| 01:20:24 | 17 | Do you have a copy of the transcript? |
| 01:20:25 | 18 | MS. DEDINAS:  I think I have just given up my copy. |
| 01:20:28 | 19 | MR. McGARRY:  Here it is. |
| 01:20:32 | 20 | MS. DEDINAS:  Yes.  Well, 6 is the question. |
| 01:20:41 | 21 | THE COURT:  I was referring to the answer.  Do you |
| 01:20:43 | 22 | want to rephrase it? |
| 01:20:45 | 23 | What's your objection? |
| 01:20:45 | 24 | MR. McGARRY:  Mischaracterizes Mr. Blumenthal's |
| 01:20:48 | 25 | testimony. |

01:20:48   1    THE COURT:  Okay.

01:20:49   2    MS. DEDINAS:  Your Honor, I wasn't attempting to

01:20:51   3  characterize it.  I specifically said I was just going to say

01:20:55   4  we are going to hear from Mr. Blumenthal --

01:20:56   5    THE COURT:  You did.

01:20:57   6    MS. DEDINAS:  -- and I just wanted to know what his

01:20:59   7  position was going to be when we get clarification on this

01:21:02   8  from Mr. Blumenthal because I don't want to have to call

01:21:04   9  Mr. Borlack again.

01:21:05  10    THE COURT:  And his testimony was that he denied.

01:21:09  11    MS. DEDINAS:  He denies it.  That's all I have on

01:21:11  12  that.

01:21:12  13  BY MS. DEDINAS:

01:21:14  14  Q.  Do you recall, sir, that on April 29th, Mr. Grossman

01:21:19  15  represented to me in writing that the warehouse computers

01:21:22  16  would be moved to the Oak Brook office?

01:21:24  17  A.  Yeah, I don't recall the exact language, but that sounds

01:21:27  18  like the substance, would be moved, yeah.

01:21:29  19  Q.  Now, do you recall that on April 30th, you made a series

01:21:35  20  of submissions to Magistrate Mason and delivered them to his

01:21:44  21  chambers?

01:21:44  22  A.  No, I don't recall what you're referring to.

01:21:46  23  Q.  Okay.  Take a look at Exhibit SH 92.

01:22:00  24  A.  Yes.  Yes.

01:22:01  25  Q.  Do you remember that you sent these letters and had been

01:22:08　1　advised that perhaps it would have been better to file them?

01:22:11　2　A.  Yes, I was advised.  I was admonished not to do this, but

01:22:16　3　I had thought it would help the court.

01:22:19　4　　　　　I do recall the letter.  I have not read it in many,

01:22:23　5　many -- much time.

01:22:24　6　Q.  Okay.  And the purpose of the letter, I would presume, is

01:22:28　7　to advise the court on the efforts you are making to comply

01:22:32　8　with gathering ESI and complying with the court's orders on

01:22:40　9　ESI; is that right?

01:22:43　10　A.  In general, yes.  I mean, I'm looking at the headings, and

01:22:48　11　I believe that -- that efforts to repair certain of the

01:22:51　12　defendants' inoperable server, production of documents, its

01:22:56　13　production of documents and efforts to repair the inoperable

01:22:59　14　server.

01:23:01　15　Q.  Now, you attached a number of exhibits to that April 30th

01:23:05　16　letter; is that correct?

01:23:06　17　A.  I recall that, yes, from memory.

01:23:11　18　Q.  And Exhibit C that you submitted to Magistrate Mason is

01:23:18　19　Mr. Grossman's April 29th letter to me; isn't that right?

01:23:23　20　A.  That's correct.  That's correct.

01:23:24　21　Q.  And that's the letter that says that the computers are

01:23:26　22　going to be moved to the Oak Brook office?

01:23:27　23　A.  That's correct.

01:23:27　24　Q.  So, in essence, you're also, by virtue of your April 30th

01:23:33　25　letter to the court, you're making that representation to the

| | | |
|---|---|---|
| 01:23:37 | 1 | court as well, right? |
| 01:23:38 | 2 | A.  The letter's purpose was to discuss inoperable server and |
| 01:23:45 | 3 | the production of data.  I had no -- you know, no -- in my |
| 01:23:51 | 4 | mind, there was no representation about anything about the |
| 01:23:55 | 5 | warehouse server, but the letter was attached.  But I wasn't |
| 01:23:58 | 6 | thinking that I'm representing to the court something about |
| 01:24:01 | 7 | this. |
| 01:24:02 | 8 | Q.  But you were interested in representing to the court what |
| 01:24:05 | 9 | the status was of your efforts; isn't that right? |
| 01:24:08 | 10 | A.  Yes, about the inoperable server. |
| 01:24:10 | 11 | Q.  Well, then why did you attach a letter about -- why did |
| 01:24:16 | 12 | you attach the April 29th letter? |
| 01:24:18 | 13 | A.  Well, the -- |
| 01:24:22 | 14 | Q.  That doesn't really -- |
| 01:24:23 | 15 | A.  -- discovery conference, Kanan ESI production. |
| 01:24:28 | 16 | Q.  Well, that's not specifically about the inoperable server, |
| 01:24:31 | 17 | is it? |
| 01:24:31 | 18 | A.  Yes, it is. |
| 01:24:34 | 19 | Q.  Well, how is that specifically about the inoperable |
| 01:24:46 | 20 | server? |
| 01:24:46 | 21 | A.  Paragraph number 3.  As you know, two of the five server |
| 01:24:52 | 22 | hard drives were inoperable and could not be imaged. |
| 01:24:56 | 23 | Q.  But the rest of the letter all talks about other ESI -- |
| 01:24:59 | 24 | status of other ESI matters; isn't that right? |
| 01:25:01 | 25 | A.  Yes. |

01:25:04　1　Q.  Okay.  Now, we heard from Mr. Grossman.  Did you or

01:25:19　2　anybody else from your office ever tell me or anybody from my

01:25:25　3　office that the warehouse server had not been moved to Oak

01:25:29　4　Brook?

01:25:29　5　A.  As far as I know, no.

01:25:30　6　Q.  Okay.  However, you did tell us that on August 20th.  Do

01:25:34　7　you recall that?

01:25:34　8　A.  Yes.  Yes.  That's true.

01:25:37　9　Q.  And that's right before we had to file the joint status

01:25:40　10　report?

01:25:40　11　A.  On August 24th, yes.

01:25:42　12　Q.  Why did you decide to tell us that on August 20th when you

01:25:46　13　hadn't told us that for many months before?

01:25:48　14　A.  Because I think we had reached the point now where there

01:25:52　15　had to be a response to your July 17 letter that was

01:25:55　16　supplemented by an August 14 additional questions, and this

01:25:59　17　now had to be answered.  We were now at the point where we --

01:26:04　18　you know, this had to be disclosed.  They had not gotten the

01:26:07　19　server, to our surprise.

01:26:10　20　Q.  And in your mind, that point didn't come earlier, like in

01:26:15　21　May or June?

01:26:17　22　A.  No.  We did not see it then, no.

01:26:22　23　Q.  Now, even in that letter, the August 20th letter, you

01:26:33　24　didn't tell us that there was a lien by Associated Bank; is

01:26:33　25　that right?

01:26:44  1  A.  I don't think we mentioned that, no.  I don't think we

01:26:46  2  mentioned that there was a lien.

01:26:48  3  Q.  You just mentioned that there was third-party control over

01:26:52  4  the server and you didn't have access to it, right?

01:26:55  5  A.  Yes.

01:26:55  6  Q.  And you didn't mention First Midwest Bank either?

01:26:57  7  A.  No.  We didn't mention by name.

01:26:59  8  Q.  So it really wasn't clear from your August 20th letter who

01:27:04  9  was the party that had control over the server, right?

01:27:07  10  A.  I assumed from that letter that it was clear.  It was

01:27:15  11  First Midwest Bank, but First Midwest Bank was not mentioned.

01:27:18  12  Q.  Okay.  So the first time that UCB or the court was

01:27:25  13  specifically advised that Associated Bank was asserting a lien

01:27:28  14  on the server was actually in open court on August 26th?

01:27:32  15  A.  Yes.

01:27:33  16  Q.  Okay.  Because it's not mentioned in the August 24th joint

01:27:37  17  status report either, right?

01:27:38  18  A.  I don't recall.  I take your word for it.

01:27:41  19  Q.  Okay.  Now, during the course of this litigation, we have

01:27:44  20  heard that the lawyers from your firm have repeatedly told the

01:27:48  21  defendants that they needed to provide access to the warehouse

01:27:51  22  server.

01:27:52  23      Did you ever get any explanation from Mr. Shah or

01:27:57  24  Mr. Paresh (sic) as to what was the reason why they didn't

01:28:01  25  have access?

01:28:01　1　A.　No, they never expressly told us that.

01:28:06　2　Q.　And did you press them on that?

01:28:10　3　A.　No, we did not.　As far as I know, it was not asked.　I

01:28:15　4　had my own state of mind on that.

01:28:18　5　Q.　What was your state of mind?

01:28:19　6　A.　I thought they had -- stupidity.　I just thought it was

01:28:24　7　just stupidity, I mean, just, you know, inadvertence.　I had

01:28:30　8　no knowledge or thinking that this was a design.

01:28:35　9　Q.　Did you get the sense that Mr. Shah was stalling on

01:28:38　10　getting access to the server?

01:28:39　11　A.　Stalling means deliberate, and I'm not sure, you know,

01:28:48　12　what was going on.　I mean, Eric was sending him important,

01:28:55　13　you know, e-mails, along with a lot of stuff, and Paresh Joshi

01:28:58　14　was the point man.

01:28:59　15　　　　　And, you know, you see, my state of mind was this is

01:29:05　16　going to get done.　This is going to get done.　This is Dave

01:29:10　17　Clark, their friend.　There is a server here.　It's not worth

01:29:15　18　anything to anybody but my clients.　It's not worth anything

01:29:19　19　to anybody else.　I mean, this was, in my mind, a stupid thing

01:29:24　20　that would be repaired and that these guys knew how to do

01:29:28　21　that.　They had Dave Clark, their friend.

01:29:32　22　　　　　And also, by the way, there was no ESI production

01:29:38　23　yet.　As of September 14, in fact, Eric and you were still

01:29:42　24　negotiating issues of ESI production.

01:29:46　25　　　　　MR. McJESSY:　Judge, would his answer be stricken as

01:29:48    1    nonresponsive?

01:29:49    2            THE COURT:  No.  I'm going to let that stand.

01:29:52    3            MS. DEDINAS:  Can I just have the question read back

01:29:59    4    so I know where I was?

01:30:10    5      (Record read.)

01:30:12    6    BY MS. DEDINAS:

01:30:13    7    Q.  And did you have any sense that he was -- you didn't know

01:30:17    8    he was negotiating to purchase the server, right?

01:30:19    9    A.  No, I didn't know that.

01:30:20   10    Q.  And you first -- you first learned that in early August,

01:30:23   11    right?

01:30:23   12    A.  In early August, August 5th.

01:30:25   13    Q.  Did you consider issuing a subpoena to First Midwest Bank

01:30:30   14    at any time when there was all this trouble getting access?

01:30:33   15    A.  No, we did not.

01:30:34   16    Q.  Okay.  And had anybody discussed making a forensic image

01:30:42   17    of the server?

01:30:43   18    A.  Eric had in his e-mails.

01:30:45   19    Q.  Do you know why that was never done?

01:30:47   20    A.  No.

01:30:50   21            Well, they didn't have access to it, I assume.  And

01:30:53   22    also we had to have somebody hired to do that.  Eric's e-mail

01:30:58   23    said when we hire an I.T. person, if I recall.

01:31:01   24    Q.  Have you ever fired a client, Mr. Borlack?

01:31:03   25    A.  Yes.

01:31:04  1   Q.  Have you ever had a client lie to you?

01:31:10  2             MR. McJESSY:  Objection.  Relevance.

01:31:11  3             THE COURT:  Sustained.

01:31:13  4   BY MS. DEDINAS:

01:31:13  5   Q.  Is there some reason why while your client was being

01:31:19  6   stupid, as you say, and taking a really long time to get a

01:31:23  7   piece of important information that you did not consider

01:31:28  8   withdrawing from representing them?

01:31:29  9   A.  There was too much work going on, and it was not something

01:31:47  10  that I could focus on.  I had a case, a huge case, something

01:31:51  11  that had grown into a huge case, and I was stretched beyond

01:31:55  12  limits, and there was no way that I could consider now coming

01:31:59  13  back in and trying to get out without negotiations and so

01:32:03  14  forth and with the client.  And so we were going to just try

01:32:07  15  and push it out.

01:32:09  16            And I also felt at the time that my client had a

01:32:13  17  meritorious case.  I did not feel they did not have a case.  I

01:32:18  18  thought they did have a case.  And we were really looking

01:32:20  19  forward to getting ESI production on the early August period

01:32:27  20  when there would be e-mails of your client explaining why they

01:32:31  21  had froze the loan.  This was -- I thought this would be a

01:32:35  22  turning point in the case and kept thinking it.  But it's my

01:32:40  23  state of mind.

01:32:41  24            MS. DEDINAS:  You have gone too long.

01:32:42  25            THE COURT:  Sustained.

01:32:42  1   BY MS. DEDINAS:

01:32:44  2   Q.  I just want an answer to the original question about

01:32:47  3   whether you considered withdrawing --

01:32:48  4         THE COURT:  And I know it's hard, but you have to

01:32:50  5   curtail --

01:32:51  6         THE WITNESS:  I did not consider quitting.  I did not

01:32:52  7   consider quitting.

01:32:53  8         MS. DEDINAS:  Thank you.

01:33:06  9         THE COURT:  Are you finished?

01:33:08  10        MS. DEDINAS:  Yes.

01:33:09  11        THE COURT:  You want to take that down?

01:33:11  12        Mr. McJessy, try not to repeat the same areas.

01:33:34  13        MR. McJESSY:  I will do my best, your Honor.

01:33:34  14                          - - -

01:33:34  15             ALAN BORLACK, CROSS-EXAMINATION

01:33:34  16   BY MR. McJESSY:

01:33:37  17   Q.  Mr. Borlack.

01:33:39  18   A.  Borlack.

01:33:41  19   Q.  I'm sorry.  I apologize.

01:33:42  20        You said that you were stretched very thin in this

01:33:45  21   litigation; is that fair?

01:33:46  22   A.  That's fair.

01:33:47  23   Q.  All right.  And you indicated that, in fact, you hired on

01:33:53  24   behalf of Mr. Shah or he engaged -- the defendants engaged

01:33:57  25   other counsel in this matter to assist you; is that right?

| | | |
|---|---|---|
| 01:33:59 | 1 | A.  Right. |
| 01:34:00 | 2 | Q.  Okay.  And you said there were a lot of ESI issues going |
| 01:34:03 | 3 | on during this entire litigation; is that fair? |
| 01:34:06 | 4 | A.  That's fair. |
| 01:34:07 | 5 | Q.  All right.  And, in fact, there has been an incredible |
| 01:34:15 | 6 | volume of correspondence that has come from the plaintiff's |
| 01:34:19 | 7 | firm regarding discovery matters; is that right? |
| 01:34:24 | 8 | A.  I don't know what "incredible" means, but there's been a |
| 01:34:27 | 9 | lot of communications.  I assume, you know, with Vilia, if you |
| 01:34:33 | 10 | are talking about opposing counsel -- |
| 01:34:35 | 11 | Q.  Correct. |
| 01:34:36 | 12 | A.  -- there's been some.  I don't know how many, though, I |
| 01:34:38 | 13 | would say, actually. |
| 01:34:39 | 14 | Q.  There's quite a volume of e-mails and letters combined |
| 01:34:41 | 15 | from them asking for discovery information -- |
| 01:34:44 | 16 | A.  There is a lot of pleadings asking for discovery |
| 01:34:47 | 17 | information, that's correct. |
| 01:34:49 | 18 | Q.  All right. |
| 01:34:50 | 19 | A.  A lot of request for documents.  There were four or five |
| 01:34:53 | 20 | requests for documents. |
| 01:34:53 | 21 | Q.  Right. |
| 01:34:54 | 22 | A.  And also expedited discovery. |
| 01:34:55 | 23 | Q.  And then there's follow-up correspondence on all of those |
| 01:34:59 | 24 | different filings, is that right, or those different discovery |
| 01:35:02 | 25 | requests? |

01:35:02  1   A.  I assume so, there's some.

01:35:05  2   Q.  And then you were also dealing with obtaining discovery

01:35:07  3   from United Central Bank; is that right?

01:35:10  4   A.  We were trying, that's right.

01:35:11  5   Q.  You were referencing -- you were looking to get the

01:35:14  6   e-mails from that relevant time period; is that right?

01:35:15  7   A.  Exactly.

01:35:16  8   Q.  Did you ever get those?

01:35:17  9   A.  No.  We never got the ESI.

01:35:19  10  Q.  All right.

01:35:19  11  A.  Either side.

01:35:20  12  Q.  To this date?

01:35:22  13  A.  To this date, as far as I know.  I am not counsel anymore.

01:35:24  14  Q.  Right.

01:35:25  15  A.  As of September 19th, Eric was negotiating with Vilia in a

01:35:29  16  letter about ESI parameters, date, ranges, and the like,

01:35:35  17  amounts.

01:35:35  18  Q.  All right.  All of the -- I will represent to you that I

01:35:40  19  received Mr. Roche's files in this matter, but the discovery

01:35:45  20  that was produced by the plaintiff in this case, UCB, the

01:35:51  21  documents and information they have produced, that all still

01:35:53  22  is with your firm; is that right?

01:35:54  23  A.  It's over 23,000 documents, if I recall correctly, hard

01:35:57  24  copies.

01:35:58  25  Q.  And you still have those documents?

| | | |
|---|---|---|
| 01:35:59 | 1 | A.  Yes, I believe we do. |
| 01:36:01 | 2 | Q.  All right.  And this server that's now the issue of the |
| 01:36:07 | 3 | motion to compel, that wasn't the only issue you were dealing |
| 01:36:10 | 4 | with during this entire period of time; is that right? |
| 01:36:13 | 5 | A.  That's for sure. |
| 01:36:14 | 6 | Q.  Now, let me go back to the beginning of where counsel |
| 01:36:22 | 7 | started out asking you questions about. |
| 01:36:26 | 8 | THE COURT:  We are not going to repeat all this. |
| 01:36:28 | 9 | MR. McJESSY:  No, we are not, but we are going -- |
| 01:36:30 | 10 | there's a couple of important matters. |
| 01:36:37 | 11 | BY MR. McJESSY: |
| 01:36:38 | 12 | Q.  Now, you testified you never thought of someone else |
| 01:36:40 | 13 | having control of the computers initially when this matter |
| 01:36:43 | 14 | started out; is that fair? |
| 01:36:45 | 15 | A.  That's fair. |
| 01:36:45 | 16 | Q.  Now, you knew on February 26th that the server was at the |
| 01:36:48 | 17 | warehouse; is that right? |
| 01:36:51 | 18 | A.  I knew that, yes. |
| 01:36:52 | 19 | Q.  I'd actually like you to take a look at the exhibits in |
| 01:36:55 | 20 | the binder.  There are two exhibits:  Exhibit 23 and |
| 01:36:59 | 21 | Exhibit 30. |
| 01:37:08 | 22 | And if you will let me know when you are at those |
| 01:37:10 | 23 | exhibits. |
| 01:37:14 | 24 | A.  I have my thumb on 30 and I have 23 open. |
| 01:37:18 | 25 | Q.  Wonderful. |

01:37:20  1   First drawing your attention to Exhibit 23. There is

01:37:29  2   an e-mail there from I believe Mr. Muschler. Is that

01:37:36  3   cubsmusch@aol.com?

01:37:37  4   A. Yes, that's David.

01:37:38  5   Q. To Mr. Paresh, and he looks to be forwarding a draft

01:37:41  6   letter that you anticipate sending to the court; is that

01:37:44  7   accurate?

01:37:44  8   A. The letter I had prepared, yes, it looks to me, yes, he

01:37:50  9   asks if it's correct, so it had to be a draft.

01:37:52  10  Q. All right. And then if you look at -- the letter is

01:37:55  11  actually attached there, and I want to draw your attention to

01:37:57  12  the second paragraph of that letter. And let me know when

01:38:00  13  you're at that second paragraph.

01:38:02  14  A. I'm at the second paragraph.

01:38:03  15  Q. And if you look at the last line of that, it mentions the

01:38:06  16  fourth server is located at 1103 Butterfield Road. Do you see

01:38:10  17  that?

01:38:10  18  A. I see that.

01:38:11  19  Q. All right. Now, if you'll look at Exhibit 30, you'll see

01:38:19  20  that that sentence has changed. Do you see that?

01:38:27  21      THE COURT: Do you want to point out to him where it

01:38:29  22  is?

01:38:29  23      THE WITNESS: I see it. You're saying it's gone from

01:38:32  24  the fourth server to the sixth server.

01:38:32  25  BY MR. McJESSY:

01:38:38  1   Q. Right.

01:38:38  2        Was it Mr. Joshi who was providing additional

01:38:41  3   information to include in this letter that was going to be

01:38:43  4   provided to the court?

01:38:44  5   A. You'd have to ask Dave. I didn't handle this, no.

01:38:48  6   Q. Okay. So you -- you were copied on the correspondence,

01:38:53  7   but you didn't -- other than receiving the copy, you had no

01:38:55  8   involvement?

01:38:55  9   A. That's a fair -- yes, that's really true.

01:38:58  10  Q. All right. Then did you review the letter that's

01:39:00  11  Exhibit 30 when it went -- at about the time it went to the

01:39:04  12  court?

01:39:04  13  A. I really can't remember.

01:39:06  14  Q. Okay. Do you remember whether you knew at the end of

01:39:09  15  February 2010 that there was a server at the warehouse in

01:39:14  16  Aurora?

01:39:14  17  A. I don't know, and I will tell you why. I don't know if I

01:39:21  18  knew that that address was the warehouse. I don't recall

01:39:25  19  knowing that.

01:39:26  20  Q. Fair enough. Then let me ask you the question a slightly

01:39:29  21  different way.

01:39:30  22        You knew there was a warehouse?

01:39:31  23  A. I did know there was a warehouse, yes.

01:39:33  24  Q. Did you know that there was a server at the warehouse?

01:39:35  25  A. That's what I'm not sure of. I'm not sure that I knew

456

01:39:40   1   that the server that he is talking about is the warehouse.

01:39:43   2   Q.  Okay.

01:39:44   3   A.  I didn't -- I'm not sure.

01:39:45   4        But I want to tell you, I mean, I just don't recall.

01:39:49   5   It didn't -- it didn't focus in on me.  That's all I can say.

01:39:54   6   Q.  Okay.  At any point, did you become aware that the sixth

01:39:58   7   server referred to here was the server at the warehouse that

01:40:03   8   we're talking about now?

01:40:05   9   A.  I never focused on the sixth, but I did learn that the

01:40:08   10  server was at the warehouse.

01:40:09   11  Q.  Now, if you turn to Exhibit 17 -- I'm sorry, Exhibit 22.

01:40:32   12       Now, this is an e-mail from you to Mr. Shah and

01:40:37   13  Mr. Schreiber, Mr. Blumenthal.  And this is discussing the

01:40:38   14  friendly foreclosure of the warehouse; is that right?

01:40:39   15  A.  Very briefly.

01:40:40   16  Q.  I understand that.  But you had a conversation about the

01:40:41   17  fact that there's going to be a foreclosure on the warehouse;

01:40:45   18  is that right?

01:40:45   19  A.  Right.  Right.

01:40:46   20  Q.  All right.  Did you understand at this time that this was

01:40:50   21  a warehouse located in Aurora, Illinois?

01:40:53   22  A.  I can't tell you I did.  I can't say that.

01:40:56   23  Q.  Okay.  Why were you involved in the discussions of the

01:41:02   24  friendly foreclosure?

01:41:04   25  A.  Because they wanted me to file a motion that because FMB

01:41:11    1    was -- UCB, rather, the plaintiff here, was assigning the note

01:41:17    2    to FMB, that could lead to a very good argument that the

01:41:23    3    guaranties on other matters by Varsha and Mehul Shah were

01:41:30    4    extinguished.  And this became -- Eric did research on this,

01:41:33    5    and this became the affirmative defenses that we filed on or

01:41:36    6    about April 12 and asked the judge, Judge Gettleman, for leave

01:41:42    7    to file them.  They were later, because we had only filed.

01:41:46    8    And that was why they were talking to me.  That's what they

01:41:49    9    wanted me to do.

01:41:50   10    Q.  All right.  So you say, I will compose an e-mail for you

01:41:56   11    to see to send to UCB about this.

01:41:59   12          What are you referring to?

01:42:00   13    A.  That's about the inventory.  That's a second thing.  The

01:42:03   14    inventory, now, as I recall -- let me just look at this.

01:42:11   15          Because the inventory was at the warehouse and my

01:42:14   16    client was refusing to pay any more because before it was in

01:42:18   17    effect stored for free because they owned the warehouse, they

01:42:22   18    either -- either FMB was going to have to pay -- I'm sorry,

01:42:27   19    UCB was going to have to pay FMB, I'm saying, or my clients'

01:42:32   20    going to have to move the inventory somewhere else.  That's

01:42:35   21    where I was on that date.

01:42:36   22          Now, this later changed.  But that was the letter

01:42:41   23    that I wanted to compose to say, do you want to pay for this.

01:42:45   24    Q.  Okay.  Now, this is important.  You said they will have to

01:42:50   25    take -- remove the inventory.  Did you mean UCB or your

01:42:54  1  client?

01:42:54  2  A.  No, my client.

01:42:55  3  Q.  Now, if you go to paragraph 2 of this e-mail, it says,

01:43:01  4  That means UCB will have to be given the choice of either

01:43:05  5  paying the warehouse rent, if it wants the inventory to stay

01:43:09  6  there, or we will have to transfer the inventory to somewhere

01:43:12  7  else.

01:43:14  8      Why is it that UCB is going to have to pay for that

01:43:18  9  -- pay for the rent if it's going to stay there?

01:43:21  10  A.  Because that means UCB doesn't -- you know, UCB is the one

01:43:26  11  that they were denied the TRO, but all the expedited discovery

01:43:32  12  was about the inventory.  And if they wanted that inventory to

01:43:36  13  stay at that warehouse, they would have to pay FMB because my

01:43:40  14  client says they can't afford to do that.

01:43:42  15  Q.  You knew United Central Bank had a security interest in

01:43:45  16  the contents of that warehouse; is that right?

01:43:46  17  A.  I never thought of that.

01:43:47  18      MS. DEDINAS:  Objection.

01:43:48  19      THE WITNESS:  That was not --

01:43:49  20      THE COURT:  Wait a second, please.

01:43:50  21      THE WITNESS:  I'm sorry.  That did not --

01:43:52  22      THE COURT:  Wait a second, please.  There is an

01:43:54  23  objection.

01:43:54  24      MS. DEDINAS:  It's foundation, and foundation about

01:43:57  25  whether he knows what the nature of UCB's security interest

01:44:02  1   is.

01:44:04  2            MR. McJESSY:  Let me ask the question slightly

01:44:05  3   differently.

01:44:06  4   BY MR. McJESSY:

01:44:07  5   Q.  Did you know that United Central Bank had a security

01:44:11  6   interest in the contents of the warehouse?

01:44:13  7   A.  I can't recall.  I really can't.

01:44:14  8   Q.  Did you eventually compose and send that e-mail?

01:44:16  9   A.  No.  It never worked out -- it never worked out that way.

01:44:21  10  Q.  Why not?

01:44:22  11  A.  And I can tell you.  Well, on March 24, Serritella sends a

01:44:26  12  letter to Blumenthal, which he passes on to me, which says an

01:44:31  13  order of eviction is entered and now you've got until

01:44:39  14  March 31st to do something.  It's to the Boodell firm.  You

01:44:45  15  have to figure out what you want to do about the inventory

01:44:48  16  because, otherwise, we, FMB, are going to dispose of it.

01:44:53  17            Vilia and I had an exchange of letters.  I believe

01:44:56  18  Vilia's letter to me was March 29, I responded on April 2

01:45:01  19  about what to do about the inventory.

01:45:04  20  Q.  Was that letter in response to the March 24th letter from

01:45:10  21  William Serritella to Mr. Domanskis?

01:45:14  22  A.  Yes, in a way.  Yes, it was in a way.  That's what

01:45:18  23  precipitated it.

01:45:19  24            MS. DEDINAS:  Objection.  He's asking about whether

01:45:21  25  my letter to him was in response to a letter I received.

01:45:25   1   THE COURT:  That's what you're doing.

01:45:27   2   MR. McJESSY:  No, actually, it was whether his

01:45:30   3   communications with --

01:45:35   4   THE WITNESS:  Counsel.

01:45:36   5   THE COURT:  Thank you.  Whether his communications

01:45:37   6   with opposing counsel were prompted by the letter from

01:45:44   7   Mr. Serritella to Mr. Domanskis.

01:45:49   8   THE WITNESS:  My recollection is counsel's letter.

01:45:52   9   BY MR. McJESSY:

01:45:53   10  Q.  Ms. Dedinas?

01:45:54   11  THE COURT:  Which counsel?

01:45:55   12  THE WITNESS:  Ms. Dedinas.  Ms. Dedinas.  Pardon me.

01:45:58   13  March 29 letter was precipitated by what was said by

01:46:03   14  Serritella in his 29th, but -- I haven't finished answering

01:46:09   15  your question.

01:46:10   16  BY MR. McJESSY:

01:46:10   17  Q.  All right.

01:46:11   18  A.  On April 7, Ms. Dedinas writes me and says, we've agreed,

01:46:15   19  as I recall, with FMB, that we will have a license to access

01:46:21   20  the warehouse for the inventory.  And it was then on April 9 I

01:46:29   21  e-mailed Steve Blumenthal and I said, Steve, will you handle

01:46:32   22  this agreement, getting this agreement negotiated.  And it led

01:46:35   23  to a tri-party, if that's the right word, agreement eventually

01:46:40   24  signed by UCB, FMB, and us as to the disposal of the

01:46:44   25  inventory.

01:46:44  1  Q.  All right.  Very good.

01:46:45  2      Now, your e-mail is dated Exhibit -- I'm sorry.

01:46:51  3  Strike that.

01:46:51  4      Your e-mail, Exhibit 22, is dated February 26th.

01:46:57  5      I'm sorry.  It's dated February 24th; is that right?

01:47:02  6  A.  Yes.

01:47:02  7  Q.  And then Exhibit 28 is an e-mail also confirming a call.

01:47:07  8  It's an e-mail from you to Mr. Blumenthal, and it confirms a

01:47:11  9  call again discussing the friendly foreclosure; is that right?

01:47:14  10 A.  That's correct.

01:47:14  11 Q.  All right.  And that e-mail is on the same date as the

01:47:23  12 letter that's being sent to the court saying that there is a

01:47:27  13 server at the warehouse; is that right?

01:47:30  14 A.  Well --

01:47:31  15 Q.  It's a yes-or-no question.

01:47:32  16 A.  No, it didn't say that.

01:47:34  17 Q.  Okay.  The letter says that, The sixth server is located

01:47:40  18 at 1103 Butterfield Road, Aurora, Illinois, 60504?

01:47:45  19 A.  That's correct.

01:47:45  20 Q.  All right.  And is it your testimony that as of

01:47:50  21 February 28th you did not know that the property that was the

01:47:54  22 subject of the foreclosure was the warehouse located at 1103

01:47:59  23 Butterfield Road in Aurora?

01:48:01  24 A.  I do not recall knowing that.  That's true.  I do not

01:48:06  25 recall knowing that the warehouse -- that was the address.

01:48:09   1   Q.  Okay.

01:48:09   2   A.  It's --

01:48:10   3           THE COURT:  Okay.

01:48:12   4   BY MR. McJESSY:

01:48:19   5   Q.  Sir, on March 3rd, your office advised the defendants that

01:48:25   6   they are not to take any action with respect to any of the

01:48:33   7   computers, servers, or related equipment; is that right?

01:48:37   8   A.  Is that a direct quote?  May I have the e-mail?

01:48:41   9   Q.  Yes, Exhibit 31.

01:48:54   10  A.  I assume you have read that correctly.  I assume it is.

01:48:57   11  That was Dave Muschler's e-mail.

01:48:59   12  Q.  Correct.

01:48:59   13          And it says, You are not to take any action; is that

01:48:59   14  right?

01:49:06   15  A.  That is the last sentence.

01:49:07   16  Q.  Okay.

01:49:08   17  A.  The last sentence.

01:49:08   18  Q.  Between February 28th, the date of the letter to this

01:49:13   19  court, and March 3rd, do you know whether defendants had been

01:49:19   20  given any instructions with respect to the server in the

01:49:23   21  warehouse?

01:49:24   22  A.  Yes.

01:49:24   23  Q.  Okay.  What were the instructions that were given to them

01:49:29   24  between February 28th and March 3rd?

01:49:31   25  A.  Between February 28?  No, no.

01:49:34  1  Q.  Okay.  Now, the friendly foreclosure occurs on March 15th;
01:49:47  2  is that right?
01:49:47  3  A.  Serritella so said in an e-mail.  I later learned of it.
01:49:50  4  Q.  You had a number of conversations with Mr. Blumenthal
01:49:52  5  about the friendly foreclosure at the end of February?
01:49:55  6  A.  As far as I can recall, there were two, and they were both
01:49:59  7  memorialized in an e-mail.
01:50:01  8  Q.  All right.  Did you have any discussions with him in March
01:50:03  9  about that subject?
01:50:04  10  A.  I don't think so.  I don't recall that.
01:50:09  11  Q.  Were you told when this was going to occur?
01:50:11  12  A.  No.
01:50:11  13  Q.  Even approximately?
01:50:12  14  A.  No.
01:50:12  15  Q.  Okay.  So you didn't know that the foreclosure occurred on
01:50:16  16  March 15th until you received the letter from -- the letter
01:50:21  17  that was addressed from Mr. Serritella to Mr. Domanskis; is
01:50:24  18  that your testimony?
01:50:24  19  A.  No, I didn't know about the eviction.  On March 17, Mehul
01:50:30  20  Shah e-mailed me all of the documentation -- the legal
01:50:34  21  documentation.  It was quite hefty.
01:50:37  22          So he did e-mail that to me.
01:50:39  23  Q.  Okay.  So then on March 17th, you knew that the friendly
01:50:47  24  foreclosure had occurred?
01:50:48  25  A.  Yes.

01:50:48  1  Q.  Do you understand that a foreclosure means that the

01:50:50  2  property was turned over to a different party?

01:50:52  3  A.  Yes.

01:50:52  4  Q.  Between March 3rd and March 17th, were the defendants

01:50:58  5  given any direction with respect to the handling of the server

01:51:02  6  at the warehouse?

01:51:03  7  A.  Yes.

01:51:03  8  Q.  Okay.

01:51:04  9  A.  The March 3rd e-mail.

01:51:07  10  Q.  Other than the March 3rd e-mail, were they given any

01:51:09  11  direction?

01:51:10  12  A.  Not to my knowledge.

01:51:16  13  MR. McGARRY:  Can I have that question read, please?

01:51:18  14  I'm sorry.  The question and answer.

01:51:29  15  (Record read.)

01:51:31  16  MR. McGARRY:  I object to the form of the question,

01:51:33  17  Judge.  It mischaracterizes the evidence in this case.  There

01:51:36  18  was a March 16 e-mail from Mr. Blumenthal.

01:51:38  19  THE COURT:  Was there a March 3rd e-mail?

01:51:41  20  MR. McJESSY:  Yes, there was.  That's the one we have

01:51:43  21  been discussing.

01:51:43  22  MR. McGARRY:  He said for March 3rd to March 16, was

01:51:46  23  there any -- March 17, was there any e-mail directing the

01:51:52  24  defendants.

01:51:54  25  MR. McJESSY:  I don't think it mischaracterizes the

01:51:56   1   evidence.  I think that e-mail was from Mr. Blumenthal to

01:51:59   2   Mr. Serritella.

01:52:00   3           THE COURT:  That's my understanding also.

01:52:03   4           Your objection is overruled.

01:52:12   5   BY MR. McJESSY:

01:52:19   6   Q.  Sir, you testified that you assumed the server would be

01:52:23   7   removed from the warehouse at the time of the foreclosure or

01:52:26   8   before that.  Do you remember that?

01:52:27   9   A.  I do remember that.

01:52:28   10   Q.  Did you bother to ask the defendants what was going to be

01:52:32   11   done with the server?

01:52:33   12   A.  I did not.

01:52:34   13   Q.  Were you told that it had been moved?

01:52:37   14   A.  No, I don't recall that being told to me specifically.

01:52:43   15   Q.  As of -- all right.

01:52:45   16           Now, I want to turn to Exhibit 218.  I would like you

01:53:01   17   to look at page 8.  And I want to draw your attention to the

01:53:28   18   entry at the bottom of that page.  It's the paragraph that

01:53:31   19   begins, During the meeting.

01:53:32   20           Do you see that?

01:53:33   21   A.  I see that.

01:53:34   22   Q.  And this is referring to the April 23rd meeting that

01:53:37   23   occurred at the Oak Brook offices of Kanan; is that right?

01:53:40   24   A.  Correct.

01:53:41   25   Q.  Okay.  And it says, During the meeting, Ms. Dedinas

01:53:45 1 advises Mr. Grossman the defendants have left a server at the

01:53:50 2 warehouse.

01:53:50 3      I want to focus first on that sentence. Is that your

01:53:53 4 understanding of what occurred at this meeting?

01:53:55 5 A. That is my understanding. I was not present.

01:53:57 6 Q. Okay. Do you have any idea where Ms. Dedinas got the

01:54:02 7 information that the server had been left at the warehouse?

01:54:04 8 A. No, I don't.

01:54:06 9 Q. All right. Did you ever ask?

01:54:08 10 A. No.

01:54:09 11 Q. Okay. The next sentence says, This is defendants'

01:54:16 12 counsel's first notice of same.

01:54:19 13      Okay. Had you -- prior to April 23rd, had you been

01:54:26 14 told that the server had been moved from the warehouse?

01:54:29 15 A. No.

01:54:30 16 Q. And on February 28th, you knew that there was a server at

01:54:39 17 the Aurora location; is that right?

01:54:41 18 A. Yes, at the warehouse, yeah.

01:54:42 19 Q. Okay. At the warehouse. Thank you.

01:54:45 20      So April 23rd wasn't the first notice you had that

01:54:52 21 the server was at the warehouse is that right? The fact of

01:54:59 22 the matter is you had never been told different?

01:55:02 23      THE COURT: Are you asking two questions or one?

01:55:05 24      THE WITNESS: I had not been told that, that is

01:55:08 25 correct. I had not been told that.

01:55:10　1　BY MR. McJESSY:

01:55:21　2　Q.　Now, you were aware that as of April 23rd, the defendants

01:55:27　3　didn't own the warehouse anymore; is that right?

01:55:30　4　A.　That's correct.

01:55:30　5　Q.　And you understood it was owned by First Midwest Bank; is

01:55:30　6　that right?

01:55:36　7　A.　Yes.　Yes.

01:55:36　8　Q.　Okay.　So the meeting occurred on April 23rd.　You heard

01:55:40　9　testimony that there was an offer by a representative of Dell

01:55:45　10　to go over to the warehouse.　Do you remember that testimony?

01:55:48　11　A.　I heard that testimony.　I did not witness it.

01:55:53　12　　　　　　MR. McGARRY:　Objection, your Honor.　It was

01:55:54　13　established that it wasn't a representative of Dell.

01:55:56　14　　　　　　THE COURT:　You are absolutely right.

01:55:57　15　　　　　　MR. McJESSY:　Fair enough.

01:55:59　16　　　　　　THE COURT:　Sustained.

01:56:00　17　BY MR. McJESSY:

01:56:01　18　Q.　You heard that there was a computer consultant who was

01:56:03　19　Dell certified that was at the Oak Brook offices and an offer

01:56:07　20　was made to go to the warehouse for purposes of examining the

01:56:11　21　server; is that right?

01:56:11　22　A.　I heard that testimony today.

01:56:13　23　　　　　　MR. McGARRY:　Your Honor, that mischaracterizes very

01:56:16　24　badly.

01:56:17　25　　　　　　THE COURT:　Sustained.　And that will be stricken.

| | | |
|---|---|---|
| 01:56:23 | 1 | BY MR. McJESSY: |
| 01:56:29 | 2 | Q.  You heard the testimony that there was a computer |
| 01:56:31 | 3 | consultant who was Dell certified who was at the Oak Brook |
| 01:56:35 | 4 | office who had offered to go get the server that was at the |
| 01:56:37 | 5 | warehouse; is that right? |
| 01:56:38 | 6 | MR. McGARRY:  Again, your Honor, that |
| 01:56:39 | 7 | mischaracterizes it.  I am afraid Mr. Garrie offered the |
| 01:56:45 | 8 | services of the expert to do that.  I want to be clear about |
| 01:56:48 | 9 | that. |
| 01:56:48 | 10 | THE COURT:  He is right. |
| 01:56:49 | 11 | MR. McJESSY:  But isn't that my question? |
| 01:56:51 | 12 | THE WITNESS:  No. |
| 01:56:51 | 13 | THE COURT:  No, it wasn't. |
| 01:56:53 | 14 | MR. McJESSY:  Okay. |
| 01:56:55 | 15 | BY MR. McJESSY: |
| 01:56:56 | 16 | Q.  You're aware that there was testimony that Mr. Garrie had |
| 01:57:00 | 17 | offered the services of a computer consultant who was at the |
| 01:57:04 | 18 | facility in Oak Brook at Kanan's offices to go over and get |
| 01:57:10 | 19 | the server that was at the warehouse? |
| 01:57:11 | 20 | A.  Yes.  I don't know if he was called a consultant; but, |
| 01:57:15 | 21 | yes. |
| 01:57:15 | 22 | Q.  All right.  Were you aware that the defendants didn't have |
| 01:57:21 | 23 | ownership of the warehouse anymore at that time? |
| 01:57:23 | 24 | A.  On April 23? |
| 01:57:25 | 25 | Q.  Yes. |

| | | |
|---|---|---|
| 01:57:25 | 1 | A. Even though I'm not at the meeting? |
| 01:57:27 | 2 | Q. Right. |
| 01:57:28 | 3 | A. Yes, I knew that. |
| 01:57:29 | 4 | Q. Okay. Did you know that they did not have keys to the |
| 01:57:32 | 5 | warehouse anymore? |
| 01:57:33 | 6 | A. I didn't know that. |
| 01:57:35 | 7 | Q. Now, your office was interacting with the defendants all |
| 01:57:54 | 8 | during February, March, April, May, June regarding this |
| 01:58:00 | 9 | lawsuit; is that right? |
| 01:58:01 | 10 | A. Yes. Defendants being Mehul and Paresh Joshi. |
| 01:58:05 | 11 | Q. Thank you. My question was those were the only two |
| 01:58:09 | 12 | employees left at the company during that period of time; is |
| 01:58:09 | 13 | that right? |
| 01:58:11 | 14 | A. That's right, as far as we knew. |
| 01:58:12 | 15 | Q. So they were your only contacts at Kanan? |
| 01:58:15 | 16 | A. Correct. |
| 01:58:15 | 17 | Q. And they were responsible for doing everything that needed |
| 01:58:18 | 18 | to be done with respect to this litigation? |
| 01:58:21 | 19 | A. Well, everything -- yeah, I mean, except what we did. |
| 01:58:26 | 20 | Q. Right. |
| 01:58:27 | 21 | A. Yeah, of course. |
| 01:58:27 | 22 | Q. Okay. I mean, as far as the client -- the representatives |
| 01:58:32 | 23 | of the client or the persons with the client who were |
| 01:58:35 | 24 | responding to all of your requests for discovery information, |
| 01:58:38 | 25 | it was just the two of them; is that right? |

01:58:42    1   A.   Steve Blumenthal may have responded with some discovery

01:58:47    2   information.   I'm not sure if Schreiber did.   But I'm thinking

01:58:51    3   of interrogatory answers.   I know Blumenthal was involved in

01:58:58    4   some of the information we needed to respond.

01:59:02    5   Q.   Okay.   But Mr. Shah and Mr. Joshi were the only employees

01:59:06    6   of the company?

01:59:06    7   A.   The only ones we knew of.

01:59:08    8   Q.   Okay.   Now, sir, between February 28th when this court

01:59:35    9   gets the notice that we have discussed --

01:59:38   10   A.   26th.

01:59:38   11   Q.   I'm sorry, February 26th.   Thank you.

01:59:41   12            -- (continuing) and the meeting on April 23rd, had

01:59:44   13   the defendants advised you or to your knowledge anybody else

01:59:49   14   at your office that the server from the warehouse had been

01:59:52   15   moved?

01:59:52   16   A.   No.

01:59:53   17   Q.   And I take it from your testimony you really hadn't paid

01:59:58   18   attention to that issue between February and April either; is

02:00:02   19   that fair?

02:00:02   20   A.   Yes, I didn't consider it an issue either.

02:00:04   21   Q.   All right.

02:00:05   22   A.   I just didn't -- yes, it didn't even occur to me.

02:00:08   23   Q.   Fair enough.

02:00:09   24            And -- but it does become an issue on April 23rd; is

02:00:15   25   that right?

02:00:15  1  A.  I now know.  It wasn't there, but I now know from what I

02:00:20  2  learned.

02:00:20  3  Q.  Who told you?

02:00:21  4  A.  Eric.

02:00:22  5  Q.  And was that after the meeting?

02:00:24  6  A.  Oh, sure, but it would have been probably the following

02:00:27  7  week, I assume.

02:00:28  8  Q.  Okay.  Not --

02:00:30  9  A.  The meeting was on Friday.

02:00:31  10  Q.  All right.

02:00:32  11  A.  It ended late, as I have heard.

02:00:34  12  Q.  Okay.  And then you learned about it sometime the

02:00:36  13  following week?

02:00:37  14  A.  Yes.

02:00:37  15  Q.  All right.  And that's when all of these requests begin to

02:00:42  16  the defendants to gain control of the server that's now at the

02:00:47  17  First Midwest Bank warehouse; is that right?

02:00:50  18  A.  I'd call it demands.

02:00:53  19  Q.  The demand by Eric to the defendants to get control of the

02:00:58  20  server that's now at the First Midwest Bank warehouse?

02:01:02  21  A.  Correct.

02:01:02  22  Q.  And at no point do the defendants advise you or anyone

02:01:05  23  else at your firm that they have possession or control of the

02:01:09  24  server; is that right?

02:01:10  25  A.  That's correct.

| | | |
|---|---|---|
| 02:01:10 | 1 | Q.  Okay.  They repeatedly say that, we're working on it? |
| 02:01:14 | 2 | A.  Correct. |
| 02:01:14 | 3 | Q.  And did you ever -- did you or to your knowledge anyone at |
| 02:01:19 | 4 | your office advise United Central Bank that your -- you, |
| 02:01:29 | 5 | meaning Bailey Borlack, or the defendants had possession or |
| 02:01:32 | 6 | control of the server? |
| 02:01:33 | 7 | A.  To my knowledge, not until August 20.  To my knowledge. |
| 02:01:37 | 8 | Q.  All right.  And what did you tell them on August 20th? |
| 02:01:40 | 9 | A.  It's in a letter.  You know, it's not my letter, but you |
| 02:01:43 | 10 | have it. |
| 02:01:43 | 11 | Q.  All right.  If you could take a look at the letter. |
| 02:01:46 | 12 | A.  If you can give me the exhibit number, please. |
| 02:02:01 | 13 | Q.  You know what?  Why don't we skip that at the moment.  Let |
| 02:02:05 | 14 | me ask a different question. |
| 02:02:06 | 15 | Was United Central Bank aware that First Midwest Bank |
| 02:02:09 | 16 | had taken control of the warehouse -- |
| 02:02:11 | 17 | MS. DEDINAS:  Objection. |
| 02:02:13 | 18 | BY MR. McJESSY: |
| 02:02:14 | 19 | Q.  -- to your knowledge? |
| 02:02:14 | 20 | THE COURT:  Sustained. |
| 02:02:15 | 21 | BY MR. McJESSY: |
| 02:02:16 | 22 | Q.  Did you have any discussions with counsel for United |
| 02:02:20 | 23 | Central Bank wherein they indicated they had knowledge that |
| 02:02:23 | 24 | the warehouse was now in the possession of First Midwest Bank? |
| 02:02:26 | 25 | A.  I don't recall.  I don't recall. |

| | | |
|---|---|---|
| 02:02:33 | 1 | Q. You didn't -- |
| 02:02:34 | 2 | A. My conversations would have been very limited, if any. |
| 02:02:38 | 3 | Q. All right. What was your role in the lawsuit? |
| 02:02:39 | 4 | A. In the lawsuit? I was lead counsel. |
| 02:02:41 | 5 | Q. All right. And what were you doing? |
| 02:02:43 | 6 | A. I was handling multi, myriad of issues, including when |
| 02:02:51 | 7 | Western Springs also sued Mr. Shah, and I had to get involved |
| 02:02:55 | 8 | in that state court action as well. I was handling the |
| 02:03:01 | 9 | expedited discovery, which pertained to the inventory; I was |
| 02:03:06 | 10 | handling the pleadings; I was handling our request for |
| 02:03:10 | 11 | documents; I was talking with my client about the merits of |
| 02:03:14 | 12 | this case; I was writing briefs. Boy, you know, I'm sure when |
| 02:03:23 | 13 | I walk out of here, there will be 150 things I said, why |
| 02:03:26 | 14 | didn't I say, but, I mean, I just can't get them now. But I |
| 02:03:30 | 15 | wish you'd look at my bills. |
| 02:03:31 | 16 | Q. All right. Well, I have looked at your bills, and they |
| 02:03:34 | 17 | are quite substantial. Do you know how much time you were |
| 02:03:37 | 18 | spending on this matter every month? |
| 02:03:38 | 19 | A. Huge, huge, Counsel. Huge. It was stretching me beyond |
| 02:03:43 | 20 | belief because I also have other cases. And I had payment |
| 02:03:48 | 21 | issues with my client as well. And so it was the -- the case |
| 02:03:54 | 22 | was becoming very, very problematic for our small firm, which |
| 02:04:02 | 23 | is why I hoped Flesch and Glickman could help. |
| 02:04:06 | 24 | Q. Thank you. |
| 02:04:07 | 25 | Sir, to your knowledge, did Associated Bank ever |

| | | |
|---|---|---|
| 02:04:10 | 1 | commence an action to repossess the server? |
| 02:04:12 | 2 | A.  Not to my knowledge.  Nobody ever told me that. |
| 02:04:14 | 3 | Q.  To your knowledge, did anyone ever commence an action to |
| 02:04:18 | 4 | repossess the server? |
| 02:04:19 | 5 | A.  Not to my knowledge.  Nobody ever told me that. |
| 02:04:22 | 6 | Q.  So to your knowledge, the server was never repossessed? |
| 02:04:25 | 7 | A.  Correct, to my knowledge. |
| 02:04:27 | 8 | Q.  Now, the notice to the defendants on April 26th, that's |
| 02:04:34 | 9 | the first notice to them from your firm to move the server |
| 02:04:39 | 10 | from the warehouse; is that right? |
| 02:04:40 | 11 | A.  No, I think it was, from what I've heard, April 23. |
| 02:04:44 | 12 | Q.  Okay.  Were they actually told on April 23 to -- strike |
| 02:04:49 | 13 | that. |
| 02:04:49 | 14 | Who told them on April 23 to move the server? |
| 02:04:52 | 15 | A.  Eric and Daniel Garrie. |
| 02:04:54 | 16 | Q.  Okay.  Your testimony is that you understand they were |
| 02:04:58 | 17 | actually told to move it on April 23? |
| 02:05:00 | 18 | A.  Exactly.  Yeah, they were told and agreed to it. |
| 02:05:03 | 19 | Q.  But the warehouse was already owned by First Midwest Bank |
| 02:05:07 | 20 | at this time; is that right? |
| 02:05:07 | 21 | A.  Yes, yes, yes. |
| 02:05:09 | 22 | Q.  Now, you know Dave Clark; is that right? |
| 02:05:11 | 23 | A.  I met Mr. Clark one time before I was discharged as |
| 02:05:15 | 24 | counsel. |
| 02:05:15 | 25 | Q.  Okay.  Did you talk to him on more than one occasion? |

| | | |
|---|---|---|
| 02:05:18 | 1 | A.  Yes, I did. |
| 02:05:19 | 2 | Q.  Do you have his phone number? |
| 02:05:21 | 3 | A.  I did have his cell phone number, yes. |
| 02:05:23 | 4 | Q.  Okay.  Did you ever -- you knew he was with First Midwest |
| 02:05:26 | 5 | Bank? |
| 02:05:26 | 6 | A.  I did. |
| 02:05:27 | 7 | Q.  You knew First Midwest Bank possessed the server? |
| 02:05:30 | 8 | A.  Yes. |
| 02:05:30 | 9 | Q.  You knew Midwest Bank owned the warehouse? |
| 02:05:34 | 10 | A.  Yes. |
| 02:05:35 | 11 | Q.  Did you ever call him directly to ask for access to the |
| 02:05:38 | 12 | server? |
| 02:05:39 | 13 | A.  No. |
| 02:05:39 | 14 | Q.  United Central Bank's attorneys had been told on |
| 02:06:05 | 15 | February 26th that the server was at -- you acknowledge that |
| 02:06:12 | 16 | the Butterfield Road address is the warehouse? |
| 02:06:14 | 17 | A.  Yes, I do. |
| 02:06:15 | 18 | Q.  They were told that the server was at the warehouse; is |
| 02:06:19 | 19 | that right? |
| 02:06:19 | 20 | A.  The letter certainly indicated that. |
| 02:06:21 | 21 | Q.  All right.  Were they at any time told by your firm or -- |
| 02:06:27 | 22 | by you or anyone at your firm, to your knowledge, that the |
| 02:06:29 | 23 | server had been moved from that location? |
| 02:06:32 | 24 | A.  No. |
| 02:06:34 | 25 | Q.  In fact, the first time that they're told that is when you |

02:06:38  1  learn from Mr. Shah that First Midwest Bank has sold the
02:06:42  2  server, and that's in August of 2010; is that right?
02:06:46  3  A.  When I learned from the e-mail that Mr. Shah forwarded to
02:06:49  4  me.
02:06:50  5  Q.  All right.  And to your knowledge --
02:06:53  6  A.  On August 3rd.
02:06:54  7  Q.  All right.  And to your knowledge, the server was in the
02:06:56  8  warehouse at least through the end of July 2010?
02:07:00  9  A.  As far as I know, yes.
02:07:24  10       MR. McJESSY:  Judge, just one minute.
02:07:26  11       THE COURT:  Sure.
02:07:27  12    (Brief pause.)
02:07:45  13       MR. McJESSY:  I don't have any other questions.
02:07:53  14  Thank you, your Honor.
02:07:54  15       THE COURT:  Thank you.
02:07:54  16       MR. McGARRY:  May I, your Honor?
02:07:56  17       THE COURT:  Yes.
02:07:57  18              - - -
02:07:57  19       ALAN BORLACK, CROSS-EXAMINATION
02:07:57  20  BY MR. McGARRY:
02:08:30  21  Q.  Again, this is the deposition of Mr. Blumenthal on
02:08:34  22  November 9th, 2010, page 28.  What I'd like to do is since you
02:08:44  23  were asked a question about a conversation with
02:08:45  24  Mr. Blumenthal, I'd like to read the question and answer that
02:08:49  25  he gave and get your reaction to that.

| | |
|---|---|
| 02:08:51 | 1 |
| 02:08:52 | 2 |
| 02:08:56 | 3 |
| 02:08:57 | 4 |
| 02:08:58 | 5 |
| 02:08:59 | 6 |
| 02:09:04 | 7 |
| 02:09:06 | 8 |
| 02:09:08 | 9 |
| 02:09:11 | 10 |
| 02:09:17 | 11 |
| 02:09:24 | 12 |
| 02:09:29 | 13 |
| 02:09:34 | 14 |
| 02:09:38 | 15 |
| 02:09:42 | 16 |
| 02:09:43 | 17 |
| 02:09:45 | 18 |
| 02:09:51 | 19 |
| 02:09:52 | 20 |
| 02:09:53 | 21 |
| 02:09:56 | 22 |
| 02:09:56 | 23 |
| 02:10:01 | 24 |
| 02:10:05 | 25 |

A.  That he gave.

Q.  Yes, the question and answer.  Beginning at line 6, just for the record, through line --

        THE COURT:  14.

BY MR. McGARRY:

Q.  14.  By Mr. Lipton:

        "QUESTION:  And was that the conversation that was unprivileged between you and Mr. Borlack?

        "ANSWER:  All that I recall is that Mr. Borlack asking me to call FMB's attorney counsel to see if I could work out to allow UCB to get access to for (sic) the inventory.  And then the course of that conversation, I believe I advised him what the client had told me on what was going on with FMB's negotiations to buy the computer equipment."

        Did you ever have such a conversation with Mr. Blumenthal on the telephone?

A.  Not about the server, no.

Q.  The telephone conversation he believes he had, you don't recall?

A.  I did not have it.

Q.  All right.  Now, how many conversations on the phone did you have with Mr. Blumenthal?

A.  There were -- you know, I can't count them.

Q.  Based on your custom and practice in this case with all the e-mails, would you have written a memorandum or an e-mail

02:10:07   1   to him if he had said that to you?

02:10:09   2   A.  Very -- oh, yes.  Oh, yes.  If he said to me, we've left

02:10:13   3   the server at the warehouse?

02:10:15   4   Q.  Yes, sir.

02:10:16   5   A.  You bet you.

02:10:16   6   Q.  Is there any such e-mail found in any of these

02:10:19   7   communications, sir?

02:10:20   8   A.  None.

02:10:20   9   Q.  You were asked questions --

02:10:31   10   A.  I meant we're going to --

02:10:33   11        THE COURT:  Wait a second.  Wait a second.

02:10:34   12        THE WITNESS:  I'm sorry.  Pardon me, your Honor.

02:10:36   13   BY MR. McGARRY:

02:10:37   14   Q.  You know, you were asked questions about your e-mails in

02:10:41   15   February 28th -- or what you did -- let me start again.

02:10:45   16        You were shown Exhibits 22, 30, and 31 by defense

02:10:51   17   counsel, which were e-mails in February and March through

02:10:57   18   March 17th.  And you were asked questions if you advised their

02:11:00   19   clients to -- not to -- let me pull back.

02:11:05   20        During the period February 28 through March 3rd and

02:11:09   21   March 3rd through March 17th, the question is you were

02:11:12   22   directed to that time frame.  Do you remember that,

02:11:15   23   Mr. Borlack?

02:11:15   24   A.  I recall, yes.

02:11:16   25   Q.  During that time frame, had your clients ever told you

02:11:19  1  they were negotiating to buy the lease for their computers?

02:11:23  2  A.  No.

02:11:24  3  Q.  When did you first find that out?

02:11:29  4  A.  Well, you know when we first found that out?  I guess in

02:11:34  5  the August 5 telephone call with Mr. Shah when he said that

02:11:41  6  Associated Bank had originally wanted $370,000, but then they

02:11:46  7  finally dropped the price to $60,000 and that that's okay.

02:11:53  8  He'd -- I said in my e-mail, that's of.  I meant by of, okay.

02:11:59  9  In other words, I will accept that and was going to call Dave

02:12:02  10  Clark that day.

02:12:03  11       So there was a deal that we were told that he

02:12:05  12  would -- he would buy it from somebody, I don't know FMB or

02:12:10  13  Associated Bank, for 60,000.

02:12:12  14       Then on August 25, he finally sent us the e-mail

02:12:17  15  trail that he had with Mr. Clark, an August 9 e-mail.  That

02:12:22  16  August 9 e-mail had a June -- it had a thread with June 28

02:12:28  17  e-mails between him and Clark.  And Clark says, we --

02:12:33  18  Associated Bank is offering $65,000.  And he says, in so many

02:12:38  19  words, it's in evidence, we, not I, not you, we should accept

02:12:43  20  that.

02:12:44  21       And then Mr. Shah e-mails back on June 28, the same

02:12:48  22  day, and he says, fine.  He says, If you can get it down to

02:12:53  23  60,000, great, but get it at 65,000.

02:12:56  24  Q.  Wouldn't that information be important to you as lead

02:13:01  25  counsel and their defense of the UCB litigation?

02:13:05  1    A.  Of course.

02:13:06  2    Q.  I want to direct your attention to SH 46.  And this is the

02:13:25  3    March 16th e-mail from Steven Blumenthal to William

02:13:31  4    Serritella.  And the judge correctly pointed out to me, fixed

02:13:35  5    my error, that this was not an e-mail to the clients, correct?

02:13:39  6    A.  No.

02:13:40  7    Q.  But it was a letter -- it was an e-mail from the clients'

02:13:42  8    lawyer, right?

02:13:43  9    A.  Right, with a copy to Mr. Shah.

02:13:45  10   Q.  And he is -- Mr. Blumenthal is your clients' agent, is he

02:13:50  11   not?

02:13:50  12   A.  A lawyer is an agent, I would think so, yes.

02:13:54  13   Q.  And his knowledge is imputed to them, is it not, as a

02:13:59  14   matter of law?

02:13:59  15        MR. McJESSY:  Objection.  Foundation.

02:14:00  16        THE COURT:  Sustained.  Sustained.

02:14:04  17   BY MR. McGARRY:

02:14:16  18   Q.  It's your clients' own corporate lawyer advising

02:14:19  19   Mr. Clark's client -- or Mr. Clark's lawyer not to do anything

02:14:24  20   with that computer?

02:14:25  21   A.  That's how I read it.  We got it after we were discharged

02:14:29  22   as counsel.  That's the first time we ever saw it.

02:14:32  23   Q.  Can you tell me -- do you have any understanding as to why

02:14:41  24   Mr. Blumenthal did not include you in that e-mail?

02:14:46  25        MR. McJESSY:  Objection.  Foundation.

02:14:47  1   THE WITNESS:  I can't answer that because there is an
02:14:50  2   order in limine.
02:14:50  3   THE COURT:  You shouldn't answer that.
02:14:53  4   THE WITNESS:  I'm sorry, Judge.  Forgive me.  I'm not
02:14:56  5   used to this.
02:14:57  6   THE COURT:  Re-ask the question.  Lay a foundation.
02:15:00  7   BY MR. McGARRY:
02:15:02  8   Q.  Well, now that I know his answer, I may just --
02:15:05  9   THE COURT:  The answer will be stricken.
02:15:07  10  MR. McGARRY:  Thank you, your Honor.
02:15:07  11  BY MR. McGARRY:
02:15:09  12  Q.  I may just -- without violating the court's in limine, do
02:15:17  13  you know why Mr. Blumenthal would have omitted you from that
02:15:20  14  e-mail strand?
02:15:21  15  A.  My mind, I can't answer that without violating the order.
02:15:28  16  Q.  All right.  Did you ever -- what was your reaction when
02:15:33  17  you learned that your clients were leaving a server at the
02:15:38  18  warehouse?
02:15:38  19  A.  I thought it was absolute stupidity.  I mean, just -- just
02:15:45  20  -- just -- you know, nincompoop is the best word.  It just --
02:15:51  21  but human beings are human beings, you know.  I didn't ascribe
02:15:56  22  any ill motives to them.  I just assumed, you guys, you know,
02:16:00  23  geez.
02:16:01  24  Q.  All right.  Let me ask you this.  As far as Dave Clark is
02:16:06  25  concerned, how did your clients, Mr. Shah or Mr. Joshi, how

02:16:09    1    did they describe to you their relationship with Mr. Clark?

02:16:13    2    A.  Well, he was mentioned the very first day I met with

02:16:16    3    Mr. Shah as somebody who was formally at Mutual Bank and then

02:16:26    4    UCB.  And he may have said, he probably did, that he was at

02:16:29    5    First Midwest Bank, but First Midwest Bank wouldn't yet

02:16:31    6    register with me, so I don't know about.

02:16:35    7            But it became apparent as we went along that

02:16:39    8    Mr. Clark had a tremendous relationship with them.  Beginning

02:16:43    9    in February, starting I think February 20th, through June, I

02:16:49    10   get repeated e-mails from Mr. Shah or Flesch and, in one case,

02:16:58    11   I think, even Blumenthal about things that Mr. Clark is

02:17:02    12   telling them that relates to our case, and that includes

02:17:06    13   Mr. Clark sending me an e-mail on May 11 in which the e-mail

02:17:11    14   was to show he had bird-dogged two potential witnesses.  And

02:17:16    15   he sent it to me as an FYI with the e-mails he sent to the two

02:17:20    16   potential witnesses.

02:17:21    17           So I mean, this guy was -- they had a wonderful

02:17:25    18   relationship.  And one of the e-mails said that Mr. Clark

02:17:31    19   believed that he -- as I recall it, that he had been unfairly

02:17:35    20   fired by UCB because he stood up for the defendants before

02:17:44    21   UCB.  Now --

02:17:44    22           THE COURT:  Okay.

02:17:46    23           THE WITNESS:  -- the affidavit --

02:17:46    24           MR. McGARRY:  Thank you.

02:17:50    25   BY MR. McGARRY:

02:17:50    1   Q.  Did Mr. Joshi tell you that he had any special training or
02:17:54    2   experience in the law?
02:17:55    3   A.  Yes.  One day at one of his three depositions during
02:17:59    4   expedited discovery, he mentioned to me that he either was
02:18:04    5   deemed a lawyer or trained as a lawyer in India.
02:18:09    6             Now, let me be clear.  He was not telling me in any
02:18:12    7   way that he is up to American standards or that he practices
02:18:15    8   law --
02:18:16    9             THE COURT:  Okay.
02:18:17   10             THE WITNESS:  -- or anything else.
02:18:18   11             MR. McJESSY:  Your Honor, can we have that question
02:18:20   12   and answer read back?
02:18:21   13             THE COURT:  Do you really want it read back?
02:18:26   14             MR. McJESSY:  Believe it or not, yes.
02:18:27   15             THE COURT:  Go ahead and read it back.
02:18:54   16     (Record read.)
02:18:56   17             MR. McGARRY:  I have nothing further, your Honor.
02:18:58   18             THE COURT:  Okay.
02:18:59   19             MR. McGARRY:  Thank you.
02:19:00   20             THE COURT:  Redirect?
02:19:01   21             MS. DEDINAS:  No.
02:19:02   22             MR. McJESSY:  Judge, just a couple questions?
02:19:03   23             THE COURT:  Okay.
02:19:07   24                               - - -
02:19:07   25             ALAN BORLACK, RECROSS-EXAMINATION

| | | |
|---|---|---|
| 02:19:07 | 1 | BY MR. McJESSY: |
| 02:19:09 | 2 | Q. Sir, if you could turn to Exhibit 101. |
| 02:19:20 | 3 | A. Yes. |
| 02:19:20 | 4 | Q. That's an e-mail from Mr. Joshi to Eric Grossman at your |
| 02:19:24 | 5 | firm dated Thursday, May 13th, 9:38 a.m., and it discusses -- |
| 02:19:30 | 6 | it states, Currently, First Midwest is working with Associated |
| 02:19:34 | 7 | Bank, from whom we have leased the computers residing at the |
| 02:19:37 | 8 | warehouse, to resolve the matter between them. |
| 02:19:40 | 9 | And there's parens around the word "from" until the |
| 02:19:44 | 10 | word "warehouse." Do you see that? |
| 02:19:46 | 11 | A. Yes. |
| 02:19:47 | 12 | Q. And you are copied on that e-mail; is that right? |
| 02:19:49 | 13 | A. Yes. |
| 02:19:49 | 14 | Q. Did you read that e-mail when you received it? |
| 02:19:52 | 15 | A. I'm sure I did. |
| 02:19:54 | 16 | Q. Do you have a recollection of having read it, or you're |
| 02:19:55 | 17 | just assuming? |
| 02:19:56 | 18 | A. I can't specifically, but I just zoomed down the line. |
| 02:20:00 | 19 | Q. What -- did you have an understanding of what this e-mail |
| 02:20:03 | 20 | was telling you? |
| 02:20:04 | 21 | A. Yeah, I think I did. |
| 02:20:08 | 22 | Q. What did you understand it -- what did you understand the |
| 02:20:12 | 23 | e-mail to mean? |
| 02:20:12 | 24 | A. That the defendants owed some money to Associated Bank and |
| 02:20:18 | 25 | they were talking about it, consistent with the April 16 |

02:20:21   1   e-mail.

02:20:21   2   Q.  And that --

02:20:23   3   A.  19 e-mail.

02:20:24   4   Q.  And it says, from whom we have leased the computers.

02:20:27   5   Did that e-mail convey to you that the defendants had

02:20:30   6   leased their computers from Associated Bank?

02:20:32   7   A.  Well, that's what it says.

02:20:34   8   Q.  Okay.  So you understood as of May 13th that their

02:20:38   9   computers were leased from Associated Bank?

02:20:40  10   A.  That's correct.

02:20:40  11   Q.  Now, I'd like you to take a look at Exhibit 46, which

02:20:50  12   counsel just referenced.  This is that e-mail from Steve

02:21:05  13   Blumenthal to William Serritella, and it's copied to other

02:21:11  14   individuals.  And it's the e-mail wherein Mr. Blumenthal

02:21:14  15   advises Mr. Serritella that steps need to be taken to preserve

02:21:20  16   the items at the warehouse; specifically, the computers.

02:21:26  17   Do you see that?

02:21:27  18   A.  Would you point me to the language you have in mind?

02:21:30  19   Q.  Yes.  Well, I will just read it to you.  It begins, I need

02:21:34  20   to make sure -- I need to make sure that the hard drive and

02:21:37  21   system are accessible before we re-acquire since those items

02:21:41  22   will be relevant to the UCB litigation and discovery.

02:21:47  23   Accordingly, until the outside date by which we must

02:21:52  24   re-acquire the items and repay the bank, I need the bank to

02:21:55  25   agree that they will preserve the items and allow access to

02:21:58  1  UCB or us in connection with the litigation.

02:22:04  2       Do you see that?

02:22:06  3  A.  I do.

02:22:07  4  Q.  Did you have any communications with Mr. Blumenthal to

02:22:11  5  induce him to send this e-mail to Mr. Serritella?

02:22:14  6  A.  Absolutely not.

02:22:15  7  Q.  Okay.  You did not ask him to do that?

02:22:18  8  A.  I did not.

02:22:19  9  Q.  Okay.  So do you have any knowledge as to how he was aware

02:22:26  10  to do this?

02:22:27  11  A.  I do now.

02:22:29  12  Q.  Okay.  And did you then?

02:22:32  13  A.  I did not.

02:22:33  14  Q.  Okay.  And what is your knowledge now?

02:22:37  15  A.  Now is I've seen all the e-mails between Blumenthal and

02:22:42  16  Shah and Clark and Serritella.  I mean, beginning in January,

02:22:47  17  in February, he asked Clark to negotiate with him --

02:22:49  18  Q.  Hold on.  If I can stop you right there.  Now, I'm

02:22:53  19  specifically referring to the request.  Mr. Blumenthal is

02:22:58  20  giving notice to the counsel for First Midwest Bank that they

02:23:03  21  need to preserve the hard drive at the warehouse.  Do you

02:23:06  22  agree with that?

02:23:06  23  A.  Yes.

02:23:07  24  Q.  Okay.  Somehow, Mr. Blumenthal knows to do that; is that

02:23:07  25  right?

02:23:13   1   A.  That's right.

02:23:13   2   Q.  To your knowledge, neither you nor anyone else at your

02:23:16   3   firm told him to do that; is that right?

02:23:20   4   A.  That's correct.

02:23:20   5   Q.  Okay.  Do you know whether it was, in fact, the defendants

02:23:24   6   themselves that asked him to do that?

02:23:26   7   A.  I would not know that for a fact.

02:23:28   8   Q.  And you were involved at the end of February in the

02:23:40   9   discussions about the foreclosure on the warehouse.  We have

02:23:44   10  been through that, right?

02:23:45   11  A.  Two discussions with Mehul and Blumenthal.

02:23:49   12  Q.  And some phone calls with Blumenthal?

02:23:51   13  A.  Phone calls with Mehul on the line.  Two phone calls, as

02:23:54   14  far as I know.

02:23:55   15  Q.  Right.

02:23:55   16  A.  Memorializing two e-mails.

02:23:57   17  Q.  Two phone calls with Mr. Blumenthal and two e-mails; is

02:24:02   18  that what you're saying?

02:24:02   19  A.  E-mails confirming the phone calls, correct.

02:24:05   20  Q.  All right.  And at no time did you tell Mr. Blumenthal to

02:24:09   21  take steps to protect the computer equipment that's at the

02:24:12   22  warehouse; is that right?

02:24:13   23  A.  That's correct.  Except to preserve the server, you said.

02:24:17   24  Q.  Correct.

02:24:18   25  A.  Yes, that's correct.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 02:24:21 | 1  | MR. McJESSY:  Thank you. |
| 02:24:22 | 2  | THE COURT:  Anybody else have any questions? |
| 02:24:24 | 3  | I have a couple that I'd like to ask you. |
| 02:24:26 | 4  | There was a time where you were exchanging -- you |
| 02:24:31 | 5  | were either copied by Mr. Blumenthal on e-mails or e-mailed |
| 02:24:37 | 6  | directly, and vice versa.  That stopped for a period of time |
| 02:24:43 | 7  | and then didn't resume until a couple months later in August? |
| 02:24:48 | 8  | THE WITNESS:  Well, Judge, you know, I can't say that |
| 02:24:53 | 9  | because I don't -- we don't have all the e-mails between us. |
| 02:24:58 | 10 | I don't recall -- |
| 02:25:00 | 11 | THE COURT:  Are there more e-mails between you? |
| 02:25:02 | 12 | THE WITNESS:  Not on this topic, as far as I know, |
| 02:25:04 | 13 | but I mean on all kinds of things.  For example, Judge, |
| 02:25:08 | 14 | Mr. Blumenthal spoke with me about the events about getting -- |
| 02:25:16 | 15 | how Kanan tried to get a new loan from some other bank. |
| 02:25:19 | 16 | But there was no -- I think to get to the core of |
| 02:25:23 | 17 | what I think you're asking, there was no deliberate decision |
| 02:25:26 | 18 | by me in any way to cut Mr. Blumenthal off. |
| 02:25:30 | 19 | THE COURT:  Well, would you turn to Exhibit 170? |
| 02:25:34 | 20 | THE WITNESS:  Yes. |
| 02:25:44 | 21 | THE COURT:  That's an e-mail dated August 4th. |
| 02:25:46 | 22 | THE WITNESS:  Yes. |
| 02:25:46 | 23 | THE COURT:  From you to Mr. Shah and copied to |
| 02:25:51 | 24 | several other people. |
| 02:25:52 | 25 | THE WITNESS:  Yes. |

489

| | | |
|---|---|---|
| 02:25:53 | 1 | THE COURT: Have you reviewed that? |
| 02:25:54 | 2 | THE WITNESS: I have. |
| 02:25:55 | 3 | THE COURT: Okay. What was that all about? |
| 02:25:58 | 4 | THE WITNESS: First of all, Steve Blumenthal was |
| 02:26:03 | 5 | listed as a witness on our Rule 26 disclosure very early on. |
| 02:26:08 | 6 | In addition, I came to learn that not only did he |
| 02:26:11 | 7 | have knowledge about the events that led up to -- that |
| 02:26:15 | 8 | involved the alleged default, but I also learned that he was |
| 02:26:19 | 9 | one of the people who had -- was involved in trying to get |
| 02:26:24 | 10 | loans from other banks to Mr. Shah after the default. |
| 02:26:29 | 11 | Now, at one point not far from this e-mail, I am |
| 02:26:34 | 12 | meeting at a meeting with Mr. Glickman. And Don says, you |
| 02:26:39 | 13 | know, Alan, should you be e-mailing Blumenthal? He's going to |
| 02:26:42 | 14 | be a witness in the case. Is that going to be a problem? |
| 02:26:45 | 15 | And I remember saying to Don, I don't think so, you |
| 02:26:48 | 16 | know, he's a lawyer, he's -- you know, I don't think so. But |
| 02:26:51 | 17 | I began to think about it. |
| 02:26:52 | 18 | And that's why when I said he's going to be a |
| 02:26:56 | 19 | witness, I'm thinking he's going to be a factual witness, not |
| 02:27:00 | 20 | about the server, not about the server at all. I'm thinking |
| 02:27:04 | 21 | he's going to be a witness on the events on the merits in the |
| 02:27:08 | 22 | lawsuit. |
| 02:27:11 | 23 | THE COURT: Anything else? |
| 02:27:12 | 24 | THE WITNESS: No, I think that's it. |
| 02:27:14 | 25 | THE COURT: Okay. |

| | | |
|---|---|---|
| 02:27:17 | 1 | MR. McJESSY: One? |
| 02:27:18 | 2 | THE COURT: I am not finished yet. |
| 02:27:20 | 3 | As to Mr. Clark, did you ever talk to him on the |
| 02:27:25 | 4 | phone about this, the server? |
| 02:27:27 | 5 | THE WITNESS: No, I never did. |
| 02:27:28 | 6 | THE COURT: Why not? |
| 02:27:29 | 7 | THE WITNESS: I think, you know, my feeling was the |
| 02:27:34 | 8 | client was dealing with this, the client said he could get |
| 02:27:38 | 9 | this done, Mr. Clark was -- he had the relationship with |
| 02:27:43 | 10 | Clark, and it just never occurred to me to do that. |
| 02:27:47 | 11 | THE COURT: Didn't Mr. Clark testify that he had only |
| 02:27:50 | 12 | met him one time? |
| 02:27:52 | 13 | THE WITNESS: Well, if -- I'm not sure I recall that, |
| 02:27:59 | 14 | in any event. But I will tell you this, he sure talked to |
| 02:28:02 | 15 | Mehul a heck of a lot, as he did to -- |
| 02:28:05 | 16 | THE COURT: Mr. Clark did? |
| 02:28:06 | 17 | THE WITNESS: Mr. Clark. |
| 02:28:07 | 18 | THE COURT: That, I understand. |
| 02:28:08 | 19 | THE WITNESS: And also to Jim Flesch, who got on the |
| 02:28:11 | 20 | phone with Mehul. |
| 02:28:12 | 21 | And also we met -- |
| 02:28:13 | 22 | THE COURT: That's all right. My question is -- |
| 02:28:15 | 23 | THE WITNESS: The affidavit? |
| 02:28:16 | 24 | THE COURT: -- you never called him? |
| 02:28:17 | 25 | THE WITNESS: I never called him. |

| | | |
|---|---|---|
| 02:28:18 | 1 | THE COURT:  And did you ever discuss with |
| 02:28:21 | 2 | Mr. Blumenthal having Mr. Blumenthal call him? |
| 02:28:25 | 3 | THE WITNESS:  No. |
| 02:28:26 | 4 | THE COURT:  All right.  Thank you. |
| 02:28:31 | 5 | MR. McJESSY:  Your Honor, if I can talk to counsel |
| 02:28:35 | 6 | for a moment? |
| 02:28:37 | 7 | THE COURT:  Sure.  Sure.  Hang on. |
| 02:29:55 | 8 | MR. McGARRY:  May I ask a question? |
| 02:29:56 | 9 | THE COURT:  Sure. |
| 02:29:58 | 10 | - - - |
| 02:29:58 | 11 | ALAN BORLACK, RECROSS-EXAMINATION |
| 02:29:58 | 12 | BY MR. McGARRY: |
| 02:30:09 | 13 | Q.  I am going to refer you again to Exhibit 46, which is |
| 02:30:11 | 14 | Mr. Blumenthal's e-mail.  And I wondered -- I just want to |
| 02:30:16 | 15 | show you a billing entry.  I can show counsel.  I have just |
| 02:30:22 | 16 | been presented a billing statement on this matter and the |
| 02:30:25 | 17 | billing statement for 3/16. |
| 02:30:32 | 18 | MR. McGARRY:  I will represent to the court that |
| 02:30:34 | 19 | there is a billing statement that indicates a telephone call |
| 02:30:36 | 20 | with SHB.  And you were asking questions, Judge, about whether |
| 02:30:40 | 21 | he talked to Mr. Blumenthal, and I thought the billing |
| 02:30:43 | 22 | statement might help refresh his memory if he has no memory. |
| 02:30:48 | 23 | THE COURT:  There is your statement. |
| 02:30:50 | 24 | MR. McGARRY:  Thank you.  May I approach, your Honor? |
| 02:30:54 | 25 | THE COURT:  Sure. |

02:30:55    1   BY MR. McGARRY:

02:30:58    2   Q.  Mr. Borlack, take a look at that document and tell the

02:31:02    3   court what that document is.

02:31:08    4   A.  Well, I had a conference call with Steve Blumenthal and

02:31:14    5   John Bennek (phonetic).

02:31:15    6   Q.  Just tell -- I need the record to reflect what you're

02:31:19    7   looking at, sir.

02:31:20    8   A.  I'm looking at the entry for March 16 in my billing

02:31:23    9   statement.

02:31:23   10   Q.  Is that a true and accurate copy of your billing records?

02:31:26   11   A.  I'm sure it is.

02:31:26   12   Q.  All right.  Tell us what --

02:31:28   13        THE COURT:  What date one more time?

02:31:30   14   BY MR. McGARRY:

02:31:30   15   Q.  The date?

02:31:31   16   A.  March 16, 2010.

02:31:34   17        THE COURT:  Thank you.

02:31:38   18   BY MR. McGARRY:

02:31:39   19   Q.  My question is then, in light of Exhibit 46, and having

02:31:44   20   looked at that, does that refresh your memory regarding a

02:31:48   21   telephone conversation you had with Mr. Blumenthal and does it

02:31:52   22   refresh your memory regarding the subject matter of that

02:31:55   23   telephone call?

02:31:55   24   A.  No, I can't -- I mean, there is a conference call with him

02:32:02   25   and me and Bennek.  Bennek is a potential witness.  He used to

| | |
|---|---|
| 02:32:08 | 1 |
| 02:32:10 | 2 |
| 02:32:14 | 3 |
| 02:32:18 | 4 |
| 02:32:22 | 5 |
| 02:32:24 | 6 |
| 02:32:26 | 7 |
| 02:32:28 | 8 |
| 02:32:31 | 9 |
| 02:32:34 | 10 |
| 02:32:36 | 11 |
| 02:32:36 | 12 |
| 02:32:40 | 13 |
| 02:32:41 | 14 |
| 02:32:44 | 15 |
| 02:32:48 | 16 |
| 02:32:49 | 17 |
| 02:32:50 | 18 |
| 02:32:55 | 19 |
| 02:32:56 | 20 |
| 02:32:59 | 21 |
| 02:33:05 | 22 |
| 02:33:05 | 23 |
| 02:33:05 | 24 |
| 02:33:09 | 25 |

1  work for Mutual Bank.

2        So we got on the phone to talk with him.  I can only

3  assume that the telephone call with Steve foreshadowed that or

4  prepared for that phone call that he was on with Bennek.

5        Now, Bennek had nothing to do with the server.  He

6  was working with some other bank.

7  Q.  I just want to focus on -- and my question is I'm trying

8  to see if -- we're all interested in knowing whether that

9  refreshes your memory as to whether you spoke to

10  Mr. Blumenthal on that date and the subject of that

11  communication.

12  A.  It only refreshes my memory that I spoke with him on that

13  date.

14  Q.  Was the conversation about the inventory on that date?

15  A.  It might very well have been.  I mean, it might well have

16  been.  I cannot recall.

17  Q.  Did ESI come up, do you think?

18  A.  No.  Steve Blumenthal and I did not talk about ESI.

19        MR. McGARRY:  Thank you, your Honor.

20        THE WITNESS:  As far as I can recall.

21        THE COURT:  Thank you.  That's it.  You can step

22  down.

23    (Witness leaves the stand.)

24        THE COURT:  Call your next witness.

25        MS. DEDINAS:  We were going to let them call

| | | |
|---|---|---|
| 02:33:10 | 1 | Mr. Garrie. |
| 02:33:12 | 2 | MR. McGARRY:  The respondents would call Mr. Garrie. |
| 02:33:33 | 3 | MS. DEDINAS:  Can we take a quick break, your Honor? |
| 02:33:35 | 4 | THE COURT:  Sure. |
| 02:33:38 | 5 | (Short break.) |
| 02:43:42 | 6 | (Witness sworn.) |
| 02:43:42 | 7 | MS. DEDINAS:  Your Honor, may I approach for a |
| 02:43:44 | 8 | minute? |
| 02:43:44 | 9 | THE COURT:  Sure. |
| 02:43:47 | 10 | MS. DEDINAS:  During the break -- |
| 02:43:48 | 11 | THE COURT:  Do you need to approach? |
| 02:43:49 | 12 | MS. DEDINAS:  No, I'm sorry.  I just wanted to make a |
| 02:43:51 | 13 | statement. |
| 02:43:52 | 14 | During the break, Mr. Grossman pointed out to me that |
| 02:43:54 | 15 | I had made a representation in my questioning that was |
| 02:43:58 | 16 | inaccurate, and I wanted to correct that on the record. |
| 02:44:03 | 17 | THE COURT:  Okay.  And your questioning of whom? |
| 02:44:05 | 18 | MS. DEDINAS:  Of Mr. Grossman. |
| 02:44:07 | 19 | THE COURT:  Okay. |
| 02:44:07 | 20 | MR. McGARRY:  Mr. Borlack. |
| 02:44:08 | 21 | MS. DEDINAS:  Was it Mr. Borlack? |
| 02:44:09 | 22 | MR. McGARRY:  Yes. |
| 02:44:09 | 23 | MS. DEDINAS:  I think the question was that in the |
| 02:44:13 | 24 | joint status report on discovery that was filed with the court |
| 02:44:22 | 25 | on August 24th, I think I had asserted that the defendants did |

| | |
|---|---|
| 02:44:27 | 1 |
| 02:44:33 | 2 |
| 02:44:36 | 3 |
| 02:44:39 | 4 |
| 02:44:45 | 5 |
| 02:44:49 | 6 |
| 02:44:49 | 7 |
| 02:44:50 | 8 |
| 02:44:55 | 9 |
| 02:44:56 | 10 |
| 02:44:58 | 11 |
| 02:45:00 | 12 |
| 02:45:12 | 13 |
| 02:45:14 | 14 |
| 02:45:20 | 15 |
| 02:45:22 | 16 |
| 02:45:23 | 17 |
| 02:45:24 | 18 |
| 02:45:24 | 19 |
| 02:45:24 | 20 |
| 02:45:26 | 21 |
| 02:45:32 | 22 |
| 02:45:36 | 23 |
| 02:45:42 | 24 |
| 02:45:46 | 25 |

1  not advise the court that the -- Associated Bank had a lien on

2  the server at that time and that the first time they had

3  advised the court was in court on the 26th.

4         In fact, the document itself does mention the lien by

5  Associated Bank.  So I just wanted to correct the record.

6              THE COURT:  Okay.

7              MR. McGARRY:  Your Honor, and that would be at

8  paragraph 4 on page 2 of Exhibit No. --

9              MS. DEDINAS:  185.

10             MR. McGARRY:  -- 185.

11             MS. DEDINAS:  Thank you.

12             THE COURT:  Page 4, paragraph?

13             MS. DEDINAS:  Paragraph 4 on page 2.

14             THE COURT:  Page 2, paragraph 4.  Thank you.

15             MR. McGARRY:  Your Honor, the respondents call

16 Mr. Daniel Garrie.

17             THE COURT:  Okay.

18                            - - -

19             DANIEL GARRIE, DIRECT EXAMINATION

20 BY MR. McGARRY:

21 Q.  Mr. Garrie, what is your occupation, sir?

22 A.  I am a managing partner at Focus Solution Recourse

23 Delivery Group, which is a boutique consulting firm

24 specializing in electronic discovery and ESI issues.  And I

25 also serve as a court-appointed special master and neutral

02:45:51 1   electronic discovery disputes.

02:45:52 2   Q.  What is the nature of your company?

02:45:54 3   A.  My company, as I said, focuses on electronic discovery and

02:45:58 4   computer forensics.

02:45:59 5   Q.  Have you been appointed by courts in the special master or

02:46:04 6   as a neutral or expert?

02:46:06 7   A.  I have been appointed by the courts both as a special

02:46:09 8   master and used as a neutral in arbitration, most recently in

02:46:17 9   California in Covern v. Dine (phonetic).

02:46:21 10  Q.  I told you we're going to try to be brief, but you don't

02:46:24 11  have to try to rush and speak real fast.  It's helpful for the

02:46:29 12  court reporter.  Thank you.

02:46:30 13        Have you come here today voluntarily?

02:46:32 14  A.  Yes.

02:46:32 15  Q.  Why?

02:46:33 16  A.  In part to clarify what I think there may have been some

02:46:38 17  confusion around the prior testimony that I had made before in

02:46:41 18  this court, as well as offer and clarify as to what specific

02:46:47 19  actions that I performed.

02:46:48 20  Q.  Have you -- just a real thumbnail sketch of your

02:46:55 21  educational background?

02:46:57 22  A.  I hold a bachelor's and master's in computer science from

02:47:00 23  Brandeis University, a law degree from Rutgers, and I am a

02:47:05 24  member of the New York state bar.

02:47:06 25  Q.  Make it so the people in the back bleachers can hear you.

02:47:10  1  Okay?

02:47:10  2  A.  Sounds good.

02:47:11  3  Q.  Have you ever -- have you published any articles or

02:47:14  4  treatises?

02:47:14  5  A.  I have written 60-plus articles.  I am also the lead

02:47:18  6  author and editor for the treatise published by Thompson on

02:47:23  7  electronic discovery and arbitration this coming fall.

02:47:26  8  Q.  That's Thompson West, the legal publisher?

02:47:29  9  A.  Yes.  It's to be published worldwide.

02:47:31  10  Q.  And what do you do on a day-to-day basis, sir?

02:47:33  11  A.  I generally split my duties between performing forensic

02:47:38  12  work and working with counsel or the courts on various

02:47:41  13  electronic discovery issues.

02:47:43  14  Q.  What special qualifications do you have for that, sir?

02:47:47  15  A.  Prior to practicing law, I have over a decade almost of

02:47:54  16  experience working in technology, specifically with enterprise

02:47:58  17  systems and web-based systems, as well as computer forensics.

02:48:02  18  I have worked in the past for the Department of Justice,

02:48:04  19  Department of Homeland Security, and several other agencies

02:48:07  20  there within on a range of computer forensic and related

02:48:12  21  issues.

02:48:12  22  Q.  All right.  Were you asked to work on the UCB litigation

02:48:17  23  here?

02:48:17  24  A.  I was.  I was retained by Mr. Borlack with regard to --

02:48:22  25  actually, my initial task, what I was tasked with was the

02:48:26  1  recovery and restoration of the inoperable -- an inoperable

02:48:36  2  server that was at the Kanan facilities, and from there, my

02:48:39  3  duties were expanded to work with the Borlack firm and their

02:48:41  4  clients on general ESI matters.

02:48:42  5  Q.  Just briefly, would you open the book to SH 34.  If you

02:48:47  6  need help, let me know.  They are numbered on the cover.

02:49:00  7        While you are looking, I will ask you, is Exhibit 34

02:49:04  8  your contract that you entered into in this case to perform

02:49:08  9  services?

02:49:08  10  A.  Yes, it is.

02:49:10  11  Q.  Okay.  Take a quick look.  Was your engagement -- did it

02:49:26  12  assist Bailey Borlack and Nadelhoffer in electronic discovery?

02:49:29  13  A.  Yes.  That was the primary focus specific to this

02:49:31  14  individual matter.

02:49:32  15  Q.  Is that something you have had experience in before?

02:49:34  16  A.  I have worked with law firms all over the country on such

02:49:37  17  matters.

02:49:38  18        I might point out that the contract wasn't officially

02:49:44  19  executed until April 1st.

02:49:46  20  Q.  So you were technically engaged April 1st, so that's when

02:49:49  21  the contract was entered?

02:49:50  22  A.  Yes.

02:49:50  23  Q.  And who was the client who retained you?

02:49:52  24  A.  I was retained by the Borlack firm.

02:49:55  25  Q.  And what did you do during the month of April 2010 on the

02:50:01  1    UCB case?

02:50:02  2    A.  On the UCB case, actually April 1st, a colleague of mine

02:50:11  3    that works for FSRDG, Matt Denecke, went on site at Kanan to

02:50:13  4    assess the inoperable server.  At that time, we reached a

02:50:16  5    decision that to repair it and image it on site required

02:50:19  6    additional special equipment, so we rescheduled for -- I think

02:50:24  7    eventually it was April 23rd.

02:50:26  8          And also during that month, I read through a great

02:50:30  9    deal of paper.

02:50:31  10   Q.  Spell the name Matt Denecke, please.

02:50:35  11   A.  I'm not the best speller, but I would go with D-e-n-a-k-e

02:50:43  12   (sic).  I'm sorry.  I can provide the court --

02:50:46  13   Q.  What do you know of Mr. Matt Denecke's background and

02:50:50  14   qualifications in computers?

02:50:51  15   A.  He is a specialized Dell technician that works with Dell

02:50:56  16   hardware specifically.  He works with clients in the Midwest,

02:51:01  17   specifically in such matters including and not limited to

02:51:05  18   computer repair and support.

02:51:07  19   Q.  Does he -- now, is his experience limited to Dell

02:51:12  20   computers?

02:51:12  21   A.  No.

02:51:13  22         MR. McJESSY:  Objection.  Foundation.

02:51:17  23   BY MR. McGARRY:

02:51:17  24   Q.  Do you know?  Do you know if his experience is limited to

02:51:20  25   Dell computers?

02:51:21 1   A.  No, it is not limited to Dell.  He has experience with

02:51:24 2   all -- many different types of servers and machines.

02:51:28 3   Q.  How do you know that?

02:51:30 4   A.  Because he has performed work for other clients within

02:51:35 5   FSRDG.

02:51:37 6   Q.  Would he have qualifications, say, to look at or inspect a

02:51:43 7   computer built by Hewlitt Packard?

02:51:46 8   A.  Yes.  It would depend on the type of computer.  Some of

02:51:49 9   the older Hewlitt Packard machines require very specialized

02:51:53 10  knowledge, so it would depend, I guess, on the specific

02:51:55 11  device.

02:51:56 12  Q.  Now, when you were talking about inoperable server on

02:52:01 13  site, what site was that?

02:52:02 14  A.  That was -- the only site that we -- any employees from

02:52:06 15  FSRDG have actually been is Oak Brook.

02:52:09 16  Q.  Okay.  And now directing your attention to April 23rd,

02:52:12 17  okay, do you recall being at that site on April 23rd?

02:52:15 18  A.  Yes.  On paper April 23rd at about 9:00 a.m., myself,

02:52:22 19  Mr. Spernow, who heads up the computer forensic group at

02:52:27 20  FSRDG, Matt Denecke, Ms. Dedinas, her ESI liaison, Mr. Joshi,

02:52:31 21  and Mr. Shah.  I think I'm not forgetting anybody.  We all --

02:52:36 22  and Mr. Grossman.  My apologies.

02:52:40 23          And we all showed up at 9:00 a.m. at Kanan in Oak

02:52:46 24  Brook and in the conference room where the inoperable server

02:52:50 25  was, which was -- we were told a file server.

02:52:53  1  Q.  All right.  Let me see if I can shorten this.  Basically

02:52:56  2  during that daytime, there was a meeting, then there was a

02:53:01  3  lunch break, about two hours, and then there was further

02:53:06  4  meetings?

02:53:06  5  A.  That's correct.

02:53:07  6  Q.  Okay.  So just tell the court in the first meeting

02:53:11  7  basically what was going on.

02:53:14  8  A.  In the first meeting, there were many moving pieces.  The

02:53:18  9  first focus was on imaging the drives and the inoperable

02:53:21  10  server.  Once we got that process started, we were discussing

02:53:24  11  general ESI issues.  During the course of that conversation,

02:53:29  12  Ms. Denecke -- my apologies --

02:53:36  13  Q.  Ms. Dedinas?

02:53:37  14  A.  -- Ms. Dedinas was kind enough to, since I had just been

02:53:41  15  engaged, point out additional servers that was at the

02:53:45  16  warehouse, as well as bring to our attention backup tapes that

02:53:52  17  some prior I.T. individual who had worked for Kanan had

02:53:57  18  brought to their attention.

02:53:58  19  Q.  At the time you were there, had Kanan been able to pull

02:54:01  20  together an accurate list, I think there is another word you

02:54:06  21  have used --

02:54:06  22  A.  An asset list.

02:54:08  23  Q.  An asset list.

02:54:09  24  A.  No.  In fact, that was one of the more frustrating pieces

02:54:12  25  of this entire engagement, which was we weren't actually ever

02:54:15  1  able to get a full, complete list of the computers and

02:54:18  2  machines and servers and devices that had been known, so it

02:54:22  3  made it very challenging because we basically were working

02:54:26  4  only off what we were told and what we were able to see.

02:54:30  5  Q.  Did you understand that at the time, the Kanan company was

02:54:33  6  a going concern, or were they going out of business?  Do you

02:54:37  7  know what their status was?

02:54:38  8  A.  I was aware that they were having issues and troubles.  I

02:54:45  9  knew that they were having definite financial trouble.  I

02:54:48  10  wasn't very aware specifically.

02:54:49  11  Q.  Now, did Ms. Dedinas reveal to you how she became aware

02:54:54  12  that there was a server at the Aurora warehouse?

02:54:57  13  A.  Yes.  She provided -- she actually referenced a letter

02:55:04  14  that Mr. Muschler had submitted to the court where he listed

02:55:10  15  the warehouse server.  However, I'm not sure if the tapes were

02:55:14  16  in that letter, but I am certain the warehouse server was.

02:55:17  17          MR. McGARRY:  Exhibit 30, your Honor.  I can move on,

02:55:21  18  if you'd like, your Honor.

02:55:22  19          THE COURT:  It's just that he's rambling in the

02:55:25  20  answers.  You don't need to do that.

02:55:27  21          If you would just answer his question.  If he wants

02:55:30  22  any more, he will ask you another question.  Okay?

02:55:33  23          30?

02:55:34  24          MR. McGARRY:  Exhibit 30, your Honor.

02:55:36  25  BY MR. McGARRY:

02:55:36　1　Q.　Take a look at Exhibit 30.　Is that the letter that you

02:55:40　2　believe Ms. Dedinas was referring to?

02:55:42　3　A.　I believe so, or it might have been a different letter.

02:56:04　4　There was two letters.　Another one was from March 1st.

02:56:07　5　Q.　Okay.　Let me move on.　So the subject matter of the -- of

02:56:12　6　a server out in the warehouse was brought up.　And so what, if

02:56:16　7　anything, occurred with regard to that?　That's what we're

02:56:19　8　here about.　What, if anything, occurred next on that subject?

02:56:21　9　A.　Well, specifically at our lunch break, we spoke with

02:56:25　10　Mr. Joshi, Mr. Shah, myself, and Mr. Grossman, and Mr. Spernow

02:56:33　11　in Mr. Shah's office, and we specifically instructed him to

02:56:38　12　obtain and provide -- transport that warehouse server to the

02:56:42　13　Oak Brook facilities.

02:56:43　14　Q.　I need to you to be a little more specific.　Listen to the

02:56:47　15　question.

02:56:47　16　　　　　Who was present in the meeting?

02:56:50　17　A.　As I said, the initial people -- attendees at the meeting

02:56:57　18　were myself, Mr. Spernow, Mr. Grossman, Mr. Shah, and

02:57:00　19　Mr. Joshi.

02:57:01　20　Q.　Okay.　Where was the meeting?

02:57:02　21　A.　As I said, it was in Mr. Shah's office.

02:57:07　22　Q.　And how long did the meeting take place?

02:57:09　23　A.　I couldn't say exactly.　Thirty minutes.

02:57:13　24　Q.　All right.

02:57:14　25　A.　Maybe a bit longer.　I don't know.

02:57:15  1  Q.  All right.  Did the subject matter of the -- all right.

02:57:20  2      Now, what did you say, if anything, to Mr. Shah or

02:57:24  3  Mr. Joshi regarding the need to get access to that computer?

02:57:27  4  A.  Well, I told them that it was a must.  I actually said it

02:57:32  5  three times, that it was an absolute necessity to have access

02:57:36  6  to be able to either obtain it or get a copy thereof.

02:57:40  7  Q.  Okay.  Was Mr. Grossman present when that was said?

02:57:43  8  A.  Yes.

02:57:43  9  Q.  Okay.  What, if anything, did Mr. Shah or Mr. Joshi say in

02:57:47  10  response to that?

02:57:48  11  A.  They said it wasn't a problem.

02:57:50  12  Q.  Okay.

02:57:50  13  A.  That it could be provided.

02:57:52  14  Q.  During that conversation, did anyone call Mr. Clark?

02:57:57  15  A.  Yes, with -- Mr. Shah phoned Mr. Clark.  And the first

02:58:06  16  time he called, Mr. Clark actually didn't answer, and he left

02:58:09  17  a message.  And then Mr. Clark actually called back.

02:58:12  18  Q.  Now, did he tell you why he was calling Mr. Clark?

02:58:14  19  A.  He did.  He said very clearly he was calling Mr. Clark to

02:58:17  20  demonstrate that we could easily obtain access to the

02:58:21  21  warehouse and the machine.

02:58:22  22  Q.  All right.  And did Mr. Clark call while you were in that

02:58:25  23  meeting?

02:58:26  24  A.  Yes, he did.

02:58:26  25  Q.  Tell the court how that -- what Mr. Clark said, what

| | | |
|---|---|---|
| 02:58:31 | 1 | Mr. Shah said, if anything; and what you said, if anything. |
| 02:58:36 | 2 | A. Mr. Shah answered the phone, and it was pleasantries, and |
| 02:58:40 | 3 | then informed Mr. Clark that he was going to put him on |
| 02:58:42 | 4 | speakerphone. And then -- the question was posed |
| 02:58:50 | 5 | specifically, are we able to obtain access to the warehouse |
| 02:58:53 | 6 | and the server. And Mr. Clark said, sure, not a problem, come |
| 02:58:57 | 7 | by tomorrow and pick it up, or something to that effect. |
| 02:59:00 | 8 | Q. All right. Now, do you remember if that was a Friday, |
| 02:59:05 | 9 | that meeting? |
| 02:59:06 | 10 | A. I do not. I think -- I want to say yes, but I'd have to |
| 02:59:12 | 11 | see a calendar. |
| 02:59:12 | 12 | Q. Did you have the means and the interest in going over to |
| 02:59:16 | 13 | that -- or the ability to go and pick that up on the next day? |
| 02:59:20 | 14 | A. Yes. In fact, I actually offered and suggested to allow |
| 02:59:25 | 15 | my team, Mr. Denecke, to actually go to the warehouse and get |
| 02:59:28 | 16 | the server. |
| 02:59:28 | 17 | Q. Okay. Now, let's get to that. Was Mr. Clark on the phone |
| 02:59:32 | 18 | when you said that? |
| 02:59:33 | 19 | A. No. |
| 02:59:34 | 20 | Q. Okay. So how did the conversation end? |
| 02:59:36 | 21 | A. Mr. Clark said, yes, it shouldn't be a problem. And then |
| 02:59:41 | 22 | the phone was -- the call was ended. |
| 02:59:43 | 23 | Q. Were you introduced to Mr. Clark as the ESI expert or |
| 02:59:49 | 24 | assistant that was retained for the Kanan litigation? |
| 02:59:52 | 25 | A. Yes, as the ESI liaison I think was the term he used. |

02:59:56  1  Q.  And Mr. Shah made that introduction?

03:00:00  2  A.  Yes.

03:00:01  3  Q.  Did Mr. Joshi participate in the conversation?

03:00:03  4  A.  He was sitting in the room.  He wasn't actively speaking.

03:00:07  5  Q.  All right.  So now after the phone call, tell us, was

03:00:13  6  Mr. Denecke present in the phone call?

03:00:15  7  A.  Mr. Denecke was not there, neither was Mr. Spernow.

03:00:20  8  Q.  Was Mr. Denecke present at the building?

03:00:22  9  A.  Yes, Mr. Denecke was there working, identifying the

03:00:26  10  different machines.

03:00:27  11  Q.  Now, did you and/or Mr. Denecke or both of you offer to

03:00:30  12  Mr. Shah to go pick up that server?

03:00:32  13  A.  Yes, I offered Mr. Denecke's services.

03:00:35  14  Q.  All right.  Tell the court what you said at that time and

03:00:39  15  to whom.

03:00:39  16  A.  To Mr. Shah, if he would like, I am more than happy to

03:00:43  17  have Mr. Denecke go over to the warehouse and pick up the

03:00:47  18  server.

03:00:48  19  Q.  Okay.  And what, if anything, did Mr. Shah say to you in

03:00:50  20  response?

03:00:50  21  A.  No thanks, I will arrange for it to be transported over,

03:00:55  22  or something to that effect.

03:00:56  23  Q.  Now, were you aware that Ms. Dedinas was coming back and

03:01:02  24  had further questions regarding that warehouse server,

03:01:05  25  correct?

507

03:01:06  1   A.   Yeah.

03:01:07  2   Q.   Okay.  So the meeting then resumed, the afternoon session

03:01:10  3   of the meeting resumed, correct?

03:01:12  4   A.   Yes, it did.  We were continuing to image the drives of

03:01:15  5   the inoperable server.

03:01:16  6   Q.   Did you have conversations with Ms. Dedinas or the expert

03:01:20  7   for UCB?

03:01:21  8   A.   Yes, at multiple points throughout.

03:01:24  9   Q.   Did Mr. Grossman have communications with Ms. Dedinas and

03:01:27  10  representatives of UCB?

03:01:29  11  A.   Yes.

03:01:29  12  Q.   And in that -- in those conversations, were there any

03:01:34  13  representations made to Ms. Dedinas or representatives of UCB

03:01:38  14  regarding whether or not there would be access to the computer

03:01:40  15  or whether the computer would be moved?

03:01:42  16  A.   Yes.  Based on the remarks provided by both Mr. Clark and

03:01:47  17  Mr. Shah, both I think myself and Mr. Grossman informed her

03:01:52  18  that we had access and that the server was being -- would be

03:01:55  19  moved to the Oak Brook facilities.

03:01:56  20  Q.   And did Mr. Shah give you a reason why he didn't want you

03:01:59  21  to move it?

03:02:00  22  A.   I think there was some allusion or reference to a holiday

03:02:09  23  or something to that effect.

03:02:10  24  Q.   So if you had offered to get it on this particular

03:02:13  25  holiday, they would not be available to give you access?  What

508

| | | |
|---|---|---|
| 03:02:17 | 1 | did the holiday have to do with anything? |
| 03:02:19 | 2 | A.  I honestly don't know.  I just know that we offered the |
| 03:02:22 | 3 | services and that Mr. Shah declined them. |
| 03:02:24 | 4 | Q.  And were you and Mr. Denecke personally ready, willing, |
| 03:02:28 | 5 | and able to go pick up that server that weekend? |
| 03:02:30 | 6 | A.  Of course.  That would have -- yes. |
| 03:02:32 | 7 | Q.  Did either Mr. Shah or Mr. Joshi characterize Mr. Clark in |
| 03:02:45 | 8 | any way as whether they were familiar with him? |
| 03:02:47 | 9 | A.  Yeah, they actually referred to him as their inside man, |
| 03:02:51 | 10 | that he had been a previous employee of UCB and had moved over |
| 03:02:55 | 11 | to the new bank. |
| 03:02:59 | 12 | Q.  Did you then instruct or recommend to Mr. Grossman that |
| 03:03:29 | 13 | any further steps be taken? |
| 03:03:31 | 14 | A.  Yes.  I repeatedly instructed Mr. Grossman to get -- |
| 03:03:37 | 15 | arrange for the transportation of the server from the |
| 03:03:40 | 16 | warehouse to Oak Brook. |
| 03:03:42 | 17 | Q.  Do you have any knowledge as to whether he tried to do |
| 03:03:44 | 18 | that? |
| 03:03:44 | 19 | A.  Yes, I do. |
| 03:03:47 | 20 | Q.  Just what is the extent of your knowledge of that? |
| 03:03:51 | 21 | A.  My repeated conversations informing him that it was |
| 03:03:55 | 22 | absolutely critical. |
| 03:03:56 | 23 | Q.  Do you know if he was communicating that to his clients |
| 03:04:00 | 24 | from your conversations with him? |
| 03:04:01 | 25 | A.  He told me that he was. |

03:04:02   1   Q.  Did anyone -- Mr. Clark or anyone at that time or at any
03:04:15   2   time during this litigation suggest to you that a subpoena or
03:04:18   3   court order would be required for Kanan to get access to its
03:04:20   4   server in the warehouse?
03:04:22   5   A.  No.
03:04:22   6   Q.  And you were under the impression that you could drive
03:04:33   7   over and pick it up if you were allowed to do that?
03:04:35   8   A.  Yes, and that's what we were told.
03:04:37   9   Q.  I'd like to move on to a time in history when you were
03:04:42  10   here in the courtroom.  I think it was this courtroom, was
03:04:44  11   it --
03:04:44  12          THE COURT:  It was.
03:04:46  13          MR. McGARRY:  Thank you, Judge.
03:04:47  14   BY MR. McGARRY:
03:04:47  15   Q.  -- (continuing) on May 19th.
03:04:50  16          And there were discussions, and just, if you could,
03:04:55  17   just tell us what was going on ESI-wise on May 19th that you
03:04:58  18   were concerned with.
03:04:59  19   A.  Reporting to the court our efforts regarding the recovery
03:05:02  20   of the inoperable server and our ongoing ESI efforts in
03:05:06  21   constructing and identifying the different computers and
03:05:10  22   machines that Kanan had.
03:05:11  23   Q.  You've prepared a declaration in this case, did you not?
03:05:17  24   A.  Yes.
03:05:17  25   Q.  And is that declaration accurate, to the best of your

knowledge?

A. Yes, it is.

Q. Now, why is it a declaration and not an affidavit?

A. It's more my fault than anything. It was Sunday afternoon, and, unfortunately, I wasn't able to find what perhaps would have been an acceptable notary at the time, so rather be safe, since I didn't know the exact local rules of the court, I submitted it as a declaration as allowed under the federal rules.

Q. I'm looking in my notes for the transcript. You have them -- do you have those?

This is the -- why were you in court that day again?

A. I was in court that day to just inform the court as to our efforts regarding the recovery of the inoperable server as well as our ongoing ESI efforts.

Q. I just want to focus on a couple of parts of this and maybe someone else or the court has further questions. But I want to give you an opportunity to explain what you meant that day.

The court said -- I'm on page 5 of your declaration, so I'm not looking at the actual transcript, but I think we have accurately stated to the court, so there are backup tapes. Mr. Garrie, spelled wrong, yes, your Honor. Court, okay. Mr. Garrie, there were -- their liaison expert actually -- their liaison informed us that -- of the tapes, actually,

03:07:23 1 when we were there. And we did find them, and we have

03:07:26 2 verified the tapes, so we are in the process.

03:07:30 3 Next statement. And with regard to the servers, we

03:07:33 4 have also verified all of them. We have them under our

03:07:37 5 control and custody -- I'm sorry, custody and control.

03:07:42 6 When you made those statements, did you believe those

03:07:43 7 statements were accurate?

03:07:44 8 A. Yes, as they applied to Oak Brook and the facilities I had

03:07:50 9 seen.

03:07:50 10 Q. I don't see a question directly on that by the Court, but

03:07:54 11 having looked back on this, and I want to make sure you're

03:07:58 12 accurate, did you understand that you were being asked about

03:08:01 13 the warehouse server?

03:08:03 14 A. No.

03:08:03 15 Q. Well, can you explain how that is.

03:08:06 16 A. Because I was -- the focus of my -- the focus of the

03:08:15 17 hearing that day was on the inoperable server and the efforts

03:08:19 18 we had done regarding that at the Oak Brook facilities, and we

03:08:28 19 had just -- had been previously discussing that.

03:08:32 20 Q. Okay. And you believe the statements you made were

03:08:35 21 accurate.

03:08:36 22 Could you tell me, is it important to you that Judge

03:08:43 23 Mason understand that you intended to be honest when you were

03:08:47 24 in court addressing the court that day?

03:08:49 25 A. Yes, that's one of the main reasons why I'm here.

| | | |
|---|---|---|
| 03:08:51 | 1 | Q.  Why is that important? |
| 03:08:53 | 2 | A.  I serve as a special master in other judicial-appointed |
| 03:08:57 | 3 | capacities.  I believe that it is -- I am very concerned that |
| 03:09:03 | 4 | there may have been confusion with regards to my statements |
| 03:09:05 | 5 | and... |
| 03:09:14 | 6 | MR. McGARRY:  I have nothing further, your Honor. |
| 03:09:15 | 7 | THE COURT:  Can I ask you a question? |
| 03:09:17 | 8 | MR. McGARRY:  Yes. |
| 03:09:18 | 9 | THE COURT:  Have you read from his declaration? |
| 03:09:19 | 10 | MR. McGARRY:  Yes. |
| 03:09:20 | 11 | THE COURT:  And he submitted that declaration? |
| 03:09:22 | 12 | MR. McGARRY:  Yes. |
| 03:09:22 | 13 | THE COURT:  And he misspelled his own name? |
| 03:09:25 | 14 | MR. McGARRY:  Oh, no, we just used it exactly as it |
| 03:09:29 | 15 | is in the transcript.  We don't want to change anything in |
| 03:09:31 | 16 | this case, your Honor. |
| 03:09:37 | 17 | We did spell his name correctly at the top of the |
| 03:09:39 | 18 | declaration, for the record. |
| 03:09:41 | 19 | THE COURT:  Okay. |
| 03:09:42 | 20 | MR. McGARRY:  Thank you, Judge. |
| 03:09:43 | 21 | THE COURT:  Cross. |
| 03:09:43 | 22 | - - - |
| 03:09:43 | 23 | DANIEL GARRIE, CROSS-EXAMINATION |
| 03:09:43 | 24 | BY MS. DJORDJEVIC: |
| 03:10:08 | 25 | Q.  Good afternoon, Mr. Garrie. |

03:10:09   1   A.  Good afternoon.

03:10:10   2   Q.  You were just testifying about some statements that you

03:10:11   3   made at the May 19 status hearing in this court, correct?

03:10:16   4   A.  Yes.

03:10:16   5   Q.  And you said you were attempting to clarify what you meant

03:10:19   6   at the time that you made those statements?

03:10:21   7   A.  Yes.

03:10:22   8   Q.  Now, you had just finished testifying that you said the

03:10:28   9   main focus of that hearing was the inoperable server; is that

03:10:32   10  correct?

03:10:32   11  A.  Providing a status update with regards to our --

03:10:35   12  Q.  The inoperable server, efforts to recover the data on the

03:10:40   13  inoperable server?

03:10:41   14  A.  Yes, because we ended up shipping the drives -- two of the

03:10:44   15  drives to a clean room facility, Gillware.

03:10:47   16          MS. DJORDJEVIC:  It was actually a yes-or-no

03:10:48   17  question --

03:10:48   18          THE WITNESS:  I'm sorry.

03:10:48   19          MS. DJORDJEVIC:  -- so I'm going to object as

03:10:50   20  nonresponsive and ask that that be stricken.

03:10:53   21          THE COURT:  It will be stricken.

03:10:54   22  BY MS. DJORDJEVIC:

03:10:55   23  Q.  You just testified that the main focus of the hearing that

03:10:58   24  day was to provide an update on the efforts to recover the

03:11:01   25  data on the inoperable server; is that correct?

03:11:03  1   A.  Yes, at Oak Brook.

03:11:05  2   Q.  But that's not the only thing that was discussed in that

03:11:07  3   hearing, was it?

03:11:08  4   A.  That is correct.  I would have to see the transcript.

03:11:14  5   Q.  And I can.  Let me ask you first, and to the extent you

03:11:17  6   don't recall, I will show you.  For example, backup tapes were

03:11:20  7   discussed during that hearing?

03:11:24  8             MR. McGARRY:  I'm sorry, what?

03:11:26  9   BY MS. DJORDJEVIC:

03:11:27  10  Q.  Backup tapes.

03:11:27  11  A.  Yes.

03:11:27  12  Q.  And data maps were discussed during that hearing as well?

03:11:30  13  A.  Yes.

03:11:31  14  Q.  And, in fact, there was a discussion about defendants

03:11:35  15  providing a data map during that hearing?

03:11:37  16  A.  I'll take your word for it.  If I could see the

03:11:42  17  transcript.

03:11:43  18  Q.  Sure.  I can find the page for you.

03:12:03  19            MS. DJORDJEVIC:  May I approach?

03:12:04  20            THE COURT:  Sure.

03:12:05  21            MS. DJORDJEVIC:  I will give you a copy.  I

03:12:08  22  apologize.  This is loose.

03:12:09  23  BY MS. DJORDJEVIC:

03:12:18  24  Q.  So if you start on page 4, and you can flip through --

03:12:29  25            THE COURT:  His statement is on page 23.

515

03:12:32　1　　　　　　MS. DJORDJEVIC:  Oh, of the transcript for the

03:12:33　2　hearing.

03:12:33　3　　　　　　THE COURT:  Yes.

03:12:34　4　　　　　　MS. DJORDJEVIC:  That's what we're looking at at the

03:12:35　5　moment is actually the transcript from the May 19th hearing --

03:12:38　6　　　　　　THE COURT:  Correct.

03:12:38　7　　　　　　MS. DJORDJEVIC:  -- rather than to his statement.

03:12:40　8　　　　　　THE COURT:  Right.

03:12:40　9　　　　　　MS. DJORDJEVIC:  I am just asking to flip through the

03:12:42　10　statement to see if it refreshes his recollection about the

03:12:46　11　discussion of data maps.

03:12:49　12　　　　　　MR. McGARRY:  Your Honor, may I inquire if that's

03:12:51　13　marked as an exhibit?

03:12:52　14　　　　　　MS. DJORDJEVIC:  It's not.

03:12:53　15　　　　　　THE COURT:  It is not.

03:13:18　16　　　　　　THE WITNESS:  Yes.  I see it, sorry, page 22.

03:13:20　17　BY MS. DJORDJEVIC:

03:13:21　18　Q.  Well, starting on page 4, actually, there is a discussion

03:13:23　19　regarding data maps generally, defendants' data, the bank's

03:13:29　20　data that goes on for a number of pages.

03:13:31　21　A.  Was I involved in that discussion?

03:13:32　22　Q.  You were in court that day, correct?  I am not actually

03:13:35　23　asking what you spoke about.  I am asking is it your

03:13:38　24　recollection that data maps were discussed?

03:13:41　25　A.  Yes, yes.

03:13:41  1  Q.  And is it your recollection that the court actually set a

03:13:44  2  deadline for defendants to produce their data map during that

03:13:48  3  hearing?

03:13:48  4  A.  I'm going to go with yes, I'm assuming you are asking.  I

03:14:00  5  don't know -- sorry.

03:14:01  6  Q.  All right.  So a number of things in addition to the

03:14:03  7  inoperable server were discussed during that hearing?

03:14:07  8  A.  The data maps and the tapes.

03:14:09  9  Q.  And as we just discussed that during that hearing, you

03:14:15  10  stated to the court, and for that, it's both -- here, we will

03:14:19  11  find it.

03:14:23  12       Starting on page 23, line 14, you stated to the court

03:14:31  13  with regards to the servers, So we have also verified all of

03:14:34  14  them work.  We have them all under our custody and control.

03:14:37  15       Is that correct?

03:14:37  16  A.  Yes.

03:14:38  17  Q.  Okay.  And you are now testifying that even though you

03:14:43  18  said we have all of the servers under our custody and control,

03:14:47  19  you weren't actually referring to all of defendants' servers?

03:14:50  20  A.  I was only referring to all of the servers at Oak Brook

03:14:53  21  that I had seen.  I haven't -- sorry.

03:14:56  22  Q.  And those were the servers you said you had seen during

03:15:11  23  the April 23rd ESI meeting at Kanan's offices?

03:15:16  24  A.  Yeah, the machines -- actually multiple machines and

03:15:18  25  servers.  When I said "all," I was referring to Oak Brook.

03:15:21　1　Q.　Your statement to the court at that time was not

03:15:23　2　qualified, was it?

03:15:23　3　A.　No, it was not.

03:15:24　4　Q.　Okay.　And you didn't explain that you were only referring

03:15:29　5　to the servers that you actually saw at defendants' Oak Brook

03:15:34　6　offices on April 23rd?

03:15:35　7　A.　No, I did not.　I certainly --

03:15:38　8　Q.　In fact, what you actually said was, With respect to the

03:15:41　9　servers, we have them all under our custody and control?

03:15:44　10　A.　As I said, I -- that's correct.　I was referring to, as I

03:15:47　11　said, all, as in the ones I had seen at Oak Brook, not -- as I

03:15:52　12　mentioned earlier, we weren't provided a list of all of the

03:15:56　13　machines --

03:15:56　14　　　　　MS. DJORDJEVIC:　Objection.　Nonresponsive, move to

03:15:58　15　strike.

03:15:59　16　　　　　THE COURT:　Sustained.　I will strike that.

03:15:59　17　　　　　MS. DJORDJEVIC:　Do you have the question, actually?

03:16:17　18　　(Record read.)

03:16:17　19　　　　　THE WITNESS:　That is correct, yes, all of the ones I

03:16:19　20　saw.

03:16:19　21　　　　　MS. DJORDJEVIC:　Objection.　Move to strike as

03:16:21　22　nonresponsive, the last half of his answer.

03:16:24　23　　　　　THE COURT:　I will grant that.

03:16:27　24　　　　　MS. DJORDJEVIC:　Would you ask the question again?

03:16:39　25　　(Record read.)

03:16:40  1       THE WITNESS:  Yes.

03:16:41  2   BY MS. DJORDJEVIC:

03:16:43  3   Q.  And, in fact, during that April 23rd meeting, the servers

03:16:47  4   at the Aurora warehouse were discussed, weren't they?

03:16:50  5   A.  Ms. Dedinas mentioned them to us.

03:16:55  6   Q.  And you also said that you had a half-hour meeting with

03:16:59  7   Mr. Shah and Mr. Joshi and yourself and Mr. Grossman and at

03:17:03  8   one point Mr. Clark on the telephone regarding getting access

03:17:07  9   to the server at the Aurora warehouse; is that correct?

03:17:10  10  A.  And Mr. Spernow was not there.

03:17:12  11  Q.  I actually didn't say Mr. Spernow's name.

03:17:15  12       THE COURT:  She didn't.

03:17:16  13       THE WITNESS:  Yes, you're correct.

03:17:18  14  BY MS. DJORDJEVIC:

03:17:18  15  Q.  So you spent a good amount of time, half an hour, at the

03:17:22  16  April 23rd meeting actually discussing getting access to the

03:17:25  17  server?

03:17:25  18  A.  No, that's incorrect.  About five or maybe 10 minutes were

03:17:29  19  spent discussing the warehouse server, maybe a little longer.

03:17:34  20  Q.  Okay.

03:17:34  21  A.  I'm not exactly sure.  But we discussed multiple things,

03:17:38  22  including the backup tapes and other issues there.

03:17:40  23  Q.  And you stated that during that discussion with Mr. Shah

03:17:45  24  and Mr. Joshi, Mr. Grossman, that you told them, I presume you

03:17:50  25  were referring to Mr. Shah and Mr. Joshi, three times about

03:17:53   1   the absolute necessity to obtain the server or get a copy of

03:17:59   2   it; is that correct?

03:17:59   3   A.  Yes, during that meeting alone, three times.

03:18:01   4   Q.  And then you testified that you and Mr. Grossman told --

03:18:16   5   you said then that afterwards when the general meeting

03:18:20   6   continued on April 23rd, you and Mr. Grossman told Ms. Dedinas

03:18:24   7   that you had access to the warehouse server and that it would

03:18:28   8   be moved to the Oak Brook office?

03:18:29   9   A.  Yeah, I don't remember if it was myself or Mr. Grossman,

03:18:32   10  but I do remember the information being provided.

03:18:34   11  Q.  Okay.  Do you recall that earlier you stated that it was

03:18:36   12  both you and Mr. Grossman?

03:18:37   13  A.  I did.

03:18:38   14  Q.  And is that statement -- so it's either you or

03:18:42   15  Mr. Grossman, but one of you said it?

03:18:44   16  A.  That is correct.

03:18:44   17  Q.  And both of were you present when that statement was made?

03:18:47   18  A.  Yes.

03:18:47   19  Q.  Okay.  Now, between April 23rd and this May 19th hearing,

03:18:56   20  did either you or Mr. Grossman or Mr. Borlack ever tell

03:19:02   21  Ms. Dedinas or anyone else from UCB that that hadn't been

03:19:05   22  done, that the server had not been moved?

03:19:06   23  A.  I had not.

03:19:08   24  Q.  And to your knowledge, had Mr. Grossman?

03:19:10   25  A.  I don't have such knowledge.

03:19:12   1   Q.  And to your knowledge, had Mr. Borlack?

03:19:14   2   A.  Again, I don't know.

03:19:15   3   Q.  And you didn't tell the court on May 19th that it hadn't

03:19:21   4   been moved, did you?

03:19:22   5   A.  No, I did not.

03:19:23   6   Q.  And to your knowledge, did Mr. Grossman tell the court

03:19:26   7   that day that it hadn't been moved?

03:19:29   8          MR. McGARRY:  Your Honor, the record speaks for

03:19:31   9   itself.

03:19:31  10          THE COURT:  No, she can ask, if he knows the answer.

03:19:33  11          THE WITNESS:  Honestly, I don't know.

03:19:35  12   BY MS. DJORDJEVIC:

03:19:35  13   Q.  And to your knowledge, did Mr. Borlack tell the court that

03:19:37  14   day that the server had not been moved?

03:19:39  15   A.  Again, I don't know.  There is a transcript here.  I would

03:19:43  16   have to read it.

03:19:45  17   Q.  And the only statement you made to the court that day was,

03:19:48  18   quote, And with regard to the servers, we have also verified

03:19:50  19   all of them work, we have them all under our custody and

03:19:53  20   control.

03:19:54  21          Correct?

03:19:54  22   A.  Yes.

03:19:55  23   Q.  Okay.  So to your knowledge, neither Ms. Dedinas nor the

03:20:05  24   court had any reason -- or had not been told anything other

03:20:11  25   than what your statement was, that the servers would be moved,

| | | |
|---|---|---|
| 03:20:17 | 1 | Ms. Dedinas had been told that on the 23rd, and now |
| 03:20:19 | 2 | Ms. Dedinas and the court were being told by you that you had |
| 03:20:22 | 3 | all the servers under the custody and control; is that |
| 03:20:25 | 4 | correct? |
| 03:20:25 | 5 | A.  Could you repeat the question?  I'm sorry. |
| 03:20:26 | 6 | Q.  Sure.  To your knowledge, Ms. Dedinas had been told that |
| 03:20:28 | 7 | you were going to move the servers, correct?  You told her |
| 03:20:31 | 8 | that or Mr. Grossman told her that on April 23rd? |
| 03:20:33 | 9 | A.  We told her that they were being moved or we were |
| 03:20:36 | 10 | arranging for them to be moved. |
| 03:20:37 | 11 | Q.  And then on May 19th, you told both Ms. Dedinas and the |
| 03:20:40 | 12 | court that you had all the servers under your custody and |
| 03:20:43 | 13 | control? |
| 03:20:43 | 14 | A.  Yes. |
| 03:20:44 | 15 | Q.  All right.  And you hadn't told anybody otherwise between |
| 03:20:47 | 16 | those two periods? |
| 03:20:48 | 17 | A.  Told -- I'm sorry, told other people?  I had spoken with |
| 03:20:55 | 18 | both Mr. Grossman and Mr. Borlack. |
| 03:20:57 | 19 | Q.  You hadn't told Ms. Dedinas that all the servers weren't |
| 03:21:00 | 20 | under defendants' custody and control? |
| 03:21:02 | 21 | A.  That is correct. |
| 03:21:03 | 22 | Q.  And you hadn't told the court? |
| 03:21:05 | 23 | A.  No, I did not tell the court. |
| 03:21:07 | 24 | Q.  And, in fact, to the extent you are now saying that the |
| 03:21:16 | 25 | servers you were referring to were the servers that were in |

03:21:21  1  some sense at issue at the April 23rd meeting, the warehouse

03:21:24  2  server was actually discussed at that meeting, correct?

03:21:27  3  A.  I don't understand the question.

03:21:27  4  Q.  Okay.  That's fine.

03:21:33  5       Just to go a little further, we went over a little

03:21:43  6  earlier that the data maps were discussed at the May 19th

03:21:48  7  hearing; is that correct?

03:21:49  8  A.  Yes.

03:21:50  9  Q.  Okay.  And if you turn to -- do you recall that you made

03:21:57  10  some representations to the court that day about the -- why

03:22:02  11  data maps are necessary in electronic discovery?

03:22:05  12  A.  I do not.  You just gave me the transcript.

03:22:14  13  Q.  Sure.  If you could turn to page 4, starting on line 8.

03:22:23  14  This is you speaking.  It says, The purpose and intent of the

03:22:27  15  data map is to facilitate costly -- like cost-effective

03:22:31  16  discovery.

03:22:31  17       Did I read that correctly?

03:22:33  18  A.  Did --

03:22:37  19  Q.  Did I read that correctly?

03:22:39  20  A.  Yeah, that's what's written.

03:22:40  21  Q.  Okay.  And that was your statement, you said that at the

03:22:43  22  time?

03:22:43  23  A.  Yeah, you're reading my statement.

03:22:46  24  Q.  Okay.  And is that a correct statement?

03:22:48  25  A.  Yes.

03:22:53  1   Q.  And then if you go down to line 14, I understand that at
03:23:02  2   this point, you're discussing UCB's system specifically, but
03:23:05  3   line 14, after the first comma, continues, So it is going to
03:23:10  4   be really hard to write -- craft narrowly-tailored and
03:23:14  5   reasonably search if we don't know the world within which
03:23:16  6   we're searching, and that's the intent of a data map.
03:23:18  7        Did I read that correctly?
03:23:21  8   A.  No.
03:23:21  9   Q.  What did I read incorrectly?
03:23:23  10  A.  You added the word "which."
03:23:30  11  Q.  Okay.  I will read this again.  So it is going to be
03:23:33  12  really hard to write, and then there is a hyphen, craft
03:23:37  13  narrowly-tailored and reasonably search if we don't know the
03:23:41  14  world within we are searching, and that's the intent of a data
03:23:44  15  map.
03:23:44  16        Did I read that correctly?
03:23:45  17  A.  Yes.
03:23:45  18  Q.  And is that statement accurate?
03:23:46  19  A.  Yes.
03:23:46  20  Q.  Okay.  And so you basically informed the court at that
03:23:54  21  point that you need to know about the entire universe of
03:23:58  22  entities, ESI system, in order to craft a data map and you
03:24:02  23  need the data map in order to properly get the information
03:24:05  24  that you need to conduct proper electronic discovery; is that
03:24:08  25  correct?

03:24:08　1　A.　No.　The data map is one piece of what is required to

03:24:13　2　actually perform your work.

03:24:14　3　Q.　I didn't actually say it was the only piece, but do you

03:24:17　4　need the data map as one piece?

03:24:19　5　A.　Use of the data map is generally the best method to use if

03:24:24　6　it's available.

03:24:24　7　Q.　And so, for example, defendants' data map, if they were to

03:24:31　8　do one, would need to include the entire universe of computers

03:24:34　9　and servers used by defendants?

03:24:36　10　A.　Yes.

03:24:39　11　Q.　And, otherwise, you wouldn't actually be able to use that

03:24:42　12　data map?

03:24:44　13　A.　You would be able to use it.　You wouldn't -- I don't --

03:24:49　14　you would be able to use the data map.　It just wouldn't be

03:24:53　15　complete.

03:24:53　16　Q.　And as we discussed earlier, defendants were ordered to

03:25:01　17　produce a data map, a deadline was set that day during that

03:25:05　18　hearing?

03:25:05　19　　　　　MR. McGARRY:　Your Honor, I'm sorry.　It's coming so

03:25:08　20　fast.　I'm sorry.　I apologize.　I couldn't hear the question.

03:25:11　21　　　　　THE COURT:　Sure.

03:25:11　22　　　　　MS. DJORDJEVIC:　Can you read it back?　Sorry.　I

03:25:12　23　have been told I'm not loud enough.　I keep thinking I am.

03:25:12　24　　　　　MR. McGARRY:　I'm having the same problem.

03:25:29　25　　(Record read.)

03:25:30  1    MR. McGARRY:  Your Honor, I think it's gone really
03:25:32  2  far afield from the testimony, the direct testimony.
03:25:34  3    THE COURT:  Well, I think you went into his statement
03:25:37  4  there, and that statement came from him -- his -- you quoted
03:25:41  5  from the statement and made reference to the transcript, so
03:25:45  6  that's what she's questioning about.
03:25:47  7    MR. McGARRY:  I understand, Judge, but in their
03:25:49  8  sanction motion, they only claim that he failed -- that he
03:25:54  9  misrepresented and that therefore the respondents are guilty
03:25:56  10  and should be sanctioned because he testified the way he did.
03:25:59  11  And that was the quoted part that I think that they were
03:26:01  12  relying on, not this other stuff that we are going over now.
03:26:05  13    MS. DJORDJEVIC:  And, your Honor, he tried to explain
03:26:07  14  into his affidavit what his understanding was of the purpose
03:26:09  15  of that statement, and I am trying to put a complete context
03:26:12  16  on his understanding of the statement.
03:26:15  17    THE COURT:  And I know you are, but you need to pick
03:26:18  18  it up a little bit.  So your objection is overruled.
03:26:22  19    MS. DJORDJEVIC:  Would you read the question back?
03:26:36  20   (Record read.)
03:26:38  21    THE WITNESS:  I honestly have no idea.  You just gave
03:26:41  22  me the transcript.  If you say so, I will say yes, but I don't
03:26:44  23  know where it is in the transcript.  I apologize.
03:26:46  24  BY MS. DJORDJEVIC:
03:26:47  25  Q.  Okay.  You did just testify the data map is the best for

03:27:01  1  crafting?

03:27:01  2  A.  It's one of the -- it's not the best.  It's one of the

03:27:07  3  tools you use.

03:27:08  4  Q.  If the data map isn't complete, then your search is not

03:27:12  5  going to be complete either?

03:27:13  6  A.  That's not it either.  I said it's a tool and if it's not

03:27:16  7  complete, you still use it because it's better than having

03:27:19  8  nothing.

03:27:19  9  Q.  Actually, that's not what you said either, but

10  (unintelligible).

11         THE COURT REPORTER:  I'm sorry, you sort of trailed

12  off.

13         MS. DJORDJEVIC:  It's okay, yeah.  I don't even

14  remember back anymore.

15  BY MS. DJORDJEVIC:

03:27:46  16  Q.  You did testify that defendants' data map would need to

03:27:51  17  include the complete universe of the computers in

03:27:53  18  (unintelligible).

03:27:53  19  A.  Can you -- I --

03:27:54  20  Q.  Just now you testified to that.  I asked you that question

03:27:56  21  and you answered.

03:27:58  22         THE COURT:  Sustained.

03:28:01  23  BY MS. DJORDJEVIC:

03:28:04  24  Q.  Now, did you work with defendants to put together their

03:28:06  25  data map?

| | | |
|---|---|---|
| 03:28:09 | 1 | THE COURT: Now that is going beyond the scope. |
| 03:28:10 | 2 | MS. DJORDJEVIC: Okay. |
| 03:28:27 | 3 | I am done. |
| 03:28:32 | 4 | - - - |
| 03:28:32 | 5 | DANIEL GARRIE, CROSS-EXAMINATION |
| 03:28:32 | 6 | BY MR. McJESSY: |
| 03:28:48 | 7 | Q. Just a few questions, Mr. Garrie. |
| 03:28:54 | 8 | Have you done work for Mr. Borlack's firm before? |
| 03:28:56 | 9 | A. No. |
| 03:28:57 | 10 | Q. This is the first matter that you were retained by them? |
| 03:29:00 | 11 | A. Yes. |
| 03:29:04 | 12 | Q. All right. And do you have any relationship with |
| 03:29:08 | 13 | Mr. Borlack, any personal relationship? |
| 03:29:12 | 14 | A. I consider him a colleague and a friend. |
| 03:29:14 | 15 | Q. You are not a family member or anything like that? |
| 03:29:16 | 16 | A. No. |
| 03:29:17 | 17 | Q. One question -- or a couple of questions, I guess, about |
| 03:29:22 | 18 | the meeting that occurred on April 23rd. You mentioned during |
| 03:29:27 | 19 | the course of that meeting that Ms. Dedinas had raised the |
| 03:29:30 | 20 | issue of a warehouse server; is that right? |
| 03:29:32 | 21 | A. Yes. |
| 03:29:33 | 22 | Q. Okay. She was clearly advised that it wasn't at the Oak |
| 03:29:36 | 23 | Brook office; is that right? |
| 03:29:42 | 24 | MS. DJORDJEVIC: Objection. |
| 03:29:42 | 25 | THE WITNESS: I don't know. |

03:29:42   1   BY MR. McJESSY:

03:29:44   2   Q.  Okay.  Were you party to --

03:29:45   3           THE COURT:  Where is this coming from?  What's the

03:29:47   4   objection?

03:29:49   5           MS. DJORDJEVIC:  There is no basis for Mr. Garrie to

03:29:51   6   have knowledge of what Ms. Dedinas was advised of.

03:29:56   7           THE COURT:  Sustained.

03:29:57   8   BY MR. McJESSY:

03:29:58   9   Q.  Did you have any discussions -- strike that.

03:29:59  10           You were at a meeting at the Oak Brook office, and

03:30:03  11   Ms. Dedinas was present; is that right?

03:30:04  12   A.  Yes.

03:30:04  13   Q.  During the course of any of the discussions where she was

03:30:07  14   present, was it discussed that there was a server that was not

03:30:11  15   present at the Oak Brook office?

03:30:13  16   A.  Yes.

03:30:16  17   Q.  Okay.  And so as part of -- all right.  So as part of

03:30:25  18   those discussions, was she advised that the server wasn't

03:30:28  19   there?

03:30:29  20           MS. DJORDJEVIC:  Objection.

03:30:30  21           THE COURT:  Wasn't where?

03:30:31  22           MR. McJESSY:  That the server --

03:30:32  23           THE COURT:  And how would he know that?

03:30:34  24           MR. McJESSY:  He was party to the conversation.

03:30:36  25           THE COURT:  Well, she may have been advised by

03:30:38   1   somebody else or not advised by somebody else.

03:30:43   2   BY MR. McJESSY:

03:30:44   3   Q.  While you were at the meeting at the Oak Brook office, a

03:30:47   4   meeting that included Ms. Dedinas, there were discussions that

03:30:50   5   involved a server that was located off-site at a warehouse; is

03:30:55   6   that right?

03:30:55   7   A.  Yes.

03:30:56   8   Q.  All right.  And you also testified that during a lunch

03:31:04   9   break, you went into an office and a call was placed to

03:31:08  10   Mr. Clark; is that right?

03:31:09  11   A.  We went into Mr. Shah's office.

03:31:15  12   Q.  And Mr. Clark wasn't available.  He called back.  Now, you

03:31:18  13   were present when he called back and he was put on

03:31:21  14   speakerphone; is that right?

03:31:23  15   A.  Yes.

03:31:23  16   Q.  Okay.  And this meeting took place on April 23rd.  Do you

03:31:28  17   remember that that was, in fact, a Friday?

03:31:30  18   A.  I do not remember.  If you show me a calendar, I can tell

03:31:35  19   with you certainty.

03:31:35  20   Q.  I will represent to you that April 23rd was indeed a

03:31:38  21   Friday.

03:31:38  22   A.  Then yes.

03:31:39  23   Q.  All right.  And do you remember what time of the day it

03:31:45  24   was that you -- that Mr. Clark called back?

03:31:47  25   A.  Midday.

03:31:50  1   Q.  What does midday mean to you?

03:31:52  2   A.  Between 11:00-ish and 1:00-ish.

03:31:56  3   Q.  Sometime during that period of time.

03:32:00  4       You testified that Mr. Clark said that he would make

03:32:06  5   the warehouse available the next day; is that right?

03:32:11  6   A.  He said we could come by and pick up the server from the

03:32:14  7   warehouse the next day, or whenever, actually.

03:32:17  8   Q.  Okay.  Did you understand that the warehouse was owned by

03:32:22  9   First Midwest Bank?

03:32:23  10  A.  No.

03:32:24  11  Q.  Did you understand from anybody at that time that the

03:32:29  12  warehouse was not owned by Kanan?

03:32:33  13  A.  I didn't know who owned the warehouse.

03:32:37  14  Q.  At all?

03:32:38  15  A.  I mean, I had no direct knowledge.  It had been

03:32:41  16  represented that Kanan owned the warehouse.

03:32:45  17  Q.  You had direct knowledge that Kanan owned the warehouse?

03:32:50  18  A.  No, it had been represented to me.  I didn't have any

03:32:53  19  direct knowledge.

03:32:53  20  Q.  Who represented to you that Kanan owned the warehouse?

03:32:56  21  A.  Mr. Shah.

03:32:57  22  Q.  Okay.  At that meeting?

03:32:58  23  A.  Yeah.  I don't remember exactly, but, yes.

03:33:05  24  Q.  And do you remember whether you were told that Kanan had

03:33:12  25  once owned the warehouse as compared to it currently owns the

03:33:17   1    warehouse?

03:33:17   2    A.  I was under the impression that they owned -- Kanan owned

03:33:24   3    the warehouse.

03:33:25   4    Q.  Do you know why Mr. Shah was calling Mr. Clark?

03:33:28   5    A.  To show us that it wasn't a problem or an issue to get the

03:33:33   6    warehouse -- access to the warehouse because there was some

03:33:38   7    issue around some financial -- I actually don't know, to be

03:33:44   8    honest.  He said he had an inside man at the bank and that we

03:33:47   9    would be able to easily obtain access.

03:33:49   10    Q.  Okay.  There was somebody at the bank who would provide

03:33:52   11    access; is that right?

03:33:56   12    A.  Yeah, but I didn't know which bank at that time.

03:33:58   13    Q.  All right.  And so you knew that Mr. Shah didn't have the

03:34:05   14    key to get into the warehouse on that day; is that right?

03:34:08   15    A.  No, that is not correct.

03:34:09   16    Q.  Okay.  Why is that not correct?

03:34:11   17    A.  Because he said that he could go over and get it.  He

03:34:17   18    would go over and get it.

03:34:18   19    Q.  He said he would go over and get the key?

03:34:20   20    A.  He would go over and get the server from the warehouse.

03:34:23   21    When I offered to go over or have Mr. Denecke get it, he said

03:34:27   22    he would go over, arrange someone to go over and get it, so I

03:34:30   23    assumed that he had access.

03:34:32   24    Q.  Okay.  You don't have any understanding of why Mr. Shah

03:34:35   25    had to call Mr. Clark in order to get access to the warehouse?

03:34:40   1   A.  No.

03:34:41   2   Q.  Did Mr. Clark say anything about having to contact U.S.

03:34:55   3   Equities in order to gain access to the warehouse?

03:34:56   4   A.  No, it was a short conversation.

03:34:57   5   Q.  Did Mr. Clark say that he had the key to the warehouse?

03:35:00   6   A.  No.

03:35:00   7   Q.  Did Mr. Clark say that he, himself, could provide access

03:35:04   8   to the warehouse?

03:35:05   9   A.  Yes.

03:35:05   10  Q.  Are you aware that Mr. Clark didn't have a key to the

03:35:14   11  warehouse?

03:35:15   12  A.  No.

03:35:15   13  Q.  Is that contrary to your understanding?

03:35:17   14  A.  I understood Mr. Clark to be able to provide access.

03:35:26   15  Q.  Okay.  And it was your understanding that he was willing

03:35:32   16  to do this on a Saturday?

03:35:35   17  A.  Yeah, they seemed to be very collegial and close.

03:35:48   18  Q.  You were never told by Mr. Shah that the server that was

03:35:59   19  at the warehouse had been moved to the Oak Brook office,

03:36:02   20  correct?

03:36:03   21  A.  That it had been moved?

03:36:10   22  Q.  Correct.

03:36:11   23  A.  That's correct.

03:36:11   24  Q.  You were never told by Mr. Joshi that the server had been

03:36:14   25  moved from the warehouse to the Oak Brook office; is that

03:36:17  1  correct?

03:36:17  2  A.  That is correct.

03:36:21  3  Q.  If you could turn to Exhibit 34.  Well, strike that.  Let

03:36:36  4  me just maybe cut to the chase a little bit more quickly.

03:36:40  5       There is an e-mail correspondence to Mr. Shah --

03:36:44  6       THE COURT:  Wait.

03:36:46  7       THE WITNESS:  Sorry.

03:36:48  8  BY MR. McJESSY:

03:36:48  9  Q.  Let me just represent to you that there is an e-mail

03:36:50  10  correspondence from Mr. Muschler -- do you know Mr. Muschler?

03:36:53  11  A.  Yes.

03:36:54  12  Q.  Okay.  He is an attorney with Mr. Borlack's office?

03:36:57  13  A.  Yes.

03:36:57  14  Q.  All right.  There is an e-mail correspondence from

03:37:00  15  Mr. Muschler to Mr. Shah, and it says in part, We have

03:37:02  16  identified an individual with whom Alan is very familiar and

03:37:06  17  would be able to provide very capable assistance.

03:37:10  18       And this is an e-mail discussing engaging an ESI

03:37:13  19  expert.  I will represent to you that that's you.

03:37:16  20       Do you know how it is that Mr. Borlack would be very

03:37:19  21  familiar with you?

03:37:20  22  A.  Because I send him my articles and other materials.

03:37:25  23  Q.  Okay.  From marketing efforts then?

03:37:28  24  A.  Well, that and he is -- I mean, he is a colleague and a

03:37:34  25  friend, so we speak from time to time, and I tell him about

| | | |
|---|---|---|
| 03:37:37 | 1 | what I'm doing. |
| 03:37:38 | 2 | Q.  How long have you known him? |
| 03:37:40 | 3 | A.  A while.  At least -- I couldn't tell you the exact time, |
| 03:37:52 | 4 | but for a good while. |
| 03:37:53 | 5 | Q.  More than five years? |
| 03:37:54 | 6 | A.  Yes. |
| 03:37:54 | 7 | Q.  More than 10 years? |
| 03:37:56 | 8 | A.  Yes. |
| 03:37:56 | 9 | Q.  How old are you? |
| 03:37:59 | 10 | A.  I am 34. |
| 03:38:07 | 11 | Q.  Have you known him for more than 20 years? |
| 03:38:10 | 12 | A.  Yeah, I mean, my grandfather was his colleague.  You'd |
| 03:38:16 | 13 | have to ask Mr. Borlack, to be honest, but I have known |
| 03:38:19 | 14 | Mr. Borlack for quite some time. |
| 03:38:21 | 15 | Q.  Pretty much most of your life? |
| 03:38:22 | 16 | A.  Not closely, but I have known of him and known -- come to |
| 03:38:28 | 17 | know him better as I became an attorney, et cetera.  This is |
| 03:38:36 | 18 | why I actually -- yes, I had known Mr. Borlack for quite a |
| 03:38:40 | 19 | while. |
| 03:38:40 | 20 | Q.  You consider him a friend? |
| 03:38:42 | 21 | A.  A friend and also a -- a mentor. |
| 03:38:47 | 22 | Q.  It's a yes-or-no question. |
| 03:38:48 | 23 | A.  Yes. |
| 03:38:48 | 24 | Q.  Thank you, sir. |
| 03:38:49 | 25 | Now, I'd like you to take a look at one exhibit, |

03:38:55  1    Exhibit 135.  I'd like to first address -- have you address
03:39:33  2    your attention to an e-mail --
03:39:34  3         MS. DJORDJEVIC:  Objection.  This e-mail didn't come
03:39:36  4    in on direct.
03:39:37  5         THE COURT:  Go ahead and ask the question.
03:39:41  6    BY MR. McJESSY:
03:39:42  7    Q.  I'd like you to look at an e-mail that's at the bottom of
03:39:45  8    the page.  On the front page it's dated July 1st, 2010, at
03:39:50  9    11:00 a.m.  And it says, louissmalley@hotmail.com wrote, and
03:39:58  10   it says, Daniel, currently there is just myself and Paresh at
03:40:02  11   the Oak Brook location.  We have more people logging in from
03:40:05  12   other locations.
03:40:07  13        Can you tell me what that e-mail is referring to?
03:40:10  14   A.  It was referring to whether or not remote access inbound
03:40:26  15   to Oak Brook was possible.
03:40:27  16   Q.  And then there is a message above that, if you look.  It's
03:40:29  17   a message to Lou from Eric Grossman, and you're copied on it.
03:40:35  18   Actually, it's in part to you.  And it's dated July 1st, 2010,
03:40:41  19   11:27 a.m.
03:40:44  20        Do you see that?
03:40:45  21   A.  Yes.
03:40:45  22   Q.  And there is a line in there that begins, It is currently.
03:40:49  23   It says, It is currently at the former Aurora warehouse, and
03:40:55  24   we don't have control over the premises or machine, so Paresh
03:41:00  25   needs to coordinate your access to that machine.

03:41:02  1        Do you see that?

03:41:03  2  A.  Yeah.

03:41:03  3  Q.  And you understand that that was referring to the

03:41:08  4  warehouse server; is that right?

03:41:12  5  A.  I'm reading the e-mail.

03:41:14  6  Q.  Sure.

03:41:18  7        MR. McGARRY:  Before he answers, Judge, I'd object on

03:41:22  8  the basis it's beyond the scope of --

03:41:23  9        THE COURT:  And that was the prior objection too.  I

03:41:25  10  am going to let him answer this question and then you are

03:41:27  11  going to move on.

03:41:29  12        THE WITNESS:  Yes, I think.  Yes.

03:41:33  13        Can you repeat the question?  I'm sorry.

03:41:35  14        THE COURT:  No.  No.

03:41:36  15        THE WITNESS:  I was reading the e-mail.

03:41:37  16        THE COURT:  That's enough.  Move on.

03:41:43  17        MR. McJESSY:  All right.

03:41:55  18        I have no other questions, Judge.

03:41:59  19        MR. McGARRY:  Nothing further, your Honor.

03:42:00  20        MS. DJORDJEVIC:  Nothing further.

03:42:02  21        THE COURT:  You may step down, sir.

03:42:05  22        THE WITNESS:  Thank you, your Honor.

03:42:06  23     (Witness leaves the stand.)

03:42:40  24        THE COURT:  Ready to call your next witness?

03:42:42  25        MS. DJORDJEVIC:  Yes, we are getting him.  It will be

| | | |
|---|---|---|
| 03:42:44 | 1 | Mr. Serritella. |
| 03:43:25 | 2 | THE COURT:  Are we ready? |
| 03:43:53 | 3 | (Witness sworn.) |
| 03:43:53 | 4 | - - - |
| 03:43:53 | 5 | WILLIAM J. SERRITELLA, DIRECT EXAMINATION |
| 03:43:53 | 6 | BY MS. DJORDJEVIC: |
| 03:43:57 | 7 | Q.  Good afternoon, Mr. Serritella. |
| 03:43:58 | 8 | A.  Good afternoon.  You can call me Bill. |
| 03:44:02 | 9 | Q.  Could you state your full name for the court and spell it |
| 03:44:05 | 10 | for the court reporter. |
| 03:44:05 | 11 | A.  Of course.  William J. Serritella, Jr., |
| 03:44:11 | 12 | S-e-r-r-i-t-e-l-l-a. |
| 03:44:11 | 13 | Q.  And is your occupation? |
| 03:44:15 | 14 | A.  Attorney. |
| 03:44:17 | 15 | Q.  Where do you work? |
| 03:44:19 | 16 | A.  Aronberg, Goldgehn, Davis & Garmisa. |
| 03:44:23 | 17 | Q.  May I refer to the firm as Aronberg Goldgehn? |
| 03:44:27 | 18 | A.  Sure.  Aronberg would probably be easier for you. |
| 03:44:30 | 19 | Q.  Even better. |
| 03:44:31 | 20 | What is your position at Aronberg? |
| 03:44:32 | 21 | A.  I am a member of the firm and I am the chairman of the |
| 03:44:35 | 22 | litigation department. |
| 03:44:35 | 23 | Q.  And do you have a professional relationship with First |
| 03:44:41 | 24 | Midwest Bank? |
| 03:44:41 | 25 | A.  Our firm does represent First Midwest Bank, yes. |

538

| | | |
|---|---|---|
| 03:44:44 | 1 | Q.  And do you represent First Midwest Bank? |
| 03:44:45 | 2 | A.  I do work for First Midwest Bank, yes. |
| 03:44:51 | 3 | MR. LIPTON:  Could the witness speak up, your Honor. |
| 03:44:52 | 4 | I can't hear him. |
| 03:44:53 | 5 | THE COURT:  Sure.  If you would. |
| 03:44:54 | 6 | THE WITNESS:  I'm sorry, your Honor. |
| 03:44:57 | 7 | BY MS. DJORDJEVIC: |
| 03:44:57 | 8 | Q.  And are you or your firm counsel for First Midwest Bank or |
| 03:45:01 | 9 | had you been counsel for First Midwest Bank for any matters |
| 03:45:05 | 10 | involving any of the defendants in this litigation? |
| 03:45:07 | 11 | A.  Yes. |
| 03:45:08 | 12 | Q.  And what matters would those be? |
| 03:45:12 | 13 | A.  Our firm and myself represented First Midwest Bank in the |
| 03:45:18 | 14 | foreclosure of the warehouse which ultimately ended up into a |
| 03:45:25 | 15 | DIL, deed in lieu of foreclosure agreement.  We represented |
| 03:45:29 | 16 | First Midwest Bank for purposes of terminating the leasehold |
| 03:45:35 | 17 | interest of Kanan Fashions, and I represented First Midwest |
| 03:45:39 | 18 | Bank when this dispute over the computer took place. |
| 03:45:44 | 19 | I also represented First Midwest Bank in connection |
| 03:45:48 | 20 | with their attempt and ultimately successful attempt to |
| 03:45:51 | 21 | purchase the lease of the server that is at issue here from |
| 03:45:55 | 22 | Associated Bank. |
| 03:45:56 | 23 | Q.  Okay.  First Midwest Bank also purchased Mr. Shah's |
| 03:46:00 | 24 | personal guaranty of that lease; is that correct? |
| 03:46:02 | 25 | A.  The personal guaranty came with the lease, yes. |

03:46:05　1　Q.　And you mentioned the deed in lieu of foreclosure

03:46:10　2　transaction.

03:46:11　3　A.　Yes.

03:46:11　4　Q.　Was that a forced foreclosure?

03:46:14　5　A.　I would say it's more in line with a consent foreclosure.

03:46:19　6　A deed in lieu of foreclosure transaction is different than a

03:46:22　7　consent foreclosure, but it's very similar.

03:46:24　8　Q.　And Creative Warehousing was the entity foreclosed upon;

03:46:30　9　is that correct?

03:46:30　10　A.　Creative Warehouse -- I'm not trying to be difficult, but

03:46:33　11　I want to try to be precise.　Creative Warehousing, to the

03:46:37　12　best of my recollection, was the owner of the property, so

03:46:40　13　that was one of the parties in the transaction.　But I believe

03:46:42　14　that Kanan Fashions was also a maker of the note that was

03:46:46　15　secured by the mortgage on the property.

03:46:50　16　Q.　And both Creative Warehousing and Kanan Fashions agreed to

03:46:56　17　enter into the deed in lieu of foreclosure transaction?

03:46:59　18　A.　Yes.

03:47:00　19　Q.　And you also mentioned an eviction?

03:47:02　20　A.　A consensual eviction, yes.

03:47:06　21　Q.　And who was evicted?

03:47:07　22　A.　Once First Midwest Bank became the owner of the property

03:47:11　23　pursuant to the deed in lieu transaction, it evicted Kanan

03:47:16　24　Fashions from the premises.

03:47:17　25　Q.　So Kanan Fashions had been a tenant in the warehouse?

03:47:20  1   A.  It's my understanding that Kanan Fashions leased the

03:47:22  2   warehouse from Creative Warehousing, yes.

03:47:24  3   Q.  And you had said that Kanan Fashions agreed to that

03:47:28  4   eviction?

03:47:28  5   A.  Essentially, yes.

03:47:29  6   Q.  And do you recall when the deed in lieu of foreclosure

03:47:34  7   transaction closed?

03:47:35  8   A.  Late March 2010.

03:47:37  9   Q.  Does March 15th sound right?

03:47:41  10  A.  I don't remember the exact date.

03:47:42  11  Q.  Do you recall when the agreed eviction order was entered?

03:47:46  12  A.  Not long thereafter.  Within a few days.

03:47:49  13  Q.  If you could look at page -- Exhibit 57 in the binder

03:48:00  14  there, SH 57.  Let me know if that refreshes your recollection

03:48:05  15  as to when the agreed eviction order was entered.

03:48:25  16  A.  According to this order, the eviction -- the agreed order

03:48:28  17  of eviction was entered on March 24th, 2010.

03:48:31  18  Q.  And your firm signed that order on behalf of First Midwest

03:48:36  19  Bank; is that correct?

03:48:37  20  A.  Yes, ma'am.

03:48:38  21  Q.  And if you could take a look at Exhibit 46, point you to

03:48:48  22  the right part to see if that refreshes your recollection on

03:48:51  23  when the deed in lieu transaction closed.

03:48:56  24          If you would look at the --

03:48:58  25  A.  46?

03:48:59  1  Q.  SH 46, yes.

03:49:05  2      And the first page has two e-mails on it.  The bottom

03:49:09  3  one is from you.  It's a March 15th, 2010, e-mail from you to

03:49:13  4  Mr. Blumenthal.

03:49:14  5  A.  This would certainly lead me to believe that it closed on

03:49:17  6  March 15.

03:49:17  7      THE COURT:  You need to turn around.  If you need to

03:49:20  8  bring the book over here, you can do that.

03:49:22  9      THE WITNESS:  I understand.

03:49:24  10      That certainly refreshes my recollection that the

03:49:26  11  transaction closed on March 15th, 2010.

03:49:26  12  BY MS. DJORDJEVIC:

03:49:30  13  Q.  That's the deed in lieu transaction?

03:49:32  14  A.  Yes.

03:49:32  15  Q.  And between the -- March 15th when the deed in lieu

03:49:36  16  transaction closed and March 24th when the agreed eviction

03:49:40  17  order was entered, Kanan Fashions was still a tenant at the

03:49:45  18  warehouse, correct?

03:49:45  19  A.  I would say that's correct.

03:49:46  20  Q.  So during that period, they would have a right to access

03:49:48  21  the warehouse?

03:49:49  22  A.  Yes.

03:49:49  23  Q.  And even if, say, First Midwest Bank had chosen to change

03:49:58  24  the locks on the warehouse when the deed in lieu transaction

03:50:01  25  closed, Kanan Fashions could have insisted on getting in

03:50:04  1  during that period between the deed in lieu and the agreed

03:50:06  2  eviction order being entered?

03:50:08  3  A.  I would say yes.

03:50:09  4  Q.  And do you know who Kanan Fashions and Creative

03:50:16  5  Warehousing's counsel was for the deed in lieu transaction and

03:50:18  6  the agreed eviction?

03:50:19  7  A.  The firm of Much Shelist -- there's more to the firm, but

03:50:24  8  Much Shelist was the law firm, and Steve Blumenthal was the

03:50:26  9  primary contact.

03:50:27  10  Q.  And was Mr. Blumenthal also representing Mr. Shah in those

03:50:31  11  transactions?

03:50:31  12  A.  To the best of my knowledge, yes.

03:50:33  13  Q.  And did you work with Mr. Blumenthal in negotiating the

03:50:40  14  deed in lieu transaction and the agreed eviction?

03:50:43  15  A.  I am concerned about your language.  Worked with, but,

03:50:47  16  yes, I negotiated and other members of my firm negotiated the

03:50:51  17  transactions that we have been discussing with Mr. Blumenthal

03:50:55  18  and I believe a few other members of his firm.

03:50:56  19  Q.  So you and your firm negotiated on behalf of First Midwest

03:51:00  20  Bank?

03:51:00  21  A.  Yes.

03:51:00  22  Q.  And Steve Blumenthal and his firm negotiated on behalf of

03:51:04  23  Kanan Fashions, Creative Warehousing, and Mr. Shah?

03:51:07  24  A.  Yes.  Yes.

03:51:07  25  Q.  And did you have communications with Mr. Blumenthal during

543

03:51:12  1 | the course of those negotiations?

03:51:13  2 | A.  Many.

03:51:13  3 | Q.  Do you recall receiving any communications from

03:51:23  4 | Mr. Blumenthal about computer equipment in the Aurora

03:51:27  5 | warehouse?

03:51:27  6 | A.  Once this all started, it was brought to my attention,

03:51:31  7 | yes.

03:51:31  8 | Q.  Do you recall when that communication was?

03:51:36  9 | A.  I believe March 16th, 2010.

03:51:38  10 | Q.  Is that the only communication you had with Mr. Blumenthal

03:51:42  11 | regarding the server in the Aurora warehouse?

03:51:46  12 | A.  Could you ask me that question again, please.

03:51:49  13 | Q.  Was that the only communication you had with

03:51:51  14 | Mr. Blumenthal regarding the server in the Aurora warehouse?

03:51:53  15 | A.  Certainly the only one I remember.

03:51:54  16 | Q.  Do you recall if Mr. Blumenthal said anything to you in

03:52:15  17 | that March 16th communication about preserving the computer

03:52:22  18 | system in the warehouse?

03:52:23  19 | A.  As I recall, he sent me an e-mail saying that he wanted

03:52:31  20 | First Midwest Bank to come to some sort of an agreement to

03:52:34  21 | preserve the computer server.  That's my best recollection.

03:52:40  22 | Q.  And that's the same computer server that is the issue of

03:52:43  23 | this sanctions motion before the court?

03:52:46  24 | A.  As far as I know, yes.

03:52:47  25 | Q.  And do you recall if he told you why he wanted First

03:52:54　1　Midwest Bank to agree to preserve the server?

03:52:57　2　A.　I believe he said that the computer server had information

03:53:04　3　on it that may be relevant to this lawsuit.

03:53:05　4　Q.　Okay.　And you understood it was this lawsuit that he was

03:53:08　5　referring to?

03:53:09　6　A.　Yes.

03:53:11　7　　　　　MR. McGARRY:　Judge Mason, we are just having trouble

03:53:13　8　hearing here.　I think the witnesses are quiet.

03:53:15　9　　　　　THE WITNESS:　I'm sorry.　I will try to speak up.

03:53:20　10　　　　　MS. DJORDJEVIC:　I can't put this any closer.　Is

03:53:22　11　there a volume --

03:53:22　12　　　　　THE COURT:　No.　I think you talk very, very fast,

03:53:26　13　and I think it's hard to pick it up, and then you trail off.

03:53:27　14　So do your best, and if you can't hear, just speak up.

03:53:29　15　　　　　THE WITNESS:　I can't get closer.

03:53:30　16　　　　　THE COURT:　You don't need to get closer.　Just speak

03:53:33　17　up.　Assume it doesn't work.

03:53:37　18　BY MS. DJORDJEVIC:

03:53:39　19　Q.　Was Mr. Blumenthal's March 16th e-mail sent just to you?

03:53:42　20　A.　I don't think so.

03:53:44　21　Q.　Do you recall who else he sent the e-mail to?

03:53:48　22　A.　Since we have looked at it so many times in discovery

03:53:51　23　regarding these proceedings, I believe he sent a copy to Dave

03:53:58　24　Clark, who was a representative of First Midwest Bank.　And he

03:54:02　25　may also have sent it to my partner, Bernard Schlifke, who is

03:54:07   1   a transactional lawyer that worked with me and other members

03:54:11   2   of my firm on the DIL transaction.

03:54:14   3   Q.  Do you recall if you sent it to Mr. Shah?

03:54:17   4   A.  I honestly don't remember.

03:54:18   5   Q.  Okay.  Could you take a look at SH 46 again.

03:54:21   6   A.  Sure.

03:54:24   7   Q.  And this time I'd like you to look at the top e-mail,

03:54:27   8   which is a March 16, 2010, e-mail sent at 9:20 a.m. from

03:54:33   9   Steven H. Blumenthal to William Serritella.

03:54:36  10   A.  Yes is the answer to your question.

03:54:38  11   Q.  Okay.  So you can see that it was also sent to Mr. Shah?

03:54:41  12   A.  That's what this document indicates, yes.

03:54:43  13   Q.  And looking at SH 46, is this top e-mail the e-mail that

03:54:47  14   we have just been -- the same e-mail that we have just been

03:54:50  15   discussing?

03:54:51  16   A.  Yes.

03:54:51  17   Q.  Now, did you get a request similar to this one with

03:55:16  18   respect to preserving the server from Mr. Borlack's firm?

03:55:20  19   A.  I don't recall receiving anything like that from

03:55:24  20   Mr. Borlack's firm.

03:55:25  21   Q.  And in this e-mail, if you look at the last sentence of

03:55:35  22   the first paragraph.

03:55:39  23   A.  Okay.

03:55:39  24   Q.  And it says, Accordingly, until the outside date by which

03:55:45  25   we must re-acquire the items and repay the bank, I need the

03:55:48  1  bank to agree that they will preserve the items and allow

03:55:51  2  access to UCB or us in connection with the litigation.

03:55:54  3      Did I read that correctly?

03:55:55  4  A.  I see that.

03:55:57  5  Q.  So Mr. Blumenthal asked FMB to agree that they will

03:56:01  6  preserve the items and allow access to UCB or us, what was

03:56:04  7  your understanding of his reference to "us"?

03:56:07  8  A.  I don't know who he was referring to with us.  I assume

03:56:15  9  his clients.

03:56:18  10      Was that your question as to what us meant in this?

03:56:20  11 Q.  Yes.

03:56:20  12      So did FMB agree to preserve -- is your understanding

03:56:26  13 that the reference to items there, the computer server in the

03:56:28  14 warehouse?

03:56:29  15 A.  Yes.

03:56:29  16 Q.  So did FMB agree to preserve the items, the server, and

03:56:35  17 allow access to UCB for Mr. Blumenthal's clients in connection

03:56:39  18 with this litigation?

03:56:40  19 A.  Not to my knowledge.

03:56:41  20 Q.  Okay.  Did First Midwest Bank enter into any type of

03:56:44  21 written agreement to preserve the computer server kept at the

03:56:50  22 Aurora warehouse?

03:56:51  23 A.  Not to my knowledge.

03:56:52  24 Q.  Did First Midwest Bank enter into a written agreement to

03:56:55  25 preserve the data contained on the computer server located in

| | | |
|---|---|---|
| 03:56:59 | 1 | the Aurora warehouse? |
| 03:56:59 | 2 | A. Not to my knowledge. |
| 03:57:00 | 3 | Q. And did First Midwest Bank enter into a written agreement |
| 03:57:06 | 4 | of any kind with Kanan Fashions, Creative Warehousing, |
| 03:57:12 | 5 | Mr. Shah, or any other defendant in this case regarding the |
| 03:57:16 | 6 | computer server at the Aurora warehouse? |
| 03:57:18 | 7 | A. Not to my knowledge. |
| 03:57:21 | 8 | Q. Did First Midwest Bank take -- |
| 03:57:25 | 9 | MR. LIPTON: I'm sorry. Can I have that question and |
| 03:57:27 | 10 | answer read back, please. |
| 03:57:27 | 11 | THE COURT: Sure. |
| 03:57:43 | 12 | (Record read.) |
| 03:57:45 | 13 | MR. LIPTON: Thank you. |
| 03:57:46 | 14 | BY MS. DJORDJEVIC: |
| 03:57:46 | 15 | Q. Did First Midwest Bank take any actions to preserve the |
| 03:57:52 | 16 | computer server at the Aurora warehouse? |
| 03:57:54 | 17 | A. Well, I'm not sure how to answer that. We certainly -- |
| 03:57:58 | 18 | once we became owners of the warehouse, we secure -- we |
| 03:58:02 | 19 | changed the locks, as far as I know. So, you know, we took |
| 03:58:06 | 20 | ordinary security measures to prevent strangers from accessing |
| 03:58:10 | 21 | the warehouse. |
| 03:58:11 | 22 | But if you're asking me if we took any -- did |
| 03:58:13 | 23 | anything specific with respect to the computers, I would say |
| 03:58:21 | 24 | the answer to that is no. |
| 03:58:22 | 25 | Q. And what computers are you referring to? |

03:58:23    1    A.   The server.

03:58:24    2    Q.   And did First Midwest Bank take any action to allow access

03:58:29    3    to United Central Bank or any of the defendants in this case

03:58:32    4    to the server?

03:58:33    5    A.   I don't know what you mean by did we take any action.

03:58:38    6    Q.   Did you let anybody in --

03:58:44    7    A.   To my knowledge --

03:58:44    8    Q.   -- to get to the server?

03:58:45    9    A.   To my knowledge, no one ever asked First Midwest Bank for

03:58:48   10    access to the warehouse to look at, copy, do anything with the

03:58:54   11    computer server, so I would have to say, to my knowledge, the

03:58:57   12    answer to your question is no.

03:59:00   13    Q.   And First Midwest Bank didn't -- did First Midwest Bank

03:59:02   14    take any actions to preserve the contents of the computer

03:59:06   15    server?

03:59:06   16    A.   No, not to my knowledge.

03:59:08   17    Q.   Okay.  And, in fact, to this day, First Midwest Bank

03:59:13   18    maintains that it had no duty to take any kind of actions with

03:59:16   19    respect to the server or its contents; is that correct?

03:59:19   20    A.   That is correct.

03:59:20   21    Q.   Did you ever respond to the portion of Mr. Blumenthal's

03:59:32   22    March 16th e-mail asking First Midwest Bank to agree to

03:59:35   23    preserve the server and to allow access to it?

03:59:38   24    A.   No.

03:59:38   25    Q.   Did you ever respond to any of the defendants regarding

549

| | | |
|---|---|---|
| 03:59:50 | 1 | that portion of Mr. Blumenthal's March 16th e-mail? |
| 03:59:53 | 2 | A.  No. |
| 03:59:53 | 3 | Q.  And did you ever talk to anyone from UCB about getting |
| 04:00:04 | 4 | access to the server for purposes of this litigation? |
| 04:00:07 | 5 | A.  Yes. |
| 04:00:08 | 6 | Q.  When was that? |
| 04:00:11 | 7 | A.  Early May 2010. |
| 04:00:14 | 8 | Q.  Do you have a more specific date? |
| 04:00:20 | 9 | A.  I want to say it was May 9th, but I'm not certain about |
| 04:00:23 | 10 | that. |
| 04:00:23 | 11 | Q.  Who did you speak to? |
| 04:00:25 | 12 | A.  There was a meeting at First Midwest Bank between -- and I |
| 04:00:32 | 13 | don't know how well I'm going to do with this name -- Robert |
| 04:00:36 | 14 | Hoholik, Matt Piggee, is that right, from your office, Dave |
| 04:00:41 | 15 | Clark, and myself. |
| 04:00:42 | 16 | Q.  And what was this meeting about? |
| 04:00:45 | 17 | A.  The purpose of the meeting was to discuss the inventory. |
| 04:00:48 | 18 | Q.  And that's the clothing inventory at the warehouse? |
| 04:00:52 | 19 | A.  Yes. |
| 04:00:52 | 20 | Q.  Is that the only inventory at the warehouse? |
| 04:00:54 | 21 | A.  I don't know.  That's what was discussed at the meeting. |
| 04:00:56 | 22 | Q.  Okay.  How did the subject of the server come up? |
| 04:01:03 | 23 | A.  When Mr. Hoholik was talking to Mr. Clark -- they worked |
| 04:01:10 | 24 | together, so they had a lot of history -- the issues regarding |
| 04:01:13 | 25 | the clothing came up, and Mr. Hoholik was adamant about the |

04:01:18  1  fact that Mr. Shah had understated the amount of inventory at

04:01:23  2  the warehouse.

04:01:23  3      At some point during that discussion, he said to

04:01:26  4  Mr. Clark, I may need to get access to the computer at the

04:01:30  5  warehouse because I believe that will substantiate our claim

04:01:34  6  that the inventory was understated.

04:01:37  7  Q.  And what did Mr. Clark say in response?

04:01:39  8  A.  He said, send me a subpoena and you can have access.

04:01:43  9  Q.  And did anyone respond to what Mr. Clark said?

04:01:47  10 A.  Bob said, okay, and that was the end of it.

04:01:51  11 Q.  Did you say anything specific about the server?

04:01:52  12 A.  At the very end of the meeting, Matt Piggee said to me,

04:01:58  13 will you accept service of a subpoena on First Midwest Bank.

04:02:02  14 And I said yes.

04:02:03  15 Q.  Was there any mention during that meeting about defendants

04:02:07  16 getting access to the server?

04:02:08  17 A.  No.

04:02:08  18 Q.  And did Mr. Clark say anything about requiring a subpoena

04:02:14  19 of anyone in order to get access to the server?

04:02:17  20 A.  Other than what I just told you, no.

04:02:19  21 Q.  Did you ever discuss the portion of Mr. Blumenthal's

04:02:41  22 March 16th e-mail asking First Midwest Bank to preserve the

04:02:44  23 server and allow access to it with Mr. Clark?

04:02:49  24      THE WITNESS:  Judge, I am not comfortable answering

04:02:52  25 questions about discussions I may or may not have had with my

04:02:54    1    client.

04:02:54    2                THE COURT:  Answer the question.

04:02:56    3                THE WITNESS:  No.

04:02:57    4    BY MS. DJORDJEVIC:

04:02:58    5    Q.  Did you ever discuss Mr. Blumenthal's request that First

04:03:04    6    Midwest Bank agree to preserve the server and allow access to

04:03:08    7    it with anyone at First Midwest Bank?

04:03:10    8    A.  No.

04:03:10    9    Q.  Why not?

04:03:19    10   A.  I read this e-mail as meaning that Mr. Blumenthal was

04:03:25    11   going to send me some sort of a proposed written agreement to

04:03:28    12   review, and until I received that, I didn't think there was

04:03:34    13   anything for me to do.

04:03:35    14   Q.  Did the e-mail state that he is going to send you a

04:03:39    15   written agreement?

04:03:39    16   A.  No, but I read the words, I need the bank to agree, as if

04:03:44    17   there's going to be something further because other than just

04:03:47    18   these somewhat general terms, I don't know specifically what

04:03:51    19   he wanted me to agree to.

04:03:53    20   Q.  And you didn't feel the need to inform anyone else at

04:03:56    21   First Midwest Bank that Mr. Blumenthal might be sending you an

04:04:00    22   agreement because they're expecting you to preserve data on

04:04:03    23   this server that you now have in the warehouse?

04:04:05    24   A.  I'm sorry.  Could you read me that question?

04:04:09    25                MS. DJORDJEVIC:  Would you read it back.

04:04:24    1    (Record read.)

04:04:26    2         THE WITNESS:   No.

04:04:26    3    BY MS. DJORDJEVIC:

04:04:27    4    Q.  Why not?

04:04:28    5    A.  Well, I generally don't inform my clients that an

04:04:31    6    agreement might be coming for me to look at and for me to

04:04:34    7    share with my client.  If and when I would have received a

04:04:37    8    draft, I would have sent it to my client and we would have

04:04:40    9    discussed it.

04:04:41    10   Q.  Did you inform anyone at First Midwest Bank that

04:04:46    11   Mr. Blumenthal represented to you that the server contained

04:04:52    12   data relevant to litigation?

04:04:54    13   A.  No.

04:04:55    14   Q.  Why not?

04:04:56    15   A.  Same reason:  I was expecting an agreement -- a draft

04:05:03    16   agreement from Mr. Blumenthal, and I never heard anything

04:05:06    17   further, so I never discussed this e-mail with anyone.

04:05:07    18   Q.  So you didn't think First Midwest Bank, someone other than

04:05:15    19   Dave Clark, since he received this e-mail, correct?

04:05:18    20   A.  Dave Clark was copied on the e-mail, correct.

04:05:22    21   Q.  There are people senior to Dave Clark at the bank?

04:05:24    22   A.  Sure.

04:05:25    23   Q.  And he works in a specific area, he is in special assets,

04:05:28    24   right?

04:05:28    25   A.  Could you repeat that?  I'm sorry.  I didn't hear you.

553

04:05:31  1  Q.  Dave Clark works in special assets?

04:05:33  2  A.  Yes.

04:05:33  3  Q.  He doesn't respond to litigation-related matters for the

04:05:40  4  bank, correct?

04:05:44  5  A.  I'm not sure that's correct.

04:05:45  6  Q.  Is he in the legal department?

04:05:47  7  A.  Certainly not.

04:05:47  8          THE COURT:  Is he a lawyer?

04:05:49  9          THE WITNESS:  He certainly is not.  Not to my

04:05:53  10  knowledge.  Maybe he is and I don't know it, but I don't think

04:05:55  11  Dave Clark is a lawyer.

04:05:55  12  BY MS. DJORDJEVIC:

04:05:56  13  Q.  And you didn't think it was -- that you needed to inform

04:06:01  14  your client that someone else was making a claim that there

04:06:04  15  was a server in your possession that had data on it relevant

04:06:07  16  to litigation?

04:06:09  17  A.  My client got a copy of the e-mail, so the answer to your

04:06:13  18  question is no.

04:06:13  19  Q.  You also said you never discussed this with Dave Clark?

04:06:16  20  A.  I did not discuss it with Dave Clark.

04:06:19  21  Q.  And you didn't think there was any need to discuss it with

04:06:22  22  Dave Clark?

04:06:23  23  A.  Did not.

04:06:23  24  Q.  And you didn't think there was any need to discuss it with

04:06:27  25  anyone above Dave Clark at the bank?

| | | |
|---|---|---|
| 04:06:29 | 1 | A.  I did not. |
| 04:06:30 | 2 | Q.  Did you ever talk to Dave Clark about the need to get a |
| 04:06:48 | 3 | subpoena before allowing anyone to have access to the server? |
| 04:06:53 | 4 | A.  Again, I am going to invoke the attorney-client privilege. |
| 04:06:58 | 5 | THE COURT:  Well, he was at the meeting. |
| 04:06:59 | 6 | THE WITNESS:  I was at the meeting on May 9. |
| 04:07:01 | 7 | THE COURT:  But Mr. Clark was too, you said, right? |
| 04:07:06 | 8 | THE WITNESS:  Yes. |
| 04:07:06 | 9 | BY MS. DJORDJEVIC: |
| 04:07:07 | 10 | Q.  Outside of that meeting, did you ever talk to Dave Clark |
| 04:07:09 | 11 | about the need for First Midwest Bank to ask for a subpoena or |
| 04:07:12 | 12 | court order in order to give anyone access to the server? |
| 04:07:15 | 13 | A.  I don't remember. |
| 04:07:16 | 14 | Q.  Did you provide any advice to Mr. Clark regarding whether |
| 04:07:27 | 15 | or not First Midwest Bank should ask for a subpoena in order |
| 04:07:31 | 16 | to give anyone access to the server? |
| 04:07:33 | 17 | A.  I don't remember. |
| 04:07:36 | 18 | Q.  Did you provide advice to anyone else at First Midwest |
| 04:07:39 | 19 | Bank regarding obtaining a subpoena before providing access to |
| 04:07:47 | 20 | the server? |
| 04:07:48 | 21 | A.  No. |
| 04:07:48 | 22 | Q.  And when you say you don't remember, you could have |
| 04:07:51 | 23 | provided such advice to Mr. Clark, you just don't recall, or |
| 04:07:54 | 24 | you affirmatively don't recall providing any such advice to |
| 04:07:57 | 25 | Mr. Clark? |

04:07:57  1  A.  No, I don't remember whether I discussed that particular

04:08:00  2  issue with Mr. Clark outside of the discussion that we have

04:08:03  3  talked about.

04:08:03  4  Q.  If you had had such a discussion with Mr. Clark, would it

04:08:09  5  have been memorialized in writing?

04:08:10  6  A.  Maybe.  We may have -- it's possible.  It's possible that

04:08:17  7  if we had the discussion, it would have been via e-mail.  It's

04:08:21  8  also possible that we would have talked about it over the

04:08:23  9  phone.

04:08:23  10  Q.  Okay.  Were you concerned about anyone getting access to

04:08:40  11  the server?

04:08:44  12       MR. McJESSY:  Objection.  What period of time?

04:08:48  13       MS. DJORDJEVIC:  After the date in lieu of

04:08:50  14  foreclosure transaction.

04:08:52  15       THE WITNESS:  I can't say I gave much thought to the

04:08:54  16  server after the transaction until this all took place.

04:08:59  17       Well, I mean, obviously there was the issue of the

04:09:01  18  purchase of the lease, but as far as the parties in this case

04:09:07  19  go, no one ever asked me for access to the server, so it

04:09:10  20  wasn't -- it wasn't on the top of my mind.

04:09:14  21  BY MS. DJORDJEVIC:

04:09:14  22  Q.  Did you ask Mr. Clark after the May 9th meeting why it was

04:09:18  23  he asked for a subpoena or court order?

04:09:19  24  A.  I don't remember.

04:09:20  25  Q.  You don't remember if you asked him?

04:09:23   1    A.  Correct.

04:09:23   2    Q.  Did you provide any advice to First Midwest Bank regarding

04:09:44   3    whether the bank had any obligation to hold onto the server

04:09:48   4    versus being able to sell it?

04:09:50   5    A.  I'm not sure I understand your question.  I'm sorry.

04:09:54   6    Q.  Did you provide any advice to First Midwest Bank regarding

04:10:02   7    whether or not they were free and clear to sell the server

04:10:05   8    once they received the assignment from Associated Bank?

04:10:07   9    A.  Yes.

04:10:09   10   Q.  And what did you tell them?

04:10:12   11   A.  That's protected.

04:10:14   12        THE COURT:  He doesn't have to answer that.

04:10:16   13        MS. DJORDJEVIC:  Okay.  And, your Honor, Mr. Clark

04:10:18   14   yesterday was asked by Ms. Dedinas whether or not he discussed

04:10:24   15   this e-mail, the March 16th e-mail, with his counsel.  He

04:10:28   16   testified that he had --

04:10:29   17        THE COURT:  So he waived the privilege.

04:10:31   18        MS. DJORDJEVIC:  -- and as a result of those

04:10:32   19   conversations that he was satisfied that they had no

04:10:37   20   obligation to hold the server.

04:10:40   21        THE COURT:  Answer that question.

04:10:40   22        THE WITNESS:  At some point towards the -- several

04:10:43   23   months after this e-mail, Mr. Clark had asked me if the bank

04:10:46   24   could sell the computer.  And I said, as far as I know, yes.

04:10:50   25        THE COURT:  Can you keep your voice up.

04:10:52  1          THE WITNESS:  Sorry.

04:10:52  2  BY MS. DJORDJEVIC:

04:10:53  3  Q.  Is that all he asked you, if he could sell the computer?

04:10:55  4  A.  Yes.

04:10:56  5  Q.  And what was your basis for telling him that?

04:10:58  6  A.  Let me -- what I said was, once you become the owner of

04:11:03  7  the computer, then you can sell it.  The conversation came

04:11:08  8  very close in proximity to the time that First Midwest was

04:11:13  9  very close to closing on the sale of the lease.

04:11:16  10  Q.  And was there any discussion at that point about the

04:11:19  11  representations that had been made that the server was needed

04:11:22  12  for somebody else's litigation?

04:11:23  13  A.  It was not discussed.

04:11:24  14  Q.  And did you discuss whether or not First Midwest Bank was

04:11:32  15  free to sell the server with anyone else at First Midwest Bank

04:11:35  16  besides Dave Clark?

04:11:36  17  A.  No.

04:11:37  18  Q.  And was it just that one discussion?

04:11:39  19  A.  Yes.

04:11:39  20  Q.  Was that memorialized?

04:11:41  21  A.  No, it was a telephone call.

04:11:42  22  Q.  Are there any written communications regarding the advice

04:11:50  23  you provided to Mr. Clark about the bank's ability to sell the

04:11:52  24  server?

04:11:53  25  A.  I don't know.

04:11:56   1          MR. LIPTON:  Could we have that repeated, please?

04:11:58   2          THE COURT:  Sure, you can.  You need to keep your

04:12:00   3   voice up, both of you, please.

04:12:02   4          Could you repeat it, please.

04:12:02   5     (Record read.)

04:12:16   6   BY MS. DJORDJEVIC:

04:12:21   7   Q.  And FMB did sell the server?

04:12:24   8   A.  They sold the lease, yes.

04:12:25   9   Q.  They sold the lease, and the server went along with it?

04:12:29   10  A.  My understanding, yes.

04:12:31   11  Q.  And the guaranty went along with it?

04:12:33   12  A.  My understanding is yes.

04:12:34   13  Q.  When did that sale occur?

04:12:35   14  A.  I have learned after all this started, in late July 2010.

04:12:40   15  Q.  And you were involved in the negotiations over the price

04:12:43   16  for the lease, correct?

04:12:46   17  A.  Yes.  I was involved in the acquisition of the lease from

04:12:51   18  Associated Bank.  I negotiated the deal with Associated Bank's

04:12:54   19  lawyer.

04:12:54   20  Q.  And your firm dealt with the actual assignment and

04:12:59   21  transfer of the related papers?

04:13:00   22  A.  That is correct.  My partner, Bob Sodikoff, actually

04:13:04   23  handled the paperwork that evidenced the transfer.

04:13:07   24  Q.  And the lease, so the server and the guaranty that went

04:13:13   25  along with it were not sold to Mr. Shah, correct?

04:13:16  1  A. No, not to my knowledge.

04:13:18  2  Q. They were sold to a foreign company?

04:13:20  3  A. I have learned that, yes.

04:13:22  4  Q. Do you know the name of the company?

04:13:24  5  A. I believe it's called Diagems.

04:13:27  6  Q. Now, before the lease and server were sold, did First

04:13:36  7  Midwest Bank check whether there was anything on the server?

04:13:38  8  A. I would have no idea.

04:13:40  9  Q. You have no knowledge of whether they checked?

04:13:44  10  A. Correct.

04:13:44  11  Q. Did you advise anybody to check?

04:13:47  12  A. No.

04:13:48  13  Q. To your knowledge, did First Midwest Bank erase any data

04:13:57  14  on the server before selling it?

04:13:58  15  A. Not to my knowledge.

04:13:59  16  Q. Did you advise anybody about whether or not that's

04:14:02  17  something they should do prior to selling the server?

04:14:04  18  A. I had no discussions with anyone about erasing anything.

04:14:08  19  Q. Does First Midwest Bank have any type of protocol in place

04:14:14  20  for how to deal with things like computer equipment that they

04:14:19  21  might get as part of an assignment or foreclosure, something

04:14:23  22  that originally belonged to someone else?

04:14:24  23  A. I don't know.

04:14:25  24  Q. So that's not something that you provided advice to First

04:14:31  25  Midwest Bank about?

04:14:32  1   A.  I provided no such advice.

04:14:33  2   Q.  And so you don't know one way or the other whether First

04:14:43  3   Midwest Bank took any steps to remove any potentially

04:14:50  4   confidential and proprietary information from the server

04:14:53  5   before it was sold, correct?

04:14:55  6   A.  I have no knowledge of that one way or another.

04:14:57  7   Q.  You did know that the server was used for Kanan's

04:15:05  8   business?

04:15:05  9   A.  I knew that from the May 9th discussion that Mr. Hoholik

04:15:09  10  had with Mr. Clark.

04:15:10  11  Q.  So -- and that was before the lease and the server were

04:15:13  12  sold?

04:15:13  13  A.  Yes.

04:15:14  14  Q.  And you knew that Mr. Shah wanted it back to use for a new

04:15:18  15  business that he was hoping to start?

04:15:20  16  A.  That was my understanding.  And the primary purpose for

04:15:28  17  purchasing the lease was the guaranty aspect.

04:15:31  18  Q.  Okay.  And Mr. Blumenthal had told you that the server was

04:15:35  19  relevant to the litigation, this litigation?

04:15:37  20  A.  That's what this March 16th e-mail says, yes.

04:15:41  21  Q.  And yet you weren't concerned that First Midwest Bank

04:15:44  22  might be giving away somebody else's proprietary information

04:15:50  23  when they sold the server?

04:15:51  24  A.  Four months later, no, I wasn't aware.

04:15:53  25  Q.  But you yourself hadn't taken any steps to check whether

| | | |
|---|---|---|
| 04:15:57 | 1 | there was anything on the server? |
| 04:15:58 | 2 | A.  I personally have no idea what was on the server.  I |
| 04:16:01 | 3 | assumed, based on a discussion from Mr. Hoholik and Mr. Clark, |
| 04:16:04 | 4 | that Kanan had information on it, but I don't know. |
| 04:16:07 | 5 | Q.  And you don't have any knowledge that First Midwest Bank |
| 04:16:09 | 6 | ever checked what was on the server either? |
| 04:16:10 | 7 | A.  I have no such knowledge. |
| 04:16:11 | 8 | Q.  And you said you're the head of the litigation group? |
| 04:16:17 | 9 | A.  Yes. |
| 04:16:18 | 10 | Q.  Do you deal with ESI in that position? |
| 04:16:21 | 11 | A.  Sure. |
| 04:16:21 | 12 | Q.  And do you deal with preservation obligations in that |
| 04:16:24 | 13 | position? |
| 04:16:25 | 14 | A.  Sure. |
| 04:16:25 | 15 | Q.  Including preserving data on computer servers if a client |
| 04:16:34 | 16 | happens to have computer servers? |
| 04:16:36 | 17 | A.  I deal with ESI issues, yes. |
| 04:16:39 | 18 | Q.  Do you deal with providing litigation hold type |
| 04:16:53 | 19 | information to third parties that you know might have data |
| 04:16:56 | 20 | relevant to your client's litigation? |
| 04:16:59 | 21 | A.  Sure. |
| 04:17:01 | 22 | Q.  Have you ever sent letters to a third party instructing |
| 04:17:05 | 23 | them that they had an obligation to preserve data with respect |
| 04:17:09 | 24 | to your client's litigation? |
| 04:17:13 | 25 | A.  I don't think I ever sent a letter to a third party |

04:17:16  1   telling them they should preserve evidence.  I would do

04:17:20  2   something else.

04:17:20  3   Q.  What would you do?

04:17:22  4   A.  I would issue a subpoena or I would get a preservation

04:17:25  5   order in a case that was pending or I would get an agreement

04:17:26  6   from that third party to preserve it.  I would do one of those

04:17:29  7   three things.

04:17:29  8   Q.  Is that what you were expecting to have happen here?

04:17:32  9   A.  Yes, based on this e-mail.

04:17:34  10  Q.  And did defendants ever send you a subpoena?

04:17:38  11  A.  No.

04:17:38  12  Q.  Or sent First Midwest Bank a subpoena for the server?

04:17:42  13  A.  Not to my knowledge.

04:17:42  14  Q.  Did respondents ever send First Midwest Bank a subpoena

04:17:46  15  for the server?

04:17:47  16  A.  Not to my knowledge.

04:17:48  17  Q.  Did defendants or respondents ever send First Midwest Bank

04:17:51  18  a subpoena for the data on the server?

04:17:53  19         MR. McGARRY:  Sorry.  We are losing hearing over

04:17:55  20  here.

04:17:56  21         THE COURT:  Speak up and go slower, please.

04:17:57  22         MS. DJORDJEVIC:  Sorry.  I'm trying.

04:17:58  23         MR. McGARRY:  Thank you.

04:18:03  24         Can we have the last question?

04:18:18  25         THE COURT:  Sure.

| | | |
|---|---|---|
| 04:18:18 | 1 | THE COURT REPORTER:  I'm having a hard time too. |
| 04:18:18 | 2 | THE COURT:  Just slow down a little bit.  Try to slow |
| 04:18:20 | 3 | down and speak up. |
| 04:18:33 | 4 | (Record read.) |
| 04:18:33 | 5 | MR. McJESSY:  I just object that defendants in this |
| 04:18:35 | 6 | case are individuals and companies are not attorneys, they |
| 04:18:41 | 7 | couldn't issue a subpoena.  Also compound. |
| 04:18:42 | 8 | THE COURT:  Rephrase your question. |
| 04:18:43 | 9 | MR. McJESSY:  The respondents are attorneys, the |
| 04:18:45 | 10 | defendants are not. |
| 04:18:47 | 11 | BY MS. DJORDJEVIC: |
| 04:18:47 | 12 | Q.  Did respondents ever issue a subpoena to First Midwest |
| 04:18:50 | 13 | Bank to preserve the data on the server? |
| 04:18:52 | 14 | MR. McJESSY:  Again, same objection.  Defendants |
| 04:18:55 | 15 | aren't attorneys. |
| 04:18:56 | 16 | MS. DJORDJEVIC:  I said respondents. |
| 04:18:58 | 17 | MR. McJESSY:  Oh, I'm sorry. |
| 04:19:01 | 18 | THE WITNESS:  Prior to the time that this all |
| 04:19:03 | 19 | started, the answer to your question is no, I received -- to |
| 04:19:06 | 20 | my knowledge, First Midwest Bank received no subpoenas related |
| 04:19:09 | 21 | to anything involving this case. |
| 04:19:12 | 22 | Once this dispute arose, I got several; First Midwest |
| 04:19:15 | 23 | Bank was served with several subpoenas. |
| 04:19:17 | 24 | BY MS. DJORDJEVIC: |
| 04:19:17 | 25 | Q.  Did the defendants ever ask you to preserve the data on |

| | | |
|---|---|---|
| 04:19:26 | 1 | the server at the warehouse? |
| 04:19:27 | 2 | A.  Defendants Kanan, Creative, Shah.  Those three? |
| 04:19:33 | 3 | Q.  At least those three, yes. |
| 04:19:36 | 4 | A.  No. |
| 04:19:36 | 5 | Q.  To your knowledge, did Kanan Fashions, Creative |
| 04:19:39 | 6 | Warehousing, or Mr. Shah ask anyone at First Midwest Bank to |
| 04:19:43 | 7 | preserve the data on the server? |
| 04:19:45 | 8 | A.  Not to my knowledge. |
| 04:19:46 | 9 | Q.  First Midwest Bank had physical possession of the server |
| 04:19:57 | 10 | once the agreed eviction order was entered; is that correct? |
| 04:20:00 | 11 | A.  Yes. |
| 04:20:00 | 12 | Q.  And did First Midwest Bank then negotiate with Associated |
| 04:20:06 | 13 | Bank to try and buy the lease, the server, and guaranty that |
| 04:20:10 | 14 | went with it? |
| 04:20:11 | 15 | A.  Yes. |
| 04:20:11 | 16 | Q.  Who negotiated on behalf of First Midwest Bank? |
| 04:20:14 | 17 | A.  Mr. Clark negotiated with -- I don't remember the person's |
| 04:20:19 | 18 | name at Associated Bank.  I was also negotiating with |
| 04:20:24 | 19 | Associated Bank's counsel, Associated Bank's attorney. |
| 04:20:28 | 20 | Q.  Okay.  So you were negotiating with Associated Bank's |
| 04:20:30 | 21 | attorney? |
| 04:20:31 | 22 | A.  Yes. |
| 04:20:31 | 23 | Q.  Okay. |
| 04:20:33 | 24 | THE COURT:  Is that Ms. Jacobs? |
| 04:20:35 | 25 | THE WITNESS:  That is Ms. Jacobs, yes. |

04:20:36  1   BY MS. DJORDJEVIC:

04:20:37  2   Q.  During the course of your negotiations with Ms. Jacobs,

04:20:40  3   did Associated Bank ever demand the return of the server?

04:20:46  4   A.  Yes.

04:20:46  5   Q.  And they did that more than once?

04:20:48  6   A.  I don't know.

04:20:51  7   Q.  Some of those demands came directly to you?

04:20:55  8   A.  I'm sure they did.

04:20:57  9   Q.  And some --

04:20:59  10      THE COURT:  Keep your voice up.

04:20:59  11  BY MS. DJORDJEVIC:

04:21:00  12  Q.  And some correspondence you were copied on?

04:21:04  13  A.  Probably.

04:21:04  14  Q.  We will go through these quickly.  If you could take a

04:21:13  15  quick look at Exhibit 61.  Also 102 and 103.

04:21:31  16      THE COURT:  Simultaneously or together?

04:21:37  17      MS. DJORDJEVIC:  For the moment, we will take a quick

04:21:40  18  look at them.

04:21:42  19      THE COURT:  Take your time.

04:21:47  20  BY MS. DJORDJEVIC:

04:21:47  21  Q.  Exhibit 61 is a March 29th, 2010, fax from Tina Jacobs to

04:21:53  22  William Serritella attaching a March 29th, 2010, letter to Mr.

04:21:59  23  Serritella?

04:22:00  24  A.  I'm sorry.  I was still reading.  Can you slow down?

04:22:05  25  Q.  That was just for the court reporter.

04:22:07  1   A.  Okay.  I'm sorry.

04:22:10  2   Q.  Exhibit 102.  I'm just reading what these are.  I don't

04:22:10  3   have a question for you at the moment.

04:22:20  4            Exhibit 102 is a May 13th, 2010, e-mail to Tina

04:22:23  5   Jacobs to several people, including Mr. Serritella, which

04:22:27  6   attaches a document which is at Exhibit 103, and it is a May

04:22:32  7   13th, 2010, letter from Ms. Jacobs to First Midwest Bank,

04:22:40  8   Kanan Fashions, Incorporated, Creative Warehousing (Chicago),

04:22:43  9   LLC, and Mr. Mehul Shah, which was cc'd to Mr. Serritella,

04:22:49  10  among several other people.

04:22:53  11           I'm sorry.  If you could also take a quick look

04:22:57  12  at 126.  126 is the 4/2010 letter from Tina Jacobs to

04:23:06  13  Mr. Serritella.

04:23:17  14  A.  Okay.

04:23:17  15  Q.  Did you receive these letters and e-mails?

04:23:19  16  A.  Yes.

04:23:19  17  Q.  Would you characterize them as containing demands from

04:23:26  18  Associated Bank for the return of the server or threats to do

04:23:30  19  so if negotiations were not successful?

04:23:32  20  A.  Yes.

04:23:33  21  Q.  Now, did you ever inform UCB, United Central Bank, that

04:23:40  22  Associated Bank was demanding repossession of the server or

04:23:43  23  threatening to do so?

04:23:44  24  A.  I don't remember ever doing that, no.

04:23:48  25  Q.  Did you ever send United Central Bank copies of any of the

04:23:53　1　correspondence that you just looked at?

04:23:55　2　A.　I don't remember doing that.

04:23:57　3　Q.　Did you ever inform Bailey Borlack that Associated Bank

04:24:03　4　was demanding repossession of the server, either directly or

04:24:07　5　negotiations did not work out?

04:24:09　6　A.　I don't remember doing that either.

04:24:10　7　Q.　To your knowledge, was Mr. Blumenthal aware that

04:24:24　8　Associated Bank had demanded the return of the server?

04:24:30　9　A.　Yes.

04:24:30　10　Q.　Did he ever raise any concerns regarding those demands

04:24:33　11　with you?

04:24:33　12　A.　No.

04:24:38　13　　　　　Well, I mean, what he was concerned about was whether

04:24:41　14　or not we could re-acquire the lease.　And the guaranty was

04:24:48　15　what he was primarily concerned with.

04:24:50　16　Q.　Did he ever express any concern with respect to his

04:24:56　17　March 16th request that First Midwest Bank preserve the data

04:25:00　18　given that Associated Bank was demanding return of the

04:25:04　19　servers?

04:25:05　20　A.　Mr. Blumenthal never discussed his March 16th e-mail with

04:25:08　21　me.　So no is the answer to your question.　I'm sorry.

04:25:12　22　Q.　And did he ever discuss that portion of the contents with

04:25:16　23　you?

04:25:16　24　A.　No.

04:25:16　25　Q.　Did you have any negotiations with anyone from Bailey

04:25:27  1  Borlack prior to the sale of the lease and the server?

04:25:30  2  A.  Yes.

04:25:30  3  Q.  When?

04:25:33  4        MR. McGARRY:  I'm sorry, Judge.  I have to ask to

04:25:35  5  have it read again, please.

04:25:37  6        THE COURT:  Sure.

04:25:47  7    (Record read.)

04:25:47  8        THE WITNESS:  I thought you said "discussions."  Did

04:25:50  9  you say discussions or negotiations?

04:25:53  10        MS. DJORDJEVIC:  I tried to say -- I meant to say

04:25:57  11  discussions.

04:25:58  12        THE WITNESS:  That's what I thought you said.

04:26:00  13        Yes, I had a few conversations with Mr. Borlack.

04:26:02  14  BY MS. DJORDJEVIC:

04:26:03  15  Q.  When were those conversations?

04:26:05  16  A.  I don't remember specific dates.

04:26:06  17  Q.  What did you discuss?

04:26:07  18  A.  We had one -- at least one conversation when the dispute

04:26:15  19  arose with your client about the inventory.  I believe there

04:26:20  20  was one very brief conversation when Mr. Borlack, basically

04:26:25  21  introduced himself to me and said that he was representing

04:26:27  22  Mr. Shah and his entities in his litigation with you.  And

04:26:32  23  then -- let me see.  We had a couple of conversations, and I

04:26:45  24  believe we exchanged e-mails after Mr. Borlack learned, I

04:26:47  25  think for the first time, I don't know, that the server had

04:26:48  1  been sold.

04:26:49  2  Q.  We'll get to those in a second.  I was just asking about

04:26:50  3  conversations before the sale.

04:26:51  4  A.  Okay.

04:26:52  5  Q.  You said you had a few, and there was one about inventory?

04:26:54  6  A.  Yes.

04:26:55  7  Q.  And you were also introduced to his clients, Mr. Shah

04:26:59  8  and --

04:27:01  9  A.  No, Mr. Borlack called me to say that --

04:27:04  10  Q.  To introduce himself?

04:27:06  11  A.  Yes.

04:27:06  12  Q.  Were any of your discussions with Bailey Borlack prior to

04:27:12  13  the sale of the lease and the server regarding the server?

04:27:16  14  A.  No.

04:27:16  15  Q.  You said you did have discussions with Mr. Borlack after

04:27:21  16  the lease and the server were sold?

04:27:23  17  A.  Yes.

04:27:23  18  Q.  And do you know approximately when those were?

04:27:26  19  A.  I don't.  August, September would be my best guess.

04:27:38  20  Q.  And what were you talking to Mr. Borlack about at that

04:27:40  21  time?

04:27:40  22  A.  I don't remember if it was in an e-mail or a phone call,

04:27:45  23  but Mr. Borlack informed me that he had learned for the first

04:27:47  24  time that the server had been sold, and that was the first I

04:27:54  25  had heard of it too.  And he asked me who bought it.

570

| | | |
|---|---|---|
| 04:28:00 | 1 | THE COURT:  One second, please. |
| 04:28:00 | 2 | MS. DJORDJEVIC:  Can I have the last question read |
| 04:28:00 | 3 | back, please, so I can remember where I was. |
| 04:29:18 | 4 | (Record read.) |
| 04:29:25 | 5 | BY MS. DJORDJEVIC: |
| 04:29:27 | 6 | Q.  Did you have any other discussions with Mr. Borlack about |
| 04:29:29 | 7 | the server? |
| 04:29:30 | 8 | A.  We had a few conversations and/or e-mails about that |
| 04:29:36 | 9 | subject shortly within that very short time frame. |
| 04:29:38 | 10 | Q.  Did any of them have to do with the court's August 26th |
| 04:29:46 | 11 | order to defendants to get the server or a copy of the server? |
| 04:29:49 | 12 | A.  I don't remember him mentioning that specific order, no. |
| 04:29:54 | 13 | Q.  Do you recall telling Mr. Borlack that First Midwest Bank |
| 04:30:02 | 14 | as of -- you said these conversations were after the sale, |
| 04:30:05 | 15 | right? |
| 04:30:05 | 16 | A.  Yes. |
| 04:30:05 | 17 | Q.  Do you recall telling Mr. Borlack that First Midwest Bank |
| 04:30:09 | 18 | owned the computer? |
| 04:30:10 | 19 | A.  I don't remember saying that. |
| 04:30:15 | 20 | Q.  Do you remember telling him that First Midwest Bank was |
| 04:30:18 | 21 | free to do with it what they want? |
| 04:30:20 | 22 | A.  I don't remember saying that either. |
| 04:30:22 | 23 | Q.  Did First Midwest Bank take actual ownership of the server |
| 04:30:33 | 24 | at some point? |
| 04:30:33 | 25 | A.  I would say yes. |

04:30:37   1   Q.  And is it your position, as First Midwest Bank's counsel,
04:30:44   2   that once they took ownership of the server, that First
04:30:47   3   Midwest Bank was free to do with it what they will?
04:30:51   4   A.  Yes.
04:30:51   5   Q.  To your knowledge, is there currently any property at the
04:30:55   6   Aurora warehouse that does not belong to First Midwest Bank?
04:30:59   7   A.  Not to my knowledge.
04:31:00   8   Q.  So there are no computers there that don't belong to First
04:31:05   9   Midwest Bank?
04:31:05  10   A.  There are -- I learned very recently that there are some
04:31:09  11   what appear to be old PCs there.
04:31:12  12        The reason I answered your question in the negative
04:31:14  13   is pursuant to the DIL agreement, I believe that both Kanan
04:31:20  14   and/or Creative assigned to First Midwest Bank not only the
04:31:26  15   real estate but any personal property that was there as well
04:31:29  16   that they owned.
04:31:30  17   Q.  Okay.  Do you know who owns the computers that you just
04:31:35  18   mentioned?
04:31:35  19   A.  I would take the position that First Midwest Bank owns
04:31:39  20   them, although I haven't thought through that very carefully.
04:31:42  21   But as I sit here, that would be my answer to your question.
04:31:45  22   Q.  And when did you learn that those computers were at the
04:31:47  23   Aurora warehouse?
04:31:48  24   A.  The day before I -- when I called you and told you I had
04:31:52  25   learned of it the day before.

04:31:53  1  Q.  How did you learn of it?

04:31:57  2  A.  I was told by my client that someone from First Midwest

04:32:02  3  Bank went out there for a routine visit and they happened to

04:32:05  4  notice somewhere in the warehouse that there were these old

04:32:08  5  PCs laying around.

04:32:09  6         THE COURT:  When you say your "client," who do you

04:32:11  7  mean?

04:32:12  8         THE WITNESS:  Dave Clark told me that Gerry Brosnan,

04:32:18  9  who is the new head of special assets at First Midwest Bank,

04:32:20  10  was the one that saw the computers on the site.

04:32:25  11  BY MS. DJORDJEVIC:

04:32:26  12  Q.  What is the gentleman's name again?  I'm sorry.

04:32:28  13  A.  Gerry, Gerald Brosnan.

04:32:31  14  Q.  And Gerald Brosnan informed Dave Clark about the

04:32:41  15  computers?

04:32:41  16  A.  As far as I know.

04:32:42  17  Q.  Did Dave Clark tell you why Mr. Brosnan was telling him

04:32:47  18  about the computers?

04:32:48  19  A.  Mr. Brosnan was aware of these proceedings, and he wanted

04:32:53  20  to make sure that I knew that these were out there.

04:32:55  21  Q.  And what did you tell Dave Clark when he informed you that

04:32:59  22  there were computers out at the warehouse that might have been

04:33:03  23  defendants'?

04:33:04  24  A.  I told him I was going to call you and tell you.

04:33:08  25  Q.  Did you tell him anything else?

04:33:09   1   A.  Did I tell him anything else?

04:33:11   2   Q.  Um-hmm.

04:33:12   3   A.  No.

04:33:12   4   Q.  Has First Midwest Bank taken any steps to secure those PCs

04:33:20   5   once Mr. Brosnan informed Dave Clark that they were at the

04:33:23   6   warehouse?

04:33:24   7   A.  I instructed my client to make sure that they stay there.

04:33:27   8   Q.  And what do you mean by "make sure that they stay there"?

04:33:31   9   A.  Well, that they don't sell them or dispose of them in any

04:33:34   10  way.

04:33:34   11  Q.  Do you know where in the warehouse they are?

04:33:36   12  A.  I don't.

04:33:37   13  Q.  So Mr. Clark just told you they are at the warehouse?

04:33:42   14  A.  Yes.

04:33:42   15  Q.  He didn't mention that they were in a room or scattered

04:33:47   16  about or anything like that?

04:33:48   17  A.  He did not.

04:33:51   18          MS. DJORDJEVIC:  That's all.

04:34:05   19          THE COURT:  We are going to take a 10-minute break.

04:49:07   20     (Short break.)

04:49:07   21                          - - -

04:49:07   22          WILLIAM J. SERRITELLA, CROSS-EXAMINATION

04:49:07   23  BY MR. McJESSY:

04:49:09   24  Q.  Mr. Serritella, is there any doubt in your mind that at

04:49:12   25  your meeting with Mr. Piggee and Mr. Hoholik, Mr. Clark in

04:49:18    1    early May that you told Mr. Piggee that if he sent you a

04:49:23    2    subpoena, would you provide him with the server?

04:49:25    3    A.   That's not what I said.   Mr. Piggee asked me if I would

04:49:30    4    accept service of the subpoena, and I said that I would.

04:49:33    5    Q.   Okay.   Is there any doubt -- let me rephrase my question

04:49:36    6    then.

04:49:37    7          Is there any doubt in your mind that he asked you to

04:49:41    8    receive the subpoena for the server?

04:49:44    9          MS. DEDINAS:   Objection.

04:49:46   10          THE COURT:   What's the basis?

04:49:47   11          MS. DEDINAS:   He didn't say it was a subpoena for a

04:49:49   12    server.   It was just a discussion about a server, a subpoena

04:49:54   13    in general.

04:49:57   14          THE COURT:   That's sustained if that's what the

04:50:00   15    question was.

04:50:01   16    BY MR. McJESSY:

04:50:02   17    Q.   Can you recall specifically what Mr. Piggee said to you

04:50:05   18    when you spoke with him?

04:50:06   19    A.   To the best of my recollection, he said, if we serve a

04:50:10   20    subpoena, will you -- on First Midwest Bank, will you accept

04:50:13   21    service.   And I said yes.

04:50:15   22    Q.   All right.   Do you know -- do you know what he was going

04:50:20   23    to -- did you have any understanding of what the subpoena was

04:50:23   24    going to be for?

04:50:24   25    A.   The only subpoena we discussed at the meeting was the one

04:50:29  1  that Mr. Hoholik had mentioned to Mr. Clark, but I don't know

04:50:33  2  what he meant by the subpoena.  That's what I understood it to

04:50:35  3  mean, but I don't have any specific knowledge.

04:50:37  4  Q.  All right.  And I want to be clear.  Is there any doubt in

04:50:41  5  your mind as to what Mr. Hoholik said to Mr. Clark regarding a

04:50:47  6  request for the server or access to the server?

04:50:50  7  A.  No.

04:50:51  8  Q.  As best you can recall, specifically, what did Mr. Hoholik

04:50:56  9  say?

04:50:56  10  A.  About the server?

04:50:59  11  Q.  Correct.

04:51:00  12  A.  Mr. Hoholik said that he believed that Kanan and/or --

04:51:06  13  Kanan, I assume, inflated its inventory reports to United

04:51:13  14  Central Bank and that he felt that the information on the

04:51:17  15  server would substantiate that fact.

04:51:19  16  Q.  Okay.  And as best you can recall, specifically, what did

04:51:23  17  Mr. Clark say?

04:51:23  18  A.  Mr. Clark -- with regard to the issue of the inventory,

04:51:29  19  Mr. Clark mentioned that he recalled that someone from the

04:51:34  20  bank had actually done an audit, so I don't necessarily think

04:51:38  21  he agreed with what Mr. Hoholik was saying.

04:51:40  22  Q.  Okay.

04:51:41  23  A.  With respect to the server, he said, send me a subpoena

04:51:46  24  and you can have access.

04:51:48  25  Q.  All right.  Now, did you ever get a subpoena from United

04:51:58   1   Central Bank?

04:51:58   2   A.  Yes.

04:51:58   3   Q.  Okay.  And when was that?

04:52:00   4   A.  After all this started.

04:52:03   5   Q.  Okay.  It was after the server had already been sold?

04:52:06   6   A.  Yes.

04:52:06   7   Q.  This meeting occurred in May; is that right?

04:52:09   8   A.  May of 2010, yes.

04:52:11   9   Q.  And you didn't receive a subpoena in May?

04:52:13   10  A.  I did not.

04:52:15   11  Q.  And you didn't receive a subpoena in June?

04:52:18   12  A.  I did not.

04:52:20   13       THE COURT:  You can go through all the months just

04:52:22   14  without asking each time?

04:52:24   15  BY MR. McJESSY:

04:52:25   16  Q.  Or July or August?

04:52:26   17  A.  Best I can remember, the subpoena came, I want to say,

04:52:31   18  September or October.

04:52:32   19  Q.  All right.  And I'm sorry, I just missed this.  Did you

04:52:36   20  agree to accept service of the subpoena on behalf of Midwest

04:52:40   21  Bank?

04:52:40   22  A.  Yes.

04:52:40   23  Q.  Now, you handled the friendly foreclosure -- strike that.

04:52:45   24       You handled the deed in lieu of foreclosure

04:52:48   25  transaction with Kanan, Creative Warehousing, and Mr. Shah; is

04:52:48   1   that right?

04:52:52   2   A.  I was involved with other members of my firm, yes.

04:52:54   3   Q.  All right.  And as part of that transaction, the personal

04:53:00   4   guaranties of Mr. Shah were released; is that right?

04:53:03   5   A.  Yes.

04:53:04   6   Q.  Okay.  Do you remember was his wife a personal guarantor

04:53:08   7   on that lease -- or that loan?

04:53:10   8   A.  I can't remember.

04:53:12   9   Q.  All right.  But you know his personal guaranty was

04:53:15   10   released?

04:53:16   11   A.  His personal guaranty to First Midwest Bank was released,

04:53:20   12   yes.

04:53:20   13   Q.  All right.  Is there anything unusual about that in the

04:53:23   14   context of a deed in lieu of foreclosure transaction?

04:53:26   15   A.  No.

04:53:27   16   Q.  Okay.  In fact, that's -- release of a personal guaranty

04:53:30   17   is typically why there is a deed in lieu of foreclosure; is

04:53:33   18   that right?

04:53:33   19   A.  Most of the time, yes.

04:53:35   20   Q.  Okay.

04:53:38   21        MS. DJORDJEVIC:  Objection to this whole line of

04:53:39   22   questions as outside the scope.  We didn't go didn't go into

04:53:42   23   the details -- actually didn't discuss the guaranties and the

04:53:43   24   deed in lieu at all.

04:53:44   25        MR. McJESSY:  Well, they discussed the foreclosure

04:53:46   1   transaction.

04:53:46   2           THE COURT:  Move on.  Move on.

04:53:48   3           MS. DJORDJEVIC:  We discussed the dates they

04:53:49   4   occurred.

04:53:50   5           MR. McJESSY:  He's disclosed as our witness.

04:53:50   6           THE COURT:  Move on.

04:53:51   7   BY MR. McJESSY:

04:53:55   8   Q.  Sir, was there a lawsuit filed for the foreclosure?

04:53:57   9   A.  Yes.

04:53:58   10  Q.  And do you know, was United Central Bank a named party in

04:54:02   11  that lawsuit?

04:54:03   12  A.  Yes.  Yes.

04:54:04   13  Q.  Why was that?

04:54:05   14  A.  Because, to the best of my recollection, UCB held a junior

04:54:10   15  mortgage on the property.

04:54:11   16  Q.  All right.  And do you know whether they were served with

04:54:16   17  a copy of the complaint in that foreclosure action?

04:54:18   18  A.  I don't have specific knowledge, but I have to believe

04:54:23   19  they did, they were.

04:54:24   20  Q.  All right.  And if you could turn to --

04:54:54   21          MR. McJESSY:  I'm sorry, your Honor.  I need a

04:54:56   22  moment.

04:54:56   23  BY MR. McJESSY:

04:55:06   24  Q.  If you could turn to Exhibit 56.

04:55:08   25          MS. DJORDJEVIC:  Objection, scope.

| | | |
|---|---|---|
| 04:55:11 | 1 | THE COURT:  I don't even know what it is yet.  How do |
| 04:55:13 | 2 | you know? |
| 04:55:13 | 3 | MS. DJORDJEVIC:  We didn't ask about Exhibit 56. |
| 04:55:16 | 4 | THE COURT:  Do you know what it is? |
| 04:55:18 | 5 | MS. DJORDJEVIC:  Let's see. |
| 04:55:20 | 6 | THE COURT:  I am not asking you.  I will flip to it |
| 04:55:22 | 7 | myself. |
| 04:55:26 | 8 | And you called this witness yourself, correct? |
| 04:55:29 | 9 | MR. McJESSY:  Correct, your Honor. |
| 04:55:30 | 10 | MS. DJORDJEVIC:  Are we moving on into direct then? |
| 04:55:32 | 11 | Yesterday we had some issues over what was cross and what was |
| 04:55:35 | 12 | direct -- |
| 04:55:36 | 13 | THE COURT:  Will you calm down, please. |
| 04:55:36 | 14 | MS. DJORDJEVIC:  Sorry. |
| 04:55:37 | 15 | THE COURT:  It's getting very hot in here. |
| 04:55:40 | 16 | MS. DJORDJEVIC:  I'm sorry. |
| 04:55:41 | 17 | THE COURT:  Go ahead and ask your question. |
| 04:55:43 | 18 | BY MR. McJESSY: |
| 04:55:44 | 19 | Q.  Sir, if could you turn to the last two pages of that |
| 04:55:46 | 20 | exhibit, it's a letter from you to Mr. Domanskis dated |
| 04:55:51 | 21 | March 24th, 2010. |
| 04:55:52 | 22 | A.  I see it. |
| 04:55:53 | 23 | Q.  All right.  And you prepared and sent this letter, |
| 04:55:56 | 24 | obviously? |
| 04:55:57 | 25 | A.  Yes. |

04:55:57    1   Q.  All right.  What was the purpose of this letter?

04:55:59    2   A.  Well, at or about this time, the bank had become the owner

04:56:09    3   of the warehouse, my client, the bank.

04:56:11    4   Q.  Had the locks been changed by this time, do you know?

04:56:14    5   A.  I don't know.  The bank wanted to use the warehouse to

04:56:20    6   store bank records, and there was a tremendous amount of

04:56:26    7   inventory in the warehouse, so the bank wanted to let UCB know

04:56:31    8   because we knew that UCB had a security interest, purported

04:56:35    9   security interest, which as far as I knew was valid, in all

04:56:38   10   this inventory.

04:56:39   11   Q.  Did anybody from UCB, United Central Bank, contact you

04:56:42   12   about that?

04:56:42   13   A.  I don't remember.

04:56:46   14   Q.  How do you know about the security interest?

04:56:48   15   A.  Well, now that gets somewhat complicated.  This loan that

04:56:53   16   we're talking about was at one time a participation loan

04:56:56   17   between First Midwest and United Central Bank.

04:56:59   18   Q.  All right.

04:56:59   19   A.  Upon default, First Midwest Bank had a right to take

04:57:05   20   control of the real estate portion of the loan for lack -- I

04:57:09   21   am trying to simplify it for you.

04:57:11   22   Q.  Please do.

04:57:12   23   A.  So once the default occurred, there became a split, and we

04:57:16   24   took about $8 million of the loan, and that particular loan

04:57:20   25   was secured by the real estate.

04:57:24   1          The remainder of the loan, which is a significant

04:57:27   2   number, but I don't remember which, that became UCB's loan.

04:57:31   3   That was secured by a junior mortgage on the property and the

04:57:36   4   personal property of Kanan and Creative, primarily Kanan.

04:57:44   5   Q.  So for what was ever in the warehouse?

04:57:47   6   A.  It was my understanding that the inventory was -- was

04:57:52   7   United Central Bank's collateral for this loan.

04:57:53   8   Q.  All right.  Go on.

04:57:54   9   A.  So the purpose of this letter was to tell Mr. Domanskis,

04:58:01   10  we need this space, your collateral is in here, do something.

04:58:05   11  Q.  Okay.  And now Exhibit 56 I don't think actually includes

04:58:12   12  an attachment of the eviction order, but if you turn to

04:58:14   13  Exhibit 57, I believe that that was the enclosure that was

04:58:20   14  with your letter, but can you confirm that for me?

04:58:23   15  A.  Can you give me a second, please?

04:58:23   16  Q.  Sure.

04:58:45   17  A.  It certainly looks like the agreed eviction order was

04:58:48   18  enclosed with my letter.

04:58:49   19  Q.  All right.  And the agreed eviction order wasn't stayed,

04:58:52   20  it was effective immediately; is that right?

04:58:55   21  A.  To the best of my knowledge, yes.

04:58:56   22  Q.  All right.  Did you get a response to this letter

04:59:05   23  regarding the items in the warehouse?

04:59:07   24  A.  I did.

04:59:07   25  Q.  And when did you get that response and from whom?

| | | |
|---|---|---|
| 04:59:10 | 1 | A.  I don't remember when Mr. Domanskis called me. |
| 04:59:15 | 2 | Q.  All right.  And can you tell me what you told him? |
| 04:59:18 | 3 | A.  He said to me that he was somewhat upset because we |
| 04:59:27 | 4 | weren't giving UCB enough time to take the steps necessary to |
| 04:59:32 | 5 | repossess his collateral, and he asked me if we could |
| 04:59:36 | 6 | negotiate that issue. |
| 04:59:36 | 7 | Q.  All right.  And did you? |
| 04:59:38 | 8 | A.  Yes. |
| 04:59:39 | 9 | Q.  And what was -- did you reach an agreement? |
| 04:59:42 | 10 | A.  Ultimately, yes. |
| 04:59:43 | 11 | Q.  Was it for a lease of the warehouse? |
| 04:59:45 | 12 | A.  No. |
| 04:59:46 | 13 | Q.  What was the agreement?  That was the agreement to sell |
| 04:59:49 | 14 | off the inventory and divide up the sale -- the amount between |
| 04:59:52 | 15 | the parties; is that the agreement? |
| 04:59:54 | 16 | A.  In layman's terms, yes. |
| 04:59:55 | 17 | Q.  All right.  Was it ever discussed that there would be a |
| 05:00:04 | 18 | lease of the warehouse by United Central Bank? |
| 05:00:06 | 19 | A.  Sure, that was one of the possibilities that we were |
| 05:00:08 | 20 | discussing. |
| 05:00:08 | 21 | Q.  Okay.  And then they would have taken possession of the |
| 05:00:11 | 22 | warehouse for some time period? |
| 05:00:13 | 23 | A.  Let me be careful.  They would have taken possession of a |
| 05:00:16 | 24 | portion of the warehouse.  My client still needed some of the |
| 05:00:20 | 25 | warehouse to store bank records. |

05:00:22  1   Q.  Okay.  Just give me an idea.  How quickly did your client
05:00:27  2   start moving in records?
05:00:28  3   A.  I don't know, but it was made clear -- my direction was
05:00:31  4   that they needed it quickly, so I had to do something.
05:00:36  5   Q.  Just a couple of brief questions about the e-mail that you
05:00:45  6   received on March 16th from Steve Blumenthal, and you don't
05:00:50  7   need to look it up, but that was the e-mail where he said, We
05:00:53  8   will preserve the hard drives.
05:00:55  9        Do you recall that e-mail?
05:00:55  10  A.  I do.
05:00:56  11  Q.  All right.  Did you understand that Mr. Blumenthal
05:00:59  12  represented Mr. Shah, Creative Warehouse, and Kanan Fashions?
05:01:04  13  A.  That was my understanding, but I don't know if he
05:01:09  14  represented all three of those entities specifically.
05:01:11  15  Q.  Were all three of those entities involved in the deed in
05:01:14  16  lieu transaction, to the best of your recollection?
05:01:16  17  A.  Yes, they were.
05:01:17  18  Q.  Okay.  And to the best of your recollection, was he
05:01:20  19  negotiating on behalf of all three of those entities?
05:01:22  20  A.  Yes.
05:01:23  21  Q.  All right.  Who arranged the meeting that occurred on
05:02:01  22  May 9th?
05:02:02  23  A.  I don't remember.
05:02:05  24  Q.  If you could -- do you recall getting a demand from
05:02:21  25  Jones & Jacobs for the -- well, actually, I'm going to have

| | | |
|---|---|---|
| 05:02:27 | 1 | you turn to Exhibit 103.  Two questions or three questions I |
| 05:02:30 | 2 | want to ask about that. |
| 05:02:51 | 3 | A.  Okay. |
| 05:02:52 | 4 | Q.  Did you receive a copy of this letter?  You're copied on |
| 05:02:57 | 5 | it, I'll point out. |
| 05:02:59 | 6 | A.  I don't specifically remember it, but I would have to |
| 05:03:02 | 7 | believe that I did. |
| 05:03:03 | 8 | Q.  All right.  There is a Mr. Ira Lauter from Rick Levin and |
| 05:03:07 | 9 | Associates identified on page two.  That's who they want you |
| 05:03:11 | 10 | to contact to arrange for somebody to take possession of the |
| 05:03:15 | 11 | computer equipment.  Do you see that? |
| 05:03:16 | 12 | A.  I do. |
| 05:03:17 | 13 | Q.  Do you know Mr. Levin, or do you know -- I'm sorry -- |
| 05:03:23 | 14 | Mr. Lauter? |
| 05:03:24 | 15 | A.  No. |
| 05:03:24 | 16 | Q.  Are you familiar with Rick Levin and Associates? |
| 05:03:26 | 17 | A.  No. |
| 05:03:27 | 18 | Q.  Now, at the bottom of the first page of this letter, there |
| 05:03:31 | 19 | is a paragraph that talks about demand being made upon First |
| 05:03:37 | 20 | Midwest and they're being refused the right to take the |
| 05:03:40 | 21 | computer equipment. |
| 05:03:42 | 22 | Do you know who refused to allow them to do that? |
| 05:03:44 | 23 | A.  Me. |
| 05:03:45 | 24 | Q.  Okay.  And why did you do that? |
| 05:03:46 | 25 | A.  I was trying to negotiate the best price that I could for |

| | | |
|---|---|---|
| 05:03:51 | 1 | the purchase of the lease, and I wanted to make it as |
| 05:03:55 | 2 | difficult as possible for them to repossess their equipment. |
| 05:03:59 | 3 | Q.  All right. |
| 05:04:00 | 4 | A.  Which happens to me all the time when I represent secured |
| 05:04:03 | 5 | lenders. |
| 05:04:04 | 6 | Q.  So force them to file a lawsuit if they actually want to |
| 05:04:06 | 7 | take possession of the equipment? |
| 05:04:07 | 8 | A.  Yes. |
| 05:04:08 | 9 | Q.  To your knowledge, was there ever a lawsuit filed to take |
| 05:04:10 | 10 | possession of the equipment? |
| 05:04:11 | 11 | A.  To my knowledge, no. |
| 05:04:14 | 12 | Q.  So from your perspective, the refusal was a negotiating |
| 05:04:22 | 13 | strategy? |
| 05:04:23 | 14 | A.  Yes. |
| 05:04:23 | 15 | Q.  And if you could turn to Exhibit 49. |
| 05:05:02 | 16 | A.  Okay. |
| 05:05:02 | 17 | Q.  Now, this is an e-mail -- I'm looking at actually sort of |
| 05:05:06 | 18 | the second e-mail down on the first page.  It begins, from |
| 05:05:09 | 19 | William Serritella, sent Wednesday, March 17th, 2010, |
| 05:05:15 | 20 | 11:12 a.m. |
| 05:05:16 | 21 | Do you see that? |
| 05:05:16 | 22 | A.  I do. |
| 05:05:18 | 23 | Q.  And this is about two days after the consent foreclosure |
| 05:05:22 | 24 | has taken place.  Does that sound about right? |
| 05:05:25 | 25 | A.  Sure. |

| | | |
|---|---|---|
| 05:05:25 | 1 | Q. All right. And there is a -- you write in the fifth |
| 05:05:33 | 2 | paragraph, In closing, let me make one thing perfectly clear, |
| 05:05:39 | 3 | period. Your e-mail states Associated Bank intends to, quote, |
| 05:05:42 | 4 | remove the equipment, end quote, period. Please understand |
| 05:05:47 | 5 | that First Midwest Bank is the owner of the property where the |
| 05:05:50 | 6 | equipment is located. Neither Mr. Lauter nor any other |
| 05:05:54 | 7 | representative of Associated Bank will be given access to the |
| 05:05:58 | 8 | property absent a court order permitting such access. |
| 05:06:02 | 9 | Do you see that? |
| 05:06:02 | 10 | A. I do. |
| 05:06:03 | 11 | Q. All right. So does this help refresh your memory as to |
| 05:06:08 | 12 | whether within two days of the consent foreclosure First |
| 05:06:14 | 13 | Midwest Bank took the position that it owned the property and |
| 05:06:17 | 14 | nobody would be allowed on it absent a court order? |
| 05:06:20 | 15 | A. That was our position, yes. |
| 05:06:23 | 16 | Q. All right. |
| 05:06:24 | 17 | A. With respect to Associated for the reason that I gave you. |
| 05:06:27 | 18 | Q. Nobody was going -- Associated wasn't going to take the |
| 05:06:31 | 19 | server without a court order at that point; is that right? |
| 05:06:34 | 20 | A. That is right. |
| 05:06:34 | 21 | Q. And First Midwest Bank would have refused them access to |
| 05:06:38 | 22 | the property? |
| 05:06:38 | 23 | A. Yes. |
| 05:06:40 | 24 | Q. When First Midwest Bank took over possession of the |
| 05:06:45 | 25 | property, as I understand it, they hired a company, U.S. |

| | | |
|---|---|---|
| 05:06:47 | 1 | Equities, to basically manage the properties that they have |
| 05:06:52 | 2 | possession of? |
| 05:06:52 | 3 | A.  That is my understanding. |
| 05:06:53 | 4 | Q.  Do you have any involvement with that process? |
| 05:06:55 | 5 | A.  No. |
| 05:06:55 | 6 | Q.  Do you have any understanding of how arrangements need to |
| 05:06:58 | 7 | be made to go onto property once management has been turned |
| 05:07:01 | 8 | over to U.S. Equities? |
| 05:07:02 | 9 | A.  Other than what Dave Clark said in his deposition?  No. |
| 05:07:07 | 10 | Q.  Okay.  When you first were negotiating the friendly |
| 05:07:34 | 11 | foreclosure with Mr. Blumenthal, was it brought up that as |
| 05:07:41 | 12 | part of those negotiations, Mr. Shah wanted First Midwest Bank |
| 05:07:49 | 13 | to negotiate for the acquisition of the server, the lease, the |
| 05:07:54 | 14 | guaranty? |
| 05:07:55 | 15 | A.  Yes. |
| 05:07:55 | 16 | Q.  Okay.  Did he make that a -- I'm assuming -- did you speak |
| 05:08:02 | 17 | with Mr. Shah through these negotiations, or did you speak |
| 05:08:06 | 18 | with Mr. Blumenthal? |
| 05:08:07 | 19 | A.  I had -- there was one initial meeting at First Midwest |
| 05:08:14 | 20 | Bank between Mr. Clark, me, Mr. Shah, and Mr. Blumenthal.  At |
| 05:08:21 | 21 | that meeting, we sort of hammered out the essence of the deal. |
| 05:08:24 | 22 | Q.  All right.  Do you remember when that was? |
| 05:08:26 | 23 | A.  Probably in February of 2010. |
| 05:08:29 | 24 | Q.  All right. |
| 05:08:32 | 25 | A.  But don't quote me on that.  I don't remember the exact |

| | | |
|---|---|---|
| 05:08:34 | 1 | date. |
| 05:08:34 | 2 | Q. That's an estimate. I understand. |
| 05:08:36 | 3 | A. Yes. |
| 05:08:37 | 4 | Q. It was part of those discussions that I assume Mr. Shah |
| 05:08:42 | 5 | then did himself personally raise the issue of having First |
| 05:08:47 | 6 | Midwest Bank try to negotiate for the guaranty and the server? |
| 05:08:51 | 7 | A. I can't tell you whether Mr. Blumenthal made that a |
| 05:08:55 | 8 | condition of the deal or whether it was Mr. Shah himself. I |
| 05:08:58 | 9 | don't remember. |
| 05:08:58 | 10 | Q. All right. And then thereafter, I take it, you negotiated |
| 05:09:03 | 11 | directly with Mr. Blumenthal? |
| 05:09:04 | 12 | A. That is correct. |
| 05:09:04 | 13 | Q. All right. And at the first meeting -- well, at any time, |
| 05:09:11 | 14 | did either Mr. Blumenthal or Mr. Shah say why he wanted to |
| 05:09:14 | 15 | obtain the guaranty -- obtain the server? |
| 05:09:17 | 16 | A. Yes. |
| 05:09:17 | 17 | Q. Okay. What was that? |
| 05:09:18 | 18 | A. There were two reasons. The primary one was because |
| 05:09:22 | 19 | Mr. Shah -- I believe this is the guaranty that his wife was |
| 05:09:27 | 20 | on, and it was very important that Mr. Shah and his wife get |
| 05:09:30 | 21 | out of the guaranty of the lease. That was the primary |
| 05:09:35 | 22 | reason. |
| 05:09:35 | 23 | The secondary reason was Mr. Shah was contemplating |
| 05:09:39 | 24 | -- this is what was explained to me at this meeting. |
| 05:09:42 | 25 | Q. I understand. |

05:09:43  1   A.   That Mr. Shah was contemplating -- once he sorted out his

05:09:47  2   differences with UCB, that he was going to start up a new

05:09:52  3   company doing something similar to what he had been doing and

05:09:55  4   that he would need to lease a portion of the space to do that,

05:10:00  5   and the computer was important in that -- was going to be

05:10:07  6   important in that new business.

05:10:08  7   Q.   Okay.   Did you know that it would run the racking system?

05:10:12  8   A.   At that time, I don't think that was discussed.   I learned

05:10:15  9   that later at some point.

05:10:16  10  Q.   All right.   And, in fact, a right to release the warehouse

05:10:22  11  was part of negotiations; is that right?

05:10:31  12  A.   Yes.

05:10:31  13         MR. McJESSY:   I may be done, Judge.

05:10:50  14         I don't have any other questions.

05:10:51  15         THE COURT:   Thank you.

05:10:52  16         Mr. Lipton?

05:11:10  17                              - - -

05:11:10  18         WILLIAM J. SERRITELLA, CROSS-EXAMINATION

05:11:10  19  BY MR. LIPTON:

05:11:12  20  Q.   Mr. Serritella.

05:11:13  21  A.   Yes, sir.

05:11:13  22  Q.   You testified for UCB's counsel that you had three

05:11:21  23  conversations with Mr. Borlack?

05:11:23  24  A.   Those are the three I remember.   There may have been more.

05:11:25  25  Q.   Okay.   You don't recall having any kind of conversation

05:11:29   1   with Mr. Borlack or any member of his firm concerning the

05:11:33   2   negotiations to purchase the warehouse server, do you?

05:11:38   3   A.  I recall no such conversations.

05:11:40   4   Q.  And you're familiar with the e-mails in this case?

05:11:43   5   A.  Generally, yes.

05:11:44   6   Q.  Do you have any knowledge of any e-mails or any other

05:11:49   7   writing going to Mr. Borlack or any member of his firm that

05:11:52   8   concerned the purchase -- the negotiations to purchase the

05:11:55   9   server at the warehouse in this case?

05:11:57   10   A.  No.

05:11:57   11   Q.  Okay.  One of the conversations you testified to having

05:12:09   12   with Mr. Borlack was that -- well, you testified to three.

05:12:15   13   One was about inventory?

05:12:17   14   A.  Yes.

05:12:17   15   Q.  One was that he introduced himself, and there was some

05:12:20   16   other issue that was discussed that you didn't recall?

05:12:24   17   A.  I recall three subject matters that I discussed.

05:12:28   18   Q.  Right.  I want to go through each one of them.

05:12:32   19   A.  Okay.

05:12:32   20   Q.  The first one concerned inventory, correct?

05:12:34   21   A.  The first call was to introduce himself to me.

05:12:38   22   Q.  The first call was to introduce himself.

05:12:40   23          And was there anything else involved in that

05:12:43   24   discussion?

05:12:44   25   A.  No, just that he told me that he would be handling the

05:12:48   1   litigation, that Mr. Blumenthal and his firm would not be, and

05:12:51   2   that if I had any questions about anything, that I could feel

05:12:54   3   free to call him.

05:12:54   4   Q. Was this call in or about early March?

05:12:58   5   A. It could have been.

05:12:59   6   Q. Please take a look at Exhibit 33. On the second page of

05:13:11   7   that exhibit, are you there? Mr. Serritella?

05:13:17   8   A. I am, yes.

05:13:18   9   Q. The second page of the exhibit?

05:13:19   10   A. Yes.

05:13:19   11   Q. All right. At the bottom of the page, do you see an

05:13:22   12   e-mail from you to Al Domanskis, Alan Borlack, copy Dave

05:13:28   13   Clark, re: meeting with Dave Clark, and the e-mail is dated

05:13:31   14   March 5, 2010, at 4:37 p.m.?

05:13:34   15   A. I do see it, yes.

05:13:35   16   Q. During that introductory call, was that the reason for the

05:13:40   17   call, to discuss meeting with Mr. Clark?

05:13:43   18   A. It could very well have been. This is a fourth subject

05:13:48   19   that I now remember is that my client, without telling me, met

05:13:51   20   with Mr. Borlack and signed an affidavit at his request.

05:13:55   21   Q. Okay. And, ultimately, you wrote this e-mail to

05:14:03   22   Mr. Borlack and Mr. Domanskis in which you said, Gentlemen, as

05:14:05   23   you know, Al has asked -- and that is Al Domanskis, I believe?

05:14:10   24   A. Yes.

05:14:10   25   Q. -- (continuing) has asked to speak with Dave -- meaning

592

05:14:13  1  Dave Clark --

05:14:14  2  A.  Yes.

05:14:14  3  Q.  -- (continuing) regarding the affidavit that he signed in

05:14:16  4  the litigation between your two clients?

05:14:18  5  A.  Yes.

05:14:18  6  Q.  Al, Dave will answer questions that you may have in an

05:14:22  7  informal setting so long as I and Kanan's attorney are

05:14:28  8  present, parens, for obvious reasons, close parens.

05:14:32  9        Did I read that right?

05:14:33  10  A.  We are on the bottom here?

05:14:38  11  Q.  Yes.

05:14:39  12        THE COURT:  Right in the middle.

05:14:40  13  BY MR. LIPTON:

05:14:41  14  Q.  Right in the middle of that bottom e-mail.  In the middle

05:14:46  15  of the page, practically.

05:14:47  16  A.  Maybe I am looking at the wrong one.

05:14:50  17  Q.  Page 2.

05:14:52  18  A.  Okay.

05:14:56  19  Q.  Yes, I read that correctly?

05:14:58  20  A.  Yes.

05:14:58  21  Q.  All right.  And so when you meant Kanan's attorney, you

05:15:03  22  meant Alan Borlack, and that's why he was copied on the

05:15:07  23  e-mail, right?

05:15:07  24  A.  Correct.

05:15:08  25  Q.  Okay.  Now, I am going to ask you to please take a look at

05:15:16    1   Exhibit SH 148.

05:15:37    2   A.   Okay.

05:15:38    3   Q.   Have you ever seen that document before?

05:15:39    4   A.   Not until this started, no.

05:15:41    5   Q.   No, I mean before this moment, have you ever seen that

05:15:45    6   document?

05:15:45    7   A.   Yes.

05:15:45    8   Q.   And when was the first time that you recall seeing it?

05:15:48    9   A.   I believe the first time that I saw this document was when

05:16:02   10   I produced it as part of a supplemental production pursuant to

05:16:05   11   somebody's subpoena, but I can't remember which one.

05:16:07   12   Q.   So you never saw it in July of 2010, did you?

05:16:10   13   A.   I did not.

05:16:11   14   Q.   You never saw it August of 2010, did you?

05:16:13   15   A.   I did not.

05:16:13   16   Q.   You never saw it in September of 2010, did you?

05:16:16   17   A.   I did not.

05:16:17   18   Q.   So when you first saw it for production with respect to

05:16:22   19   this hearing, was there any information in that document that

05:16:26   20   came as a surprise to you?

05:16:35   21        And just to save a little time --

05:16:36   22   A.   Can I read it?

05:16:37   23        Go ahead.

05:16:38   24   Q.   Sure.  Just to save a little time, let me direct your

05:16:40   25   attention to the last two sentences of the document.

05:16:47  1  Repayment will come from a foreign corporation not controlled
05:16:50  2  by the Shahs.  The said payoff will transfer the ownership of
05:16:53  3  the lease to the foreign corporation.
05:16:55  4       Was that news to you?
05:16:56  5  A.  I want to say -- I want to say no only because -- and I am
05:17:05  6  going all the way back to my initial discussion with Mr. Shah
05:17:08  7  and Mr. Blumenthal and Mr. Clark when we negotiated the deal
05:17:12  8  -- he had mentioned that neither Kanan nor Creative, if you
05:17:18  9  were able to put together this new entity, it would not be one
05:17:20  10 of those two.  He would form a new entity.
05:17:23  11      So the fact that a new entity was involved in some
05:17:25  12 way with Mr. Shah doesn't surprise me.
05:17:27  13 Q.  What about the fact that it was a foreign corporation?
05:17:30  14 A.  Well, that doesn't surprise me because by then, I had
05:17:33  15 learned that it was, in fact, sold to a foreign corporation --
05:17:37  16 the server was, in fact, sold to a foreign corporation.
05:17:39  17 Q.  Before that, before you learned for the first time in
05:17:45  18 August that the server had been sold to a foreign
05:17:48  19 corporation --
05:17:49  20 A.  Yes.
05:17:49  21 Q.  -- did you ever have any expectation that the server would
05:17:52  22 be sold to a foreign corporation?
05:17:54  23 A.  No.
05:17:54  24 Q.  Before you learned for the first time that the server had
05:18:00  25 been sold to a foreign corporation, did you ever have any

| | | |
|---|---|---|
| 05:18:04 | 1 | expectation that it would be sold to a foreign corporation not |
| 05:18:06 | 2 | controlled by the Shahs? |
| 05:18:09 | 3 | A.  No. |
| 05:18:09 | 4 | Q.  Did you ever contemplate before learning that the server |
| 05:18:18 | 5 | had been sold that the payoff would transfer the ownership of |
| 05:18:22 | 6 | the lease to the foreign corporation? |
| 05:18:24 | 7 | A.  I don't think I thought that one way or another. |
| 05:18:29 | 8 | Q.  You always believed that the purchase that you were |
| 05:18:33 | 9 | negotiating was going to result in Mr. Shah getting the |
| 05:18:37 | 10 | computer, correct? |
| 05:18:38 | 11 | A.  That was my understanding, yes. |
| 05:18:39 | 12 | Q.  And so even though you were negotiating on behalf of FMB |
| 05:18:44 | 13 | to purchase the server, the ultimate disposition of the server |
| 05:18:49 | 14 | was that it was supposed to end up in Mr. Shah's hands, |
| 05:18:53 | 15 | correct? |
| 05:18:53 | 16 | A.  Or -- yes, or entity controlled by him, yes.  That was my |
| 05:18:58 | 17 | understanding of the transaction. |
| 05:18:59 | 18 | Q.  So when Mr. Borlack called you and asked you -- |
| 05:19:07 | 19 |             THE COURT:  When?  When? |
| 05:19:08 | 20 |             MR. LIPTON:  I'm going to make that foundation, your |
| 05:19:11 | 21 | Honor. |
| 05:19:11 | 22 | BY MR. LIPTON: |
| 05:19:11 | 23 | Q.  When Mr. Borlack called you and asked you after he found |
| 05:19:15 | 24 | out that the server had been sold what you knew about it, you |
| 05:19:20 | 25 | were just as surprised that the server was sold as he was, |

05:19:24   1   weren't you, sold to a foreign corporation named Diagems in

05:19:29   2   Dubai and it didn't go to Mr. Shah?

05:19:33   3   A.  Yes.

05:19:33   4   Q.  So the reason that you approved -- strike that.

05:19:44   5        The reason that you didn't allow access to the server

05:19:48   6   was because you were not only trying to protect it because FMB

05:19:56   7   was trying to purchase it, but also because it was supposed to

05:20:00   8   end up in Mr. Shah's hands, correct?

05:20:03   9   A.  I'm not sure I agree with you there.  My instructions were

05:20:07   10  to purchase the computer -- to try to negotiate the best

05:20:12   11  purchase price that I could for the computer.

05:20:13   12  Q.  Well, you were aware on -- as a result of Mr. Blumenthal's

05:20:17   13  March 16th e-mail, that it was -- the server contained

05:20:22   14  relevant evidence in a federal case, correct?

05:20:24   15  A.  It certainly was what he said, yes.

05:20:28   16  Q.  You had no intention of disposing of that evidence, did

05:20:30   17  you?

05:20:30   18  A.  None whatsoever.

05:20:31   19  Q.  You wanted to preserve the evidence, and as long as -- you

05:20:35   20  wanted to preserve the evidence so that FMB could purchase it,

05:20:40   21  and it was your understanding that ultimately it was going to

05:20:44   22  go to Mr. Shah, correct?

05:20:45   23        MS. DJORDJEVIC:  Objection, he testified they were

05:20:47   24  purchasing the server, not what evidence are you referring to

05:20:50   25  there.

05:20:51  1    THE COURT:  Sustained.

05:20:53  2    MR. LIPTON:  I am sorry.  I mischaracterized.  Thank

05:20:55  3  you, Counsel.  Could I have the question read back so I can

05:20:59  4  get my frame of mind back?

05:21:14  5    (Record read.)

05:21:16  6  BY MR. LIPTON:

05:21:16  7  Q.  In other words, you wanted to preserve the server so that

05:21:19  8  FMB could purchase it and that ultimately the evidence would

05:21:23  9  -- the server would go back to Mr. Shah, correct?

05:21:25  10 A.  That was my understanding of the deal, yes.

05:21:27  11 Q.  Okay.  How do you account for the fact that Mr. Clark sold

05:21:38  12 the server to somebody besides Mr. Shah?

05:21:40  13 A.  I have no knowledge relating to that.

05:21:43  14 Q.  Did you ever ask Mr. Clark why he sold the server to

05:21:47  15 somebody besides Mr. Shah?

05:21:48  16 A.  I'm sure I have.

05:21:54  17 Q.  And what was his answer?

05:21:55  18 A.  His answer --

05:22:02  19    THE WITNESS:  Again, Judge, I'm afraid I'm getting

05:22:04  20 into attorney-client here.  If you instruct me to answer, I

05:22:07  21 will.

05:22:07  22    THE COURT:  Did he seek any advice from you?

05:22:09  23    THE WITNESS:  No.

05:22:10  24    THE COURT:  Then answer.

05:22:11  25    THE WITNESS:  He told me that he contacted Mr. Shah

| | |
|---|---|
| 05:22:15 | 1 |
| 05:22:19 | 2 |
| 05:22:24 | 3 |
| 05:22:29 | 4 |
| 05:22:33 | 5 |
| 05:22:38 | 6 |
| 05:22:42 | 7 |
| 05:22:47 | 8 |
| 05:22:47 | 9 |
| 05:22:53 | 10 |
| 05:22:53 | 11 |
| 05:22:55 | 12 |
| 05:22:59 | 13 |
| 05:23:04 | 14 |
| 05:23:07 | 15 |
| 05:23:10 | 16 |
| 05:23:14 | 17 |
| 05:23:17 | 18 |
| 05:23:24 | 19 |
| 05:23:25 | 20 |
| 05:23:28 | 21 |
| 05:23:32 | 22 |
| 05:23:40 | 23 |
| 05:23:45 | 24 |
| 05:23:46 | 25 |

1 and that he was -- the bank was prepared to loan him the money
2 to purchase the server. At some point Mr. Shah told him he
3 didn't have the money, and so he then received an anonymous
4 call, and that entity expressed an interest in selling the
5 computer -- buying the computer -- the lease, actually,
6 probably the computer was what he said to me. And the wire
7 came in, and the computer was sold.
8 BY MR. LIPTON:
9 Q. And that wasn't the plan that you thought was going to go
10 down, was it?
11 A. It was not my understanding of the transaction.
12 Q. Did he tell you why he sold it to an anonymous party
13 instead of Mr. Shah when Mr. Shah had been given a 30-day note
14 to sign and even though he didn't have the money at the time
15 to buy the computer, he had 30 days to pay it off?
16 A. I didn't ask that question. He told me Mr. Shah didn't
17 have the money, so it was sold to someone else.
18 Q. Did that raise any concern in your mind about knowing the
19 fact -- strike that.
20 Knowing the fact that the server contained evidence
21 in a federal case, did that raise any concern in your mind
22 about Mr. Clark or your client's potential liability for
23 selling evidence -- strike that -- selling a server that they
24 knew --
25 THE COURT: I have no idea where you're going. Would

599

05:23:48  1  you start this over, please.

05:23:50  2          MR. LIPTON:  I will withdraw the question.

05:23:55  3          THE COURT:  Okay.

05:23:57  4  BY MR. LIPTON:

05:24:05  5  Q.  Would you take a look at -- well, strike that.

05:24:08  6          Now, you said that during the 5/9 -- the May 9th

05:24:22  7  meeting, Mr. -- with Mr. Hoholik, Mr. Piggee, Dave Clark, and

05:24:28  8  yourself to discuss the inventory, you said something along

05:24:32  9  the lines of Mr. Hoholik said Shah had understated the

05:24:38  10  inventory at the warehouse and Mr. Clark -- and so that he

05:24:42  11  would want to get access to the server, correct?

05:24:46  12  A.  Mr. Hoholik said that he believed Mr. Shah had inflated

05:24:50  13  the inventory numbers in some reports and he felt that there

05:24:54  14  was information on the computer that would substantiate that

05:24:56  15  claim.  That's what he said.  That's what I recall him saying.

05:25:01  16  Q.  Okay.  Did -- and then Mr. Clark said, send me a subpoena

05:25:08  17  and you can have access, or words to that effect?

05:25:10  18  A.  Something to that effect, yes.

05:25:11  19  Q.  Before Mr. Clark said, send me a subpoena, or words to

05:25:14  20  that effect, had you ever instructed Mr. Clark to demand a

05:25:18  21  subpoena for access to the warehouse?

05:25:20  22  A.  I don't remember.

05:25:23  23  Q.  Would you have had any reason to instruct Mr. Clark to

05:25:28  24  demand a subpoena for access to the warehouse before the

05:25:32  25  May 9th meeting?

05:25:33    1   A.  Yes.

05:25:33    2   Q.  So you just don't remember whether or not you instructed

05:25:38    3   him?

05:25:39    4   A.  I don't remember when we would have had that discussion.

05:25:43    5   Q.  Let me ask you this.  When you heard him demand a subpoena

05:25:48    6   for access to the server, was that a surprise to you, that it

05:25:55    7   had come out of his mouth, or did you expect him to say it?

05:25:59    8   A.  I can't speak to that, but it was consistent with what I

05:26:03    9   would have advised him had he asked me.

05:26:05   10   Q.  But he is not an attorney.

05:26:06   11   A.  And I want to be clear, he may have asked me before that,

05:26:11   12   I just don't remember.

05:26:11   13   Q.  Right.  I understand.

05:26:13   14          Now, I think I know the answer to this question.  I'm

05:26:27   15   going to ask you anyway.  Why was it you kept Mr. Blumenthal

05:26:31   16   informed about the negotiations between the parties to

05:26:34   17   purchase the server but Mr. Borlack's firm was not involved --

05:26:40   18   was not informed?

05:26:41   19   A.  Mr. Blumenthal made it clear to me that he was -- he was

05:26:46   20   in charge of this whole operation -- not whole operation,

05:26:49   21   that's a poor choice -- that he was the primary attorney for

05:26:52   22   Mr. Shah and his entities and that he had retained -- and that

05:26:57   23   Mr. Borlack was handling the litigation, but Mr. Blumenthal

05:27:01   24   was really in charge.  That was my understanding.

05:27:03   25   Q.  Mr. Blumenthal told you that he was in charge of the

05:27:07  1  litigation?

05:27:07  2  A.  That's not what I am trying to say.  Mr. Blumenthal was

05:27:11  3  the primary attorney for the defendants.

05:27:16  4  Q.  Okay.

05:27:16  5  A.  And that I should keep him informed on all matters.

05:27:20  6  Q.  But you knew, didn't you, that Mr. Borlack's firm was

05:27:23  7  handling the litigation?

05:27:24  8  A.  Certainly.

05:27:24  9  Q.  And you knew that the server contained relevant evidence

05:27:30  10  based on Blumenthal's e-mail to you, correct?

05:27:33  11  A.  Yes.

05:27:34  12  Q.  Is there a reason why you didn't keep the Borlack firm

05:27:43  13  advised of the negotiations to purchase the server other than

05:27:53  14  the fact that Mr. Blumenthal told you that he was basically

05:27:55  15  the lead counsel?

05:27:56  16  A.  That was the main reason, that Mr. Blumenthal had made it

05:28:01  17  clear to me that he was in communication regularly with

05:28:03  18  Mr. Borlack.  And in my mind, telling Mr. Blumenthal something

05:28:08  19  would have made its way back to Mr. Borlack.

05:28:10  20  Q.  Okay.  Well, then why didn't you simply copy Mr. Borlack

05:28:14  21  on the e-mails to Mr. Blumenthal?

05:28:15  22  A.  I could have.

05:28:16  23  Q.  But you didn't?

05:28:17  24  A.  I didn't.

05:28:17  25  Q.  All right.  Were you ever instructed not to inform the

05:28:22  1  Bailey Borlack firm about the negotiations to purchase the

05:28:26  2  server?

05:28:26  3  A.  No.

05:28:38  4          MR. LIPTON:  Let me have a minute, please.

05:29:21  5          Thank you, your Honor.

05:29:21  6          THE COURT:  While you are checking, do you mind if I

05:29:24  7  ask a few questions?

05:29:25  8          MR. LIPTON:  Please.

05:29:26  9          THE COURT:  Did you ever go to the warehouse?

05:29:27  10         THE WITNESS:  No.

05:29:28  11         THE COURT:  Do you know anybody who did?

05:29:30  12         THE WITNESS:  I know Mr. Clark has been there.

05:29:31  13         THE COURT:  How many times?

05:29:33  14         THE WITNESS:  Five or six, probably.

05:29:36  15         THE COURT:  Was he there prior to the end of July?

05:29:42  16         THE WITNESS:  Yes.

05:29:42  17         THE COURT:  When?

05:29:44  18         THE WITNESS:  I don't know specifically, but I know

05:29:46  19  that he was entertaining offers to sell the warehouse, and

05:29:49  20  that's when he would have been there.

05:29:51  21         THE COURT:  And during those times, did he observe

05:29:56  22  the server?

05:29:56  23         THE WITNESS:  I don't know that, your Honor.

05:29:57  24         THE COURT:  Do you know anybody who ever did?

05:29:59  25         THE WITNESS:  I don't.

05:30:00  1      THE COURT:  Did you ever see any pictures of the

05:30:04  2  server?

05:30:04  3      THE WITNESS:  I have not.

05:30:10  4      THE COURT:  Okay.  Thank you.

05:30:11  5      Are you ready?  Do you have some more questions?

05:30:14  6      No more questions?  No more questions?

05:30:16  7      MR. LIPTON:  No.

05:30:17  8      THE COURT:  Okay.  Thank you very much.

05:30:17  9    (Witness leaves the stand.)

05:30:49  10     THE COURT:  You have no more witnesses, right?  You

05:30:50  11  sent your witness home.

05:30:51  12     MS. DEDINAS:  We just sent them home.

05:30:54  13     THE COURT:  Sure.  And I told you.

05:30:56  14     Have a great weekend.  We will see you on Monday.  Be

05:30:58  15  here a little before 10:00, please.

05:31:03  16     You know, I didn't mention to Mr. Serritella here

05:31:07  17  about the issue that you brought up the other day, yesterday,

05:31:11  18  he shouldn't be having any conversation with Mr. Clark.

05:31:20  19     MS. DJORDJEVIC:  We did actually specifically -- not

05:31:22  20  today, but before Mr. Clark's testimony, we informed

05:31:26  21  Mr. Serritella that he should not be speaking to Mr. Clark.

05:31:29  22     THE COURT:  Because of the fact that he is a witness

05:31:30  23  and he could be recalled.  You never know.

05:31:30  24    (Mr. Serritella enters the courtroom.)

05:31:44  25     THE COURT:  Mr. Serritella, I didn't tell you before

| | | |
|---|---|---|
| 05:31:46 | 1 | you left here, because you are a witness here and because |
| 05:31:49 | 2 | Mr. Clark is a witness, you cannot discuss your testimony or |
| 05:31:55 | 3 | his testimony because he is coming back here Monday morning to |
| 05:31:58 | 4 | finish up at that time. At that time, you may take the role, |
| 05:32:02 | 5 | you know, of an attorney. I understand that. But you cannot |
| 05:32:05 | 6 | discuss your testimony here or his testimony. |
| 05:32:08 | 7 | MR. SERRITELLA: For full disclosure, your Honor, I |
| 05:32:10 | 8 | did call him last night to discuss another file that I'm |
| 05:32:14 | 9 | working on with him. And he told me that you instructed him |
| 05:32:16 | 10 | not to speak to me at all. So I said, I guess I'll talk to |
| 05:32:21 | 11 | you on Monday. |
| 05:32:25 | 12 | THE COURT: Great. Thank you very much. |
| 05:32:25 | 13 | Good night, everybody. |
| 05:32:28 | 14 | MS. DEDINAS: One last thing? I'm not sure he needs |
| 05:32:35 | 15 | to be here at 10:00. Last time he was told 9:30. |
| 05:32:39 | 16 | MS. DJORDJEVIC: We couldn't recall what he was -- |
| 05:32:41 | 17 | MR. LIPTON: If he is here at 9:30, he will certainly |
| 05:32:46 | 18 | be here by 10:00. |
| 05:32:47 | 19 | MS. DJORDJEVIC: But we may not be here and he's |
| 05:32:49 | 20 | wandering the halls. |
| 05:32:49 | 21 | THE COURT: Did you want to tell him? Tell him to be |
| 05:32:51 | 22 | here by a quarter to 10:00. |
| 05:32:59 | 23 | Now we have another problem; is that correct, |
| 05:33:05 | 24 | Mr. Muschler? You said you had a closing Monday afternoon. |
| 05:33:09 | 25 | MR. MUSCHLER: I have a closing Monday afternoon. |

05:33:11  1        THE COURT:  What time is that?

05:33:13  2        MR. MUSCHLER:  I may not be available.  I could do

05:33:18  3  something from 11:00 o'clock on or so.  I could be available

05:33:21  4  after at 3:00, 3:30, 4:00, something like that.  I would be

05:33:24  5  happy to come back here after the closing.

05:33:27  6        MR. McJESSY:  Judge --

05:33:28  7        MR. LIPTON:  Your Honor, we have no plans of calling

05:33:31  8  Mr. Muschler, I don't believe.

05:33:32  9        MR. McJESSY:  Judge, we are the ones who want to call

05:33:35  10  Mr. Muschler.  I have probably 15, 20 minutes of questions

05:33:40  11  tops to ask him.  I did pretty good on this last -- I was

05:33:44  12  pretty accurate on the last one.

05:33:46  13        I actually -- counsel was kind enough to let me speak

05:33:49  14  to him in the hall in advance, so I have a pretty good idea

05:33:52  15  what he is going to say, and there isn't a lot -- there are a

05:33:55  16  few important points the court should hear.

05:33:58  17        THE COURT:  Do you have any desire to question him?

05:34:00  18        MS. DEDINAS:  No, we are not.

05:34:01  19        THE COURT:  So you will be the only one.

05:34:04  20        MR. McJESSY:  And it will be short.  So we could

05:34:06  21  either combine them with Mr. Blumenthal or even Monday

05:34:12  22  morning.  I really don't have a lot.

05:34:15  23        THE COURT:  Mr. Blumenthal is not going to be here

05:34:17  24  until the 9th.

05:34:18  25        MR. McJESSY:  I understand.

05:34:18  1      THE COURT:  And I want to get as much done as we can.

05:34:27  2  You need to come back here.

05:34:29  3      MR. MUSCHLER:  Judge, on full disclosure, on the 9th,

05:34:33  4  I'm beginning a significant --

05:34:33  5      THE COURT:  That's why I want you back here on

05:34:35  6  Monday.

05:34:36  7      MR. MUSCHLER:  I can be back here either until 11:00

05:34:41  8  and then after the closing.

05:34:43  9      THE COURT:  And Mr. McJessy says he only has 20

05:34:47  10 minutes, which means an hour and a half.

05:34:49  11     MR. MUSCHLER:  I will bring my stopwatch.

05:34:51  12     MR. McJESSY:  The court can have a stopwatch.

13     (The hearing was adjourned at 5:30 p.m. on January 28, 2011,

14  until 10:00 a.m. on January 31, 2011.)

15

16

17

18

19

20

21

22

23

24

25

**$**

**$370,000** [1] - 479:6
**$60,000** [1] - 479:7
**$65,000** [1] - 479:18

**0**

**01** [1] - 410:15

**1**

**10** [5] - 307:2, 314:24, 417:4, 518:18, 534:7
**10-minute** [1] - 573:19
**101** [4] - 349:25, 385:1, 385:4, 484:2
**102** [3] - 565:15, 566:2, 566:4
**103** [3] - 565:15, 566:6, 584:1
**10:00** [5] - 603:15, 604:15, 604:18, 604:22, 606:14
**10th** [1] - 400:14
**11** [6] - 325:2, 427:16, 427:18, 429:20, 432:13, 482:13
**110** [1] - 327:1
**1103** [3] - 454:16, 461:18, 461:22
**111** [2] - 329:25, 374:11
**11:00** [3] - 535:9, 605:3, 606:7
**11:00-ish** [1] - 530:2
**11:12** [1] - 585:20
**11:27** [1] - 535:19
**11th** [2] - 324:2, 324:8
**12** [10] - 344:8, 361:17, 365:6, 390:2, 390:24, 393:9, 393:12, 396:18, 401:21, 457:6
**12-week** [2] - 343:24, 361:17
**122** [6] - 375:25, 376:2, 376:3, 377:7, 377:11, 377:18
**125** [6] - 376:2, 377:6, 377:8, 377:11, 377:13, 377:25
**126** [2] - 566:12
**12:10** [1] - 416:8
**12:40** [2] - 416:8, 417:8
**12th** [1] - 372:22
**13** [5] - 325:3, 325:12, 386:23, 386:25, 438:7
**135** [3] - 381:2, 381:14, 535:1
**136** [1] - 376:11
**13th** [30] - 310:21, 324:20, 324:25, 325:5, 337:7, 349:21, 350:2, 367:3, 368:2, 368:16, 368:20, 368:21, 371:8, 371:15, 372:22, 373:8, 373:12, 385:4, 385:19, 385:24, 386:6, 386:16, 386:21, 387:3, 387:13, 387:24, 484:5, 485:8, 566:4, 566:7
**14** [12] - 335:19, 374:15, 439:22, 440:9, 441:16, 445:16, 447:23, 477:4, 477:6, 516:12, 523:1, 523:3
**140** [1] - 377:9
**142** [1] - 336:1

**148** [1] - 593:1
**14th** [9] - 325:14, 334:23, 335:8, 335:12, 335:22, 335:25, 336:2, 338:1, 389:9
**15** [4] - 425:7, 425:12, 541:6, 605:10
**150** [1] - 473:13
**15th** [9] - 425:5, 437:8, 438:21, 463:1, 463:16, 540:9, 541:3, 541:11, 541:15
**16** [13] - 361:22, 390:22, 393:9, 393:12, 401:21, 432:13, 438:12, 464:18, 464:22, 484:25, 492:8, 492:16, 545:8
**16th** [15] - 380:6, 425:14, 480:3, 543:9, 543:17, 544:19, 548:22, 549:1, 550:22, 556:15, 560:20, 567:17, 567:20, 583:6, 596:13
**17** [6] - 335:20, 335:24, 445:15, 456:11, 463:19, 464:23
**170** [1] - 488:19
**178** [2] - 338:16, 338:19
**179** [4] - 339:9, 384:23, 385:5, 385:7
**17th** [9] - 335:25, 337:25, 401:6, 428:10, 463:23, 464:4, 478:18, 478:21, 585:19
**18** [2] - 335:24, 424:22
**182** [1] - 410:6
**185** [2] - 495:9, 495:10
**1854-B** [1] - 417:24
**18th** [7] - 329:6, 331:25, 332:2, 401:6, 424:7, 424:9, 426:7
**19** [2] - 485:3, 513:3
**19th** [30] - 309:24, 310:2, 324:23, 325:22, 332:10, 339:10, 385:6, 387:4, 387:8, 388:18, 388:20, 388:23, 388:25, 389:1, 390:25, 391:19, 424:21, 426:7, 428:3, 428:5, 428:6, 452:15, 509:15, 509:17, 515:5, 519:19, 520:3, 521:11, 522:6
**1:00-ish** [1] - 530:2
**1st** [13] - 380:20, 382:21, 383:1, 383:13, 383:25, 384:4, 384:18, 498:19, 498:20, 499:2, 503:4, 535:8, 535:18

**2**

**2** [9] - 378:25, 412:10, 458:3, 459:18, 495:8, 495:13, 495:14, 592:17
**2-B** [1] - 417:10
**20** [6] - 368:10, 426:13, 472:7, 534:11, 605:10, 606:9
**2010** [47] - 307:16, 312:19, 316:24, 324:23, 330:1, 339:10, 350:2, 350:22, 351:21, 352:7, 355:10, 374:11, 376:5, 378:16, 385:4, 410:9, 414:9, 424:8, 455:15, 476:2, 476:8, 476:22, 492:16, 498:25, 535:8, 535:18, 540:8, 540:17, 541:3, 541:11, 543:9, 545:8, 549:7, 558:14, 565:21, 565:22, 566:4, 566:7, 576:8, 579:21, 585:19, 587:23, 591:14, 593:12, 593:14, 593:16
**2011** [3] - 417:7, 606:13, 606:14
**205** [1] - 417:16

**20th** [9] - 335:17, 410:9, 426:10, 445:6, 445:12, 445:23, 446:8, 472:8, 482:9
**218** [2] - 312:16, 465:16
**219** [1] - 417:24
**21st** [7] - 326:16, 327:3, 328:4, 329:13, 329:14, 424:18, 425:25
**22** [6] - 434:22, 440:5, 456:11, 461:4, 478:16, 515:16
**222** [2] - 304:5, 418:5
**22nd** [3] - 440:4, 440:6, 440:12
**23** [14] - 336:4, 336:6, 337:2, 437:22, 453:20, 453:24, 454:1, 468:24, 474:11, 474:12, 474:14, 474:17, 514:25, 516:12
**23,000** [1] - 452:23
**231** [1] - 417:20
**23rd** [61] - 310:23, 312:19, 316:10, 316:18, 317:15, 318:5, 319:4, 322:18, 326:3, 335:7, 351:5, 351:21, 351:24, 355:15, 356:4, 356:8, 356:14, 356:23, 357:1, 357:3, 357:5, 357:10, 357:25, 358:6, 358:9, 358:12, 360:22, 366:6, 383:25, 384:18, 389:19, 390:25, 398:9, 399:4, 402:4, 402:7, 407:11, 411:23, 465:22, 466:13, 466:20, 467:2, 467:8, 470:12, 470:24, 499:7, 500:16, 500:17, 500:18, 516:23, 517:6, 518:3, 518:16, 519:6, 519:19, 521:1, 521:8, 522:1, 527:18, 529:16, 529:20
**24** [2] - 425:21, 459:11
**24th** [16] - 337:9, 373:21, 374:1, 378:21, 424:8, 425:18, 434:16, 435:11, 445:11, 446:16, 459:20, 461:5, 494:25, 540:17, 541:16, 579:21
**25** [1] - 479:14
**25th** [14] - 328:4, 330:1, 331:7, 350:22, 374:10, 375:10, 375:18, 375:21, 378:19, 378:25, 428:13, 428:14, 429:19, 434:11
**26** [2] - 316:24, 489:5
**26th** [36] - 317:17, 317:21, 318:3, 318:5, 319:22, 332:15, 332:19, 351:17, 351:20, 356:2, 356:4, 356:19, 356:21, 357:9, 360:16, 365:12, 365:13, 365:16, 379:1, 400:2, 412:4, 414:9, 414:20, 435:14, 435:19, 435:25, 436:8, 446:14, 453:16, 461:4, 470:10, 470:11, 474:8, 475:15, 495:3, 570:10
**27** [2] - 440:9
**27th** [7] - 376:5, 376:18, 376:25, 378:1, 378:15, 380:25, 401:12
**28** [12] - 417:7, 435:16, 439:21, 440:10, 440:21, 461:7, 462:25, 476:22, 478:20, 479:16, 479:21, 606:13
**28th** [7] - 351:9, 461:21, 462:18, 462:24, 466:16, 470:8, 478:15
**29** [2] - 459:18, 460:13
**29th** [12] - 320:10, 320:16, 322:21, 359:21, 360:10, 442:14, 443:19, 444:12, 460:14, 565:21, 565:22
**2nd** [3] - 333:13, 378:16, 411:25

## 3

**3** [2] - 410:13, 444:21
**3/16** [1] - 491:17
**30** [10] - 453:21, 453:24, 454:19, 455:11, 478:16, 502:17, 502:23, 502:24, 503:1, 598:15
**30-day** [1] - 598:13
**300** [2] - 304:5, 418:5
**307** [1] - 305:4
**30th** [3] - 442:19, 443:15, 443:24
**31** [3] - 462:9, 478:16, 606:14
**312** [4] - 304:6, 417:17, 417:25, 418:6
**31st** [1] - 459:14
**33** [1] - 591:6
**331** [2] - 307:2, 417:4
**34** [4] - 498:5, 498:7, 533:3, 534:10
**348** [1] - 305:6
**3759** [1] - 417:20
**393** [1] - 305:8
**3:00** [1] - 605:4
**3:30** [1] - 605:4
**3rd** [13] - 411:25, 425:2, 462:5, 462:19, 462:24, 464:4, 464:9, 464:10, 464:19, 464:22, 476:6, 478:20, 478:21

## 4

**4** [7] - 495:8, 495:12, 495:13, 495:14, 514:24, 515:18, 522:13
**4/2010** [1] - 566:12
**403** [1] - 305:10
**404** [1] - 305:12
**408** [1] - 305:14
**414** [1] - 305:16
**415** [1] - 305:18
**419** [1] - 305:20
**4307** [1] - 417:16
**435-5639** [1] - 417:25
**450** [1] - 305:22
**46** [9] - 480:2, 485:11, 491:13, 492:19, 540:21, 540:25, 541:1, 545:5, 545:13
**476** [1] - 305:24
**483** [1] - 306:1
**49** [1] - 585:15
**491** [1] - 306:3
**495** [1] - 306:5
**4:00** [1] - 605:4
**4:37** [1] - 591:14
**4:56** [1] - 385:6
**4th** [4] - 340:24, 365:11, 402:10, 488:21

## 5

**5** [3] - 479:5, 510:20, 591:14
**5/19** [1] - 330:4
**5/9** [1] - 599:6
**50** [3] - 390:5, 390:16, 394:18

**512** [1] - 306:7
**527** [1] - 306:9
**537** [1] - 306:11
**56** [3] - 578:24, 579:3, 581:11
**57** [3] - 540:13, 540:14, 581:13
**573** [1] - 306:13
**589** [1] - 306:15
**5:30** [1] - 606:13
**5th** [5] - 340:25, 341:1, 363:8, 391:3, 448:12

## 6

**6** [10] - 320:19, 376:11, 377:11, 377:14, 377:25, 439:21, 440:9, 441:20, 477:2
**60** [3] - 390:5, 390:16, 394:18
**60,000** [2] - 479:13, 479:23
**60-plus** [1] - 497:5
**60504** [1] - 461:18
**60601** [3] - 304:5, 417:16, 418:5
**60604** [1] - 417:25
**60613** [1] - 417:20
**61** [2] - 565:15, 565:21
**65,000** [1] - 479:23
**6:00** [1] - 392:20
**6A** [1] - 376:12
**6th** [2] - 387:11, 387:13

## 7

**7** [1] - 460:18
**704-3000** [2] - 304:6, 418:6
**773** [1] - 417:21
**79** [1] - 394:2
**7th** [4] - 307:16, 334:18, 357:17, 400:14

## 8

**8** [5] - 312:18, 441:16, 465:17, 522:13, 580:24
**8/13** [1] - 338:6
**8/17** [3] - 338:21, 338:22, 338:25
**8/27/2010** [1] - 312:17
**81** [1] - 309:25
**85** [4] - 316:23, 317:7, 412:2, 414:4
**880-1260** [1] - 417:21
**8th** [2] - 357:17, 401:12

## 9

**9** [5] - 394:25, 460:20, 479:15, 479:16, 554:6
**91** [2] - 320:15, 359:22
**92** [1] - 442:23
**938-4070** [1] - 417:17
**9:00** [3] - 393:4, 500:18, 500:23
**9:20** [1] - 545:8

**9:30** [2] - 604:15, 604:17
**9:38** [4] - 350:2, 385:5, 386:1, 484:5
**9th** [13] - 440:23, 440:24, 441:2, 441:3, 476:22, 549:9, 555:22, 560:9, 583:22, 599:6, 599:25, 605:24, 606:3

## A

**a.m** [11] - 350:2, 385:5, 386:1, 484:5, 500:18, 500:23, 535:9, 535:19, 545:8, 585:20, 606:14
**Aberman** [1] - 311:3
**ability** [2] - 505:13, 557:23
**able** [25] - 318:19, 335:8, 359:15, 359:16, 364:20, 388:15, 390:12, 408:1, 414:8, 414:20, 501:19, 502:1, 502:4, 504:6, 505:5, 508:5, 510:5, 524:11, 524:13, 524:14, 531:9, 532:14, 533:17, 556:4, 594:9
**absent** [3] - 380:18, 586:8, 586:14
**absolute** [6] - 333:15, 378:3, 378:8, 481:19, 504:5, 519:1
**absolutely** [5] - 315:11, 440:17, 467:14, 486:6, 508:22
**Absolutely** [1] - 429:13
**accept** [6] - 479:9, 479:19, 550:13, 574:4, 574:20, 576:20
**acceptable** [1] - 510:6
**accepted** [2] - 332:8, 409:15
**access** [99] - 315:8, 321:18, 326:22, 331:5, 334:19, 335:4, 337:8, 339:16, 340:15, 340:23, 341:22, 342:18, 345:10, 345:11, 345:13, 345:18, 346:3, 359:8, 375:9, 380:18, 382:9, 383:2, 389:24, 413:4, 414:8, 414:20, 429:16, 430:14, 430:21, 430:23, 432:24, 433:1, 433:8, 433:15, 433:19, 433:23, 446:4, 446:21, 446:25, 447:10, 448:14, 448:21, 460:19, 475:11, 477:11, 485:25, 504:3, 504:5, 504:20, 505:5, 507:14, 507:18, 507:25, 509:3, 518:8, 518:16, 519:7, 531:6, 531:9, 531:11, 531:23, 531:25, 532:3, 532:7, 532:14, 535:14, 535:25, 541:20, 546:2, 546:6, 546:17, 548:2, 548:10, 548:23, 549:4, 550:4, 550:8, 550:16, 550:19, 550:23, 551:6, 554:3, 554:12, 554:16, 554:19, 555:10, 555:19, 575:6, 575:24, 586:7, 586:8, 586:21, 596:5, 599:11, 599:17, 599:21, 599:24, 600:6
**accessible** [1] - 485:21
**accessing** [1] - 547:20
**accident** [1] - 422:18
**accomplish** [2] - 398:22, 399:14
**accomplished** [2] - 342:6, 342:7
**according** [2] - 401:12, 540:16
**Accordingly** [1] - 545:24
**accordingly** [1] - 485:23
**account** [1] - 597:11
**accurate** [14] - 312:25, 358:11, 360:10, 382:7, 394:8, 454:7, 492:10, 501:20,

509:25, 511:7, 511:12, 511:21, 523:18, 605:12

**accurately** [3] - 430:1, 430:3, 510:22
**accused** [1] - 401:20
**acknowledge** [2] - 380:20, 475:15
**acknowledging** [1] - 430:12
**acquire** [5] - 387:5, 485:21, 485:24, 545:25, 567:14
**acquisition** [2] - 558:17, 587:13
**acting** [1] - 380:6
**action** [13] - 360:13, 372:14, 372:16, 377:21, 390:13, 462:6, 462:13, 473:8, 474:1, 474:3, 548:2, 548:5, 578:17
**actions** [5] - 337:23, 496:19, 547:15, 548:14, 548:18
**actively** [2] - 403:21, 506:4
**activities** [4] - 309:19, 326:3, 411:21, 411:22
**activity** [2] - 342:23, 399:1
**acts** [1] - 399:1
**actual** [3] - 510:21, 558:20, 570:23
**adamant** [1] - 549:25
**added** [4] - 377:15, 378:1, 378:5, 523:10
**adding** [1] - 377:16
**addition** [3] - 317:15, 489:6, 516:6
**additional** [11] - 308:20, 338:5, 377:16, 377:22, 378:1, 378:2, 396:24, 445:16, 455:2, 499:6, 501:15
**address** [5] - 455:18, 461:25, 475:16, 535:1
**addressed** [1] - 463:17
**addressing** [2] - 402:5, 511:24
**adjourned** [2] - 416:8, 606:13
**admonished** [1] - 443:2
**admonishment** [1] - 307:7
**admonition** [1] - 432:1
**admonitions** [1] - 308:20
**advance** [1] - 605:14
**advice** [10] - 554:14, 554:18, 554:23, 554:24, 556:2, 556:6, 557:22, 559:24, 560:1, 597:22
**advise** [15] - 370:24, 375:10, 375:14, 375:18, 376:15, 376:23, 377:21, 382:21, 433:20, 443:7, 471:22, 472:4, 495:1, 559:11, 559:16
**advised** [28] - 308:18, 351:21, 371:17, 376:24, 392:6, 392:7, 392:10, 421:10, 427:25, 432:17, 432:18, 436:1, 438:21, 443:1, 443:2, 446:13, 462:5, 470:13, 477:12, 478:18, 495:3, 527:22, 528:6, 528:18, 528:25, 529:1, 600:9, 601:13
**advises** [3] - 312:20, 466:1, 485:15
**advising** [2] - 376:25, 480:18
**affidavit** [8] - 314:8, 389:21, 482:23, 490:23, 510:3, 525:14, 591:20, 592:3
**affirmatively** [1] - 554:24
**afford** [1] - 458:14
**afield** [1] - 525:2
**afraid** [2] - 468:7, 597:19
**afternoon** [9] - 318:2, 507:2, 510:5,

512:25, 513:1, 537:7, 537:8, 604:24, 604:25
**afterwards** [1] - 519:5
**agencies** [1] - 497:19
**agent** [2] - 480:10, 480:12
**ago** [4] - 330:13, 356:18, 386:15, 429:2
**agree** [15] - 434:2, 438:19, 485:25, 486:22, 544:1, 546:1, 546:5, 546:12, 546:16, 548:22, 551:6, 551:16, 551:19, 576:20, 596:9
**agreed** [19] - 329:16, 332:8, 425:18, 425:20, 460:18, 474:18, 539:16, 540:3, 540:11, 540:15, 540:16, 541:16, 542:1, 542:6, 542:14, 564:10, 575:21, 581:17, 581:19
**agreeing** [1] - 430:11
**agreement** [22] - 329:17, 424:20, 460:22, 460:23, 538:15, 543:20, 546:21, 546:24, 547:3, 551:11, 551:15, 551:22, 552:6, 552:15, 552:16, 562:5, 571:13, 582:9, 582:13, 582:15
**ahead** [9] - 322:13, 343:13, 393:5, 406:6, 424:2, 483:15, 535:5, 579:17, 593:23
**airport** [1] - 392:21
**al** [2] - 307:3, 417:7
**Al** [4] - 591:12, 591:23, 592:6
**Alan** [17] - 304:3, 308:4, 316:25, 320:17, 339:11, 340:1, 340:5, 340:24, 365:10, 418:3, 419:13, 434:24, 435:17, 489:13, 533:16, 591:12, 592:22
**ALAN** [12] - 304:4, 305:20, 305:22, 305:24, 306:1, 306:3, 418:4, 419:10, 450:15, 476:19, 483:25, 491:11
**alleged** [2] - 427:2, 489:8
**allow** [14] - 342:18, 405:8, 477:11, 485:25, 505:14, 546:1, 546:6, 546:17, 548:2, 548:23, 550:23, 551:6, 584:22, 596:5
**allowed** [4] - 361:8, 509:7, 510:8, 586:14
**allowing** [1] - 554:3
**allusion** [1] - 507:22
**almost** [1] - 497:15
**alone** [2] - 433:21, 519:3
**alteration** [1] - 420:21
**amended** [1] - 424:23
**American** [1] - 483:7
**amount** [4] - 518:15, 550:1, 580:6, 582:14
**amounts** [1] - 452:17
**AMY** [1] - 417:15
**analysis** [1] - 335:10
**and..** [1] - 512:5
**anonymous** [2] - 598:3, 598:12
**ANSWER** [1] - 477:9
**answer** [66] - 315:19, 321:24, 323:5, 323:11, 336:18, 340:13, 341:4, 343:21, 344:14, 344:22, 345:4, 348:16, 349:9, 354:16, 357:8, 362:2, 362:14, 372:6, 373:4, 386:25, 387:9, 390:14, 390:15,

409:23, 412:8, 430:7, 431:20, 439:5, 439:11, 439:15, 441:21, 447:25, 450:2, 464:14, 476:24, 477:2, 481:1, 481:3, 481:8, 481:9, 481:15, 483:12, 502:21, 504:16, 517:22, 520:10, 536:10, 545:10, 547:10, 547:17, 547:24, 548:12, 551:2, 553:17, 556:12, 556:21, 563:19, 567:21, 571:21, 592:6, 597:17, 597:18, 597:20, 597:24, 600:14
**answered** [6] - 345:6, 395:18, 445:17, 505:2, 526:21, 571:12
**answering** [3] - 347:19, 460:14, 550:24
**answers** [4] - 336:6, 470:3, 502:20, 536:7
**anticipate** [2] - 330:21, 454:6
**anticipated** [3] - 323:15, 324:13, 334:8
**Antioch** [1] - 399:11
**anyway** [1] - 600:15
**apart** [1] - 378:15
**apologies** [2] - 500:22, 501:12
**apologize** [5] - 409:14, 450:19, 514:22, 524:20, 525:23
**apparent** [1] - 482:7
**appear** [2] - 413:16, 571:11
**APPEARANCES** [3] - 304:1, 417:12, 418:1
**appeared** [2] - 325:22, 434:11
**applied** [2] - 430:14, 511:8
**apply** [2] - 433:15, 433:25
**appointed** [4] - 495:25, 496:5, 496:7, 512:2
**appreciate** [2] - 347:22, 383:21
**apprised** [2] - 427:7, 427:20
**approach** [4] - 491:24, 494:7, 494:11, 514:19
**approaching** [1] - 383:19
**approved** [1] - 596:4
**April** [118] - 307:16, 309:24, 310:2, 310:23, 312:19, 316:18, 316:24, 317:15, 317:17, 317:21, 319:4, 319:22, 320:10, 320:16, 322:18, 326:3, 351:5, 351:21, 351:24, 355:10, 355:15, 356:4, 356:8, 356:14, 356:22, 356:23, 357:1, 357:3, 357:5, 357:10, 357:17, 357:25, 358:6, 358:9, 358:12, 359:21, 360:10, 360:16, 360:22, 365:12, 365:13, 365:16, 366:6, 372:22, 373:6, 373:7, 374:15, 380:6, 383:25, 384:15, 384:18, 389:9, 389:13, 389:19, 390:25, 393:15, 393:16, 398:9, 399:4, 400:13, 400:14, 407:11, 411:23, 412:4, 414:9, 414:20, 437:22, 438:12, 442:14, 442:19, 443:15, 443:19, 443:24, 444:12, 457:6, 459:18, 460:18, 460:20, 465:22, 466:13, 466:20, 467:2, 467:8, 468:24, 469:8, 470:12, 470:18, 470:24, 474:8, 474:11, 474:12, 474:14, 474:17, 484:25, 498:19, 498:20, 498:25, 499:2, 499:7, 500:16, 500:17, 500:18, 516:23, 517:6, 518:3, 518:16, 519:6, 519:19,

521:8, 522:1, 527:18, 529:16, 529:20
**arbitration** [2] - 496:8, 497:7
**area** [5] - 380:10, 419:6, 420:10, 436:18, 552:23
**areas** [1] - 450:12
**argument** [3] - 423:6, 423:13, 457:2
**argumentative** [2] - 344:10, 433:11
**Aronberg** [4] - 537:16, 537:17, 537:18, 537:20
**arose** [2] - 563:22, 568:19
**arrange** [4] - 506:21, 508:15, 531:22, 584:10
**arranged** [1] - 583:21
**arrangements** [7] - 333:7, 346:14, 346:19, 346:20, 420:5, 437:14, 587:6
**arranging** [2] - 361:10, 521:10
**articles** [3] - 497:3, 497:5, 533:22
**ascribe** [1] - 481:21
**aspect** [1] - 560:17
**aspects** [1] - 307:25
**asserted** [1] - 494:25
**asserting** [1] - 446:13
**assess** [1] - 499:4
**asset** [2] - 501:22, 501:23
**assets** [3] - 552:23, 553:1, 572:9
**assigned** [1] - 571:14
**assigning** [1] - 457:1
**assignment** [3] - 556:8, 558:20, 559:21
**assist** [5] - 364:1, 364:15, 398:17, 450:25, 498:12
**assistance** [2] - 399:24, 533:17
**assistant** [1] - 505:24
**assisting** [3] - 308:4, 315:1, 366:22
**Associated** [57] - 310:17, 340:19, 340:23, 341:2, 341:19, 350:6, 350:8, 350:13, 367:4, 367:12, 367:20, 367:22, 368:2, 368:16, 380:4, 385:14, 385:16, 385:20, 386:7, 386:24, 387:22, 388:1, 388:10, 394:24, 394:25, 438:6, 445:24, 446:13, 473:25, 479:6, 479:13, 479:18, 484:6, 484:24, 485:6, 485:9, 495:1, 495:5, 538:22, 556:8, 558:18, 564:12, 564:18, 564:19, 564:20, 565:3, 566:18, 566:22, 567:3, 567:8, 567:18, 586:3, 586:7, 586:17, 586:18
**Associates** [2] - 584:9, 584:16
**assume** [22] - 324:8, 345:17, 345:19, 345:20, 345:23, 345:24, 346:2, 408:24, 421:4, 437:1, 439:17, 448:21, 451:9, 452:1, 462:10, 471:7, 493:3, 544:17, 546:8, 575:13, 588:4
**assumed** [10] - 341:14, 366:1, 436:24, 437:6, 437:7, 446:10, 465:6, 481:22, 531:23, 561:3
**assumes** [1] - 336:17
**assuming** [4] - 430:8, 484:17, 516:4, 587:16
**assumption** [2] - 325:7, 379:24
**assurances** [1] - 413:10
**attach** [2] - 444:11, 444:12

**attached** [5] - 327:4, 338:6, 443:15, 444:5, 454:11
**attaches** [1] - 566:6
**attaching** [1] - 565:22
**attachment** [1] - 581:12
**attempt** [3] - 311:14, 538:20
**attempted** [3] - 311:11, 311:22, 313:15
**attempting** [3] - 438:22, 442:2, 513:5
**attend** [2] - 373:1, 437:22
**attended** [1] - 427:13
**attendees** [1] - 503:17
**attention** [20] - 320:18, 330:3, 385:7, 390:3, 410:13, 412:2, 437:23, 437:25, 438:1, 454:1, 454:11, 465:17, 470:18, 480:2, 500:16, 501:16, 501:18, 535:2, 543:6, 593:25
**attorney** [5] - 362:23, 392:16, 477:10, 533:12, 534:17, 537:14, 554:4, 564:19, 564:21, 592:7, 592:21, 597:20, 600:10, 600:21, 601:3, 604:5
**attorney-client** [2] - 554:4, 597:20
**attorneys** [12] - 347:10, 358:22, 358:25, 359:11, 373:13, 382:21, 384:20, 419:22, 475:14, 563:6, 563:9, 563:15
**audit** [1] - 575:20
**August** [64] - 335:17, 335:20, 337:7, 337:9, 337:25, 339:10, 340:24, 340:25, 341:1, 361:21, 363:8, 364:19, 364:21, 365:3, 365:11, 385:6, 387:4, 387:7, 387:11, 387:13, 388:18, 388:20, 388:23, 388:25, 389:1, 390:25, 391:3, 391:19, 393:17, 395:17, 396:25, 400:2, 402:10, 410:9, 424:8, 427:2, 445:6, 445:11, 445:12, 445:16, 445:23, 446:8, 446:14, 446:16, 448:10, 448:12, 449:19, 472:7, 472:8, 476:2, 476:6, 479:5, 479:14, 479:15, 479:16, 488:7, 488:21, 494:25, 569:19, 570:10, 576:16, 593:14, 594:18
**Aurora** [29] - 313:22, 313:23, 314:12, 315:6, 318:16, 318:20, 373:15, 382:3, 399:21, 399:22, 412:24, 455:16, 456:21, 461:18, 461:23, 466:17, 502:12, 518:4, 518:9, 535:23, 543:4, 543:11, 543:14, 546:22, 547:1, 547:6, 547:16, 571:6, 571:23
**author** [1] - 497:6
**authorized** [2] - 311:7, 407:13
**available** [10] - 330:18, 335:9, 397:11, 401:22, 507:25, 524:6, 529:12, 530:5, 605:2, 605:3
**Avenue** [1] - 417:16
**await** [1] - 337:18
**aware** [51] - 319:24, 320:9, 322:17, 322:20, 346:21, 349:18, 349:19, 351:8, 351:16, 351:25, 352:6, 352:13, 352:21, 354:15, 355:8, 356:8, 357:5, 357:13, 360:12, 361:13, 368:15, 371:3, 380:17, 383:12, 387:1, 387:4, 387:10, 390:8, 390:9, 405:2, 405:7, 406:14, 407:4,

425:13, 425:17, 434:16, 456:6, 467:2, 468:16, 468:22, 472:15, 486:9, 502:8, 502:10, 502:11, 506:23, 532:10, 560:24, 567:7, 572:19, 596:12

## B

**bachelor's** [1] - 496:22
**background** [3] - 393:23, 496:21, 499:13
**backup** [12] - 328:15, 328:23, 329:1, 329:5, 329:9, 329:10, 436:5, 501:16, 510:22, 514:6, 514:10, 518:22
**badgering** [1] - 413:3
**badly** [1] - 467:24
**Bailey** [14] - 353:2, 353:20, 362:6, 363:25, 364:13, 373:13, 384:19, 406:2, 472:5, 498:12, 567:3, 567:25, 569:12, 602:1
**Bank** [215] - 307:2, 310:18, 314:3, 314:8, 321:20, 322:23, 322:25, 323:10, 323:12, 331:20, 331:24, 340:23, 341:2, 341:19, 341:22, 345:15, 346:15, 350:6, 350:8, 350:12, 350:13, 352:9, 352:13, 352:21, 353:9, 354:1, 354:6, 355:8, 355:9, 358:22, 359:1, 359:12, 362:24, 363:15, 367:3, 367:4, 367:11, 367:12, 367:20, 367:22, 368:2, 368:16, 368:23, 371:10, 373:13, 373:14, 380:4, 380:17, 385:16, 385:20, 386:7, 387:22, 387:25, 388:1, 388:10, 391:25, 392:4, 392:7, 394:24, 394:25, 401:1, 427:2, 437:17, 438:6, 445:24, 446:6, 446:11, 446:13, 448:13, 452:3, 458:15, 459:5, 467:5, 471:17, 471:20, 472:4, 472:15, 472:23, 472:24, 473:25, 474:19, 475:5, 475:7, 475:9, 476:1, 479:6, 479:13, 479:18, 482:3, 482:5, 484:7, 484:24, 485:6, 485:9, 486:20, 493:1, 495:1, 495:5, 530:9, 537:24, 537:25, 538:1, 538:2, 538:8, 538:9, 538:13, 538:16, 538:18, 538:19, 538:22, 538:23, 539:22, 540:19, 541:23, 542:20, 543:20, 544:1, 544:24, 546:20, 546:24, 547:3, 547:8, 547:15, 548:2, 548:3, 548:9, 548:13, 548:17, 548:22, 549:12, 550:13, 550:22, 551:6, 551:7, 551:21, 552:10, 552:18, 554:11, 554:15, 554:19, 556:2, 556:6, 556:8, 557:14, 557:15, 558:18, 559:7, 559:13, 559:19, 559:25, 560:3, 560:21, 561:5, 562:12, 562:14, 562:17, 563:13, 563:20, 563:23, 564:6, 564:9, 564:12, 564:13, 564:16, 564:18, 565:3, 566:7, 566:18, 566:21, 566:22, 566:25, 567:3, 567:8, 567:17, 567:18, 570:13, 570:17, 570:20, 570:23, 571:3, 571:6, 571:9, 571:14, 571:19, 572:3, 572:9, 573:4, 574:20, 575:14, 576:1, 576:21, 577:11, 578:10, 580:11, 580:17, 580:19, 582:18, 586:3, 586:5, 586:7, 586:13, 586:21, 586:24, 587:12,

587:20, 588:6

**bank** [25] - 314:7, 485:24, 488:15, 493:6, 508:11, 531:8, 531:10, 531:12, 545:25, 546:1, 551:16, 552:21, 553:4, 553:25, 556:3, 556:23, 575:20, 580:2, 580:3, 580:5, 580:6, 580:7, 582:25, 598:1

**BANK** [1] - 417:4

**bank's** [4] - 312:1, 313:18, 515:19, 557:23

**Bank's** [27] - 331:21, 350:20, 352:3, 357:6, 358:7, 361:18, 363:19, 365:18, 366:10, 368:4, 368:17, 371:18, 378:13, 380:15, 380:21, 383:12, 383:14, 384:2, 384:21, 414:8, 475:14, 558:18, 564:19, 564:20, 571:1, 581:7

**banks** [1] - 489:10

**bar** [1] - 496:24

**barn** [2] - 366:12, 366:19

**barnful** [1] - 398:16

**based** [15] - 343:25, 344:1, 344:3, 355:7, 357:11, 358:14, 387:1, 390:14, 477:24, 497:17, 507:16, 561:3, 562:9, 601:10

**basis** [11] - 309:7, 340:16, 355:5, 362:12, 387:13, 441:8, 497:10, 528:5, 536:8, 557:5, 574:10

**beat** [1] - 323:6

**became** [12] - 307:15, 371:2, 405:7, 457:4, 457:5, 482:7, 502:11, 534:17, 539:22, 547:18, 580:23, 581:2

**become** [5] - 425:16, 456:6, 470:24, 557:6, 580:2

**becoming** [3] - 357:12, 357:16, 473:22

**BEFORE** [1] - 417:10

**began** [6] - 308:4, 313:20, 372:24, 401:11, 402:1, 489:17

**begin** [3] - 313:5, 394:23, 471:15

**beginning** [12] - 307:21, 318:16, 380:4, 389:9, 393:15, 393:16, 402:2, 453:6, 477:2, 482:8, 486:16, 606:4

**begins** [4] - 465:19, 485:19, 535:22, 585:18

**behalf** [11] - 362:11, 364:5, 395:4, 450:24, 540:18, 542:19, 542:22, 564:16, 576:20, 583:19, 595:12

**beings** [2] - 481:21

**belief** [5] - 379:15, 384:7, 411:12, 441:12, 473:20

**believes** [1] - 477:18

**belong** [2] - 571:6, 571:8

**belonged** [1] - 559:22

**below** [3] - 338:5, 338:11, 377:22

**Bennek** [5] - 492:5, 492:25, 493:4, 493:5

**Bernard** [1] - 544:25

**best** [25] - 363:18, 363:22, 383:23, 450:13, 481:20, 499:11, 509:25, 524:5, 525:25, 526:2, 539:12, 542:12, 543:21, 544:14, 569:19, 574:19, 575:8, 575:16, 576:17, 578:14, 581:21, 583:16,

**bet** [1] - 478:5

**better** [6] - 400:4, 428:14, 443:1, 526:7, 534:17, 537:19

**between** [45] - 328:4, 328:21, 332:3, 339:22, 350:7, 351:20, 353:1, 353:20, 356:3, 358:3, 367:21, 376:2, 383:25, 384:15, 384:18, 387:3, 387:12, 387:25, 388:9, 390:6, 391:13, 462:18, 462:24, 462:25, 464:4, 470:8, 470:18, 477:8, 479:17, 484:8, 486:15, 488:9, 488:11, 497:11, 519:19, 521:15, 530:2, 541:15, 542:1, 549:12, 580:17, 582:14, 587:20, 592:4, 600:16

**beyond** [9] - 354:22, 391:15, 405:17, 405:20, 406:19, 449:11, 473:19, 527:1, 536:8

**Bill** [3] - 311:5, 313:5, 537:8

**billing** [8] - 364:9, 491:15, 491:16, 491:17, 491:19, 491:21, 492:8, 492:10

**bills** [2] - 473:15, 473:16

**binder** [3] - 384:25, 453:20, 540:13

**bird** [1] - 482:14

**bird-dogged** [1] - 482:14

**bit** [9] - 332:6, 334:7, 343:8, 383:22, 389:10, 503:25, 525:18, 533:4, 563:2

**black** [1] - 397:8

**blade** [1] - 408:4

**bleachers** [1] - 496:25

**blue** [1] - 397:8

**Blumenthal** [101] - 348:13, 390:7, 404:5, 404:24, 425:14, 426:1, 426:5, 426:9, 426:21, 427:15, 427:20, 427:25, 434:24, 435:18, 438:17, 438:20, 439:21, 440:15, 442:4, 442:8, 456:13, 459:12, 460:21, 461:8, 463:4, 464:18, 465:1, 470:1, 470:3, 476:21, 476:24, 477:16, 477:22, 480:3, 480:10, 480:24, 481:13, 482:11, 485:13, 485:14, 486:4, 486:15, 486:19, 486:24, 487:11, 487:12, 487:17, 487:20, 488:5, 488:14, 488:18, 489:4, 489:13, 491:2, 491:21, 492:4, 492:21, 493:10, 493:18, 541:4, 542:8, 542:10, 542:13, 542:17, 542:22, 542:25, 543:4, 543:10, 543:14, 543:16, 545:9, 546:5, 551:10, 551:21, 552:11, 552:16, 560:18, 567:7, 567:20, 583:6, 583:11, 587:11, 587:18, 587:20, 588:7, 588:11, 588:14, 591:1, 594:7, 600:15, 600:19, 600:23, 600:25, 601:2, 601:14, 601:16, 601:18, 601:21, 605:21, 605:23

**Blumenthal's** [10] - 441:24, 491:14, 544:19, 546:17, 548:21, 549:1, 550:21, 551:5, 596:12, 601:10

**board** [1] - 421:25

**Bob** [2] - 550:10, 558:22

**bolded** [1] - 377:22

**bolding** [1] - 342:2

**Boodell** [4] - 353:2, 353:20, 356:5, 459:14

**BOODELL** [1] - 417:13

**book** [2] - 498:5, 541:8

**books** [1] - 436:24

**Borlack** [86] - 304:3, 316:25, 320:17, 328:10, 330:2, 336:2, 339:11, 340:1, 340:4, 340:5, 340:7, 353:2, 353:17, 353:20, 362:6, 363:25, 364:13, 365:10, 373:13, 384:19, 392:6, 392:9, 396:1, 400:16, 406:2, 418:3, 419:4, 419:13, 419:14, 434:24, 435:17, 440:5, 442:9, 448:24, 450:17, 450:18, 472:5, 477:8, 477:9, 478:23, 492:2, 494:20, 494:21, 497:24, 498:3, 498:12, 498:24, 519:20, 520:1, 520:13, 521:18, 527:13, 533:20, 534:13, 534:14, 534:18, 567:3, 568:1, 568:13, 568:20, 568:24, 569:9, 569:12, 569:15, 569:20, 569:23, 570:6, 570:13, 570:17, 589:23, 590:1, 590:7, 590:12, 591:12, 591:20, 591:22, 592:22, 595:18, 595:23, 600:23, 601:12, 601:18, 601:19, 601:20, 602:1

**BORLACK** [10] - 305:20, 305:22, 305:24, 306:1, 306:3, 419:10, 450:15, 476:19, 483:25, 491:11

**Borlack's** [7] - 440:25, 527:8, 533:12, 545:18, 545:20, 600:17, 601:6

**bother** [1] - 465:10

**bottom** [10] - 374:21, 376:11, 377:9, 465:18, 535:7, 541:2, 584:18, 591:11, 592:10, 592:14

**bought** [1] - 569:25

**boutique** [1] - 495:23

**boxes** [1] - 414:11

**boy** [1] - 473:12

**brand** [1] - 408:2

**Brandeis** [1] - 496:23

**break** [14] - 313:11, 368:7, 368:12, 368:13, 398:13, 494:3, 494:5, 494:10, 494:14, 501:3, 503:9, 529:9, 573:19, 573:20

**Brief** [4] - 383:18, 384:12, 392:14, 476:12

**brief** [5] - 338:7, 402:23, 496:10, 568:20, 583:5

**briefly** [2] - 456:15, 498:5

**briefs** [1] - 473:12

**bring** [5] - 332:11, 399:23, 501:16, 541:8, 606:11

**bringing** [3] - 359:8, 390:2, 390:18

**broad** [2] - 433:23, 434:1

**broke** [3] - 312:6, 313:10, 368:15

**Brook** [73] - 311:21, 312:14, 313:24, 314:12, 315:5, 315:6, 316:2, 316:17, 317:10, 318:9, 318:20, 318:24, 320:12, 320:21, 320:22, 321:1, 323:14, 324:9, 325:1, 326:4, 326:7, 333:23, 334:5, 334:11, 341:16, 342:1, 346:9, 356:13, 358:18, 359:23, 360:2, 360:8, 360:9, 361:18, 365:14, 365:18, 366:4, 399:2, 399:23, 407:11, 409:10, 411:6, 411:22, 412:22, 415:25, 442:16, 443:22, 445:4, 465:23, 467:19, 468:3, 468:18, 500:15,

500:24, 503:13, 507:19, 508:16, 511:8, 511:18, 514:1, 516:20, 516:25, 517:5, 517:11, 519:8, 527:23, 528:10, 528:15, 529:3, 532:19, 532:25, 535:11, 535:15

**Brosnan** [6] - 572:8, 572:13, 572:14, 572:17, 572:19, 573:5

**brought** [10] - 311:6, 409:24, 420:2, 437:23, 437:25, 501:18, 503:6, 543:6, 587:11, 603:17

**building** [11] - 341:22, 345:9, 345:10, 345:12, 345:13, 345:18, 345:21, 345:22, 346:3, 434:13, 506:8

**built** [1] - 500:7

**business** [17] - 318:13, 318:14, 380:1, 395:7, 401:2, 403:10, 403:14, 403:20, 404:15, 404:20, 405:11, 405:24, 406:16, 502:6, 560:8, 560:15, 589:6

**businessmen** [1] - 393:24

**Butterfield** [4] - 454:16, 461:18, 461:23, 475:16

**buy** [8] - 333:11, 395:20, 401:9, 477:14, 479:1, 479:12, 564:13, 598:15

**buyers** [1] - 345:25

**buying** [1] - 598:5

**BY** [189] - 304:4, 305:5, 305:7, 305:9, 305:11, 305:13, 305:15, 305:17, 305:19, 305:21, 305:23, 305:25, 306:2, 306:4, 306:6, 306:8, 306:10, 306:12, 306:14, 306:16, 307:10, 308:16, 309:13, 314:15, 317:8, 319:21, 322:19, 323:8, 328:8, 336:25, 338:24, 339:8, 340:6, 340:17, 341:12, 343:16, 345:7, 346:13, 347:24, 348:11, 349:15, 351:15, 352:25, 354:4, 354:10, 354:21, 355:13, 355:21, 357:15, 362:5, 362:16, 363:24, 366:17, 366:20, 368:14, 370:17, 371:14, 372:1, 372:12, 373:25, 375:17, 380:13, 381:15, 382:20, 383:24, 384:14, 384:17, 386:8, 386:20, 388:14, 390:21, 391:12, 391:18, 393:8, 394:1, 395:14, 398:8, 400:10, 403:5, 404:14, 406:11, 406:21, 407:9, 408:9, 408:18, 409:16, 414:3, 415:5, 415:21, 417:14, 417:19, 418:4, 419:11, 423:19, 424:6, 428:18, 429:3, 430:6, 431:13, 431:24, 432:12, 433:13, 434:10, 439:9, 441:5, 442:13, 448:6, 449:4, 450:1, 450:16, 453:11, 454:25, 459:4, 460:9, 460:16, 462:4, 465:5, 467:1, 467:17, 468:1, 468:15, 472:18, 472:21, 476:20, 477:5, 478:13, 480:17, 481:7, 481:11, 482:25, 484:1, 491:12, 492:1, 492:14, 492:18, 495:20, 499:23, 502:25, 509:14, 512:24, 513:22, 514:9, 514:23, 515:17, 518:2, 518:14, 520:12, 525:24, 526:15, 526:23, 527:6, 528:1, 528:8, 529:2, 533:8, 535:6, 537:6, 538:7, 541:12, 544:18, 547:14, 551:4, 552:3, 553:12, 554:9, 555:21, 557:2, 558:6, 563:11, 563:24, 565:1, 565:11, 565:20, 568:14, 570:5, 572:11, 573:23, 574:16, 576:15, 578:7, 578:23, 579:18,

589:19, 592:13, 595:22, 597:6, 598:8, 599:4

## C

**calendar** [2] - 505:11, 529:18

**California** [1] - 496:9

**calm** [1] - 579:13

**candid** [1] - 308:12

**cannot** [4] - 390:20, 493:16, 604:2, 604:5

**capable** [2] - 318:12, 533:17

**capacities** [1] - 512:3

**care** [3] - 365:24, 398:23

**careful** [2] - 398:4, 582:23

**carefully** [1] - 571:20

**CAROLYN** [1] - 417:23

**carry** [1] - 315:19

**case** [53] - 307:15, 307:19, 307:25, 308:17, 315:1, 344:19, 344:21, 345:5, 352:13, 364:11, 367:16, 379:9, 400:12, 400:17, 400:18, 419:14, 419:17, 419:23, 423:12, 426:6, 427:22, 428:1, 449:10, 449:11, 449:17, 449:18, 449:22, 452:20, 464:17, 473:12, 473:21, 477:24, 482:10, 482:12, 489:14, 498:8, 499:1, 499:2, 509:23, 512:16, 547:5, 548:3, 555:18, 562:5, 563:6, 563:21, 590:4, 590:9, 596:14, 598:21

**cases** [1] - 473:20

**cc** [1] - 381:23

**cc'd** [2] - 390:6, 566:9

**cell** [1] - 475:3

**CENTRAL** [1] - 417:4

**Central** [34] - 307:2, 331:20, 331:24, 350:20, 352:21, 354:6, 355:8, 358:22, 358:25, 359:12, 363:15, 368:23, 373:12, 383:12, 391:25, 427:1, 452:3, 458:15, 459:5, 472:4, 472:15, 472:23, 475:14, 548:3, 566:21, 566:25, 575:14, 576:1, 578:10, 580:11, 580:17, 581:7, 582:18

**certain** [5] - 421:25, 423:5, 443:11, 502:16, 549:9

**certainly** [19] - 346:8, 387:1, 388:17, 394:15, 396:7, 396:17, 408:11, 475:20, 517:7, 541:5, 541:10, 543:15, 547:17, 553:7, 553:9, 581:17, 596:15, 601:8, 604:17

**certainty** [1] - 529:19

**certified** [2] - 467:19, 468:3

**cetera** [2] - 412:11, 534:17

**chairman** [1] - 537:21

**challenging** [1] - 502:3

**chambers** [1] - 442:21

**chance** [2] - 393:4, 423:16

**change** [2] - 512:15, 541:23

**changed** [5] - 377:14, 454:20, 457:22, 547:19, 580:4

**changing** [2] - 342:3, 397:6

**characterization** [2] - 431:17, 431:22

**characterize** [4] - 438:18, 442:3, 508:7, 566:17

**characterizes** [1] - 441:10

**characterizing** [1] - 334:13

**charge** [5] - 321:3, 420:16, 600:20, 600:24, 600:25

**chase** [1] - 533:4

**check** [4] - 415:9, 559:7, 559:11, 560:25

**checked** [1] - 402:15, 559:9, 561:6

**checking** [1] - 602:6

**Chicago** [7] - 304:5, 417:7, 417:16, 417:20, 417:25, 418:5, 566:8

**China** [1] - 318:16

**CHING** [1] - 417:19

**choice** [2] - 458:4, 600:21

**chosen** [1] - 541:23

**chronology** [4] - 312:15, 312:17, 342:22, 393:14

**circumstances** [1] - 344:19

**claim** [5] - 374:16, 525:8, 550:5, 553:14, 599:15

**claimed** [1] - 352:19

**claims** [4] - 370:20, 380:8, 380:14, 389:15

**clarification** [3] - 329:7, 433:22, 442:7

**clarified** [1] - 310:12

**clarify** [7] - 328:6, 358:13, 400:11, 440:15, 496:16, 496:18, 513:5

**Clark** [135] - 314:7, 314:13, 314:21, 314:22, 315:7, 315:9, 316:11, 316:14, 321:18, 342:17, 344:1, 361:10, 389:19, 389:20, 389:23, 390:7, 391:7, 391:8, 395:4, 413:6, 447:17, 447:21, 474:22, 474:23, 479:10, 479:15, 479:17, 481:24, 482:1, 482:8, 482:11, 482:13, 482:18, 486:16, 486:17, 490:3, 490:9, 490:10, 490:11, 490:16, 490:17, 504:14, 504:15, 504:16, 504:17, 504:18, 504:19, 504:22, 504:25, 505:3, 505:6, 505:17, 505:21, 505:23, 507:16, 508:7, 509:1, 518:8, 529:10, 529:12, 529:24, 530:4, 531:4, 531:25, 532:2, 532:5, 532:7, 532:10, 532:14, 544:24, 549:15, 549:23, 550:4, 550:7, 550:9, 550:18, 550:23, 552:19, 552:20, 552:21, 553:1, 553:11, 553:19, 553:20, 553:22, 553:25, 554:2, 554:7, 554:10, 554:14, 554:23, 554:25, 555:2, 555:4, 555:22, 556:13, 556:23, 557:16, 557:23, 560:10, 561:3, 564:17, 572:8, 572:14, 572:17, 572:21, 573:5, 573:13, 573:25, 575:1, 575:5, 575:17, 575:18, 575:19, 587:9, 587:20, 591:13, 591:17, 592:1, 594:7, 597:11, 597:14, 598:22, 599:7, 599:10, 599:16, 599:19, 599:20, 599:23, 602:12, 603:18, 603:21, 604:2

**Clark's** [4] - 314:23, 480:19, 603:20

**clean** [1] - 513:15

**clear** [14] - 315:12, 331:3, 372:7,

446:8, 446:10, 468:8, 483:6, 556:7, 575:4, 583:3, 586:2, 600:11, 600:19, 601:17

**clearly** [5] - 357:22, 388:25, 427:3, 504:19, 527:22

**CLERK** [1] - 307:2

**clerk** [1] - 436:7

**client** [53] - 308:25, 316:8, 323:2, 323:18, 325:11, 331:10, 341:13, 344:3, 373:3, 374:15, 413:11, 420:25, 423:17, 434:6, 434:12, 435:22, 438:3, 448:24, 449:1, 449:5, 449:14, 449:16, 449:20, 457:16, 458:1, 458:2, 458:14, 469:22, 469:23, 473:11, 473:21, 477:13, 480:19, 490:8, 498:23, 551:1, 552:7, 552:8, 553:14, 553:17, 554:4, 561:15, 568:19, 572:2, 572:6, 573:7, 580:3, 582:24, 583:1, 591:19, 597:20

**client's** [7] - 310:17, 327:15, 334:13, 433:1, 561:20, 561:24, 598:22

**clients** [71] - 308:18, 308:21, 309:2, 309:6, 309:14, 310:12, 315:21, 316:14, 316:16, 317:10, 319:3, 319:25, 322:24, 324:15, 324:20, 331:3, 331:17, 332:15, 332:22, 333:13, 335:7, 337:2, 339:3, 346:19, 347:17, 348:1, 389:12, 393:21, 394:4, 394:10, 395:20, 396:6, 396:14, 396:19, 398:17, 399:13, 402:15, 403:7, 403:9, 403:13, 405:23, 406:5, 409:18, 415:22, 420:16, 421:10, 426:20, 428:8, 428:20, 434:17, 436:9, 436:19, 437:10, 438:5, 447:18, 478:19, 478:25, 480:5, 481:17, 481:25, 498:4, 499:16, 500:4, 508:23, 546:9, 546:17, 552:5, 569:7, 592:4

**clients'** [12] - 342:20, 390:3, 430:15, 433:5, 433:8, 433:15, 433:19, 435:8, 457:19, 480:7, 480:10, 480:18

**close** [8] - 321:19, 377:22, 388:2, 436:16, 532:17, 557:8, 557:9, 592:8

**closed** [7] - 438:21, 540:7, 540:23, 541:5, 541:11, 541:16, 541:25

**closely** [2] - 439:18, 534:16

**closer** [5] - 361:21, 390:24, 544:10, 544:15, 544:16

**closing** [6] - 557:9, 586:2, 604:24, 604:25, 605:5, 606:8

**clothing** [4] - 318:16, 352:18, 549:18, 549:25

**coin** [1] - 396:13

**collateral** [3] - 581:7, 581:10, 582:5

**colleague** [4] - 499:2, 527:14, 533:24, 534:12

**collegial** [1] - 532:17

**color** [5] - 342:3, 397:20, 397:21, 397:22

**colors** [1] - 397:6

**combine** [1] - 605:21

**combined** [1] - 451:14

**comfortable** [2] - 423:23, 550:24

**coming** [7] - 449:12, 497:7, 506:23,

**comma** [1] - 523:3

**commemorate** [1] - 339:12

**commence** [2] - 474:1, 474:3

**commitment** [1] - 438:24

**committed** [1] - 329:12

**communicating** [2] - 375:20, 508:23

**communication** [7] - 359:17, 493:11, 543:8, 543:10, 543:13, 543:17, 601:17

**communications** [23] - 320:4, 353:19, 353:23, 353:24, 369:13, 369:14, 371:15, 371:24, 372:2, 387:12, 390:18, 391:7, 394:18, 398:24, 451:9, 460:3, 460:5, 478:7, 486:4, 507:9, 542:25, 543:3, 557:22

**companies** [1] - 563:6

**company** [11] - 403:22, 404:1, 469:12, 470:6, 496:2, 496:3, 502:5, 559:2, 559:4, 586:25, 589:3

**compared** [1] - 530:25

**compel** [1] - 453:3

**complaint** [3] - 308:5, 424:9, 578:17

**complete** [10] - 331:20, 336:8, 336:24, 502:1, 524:15, 525:15, 526:4, 526:5, 526:7, 526:17

**completed** [2] - 324:22, 338:12

**completely** [2] - 358:11, 372:7

**complicated** [1] - 580:15

**comply** [1] - 443:7

**complying** [1] - 443:8

**component** [3] - 327:14, 337:14, 412:12

**components** [1] - 412:13

**compose** [3] - 457:10, 457:23, 459:8

**compound** [2] - 372:11, 563:7

**computer** [93] - 315:16, 315:17, 346:16, 346:25, 347:8, 348:1, 360:13, 364:4, 370:2, 370:21, 371:4, 371:16, 371:25, 372:4, 374:2, 374:18, 380:9, 388:2, 389:24, 401:9, 407:11, 407:16, 407:20, 408:10, 408:11, 409:17, 412:12, 412:13, 414:6, 414:23, 421:4, 428:9, 430:15, 431:15, 433:2, 433:9, 433:16, 433:19, 433:24, 436:9, 437:11, 438:23, 467:18, 468:2, 468:17, 477:14, 480:20, 487:21, 496:4, 496:22, 497:17, 497:20, 499:18, 500:7, 500:8, 500:19, 504:3, 507:14, 507:15, 538:18, 543:4, 543:17, 543:21, 543:22, 544:2, 546:13, 546:21, 546:25, 547:6, 547:16, 548:11, 548:14, 550:4, 556:24, 557:3, 557:7, 559:20, 561:15, 561:16, 570:18, 584:11, 584:21, 589:5, 595:10, 596:10, 596:11, 598:5, 598:6, 598:7, 598:15, 599:14

**computers** [63] - 320:11, 320:19, 320:21, 321:1, 321:5, 321:7, 321:16, 322:25, 323:13, 323:19, 324:25, 346:8, 350:9, 356:12, 359:22, 360:1, 369:18, 369:19, 369:24, 370:13, 372:15, 372:17, 373:10, 385:9, 386:13, 386:16,

386:21, 386:24, 401:17, 412:22, 421:7, 429:16, 430:22, 432:24, 433:4, 434:8, 436:20, 442:15, 443:21, 453:13, 462:7, 479:1, 484:7, 485:4, 485:6, 485:9, 485:16, 499:14, 499:20, 499:25, 502:1, 509:21, 524:8, 526:17, 547:23, 547:25, 571:8, 571:17, 571:22, 572:10, 572:15, 572:18, 572:22

**concern** [7] - 363:7, 365:21, 366:9, 502:6, 567:16, 598:18, 598:21

**concerned** [17] - 364:19, 365:3, 365:9, 381:22, 394:20, 401:16, 423:18, 481:25, 509:18, 512:3, 542:15, 555:10, 560:21, 567:13, 567:15, 590:8, 590:20

**concerning** [6] - 332:4, 343:6, 354:17, 391:6, 396:2, 590:1

**concerns** [2] - 363:6, 567:10

**conclude** [2] - 327:17, 327:18

**conclusion** [1] - 362:13

**condition** [1] - 588:8

**conduct** [1] - 523:24

**confer** [2] - 325:16, 402:20

**conference** [6] - 311:9, 313:14, 444:15, 492:4, 492:24, 500:24

**confidential** [1] - 560:4

**confirm** [2] - 314:13, 581:14

**confirmation** [2] - 317:9, 435:21

**confirmed** [3] - 317:19, 435:13, 435:20

**confirming** [2] - 461:7, 487:19

**confirms** [2] - 425:12, 461:8

**confused** [1] - 329:2

**confusing** [1] - 328:24

**confusion** [2] - 496:17, 512:4

**conjunction** [3] - 385:13, 388:5, 388:7

**connection** [5] - 432:16, 486:1, 538:19, 546:2, 546:17

**consensual** [1] - 539:20

**consent** [5] - 420:3, 539:5, 539:7, 585:23, 586:12

**consider** [9] - 336:10, 448:13, 449:7, 449:12, 450:6, 450:7, 470:20, 527:14, 534:20

**consideration** [1] - 318:21

**considered** [2] - 321:23, 450:3

**consistent** [2] - 484:25, 600:8

**constantly** [1] - 413:12

**constructing** [1] - 509:21

**construed** [1] - 309:23

**consult** [1] - 366:13

**consultant** [4] - 467:18, 468:3, 468:17, 468:20

**consulting** [1] - 495:23

**contact** [7] - 308:9, 366:22, 379:16, 532:2, 542:9, 580:11, 584:10

**contacted** [1] - 597:25

**contacts** [1] - 469:15

**contain** [1] - 421:8

**contained** [5] - 546:25, 552:11, 596:13, 598:20, 601:9

**containing** [1] - 566:17

**contains** [1] - 379:8

**contemplate** [2] - 325:19, 595:4
**contemplating** - 588:23, 589:1
**contend** [1] - 424:16
**contents** [15] - 331:14, 332:17, 333:14, 333:19, 357:13, 359:16, 375:3, 375:6, 376:14, 378:4, 458:16, 459:6, 548:14, 548:19, 567:22
**context** [4] - 345:5, 525:15, 577:14
**continually** [1] - 344:5
**continue** [1] - 309:14
**continued** - 519:6
**CONTINUED** [2] - 304:1, 418:1
**continues** [1] - 523:3
**continuing** [9] - 309:1, 319:13, 344:2, 393:16, 470:12, 507:4, 509:15, 591:25, 592:3
**contract** [3] - 498:8, 498:18, 498:21
**contrary** [1] - 532:13
**control** [87] - 318:23, 321:21, 324:21, 326:1, 331:5, 331:13, 332:16, 333:14, 335:13, 336:15, 336:17, 337:3, 337:14, 338:25, 339:16, 350:21, 351:3, 359:2, 359:17, 359:19, 361:7, 362:7, 364:2, 364:16, 364:18, 364:20, 364:22, 365:4, 369:12, 374:5, 375:5, 375:7, 375:11, 375:19, 376:19, 377:1, 377:3, 380:5, 382:3, 382:11, 382:14, 382:16, 382:22, 387:4, 387:17, 387:19, 388:6, 388:8, 388:11, 388:15, 388:21, 388:24, 389:2, 390:4, 390:13, 390:22, 391:1, 391:20, 391:23, 392:1, 392:3, 395:18, 397:1, 413:4, 433:4, 433:5, 434:8, 446:3, 446:9, 453:13, 471:16, 471:19, 471:23, 472:6, 472:16, 511:5, 516:14, 516:18, 517:9, 520:20, 521:3, 521:13, 521:20, 535:24, 580:20
**controlled** [3] - 594:1, 595:2, 595:16
**conversation** [43] - 315:15, 316:9, 316:11, 317:16, 318:3, 328:10, 328:18, 328:19, 329:8, 329:15, 329:16, 329:21, 330:10, 339:3, 339:13, 339:15, 339:20, 339:22, 342:12, 378:21, 385:8, 389:18, 400:1, 435:2, 456:16, 476:23, 477:7, 477:12, 477:15, 477:18, 492:21, 493:14, 501:11, 504:14, 505:20, 506:3, 528:24, 532:4, 557:7, 568:18, 568:20, 589:25, 603:18
**conversations** [19] - 342:10, 379:2, 463:4, 473:2, 477:21, 507:6, 507:12, 508:21, 508:24, 556:19, 568:13, 568:15, 568:23, 569:3, 570:8, 570:14, 589:23, 590:3, 590:11
**convey** [6] - 359:11, 376:18, 429:15, 432:23, 432:25, 485:5
**conveyed** [4] - 379:18, 384:1, 384:19, 430:20
**conveying** [1] - 377:2
**coordinate** [3] - 383:2, 420:8, 535:25
**coordinated** [1] - 420:9
**copied** [19] - 353:18, 381:6, 381:9, 381:19, 381:21, 426:1, 426:21, 427:4,

434:24, 455:6, 484:12, 485:13, 488:5, 488:23, 535:17, 552:20, 565:12, 584:4, 592:22
**copies** [12] - 316:25, 320:17, 435:18, 452:24, 566:25
**copy** [38] - 319:11, 329:17, 331:13, 332:16, 333:14, 333:19, 333:24, 342:19, 343:3, 375:5, 376:13, 378:3, 381:16, 420:14, 422:12, 430:2, 432:4, 432:6, 432:7, 437:14, 440:19, 440:22, 441:17, 441:18, 455:7, 480:9, 492:10, 504:6, 514:21, 519:1, 544:23, 548:10, 553:17, 570:11, 578:17, 584:4, 591:12, 601:20
**core** [1] - 488:16
**corner** [1] - 377:9
**corporate** [6] - 391:6, 404:18, 404:25, 426:22, 426:23, 480:18
**corporation** [11] - 594:1, 594:3, 594:13, 594:15, 594:16, 594:19, 594:22, 594:25, 595:1, 595:6, 596:1
**correct** [193] - 308:11, 309:3, 317:18, 324:5, 324:11, 327:6, 329:20, 331:6, 331:9, 332:14, 332:21, 332:24, 333:9, 334:14, 334:17, 337:11, 337:20, 338:9, 338:23, 339:2, 339:24, 340:9, 341:11, 341:17, 341:20, 341:23, 343:20, 346:23, 348:3, 349:22, 350:3, 350:10, 351:4, 352:5, 352:8, 352:11, 355:17, 358:1, 358:2, 358:24, 360:11, 360:24, 361:23, 363:2, 363:11, 363:21, 364:6, 365:15, 365:19, 366:5, 366:8, 367:18, 368:5, 369:4, 370:10, 371:19, 373:16, 376:6, 376:9, 377:15, 377:24, 379:4, 380:16, 381:8, 381:11, 382:6, 385:10, 385:12, 385:15, 385:18, 385:20, 385:21, 388:16, 389:4, 391:24, 392:2, 392:5, 396:14, 396:15, 397:1, 397:10, 399:5, 400:13, 400:16, 401:3, 401:4, 402:18, 403:7, 403:11, 404:17, 404:19, 404:23, 405:1, 410:10, 410:11, 411:9, 412:5, 412:6, 419:15, 419:21, 424:25, 435:10, 443:16, 443:20, 443:23, 451:11, 451:17, 454:9, 461:10, 461:19, 462:12, 465:24, 466:25, 467:4, 469:16, 471:21, 471:25, 472:2, 474:7, 480:5, 485:10, 487:4, 487:19, 487:23, 487:24, 487:25, 494:16, 495:5, 501:5, 506:25, 507:3, 513:3, 513:10, 513:25, 514:4, 515:6, 515:22, 516:15, 517:10, 517:19, 518:9, 518:13, 519:2, 519:16, 520:21, 521:4, 521:7, 521:21, 522:2, 522:7, 522:24, 523:25, 531:15, 531:16, 532:20, 532:22, 532:23, 533:1, 533:2, 538:24, 539:9, 540:19, 541:18, 541:19, 548:19, 548:20, 552:19, 552:20, 553:4, 553:5, 556:1, 558:16, 558:22, 558:25, 559:10, 560:5, 564:10, 575:11, 579:8, 579:9, 588:12, 590:20, 592:24, 595:10, 595:15, 596:8, 596:14, 596:22, 597:9, 599:11, 601:10, 604:23
**correctly** [10] - 452:23, 462:10, 480:4,

512:17, 522:17, 522:19, 523:7, 523:16, 546:3, 592:19
**correspondence** [9] - 426:25, 451:6, 451:23, 455:6, 533:5, 533:10, 533:23, 565:12, 567:1
**cost** [2] - 332:2, 522:15
**cost-effective** [1] - 522:15
**costly** [1] - 522:15
**Counsel** [5] - 419:16, 420:18, 425:4, 473:19, 597:3
**counsel** [76] - 311:21, 350:20, 352:12, 361:16, 368:23, 369:7, 370:12, 370:24, 371:15, 371:17, 371:25, 372:2, 372:13, 372:15, 373:9, 373:12, 375:10, 375:14, 375:18, 375:21, 376:18, 376:25, 377:3, 383:4, 383:12, 384:1, 391:6, 391:13, 393:3, 394:19, 402:20, 404:1, 404:4, 404:15, 404:18, 404:25, 406:2, 406:23, 419:5, 419:17, 421:20, 422:14, 422:22, 425:16, 426:22, 426:23, 429:25, 450:25, 451:10, 452:13, 453:6, 460:4, 460:6, 460:11, 472:22, 473:4, 474:24, 477:10, 478:17, 479:25, 480:22, 485:12, 486:20, 491:5, 491:15, 497:12, 538:8, 538:9, 542:5, 556:15, 564:19, 571:1, 589:22, 601:15, 605:13
**counsel's** [5] - 312:16, 312:22, 370:18, 460:8, 466:12
**count** [1] - 477:23
**counterclaim** [2] - 362:21, 379:20
**counterclaims** [1] - 379:13
**country** [3] - 401:23, 401:24, 498:16
**couple** [11] - 309:8, 351:1, 410:5, 453:10, 483:22, 488:3, 488:7, 510:16, 527:17, 568:23, 583:5
**course** [15] - 330:15, 330:17, 337:22, 436:23, 446:19, 469:21, 477:12, 480:1, 501:11, 508:6, 527:19, 528:13, 537:11, 543:1, 565:2
**court** [108] - 307:1, 315:10, 324:22, 325:22, 325:25, 328:22, 328:24, 329:2, 331:23, 337:10, 337:13, 348:24, 351:9, 351:16, 356:2, 380:18, 392:19, 396:5, 396:9, 397:5, 397:24, 397:25, 398:5, 400:6, 409:18, 419:1, 423:7, 424:21, 428:4, 429:24, 430:11, 430:12, 431:6, 434:11, 434:15, 436:1, 436:2, 436:4, 443:3, 443:7, 443:25, 444:1, 444:6, 444:8, 446:12, 446:14, 454:6, 455:4, 455:12, 461:12, 462:19, 470:8, 473:8, 491:18, 492:3, 494:24, 495:1, 495:3, 495:25, 496:12, 496:18, 499:12, 501:6, 502:14, 504:25, 506:14, 509:3, 509:19, 510:8, 510:12, 510:13, 510:17, 510:20, 510:22, 510:23, 511:24, 513:3, 515:22, 516:1, 516:10, 516:12, 517:1, 520:3, 520:6, 520:13, 520:17, 520:24, 521:2, 521:12, 521:22, 521:23, 522:10, 523:20, 537:9, 537:10, 543:23, 554:12, 555:23, 565:25, 586:8, 586:14, 586:19, 605:16, 606:12
**Court** [7] - 414:4, 417:23, 417:24,

429:9, 429:14, 432:22, 511:10

**COURT** [370] - 307:4, 307:7, 308:14, 309:12, 314:5, 317:7, 319:5, 319:7, 319:10, 319:13, 319:18, 319:20, 322:1, 322:4, 322:7, 322:10, 322:13, 322:15, 323:6, 328:3, 336:18, 338:15, 338:17, 338:21, 339:6, 340:2, 340:13, 343:11, 343:13, 344:12, 344:14, 344:20, 345:1, 346:12, 347:4, 347:16, 347:19, 347:22, 348:5, 348:7, 348:16, 348:21, 348:24, 349:8, 352:24, 353:12, 354:3, 354:9, 354:15, 355:12, 355:20, 357:8, 362:12, 362:14, 363:22, 366:16, 366:19, 368:6, 368:9, 368:12, 370:16, 371:13, 372:10, 373:23, 375:15, 380:10, 381:14, 382:19, 383:17, 383:19, 384:8, 384:11, 384:13, 384:16, 385:24, 386:3, 386:19, 388:13, 390:20, 391:11, 391:14, 391:17, 392:12, 392:23, 393:2, 393:5, 393:25, 395:10, 397:14, 397:16, 397:18, 398:2, 398:7, 400:3, 400:9, 402:22, 403:1, 404:11, 405:19, 405:21, 406:1, 406:6, 406:8, 406:20, 407:8, 408:7, 408:14, 408:25, 409:12, 409:15, 409:23, 410:1, 410:5, 410:9, 410:12, 410:17, 410:22, 411:1, 411:7, 411:12, 411:15, 411:18, 411:23, 412:1, 412:7, 412:16, 412:19, 412:21, 412:23, 413:1, 413:8, 413:12, 413:15, 413:18, 413:21, 413:24, 415:3, 415:15, 415:18, 416:7, 417:1, 419:2, 419:5, 421:17, 421:20, 422:1, 422:4, 422:6, 422:8, 422:21, 422:24, 423:2, 423:16, 423:22, 423:25, 424:2, 428:15, 429:1, 429:19, 429:21, 430:2, 430:5, 431:11, 431:19, 432:2, 432:7, 432:11, 433:12, 434:2, 439:6, 439:13, 439:16, 439:20, 439:23, 440:5, 440:9, 440:11, 440:13, 440:16, 440:20, 440:22, 441:4, 441:10, 441:15, 441:21, 442:1, 442:5, 442:10, 448:2, 449:3, 449:25, 450:4, 450:9, 450:11, 453:8, 454:21, 458:20, 458:22, 460:1, 460:5, 460:11, 462:3, 464:19, 465:3, 466:23, 467:14, 467:16, 467:25, 468:10, 468:13, 472:20, 476:11, 476:15, 476:17, 477:4, 478:11, 480:16, 481:3, 481:6, 481:9, 482:22, 483:9, 483:13, 483:15, 483:18, 483:20, 483:23, 488:2, 488:11, 488:19, 488:21, 488:23, 489:1, 489:3, 489:23, 489:25, 490:2, 490:6, 490:11, 490:16, 490:18, 490:22, 490:24, 491:1, 491:4, 491:7, 491:9, 491:23, 491:25, 492:13, 492:17, 493:21, 493:24, 494:4, 494:9, 494:11, 494:17, 494:19, 495:6, 495:12, 495:14, 495:17, 502:19, 509:12, 512:7, 512:9, 512:11, 512:13, 512:19, 512:21, 513:21, 514:20, 514:25, 515:3, 515:6, 515:8, 515:15, 517:16, 517:23, 518:12, 520:10, 524:21, 525:3, 525:17, 526:11, 526:22, 527:1, 528:3, 528:7, 528:21, 528:23, 528:25, 533:6, 535:5, 536:9,

**Court's** [2] - 432:1, 433:14

**court's** [4] - 328:25, 443:8, 481:12, 570:10

**court-appointed** [1] - 495:25

**courtroom** [4] - 397:3, 509:10, 603:24

**courts** [3] - 496:5, 496:7, 497:12

**cover** [3] - 377:20, 425:23, 498:6

**covered** [2] - 380:10, 437:9

**Covern** [1] - 496:9

**COX** [1] - 417:23

**craft** [3] - 523:4, 523:12, 523:22

**crafting** [1] - 526:1

**creative** [1] - 539:10

**Creative** [21] - 327:24, 329:22, 330:6, 374:17, 412:24, 425:6, 539:8, 539:11, 539:16, 540:2, 542:4, 542:23, 547:4, 564:2, 564:5, 566:8, 571:14, 576:25, 581:4, 583:12, 594:8

**creditor** [1] - 310:3

**critical** [4] - 338:7, 338:12, 394:7, 508:22

**cross** [5] - 348:18, 405:18, 422:25, 512:21, 579:11

**CROSS** [16] - 305:6, 305:8, 305:22, 305:24, 306:7, 306:9, 306:13, 306:15, 348:10, 393:7, 450:15, 476:19, 512:23, 527:5, 573:22, 589:18

**CROSS-EXAMINATION** [16] - 305:6, 305:8, 305:22, 305:24, 306:7, 306:9, 306:13, 306:15, 348:10, 393:7, 450:15, 476:19, 512:23, 527:5, 573:22, 589:18

**CRR** [1] - 417:23

**Cruises** [1] - 383:9

**CSR** [1] - 417:23

**cubsmusch@aol.com** [1] - 454:3

**CULBERTSON** [2] - 304:3, 418:3

**curious** [2] - 397:16, 412:8

**curtail** [1] - 450:5

**custodian** [1] - 325:15

**custody** [10] - 421:7, 511:5, 516:14, 516:18, 517:9, 520:19, 521:3, 521:12, 521:20

**custom** [2] - 406:14, 477:24

**customers** [1] - 318:17

**cut** [5] - 343:5, 372:11, 391:3, 488:18,

536:14, 536:16, 536:21, 536:24, 537:2, 538:5, 541:7, 544:12, 544:16, 547:11, 551:2, 553:8, 554:5, 554:7, 556:12, 556:17, 556:21, 556:25, 558:2, 562:21, 562:25, 563:1, 563:2, 563:8, 564:24, 565:10, 565:16, 565:19, 568:6, 570:1, 572:6, 573:19, 574:10, 574:14, 576:13, 578:2, 578:6, 579:1, 579:4, 579:6, 579:13, 579:15, 579:17, 589:15, 592:12, 595:19, 597:1, 597:22, 597:24, 598:25, 599:3, 602:6, 602:9, 602:11, 602:13, 602:15, 602:17, 602:21, 602:24, 603:1, 603:4, 603:8, 603:10, 603:13, 603:22, 603:25, 604:12, 604:21, 605:1, 605:17, 605:19, 605:23, 606:1, 606:5, 606:9

**cutoff** [1] - 344:2

**D**

**daily** [2] - 315:20, 340:16

**damage** [2] - 315:17, 315:24

**damaged** [1] - 365:21

**damaging** [1] - 382:17

**Daniel** [9] - 311:4, 311:5, 311:6, 313:5, 314:14, 381:23, 474:15, 495:16, 535:10

**DANIEL** [6] - 306:5, 306:7, 306:9, 495:19, 512:23, 527:5

**dark** [2] - 341:3, 404:6

**data** [89] - 313:21, 315:17, 315:24, 319:23, 320:5, 320:7, 324:22, 325:15, 325:20, 326:17, 326:19, 326:25, 327:5, 327:12, 327:15, 327:20, 327:23, 327:24, 328:10, 328:11, 328:16, 328:23, 329:22, 330:5, 330:20, 330:25, 331:1, 331:4, 331:20, 331:24, 332:1, 332:5, 332:7, 332:9, 332:11, 334:15, 334:24, 335:4, 375:3, 378:5, 383:7, 421:8, 437:14, 444:3, 513:12, 513:25, 514:12, 514:15, 515:11, 515:19, 515:20, 515:24, 516:2, 516:8, 522:6, 522:11, 522:15, 523:6, 523:14, 523:22, 523:23, 524:1, 524:4, 524:5, 524:7, 524:12, 524:14, 524:17, 525:25, 526:4, 526:16, 526:25, 546:25, 551:22, 552:12, 553:15, 559:13, 561:15, 561:19, 561:23, 562:18, 563:13, 563:25, 564:7, 567:17

**date** [30] - 308:23, 332:10, 341:13, 351:13, 387:7, 415:8, 416:9, 425:7, 425:12, 439:23, 439:25, 440:2, 440:11, 452:12, 452:13, 452:16, 457:21, 461:11, 462:18, 485:23, 492:13, 492:15, 493:10, 493:13, 493:14, 540:10, 545:24, 549:8, 555:13, 588:1

**dated** [23] - 310:2, 316:24, 320:16, 327:2, 330:1, 339:10, 350:2, 374:9, 374:10, 376:4, 385:4, 385:5, 425:21, 435:19, 461:2, 461:4, 461:5, 484:5, 488:21, 535:8, 535:18, 579:20, 591:13

**dates** [2] - 568:16, 578:3

**Dave** [40] - 314:7, 321:18, 342:17, 356:1, 389:18, 419:24, 428:21, 447:16, 447:21, 455:5, 462:11, 474:22, 479:9, 481:24, 544:23, 549:14, 552:19, 552:20, 552:21, 553:1, 553:11, 553:19, 553:20, 553:22, 553:25, 554:2, 554:10, 557:16, 572:8, 572:14, 572:17, 572:21, 573:5, 587:9, 591:12, 591:13, 591:25, 592:1, 592:6, 599:7

**Dave's** [1] - 419:25

**David** [8] - 311:3, 316:25, 320:17, 430:9, 431:23, 434:25, 435:18, 454:4

**DAVID** [1] - 417:15

**Davis** [1] - 537:16

**day-to-day** [1] - 497:10

533:4

**days** [8] - 325:3, 376:7, 378:15, 383:7, 540:12, 585:23, 586:12, 598:15

**daytime** [1] - 501:2

**deadline** [2] - 516:2, 524:17

**deadlines** [1] - 393:14

**deal** [16] - 364:21, 364:23, 391:3, 438:21, 479:11, 499:9, 558:18, 559:20, 561:10, 561:12, 561:17, 561:18, 587:21, 588:8, 594:7, 597:10

**dealing** [9] - 308:6, 342:20, 366:3, 390:1, 398:11, 427:1, 452:2, 453:3, 490:8

**dealt** [1] - 558:20

**Dearborn** [1] - 417:24

**decade** [1] - 497:15

**deceived** [2] - 394:12, 403:7

**decide** [2] - 396:9, 445:12

**decision** [4] - 347:20, 348:24, 488:17, 499:5

**declaration** [8] - 509:23, 509:25, 510:3, 510:8, 510:20, 512:9, 512:11, 512:18

**declined** [1] - 508:3

**Dedinas** [53] - 312:20, 327:2, 351:24, 355:14, 356:8, 359:21, 360:16, 366:7, 369:10, 369:11, 372:25, 373:19, 383:6, 384:23, 395:19, 398:9, 398:10, 398:13, 402:12, 402:18, 406:3, 410:10, 441:13, 460:10, 460:12, 460:18, 465:25, 466:6, 500:20, 501:13, 501:14, 502:11, 503:2, 506:23, 507:6, 507:9, 507:13, 518:5, 519:6, 519:21, 520:23, 521:1, 521:2, 521:6, 521:11, 521:19, 527:19, 528:6, 528:11, 529:4, 556:14

**DEDINAS** [141] - 305:5, 305:11, 305:21, 307:5, 307:10, 308:16, 309:13, 314:15, 317:8, 319:6, 319:12, 319:21, 322:3, 322:11, 322:14, 322:19, 323:3, 323:8, 328:4, 328:8, 336:20, 336:25, 338:16, 338:19, 338:22, 338:24, 339:8, 340:5, 340:6, 340:17, 341:9, 341:12, 343:16, 344:16, 345:7, 346:13, 347:11, 347:14, 347:24, 348:4, 348:6, 348:15, 348:17, 349:6, 351:11, 351:13, 352:23, 353:11, 354:2, 354:8, 354:14, 355:11, 355:19, 357:7, 363:20, 370:15, 371:12, 392:11, 392:25, 403:2, 403:5, 404:10, 406:17, 406:19, 407:7, 408:22, 409:2, 409:5, 409:8, 409:14, 417:14, 419:4, 419:11, 421:14, 421:18, 421:21, 422:5, 422:10, 422:17, 423:10, 423:19, 424:4, 424:6, 428:17, 428:18, 429:3, 429:20, 429:23, 430:4, 430:6, 431:13, 431:24, 432:6, 432:9, 432:12, 433:13, 433:25, 434:10, 439:9, 439:18, 439:21, 440:2, 440:10, 440:14, 440:25, 441:3, 441:5, 441:18, 441:20, 442:2, 442:6, 442:11, 442:13, 448:3, 448:6, 449:4, 449:24, 450:1, 450:8, 450:10, 458:18, 458:24, 459:24, 472:17, 483:21, 493:25, 494:3, 494:7, 494:10, 494:12, 494:18, 494:21, 494:23, 495:9, 495:11, 495:13, 574:9,

574:11, 603:12, 604:14, 605:18

**Dedinas'** [6] - 358:15, 372:22, 374:13, 389:14, 394:5, 405:20

**deed** [19] - 438:24, 538:15, 539:1, 539:6, 539:17, 539:23, 540:6, 540:23, 541:13, 541:15, 541:24, 542:1, 542:5, 542:14, 576:24, 577:14, 577:17, 577:24, 583:15

**deemed** [1] - 483:5

**default** [7] - 389:16, 427:2, 434:12, 489:8, 489:10, 580:19, 580:23

**defaults** [1] - 402:13

**defendant** [2] - 427:5, 547:5

**defendants** [85] - 312:21, 324:3, 338:4, 346:24, 347:25, 349:7, 350:21, 351:2, 359:1, 359:7, 360:13, 360:17, 362:19, 364:1, 365:14, 365:17, 366:13, 366:23, 367:1, 367:16, 374:5, 375:8, 375:11, 375:19, 376:19, 379:11, 379:18, 380:18, 382:8, 382:11, 382:13, 382:22, 389:2, 389:5, 391:25, 413:4, 414:7, 419:19, 419:20, 420:5, 424:17, 425:2, 426:1, 426:14, 438:22, 446:21, 450:24, 462:5, 462:19, 464:4, 464:24, 465:10, 466:1, 467:2, 468:22, 469:7, 469:10, 470:13, 471:16, 471:19, 471:22, 472:5, 474:8, 482:20, 484:24, 485:5, 487:5, 494:25, 514:14, 516:2, 524:9, 524:16, 526:24, 538:10, 548:3, 548:25, 550:15, 562:10, 562:17, 563:5, 563:10, 563:25, 564:2, 570:11, 601:3

**Defendants** [3] - 417:8, 417:19, 563:14

**defendants'** [17] - 312:22, 379:9, 379:14, 389:22, 420:3, 428:1, 431:15, 443:12, 466:11, 515:19, 516:19, 517:5, 521:20, 524:7, 526:16, 572:23

**defense** [6] - 389:22, 400:20, 400:22, 400:24, 478:16, 479:25

**defenses** [1] - 457:5

**definite** [1] - 502:9

**definition** [1] - 421:5

**defunct** [1] - 366:3

**degree** [1] - 496:23

**delay** [3] - 361:17, 363:6, 401:20

**delayed** [2] - 337:17, 402:7

**delays** [1] - 361:14

**delegate** [1] - 420:6

**deletion** [2] - 315:24, 420:21

**deliberate** [2] - 447:11, 488:17

**delivered** [1] - 442:20

**Delivery** [1] - 495:23

**Dell** [19] - 311:7, 398:21, 407:10, 407:13, 407:14, 407:16, 407:20, 408:10, 408:11, 409:9, 467:9, 467:13, 467:19, 468:3, 499:15, 499:19, 499:25, 500:1

**Dell-authorized** [1] - 407:13

**delocation** [1] - 420:22

**demand** [12] - 310:4, 371:3, 372:3, 372:5, 389:16, 471:19, 565:3, 583:24,

584:19, 599:20, 599:24, 600:5

**demanded** [1] - 567:8

**demanding** [3] - 566:22, 567:4, 567:18

**demands** [5] - 370:5, 471:18, 565:7, 566:17, 567:10

**demonstrate** [1] - 504:20

**demonstrative** [1] - 421:15

**DENAKE** [1] - 499:11

**Denecke** [20] - 311:7, 398:21, 399:10, 399:11, 399:21, 408:19, 409:24, 499:3, 499:10, 500:20, 501:12, 505:15, 506:6, 506:7, 506:8, 506:9, 506:11, 506:17, 508:4, 531:21

**Denecke's** [3] - 409:17, 499:13, 506:13

**denied** [4] - 399:24, 400:3, 442:10, 458:11

**denies** [1] - 442:11

**denying** [1] - 440:16

**Department** [2] - 497:18, 497:19

**department** [2] - 537:22, 553:6

**deposition** [6] - 439:20, 439:21, 439:25, 440:3, 476:21, 587:9

**depositions** [1] - 483:3

**describe** [2] - 337:23, 482:1

**DESCRIPTION** [1] - 305:2

**description** [1] - 407:25

**design** [1] - 447:8

**designed** [2] - 394:16, 406:15

**desire** [1] - 605:17

**despite** [1] - 344:4

**destruction** [1] - 420:21

**detail** [2] - 326:19, 404:8

**detailed** [1] - 441:12

**details** [3] - 388:3, 390:1, 577:23

**determine** [3] - 310:9, 318:19, 409:20

**device** [1] - 500:11

**devices** [1] - 502:2

**Diagems** [2] - 559:5, 596:1

**differences** [1] - 589:2

**different** [13] - 390:13, 390:16, 451:24, 455:21, 464:2, 466:22, 472:14, 500:2, 503:3, 506:10, 509:21, 539:6

**differently** [2] - 401:22, 459:3

**difficult** [3] - 384:25, 539:10, 585:2

**difficulty** [1] - 365:4

**digital** [1] - 338:7

**DIL** [3] - 538:15, 545:2, 571:13

**diligent** [1] - 310:9

**dine** [1] - 496:9

**direct** [15] - 318:25, 320:18, 380:23, 410:13, 412:1, 462:8, 480:2, 525:2, 530:15, 530:17, 530:19, 535:4, 579:10, 579:12, 593:24

**DIRECT** [8] - 305:4, 305:20, 306:5, 306:11, 307:9, 419:10, 495:19, 537:5

**directed** [3] - 320:4, 434:6, 478:22

**directing** [2] - 464:23, 500:16

**direction** [6] - 319:7, 319:9, 365:17, 464:5, 464:11, 583:3

**directions** [1] - 437:16

**directly** [10] - 347:14, 349:2, 405:24, 411:11, 475:11, 488:6, 511:10, 565:7, 567:4, 588:11

**disagree** [2] - 344:20, 438:19

**disagreeing** [1] - 431:9

**discharged** [3] - 425:16, 474:23, 480:21

**disclosed** [5] - 371:2, 374:4, 409:18, 445:18, 578:5

**disclosure** [3] - 489:5, 604:7, 606:3

**disclosures** [1] - 396:5

**discovery** [32] - 308:1, 343:5, 393:11, 424:21, 425:12, 432:16, 432:17, 444:15, 451:7, 451:15, 451:16, 451:22, 451:24, 452:2, 452:19, 458:11, 469:24, 470:1, 473:9, 483:4, 485:22, 494:24, 495:24, 496:1, 496:3, 497:7, 497:13, 498:12, 522:11, 522:16, 523:24, 544:22

**discuss** [25] - 313:7, 313:9, 331:25, 333:22, 358:17, 403:13, 403:16, 404:21, 444:2, 491:1, 549:17, 550:21, 551:5, 553:20, 553:21, 553:24, 557:14, 567:22, 568:17, 577:23, 591:17, 599:8, 604:2, 604:6, 604:8

**discussed** [40] - 309:6, 313:13, 316:4, 317:14, 317:24, 323:18, 353:9, 360:23, 378:18, 387:15, 387:17, 448:16, 470:9, 514:2, 514:7, 514:12, 515:24, 516:7, 516:9, 518:4, 518:21, 522:2, 522:6, 524:16, 528:14, 549:21, 552:9, 552:17, 553:19, 555:1, 556:14, 557:13, 567:20, 574:25, 577:25, 578:3, 582:17, 589:8, 590:16, 590:17

**discusses** [1] - 484:5

**discussing** [16] - 376:8, 377:18, 395:1, 404:21, 456:13, 461:9, 464:21, 501:10, 511:19, 518:16, 518:19, 523:2, 533:18, 542:17, 545:15, 582:20

**discussion** [22] - 313:20, 316:1, 326:3, 332:1, 354:5, 514:14, 515:11, 515:18, 515:21, 518:23, 550:3, 555:2, 555:4, 555:7, 557:10, 557:18, 560:9, 561:3, 574:12, 590:24, 594:6, 600:4

**discussions** [31] - 309:1, 311:25, 314:1, 343:6, 353:19, 353:25, 354:17, 355:2, 355:3, 367:5, 398:20, 405:7, 456:23, 463:8, 472:22, 487:9, 487:11, 509:16, 528:9, 528:13, 528:18, 529:4, 550:25, 559:18, 568:8, 568:9, 568:11, 569:12, 569:15, 570:6, 588:4

**disposal** [1] - 460:24

**dispose** [2] - 459:16, 573:9

**disposing** [1] - 596:16

**disposition** [1] - 595:13

**dispute** [6] - 328:21, 351:5, 351:24, 538:18, 563:22, 568:18

**disputes** [1] - 496:1

**distracted** [1] - 384:11

**DISTRICT** [2] - 417:1, 417:1

**divide** [1] - 582:14

**DIVISION** [1] - 417:2

**DJORDJEVIC** [87] - 306:8, 306:12, 348:18, 384:6, 384:10, 417:14, 439:24, 440:6, 441:2, 512:24, 513:16, 513:19, 513:22, 514:9, 514:19, 514:21, 514:23, 515:1, 515:4, 515:7, 515:9, 515:14, 515:17, 517:14, 517:17, 517:21, 517:24, 518:2, 518:14, 520:12, 524:22, 525:13, 525:19, 525:24, 526:13, 526:15, 526:23, 527:2, 527:24, 528:5, 528:20, 535:3, 536:20, 536:25, 537:6, 538:7, 541:12, 544:10, 544:18, 547:14, 551:4, 551:25, 552:3, 553:12, 554:9, 555:13, 555:21, 556:13, 556:18, 557:2, 558:6, 562:22, 563:11, 563:16, 563:24, 565:1, 565:11, 565:17, 565:20, 568:10, 568:14, 570:2, 570:5, 572:11, 573:18, 577:21, 578:3, 578:25, 579:3, 579:5, 579:10, 579:14, 579:16, 596:23, 603:19, 604:16, 604:19

**Docket** [1] - 417:4

**document** [12] - 408:1, 441:1, 492:2, 492:3, 495:4, 545:12, 566:6, 593:3, 593:6, 593:9, 593:19, 593:25

**documentation** [2] - 463:20, 463:21

**documented** [1] - 342:10

**documenting** [1] - 435:7

**documents** [24] - 343:4, 443:12, 443:13, 451:19, 451:20, 452:21, 452:23, 452:25, 473:11

**dogged** [1] - 482:14

**dollar** [1] - 318:14

**dollars** [1] - 364:7

**DOMANSKIS** [1] - 417:13

**Domanskis** [12] - 353:2, 353:20, 356:5, 459:21, 460:7, 463:17, 579:20, 581:9, 582:1, 591:12, 591:22, 591:23

**Don** [2] - 489:12, 489:15

**done** [25] - 319:1, 324:6, 324:13, 342:9, 343:7, 344:6, 344:9, 358:18, 361:15, 375:22, 416:7, 447:16, 448:19, 465:11, 469:18, 490:9, 511:18, 519:22, 527:3, 527:8, 575:20, 589:13, 606:1

**door** [1] - 342:19

**double** [1] - 402:15

**double-checked** [1] - 402:15

**doubt** [5] - 343:1, 573:24, 574:5, 574:7, 575:4

**down** [27] - 412:10, 413:21, 419:7, 422:8, 422:9, 422:16, 423:12, 423:22, 423:25, 428:9, 429:8, 429:10, 430:18, 431:16, 432:18, 450:11, 479:22, 484:18, 493:22, 523:1, 536:21, 563:2, 563:3, 565:24, 579:13, 585:18, 598:10

**draft** [4] - 454:5, 454:9, 552:8, 552:15

**drafted** [1] - 365:10

**dragging** [1] - 342:20

**draw** [2] - 454:11, 465:17

**drawing** [2] - 385:7, 454:1

**drive** [3] - 485:20, 486:21, 509:6

**drives** [9] - 311:12, 313:15, 329:2, 444:22, 501:9, 507:4, 513:14, 513:15,

583:8

**drop** [1] - 421:4

**dropped** [1] - 479:7

**Dubai** [1] - 596:2

**due** [2] - 337:9, 372:10

**During** [3] - 312:20, 465:19, 465:25

**during** [54] - 313:11, 317:21, 319:3, 339:15, 343:24, 345:8, 355:15, 374:4, 389:19, 390:9, 393:11, 398:13, 401:20, 413:3, 446:19, 451:3, 453:4, 469:8, 469:12, 478:20, 478:25, 483:3, 494:10, 494:14, 498:25, 499:8, 501:2, 501:11, 504:14, 509:2, 514:7, 514:12, 514:15, 516:2, 516:7, 516:9, 516:22, 518:3, 518:23, 519:3, 524:17, 527:18, 528:13, 529:8, 530:3, 541:20, 542:1, 542:25, 550:3, 550:15, 565:2, 591:16, 599:6, 602:21

**duties** [3] - 421:11, 497:11, 498:3

**duty** [13] - 308:18, 308:21, 309:2, 309:7, 309:15, 309:18, 347:14, 347:17, 420:17, 428:1, 428:20, 432:25, 548:18

**E**

**e-mail** [206] - 309:17, 310:2, 310:3, 310:16, 316:24, 318:2, 320:11, 325:2, 325:3, 327:2, 327:8, 327:13, 328:5, 330:1, 330:11, 330:12, 331:17, 331:18, 333:25, 338:6, 338:10, 338:19, 339:4, 339:10, 339:12, 339:18, 340:3, 340:12, 340:18, 342:12, 349:24, 350:1, 350:4, 350:18, 359:24, 360:16, 363:9, 363:10, 367:3, 367:24, 368:22, 369:2, 369:5, 369:8, 369:10, 369:17, 370:23, 372:22, 372:23, 373:5, 374:10, 374:13, 374:21, 376:4, 376:8, 377:13, 377:18, 377:20, 378:18, 379:7, 380:7, 380:20, 380:25, 381:6, 381:9, 381:20, 381:21, 381:25, 382:2, 383:1, 383:6, 385:4, 385:5, 385:19, 386:6, 387:1, 387:2, 387:24, 387:25, 389:9, 389:14, 397:22, 401:12, 402:3, 404:9, 412:3, 414:4, 415:3, 415:4, 424:17, 425:2, 425:11, 425:14, 425:25, 427:22, 428:2, 434:23, 435:15, 435:17, 438:7, 438:12, 448:22, 454:2, 456:12, 457:10, 458:3, 459:8, 461:2, 461:4, 461:7, 461:8, 461:11, 462:8, 462:11, 463:3, 463:7, 463:22, 464:9, 464:10, 464:18, 464:19, 464:23, 465:1, 476:3, 477:25, 478:6, 479:8, 479:14, 479:15, 479:16, 480:3, 480:5, 480:7, 480:24, 481:14, 482:13, 484:4, 484:12, 484:14, 484:19, 484:23, 485:1, 485:3, 485:5, 485:12, 485:14, 486:5, 488:21, 489:11, 491:14, 533:5, 533:9, 533:14, 533:18, 535:2, 535:3, 535:7, 535:13, 536:5, 536:15, 541:3, 543:19, 544:19, 544:21, 545:7, 545:8, 545:13, 545:14, 545:21, 548:22, 549:1, 550:22, 551:10, 551:14, 552:17, 552:19, 552:20,

553:17, 555:7, 556:15, 556:23, 560:20, 562:9, 566:4, 567:20, 569:22, 583:5, 583:7, 583:9, 585:17, 585:18, 586:3, 591:12, 591:13, 591:21, 592:14, 592:23, 596:13, 601:10

**e-mailed** [6] - 338:4, 372:24, 427:17, 460:21, 463:20, 488:5

**e-mailing** [1] - 489:13

**e-mails** [54] - 309:21, 309:22, 342:4, 342:8, 342:11, 344:5, 349:13, 353:18, 354:19, 378:15, 379:3, 381:16, 385:2, 385:24, 390:6, 390:16, 391:5, 394:19, 396:2, 396:22, 396:24, 397:5, 397:11, 397:14, 413:13, 414:14, 427:4, 447:13, 448:18, 449:20, 451:14, 452:6, 477:25, 478:14, 478:17, 479:17, 479:21, 482:10, 482:15, 482:18, 486:15, 487:16, 487:17, 487:19, 488:5, 488:9, 488:11, 541:2, 566:15, 568:24, 570:8, 590:4, 590:6, 601:21

**early** [13] - 334:10, 334:18, 400:17, 400:18, 415:8, 427:2, 448:10, 448:12, 449:19, 489:5, 549:7, 574:1, 591:4

**easier** [1] - 537:18

**easily** [2] - 504:20, 531:9

**EASTERN** [1] - 417:2

**editor** [1] - 497:6

**educational** [1] - 496:21

**effect** [11] - 346:22, 349:14, 398:25, 435:20, 457:17, 505:7, 506:22, 507:23, 599:17, 599:18, 599:20

**effective** [2] - 522:15, 581:20

**effects** [1] - 400:7

**effort** [6] - 310:4, 367:5, 368:24, 372:14, 372:16, 422:3

**efforts** [32] - 309:5, 309:19, 309:22, 309:23, 310:9, 312:10, 319:22, 320:2, 320:4, 320:6, 339:16, 340:10, 348:13, 387:4, 387:5, 387:17, 388:6, 388:8, 388:11, 396:3, 443:7, 443:11, 443:13, 444:9, 509:19, 509:20, 510:14, 510:15, 511:17, 513:12, 513:24, 533:23

**either** [37] - 320:20, 331:13, 333:18, 342:2, 363:25, 375:5, 378:3, 381:9, 396:21, 399:24, 402:9, 409:18, 433:25, 446:6, 446:17, 452:11, 457:18, 458:4, 470:18, 470:20, 483:4, 488:5, 504:6, 508:7, 519:14, 519:20, 526:5, 526:6, 526:9, 561:6, 567:4, 567:6, 570:22, 588:14, 605:21, 606:7

**electronic** [9] - 424:21, 495:24, 496:1, 496:3, 497:7, 497:13, 498:12, 522:11, 523:24

**electronically** [2] - 315:2, 424:14

**electronically-stored** [1] - 315:2

**emphasis** [1] - 396:24

**employee** [1] - 508:10

**employees** [6] - 429:15, 430:20, 432:23, 469:12, 470:5, 500:14

**employees'** [1] - 320:19

**enclosed** [1] - 581:18

**enclosure** [1] - 581:13

**end** [19] - 307:21, 312:3, 338:12, 361:21, 365:8, 365:9, 387:7, 402:1, 455:14, 463:5, 476:8, 487:8, 505:20, 550:10, 550:12, 586:4, 595:14, 596:8, 602:15

**ended** [4] - 471:11, 505:22, 513:14, 538:14

**engage** [2] - 313:20, 372:25

**engaged** [11] - 333:10, 343:6, 349:2, 364:4, 364:13, 366:12, 366:21, 450:24, 498:20, 501:15

**engagement** [2] - 498:11, 501:25

**engaging** [1] - 533:18

**ensure** [1] - 322:25

**ensuring** [1] - 349:4

**entail** [1] - 354:13

**entailed** [2] - 354:11, 354:16

**enter** [5] - 355:2, 539:17, 546:20, 546:24, 547:3

**entered** [9] - 459:13, 498:8, 498:21, 540:11, 540:15, 540:17, 541:17, 542:2, 564:10

**enterprise** [1] - 497:16

**enters** [1] - 603:24

**entertaining** [1] - 602:19

**entire** [8] - 354:25, 432:19, 432:20, 451:3, 453:4, 501:25, 523:21, 524:8

**entities** [6] - 523:22, 568:22, 583:14, 583:15, 583:19, 600:22

**entity** [6] - 539:8, 594:9, 594:10, 594:11, 595:16, 598:4

**entry** [5] - 312:19, 408:1, 465:18, 491:15, 492:8

**equipment** [23] - 360:14, 371:4, 371:16, 372:4, 373:18, 373:20, 374:2, 408:1, 414:6, 414:23, 462:7, 477:14, 487:21, 499:6, 543:4, 559:20, 584:11, 584:21, 585:2, 585:7, 585:10, 586:4, 586:6

**Equities** [3] - 532:3, 587:1, 587:8

**erase** [1] - 559:13

**erasing** [1] - 559:18

**Eric** [23] - 304:3, 307:12, 316:24, 327:2, 338:19, 339:11, 340:3, 377:23, 418:3, 419:24, 420:1, 438:12, 447:12, 447:23, 448:18, 452:15, 457:4, 471:4, 471:19, 474:15, 484:4, 535:17

**ERIC** [16] - 305:4, 305:6, 305:8, 305:10, 305:12, 305:14, 305:16, 305:18, 307:9, 348:10, 393:7, 403:4, 404:13, 408:17, 414:2, 415:20

**Eric's** [3] - 437:25, 438:1, 448:22

**error** [1] - 480:5

**escalated** [1] - 344:5

**ESI** [76] - 308:7, 308:10, 309:4, 309:7, 309:16, 309:18, 309:20, 309:22, 309:23, 310:22, 311:3, 311:4, 311:10, 311:21, 312:1, 312:15, 312:17, 313:17, 313:18, 313:21, 315:1, 315:21, 318:25, 324:22, 327:15, 331:21, 332:4, 337:14,

338:1, 343:7, 344:2, 357:13, 357:16, 357:19, 370:6, 372:25, 378:9, 389:19, 393:11, 393:14, 393:18, 393:19, 398:15, 400:13, 411:5, 411:21, 420:15, 437:22, 443:8, 443:9, 444:15, 444:23, 444:24, 447:22, 447:24, 449:19, 451:2, 452:9, 452:16, 493:17, 493:18, 495:24, 498:4, 500:20, 501:11, 505:23, 505:25, 509:17, 509:20, 510:15, 516:23, 522:22, 533:18, 561:10, 561:17

**ESI-wise** [1] - 509:17

**essence** [2] - 443:24, 587:21

**essentially** [2] - 342:4, 540:5

**established** [2] - 322:11, 467:13

**estate** [3] - 571:15, 580:20, 580:25

**estimate** [2] - 368:11, 588:2

**et** [4] - 307:3, 412:11, 417:7, 534:17

**event** [3] - 424:8, 433:8, 490:14

**events** [5] - 423:5, 423:12, 488:14, 489:7, 489:21

**eventually** [4] - 395:6, 459:8, 460:23, 499:7

**evicted** [4] - 437:2, 437:4, 539:21, 539:23

**eviction** [19] - 361:3, 425:19, 459:13, 463:19, 539:19, 539:20, 540:4, 540:11, 540:15, 540:16, 540:17, 541:16, 542:2, 542:6, 542:14, 564:10, 581:12, 581:17, 581:19

**evidence** [24] - 308:18, 308:21, 309:2, 347:18, 362:9, 362:17, 379:12, 396:10, 420:17, 428:1, 434:7, 464:17, 465:1, 479:19, 562:1, 596:14, 596:16, 596:19, 596:20, 596:24, 597:8, 598:20, 598:23, 601:9

**evidenced** [1] - 558:23

**ex** [1] - 320:19

**ex-employees'** [1] - 320:19

**exact** [8] - 328:6, 415:8, 439:25, 442:17, 510:7, 534:3, 540:10, 587:25

**exactly** [14] - 313:12, 316:1, 329:18, 337:4, 337:6, 340:12, 370:23, 405:25, 452:7, 474:18, 503:23, 512:14, 518:21, 530:23

**EXAMINATION** [38] - 305:4, 305:6, 305:8, 305:10, 305:12, 305:14, 305:16, 305:18, 305:20, 305:22, 305:24, 306:1, 306:3, 306:5, 306:7, 306:9, 306:11, 306:13, 306:15, 307:9, 348:10, 393:7, 403:4, 404:13, 408:17, 414:2, 415:20, 419:10, 450:15, 476:19, 483:25, 491:11, 495:19, 512:23, 527:5, 537:5, 573:22, 589:18

**examining** [1] - 467:20

**example** [3] - 488:13, 514:6, 524:7

**except** [4] - 326:10, 438:12, 469:19, 487:23

**exchange** [3] - 369:2, 435:3, 459:17

**exchanged** [1] - 568:24

**exchanging** [1] - 488:4

**excuse** [3] - 320:1, 338:13, 383:17

**executed** [1] - 498:19
**Exhibit** [73] - 309:24, 312:16, 316:23, 320:15, 327:1, 329:25, 336:1, 339:9, 349:25, 359:22, 374:11, 375:25, 376:2, 376:3, 377:6, 377:7, 377:8, 377:11, 377:13, 377:18, 377:25, 381:2, 384:23, 385:1, 385:4, 385:5, 385:7, 410:6, 412:2, 434:22, 435:16, 442:23, 443:18, 453:20, 453:21, 454:1, 454:19, 455:11, 456:11, 461:2, 461:4, 461:7, 462:9, 465:16, 484:2, 485:11, 488:19, 491:13, 492:19, 495:8, 498:7, 502:17, 502:24, 503:1, 533:3, 535:1, 540:13, 540:21, 565:15, 565:21, 566:2, 566:4, 566:6, 578:24, 579:3, 581:11, 581:13, 584:1, 585:15, 591:6, 593:1
**exhibit** [16] - 317:2, 317:4, 317:5, 338:14, 376:10, 381:12, 385:8, 421:15, 423:14, 429:22, 472:12, 515:13, 534:25, 579:20, 591:7, 591:9
**exhibits** [5] - 413:2, 443:15, 453:19, 453:20, 453:23
**Exhibits** [2] - 394:2, 478:16
**exist** [1] - 357:2
**existence** [2] - 357:2, 358:5
**expanded** [1] - 498:3
**expect** [2] - 325:15, 600:7
**expectation** [2] - 594:21, 595:1
**expected** [5] - 323:19, 327:12, 383:1, 383:20, 383:22
**expecting** [3] - 551:22, 552:15, 562:8
**expedited** [5] - 355:5, 451:22, 458:11, 473:9, 483:4
**experience** [6] - 483:2, 497:16, 498:15, 499:19, 499:24, 500:1
**expert** [8] - 398:16, 409:17, 468:8, 496:6, 505:23, 507:6, 510:24, 533:19
**experts** [5] - 364:4, 366:12, 366:19, 366:21, 399:15
**explain** [4] - 510:18, 511:15, 517:4, 525:13
**explained** [2] - 392:18, 588:24
**explaining** [1] - 449:20
**explanation** [2] - 324:15, 446:23
**express** [2] - 323:25, 567:16
**expressed** [1] - 598:4
**expressly** [1] - 447:1
**extent** [3] - 508:20, 514:5, 521:24
**extinguished** [1] - 457:4
**extra** [1] - 432:6

**F**

**face** [4] - 399:3, 399:16
**face-to-face** [2] - 399:3, 399:16
**facilitate** [1] - 522:15
**facilities** [5] - 498:2, 503:13, 507:19, 511:8, 511:18
**facility** [3] - 437:3, 468:18, 513:15
**fact** [62] - 310:12, 311:19, 313:22,

321:9, 321:10, 323:1, 325:9, 332:8, 332:12, 344:1, 347:1, 347:22, 347:25, 360:6, 360:8, 366:6, 369:8, 369:17, 374:13, 374:14, 381:9, 390:5, 391:22, 398:19, 401:15, 427:4, 427:10, 427:13, 428:8, 434:16, 435:7, 438:13, 447:23, 450:23, 451:5, 456:17, 466:21, 475:25, 487:5, 487:7, 495:4, 501:24, 505:14, 514:14, 517:8, 518:3, 521:24, 529:17, 548:17, 550:1, 575:15, 577:16, 589:10, 594:11, 594:13, 594:15, 594:16, 597:11, 598:19, 598:20, 601:14, 603:22
**facts** [2] - 401:13, 423:11
**factual** [1] - 489:19
**failed** [1] - 525:8
**fair** [19] - 324:8, 347:9, 379:18, 379:24, 396:18, 414:19, 420:19, 431:22, 450:21, 450:22, 451:3, 451:4, 453:14, 453:15, 455:9, 455:20, 467:15, 470:19, 470:23
**fairly** [4] - 308:12, 355:5, 427:20, 441:9
**fall** [1] - 497:7
**familiar** [5] - 508:8, 533:16, 533:21, 584:16, 590:4
**family** [1] - 527:15
**far** [26] - 318:11, 321:11, 389:20, 399:11, 401:16, 423:17, 430:5, 445:5, 447:3, 452:13, 463:6, 469:14, 469:22, 476:9, 481:24, 487:14, 488:12, 489:11, 493:20, 525:2, 543:24, 547:19, 555:18, 556:24, 572:16, 580:9
**FASHIONS** [1] - 417:7
**Fashions** [18] - 307:3, 403:23, 404:2, 538:17, 539:14, 539:16, 539:24, 539:25, 540:1, 540:3, 541:17, 541:25, 542:4, 542:23, 547:4, 564:5, 566:8, 583:12
**Fashions'** [1] - 374:17
**fast** [3] - 496:11, 524:20, 544:12
**fault** [1] - 510:4
**favor** [5] - 434:17, 435:4, 435:5, 435:8
**fax** [1] - 565:21
**FCRR** [1] - 417:23
**feasible** [1] - 318:5
**February** [48] - 307:21, 351:9, 351:17, 351:20, 356:2, 356:3, 356:19, 356:21, 357:9, 394:25, 424:21, 424:22, 428:3, 428:5, 428:6, 428:10, 428:13, 429:19, 434:11, 434:16, 435:11, 435:14, 435:19, 435:25, 436:8, 453:16, 455:15, 461:4, 461:5, 461:21, 462:18, 462:24, 462:25, 463:5, 466:16, 469:8, 470:8, 470:11, 470:18, 475:15, 478:15, 478:17, 478:20, 482:9, 486:17, 487:8, 587:23
**federal** [3] - 510:9, 596:14, 598:21
**fellows** [1] - 441:15
**felt** [4] - 403:6, 449:16, 575:14, 599:13
**festering** [1] - 343:1
**few** [15] - 317:25, 328:13, 376:7, 378:15, 383:7, 391:15, 402:2, 527:7,

540:12, 542:18, 568:13, 569:5, 570:8, 602:7, 605:16
**fictional** [1] - 347:13
**fifth** [1] - 586:1
**figure** [2] - 318:19, 459:15
**file** [9] - 416:3, 424:20, 443:1, 445:9, 456:25, 457:7, 500:25, 585:6, 604:8
**filed** [11] - 312:15, 424:9, 424:14, 424:15, 427:11, 427:19, 457:5, 457:7, 494:24, 578:8, 585:9
**files** [2] - 335:4, 452:19
**filing** [1] - 424:22
**filings** [1] - 451:24
**finally** [4] - 374:15, 427:17, 479:7, 479:14
**financial** [2] - 502:9, 531:7
**fine** [6] - 368:8, 398:7, 421:17, 439:20, 479:22, 522:4
**finish** [1] - 604:4
**finished** [6] - 348:5, 349:5, 450:9, 460:14, 490:2, 513:8
**fired** [2] - 448:24, 482:20
**firm** [48] - 311:6, 334:18, 351:3, 401:5, 403:16, 403:17, 420:3, 420:4, 446:20, 451:7, 452:22, 459:14, 471:23, 473:22, 474:9, 475:21, 475:22, 484:5, 487:3, 495:23, 498:3, 498:24, 527:8, 537:17, 537:21, 537:25, 538:8, 538:13, 540:18, 542:7, 542:8, 542:16, 542:18, 542:19, 542:22, 545:2, 545:18, 545:20, 558:20, 577:2, 590:1, 590:7, 591:1, 600:17, 601:6, 601:12, 602:1
**firms** [1] - 498:16
**first** [77] - 307:4, 308:23, 310:20, 312:22, 316:16, 326:16, 327:5, 327:10, 327:19, 330:5, 356:15, 357:1, 358:4, 358:9, 358:12, 360:17, 360:19, 360:20, 371:20, 400:11, 400:14, 401:13, 402:2, 424:8, 424:19, 424:20, 427:15, 427:16, 428:11, 437:19, 437:23, 438:2, 438:9, 439:25, 440:1, 440:2, 446:12, 448:10, 454:1, 466:3, 466:12, 466:20, 474:9, 475:25, 479:3, 479:4, 480:22, 482:2, 489:4, 495:2, 501:6, 501:8, 501:9, 504:15, 514:5, 523:3, 527:10, 535:1, 541:2, 545:22, 568:25, 569:23, 569:24, 584:18, 585:18, 587:10, 588:13, 590:20, 590:21, 590:22, 593:8, 593:9, 593:18, 594:17, 594:24
**First** [158] - 314:3, 314:8, 321:20, 322:23, 322:24, 323:10, 323:11, 341:21, 345:8, 345:15, 346:15, 350:6, 350:12, 352:3, 352:9, 352:13, 352:21, 353:3, 353:25, 355:9, 357:6, 358:6, 361:18, 362:24, 363:19, 365:18, 366:10, 367:3, 367:11, 367:20, 368:3, 377:17, 371:10, 373:14, 378:13, 380:3, 380:14, 380:17, 380:21, 383:13, 384:2, 384:20, 386:6, 387:22, 387:25, 388:9, 392:4, 392:7, 401:1, 414:8, 437:17, 446:6, 446:11, 448:13, 467:5, 471:17, 471:20, 472:15, 472:24, 474:19, 475:4,

475:7, 476:1, 482:5, 484:6, 486:20, 530:9, 537:23, 537:25, 538:1, 538:2, 538:8, 538:9, 538:13, 538:16, 538:17, 538:19, 538:23, 539:22, 540:18, 541:23, 542:19, 543:20, 543:25, 544:24, 546:20, 546:24, 547:3, 547:8, 547:15, 548:2, 548:9, 548:13, 548:17, 548:22, 549:12, 550:13, 550:22, 551:5, 551:7, 551:21, 552:10, 552:18, 554:11, 554:15, 554:18, 556:2, 556:6, 557:8, 557:14, 557:15, 559:6, 559:13, 559:19, 559:24, 560:2, 560:21, 561:5, 562:12, 562:14, 562:17, 563:12, 563:20, 563:22, 564:6, 564:9, 564:12, 564:16, 566:7, 567:17, 570:13, 570:17, 570:20, 570:23, 571:1, 571:2, 571:6, 571:8, 571:14, 571:19, 572:2, 572:9, 573:4, 574:20, 577:11, 580:17, 580:19, 584:19, 586:5, 586:12, 586:21, 586:24, 587:12, 587:19, 588:5

**five** [10] - 314:24, 335:19, 368:12, 388:13, 408:4, 444:21, 451:19, 518:18, 534:5, 602:14

**five-blade** [1] - 408:4

**fixed** [1] - 480:4

**Flesch** [3] - 473:23, 482:10, 490:19

**Flesch's** [1] - 420:4

**flight** [1] - 392:20

**flip** [3] - 514:24, 515:9, 579:6

**flown** [1] - 399:8

**FMB** [19] - 355:3, 435:2, 456:25, 457:2, 457:18, 457:19, 458:13, 459:16, 460:19, 460:24, 479:12, 546:5, 546:12, 546:16, 558:7, 595:12, 596:6, 596:20, 597:8

**FMB's** [3] - 355:3, 477:10, 477:13

**Focus** [1] - 495:22

**focus** [12] - 433:18, 449:10, 456:5, 466:3, 493:7, 498:13, 501:9, 510:16, 511:16, 513:9, 513:23

**focused** [2] - 358:12, 456:9

**focuses** [1] - 496:3

**follow** [11] - 315:23, 316:20, 317:25, 319:5, 335:20, 380:25, 408:15, 413:22, 415:10, 415:17, 451:23

**follow-up** [5] - 319:5, 335:20, 408:15, 413:22, 451:23

**followed** [2] - 310:12, 317:12

**following** [8] - 307:1, 325:3, 340:25, 377:21, 378:17, 419:1, 471:6, 471:13

**font** [1] - 342:3

**foot** [1] - 342:20

**foot-dragging** [1] - 342:20

**force** [1] - 585:6

**forced** [1] - 539:4

**foreclosed** [4] - 312:5, 314:3, 345:21, 539:8

**foreclosure** [53] - 320:8, 321:13, 322:12, 352:6, 361:1, 401:16, 405:2, 405:3, 406:24, 407:2, 407:5, 425:5, 434:17, 435:2, 436:13, 436:21, 437:8,

437:12, 437:21, 438:24, 456:14, 456:17, 456:24, 461:9, 461:22, 463:1, 463:5, 463:15, 463:24, 464:1, 465:7, 487:9, 538:14, 538:15, 539:1, 539:4, 539:5, 539:6, 539:7, 539:17, 540:6, 555:14, 559:21, 576:23, 576:24, 577:14, 577:17, 577:25, 578:8, 578:17, 585:23, 586:12, 587:11

**foreign** [12] - 559:2, 594:1, 594:3, 594:13, 594:15, 594:16, 594:18, 594:22, 594:25, 595:1, 595:6, 596:1

**forensic** [6] - 311:17, 318:22, 448:16, 497:11, 497:20, 500:19

**forensics** [2] - 496:4, 497:17

**foreshadowed** [1] - 493:3

**forgetting** [1] - 500:21

**forgive** [1] - 481:4

**form** [4] - 336:16, 366:15, 464:16, 594:10

**formally** [1] - 482:3

**former** [3] - 312:16, 382:3, 535:23

**forth** [4] - 376:1, 392:22, 394:6, 449:14

**forthcoming** [1] - 308:13

**forward** [3] - 381:23, 395:7, 449:19

**forwarded** [3] - 373:3, 389:14, 476:3

**forwarding** [1] - 454:5

**foundation** [16] - 322:6, 322:10, 348:17, 353:11, 354:2, 354:8, 384:6, 409:21, 415:14, 458:24, 480:15, 480:25, 481:6, 499:22, 595:20

**four** [3] - 361:3, 451:19, 560:24

**fourth** [3] - 454:16, 454:24, 591:18

**frame** [11] - 323:15, 323:18, 323:21, 328:3, 331:19, 392:21, 413:5, 478:22, 478:25, 570:9, 597:4

**frankly** [1] - 434:7

**free** [6] - 457:17, 556:7, 557:15, 570:21, 571:3, 591:3

**Friday** [10] - 317:13, 327:2, 328:11, 392:22, 399:3, 402:4, 471:9, 505:8, 529:17, 529:21

**friend** [8] - 314:10, 389:20, 447:17, 447:21, 527:14, 533:25, 534:20, 534:21

**friendly** [25] - 321:13, 322:12, 322:24, 352:6, 401:16, 405:3, 406:24, 407:2, 407:5, 425:5, 434:17, 435:2, 436:13, 436:21, 437:8, 437:18, 437:11, 437:20, 456:14, 456:24, 461:9, 463:1, 463:5, 463:23, 576:23, 587:10

**front** [3] - 430:2, 440:15, 535:8

**froze** [1] - 449:21

**frustrating** [1] - 501:24

**FSRDG** [6] - 318:25, 364:14, 499:3, 500:5, 500:15, 500:20

**Fugiel** [1] - 428:10

**fulfilled** [1] - 334:12

**full** [6] - 420:20, 423:5, 502:1, 537:9, 604:7, 606:3

**functionality** [1] - 406:10

**funds** [1] - 340:19

**future** [3] - 433:9, 433:16, 436:14

**FYI** [1] - 482:15

## G

**gain** [7] - 378:4, 387:4, 390:22, 414:8, 414:20, 471:16, 532:3

**gaining** [1] - 359:8

**Garmisa** [1] - 537:16

**Garrie** [34] - 311:4, 311:5, 313:2, 313:5, 314:14, 314:25, 315:4, 319:4, 319:15, 325:25, 326:13, 358:16, 364:1, 392:16, 398:15, 398:19, 399:7, 399:13, 399:19, 400:7, 409:25, 410:2, 468:7, 468:16, 474:15, 494:1, 494:2, 495:16, 495:21, 510:23, 510:24, 512:25, 527:7, 528:5

**GARRIE** [6] - 306:5, 306:7, 306:9, 495:19, 512:23, 527:5

**Garrie's** [1] - 311:6

**gather** [1] - 362:9

**gathering** [2] - 313:21, 443:8

**geez** [1] - 481:23

**general** [13] - 309:18, 354:20, 354:23, 354:24, 354:25, 369:18, 426:22, 443:10, 498:4, 501:11, 519:5, 551:18, 574:13

**generally** [17] - 308:12, 308:24, 309:21, 315:18, 353:7, 370:2, 403:19, 421:10, 427:7, 427:9, 427:23, 497:11, 515:19, 524:5, 552:5, 590:5

**gentleman's** [1] - 572:12

**Gentlemen** [1] - 591:22

**Gerald** [2] - 572:13, 572:14

**Gerry** [1] - 572:8

**gerry** [1] - 572:13

**Gettleman** [1] - 457:6

**Gillware** [1] - 513:15

**given** [13] - 314:2, 360:17, 360:21, 365:13, 413:10, 441:18, 458:4, 462:20, 462:23, 464:5, 464:10, 567:18, 586:7, 598:13

**Glickman** [2] - 473:23, 489:12

**global** [1] - 318:14

**goings** [1] - 427:7

**Goldgehn** [2] - 537:16, 537:17

**grandfather** [1] - 534:12

**grant** [1] - 517:23

**great** [4] - 479:23, 499:8, 603:14, 604:12

**Grossman** [43] - 304:3, 307:5, 307:12, 307:15, 312:20, 316:24, 327:2, 338:20, 339:11, 340:3, 348:12, 348:13, 348:19, 403:6, 418:3, 419:24, 442:14, 445:1, 466:1, 484:4, 494:14, 494:18, 500:22, 503:10, 503:18, 504:7, 507:9, 507:17, 508:12, 508:14, 518:7, 518:24, 519:4, 519:6, 519:9, 519:12, 519:15, 519:20, 519:24, 520:6, 521:8, 521:18, 535:17

**GROSSMAN** [6] - 305:4, 305:6, 305:8, 305:10, 305:12, 305:14, 305:16, 305:18, 307:9, 348:10, 393:7, 403:4,

404:13, 408:17, 414:2, 415:20
**Grossman's** [1] - 443:19
**Group** [1] - 495:23
**group** [3] - 410:14, 500:19, 561:8
**grown** [1] - 449:11
**guarantees** [1] - 407:5
**guaranties** [5] - 400:24, 406:23, 457:3, 577:4, 577:23
**guarantor** [1] - 577:6
**guaranty** [16] - 435:3, 538:24, 538:25, 558:11, 558:24, 560:17, 564:13, 567:14, 577:9, 577:11, 577:16, 587:14, 588:6, 588:15, 588:19, 588:21
**guess** [11] - 371:21, 414:5, 421:3, 433:17, 434:14, 435:20, 479:4, 500:10, 527:17, 569:19, 604:10
**guessing** [1] - 368:11
**guilty** [1] - 525:9
**guy** [3] - 389:20, 427:3, 482:17
**guys** [2] - 447:20, 481:22

## H

**half** [5] - 386:15, 517:22, 518:6, 518:15, 606:10
**half-hour** [1] - 518:6
**hall** [1] - 605:14
**halls** [1] - 604:20
**hallway** [1] - 422:16
**hammered** [1] - 587:21
**hand** [1] - 377:9
**handful** [1] - 387:16
**handle** [4] - 357:19, 431:23, 455:5, 460:21
**handled** [6] - 366:10, 403:24, 436:22, 558:23, 576:23, 576:24
**handling** [11] - 333:6, 333:7, 421:1, 464:5, 473:6, 473:8, 473:10, 590:25, 600:23, 601:7
**hands** [2] - 595:14, 596:8
**hang** [1] - 491:7
**happy** [2] - 506:16, 605:5
**hard** [14] - 311:12, 313:15, 343:3, 420:14, 444:22, 450:4, 452:23, 485:20, 486:21, 523:4, 523:12, 544:13, 563:1, 583:8
**hardware** [1] - 499:16
**head** [3] - 408:3, 561:8, 572:9
**headings** [1] - 443:10
**heads** [1] - 500:19
**hear** [12] - 430:16, 431:5, 438:17, 439:11, 440:14, 442:4, 496:25, 524:20, 538:4, 544:14, 552:25, 605:16
**heard** [17] - 307:7, 374:15, 391:7, 392:25, 429:9, 445:1, 446:20, 467:8, 467:11, 467:18, 467:22, 468:2, 471:11, 474:11, 552:16, 569:25, 600:5
**hearing** [33] - 325:23, 329:5, 331:25, 332:2, 401:15, 404:9, 416:8, 426:13, 428:3, 429:4, 429:6, 431:3, 434:16,

511:17, 513:3, 513:9, 513:23, 514:3, 514:7, 514:12, 514:15, 515:2, 515:5, 516:3, 516:7, 516:9, 519:19, 522:7, 524:18, 544:8, 562:19, 593:19, 606:13
**hearsay** [1] - 354:14
**heart** [1] - 394:20
**heavy** [1] - 318:6
**heck** [1] - 490:15
**hefty** [1] - 463:21
**heightened** [1] - 396:23
**held** [1] - 578:14
**help** [10] - 361:24, 362:1, 362:7, 420:3, 431:12, 443:3, 473:23, 491:22, 498:6, 586:11
**helpful** [8] - 362:20, 377:8, 379:9, 379:12, 379:19, 421:14, 422:4, 496:11
**helping** [2] - 400:16, 400:20
**Hewlitt** [4] - 408:5, 408:23, 500:7, 500:9
**hidden** [1] - 390:16
**highlighting** [1] - 342:3
**highlights** [2] - 421:25, 423:4
**highly** [1] - 407:25
**highly-technical** [1] - 407:25
**himself** [8] - 532:7, 568:21, 569:10, 588:5, 588:8, 590:15, 590:21, 590:22
**hindsight** [2] - 390:15, 413:14
**HINSHAW** [2] - 304:3, 418:3
**hire** [1] - 448:23
**hired** [5] - 331:14, 375:6, 448:22, 450:23, 586:25
**history** [2] - 509:9, 549:24
**hmm** [1] - 573:2
**Hoholik** [14] - 549:14, 549:23, 549:25, 560:9, 561:3, 573:25, 575:1, 575:5, 575:8, 575:12, 575:21, 599:7, 599:9, 599:12
**hold** [8] - 320:4, 389:12, 422:19, 486:18, 496:22, 556:3, 556:20, 561:18
**holding** [1] - 321:15
**Holdings/Creative** [1] - 383:9
**holds** [1] - 434:6
**holiday** [4] - 424:11, 507:22, 507:25, 508:1
**home** [2] - 603:11, 603:12
**Homeland** [1] - 497:19
**honest** [3] - 511:23, 531:8, 534:13
**honestly** [5] - 434:7, 508:2, 520:11, 525:21, 545:4
**Honor** [75] - 317:6, 322:11, 338:13, 343:12, 347:3, 347:6, 347:11, 347:14, 349:6, 362:11, 366:15, 368:8, 373:24, 381:12, 383:21, 386:1, 386:17, 391:10, 397:15, 400:8, 405:17, 405:25, 408:13, 413:14, 415:13, 416:6, 421:14, 422:23, 424:1, 429:17, 439:4, 440:4, 440:18, 441:7, 442:2, 450:13, 467:12, 467:23, 468:6, 476:14, 476:16, 478:12, 481:10, 483:11, 483:17, 491:5, 491:24, 493:19, 494:3, 494:7, 495:7, 495:15, 502:17, 502:18, 502:24, 510:23, 512:6, 512:16,

515:12, 520:8, 524:19, 525:1, 525:13, 536:19, 536:22, 538:3, 538:6, 556:13, 578:21, 579:9, 595:21, 602:5, 602:23, 604:7, 605:7
**HONORABLE** [1] - 417:10
**hope** [1] - 359:15
**hoped** [2] - 325:21, 473:23
**hoping** [2] - 337:1, 560:15
**hot** [1] - 579:15
**hour** [4] - 386:15, 518:6, 518:15, 606:10
**hours** [1] - 501:3
**housekeeping** [1] - 392:15
**HP** [1] - 408:8
**huge** [5] - 449:10, 449:11, 473:19
**human** [1] - 481:21
**hyphen** [2] - 374:16, 523:12
**hypothetical** [2] - 344:12, 344:13

## I

**I.T** [4] - 331:14, 375:6, 448:23, 501:17
**idea** [7] - 466:6, 525:21, 559:8, 561:2, 583:1, 598:25, 605:14
**identified** [3] - 411:10, 533:16, 584:9
**identify** [3] - 335:3, 410:20, 423:20
**identifying** [2] - 506:9, 509:21
**IL** [4] - 304:5, 417:16, 417:20, 418:5
**ill** [1] - 481:22
**Illinois** [5] - 399:11, 417:7, 417:25, 456:21, 461:18
**ILLINOIS** [1] - 417:1
**image** [10] - 311:17, 311:23, 311:24, 318:22, 319:2, 319:12, 320:6, 448:16, 499:5, 507:4
**imaged** [1] - 444:22
**imaging** [4] - 313:16, 319:13, 358:17, 501:9
**immediately** [3] - 324:21, 338:4, 581:20
**impediment** [1] - 318:8
**imperative** [1] - 393:10
**important** [22] - 337:15, 379:5, 380:2, 394:4, 401:3, 402:12, 402:19, 426:9, 426:24, 426:25, 429:12, 447:12, 449:7, 453:10, 457:24, 479:24, 511:22, 512:1, 588:20, 589:5, 589:6, 605:16
**impression** [2] - 509:6, 531:2
**improperly** [1] - 315:16
**imputed** [1] - 480:13
**IN** [1] - 417:1
**inaccessible** [1] - 421:2
**inaccurate** [1] - 494:16
**inadvertence** [1] - 447:7
**inadvertently** [2] - 346:17, 424:24
**inappropriate** [1] - 398:1
**inbound** [1] - 535:14
**INC** [1] - 417:7
**inception** [1] - 419:15
**incineration** [1] - 420:22

**include** [15] - 326:19, 327:14, 327:17, 328:15, 331:1, 334:15, 353:24, 359:16, 412:13, 420:25, 421:6, 455:3, 480:24, 524:8, 526:17

**included** [16] - 311:11, 327:24, 329:22, 330:20, 381:25, 383:8, 390:17, 391:5, 394:19, 396:1, 396:2, 401:17, 426:11, 426:12, 529:4

**includes** [3] - 330:6, 482:12, 581:11

**including** [7] - 313:22, 343:3, 473:6, 499:17, 518:22, 561:15, 566:5

**incomplete** [2] - 327:9, 421:2

**Incorporated** [2] - 307:3, 566:8

**incorrect** [3] - 326:12, 326:15, 518:18

**incorrectly** [1] - 523:9

**incredible** [2] - 451:5, 451:8

**indeed** [2] - 329:13, 529:20

**independent** [1] - 339:19

**index** [1] - 320:7

**India** [1] - 483:5

**indicate** [5] - 318:4, 318:8, 327:8, 360:5, 383:1

**indicated** [15] - 315:7, 324:6, 329:9, 333:15, 337:16, 376:14, 389:23, 391:3, 399:19, 450:23, 472:23, 475:20

**indicates** [4] - 339:18, 435:1, 491:19, 545:12

**indices** [6] - 328:15, 328:22, 329:1, 329:4, 329:5, 329:10

**individual** [3] - 498:14, 501:17, 533:16

**individuals** [3] - 364:15, 485:14, 563:6

**induce** [1] - 486:5

**infer** [1] - 327:14

**inference** [1] - 409:22

**inflated** [2] - 575:13, 599:12

**inform** [8] - 510:13, 551:20, 552:5, 552:10, 553:13, 566:21, 567:3, 601:25

**informal** [1] - 592:7

**information** [52] - 313:16, 313:21, 315:2, 331:11, 332:12, 337:17, 337:21, 338:5, 362:20, 374:22, 375:1, 377:17, 379:8, 379:19, 391:5, 394:7, 394:8, 396:4, 396:8, 396:24, 402:17, 410:17, 410:22, 410:24, 411:3, 411:5, 411:13, 411:14, 411:15, 411:19, 411:20, 412:7, 449:7, 451:15, 451:17, 452:21, 455:3, 466:7, 469:24, 470:2, 470:4, 479:24, 519:10, 523:23, 544:2, 560:4, 560:22, 561:4, 561:19, 575:14, 593:19, 599:14

**informed** [18] - 347:17, 353:16, 363:4, 389:12, 390:3, 401:24, 505:3, 507:17, 510:25, 523:20, 569:23, 572:14, 572:21, 573:5, 600:16, 600:18, 601:3, 603:20

**informing** [1] - 508:21

**initial** [5] - 309:15, 497:25, 503:17, 587:19, 594:6

**inoperable** [33] - 311:12, 311:22, 313:15, 319:17, 329:1, 329:4, 430:24, 430:25, 431:2, 431:7, 431:23, 443:12, 443:13, 444:2, 444:10, 444:16, 444:19,

444:22, 498:1, 499:4, 500:12, 500:24, 501:9, 507:5, 509:20, 510:14, 511:17, 513:9, 513:12, 513:13, 513:25, 516:7

**inquire** [3] - 339:15, 372:13, 515:12

**inquired** [2] - 324:3, 334:23

**inquiries** [1] - 383:4

**inquiry** [3] - 335:8, 335:12, 373:8

**inside** [3] - 389:20, 508:9, 531:8

**insisted** [1] - 541:25

**inspect** [2] - 397:12, 500:6

**instead** [1] - 598:13

**instruct** [6] - 309:14, 363:25, 364:15, 508:12, 597:20, 599:23

**instructed** [14] - 309:6, 309:8, 317:16, 398:15, 398:16, 428:20, 503:11, 508:14, 573:7, 599:20, 600:2, 601:25, 604:9

**instructing** [4] - 396:6, 420:16, 420:25, 561:22

**instruction** [6] - 315:22, 316:16, 317:10, 317:15, 430:14, 433:14

**instructions** [11] - 308:20, 309:15, 316:20, 317:19, 347:15, 366:25, 437:10, 437:16, 462:20, 462:23, 596:9

**intact** [1] - 420:24

**intend** [2] - 374:18, 403:19

**intended** [2] - 412:15, 511:23

**intends** [1] - 586:3

**intent** [4] - 318:23, 522:14, 523:6, 523:14

**intention** [4] - 330:25, 331:2, 396:20, 596:16

**intentional** [1] - 421:1

**interacting** [2] - 308:9, 469:7

**interest** [12] - 370:8, 374:17, 400:25, 458:15, 458:25, 459:6, 505:12, 538:17, 580:8, 580:9, 580:14, 598:4

**interested** [2] - 444:8, 493:8

**interrogatory** [1] - 470:3

**introduce** [3] - 569:10, 590:21, 590:22

**introduced** [5] - 314:25, 505:23, 568:21, 569:7, 590:15

**introduction** [1] - 506:1

**introductory** [1] - 591:16

**inventory** [41] - 352:18, 352:20, 353:2, 353:6, 353:21, 354:18, 355:4, 457:13, 457:14, 457:15, 457:20, 457:25, 458:5, 458:6, 458:12, 459:15, 459:19, 460:20, 460:25, 473:9, 477:11, 493:14, 549:17, 549:18, 549:20, 550:1, 550:6, 568:19, 569:5, 575:13, 575:18, 580:7, 580:10, 581:6, 582:14, 590:13, 590:20, 599:8, 599:10, 599:13

**invoices** [2] - 438:13, 438:14

**invoke** [1] - 554:4

**involve** [1] - 405:3

**involved** [37] - 307:15, 307:18, 307:22, 307:25, 308:3, 308:17, 340:23, 357:12, 357:16, 387:21, 395:5, 400:11, 400:12, 400:24, 407:1, 419:14, 426:17, 427:1, 427:3, 432:14, 456:23, 470:3, 477:7,

487:8, 489:8, 489:9, 515:21, 529:5, 558:15, 558:17, 577:2, 583:15, 590:23, 594:11, 600:17

**involvement** [2] - 455:8, 587:4

**involves** [3] - 318:17, 347:15, 371:21

**involving** [4] - 318:15, 390:7, 538:10, 563:21

**Ira** [1] - 584:8

**irrelevant** [2] - 347:6, 382:18

**issue** [50] - 321:23, 328:14, 328:25, 332:3, 334:20, 337:5, 337:18, 340:22, 342:25, 343:23, 343:25, 344:4, 346:11, 350:15, 358:12, 363:5, 363:15, 367:21, 369:11, 370:25, 371:8, 374:15, 380:3, 381:22, 387:25, 389:6, 390:19, 402:6, 431:6, 453:2, 453:3, 470:18, 470:20, 470:24, 522:1, 527:20, 531:5, 531:7, 538:21, 543:22, 555:2, 555:17, 562:4, 563:7, 563:12, 575:18, 582:6, 588:5, 590:16, 603:17

**issued** [2] - 362:23, 425:25

**issues** [20] - 308:5, 308:7, 308:10, 317:24, 342:21, 352:17, 380:7, 389:15, 389:24, 390:4, 393:15, 423:8, 427:3, 431:7, 447:24, 451:2, 473:6, 473:21, 495:24, 497:13, 497:21, 501:11, 502:8, 518:22, 549:24, 561:17, 579:11

**issuing** [1] - 448:13

**italics** [1] - 396:23

**items** [20] - 338:11, 377:21, 414:11, 485:16, 485:21, 485:24, 485:25, 545:25, 546:1, 546:6, 546:13, 546:16, 581:23

**iteration** [7] - 326:17, 327:5, 327:10, 327:19, 330:5, 330:21, 331:4

**itself** [3] - 411:8, 495:4, 520:9

**J**

**Jacobs** [6] - 564:24, 564:25, 565:2, 565:21, 566:5, 566:7, 566:12, 583:25

**January** [19] - 307:21, 309:9, 309:15, 389:13, 394:24, 401:6, 401:9, 401:11, 401:12, 417:7, 424:7, 424:9, 424:18, 425:25, 426:10, 426:13, 486:16, 606:13, 606:14

**Jim** [2] - 420:3, 490:19

**job** [1] - 362:9

**John** [1] - 492:5

**joint** [5] - 337:8, 424:20, 445:9, 446:16, 494:24

**Jones** [1] - 583:25

**Joshi** [79] - 311:9, 313:3, 313:4, 314:6, 314:12, 315:3, 315:12, 316:25, 317:12, 317:22, 317:23, 317:25, 318:4, 319:3, 319:17, 319:18, 321:4, 330:1, 334:19, 338:20, 339:13, 339:23, 345:14, 358:16, 359:6, 361:6, 361:24, 362:7, 364:16, 364:18, 367:15, 369:5, 369:8, 373:23, 374:1, 376:4, 377:3, 380:7, 381:7, 381:16, 387:12, 388:15, 388:20,

388:24, 389:10, 389:14, 389:17, 390:6, 397:19, 398:20, 398:25, 399:20, 399:24, 400:1, 402:4, 412:4, 415:24, 432:15, 434:24, 435:19, 447:13, 455:2, 469:10, 470:5, 481:25, 483:1, 484:4, 500:20, 503:10, 503:19, 504:3, 504:9, 506:3, 508:7, 518:7, 518:24, 518:25, 532:24

**Joshi's** [5] - 349:24, 370:3, 379:22, 388:6, 388:10

**Jr** [1] - 537:11

**Judge** [22] - 332:10, 395:13, 402:24, 409:22, 422:13, 432:18, 457:6, 464:17, 481:4, 488:8, 488:13, 491:20, 509:13, 511:22, 512:20, 525:7, 536:7, 536:18, 544:7, 568:4, 589:13, 597:19

**judge** [20] - 348:20, 349:1, 362:2, 391:15, 392:15, 413:22, 421:23, 423:13, 428:21, 431:10, 439:11, 447:25, 457:6, 476:10, 480:4, 483:22, 550:24, 605:6, 605:9, 606:3

**judge's** [1] - 436:7

**judicial** [3] - 397:25, 398:6, 512:2

**judicial-appointed** [1] - 512:2

**July** [42] - 334:10, 334:18, 334:23, 335:7, 335:8, 335:12, 335:19, 335:22, 335:25, 336:2, 338:1, 363:10, 365:3, 365:7, 365:8, 365:9, 380:20, 382:21, 383:1, 383:13, 383:25, 384:4, 384:18, 393:16, 395:17, 396:25, 397:17, 402:2, 402:4, 402:7, 411:25, 445:15, 476:8, 535:8, 535:18, 558:14, 576:16, 593:12, 602:15

**June** [19] - 333:13, 363:10, 378:16, 380:4, 393:16, 395:17, 396:25, 397:17, 402:1, 427:16, 427:18, 427:20, 445:21, 469:8, 479:16, 479:21, 482:9, 576:11

**junior** [2] - 578:14, 581:3

**jury** [2] - 422:1, 423:6

**Justice** [1] - 497:18

## K

**Kanan** [57] - 307:2, 312:4, 321:17, 343:7, 345:11, 367:15, 370:2, 370:6, 373:10, 383:8, 393:18, 395:18, 403:23, 404:2, 444:15, 465:23, 469:15, 488:15, 498:2, 499:3, 500:23, 501:17, 501:19, 502:5, 505:24, 509:3, 509:22, 530:12, 530:16, 530:17, 530:20, 530:24, 531:2, 538:17, 539:14, 539:16, 539:23, 539:25, 540:1, 540:3, 541:17, 541:25, 542:4, 542:23, 547:4, 561:4, 564:2, 564:5, 566:8, 571:13, 575:12, 575:13, 576:25, 581:4, 583:12, 594:8

**KANAN** [1] - 417:7

**Kanan's** [31] - 309:20, 309:22, 310:23, 311:20, 313:21, 320:12, 320:19, 320:20, 320:22, 323:14, 324:22, 326:3, 326:17, 327:5, 334:24, 346:9, 359:23, 369:18, 370:13, 370:20, 372:17, 378:9,

380:8, 411:5, 411:22, 426:22, 468:18, 516:23, 560:7, 592:7, 592:21

**keep** [12] - 321:1, 323:10, 323:12, 342:24, 390:18, 420:24, 524:23, 556:25, 558:2, 565:10, 601:5, 601:12

**keeping** [1] - 421:7

**kept** [16] - 313:24, 320:20, 321:6, 323:1, 341:3, 343:24, 346:4, 390:2, 390:16, 394:15, 404:6, 427:7, 427:20, 449:22, 546:21, 600:15

**KEVIN** [1] - 417:19

**key** [6] - 423:12, 427:10, 531:14, 531:19, 532:5, 532:10

**keys** [1] - 469:4

**KGAUFS** [1] - 410:15

**kick** [1] - 342:5

**kind** [9] - 320:25, 330:9, 333:11, 406:15, 501:14, 547:4, 548:18, 589:25, 605:13

**kinds** [1] - 488:13

**King** [1] - 424:11

**knowing** [7] - 390:22, 455:19, 461:24, 461:25, 493:8, 598:18, 598:20

**knowledge** [82] - 354:11, 356:3, 356:23, 362:6, 363:18, 363:22, 378:4, 383:11, 384:18, 416:5, 425:10, 433:3, 435:8, 447:8, 464:12, 470:13, 472:3, 472:7, 472:19, 472:23, 473:25, 474:2, 474:3, 474:5, 474:6, 474:7, 475:22, 476:5, 476:7, 480:13, 486:9, 486:14, 487:2, 489:7, 500:10, 508:17, 508:20, 510:1, 519:24, 519:25, 520:1, 520:6, 520:13, 520:23, 521:6, 528:6, 530:15, 530:17, 530:19, 542:12, 546:19, 546:23, 547:2, 547:7, 548:7, 548:9, 548:11, 548:16, 553:10, 559:1, 559:9, 559:13, 559:15, 560:6, 561:5, 561:7, 562:13, 562:16, 563:20, 564:5, 564:8, 567:7, 571:5, 571:7, 575:3, 578:18, 581:21, 585:9, 585:11, 590:6, 597:13

**known** [9] - 357:25, 372:5, 502:2, 534:2, 534:11, 534:13, 534:16, 534:18

**knows** [2] - 348:16, 458:25, 486:24, 520:10

## L

**lack** [2] - 322:6, 580:20

**language** [9] - 328:6, 378:2, 430:16, 431:3, 431:8, 442:17, 485:18, 542:15

**Lanka** [1] - 318:16

**laptop** [2] - 315:20, 397:3

**large** [1] - 408:12

**LaSalle** [2] - 304:5, 418:5

**last** [16] - 312:19, 415:10, 454:15, 462:15, 462:17, 517:22, 545:21, 562:24, 570:2, 579:19, 593:25, 604:8, 604:14, 604:15, 605:11, 605:12

**late** [3] - 471:11, 540:8, 558:14

**Lauter** [2] - 584:8, 584:14, 586:6

**law** [7] - 480:14, 483:2, 483:8, 496:23,

497:15, 498:16, 542:8

**lawsuit** [5] - 310:4, 362:10, 362:17, 362:20, 363:15, 427:19, 469:9, 473:3, 473:4, 489:22, 544:3, 544:4, 578:8, 578:11, 585:6, 585:9

**lawyer** [15] - 396:5, 396:14, 426:9, 426:24, 480:8, 480:12, 480:18, 480:19, 483:5, 489:16, 545:1, 553:8, 553:11, 558:19

**lawyers** [1] - 446:20

**lay** [2] - 322:10, 481:6

**laying** [1] - 572:5

**layman's** [1] - 582:16

**lead** [7] - 419:17, 457:2, 473:4, 479:24, 497:5, 541:5, 601:15

**learn** [10] - 324:25, 353:23, 395:3, 403:25, 437:19, 456:9, 476:1, 489:6, 571:22, 572:1

**learned** [22] - 358:4, 386:15, 401:13, 406:9, 438:5, 448:10, 463:3, 471:2, 471:12, 476:3, 481:17, 489:8, 558:14, 559:3, 568:24, 569:23, 571:10, 571:25, 589:8, 594:15, 594:17, 594:24

**learning** [2] - 438:9, 595:4

**lease** [43] - 354:6, 355:3, 367:23, 367:24, 385:9, 386:9, 386:12, 395:20, 401:9, 405:4, 408:1, 438:8, 438:23, 479:1, 538:21, 538:24, 538:25, 555:18, 557:9, 558:8, 558:9, 558:16, 558:17, 558:24, 559:6, 560:11, 560:17, 564:13, 567:14, 568:1, 569:13, 569:16, 577:7, 582:11, 582:18, 585:1, 587:13, 588:21, 589:4, 594:3, 595:6, 598:5

**leased** [14] - 310:17, 349:21, 350:8, 386:16, 386:22, 386:24, 388:1, 395:21, 438:5, 484:7, 485:4, 485:6, 485:9, 540:1

**leasehold** [1] - 538:16

**leasing** [1] - 438:15

**least** [11] - 320:3, 373:8, 373:13, 390:5, 394:18, 401:12, 415:3, 476:8, 534:3, 564:3, 568:18

**leave** [4] - 313:5, 401:23, 433:21, 457:6

**leaves** [3] - 493:23, 536:23, 603:9

**leaving** [1] - 481:17

**led** [3] - 399:25, 460:22, 489:7

**left** [17] - 312:4, 312:13, 312:21, 313:3, 314:23, 316:8, 347:18, 390:11, 424:24, 437:20, 438:3, 466:1, 466:7, 469:12, 478:2, 504:16, 604:1

**legal** [6] - 308:4, 362:13, 403:24, 463:20, 497:8, 553:6

**lenders** [1] - 585:5

**lengthy** [4] - 310:22, 311:25, 317:23, 389:19

**less** [1] - 332:9

**letter** [99] - 320:16, 320:24, 322:20, 323:15, 335:1, 335:20, 335:22, 335:25, 336:2, 336:6, 336:12, 338:1, 340:24, 356:1, 356:4, 356:21, 357:10, 357:12,

357:14, 357:18, 357:22, 358:4, 359:21, 360:10, 363:7, 363:9, 363:10, 365:10, 374:8, 386:23, 394:25, 402:10, 410:9, 425:14, 425:21, 436:6, 436:7, 443:4, 443:6, 443:16, 443:19, 443:21, 443:25, 444:5, 444:11, 444:12, 444:23, 445:15, 445:23, 446:8, 446:10, 452:16, 454:6, 454:8, 454:10, 454:12, 455:3, 455:10, 457:22, 459:12, 459:18, 459:20, 459:25, 460:6, 460:8, 460:13, 461:12, 461:17, 462:18, 463:16, 472:9, 472:11, 475:20, 480:7, 502:13, 502:16, 503:1, 503:3, 561:25, 565:22, 566:7, 566:12, 579:20, 579:23, 580:1, 581:9, 581:14, 581:18, 581:22, 584:4, 584:18

**letter's** [1] - 444:2
**letters** [7] - 410:13, 442:25, 451:14, 459:17, 503:4, 561:22, 566:15
**Levin** [3] - 584:8, 584:13, 584:16
**liability** [1] - 598:22
**liaison** [10] - 311:3, 311:4, 313:17, 315:1, 315:21, 318:25, 500:20, 505:25, 510:24, 510:25
**liaisons** [3] - 311:21, 346:24, 372:25
**license** [1] - 460:19
**lie** [1] - 449:1
**lien** [7] - 340:19, 352:19, 445:24, 446:2, 446:13, 495:1, 495:4
**lieu** [20] - 438:24, 538:15, 539:1, 539:6, 539:17, 539:23, 540:6, 540:23, 541:13, 541:15, 541:24, 542:1, 542:5, 542:14, 555:13, 576:24, 577:14, 577:17, 577:24, 583:16
**life** [1] - 534:15
**light** [2] - 395:9, 492:19
**limine** [2] - 481:2, 481:12
**limited** [5] - 473:2, 499:17, 499:19, 499:24, 500:1
**limits** [1] - 449:12
**line** [23] - 421:15, 422:11, 422:20, 423:8, 424:7, 432:3, 432:13, 439:21, 440:8, 440:9, 454:15, 477:2, 477:3, 484:18, 487:13, 516:12, 522:13, 523:1, 523:3, 535:22, 539:5, 577:21
**lines** [3] - 422:3, 441:16, 599:9
**LIPTON** [29] - 304:4, 306:16, 362:11, 362:13, 418:4, 422:11, 422:19, 429:22, 440:18, 440:21, 441:14, 538:3, 547:9, 547:13, 558:1, 589:19, 592:13, 595:20, 595:22, 597:2, 597:6, 598:8, 599:2, 599:4, 602:4, 602:8, 603:7, 604:17, 605:7
**Lipton** [2] - 477:6, 589:16
**list** [6] - 325:15, 501:20, 501:22, 501:23, 502:1, 517:12
**listed** [2] - 489:5, 502:14
**listen** [1] - 503:14
**litigation** [43] - 320:3, 342:21, 343:3, 389:12, 394:19, 394:21, 401:14, 426:18, 427:8, 427:14, 427:21, 434:5, 446:19, 450:21, 451:3, 469:18, 479:25,

485:22, 486:1, 497:22, 505:24, 509:2, 537:22, 538:10, 546:2, 546:18, 549:4, 552:12, 553:3, 553:16, 557:12, 560:19, 561:8, 561:18, 561:20, 561:24, 568:22, 591:1, 592:4, 600:23, 601:1, 601:7
**litigation-related** [1] - 553:3
**LLC** [2] - 417:13, 566:9
**LLP** [2] - 304:3, 418:3
**loan** [14] - 401:1, 434:13, 449:21, 488:15, 577:7, 580:15, 580:16, 580:20, 580:24, 581:1, 581:2, 581:7, 598:1
**loans** [1] - 489:10
**local** [1] - 510:7
**locate** [1] - 392:10
**located** [10] - 356:24, 368:3, 368:17, 454:16, 456:21, 461:17, 461:22, 529:5, 546:25, 586:6
**locating** [1] - 330:14
**location** [8] - 313:25, 320:20, 320:25, 321:6, 321:21, 466:17, 475:23, 535:11
**locations** [1] - 535:12
**locked** [2] - 321:2, 324:9
**locks** [3] - 541:24, 547:19, 580:4
**logging** [1] - 535:11
**logistics** [2] - 318:18, 341:15
**look** [47] - 309:24, 310:1, 316:23, 320:15, 327:1, 328:5, 329:25, 339:9, 349:25, 377:10, 384:23, 385:1, 408:1, 413:2, 434:22, 442:23, 453:19, 454:10, 454:15, 454:19, 457:14, 465:17, 472:11, 473:15, 485:11, 492:2, 498:11, 500:6, 503:1, 534:25, 535:7, 535:16, 540:13, 540:21, 540:24, 545:5, 545:7, 545:21, 548:10, 552:6, 565:15, 565:18, 566:11, 583:7, 591:6, 592:25, 599:7
**looked** [5] - 473:16, 492:20, 511:11, 544:22, 567:1
**looking** [15] - 338:15, 390:15, 422:23, 443:10, 449:18, 452:5, 492:7, 492:8, 498:7, 510:10, 510:21, 515:4, 545:13, 585:17, 592:16
**looks** [3] - 454:5, 454:8, 581:17
**loop** [2] - 394:15, 426:16
**loose** [1] - 514:22
**lose** [3] - 435:22, 436:12, 437:2
**losing** [1] - 562:19
**Lou** [4] - 381:22, 381:23, 383:2, 535:17
**loud** [1] - 524:23
**louissmalley@hotmail.com** [1] - 535:9
**lunch** [6] - 312:7, 313:10, 398:13, 501:3, 503:9, 529:8
**Luther** [1] - 424:11

## M

**ma'am** [2] - 424:19, 540:20
**machine** [11] - 382:4, 382:14, 382:17, 382:23, 408:4, 408:5, 411:7, 411:11, 504:21, 535:24, 535:25

**machines** [8] - 500:2, 500:9, 502:2, 506:10, 509:22, 516:24, 517:13
**Magistrate** [4] - 428:19, 429:7, 442:20, 443:18
**mail** [207] - 309:17, 310:2, 310:3, 310:16, 314:23, 316:24, 318:2, 320:11, 325:2, 325:3, 327:2, 327:8, 327:13, 328:5, 330:1, 330:11, 330:12, 331:17, 331:18, 333:25, 338:6, 338:10, 338:19, 339:4, 339:10, 339:12, 339:18, 340:3, 340:12, 340:18, 342:12, 349:24, 350:1, 350:4, 350:18, 359:24, 360:16, 363:9, 363:10, 367:3, 367:24, 368:22, 369:2, 369:5, 369:8, 369:10, 369:17, 370:23, 372:22, 372:23, 373:5, 374:10, 374:13, 374:21, 376:4, 376:8, 377:13, 377:18, 377:20, 378:18, 379:7, 380:7, 380:20, 380:25, 381:6, 381:9, 381:20, 381:21, 381:25, 382:2, 383:1, 383:6, 385:4, 385:5, 385:19, 386:6, 387:1, 387:2, 387:24, 387:25, 389:9, 389:14, 397:22, 401:12, 402:3, 404:9, 412:3, 414:4, 415:3, 415:4, 424:17, 425:2, 425:11, 425:14, 425:25, 427:22, 428:2, 434:23, 435:15, 435:17, 438:7, 438:12, 448:22, 454:2, 456:12, 457:10, 458:3, 459:8, 461:2, 461:4, 461:7, 461:8, 461:11, 462:8, 462:11, 463:3, 463:7, 463:22, 464:9, 464:10, 464:18, 464:19, 464:23, 465:1, 476:3, 477:25, 478:6, 479:8, 479:14, 479:15, 479:16, 480:3, 480:5, 480:7, 480:24, 481:14, 482:13, 484:4, 484:12, 484:14, 484:19, 484:23, 485:1, 485:3, 485:5, 485:12, 485:14, 486:5, 488:21, 489:11, 491:14, 533:5, 533:9, 533:14, 533:18, 535:2, 535:3, 535:7, 535:13, 536:5, 536:15, 541:3, 543:19, 544:19, 544:21, 545:7, 545:8, 545:13, 545:14, 545:21, 548:22, 549:1, 550:22, 551:10, 551:14, 552:17, 552:19, 552:20, 553:17, 555:7, 556:15, 556:23, 560:20, 562:9, 566:4, 567:20, 569:22, 583:5, 583:7, 583:9, 585:17, 585:18, 586:3, 591:12, 591:13, 591:21, 592:14, 592:23, 596:13, 601:10
**mailed** [6] - 338:4, 372:24, 427:17, 460:21, 463:20, 488:5
**mailing** [1] - 489:13
**mails** [54] - 309:21, 309:22, 342:4, 342:8, 342:11, 344:5, 349:13, 353:18, 354:19, 378:15, 379:3, 381:16, 385:2, 385:24, 390:6, 390:16, 391:5, 394:19, 396:2, 396:22, 396:24, 397:5, 397:11, 397:14, 413:13, 414:14, 427:4, 447:13, 448:18, 449:20, 451:14, 452:6, 477:25, 478:14, 478:17, 479:17, 479:21, 482:10, 482:15, 482:18, 486:15, 487:16, 487:17, 487:19, 488:5, 488:9, 488:11, 541:2, 566:15, 568:24, 570:8, 590:4, 590:6, 601:21
**main** [6] - 308:6, 328:25, 511:25, 513:9, 513:23, 601:16

**maintains** [1] - 548:18
**maker** [1] - 539:14
**man** [3] - 447:14, 508:9, 531:8
**manage** [1] - 587:1
**managed** [1] - 337:3
**management** [1] - 587:7
**managing** [1] - 495:22
**manner** [1] - 398:11
**manufacture** [1] - 318:15
**map** [50] - 324:22, 325:15, 325:20, 326:17, 326:19, 326:25, 327:5, 327:12, 327:20, 327:23, 327:24, 328:11, 328:16, 328:23, 329:22, 330:5, 330:20, 331:1, 331:4, 331:20, 331:24, 332:1, 332:5, 332:7, 332:9, 332:12, 334:15, 334:24, 378:5, 383:7, 383:8, 514:15, 516:2, 522:15, 523:6, 523:15, 523:22, 523:23, 524:1, 524:4, 524:5, 524:7, 524:12, 524:14, 524:17, 525:25, 526:4, 526:16, 526:25
**maps** [7] - 514:12, 515:11, 515:19, 515:24, 516:8, 522:6, 522:11
**March** [74] - 309:9, 309:15, 350:22, 352:7, 389:13, 414:14, 425:2, 425:5, 425:7, 425:12, 425:14, 425:18, 425:21, 437:8, 438:21, 459:11, 459:14, 459:18, 459:20, 460:13, 462:5, 462:19, 462:24, 463:1, 463:8, 463:16, 463:19, 463:23, 464:4, 464:9, 464:10, 464:18, 464:19, 464:22, 464:23, 469:8, 478:17, 478:18, 478:20, 478:21, 480:3, 492:8, 492:16, 503:4, 540:8, 540:9, 540:17, 541:3, 541:6, 541:11, 541:15, 541:16, 543:9, 543:17, 544:19, 545:8, 548:22, 549:1, 550:22, 556:15, 560:20, 565:21, 565:22, 567:17, 567:20, 579:21, 583:6, 585:19, 591:4, 591:14, 596:13
**mark** [1] - 377:7
**marked** [1] - 515:13
**marketing** [1] - 533:23
**marks** [1] - 383:9
**Martin** [1] - 424:11
**Mason** [7] - 332:10, 428:19, 429:7, 442:20, 443:18, 511:23, 544:7
**MASON** [1] - 417:10
**master** [4] - 495:25, 496:5, 496:8, 512:2
**master's** [1] - 496:22
**material** [4] - 396:4, 396:8, 420:23, 421:2
**materials** [1] - 533:22
**Matt** [9] - 311:7, 398:21, 399:21, 499:3, 499:10, 499:13, 500:20, 549:14, 550:12
**matter** [25] - 350:7, 360:6, 369:17, 377:17, 385:22, 386:7, 390:5, 392:15, 395:3, 398:19, 429:23, 432:14, 450:25, 452:19, 453:13, 466:22, 473:18, 480:14, 484:8, 491:16, 492:22, 498:14, 503:5, 504:1, 527:10
**matters** [17] - 317:24, 394:20, 401:2, 403:24, 444:24, 451:7, 453:10, 457:3,

498:4, 498:17, 499:17, 538:9, 538:12, 553:3, 590:17, 601:5
**McGarry** [138] - 304:4, 305:9, 305:15, 305:19, 305:25, 306:4, 306:6, 322:6, 322:9, 336:16, 338:13, 341:6, 343:10, 343:12, 344:10, 344:13, 344:18, 346:10, 347:2, 347:6, 347:12, 366:15, 381:12, 382:18, 386:17, 392:13, 392:15, 393:3, 393:8, 394:1, 395:13, 395:14, 397:15, 397:17, 397:21, 397:24, 398:1, 398:4, 398:8, 400:6, 400:10, 402:20, 402:24, 405:17, 405:20, 408:14, 408:15, 408:18, 408:23, 409:1, 409:4, 409:7, 409:11, 409:16, 409:22, 410:3, 415:13, 415:17, 415:21, 416:6, 418:4, 421:22, 421:24, 422:2, 422:15, 422:24, 423:1, 423:4, 423:13, 429:17, 429:25, 432:4, 433:11, 433:22, 434:4, 440:8, 441:7, 441:11, 441:19, 441:24, 464:13, 464:16, 464:22, 467:12, 467:23, 468:6, 476:16, 476:20, 477:5, 478:13, 480:17, 481:7, 481:10, 481:11, 482:24, 482:25, 483:17, 483:19, 491:8, 491:12, 491:18, 491:24, 492:1, 492:14, 492:18, 493:19, 494:2, 494:20, 494:22, 495:7, 495:10, 495:15, 495:20, 499:23, 502:17, 502:24, 502:25, 509:13, 509:14, 512:6, 512:8, 512:10, 512:12, 512:14, 512:20, 514:8, 515:12, 520:8, 524:19, 524:24, 525:1, 525:7, 536:7, 536:19, 544:7, 562:19, 562:23, 568:4
**mcJESSY** [1] - 417:19
**McJessy** [154] - 305:7, 305:13, 305:17, 305:23, 306:2, 306:10, 306:14, 309:10, 317:5, 321:24, 348:11, 348:20, 348:22, 349:1, 349:15, 351:14, 351:15, 352:25, 353:13, 354:4, 354:10, 354:21, 355:13, 355:21, 357:15, 362:2, 362:5, 362:16, 363:24, 366:17, 366:20, 368:8, 368:10, 368:14, 370:17, 371:14, 372:1, 372:12, 373:24, 373:25, 375:16, 375:17, 380:12, 380:13, 381:15, 382:20, 383:21, 383:24, 384:14, 384:17, 385:25, 386:8, 386:20, 388:14, 390:21, 391:9, 391:12, 391:15, 391:18, 395:15, 396:22, 397:23, 397:25, 404:14, 405:22, 406:2, 406:7, 406:11, 406:21, 407:9, 408:9, 408:12, 409:21, 413:22, 413:25, 414:3, 415:5, 417:19, 421:23, 422:12, 422:18, 422:23, 431:17, 439:4, 439:8, 447:25, 449:2, 450:12, 450:13, 450:16, 453:9, 453:11, 454:25, 459:2, 459:4, 460:2, 460:9, 460:16, 462:4, 464:20, 464:25, 465:5, 467:1, 467:15, 467:17, 468:1, 468:11, 468:14, 468:15, 472:18, 472:21, 476:10, 476:13, 480:15, 480:25, 483:11, 483:14, 483:22, 484:1, 488:1, 490:1, 491:5, 499:22, 527:6, 528:1, 528:8, 528:22, 528:24, 529:2, 533:8, 535:6, 536:17, 555:12, 563:5, 563:9, 563:14, 563:17,

573:23, 574:16, 576:15, 577:25, 578:5, 578:7, 578:21, 578:23, 579:9, 579:18, 589:13, 605:6, 605:9, 605:20, 605:25, 606:9, 606:12
**mean** [46] - 323:23, 326:6, 326:7, 333:5, 333:6, 365:1, 370:4, 375:1, 386:12, 408:25, 420:24, 421:3, 425:11, 431:21, 432:25, 433:23, 436:15, 438:10, 438:13, 443:10, 447:7, 447:12, 447:19, 456:4, 457:25, 469:19, 469:22, 473:14, 481:19, 482:17, 484:23, 486:16, 488:13, 492:24, 493:15, 530:1, 530:15, 533:24, 534:12, 548:5, 555:17, 567:13, 572:7, 573:8, 575:3, 593:5
**meaning** [7] - 370:7, 383:13, 399:1, 408:4, 472:5, 551:10, 591:25
**means** [11] - 318:19, 366:1, 420:20, 420:24, 447:11, 451:8, 458:4, 458:10, 464:1, 505:12, 606:10
**meant** [16] - 326:9, 332:25, 333:7, 364:24, 365:2, 367:11, 367:19, 478:10, 479:8, 510:18, 513:5, 546:10, 568:10, 575:2, 592:21, 592:22
**measure** [1] - 401:21
**measures** [1] - 547:20
**meeting** [84] - 310:22, 311:11, 311:14, 311:25, 312:3, 312:20, 313:12, 317:13, 317:23, 319:4, 322:18, 355:16, 356:4, 356:22, 357:10, 358:5, 358:16, 360:23, 366:6, 399:3, 399:16, 427:15, 428:10, 432:15, 437:22, 465:19, 465:22, 465:25, 466:4, 467:8, 469:1, 470:12, 471:5, 471:9, 489:12, 501:2, 501:6, 501:8, 503:16, 503:17, 503:20, 503:22, 504:23, 505:9, 507:2, 507:3, 516:23, 518:3, 518:6, 518:16, 519:3, 519:5, 522:1, 522:2, 527:18, 527:19, 528:10, 529:3, 529:4, 529:16, 530:22, 549:12, 549:16, 549:17, 549:21, 550:12, 550:15, 554:5, 554:6, 554:10, 555:22, 573:25, 574:25, 576:7, 583:21, 587:19, 587:21, 588:13, 588:24, 591:13, 591:17, 599:7, 599:25
**meetings** [4] - 311:8, 389:19, 427:13, 501:4
**Mehul** [23] - 311:9, 316:25, 340:14, 340:16, 340:18, 340:24, 340:25, 363:8, 394:23, 395:1, 402:5, 402:11, 427:23, 434:23, 435:18, 457:3, 463:19, 469:12, 487:11, 487:13, 490:15, 490:20, 566:9
**member** [5] - 496:24, 527:15, 537:21, 590:1, 590:7
**members** [4] - 542:16, 542:18, 545:1, 577:2
**memorandum** [1] - 477:25
**memorialized** [5] - 374:8, 374:10, 463:7, 555:5, 557:20
**memorializing** [1] - 487:16
**memory** [8] - 443:17, 491:22, 492:20, 492:22, 493:9, 493:12, 586:11
**mention** [8] - 314:7, 323:14, 446:6, 446:7, 495:4, 550:15, 573:15, 603:16

**mentioned** [28] - 315:1, 315:3, 319:3, 333:25, 350:7, 354:24, 379:25, 386:2, 394:18, 406:22, 407:10, 438:13, 446:1, 446:2, 446:3, 446:11, 446:16, 482:2, 483:4, 517:12, 518:5, 527:18, 539:1, 539:19, 571:18, 575:1, 575:19, 594:8
**mentioning** [1] - 570:12
**mentions** [3] - 340:15, 385:13, 454:15
**mentor** [1] - 534:21
**mere** [1] - 394:17
**meritorious** [1] - 449:17
**merits** [2] - 473:11, 489:21
**message** [5] - 314:23, 384:19, 504:17, 535:16, 535:17
**met** [9] - 426:5, 427:16, 427:17, 427:18, 474:23, 482:2, 490:12, 490:21, 591:19
**method** [1] - 524:5
**methods** [1] - 318:19
**MICHAEL** [1] - 417:10
**Michigan** [1] - 417:16
**midday** [2] - 529:25, 530:1
**middle** [3] - 592:12, 592:14
**midpoint** [1] - 313:12
**Midwest** [162] - 314:3, 314:8, 321:20, 322:23, 322:24, 323:10, 323:11, 341:22, 345:8, 345:15, 346:15, 350:6, 350:12, 352:3, 352:9, 352:13, 352:21, 353:9, 353:25, 355:9, 357:6, 358:7, 361:18, 362:24, 363:19, 365:18, 366:10, 367:3, 367:11, 367:20, 368:4, 368:17, 371:10, 371:17, 373:14, 378:13, 380:4, 380:14, 380:17, 380:21, 383:14, 384:2, 384:21, 386:6, 387:22, 387:25, 388:10, 392:4, 392:7, 401:1, 414:8, 437:17, 446:6, 446:11, 448:13, 467:5, 471:17, 471:20, 472:15, 472:24, 474:19, 475:4, 475:7, 475:9, 476:1, 482:5, 484:6, 486:20, 499:16, 530:9, 537:24, 537:25, 538:1, 538:2, 538:8, 538:9, 538:13, 538:16, 538:17, 538:19, 538:23, 539:22, 540:18, 541:23, 542:19, 543:20, 544:1, 544:24, 546:20, 546:24, 547:3, 547:8, 547:15, 548:2, 548:9, 548:13, 548:17, 548:22, 549:12, 550:13, 550:22, 551:6, 551:7, 551:21, 552:10, 552:18, 554:11, 554:15, 554:18, 556:2, 556:6, 557:8, 557:14, 557:15, 559:7, 559:13, 559:19, 559:25, 560:3, 560:21, 561:5, 562:12, 562:14, 562:17, 563:12, 563:20, 563:22, 564:6, 564:9, 564:12, 564:16, 566:7, 567:17, 570:13, 570:17, 570:20, 570:23, 571:1, 571:3, 571:6, 571:9, 571:14, 571:19, 572:2, 572:9, 573:4, 574:20, 576:20, 577:11, 580:17, 580:19, 584:20, 586:5, 586:13, 586:21, 586:24, 587:12, 587:19, 588:6
**might** [30] - 332:2, 337:3, 345:21, 345:25, 347:12, 379:22, 384:24, 395:7, 408:8, 421:14, 421:16, 429:15, 430:14, 430:21, 432:24, 433:15, 437:9, 438:18,

438:19, 491:22, 493:15, 498:18, 503:3, 551:21, 552:6, 559:21, 560:22, 561:19, 572:22
**migration** [1] - 420:22
**million** [1] - 580:24
**mind** [21] - 379:5, 421:4, 427:25, 444:4, 445:20, 447:4, 447:5, 447:15, 447:19, 449:23, 481:15, 485:18, 555:20, 573:24, 574:7, 575:5, 597:4, 598:18, 598:21, 601:18, 602:6
**mine** [1] - 499:2
**minute** [5] - 391:14, 391:17, 476:10, 494:8, 602:4
**minutes** [9] - 314:24, 368:11, 368:12, 388:13, 391:15, 503:23, 518:18, 605:10, 606:10
**mischaracterization** [2] - 332:6, 386:18
**mischaracterized** [1] - 597:2
**mischaracterizes** [5] - 441:24, 464:17, 464:25, 467:23, 468:7
**mislead** [1] - 396:21
**misrepresented** [1] - 525:9
**missed** [1] - 576:19
**misspelled** [1] - 512:13
**moment** [7] - 472:13, 491:6, 515:5, 565:17, 566:3, 578:22, 593:5
**Monday** [10] - 317:13, 318:1, 400:1, 603:14, 604:3, 604:11, 604:24, 604:25, 605:21, 606:6
**money** [7] - 364:10, 364:12, 484:24, 598:1, 598:3, 598:14, 598:17
**monitoring** [2] - 346:24, 348:1
**month** [3] - 473:18, 498:25, 499:8
**months** [5] - 445:13, 488:7, 556:23, 560:24, 576:13
**morning** [12] - 307:13, 307:14, 313:12, 317:13, 317:17, 317:22, 318:1, 348:12, 400:1, 435:20, 604:3, 605:22
**mortgage** [3] - 539:15, 578:15, 581:3
**most** [4] - 398:10, 496:8, 534:15, 577:19
**motion** [9] - 314:9, 332:11, 347:9, 389:22, 389:23, 453:3, 456:25, 525:8, 543:23
**motives** [1] - 481:22
**mouth** [1] - 600:7
**move** [37] - 309:10, 315:6, 316:2, 316:16, 317:10, 317:17, 318:5, 321:24, 323:3, 333:8, 342:1, 360:18, 362:2, 365:14, 365:17, 365:22, 366:1, 366:14, 391:9, 437:3, 441:6, 457:20, 474:9, 474:14, 474:17, 502:17, 503:5, 507:21, 509:9, 517:14, 517:21, 521:7, 536:11, 536:16, 578:2, 578:6
**moved** [54] - 313:23, 313:24, 314:11, 318:24, 320:12, 320:22, 323:14, 323:19, 324:9, 324:16, 325:1, 325:6, 325:9, 325:11, 334:4, 334:11, 343:19, 351:22, 356:6, 356:12, 358:6, 358:18, 359:23, 360:1, 360:6, 360:7, 360:8,

360:9, 361:17, 367:1, 384:1, 384:20, 442:16, 442:18, 443:22, 445:3, 465:13, 466:14, 470:15, 475:23, 507:15, 507:19, 508:10, 519:8, 519:22, 520:4, 520:7, 520:14, 520:25, 521:9, 521:10, 532:19, 532:21, 532:25
**moving** [11] - 315:16, 318:8, 318:20, 324:3, 341:15, 344:2, 365:25, 366:23, 501:8, 579:10, 583:2
**MR** [320] - 304:4, 304:4, 305:7, 305:9, 305:13, 305:15, 305:17, 305:19, 305:23, 305:25, 306:2, 306:4, 306:6, 306:10, 306:14, 306:16, 309:10, 317:5, 321:24, 322:6, 322:9, 336:16, 338:13, 341:6, 343:10, 343:12, 344:10, 344:13, 344:18, 346:10, 347:2, 347:6, 347:12, 348:11, 348:20, 348:22, 349:1, 349:15, 351:14, 351:15, 352:25, 353:13, 354:4, 354:10, 354:21, 355:13, 355:21, 357:15, 362:2, 362:5, 362:11, 362:13, 362:16, 363:24, 366:15, 366:17, 366:20, 368:8, 368:10, 370:17, 371:14, 372:1, 372:12, 373:24, 373:25, 375:16, 375:17, 380:12, 380:13, 381:12, 381:15, 382:18, 382:20, 383:21, 383:24, 384:14, 384:17, 385:25, 386:8, 386:17, 386:20, 388:14, 390:21, 391:9, 391:12, 391:15, 391:18, 392:15, 393:3, 393:8, 394:1, 395:13, 395:14, 397:15, 397:17, 397:21, 397:23, 397:24, 397:25, 398:4, 398:8, 400:6, 400:10, 402:20, 402:24, 404:14, 405:17, 405:20, 405:22, 406:2, 406:7, 406:11, 406:21, 407:9, 408:9, 408:12, 408:15, 408:18, 408:23, 409:1, 409:4, 409:7, 409:11, 409:16, 409:21, 409:22, 410:3, 413:22, 413:25, 414:3, 415:5, 415:13, 415:17, 415:21, 416:6, 417:15, 417:19, 418:4, 418:4, 421:22, 421:23, 421:24, 422:2, 422:11, 422:12, 422:15, 422:18, 422:19, 422:23, 423:1, 423:4, 423:13, 429:17, 429:22, 429:25, 431:17, 432:4, 433:11, 433:22, 434:4, 439:4, 439:8, 440:8, 440:18, 440:21, 441:7, 441:11, 441:14, 441:19, 441:24, 447:25, 449:2, 450:13, 450:16, 453:9, 453:11, 454:25, 459:2, 459:4, 460:2, 460:9, 460:16, 462:4, 464:13, 464:16, 464:20, 464:22, 464:25, 465:5, 467:1, 467:12, 467:15, 467:17, 467:23, 468:1, 468:6, 468:11, 468:14, 468:15, 472:18, 472:21, 476:10, 476:13, 476:16, 476:20, 477:5, 478:13, 480:15, 480:17, 480:25, 481:7, 481:10, 481:11, 482:24, 482:25, 483:11, 483:14, 483:17, 483:19, 483:22, 484:1, 488:1, 490:1, 491:5, 491:8, 491:12, 491:18, 491:24, 492:1, 492:14, 492:18, 493:19, 494:2, 494:20, 494:22, 495:7, 495:10, 495:15, 495:20, 499:22, 499:23, 502:17, 502:24, 502:25, 509:13, 509:14, 512:6, 512:8, 512:10, 512:12, 512:14, 512:20,

514:8, 515:12, 520:8, 524:19, 524:24, 525:1, 525:7, 527:6, 528:1, 528:8, 528:22, 528:24, 529:2, 533:8, 535:6, 536:7, 536:17, 536:19, 538:3, 544:7, 547:9, 547:13, 555:12, 558:1, 562:19, 562:23, 563:5, 563:9, 563:14, 563:17, 568:4, 573:23, 574:16, 576:15, 577:25, 578:5, 578:7, 578:21, 578:23, 579:9, 579:18, 589:13, 589:19, 592:13, 595:20, 595:22, 597:2, 597:6, 598:8, 599:2, 599:4, 602:4, 602:8, 603:7, 604:7, 604:17, 604:25, 605:2, 605:6, 605:7, 605:9, 605:20, 605:25, 606:3, 606:7, 606:11, 606:12

**MS** [229] - 305:5, 305:11, 305:21, 306:8, 306:12, 307:5, 307:10, 308:16, 309:13, 314:15, 317:8, 319:6, 319:12, 319:21, 322:3, 322:11, 322:14, 322:19, 323:3, 323:8, 328:4, 328:8, 336:20, 336:25, 338:16, 338:19, 338:22, 338:24, 339:8, 340:5, 340:6, 340:17, 341:9, 341:12, 343:16, 344:16, 345:7, 346:13, 347:11, 347:14, 347:24, 348:4, 348:6, 348:15, 348:17, 348:18, 349:6, 351:11, 351:13, 352:23, 353:11, 354:2, 354:8, 354:14, 355:11, 355:19, 357:7, 363:20, 370:15, 371:12, 384:6, 384:10, 392:11, 392:25, 403:2, 403:5, 404:10, 406:17, 406:19, 407:7, 408:22, 409:2, 409:5, 409:8, 409:14, 417:14, 417:14, 417:23, 419:4, 419:11, 421:14, 421:18, 421:21, 422:5, 422:10, 422:17, 423:10, 423:19, 424:4, 424:6, 428:17, 428:18, 429:3, 429:20, 429:23, 430:4, 430:6, 431:13, 431:24, 432:6, 432:9, 432:12, 433:13, 433:25, 434:10, 439:9, 439:18, 439:21, 439:24, 440:2, 440:6, 440:10, 440:14, 440:25, 441:2, 441:3, 441:5, 441:18, 441:20, 442:2, 442:6, 442:11, 442:13, 448:3, 448:6, 449:4, 449:24, 450:1, 450:8, 450:10, 458:18, 458:24, 459:24, 472:17, 483:21, 493:25, 494:3, 494:7, 494:10, 494:12, 494:18, 494:21, 494:23, 495:9, 495:11, 495:13, 512:24, 513:16, 513:19, 513:22, 514:9, 514:19, 514:21, 514:23, 515:1, 515:4, 515:7, 515:9, 515:14, 515:17, 517:14, 517:17, 517:21, 517:24, 518:2, 518:14, 520:12, 524:22, 525:13, 525:19, 525:24, 526:13, 526:15, 526:23, 527:2, 527:24, 528:5, 528:20, 535:3, 536:20, 536:25, 537:6, 538:7, 541:12, 544:10, 544:18, 547:14, 551:4, 551:25, 552:3, 553:12, 554:9, 555:13, 555:21, 556:13, 556:18, 557:2, 558:6, 562:22, 563:11, 563:16, 563:24, 565:1, 565:11, 565:17, 565:20, 568:10, 568:14, 570:2, 570:5, 572:11, 573:18, 574:9, 574:11, 577:21, 578:3, 578:25, 579:3, 579:5, 579:10, 579:14, 579:16, 596:23, 603:12, 603:19, 604:14, 604:16, 604:19, 605:18

**multi** [1] - 473:6

**multimillion** [1] - 318:14
**multimillion-dollar** [1] - 318:14
**multiple** [3] - 507:8, 516:24, 518:21
**MUSCHLER** [5] - 604:25, 605:2, 606:3, 606:7, 606:11
**Muschler** [18] - 307:23, 317:1, 320:17, 360:12, 372:24, 419:24, 428:22, 434:25, 435:18, 436:1, 454:2, 502:14, 533:10, 533:15, 604:24, 605:8, 605:10
**Muschler's** [2] - 356:1, 462:11
**must** [11] - 330:14, 331:12, 333:18, 338:12, 375:4, 378:3, 378:4, 403:18, 485:23, 504:4, 545:25
**mutation** [1] - 420:23
**Mutual** [2] - 482:3, 493:1
**myriad** [2] - 390:1, 473:6

## N

**NADA** [1] - 417:14
**Nadelhoffer** [1] - 498:12
**name** [13] - 307:11, 311:7, 419:12, 446:7, 499:10, 512:13, 512:17, 518:11, 537:9, 549:13, 559:4, 564:18, 572:12
**named** [2] - 578:10, 596:1
**narrative** [2] - 343:8, 431:11
**narratives** [1] - 395:11
**narrowly** [2] - 523:4, 523:13
**narrowly-tailored** [2] - 523:4, 523:13
**narrows** [1] - 423:11
**nature** [3] - 400:19, 458:25, 496:2
**necessarily** [2] - 404:21, 575:20
**necessary** [3] - 413:17, 522:11, 582:4
**necessity** [2] - 504:5, 519:1
**need** [47] - 355:3, 362:1, 363:4, 371:22, 375:1, 383:20, 391:15, 413:10, 422:8, 422:20, 436:19, 485:15, 485:19, 485:20, 485:24, 486:21, 492:6, 494:11, 498:6, 502:20, 503:14, 504:3, 523:21, 523:23, 523:24, 524:4, 524:8, 525:17, 526:16, 541:7, 544:16, 545:25, 550:4, 551:16, 551:20, 553:21, 553:24, 554:2, 554:11, 558:2, 578:21, 581:10, 583:7, 587:6, 589:4, 606:2
**needed** [25] - 313:23, 313:24, 315:3, 315:4, 317:25, 319:1, 324:21, 331:4, 333:14, 337:15, 344:2, 355:5, 366:2, 379:25, 387:19, 399:2, 405:23, 446:21, 469:17, 470:4, 553:13, 557:11, 582:24, 583:4
**needing** [2] - 315:10, 395:6
**needs** [7] - 324:6, 383:2, 422:19, 422:21, 423:7, 535:25, 604:14
**nefarious** [1] - 405:10
**negative** [1] - 571:12
**negligent** [1] - 421:1
**negotiate** [10] - 354:6, 395:4, 401:9, 486:17, 564:12, 582:6, 584:25, 587:13, 588:6, 596:10
**negotiated** [11] - 405:3, 460:22,

542:16, 542:19, 542:22, 558:18, 564:16, 564:17, 588:10, 594:7
**negotiating** [15] - 350:13, 367:14, 387:21, 447:24, 448:8, 452:15, 479:1, 542:13, 564:18, 564:20, 583:19, 585:12, 587:10, 595:9, 595:12
**negotiations** [34] - 333:11, 341:2, 341:18, 352:20, 353:1, 353:5, 353:8, 353:14, 353:16, 354:5, 354:11, 354:13, 385:22, 388:9, 390:10, 394:24, 396:3, 449:13, 477:14, 543:1, 558:15, 565:2, 566:19, 567:5, 567:25, 568:9, 587:12, 587:17, 589:11, 590:2, 590:8, 600:16, 601:13, 602:1
**neutral** [3] - 495:25, 496:6, 496:8
**never** [49] - 342:6, 343:14, 344:4, 351:2, 358:21, 358:25, 361:13, 363:4, 364:9, 371:2, 371:24, 379:16, 388:4, 388:15, 390:3, 390:8, 391:22, 391:25, 412:23, 421:3, 421:4, 427:18, 434:5, 434:7, 436:22, 447:1, 448:19, 452:9, 453:12, 456:9, 458:17, 459:9, 466:22, 474:6, 490:5, 490:10, 490:24, 490:25, 532:18, 532:24, 552:16, 552:17, 553:19, 567:20, 593:12, 593:14, 593:16, 603:23
**New** [1] - 496:24
**new** [16] - 380:1, 403:10, 403:14, 403:22, 404:1, 405:11, 405:24, 488:15, 508:11, 560:14, 572:9, 589:2, 589:6, 594:9, 594:10, 594:11
**news** [1] - 594:4
**next** [15] - 311:13, 319:1, 325:16, 330:21, 390:2, 419:2, 466:11, 493:24, 503:8, 505:13, 511:3, 530:5, 530:7, 536:24
**night** [2] - 604:8, 604:13
**nincompoop** [1] - 481:20
**nobody** [7] - 346:15, 347:25, 395:8, 474:2, 474:5, 586:14, 586:18
**none** [2] - 478:8, 596:18
**nonresponsive** [9] - 309:10, 321:25, 362:3, 391:10, 391:11, 448:1, 513:20, 517:14, 517:22
**North** [4] - 304:5, 417:16, 417:20, 418:5
**NORTHERN** [1] - 417:1
**northern** [1] - 399:12
**notary** [1] - 510:6
**note** [5] - 377:12, 435:4, 457:1, 539:14, 598:13
**notes** [3] - 329:9, 377:22, 510:10
**nothing** [10] - 402:24, 405:10, 410:4, 419:25, 483:17, 493:5, 512:6, 526:8, 526:19, 536:20
**notice** [18] - 312:22, 356:5, 356:15, 356:19, 358:10, 360:17, 360:19, 360:20, 365:14, 397:25, 398:6, 466:12, 466:20, 470:9, 474:8, 474:9, 486:20, 572:4
**notices** [1] - 389:16

**notified** [1] - 357:1
**November** [9] - 440:4, 440:5, 440:6, 440:12, 440:23, 440:24, 441:2, 441:3, 476:22
**number** [24] - 338:14, 346:3, 366:21, 368:24, 376:11, 381:13, 381:13, 394:17, 403:7, 411:8, 411:10, 412:10, 429:22, 432:2, 432:3, 435:15, 443:15, 444:21, 463:4, 472:12, 475:2, 475:3, 515:20, 516:6, 581:2
**numbered** [2] - 412:11, 498:6
**numbers** [1] - 599:13
**numerous** [3] - 342:3, 359:6, 412:3

## O

**o'clock** [3] - 392:21, 417:8, 605:3
**Oak** [73] - 311:21, 312:14, 313:24, 314:12, 315:5, 315:6, 316:2, 316:17, 317:10, 318:9, 318:20, 318:24, 320:12, 320:20, 320:22, 321:1, 323:14, 324:9, 325:1, 326:3, 326:7, 333:23, 334:5, 334:11, 341:16, 342:1, 346:9, 356:13, 358:18, 359:23, 360:2, 360:8, 360:9, 361:18, 365:14, 365:18, 366:4, 399:2, 399:23, 407:11, 409:10, 411:5, 411:22, 412:22, 415:25, 442:16, 443:22, 445:3, 465:23, 467:19, 468:3, 468:18, 500:15, 500:23, 503:13, 507:19, 508:16, 511:8, 511:18, 514:1, 516:20, 516:25, 517:5, 517:11, 519:8, 527:22, 528:10, 528:15, 529:3, 532:19, 532:25, 535:11, 535:15
**object** [9] - 322:6, 344:18, 366:15, 397:23, 431:17, 464:16, 513:19, 536:7, 563:5
**objection** [66] - 309:10, 321:24, 322:15, 323:3, 336:16, 344:10, 345:2, 346:10, 348:15, 348:25, 351:11, 352:23, 353:11, 354:2, 354:8, 354:14, 355:11, 355:19, 357:7, 362:11, 362:12, 363:20, 370:15, 371:12, 382:18, 384:6, 384:9, 384:13, 386:17, 392:11, 398:3, 406:17, 407:7, 408:22, 409:21, 415:13, 433:11, 434:2, 434:3, 434:4, 441:8, 441:23, 449:2, 458:18, 458:23, 459:24, 465:4, 467:12, 472:17, 480:15, 480:25, 499:22, 517:14, 517:21, 525:18, 527:24, 528:4, 528:20, 536:9, 555:12, 563:14, 574:9, 577:21, 578:25, 596:23
**objections** [1] - 322:8
**obligation** [6] - 432:25, 433:9, 433:20, 556:3, 556:20, 561:23
**obligations** [1] - 561:12
**observe** [1] - 602:21
**obtain** [24] - 339:16, 340:11, 361:7, 361:24, 362:7, 364:18, 364:20, 364:21, 380:5, 387:17, 388:6, 388:8, 388:11, 388:15, 391:4, 438:22, 503:12, 504:6, 504:20, 505:5, 519:1, 531:9, 588:15
**obtained** [5] - 359:17, 388:20, 388:24,

**obtaining** [11] - 332:16, 340:15, 340:18, 364:2, 364:16, 376:13, 376:19, 377:1, 377:3, 452:2, 554:19
**obvious** [1] - 592:8
**obviously** [9] - 311:11, 318:17, 342:24, 379:15, 380:2, 394:20, 402:19, 555:17, 579:24
**occasion** [1] - 474:25
**occasions** [1] - 421:12
**occupation** [2] - 495:21, 537:13
**occur** [3] - 463:11, 470:22, 558:13
**occurred** [21] - 308:24, 316:9, 316:17, 352:7, 401:11, 404:9, 436:22, 437:8, 463:15, 463:24, 465:23, 466:4, 467:8, 490:10, 503:7, 503:8, 527:18, 576:7, 578:4, 580:23, 583:21
**occurs** [2] - 429:11, 463:1
**October** [1] - 576:18
**OF** [2] - 417:1, 417:9
**off-site** [1] - 529:5
**offer** [8] - 361:24, 362:1, 362:6, 399:23, 467:9, 467:19, 496:18, 506:11
**offered** [10] - 314:13, 398:21, 468:4, 468:7, 468:17, 505:14, 506:13, 507:24, 508:2, 531:21
**offering** [1] - 479:18
**offers** [1] - 602:19
**office** [44] - 307:19, 313:13, 315:5, 315:6, 316:17, 317:11, 318:9, 320:13, 320:21, 320:22, 321:1, 321:2, 323:14, 324:9, 325:1, 326:8, 334:5, 346:14, 399:2, 407:11, 412:22, 415:25, 442:16, 443:22, 445:2, 445:3, 462:5, 468:4, 469:7, 470:14, 472:4, 503:11, 503:21, 519:8, 527:23, 528:10, 528:15, 529:3, 529:9, 529:11, 532:19, 532:25, 533:12, 549:14
**offices** [22] - 310:23, 311:20, 313:24, 316:3, 318:24, 326:4, 333:24, 334:11, 341:16, 346:9, 358:19, 361:18, 365:18, 399:23, 409:10, 411:6, 411:22, 465:23, 467:19, 468:18, 516:23, 517:6
**Official** [1] - 417:24
**officially** [1] - 498:23
**old** [3] - 534:9, 571:11, 572:4
**older** [1] - 500:9
**omission** [1] - 394:17
**omitted** [2] - 423:8, 481:13
**on-site** [2] - 411:21
**once** [17] - 318:23, 318:24, 501:10, 530:25, 539:22, 543:6, 547:18, 556:8, 557:6, 563:22, 564:10, 565:5, 571:2, 573:5, 580:23, 587:7, 589:1
**One** [1] - 374:22
**one** [100] - 311:15, 316:12, 324:12, 331:10, 331:12, 336:3, 342:21, 369:1, 375:4, 376:1, 380:25, 385:25, 386:1, 390:9, 391:14, 391:17, 399:25, 402:21, 408:15, 411:18, 412:2, 412:11, 413:1, 413:25, 414:7, 414:10, 414:25, 415:17,

420:14, 421:24, 422:25, 424:19, 429:4, 429:7, 431:6, 433:25, 438:15, 440:1, 440:11, 458:10, 464:20, 466:23, 474:23, 474:25, 476:10, 482:10, 482:18, 483:3, 489:9, 489:11, 490:1, 490:12, 492:12, 501:24, 503:4, 511:25, 518:8, 519:15, 524:1, 524:4, 524:8, 526:2, 527:17, 534:25, 539:13, 541:3, 543:15, 545:17, 548:9, 555:19, 557:18, 560:2, 560:6, 562:6, 568:18, 568:20, 569:5, 570:1, 572:10, 574:25, 580:16, 582:19, 586:2, 587:19, 588:18, 590:11, 590:13, 590:15, 590:18, 590:20, 592:16, 593:11, 594:9, 595:7, 604:14, 605:12, 605:19
**ones** [5] - 397:15, 470:7, 517:11, 517:19, 605:9
**ongoing** [4] - 309:7, 309:19, 509:20, 510:15
**open** [5] - 307:1, 419:1, 446:14, 453:24, 498:5
**operated** [1] - 406:16
**operation** [3] - 318:15, 600:20
**opinion** [2] - 423:6, 431:19
**opponent** [1] - 396:5
**opportunity** [1] - 510:18
**opposed** [1] - 411:7
**opposing** [3] - 421:20, 451:10, 460:6
**opposition** [1] - 314:9
**option** [2] - 405:4, 405:8
**order** [45] - 312:17, 315:10, 328:22, 328:24, 328:25, 329:2, 331:24, 340:19, 380:18, 392:22, 396:10, 403:10, 404:1, 425:18, 425:20, 459:13, 481:2, 481:15, 509:3, 523:22, 523:23, 531:25, 532:3, 540:11, 540:15, 540:16, 540:18, 541:17, 542:2, 550:19, 554:12, 554:15, 555:23, 562:5, 564:10, 570:11, 570:12, 581:12, 581:17, 581:19, 586:8, 586:14, 586:19
**ordered** [1] - 524:16
**orders** [1] - 443:8
**ordinary** [2] - 436:23, 547:20
**original** [2] - 311:19, 450:2
**originally** [3] - 360:12, 479:6, 559:22
**otherwise** [3] - 459:16, 521:15, 524:11
**outside** [5] - 433:4, 485:23, 545:24, 555:2, 577:22
**Outside** [1] - 554:10
**overruled** [8] - 322:15, 345:2, 347:16, 363:23, 406:8, 434:2, 465:4, 525:18
**overseas** [1] - 402:6
**oversight** [1] - 422:17
**owe** [1] - 337:16
**owed** [2] - 337:21, 484:24
**own** [6] - 420:5, 430:2, 447:4, 467:3, 480:18, 512:13
**owned** [24] - 352:9, 352:13, 353:25, 355:8, 367:25, 368:16, 370:14, 373:10, 457:17, 467:5, 474:19, 475:9, 530:8, 530:12, 530:13, 530:16, 530:17,

530:20, 530:25, 531:2, 570:18, 571:16, 586:13

**owner** [5] - 539:12, 539:22, 557:6, 580:2, 586:5

**owners** [1] - 547:18

**ownership** [13] - 345:9, 352:22, 353:9, 370:8, 373:9, 373:17, 373:20, 387:6, 468:23, 570:23, 571:2, 594:2, 595:5

**owns** [4] - 368:2, 530:25, 571:17, 571:19

## P

**p.m** [6] - 385:6, 416:8, 417:8, 591:14, 606:13

**Packard** [4] - 408:5, 408:23, 500:7, 500:9

**pad** [1] - 412:11

**PAGE** [1] - 305:2

**page** [41] - 312:18, 320:18, 350:1, 376:10, 376:12, 377:9, 410:13, 429:20, 432:2, 432:13, 439:21, 440:8, 440:9, 440:21, 465:17, 465:18, 476:22, 495:8, 495:12, 495:13, 495:14, 510:20, 514:18, 514:24, 514:25, 515:16, 515:18, 516:12, 522:13, 535:8, 540:13, 541:2, 584:9, 584:18, 585:18, 591:6, 591:9, 591:11, 592:15, 592:17

**pages** [2] - 515:20, 579:19

**paid** [5] - 364:7, 364:10, 364:12, 420:4, 470:17

**pants** [1] - 342:5

**paper** [2] - 499:9, 500:18

**papers** [1] - 558:21

**paperwork** [1] - 558:23

**paragraph** [24] - 312:19, 320:19, 330:4, 374:14, 376:11, 376:12, 377:11, 377:14, 377:25, 412:10, 444:21, 454:12, 454:13, 454:14, 458:3, 465:18, 495:8, 495:12, 495:13, 495:14, 545:22, 584:19, 586:2

**parameters** [1] - 452:16

**pardon** [2] - 460:12, 478:12

**paren** [4] - 377:22, 388:1, 388:2

**parens** [3] - 484:9, 592:8

**Paresh** [21] - 311:9, 316:25, 333:6, 338:20, 340:10, 340:14, 373:22, 377:20, 381:24, 383:2, 390:6, 427:23, 434:24, 435:19, 438:7, 446:24, 447:13, 454:5, 469:10, 535:10, 535:24

**Paresh's** [1] - 402:6

**part** [45] - 309:19, 325:20, 326:2, 328:16, 329:6, 329:8, 342:20, 353:8, 353:14, 353:23, 353:24, 354:5, 357:18, 362:9, 365:7, 367:5, 371:19, 371:20, 377:25, 378:9, 381:1, 388:10, 398:20, 404:9, 405:3, 406:23, 407:5, 411:21, 415:8, 415:9, 428:2, 438:23, 496:16, 525:11, 528:17, 533:15, 535:18, 540:22, 559:21, 577:3, 587:12, 588:4, 589:11, 593:10

**partial** [1] - 420:20

**participate** [3] - 311:8, 311:10, 506:3

**participation** [1] - 580:16

**particular** [4] - 420:10, 507:24, 555:1, 580:24

**parties** [11] - 367:14, 367:17, 374:16, 392:18, 422:2, 423:14, 539:13, 555:18, 561:19, 582:15, 600:16

**partner** [4] - 428:21, 495:22, 544:25, 558:22

**parts** [1] - 510:16

**party** [17] - 350:8, 370:20, 380:8, 380:14, 389:15, 437:2, 446:3, 446:9, 460:23, 464:2, 528:2, 528:24, 561:22, 561:25, 562:6, 578:10, 598:12

**passage** [1] - 361:17

**passed** [2] - 334:3, 396:18

**passes** [1] - 459:12

**past** [1] - 497:18

**pause** [5] - 383:18, 384:12, 392:14, 402:23, 476:12

**pay** [8] - 457:16, 457:18, 457:19, 457:23, 458:8, 458:9, 458:13, 598:15

**paying** [2] - 438:14, 458:5

**payment** [1] - 473:20

**payoff** [2] - 594:2, 595:5

**PCs** [3] - 571:11, 572:5, 573:4

**pending** [2] - 428:16, 562:5

**Pendleton** [1] - 356:2

**people** [14] - 318:13, 345:15, 346:3, 346:6, 430:14, 488:24, 489:9, 496:25, 503:17, 521:17, 535:11, 552:21, 566:5, 566:10

**perfectly** [1] - 586:2

**perform** [2] - 498:8, 524:2

**performed** [2] - 496:19, 500:4

**performing** [1] - 497:11

**perhaps** [2] - 443:1, 510:6

**period** [20] - 343:24, 345:8, 379:3, 395:16, 396:25, 401:25, 402:2, 449:19, 452:6, 453:4, 469:12, 478:20, 488:6, 530:3, 541:20, 542:1, 555:12, 582:22, 586:3, 586:4

**periods** [1] - 521:16

**permit** [1] - 342:18

**permitted** [2] - 321:17, 345:11

**permitting** [1] - 586:2

**person** [6] - 308:6, 316:17, 331:14, 375:6, 397:18, 448:23

**person's** [1] - 564:17

**personal** [13] - 379:16, 407:4, 414:11, 527:13, 538:24, 538:25, 571:15, 577:3, 577:6, 577:9, 577:11, 577:16, 581:4

**personally** [7] - 322:17, 356:21, 357:4, 399:1, 508:4, 561:2, 588:5

**persons** [1] - 469:23

**perspective** [1] - 585:12

**pertained** [1] - 473:9

**phone** [24] - 315:13, 329:6, 339:25, 340:7, 340:8, 475:2, 475:3, 477:21, 487:12, 487:13, 487:17, 487:19, 490:4,

490:20, 493:2, 493:4, 505:2, 505:17, 505:22, 506:5, 506:6, 555:9, 569:22

**phoned** [1] - 504:15

**phonetic** [2] - 492:5, 496:9

**photograph** [1] - 412:12

**photographs** [10] - 412:17, 412:21, 412:23, 414:5, 414:22, 414:23, 414:25, 415:2, 415:6, 415:11

**physical** [3] - 341:15, 352:18, 564:9

**physically** [2] - 316:6, 424:15

**pick** [12] - 316:4, 361:8, 399:22, 505:7, 505:13, 506:12, 506:17, 508:5, 509:7, 525:17, 530:6, 544:13

**picking** [2] - 405:24, 414:11

**picture** [1] - 415:14

**pictures** [5] - 415:22, 415:24, 416:3, 416:4, 603:1

**piece** [4] - 449:7, 524:1, 524:3, 524:4

**pieces** [2] - 501:8, 501:24

**Piggee** [7] - 549:14, 550:12, 573:25, 574:1, 574:3, 574:17, 599:7

**place** [9] - 314:4, 314:13, 314:16, 315:15, 377:7, 399:3, 412:11, 503:22, 529:16, 538:18, 555:16, 559:19, 585:24

**placed** [2] - 314:22, 529:9

**plaintiff** [2] - 452:20, 457:1

**Plaintiff** [2] - 417:5, 417:13

**plaintiff's** [3] - 352:12, 389:23, 451:6

**plan** [2] - 435:13, 598:9

**planned** [1] - 436:15

**plans** [5] - 403:13, 404:6, 404:8, 404:20, 605:7

**pleadings** [6] - 400:16, 400:18, 401:3, 427:10, 451:16, 473:10

**pleasantries** [1] - 505:2

**point** [62] - 308:6, 313:10, 314:25, 315:7, 315:9, 321:20, 330:19, 331:10, 335:12, 343:5, 349:2, 357:4, 357:12, 361:11, 365:10, 366:12, 366:21, 367:8, 367:10, 367:22, 369:9, 375:7, 376:1, 376:2, 379:18, 379:21, 379:25, 390:9, 402:10, 403:18, 405:7, 405:9, 414:10, 421:15, 422:9, 429:4, 429:7, 438:5, 445:14, 445:17, 445:20, 447:14, 449:22, 454:21, 456:6, 471:22, 485:18, 489:11, 498:18, 501:15, 518:8, 523:2, 523:21, 540:21, 550:3, 556:22, 557:10, 570:24, 584:5, 586:19, 589:9, 598:2

**pointed** [2] - 480:4, 494:14

**points** [2] - 507:8, 605:16

**poor** [1] - 600:21

**portion** [8] - 336:11, 548:21, 549:1, 550:21, 567:22, 580:20, 582:24, 589:4

**posed** [1] - 505:4

**position** [9] - 336:5, 442:7, 537:20, 561:10, 561:13, 571:1, 571:19, 586:13, 586:15

**possessed** [1] - 475:7

**possession** [30] - 333:18, 334:19, 350:21, 351:3, 353:5, 353:21, 359:1, 373:10, 374:5, 374:18, 378:3, 382:16,

389:16, 391:4, 391:20, 391:23, 392:1, 392:3, 471:23, 472:5, 472:24, 553:15, 564:9, 582:21, 582:23, 584:10, 585:7, 585:10, 586:24, 587:2

**possessions** [1] - 437:3

**possibilities** [1] - 582:19

**possibility** [1] - 333:22

**possible** [12] - 311:23, 311:24, 331:12, 336:8, 336:24, 374:23, 375:22, 535:15, 555:6, 555:8, 585:2

**potential** [4] - 482:14, 482:16, 492:25, 598:22

**potentially** [1] - 560:3

**practically** [2] - 340:16, 592:15

**practice** [1] - 477:24

**practices** [1] - 483:7

**practicing** [1] - 497:15

**precipitated** [2] - 459:23, 460:13

**precise** [2] - 407:13, 539:11

**precisely** [1] - 423:10

**premises** [4] - 382:4, 437:2, 535:24, 539:24

**preparation** [1] - 357:19

**prepare** [1] - 400:20

**prepared** [5] - 454:8, 493:4, 509:23, 579:23, 598:1

**preparing** [2] - 325:15, 400:23

**preprinted** [1] - 421:25

**presence** [1] - 399:14

**present** [15] - 310:25, 311:10, 311:21, 319:7, 466:5, 503:16, 504:7, 506:6, 506:8, 519:17, 528:11, 528:14, 528:15, 529:13, 592:8

**presented** [1] - 491:16

**preservation** [8] - 309:5, 420:19, 424:17, 425:2, 425:15, 426:1, 561:12, 562:4

**preserve** [52] - 308:18, 308:21, 309:2, 309:7, 309:16, 309:18, 309:23, 312:11, 319:23, 320:5, 347:15, 347:18, 348:13, 396:10, 420:17, 421:11, 428:1, 428:20, 433:1, 433:10, 433:21, 434:6, 437:17, 485:15, 485:25, 486:21, 487:23, 543:21, 544:1, 546:1, 546:6, 546:12, 546:16, 546:21, 546:25, 547:15, 548:14, 548:23, 550:22, 551:6, 551:22, 561:23, 562:1, 562:6, 563:13, 563:25, 564:7, 567:17, 583:8, 596:19, 596:20, 597:7

**preserved** [1] - 349:4

**preserving** [3] - 543:17, 545:18, 561:15

**press** [2] - 341:25, 447:2

**pressed** [1] - 342:2

**pressing** [3] - 331:19, 332:7, 342:8

**pressured** [1] - 344:5

**presume** [3] - 380:23, 443:6, 518:24

**pretty** [6] - 380:10, 414:10, 534:15, 605:11, 605:12, 605:14

**prevent** [4] - 315:24, 420:20, 421:1, 547:20

**previous** [3] - 323:6, 422:13, 508:10

**previously** [4] - 356:14, 377:18, 379:11, 511:19

**price** [4] - 479:7, 558:15, 584:25, 596:11

**primarily** [2] - 567:15, 581:4

**primary** [8] - 308:9, 498:13, 542:9, 560:16, 588:18, 588:21, 600:21, 601:3

**priority** [3] - 333:15, 378:3, 378:8

**privilege** [2] - 544:4, 556:17

**problem** [19] - 314:11, 315:8, 341:21, 342:13, 343:18, 344:9, 392:23, 392:24, 393:1, 393:2, 393:10, 423:10, 489:14, 504:11, 505:6, 505:21, 524:24, 531:5, 604:23

**problematic** [1] - 473:22

**procedures** [1] - 315:22

**proceed** [1] - 396:6

**proceeding** [1] - 429:21

**proceedings** [5] - 307:1, 371:10, 419:1, 544:23, 572:19

**PROCEEDINGS** [1] - 417:9

**process** [8] - 325:14, 360:6, 406:24, 407:2, 407:6, 501:10, 511:2, 587:4

**produce** [5] - 309:4, 329:12, 329:13, 329:18, 331:24, 332:11, 516:2, 524:17

**produced** [4] - 330:4, 452:20, 452:21, 593:10

**producing** [3] - 329:4, 329:9, 332:1

**production** [21] - 313:18, 343:3, 343:7, 357:13, 357:16, 357:19, 393:17, 393:18, 401:14, 404:9, 420:15, 443:12, 443:13, 444:3, 444:15, 447:22, 447:24, 449:19, 593:10, 593:18

**productions** [1] - 343:6

**professional** [2] - 398:11, 537:23

**promise** [2] - 334:10, 334:14

**prompted** [1] - 460:6

**proper** [1] - 523:24

**properly** [1] - 523:23

**properties** [1] - 587:1

**property** [16] - 461:21, 464:2, 539:12, 539:15, 539:22, 571:5, 571:15, 578:15, 581:3, 581:4, 586:5, 586:8, 586:13, 586:22, 586:25, 587:7

**proposal** [1] - 338:7

**proposed** [1] - 551:11

**proprietary** [2] - 560:4, 560:22

**prospective** [1] - 345:25

**protect** [4] - 396:16, 396:19, 487:21, 596:6

**protected** [1] - 556:11

**protocol** [1] - 559:19

**protocols** [1] - 315:22

**provide** [24] - 328:22, 331:20, 336:8, 336:23, 354:20, 354:23, 354:24, 354:25, 366:25, 422:3, 446:21, 499:12, 503:12, 513:24, 531:10, 532:7, 532:14, 533:17, 554:14, 554:18, 556:2, 556:6, 574:2

**provided** [15] - 314:8, 326:16, 326:25,

389:21, 427:10, 455:4, 502:13, 504:13, 507:16, 517:12, 519:10, 554:23, 557:23, 559:24, 560:1

**providing** [6] - 455:2, 513:11, 514:15, 554:19, 554:24, 561:18

**proximity** [1] - 557:8

**published** [3] - 497:3, 497:6, 497:9

**publisher** [1] - 497:8

**pull** [2] - 478:19, 501:19

**purchase** [22] - 367:5, 385:9, 390:8, 390:11, 448:8, 538:21, 555:18, 585:1, 590:2, 590:8, 595:8, 595:13, 596:7, 596:10, 596:11, 596:20, 597:8, 598:2, 600:17, 601:13, 602:1

**purchased** [2] - 438:14, 538:23

**purchasing** [3] - 365:2, 560:17, 596:24

**purported** [1] - 580:8

**purports** [1] - 431:18

**purpose** [11] - 311:14, 366:6, 392:19, 443:6, 444:2, 522:14, 525:14, 549:17, 560:16, 580:1, 581:9

**purposes** [3] - 467:20, 538:16, 549:4

**pursuant** [2] - 539:23, 571:13, 593:10

**push** [1] - 449:15

**put** [12] - 317:19, 401:22, 413:13, 421:16, 422:4, 432:2, 505:3, 525:15, 526:24, 529:13, 544:10, 594:9

## Q

**qualifications** [5] - 409:17, 409:19, 497:14, 499:14, 500:6

**qualified** [4] - 408:19, 408:20, 409:20, 517:2

**quarter** [1] - 604:22

**QUESTION** [1] - 477:7

**questioning** [4] - 347:9, 494:15, 494:17, 525:6

**questions** [57] - 328:13, 332:4, 335:20, 335:24, 336:4, 336:7, 337:2, 348:4, 358:15, 361:16, 361:19, 368:24, 368:25, 372:11, 373:17, 395:16, 395:19, 398:10, 398:14, 400:12, 405:22, 405:25, 406:22, 406:24, 408:12, 409:8, 410:5, 414:5, 425:24, 445:16, 453:7, 466:23, 476:13, 478:9, 478:14, 478:18, 483:22, 488:2, 491:20, 506:24, 510:17, 527:7, 527:17, 536:18, 550:25, 577:22, 583:5, 584:1, 589:14, 591:2, 592:6, 602:7, 603:5, 603:6, 605:10

**quick** [6] - 434:22, 494:3, 498:11, 565:15, 565:17, 566:11

**quickly** [4] - 533:4, 565:14, 583:1, 583:4

**quiet** [1] - 544:8

**quite** [6] - 334:7, 451:14, 463:21, 473:17, 534:14, 534:18

**quitting** [2] - 450:6, 450:7

**quote** [8] - 359:7, 374:15, 383:8, 462:8, 520:18, 586:3, 586:4, 587:25

**quoted** [3] - 429:18, 525:4, 525:11

# R

**racking** [3] - 405:15, 406:15, 589:7
**radar** [1] - 342:24
**raise** [3] - 567:10, 588:5, 598:18, 598:21
**raised** [10] - 308:5, 335:24, 371:8, 373:17, 373:19, 374:14, 378:19, 381:22, 402:12, 527:19
**raising** [3] - 343:24, 369:11, 370:25
**rambling** [1] - 502:19
**ran** [1] - 405:14
**range** [1] - 497:20
**ranges** [1] - 452:16
**rapidly** [1] - 383:19
**rather** [4] - 394:16, 457:1, 510:7, 515:7
**Ravenswood** [1] - 417:20
**re** [7] - 405:4, 481:6, 485:21, 485:24, 545:25, 567:14, 591:13
**re-acquire** [4] - 485:21, 485:24, 545:25, 567:14
**re-ask** [1] - 481:6
**re-lease** [1] - 405:4
**reach** [1] - 582:9
**reached** [2] - 445:14, 499:4
**reaction** [2] - 476:25, 481:16
**read** [80] - 322:3, 322:5, 322:16, 336:20, 336:21, 341:10, 344:15, 344:16, 344:17, 345:3, 347:2, 347:5, 349:12, 357:18, 358:4, 369:17, 371:22, 371:23, 422:10, 423:20, 423:24, 426:25, 430:3, 431:8, 431:25, 432:9, 432:10, 439:5, 439:7, 439:14, 439:16, 443:4, 448:3, 448:5, 462:10, 464:13, 464:15, 476:24, 480:21, 483:12, 483:13, 483:15, 483:16, 484:14, 484:16, 485:19, 499:8, 512:9, 517:18, 517:25, 520:16, 522:17, 522:19, 523:7, 523:9, 523:11, 523:16, 524:22, 524:25, 525:19, 525:20, 546:3, 547:10, 547:12, 551:10, 551:16, 551:24, 551:25, 552:1, 558:5, 563:4, 568:5, 568:7, 570:2, 570:4, 592:9, 592:19, 593:22, 597:3, 597:5
**reader** [2] - 327:13, 327:16
**reading** [7] - 338:13, 429:25, 522:23, 536:5, 536:15, 565:24, 566:2
**ready** [5] - 329:13, 508:4, 536:24, 537:2, 603:5
**real** [5] - 496:11, 496:20, 571:15, 580:20, 580:25
**realize** [1] - 436:19
**realized** [1] - 438:2
**really** [25] - 315:19, 331:4, 395:9, 413:13, 413:25, 419:7, 420:1, 422:7, 423:11, 423:24, 441:16, 444:14, 446:8, 449:6, 449:18, 455:9, 455:13, 459:7, 470:17, 483:13, 523:4, 523:12, 525:1, 600:24, 605:22

**reason** [30] - 311:20, 318:18, 329:6, 342:6, 342:16, 359:18, 364:17, 381:19, 381:21, 384:4, 393:22, 403:21, 404:7, 404:21, 446:24, 449:5, 507:20, 520:24, 552:15, 571:12, 586:17, 588:22, 588:23, 591:16, 596:4, 596:5, 599:23, 601:12, 601:16
**reasonable** [9] - 345:17, 345:19, 345:20, 345:23, 345:24, 346:2, 420:20, 433:7, 437:1
**reasonably** [3] - 327:14, 523:5, 523:13
**reasons** [3] - 511:25, 588:18, 592:8
**recalled** [2] - 575:19, 603:23
**receive** [5] - 566:15, 574:8, 576:9, 576:11, 584:4
**received** [19] - 325:2, 337:25, 350:18, 353:19, 397:22, 410:24, 415:6, 452:19, 459:25, 463:16, 484:14, 551:12, 552:7, 552:19, 556:8, 563:19, 563:20, 583:6, 598:3
**receiving** [6] - 327:22, 335:21, 455:7, 543:3, 545:19
**recently** [2] - 496:8, 571:10
**recipient** [1] - 397:18
**recollected** [1] - 329:8
**recollection** [26] - 312:6, 313:10, 330:9, 339:20, 354:20, 354:23, 354:25, 355:1, 358:20, 381:4, 408:6, 431:22, 460:8, 484:16, 510:10, 515:24, 516:1, 539:12, 540:14, 540:22, 541:10, 543:21, 574:19, 578:14, 583:16, 583:18
**recommend** [2] - 389:5, 508:12
**record** [44] - 307:11, 310:1, 312:16, 316:24, 318:3, 320:16, 322:5, 327:1, 329:3, 329:25, 336:1, 336:21, 339:10, 340:2, 341:10, 344:17, 345:3, 347:5, 349:12, 371:23, 429:23, 432:3, 434:23, 435:17, 439:7, 439:14, 440:18, 448:5, 464:15, 477:3, 483:16, 492:6, 494:16, 495:5, 512:18, 517:25, 520:8, 524:25, 525:20, 547:12, 552:1, 558:5, 570:4, 597:5
**Record** [4] - 322:16, 517:18, 563:4, 568:7
**records** [6] - 401:8, 436:24, 492:10, 580:6, 582:25, 583:2
**Recourse** [1] - 495:22
**recover** [2] - 513:12, 513:24
**recovery** [2] - 498:1, 509:19, 510:14
**RECROSS** [12] - 305:12, 305:14, 305:16, 305:18, 306:1, 306:3, 404:13, 408:17, 414:2, 415:20, 483:25, 491:11
**RECROSS-EXAMINATION** [12] - 305:12, 305:14, 305:16, 305:18, 306:1, 306:3, 404:13, 408:17, 414:2, 415:20, 483:25, 491:11
**red** [2] - 377:23, 397:8
**redirect** [3] - 403:1, 405:20, 483:20
**REDIRECT** [2] - 305:10, 403:4
**reduced** [1] - 419:25
**refer** [5] - 376:1, 394:2, 410:6, 491:13,

537:17
**reference** [10] - 327:10, 327:13, 349:24, 368:21, 386:23, 414:10, 507:22, 525:5, 546:7, 546:13
**referenced** [5] - 329:1, 356:1, 367:24, 485:12, 502:13
**references** [5] - 374:13, 385:8, 385:20, 385:22, 387:25
**referencing** [2] - 369:18, 452:5
**referred** [6] - 340:3, 412:3, 430:24, 438:8, 456:7, 508:9
**referring** [28] - 336:3, 350:1, 355:10, 369:16, 385:25, 430:17, 431:1, 431:5, 441:21, 442:22, 457:12, 465:22, 486:19, 503:2, 516:19, 516:20, 516:25, 517:4, 517:10, 518:25, 521:25, 535:13, 535:14, 536:3, 544:5, 546:8, 547:25, 596:24
**refers** [1] - 431:14
**reflect** [1] - 492:6
**reflected** [1] - 340:12
**reflects** [2] - 342:22, 393:14
**reforwarding** [1] - 377:13
**refrain** [1] - 419:6
**refresh** [7] - 330:9, 381:4, 408:6, 491:22, 492:20, 492:22, 586:11
**refreshes** [6] - 493:9, 493:12, 515:10, 540:14, 540:22, 541:10
**refusal** [1] - 585:12
**refused** [4] - 380:17, 584:20, 584:22, 586:21
**refusing** [1] - 457:16
**regard** [9] - 308:13, 309:4, 367:12, 369:12, 497:24, 503:7, 511:3, 520:18, 575:18
**regarding** [37] - 315:22, 326:19, 338:6, 353:2, 371:16, 373:9, 374:2, 414:4, 425:15, 451:7, 469:8, 492:20, 492:22, 504:3, 506:24, 507:14, 509:19, 510:14, 511:18, 515:19, 518:8, 543:11, 543:14, 544:23, 547:5, 548:25, 549:24, 554:14, 554:19, 556:2, 556:6, 557:22, 567:10, 569:13, 575:5, 581:23, 592:3
**regards** [4] - 386:24, 512:4, 513:11, 516:13
**register** [1] - 482:6
**registered** [1] - 433:5
**regular** [1] - 387:13
**regularly** [1] - 601:17
**reiterate** [1] - 318:1
**reiterated** [1] - 387:19
**rejected** [2] - 400:3, 400:4
**related** [9] - 344:18, 344:20, 347:8, 427:14, 462:7, 497:20, 553:3, 558:21, 563:20
**relates** [1] - 482:12
**relating** [2] - 349:6, 597:13
**relationship** [3] - 308:13, 314:10, 321:19, 322:24, 342:17, 343:25, 482:1, 482:8, 482:18, 490:9, 527:12, 527:13, 537:23

**release** [5] - 340:19, 400:25, 435:3, 577:16, 589:10
**released** [6] - 400:25, 406:23, 407:5, 577:4, 577:10, 577:11
**releasing** [1] - 395:5
**relet** [2] - 405:8, 405:11
**relevance** [1] - 449:2
**relevancy** [1] - 346:10
**relevant** [11] - 420:17, 421:8, 452:6, 485:22, 544:3, 552:12, 553:15, 560:19, 561:20, 596:14, 601:9
**reliance** [2] - 369:9, 380:6
**relied** [1] - 391:4
**relying** [7] - 322:23, 323:2, 323:9, 323:11, 440:25, 525:12
**remainder** [1] - 581:1
**remains** [1] - 334:20
**remarks** [1] - 507:16
**remedies** [1] - 396:11
**remember** [80] - 312:10, 326:11, 328:14, 328:18, 329:3, 343:8, 355:16, 361:19, 368:18, 368:25, 377:2, 399:25, 406:3, 414:17, 414:18, 414:19, 415:2, 415:6, 415:8, 427:16, 428:4, 439:23, 439:24, 441:14, 442:25, 455:13, 455:14, 465:8, 465:9, 467:10, 478:22, 489:15, 505:8, 519:9, 519:10, 526:14, 529:17, 529:18, 529:23, 530:23, 530:24, 540:10, 543:15, 545:4, 554:13, 554:17, 554:22, 555:1, 555:24, 555:25, 564:17, 566:24, 567:2, 567:6, 568:16, 569:22, 570:3, 570:12, 570:19, 570:20, 570:22, 576:17, 577:6, 577:8, 580:13, 581:2, 582:1, 583:23, 584:6, 587:22, 587:25, 588:9, 589:24, 591:19, 593:11, 599:22, 600:2, 600:4, 600:12
**remote** [1] - 535:14
**remove** [4] - 437:10, 457:25, 560:3, 586:4
**removed** [2] - 355:5, 465:7
**removing** [1] - 315:23
**rent** [2] - 458:5, 458:9
**reopen** [2] - 429:11, 430:19
**repair** [12] - 311:7, 311:11, 311:14, 311:22, 313:15, 319:16, 398:22, 407:13, 443:11, 443:13, 499:5, 499:18
**repaired** [1] - 447:20
**repairman** [1] - 408:21
**repay** [2] - 485:24, 545:25
**repayment** [1] - 594:1
**repeat** [8] - 345:1, 375:12, 450:12, 453:8, 521:5, 536:13, 552:25, 558:4
**repeated** [7] - 344:23, 344:24, 349:10, 482:10, 508:21, 558:1
**repeatedly** [6] - 350:24, 363:12, 396:23, 446:20, 472:1, 508:14
**rephrase** [3] - 441:22, 563:8, 574:5
**reply** [1] - 381:23
**report** [7] - 337:9, 351:8, 351:16, 397:1, 445:10, 446:17, 494:24
**reported** [2] - 337:10, 337:12

**REPORTER** [2] - 526:11, 563:1
**reporter** [3] - 496:12, 537:10, 565:25
**Reporter** [2] - 417:23, 417:24
**reporting** [1] - 509:19
**reports** [2] - 575:13, 599:13
**repossess** [14] - 368:24, 370:6, 370:7, 371:4, 372:4, 372:14, 372:17, 373:2, 373:5, 402:13, 474:1, 474:4, 582:5, 585:2
**repossessed** [2] - 395:2, 474:6
**repossession** [7] - 310:4, 371:16, 371:21, 371:25, 389:15, 566:22, 567:4
**represent** [12] - 360:7, 398:4, 400:6, 426:20, 452:18, 491:18, 529:20, 533:9, 533:19, 537:25, 538:1, 585:4
**representation** [9] - 308:24, 310:10, 310:13, 394:4, 431:14, 431:15, 443:25, 444:4, 494:15
**representations** [6] - 334:13, 344:3, 423:5, 507:13, 522:10, 557:11
**representative** [7] - 311:5, 314:7, 407:10, 467:9, 467:13, 544:24, 586:7
**representatives** [3] - 469:22, 507:10, 507:13
**represented** [18] - 325:25, 327:5, 334:4, 414:13, 414:14, 426:13, 441:13, 442:15, 530:16, 530:18, 530:20, 538:13, 538:15, 538:17, 538:19, 552:11, 583:12, 583:14
**representing** [6] - 396:14, 444:6, 444:8, 449:8, 542:10, 568:21
**request** [13] - 331:23, 338:5, 369:21, 370:18, 394:5, 451:19, 473:10, 486:19, 545:17, 551:5, 567:17, 575:6, 591:20
**requesting** [1] - 396:23
**requests** [5] - 370:5, 451:20, 451:25, 469:24, 471:15
**require** [4] - 332:5, 332:11, 413:2, 500:9
**required** [4] - 328:22, 499:5, 509:3, 524:1
**requiring** [1] - 550:18
**rescheduled** [1] - 499:6
**research** [3] - 308:4, 400:18, 457:4
**reserved** [1] - 348:22
**residing** [1] - 484:7
**resolution** [1] - 337:18
**resolve** [5] - 350:7, 367:21, 385:22, 386:7, 484:8
**resolved** [1] - 332:3
**resources** [1] - 411:5
**respect** [31] - 309:7, 309:22, 313:14, 313:18, 315:2, 352:18, 360:13, 366:22, 369:23, 370:6, 372:10, 380:8, 393:17, 393:18, 403:24, 408:19, 462:6, 462:20, 464:5, 469:18, 517:8, 545:18, 547:23, 548:19, 561:23, 567:16, 575:23, 586:17, 593:18
**respond** [16] - 330:18, 331:17, 334:1, 335:8, 335:21, 335:23, 336:6, 336:10, 336:12, 338:10, 347:23, 470:4, 548:21,

548:25, 550:9, 553:3
**responded** [11] - 332:4, 335:19, 344:4, 369:6, 369:9, 369:22, 373:1, 394:5, 459:18, 470:1
**Respondents** [2] - 304:2, 418:2
**respondents** [8] - 494:2, 495:15, 525:9, 562:14, 562:17, 563:9, 563:12, 563:16
**respondents'** [1] - 422:14
**responding** [2] - 369:22, 469:24
**Response** [1] - 338:11
**response** [20] - 312:17, 323:7, 325:2, 335:12, 336:8, 336:24, 338:1, 370:4, 377:2, 389:16, 402:7, 406:22, 445:15, 459:20, 459:25, 504:10, 506:20, 550:7, 581:22, 581:25
**responses** [4] - 336:14, 336:23, 337:2, 337:18
**responsibilities** [1] - 389:13
**responsible** [6] - 348:1, 349:4, 420:10, 420:14, 420:15, 469:17
**rest** [1] - 444:23
**restoration** [1] - 498:1
**result** [5] - 315:17, 352:20, 556:18, 595:9, 596:12
**resume** [1] - 488:7
**resumed** [2] - 507:2, 507:3
**retained** [9] - 401:5, 401:10, 411:24, 497:24, 498:23, 498:24, 505:24, 527:10, 600:22
**return** [4] - 565:3, 566:18, 567:8, 567:18
**returned** [2] - 402:3, 402:6
**reveal** [1] - 502:11
**review** [7] - 330:18, 335:9, 338:10, 357:11, 455:10, 551:12
**reviewed** [2] - 357:9, 489:1
**reviewing** [2] - 354:19, 411:5
**Rick** [2] - 584:8, 584:16
**right-hand** [1] - 377:9
**Road** [4] - 454:16, 461:18, 461:23, 475:16
**Robert** [1] - 549:13
**Roche's** [1] - 452:19
**role** [3] - 419:25, 473:3, 604:4
**rolled** [1] - 423:14
**room** [12] - 311:9, 313:3, 313:4, 313:6, 313:14, 315:14, 319:15, 392:16, 500:24, 506:4, 513:15, 573:15
**routine** [1] - 572:3
**RPR** [1] - 417:23
**Rule** [1] - 489:5
**rules** [2] - 510:7, 510:9
**ruling** [1] - 347:23
**run** [1] - 589:7
**running** [1] - 318:14
**runs** [1] - 424:7
**rush** [3] - 393:11, 393:13, 496:11
**Rutgers** [1] - 496:23
**RYLKO** [1] - 417:15

# S

**S-e-r-r-i-t-e-l-l-a** [1] - 537:12
**safe** [1] - 510:7
**safely** [1] - 315:23
**sale** [8] - 396:10, 557:9, 558:13, 568:1, 569:3, 569:13, 570:14, 582:14
**sanction** [2] - 347:9, 525:8
**sanctioned** [2] - 423:14, 525:10
**sanctions** [1] - 543:23
**satisfaction** [1] - 332:13
**satisfied** [1] - 556:19
**Saturday** [1] - 532:16
**save** [2] - 593:21, 593:24
**saw** [15] - 364:9, 421:24, 422:15, 423:4, 425:20, 426:25, 480:22, 517:5, 517:20, 572:10, 593:9, 593:12, 593:14, 593:16, 593:18
**scattered** [1] - 573:15
**scheduling** [1] - 372:25
**scheme** [1] - 395:5
**Schlifke** [1] - 544:25
**Schreiber** [8] - 426:7, 426:12, 426:17, 426:19, 427:1, 434:23, 456:13, 470:2
**science** [1] - 496:22
**scope** [6] - 348:18, 406:19, 527:1, 536:8, 577:22, 578:25
**Scott** [3] - 426:12, 426:19, 434:23
**search** [3] - 523:5, 523:13, 526:4
**searching** [2] - 523:6, 523:14
**Seattle** [3] - 392:20, 399:8, 399:9
**second** [26] - 320:18, 331:4, 348:21, 371:19, 372:23, 374:14, 376:10, 384:8, 402:21, 410:14, 414:22, 441:15, 454:12, 454:13, 454:14, 457:13, 458:20, 458:22, 478:11, 569:2, 570:1, 581:15, 585:18, 591:6, 591:9
**secondary** [1] - 588:23
**section** [1] - 431:14
**secure** [15] - 313:25, 320:20, 320:25, 321:6, 321:10, 321:21, 323:1, 323:10, 323:12, 333:18, 346:8, 378:3, 421:7, 547:18, 573:4
**secured** [6] - 347:1, 374:17, 539:15, 580:25, 581:3, 585:4
**securely** [2] - 321:16, 346:4
**securing** [1] - 321:3
**security** [7] - 458:15, 458:25, 459:5, 547:20, 580:8, 580:9, 580:14
**Security** [1] - 497:19
**see** [62] - 312:23, 327:21, 328:13, 349:17, 350:15, 356:21, 362:1, 374:19, 374:24, 376:16, 378:6, 382:5, 393:2, 395:9, 410:14, 413:9, 415:9, 422:6, 422:11, 422:15, 423:18, 423:21, 425:20, 427:24, 428:23, 428:25, 429:24, 432:5, 445:22, 447:15, 454:16, 454:18, 454:19, 454:20, 454:23, 457:11, 465:20, 465:21, 477:10, 484:10, 485:17, 486:2, 493:8, 501:1,

502:4, 505:11, 511:10, 514:4, 514:16, 515:10, 515:16, 535:20, 536:1, 540:22, 545:11, 546:4, 568:23, 579:5, 579:22, 584:11, 585:21, 586:9, 591:11, 591:15, 603:1, 603:14
**seeing** [2] - 411:7, 593:8
**seek** [3] - 374:18, 396:10, 597:22
**sell** [12] - 345:22, 556:4, 556:7, 556:24, 557:3, 557:7, 557:15, 557:23, 558:7, 573:9, 582:13, 602:19
**selling** [5] - 559:14, 559:17, 598:4, 598:23
**send** [16] - 381:16, 397:22, 457:11, 459:8, 486:5, 533:22, 550:8, 551:11, 551:14, 562:10, 562:14, 562:17, 566:25, 575:23, 599:16, 599:19
**sending** [6] - 339:4, 413:12, 447:12, 454:6, 482:13, 551:21
**sends** [1] - 459:11
**senior** [1] - 552:21
**sense** [4] - 425:11, 447:9, 448:7, 522:1
**sent** [24] - 309:17, 309:20, 310:7, 328:6, 330:11, 335:1, 340:24, 342:4, 342:8, 363:7, 365:10, 369:5, 369:8, 369:10, 389:9, 391:6, 396:22, 397:14, 397:15, 397:19, 402:3, 402:10, 424:16, 427:5, 442:25, 461:12, 479:14, 482:15, 543:19, 544:19, 544:21, 544:23, 544:25, 545:3, 545:8, 545:11, 552:8, 561:22, 561:25, 562:12, 574:1, 579:23, 585:19, 603:11, 603:12
**sentence** [7] - 431:25, 454:20, 462:15, 462:17, 466:3, 466:11, 545:21
**sentences** [1] - 593:25
**separate** [3] - 367:16, 384:25, 420:5
**separately** [1] - 420:4
**September** [5] - 447:23, 452:15, 569:19, 576:18, 593:16
**sequestering** [1] - 421:7
**series** [1] - 442:19
**Serritella** [31] - 390:7, 425:21, 459:11, 459:21, 460:7, 460:14, 463:3, 463:17, 465:2, 480:4, 485:13, 485:15, 486:5, 486:16, 537:1, 537:7, 537:11, 545:9, 565:22, 565:23, 566:5, 566:9, 566:13, 573:24, 585:19, 589:20, 591:7, 603:16, 603:21, 603:24, 603:25
**SERRITELLA** [7] - 306:11, 306:13, 306:15, 537:5, 573:22, 589:18, 604:7
**serve** [3] - 495:25, 512:2, 574:19
**served** [2] - 563:23, 578:16
**server** [482] - 310:17, 311:15, 311:18, 311:22, 312:4, 312:11, 312:13, 312:21, 313:15, 313:22, 314:11, 315:5, 315:23, 316:2, 316:17, 317:10, 317:17, 318:6, 318:9, 318:20, 318:22, 318:24, 319:1, 319:2, 319:17, 319:23, 320:7, 324:3, 324:9, 324:21, 325:5, 325:19, 326:10, 326:20, 327:17, 327:24, 329:1, 329:4, 329:23, 330:17, 330:19, 331:1, 331:5, 331:7, 331:11, 331:13, 332:16, 332:19,

333:8, 333:11, 333:14, 333:23, 334:4, 334:11, 334:16, 334:20, 335:2, 335:9, 335:14, 336:15, 337:3, 337:8, 338:6, 339:1, 339:17, 340:11, 340:23, 341:16, 342:1, 342:18, 343:19, 346:4, 346:16, 348:14, 349:4, 349:21, 350:8, 350:21, 350:24, 351:3, 351:6, 351:10, 351:17, 351:18, 351:21, 351:25, 355:15, 355:23, 356:5, 356:9, 356:24, 357:3, 357:6, 357:22, 358:1, 358:5, 358:6, 358:10, 358:17, 358:18, 358:22, 359:1, 359:9, 359:16, 360:18, 361:7, 361:17, 361:25, 362:7, 362:17, 362:19, 362:24, 363:16, 363:19, 364:2, 364:16, 364:18, 364:20, 364:22, 365:2, 365:4, 365:14, 365:17, 366:3, 366:9, 366:14, 366:23, 367:1, 367:6, 367:12, 367:15, 367:23, 367:25, 368:3, 368:16, 368:25, 369:12, 369:15, 369:23, 371:9, 371:17, 373:14, 374:6, 374:23, 375:2, 375:3, 375:5, 375:6, 375:8, 375:11, 375:19, 376:13, 376:19, 377:1, 377:4, 378:5, 378:10, 379:8, 379:12, 379:16, 379:19, 380:1, 380:5, 380:14, 380:21, 383:5, 383:13, 384:1, 384:5, 384:20, 385:11, 387:5, 387:6, 387:15, 387:18, 387:19, 388:6, 388:8, 388:11, 388:16, 388:21, 388:24, 389:2, 389:6, 390:5, 390:8, 390:11, 390:23, 391:1, 391:4, 391:20, 391:23, 392:1, 392:3, 392:6, 392:10, 395:1, 395:6, 395:8, 395:18, 395:20, 395:21, 397:1, 398:18, 399:2, 399:21, 399:22, 403:10, 405:14, 405:24, 407:15, 408:4, 408:19, 408:22, 408:25, 409:5, 409:9, 410:18, 410:21, 413:4, 414:25, 415:11, 415:14, 415:23, 416:4, 430:24, 430:25, 431:2, 431:5, 431:7, 431:23, 436:2, 436:5, 437:17, 437:20, 438:3, 438:6, 443:12, 443:14, 444:2, 444:5, 444:10, 444:16, 444:20, 444:21, 445:3, 445:19, 446:4, 446:9, 446:14, 446:22, 447:10, 447:17, 448:8, 448:17, 453:2, 453:16, 454:16, 454:24, 455:15, 455:24, 456:1, 456:7, 456:10, 461:13, 461:17, 462:20, 464:5, 465:6, 465:11, 466:1, 466:7, 466:14, 466:16, 466:21, 467:21, 468:4, 468:19, 470:14, 471:16, 471:20, 471:24, 472:6, 474:1, 474:4, 474:6, 474:9, 474:14, 475:7, 475:12, 475:15, 475:18, 475:23, 476:2, 476:7, 477:17, 478:3, 481:17, 487:23, 489:20, 490:4, 493:5, 495:2, 498:2, 499:4, 500:12, 500:24, 500:25, 501:10, 502:12, 502:15, 502:16, 503:6, 503:12, 505:6, 505:16, 506:12, 506:18, 506:24, 507:5, 507:18, 508:5, 508:15, 509:4, 509:20, 510:14, 511:13, 511:17, 513:9, 513:12, 513:13, 513:25, 516:7, 518:9, 518:17, 518:19, 519:1, 519:7, 519:22, 520:14, 522:2, 527:20, 528:14, 528:18, 528:22, 529:5, 530:6, 531:20, 532:18, 532:24, 536:4, 538:21, 543:11, 543:14, 543:21,

543:22, 544:1, 544:2, 545:18, 546:13, 546:16, 546:21, 546:25, 547:6, 547:16, 548:1, 548:4, 548:8, 548:11, 548:15, 548:19, 548:23, 549:4, 549:22, 550:11, 550:16, 550:19, 550:23, 551:6, 551:23, 552:11, 553:15, 554:3, 554:12, 554:16, 554:20, 555:11, 555:16, 555:19, 556:3, 556:7, 556:20, 557:11, 557:15, 557:24, 558:7, 558:9, 558:24, 559:6, 559:7, 559:14, 559:17, 560:4, 560:7, 560:11, 560:18, 560:23, 561:1, 561:2, 561:6, 562:12, 562:15, 562:18, 563:13, 564:1, 564:7, 564:9, 564:13, 565:3, 566:18, 566:22, 567:4, 567:8, 568:1, 568:25, 569:13, 569:16, 569:24, 570:7, 570:11, 570:23, 571:2, 574:2, 574:8, 574:12, 575:6, 575:10, 575:15, 575:23, 576:5, 586:19, 587:13, 588:6, 588:15, 590:2, 590:9, 594:16, 594:18, 594:21, 594:24, 595:4, 595:13, 595:24, 595:25, 596:5, 596:13, 596:24, 597:7, 597:9, 597:12, 597:14, 598:2, 598:20, 598:23, 599:11, 600:6, 600:17, 601:9, 601:13, 602:2, 602:22, 603:2

**servers** [37] - 325:11, 326:1, 326:5, 326:6, 326:7, 326:9, 326:10, 337:17, 356:15, 356:19, 401:18, 462:7, 500:2, 501:15, 502:2, 511:3, 516:13, 516:18, 516:19, 516:20, 516:22, 516:25, 517:5, 517:9, 518:3, 520:18, 520:25, 521:3, 521:7, 521:12, 521:19, 521:25, 524:9, 561:15, 561:16, 567:19

**service** [5] - 398:21, 550:13, 574:4, 574:21, 576:20

**services** [6] - 364:8, 468:8, 468:17, 498:9, 506:13, 508:3

**session** [1] - 507:2

**set** [3] - 340:2, 516:1, 524:17

**setting** [1] - 592:7

**several** [12] - 310:13, 361:16, 379:2, 421:12, 488:24, 497:19, 556:22, 563:22, 563:23, 566:5, 566:10

**SH** [13] - 309:25, 329:25, 394:2, 414:4, 435:16, 442:23, 480:2, 498:5, 540:14, 541:1, 545:5, 545:13, 593:1

**Shah** [143] - 311:9, 313:3, 313:4, 314:6, 314:12, 314:22, 314:25, 315:3, 315:12, 316:25, 318:4, 319:3, 319:17, 319:18, 330:2, 337:7, 345:14, 358:17, 361:6, 361:24, 362:7, 363:8, 364:16, 364:17, 364:21, 365:2, 367:15, 381:9, 381:17, 381:19, 381:25, 385:8, 387:5, 390:6, 391:3, 391:6, 392:6, 395:1, 395:2, 395:5, 397:19, 398:20, 399:20, 399:24, 401:8, 401:22, 401:24, 403:19, 405:8, 405:10, 406:16, 414:11, 426:9, 435:3, 435:5, 435:18, 446:23, 447:9, 450:24, 456:12, 457:3, 463:20, 470:5, 473:7, 476:1, 476:3, 479:5, 479:21, 480:9, 481:25, 482:3, 482:10, 486:16, 488:23, 489:10, 500:21, 503:10, 503:18, 504:2, 504:9, 504:15, 505:1,

505:2, 506:1, 506:12, 506:16, 506:19, 507:17, 507:20, 508:3, 508:7, 518:7, 518:23, 518:25, 530:21, 531:4, 531:13, 531:24, 532:18, 533:5, 533:15, 542:10, 542:23, 545:3, 545:11, 547:5, 550:1, 558:25, 560:14, 564:2, 564:6, 566:9, 568:22, 569:7, 576:25, 577:4, 583:12, 587:12, 587:17, 587:20, 588:4, 588:8, 588:14, 588:19, 588:20, 588:23, 589:1, 594:6, 594:12, 595:9, 596:2, 596:22, 597:9, 597:12, 597:15, 597:25, 598:2, 598:13, 598:16, 599:9, 599:12, 600:22

**Shah's** [12] - 313:13, 339:16, 367:5, 379:22, 394:23, 404:15, 503:11, 503:21, 529:11, 538:23, 595:14, 596:8

**Shahs** [2] - 594:2, 595:2

**share** [1] - 552:7

**Shaw** [1] - 434:23

**SHB** [1] - 491:20

**Shelist** [2] - 542:7, 542:8

**shipping** [1] - 513:14

**Short** [14] - 368:13, 494:5, 573:20

**short** [8] - 310:2, 356:18, 379:3, 392:18, 441:11, 532:4, 570:9, 605:20

**shorten** [1] - 501:1

**shortening** [1] - 400:8

**shortly** [4] - 313:11, 403:2, 426:6, 570:9

**show** [7] - 324:22, 482:14, 491:15, 514:6, 529:18, 531:5

**showed** [2] - 422:13, 500:23

**showing** [1] - 345:25

**shown** [4] - 421:20, 422:13, 422:14, 478:16

**shredding** [1] - 420:21

**shut** [6] - 428:9, 429:8, 429:9, 430:18, 431:16, 432:18

**sic** [3] - 339:11, 446:24, 477:11

**sic)** [1] - 499:12

**side** [3] - 309:20, 396:13, 452:11

**sides** [1] - 343:4

**sign** [1] - 598:14

**signed** [4] - 460:24, 540:18, 591:20, 592:3

**significant** [3] - 390:10, 581:1, 606:4

**similar** [4] - 395:16, 539:7, 545:17, 589:3

**simplified** [1] - 423:7

**simplify** [1] - 580:21

**simply** [2] - 436:24, 601:20

**simultaneously** [1] - 565:16

**sit** [2] - 407:18, 571:21

**site** [12] - 311:10, 411:21, 415:25, 499:3, 499:5, 500:13, 500:14, 500:17, 529:5, 572:10

**sitting** [2] - 394:9, 506:4

**situation** [1] - 337:9

**six** [5] - 334:3, 335:18, 335:19, 360:25, 602:14

**Sixteen** [1] - 363:6

**Sixteen-week** [1] - 363:6

**sixth** [4] - 454:24, 456:6, 456:9, 461:17

**sketch** [1] - 496:20

**skip** [2] - 312:18, 472:13

**slightly** [2] - 455:20, 459:2

**slow** [3] - 563:2, 565:24

**slower** [1] - 562:21

**slows** [1] - 419:7

**small** [1] - 473:22

**smaller** [1] - 422:12

**Smalley** [7] - 363:25, 364:9, 410:24, 411:13, 411:16, 411:17, 411:24

**Smalley's** [1] - 383:2

**Sodikoff** [1] - 558:22

**sold** [30] - 347:8, 392:7, 476:1, 558:8, 558:9, 558:25, 559:2, 559:6, 560:5, 560:12, 560:23, 569:1, 569:16, 569:24, 576:5, 594:15, 594:16, 594:18, 594:22, 594:25, 595:1, 595:5, 595:24, 595:25, 596:1, 597:11, 597:14, 598:7, 598:12, 598:17

**Solution** [1] - 495:22

**someone** [10] - 433:24, 453:12, 510:17, 531:22, 552:18, 553:14, 559:22, 572:2, 575:19, 598:17

**sometime** [5] - 401:9, 402:1, 415:7, 471:12, 530:3

**somewhat** [3] - 551:18, 580:15, 582:3

**somewhere** [7] - 399:11, 401:6, 426:8, 438:20, 457:20, 458:6, 572:4

**soon** [7] - 307:19, 313:2, 331:12, 335:7, 339:4, 374:23, 424:17

**sophisticated** [1] - 318:13

**sophistication** [1] - 393:24

**Sorry** [1] - 557:1

**sorry** [69] - 314:6, 317:5, 340:5, 341:7, 343:12, 347:2, 347:21, 351:14, 363:23, 371:22, 372:8, 372:15, 373:24, 384:10, 386:4, 389:10, 395:12, 422:17, 428:12, 429:17, 430:16, 450:19, 456:11, 457:18, 458:21, 461:2, 461:5, 464:14, 470:11, 478:12, 481:4, 494:12, 499:12, 511:5, 513:18, 514:8, 515:16, 516:5, 516:21, 521:5, 521:17, 524:19, 524:20, 524:22, 526:11, 533:7, 536:13, 538:6, 544:9, 547:9, 551:24, 552:25, 556:5, 562:19, 562:22, 563:17, 565:24, 566:1, 566:11, 567:21, 568:4, 572:12, 576:19, 578:21, 579:14, 579:16, 584:13, 597:2

**sort** [9] - 360:20, 395:5, 396:23, 438:8, 526:11, 543:20, 551:11, 585:17, 587:21

**sorted** [1] - 589:1

**sound** [3] - 414:15, 540:9, 585:24

**sounded** [1] - 395:16

**sounds** [6] - 428:14, 432:19, 432:21, 440:6, 442:17, 497:2

**space** [4] - 355:4, 433:24, 581:10, 589:4

**speaker** [4] - 428:24, 429:8, 429:12, 430:7

**speakerphone** [3] - 315:15, 505:4, 529:14

**speaking** [7] - 308:12, 309:21, 370:2, 427:23, 506:4, 522:14, 603:21
**speaks** [1] - 520:8
**special** [10] - 483:1, 495:25, 496:5, 496:7, 497:14, 499:6, 512:2, 552:23, 553:1, 572:9
**specialized** [2] - 499:15, 500:9
**specializing** [1] - 495:24
**specific** [21] - 320:6, 336:11, 343:22, 346:20, 354:19, 390:4, 393:13, 393:14, 409:19, 496:18, 498:13, 500:10, 503:14, 547:23, 549:8, 550:11, 552:23, 568:16, 570:12, 575:3, 578:18
**specifically** [52] - 308:3, 308:22, 309:17, 312:12, 314:4, 315:25, 320:5, 322:17, 324:1, 327:23, 328:12, 331:18, 335:2, 343:15, 343:17, 349:7, 355:6, 355:9, 364:9, 369:14, 369:22, 375:21, 379:21, 385:11, 399:13, 401:19, 405:5, 437:10, 442:3, 444:16, 444:19, 446:13, 465:14, 484:18, 485:16, 486:19, 497:16, 499:16, 499:17, 502:10, 503:9, 503:11, 505:5, 523:2, 551:18, 574:17, 575:8, 575:16, 583:14, 584:6, 602:18, 603:19
**spell** [3] - 499:10, 512:17, 537:9
**spelled** [1] - 510:23
**speller** [1] - 499:11
**spending** [1] - 473:18
**spent** [2] - 518:15, 518:19
**Spernow** [10] - 311:5, 313:2, 313:5, 319:15, 364:1, 500:19, 503:10, 503:18, 506:7, 518:10
**Spernow's** [1] - 518:11
**split** [2] - 497:11, 580:23
**spoken** [1] - 521:17
**spoliation** [2] - 427:11, 430:19
**Springs** [1] - 473:7
**Sri** [1] - 318:16
**stalling** [3] - 337:23, 447:9, 447:11
**stamped** [1] - 386:1
**stand** [7] - 309:12, 392:18, 439:15, 448:2, 493:23, 536:23, 603:9
**standards** [1] - 483:7
**standpoint** [1] - 402:9
**start** [11] - 403:10, 403:13, 404:1, 405:11, 405:24, 478:15, 514:24, 560:15, 583:2, 589:2, 599:1
**started** [9] - 401:8, 453:7, 453:14, 501:10, 543:6, 558:14, 563:19, 576:4, 593:4
**starting** [6] - 403:22, 482:9, 515:18, 516:12, 522:13
**state** [13] - 307:11, 335:3, 419:12, 431:19, 431:20, 447:4, 447:5, 447:15, 449:23, 473:8, 496:24, 537:9, 551:14
**statement** [32] - 312:12, 312:25, 326:2, 326:12, 326:15, 377:1, 441:12, 491:16, 491:17, 491:19, 491:22, 491:23, 492:9, 494:13, 511:3, 514:25, 515:7, 515:10, 517:1, 519:14, 519:17, 520:17, 520:25,

522:21, 522:23, 522:24, 523:18, 525:3, 525:4, 525:5, 525:15, 525:16
**statements** [6] - 511:6, 511:7, 511:20, 512:4, 513:2, 513:6
**STATES** [1] - 417:1
**states** [6] - 357:22, 370:23, 377:20, 382:2, 484:6, 586:3
**status** [20] - 309:20, 324:3, 324:4, 325:23, 329:5, 332:16, 337:9, 376:13, 377:21, 383:5, 402:5, 427:21, 444:9, 444:24, 445:9, 446:17, 494:24, 502:7, 513:3, 513:11
**stay** [5] - 458:5, 458:9, 458:13, 573:7, 573:8
**stayed** [1] - 581:19
**step** [5] - 413:21, 423:22, 423:25, 493:21, 536:21
**steps** [8] - 420:20, 485:15, 487:21, 508:13, 560:3, 560:25, 573:4, 582:4
**Steve** [14] - 426:9, 427:15, 434:24, 460:21, 470:1, 485:12, 489:4, 492:4, 493:3, 493:18, 542:8, 542:22, 583:6
**Steven** [3] - 435:18, 480:3, 545:9
**stick** [1] - 412:11
**still** [32] - 321:17, 331:7, 332:20, 340:15, 343:6, 350:9, 351:6, 351:17, 351:25, 352:18, 355:15, 356:9, 356:15, 364:19, 365:3, 371:10, 371:17, 374:5, 375:11, 375:19, 378:10, 380:6, 380:21, 383:13, 402:3, 443:22, 452:21, 452:25, 526:7, 541:17, 565:24, 582:24
**stood** [1] - 482:20
**stop** [3] - 382:17, 396:10, 486:18
**stopped** [1] - 488:6
**stopwatch** [2] - 606:11, 606:12
**store** [2] - 580:6, 582:25
**stored** [3] - 315:2, 353:3, 457:17
**straight** [1] - 340:2
**strand** [1] - 481:14
**strangers** [1] - 547:20
**strategy** [1] - 585:13
**Street** [3] - 304:5, 417:24, 418:5
**stretched** [2] - 449:11, 450:20
**stretching** [1] - 473:19
**stricken** [1] - 309:11, 321:24, 322:2, 362:2, 391:9, 391:11, 447:25, 467:25, 481:9, 513:20, 513:21
**strike** [23] - 323:4, 323:6, 330:15, 354:23, 365:12, 365:15, 370:11, 374:9, 375:16, 382:9, 437:18, 461:3, 474:12, 517:15, 517:16, 517:21, 528:9, 533:3, 576:23, 596:4, 598:19, 598:23, 599:5
**stuff** [2] - 447:13, 525:12
**stupid** [2] - 447:19, 449:6
**stupidity** [3] - 447:6, 447:7, 481:19
**subject** [14] - 342:4, 371:9, 377:17, 461:22, 463:9, 492:22, 493:10, 503:5, 503:8, 504:1, 549:22, 570:9, 590:17, 591:18
**submissions** [2] - 327:4, 442:20
**submitted** [6] - 328:11, 351:9, 443:18,

502:14, 510:8, 512:11
**subpoena** [45] - 315:10, 362:23, 363:5, 363:15, 380:3, 389:6, 396:11, 448:13, 509:2, 550:8, 550:13, 550:18, 554:3, 554:11, 554:15, 554:19, 555:23, 562:4, 562:10, 562:12, 562:14, 562:18, 563:7, 563:12, 574:2, 574:4, 574:8, 574:11, 574:12, 574:20, 574:23, 574:25, 575:2, 575:23, 575:25, 576:9, 576:11, 576:17, 576:20, 593:11, 599:16, 599:19, 599:21, 599:24, 600:5
**subpoenas** [2] - 563:20, 563:23
**subsequent** [2] - 399:7, 400:1
**subsequently** [6] - 389:18, 395:3, 398:24, 403:25, 405:16, 406:9
**substance** [1] - 442:18
**substantial** [1] - 473:17
**substantiate** [3] - 550:5, 575:15, 599:14
**suburbs** [1] - 399:12
**successful** [2] - 538:20, 566:19
**successor** [1] - 404:2
**sued** [1] - 473:7
**suggest** [1] - 509:2
**suggested** [1] - 505:14
**suggestion** [1] - 334:1
**Suite** [5] - 304:5, 417:16, 417:20, 417:24, 418:5
**summarize** [1] - 424:5
**summarizes** [1] - 441:9
**Sunday** [1] - 510:4
**supervise** [1] - 348:25
**supplement** [2] - 327:12, 330:25
**supplemental** [1] - 593:10
**supplemented** [1] - 445:16
**support** [2] - 389:22, 499:18
**suppose** [1] - 345:23
**supposed** [6] - 328:15, 329:18, 390:18, 402:5, 595:14, 596:7
**supposedly** [1] - 346:4
**surprise** [5] - 445:19, 593:20, 594:12, 594:14, 600:6
**surprised** [1] - 595:25
**sustain** [1] - 348:25
**sustained** [34] - 322:1, 346:12, 352:24, 353:12, 354:3, 354:9, 355:12, 355:20, 363:22, 363:23, 366:16, 370:16, 371:13, 382:19, 384:13, 386:19, 392:12, 405:21, 406:20, 407:8, 433:12, 449:3, 449:25, 467:16, 467:25, 472:20, 480:16, 517:16, 526:22, 528:7, 574:14, 597:1
**sworn** [4] - 307:6, 419:8, 494:6, 537:3
**system** [19] - 338:1, 371:25, 374:18, 405:15, 406:15, 428:9, 429:8, 429:9, 430:18, 432:18, 432:19, 432:20, 433:9, 433:21, 485:21, 523:2, 523:22, 543:18, 589:7
**systems** [13] - 312:1, 313:19, 331:21, 370:2, 370:21, 380:9, 430:15, 431:16, 433:2, 433:16, 433:20, 497:17

# T

**tailored** [2] - 523:4, 523:13
**talks** [2] - 444:23, 584:19
**tangent** [1] - 347:7
**tape** [1] - 329:9
**tapes** [14] - 328:15, 328:23, 329:1, 329:5, 329:10, 501:16, 502:15, 510:23, 510:25, 511:2, 514:6, 514:10, 516:8, 518:22
**task** [1] - 497:25
**tasked** [1] - 497:25
**team** [1] - 505:15
**technical** [1] - 407:25
**technically** [1] - 498:20
**technician** [4] - 311:7, 398:22, 407:13, 499:15
**technology** [1] - 497:16
**telephone** [21] - 328:10, 328:19, 329:14, 339:3, 339:12, 339:15, 339:20, 373:21, 374:1, 374:4, 435:1, 438:22, 477:16, 477:18, 479:5, 491:19, 492:21, 492:23, 493:3, 518:8, 557:21
**tenant** [2] - 539:25, 541:17
**tens** [1] - 364:7
**term** [3] - 433:23, 434:1, 505:25
**terminating** [1] - 538:16
**terms** [4] - 393:11, 394:5, 551:18, 582:16
**testified** [29] - 349:20, 355:14, 356:14, 356:18, 358:21, 359:6, 365:12, 365:13, 365:16, 373:11, 379:8, 379:14, 403:6, 403:9, 406:22, 438:20, 453:12, 465:6, 513:23, 519:4, 525:10, 526:20, 529:8, 530:4, 556:16, 589:22, 590:11, 590:12, 596:23
**testify** [7] - 379:11, 386:15, 392:17, 400:7, 490:11, 525:25, 526:16
**testifying** [4] - 392:19, 513:2, 513:8, 516:17
**testimony** [31] - 355:16, 357:20, 358:9, 358:13, 358:14, 379:22, 391:8, 391:9, 391:21, 398:1, 431:18, 441:25, 442:10, 461:20, 463:18, 467:9, 467:10, 467:11, 467:22, 468:2, 468:16, 470:17, 474:16, 496:17, 525:2, 603:20, 604:2, 604:3, 604:6
**testing** [1] - 420:21
**THE** [514] - 307:2, 307:4, 307:7, 308:14, 308:15, 309:12, 314:5, 314:6, 317:7, 319:5, 319:7, 319:9, 319:10, 319:13, 319:14, 319:18, 319:19, 319:20, 322:1, 322:4, 322:7, 322:10, 322:13, 322:15, 322:17, 323:5, 323:6, 328:3, 328:5, 336:18, 336:19, 336:22, 338:15, 338:17, 338:21, 338:23, 339:6, 339:7, 340:2, 340:13, 340:14, 341:7, 341:11, 343:11, 343:13, 343:14, 344:12, 344:14, 344:15, 344:20, 344:25, 345:1, 345:4, 346:12, 347:4, 347:16, 347:17, 347:19, 347:21,

347:22, 348:5, 348:7, 348:16, 348:21, 348:24, 349:8, 349:11, 349:13, 351:12, 352:24, 353:12, 354:3, 354:9, 354:15, 354:17, 355:12, 355:20, 357:8, 357:9, 362:4, 362:12, 362:14, 362:15, 363:21, 363:22, 366:16, 366:19, 368:6, 368:9, 368:12, 370:16, 371:13, 371:24, 372:10, 373:23, 375:15, 380:10, 381:14, 382:19, 383:17, 383:19, 384:8, 384:11, 384:13, 384:16, 385:24, 386:3, 386:4, 386:19, 388:13, 390:20, 391:11, 391:14, 391:17, 392:12, 392:23, 393:2, 393:5, 393:25, 395:10, 395:12, 397:14, 397:16, 397:18, 398:2, 398:7, 400:3, 400:4, 400:9, 402:22, 403:1, 404:11, 405:19, 405:21, 406:1, 406:6, 406:8, 406:9, 406:18, 406:20, 407:8, 408:7, 408:8, 408:14, 408:25, 409:12, 409:15, 409:23, 409:24, 410:1, 410:5, 410:8, 410:9, 410:11, 410:12, 410:16, 410:17, 410:19, 410:22, 410:23, 411:1, 411:4, 411:7, 411:9, 411:12, 411:14, 411:15, 411:17, 411:18, 411:20, 411:23, 411:24, 412:1, 412:6, 412:7, 412:15, 412:16, 412:18, 412:19, 412:20, 412:21, 412:22, 412:23, 412:25, 413:1, 413:7, 413:8, 413:9, 413:12, 413:14, 413:15, 413:16, 413:18, 413:19, 413:21, 413:24, 415:3, 415:15, 415:18, 416:7, 417:1, 417:10, 419:2, 419:5, 421:17, 421:20, 422:1, 422:4, 422:6, 422:7, 422:8, 422:21, 422:24, 423:2, 423:16, 423:22, 423:24, 423:25, 424:1, 424:2, 428:15, 429:1, 429:19, 429:21, 430:2, 430:5, 431:11, 431:19, 431:21, 432:2, 432:7, 432:11, 433:12, 434:2, 434:5, 439:6, 439:11, 439:13, 439:15, 439:16, 439:20, 439:23, 440:4, 440:5, 440:9, 440:11, 440:12, 440:13, 440:16, 440:17, 440:20, 440:22, 440:24, 441:4, 441:10, 441:15, 441:21, 442:1, 442:5, 442:10, 448:2, 449:3, 449:25, 450:4, 450:6, 450:9, 450:11, 453:8, 454:21, 454:23, 458:19, 458:20, 458:21, 458:22, 460:1, 460:4, 460:5, 460:8, 460:11, 460:12, 462:3, 464:19, 465:3, 466:23, 466:24, 467:14, 467:16, 467:25, 468:10, 468:12, 468:13, 472:20, 476:11, 476:15, 476:17, 477:4, 478:11, 478:12, 480:16, 481:1, 481:3, 481:4, 481:6, 481:9, 482:22, 482:23, 483:9, 483:10, 483:13, 483:15, 483:18, 483:20, 483:23, 488:2, 488:8, 488:11, 488:12, 488:19, 488:20, 488:21, 488:22, 488:23, 488:25, 489:1, 489:2, 489:3, 489:4, 489:23, 489:24, 489:25, 490:2, 490:5, 490:6, 490:7, 490:11, 490:13, 490:16, 490:17, 490:18, 490:19, 490:22, 490:23, 490:24, 490:25, 491:1, 491:3, 491:4, 491:7, 491:9, 491:23, 491:25, 492:13, 492:17, 493:20, 493:21, 493:24, 494:4, 494:9,

494:11, 494:17, 494:19, 495:6, 495:12, 495:14, 495:17, 502:19, 509:12, 512:7, 512:9, 512:11, 512:13, 512:19, 512:21, 513:18, 513:21, 514:20, 514:25, 515:3, 515:6, 515:8, 515:15, 515:16, 517:16, 517:19, 517:23, 518:1, 518:12, 518:13, 520:10, 520:11, 524:21, 525:3, 525:17, 525:21, 526:11, 526:22, 527:1, 527:25, 528:3, 528:7, 528:21, 528:23, 528:25, 533:6, 533:7, 535:5, 536:9, 536:12, 536:14, 536:15, 536:16, 536:21, 536:22, 536:24, 537:2, 538:5, 538:6, 541:7, 541:9, 544:9, 544:12, 544:15, 544:16, 547:11, 550:24, 551:2, 551:3, 552:2, 553:8, 553:9, 554:5, 554:6, 554:7, 554:8, 555:15, 556:12, 556:17, 556:21, 556:22, 556:25, 557:1, 558:2, 562:21, 562:25, 563:1, 563:2, 563:8, 563:18, 564:24, 564:25, 565:10, 565:16, 565:19, 568:6, 568:8, 568:12, 570:1, 572:6, 572:8, 573:19, 574:10, 574:14, 576:13, 578:2, 578:6, 579:1, 579:4, 579:6, 579:13, 579:15, 579:17, 589:15, 592:12, 595:19, 597:1, 597:19, 597:22, 597:23, 597:24, 597:25, 598:25, 599:3, 602:6, 602:9, 602:10, 602:11, 602:12, 602:13, 602:14, 602:15, 602:16, 602:17, 602:18, 602:21, 602:23, 602:24, 602:25, 603:1, 603:3, 603:4, 603:8, 603:10, 603:13, 603:22, 603:25, 604:12, 604:21, 605:1, 605:17, 605:19, 605:23, 606:1, 606:5, 606:9
**theft** [1] - 420:22
**themselves** [1] - 487:6
**theoretically** [1] - 433:17
**thereafter** [6] - 313:2, 316:9, 335:7, 424:17, 540:12, 588:10
**therefore** [1] - 525:9
**thereof** [1] - 504:6
**they've** [1] - 345:17
**thin** [1] - 450:20
**thinking** [7] - 444:6, 447:8, 449:22, 470:2, 489:19, 489:20, 524:23
**third** [11] - 330:3, 370:20, 374:16, 380:8, 380:14, 389:15, 446:3, 561:19, 561:22, 561:25, 562:6
**third-party** [5] - 370:20, 380:8, 380:14, 389:15, 446:3
**thirty** [1] - 503:23
**THOMAS** [2] - 304:4, 418:4
**Thompson** [2] - 497:6, 497:8
**THOMPSON** [1] - 417:19
**thoroughly** [2] - 380:11, 427:20
**thousands** [1] - 364:7
**thread** [1] - 479:16
**threat** [1] - 370:7
**threatening** [1] - 566:23
**threats** [5] - 370:5, 373:2, 373:5, 402:13, 566:18
**three** [18] - 313:9, 364:4, 366:18,

483:3, 504:5, 518:25, 519:3, 562:7, 564:2, 564:3, 583:14, 583:15, 583:19, 584:1, 589:22, 589:24, 590:12, 590:17
**throughout** [2] - 308:24, 507:8
**thumb** [1] - 453:24
**thumbnail** [1] - 496:20
**Thursday** [1] - 484:5
**timing** [1] - 393:9
**Tina** [3] - 565:21, 566:4, 566:12
**title** [2] - 436:12, 438:22
**today** [10] - 365:13, 365:16, 376:15, 388:2, 394:9, 400:7, 413:6, 467:22, 496:13, 603:20
**together** [5] - 501:20, 526:24, 549:24, 565:16, 594:9
**tomorrow** [2] - 388:2, 505:7
**took** [16] - 315:15, 342:1, 348:13, 399:3, 415:14, 415:24, 529:16, 538:18, 547:19, 547:22, 555:16, 560:3, 571:2, 580:24, 586:13, 586:24
**tool** [1] - 526:6
**tools** [1] - 526:3
**top** [6] - 350:1, 408:3, 512:17, 545:7, 545:13, 555:20
**topic** [1] - 488:12
**tops** [1] - 605:11
**touched** [1] - 346:15
**towards** [3] - 307:21, 312:3, 556:22
**town** [1] - 426:11
**trail** [2] - 479:15, 544:13
**trailed** [1] - 526:11
**trained** [1] - 483:5
**training** [1] - 483:1
**transaction** [23] - 539:2, 539:6, 539:13, 539:17, 539:23, 540:7, 540:23, 541:11, 541:13, 541:16, 541:24, 542:5, 542:14, 545:2, 555:14, 555:16, 576:25, 577:3, 577:14, 578:1, 583:16, 595:17, 598:11
**transactional** [1] - 545:1
**transactions** [2] - 542:11, 542:17
**transcript** [18] - 329:17, 428:24, 429:19, 431:18, 439:17, 441:17, 510:10, 510:21, 512:15, 514:4, 514:17, 515:1, 515:5, 520:15, 522:12, 525:5, 525:22, 525:23
**TRANSCRIPT** [1] - 417:9
**transfer** [6] - 398:22, 458:6, 558:21, 558:23, 594:2, 595:5
**transmitted** [1] - 397:21
**transport** [5] - 316:5, 316:7, 318:15, 398:25, 503:12
**transportation** [1] - 508:15
**transported** [1] - 506:21
**travel** [1] - 311:20
**treatise** [1] - 497:6
**treatises** [1] - 497:4
**tremendous** [2] - 482:8, 580:6
**tri** [1] - 460:23
**tri-party** [1] - 460:23
**trial** [2] - 417:9, 423:6

**tried** [5] - 396:16, 488:15, 508:17, 525:13, 568:10
**TRO** [6] - 308:5, 314:9, 389:23, 426:10, 426:13, 458:11
**trouble** [7] - 307:14, 333:23, 361:11, 361:13, 448:14, 502:9, 544:7
**troubles** [1] - 502:8
**true** [12] - 310:10, 310:14, 337:1, 362:19, 387:3, 387:13, 439:1, 439:2, 445:8, 455:9, 461:24, 492:10
**trust** [1] - 393:21
**trusted** [1] - 393:20
**truthful** [1] - 394:10
**try** [15] - 311:17, 329:7, 419:5, 422:10, 431:11, 449:14, 450:12, 496:10, 496:11, 539:11, 544:9, 563:2, 564:13, 588:6, 596:10
**trying** [20] - 341:15, 342:5, 345:21, 347:23, 367:8, 385:13, 395:20, 396:19, 449:13, 452:4, 489:9, 493:7, 525:15, 539:10, 562:22, 580:21, 584:25, 596:6, 596:7, 601:2
**turn** [20] - 336:1, 375:25, 377:6, 377:8, 410:12, 456:11, 465:16, 484:2, 488:19, 522:9, 522:13, 533:3, 541:7, 578:20, 578:24, 579:19, 581:12, 584:1, 585:15
**turned** [1] - 395:3, 464:2, 587:7
**turning** [1] - 449:22
**turns** [1] - 401:5
**twice** [1] - 310:15
**two** [43] - 320:3, 324:2, 325:3, 331:12, 367:14, 367:16, 375:4, 385:2, 385:24, 399:25, 414:5, 429:15, 430:20, 432:23, 436:8, 439:23, 444:21, 453:20, 463:6, 466:23, 469:11, 469:25, 482:14, 482:15, 487:11, 487:13, 487:16, 487:17, 501:3, 503:4, 513:14, 521:16, 541:2, 579:19, 584:1, 584:9, 585:23, 586:12, 588:18, 592:4, 593:25, 594:10
**type** [4] - 500:8, 546:20, 559:19, 561:18
**types** [2] - 335:3, 500:2
**typically** [2] - 381:16, 577:17

## U

**U.S** [3] - 532:2, 586:25, 587:8
**UCB** [49] - 332:1, 332:5, 332:7, 337:16, 337:18, 343:7, 352:19, 355:2, 384:20, 393:18, 395:17, 395:19, 446:12, 452:20, 457:1, 457:11, 457:19, 457:25, 458:4, 458:8, 458:10, 460:24, 477:11, 479:25, 482:4, 482:20, 482:21, 485:22, 486:1, 497:22, 499:1, 499:2, 507:7, 507:10, 507:13, 508:10, 519:21, 546:2, 546:6, 546:17, 549:3, 566:21, 578:14, 580:7, 580:8, 580:11, 582:4, 589:2
**UCB's** [27] - 369:7, 370:12, 370:18, 370:24, 371:15, 371:16, 371:25, 372:2, 372:13, 372:14, 372:15, 373:9, 375:10, 375:14, 375:18, 375:21, 376:18,

376:25, 377:2, 382:21, 383:4, 384:1, 400:25, 458:25, 523:2, 581:2, 589:22
**ultimate** [1] - 595:13
**ultimately** [7] - 332:8, 538:14, 538:20, 582:10, 591:21, 596:21, 597:8
**um-hmm** [1] - 573:2
**uncertain** [1] - 402:3
**under** [14] - 312:19, 421:5, 433:5, 509:6, 510:8, 511:4, 516:14, 516:18, 517:9, 520:19, 521:3, 521:12, 521:20, 531:2
**understated** [3] - 550:1, 550:6, 599:9
**understood** [27] - 321:11, 321:19, 321:20, 326:7, 333:6, 343:25, 352:9, 369:16, 369:21, 370:3, 370:11, 370:12, 385:16, 386:9, 386:12, 389:21, 404:24, 405:5, 409:8, 426:21, 430:13, 431:10, 467:5, 485:8, 532:14, 544:4, 575:2
**undertake** [1] - 399:1
**undertaken** [1] - 309:5
**unfairly** [1] - 482:19
**unfortunately** [1] - 510:5
**unidentified** [4] - 428:24, 429:7, 429:12, 430:7
**unintelligible** [1] - 432:16
**unintelligible)** [2] - 526:10, 526:18
**UNITED** [2] - 417:1, 417:4
**United** [34] - 307:2, 331:19, 331:20, 331:24, 350:20, 352:21, 354:6, 355:8, 358:22, 358:25, 359:12, 363:15, 368:23, 373:12, 383:12, 391:25, 427:1, 452:3, 458:15, 459:5, 472:4, 472:15, 472:22, 475:14, 548:3, 566:21, 566:25, 575:13, 575:25, 578:10, 580:11, 580:17, 581:7, 582:18
**universe** [3] - 523:21, 524:8, 526:17
**University** [1] - 496:23
**unprivileged** [1] - 477:8
**unusual** [2] - 407:4, 577:13
**up** [72] - 310:12, 310:16, 316:4, 316:8, 316:20, 317:12, 317:25, 318:25, 319:5, 325:3, 335:20, 347:18, 361:8, 372:11, 378:17, 380:25, 389:10, 390:19, 392:13, 399:22, 400:8, 405:11, 405:24, 408:15, 413:22, 414:11, 415:10, 415:17, 421:16, 422:4, 424:2, 426:19, 440:15, 441:18, 451:23, 482:20, 483:7, 489:7, 493:17, 500:19, 500:23, 503:6, 505:7, 505:13, 506:12, 506:17, 508:5, 509:7, 513:14, 525:18, 530:6, 538:3, 538:14, 544:9, 544:13, 544:14, 544:17, 549:22, 549:25, 556:25, 558:3, 562:21, 563:3, 565:10, 582:14, 583:7, 587:11, 589:2, 595:14, 596:8, 603:17, 604:4
**update** [3] - 388:2, 513:11, 513:24
**updated** [1] - 388:4
**upset** [1] - 582:3
**useful** [1] - 395:7
**utilize** [1] - 355:4
**utmost** [1] - 396:19

## V

**vacation** [2] - 307:23, 420:1
**valid** [1] - 580:9
**various** [4] - 308:4, 318:17, 332:4, 497:12
**Varsha** [1] - 457:3
**verbal** [1] - 317:15
**verbally** [1] - 317:16
**verified** [4] - 511:2, 511:4, 516:13, 520:18
**versa** [1] - 488:6
**versus** [1] - 556:4
**via** [2] - 321:18, 555:7
**vice** [1] - 488:6
**VILIA** [1] - 417:14
**Vilia** [10] - 310:3, 327:2, 330:5, 330:19, 338:5, 338:11, 374:14, 451:9, 452:15, 459:17
**Vilia's** [1] - 459:18
**violating** [2] - 481:12, 481:15
**virtually** [1] - 419:25
**virtue** [1] - 443:24
**visit** [1] - 572:3
**visual** [1] - 422:5
**voice** [4] - 314:23, 556:25, 558:3, 565:10
**VOLUME** [1] - 417:10
**volume** [3] - 451:6, 451:14, 544:11
**voluntarily** [1] - 496:13
**vs** [1] - 417:6

## W

**wait** [18] - 336:13, 336:22, 343:11, 348:21, 384:8, 428:15, 441:15, 458:20, 458:22, 478:11, 533:6
**waiting** [1] - 392:17
**waived** [1] - 556:17
**walk** [1] - 473:13
**wandering** [1] - 604:20
**wants** [6] - 340:19, 397:11, 430:18, 435:2, 458:5, 502:21
**ware** [1] - 379:25
**warehouse** [322] - 312:4, 312:14, 312:21, 313:22, 313:23, 314:2, 314:11, 315:5, 315:6, 315:23, 316:2, 319:23, 320:12, 320:21, 320:22, 321:5, 321:8, 321:9, 321:13, 321:16, 321:18, 321:22, 322:25, 323:10, 323:12, 323:13, 324:4, 324:9, 325:5, 325:19, 326:10, 326:20, 327:17, 330:17, 330:19, 331:1, 331:8, 332:16, 332:20, 334:4, 334:11, 334:16, 334:19, 335:9, 337:8, 337:17, 338:6, 339:1, 339:17, 340:11, 342:18, 346:25, 348:2, 350:9, 351:6, 351:10, 351:18, 351:22, 351:25, 352:3, 352:10, 352:14, 352:19, 352:22, 353:3, 353:10, 353:21, 353:25, 354:7, 354:19, 355:4, 355:8, 355:15, 355:23, 356:6, 356:9, 356:13,

356:16, 356:20, 356:24, 357:3, 357:6, 357:23, 358:1, 358:5, 358:7, 358:10, 358:17, 359:16, 359:22, 359:23, 360:2, 361:8, 361:18, 363:19, 365:15, 365:18, 366:4, 366:10, 368:4, 368:17, 369:23, 371:10, 371:18, 373:15, 376:13, 377:1, 378:11, 378:13, 380:1, 380:15, 380:18, 380:21, 382:3, 382:11, 382:22, 383:3, 383:14, 384:2, 384:5, 384:21, 390:12, 395:1, 395:5, 395:6, 395:8, 398:18, 398:23, 399:2, 399:21, 399:22, 401:1, 402:6, 405:4, 405:8, 405:11, 405:15, 406:14, 407:16, 408:25, 409:1, 409:6, 409:13, 410:18, 410:20, 412:14, 412:19, 414:8, 414:12, 414:20, 416:1, 416:4, 434:18, 435:23, 436:2, 436:5, 436:9, 436:13, 436:20, 436:23, 437:11, 437:17, 437:19, 437:20, 438:3, 438:6, 438:23, 442:15, 444:5, 445:3, 446:21, 453:17, 455:15, 455:18, 455:22, 455:23, 455:24, 456:1, 456:7, 456:10, 456:14, 456:17, 456:21, 457:15, 457:17, 458:5, 458:13, 458:16, 459:6, 460:20, 461:13, 461:22, 462:15, 462:21, 464:6, 465:7, 466:2, 466:7, 466:14, 466:18, 466:19, 466:21, 467:3, 467:10, 467:20, 468:5, 468:19, 468:23, 469:5, 470:14, 471:17, 471:20, 472:16, 472:24, 474:10, 474:19, 475:9, 475:16, 475:18, 476:8, 478:3, 481:18, 484:8, 484:10, 485:16, 486:21, 487:9, 487:22, 501:16, 502:12, 502:15, 502:16, 503:6, 503:12, 504:21, 505:5, 505:15, 506:17, 506:24, 508:16, 509:4, 511:13, 518:4, 518:9, 518:19, 519:7, 522:1, 527:20, 529:5, 530:5, 530:7, 530:8, 530:12, 530:13, 530:16, 530:17, 530:20, 530:25, 531:1, 531:3, 531:6, 531:14, 531:20, 531:25, 532:3, 532:5, 532:8, 532:11, 532:19, 532:25, 535:23, 536:4, 538:14, 539:25, 540:2, 541:18, 541:21, 541:24, 543:5, 543:11, 543:14, 543:18, 546:14, 546:22, 547:1, 547:6, 547:16, 547:18, 547:21, 548:10, 549:18, 549:20, 550:2, 550:5, 551:23, 564:1, 571:6, 571:23, 572:4, 572:22, 573:6, 573:11, 573:13, 580:3, 580:5, 580:7, 581:5, 581:23, 582:11, 582:18, 582:22, 582:24, 582:25, 589:10, 590:2, 590:9, 599:10, 599:21, 599:24, 602:9, 602:19
**Warehouse** [3] - 412:24, 539:10, 583:12
**Warehousing** [13] - 327:24, 329:23, 330:6, 425:6, 539:8, 539:11, 539:16, 540:2, 542:23, 547:4, 564:6, 566:8, 576:25
**Warehousing's** [1] - 542:5
**Warehousing/Kanan** [2] - 374:17, 383:9
**warm** [1] - 348:7
**warned** [2] - 335:7, 337:7
**ways** [1] - 403:7

**web** [1] - 497:17
**web-based** [1] - 497:17
**Wednesday** [1] - 585:19
**week** [10] - 323:23, 324:12, 325:16, 330:22, 334:23, 338:12, 363:6, 400:14, 471:7, 471:13
**weekend** [5] - 399:7, 399:15, 399:16, 508:5, 603:14
**weeks** [18] - 324:2, 334:3, 335:18, 335:19, 344:8, 360:25, 361:3, 361:17, 361:22, 365:6, 390:2, 390:22, 390:24, 393:9, 393:12, 396:18, 401:21, 402:2
**West** [1] - 497:8
**WEST** [1] - 417:15
**Western** [1] - 473:7
**whatsoever** [4] - 343:24, 379:17, 390:4, 596:18
**wherein** [4] - 359:22, 380:20, 472:23, 485:14
**white** [1] - 397:8
**whole** [6] - 342:23, 366:12, 395:3, 577:21, 600:20
**wife** [3] - 577:6, 588:19, 588:20
**WILLIAM** [6] - 306:11, 306:13, 306:15, 537:5, 573:22, 589:18
**William** [7] - 459:21, 480:3, 485:13, 537:11, 545:9, 565:22, 585:19
**willing** [3] - 318:12, 508:4, 532:15
**wiping** [1] - 420:22
**wire** [1] - 598:6
**wise** [1] - 509:17
**wish** [2] - 372:5, 473:15
**withdraw** [1] - 599:2
**withdrawing** [2] - 449:8, 450:3
**witness** [23] - 307:4, 322:8, 348:19, 348:23, 419:2, 432:4, 467:11, 489:5, 489:14, 489:19, 489:21, 492:25, 493:24, 536:23, 536:24, 538:3, 578:5, 579:8, 603:11, 603:22, 604:1, 604:2
**WITNESS** [142] - 308:15, 314:6, 319:9, 319:14, 319:19, 322:17, 323:5, 328:5, 336:19, 336:22, 338:23, 339:7, 340:14, 341:7, 341:11, 343:14, 344:15, 344:25, 345:4, 347:17, 347:21, 349:11, 349:13, 351:12, 354:17, 357:9, 362:4, 362:15, 363:21, 371:24, 386:4, 395:12, 400:4, 406:9, 406:18, 408:8, 409:24, 410:8, 410:11, 410:16, 410:19, 410:23, 411:4, 411:9, 411:14, 411:17, 411:20, 411:24, 412:6, 412:15, 412:18, 412:20, 412:22, 412:25, 413:7, 413:9, 413:14, 413:16, 413:19, 422:7, 423:24, 424:1, 431:21, 434:5, 439:11, 439:15, 440:4, 440:12, 440:17, 440:24, 450:6, 454:23, 458:19, 458:21, 460:4, 460:8, 460:12, 466:24, 468:12, 478:12, 481:1, 481:4, 482:23, 483:10, 488:8, 488:12, 488:20, 488:22, 488:25, 489:2, 489:4, 489:24, 490:5, 490:7, 490:13, 490:17, 490:19, 490:23, 490:25, 491:3, 493:20, 513:18, 515:16, 517:19, 518:1, 518:13, 520:11, 525:21,

527:25, 533:7, 536:12, 536:15, 536:22,
538:6, 541:9, 544:9, 544:15, 550:24,
551:3, 552:2, 553:9, 554:6, 554:8,
555:15, 556:22, 557:1, 563:18, 564:25,
568:8, 568:12, 572:8, 597:19, 597:23,
597:25, 602:10, 602:12, 602:14,
602:16, 602:18, 602:23, 602:25, 603:3

**Witness** [6] - 307:6, 419:8, 493:23,
494:6, 537:3, 603:9

**witnesses** [4] - 482:14, 482:16, 544:8,
603:10

**wondered** [1] - 491:14

**wonderful** [2] - 453:25, 482:17

**word** [11] - 369:15, 400:5, 433:22,
446:18, 460:23, 481:20, 484:9, 484:10,
501:20, 514:16, 523:10

**words** [9] - 309:18, 430:23, 441:14,
479:9, 479:19, 551:16, 597:7, 599:17,
599:19

**works** [5] - 499:3, 499:15, 499:16,
552:23, 553:1

**world** [3] - 347:13, 523:5, 523:14

**worldwide** [1] - 497:9

**worth** [2] - 447:17, 447:18

**write** [3] - 523:4, 523:12, 586:1

**writes** [1] - 460:18

**writing** [8] - 316:21, 317:20, 346:21,
412:4, 442:15, 473:12, 555:5, 590:7

**written** [14] - 317:9, 349:17, 360:19,
378:1, 432:8, 477:25, 497:5, 522:20,
546:21, 546:24, 547:3, 551:11, 551:15,
557:22

**wrote** [7] - 310:16, 320:11, 322:20,
383:6, 436:1, 535:9, 591:21

# Y

**years** [3] - 534:5, 534:7, 534:11

**yes-or-no** [3] - 461:15, 513:16, 534:22

**yesterday** [4] - 391:8, 556:14, 579:11,
603:17

**York** [1] - 496:24

**yourself** [7] - 358:16, 373:13, 413:6,
518:7, 560:25, 579:8, 599:8

# Z

**zoomed** [1] - 484:18

607

1           IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3

4  UNITED CENTRAL BANK,           )  Docket No. 10 C 331
                          )
5                 Plaintiff,  )
                          )
6          vs.            )
                          )
7  KANAN FASHIONS, INC., et al.,  )  Chicago, Illinois
                          )  January 31, 2011
8            Defendants.  )  10:00 o'clock a.m.

9
           TRIAL TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE MICHAEL T. MASON
                 VOLUME 3-A
11

12  APPEARANCES:

13

14  For the Plaintiff:    BOODELL & DOMANSKIS LLC
                      BY:  MS. VILIA M. DEDINAS
                           MS. NADA DJORDJEVIC
15                       MR. DAVID WEST
                           MS. AMY RYLKO
16                    205 North Michigan Avenue, Suite 4307
                    Chicago, IL  60601
17                    (312) 938-4070

18

19  For the Defendants:   McJESSY, CHING & THOMPSON
                      BY:  MR. KEVIN McJESSY
20                    3759 North Ravenswood, Suite 231
                    Chicago, IL  60613
21                    (773) 880-1260

22

23

24  Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                      Official Court Reporter
                    219 S. Dearborn Street, Suite 1854-B
25                    Chicago, Illinois  60604
                    (312) 435-5639

1  APPEARANCES CONTINUED:

2

3  For Respondents
    Alan Borlack and
    Eric Grossman:        HINSHAW & CULBERTSON LLP
4                     BY:  MR. THOMAS P. McGARRY
                         MR. ALAN R. LIPTON
5                     222 North LaSalle Street, Suite 300
                     Chicago, IL  60601
6                     (312) 704-3000

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

609

1                                   I N D E X

2
    DESCRIPTION                                                      PAGE
3

4
    MEHUL SHAH, REDIRECT EXAMINATION                                 614
5   BY MS. DEDINAS:

6
    DAVID CLARK, DIRECT EXAMINATION CONTINUED                        621
7   BY MS. DEDINAS:

8
    DAVID CLARK, CROSS-EXAMINATION                                   626
9   BY MR. McJESSY:

10
    DAVID CLARK, CROSS-EXAMINATION                                   653
11  BY MR. LIPTON:

12
    DAVID CLARK, REDIRECT EXAMINATION                                666
13  BY MS. DEDINAS:

14
    DAVID CLARK, CROSS-EXAMINATION                                   677
15  BY MR. McJESSY:

16
    SUSAN CHENG, DIRECT EXAMINATION                                  681
17  BY MS. DEDINAS:

18
    SUSAN CHENG, CROSS-EXAMINATION                                   697
19  BY MR. McJESSY:

20
    SUSAN CHENG, REDIRECT EXAMINATION                                712
21  BY MS. DEDINAS:

22
    SUSAN CHENG, RECROSS-EXAMINATION                                 714
23  BY MR. McJESSY:

24
    DAVE MUSCHLER, DIRECT EXAMINATION                                721
25  BY MR. McJESSY:

1

DAVE MUSCHLER, CROSS-EXAMINATION                          734
2   BY MS. DEDINAS:

3

DAVE MUSCHLER, CROSS-EXAMINATION                          735
4   BY MR. McGARRY:

5

DAVE MUSCHLER, DIRECT EXAMINATION                         736
6   BY MR. McGARRY:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:46:41 | 1 | (The following proceedings were had in open court:) |
| 10:00:57 | 2 | THE CLERK:  10 C 3331, United Central Bank v. Kanan |
| 10:03:29 | 3 | Fashions, et al. |
| 10:03:31 | 4 | MR. McGARRY:  Your Honor, before I call a witness, I |
| 10:03:33 | 5 | wanted to tell the court -- this is Tom McGarry. |
| 10:03:37 | 6 | THE COURT:  Yes. |
| 10:03:37 | 7 | MR. McGARRY:  I'm starting a trial this week |
| 10:03:40 | 8 | downstate and kind of working two ends of the street.  But it |
| 10:03:44 | 9 | looks like a storm is coming through, and down there the |
| 10:03:48 | 10 | prosecutor -- |
| 10:03:48 | 11 | THE COURT:  Now?  Is it stormy down there right now? |
| 10:03:52 | 12 | MR. McGARRY:  They haven't started, but they have |
| 10:03:54 | 13 | advised me that they are going to seek a continuance.  They |
| 10:03:59 | 14 | are actually guaranteeing.  So I may be off this week.  I will |
| 10:04:01 | 15 | confirm that today.  I will let you know, Judge. |
| 10:04:03 | 16 | If that is important to people's schedules in this |
| 10:04:05 | 17 | case and the court thinks that there is a reason to try to |
| 10:04:09 | 18 | have some testimony this week -- |
| 10:04:11 | 19 | THE COURT:  It would be nice -- |
| 10:04:13 | 20 | MR. McGARRY:  -- I would be available. |
| 10:04:14 | 21 | THE COURT:  -- if we could get it done tomorrow. |
| 10:04:17 | 22 | Mr. Blumenthal will be back this afternoon. |
| 10:04:18 | 23 | MR. McGARRY:  That's what I was thinking.  And then |
| 10:04:20 | 24 | on sort of the sad news part is that Alan's -- Mr. Borlack's |
| 10:04:24 | 25 | mother-in-law died -- |

612

1   THE COURT:  Oh, I'm very sorry.

2   MR. McGARRY:  -- over the weekend, so they will have

3   a service Wednesday night -- no, Thursday night, and then a

4   burial on Friday.  So he will be unavailable.

5   THE COURT:  You just let us know when you have to go

6   to that.  You have my deepest sympathy.

7   MR. McGARRY:  Thank you, your Honor.  I will confirm

8   my schedule in case it's relevant to Mr. Blumenthal.

9   THE COURT:  Okay.  Maybe you can check on it this

10  afternoon.

11  MR. McGARRY:  I will be checking constantly on this.

12  THE COURT:  Then what we've got to do is somebody has

13  to contact Mr. Blumenthal if we are going to go forward and

14  meet tomorrow, assuming you all can be here tomorrow.  That

15  would be great.

16  Now, I think Mr. Clark is in the attorney witness --

17  or in the jury room.  Did you have something else you wanted

18  to raise?

19  MS. DEDINAS:  I do have a preliminary matter, your

20  Honor.

21  THE COURT:  You better put your name on the record.

22  MS. DEDINAS:  Vilia Dedinas.

23  Your Honor, over the weekend, we had -- we received

24  documents from Paetec, P-a-e-t-e-c.  As you recall, we

25  subpoenaed those --

| | | |
|---|---|---|
| 10:05:27 | 1 | THE COURT: Right. |
| 10:05:28 | 2 | MS. DEDINAS: -- and you issued an order allowing |
| 10:05:29 | 3 | that to go forward. |
| 10:05:30 | 4 | THE COURT: For one direction, I think. |
| 10:05:31 | 5 | MS. DEDINAS: Yes. And these are incoming phone |
| 10:05:34 | 6 | calls for Mr. Clark from July 26th through the 28th, and I |
| 10:05:41 | 7 | would like two things. One is I'd like leave to introduce |
| 10:05:46 | 8 | those as an exhibit. |
| 10:05:47 | 9 | THE COURT: Um-hmm. |
| 10:05:48 | 10 | MS. DEDINAS: And then I would like to very briefly |
| 10:05:53 | 11 | call Mr. Shah to just elicit testimony as to what his phone |
| 10:06:00 | 12 | numbers are. |
| 10:06:00 | 13 | THE COURT: That will be granted. |
| 10:06:02 | 14 | MS. DEDINAS: So we will start with Mr. Shah. |
| 10:06:03 | 15 | THE COURT: Sure. |
| 10:06:05 | 16 | MS. DEDINAS: And if I may hand up some of these |
| 10:06:08 | 17 | exhibits to you. |
| 10:06:08 | 18 | MR. McJESSY: Judge, perhaps rather than testimony, |
| 10:06:10 | 19 | we could stipulate to what his phone numbers are. |
| 10:06:13 | 20 | MS. DEDINAS: Okay. Could we do that on the record? |
| 10:06:15 | 21 | THE COURT: Yes. |
| 10:06:16 | 22 | MR. McJESSY: Yes. |
| 10:06:17 | 23 | THE COURT: That's a much quicker way. That's all |
| 10:06:21 | 24 | you wanted was his phone numbers; is that correct? |
| 10:06:24 | 25 | MS. DEDINAS: Well, I actually had one other |

| 10:06:26 | 1 | question. |

THE COURT:  Let's swear him in then.  Put him back on the witness stand.

   (Witness sworn.)

        MS. DEDINAS:  It's Exhibit SH 240.

        THE COURT:  240.

        MS. DEDINAS:  And I am going to hand this to Mr. Shah.

                              - - -

                    MEHUL SHAH, REDIRECT EXAMINATION

BY MS. DEDINAS:

Q.  Mr. Shah, what's your home telephone number?

A.  630-789-9966 and -9977.

Q.  So 630-789-9977 is also a home phone number?

A.  Yes.

Q.  Do you have a cell phone?

A.  Yes.

Q.  What's your cell phone number?

A.  630-240-1234.

Q.  And what is your office number at Kanan Fashions?

A.  630-833-1234.

Q.  And do you know what Mr. Joshi's office number is?

A.  The same number, 630-833-1234.

Q.  And do you know what his home phone number?

A.  630-323-3765.

| | | |
|---|---|---|
| 10:08:08 | 1 | THE COURT: And that was his home phone? |
| 10:08:10 | 2 | THE WITNESS: Mr. Joshi's home phone, 630-323-3765. |
| 10:08:19 | 3 | MR. McJESSY: And the one before that, I'm sorry. |
| 10:08:21 | 4 | MS. DEDINAS: His office number? |
| 10:08:22 | 5 | THE COURT: Your office number. |
| 10:08:23 | 6 | THE WITNESS: It's the same number, 630-833-1234. |
| 10:08:28 | 7 | MR. McJESSY: Thank you. |
| 10:08:29 | 8 | BY MS. DEDINAS: |
| 10:08:29 | 9 | Q. And what is Mr. Joshi's cell phone number? |
| 10:08:31 | 10 | A. 630-258-0448. |
| 10:08:34 | 11 | Q. Okay. So I'd like you to take a look at Exhibit SH 240 |
| 10:08:44 | 12 | that I brought. As you will see, some of them are also |
| 10:08:50 | 13 | highlighted in yellow. |
| 10:08:51 | 14 | A. Yes. |
| 10:08:51 | 15 | Q. So I'd like to go through that. The first one on the 26th |
| 10:08:55 | 16 | of July at 10:43 in the morning, is that your phone number? |
| 10:09:03 | 17 | A. Yes. |
| 10:09:03 | 18 | Q. That's from home, right? |
| 10:09:04 | 19 | A. Yes. |
| 10:09:04 | 20 | Q. And that's a two-minute phone conversation? |
| 10:09:07 | 21 | A. Yes. |
| 10:09:07 | 22 | Q. Do you recall speaking to Mr. Clark that morning? |
| 10:09:10 | 23 | A. I must have spoken to him. I used to speak with him quite |
| 10:09:17 | 24 | frequently in those days because he had buyers coming in town, |
| 10:09:22 | 25 | so he needed information. |

616

1  Q.  Now, further down, the next series, we have -- on 7/26, we

2  have three phone calls at 3:17, 3:27, and 3:58.  Do you see

3  those?

4  A.  Correct.

5  Q.  Are those from your home phone numbers?

6  A.  Yes.

7  Q.  And then we have later that day again three phone calls,

8  one at 5:06, one at 5:12 --

9  A.  The next one is the next day.

10  Q.  -- p.m., yes.

11       So are those two from your home phone number?

12  A.  Yes, the three seconds and the nine seconds.

13  Q.  Then the following day on the 27th, there is a call at

14  9:15 in the morning?

15  A.  Yes.

16  Q.  Is that from your home number?

17  A.  Yes.

18  Q.  Okay.  Now, further on that day of the 27th, there is two

19  phone calls, one at 2:05 and one at 2:07.  Are those from your

20  home phone number?

21  A.  Yes.

22  Q.  And then later that day, there's two more phone calls, one

23  at 4:00 o'clock and 4:20?

24  A.  Yes.

25  Q.  Are those from your home number?

10:10:34  1   A.  Yes, that's my phone number.

10:10:35  2   Q.  Now, one of those is a 16-minute phone call?

10:10:38  3   A.  Yes.

10:10:40  4   Q.  Do you recall what that was about?

10:10:41  5        THE COURT:  Can you point out which one that is?

10:10:44  6        MS. DEDINAS:  Yes, it's at 7/27 at 4:20 p.m.

10:10:49  7        THE COURT:  Thank you.

10:10:49  8        THE WITNESS:  I think from what I'm recalling, there

10:10:52  9   was a conversation with him in regards to his buyers coming in

10:10:56  10  town that week or the following week, and he had requested

10:11:00  11  information from us about the blueprints as well as the type

10:11:05  12  of the roof that we have.  So it was discussions in regards to

10:11:11  13  the building.

10:11:12  14  BY MS. DEDINAS:

10:11:12  15  Q.  For 16 minutes?

10:11:13  16  A.  Yes, from what I recall.

10:11:14  17  Q.  Okay.  Now, on the 28th at 8:29 a.m., there's another

10:11:21  18  phone call.  Is that from your home as well?

10:11:23  19  A.  28 at -- yes, yes.

10:11:28  20  Q.  And then later on that morning, there's three calls at --

10:11:36  21  all at 8:56.  Are those from your office number?

10:11:40  22  A.  Yes, that's my office number.

10:11:42  23  Q.  Now, would those be faxes?

10:11:44  24  A.  No.

10:11:45  25  Q.  Those are --

10:11:47    1   A.  That's a phone line.

10:11:48    2   Q.  That's a phone line.

10:11:50    3   A.  Yes, we have a separate number for fax line.

10:11:53    4   Q.  Do you have a recollection of making three phone calls in

10:11:55    5   rapid succession to him?

10:11:57    6   A.  No, honestly, I don't recall.

10:11:59    7   Q.  And then on the 28th you called again at 9:38.  Again,

10:12:02    8   three phone calls, each of 25 second.

10:12:06    9   A.  Correct.

10:12:06   10   Q.  Is that from your office as well?

10:12:08   11   A.  Yeah, that's our number.

10:12:10   12   Q.  And that would be your -- would you be making those phone

10:12:13   13   calls?

10:12:14   14   A.  Probably.

10:12:14   15   Q.  Probably, okay.

10:12:15   16   A.  Trying to reach him for something, but maybe the

10:12:18   17   information that he needed and -- but I'm just looking at

10:12:22   18   three calls at the same time and three times repeating.

10:12:25   19   Q.  Then on 7/28 there is a phone call at 1:48 p.m.  Do you

10:12:32   20   see that?

10:12:32   21   A.  Yes.

10:12:32   22   Q.  Is that your phone -- is that from your home?

10:12:35   23   A.  Yes.

10:12:35   24   Q.  Okay.  And then the following -- on the following page,

10:12:41   25   the first entry is at 7:2- -- on 7/28/2010 at 3:28 p.m.?

| | | |
|---|---|---|
| 10:12:48 | 1 | A. Yes. |
| 10:12:49 | 2 | Q. Is that from your -- |
| 10:12:50 | 3 | A. Cell phone. |
| 10:12:50 | 4 | Q. Cell phone. |
| 10:12:51 | 5 | A. Yes. |
| 10:12:51 | 6 | Q. Do you recall what that call was for? |
| 10:12:53 | 7 | A. No. It's only three-second call. I don't remember. |
| 10:12:58 | 8 | Q. Okay. Then later on that day again at 4:53, there's |
| 10:13:05 | 9 | another phone call. Is that from your home? |
| 10:13:09 | 10 | A. Yes, that's my home number. |
| 10:13:11 | 11 | Q. Now, the one at -- on 7/28 at 4:53, that call was made |
| 10:13:33 | 12 | shortly after First Midwest Bank received a wire transfer from |
| 10:13:40 | 13 | Diagems. Do you recall that you have discussed anything about |
| 10:13:44 | 14 | a wire transfer coming in to purchase the server? |
| 10:13:46 | 15 | A. No, ma'am. |
| 10:13:46 | 16 | Q. And during any of these phone calls, did you -- were these |
| 10:13:55 | 17 | -- strike that. |
| 10:13:56 | 18 | Were all these phone calls made by you? |
| 10:13:58 | 19 | A. It must have. It's my home number and my office number, |
| 10:14:02 | 20 | yes. |
| 10:14:04 | 21 | Q. Okay. Do you know where your father was that week in |
| 10:14:09 | 22 | July? |
| 10:14:10 | 23 | A. He was in United States. |
| 10:14:14 | 24 | Q. And where was he staying? |
| 10:14:17 | 25 | A. At my sister's house. |

| | | |
|---|---|---|
| 10:14:18 | 1 | Q.  Did he visit your house at all while he was there? |
| 10:14:22 | 2 | A.  Sometimes. |
| 10:14:22 | 3 | Q.  Did he have -- did he use your telephone at all? |
| 10:14:26 | 4 | A.  No. |
| 10:14:27 | 5 | Q.  How do you know that? |
| 10:14:29 | 6 | A.  Because when he comes to my house, he usually comes in the |
| 10:14:32 | 7 | evening and we are with him.  My father is hardly on the |
| 10:14:36 | 8 | phone. |
| 10:14:36 | 9 | Q.  Does he make phone calls from his cell phone, or does he |
| 10:14:39 | 10 | make them from your phone when he is at your house? |
| 10:14:42 | 11 | A.  If he comes to my house, he would use my phone. |
| 10:14:45 | 12 | Q.  Do you know what his cell phone number is? |
| 10:14:47 | 13 | A.  No. |
| 10:14:48 | 14 | Q.  You don't know your father's -- |
| 10:14:49 | 15 | A.  He would use our phone. |
| 10:14:50 | 16 | Q.  But do you know your father's cell phone number? |
| 10:14:53 | 17 | A.  He doesn't have a cell phone. |
| 10:14:55 | 18 | Q.  He doesn't have a cell phone. |
| 10:14:57 | 19 | A.  No. |
| 10:15:05 | 20 | MS. DEDINAS:  Okay.  Thank you very much. |
| 10:15:07 | 21 | THE COURT:  Any questions from anybody else? |
| 10:15:09 | 22 | MR. LIPTON:  No. |
| 10:15:11 | 23 | MR. McJESSY:  No. |
| 10:15:12 | 24 | THE COURT:  I have a question.  You have a fax at |
| 10:15:14 | 25 | your office? |

| | | |
|---|---|---|
| 10:15:15 | 1 | THE WITNESS:  Yes. |
| 10:15:15 | 2 | THE COURT:  What's the number there? |
| 10:15:17 | 3 | THE WITNESS:  630-833-1237. |
| 10:15:23 | 4 | THE COURT:  1237? |
| 10:15:26 | 5 | THE WITNESS:  Yes. |
| 10:15:26 | 6 | THE COURT:  Okay.  Thank you very much. |
| 10:15:29 | 7 | THE WITNESS:  Thank you, your Honor. |
| 10:15:33 | 8 | MS. DEDINAS:  Can you just leave that on the witness |
| 10:15:36 | 9 | stand, the exhibit? |
| 10:15:37 | 10 | THE COURT:  Thank you very much. |
| 10:15:39 | 11 | (Witness leaves the stand.) |
| 10:15:39 | 12 | MS. DEDINAS:  And also with respect to this exhibit, |
| 10:15:43 | 13 | if I could recall Mr. Clark. |
| 10:15:45 | 14 | THE COURT:  Oh, sure.  And I think he is in the jury |
| 10:15:47 | 15 | room there.  He was here.  Unfortunately, he didn't get the |
| 10:15:52 | 16 | message from Mr. Serritella, so he was here at 10 after 9:00 |
| 10:15:57 | 17 | this morning. |
| 10:15:58 | 18 | MS. DEDINAS:  I'm sorry about that. |
| 10:15:59 | 19 | THE COURT:  It's not your fault. |
| 10:16:01 | 20 | (Witness sworn.) |
| 10:16:01 | 21 | - - - |
| 10:16:01 | 22 | DAVID CLARK, DIRECT EXAMINATION CONTINUED |
| 10:16:01 | 23 | BY MS. DEDINAS: |
| 10:16:51 | 24 | Q.  Good morning, Mr. Clark. |
| 10:16:52 | 25 | A.  Good morning. |

10:16:53  1  Q.  Mr. Clark, we just have a couple more questions for you.

10:16:57  2  If you can take a look at the page that has just been put on

10:17:01  3  top of the witness binder.

10:17:02  4          THE COURT:  Here you go.

10:17:03  5  BY MS. DEDINAS:

10:17:04  6  Q.  And let me represent to you that these are phone records

10:17:08  7  that were subpoenaed from Paetec, your phone provider, for

10:17:11  8  incoming phone calls to your line from the time period of

10:17:15  9  July 26th through July 28th.

10:17:25  10          Is your office number 630-875-7400?

10:17:31  11  A.  Yes, ma'am.

10:17:31  12  Q.  And I'd like you to take a look at the entries that are

10:17:36  13  highlighted in yellow.  And -- I'll represent to you that

10:17:41  14  Mr. Shah has testified that all of the highlighted numbers are

10:17:46  15  either from his home, office, or cell phone number.

10:17:54  16          Now, on the 26th is the day that you say you received

10:17:59  17  the phone call from somebody seeking to purchase the server;

10:17:59  18  is that right?

10:18:03  19  A.  Yes, ma'am.

10:18:04  20  Q.  Do you recall all of these phone calls from Mr. Shah on

10:18:08  21  that day?

10:18:09  22  A.  No, ma'am.

10:18:16  23  Q.  That's six phone calls from Mr. Shah that day.

10:18:20  24  A.  Yes, ma'am.

10:18:23  25  Q.  Do you recall speaking to him that day, the same day that

10:18:27   1   you got the phone call from somebody seeking to buy the
10:18:30   2   server?
10:18:31   3   A.  I don't recall, no, but I must have.
10:18:33   4   Q.  Do you recall speaking to Mr. Shah about somebody trying
10:18:41   5   to purchase the server?
10:18:42   6   A.  No, ma'am.
10:18:42   7   Q.  So even though you got a phone call from somebody who is
10:18:46   8   going to buy the server, you had six phone calls with Mr. Shah
10:18:49   9   that day and you didn't mention that to him at all?
10:18:52   10  A.  Well, four of those phone calls don't look like I spoke at
10:19:00   11  all, maybe five.  The ones that are only a few seconds long, I
10:19:07   12  have no idea what those are.  I spoke to him at 10:43 in the
10:19:14   13  morning at some length, two minutes and a minute 40 late in
10:19:18   14  the afternoon.  No, ma'am, I did not.  I was addressing due
10:19:22   15  diligence on the warehouse.
10:19:23   16  Q.  Okay.  And you don't have any further recollection of
10:19:28   17  whether you received the phone call from the anonymous caller
10:19:31   18  before or after you spoke to Mr. Shah?
10:19:34   19  A.  No, ma'am.
10:19:36   20  Q.  Okay.
10:19:37   21  A.  I would have to ask which time.
10:19:42   22  Q.  Either at 10:43 or at 3:58 where you had a phone
10:19:49   23  conversation in excess of one minute.
10:19:52   24  A.  No, ma'am, I don't recall.
10:19:53   25  Q.  Now, the following day you had five phone calls from Mr.

10:20:05  1  Shah, is that correct, on the 27th?

10:20:08  2  A. Yes, ma'am.

10:20:09  3  Q. Okay. And at least three of those calls were in excess of

10:20:14  4  a minute; is that right?

10:20:16  5  A. Yes.

10:20:16  6  Q. Do you recall what you spoke to him about?

10:20:18  7  A. No, ma'am.

10:20:18  8  Q. Now, there's one that's at 4:20 p.m. that's for 16

10:20:24  9  minutes. Do you recall that phone call?

10:20:26  10  A. No, ma'am.

10:20:28  11  Q. You don't have any recollection what you spoke to him

10:20:30  12  about?

10:20:31  13  A. No, ma'am.

10:20:32  14  Q. And it would be fair to say that even though you had a

10:20:37  15  purchaser willing to buy the server, during those phone

10:20:41  16  conversations, you didn't mention anything to Mr. Shah about

10:20:43  17  it?

10:20:44  18  A. No, ma'am.

10:20:44  19  Q. Okay. And on the 28th of July, you got a phone call

10:21:01  20  at 4:53, and I'm on page 2 now. Do you see that phone call?

10:21:09  21  A. Yes, ma'am.

10:21:13  22  Q. I'm going to represent to you that that is shortly after

10:21:18  23  you received the wire transfer from Diagems. Do you recall

10:21:23  24  speaking to Mr. Shah at all about receiving a transfer of

10:21:28  25  funds to purchase the server?

10:21:30    1    A.  No, ma'am.

10:21:32    2    Q.  So in all of these 21 phone calls or messages that you had

10:21:38    3    with him -- well, strike that.

10:21:42    4         I presume -- did you also call out to Mr. Shah as

10:21:46    5    well on those days, or did you have only incoming phone calls

10:21:49    6    with him?

10:21:50    7    A.  I don't -- I don't recall July the 28th.

10:21:55    8    Q.  Okay.  And during all the phone calls that you had with

10:21:58    9    him over this short period of time, you never spoke to him

10:22:02   10    about somebody purchasing the server?

10:22:05   11    A.  No, ma'am.

10:22:06   12    Q.  Taking a look at the phone records from the 26th, can you

10:22:12   13    recognize any phone numbers on there whose identity you would

10:22:18   14    know?

10:22:18   15    A.  The 26th?

10:22:34   16    Q.  Yes.

10:22:35   17    A.  Two numbers that I recognize from the 26th.

10:22:45   18    Q.  And which ones would those be?

10:22:48   19    A.  708-218-1622, 312-755-3136.

10:22:59   20    Q.  And is 312-755-3136 Mr. Sotcoff (phonetic)?

10:23:11   21    A.  No, it was Mr. Serritella.

10:23:14   22    Q.  Mr. Serritella.

10:23:14   23         And whose number is 708-218-1622?

10:23:19   24    A.  A gentleman by the name of Bill Brandom (phonetic).

10:23:24   25    Q.  What's your relationship with Mr. Brandom?

10:23:29  1   A.  He is a receiver on one of my properties.

10:23:32  2   Q.  Was he a receiver on the warehouse?

10:23:35  3   A.  No, ma'am.

10:23:38  4        MS. DEDINAS:  Okay.  Thank you.  I have no further

10:23:39  5   questions.

10:23:42  6        THE COURT:  Anybody else?

10:23:45  7        MR. LIPTON:  No, your Honor.

10:23:46  8        THE COURT:  Any cross of Mr. Clark?

10:23:48  9        MR. McJESSY:  Judge, we were up after his testimony

10:23:52  10  last week.

10:23:53  11       THE COURT:  Do you want to resume?

10:23:54  12       MR. McJESSY:  This is where we are going to start?

10:23:59  13       THE COURT:  Yes.

10:24:01  14       MR. McJESSY:  I am going to start out with that,

10:24:02  15  sure.  We will pick up where we left off.

10:24:04  16                           - - -

10:24:04  17             DAVID CLARK, CROSS-EXAMINATION

10:24:04  18  BY MR. McJESSY:

10:24:06  19  Q.  Mr. Clark, a couple of questions about this phone list.

10:24:09  20  Do you have voice mail?

10:24:10  21  A.  Yes, sir.

10:24:12  22  Q.  All right.  How long does your voice mail message run,

10:24:18  23  approximately, do you know?

10:24:18  24  A.  My voice mail message?

10:24:21  25  Q.  Sure.  I call in and your voice mail picks up.  What does

10:24:24  1   it say?

10:24:25  2   A.  Between 20 and 30 seconds.  It just says you have reached

10:24:28  3   the desk of David Clark and I'm sorry I can't take your phone

10:24:32  4   call right now, please leave a message, and I will get back to

10:24:35  5   you.

10:24:35  6   Q.  All right.  So if somebody calls in and you don't -- you

10:24:40  7   don't answer the phone, your line still gets picked up?

10:24:43  8   A.  Yes, sir.

10:24:44  9   Q.  All right.  So I notice that there are 15 calls on here

10:24:50  10  less than a minute, many of those, almost the majority of

10:24:53  11  those, less than 30 seconds.  If somebody calls in and gets

10:24:59  12  your voice mail, they could hang up within that period of

10:25:04  13  time; is that correct?

10:25:05  14  A.  That's correct.

10:25:05  15  Q.  And then I'm curious about this, the calls that came in on

10:25:11  16  7/28, there are three calls, two of which are listed at the

10:25:18  17  exact same second.

10:25:20  18          THE COURT:  Do you want to tell us what those are?

10:25:20  19  BY MR. McJESSY:

10:25:24  20  Q.  Yes.  They are at 8:56 a.m. and 50 seconds.  Do you see

10:25:30  21  that?

10:25:30  22  A.  Yes, sir.

10:25:32  23  Q.  And there's actually three calls all within the very same

10:25:37  24  second, at 8:56 a.m. and 49 seconds is one call, and then at

10:25:43  25  8:56 and 50 seconds are two other calls, and they all last

10:25:48  1   somehow for the exact same amount of time, 13.9 seconds.  Do

10:25:53  2   you see that?

10:25:53  3   A.  Yes, sir.

10:25:54  4   Q.  Do you have any explanation as to how three calls all

10:25:59  5   lasting 14 seconds can all occur at the same time?

10:26:04  6   A.  I don't know, sir.

10:26:06  7   Q.  Okay.  There is an e-mail out there that the parties have

10:26:19  8   discussed wherein you comment that Mr. Shah calls you three

10:26:22  9   times a day.  Do you recall that e-mail?

10:26:25  10  A.  Yes, sir.

10:26:25  11  Q.  I think it's an e-mail sometime around the beginning of

10:26:28  12  August.

10:26:30  13         When you said Mr. Shah calls you three times a day,

10:26:33  14  do you mean that you talk to him three times a day or that he

10:26:37  15  calls you and you may not talk to him, but he leaves you voice

10:26:42  16  mail messages or you don't pick up his call, that sort of

10:26:45  17  thing?

10:26:46  18         MS. DEDINAS:  Objection.

10:26:47  19         THE COURT:  Sustained.

10:26:47  20  BY MR. McJESSY:

10:26:50  21  Q.  When you say that Mr. Shah calls you three times a day, do

10:26:53  22  you talk to him three times a day?

10:26:55  23  A.  No, sir.

10:26:57  24  Q.  So when you say he calls, that might mean three voice

10:27:01  25  mails?

10:27:01 1 A.  Yes, sir.

10:27:01 2 Q.  Do you have a caller ID that shows you who is calling in

10:27:08 3 on your line?

10:27:10 4 A.  Yes, sir.

10:27:10 5 Q.  And do you have a call history that shows you if somebody

10:27:15 6 doesn't leave you a voice mail message who has called you that

10:27:18 7 day?

10:27:18 8 A.  Yes.

10:27:21 9 Q.  So Mr. Shah could call you three times in a day, not even

10:27:28 10 leave you a voice mail message, but you would know that he

10:27:32 11 called you; is that right?

10:27:34 12 A.  Yes, sir.

10:27:34 13 Q.  Now, you mentioned during the questioning about these

10:27:49 14 phone calls that you had a buyer coming in around this time,

10:27:54 15 meaning the end of July; is that right?

10:27:59 16 A.  I'm sorry.  A buyer for?

10:28:00 17 Q.  That's what I want to follow up with you on.  I thought

10:28:04 18 you said you had a buyer coming in that week.  Do you recall

10:28:09 19 that testimony?  Strike that.

10:28:11 20         Did you have a buyer coming in at approximately the

10:28:13 21 end of July, beginning of August to look at the warehouse?

10:28:16 22 A.  Yes, sir.

10:28:16 23 Q.  All right.  And were you at that time gathering

10:28:21 24 information for the buyer?

10:28:22 25 A.  Yes, sir.

10:28:23 1 Q. Were you gathering information concerning the roof of the

10:28:28 2 warehouse?

10:28:28 3 A. Yes, sir.

10:28:29 4 Q. Did you also need the plans for the warehouse?

10:28:35 5 A. Yes, sir.

10:28:36 6 Q. Did you eventually get the information for the roof and

10:28:39 7 the plans for the warehouse?

10:28:40 8 A. Yes, sir.

10:28:41 9 Q. Where did you get that?

10:28:42 10 A. To the best of my knowledge, we got it from the City of

10:28:46 11 Aurora.

10:28:46 12 Q. Did you ask Mr. Shah for that information?

10:28:48 13 A. A number of times, yes, sir.

10:28:50 14 Q. So you were -- did you talk to him about that a number of

10:28:54 15 times at the end of July, beginning of August?

10:28:55 16 A. Yes, sir.

10:28:56 17 Q. Sir, when did you first meet Mr. Shah, either on the

10:29:13 18 telephone or in person?

10:29:14 19 A. Sometime after November 2009.  I couldn't recall exactly

10:29:23 20 when.

10:29:23 21 Q. Okay.  And was the first time you met him face to face

10:29:28 22 sometime in February of 2010?

10:29:30 23 A. It could be, yes.

10:29:34 24 Q. Does that sound about right to you?

10:29:36 25 A. About right.

| | | |
|---|---|---|
| 10:29:37 | 1 | Q. Have you been to Mr. Shah's home? |
| 10:29:45 | 2 | A. No, sir. |
| 10:29:45 | 3 | Q. Has he been to yours? |
| 10:29:47 | 4 | A. No, sir. |
| 10:29:48 | 5 | Q. Have you ever met Mr. Shah's wife? |
| 10:29:49 | 6 | A. No, sir. |
| 10:29:50 | 7 | Q. To your knowledge, has he ever met your wife? |
| 10:29:53 | 8 | A. I hope not. I don't have one. |
| 10:29:57 | 9 | Q. That would be a good... |
| 10:30:02 | 10 | How many times -- aside from seeing Mr. Shah in this |
| 10:30:08 | 11 | courtroom or at a deposition or in conjunction with this |
| 10:30:13 | 12 | lawsuit, how many times had you met Mr. Shah face to face? |
| 10:30:17 | 13 | A. Perhaps six. |
| 10:30:22 | 14 | Q. Okay. And did all of those meetings concern the |
| 10:30:28 | 15 | warehouse? |
| 10:30:28 | 16 | A. Yes, sir. |
| 10:30:29 | 17 | Q. Now, you handled the friendly foreclosure of the |
| 10:30:34 | 18 | warehouse; is that right? |
| 10:30:36 | 19 | A. Yes, sir. |
| 10:30:36 | 20 | Q. On behalf of First Midwest Bank? |
| 10:30:38 | 21 | A. Yes. |
| 10:30:39 | 22 | Q. Let me finish that question. |
| 10:30:41 | 23 | All right. And Mr. Serritella was the counsel who |
| 10:30:43 | 24 | represented First Midwest Bank and assisted you; is that |
| 10:30:43 | 25 | right? |

| | | |
|---|---|---|
| 10:30:46 | 1 | A.  Yes, sir. |
| 10:30:46 | 2 | Q.  All right.  Now, as part of that transaction, Mr. Shah |
| 10:30:55 | 3 | asked First Midwest Bank to acquire the guaranty and the lease |
| 10:30:59 | 4 | for the server that was at the warehouse; is that right? |
| 10:31:02 | 5 | A.  That's correct. |
| 10:31:03 | 6 | Q.  In fact, you conditioned entering into the friendly |
| 10:31:06 | 7 | foreclosure upon First Midwest Bank's willingness to do that; |
| 10:31:06 | 8 | is that right? |
| 10:31:11 | 9 | A.  Yes, sir. |
| 10:31:11 | 10 | Q.  And you agreed to that? |
| 10:31:12 | 11 | A.  Yes, sir. |
| 10:31:13 | 12 | Q.  Now, Mr. Shah never hid from you the fact that he wanted |
| 10:31:26 | 13 | the guaranty and the server; is that right? |
| 10:31:28 | 14 | A.  No, sir. |
| 10:31:28 | 15 | Q.  All right.  And did you have discussions with |
| 10:31:34 | 16 | Mr. Blumenthal about that? |
| 10:31:35 | 17 | A.  I did not, no. |
| 10:31:39 | 18 | Q.  You personally did not? |
| 10:31:41 | 19 | A.  No. |
| 10:31:41 | 20 | Q.  All right.  Did your counsel have discussions with |
| 10:31:49 | 21 | Mr. Blumenthal about that? |
| 10:31:50 | 22 | A.  To the best of my knowledge. |
| 10:31:51 | 23 | Q.  All right.  Now, as part of the friendly foreclosure, |
| 10:31:58 | 24 | guaranties of Mr. Shah -- Mr. Shah's personal guaranty was |
| 10:32:02 | 25 | released on the loan for which the warehouse was secured, |

| | | |
|---|---|---|
| 10:32:06 | 1 | right? |
| 10:32:06 | 2 | A. That's correct. |
| 10:32:06 | 3 | Q. All right. Is there anything unusual about that in a |
| 10:32:09 | 4 | friendly foreclosure context, that the personal guaranties are |
| 10:32:12 | 5 | released? |
| 10:32:13 | 6 | A. No, it's usually negotiated. |
| 10:32:15 | 7 | Q. Okay. That's usually one of the terms of a friendly |
| 10:32:19 | 8 | foreclosure; is that right? |
| 10:32:20 | 9 | A. That's correct. |
| 10:32:20 | 10 | Q. Do you know how soon after -- do you know -- do you recall |
| 10:32:26 | 11 | that the friendly foreclosure occurred on March 15th, 2010? |
| 10:32:30 | 12 | A. I don't recall that, but I know it happened sometime in |
| 10:32:37 | 13 | March. |
| 10:32:37 | 14 | Q. Okay. Does that date sound about right to you? |
| 10:32:40 | 15 | A. It sounds about right. |
| 10:32:43 | 16 | Q. Do you recall how quickly the locks were changed after the |
| 10:32:46 | 17 | friendly foreclosure took place? |
| 10:32:47 | 18 | A. No. No, sir. |
| 10:32:50 | 19 | Q. Okay. Now, you previously testified that U.S. Equities |
| 10:32:58 | 20 | was responsible for the warehouse after First Midwest Bank |
| 10:33:02 | 21 | took possession; is that right? |
| 10:33:03 | 22 | A. That's correct. |
| 10:33:04 | 23 | Q. What is U.S. Equities? |
| 10:33:06 | 24 | A. It's a property management company. |
| 10:33:08 | 25 | Q. Okay. Did they hold the keys for the building? |

10:33:11    1   A.  To the best of my knowledge.

10:33:13    2   Q.  Okay.  Let me ask it differently.  Did you have keys to

10:33:16    3   the warehouse?

10:33:17    4   A.  No, I did not.

10:33:18    5   Q.  Okay.  If you wanted to gain access to the warehouse after

10:33:21    6   the foreclosure took place, how would you go about doing that?

10:33:24    7   A.  I would call U.S. Equities.

10:33:27    8          THE COURT:  And we have been through this.

10:33:28    9   BY MR. McJESSY:

10:33:29   10   Q.  Specifically, though, how are those arrangements made?

10:33:32   11   A.  I call a representative at U.S. Equities, tell him what

10:33:38   12   time I want to go into the warehouse, a representative from

10:33:42   13   U.S. Equities meets me there and unlocks the doors.

10:33:44   14   Q.  Okay.  Is there -- how much advance notice do you need to

10:33:49   15   give U.S. Equities?

10:33:50   16   A.  I try to give them 24 hours, but sometimes it's less.

10:33:57   17   Q.  All right.  Now, you received an e-mail from Mr.

10:34:11   18   Blumenthal on March 15th -- I'm sorry, on March 16th regarding

10:34:19   19   the hard drive and computer system that were in the warehouse.

10:34:25   20   And that's Exhibit 46.  I see you are looking at the book.

10:34:45   21          I will direct you to the e-mail at the top of that

10:34:48   22   page dated March 16th, 2010, 9:20 a.m. from Steve Blumenthal

10:34:52   23   to William Serritella, and you are copied on that.

10:34:57   24          Do you see that?

10:34:58   25   A.  Yes.

635

| | | |
|---|---|---|
| 10:34:58 | 1 | Q. Do you recall reviewing that e-mail when you received it? |
| 10:35:00 | 2 | A. No, sir. |
| 10:35:01 | 3 | Q. When is the first time that you can recall reviewing that |
| 10:35:06 | 4 | e-mail? |
| 10:35:06 | 5 | A. I believe when it was brought to my attention in one of my |
| 10:35:10 | 6 | depositions. |
| 10:35:10 | 7 | Q. All right. Now, I'd like you to turn to an e-mail dated |
| 10:35:23 | 8 | May 19th. It's Exhibit SH 108. |
| 10:35:31 | 9 | THE COURT: That was May 19th? |
| 10:35:33 | 10 | MR. McJESSY: May 19th, your Honor. |
| 10:35:35 | 11 | THE COURT: Thank you. |
| 10:35:35 | 12 | MR. McJESSY: 2010. |
| 10:35:40 | 13 | THE WITNESS: Yes, sir. |
| 10:35:41 | 14 | BY MR. McJESSY: |
| 10:35:41 | 15 | Q. I'd like to direct your attention to the e-mail on the |
| 10:35:43 | 16 | bottom of that page. It's an e-mail dated May 19th, 2010, at |
| 10:35:50 | 17 | 10:59 a.m. It's to James Dieterich, and it's from you. |
| 10:35:57 | 18 | Do you see that? |
| 10:35:57 | 19 | A. Yes, sir. |
| 10:35:58 | 20 | Q. All right. Now, that e-mail -- did you send this e-mail? |
| 10:36:06 | 21 | A. Yes, sir. |
| 10:36:06 | 22 | Q. Okay. Who is Mr. Dieterich? |
| 10:36:09 | 23 | A. The account officer at Associated Bank. |
| 10:36:12 | 24 | Q. Were you negotiating with him with respect to the |
| 10:36:15 | 25 | warehouse server? |

| | | |
|---|---|---|
| 10:36:16 | 1 | A.  Yes, sir. |
| 10:36:17 | 2 | Q.  All right.  It says -- you write the first two sentences, |
| 10:36:22 | 3 | I have received the letters from -- |
| 10:36:24 | 4 | THE COURT:  We are not going to go through this again |
| 10:36:26 | 5 | like we did the other day.  You are not going to read these. |
| 10:36:29 | 6 | Let him read it and ask your question, please. |
| 10:36:32 | 7 | MR. McJESSY:  All right. |
| 10:36:33 | 8 | BY MR. McJESSY: |
| 10:36:34 | 9 | Q.  If you could read those first two sentences there, sir. |
| 10:36:43 | 10 | A.  Yes, sir. |
| 10:36:44 | 11 | Q.  Okay.  Now, the first sentence says, I have received |
| 10:36:48 | 12 | letters from your attorney regarding the demand -- |
| 10:36:51 | 13 | THE COURT:  You just did what I asked you not to do. |
| 10:36:54 | 14 | Now, can't you ask him a question regarding this without |
| 10:36:56 | 15 | repeating the e-mail verbatim? |
| 10:37:01 | 16 | MR. McJESSY:  Yes, sir.  Yes, your Honor. |
| 10:37:03 | 17 | BY MR. McJESSY: |
| 10:37:04 | 18 | Q.  Sir, the second -- the second sentence there refers to |
| 10:37:07 | 19 | notice from attorneys regarding the server, and it |
| 10:37:15 | 20 | specifically references both attorneys for United Central and |
| 10:37:20 | 21 | Kanan.  United Central there, I assume, refers to United |
| 10:37:25 | 22 | Central Bank; is that right? |
| 10:37:25 | 23 | A.  That's correct. |
| 10:37:25 | 24 | Q.  And Kanan obviously refers to Kanan Fashions. |
| 10:37:30 | 25 | Who are the attorneys that put you on notice from |

| | | |
|---|---|---|
| 10:37:32 | 1 | each of those two parties? |
| 10:37:33 | 2 | A.  I had met with the attorney from United Central, Nat |
| 10:37:44 | 3 | Piggee, and I had had discussions with Mr. Shah and his |
| 10:37:52 | 4 | attorney, I believe Mr. Borlack, but it was a conference call, |
| 10:37:57 | 5 | so I couldn't tell you which attorney. |
| 10:37:59 | 6 | Q.  Okay.  So on behalf of United Central Bank, you're |
| 10:38:05 | 7 | specifically referring to Nat Piggee? |
| 10:38:08 | 8 | A.  Yes, sir. |
| 10:38:08 | 9 | Q.  All right.  And as you sit here today, is it your -- do |
| 10:38:13 | 10 | you believe that the statement in the second sentence of this |
| 10:38:16 | 11 | e-mail is accurate, that you were put on notice by attorneys |
| 10:38:19 | 12 | for both parties? |
| 10:38:20 | 13 | A.  Both parties told me they would be sending me a subpoena, |
| 10:38:26 | 14 | yes, sir. |
| 10:38:26 | 15 | Q.  All right.  Now, when did you have the meeting with |
| 10:38:30 | 16 | Mr. Piggee? |
| 10:38:31 | 17 | A.  I don't recall the date.  Prior to this e-mail. |
| 10:38:40 | 18 | Q.  So prior to May 19th? |
| 10:38:42 | 19 | A.  Yes. |
| 10:38:42 | 20 | Q.  Who was present at that meeting? |
| 10:38:44 | 21 | A.  Mr. Hoholik and Mr. Serritella. |
| 10:38:47 | 22 | Q.  And what was that meeting? |
| 10:38:48 | 23 | A.  The sale of the inventory. |
| 10:38:50 | 24 | Q.  All right.  And where was the meeting at? |
| 10:38:52 | 25 | A.  Conference room at First Midwest Bank. |

| | | |
|---|---|---|
| 10:38:55 | 1 | Q.  Okay.  And how long did the meeting take place? |
| 10:38:59 | 2 | A.  Thirty minutes. |
| 10:39:03 | 3 | Q.  And how did the subject of the server come up? |
| 10:39:07 | 4 | A.  It was what was remaining in the warehouse after we sold |
| 10:39:12 | 5 | the inventory. |
| 10:39:13 | 6 | Q.  Was the inven- -- had the inventory been sold by this |
| 10:39:21 | 7 | date? |
| 10:39:21 | 8 | A.  By this date, the inventory agreement had been executed. |
| 10:39:26 | 9 | I don't know that a true sale was going on at that time.  It |
| 10:39:32 | 10 | was about that time. |
| 10:39:32 | 11 | Q.  All right.  So at least an agreement had been reached with |
| 10:39:35 | 12 | respect to the inventory, and this was the only thing in the |
| 10:39:38 | 13 | warehouse that you were aware of that was not resolved yet as |
| 10:39:42 | 14 | to what was going to happen to it; is that right? |
| 10:39:44 | 15 | A.  That's correct. |
| 10:39:44 | 16 | Q.  Okay.  And so who raised the issue of the server? |
| 10:39:47 | 17 | A.  I don't remember, sir. |
| 10:39:49 | 18 | Q.  Okay.  What can you recall being said about it? |
| 10:39:53 | 19 | A.  That the server remained in the warehouse and that we |
| 10:39:58 | 20 | would like it out. |
| 10:39:59 | 21 | Q.  All right.  And did Mr. Piggee or Mr. Hoholik or |
| 10:40:05 | 22 | Mr. Serritella make any comment in response to that? |
| 10:40:08 | 23 | A.  Well, Mr. Serritella was making the comments.  Mr. Piggee, |
| 10:40:12 | 24 | I believe, made the comment that we could expect a subpoena. |
| 10:40:16 | 25 | Q.  Okay.  For the server? |

10:40:18  1   A.  I believed, since it was the only thing left, yes.

10:40:23  2   Q.  All right.  And was anything else said about it?

10:40:26  3   A.  No, sir.

10:40:27  4   Q.  Okay.  Did you ever receive a subpoena for the server?

10:40:33  5   A.  No, sir.

10:40:34  6   Q.  Your e-mail goes on to say that you will not release the

10:40:43  7   computers without a court order.  What did you mean by a

10:40:48  8   "court order"?

10:40:48  9   A.  Associated Bank could get a replevin order or either of

10:40:56  10  the two -- the plaintiff or the defendant in that case as

10:40:58  11  mentioned could get me a subpoena.

10:41:00  12  Q.  Okay.  So to you, a subpoena and a court order are the

10:41:03  13  same thing?

10:41:04  14  A.  Yes, sir.

10:41:04  15  Q.  Now, prior to May 19th, had you refused anyone else access

10:41:27  16  to the -- strike that.

10:41:28  17       Prior to May 19th, had you received any other demands

10:41:33  18  for the server?

10:41:34  19  A.  I received a demand from an attorney for Associated Bank.

10:41:41  20  I don't recall the date.

10:41:44  21       THE COURT:  Do you recall his name?

10:41:45  22       THE WITNESS:  It was a lady, Tina something.

10:41:49  23  BY MR. McJESSY:

10:42:19  24  Q.  If you could turn to Exhibit 83.  I'd like to draw your

10:42:40  25  attention to the e-mail at the bottom of that page dated

10:42:43  1   April 13th, 2010, at 4:18 p.m.  I'd like you to take a look at

10:42:50  2   that e-mail and tell me when you have had a chance to review

10:42:52  3   the first paragraph of it.

10:43:04  4   A.  Yes, sir.

10:43:05  5   Q.  And that references Ira Lauter -- you receiving a call

10:43:14  6   from a gentleman named Ira Lauter.

10:43:17  7        Who is Ira Lauter?

10:43:19  8   A.  He represented himself as a representative of Associated

10:43:23  9   Bank.

10:43:23  10  Q.  Okay.  And are you familiar with the firm of Rick Levin

10:43:31  11  and Associates?

10:43:32  12  A.  Not really.

10:43:37  13  Q.  Are you aware that Mr. Lauter works for Rick Levin and

10:43:42  14  Associates?

10:43:42  15        MS. DEDINAS:  Objection.

10:43:43  16        THE COURT:  Sustained.

10:43:44  17  BY MR. McJESSY:

10:43:44  18  Q.  Are you aware that Ira Lauter is an appraiser of computer

10:43:48  19  equipment?

10:43:48  20  A.  No, sir.

10:43:48  21  Q.  Okay.  Are you aware that Mr. Lauter had been shown the

10:43:53  22  computer equipment in the warehouse to photograph it prior to

10:43:58  23  the date of the friendly foreclosure?

10:44:00  24  A.  No, sir.

10:44:01  25  Q.  Do you remember receiving the call that's referenced here

10:44:13　1　from Ira Lauter?

10:44:17　2　A.　I received two calls from Ira Lauter over time.　I don't

10:44:23　3　recall one over the other, no.

10:44:24　4　Q.　Do you recall the substance of either of those

10:44:26　5　conversations?

10:44:26　6　A.　Mr. Lauter was claiming to represent Associated Bank and

10:44:32　7　he wanted to pick up the computer.

10:44:34　8　Q.　What did you tell him?

10:44:34　9　A.　That he would need a replevin.

10:44:37　10　Q.　Sir, I'd like you to take a look at Exhibit 43 also.　Let

10:45:26　11　me know when you have had a chance to get that.

10:45:51　12　A.　Yes, sir.

10:45:51　13　Q.　And if you could read the e-mail that's -- the one

10:45:55　14　paragraph e-mail that's here.

10:45:58　15　　　　　THE COURT:　You are talking about the first page?

10:46:00　16　　　　　MR. McJESSY:　Correct, on the first page.

10:46:00　17　BY MR. McJESSY:

10:46:02　18　Q.　It's an e-mail dated 3/15/2010 at 3:25 p.m.

10:46:09　19　A.　Yes, sir.

10:46:09　20　Q.　Do you recall receiving this e-mail?

10:46:11　21　A.　Yes, sir.

10:46:12　22　Q.　Okay.　And did you respond to this e-mail, to the best of

10:46:16　23　your knowledge, in any fashion, either by e-mail or with a

10:46:24　24　telephone call, in any way?

10:46:26　25　A.　I don't recall.

10:46:30    1    Q.  All right.  Now, this is a request asking for Mr. Lauter
10:46:41    2    to -- whether Mr. Lauter can, quote, get those hard drives.
10:46:45    3         Do you recall discussing somebody gaining access to
10:46:48    4    the hard drives on the computer separate from the computer
10:46:56    5    itself?
10:46:58    6         THE COURT:  Does he need to be reading rather than
10:47:01    7    listening to --
10:47:02    8         MR. McJESSY:  No, he can listen to what I am saying.
10:47:05    9         THE WITNESS:  I don't recall anyone having access to
10:47:07    10   the hard drives.
10:47:08    11   BY MR. McJESSY:
10:47:08    12   Q.  Okay.  That wasn't quite my question.  What seemed unusual
10:47:13    13   about this e-mail to me is somebody is not asking for the
10:47:16    14   server; they are specifically asking for access to just the
10:47:19    15   hard drives.
10:47:24    16        Do you recall anyone asking for just access to the
10:47:27    17   hard -- strike that.
10:47:30    18        Do you remember specifically why Mr. Dieterich wanted
10:47:35    19   Mr. Lauter to have access to just the hard drives?
10:47:40    20        MS. DEDINAS:  Objection.
10:47:40    21        THE COURT:  Sustained.
10:47:42    22   BY MR. McJESSY:
10:47:42    23   Q.  Do you have any understanding of why Mr. Dieterich wanted
10:47:49    24   Mr. Lauter to have access to the hard drives?
10:47:51    25   A.  No, sir.

10:47:52    1    Q.  Do you know, did you provide Mr. Lauter access to the hard

10:47:59    2    drives in response to this e-mail?

10:48:00    3            MS. DEDINAS:  Objection.

10:48:02    4            THE COURT:  If he knows whether or not he provided

10:48:04    5    it.

10:48:04    6            MS. DEDINAS:  He stated that he did not respond to

10:48:06    7    Mr. Lauter in any way.

10:48:10    8            THE COURT:  Sustained.

10:48:19    9            MR. McJESSY:  Whether he provided access wouldn't

10:48:24   10    have anything to do with whether he --

10:48:25   11            THE COURT:  He responded?

10:48:25   12            MR. McJESSY:  -- Responded.

10:48:27   13            THE COURT:  Yes, it would.  I think it would.

10:48:28   14    BY MR. McJESSY:

10:48:29   15    Q.  Sir, did you ever provide Mr. Lauter access to the hard

10:48:32   16    drives, to your knowledge?

10:48:33   17    A.  No, sir.

10:48:33   18    Q.  Now, this e-mail is dated the very same day as the

10:48:37   19    friendly foreclosure occurred.  And the e-mail is clearly

10:48:45   20    directed to you, clearly asking for the access to the server.

10:48:50   21            Do you know how it is that Jim -- well, strike that.

10:48:54   22            Jim Dieterich was with Associated Bank, you

10:48:58   23    testified, right?

10:48:58   24    A.  Yes, sir.

10:48:59   25    Q.  Do you know how it is that Associated Bank knew on

10:49:03  1  March 15th, 2010, to contact you specifically for access to

10:49:09  2  the hard drives on the server?

10:49:11  3          MS. DEDINAS:  Objection.

10:49:13  4          THE COURT:  No, he can answer.

10:49:14  5          THE WITNESS:  No, sir.

10:49:16  6  BY MR. McJESSY:

10:49:17  7  Q.  Do you know, was Associated Bank apprised of when the

10:49:23  8  friendly foreclosure was going to occur?

10:49:25  9  A.  Not that I'm aware of.

10:49:27  10  Q.  And just so I'm clear, you have no knowledge of how

10:49:31  11  Associated Bank knew that First Midwest had taken possession

10:49:36  12  of the warehouse on March 15th?

10:49:38  13  A.  Not that I recall.

10:49:39  14  Q.  Now, my understanding is that there were lease

10:49:56  15  negotiations between First Midwest Bank and United Central

10:49:58  16  Bank for the warehouse; is that right?

10:50:00  17  A.  That's correct.

10:50:01  18  Q.  Okay.  And my understanding is that the purpose of those

10:50:04  19  lease negotiations were to give United Central Bank possession

10:50:09  20  of the warehouse for the purpose of handling the inventory

10:50:13  21  that remained in the warehouse; is that right?

10:50:15  22  A.  That's correct.

10:50:15  23  Q.  Was there ever an agreement reached between First Midwest

10:50:19  24  Bank and United Central Bank for a lease in the warehouse?

10:50:22  25  A.  No, sir.

10:50:22    1   Q. During what period of time did those negotiations take

10:50:25    2   place?

10:50:25    3   A. Sometime after I took possession into the month of April.

10:50:35    4   Q. All right. That's what I was going to ask. It was -- you

10:50:37    5   weren't having negotiations prior to the time that the

10:50:41    6   friendly foreclosure occurred regarding the lease of the

10:50:44    7   warehouse by United Central Bank?

10:50:46    8   A. No, sir.

10:50:46    9   Q. Okay. It was between March -- during March and April that

10:50:52   10   you were having those discussions?

10:50:53   11   A. Yes, sir.

10:50:55   12   Q. And at that time, was it contemplated that if the parties

10:51:01   13   were able to enter into a lease, that United Central Bank

10:51:04   14   would actually take possession of the warehouse for some

10:51:06   15   period of time?

10:51:07   16   A. Yes, sir.

10:51:09   17   Q. Now, during April, May, June, 2009 -- I'm sorry, 2010,

10:51:29   18   you're having discussions with -- you are, as I understand it,

10:51:33   19   with the folks from Associated Bank trying to negotiate for

10:51:37   20   the acquisition of the server and the lease and the guaranty;

10:51:37   21   is that right?

10:51:41   22   A. That's correct.

10:51:41   23   Q. Okay. And initially, Associated Bank extends an offer to

10:51:49   24   sell the server to you without the guaranty. Do you recall

10:51:53   25   that?

10:51:53   1   A.  Yes, sir.

10:51:57   2   Q.  Okay.  Was that consistent with the discussions that you

10:52:09   3   were having with them prior to that time?

10:52:11   4   A.  I did not believe so.

10:52:13   5   Q.  Okay.  What was your understanding at the time?

10:52:22   6   A.  My request was for them to sell me the lease.  They must

10:52:29   7   have understood I was trying to buy the computer.

10:52:33   8   Q.  All right.  So that's how they responded to you?

10:52:38   9   A.  They responded to me that they would sell me -- yes, there

10:52:42  10   was a confusion --

10:52:43  11        THE COURT:  They would sell you, yes?

10:52:45  12        THE WITNESS:  Well, Mr. Dieterich and I were

10:52:47  13   apparently confused as to what he was offering for sale and I

10:52:50  14   was attempting to buy.

10:52:52  15   BY MR. McJESSY:

10:52:52  16   Q.  All right.  So whatever your communications were to them,

10:52:54  17   they understood you wanted to buy the computer itself?

10:52:58  18   A.  That seemed to be correct, yes.

10:52:59  19   Q.  All right.

10:53:02  20        THE COURT:  But that's your interpretation, is that

10:53:06  21   correct, or is that a fact?

10:53:08  22        THE WITNESS:  They sent me an e-mail at one point

10:53:12  23   agreeing to sell me the computer for X dollars.  I don't

10:53:17  24   remember how much.

10:53:18  25   BY MR. McJESSY:

| | | |
|---|---|---|
| 10:53:18 | 1 | Q. And that was not agreeable to you? |
| 10:53:19 | 2 | A. No, sir. |
| 10:53:20 | 3 | Q. Okay. You wanted the computer, the lease and the |
| 10:53:25 | 4 | guaranty? |
| 10:53:25 | 5 | A. I didn't want the computer. I only wanted the lease. |
| 10:53:27 | 6 | Q. All right. And this is a good point. If you -- the party |
| 10:53:33 | 7 | that owned the lease effectively, though, also owned the |
| 10:53:36 | 8 | server; is that right? |
| 10:53:37 | 9 | A. That's correct. |
| 10:53:37 | 10 | Q. Sir, have you ever spoken with Mr. Joshi? |
| 10:53:46 | 11 | A. Yes, sir. |
| 10:53:47 | 12 | Q. Okay. And when did you first speak with Mr. Joshi? |
| 10:53:56 | 13 | A. I don't recall. Perhaps sometime in March. |
| 10:53:58 | 14 | Q. All right. March of 2010? |
| 10:54:00 | 15 | A. 2010. |
| 10:54:01 | 16 | Q. Sir, during May, June -- well, actually, let me take a |
| 10:54:36 | 17 | step back. |
| 10:54:36 | 18 | At any point between the time that you took |
| 10:54:38 | 19 | possession of the warehouse in March of 2010 and the middle of |
| 10:54:44 | 20 | July 2010, did you show the warehouse to anybody? |
| 10:54:48 | 21 | A. Yes, sir. |
| 10:54:54 | 22 | Q. Okay. And do you know on how many occasions you showed |
| 10:54:58 | 23 | the warehouse to different parties? |
| 10:54:59 | 24 | A. Me personally? |
| 10:55:03 | 25 | Q. Let's start with that first, yes. |

10:55:05  1   A.  I think I showed the warehouse twice.

10:55:08  2   Q.  All right.  And did anybody else show the warehouse on

10:55:12  3   behalf of First Midwest Bank besides you?

10:55:14  4   A.  Yes, sir.

10:55:15  5   Q.  Okay.  Who would have done that?

10:55:17  6   A.  U.S. Equities.

10:55:18  7   Q.  All right.  And do you know how many times that occurred?

10:55:21  8   A.  No, sir.

10:55:22  9   Q.  Okay.  Do you have any estimate of the number of times

10:55:27  10  that occurred?

10:55:28  11  A.  It seems to me seven or eight times.

10:55:35  12        THE COURT:  Does that include the two that you

10:55:36  13  showed?

10:55:37  14        THE WITNESS:  Yes, sir.

10:55:37  15  BY MR. McJESSY:

10:55:38  16  Q.  All right.  And anybody that was shown the warehouse,

10:55:43  17  would they have been able to see the server as well?

10:55:46  18        MS. DEDINAS:  Objection.

10:55:47  19        THE COURT:  Sustained.

10:55:48  20  BY MR. McJESSY:

10:55:51  21  Q.  You were actually at the warehouse on at least two

10:55:55  22  occasions, as I understand it, and once I understand very

10:56:00  23  recently; is that right?

10:56:02  24  A.  I haven't been at the warehouse in months, sir.

10:56:05  25  Q.  Okay.  I must have my facts wrong.

| | | |
|---|---|---|
| 10:56:08 | 1 | During the period of March to the middle of July, you |
| 10:56:13 | 2 | were in the warehouse at least twice; is that right? |
| 10:56:16 | 3 | A.  That's correct. |
| 10:56:17 | 4 | Q.  And did you walk through the warehouse? |
| 10:56:19 | 5 | A.  Yes, sir. |
| 10:56:19 | 6 | Q.  And did you see the server that was there? |
| 10:56:20 | 7 | A.  Yes, sir. |
| 10:56:21 | 8 | Q.  Where was it kept? |
| 10:56:22 | 9 | A.  In one of the office -- well, I call it an office, one of |
| 10:56:27 | 10 | the rooms that make up the office collection. |
| 10:56:30 | 11 | Q.  There are rooms within the warehouse, I take it? |
| 10:56:33 | 12 | A.  Yes, sir. |
| 10:56:34 | 13 | Q.  Okay.  Are they temperature-controlled rooms? |
| 10:56:38 | 14 | A.  Other than they have thermostats?  No. |
| 10:56:42 | 15 | Q.  Do they have air conditioning? |
| 10:56:43 | 16 | A.  Yes, sir. |
| 10:56:44 | 17 | Q.  Okay.  And was the server on when you were there? |
| 10:56:49 | 18 | A.  Not to the best of my knowledge. |
| 10:56:51 | 19 | Q.  Okay.  When you showed people through the warehouse, did |
| 10:56:59 | 20 | you go through the office area where the server was? |
| 10:57:01 | 21 | A.  Yes, sir. |
| 10:57:02 | 22 | Q.  And the people that you were showing the warehouse to, |
| 10:57:11 | 23 | they could see the server as well; is that right? |
| 10:57:14 | 24 | MS. DEDINAS:  Objection. |
| 10:57:14 | 25 | THE COURT:  Sustained.  Lay a foundation. |

BY MR. McJESSY:

Q.  The people that you were there with, did you walk them through the area where the server was kept?

A.  Yes, sir.

Q.  Okay.  And was the server out in the open?  If you walked into the room, could you see it, or was it in a cabinet stored away?

A.  It looked like a big metal server, so I don't know if that was a cabinet or not.

Q.  All right.  I guess my -- maybe I didn't ask my question very well.

        If you walked into the room where the server was, could you see it?

A.  Yes.

Q.  On either of the two occasions where you were showing parties through the warehouse, did they ask you about the server?

A.  I don't recall.

Q.  Did Associated Bank ever sue First Midwest Bank to repossess the server?

A.  Not to the best of my knowledge.

Q.  Now, you eventually sold the server to someone other than Mr. Shah; is that right?

A.  That's correct.

Q.  All right.  And I take it you have no knowledge who may

| | | |
|---|---|---|
| 10:58:52 | 1 | have directed the person to you or how the person found out |
| 10:58:54 | 2 | about the server; is that right? |
| 10:58:57 | 3 | A.  No, sir. |
| 10:58:57 | 4 | Q.  You don't know whether Mr. Lauter directed somebody to you |
| 10:59:00 | 5 | about the server? |
| 10:59:01 | 6 | A.  No, sir. |
| 10:59:02 | 7 | Q.  And you still had -- "you," meaning First Midwest Bank -- |
| 10:59:09 | 8 | still had possession and control of the server through the end |
| 10:59:14 | 9 | of July; is that right? |
| 10:59:18 | 10 | A.  Yes, sir. |
| 10:59:18 | 11 | Q.  All right.  It was at the end of July when you eventually |
| 10:59:21 | 12 | sold the server; is that right? |
| 10:59:22 | 13 | A.  That's correct. |
| 10:59:22 | 14 | Q.  All right.  Now, the server was sold at the end of July, |
| 10:59:35 | 15 | and there is an e-mail from you to Mr. Shah dated August 30th |
| 10:59:43 | 16 | wherein you advise him that the server has been sold.  Are you |
| 10:59:47 | 17 | familiar with that e-mail? |
| 10:59:48 | 18 | A.  Yes, sir. |
| 10:59:48 | 19 | Q.  Why is it that you didn't notify him until the end of |
| 10:59:52 | 20 | August that the server had been sold? |
| 10:59:54 | 21 | A.  Mr. Shah didn't ask. |
| 10:59:56 | 22 | Q.  All right.  And you just didn't tell him? |
| 10:59:59 | 23 | A.  No, sir. |
| 10:59:59 | 24 | Q.  Sir, I'd like you just to take a look at one last exhibit, |
| 11:00:37 | 25 | Exhibit 103.  This is a letter from Jones & Jacobs to you |

11:00:57 1 regarding the computer server. And they're making a further

11:01:04 2 demand for pickup and removal of the equipment by Mr. Lauter.

11:01:10 3 Do you see on the second page it has his name and the firm

11:01:14 4 that he's with?

11:01:15 5 A. Yes, sir.

11:01:16 6 Q. All right. And this is dated May 13th, 2010.

11:01:21 7 Do you recall whether you received this letter before

11:01:24 8 or after your meeting with Mr. Piggee and Mr. Hoholik?

11:01:28 9 A. No, sir, I don't.

11:01:32 10 Q. Okay. Did you respond to this letter?

11:01:35 11 A. I did not personally, no.

11:01:38 12 Q. Okay. And it says in the last paragraph on the first page

11:01:51 13 of this letter, the demand has been made for possession of

11:01:54 14 this server and demand has been refused.

11:01:57 15 Do you see that?

11:01:58 16 A. Yes, sir.

11:02:01 17 Q. Are you one of the individuals from First Midwest Bank who

11:02:04 18 refused to turn over the server?

11:02:07 19 A. Yes, sir.

11:02:13 20 Q. To your knowledge, did anybody else at First Midwest Bank

11:02:15 21 besides you ever respond to a request for turning over the

11:02:19 22 server, besides Mr. Serritella?

11:02:25 23 A. No, sir.

11:02:26 24 Q. All right.

11:02:50 25 MR. McJESSY: I have no other questions, your Honor.

| | | |
|---|---|---|
| 11:02:52 | 1 | THE COURT:  Thank you. |
| 11:02:52 | 2 | MR. McJESSY:  Thank you, Mr. Clark. |
| 11:02:54 | 3 | THE WITNESS:  Thank you. |
| 11:02:55 | 4 | THE COURT:  Anything from Mr. Lipton? |
| 11:02:58 | 5 | MR. LIPTON:  Yes, your Honor. |
| 11:02:59 | 6 | THE COURT:  Before you ask a question, I just want to |
| 11:03:01 | 7 | clarify something, if I can, with you, Mr. Clark. |
| 11:03:03 | 8 | You were asked by Mr. McJessy regarding the locks |
| 11:03:12 | 9 | being changed at the warehouse and whether or not it was done |
| 11:03:17 | 10 | on March 15th, which was the friendly foreclosure.  Do you |
| 11:03:21 | 11 | recall that? |
| 11:03:21 | 12 | THE WITNESS:  Yes, sir. |
| 11:03:22 | 13 | THE COURT:  And you didn't know, I guess, |
| 11:03:26 | 14 | specifically, but the locks wouldn't have been changed until |
| 11:03:28 | 15 | after the eviction, would they? |
| 11:03:30 | 16 | THE WITNESS:  I don't believe they would. |
| 11:03:33 | 17 | THE COURT:  Okay.  That's all. |
| 11:03:37 | 18 | - - - |
| 11:03:37 | 19 | DAVID CLARK, CROSS-EXAMINATION |
| 11:03:37 | 20 | BY MR. LIPTON: |
| 11:04:03 | 21 | Q.  Good morning, Mr. Clark. |
| 11:04:04 | 22 | A.  Good morning. |
| 11:04:04 | 23 | Q.  Do you recall testifying at your deposition? |
| 11:04:11 | 24 | A.  Yes, sir. |
| 11:04:12 | 25 | Q.  It's true, isn't it, that previously you've testified that |

11:04:17  1  you didn't ever recall discussing the server with Mr. Borlack?

11:04:21  2  A.  Yes, sir.  If I remember that correct -- that question

11:04:28  3  correctly, yes, sir.

11:04:29  4  Q.  And it's true you've never discussed the server with

11:04:33  5  Mr. Borlack, isn't it?

11:04:33  6  A.  As I stated today, I am not sure who would have ever been

11:04:39  7  on the phone.  I never had a direct conversation -- a call

11:04:42  8  between Mr. Borlack and myself to recognize Mr. Borlack was on

11:04:46  9  the phone in any discussion of the server.

11:04:49  10  Q.  So with regard to the call that you testified to today, to

11:04:53  11  your mind, it's just -- it's equally plausible that it could

11:04:57  12  have been Mr. Blumenthal on the phone?

11:04:59  13  A.  Mr. Shah and his attorney is what I understood.

11:05:04  14  Q.  And you didn't know which attorney?

11:05:06  15  A.  No, sir.

11:05:07  16  Q.  And if it's true that you don't recall discussing the

11:05:16  17  server with Mr. Borlack, is it equally true that you don't

11:05:20  18  recall discussing the server with any member of Mr. Borlack's

11:05:23  19  firm?

11:05:23  20  A.  I would be lost to name anyone else in Mr. Borlack's firm.

11:05:31  21  Q.  So you don't --

11:05:32  22  A.  I don't recall.

11:05:32  23  Q.  You don't believe you ever discussed the server with

11:05:36  24  Mr. Grossman?

11:05:36  25  A.  I don't recall any conversations, no, ever with

11:05:41   1   Mr. Grossman.

11:05:44   2   Q.  And would your answer be the same with regard to

11:05:46   3   Mr. Muschler?

11:05:47   4   A.  Yes, sir.

11:05:47   5   Q.  Now, you were always negotiating for the server and the

11:05:58   6   lease on behalf of Mr. Shah, correct?

11:06:01   7   A.  No, sir.  I was only negotiating on behalf of the lease.

11:06:06   8   Q.  On behalf of the lease?

11:06:07   9   A.  With the lease came the guaranty.  I really never was

11:06:14   10  concerned with the underlying -- what was leased.

11:06:18   11  Q.  But it was your understanding that the items that you were

11:06:21   12  negotiating for would go back to Mr. Shah, correct?

11:06:25   13  A.  The software and computer, yes, sir.

11:06:27   14  Q.  And the guaranty?

11:06:28   15  A.  Yes, sir.

11:06:28   16  Q.  Okay.  And when did you learn that the software and the

11:06:34   17  computer and the lease were not going back to Mr. Shah?

11:06:37   18  A.  When Mr. Shah told me he didn't have the money to pay me.

11:06:42   19  Q.  Okay.  And why did that change things?

11:06:47   20  A.  I had negotiated to purchase the lease, and I now needed a

11:06:56   21  buyer.

11:06:56   22  Q.  When Mr. Shah told you he didn't have the money to pay

11:07:02   23  you, isn't that the reason that you wrote up a 30-day note?

11:07:06   24  A.  No, sir.

11:07:07   25  Q.  Wasn't there a deal before the 30-day note where Mr. Shah

11:07:12  1  was supposed -- where FMB was supposed to purchase the server

11:07:16  2  and lease and repayment was supposed to be within 24 hours?

11:07:19  3  A.  That's correct.

11:07:21  4  Q.  All right.  And then subsequently, there was a note for 30

11:07:27  5  days.  Now, why did the deal change from payment within 24

11:07:31  6  hours to payment within 30 days?

11:07:34  7  A.  To extend the money, I needed a note, and 30 days was

11:07:42  8  short term that they would let me write that note.

11:07:44  9  Q.  And who did you discuss that with at the bank?

11:07:47  10  A.  Tom Driver (phonetic).

11:07:51  11  Q.  So Tom Driver would only allow you to write a note for a

11:07:58  12  minimum of 30 days?

11:07:59  13  A.  It was a no-interest note.

11:08:03  14       THE COURT:  That's not an answer to the question.

11:08:05  15       THE WITNESS:  The answer is yes, it had to be 30

11:08:07  16  days.  No shorter.

11:08:08  17  BY MR. LIPTON:

11:08:08  18  Q.  And you were directed on that issue by Mr. Driver?

11:08:11  19  A.  I believe so.

11:08:12  20  Q.  And when did that occur?

11:08:14  21  A.  Sometime in July 2010.

11:08:18  22  Q.  And when in July in 2010?

11:08:21  23  A.  I don't recall.

11:08:22  24  Q.  Was it before or after the date of the memorandum that's

11:08:27  25  dated July 20th?

| | | |
|---|---|---|
| 11:08:29 | 1 | A.  It would have been before, sir. |
| 11:08:32 | 2 | Q.  What did Mr. Driver know about FMB's involvement in the |
| 11:08:41 | 3 | plan to purchase the computer and the lease? |
| 11:08:45 | 4 | A.  He knew that as part of the deed in lieu, the bank had |
| 11:08:51 | 5 | agreed to negotiate for the purchase of the lease. |
| 11:08:54 | 6 | Q.  And you informed him of that? |
| 11:08:55 | 7 | A.  Yes, sir. |
| 11:08:56 | 8 | Q.  Did Mr. Driver direct your activities with regard to the |
| 11:09:11 | 9 | transactions or FMB's purchase of the server and the lease, or |
| 11:09:11 | 10 | were you operating on your own? |
| 11:09:17 | 11 | A.  For the purchase of the lease? |
| 11:09:17 | 12 | Q.  The server and the lease. |
| 11:09:18 | 13 | A.  I was operating on my own. |
| 11:09:20 | 14 | Q.  You were operating on your own. |
| 11:09:22 | 15 |        So how did Mr. Driver get involved in making a |
| 11:09:24 | 16 | decision as to whether a 30-day note was necessary? |
| 11:09:27 | 17 | A.  Mr. Driver was the head of the department, and he said it |
| 11:09:31 | 18 | should be a 30-day note. |
| 11:09:34 | 19 | Q.  Now, how did the fact that Mr. Shah did not have the money |
| 11:09:46 | 20 | to pay you immediately affect the decision, your decision, to |
| 11:10:00 | 21 | sell the servers to someone else? |
| 11:10:02 | 22 | A.  I did not want to make Mr. Shah a loan on a long-term |
| 11:10:09 | 23 | basis and he could not repay me.  I needed someone to pay off |
| 11:10:13 | 24 | the agreement. |
| 11:10:13 | 25 | Q.  Well, how did -- did Mr. Shah tell you that he wouldn't be |

| | | |
|---|---|---|
| 11:10:18 | 1 | able to come up with the money within 30 days? |
| 11:10:20 | 2 | A. Yes, sir. |
| 11:10:20 | 3 | Q. When did he tell you that? |
| 11:10:22 | 4 | A. Sometime in July after I had written the note. |
| 11:10:27 | 5 | Q. Now, getting back to the memorandum of July 20th, you had |
| 11:10:42 | 6 | a conversation with Mr. Shah in which Mr. Shah told you that |
| 11:10:47 | 7 | repayment was going to be coming from a foreign corporation |
| 11:10:52 | 8 | not associated with him; is that right? |
| 11:10:54 | 9 | A. That's correct. |
| 11:10:54 | 10 | Q. When did you have that conversation with Mr. Shah? |
| 11:11:01 | 11 | A. I believe before he left the country. |
| 11:11:05 | 12 | Q. So you knew that in June? |
| 11:11:11 | 13 | A. I couldn't tell you when exactly it was, sir. |
| 11:11:18 | 14 | Q. Well, if I told you that Mr. Shah left the country in late |
| 11:11:24 | 15 | June and stayed out of the country until sometime mid to late |
| 11:11:28 | 16 | July, according to the evidence, would that be fair? |
| 11:11:32 | 17 | A. Yes, sir. |
| 11:11:34 | 18 | Q. You believe that that's about the time frame that he was |
| 11:11:37 | 19 | out of the country? |
| 11:11:38 | 20 | A. If you say so. |
| 11:11:40 | 21 | Q. So you continued to negotiate to purchase the server and |
| 11:11:49 | 22 | the computer -- I'm sorry, the server and the lease from |
| 11:11:54 | 23 | Mr. Shah despite knowing the fact as early as June that he |
| 11:11:58 | 24 | didn't have the money to pay for it? |
| 11:12:00 | 25 | A. The new tenant in my warehouse was going to lend Mr. Shah |

11:12:04  1   the money is what I was told.

11:12:06  2   Q.  What new tenant in the warehouse?

11:12:08  3   A.  Mr. Shah was going out of the country to get the lease --

11:12:13  4   a lease signed.

11:12:15  5   Q.  Okay.

11:12:26  6       MR. McGARRY:  May I have the answer read back just

11:12:28  7   for the people back here?

11:12:30  8       THE COURT:  Would you like both the question and the

11:12:32  9   answer?

11:12:34  10      MR. McGARRY:  Yes.

11:12:34  11      THE COURT:  Would you read that, please?

11:12:42  12    (Record read.)

11:12:45  13  BY MR. LIPTON:

11:12:46  14  Q.  And the lease didn't get signed, did it?

11:12:49  15  A.  No, sir.

11:12:50  16  Q.  And when did you find that out?

11:12:52  17  A.  Upon Mr. Shah's return.

11:12:54  18  Q.  And that was approximately when?

11:12:56  19  A.  I couldn't tell you, sir.  I believe you just gave me

11:13:02  20  dates a short time ago.

11:13:03  21  Q.  So when you found out that there was not going to be a

11:13:09  22  tenant who could come up with the money, did the plan change

11:13:14  23  at that point in time?

11:13:15  24  A.  Mr. Shah then notified me that he could not get the money

11:13:24  25  to pay me back, yes, sir.

11:13:25  1  Q.  And you continued to negotiate to purchase the server and

11:13:30  2  the lease?

11:13:31  3  A.  I don't know if upon that time period where I was in my

11:13:36  4  negotiations with Associated Bank.

11:13:38  5  Q.  Incidentally, if you just take a look at Exhibit SH 240,

11:13:54  6  the one that you saw this morning with all the telephone

11:13:57  7  numbers on it, that exhibit doesn't reflect any incoming

11:14:07  8  foreign calls to your business telephone, does it?

11:14:10  9  A.  I don't believe so.

11:14:15  10         THE COURT:  Go ahead and take your time and take a

11:14:17  11  look at it to make sure.

11:14:21  12         THE WITNESS:  I never heard of a 999 area code.  I

11:14:26  13  have no idea what that is.  There seem to be area codes on all

11:14:57  14  the other numbers incoming.  I don't know what they...

11:14:57  15  BY MR. LIPTON:

11:14:57  16  Q.  Okay.  Now, with regard to Exhibit 83, the April 13, 2010,

11:14:57  17  e-mail that you sent to Mr. Dieterich at 4:18 p.m., directing

11:15:21  18  your attention to the last paragraph beginning with the word

11:15:26  19  "perhaps," if you could just read the sentence -- that

11:15:28  20  sentence.

11:15:32  21         MR. McJESSY:  Counsel, what exhibit?

11:15:33  22         THE COURT:  83.  And there's several e-mails on here.

11:15:38  23  Do you want to direct him to which one, please?

11:15:44  24  BY MR. LIPTON:

11:15:44  25  Q.  Yes, the April 13th, 2010, where --

661

| | | |
|---|---|---|
| 11:15:46 | 1 | THE COURT:  The bottom one, right? |
| 11:15:49 | 2 | BY MR. LIPTON: |
| 11:15:50 | 3 | Q.  Right.  From you Mr. Clark to James Dieterich. |
| 11:15:52 | 4 | A.  Yes. |
| 11:15:52 | 5 | Q.  The very last paragraph, the one sentence that begins |
| 11:15:56 | 6 | "perhaps." |
| 11:15:58 | 7 | A.  Yes. |
| 11:15:58 | 8 | Q.  Can you explain what that sentence was meant to convey to |
| 11:16:03 | 9 | Mr. Dieterich? |
| 11:16:06 | 10 | A.  Mr. Dieterich had asked for the hard drives at a prior -- |
| 11:16:15 | 11 | in a prior e-mail, and I was merely trying to accommodate him. |
| 11:16:21 | 12 | Q.  Mr. Dieterich had asked for the hard drives? |
| 11:16:23 | 13 | A.  I looked at an e-mail earlier today, and Mr. Dieterich was |
| 11:16:29 | 14 | asking for the hard drives. |
| 11:16:30 | 15 | Q.  That was your interpretation? |
| 11:16:33 | 16 | A.  I believe his e-mail says so. |
| 11:16:39 | 17 | Q.  Do you know what the hard drives were? |
| 11:16:41 | 18 | A.  No, sir. |
| 11:16:41 | 19 | Q.  Okay.  You don't know what the function of a hard drive is |
| 11:16:48 | 20 | on a computer? |
| 11:16:48 | 21 | A.  I know the function of one. |
| 11:16:50 | 22 | Q.  What is the function of a hard drive? |
| 11:16:53 | 23 | A.  It maintains the memory. |
| 11:16:55 | 24 | Q.  So it maintains the information that's recorded on the |
| 11:16:58 | 25 | computer, correct? |

11:16:58  1   A.  That's correct.  Well, I believe that's correct.

11:17:00  2   Q.  Now, why would you be willing to give Mr. Dieterich the

11:17:08  3   hard drives in return for the lease?

11:17:11  4   A.  I had agreed to negotiate for the purchase of the lease.

11:17:22  5   If I could negotiate for the purchase of the lease by giving

11:17:25  6   the hard drives, I have accomplished what I was asked to do.

11:17:30  7   Q.  Asked by whom?

11:17:31  8   A.  By Mr. Shah and his attorney at the time when we took the

11:17:35  9   warehouse.

11:17:36  10  Q.  And by "his attorney," you mean Mr. Blumenthal?

11:17:39  11  A.  Yes, sir.

11:17:39  12  Q.  Well, when you were considering giving the hard drives

11:17:57  13  over to Mr. Dieterich, did you have any knowledge of what was

11:18:00  14  on them?

11:18:00  15  A.  No, sir.

11:18:01  16  Q.  Did you -- you knew that they had been used in the Kanan

11:18:09  17  warehouse, didn't you?

11:18:10  18  A.  Yes, sir.

11:18:10  19  Q.  And you knew that they had some kind of information on

11:18:14  20  them, didn't you?

11:18:15  21  A.  I would have to believe so.

11:18:18  22  Q.  And you knew from the March 16 e-mail that the information

11:18:23  23  that was on the hard drives was considered to be relevant

11:18:27  24  evidence in a federal lawsuit, didn't you?

11:18:29  25  A.  At that particular moment?  No, sir.

11:18:34  1  Q.  You mean at that particular moment, you weren't thinking
11:18:38  2  about it; is that right?
11:18:39  3  A.  No, sir.  As I said, I did not review the e-mail from --
11:18:47  4  on March 16th prior to my first deposition.
11:18:49  5  Q.  Well, what we're talking about here is an offer that
11:18:55  6  you're making, perhaps I can give you the hard drives and the
11:18:58  7  computers and you can sell me the lease, on April 13, less
11:19:01  8  than a month after you had received the March 16 e-mail from
11:19:06  9  Mr. Blumenthal warning the people that received that e-mail
11:19:11  10  that the computer hard drives contained evidence relevant to a
11:19:14  11  federal lawsuit, correct?
11:19:15  12  A.  As I testified here today, I did not review the e-mail
11:19:21  13  from Mr. Blumenthal.  It was directed to my attorney.  It was
11:19:25  14  copied to me.  I did not review it.
11:19:27  15  Q.  Do you always fail to review e-mails that concern business
11:19:35  16  dealings that you're working on that go to your attorney and
11:19:39  17  copy you?
11:19:39  18  A.  I think my attorney would tell me if I needed to review it
11:19:46  19  or I needed not.
11:19:47  20  Q.  Did your attorney tell you that you needed to review it?
11:19:52  21  Did Mr. Serritella ever tell you that you needed to review the
11:19:56  22  March 16 e-mail, that it contained important information on
11:20:04  23  it?
11:20:04  24  A.  Not to the best of my knowledge, sir.
11:20:05  25  Q.  Now, you testified, I believe, for Mr. McJessy that you

11:20:14   1   sold the server to someone other than Mr. Shah, correct?

11:20:17   2   A. I sold the lease to someone other than Mr. Shah.

11:20:19   3   Q. All right. Sold the lease and the server?

11:20:23   4   A. The owner of the lease owns the server, yes, sir.

11:20:25   5   Q. Okay. So you sold the lease and the server to someone

11:20:29   6   other than Mr. Shah is what you testified to Mr. McJessy,

11:20:35   7   right?

11:20:36   8   A. I believe I told him I sold the lease.

11:20:38   9   Q. How do you know it went to somebody other than Mr. Shah?

11:20:40   10   A. All I know is the person who paid me was not Mr. Shah.

11:20:50   11   Q. So you don't know whether the lease and server went to

11:20:58   12   Mr. Shah or not; isn't that right?

11:21:00   13   A. It went to the corporation that paid me. That's all I can

11:21:07   14   tell you.

11:21:08   15   Q. And how can you verify that?

11:21:11   16   A. I suppose I can't.

11:21:18   17   Q. So, actually, you don't know where the server and the

11:21:21   18   lease went. You just know they were picked up by a man named

11:21:25   19   Jim, correct?

11:21:26   20   A. Yes.

11:21:26   21   Q. Is that right?

11:21:27   22   A. Yes.

11:21:27   23   Q. Now, how long had you been negotiating on Mr. Shah's

11:21:41   24   behalf and FMB's behalf to purchase the server and the lease?

11:21:48   25   Approximately six months, February through July?

11:21:54　1　A. Yes, it could have started in February, yes, sir.

11:22:01　2　Q. And you didn't tell Mr. Shah that you sold the server to

11:22:07　3　somebody else after negotiating on his behalf for six months

11:22:12　4　to buy the server and the lease?

11:22:13　5　A. No, sir.

11:22:14　6　Q. Why not?

11:22:14　7　A. I still needed Mr. Shah's cooperation.

11:22:23　8　Q. What does that mean?

11:22:24　9　A. Well, I didn't know how cooperative Mr. Shah would be once

11:22:29　10　I told him I had sold his guaranty elsewhere.

11:22:32　11　Q. And what kind of cooperation did you need from Mr. Shah

11:22:35　12　that was more important than the issue you had been working on

11:22:38　13　for the past six months on his behalf?

11:22:41　14　A. The sale of the warehouse.

11:22:43　15　Q. You already owned the warehouse. Why did you need his

11:22:48　16　cooperation?

11:22:48　17　A. Mr. Shah had records on the warehouse that the due

11:22:52　18　diligence team wanted to look at.

11:22:54　19　Q. Such as?

11:22:58　20　A. I thought I could get the plans, I needed the -- I needed

11:23:06　21　to know about the roof, I needed cooperation from Mr. Shah

11:23:09　22　concerning the ongoing operation of the warehouse.

11:23:12　23　Q. Well, the roof was already fixed, right?

11:23:16　24　A. Sir, I needed records on when and how the roof was

11:23:21　25　repaired and what was done.

| | | |
|---|---|---|
| 11:23:23 | 1 | Q. Well, you had owned the warehouse since March 24. Why |
| 11:23:26 | 2 | hadn't you gotten these very, very important records from |
| 11:23:30 | 3 | Mr. Shah as early as March or April or May or June or July? |
| 11:23:35 | 4 | A. The due diligence team didn't ask for them until July. |
| 11:23:41 | 5 | Q. So you don't do anything unless somebody asks you to do |
| 11:23:44 | 6 | it; is that right? |
| 11:23:45 | 7 | A. Sir, the warehouse belongs to the bank. I wasn't doing |
| 11:23:48 | 8 | anything with it. |
| 11:23:48 | 9 | Q. Well, you didn't tell Mr. Shah you sold the server because |
| 11:23:53 | 10 | he didn't ask and you didn't tell him; isn't that right? |
| 11:23:55 | 11 | A. That's correct. |
| 11:23:57 | 12 | MR. LIPTON: Nothing further, at least until I |
| 11:24:02 | 13 | confer. |
| 11:24:51 | 14 | (Brief pause.) |
| 11:24:51 | 15 | MR. LIPTON: Nothing further, your Honor. |
| 11:24:53 | 16 | THE COURT: Ms. Dedinas? |
| 11:24:55 | 17 | - - - |
| 11:24:55 | 18 | DAVID CLARK, REDIRECT EXAMINATION |
| 11:24:55 | 19 | BY MS. DEDINAS: |
| 11:24:56 | 20 | Q. Mr. Clark, you just testified that you didn't tell |
| 11:24:59 | 21 | Mr. Shah about selling the server because you needed his |
| 11:25:02 | 22 | cooperation; isn't that right? |
| 11:25:04 | 23 | A. That's correct. |
| 11:25:04 | 24 | Q. And you needed it so you'd have more information about the |
| 11:25:07 | 25 | warehouse before you sold it to another party; isn't that |

11:25:10   1   right?

11:25:10   2   A.  That's correct.

11:25:10   3   Q.  And you do a lot of foreclosures, don't you, sir?

11:25:13   4   A.  That's correct.

11:25:14   5   Q.  And it's pretty common, isn't it, that you foreclose on

11:25:19   6   buildings and you get no cooperation from prior owners at all;

11:25:23   7   isn't that right?

11:25:23   8   A.  That's correct.

11:25:24   9   Q.  And you're equipped to deal with that situation, aren't

11:25:26   10  you?

11:25:27   11  A.  That's correct.

11:25:27   12  Q.  Now, you were asked a little bit about Exhibit 83 in which

11:25:34   13  you suggested that you might give the hard drives to

11:25:38   14  Associated Bank if they sell you the lease; isn't that right?

11:25:41   15  A.  That's correct.

11:25:43   16  Q.  And at this time you had been working with Mr. Shah on

11:25:48   17  reaching an agreement that would be acceptable to him to get

11:25:55   18  the lease and the server; is that right?

11:25:57   19  A.  That's correct.

11:25:57   20  Q.  Did you ever ask Mr. Shah or his attorneys whether that

11:26:01   21  might be an acceptable deal, to turn over the hard drives in

11:26:05   22  exchange for the lease?

11:26:06   23  A.  No, ma'am.

11:26:07   24  Q.  Why not?

11:26:08   25  A.  All I was given was the financial budget.

11:26:17 1  Q. And you didn't think it would be important to discuss with

11:26:19 2  Mr. Shah the fact that the situation that you were proposing

11:26:23 3  would result in him not having the actual server that ran the

11:26:28 4  warehouse?

11:26:29 5  A. I was told I was negotiating to get Mr. Shah's guaranty.

11:26:36 6         MR. McGARRY: I'm sorry. Can you ask the witness to

11:26:38 7  keep his voice up.

11:26:39 8         THE COURT: Yes, you are talking a little low.

11:26:41 9         THE WITNESS: I'm sorry. I'm congested today.

11:26:44 10        I was negotiating to get Mr. Shah's guaranty.

11:26:47 11 BY MS. DEDINAS:

11:26:47 12 Q. So Mr. Shah made it very clear to you that he didn't care

11:26:51 13 about the server at all, all he wanted was the release of his

11:26:55 14 personal guaranty?

11:26:56 15 A. That's what I was told. I was not told he didn't care

11:26:59 16 about the server. I was told he wanted his personal guaranty.

11:27:02 17 Q. Now, when you had reached an agreement with Associated

11:27:12 18 Bank and then you found out shortly thereafter that Mr. Shah

11:27:17 19 didn't have the money for the deal, why didn't you just cancel

11:27:21 20 the deal with Associated Bank?

11:27:23 21 A. I never have canceled the deal ever that I have

11:27:32 22 negotiated.

11:27:33 23 Q. But you were going to go through with a purchase for a

11:27:35 24 server and a lease that you really didn't need for your

11:27:38 25 business --

11:27:39  1   A.  No.

11:27:40  2   Q.  -- when you didn't have a buyer on the other end, right?

11:27:43  3   A.  That's correct.

11:27:47  4   Q.  Did you ask your attorney if there was a way you could get

11:27:51  5   out of the deal?

11:27:52  6   A.  No, ma'am.

11:27:53  7   Q.  In fact, you could, couldn't you, because the whole deal

11:27:58  8   was contingent upon you finally wiring money over to

11:28:01  9   Associated Bank?

11:28:02  10  A.  Yes.

11:28:06  11  Q.  And there was no written contract that obligated you to

11:28:10  12  continue with your purchase of the server from Associated

11:28:13  13  Bank, right?

11:28:13  14  A.  No.

11:28:16  15  Q.  When you indicated that Mr. Shah had a new tenant that was

11:28:22  16  going to lend him the money to buy him the server, you said

11:28:26  17  that he went out of the country to get the lease signed; is

11:28:26  18  that right?

11:28:30  19  A.  That's correct.

11:28:30  20  Q.  Is that -- was it your understanding that Mr. Shah went to

11:28:35  21  Hong Kong at that time to get a lease signed?

11:28:38  22  A.  I believe so.

11:28:39  23  Q.  So it was your understanding that a Hong Kong company was

11:28:45  24  going to provide the money to purchase the server; is that

11:28:45  25  right?

11:28:49   1   A.  That's correct.

11:28:49   2   Q.  You indicated that you spoke to Mr. Joshi.  Do you recall

11:29:00   3   that?

11:29:00   4   A.  Yes, ma'am.

11:29:01   5   Q.  How many times have you spoken to him?

11:29:03   6   A.  I believe I said two or three.  I don't recall how often I

11:29:08   7   have spoken to Mr. Joshi.

11:29:08   8   Q.  And were these phone conversations or in person?

11:29:13   9   A.  I met with Mr. Joshi I believe once, and I have had two

11:29:18   10  conversations with him.  I couldn't recall.

11:29:21   11  Q.  So if Mr. Joshi testified that he has never spoken to you,

11:29:26   12  that wouldn't be true, would it?

11:29:28   13  A.  When I say spoken, Mr. Joshi answers the telephone when I

11:29:32   14  would call Kanan and transfers me to Mr. Shah.

11:29:37   15  Q.  So when we're talking about conversations that you've had

11:29:40   16  with Mr. Joshi, I'm asking have you spoken to him in any

11:29:45   17  greater length than having him transfer a phone call to

11:29:49   18  somebody else?

11:29:50   19  A.  Mr. Joshi was --

11:29:53   20       THE COURT:  Speak up.

11:29:54   21       THE WITNESS:  Mr. Joshi was in the office one day

11:29:57   22  when I came to visit Mr. Shah.  Those were -- that was my one

11:30:01   23  meeting, and those were my two phone calls with Mr. Joshi,

11:30:05   24  pass-through phone calls.

11:30:06   25  BY MS. DEDINAS:

| | | |
|---|---|---|
| 11:30:07 | 1 | Q.  So the two phone calls were just pass-through phone calls; |
| 11:30:10 | 2 | he picked up the phone and transferred you to somebody else? |
| 11:30:14 | 3 | A.  That's correct. |
| 11:30:15 | 4 | Q.  And the time that you actually met with him, did he |
| 11:30:17 | 5 | participate in the meeting? |
| 11:30:18 | 6 | A.  No, ma'am. |
| 11:30:18 | 7 | Q.  He was just in the office and you shook hands with him? |
| 11:30:24 | 8 | A.  Yes, ma'am. |
| 11:30:25 | 9 | Q.  Okay.  Now, you were asked a little bit about some |
| 11:30:32 | 10 | negotiations with United Central Bank for a lease of the |
| 11:30:37 | 11 | warehouse.  Do you recall that? |
| 11:30:38 | 12 | A.  That is correct. |
| 11:30:39 | 13 | Q.  Do you recall that was because Kanan Fashions had |
| 11:30:43 | 14 | abandoned its inventory in the warehouse that you were |
| 11:30:49 | 15 | foreclosing on? |
| 11:30:50 | 16 | A.  Yes, ma'am. |
| 11:30:50 | 17 | Q.  And the issue was how was United Central Bank going to |
| 11:30:53 | 18 | dispose of its secured collateral within the short time frame |
| 11:30:59 | 19 | that First Midwest Bank had given it; isn't that correct? |
| 11:31:06 | 20 | A.  I'm sorry.  I don't understand. |
| 11:31:07 | 21 | Q.  Okay.  Wasn't there an issue, sir, that First Midwest Bank |
| 11:31:12 | 22 | told United Central Bank that they had to dispose of what had |
| 11:31:17 | 23 | to be a million or $2 million worth of inventory within a |
| 11:31:21 | 24 | six-day period or you were going to dispose of it for them? |
| 11:31:25 | 25 | A.  No, ma'am. |

| | | |
|---|---|---|
| 11:31:26 | 1 | Q. No? What's wrong with that statement? |
| 11:31:28 | 2 | A. I said if you don't get it out, you need to pay me rent. |
| 11:31:32 | 3 | Q. You didn't say, if you don't get it out, we're going to |
| 11:31:36 | 4 | dispose of it ourselves, or, we will do with it what we see |
| 11:31:40 | 5 | fit? |
| 11:31:40 | 6 | A. Not until after they refused to pay me the rent. |
| 11:31:43 | 7 | Q. And do you recall what you were asking for in rent? |
| 11:31:45 | 8 | A. The same rent that's been paid by Kanan. |
| 11:31:48 | 9 | Q. Which is about what, $24,000 a month? |
| 11:31:53 | 10 | A. No, ma'am. |
| 11:31:54 | 11 | Q. How much? |
| 11:31:54 | 12 | A. I believe it was much more. |
| 11:31:55 | 13 | Q. Much more, okay. |
| 11:31:57 | 14 | So at that point, there was some discussion about |
| 11:32:02 | 15 | United Central Bank entering into a short-term lease for the |
| 11:32:05 | 16 | warehouse so that it could keep the inventory there while it |
| 11:32:09 | 17 | figured out what to do with it. Do you recall that? |
| 11:32:11 | 18 | A. Yes, ma'am. |
| 11:32:12 | 19 | Q. And you were asked whether UCB would take possession of |
| 11:32:17 | 20 | the warehouse, and you indicated yes; isn't that right? |
| 11:32:19 | 21 | A. If they had a lease, they would, yes, ma'am. |
| 11:32:23 | 22 | Q. That lease was never for exclusive possession, was it? |
| 11:32:26 | 23 | A. To the best of my knowledge, there was never a lease. |
| 11:32:29 | 24 | Q. But the discussions for a lease were not for exclusive |
| 11:32:33 | 25 | possession, were they? |

11:32:34   1   A.  I don't -- I don't believe they got beyond the discussion
11:32:38   2   of pay me rent and you can keep your things in my warehouse.
11:32:42   3   Q.  They couldn't have been for exclusive possession, could
11:32:46   4   they, because First Midwest Bank was storing things in the
11:32:49   5   warehouse at that time; isn't that right?
11:32:50   6   A.  Not at that time.
11:32:51   7   Q.  Wasn't that their intention?
11:32:53   8   A.  It was the intention.
11:32:54   9   Q.  And do you recall that there was an issue with the
11:32:59   10  negotiations that First Midwest Bank would not give United
11:33:04   11  Central Bank exclusive possession of the warehouse?
11:33:06   12  A.  No, ma'am.
11:33:07   13  Q.  Okay.  And that deal never occurred, right?
11:33:15   14  A.  The lease?
11:33:19   15  Q.  A lease, right.
11:33:20   16  A.  No lease ever occurred.
11:33:21   17  Q.  Because another solution was agreed to by the parties;
11:33:24   18  isn't that right?
11:33:25   19  A.  I sold the inventory.
11:33:32   20       THE COURT:  That's not the answer to the question.
11:33:34   21       THE WITNESS:  I don't think we agreed on anything
11:33:35   22  until after I sold the inventory.
11:33:37   23  BY MS. DEDINAS:
11:33:38   24  Q.  And after you sold the inventory to a liquidator, there
11:33:41   25  was an agreement with United Central Bank on how to split the

11:33:45  1  proceeds of that inventory; isn't that right?

11:33:49  2  A.  That's correct.

11:33:49  3  Q.  Now, there is a letter in which First Midwest Bank

11:33:52  4  notified United Central Bank that there had been inventory

11:33:59  5  abandoned at the warehouse; isn't that right?

11:34:02  6  A.  That's correct.

11:34:02  7  Q.  Was there ever any written letter or notification to

11:34:06  8  United Central Bank that Kanan Fashions had abandoned a server

11:34:09  9  at the warehouse?

11:34:10  10  A.  I don't recall, no.

11:34:14  11  Q.  Okay.  Now, you indicated that you had a meeting in May

11:34:21  12  with Mr. Piggee and Mr. Hoholik.  Do you recall that?

11:34:25  13  A.  I believe I said April, but, yes.

11:34:27  14  Q.  And that was about the issues relating to the inventory

11:34:33  15  left at the warehouse; isn't that right?

11:34:35  16  A.  That's correct.

11:34:35  17  Q.  That meeting didn't occur at the warehouse, did it?

11:34:39  18  A.  No, ma'am.

11:34:40  19  Q.  To your knowledge, has Mr. Piggee ever been at the

11:34:44  20  warehouse?

11:34:44  21  A.  To my knowledge?

11:34:48  22  Q.  Yes.

11:34:49  23  A.  No.

11:34:49  24  Q.  And you indicated also in your testimony that Mr. Piggee

11:35:03  25  told you that he was going to get a court order.  Do you

| | | |
|---|---|---|
| 11:35:08 | 1 | recall that? |
| 11:35:09 | 2 | A.  Yes. |
| 11:35:09 | 3 | Q.  And I believe in Exhibit 108, you were asked about that |
| 11:35:17 | 4 | and you -- you were asked about a statement that says, the |
| 11:35:20 | 5 | problem is that I have been put on notice by both attorneys |
| 11:35:23 | 6 | for United Central and Kanan that I am not to release the |
| 11:35:28 | 7 | computers without a court order. |
| 11:35:29 | 8 | Do you recall that? |
| 11:35:30 | 9 | A.  Yes, ma'am. |
| 11:35:32 | 10 | Q.  Do you recall giving your deposition in this matter on |
| 11:35:37 | 11 | January 13th? |
| 11:35:38 | 12 | A.  Yes, ma'am. |
| 11:35:40 | 13 | Q.  And I asked you about that very sentence in your |
| 11:35:44 | 14 | deposition.  Do you recall that? |
| 11:35:45 | 15 | A.  Yes, ma'am. |
| 11:35:46 | 16 | Q.  Okay.  The question I asked was -- and I am on page 211, |
| 11:35:54 | 17 | line 1 -- you had testified previously that you had told |
| 11:36:00 | 18 | attorneys for United Central Bank that they would be required |
| 11:36:02 | 19 | to get a court order; is that right?  And your answer was yes. |
| 11:36:06 | 20 | Do you recall that? |
| 11:36:06 | 21 | A.  I'm sorry. |
| 11:36:13 | 22 | THE COURT:  She is asking you a question. |
| 11:36:16 | 23 | THE WITNESS:  211, I don't recall, no. |
| 11:36:18 | 24 | BY MS. DEDINAS: |
| 11:36:18 | 25 | Q.  Okay.  I am just asking -- |

| | | |
|---|---|---|
| 11:36:20 | 1 | THE COURT:  She just read the question that you had |
| 11:36:22 | 2 | been asked. |
| 11:36:23 | 3 | THE WITNESS:  Yes.  Yes, I do remember you asking me |
| 11:36:26 | 4 | that question, yes. |
| 11:36:29 | 5 | BY MS. DEDINAS: |
| 11:36:29 | 6 | Q.  And your answer was yes? |
| 11:36:30 | 7 | A.  Yes. |
| 11:36:31 | 8 | Q.  And then I asked, Did anybody ever tell you that you |
| 11:36:34 | 9 | should -- |
| 11:36:34 | 10 | THE COURT:  There is nothing in there that can help |
| 11:36:37 | 11 | you. |
| 11:36:37 | 12 | MS. DEDINAS:  You are just going to have to listen. |
| 11:36:39 | 13 | I will start again. |
| 11:36:40 | 14 | BY MS. DEDINAS: |
| 11:36:40 | 15 | Q.  My question then was, Did anyone ever tell you that you |
| 11:36:43 | 16 | should not -- anybody from United Central Bank or their |
| 11:36:46 | 17 | counsel tell you that you should not release the equipment |
| 11:36:49 | 18 | without a court order? |
| 11:36:51 | 19 | A.  Not to the best of my memory. |
| 11:36:53 | 20 | Q.  And the answer that you gave was no. |
| 11:36:57 | 21 | Do you recall that? |
| 11:36:57 | 22 | A.  Yes. |
| 11:36:58 | 23 | Q.  And then I asked you, Did anybody put you on notice from |
| 11:37:04 | 24 | Kanan or their counsel that you should not release the |
| 11:37:07 | 25 | computers without a court order?  And your answer was no. |

| | | |
|---|---|---|
| 11:37:11 | 1 | Do you recall that? |
| 11:37:11 | 2 | A. Yes. |
| 11:37:12 | 3 | Q. And I said, I asked you, So why did you say that to |
| 11:37:17 | 4 | Mr. Dieterich? |
| 11:37:20 | 5 | Do you recall that? |
| 11:37:21 | 6 | A. Yes. |
| 11:37:21 | 7 | Q. And your answer that you gave in your deposition was, I |
| 11:37:25 | 8 | was trying to avoid being brought into litigation by having a |
| 11:37:28 | 9 | court order to turn the computer over. |
| 11:37:31 | 10 | Do you recall that? |
| 11:37:31 | 11 | A. Yes. |
| 11:37:39 | 12 | MS. DEDINAS:  No further questions. |
| 11:37:40 | 13 | THE COURT:  Mr. McJessy? |
| 11:37:42 | 14 | MR. McJESSY:  A few questions. |
| 11:37:43 | 15 | THE COURT:  Do you mind if we take a quick break here |
| 11:37:46 | 16 | for a second?  I'm sorry.  Five minutes, please. |
| 11:37:52 | 17 | (Short break.) |
| 11:37:52 | 18 | - - - |
| 11:37:52 | 19 | DAVID CLARK, CROSS-EXAMINATION |
| 11:37:52 | 20 | BY MR. McJESSY: |
| 11:51:29 | 21 | Q. Sir, just a couple of questions to follow up on the last |
| 11:51:33 | 22 | point that counsel for United Central Bank was asking you |
| 11:51:36 | 23 | about.  She was asking you about your e-mail that's Exhibit SH |
| 11:51:42 | 24 | 108 wherein you say that you have been put on notice by the |
| 11:51:49 | 25 | attorneys for Kanan Fashions and United Central not to release |

11:51:55 1 the computers. Do you remember those questions?

11:51:57 2 A. Yes, sir.

11:51:57 3 Q. And you said that this e-mail was sort of a negotiating

11:52:02 4 ploy on your behalf because you didn't want to turn the

11:52:05 5 computers over to the other -- to Associated Bank; is that

11:52:08 6 right?

11:52:08 7 A. That's correct.

11:52:08 8 Q. And when you had met with Mr. Piggee and Mr. Hoholik in

11:52:19 9 your recollection at the end of April or sometime, end of

11:52:23 10 April, early May, they didn't tell you at that time not to

11:52:27 11 release the server to anybody; is that right?

11:52:31 12 A. I don't recall that they did, no.

11:52:32 13 Q. Okay. The only thing that you recall during that

11:52:37 14 conversation is that they would provide you with a court --

11:52:41 15 I'm sorry. Strike that.

11:52:43 16     The only thing that you can recall is that they would

11:52:45 17 provide you with a subpoena for the server; is that right?

11:52:48 18 A. That's correct.

11:52:49 19 Q. I want to ask you another question -- one other area I

11:52:53 20 want to ask you about. When Mr. Shah was looking for

11:52:58 21 financing to acquire the server in July of 2010, you were

11:53:07 22 asked some questions about that. Is it your -- was Mr. Shah

11:53:13 23 actually looking for investors to lease the warehouse?

11:53:17 24     MS. DEDINAS: Objection. Foundation.

11:53:18 25     THE COURT: Sustained.

| | | |
|---|---|---|
| 11:53:18 | 1 | BY MR. McJESSY: |
| 11:53:21 | 2 | Q. At the time, was it your understanding that Mr. Shah was |
| 11:53:24 | 3 | looking for financing just for the server? |
| 11:53:27 | 4 | A. No, sir. |
| 11:53:28 | 5 | Q. What was your understanding of what Mr. Shah was looking |
| 11:53:33 | 6 | to do? |
| 11:53:34 | 7 | MS. DEDINAS: Objection. Foundation. |
| 11:53:35 | 8 | THE COURT: Sustained. |
| 11:53:37 | 9 | BY MR. McJESSY: |
| 11:53:38 | 10 | Q. You and Mr. Shah were having negotiations or -- strike |
| 11:53:42 | 11 | that. |
| 11:53:42 | 12 | You and Mr. Shah were having regular discussions |
| 11:53:45 | 13 | during June and July of 2010; is that right? |
| 11:53:47 | 14 | A. That's correct. |
| 11:53:48 | 15 | Q. What were you discussing? |
| 11:53:50 | 16 | A. Him finding a tenant for the building. |
| 11:53:57 | 17 | Q. And was it your -- did Mr. Shah convey to you what he was |
| 11:54:01 | 18 | going to do to try to find a tenant for the building? |
| 11:54:05 | 19 | A. At one point, he said he was going to go out of the |
| 11:54:08 | 20 | country to find a tenant for the building. |
| 11:54:10 | 21 | MS. DEDINAS: Objection. Move to strike. |
| 11:54:13 | 22 | THE COURT: Based on? |
| 11:54:14 | 23 | MS. DEDINAS: It was a yes-or-no question. |
| 11:54:18 | 24 | THE COURT: He can answer. |
| 11:54:19 | 25 | BY MR. McJESSY: |

| | | |
|---|---|---|
| 11:54:23 | 1 | Q.  And was it your understanding that that process would |
| 11:54:31 | 2 | ultimately lead to the financing for the server as well? |
| 11:54:35 | 3 | A.  Yes, sir. |
| 11:54:37 | 4 | Q.  So this wasn't -- your understanding of the deal wasn't |
| 11:54:43 | 5 | that this was just Mr. Shah trying to find financing to buy |
| 11:54:47 | 6 | the server, this was an effort to find investors to lease the |
| 11:54:51 | 7 | warehouse and begin an operation there? |
| 11:54:54 | 8 | A.  That's correct. |
| 11:54:56 | 9 | MR. McJESSY:  I don't have any more questions, your |
| 11:55:00 | 10 | Honor. |
| 11:55:00 | 11 | THE COURT:  Mr. Lipton? |
| 11:55:02 | 12 | MR. LIPTON:  No, thank you, your Honor. |
| 11:55:05 | 13 | THE COURT:  Okay.  You are finished.  Step down. |
| 11:56:16 | 14 | (Witness leaves the stand.) |
| 11:56:16 | 15 | MS. DEDINAS:  Your Honor, our next witness is Susan |
| 11:56:18 | 16 | Cheng. |
| 11:56:18 | 17 | THE COURT:  Ms. Cheng, if you can come up here. |
| 11:56:41 | 18 | (Witness sworn.) |
| 11:56:41 | 19 | THE COURT:  Ms. Cheng, if you would please speak up |
| 11:56:43 | 20 | so everybody can hear you here in the courtroom. |
| 11:56:46 | 21 | THE WITNESS:  Sure. |
| 11:56:46 | 22 | THE COURT:  And if there is an objection made, please |
| 11:56:49 | 23 | wait until I have ruled on the objection before you answer. |
| 11:56:53 | 24 | Thank you. |
| 11:56:53 | 25 | THE WITNESS:  Thank you. |

|          |    |                                                       |
|----------|----|-------------------------------------------------------|
| 11:56:55 | 1  | - - -                                                 |
| 11:56:55 | 2  | SUSAN CHENG, DIRECT EXAMINATION                       |
| 11:56:55 | 3  | BY MS. DEDINAS:                                        |
| 11:56:56 | 4  | Q.  Could you state your full name, please.           |
| 11:56:58 | 5  | A.  Susan Cheng.                                       |
| 11:57:00 | 6  | Q.  And Ms. Cheng, what is your occupation?            |
| 11:57:02 | 7  | A.  I am a forensic accountant.                        |
| 11:57:03 | 8  | Q.  Where are you employed?                            |
| 11:57:04 | 9  | A.  Russell Novak & Company.  It's a CPA firm.         |
| 11:57:09 | 10 | Q.  And what educational background do you have in accounting? |
| 11:57:12 | 11 | A.  I have a CPA, which is a certified public accountant; I am |
| 11:57:18 | 12 | a certified forensic examiner, a CFE; and I am a CFF, which is |
| 11:57:26 | 13 | a certificate in financial forensics of the AICPA.    |
| 11:57:34 | 14 | Q.  How long have you been a certified public accountant? |
| 11:57:37 | 15 | A.  Since 1983.                                        |
| 11:57:39 | 16 | Q.  And how long have you been a certified fraud examiner? |
| 11:57:41 | 17 | A.  Since 2007.                                        |
| 11:57:43 | 18 | Q.  And how long have you been a certified financial forensic? |
| 11:57:49 | 19 | A.  Since 2009.                                        |
| 11:57:50 | 20 | Q.  Now, Ms. Cheng, have you been asked to look at some |
| 11:57:53 | 21 | accounting records pertaining to the relationship between |
| 11:57:57 | 22 | Kanan Fashions and some of its customers?             |
| 11:57:58 | 23 | A.  Yes, I have.                                       |
| 11:57:59 | 24 | Q.  And in particular, did you look at accounting records |
| 11:58:02 | 25 | pertaining to Kanan Fashions' relationship with a company |

| | | |
|---|---|---|
| 11:58:06 | 1 | called Boscov's, B-o-s-c-o-v-s? |
| 11:58:08 | 2 | A. Yes, I have. |
| 11:58:19 | 3 | Q. Can you tell me what records you reviewed? |
| 11:58:21 | 4 | A. The Boscov's records that I have seen included -- from the |
| 11:58:26 | 5 | Boscov's side, they were purchase records, accounts payable |
| 11:58:37 | 6 | history report, check history report, and invoices sent to |
| 11:58:45 | 7 | Kanan -- sent by Kanan to Boscov's. |
| 11:58:48 | 8 | Q. So you have looked at the invoices that Boscov's produced |
| 11:58:53 | 9 | that Kanan Fashions sent to them? |
| 11:58:55 | 10 | A. Correct. |
| 11:58:56 | 11 | Q. And from the Kanan Fashions' side, what documents did you |
| 11:59:02 | 12 | review from that side? |
| 11:59:04 | 13 | A. There were income statements, balance sheets, accounts |
| 11:59:14 | 14 | receivable summary report and detailed accounts receivable |
| 11:59:18 | 15 | ledger reports. |
| 11:59:18 | 16 | Q. And did you review any documents that were produced |
| 11:59:26 | 17 | pursuant to subpoena by Wolf & Company? |
| 11:59:28 | 18 | A. Yes, I have. |
| 11:59:28 | 19 | Q. Do you understand who Wolf & Company is? |
| 11:59:31 | 20 | A. Yes, I do. They were the outside accountants for Kanan. |
| 11:59:37 | 21 | They had performed a review for the -- for several years for |
| 11:59:42 | 22 | Kanan, and they also performed agreed-upon procedures on |
| 11:59:49 | 23 | behalf of the bank. |
| 11:59:49 | 24 | Q. And the "bank" would be United Central Bank? |
| 11:59:52 | 25 | A. Yes. |

683

11:59:53  1  Q.  Do you know what the purpose of the review was for the
11:59:56  2  bank?
11:59:57  3  A.  Based on my understanding, the review for the bank was
12:00:02  4  initially for the approval of the bank loan from the bank to
12:00:12  5  Kanan.
12:00:12  6  Q.  There are a number of witness binders next to you, and I'd
12:00:17  7  like you to take a quick look at several exhibits.  There
12:00:23  8  would be Exhibits 226, 227, 228, and 233.
12:00:46  9        Let me know when you're ready.
12:00:48  10  A.  Sure.
12:00:48  11        Okay.  I have 226.
12:00:49  12  Q.  Tell me briefly what Exhibit --
12:00:51  13        MS. DEDINAS:  And just for the record, these are
12:00:52  14  Bates stamped with D numbers, which, your Honor, were
12:00:57  15  documents produced by the defendants in this case.
12:00:59  16        THE COURT:  Thank you.
12:01:01  17        MS. DEDINAS:  And they are not in Bates stamped
12:01:05  18  order.
12:01:05  19  BY MS. DEDINAS:
12:01:05  20  Q.  Can you tell me briefly what these documents are.
12:01:08  21  A.  The pages within Exhibit 226 pertain to the aged accounts
12:01:29  22  receivable report of Kanan Fashions, the first one here being
12:01:35  23  August 2008 and the last page is December 2008.
12:01:45  24  Q.  So these are pages of accounts receivable aged -- and they
12:01:57  25  go by month -- August, September, October, November, December

12:02:03  1  of 2008; is that correct?

12:02:04  2  A.  Yes.

12:02:04  3  Q.  Let's take a look at 227.  Again, these are Bates stamped

12:02:11  4  with D numbers reflecting production by the defendants.

12:02:14  5      Can you tell me what these documents are.

12:02:16  6  A.  The four pages in Exhibit 227 contain the balance sheet

12:02:30  7  and the income statement of Kanan Fashions for January 2009

12:02:40  8  until -- or through June 2009.

12:02:46  9      MR. McJESSY:  Judge, I'd like to make a relevance

12:02:48  10 objection to this, and I just want to make the objection for

12:02:53  11 the record that the issue that the court is presented with

12:02:58  12 here isn't ultimate liability on the merits of the claims that

12:03:04  13 have been made here but on the issues raised by the motion for

12:03:10  14 discovery sanctions filed by the plaintiff in this matter.

12:03:14  15     So I just want to make the objection for the record

12:03:19  16 that I am not sure what the relevance has to do with this

12:03:22  17 information, and I am presuming that there aren't going to be

12:03:29  18 any sort of findings based on liability on the accounting

12:03:33  19 record themselves because obviously that's not the issue

12:03:35  20 that's been presented to the court to resolve at this time.

12:03:40  21     THE COURT:  Ms. Dedinas, do you want to explain what

12:03:42  22 they're going to be used for --

12:03:44  23     MS. DEDINAS:  Yes.

12:03:44  24     THE COURT:  -- or what you hope they're going to be

12:03:46  25 used for?  I think I know, but I am not going to state it.

12:03:49   1   You state it.

12:03:49   2         MS. DEDINAS: Your Honor, this will go, we believe,

12:03:51   3   to two elements. Number one, it will go, we believe, to the

12:03:56   4   issue of motive as to why the server might be missing and why

12:04:01   5   there might be a motive for its disappearance.

12:04:07   6         And, second, it will go to the issue of prejudice to

12:04:10   7   the bank.

12:04:10   8         THE COURT: Thank you very much. And your objection

12:04:13   9   is on the record.

12:04:14   10         MR. McJESSY: Thank you, your Honor.

12:04:15   11         THE COURT: Sure.

12:04:17   12   BY MS. DEDINAS:

12:04:17   13   Q. Okay. Let's take a look at Exhibit 228. Again, these

12:04:24   14   are, for the record, Bates stamped with D numbers reflecting a

12:04:28   15   production by the defendants.

12:04:31   16         Could you briefly describe what these documents are.

12:04:34   17   A. Yes. Exhibit 228 is a similar report to Exhibit 226. It

12:04:43   18   is the aged accounts receivable report of Kanan Fashions from

12:04:50   19   July 2009 through November 2009.

12:04:58   20   Q. Thank you.

12:04:59   21         THE COURT: Excuse me one second. You know, I don't

12:05:02   22   have a 228. There is a tab for it, but there is nothing

12:05:06   23   there. Do you have an extra copy, please? I'm sorry.

12:05:09   24         MS. DEDINAS: Sure.

12:05:30   25         THE COURT: Thank you.

12:05:32    1    BY MS. DEDINAS:

12:05:34    2    Q.  So you explained what 228 was.  Do you want to read that

12:05:38    3    back?

12:05:39    4                THE COURT:  Please.

12:05:56    5        (Record read.)

12:05:59    6                THE COURT:  And can I hang on to this?

12:06:01    7                MR. WEST:  Absolutely, your Honor.

12:06:02    8                MS. DEDINAS:  Yes.

12:06:03    9    BY MS. DEDINAS:

12:06:03   10    Q.  And let's take a look at Exhibit 233, and let me know when

12:06:07   11    you have had a chance to get to that exhibit.

12:06:19   12    A.  Yes.

12:06:19   13    Q.  And these are, for the record, Bates stamped with Wolf

12:06:22   14    Bates stamp numbers indicating production pursuant to subpoena

12:06:26   15    by Wolf & Company.

12:06:27   16                And what is this document?

12:06:29   17    A.  Exhibit 233 appears to be a Wolf & Company production

12:06:39   18    containing the December 2008 borrowing base certificate

12:06:48   19    prepared by Kanan Fashions followed by accounts receivable

12:06:53   20    reports.

12:06:55   21                MR. McJESSY:  Objection, your Honor.  Move to strike

12:06:57   22    testimony.  The witness doesn't seem to have firsthand

12:07:01   23    knowledge of what this is.

12:07:02   24                THE COURT:  I think it's a good objection because she

12:07:06   25    says it appears to be, so we need some clarification.

12:07:10   1   BY MS. DEDINAS:

12:07:11   2   Q.  Okay.  Were these provided to you by counsel with the

12:07:14   3   representation that they were produced by Wolf & Company?

12:07:17   4   A.  Yes, that is correct.  I have seen these records in the

12:07:23   5   files produced by Wolf & Company through the attorneys.

12:07:30   6            THE COURT:  Okay.  Thank you.

12:07:31   7   BY MS. DEDINAS:

12:07:32   8   Q.  Now, what was the purpose of your reviewing these four

12:07:36   9   exhibits?

12:07:36   10  A.  The purpose of my reviewing these four exhibits was I was

12:07:48   11  asked by the attorneys to review these records and to conduct

12:07:53   12  a forensic accounting assignment to take a look at how much

12:08:02   13  was reported by Kanan Fashions in terms of sales to Boscov's

12:08:09   14  versus what Boscov's reported as purchases from Kanan.

12:08:17   15  Q.  Okay.  So these four documents would relate to the Kanan

12:08:24   16  Fashions' reported income; is that right?

12:08:27   17  A.  These exhibits would relate to sales, collections, and

12:08:35   18  accounts receivable.

12:08:36   19  Q.  By which party?

12:08:38   20  A.  Recorded by Kanan relating to the customer Boscov's.

12:08:42   21  Q.  Okay.  Now, did you prepare a summary chart of the

12:08:46   22  information in the records that you received -- reviewed in

12:08:51   23  Exhibits 226, 227, 228, and 232?

12:08:59   24            MR. McJESSY:  33?

12:09:00   25            MS. DEDINAS:  233, sorry.

| | |
|---|---|
| 12:09:02 | 1 |
| 12:09:03 | 2 |
| 12:09:03 | 3 |
| 12:09:14 | 4 |
| 12:09:14 | 5 |
| 12:09:18 | 6 |
| 12:09:26 | 7 |
| 12:09:33 | 8 |
| 12:09:38 | 9 |
| 12:09:46 | 10 |
| 12:09:52 | 11 |
| 12:09:57 | 12 |
| 12:09:57 | 13 |
| 12:10:06 | 14 |
| 12:10:10 | 15 |
| 12:10:20 | 16 |
| 12:10:28 | 17 |
| 12:10:30 | 18 |
| 12:10:30 | 19 |
| 12:10:35 | 20 |
| 12:10:37 | 21 |
| 12:10:49 | 22 |
| 12:10:56 | 23 |
| 12:11:02 | 24 |
| 12:11:06 | 25 |

THE WITNESS:  Yes, I have.

BY MS. DEDINAS:

Q.  Can you take a look at Exhibit 229.

A.  Yes.

Q.  Can you briefly describe what this summary chart is.

A.  This is a summary of Kanan Fashions' reported sales to Boscov's and accounts receivable from Boscov's between the months of August 2008 through October 2009.

Q.  And does this exhibit, 229, fairly and accurately summarize the accounts receivable, sales, and payments made by Boscov's as reflected in Kanan Fashions' and Wolf's records?

A.  Yes, it does.

Q.  Now, let's take a look at the sales column.  How much in sales to Boscov's did Kanan Fashions reflect in the year 2008?

A.  In the year 2008, the sales as reflected on this particular summary was a dollar amount of 3,123,052.

Q.  So a little over $3 million?

A.  Yes.

Q.  And how much in sales to Boscov's did Kanan Fashions reflect in the year 2009?

A.  In 2009, that amount is 946,606.

Q.  And what is the total amount that Kanan Fashions show that it got paid or got credits from Boscov's, according to their records, according to Kanan Fashions' records?

A.  According to Kanan Fashions' records, the two years

| | | |
|---|---|---|
| 12:11:10 | 1 | combined gave a total amount of 4,069,658. |
| 12:11:20 | 2 | Q. Now, were you also provided with accounting records from |
| 12:11:25 | 3 | Boscov's? |
| 12:11:26 | 4 | A. Yes, I was. |
| 12:11:28 | 5 | Q. Okay. And we mentioned some of the Boscov's records that |
| 12:11:35 | 6 | you reviewed, so specifically, I'd like you to take a look at |
| 12:11:46 | 7 | Exhibit 231. |
| 12:11:49 | 8 | A. Yes. |
| 12:11:49 | 9 | Q. What is this document? |
| 12:12:02 | 10 | A. This was a document provided by Boscov's. It's called a |
| 12:12:09 | 11 | payment history report. |
| 12:12:11 | 12 | Q. And are these the Boscov's records that you reviewed? |
| 12:12:23 | 13 | A. Yes. |
| 12:12:24 | 14 | Q. Did you prepare a summary of the data in Exhibit 231? |
| 12:12:30 | 15 | A. Yes, I did. |
| 12:12:31 | 16 | Q. Can you look at Exhibit 232. |
| 12:12:43 | 17 | A. Yes. |
| 12:12:44 | 18 | Q. Is this the summary that you prepared of the Boscov's |
| 12:12:46 | 19 | records? |
| 12:12:47 | 20 | A. Yes, it is. |
| 12:12:47 | 21 | Q. And could you describe for us what this summary reflects. |
| 12:12:51 | 22 | A. Exhibit 232 is a summary of Boscov's' payments to Kanan |
| 12:13:01 | 23 | Fashions for the period from September 2008 through September |
| 12:13:07 | 24 | 2009. |
| 12:13:08 | 25 | Q. And according to your summary, what's the total amount in |

12:13:15   1   payments that Boscov's made to Kanan in 2008, according to

12:13:20   2   Boscov's' records?

12:13:22   3   A.  What Boscov's reported in 2008 was $530,177.35.

12:13:38   4   Q.  And how much did they -- did Boscov's report in payments

12:13:42   5   to Kanan Fashions in 2009?

12:13:44   6   A.  In 2009, Boscov's reported payments that totalled

12:13:58   7   $713,925.42.

12:14:00   8   Q.  Now, if I'd ask you to compare the summary charts of 229

12:14:08   9   to 232, are those summaries for the same -- records for the

12:14:17   10   same time period?

12:14:18   11   A.  Yes.

12:14:19   12   Q.  And what does the comparison of these two documents show?

12:14:27   13   A.  If you were to compare Exhibit 229 to Exhibit 232, you

12:14:39   14   would see that the amounts in 2008 and 2009, according to

12:14:49   15   Exhibit 229, to be larger than the amounts on Exhibit 232.

12:14:55   16   Q.  And they're larger by what magnitude?

12:15:00   17   A.  Looking at the total number, which was combining 2008

12:15:07   18   and 2009, Exhibit 229 showed close to $4.1 million, whereas

12:15:17   19   Exhibit 232 showed a total of about $1.2 million.  So the

12:15:23   20   difference between the two exhibits would be approximately

12:15:28   21   $2.9 million.

12:15:29   22   Q.  Do you find anything unusual about those two numbers?

12:15:34   23   A.  To the extent that Boscov's was accurately reporting the

12:15:46   24   amount of purchases it had made from Kanan, the dollar amount

12:15:52   25   of the Boscov's purchases should be the same as the dollar

| | | |
|---|---|---|
| 12:15:58 | 1 | amount of the sales to Boscov's made by Kanan. |
| 12:16:04 | 2 | Q. And they're not? |
| 12:16:07 | 3 | A. They are not. |
| 12:16:08 | 4 | Q. And in your experience, do you have any opinion as to why |
| 12:16:13 | 5 | there might be a discrepancy? |
| 12:16:14 | 6 | A. Well, speaking as a forensic accountant, this particular |
| 12:16:27 | 7 | discrepancy, because of the magnitude of the discrepancy, |
| 12:16:30 | 8 | which was $2.9 million, is such that it cannot be due to an |
| 12:16:35 | 9 | accounting error or an inadvertent mistake or could be |
| 12:16:42 | 10 | explained by timing differences in billings and collections. |
| 12:16:49 | 11 | Q. Now, did you make any further effort to try to figure out |
| 12:16:54 | 12 | where these discrepancies came from? |
| 12:16:56 | 13 | A. Yes, I have. |
| 12:16:58 | 14 | Q. What did you do? |
| 12:17:00 | 15 | A. I looked at the invoices that were produced to us by |
| 12:17:14 | 16 | Boscov's and compared the amounts on the individual invoices |
| 12:17:18 | 17 | to the detailed accounts receivable listing provided by Kanan. |
| 12:17:23 | 18 | Q. And what did you observe when you compared those two sets |
| 12:17:28 | 19 | of documents? |
| 12:17:28 | 20 | A. I found differences between the two sets of documents. |
| 12:17:33 | 21 | Q. How many instances -- now, are you describing differences |
| 12:17:39 | 22 | in the invoice amounts? |
| 12:17:40 | 23 | A. Yes, I am. |
| 12:17:42 | 24 | Q. And how many such instances did you observe? |
| 12:17:45 | 25 | A. Over this period, numerous instances. |

| | | |
|---|---|---|
| 12:17:49 | 1 | Q. Did you notice any patterns to the discrepancies? |
| 12:17:53 | 2 | A. Yes, I did. |
| 12:17:55 | 3 | Q. Okay. What types of patterns did you observe? |
| 12:17:57 | 4 | A. In general, I observed two particular techniques that had |
| 12:18:04 | 5 | been used. One -- would you like me to describe it? |
| 12:18:09 | 6 | Q. Yes. Let's start with the first one. |
| 12:18:11 | 7 | A. Sure. The first one is -- it's called decimal sliding and |
| 12:18:20 | 8 | the second one is called raising. |
| 12:18:24 | 9 | Q. What's decimal sliding? |
| 12:18:26 | 10 | A. Decimal sliding is a way to increase an original amount by |
| 12:18:35 | 11 | 10 times or a hundred times by sliding the decimal place by |
| 12:18:41 | 12 | one or by two. Sliding the decimal place by one increased the |
| 12:18:50 | 13 | actual amount by 10 times. Sliding it -- sliding the decimal |
| 12:18:54 | 14 | places two times would increase the amount by a hundred times, |
| 12:18:58 | 15 | and so on. |
| 12:18:59 | 16 | Q. And what, Ms. Cheng, is raising? |
| 12:19:06 | 17 | A. Raising is adding leading digits in front of an actual |
| 12:19:10 | 18 | amount. So, for example, if your actual amount is $100, |
| 12:19:16 | 19 | raising means adding -- as I said, adding leading digits to |
| 12:19:21 | 20 | the front. So if I add 25 in front of 100, the amount 100 |
| 12:19:29 | 21 | then becomes 25,100. |
| 12:19:35 | 22 | Q. And you observed these two types of discrepancies or |
| 12:19:44 | 23 | techniques within the Kanan Fashions'/Boscov's' relationship; |
| 12:19:51 | 24 | is that correct? |
| 12:19:51 | 25 | A. That is correct. |

12:19:52  1  Q.  Did you attempt to summarize a few examples of these

12:19:57  2  discrepancies?

12:19:58  3  A.  Yes, I have.

12:19:59  4  Q.  I'd like you to look at Exhibit 236.  Can you tell me what

12:20:14  5  this exhibit is.

12:20:15  6  A.  Exhibit 236 contains selected examples of discrepancies in

12:20:27  7  Kanan Fashions' billings to Boscov's.

12:20:31  8  Q.  Okay.  So there are two sections here, invoice date,

12:20:39  9  invoice number, and then amounts, and there is one section

12:20:45  10  from August 15th, 2008, and then another section from October

12:20:49  11  30th, 2008.  Do you see that?

12:20:52  12  A.  Yes.

12:20:53  13  Q.  Let's work with the first grouping of August 15th, 2008.

12:20:59  14  Can you describe for us what you observed with respect to the

12:21:06  15  invoices and their -- each one is -- there's three invoices on

12:21:11  16  that same date; isn't that right?

12:21:13  17  A.  Yes.

12:21:13  18  Q.  Each one with a slightly different number?

12:21:18  19  A.  Correct.

12:21:18  20  Q.  Can you describe for us what you've observed about the

12:21:21  21  invoices from August 15th, 2008.

12:21:24  22  A.  The three examples here for the invoice date August 15th,

12:21:33  23  2008, which are the numbers ending with 51, 52, 59, these

12:21:43  24  three invoices as a group would be an example of what I

12:21:49  25  referred to earlier as decimal sliding.

12:21:53  1      So using 51 as an example, invoice 51 as an example,

12:22:05  2  1,224 became 12,240.

12:22:09  3  Q.  Just to clarify, the amount that is appearing on the KFI

12:22:15  4  accounts receivable ledger is $12,240; is that correct?

12:22:20  5  A.  Yes.

12:22:20  6  Q.  And then that same invoice on Boscov's' records is for

12:22:26  7  $1,224; is that correct?

12:22:28  8  A.  Yes.

12:22:28  9  Q.  And can you then lead us through the next two invoices.

12:22:34  10  A.  The invoice number ending 52, according to the invoice

12:22:44  11  produced by Boscov's, that invoice had a total of $816.  That

12:22:54  12  same invoice on the detailed accounts receivable ledger of

12:22:59  13  Kanan shows $8,160.

12:23:07  14  Q.  And just so we're clear, copies of these invoices, the

12:23:12  15  specific data relating to these invoices, are in the records

12:23:17  16  that you have just referred to as having been reviewed and as

12:23:20  17  part of the exhibits; is that correct?

12:23:21  18  A.  Correct.

12:23:21  19  Q.  And then the third example is 59.  That also shows decimal

12:23:27  20  sliding; is that correct?

12:23:28  21  A.  Yes.

12:23:29  22  Q.  Okay.  Let's move on to the October 30th invoices.  And

12:23:35  23  there's three invoices there:  10027, 09, 14, and 17.  Do you

12:23:44  24  see that there?

12:23:45  25  A.  Yes.

12:23:46   1   Q.  Could you describe -- let's start with the first one.  Can
12:23:49   2   you describe what you observed in your comparison of the two
12:23:54   3   sets of invoices for that particular number?
12:23:58   4   A.  On the first invoice, which is the one ending with
12:24:02   5   number 9, the invoice ending with number 9, the amount on the
12:24:08   6   Boscov's' invoice itself was for $456.75.  On this same
12:24:19   7   invoice, what was reported by Kanan Fashions in their accounts
12:24:23   8   receivable ledger was $24,536.75.
12:24:33   9   Q.  And what about the next one, the invoice number 14?  What
12:24:39  10   difference did you observe there?
12:24:41  11   A.  On invoice number 14, the difference in dollar amounts is
12:24:49  12   $28,800.  And this particular difference came from the invoice
12:24:59  13   itself, which was $87, versus the accounts receivable ledger
12:25:05  14   from Kanan showing this same invoice to be 28,887.
12:25:13  15   Q.  So that is a raising of adding 288 to the number of the
12:25:25  16   invoice?
12:25:25  17   A.  To the dollar amount of the invoice, yes.
12:25:27  18   Q.  And then the last item?
12:25:28  19   A.  The last item is invoice number ending in 17.  The invoice
12:25:37  20   produced by Boscov's showed $159.50.  This same invoice on
12:25:47  21   Kanan's accounts receivable ledger was $24,159.50.
12:25:55  22   Q.  Now, just taking a look at these six invoices, how much
12:26:02  23   difference in dollars is there in what Kanan Fashions reports
12:26:09  24   as an account receivable compared to what Boscov's indicates
12:26:13  25   as having paid out?

12:26:15  1   A.   Just looking at these two groups containing six invoices,

12:26:21  2   the difference between what Boscov's reported versus what

12:26:27  3   Kanan reported was about $100,000.

12:26:30  4   Q.   Now, Ms. Cheng, is your investigation of the Boscov's'

12:26:35  5   relationship complete at this time?

12:26:36  6   A.   The investigation into Boscov's is still preliminary and

12:26:46  7   not complete.   This particular -- these schedules that I have

12:26:52  8   prepared were based on information that had been produced to

12:26:57  9   us to date, and to the extent that there are other accounting

12:27:03  10  records out there, it could either corroborate what I have

12:27:07  11  seen or disconfirm what I have seen.

12:27:10  12  Q.   And are you in the process of investigating Kanan

12:27:15  13  Fashions' relationship with other customers as well?

12:27:18  14  A.   Yes, I am.

12:27:19  15  Q.   Now, if you wanted to do further investigation into these

12:27:24  16  discrepancies, what data would you want to examine from Kanan

12:27:29  17  Fashions' records?

12:27:30  18  A.   My understanding is that Kanan Fashions had utilized Great

12:27:41  19  Claims Accounting to keep track of their accounting records,

12:27:45  20  so to the extent that Great Claims Accounting records are

12:27:49  21  available, we would like to see them, along with other

12:27:53  22  records, such as billing records, correspondence with, for

12:28:00  23  example, Boscov's regarding the sales.

12:28:08  24       So all accounting records and perhaps billing records

12:28:11  25  and customer correspondence.

| | | |
|---|---|---|
| 12:28:14 | 1 | Q. And, Ms. Cheng, would you be interested in seeing any data |
| 12:28:19 | 2 | relating to Kanan Fashions' inventory? |
| 12:28:22 | 3 | A. It is my understanding that there was an inventory server. |
| 12:28:30 | 4 | I do not know if the inventory server contained additional |
| 12:28:36 | 5 | accounting information along with inventory information. |
| 12:28:40 | 6 | Since we have seen that, Kanan Fashions had reported a much |
| 12:28:45 | 7 | higher amount of sales to Boscov's than what Boscov's said |
| 12:28:50 | 8 | they actually purchased, the data within the inventory server |
| 12:28:57 | 9 | would serve to again corroborate the sales or disaffirm the |
| 12:29:03 | 10 | sales. There would be -- you would have to have enough |
| 12:29:07 | 11 | inventory to support the level of sales that you are |
| 12:29:11 | 12 | recording. |
| 12:29:13 | 13 | MS. DEDINAS: Thank you. |
| 12:29:20 | 14 | THE COURT: Mr. McJessy. |
| 12:29:21 | 15 | MR. McJESSY: Yes, your Honor. |
| 12:29:25 | 16 | - - - |
| 12:29:25 | 17 | SUSAN CHENG, CROSS-EXAMINATION |
| 12:29:25 | 18 | BY MR. McJESSY: |
| 12:29:32 | 19 | Q. Good morning, Ms. Cheng. |
| 12:29:33 | 20 | A. Good morning. |
| 12:29:33 | 21 | Q. You indicated that you don't know what was on the |
| 12:29:36 | 22 | inventory server in this instance; is that right? You don't |
| 12:29:38 | 23 | know what information was kept on it? |
| 12:29:40 | 24 | A. Without seeing the server -- |
| 12:29:47 | 25 | Q. Let me ask my question a different way. |

| | | |
|---|---|---|
| 12:29:49 | 1 | Do you know what information was kept on the |
| 12:29:51 | 2 | inventory server that's the subject of the motion that's |
| 12:29:55 | 3 | before the court today? |
| 12:29:56 | 4 | A.  My understanding is inventory information and possibly |
| 12:30:02 | 5 | other accounting information. |
| 12:30:03 | 6 | Q.  Okay.  How do you have -- |
| 12:30:07 | 7 | MR. McJESSY:  Judge, I actually move that it be |
| 12:30:10 | 8 | stricken.  That's nonresponsive. |
| 12:30:13 | 9 | THE COURT:  Just a second. |
| 12:30:14 | 10 | MR. McJESSY:  I asked her if she knows. |
| 12:30:41 | 11 | THE COURT:  That answer can stand. |
| 12:30:42 | 12 | BY MR. McJESSY: |
| 12:30:43 | 13 | Q.  All right.  How do you have that understanding? |
| 12:30:44 | 14 | A.  Based on -- this understanding was based on discussion |
| 12:30:56 | 15 | with counsel. |
| 12:30:56 | 16 | Q.  So you were told that by Ms. Dedinas? |
| 12:30:58 | 17 | A.  It was based on conversations with Ms. Dedinas. |
| 12:31:06 | 18 | Q.  Anybody else? |
| 12:31:07 | 19 | A.  No. |
| 12:31:08 | 20 | Q.  Okay.  So she told you what she thinks is on the server; |
| 12:31:08 | 21 | is that right? |
| 12:31:17 | 22 | A.  She gave me that information so that I, acting as the |
| 12:31:24 | 23 | forensic accountant, can think about whether this would be |
| 12:31:29 | 24 | information that would be useful to my work. |
| 12:31:33 | 25 | MR. McJESSY:  Judge, I am going to ask that that |

| | | |
|---|---|---|
| 12:31:35 | 1 | answer be stricken as nonresponsive. |
| 12:31:40 | 2 | THE COURT:  All right.  I will strike that. |
| 12:31:41 | 3 | BY MR. McJESSY: |
| 12:31:42 | 4 | Q.  What information is on the server? |
| 12:31:43 | 5 | MS. DEDINAS:  Objection.  Foundation. |
| 12:31:45 | 6 | THE COURT:  Sustained.  You can ask that a different |
| 12:32:01 | 7 | way. |
| 12:32:02 | 8 | BY MR. McJESSY: |
| 12:32:03 | 9 | Q.  Have you reviewed the information that's on the server? |
| 12:32:05 | 10 | A.  When the server becomes available, that information would |
| 12:32:18 | 11 | likely be reviewed. |
| 12:32:19 | 12 | THE COURT:  Do you want to strike that? |
| 12:32:22 | 13 | MR. McJESSY:  I do, Judge. |
| 12:32:22 | 14 | THE COURT:  That will be stricken. |
| 12:32:23 | 15 | You need to answer his question, please. |
| 12:32:26 | 16 | THE WITNESS:  Yes, your Honor. |
| 12:32:27 | 17 | THE COURT:  Do you want him to repeat it to you? |
| 12:32:29 | 18 | BY MR. McJESSY: |
| 12:32:30 | 19 | Q.  Have you reviewed the information that's on the server? |
| 12:32:32 | 20 | A.  No, because it's not made available yet. |
| 12:32:35 | 21 | Q.  All right.  Did you see any documents that told you what |
| 12:32:50 | 22 | information was on the server? |
| 12:32:52 | 23 | A.  No, those documents have not been produced. |
| 12:33:01 | 24 | Q.  So your complete knowledge of what information is on the |
| 12:33:08 | 25 | server is based on a conversation that you had with |

| | | |
|---|---|---|
| 12:33:13 | 1 | Ms. Dedinas; is that right? |
| 12:33:18 | 2 | A.  Can you repeat that, please? |
| 12:33:19 | 3 | Q.  So your entire knowledge of what information may be on the |
| 12:33:25 | 4 | server is based on a conversation that you had with |
| 12:33:29 | 5 | Ms. Dedinas; is that right? |
| 12:33:40 | 6 | A.  Yes. |
| 12:33:40 | 7 | Q.  How long was that conversation? |
| 12:33:43 | 8 | A.  Can you explain what you meant by "how long"? |
| 12:33:53 | 9 | Q.  How many minutes was it? |
| 12:33:54 | 10 | A.  It was over a period of time. |
| 12:34:03 | 11 | Q.  Okay.  Over what period of time? |
| 12:34:06 | 12 | A.  Last month or two. |
| 12:34:12 | 13 | Q.  Okay.  And how many conversations did you have wherein she |
| 12:34:16 | 14 | told you what was on the server? |
| 12:34:17 | 15 | A.  The conversation was about getting more corroborating |
| 12:34:29 | 16 | evidence and not so much focusing on the inventory server. |
| 12:34:34 | 17 | Q.  So the conversation didn't focus on what was on the |
| 12:34:41 | 18 | inventory server; is that right? |
| 12:34:49 | 19 | A.  Correct, because we don't know what's on the server. |
| 12:34:52 | 20 | Q.  All right.  You don't know; is that right? |
| 12:34:55 | 21 | A.  It has not been produced. |
| 12:34:56 | 22 | Q.  You don't know; is that right? |
| 12:35:01 | 23 | A.  Correct. |
| 12:35:02 | 24 | Q.  Do you know where Ms. Dedinas got her knowledge about what |
| 12:35:17 | 25 | she told you might be on the server? |

12:35:20   1   A.  I do not know.

12:35:22   2   Q.  Did you ask her?

12:35:24   3   A.  No.

12:35:24   4   Q.  Isn't that something you'd want to know if you're relying

12:35:30   5   on the information that she's providing to you?

12:35:32   6   A.  I am relying on the information that has already been

12:35:38   7   produced, and the additional data would only serve to

12:35:44   8   corroborate or disconfirm what we have seen so far.

12:35:49   9   Q.  It would corroborate or disconcern?

12:35:51   10  A.  Disconfirm.

12:35:52   11  Q.  Disconfirm.  I'm sorry.

12:35:55   12        What does "disconfirm" mean?

12:35:57   13  A.  To the extent that perhaps Boscov's had reported

12:36:03   14  incorrectly their purchases from Kanan.  Perhaps more records

12:36:13   15  would tell us if that was correct or incorrect.

12:36:18   16  Q.  So your conclusions could change if you receive more

12:36:22   17  information; is that right?

12:36:26   18  A.  From the standpoint of analysis and further investigation

12:36:32   19  work, yes.

12:36:32   20  Q.  In fact, you said that your analysis right now is

12:36:35   21  preliminary; is that right?

12:36:37   22  A.  It is not finalized, correct.

12:36:39   23  Q.  I think you used the word "preliminary."  Do you recall

12:36:42   24  using that word?

12:36:43   25  A.  Yes.

12:36:43  1   Q.  So you're not done yet; is that right?

12:36:46  2   A.  Correct.

12:36:46  3   Q.  And I notice that in this document of Boscov's'

12:36:57  4   purchases --

12:36:58  5            THE COURT:  What exhibit?

12:37:00  6            MR. McJESSY:  Exhibit 231, your Honor.

12:37:02  7   BY MR. McJESSY:

12:37:03  8   Q.  -- (continuing) it doesn't reflect credits or returns of

12:37:06  9   merchandise; am I right about that, or am I wrong?

12:37:11  10  A.  Exhibit 231 reflects, according to Boscov's, all the

12:37:39  11  payments it made to Kanan which would have reflected returns

12:37:46  12  and credits.

12:37:47  13  Q.  Where does it say that?

12:37:49  14  A.  For example, I would direct your attention to page 24 --

12:38:38  15  23 of 44 of this payment report, Exhibit 231.

12:38:45  16  Q.  All right.  I'm there.  What are you specifically looking

12:38:50  17  at?

12:38:52  18  A.  I believe the item dated April 13th, 2009.

12:39:01  19  Q.  Yes.

12:39:02  20  A.  It says, RTV.

12:39:05  21  Q.  I see that.

12:39:06  22  A.  It possibly was a return.

12:39:08  23  Q.  Let me ask you about that.  You say you believe.  Do you

12:39:12  24  know that that's what that was?

12:39:13  25  A.  No, I did not see a return document.

12:39:24   1   Q.  You said it's "possibly" a return.  Why do you think

12:39:27   2   possibly?

12:39:27   3   A.  Because this report does not say what the term RTV meant.

12:39:37   4   Q.  Well, did you call somebody at Boscov's and ask them?

12:39:40   5   A.  No, but I believe this would be --

12:39:45   6   Q.  Wait.  You're relying on this document for your report,

12:39:48   7   aren't you?

12:39:51   8           MR. LIPTON:  Objection.  Relevance.

12:39:53   9           THE COURT:  No, she can answer.

12:39:55   10           THE WITNESS:  Can you repeat?

12:39:57   11   BY MR. McJESSY:

12:39:58   12   Q.  You are relying on this document in coming to the

12:40:00   13   conclusions in your report that you're asking this court to

12:40:05   14   consider or that counsel is asking this court to consider;

12:40:08   15   isn't that right?

12:40:08   16   A.  The reliance placed on this particular document pertained

12:40:18   17   to the total dollar of payments made by Boscov's to Kanan.

12:40:22   18   Q.  Correct.  But you're relying on this document for that

12:40:33   19   purpose, correct?

12:40:33   20   A.  For payments, yes.

12:40:34   21   Q.  Would you want to know what credits there might be between

12:40:39   22   Boscov's and Kanan?

12:40:41   23   A.  If documents were produced, I would definitely look at

12:40:46   24   them.

12:40:46   25   Q.  Okay.  Do you know whether they were produced?

704

| | | |
|---|---|---|
| 12:40:49 | 1 | A.  They were not produced at this time to me. |
| 12:40:54 | 2 | Q.  Okay.  Have you spoken to anyone at Boscov's to find out |
| 12:40:58 | 3 | about any such documents? |
| 12:40:59 | 4 | A.  I did not have a conversation with Boscov's. |
| 12:41:07 | 5 | Q.  All right.  So do you know what the codes and other terms |
| 12:41:12 | 6 | in this document that is marked as Exhibit SH 231 mean? |
| 12:41:20 | 7 | A.  Can you explain what you meant? |
| 12:41:27 | 8 | Q.  Well, sure.  Let's go back to the entry that you were |
| 12:41:30 | 9 | directing me to, which I believe was on page 23 of 44. |
| 12:41:35 | 10 | THE COURT:  Right. |
| 12:41:38 | 11 | BY MR. McJESSY: |
| 12:41:38 | 12 | Q.  Do you know what the code "RTV" stands for in that entry? |
| 12:41:44 | 13 | A.  Return voucher, r-e-t-u-r-n, v-o-u-c-h-e-r. |
| 12:42:00 | 14 | Q.  Do you know that, or are you speculating? |
| 12:42:03 | 15 | A.  I am seeing that it was a credit. |
| 12:42:08 | 16 | Q.  I understand that, but are you speculating or do you know |
| 12:42:12 | 17 | that that is what you just told me it was? |
| 12:42:14 | 18 | A.  I do not know for certain. |
| 12:42:20 | 19 | Q.  All right.  Now, if I understand you correctly, whether |
| 12:42:42 | 20 | there were returns and credits from Boscov's to Kanan, that is |
| 12:42:47 | 21 | something that you would want to know; is that right? |
| 12:42:50 | 22 | A.  Yes. |
| 12:42:53 | 23 | Q.  And if there were, that might affect the conclusions in |
| 12:42:59 | 24 | your report; is that correct? |
| 12:43:00 | 25 | A.  It could. |

12:43:02  1   Q.  Okay.  And those documents, if there are any, so far

12:43:09  2   haven't been produced to you; is that right?

12:43:12  3   A.  Correct.

12:43:12  4   Q.  Okay.  And you did prepare a report that you have talked

12:43:20  5   about this morning, and you did that without any access to the

12:43:25  6   server in this case; is that right?

12:43:28  7         MS. DEDINAS:  Your Honor, I would just like to object

12:43:31  8   to the characterization.  It's a summary report, not a report.

12:43:37  9         THE COURT:  Sustained.

12:43:38  10  BY MR. McJESSY:

12:43:39  11  Q.  It's a summary report.

12:43:41  12        THE COURT:  Right, which is what she said from the

12:43:43  13  very beginning.

12:43:44  14        MR. McJESSY:  Okay.

12:43:46  15  BY MR. McJESSY:

12:43:47  16  Q.  You prepared your summary report without access to Kanan's

12:43:50  17  server; is that right?

12:43:59  18  A.  Correct.

12:43:59  19  Q.  You prepared your report based on documents that came from

12:44:04  20  Kanan and from third parties, correct?

12:44:08  21  A.  Correct.

12:44:10  22  Q.  So to prepare your report, you didn't need the server; is

12:44:10  23  that right?

12:44:19  24  A.  That's not right.

12:44:20  25  Q.  Why is that not right?

12:44:24  1  A.  From a forensic investigation standpoint, more data is

12:44:32  2  always better than less data.

12:44:36  3  Q.  But you didn't need the inventory server to prepare the

12:44:49  4  summary report that you did prepare; is that right?

12:44:56  5  A.  The summary report was for sales, collections, and

12:45:01  6  receivables.  It's not inventory numbers, so not yet.

12:45:08  7  Q.  I think my question was you didn't need the server to

12:45:21  8  prepare your summary report, and you ended your answer with

12:45:26  9  not yet.  Let me just -- if my question is confusing, please

12:45:31  10  tell me.

12:45:32  11      But you did not need the server to prepare the

12:45:36  12  summary report that you've produced that we're looking at; is

12:45:36  13  that right?

12:45:42  14  A.  I have not yet looked at the data within the inventory

12:45:47  15  server.

12:45:47  16  Q.  Now, if you could look at Exhibit 232.

12:46:32  17  A.  Yes.

12:46:33  18  Q.  If you could also take a look at Exhibit 229.  Look at

12:46:49  19  those together.

12:46:54  20  A.  Yes.

12:46:54  21  Q.  Now, can you show me on Exhibit 232 where credits are

12:47:02  22  reflected?

12:47:03  23  A.  As I indicated, Exhibit 232 is a summary of Boscov's

12:47:21  24  payments made during that one year time period between 2008

12:47:26  25  and 2009.  These amounts on this one page, 232, came from the

```
12:47:37   1   data contained in 231.
12:47:40   2   Q.  Okay.  Which we've looked at.  That's that large
12:47:45   3   submission from Boscov's; is that correct?
12:47:46   4   A.  Yes.
12:47:47   5        THE COURT:  And I think she meant Exhibit 232, not
12:47:50   6   page.
12:47:52   7        MR. McJESSY:  Understood.
12:47:53   8        THE WITNESS:  Yes, your Honor.  I'm sorry.
12:47:58   9   BY MR. McJESSY:
12:48:05  10   Q.  And Exhibit 232 doesn't show any payments that came after
12:48:09  11   September 29 -- after September 24th, 2009; is that right?
12:48:19  12   A.  Can you repeat, sir?
12:48:20  13   Q.  Yes.  Exhibit 232 doesn't show any payments that came
12:48:25  14   after September 24th, 2009; is that right?
12:48:34  15   A.  That was consistent with --
12:48:36  16        THE COURT:  No, no.
12:48:38  17        MR. McJESSY:  It's a yes-or-no answer.
12:48:39  18        THE WITNESS:  Yes.
12:48:43  19        MR. McJESSY:  Thank you.
12:49:16  20        If I can have just a minute, your Honor?
12:49:18  21        THE COURT:  Sure.
12:49:19  22     (Brief pause.)
12:49:49  23   BY MR. McJESSY:
12:49:49  24   Q.  You mentioned that there had been an agreed-upon
12:49:52  25   procedures review by Wolf & Company?
```

12:49:55　1　　　　　　　THE COURT:　Wolf.

12:49:56　2　BY MR. McJESSY:

12:49:57　3　Q.　For the bank; is that right?

12:50:00　4　A.　Wolf & Company -- yes, Wolf & Company performed some work

12:50:06　5　for the bank.

12:50:06　6　Q.　They prepared a report.

12:50:11　7　　　　　　Who is Wolf & Company, do you know?

12:50:13　8　A.　My understanding is that they are a CPA firm.

12:50:20　9　Q.　They're in your business; is that right?　You work for a

12:50:25　10　CPA firm?

12:50:26　11　A.　They are both CPA firms.

12:50:29　12　Q.　All right.　And you are aware that they did -- I don't

12:50:36　13　want to call it an audit because I don't believe it actually

12:50:38　14　was a formal audit, it was an agreed-upon procedures review of

12:50:43　15　the inventory of Kanan Fashions.　Are you aware of that?

12:50:47　16　A.　I am aware that they did agreed-upon procedures on behalf

12:50:58　17　of the bank that included inventory.

12:51:04　18　Q.　Okay.　Did you review the report that they prepared?

12:51:07　19　A.　Not in the context of preparing these three schedules.

12:51:20　20　Q.　Did you review the report that they prepared?

12:51:22　21　A.　I had looked at their reports.

12:51:27　22　Q.　Okay.　And have you reviewed it carefully, or did you just

12:51:31　23　see the cover of it?

12:51:32　24　A.　I looked at the contents of their report.

12:51:36　25　Q.　All right.　And do you believe it is accurate?

| | | |
|---|---|---|
| 12:51:43 | 1 | MS. DEDINAS:  Objection.  Foundation. |
| 12:51:45 | 2 | THE COURT:  Sustained. |
| 12:51:45 | 3 | BY MR. McJESSY: |
| 12:51:49 | 4 | Q.  Did you review it well enough to make an assessment of the |
| 12:51:52 | 5 | report? |
| 12:51:52 | 6 | A.  An assessment as to what? |
| 12:51:59 | 7 | Q.  As to whether it was accurate. |
| 12:52:01 | 8 | A.  I couldn't answer the question, what you meant by as to |
| 12:52:09 | 9 | accurate. |
| 12:52:10 | 10 | Q.  Did you disagree with the conclusions in the report? |
| 12:52:14 | 11 | MS. DEDINAS:  Objection.  Foundation. |
| 12:52:15 | 12 | MR. McJESSY:  Fair enough. |
| 12:52:16 | 13 | BY MR. McJESSY: |
| 12:52:17 | 14 | Q.  Did you review the report well enough to determine whether |
| 12:52:20 | 15 | you could agree or disagree with the conclusions in the |
| 12:52:22 | 16 | report? |
| 12:52:22 | 17 | A.  In the context of preparing these schedules, what that |
| 12:52:30 | 18 | report showed did not affect what I was doing on behalf of the |
| 12:52:38 | 19 | bank. |
| 12:52:39 | 20 | Q.  That was really nonresponsive, but I won't move to strike. |
| 12:52:43 | 21 | That's fine. |
| 12:52:44 | 22 | Do you know what an agreed-upon procedures review is? |
| 12:52:53 | 23 | A.  Yes. |
| 12:52:57 | 24 | Q.  What is that? |
| 12:52:59 | 25 | A.  In that particular engagement between Wolf & Company and |

| | | |
|---|---|---|
| 12:53:08 | 1 | the bank, the bank had asked the CPAs to perform certain |
| 12:53:18 | 2 | procedures that were agreed upon between the two parties. |
| 12:53:22 | 3 | Q.  Okay.  And so the bank and the accounting firm agree on |
| 12:53:29 | 4 | the procedures that will be used in order for the accounting |
| 12:53:32 | 5 | firm to prepare a report that provides the bank with the |
| 12:53:36 | 6 | information that it's requested; is that right? |
| 12:53:42 | 7 | A.  That was my understanding. |
| 12:53:43 | 8 | Q.  All right.  And do you know what the conclusions were in |
| 12:53:47 | 9 | the report prepared by the Wolf firm? |
| 12:53:52 | 10 | MS. DEDINAS:  Objection.  Relevance. |
| 12:53:53 | 11 | THE COURT:  Sustained. |
| 12:53:55 | 12 | BY MR. McJESSY: |
| 12:53:57 | 13 | Q.  Are you aware that the Wolf firm did not find |
| 12:54:01 | 14 | discrepancies in Kanan's inventory? |
| 12:54:04 | 15 | A.  Can you repeat the question? |
| 12:54:13 | 16 | Q.  Yes.  Are you aware that the Wolf company did not find |
| 12:54:18 | 17 | discrepancies in Kanan's inventory? |
| 12:54:21 | 18 | A.  Based on reading the Wolf reports for that assignment, I |
| 12:54:31 | 19 | did not recall seeing discrepancies being brought up. |
| 12:54:35 | 20 | Q.  All right.  Thank you. |
| 12:54:44 | 21 | Now, you relied on the records that were produced to |
| 12:54:48 | 22 | you, and you understand those records to be from Boscov's is |
| 12:54:52 | 23 | that right, in preparing your report, Exhibit 232, your |
| 12:55:03 | 24 | summary report? |
| 12:55:03 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:55:04 | 1 | Q.  All right.  Do you know how those records were maintained |
| 12:55:11 | 2 | by Boscov's? |
| 12:55:11 | 3 | A.  No. |
| 12:55:15 | 4 | Q.  Do you know how they compiled those records in order to |
| 12:55:19 | 5 | produce them? |
| 12:55:20 | 6 | A.  How they compiled? |
| 12:55:26 | 7 | Q.  Yes. |
| 12:55:27 | 8 | A.  No. |
| 12:55:28 | 9 | Q.  Do you know that the records are complete? |
| 12:55:38 | 10 | A.  They produced the complete payment history, for example, |
| 12:55:55 | 11 | that is in Exhibit 231. |
| 12:55:57 | 12 | Q.  How do you know that that is a complete payment history? |
| 12:56:00 | 13 | A.  Boscov's also produced an affidavit indicating that this |
| 12:56:18 | 14 | was the payment history from them to Kanan. |
| 12:56:23 | 15 | Q.  That's what their affidavit said? |
| 12:56:35 | 16 | A.  I believe it says the payment history report is correct. |
| 12:56:49 | 17 | Q.  And do you know whether this is all of the records that |
| 12:56:52 | 18 | Boscov's had with respect to Kanan? |
| 12:56:59 | 19 | THE COURT:  During this time period? |
| 12:57:01 | 20 | MR. McJESSY:  Correct.  During this time period. |
| 12:57:03 | 21 | Thank you. |
| 12:57:05 | 22 | THE WITNESS:  No. |
| 12:57:07 | 23 | MR. McJESSY:  I don't have any other questions. |
| 12:57:27 | 24 | THE COURT:  Thank you.  Anything from the |
| 12:57:30 | 25 | respondents? |

| | | |
|---|---|---|
| 12:57:32 | 1 | MR. LIPTON:  We will pass, your Honor. |
| 12:57:33 | 2 | THE COURT:  Anything else? |
| 12:57:35 | 3 | MS. DEDINAS:  Yes. |
| 12:57:36 | 4 | THE COURT:  Keep in mind we have a court reporter |
| 12:57:37 | 5 | here that even if we don't want a break, she does. |
| 12:57:41 | 6 | MS. DEDINAS:  Okay.  I will be real short. |
| 12:57:43 | 7 | - - - |
| 12:57:43 | 8 | SUSAN CHENG, REDIRECT EXAMINATION |
| 12:57:43 | 9 | BY MS. DEDINAS: |
| 12:57:44 | 10 | Q.  Ms. Cheng, you were asked how do you know whether you have |
| 12:57:47 | 11 | reviewed all of the Boscov's records that there are; is that |
| 12:57:53 | 12 | right? |
| 12:57:53 | 13 | A.  Right. |
| 12:57:53 | 14 | Q.  And you indicated that there is an affidavit.  Can I have |
| 12:57:57 | 15 | you take a look at SH 230? |
| 12:58:02 | 16 | A.  Yes. |
| 12:58:06 | 17 | MS. DEDINAS:  And for the record, we do have the |
| 12:58:08 | 18 | original affidavit under Rule 803(6) -- |
| 12:58:21 | 19 | THE COURT:  This is fine. |
| 12:58:23 | 20 | BY MS. DEDINAS: |
| 12:58:23 | 21 | Q.  Okay.  So I'd just like to direct your attention to |
| 12:58:26 | 22 | paragraph 2 of the affidavit.  It says, The attached records |
| 12:58:30 | 23 | are true copies of all original records maintained by Boscov's |
| 12:58:34 | 24 | department store regarding Kanan Fashions that were requested |
| 12:58:37 | 25 | by plaintiff, United Central Bank, in connection with the |

| | | |
|---|---|---|
| 12:58:40 | 1 | captioned matter and that they are kept in the regular and |
| 12:58:44 | 2 | ordinary course of business activity there. |
| 12:58:47 | 3 | Do you have any reason to believe that you have not |
| 12:58:51 | 4 | been provided with all of the records of the Boscov's' |
| 12:58:54 | 5 | relationship with Kanan Fashions? |
| 12:58:55 | 6 | A.  No, I have no reason to believe that. |
| 12:58:59 | 7 | Q.  Okay.  Now, you were also asked whether Wolf & Company had |
| 12:59:09 | 8 | found the same discrepancies that you had, isn't that right, |
| 12:59:19 | 9 | or that Wolf & Company had not found any discrepancies in |
| 12:59:23 | 10 | their report.  Do you recall that? |
| 12:59:26 | 11 | A.  I believe it was concerning inventory. |
| 12:59:31 | 12 | Q.  Do you know if Wolf & Company performed an audit of the |
| 12:59:36 | 13 | inventory? |
| 12:59:37 | 14 | A.  Based on their reports, they did not conduct an audit of |
| 12:59:44 | 15 | the inventory. |
| 12:59:44 | 16 | Q.  So what did Wolf & Company's report -- what kind of |
| 12:59:51 | 17 | records were they basing the report on? |
| 12:59:55 | 18 | MR. McJESSY:  Objection.  Foundation. |
| 12:59:58 | 19 | THE COURT:  Sustained. |
| 12:59:59 | 20 | BY MS. DEDINAS: |
| 12:59:59 | 21 | Q.  Based on your review of the Wolf & Company report, what |
| 01:00:04 | 22 | was the basis for the data that they had to reach their |
| 01:00:10 | 23 | conclusions? |
| 01:00:11 | 24 | A.  I believe they reviewed some inventory records, but I do |
| 01:00:23 | 25 | not -- not having spent time looking at -- analyzing that |

01:00:29  1  particular report, I could not speak to the exact records that

01:00:33  2  they looked at.

01:00:33  3  Q.  And based on your review of your report, where would they

01:00:38  4  have gotten those records from?

01:00:40  5  A.  Typically, outside accountants hired by a company would

01:00:46  6  obtain all their records from their client, which in this case

01:00:50  7  would be Kanan.

01:00:52  8         MR. McJESSY:  Objection.

01:00:52  9         THE COURT:  Sustained.

01:00:54  10        MR. McJESSY:  Thank you.  Move that it be stricken.

01:01:02  11        THE COURT:  It will be stricken.

01:01:03  12        MS. DEDINAS:  No further questions.

01:01:05  13        MR. McJESSY:  Very briefly, your Honor.

01:01:06  14                    - - -

01:01:06  15        SUSAN CHENG, RECROSS-EXAMINATION

01:01:06  16  BY MR. McJESSY:

01:01:08  17  Q.  I want to draw your attention still to the affidavit that

01:01:11  18  I think you have.

01:01:11  19        THE COURT:  230?

01:01:12  20        MR. McJESSY:  230.  Thank you, your Honor.

01:01:12  21  BY MR. McJESSY:

01:01:15  22  Q.  This doesn't say that Boscov's has produced all of its

01:01:17  23  records related to Kanan; is that correct?  The attached

01:01:23  24  records are true copies of all original records maintained by

01:01:27  25  Boscov's department store regarding Kanan Fashions, Inc., that

| | | |
|---|---|---|
| 01:01:31 | 1 | were requested by plaintiff, United Central Bank; is that |
| 01:01:31 | 2 | right? |
| 01:01:38 | 3 | A.  You're reading from paragraph 2? |
| 01:01:40 | 4 | THE COURT:  2. |
| 01:01:41 | 5 | BY MR. McJESSY: |
| 01:01:42 | 6 | Q.  Correct. |
| 01:01:42 | 7 | A.  That's what it says. |
| 01:01:43 | 8 | Q.  All right.  And I just -- I want to know what you know. |
| 01:01:48 | 9 | Do you know whether you were given all of Boscov's' records |
| 01:01:52 | 10 | concerning Kanan Fashions, all of the records? |
| 01:01:56 | 11 | A.  I believe Boscov's had produced all of the records. |
| 01:02:09 | 12 | Q.  Okay.  This affidavit doesn't say that, so why do you |
| 01:02:14 | 13 | think that? |
| 01:02:14 | 14 | A.  This says Boscov's had produced all original records |
| 01:02:26 | 15 | maintained by them regarding Kanan Fashions. |
| 01:02:29 | 16 | Q.  That were requested by plaintiff, United Central Bank, |
| 01:02:35 | 17 | correct? |
| 01:02:39 | 18 | So do you read that if United Central Bank didn't |
| 01:02:42 | 19 | request certain records, then they may not have been produced? |
| 01:02:46 | 20 | A.  I believe it says the plaintiff requested all original |
| 01:02:50 | 21 | records. |
| 01:02:51 | 22 | Q.  So your knowledge of what Boscov's produced is based |
| 01:02:58 | 23 | solely on this affidavit; is that right? |
| 01:03:00 | 24 | A.  And the documents that I had seen. |
| 01:03:02 | 25 | Q.  The ones that you were given by United Central Bank's |

| | | |
|---|---|---|
| 01:03:06 | 1 | counsel; is that right? |
| 01:03:13 | 2 | A.  The ones I have requested and were given, yes. |
| 01:03:16 | 3 | Q.  All right.  And you made no independent effort to follow |
| 01:03:20 | 4 | up with Boscov's whether they produced all of the records that |
| 01:03:24 | 5 | they had.  You relied just on this affidavit; is that right? |
| 01:03:36 | 6 | A.  The question was did I just rely on this affidavit? |
| 01:03:40 | 7 | Q.  I will withdraw the question. |
| 01:03:43 | 8 | THE COURT:  Thank you very much. |
| 01:03:45 | 9 | BY MR. McJESSY: |
| 01:03:46 | 10 | Q.  You made no independent effort to verify with Boscov's |
| 01:03:51 | 11 | whether it produced all records concerning Kanan Fashions, is |
| 01:03:56 | 12 | that right, for this period of time? |
| 01:03:58 | 13 | A.  Not personally. |
| 01:04:03 | 14 | Q.  All right.  And are you aware that Wolf -- strike that. |
| 01:04:10 | 15 | Do you know what sampling is in inventory, in |
| 01:04:14 | 16 | inventory counts? |
| 01:04:15 | 17 | A.  As in taking a sample? |
| 01:04:21 | 18 | Q.  Yes. |
| 01:04:24 | 19 | THE COURT:  It doesn't sound like she does. |
| 01:04:27 | 20 | BY MR. McJESSY: |
| 01:04:27 | 21 | Q.  All right.  Are you aware that Wolf & Company did actual |
| 01:04:40 | 22 | inventory counts as part of its agreed-upon procedures? |
| 01:04:44 | 23 | A.  I believe their report says they did test counts. |
| 01:04:57 | 24 | MR. McJESSY:  No other questions, your Honor.  Thank |
| 01:04:59 | 25 | you. |

01:04:59 1        THE COURT:  Anything else?

01:05:00 2        MR. LIPTON:  None, your Honor.

01:05:01 3        THE COURT:  Anything else?

01:05:02 4        MS. DEDINAS:  No.

01:05:02 5        THE COURT:  Thank you very much.

01:05:03 6        THE WITNESS:  Thank you, your Honor.

01:05:07 7     (Witness leaves the stand.)

01:05:07 8        THE COURT:  We are going to take a break for lunch.

01:05:09 9        MS. DEDINAS:  Yes.  I think there's -- Mr. Blumenthal

01:05:12 10   -- we need to confirm about Mr. Blumenthal.  He is available

01:05:15 11   at 10:00 o'clock tomorrow.

01:05:16 12       THE COURT:  Fine.  And you had a matter anyway, don't

01:05:20 13   you?

01:05:20 14       MR. McJESSY:  No, I did.

01:05:23 15       THE COURT:  You can't be here until 10:00?  You can

01:05:26 16   be here at 10:00?

01:05:27 17       MR. McJESSY:  Yes.

01:05:29 18       THE COURT:  So we are still waiting for Mr. Muschler.

01:05:33 19   Do we have any idea when he can be here?

01:05:36 20       MR. McGARRY:  No, but I think he can come in

01:05:38 21   tomorrow, I think.  We will find him.

01:05:39 22       THE COURT:  I guess the question in my mind is I am

01:05:41 23   worried about this snow, as we all are, I am sure, and if

01:05:46 24   there is a way to get it done today, we'd have that out of the

01:05:49 25   way.  I'd just assume not have it hanging anymore.  And I

01:05:53    1  don't know how long Mr. Blumenthal is going to take tomorrow,

01:05:55    2  assuming -- well, he will be here now, we are told.

01:06:00    3           MR. McGARRY:  Your Honor, we will --

01:06:01    4           THE COURT:  Why don't you do this.  Call him during

01:06:04    5  the lunch hour and come back and let the court know.

01:06:09    6           Why don't we take -- take an hour if you want for

01:06:13    7  lunch.  Thank you very much.

            8    (The hearing was adjourned at 1:05 p.m. until 3:00 p.m. of

            9  this same day and date.)

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

719

```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3

 4   UNITED CENTRAL BANK,              )   Docket No. 10 C 331
                                       )
 5                       Plaintiff,    )
                                       )
 6              vs.                    )
                                       )
 7   KANAN FASHIONS, INC., et al.,     )   Chicago, Illinois
                                       )   January 31, 2011
 8                       Defendants.   )   3:00 o'clock p.m.

 9
                     TRIAL TRANSCRIPT OF PROCEEDINGS
10               BEFORE THE HONORABLE MICHAEL T. MASON
                             VOLUME 3-B
11

12   APPEARANCES:

13
     For the Plaintiff:     BOODELL & DOMANSKIS LLC
14                          BY:  MS. VILIA M. DEDINAS
                                 MS. NADA DJORDJEVIC
15                               MR. DAVID WEST
                                 MS. AMY RYLKO
16                          205 North Michigan Avenue, Suite 4307
                            Chicago, IL  60601
17                          (312) 938-4070

18

19   For the Defendants:    McJESSY, CHING & THOMPSON
                            BY:  MR. KEVIN McJESSY
20                          3759 North Ravenswood, Suite 231
                            Chicago, IL  60613
21                          (773) 880-1260

22

23
     Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 1854-B
25                          Chicago, Illinois  60604
                            (312) 435-5639
```

1    APPEARANCES CONTINUED:

2
     For Respondents
3    Alan Borlack and
     Eric Grossman:              HINSHAW & CULBERTSON LLP
4                                BY:  MR. THOMAS P. McGARRY
                                     MR. ALAN R. LIPTON
5                                222 North LaSalle Street, Suite 300
                                 Chicago, IL  60601
6                                (312) 704-3000

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:46:41 | 1 | (The following proceedings were had in open court:) |
| 03:00:59 | 2 | THE COURT: Counsel, call your next witness. |
| 03:01:03 | 3 | MS. DEDINAS: I will be recalling Mr. Muschler next, |
| 03:01:07 | 4 | right? |
| 03:01:08 | 5 | MR. McJESSY: Correct. |
| 03:01:37 | 6 | (Witness sworn.) |
| 03:01:37 | 7 | - - - |
| 03:01:37 | 8 | DAVE MUSCHLER, DIRECT EXAMINATION |
| 03:01:37 | 9 | BY MR. McJESSY: |
| 03:01:40 | 10 | Q. Mr. Muschler, you work at Bailey Borlack; is that right? |
| 03:01:42 | 11 | A. That's right. |
| 03:01:42 | 12 | Q. All right. And the lawsuit that we're here about was -- |
| 03:01:47 | 13 | when did you first become involved in it? |
| 03:01:49 | 14 | A. I would say in the first meeting at Vilia's was |
| 03:01:58 | 15 | February 17th; shortly before February 17th, I became |
| 03:02:01 | 16 | involved. |
| 03:02:01 | 17 | Q. All right. And when -- just to give me an end time frame |
| 03:02:07 | 18 | as well, your involvement in this lawsuit sort of came to an |
| 03:02:12 | 19 | end at a certain point; is that fair? |
| 03:02:14 | 20 | A. About two months later when I was going to -- on a |
| 03:02:19 | 21 | vacation with my wife, so it would have been about mid March. |
| 03:02:24 | 22 | Q. All right. That would be about a month later? |
| 03:02:26 | 23 | A. No, it would have been mid April. |
| 03:02:30 | 24 | Q. All right. |
| 03:02:30 | 25 | A. March is when I go to spring training, excuse me. |

03:02:34  1  Q.  All right.  So you were involved in the lawsuit from mid

03:02:40  2  February to mid April; is that fair?

03:02:42  3  A.  Correct.

03:02:42  4  Q.  And were you still -- there's been testimony about an

03:02:45  5  April meeting, on April 23rd, at the offices -- the Oak Brook

03:02:51  6  offices of Kanan.  Were you still involved in handling this

03:02:55  7  lawsuit actively when that meeting occurred?

03:02:57  8  A.  I would say no.  I think at that time, I was out of the

03:03:01  9  country.  I think I had handed it over per Alan's direction to

03:03:08  10  Eric, my involvement to Eric at that time.

03:03:09  11  Q.  All right.  And so when you first became involved in the

03:03:13  12  lawsuit, there was a meeting with Ms. Dedinas; is that right?

03:03:16  13  A.  Correct.

03:03:16  14  Q.  And what was the purpose of that meeting?

03:03:18  15  A.  To try and get a handle on -- understand that the federal

03:03:23  16  judge had denied a motion or whatever.  I don't even know all

03:03:30  17  the details, but there was expedited discovery provided for.

03:03:35  18        Our meeting with Ms. Dedinas, her expert, may have

03:03:40  19  been one other attorney for them at the time, and Mr. Joshi

03:03:45  20  and Ray Fugiel were to get a handle on Kanan's computer

03:03:52  21  systems at that time.  We had no idea what the computer

03:03:56  22  systems consisted of, and we were trying to identify the

03:03:59  23  computer systems.

03:04:00  24  Q.  All right.  And as a result of that meeting -- strike

03:04:03  25  that.

03:04:03　1　　　　　During the course of that meeting, were the computer

03:04:06　2　systems that existed identified?

03:04:07　3　A.　Well, they were.　I mean, the guy who had the most

03:04:14　4　understanding in connection with them was Kanan's former

03:04:19　5　computer person, let me say, Ray Fugiel.

03:04:23　6　Q.　He was at the meeting?

03:04:25　7　A.　He was at the meeting.

03:04:26　8　Q.　All right.　And did he identify all of the servers that

03:04:29　9　existed?

03:04:29　10　A.　Well, kind of.

03:04:31　11　　　　　The only reason I say "kind of," I don't mean -- we

03:04:35　12　were identifying what was there in some regard.

03:04:38　13　Q.　When you say "was there" --

03:04:39　14　A.　In Kanan.

03:04:41　15　Q.　Was there?

03:04:42　16　A.　What Kanan had.

03:04:43　17　Q.　Okay.

03:04:44　18　A.　But, subsequently, the number of servers at the Oak Brook

03:04:47　19　facility, as I recall, increased from four to five or from

03:04:53　20　three to four to five as a result of subsequent conversations

03:04:57　21　with either Mr. Joshi or Mr. Fugiel.

03:05:01　22　Q.　So one of the two of them, either Mr. Joshi or Mr. Fugiel,

03:05:05　23　identified additional computers?

03:05:07　24　A.　After the meeting.

03:05:08　25　Q.　Okay.　Now, let's -- so if I can do this without exhibits.

724

03:05:12   1   Do you remember there were two versions of a letter to the
03:05:14   2   Court prepared, one on February -- I believe it was February
03:05:17   3   24th and then a subsequent revised letter that was sent to the
03:05:23   4   Court and it was dated February 26th.  Do you remember those
03:05:25   5   two letters?
03:05:26   6   A.  I do remember them, yes.
03:05:27   7   Q.  And both of those letters reference a server at the
03:05:30   8   warehouse.  Do you know that?  Do you recall that?
03:05:33   9   A.  Yes.
03:05:33  10   Q.  Okay.  So how is it -- when is it that you became aware
03:05:38  11   that there was a server at the warehouse?  Was it at this
03:05:41  12   meeting on February 17th or 18th, whatever it was, with
03:05:46  13   Ms. Dedinas, or was it subsequent to that?
03:05:49  14   A.  I am fairly confident that I can say it was at the meeting
03:05:52  15   with Ms. Dedinas.
03:05:53  16   Q.  All right.
03:05:53  17   A.  And her expert.  I have to say that her expert was a
03:05:58  18   significant participant in that meeting.
03:05:59  19   Q.  Do you remember who that expert was?
03:06:02  20   A.  I am bad on names, Counsel.  Is it David or Daniel
03:06:07  21   Abraham?  He was the expert that I dealt with, you know,
03:06:11  22   whenever I had any dealings with them.  I can't remember
03:06:15  23   exactly his name.
03:06:16  24   Q.  So as best you can recall, the defendants -- or Mr. Shah,
03:06:22  25   Mr. Joshi, they identified all of the computers that they

03:06:26 1    could think of, along with their I.T. person during the course

03:06:30 2    of that meeting or shortly thereafter?

03:06:32 3    A.  The only difference I'd have with that statement, Counsel,

03:06:35 4    is that I had very little, if any, contact with Mr. Shah.

03:06:40 5    Q.  Okay.

03:06:40 6    A.  All of my contact was with Mr. Joshi and with what contact

03:06:49 7    I could have with Ray Fugiel.

03:06:50 8    Q.  All right.

03:06:51 9    A.  I had very little contact with Mr. Shah.

03:06:53 10   Q.  All right.  And you drafted the letter to the Court that

03:06:57 11   was ultimately sent on February 26th, right?

03:07:00 12   A.  Correct.

03:07:00 13   Q.  Okay.  And at that time, the warehouse server was

03:07:03 14   disclosed to the court and to UCB's counsel; is that right?

03:07:10 15   A.  That's correct.

03:07:10 16   Q.  And then you sent an e-mail out a few days later on

03:07:14 17   March 3rd saying take no action with respect to the computers

03:07:19 18   and servers.

03:07:20 19        Do you recall that e-mail?

03:07:21 20   A.  Yes.

03:07:21 21   Q.  And was the purpose of that e-mail -- well, strike that.

03:07:24 22   Let me take a step back.

03:07:26 23        There was a prior e-mail to that that asked the

03:07:28 24   clients to shut down the backup process on one of the servers;

03:07:28 25   is that right?

03:07:33  1  A.  That's correct.

03:07:33  2  Q.  All right.

03:07:34  3  A.  Well, I think it was to shut down the backup completely.

03:07:37  4  Q.  Okay.  On any computer?

03:07:38  5  A.  Because I'll say Vilia's expert, Dave, whatever his name

03:07:44  6  was, was very concerned that if the backup continued, it could

03:07:48  7  erase information, so he was very, I'll say, adamant.  He is a

03:07:54  8  good guy, he said shut down the backup system, so I said the

03:07:59  9  next day I believe we had Mr. Fugiel to Oak Brook and shut

03:08:04  10  down the backup system and shut down the computers in general.

03:08:07  11  Q.  All right.  So that happened the next day?

03:08:10  12  A.  It's my recollection, yes.

03:08:13  13  Q.  And you received confirmation of that?

03:08:14  14  A.  Well, as I recall, I had e-mail discussion with Mr. Joshi

03:08:20  15  about that.  I didn't have -- I don't think I had any direct

03:08:24  16  contact with Mr. Fugiel after that meeting, but Mr. Joshi

03:08:30  17  confirmed to me because it was very, very important that we

03:08:33  18  shut down the servers so that we won't lose any information.

03:08:36  19  Q.  All right.  And to the best of your knowledge, the

03:08:40  20  defendants did that?

03:08:40  21  A.  Yes.

03:08:41  22  Q.  All right.  And then you send out an e-mail at the

03:08:44  23  beginning of March saying, take no action with respect to the

03:08:47  24  computers?

03:08:48  25          MR. McGARRY:  Your Honor, I object.  It

| | |
|---|---|
| 03:08:49 | 1 |
| 03:08:54 | 2 |
| 03:08:56 | 3 |
| 03:08:56 | 4 |
| 03:08:58 | 5 |
| 03:08:58 | 6 |
| 03:09:23 | 7 |
| 03:09:28 | 8 |
| 03:09:29 | 9 |
| 03:09:29 | 10 |
| 03:09:36 | 11 |
| 03:09:43 | 12 |
| 03:09:45 | 13 |
| 03:09:47 | 14 |
| 03:09:47 | 15 |
| 03:09:50 | 16 |
| 03:09:52 | 17 |
| 03:09:58 | 18 |
| 03:10:00 | 19 |
| 03:10:07 | 20 |
| 03:10:11 | 21 |
| 03:10:16 | 22 |
| 03:10:21 | 23 |
| 03:10:24 | 24 |
| 03:10:25 | 25 |

1  mischaracterizes the actual exhibit, which is SH 31.

2      MR. McJESSY:  Well, let's turn to SH 31.

3      THE COURT:  Sustained.

4  BY MR. McJESSY:

5  Q.  Do you have it there?

6  A.  I have Exhibit 31.

7  Q.  And this is the e-mail that you sent out to Mr. Shah and

8  Mr. Joshi; is that right?

9  A.  That's correct.

10  Q.  All right.  And it says at the end -- well, I won't read

11  the e-mail because we can all do that ourselves.

12      You are directing the clients that nothing should be

13  done with the computers; is that fair?

14  A.  That's correct.

15  Q.  All right.  And you're directing them not to take any

16  action at this time?

17  A.  At that time on March 3rd, I wanted -- it was my

18  understanding that there were two people who had access to the

19  computers.  I took that to be Mr. Joshi and Mr. Shah.  I

20  didn't think -- my understanding was they didn't have much

21  experience or understanding with computers, nor do I, and my

22  intent at that time was, guys, shut this thing down, don't

23  anybody touch it until we get somebody there who knows

24  something about it.

25  Q.  All right.  And then the rest of the time that you're

| | |
|---|---|
| 03:10:28 | 1 |
| 03:10:32 | 2 |
| 03:10:36 | 3 |
| 03:10:43 | 4 |
| 03:10:50 | 5 |
| 03:10:54 | 6 |
| 03:10:57 | 7 |
| 03:10:57 | 8 |
| 03:11:01 | 9 |
| 03:11:05 | 10 |
| 03:11:06 | 11 |
| 03:11:07 | 12 |
| 03:11:13 | 13 |
| 03:11:15 | 14 |
| 03:11:16 | 15 |
| 03:11:16 | 16 |
| 03:11:19 | 17 |
| 03:11:20 | 18 |
| 03:11:27 | 19 |
| 03:11:34 | 20 |
| 03:11:38 | 21 |
| 03:11:41 | 22 |
| 03:11:42 | 23 |
| 03:11:45 | 24 |
| 03:11:46 | 25 |

1  involved in this matter, at any time did you give any
2  instructions to anybody to do anything different after that?
3  A.  Well, that's not an easy -- because -- question to answer
4  because we did subsequently have a meeting -- well, I can --
5  Vilia wasn't there -- at Kanan to deal with that questionable
6  server, the one that was giving us trouble.
7  Q.  Okay.
8  A.  So to the extent, we were trying to deal with that server
9  at the time.  That was the whole focus of attention when I was
10  involved in this case.
11  Q.  Fair enough.
12         When did you become aware -- strike that.
13         The server that had the problem was at the Oak Brook
14  office?
15  A.  Correct.
16  Q.  When did you become aware that the server at the Oak Brook
17  office had some problem?
18  A.  I think relatively early on.  I think the letter that I
19  wrote said that Ray mentioned something about that server
20  having problems when he shut it down or turned it on on
21  January 27th, so that would have been prior to the
22  February 17th meeting.
23         So I think we knew early on, and I think we knew at
24  the meeting --
25  Q.  All right.

03:11:47  1   A.  -- at Vilia's office that there was a problem with the

03:11:51  2   server at the Oak Brook office.

03:11:52  3   Q.  All right.  And then you devoted your attention to trying

03:12:00  4   to determine what the problem was and obtain data from that

03:12:06  5   server; is that fair?

03:12:07  6   A.  To obtain -- to protect -- to prevent any data from being

03:12:13  7   lost on the server.

03:12:14  8   Q.  Whatever data was there, you wanted to prevent any further

03:12:18  9   loss if there had been loss?

03:12:19  10          MR. McGARRY:  Your Honor, I just want to understand

03:12:21  11  if he's calling this witness as an adverse witness, then I

03:12:24  12  have no objection to leading or cross.

03:12:26  13          THE COURT:  He is an adverse witness.

03:12:28  14          MR. McGARRY:  Thank you, your Honor.

03:12:30  15  BY MR. McJESSY:

03:12:30  16  Q.  Go ahead, sir.

03:12:31  17  A.  Reread the question or restate the question.

03:12:34  18  Q.  Let me just -- I'll withdraw it and ask you a different

03:12:38  19  question.

03:12:38  20  A.  Okay.

03:12:38  21  Q.  As of the beginning of March after you have shut down the

03:12:45  22  computers, you had your meeting in February, as of the

03:12:48  23  beginning of March, fair to say that most of the attention on

03:12:51  24  the computers is devoted to the malfunctioning server?

03:12:55  25  A.  At that time, and I don't mean to speak for anybody else

| 03:13:01 | 1 | in this room, but all of our attention was on that -- |

03:13:01 1 in this room, but all of our attention was on that --

03:13:06 2 including Judge Mason, was on that server. It was that there

03:13:10 3 was a question with regard to it, we didn't know what it was,

03:13:14 4 I had some people tell me, look, you may be able to just turn

03:13:17 5 that server on, it may be able to fix itself. We weren't

03:13:20 6 going to take that risk. But nobody knew what was wrong with

03:13:27 7 it, and I didn't want anybody doing anything with it, so I

03:13:29 8 said, don't do anything with it until we get someone here who

03:13:33 9 knows something about it.

03:13:34 10 Q. And then between that time period -- and I am not

03:13:36 11 concerned about that server at the moment. I want to focus on

03:13:40 12 the warehouse server.

03:13:42 13 Between that time period and the time that your

03:13:45 14 day-to-day handling of the case ended in March -- I'm sorry,

03:13:48 15 in April, did you give any instruction to the defendants to

03:13:51 16 take any action with respect to the warehouse server?

03:13:54 17 A. No, nothing separate from any general, you know, that we

03:13:59 18 did with all of the computers. Nothing special with regard to

03:14:02 19 the warehouse server.

03:14:03 20 Q. Okay.

03:14:04 21 THE COURT: Other than preservation?

03:14:06 22 THE WITNESS: Yes. Yes. Just like with all the

03:14:08 23 other computer systems.

03:14:13 24 BY MR. McJESSY:

03:14:13 25 Q. Now, you were copied on a couple of e-mails at the end of

03:14:21  1   February concerning the foreclosure, the friendly foreclosure

03:14:25  2   that was going to take place on the warehouse.  Do you

03:14:27  3   remember those e-mails?

03:14:28  4   A.  I really don't.

03:14:29  5   Q.  All right.  If you could take perhaps a look at Exhibits

03:14:35  6   22 and 28.  Just let me know when you have had a chance to

03:14:38  7   look at them.

03:15:21  8   A.  I have seen them.  I have looked at them.

03:15:22  9   Q.  Do you remember receiving those e-mails?

03:15:24  10  A.  I can honestly say no.

03:15:25  11  Q.  All right.  That's fine.  We would want you to honestly

03:15:31  12  say.

03:15:32  13  A.  Unlike everything else that I have said so far, honestly,

03:15:36  14  no.

03:15:36  15  Q.  All right.  Aside from these e-mails then, do you have any

03:15:40  16  independent recollection of the discussions concerning the

03:15:43  17  friendly foreclosure on the warehouse at the end of February?

03:15:46  18  A.  None whatsoever.

03:15:48  19  Q.  All right.  Now, did you ever advise -- let me take a step

03:15:56  20  back.

03:15:56  21       You knew the server was at the warehouse at least as

03:16:00  22  of the end of February?

03:16:02  23  A.  Yes.

03:16:02  24  Q.  Fair enough?

03:16:03  25  A.  Yes.

03:16:03 1  Q.  Did you ever advise United Central Bank or its counsel

03:16:08 2  that the server had been moved from there?

03:16:10 3  A.  Had been moved from the warehouse?

03:16:14 4  Q.  Correct.

03:16:15 5  A.  I didn't advise them because I had no knowledge, I mean,

03:16:19 6  if it had been moved.

03:16:20 7        So the answer to your question is no.

03:16:22 8  Q.  All right.  An expert witness was engaged in the beginning

03:16:45 9  of March to deal with ESI?

03:16:48 10        THE COURT:  By whom?

03:16:51 11  BY MR. McJESSY:

03:16:52 12  Q.  By Bailey Borlack; is that right?

03:16:53 13  A.  Correct.

03:16:53 14  Q.  And that was Mr. Garrie who testified yesterday; is that

03:16:53 15  right?

03:16:57 16  A.  That's correct.

03:16:57 17  Q.  Or on Friday, I guess, actually.

03:17:00 18  A.  Yes.

03:17:00 19  Q.  Were you involved in hiring him?

03:17:03 20  A.  Really not.  I mean, it was somebody that Alan had

03:17:08 21  knowledge of and Alan recommended.  I made some contact with

03:17:12 22  him and discussed things with him.  And at one point in March

03:17:19 23  and early April was maybe the point person for talking to

03:17:26 24  Mr. Garrie.

03:17:27 25        But other than that, it was really Alan who made the

03:17:30    1    contact with Mr. Garrie.

03:17:32    2    Q.  When he was initially hired by Bailey Borlack to act as

03:17:37    3    the ESI consultant, did you meet at any point to discuss the

03:17:44    4    warehouse server?

03:17:45    5    A.  No.

03:17:45    6         Did I meet?  Face to face, no.

03:17:50    7    Q.  Did you ever discuss with him over the phone the warehouse

03:17:52    8    server?

03:17:53    9    A.  Well, it certainly would have been a part of discussion in

03:17:57   10    that that was part of the computer system at Kanan, but it was

03:18:00   11    nothing unique.  I mean, there was nothing special about that

03:18:04   12    conversation.  It was just another aspect of the computer

03:18:07   13    system.

03:18:07   14    Q.  Well, let me ask you more precisely.  Did you ever discuss

03:18:10   15    with him that there was a server at Kanan warehouse which was

03:18:16   16    separate from the computers at its Oak Brook offices?

03:18:20   17    A.  I think we did discuss, you know, at least identify that,

03:18:24   18    that there was this server at the warehouse.

03:18:27   19    Q.  All right.  So the best of your recollection is that you

03:18:30   20    did make him aware of that?

03:18:31   21    A.  Yes.

03:18:32   22    Q.  Now, did you become aware that there had been a friendly

03:18:50   23    foreclosure on March 15th?

03:18:53   24    A.  I got to answer that question, Counsel, no.

03:18:57   25    Q.  All right.  Did you at any point become aware that the

03:19:00  1  defendants had lost possession of the warehouse?

03:19:03  2  A.  No.

03:19:03  3  Q.  Sir, there was a court hearing in this matter in mid to

03:19:48  4  late May, May 18th or thereabouts.

03:19:52  5          THE COURT:  19th.

03:19:53  6  BY MR. McJESSY:

03:19:54  7  Q.  19th, where Mr. Garrie was present in court.  Did you hear

03:19:59  8  his testimony concerning that hearing on Friday?

03:20:01  9  A.  I heard what he said, yeah.

03:20:05  10  Q.  Were you present at that hearing?

03:20:08  11  A.  No.

03:20:09  12          MR. McJESSY:  I have no other questions, your Honor.

03:20:21  13          THE COURT:  Okay.  Actually, I believe it's your

03:20:24  14  turn.

03:20:25  15                      - - -

03:20:25  16          DAVE MUSCHLER, CROSS-EXAMINATION

03:20:25  17  BY MS. DEDINAS:

03:20:32  18  Q.  Mr. Muschler, I just have a couple really quick questions

03:20:35  19  regarding your advice to the client that you are not to take

03:20:38  20  any action.  Tell me what you meant about that.  If your

03:20:41  21  clients were to anticipate a natural disaster coming to their

03:20:50  22  warehouse, would you expect them to continue to take your

03:20:55  23  admonition to take no further action and leave the warehouse

03:20:58  24  server there?

03:21:01  25          MR. McJESSY:  Objection, your Honor.  Hypothetical.

03:21:03  1        THE COURT:  She can pose a hypothetical to him.  It
03:21:06  2  depends on how much weight I give to it.
03:21:09  3        THE WITNESS:  Well, if I can answer that this way.
03:21:13  4  At the time, my concern with these clients, Mr. Shah and
03:21:19  5  Mr. Joshi, was that nothing be done to these computers or the
03:21:27  6  servers or whatever they had there that could result in the
03:21:31  7  loss of information.  If a natural disaster was going to
03:21:37  8  occur, I apologize for saying this, but I would think common
03:21:40  9  sense would dictate you're going to save something.  I mean,
03:21:44  10 you are not going to let something be destroyed.
03:21:48  11 BY MS. DEDINAS:
03:21:49  12 Q.  So when you said you're not to take any further action,
03:21:52  13 you wouldn't have anticipated that your clients would have
03:21:54  14 left the server behind while they got evicted from the
03:21:58  15 warehouse, would you?
03:21:59  16 A.  That's correct.
03:22:03  17        MS. DEDINAS:  No further questions.
03:22:04  18        THE COURT:  Mr. McGarry.
03:22:04  19                   - - -
03:22:04  20        DAVE MUSCHLER, CROSS-EXAMINATION
03:22:04  21 BY MR. McGARRY:
03:22:15  22 Q.  I just want to clarify a thing or two.  I think you've
03:22:20  23 testified with clarity, but you were asked if Mr. Garrie was
03:22:24  24 an expert witness, and then counsel also used the word ESI
03:22:30  25 consultant.  What was he, an expert witness or a consultant?

03:22:34  1  A.  Well, at the time, and I apologize for missing that, but

03:22:38  2  at the time, he was hired as a consultant.  We needed help in

03:22:43  3  connection with the computers, and Mr. Garrie was there to

03:22:49  4  give us help.  And by "us," I mean as attorneys and as the

03:22:54  5  clients.

03:22:55  6      MR. McGARRY:  Thank you.  Judge, I don't have any

03:22:57  7  further cross-examination, but if I could ask him a question

03:23:01  8  on direct.

03:23:02  9      THE COURT:  Yes.

03:23:03  10                      - - -

03:23:03  11          DAVE MUSCHLER, DIRECT EXAMINATION

03:23:03  12  BY MR. McGARRY:

03:23:04  13  Q.  Mr. Muschler, I put your resume in evidence in the book.

03:23:08  14  It's Exhibit No. 237.  Is that an accurate copy of your

03:23:14  15  professional resume, 237?

03:23:20  16  A.  I don't think I have 237 here.

03:23:44  17      MR. McGARRY:  I think what happened was we delivered

03:23:47  18  to the court some extra copies but they didn't get punched in.

03:23:51  19  May I present this to counsel and the court?

03:23:54  20      THE COURT:  And identify which you already have, I

03:23:57  21  guess.

03:23:57  22      MR. McGARRY:  237, C.V..

03:24:09  23      THE WITNESS:  It's not very exciting.

03:24:14  24      MR. McGARRY:  We will be the judge of that.

03:24:16  25      THE COURT:  Yes.

| | | |
|---|---|---|
| 03:24:17 | 1 | BY MR. McGARRY: |
| 03:24:20 | 2 | Q.  Anyway, that is in the book, and I just wanted to |
| 03:24:22 | 3 | represent, is that an accurate statement of your summation of |
| 03:24:26 | 4 | your professional career? |
| 03:24:27 | 5 | A.  Yes, it is. |
| 03:24:28 | 6 | Q.  Now, you were also a combat soldier in Vietnam, correct? |
| 03:24:32 | 7 | A.  That's correct. |
| 03:24:33 | 8 | Q.  Did you receive any citations or awards? |
| 03:24:35 | 9 | A.  Well, I wouldn't call them awards.  I mean, I received |
| 03:24:40 | 10 | some commendations, whatever. |
| 03:24:43 | 11 | Q.  Did you receive any medals for valor? |
| 03:24:46 | 12 | A.  Yes. |
| 03:24:47 | 13 | Q.  Tell the judge. |
| 03:24:48 | 14 | A.  I received a bronze star, Army commendation medal, an air |
| 03:24:52 | 15 | medal, a combat infantryman's badge, and a variety of other... |
| 03:24:58 | 16 | Q.  Do you feel yourself that you acted in good faith to |
| 03:25:01 | 17 | preserve electronically-stored information in this case? |
| 03:25:04 | 18 | A.  We did the best we could to gather the information at the |
| 03:25:09 | 19 | time, and, frankly, I tried to work with Vilia in gathering |
| 03:25:15 | 20 | that information.  That was my goal, and I thought we |
| 03:25:17 | 21 | accomplished it in the period of time I was working on it. |
| 03:25:20 | 22 | MR. McGARRY:  Thank you.  I have nothing further, |
| 03:25:22 | 23 | Judge. |
| 03:25:22 | 24 | THE COURT:  Anything else? |
| 03:25:23 | 25 | MR. McJESSY:  Nothing else, your Honor. |

03:25:25   1          THE COURT:  You can step down.

03:25:27   2          THE WITNESS:  Thank you, Judge.

03:25:28   3      (Witness leaves the stand.)

03:25:28   4          THE COURT:  That's it.  Anything else for today?  We

03:25:30   5   are going to start at 10:00 o'clock tomorrow morning.  You can

03:25:33   6   leave your stuff here if you want.  We will lock the

03:25:36   7   courtroom.

           8      (The hearing was adjourned at 3:30 p.m. on January 31, 2011,

           9   until 10:00 a.m. on February 1, 2011.)

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

## $

**$1,224** [1] - 694:7
**$100** [1] - 692:18
**$100,000** [1] - 696:3
**$12,240** [1] - 694:4
**$159.50** [1] - 695:20
**$24,000** [1] - 672:9
**$24,159.50** [1] - 695:21
**$24,536.75** [1] - 695:8
**$28,800** [1] - 695:12
**$456.75** [1] - 695:6
**$530,177.35** [1] - 690:3
**$713,925.42** [1] - 690:7
**$8,160** [1] - 694:13
**$816** [1] - 694:11
**$87** [1] - 695:13

## 0

**09** [1] - 694:23

## 1

**1** [2] - 675:17, 738:9
**1,224** [1] - 694:2
**1.2** [1] - 690:19
**10** [5] - 611:2, 621:16, 692:11, 692:13, 719:4
**100** [2] - 692:20
**10027** [1] - 694:23
**103** [1] - 651:25
**108** [3] - 635:8, 675:3, 677:24
**10:00** [5] - 717:11, 717:15, 717:16, 738:5, 738:9
**10:43** [3] - 615:16, 623:12, 623:22
**10:59** [1] - 635:17
**12,240** [1] - 694:2
**1237** [1] - 621:4
**13** [2] - 660:16, 663:7
**13.9** [1] - 628:1
**13th** [5] - 640:1, 652:6, 660:25, 675:11, 702:18
**14** [4] - 628:5, 694:23, 695:9, 695:11
**15** [1] - 627:9
**15th** [10] - 633:11, 634:18, 644:1, 644:12, 653:10, 693:10, 693:13, 693:21, 693:22, 733:23
**16** [5] - 617:15, 624:8, 662:22, 663:8, 663:22
**16-minute** [1] - 617:2
**16th** [3] - 634:18, 634:22, 663:4
**17** [2] - 694:23, 695:19
**17th** [4] - 721:15, 724:12, 728:22
**1854-B** [1] - 719:24
**18th** [2] - 724:12, 734:4
**1983** [1] - 681:15
**19th** [9] - 635:8, 635:9, 635:10, 635:16, 637:18, 639:15, 639:17, 734:5, 734:7

**1:05** [1] - 718:8
**1:48** [1] - 618:19

## 2

**2** [5] - 624:20, 671:23, 712:22, 715:3, 715:4
**2.9** [2] - 690:21, 691:8
**20** [1] - 627:2
**2007** [1] - 681:17
**2008** [18] - 683:23, 684:1, 686:18, 688:8, 688:14, 688:15, 689:23, 690:1, 690:3, 690:14, 690:17, 693:10, 693:11, 693:13, 693:21, 693:23, 706:24
**2009** [19] - 630:19, 645:17, 681:19, 684:7, 684:8, 685:19, 688:8, 688:20, 688:21, 689:24, 690:5, 690:6, 690:14, 690:18, 702:18, 706:25, 707:11, 707:14
**2010** [19] - 630:22, 633:11, 634:22, 635:12, 635:16, 640:1, 644:1, 645:17, 647:14, 647:15, 647:19, 647:20, 652:6, 656:21, 656:22, 660:16, 660:25, 678:21, 679:13
**2011** [3] - 719:7, 738:8, 738:9
**205** [1] - 719:16
**20th** [2] - 656:25, 658:5
**21** [1] - 625:2
**211** [2] - 675:16, 675:23
**219** [1] - 719:24
**22** [1] - 731:6
**222** [2] - 608:5, 720:5
**226** [5] - 683:8, 683:11, 683:21, 685:17, 687:23
**227** [4] - 683:8, 684:3, 684:6, 687:23
**228** [6] - 683:8, 685:13, 685:17, 685:22, 686:2, 687:23
**229** [7] - 688:3, 688:9, 690:8, 690:13, 690:15, 690:18, 706:18
**23** [2] - 702:15, 704:9
**230** [3] - 712:15, 714:19, 714:20
**231** [9] - 689:7, 689:14, 702:6, 702:10, 702:15, 704:6, 707:1, 711:11, 719:20
**232** [15] - 687:23, 689:16, 689:22, 690:9, 690:13, 690:15, 690:19, 706:16, 706:21, 706:23, 706:25, 707:5, 707:10, 707:13, 710:23
**233** [4] - 683:8, 686:10, 686:17, 687:25
**236** [2] - 693:4, 693:6
**237** [4] - 736:14, 736:15, 736:16, 736:22
**23rd** [1] - 722:5
**24** [5] - 634:16, 656:2, 656:5, 666:1, 702:14
**240** [4] - 614:5, 614:6, 615:11, 660:5
**24th** [3] - 707:11, 707:14, 724:3
**25** [2] - 618:8, 692:20
**25,100** [1] - 692:21
**26th** [9] - 613:6, 615:15, 622:9, 622:16, 625:12, 625:15, 625:17, 724:4, 725:11
**27th** [4] - 616:13, 616:18, 624:1,

728:21
**28** [2] - 617:19, 731:6
**28,887** [1] - 695:14
**288** [1] - 695:15
**28th** [6] - 613:6, 617:17, 618:7, 622:9, 624:19, 625:7
**29** [1] - 707:11
**2:05** [1] - 616:19
**2:07** [1] - 616:19

## 3

**3** [1] - 688:17
**3,123,052** [1] - 688:16
**3-B** [1] - 719:10
**3/15/2010** [1] - 641:18
**30** [8] - 627:2, 627:11, 656:4, 656:6, 656:7, 656:12, 656:15, 658:1
**30-day** [4] - 655:23, 655:25, 657:16, 657:18
**300** [2] - 608:5, 720:5
**30th** [3] - 651:15, 693:11, 694:22
**31** [5] - 719:7, 727:1, 727:2, 727:6, 738:8
**312** [4] - 608:6, 719:17, 719:25, 720:6
**312-755-3136** [2] - 625:19, 625:20
**33** [1] - 687:24
**331** [1] - 719:4
**3331** [1] - 611:2
**3759** [1] - 719:20
**3:00** [2] - 718:8, 719:8
**3:17** [1] - 616:2
**3:25** [1] - 641:18
**3:27** [1] - 616:2
**3:28** [1] - 618:25
**3:30** [1] - 738:8
**3:58** [2] - 616:2, 623:22
**3rd** [2] - 725:17, 727:17

## 4

**4,069,658** [1] - 689:1
**4.1** [1] - 690:18
**40** [1] - 623:13
**43** [1] - 641:10
**4307** [1] - 719:16
**435-5639** [1] - 719:25
**44** [2] - 702:15, 704:9
**46** [1] - 634:20
**49** [1] - 627:24
**4:00** [1] - 616:23
**4:18** [2] - 640:1, 660:17
**4:20** [3] - 616:23, 617:6, 624:8
**4:53** [3] - 619:8, 619:11, 624:20

## 5

**50** [2] - 627:20, 627:25
**51** [3] - 693:23, 694:1

**52** [2] - 693:23, 694:10
**59** [2] - 693:23, 694:19
**5:06** [1] - 616:8
**5:12** [1] - 616:8

## 6

**60601** [3] - 608:5, 719:16, 720:5
**60604** [1] - 719:25
**60613** [1] - 719:20
**614** [1] - 609:4
**621** [1] - 609:6
**626** [1] - 609:8
**630-240-1234** [1] - 614:19
**630-258-0448** [1] - 615:10
**630-323-3765** [2] - 614:25, 615:2
**630-789-9966** [1] - 614:13
**630-789-9977** [1] - 614:14
**630-833-1234** [3] - 614:21, 614:23, 615:6
**630-833-1237** [1] - 621:3
**630-875-7400** [1] - 622:10
**653** [1] - 609:10
**666** [1] - 609:12
**677** [1] - 609:14
**681** [1] - 609:16
**697** [1] - 609:18

## 7

**7/26** [1] - 616:1
**7/27** [1] - 617:6
**7/28** [3] - 618:19, 619:11, 627:16
**7/28/2010** [1] - 618:25
**704-3000** [2] - 608:6, 720:6
**708-218-1622** [2] - 625:19, 625:23
**712** [1] - 609:20
**714** [1] - 609:22
**721** [1] - 609:24
**734** [1] - 610:1
**735** [1] - 610:3
**736** [1] - 610:5
**773** [1] - 719:21
**7:2** [1] - 618:25

## 8

**803(6** [1] - 712:18
**83** [4] - 639:24, 660:16, 660:22, 667:12
**880-1260** [1] - 719:21
**8:29** [1] - 617:17
**8:56** [4] - 617:21, 627:20, 627:24, 627:25

## 9

**9** [2] - 695:5
**938-4070** [1] - 719:17

**946,606** [1] - 688:21
**9977** [1] - 614:13
**999** [1] - 660:12
**9:00** [1] - 621:16
**9:15** [1] - 616:14
**9:20** [1] - 634:22
**9:38** [1] - 618:7

## A

**a.m** [6] - 617:17, 627:20, 627:24, 634:22, 635:17, 738:9
**abandoned** [4] - 671:14, 674:5, 674:8
**able** [5] - 645:13, 648:17, 658:1, 730:4, 730:5
**Abraham** [1] - 724:21
**absolutely** [1] - 686:7
**acceptable** [2] - 667:17, 667:21
**access** [16] - 634:5, 639:15, 642:3, 642:9, 642:14, 642:16, 642:19, 642:24, 643:1, 643:9, 643:15, 643:20, 644:1, 705:5, 705:16, 727:18
**accommodate** [1] - 661:11
**accomplished** [2] - 662:6, 737:21
**according** [9] - 658:16, 688:23, 688:24, 688:25, 689:25, 690:1, 690:14, 694:10, 702:10
**account** [2] - 635:23, 695:24
**accountant** [5] - 681:7, 681:11, 681:14, 691:6, 698:23
**accountants** [2] - 682:20, 714:5
**Accounting** [2] - 696:19, 696:20
**accounting** [14] - 681:10, 681:21, 681:24, 684:18, 687:12, 689:2, 691:9, 696:9, 696:19, 696:24, 697:5, 698:5, 710:3, 710:4
**accounts** [16] - 682:5, 682:13, 682:14, 683:21, 683:24, 685:18, 686:19, 687:18, 688:7, 688:10, 691:17, 694:4, 694:12, 695:7, 695:13, 695:21
**accurate** [6] - 637:11, 708:25, 709:7, 709:9, 736:14, 737:3
**accurately** [2] - 688:9, 690:23
**acquire** [2] - 632:3, 678:21
**acquisition** [1] - 645:20
**act** [1] - 733:2
**acted** [1] - 737:16
**acting** [1] - 698:22
**action** [7] - 725:17, 726:23, 727:16, 730:16, 734:20, 734:23, 735:12
**actively** [1] - 722:7
**activities** [1] - 657:8
**activity** [1] - 713:2
**actual** [6] - 668:3, 692:13, 692:17, 692:18, 716:21, 727:1
**adamant** [1] - 726:7
**add** [1] - 692:20
**adding** [4] - 692:17, 692:19, 695:15
**additional** [3] - 697:4, 701:7, 723:23
**addressing** [1] - 623:14

**adjourned** [2] - 718:4, 738:8
**admonition** [1] - 734:23
**advance** [1] - 634:14
**adverse** [2] - 729:11, 729:13
**advice** [1] - 734:19
**advise** [4] - 651:16, 731:19, 732:1, 732:5
**advised** [1] - 611:13
**affect** [3] - 657:20, 704:23, 709:18
**affidavit** [11] - 711:13, 711:15, 712:14, 712:18, 712:22, 714:17, 715:12, 715:23, 716:5, 716:6
**afternoon** [3] - 611:22, 612:10, 623:14
**aged** [3] - 683:21, 683:24, 685:18
**ago** [1] - 659:20
**agree** [2] - 709:15, 710:3
**agreeable** [1] - 647:1
**agreed** [12] - 632:10, 657:5, 662:4, 673:17, 673:21, 682:22, 707:24, 708:14, 708:16, 709:22, 710:2, 716:22
**agreed-upon** [6] - 682:22, 707:24, 708:14, 708:16, 709:22, 716:22
**agreeing** [1] - 646:23
**agreement** [7] - 638:8, 638:11, 644:23, 657:24, 667:17, 668:17, 673:25
**ahead** [2] - 660:10, 729:16
**AICPA** [1] - 681:13
**air** [2] - 649:15, 737:14
**al** [2] - 611:3, 719:7
**Alan** [5] - 608:3, 720:3, 732:20, 732:21, 732:25
**ALAN** [2] - 608:4, 720:4
**Alan's** [2] - 611:24, 722:9
**allow** [1] - 656:11
**allowing** [1] - 613:2
**almost** [1] - 627:10
**amount** [19] - 628:1, 688:16, 688:21, 688:22, 689:1, 689:25, 690:24, 691:1, 692:10, 692:13, 692:14, 692:18, 692:20, 694:3, 695:5, 695:17, 697:7
**amounts** [7] - 690:14, 690:15, 691:16, 691:22, 693:9, 695:11, 706:25
**AMY** [1] - 719:15
**analysis** [2] - 701:18, 701:20
**analyzing** [1] - 713:25
**anonymous** [1] - 623:17
**answer** [26] - 627:7, 644:4, 655:2, 656:14, 656:15, 659:6, 659:9, 673:20, 675:19, 676:6, 676:20, 676:25, 677:7, 679:24, 680:23, 698:11, 699:1, 699:15, 703:9, 706:8, 707:17, 709:8, 728:3, 732:7, 733:24, 735:3
**answers** [1] - 670:13
**anticipate** [1] - 734:21
**anticipated** [1] - 735:13
**anyway** [2] - 717:12, 737:2
**apologize** [2] - 735:8, 736:1
**APPEARANCES** [3] - 608:1, 719:12, 720:1
**appearing** [1] - 694:3
**appraiser** [1] - 640:18

**apprised** [1] - 644:7
**approval** [1] - 683:4
**April** [18] - 640:1, 645:3, 645:9, 645:17, 660:16, 660:25, 663:7, 666:3, 674:13, 678:9, 678:10, 702:18, 721:23, 722:2, 722:5, 730:15, 732:23
**area** [5] - 649:20, 650:3, 660:12, 660:13, 678:19
**Army** [1] - 737:14
**arrangements** [1] - 634:10
**aside** [2] - 631:10, 731:15
**aspect** [1] - 733:12
**assessment** [2] - 709:4, 709:6
**assignment** [2] - 687:12, 710:18
**assisted** [1] - 631:24
**Associated** [19] - 635:23, 639:9, 639:19, 640:8, 641:6, 643:22, 643:25, 644:7, 644:11, 645:19, 645:23, 650:19, 660:4, 667:14, 668:17, 668:20, 669:9, 669:12, 678:5
**associated** [1] - 658:8
**Associates** [2] - 640:11, 640:14
**assume** [2] - 636:21, 717:25
**assuming** [2] - 612:14, 718:2
**attached** [2] - 712:22, 714:23
**attempt** [1] - 693:1
**attempting** [1] - 646:14
**attention** [11] - 635:5, 635:15, 639:25, 660:18, 702:14, 712:21, 714:17, 728:9, 729:3, 729:23, 730:1
**attorney** [16] - 612:16, 636:12, 637:2, 637:4, 637:5, 639:19, 654:13, 654:14, 662:8, 662:10, 663:13, 663:16, 663:18, 663:20, 669:4, 722:19
**attorneys** [11] - 636:19, 636:20, 636:25, 637:11, 667:20, 675:5, 675:18, 677:25, 687:5, 687:11, 736:4
**audit** [4] - 708:13, 708:14, 713:12, 713:14
**August** [12] - 628:12, 629:21, 630:15, 651:15, 651:20, 683:23, 683:25, 688:8, 693:10, 693:13, 693:21, 693:22
**Aurora** [1] - 630:11
**available** [5] - 611:20, 696:21, 699:10, 699:20, 717:10
**Avenue** [1] - 719:16
**avoid** [1] - 677:8
**awards** [2] - 737:8, 737:9
**aware** [18] - 638:13, 640:13, 640:18, 640:21, 644:9, 708:12, 708:15, 708:16, 710:13, 710:16, 716:14, 716:21, 724:10, 728:12, 728:16, 733:20, 733:22, 733:25

## B

**background** [1] - 681:10
**backup** [5] - 725:24, 726:3, 726:6, 726:8, 726:10
**bad** [1] - 724:20

**badge** [1] - 737:15
**Bailey** [3] - 721:10, 732:12, 733:2
**balance** [2] - 682:13, 684:6
**BANK** [1] - 719:4
**bank** [19] - 656:9, 657:4, 666:7, 682:23, 682:24, 683:2, 683:3, 683:4, 685:7, 708:3, 708:5, 708:17, 709:19, 710:1, 710:3, 710:5
**Bank** [62] - 611:2, 619:12, 631:20, 631:24, 632:3, 633:20, 635:23, 636:22, 637:6, 637:25, 639:9, 639:19, 640:9, 641:6, 643:22, 643:25, 644:7, 644:11, 644:15, 644:16, 644:19, 644:24, 645:7, 645:13, 645:19, 645:23, 648:3, 650:19, 651:7, 652:17, 652:20, 660:4, 667:14, 668:18, 668:20, 669:9, 669:13, 671:10, 671:17, 671:19, 671:21, 671:22, 672:15, 673:4, 673:10, 673:11, 673:25, 674:3, 674:4, 674:8, 675:18, 676:16, 677:22, 678:5, 682:24, 712:25, 715:1, 715:16, 715:18, 732:1
**Bank's** [2] - 632:7, 715:25
**base** [1] - 686:18
**based** [15] - 679:22, 683:3, 684:18, 696:8, 698:14, 698:17, 699:25, 700:4, 705:19, 710:18, 713:14, 713:21, 714:3, 715:22
**basing** [1] - 713:17
**basis** [2] - 657:23, 713:22
**Bates** [6] - 683:14, 683:17, 684:3, 685:14, 686:13, 686:14
**became** [4] - 694:2, 721:15, 722:11, 724:10
**become** [5] - 721:13, 728:12, 728:16, 733:22, 733:25
**becomes** [2] - 692:21, 699:10
**BEFORE** [1] - 719:10
**begin** [1] - 680:7
**beginning** [9] - 628:11, 629:21, 630:15, 660:18, 705:13, 726:23, 729:21, 729:23, 732:8
**begins** [1] - 661:5
**behalf** [14] - 631:20, 637:6, 648:3, 655:6, 655:7, 655:8, 664:24, 665:3, 665:13, 678:4, 682:23, 708:16, 709:18
**behind** [1] - 735:14
**belongs** [1] - 666:7
**best** [13] - 630:10, 632:22, 634:1, 641:22, 649:18, 650:21, 663:24, 672:23, 676:19, 724:24, 726:19, 733:19, 737:18
**better** [2] - 612:21, 706:2
**between** [17] - 627:2, 644:15, 644:23, 645:9, 647:18, 654:8, 681:21, 688:7, 690:20, 691:20, 696:2, 703:21, 706:24, 709:25, 710:2, 730:10, 730:13
**beyond** [1] - 673:1
**big** [1] - 650:8
**Bill** [1] - 625:24
**billing** [2] - 696:22, 696:24
**billings** [2] - 691:10, 693:7

**binder** [1] - 622:3
**binders** [1] - 683:6
**bit** [2] - 667:12, 671:9
**blueprints** [1] - 617:11
**Blumenthal** [14] - 611:22, 612:8, 612:13, 632:16, 632:21, 634:18, 634:22, 654:12, 662:10, 663:9, 663:13, 717:9, 717:10, 718:1
**BOODELL** [1] - 719:13
**book** [2] - 634:20, 736:13, 737:2
**Borlack** [15] - 608:3, 637:4, 654:1, 654:5, 654:8, 654:17, 720:3, 721:10, 732:12, 733:2
**Borlack's** [3] - 611:24, 654:18, 654:20
**borrowing** [1] - 686:18
**Boscov's** [59] - 682:1, 682:4, 682:5, 682:7, 682:8, 687:13, 687:14, 687:20, 688:7, 688:11, 688:14, 688:19, 688:23, 689:3, 689:5, 689:10, 689:12, 689:18, 690:1, 690:3, 690:4, 690:6, 690:23, 690:25, 691:1, 691:16, 693:7, 694:11, 695:20, 695:24, 696:2, 696:6, 696:23, 697:7, 701:13, 702:10, 703:4, 703:17, 703:22, 704:2, 704:4, 704:20, 706:23, 707:3, 710:22, 711:2, 711:13, 711:18, 712:11, 712:23, 714:22, 714:25, 715:11, 715:14, 715:22, 716:4, 716:10
**Boscov's'** [8] - 689:22, 690:2, 694:6, 695:6, 696:4, 702:3, 713:4, 715:9
**BOSCOVS** [1] - 682:1
**bottom** [3] - 635:16, 639:25, 661:1
**Brandom** [2] - 625:24, 625:25
**break** [4] - 677:15, 677:17, 712:5, 717:8
**Brief** [2] - 666:14, 707:22
**briefly** [6] - 613:10, 683:12, 683:20, 685:16, 688:5, 714:13
**bronze** [1] - 737:14
**Brook** [7] - 722:5, 723:18, 726:9, 728:13, 728:16, 729:2, 733:16
**brought** [4] - 615:12, 635:5, 677:8, 710:19
**budget** [1] - 667:25
**building** [5] - 617:13, 633:25, 679:16, 679:18, 679:20
**buildings** [1] - 667:6
**burial** [1] - 612:4
**business** [5] - 660:8, 663:15, 668:25, 708:9, 713:2
**buy** [9] - 623:1, 623:8, 624:15, 646:7, 646:14, 646:17, 665:4, 669:16, 680:5
**buyer** [5] - 629:14, 629:16, 629:18, 629:20, 629:24, 655:21, 669:2
**buyers** [2] - 615:24, 617:9
**BY** [102] - 608:4, 609:5, 609:7, 609:9, 609:11, 609:13, 609:15, 609:17, 609:19, 609:21, 609:23, 609:25, 610:2, 610:4, 610:6, 614:11, 615:8, 617:14, 621:23, 622:5, 626:18, 627:19, 628:20, 634:9, 635:14, 636:8, 636:17, 639:23, 640:17, 641:17, 642:11, 642:22,

643:14, 644:6, 646:15, 646:25, 648:15, 648:20, 650:1, 653:20, 656:17, 659:13, 660:15, 660:24, 661:2, 666:19, 668:11, 670:25, 673:23, 675:24, 676:5, 676:14, 677:20, 679:1, 679:9, 679:25, 681:3, 683:19, 685:12, 686:1, 686:9, 687:1, 687:7, 688:2, 697:18, 698:12, 699:3, 699:8, 699:18, 702:7, 703:11, 704:11, 705:10, 705:15, 707:9, 707:23, 708:2, 709:3, 709:13, 710:12, 712:9, 712:20, 713:20, 714:16, 714:21, 715:5, 716:9, 716:20, 719:14, 719:19, 720:4, 721:9, 727:4, 729:15, 730:24, 732:11, 734:6, 734:17, 735:11, 735:21, 736:12, 737:1

**C**

**C.V.** [1] - 736:22
**cabinet** [2] - 650:6, 650:9
**caller** [2] - 623:17, 629:2
**cancel** [1] - 668:19
**canceled** [1] - 668:21
**cannot** [1] - 691:8
**captioned** [1] - 713:1
**care** [2] - 668:12, 668:15
**career** [1] - 737:4
**carefully** [1] - 708:22
**CAROLYN** [1] - 719:23
**case** [9] - 611:17, 612:8, 639:10, 683:15, 705:6, 714:6, 728:10, 730:14, 737:17
**cell** [11] - 614:16, 614:18, 615:9, 619:3, 619:4, 620:9, 620:12, 620:16, 620:17, 620:18, 622:15
**CENTRAL** [1] - 719:4
**Central** [31] - 611:2, 636:20, 636:21, 636:22, 637:2, 637:6, 644:15, 644:19, 644:24, 645:7, 645:13, 671:10, 671:17, 671:22, 672:15, 673:11, 673:23, 674:4, 674:8, 675:6, 675:18, 676:16, 677:22, 677:25, 682:24, 712:25, 715:1, 715:16, 715:18, 715:25, 732:1
**certain** [4] - 704:18, 710:1, 715:19, 721:19
**certainly** [1] - 733:9
**certificate** [2] - 681:13, 686:18
**certified** [5] - 681:11, 681:12, 681:14, 681:16, 681:18
**CFE** [1] - 681:12
**CFF** [1] - 681:12
**chance** [4] - 640:2, 641:11, 686:11, 731:6
**change** [4] - 655:19, 656:5, 659:22, 701:16
**changed** [3] - 633:16, 653:9, 653:14
**characterization** [1] - 705:8
**chart** [2] - 687:21, 688:5
**charts** [1] - 690:8
**check** [2] - 612:9, 682:6
**checking** [1] - 612:11
**CHENG** [8] - 609:16, 609:18, 609:20,

609:22, 681:2, 697:17, 712:8, 714:15
**Cheng** [11] - 680:16, 680:17, 680:19, 681:5, 681:6, 681:20, 692:16, 696:4, 697:1, 697:19, 712:10
**Chicago** [6] - 608:5, 719:7, 719:16, 719:20, 719:25, 720:5
**CHING** [1] - 719:19
**citations** [1] - 737:8
**City** [1] - 630:10
**claiming** [1] - 641:6
**Claims** [2] - 696:19, 696:20
**claims** [1] - 684:12
**clarification** [1] - 686:25
**clarify** [2] - 653:7, 694:3, 735:22
**clarity** [1] - 735:23
**CLARK** [10] - 609:6, 609:8, 609:10, 609:12, 609:14, 621:22, 626:17, 653:19, 666:18, 677:19
**Clark** [14] - 612:16, 613:6, 615:22, 621:13, 621:24, 622:1, 626:8, 626:19, 627:3, 653:2, 653:7, 653:21, 661:3, 666:20
**clear** [3] - 644:10, 668:12, 694:14
**clearly** [2] - 643:19, 643:20
**CLERK** [1] - 611:2
**client** [2] - 714:6, 734:19
**clients** [6] - 725:24, 727:12, 734:21, 735:4, 735:13, 736:5
**close** [1] - 690:18
**code** [2] - 660:12, 704:12
**codes** [2] - 660:13, 704:5
**collateral** [1] - 671:18
**collection** [1] - 649:10
**collections** [3] - 687:17, 691:10, 706:5
**column** [1] - 688:13
**combat** [2] - 737:6, 737:15
**combined** [1] - 689:1
**combining** [1] - 690:17
**coming** [10] - 611:9, 615:24, 617:9, 619:14, 629:14, 629:18, 629:20, 658:7, 703:12, 734:21
**commendation** [1] - 737:14
**commendations** [1] - 737:10
**comment** [3] - 628:8, 638:22, 638:24
**comments** [1] - 638:23
**common** [2] - 667:5, 735:8
**communications** [1] - 646:16
**company** [5] - 633:24, 669:23, 681:25, 710:16, 714:5
**Company** [17] - 681:9, 682:17, 682:19, 686:15, 686:17, 687:3, 687:5, 707:25, 708:4, 708:7, 709:25, 713:7, 713:9, 713:12, 713:21, 716:21
**Company's** [1] - 713:16
**compare** [2] - 690:8, 690:13
**compared** [3] - 691:16, 691:18, 695:24
**comparison** [2] - 690:12, 695:2
**compiled** [2] - 711:4, 711:6
**complete** [6] - 696:5, 696:7, 699:24, 711:9, 711:10, 711:12
**completely** [1] - 726:3

**computer** [29] - 634:19, 640:18, 640:22, 641:7, 642:4, 646:7, 646:17, 646:23, 647:3, 647:5, 652:1, 655:13, 655:17, 657:3, 658:22, 661:20, 661:25, 663:10, 677:9, 722:20, 722:21, 722:23, 723:1, 723:5, 726:4, 730:23, 733:10, 733:12
**computers** [20] - 639:7, 663:7, 675:7, 676:25, 678:1, 678:5, 723:23, 724:25, 725:17, 726:10, 726:24, 727:13, 727:19, 727:21, 729:22, 729:24, 730:18, 733:16, 735:5, 736:3
**concern** [3] - 631:14, 663:15, 735:4
**concerned** [3] - 655:10, 726:6, 730:11
**concerning** [8] - 630:1, 665:22, 713:11, 715:10, 716:11, 731:1, 731:16, 734:8
**conclusions** [7] - 701:16, 703:13, 704:23, 709:10, 709:15, 710:8, 713:23
**conditioned** [1] - 632:6
**conditioning** [1] - 649:15
**conduct** [2] - 687:11, 713:14
**confer** [1] - 666:13
**conference** [2] - 637:4, 637:25
**confident** [1] - 724:14
**confirm** [3] - 611:15, 612:7, 717:10
**confirmation** [1] - 726:13
**confirmed** [1] - 726:17
**confused** [1] - 646:13
**confusing** [1] - 706:9
**confusion** [1] - 646:10
**congested** [1] - 668:9
**conjunction** [1] - 631:11
**connection** [3] - 712:25, 723:4, 736:3
**consider** [1] - 703:14
**considered** [1] - 662:23
**considering** [1] - 662:12
**consisted** [1] - 722:22
**consistent** [2] - 646:2, 707:15
**constantly** [1] - 612:11
**consultant** [4] - 733:3, 735:25, 736:2
**contact** [9] - 612:13, 644:1, 725:4, 725:6, 725:9, 726:16, 732:21, 733:1
**contain** [1] - 684:6
**contained** [4] - 663:10, 663:22, 697:4, 707:1
**containing** [2] - 686:18, 696:1
**contains** [1] - 693:6
**contemplated** [1] - 645:12
**contents** [1] - 708:24
**context** [3] - 633:4, 708:19, 709:17
**contingent** [1] - 669:8
**continuance** [1] - 611:13
**continue** [2] - 669:12, 734:22
**CONTINUED** [4] - 608:1, 609:6, 621:22, 720:1
**continued** [3] - 658:21, 660:1, 726:6
**continuing** [1] - 702:8
**contract** [1] - 669:11
**control** [1] - 651:8
**controlled** [1] - 649:13

**conversation** [14] - 615:20, 617:9, 623:23, 654:7, 658:6, 658:10, 678:14, 699:25, 700:4, 700:7, 700:15, 700:17, 704:4, 733:12

**conversations** [9] - 624:16, 641:5, 654:25, 670:8, 670:10, 670:15, 698:17, 700:13, 723:20

**convey** [2] - 661:8, 679:17

**cooperation** [6] - 665:7, 665:11, 665:16, 665:21, 666:22, 667:6

**cooperative** [1] - 665:9

**copied** [3] - 634:23, 663:14, 730:25

**copies** [4] - 694:14, 712:23, 714:24, 736:18

**copy** [3] - 663:17, 685:23, 736:14

**corporation** [2] - 658:7, 664:13

**correct** [98] - 613:24, 616:4, 618:9, 624:1, 627:13, 627:14, 632:5, 633:2, 633:9, 633:22, 636:23, 638:15, 641:16, 644:17, 644:22, 645:22, 646:18, 646:21, 647:9, 649:3, 650:24, 651:13, 654:2, 655:6, 655:12, 656:3, 658:9, 661:25, 662:1, 663:11, 664:1, 664:19, 666:11, 666:23, 667:2, 667:4, 667:8, 667:11, 667:15, 667:19, 669:3, 669:19, 670:1, 671:3, 671:12, 671:19, 674:2, 674:6, 674:16, 678:7, 678:18, 679:14, 680:8, 682:10, 684:1, 687:4, 692:24, 692:25, 693:19, 694:4, 694:7, 694:17, 694:18, 694:20, 700:19, 700:23, 701:15, 701:22, 702:2, 703:18, 703:19, 704:24, 705:3, 705:18, 705:20, 705:21, 707:3, 711:16, 711:20, 714:23, 715:6, 715:17, 721:5, 722:3, 722:13, 725:12, 725:15, 726:1, 727:9, 727:14, 728:15, 732:4, 732:13, 732:16, 735:16, 737:6, 737:7

**correctly** [2] - 654:3, 704:19

**correspondence** [2] - 696:22, 696:25

**corroborate** [4] - 696:10, 697:9, 701:8, 701:9

**corroborating** [1] - 700:15

**Counsel** [3] - 724:20, 725:3, 733:24

**counsel** [15] - 631:23, 632:20, 660:21, 676:17, 676:24, 677:22, 687:2, 698:15, 703:14, 716:1, 721:2, 725:14, 732:1, 735:24, 736:19

**country** [8] - 658:11, 658:14, 658:15, 658:19, 659:3, 669:17, 679:20, 722:9

**counts** [3] - 716:16, 716:22, 716:23

**couple** [5] - 622:1, 626:19, 677:21, 730:25, 734:18

**course** [3] - 713:2, 723:1, 725:1

**court** [26] - 611:1, 611:5, 611:17, 639:7, 639:8, 639:12, 674:25, 675:7, 675:19, 676:18, 676:25, 677:9, 678:14, 684:11, 684:20, 698:3, 703:13, 703:14, 712:4, 718:5, 721:1, 725:14, 734:3, 734:7, 736:18, 736:19

**Court** [5] - 719:23, 719:24, 724:2, 724:4, 725:10

**COURT** [153] - 611:6, 611:11, 611:19, 611:21, 612:1, 612:5, 612:9, 612:12, 612:21, 613:1, 613:4, 613:9, 613:13, 613:15, 613:21, 613:23, 614:2, 614:6, 615:1, 615:5, 617:5, 617:7, 620:21, 620:24, 621:2, 621:4, 621:6, 621:10, 621:14, 621:19, 622:4, 626:6, 626:8, 626:11, 626:13, 627:18, 628:19, 634:8, 635:9, 635:11, 636:4, 636:13, 639:21, 640:16, 641:15, 642:6, 642:21, 643:4, 643:8, 643:11, 643:13, 644:4, 646:11, 646:20, 648:12, 648:19, 649:25, 653:1, 653:4, 653:6, 653:13, 653:17, 656:14, 659:8, 659:11, 660:10, 660:22, 661:1, 666:16, 668:8, 670:20, 673:20, 675:22, 676:1, 676:10, 677:13, 677:15, 678:25, 679:8, 679:22, 679:24, 680:11, 680:13, 680:17, 680:19, 680:22, 683:16, 684:21, 684:24, 685:8, 685:11, 685:21, 685:25, 686:4, 686:6, 686:24, 687:6, 697:14, 698:9, 698:11, 699:2, 699:6, 699:12, 699:14, 699:17, 702:5, 703:9, 704:10, 705:9, 705:12, 707:5, 707:16, 707:21, 708:1, 709:2, 710:11, 711:19, 711:24, 712:2, 712:4, 712:19, 713:19, 714:9, 714:11, 714:19, 715:4, 716:8, 716:19, 717:1, 717:3, 717:5, 717:8, 717:12, 717:15, 717:18, 717:22, 718:4, 719:1, 721:2, 727:3, 729:13, 730:21, 732:10, 734:5, 734:13, 735:1, 735:18, 736:9, 736:20, 736:25, 737:24, 738:1, 738:4

**courtroom** [3] - 631:11, 680:20, 738:7

**cover** [1] - 708:23

**COX** [1] - 719:23

**CPA** [5] - 681:9, 681:11, 708:8, 708:10, 708:11

**CPAs** [1] - 710:1

**credit** [1] - 704:15

**credits** [6] - 688:23, 702:8, 702:12, 703:21, 704:20, 706:21

**cross** [3] - 626:8, 729:12, 736:7

**CROSS** [12] - 609:8, 609:10, 609:14, 609:18, 610:1, 610:3, 626:17, 653:19, 677:19, 697:17, 734:16, 735:20

**cross-examination** [1] - 736:7

**CROSS-EXAMINATION** [12] - 609:8, 609:10, 609:14, 609:18, 610:1, 610:3, 626:17, 653:19, 677:19, 697:17, 734:16, 735:20

**CRR** [1] - 719:23

**CSR** [1] - 719:23

**CULBERTSON** [2] - 608:3, 720:3

**curious** [1] - 627:15

**customer** [1] - 687:20, 696:25

**customers** [2] - 681:22, 696:13

## D

**Daniel** [1] - 724:20

**data** [14] - 689:14, 694:15, 696:16, 697:1, 697:8, 701:7, 706:1, 706:2, 706:14, 707:1, 713:22, 729:4, 729:6, 729:8

**date** [12] - 633:14, 637:17, 638:7, 638:8, 639:20, 640:23, 656:24, 693:8, 693:16, 693:22, 696:9, 718:9

**dated** [11] - 634:22, 635:7, 635:16, 639:25, 641:18, 643:18, 651:15, 652:6, 656:25, 702:18, 724:4

**dates** [1] - 659:20

**DAVE** [8] - 609:24, 610:1, 610:3, 610:5, 721:8, 734:16, 735:20, 736:11

**Dave** [1] - 726:5

**David** [2] - 627:3, 724:20

**DAVID** [11] - 609:6, 609:8, 609:10, 609:12, 609:14, 621:22, 626:17, 653:19, 666:18, 677:19, 719:15

**day-to-day** [1] - 730:14

**days** [9] - 615:24, 625:5, 656:5, 656:6, 656:7, 656:12, 656:16, 658:1, 725:16

**deal** [14] - 655:25, 656:5, 667:9, 667:21, 668:19, 668:20, 668:21, 669:5, 669:7, 673:13, 680:4, 728:5, 728:8, 732:9

**dealings** [2] - 663:16, 724:22

**dealt** [1] - 724:21

**Dearborn** [1] - 719:24

**December** [3] - 683:23, 683:25, 686:18

**decimal** [8] - 692:7, 692:9, 692:10, 692:11, 692:12, 692:13, 693:25, 694:19

**decision** [3] - 657:16, 657:20

**Dedinas** [12] - 612:22, 666:16, 684:21, 698:16, 698:17, 700:1, 700:5, 700:24, 722:12, 722:18, 724:13, 724:15

**DEDINAS** [86] - 609:5, 609:7, 609:13, 609:17, 609:21, 610:2, 612:19, 612:22, 613:2, 613:5, 613:10, 613:14, 613:16, 613:20, 613:25, 614:5, 614:7, 614:11, 615:4, 615:8, 617:6, 617:14, 620:20, 621:8, 621:12, 621:18, 621:23, 622:5, 626:4, 628:18, 640:15, 642:20, 643:3, 643:6, 644:3, 648:18, 649:24, 666:19, 668:11, 670:25, 673:23, 675:24, 676:5, 676:12, 676:14, 677:12, 678:24, 679:7, 679:21, 679:23, 680:15, 681:3, 683:13, 683:17, 683:19, 684:23, 685:2, 685:12, 685:24, 686:1, 686:8, 686:9, 686:11, 687:7, 687:25, 688:2, 697:13, 699:5, 705:7, 709:1, 709:11, 710:10, 712:3, 712:6, 712:9, 712:17, 712:20, 713:20, 714:12, 717:4, 717:9, 719:14, 721:3, 734:17, 735:11, 735:17

**deed** [1] - 657:4

**deepest** [1] - 612:6

**defendant** [1] - 639:10

**Defendants** [2] - 719:8, 719:19

**defendants** [7] - 683:15, 684:4, 685:15, 724:24, 726:20, 730:15, 734:1

**definitely** [1] - 703:23

**delivered** [1] - 736:17

**demand** [5] - 636:12, 639:19, 652:2,

652:13, 652:14

**demands** [1] - 639:17

**denied** [1] - 722:16

**department** [3] - 657:17, 712:24, 714:25

**deposition** [6] - 631:11, 653:23, 663:4, 675:10, 675:14, 677:7

**depositions** [1] - 635:6

**describe** [8] - 685:16, 688:5, 689:21, 692:5, 693:14, 693:20, 695:1, 695:2

**describing** [1] - 691:21

**DESCRIPTION** [1] - 609:2

**desk** [1] - 627:3

**despite** [1] - 658:23

**destroyed** [1] - 735:10

**detailed** [3] - 682:14, 691:17, 694:12

**details** [1] - 722:17

**determine** [2] - 709:14, 729:4

**devoted** [2] - 729:3, 729:24

**Diagems** [2] - 619:13, 624:23

**dictate** [1] - 735:9

**died** [1] - 611:25

**Dieterich** [15] - 635:17, 635:22, 642:18, 642:23, 643:22, 646:12, 660:17, 661:3, 661:9, 661:10, 661:12, 661:13, 662:2, 662:13, 677:4

**difference** [7] - 690:20, 695:10, 695:11, 695:12, 695:23, 696:2, 725:3

**differences** [3] - 691:10, 691:20, 691:21

**different** [6] - 647:23, 693:18, 697:25, 699:6, 728:2, 729:18

**differently** [1] - 634:2

**digits** [2] - 692:17, 692:19

**diligence** [2] - 623:15, 665:18, 666:4

**direct** [9] - 634:21, 635:15, 654:7, 657:8, 660:23, 702:14, 712:21, 726:15, 736:8

**DIRECT** [8] - 609:6, 609:16, 609:24, 610:5, 621:22, 681:2, 721:8, 736:11

**directed** [5] - 643:20, 651:1, 651:4, 656:18, 663:13

**directing** [4] - 660:17, 704:9, 727:12, 727:15

**direction** [2] - 613:4, 722:9

**disaffirm** [1] - 697:9

**disagree** [2] - 709:10, 709:15

**disappearance** [1] - 685:5

**disaster** [2] - 734:21, 735:7

**disclosed** [1] - 725:14

**disconcern** [1] - 701:9

**disconfirm** [5] - 696:11, 701:8, 701:10, 701:11, 701:12

**discovery** [2] - 684:14, 722:17

**discrepancies** [1] - 691:12, 692:22, 693:2, 693:6, 696:16, 710:14, 710:17, 710:19, 713:8, 713:9

**discrepancy** [3] - 691:5, 691:7

**discuss** [6] - 656:9, 668:1, 733:3, 733:7, 733:14, 733:17

**discussed** [5] - 619:13, 628:8, 654:4,

654:23, 732:22

**discussing** [5] - 642:3, 654:1, 654:16, 654:18, 679:15

**discussion** [6] - 654:9, 672:14, 673:1, 698:14, 726:14, 733:9

**discussions** [10] - 617:12, 632:15, 632:20, 637:3, 645:10, 645:18, 646:2, 672:24, 679:12, 731:16

**dispose** [4] - 671:18, 671:22, 671:24, 672:4

**DISTRICT** [2] - 719:1, 719:1

**DIVISION** [1] - 719:2

**DJORDJEVIC** [1] - 719:14

**Docket** [1] - 719:4

**document** [10] - 686:16, 689:9, 689:10, 702:3, 702:25, 703:6, 703:12, 703:16, 703:18, 704:6

**documents** [18] - 612:24, 682:11, 682:16, 683:15, 683:20, 684:5, 685:16, 687:15, 690:12, 691:19, 691:20, 699:21, 699:23, 703:23, 704:3, 705:1, 705:19, 715:24

**dollar** [6] - 688:16, 690:24, 690:25, 695:11, 695:17, 703:17

**dollars** [2] - 646:23, 695:23

**DOMANSKIS** [1] - 719:13

**done** [8] - 611:21, 648:5, 653:9, 665:25, 702:1, 717:24, 727:13, 735:5

**doors** [1] - 634:13

**down** [14] - 611:9, 611:11, 616:1, 680:13, 725:24, 726:3, 726:8, 726:10, 726:18, 727:22, 728:20, 729:21, 738:1

**downstate** [1] - 611:8

**drafted** [1] - 725:10

**draw** [2] - 639:24, 714:17

**drive** [3] - 634:19, 661:19, 661:22

**Driver** [2] - 656:10, 656:11

**driver** [5] - 656:18, 657:2, 657:8, 657:15, 657:17

**drives** [21] - 642:2, 642:4, 642:10, 642:15, 642:19, 642:24, 643:2, 643:16, 644:2, 661:10, 661:12, 661:14, 661:17, 662:3, 662:6, 662:12, 662:23, 663:6, 663:10, 667:13, 667:21

**due** [4] - 623:14, 665:17, 666:4, 691:8

**during** [17] - 619:16, 624:15, 625:8, 629:13, 645:1, 645:9, 645:17, 647:16, 649:1, 678:13, 679:13, 706:24, 711:19, 711:20, 718:4, 723:1, 725:1

**E**

**e-mail** [51] - 628:7, 628:9, 628:11, 634:17, 634:21, 635:1, 635:4, 635:7, 635:15, 635:16, 635:20, 636:15, 637:11, 637:17, 639:6, 639:25, 640:2, 641:13, 641:14, 641:18, 641:20, 641:22, 641:23, 642:13, 643:2, 643:18, 643:19, 646:22, 651:15, 651:17, 660:17, 661:11, 661:13, 661:16, 662:22, 663:3, 663:8, 663:9, 663:12,

663:22, 677:23, 678:3, 725:16, 725:19, 725:21, 725:23, 726:14, 726:22, 727:7, 727:11

**e-mails** [6] - 660:22, 663:15, 730:25, 731:3, 731:9, 731:15

**early** [6] - 658:23, 666:3, 678:10, 728:18, 728:23, 732:23

**EASTERN** [1] - 719:2

**easy** [1] - 728:3

**educational** [1] - 681:10

**effectively** [1] - 647:7

**effort** [4] - 680:6, 691:11, 716:3, 716:10

**eight** [1] - 648:11

**either** [10] - 622:15, 623:22, 630:17, 639:9, 641:4, 641:23, 650:15, 696:10, 723:21, 723:22

**electronically** [1] - 737:17

**electronically-stored** [1] - 737:17

**elements** [1] - 685:3

**elicit** [1] - 613:11

**elsewhere** [1] - 665:10

**employed** [1] - 681:8

**end** [16] - 629:15, 629:21, 630:15, 651:8, 651:11, 651:14, 651:19, 669:2, 678:9, 721:17, 721:19, 727:10, 730:25, 731:17, 731:22

**ended** [2] - 706:8, 730:14

**ending** [5] - 693:23, 694:10, 695:4, 695:5, 695:19

**ends** [1] - 611:8

**engaged** [1] - 732:8

**engagement** [1] - 709:25

**enter** [1] - 645:13

**entering** [2] - 632:6, 672:15

**entire** [1] - 700:3

**entries** [1] - 652:12

**entry** [3] - 618:25, 704:8, 704:12

**equally** [2] - 654:11, 654:17

**equipment** [4] - 640:19, 640:22, 652:2, 676:17

**equipped** [1] - 667:9

**Equities** [7] - 633:19, 633:23, 634:7, 634:11, 634:13, 634:15, 648:6

**erase** [1] - 726:7

**Eric** [4] - 608:3, 720:3, 722:10

**error** [1] - 691:9

**ESI** [3] - 732:9, 733:3, 735:24

**estimate** [1] - 648:9

**et** [2] - 611:3, 719:7

**evening** [1] - 620:7

**eventually** [3] - 630:6, 650:22, 651:11

**evicted** [1] - 735:14

**eviction** [1] - 653:15

**evidence** [5] - 658:16, 662:24, 663:10, 700:16, 736:13

**exact** [3] - 627:17, 628:1, 714:1

**exactly** [3] - 630:19, 658:13, 724:23

**examination** [1] - 736:7

**EXAMINATION** [28] - 609:4, 609:6, 609:8, 609:10, 609:12, 609:14, 609:16,

609:18, 609:20, 609:22, 609:24, 610:1, 610:3, 610:5, 614:10, 621:22, 626:17, 653:19, 666:18, 677:19, 681:2, 697:17, 712:8, 714:15, 721:8, 734:16, 735:20, 736:11

**examine** [1] - 696:16
**examiner** [2] - 681:12, 681:16
**example** [8] - 692:18, 693:24, 694:1, 694:19, 696:23, 702:14, 711:10
**examples** [3] - 693:1, 693:6, 693:22
**excess** [2] - 623:23, 624:3
**exchange** [1] - 667:22
**exciting** [1] - 736:23
**exclusive** [4] - 672:22, 672:24, 673:3, 673:11
**excuse** [2] - 685:21, 721:25
**executed** [1] - 638:8
**Exhibit** [48] - 614:5, 615:11, 634:20, 635:8, 639:24, 641:10, 651:25, 660:5, 660:16, 667:12, 675:3, 677:23, 683:12, 683:21, 684:6, 685:13, 685:17, 686:10, 686:17, 688:3, 689:7, 689:14, 689:16, 689:22, 690:13, 690:15, 690:18, 690:19, 693:4, 693:6, 702:6, 702:10, 702:15, 704:6, 706:16, 706:18, 706:21, 706:23, 707:5, 707:10, 707:13, 710:23, 711:11, 727:6, 736:14
**exhibit** [11] - 613:8, 621:9, 621:12, 651:24, 660:7, 660:21, 686:11, 688:9, 693:5, 702:5, 727:1
**Exhibits** [3] - 683:8, 687:23, 731:5
**exhibits** [8] - 613:17, 683:7, 687:9, 687:10, 687:17, 690:20, 694:17, 723:25
**existed** [2] - 723:2, 723:9
**expect** [2] - 638:24, 734:22
**expedited** [1] - 722:17
**experience** [2] - 691:4, 727:21
**expert** [9] - 722:18, 724:17, 724:19, 724:21, 726:5, 732:8, 735:24, 735:25
**explain** [4] - 661:8, 684:21, 700:8, 704:7
**explained** [2] - 686:2, 691:10
**explanation** [1] - 628:4
**extend** [1] - 656:7
**extends** [1] - 645:23
**extent** [5] - 690:23, 696:9, 696:20, 701:13, 728:8
**extra** [2] - 685:23, 736:18

## F

**face** [6] - 630:21, 631:12, 733:6
**facility** [1] - 723:19
**fact** [8] - 632:6, 632:12, 646:21, 657:19, 658:23, 668:2, 669:7, 701:20
**facts** [1] - 648:25
**fail** [1] - 663:15
**fair** [10] - 624:14, 658:16, 709:12, 721:19, 722:2, 727:13, 728:11, 729:5, 729:23, 731:24

**fairly** [2] - 688:9, 724:14
**faith** [1] - 737:16
**familiar** [2] - 640:10, 651:17
**far** [3] - 701:8, 705:1, 731:13
**fashion** [1] - 641:23
**FASHIONS** [1] - 719:7
**Fashions** [29] - 611:3, 614:20, 636:24, 671:13, 674:8, 677:25, 681:22, 682:9, 683:22, 684:7, 685:18, 686:19, 687:13, 688:14, 688:19, 688:22, 689:23, 690:5, 695:7, 695:23, 696:18, 697:6, 708:15, 712:24, 713:5, 714:25, 715:10, 715:15, 716:11
**Fashions'** [11] - 681:25, 682:11, 687:16, 688:6, 688:11, 688:24, 688:25, 693:7, 696:13, 696:17, 697:2
**Fashions'/Boscov's'** [1] - 692:23
**father** [2] - 619:21, 620:7
**father's** [2] - 620:14, 620:16
**fault** [1] - 621:19
**fax** [2] - 618:3, 620:24
**faxes** [1] - 617:23
**FCRR** [1] - 719:23
**February** [17] - 630:22, 664:25, 665:1, 721:15, 722:2, 724:2, 724:4, 724:12, 725:11, 728:22, 729:22, 731:1, 731:17, 731:22, 738:9
**federal** [3] - 662:24, 663:11, 722:15
**few** [4] - 623:11, 677:14, 693:1, 725:16
**figure** [1] - 691:11
**figured** [1] - 672:17
**filed** [1] - 684:14
**files** [1] - 687:5
**finalized** [1] - 701:22
**finally** [1] - 669:8
**financial** [3] - 667:25, 681:13, 681:18
**financing** [4] - 678:21, 679:3, 680:2, 680:5
**findings** [1] - 684:18
**fine** [4] - 709:21, 712:19, 717:12, 731:11
**finish** [1] - 631:22
**finished** [1] - 680:13
**firm** [11] - 640:10, 652:3, 654:19, 654:20, 681:9, 708:8, 708:10, 710:3, 710:5, 710:9, 710:13
**firms** [1] - 708:11
**first** [24] - 615:15, 618:25, 630:17, 630:21, 635:3, 636:2, 636:9, 636:11, 640:3, 641:15, 641:16, 647:12, 647:25, 652:12, 663:4, 683:22, 692:6, 692:7, 693:13, 695:1, 695:4, 721:13, 721:14, 722:11
**First** [20] - 619:12, 631:20, 631:24, 632:3, 632:7, 633:20, 637:25, 644:11, 644:15, 644:23, 648:3, 650:19, 651:7, 652:17, 652:20, 671:19, 671:21, 673:4, 673:10, 674:3
**firsthand** [1] - 686:22
**fit** [1] - 672:5
**five** [5] - 623:11, 623:25, 677:16,

723:19, 723:20
**fix** [1] - 730:5
**fixed** [1] - 665:23
**FMB** [1] - 656:1
**FMB's** [3] - 657:2, 657:9, 664:24
**focus** [3] - 700:17, 728:9, 730:11
**focusing** [1] - 700:16
**folks** [1] - 645:19
**follow** [3] - 629:17, 677:21, 716:3
**followed** [1] - 686:19
**following** [7] - 611:1, 616:13, 617:10, 618:24, 623:25, 721:1
**foreclose** [1] - 667:5
**foreclosing** [1] - 671:15
**foreclosure** [17] - 631:17, 632:7, 632:23, 633:4, 633:8, 633:11, 633:17, 634:6, 640:23, 643:19, 644:8, 645:6, 653:10, 731:1, 731:17, 733:23
**foreclosures** [1] - 667:3
**foreign** [2] - 658:7, 660:8
**forensic** [7] - 681:7, 681:12, 681:18, 687:12, 691:6, 698:23, 706:1
**forensics** [1] - 681:13
**formal** [1] - 708:14
**former** [1] - 723:4
**forward** [2] - 612:13, 613:3
**foundation** [7] - 649:25, 678:24, 679:7, 699:5, 709:1, 709:11, 713:18
**four** [7] - 623:10, 684:6, 687:8, 687:10, 687:15, 723:19, 723:20
**frame** [3] - 658:18, 671:18, 721:17
**frankly** [1] - 737:19
**fraud** [1] - 681:16
**frequently** [1] - 615:24
**Friday** [3] - 612:4, 732:17, 734:8
**friendly** [15] - 631:17, 632:6, 632:23, 633:4, 633:7, 633:11, 633:17, 640:23, 643:19, 644:8, 645:6, 653:10, 731:1, 731:17, 733:22
**front** [3] - 692:17, 692:20
**Fugiel** [7] - 722:20, 723:5, 723:21, 723:22, 725:7, 726:9, 726:16
**full** [1] - 681:4
**function** [3] - 661:19, 661:21, 661:22
**funds** [1] - 624:25

## G

**gain** [1] - 634:5
**gaining** [1] - 642:3
**Garrie** [6] - 732:14, 732:24, 733:1, 734:7, 735:23, 736:3
**gather** [1] - 737:18
**gathering** [3] - 629:23, 630:1, 737:19
**general** [3] - 692:4, 726:10, 730:17
**gentleman** [2] - 625:24, 640:6
**given** [5] - 667:25, 671:19, 715:9, 715:25, 716:2
**goal** [1] - 737:20
**good..** [1] - 631:9

**granted** [1] - 613:13
**Great** [2] - 696:18, 696:20
**great** [1] - 612:15
**greater** [1] - 670:17
**Grossman** [4] - 608:3, 654:24, 655:1, 720:3
**group** [1] - 693:24
**grouping** [1] - 693:13
**groups** [1] - 696:1
**guaranteeing** [1] - 611:14
**guaranties** [2] - 632:24, 633:4
**guaranty** [13] - 632:3, 632:13, 632:24, 645:20, 645:24, 647:4, 655:9, 655:14, 665:10, 668:5, 668:10, 668:14, 668:16
**guess** [5] - 650:10, 653:13, 717:22, 732:17, 736:21
**guy** [2] - 723:3, 726:8
**guys** [1] - 727:22

### H

**hand** [2] - 613:16, 614:7
**handed** [1] - 722:9
**handle** [2] - 722:15, 722:20
**handled** [1] - 631:17
**handling** [3] - 644:20, 722:6, 730:14
**hands** [1] - 671:7
**hang** [2] - 627:12, 686:6
**hanging** [1] - 717:25
**hard** [25] - 634:19, 642:2, 642:4, 642:10, 642:15, 642:17, 642:19, 642:24, 643:1, 643:15, 644:2, 661:10, 661:12, 661:14, 661:17, 661:19, 661:22, 662:3, 662:6, 662:12, 662:23, 663:6, 663:10, 667:13, 667:21
**hardly** [1] - 620:7
**head** [1] - 657:17
**hear** [2] - 680:20, 734:7
**heard** [2] - 660:12, 734:9
**hearing** [5] - 718:8, 734:3, 734:8, 734:10, 738:8
**help** [3] - 676:10, 736:2, 736:4
**hid** [1] - 632:12
**higher** [1] - 697:7
**highlighted** [3] - 615:13, 622:13, 622:14
**himself** [1] - 640:8
**HINSHAW** [2] - 608:3, 720:3
**hired** [3] - 714:5, 733:2, 736:2
**hiring** [1] - 732:19
**history** [8] - 629:5, 682:6, 689:11, 711:10, 711:12, 711:14, 711:16
**hmm** [1] - 613:9
**Hoholik** [5] - 637:21, 638:21, 652:8, 674:12, 678:8
**hold** [1] - 633:25
**home** [18] - 614:12, 614:14, 614:24, 615:1, 615:2, 615:18, 616:5, 616:11, 616:16, 616:20, 616:25, 617:18, 618:22, 619:9, 619:10, 619:19, 622:15,

631:1
**honestly** [4] - 618:6, 731:10, 731:11, 731:13
**Hong** [2] - 669:21, 669:23
**Honor** [38] - 611:4, 612:7, 612:20, 612:23, 621:7, 626:7, 635:10, 636:16, 652:25, 653:5, 666:15, 680:10, 680:12, 680:15, 683:14, 685:2, 685:10, 686:7, 686:21, 697:15, 699:16, 702:6, 705:7, 707:8, 707:20, 712:1, 714:13, 714:20, 716:24, 717:2, 717:6, 718:3, 726:25, 729:10, 729:14, 734:12, 734:25, 737:25
**HONORABLE** [1] - 719:10
**hope** [2] - 631:8, 684:24
**hour** [2] - 718:5, 718:6
**hours** [3] - 634:16, 656:2, 656:6
**house** [5] - 619:25, 620:1, 620:6, 620:10, 620:11
**hundred** [2] - 692:11, 692:14
**hypothetical** [2] - 734:25, 735:1

### I

**I.T** [1] - 725:1
**ID** [1] - 629:2
**idea** [4] - 623:12, 660:13, 717:19, 722:21
**identified** [3] - 723:2, 723:23, 724:25
**identify** [4] - 722:22, 723:8, 733:17, 736:20
**identifying** [1] - 723:12
**identity** [1] - 625:13
**IL** [4] - 608:5, 719:16, 719:20, 720:5
**ILLINOIS** [1] - 719:1
**Illinois** [2] - 719:7, 719:25
**immediately** [1] - 657:20
**important** [6] - 611:16, 663:22, 665:12, 666:2, 668:1, 726:17
**IN** [1] - 719:1
**inadvertent** [1] - 691:9
**INC** [1] - 719:7
**Inc** [1] - 714:25
**incidentally** [1] - 660:5
**include** [1] - 648:12
**included** [2] - 682:4, 708:17
**including** [1] - 730:2
**income** [2] - 682:13, 684:7, 687:16
**incoming** [5] - 613:5, 622:8, 625:5, 660:7, 660:14
**incorrect** [1] - 701:15
**incorrectly** [1] - 701:14
**increase** [2] - 692:10, 692:14
**increased** [2] - 692:12, 723:19
**independent** [2] - 716:3, 716:10, 731:16
**indicated** [8] - 669:15, 670:2, 672:20, 674:11, 674:24, 697:21, 706:23, 712:14
**indicates** [1] - 695:24
**indicating** [2] - 686:14, 711:13
**individual** [1] - 691:16

**individuals** [1] - 652:17
**infantryman's** [1] - 737:15
**information** [40] - 615:25, 617:11, 618:17, 629:24, 630:1, 630:6, 630:12, 661:24, 662:19, 662:22, 663:22, 666:24, 684:17, 687:22, 696:8, 697:5, 697:23, 698:1, 698:4, 698:5, 698:22, 698:24, 699:4, 699:9, 699:10, 699:19, 699:22, 699:24, 700:3, 701:5, 701:6, 701:17, 710:6, 726:7, 726:18, 735:7, 737:17, 737:18, 737:20
**informed** [1] - 657:6
**instance** [1] - 697:22
**instances** [3] - 691:21, 691:24, 691:25
**instruction** [1] - 730:15
**instructions** [1] - 728:2
**intent** [1] - 727:22
**intention** [2] - 673:7, 673:8
**interest** [1] - 656:13
**interested** [1] - 697:1
**interpretation** [2] - 646:20, 661:15
**introduce** [1] - 613:7
**inven** [1] - 638:6
**inventory** [40] - 637:23, 638:5, 638:6, 638:8, 638:12, 644:20, 671:14, 671:23, 672:16, 673:19, 673:22, 673:24, 674:1, 674:4, 674:14, 697:2, 697:3, 697:4, 697:5, 697:8, 697:11, 697:22, 698:2, 698:4, 700:16, 700:18, 706:3, 706:6, 706:14, 708:15, 708:17, 710:14, 710:17, 713:11, 713:13, 713:15, 713:24, 716:15, 716:16, 716:22
**investigating** [1] - 696:12
**investigation** [5] - 696:4, 696:6, 696:15, 701:18, 706:1
**investors** [2] - 678:23, 680:6
**invoice** [20] - 691:22, 693:8, 693:9, 693:22, 694:1, 694:6, 694:10, 694:11, 694:12, 695:4, 695:5, 695:6, 695:7, 695:9, 695:11, 695:12, 695:14, 695:16, 695:17, 695:19, 695:20
**invoices** [16] - 682:6, 682:8, 691:15, 691:16, 693:15, 693:21, 693:24, 694:9, 694:14, 694:15, 694:22, 694:23, 695:3, 695:22, 696:1
**involved** [6] - 657:15, 721:13, 721:16, 722:1, 722:6, 722:11, 728:1, 728:10, 732:19
**involvement** [3] - 657:2, 721:18, 722:10
**Ira** [6] - 640:5, 640:6, 640:7, 640:18, 641:1, 641:2
**issue** [6] - 638:16, 656:18, 665:12, 671:17, 671:21, 673:9, 684:11, 684:19, 685:4, 685:6
**issued** [1] - 613:2
**issues** [2] - 674:14, 684:13
**item** [3] - 695:18, 695:19, 702:18
**items** [1] - 655:11
**itself** [5] - 642:5, 646:17, 695:6, 695:13, 730:5

## J

**Jacobs** [1] - 651:25
**James** [2] - 635:17, 661:3
**January** [5] - 675:11, 684:7, 719:7, 728:21, 738:8
**Jim** [3] - 643:21, 643:22, 664:19
**Jones** [1] - 651:25
**Joshi** [21] - 647:10, 647:12, 670:2, 670:7, 670:9, 670:11, 670:13, 670:16, 670:19, 670:21, 670:23, 722:19, 723:21, 723:22, 724:25, 725:6, 726:14, 726:16, 727:8, 727:19, 735:5
**Joshi's** [3] - 614:22, 615:2, 615:9
**Judge** [5] - 611:15, 699:13, 730:2, 737:23, 738:2
**judge** [9] - 613:18, 626:9, 684:9, 698:7, 698:25, 722:16, 736:6, 736:24, 737:13
**July** [27] - 613:6, 615:16, 619:22, 622:9, 623:14, 625:15, 629:21, 630:15, 647:20, 649:1, 651:9, 651:11, 651:14, 656:21, 656:22, 656:25, 658:4, 658:5, 658:16, 664:25, 666:3, 666:4, 678:21, 679:13, 685:19
**June** [8] - 645:17, 647:16, 658:12, 658:15, 658:23, 666:3, 679:13, 684:8
**jury** [2] - 612:17, 621:14

## K

**KANAN** [1] - 719:7
**Kanan** [78] - 611:2, 614:20, 636:21, 636:24, 662:16, 670:14, 671:13, 672:8, 674:8, 675:6, 676:24, 677:25, 681:22, 681:25, 682:7, 682:9, 682:11, 682:20, 682:22, 683:5, 683:22, 684:7, 685:18, 686:19, 687:13, 687:14, 687:15, 687:20, 688:6, 688:11, 688:14, 688:19, 688:22, 688:24, 688:25, 689:22, 690:1, 690:5, 690:24, 691:1, 691:17, 692:23, 693:7, 694:13, 695:7, 695:14, 695:23, 696:3, 696:12, 696:16, 696:18, 697:2, 697:6, 701:14, 702:11, 703:17, 703:22, 704:20, 705:20, 708:15, 711:14, 711:18, 712:24, 713:5, 714:7, 714:23, 714:25, 715:10, 715:15, 716:11, 722:6, 723:14, 723:16, 728:5, 733:10, 733:15
**Kanan's** [2] - 695:21, 705:16, 710:14, 710:17, 722:20, 723:4
**keep** [5] - 668:7, 672:16, 673:2, 696:19, 712:4
**kept** [5] - 649:8, 650:3, 697:23, 698:1, 713:1
**KEVIN** [1] - 719:19
**keys** [2] - 633:25, 634:2
**KFI** [1] - 694:3
**kind** [6] - 611:8, 662:19, 665:11, 713:16, 723:10, 723:11
**knowing** [1] - 658:23

**knowledge** [24] - 630:10, 631:7, 632:22, 634:1, 641:23, 643:16, 644:10, 649:18, 650:21, 650:25, 652:20, 662:13, 663:24, 672:23, 674:19, 674:21, 686:23, 699:24, 700:3, 700:24, 715:22, 726:19, 732:5, 732:21
**knows** [4] - 643:4, 698:10, 727:23, 730:9
**Kong** [2] - 669:21, 669:23

## L

**lady** [1] - 639:22
**large** [1] - 707:2
**larger** [2] - 690:15, 690:16
**LaSalle** [2] - 608:5, 720:5
**last** [11] - 626:10, 627:25, 651:24, 652:12, 660:18, 661:5, 677:21, 683:23, 695:18, 695:19, 700:12
**lasting** [1] - 628:5
**late** [4] - 623:13, 658:14, 658:15, 734:4
**Lauter** [18] - 640:5, 640:6, 640:7, 640:13, 640:18, 640:21, 641:1, 641:2, 641:6, 642:1, 642:2, 642:19, 642:24, 643:1, 643:7, 643:15, 651:4, 652:2
**law** [1] - 611:25
**lawsuit** [8] - 631:12, 662:24, 663:11, 721:12, 721:18, 722:1, 722:7, 722:12
**lay** [1] - 649:25
**lead** [2] - 680:2, 694:9
**leading** [3] - 692:17, 692:19, 729:12
**learn** [1] - 655:16
**lease** [58] - 632:3, 644:14, 644:19, 644:24, 645:6, 645:13, 645:20, 646:6, 647:3, 647:5, 647:7, 655:6, 655:7, 655:8, 655:9, 655:17, 655:20, 656:2, 657:3, 657:5, 657:9, 657:11, 657:12, 658:22, 659:3, 659:4, 659:14, 660:2, 662:3, 662:4, 662:5, 663:7, 664:2, 664:3, 664:4, 664:5, 664:8, 664:11, 664:18, 664:24, 665:4, 667:14, 667:18, 667:22, 668:24, 669:17, 669:21, 671:10, 672:15, 672:21, 672:22, 672:23, 672:24, 673:14, 673:15, 673:16, 678:23, 680:6
**leased** [1] - 655:10
**least** [7] - 624:3, 638:11, 648:21, 649:2, 666:12, 731:21, 733:17
**leave** [7] - 613:7, 621:8, 627:4, 629:6, 629:10, 734:23, 738:6
**leaves** [5] - 621:11, 628:15, 680:14, 717:7, 738:3
**ledger** [6] - 682:15, 694:4, 694:12, 695:8, 695:13, 695:21
**left** [6] - 626:15, 639:1, 658:11, 658:14, 674:15, 735:14
**lend** [2] - 658:25, 669:16
**length** [2] - 623:13, 670:17
**less** [5] - 627:10, 627:11, 634:16, 663:7, 706:2
**letter** [10] - 651:25, 652:7, 652:10,

652:13, 674:3, 674:7, 724:1, 724:3, 725:10, 728:18
**letters** [4] - 636:3, 636:12, 724:5, 724:7
**level** [1] - 697:11
**Levin** [2] - 640:10, 640:13
**liability** [2] - 684:12, 684:18
**lieu** [1] - 657:4
**likely** [1] - 699:11
**line** [6] - 618:1, 618:2, 618:3, 622:8, 627:7, 629:3, 675:17
**LIPTON** [18] - 608:4, 609:11, 620:22, 626:7, 653:5, 653:20, 656:17, 659:13, 660:15, 660:24, 661:2, 666:12, 666:15, 680:12, 703:8, 712:1, 717:2, 720:4
**Lipton** [2] - 653:4, 680:11
**liquidator** [1] - 673:24
**list** [1] - 626:19
**listed** [1] - 627:16
**listen** [2] - 642:8, 676:12
**listening** [1] - 642:7
**listing** [1] - 691:17
**litigation** [1] - 677:8
**LLC** [1] - 719:13
**LLP** [2] - 608:3, 720:3
**loan** [3] - 632:25, 657:22, 683:4
**lock** [1] - 738:6
**locks** [3] - 633:16, 653:8, 653:14
**long-term** [1] - 657:22
**look** [33] - 615:11, 622:2, 622:12, 623:10, 625:12, 629:21, 640:1, 641:10, 651:24, 660:5, 660:11, 665:18, 681:20, 681:24, 683:7, 684:3, 685:13, 686:10, 687:12, 688:3, 688:13, 689:6, 689:16, 693:4, 695:22, 703:23, 706:10, 706:18, 712:15, 730:4, 731:5, 731:7
**looked** [6] - 650:8, 661:13, 682:8, 691:15, 706:14, 707:2, 708:21, 708:24, 714:2, 731:8
**looking** [11] - 618:17, 634:20, 678:20, 678:23, 679:3, 679:5, 690:17, 696:1, 702:16, 706:12, 713:25
**looks** [1] - 611:9
**lose** [1] - 726:18
**loss** [3] - 729:9, 735:7
**lost** [3] - 654:20, 729:7, 734:1
**low** [1] - 668:8
**lunch** [3] - 717:8, 718:5, 718:7

## M

**ma'am** [33] - 619:15, 622:11, 622:19, 622:22, 622:24, 623:6, 623:14, 623:19, 623:24, 624:2, 624:7, 624:10, 624:13, 624:18, 624:21, 625:1, 625:11, 626:3, 667:23, 669:6, 670:4, 671:6, 671:8, 671:16, 671:25, 672:10, 672:18, 672:21, 673:12, 674:18, 675:9, 675:12, 675:15
**magnitude** [2] - 690:16, 691:7

**mail** [59] - 626:20, 626:22, 626:24, 626:25, 627:12, 628:7, 628:9, 628:11, 628:16, 629:6, 629:10, 634:17, 634:21, 635:1, 635:4, 635:7, 635:15, 635:16, 635:20, 636:15, 637:11, 637:17, 639:6, 639:25, 640:2, 641:13, 641:14, 641:18, 641:20, 641:22, 641:23, 642:13, 643:2, 643:18, 643:19, 646:22, 651:15, 651:17, 660:17, 661:11, 661:13, 661:16, 662:22, 663:3, 663:8, 663:9, 663:12, 663:22, 677:23, 678:3, 725:16, 725:19, 725:21, 725:23, 726:14, 726:22, 727:7, 727:11

**mails** [7] - 628:25, 660:22, 663:15, 730:25, 731:3, 731:9, 731:15

**maintained** [4] - 711:1, 712:23, 714:24, 715:15

**maintains** [2] - 661:23, 661:24

**majority** [1] - 627:10

**malfunctioning** [1] - 729:24

**man** [1] - 664:18

**management** [1] - 633:24

**March** [31] - 633:11, 633:13, 634:18, 634:22, 644:1, 644:12, 645:9, 647:13, 647:14, 647:19, 649:1, 653:10, 662:22, 663:4, 663:8, 663:22, 666:1, 666:3, 721:21, 721:25, 725:17, 726:23, 727:17, 729:21, 729:23, 730:14, 732:9, 732:22, 733:23

**marked** [1] - 704:6

**Mason** [1] - 730:2

**MASON** [1] - 719:10

**matter** [7] - 612:19, 675:10, 684:14, 713:1, 717:12, 728:1, 734:3

**McGarry** [30] - 608:4, 610:4, 610:6, 611:4, 611:5, 611:7, 611:12, 611:20, 611:23, 612:2, 612:7, 612:11, 659:6, 659:10, 668:6, 717:20, 718:3, 720:4, 726:25, 729:10, 729:14, 735:18, 735:21, 736:6, 736:12, 736:17, 736:22, 736:24, 737:1, 737:22

**mcJESSY** [1] - 719:19

**McJessy** [112] - 609:9, 609:15, 609:19, 609:23, 609:25, 613:18, 613:22, 615:3, 615:7, 620:23, 626:9, 626:12, 626:14, 626:18, 627:19, 628:20, 634:9, 635:10, 635:12, 635:14, 636:14, 636:7, 636:8, 636:16, 636:17, 641:17, 642:8, 642:11, 642:22, 643:12, 643:14, 644:6, 646:15, 646:25, 648:15, 648:20, 650:1, 652:25, 653:2, 653:8, 660:21, 663:25, 664:6, 677:13, 677:14, 677:20, 679:1, 679:9, 679:25, 680:9, 684:9, 685:10, 686:7, 686:21, 687:24, 697:15, 697:18, 698:7, 698:10, 698:12, 698:25, 699:3, 699:8, 699:13, 699:18, 702:6, 702:7, 703:8, 703:11, 704:11, 705:10, 705:14, 705:15, 707:7, 707:9, 707:17, 707:19, 707:23, 708:2, 709:3, 709:12, 709:13, 710:12, 711:20, 711:23, 712:1, 713:18, 714:8, 714:10, 714:13, 714:16, 714:20, 714:21, 715:5, 716:9, 716:20, 716:24, 717:2, 717:14, 717:17, 717:20, 718:3, 719:15, 719:19, 720:4, 720:4, 721:5, 721:9, 726:25, 727:2, 727:4, 729:10, 729:14, 729:15, 730:24, 732:11, 734:6, 734:12, 734:25, 735:21, 736:6, 736:12, 736:17, 736:22, 736:24, 737:1, 737:22, 737:25

**MS** [89] - 609:5, 609:7, 609:13, 609:17, 609:21, 610:2, 612:19, 612:22, 613:2, 613:5, 613:10, 613:14, 613:16, 613:20, 613:25, 614:5, 614:7, 614:11, 615:4, 615:8, 617:6, 617:14, 620:20, 621:8, 621:12, 621:18, 621:23, 622:5, 626:4,

**mean** [17] - 628:14, 628:24, 639:7, 662:10, 663:1, 665:8, 701:12, 704:6, 723:3, 723:11, 729:25, 732:5, 732:20, 733:11, 735:9, 736:4, 737:9

**meaning** [2] - 629:15, 651:7

**means** [1] - 692:19

**meant** [7] - 661:8, 700:8, 703:3, 704:7, 707:5, 709:8, 734:20

**medal** [2] - 737:14, 737:15

**medals** [1] - 737:11

**meet** [4] - 612:14, 630:17, 733:3, 733:6

**meeting** [30] - 637:15, 637:20, 637:22, 637:24, 638:1, 652:8, 670:23, 671:5, 674:11, 674:17, 721:14, 722:5, 722:7, 722:12, 722:14, 722:18, 722:24, 723:1, 723:6, 723:7, 723:24, 724:12, 724:14, 724:18, 725:2, 726:16, 728:4, 728:22, 728:24, 729:22

**meetings** [1] - 631:14

**meets** [1] - 634:13

**MEHUL** [2] - 609:4, 614:10

**member** [1] - 654:18

**memorandum** [2] - 656:24, 658:5

**memory** [2] - 661:23, 676:19

**mention** [2] - 623:9, 624:16

**mentioned** [5] - 629:13, 639:11, 689:5, 707:24, 728:19

**merchandise** [1] - 702:9

**merely** [1] - 661:11

**merits** [1] - 684:12

**message** [6] - 621:16, 626:22, 626:24, 627:4, 629:6, 629:10

**messages** [2] - 625:2, 628:16

**met** [8] - 630:21, 631:5, 631:7, 631:12, 637:2, 670:9, 671:4, 678:8

**metal** [1] - 650:8

**MICHAEL** [1] - 719:10

**Michigan** [1] - 719:16

**mid** [6] - 658:15, 721:21, 721:23, 722:1, 722:2, 734:3

**middle** [2] - 647:19, 649:1

**Midwest** [20] - 619:12, 631:20, 631:24, 632:3, 632:7, 633:20, 637:25, 644:11, 644:15, 644:23, 648:3, 650:19, 651:7, 652:17, 652:20, 671:19, 671:21, 673:4, 673:10, 674:3

**might** [9] - 628:24, 667:13, 667:21, 685:4, 685:5, 691:5, 700:25, 703:21, 704:23

**million** [7] - 671:23, 688:17, 690:18, 690:19, 690:21, 691:8

**mind** [4] - 654:11, 677:15, 712:4, 717:22

**minimum** [1] - 656:12

**minute** [6] - 615:20, 623:13, 623:23, 624:4, 627:10, 707:20

**minutes** [6] - 617:15, 623:13, 624:9,

638:2, 677:16, 700:9

**mischaracterizes** [1] - 727:1

**missing** [2] - 685:4, 736:1

**mistake** [1] - 691:9

**moment** [3] - 662:25, 663:1, 730:11

**money** [13] - 655:18, 655:22, 656:7, 657:19, 658:1, 658:24, 659:1, 659:22, 659:24, 668:19, 669:8, 669:16, 669:24

**month** [6] - 645:3, 663:8, 672:9, 683:25, 700:12, 721:22

**months** [6] - 648:24, 664:25, 665:3, 665:13, 688:8, 721:20

**morning** [15] - 615:16, 615:22, 616:14, 617:20, 621:17, 621:24, 621:25, 623:13, 653:21, 653:22, 660:6, 697:19, 697:20, 705:5, 738:5

**most** [2] - 723:3, 729:23

**mother** [1] - 611:25

**mother-in-law** [1] - 611:25

**motion** [3] - 684:13, 698:2, 722:16

**motive** [2] - 685:4, 685:5

**move** [6] - 679:21, 686:21, 694:22, 698:7, 709:20, 714:10

**moved** [3] - 732:2, 732:3, 732:6

**MR** [155] - 608:4, 608:4, 609:9, 609:11, 609:15, 609:19, 609:23, 609:25, 610:4, 610:6, 611:4, 611:7, 611:12, 611:20, 611:23, 612:2, 612:7, 612:11, 613:18, 613:22, 615:3, 615:7, 620:22, 620:23, 626:7, 626:9, 626:12, 626:14, 626:18, 627:19, 628:20, 634:9, 635:10, 635:12, 635:14, 636:7, 636:8, 636:16, 636:17, 639:23, 640:17, 641:16, 641:17, 642:8, 642:11, 642:22, 643:9, 643:12, 643:14, 644:6, 646:15, 646:25, 648:15, 648:20, 650:1, 652:25, 653:2, 653:5, 653:20, 656:17, 659:6, 659:10, 659:13, 660:15, 660:21, 660:24, 661:2, 666:12, 666:15, 668:6, 677:14, 677:20, 679:1, 679:9, 679:25, 680:9, 680:12, 684:9, 685:10, 686:7, 686:21, 687:24, 697:15, 697:18, 698:7, 698:10, 698:12, 698:25, 699:3, 699:8, 699:13, 699:18, 702:6, 702:7, 703:8, 703:11, 704:11, 705:10, 705:14, 705:15, 707:7, 707:9, 707:17, 707:19, 707:23, 708:2, 709:3, 709:12, 709:13, 710:12, 711:20, 711:23, 712:1, 713:18, 714:8, 714:10, 714:13, 714:16, 714:20, 714:21, 715:5, 716:9, 716:20, 716:24, 717:2, 717:14, 717:17, 717:20, 718:3, 719:15, 719:19, 720:4, 720:4, 721:5, 721:9, 726:25, 727:2, 727:4, 729:10, 729:14, 729:15, 730:24, 732:11, 734:6, 734:12, 734:25, 735:21, 736:6, 736:12, 736:17, 736:22, 736:24, 737:1, 737:22, 737:25

628:18, 640:15, 642:20, 643:3, 643:6, 644:3, 648:18, 649:24, 666:19, 668:11, 670:25, 673:23, 675:24, 676:5, 676:12, 676:14, 677:12, 678:24, 679:7, 679:21, 679:23, 680:15, 681:3, 683:13, 683:17, 683:19, 684:23, 685:2, 685:12, 685:24, 686:1, 686:8, 686:9, 687:1, 687:7, 687:25, 688:2, 697:13, 699:5, 705:7, 709:1, 709:11, 710:10, 712:3, 712:6, 712:9, 712:17, 712:20, 713:20, 714:12, 717:4, 717:9, 719:14, 719:14, 719:15, 719:23, 721:3, 734:17, 735:11, 736:13

**Muschler** [6] - 655:3, 717:18, 721:3, 721:10, 734:18, 736:13

**MUSCHLER** [8] - 609:24, 610:1, 610:3, 610:5, 721:8, 734:16, 735:20, 736:11

**must** [5] - 615:23, 619:19, 623:3, 646:6, 648:25

## N

**NADA** [1] - 719:14
**name** [8] - 612:21, 625:24, 639:21, 652:3, 654:20, 681:4, 724:23, 726:5
**named** [2] - 640:6, 664:18
**names** [1] - 724:20
**Nat** [2] - 637:2, 637:7
**natural** [2] - 734:21, 735:7
**necessary** [1] - 657:16
**need** [15] - 630:4, 634:14, 641:9, 642:6, 665:11, 665:15, 668:24, 672:2, 686:25, 699:15, 705:22, 706:3, 706:7, 706:11, 717:10
**needed** [17] - 615:25, 618:17, 655:20, 656:7, 657:23, 663:18, 663:19, 663:20, 663:21, 665:7, 665:20, 665:21, 665:24, 666:21, 666:24, 736:2
**negotiate** [6] - 645:19, 657:5, 658:21, 660:1, 662:4, 662:5
**negotiated** [3] - 633:6, 655:20, 668:22
**negotiating** [9] - 635:24, 655:5, 655:7, 655:12, 664:23, 665:3, 668:5, 668:10, 678:3
**negotiations** [8] - 644:15, 644:19, 645:1, 645:5, 660:4, 671:10, 673:10, 679:10
**never** [11] - 625:9, 632:12, 654:4, 654:7, 655:9, 660:12, 668:21, 670:11, 672:22, 672:23, 673:13
**new** [3] - 658:25, 659:2, 669:15
**news** [1] - 611:24
**next** [11] - 616:1, 616:9, 680:15, 683:6, 694:9, 695:9, 721:2, 721:3, 726:9, 726:11
**nice** [1] - 611:19
**night** [2] - 612:3
**nine** [1] - 616:12
**no-interest** [1] - 656:13
**nobody** [1] - 730:6
**none** [2] - 717:2, 731:18
**nonresponsive** [3] - 698:8, 699:1,

709:20
**North** [4] - 608:5, 719:16, 719:20, 720:5
**NORTHERN** [1] - 719:1
**note** [10] - 655:23, 655:25, 656:4, 656:7, 656:8, 656:11, 656:13, 657:16, 657:18, 658:14
**nothing** [12] - 666:12, 666:15, 676:10, 685:22, 727:12, 730:17, 730:18, 733:11, 735:5, 737:22, 737:25
**notice** [10] - 627:9, 634:14, 636:19, 636:25, 637:11, 675:5, 676:23, 677:24, 692:1, 702:3
**notification** [1] - 674:7
**notified** [2] - 659:24, 674:4
**notify** [1] - 651:19
**Novak** [1] - 681:9
**November** [3] - 630:19, 683:25, 685:19
**number** [47] - 614:12, 614:14, 614:18, 614:20, 614:22, 614:23, 614:24, 615:4, 615:5, 615:6, 615:9, 615:16, 616:11, 616:16, 616:20, 616:25, 617:1, 617:21, 617:22, 618:3, 618:11, 619:10, 619:19, 620:12, 620:16, 621:2, 622:10, 622:15, 625:23, 630:13, 630:14, 648:9, 683:6, 685:3, 690:17, 693:9, 693:18, 694:10, 695:3, 695:5, 695:9, 695:11, 695:15, 695:19, 723:18
**numbers** [16] - 613:12, 613:19, 613:24, 616:5, 622:14, 625:13, 625:17, 660:7, 660:14, 683:14, 684:4, 685:14, 686:14, 690:22, 693:23, 706:6
**numerous** [1] - 691:25

## O

**o'clock** [4] - 616:23, 717:11, 719:8, 738:5
**Oak** [7] - 722:5, 723:18, 726:9, 728:13, 728:16, 729:2, 733:16
**object** [2] - 705:7, 726:25
**objection** [27] - 628:18, 640:15, 642:20, 643:3, 644:3, 648:18, 649:24, 678:24, 679:7, 679:21, 680:22, 680:23, 684:10, 684:15, 685:8, 686:21, 686:24, 699:5, 703:8, 709:1, 709:11, 710:10, 713:18, 714:8, 729:12, 734:25
**obligated** [1] - 669:11
**observe** [4] - 691:18, 691:24, 692:3, 695:10
**observed** [5] - 692:4, 692:22, 693:14, 693:20, 695:2
**obtain** [3] - 714:6, 729:4, 729:6
**obviously** [2] - 636:24, 684:19
**occasions** [3] - 647:22, 648:22, 650:15
**occupation** [1] - 681:6
**occur** [5] - 628:5, 644:8, 656:20, 674:17, 735:8
**occurred** [8] - 633:11, 643:19, 645:6, 648:7, 648:10, 673:13, 673:16, 722:7

**October** [4] - 683:25, 688:8, 693:10, 694:22
**OF** [2] - 719:1, 719:9
**offer** [2] - 645:23, 663:5
**offering** [1] - 646:13
**office** [21] - 614:20, 614:22, 615:4, 615:5, 617:21, 617:22, 618:10, 619:19, 620:25, 622:10, 622:15, 649:9, 649:10, 649:20, 670:21, 671:7, 728:14, 728:17, 729:1, 729:2
**officer** [1] - 635:23
**offices** [3] - 722:5, 722:6, 733:16
**Official** [1] - 719:24
**often** [1] - 670:6
**once** [3] - 648:22, 665:9, 670:9
**one** [60] - 613:4, 613:7, 613:25, 615:3, 615:15, 616:8, 616:9, 616:19, 616:22, 617:2, 617:5, 619:11, 623:23, 624:8, 626:1, 627:24, 631:8, 633:7, 635:5, 641:3, 641:13, 646:22, 649:9, 651:24, 652:17, 660:6, 660:23, 661:1, 661:5, 661:21, 670:21, 670:22, 678:19, 679:19, 683:22, 685:3, 685:21, 692:5, 692:6, 692:7, 692:8, 692:12, 693:9, 693:15, 693:18, 695:1, 695:4, 695:9, 706:24, 706:25, 722:19, 723:22, 724:2, 725:24, 728:6, 732:22
**ones** [4] - 623:11, 625:18, 715:25, 716:2
**ongoing** [1] - 665:22
**open** [3] - 611:1, 650:5, 721:1
**operating** [3] - 657:10, 657:13, 657:14
**operation** [2] - 665:22, 680:7
**opinion** [1] - 691:4
**order** [14] - 613:2, 639:7, 639:8, 639:9, 639:12, 674:25, 675:7, 675:19, 676:18, 676:25, 677:9, 683:18, 710:4, 711:4
**ordinary** [1] - 713:2
**original** [6] - 692:10, 712:18, 712:23, 714:24, 715:14, 715:20
**other..** [1] - 737:15
**ourselves** [2] - 672:4, 727:11
**outside** [2] - 682:20, 714:5
**own** [3] - 657:10, 657:13, 657:14
**owned** [4] - 647:7, 665:15, 666:1
**owner** [1] - 664:4
**owners** [1] - 667:6
**owns** [1] - 664:4

## P

**P-a-e-t-e-c** [1] - 612:24
**p.m** [12] - 616:10, 617:6, 618:19, 618:25, 624:8, 640:1, 641:18, 660:17, 718:8, 719:8, 738:8
**Paetec** [2] - 612:24, 622:7
**PAGE** [1] - 609:2
**page** [16] - 618:24, 622:2, 624:20, 634:22, 635:16, 639:25, 641:15, 641:16, 652:3, 652:12, 675:16, 683:23,

702:14, 704:9, 706:25, 707:6
**pages** [3] - 683:21, 683:24, 684:6
**paid** [5] - 664:10, 664:13, 672:8, 688:23, 695:25
**paragraph** [7] - 640:3, 641:14, 652:12, 660:18, 661:5, 712:22, 715:3
**part** [8] - 611:24, 632:2, 632:23, 657:4, 694:17, 716:22, 733:9, 733:10
**participant** [1] - 724:18
**participate** [1] - 671:5
**particular** [12] - 662:25, 663:1, 681:24, 688:16, 691:6, 692:4, 695:3, 695:12, 696:7, 703:16, 709:25, 714:1
**parties** [10] - 628:7, 637:1, 637:12, 637:13, 645:12, 647:23, 650:16, 673:17, 705:20, 710:2
**party** [4] - 647:6, 666:25, 687:19
**pass** [3] - 670:24, 671:1, 712:1
**pass-through** [2] - 670:24, 671:1
**past** [1] - 665:13
**patterns** [2] - 692:1, 692:3
**pause** [2] - 666:14, 707:22
**pay** [9] - 655:18, 655:22, 657:20, 657:23, 658:24, 659:25, 672:2, 672:6, 673:2
**payable** [1] - 682:5
**payment** [8] - 656:5, 656:6, 689:11, 702:15, 711:10, 711:12, 711:14, 711:16
**payments** [11] - 688:10, 689:22, 690:1, 690:4, 690:6, 702:11, 703:17, 703:20, 706:24, 707:10, 707:13
**people** [7] - 649:19, 649:22, 650:2, 659:7, 663:9, 727:18, 730:4
**people's** [1] - 611:16
**per** [1] - 722:9
**perform** [1] - 710:1
**performed** [4] - 682:21, 682:22, 708:4, 713:12
**perhaps** [10] - 613:18, 631:13, 647:13, 660:19, 661:6, 663:6, 696:24, 701:13, 701:14, 731:5
**period** [20] - 622:8, 625:9, 627:12, 645:1, 645:15, 649:1, 660:3, 671:24, 689:23, 690:10, 691:25, 700:10, 700:11, 706:24, 711:19, 711:20, 716:12, 730:10, 730:13, 737:21
**person** [8] - 630:18, 651:1, 664:10, 670:8, 723:5, 725:1, 732:23
**personal** [4] - 632:24, 633:4, 668:14, 668:16
**personally** [4] - 632:18, 647:24, 652:11, 716:13
**pertain** [1] - 683:21
**pertained** [1] - 703:16
**pertaining** [2] - 681:21, 681:25
**phone** [83] - 613:5, 613:11, 613:19, 613:24, 614:14, 614:16, 614:18, 614:24, 615:1, 615:2, 615:9, 615:16, 615:20, 616:2, 616:5, 616:7, 616:11, 616:19, 616:20, 616:22, 617:1, 617:2, 617:18, 618:1, 618:2, 618:4, 618:8,

618:12, 618:19, 618:22, 619:3, 619:4, 619:9, 619:16, 619:18, 620:8, 620:9, 620:10, 620:11, 620:12, 620:15, 620:16, 620:17, 620:18, 622:6, 622:7, 622:8, 622:15, 622:17, 622:20, 622:23, 623:1, 623:7, 623:8, 623:10, 623:17, 623:22, 623:25, 624:9, 624:15, 624:19, 624:20, 625:2, 625:5, 625:8, 625:12, 625:13, 626:19, 627:3, 627:7, 629:14, 654:7, 654:9, 654:12, 670:8, 670:17, 670:23, 670:24, 671:1, 671:2, 733:7
**phonetic** [1] - 625:20
**phonetic)** [2] - 625:24, 656:10
**photograph** [1] - 640:22
**pick** [3] - 626:15, 628:16, 641:7
**picked** [3] - 627:7, 664:18, 671:2
**picks** [1] - 626:25
**pickup** [1] - 652:2
**Piggee** [10] - 637:3, 637:7, 637:16, 638:21, 638:23, 652:8, 674:12, 674:19, 674:24, 678:8
**place** [7] - 633:17, 634:6, 638:1, 645:2, 692:11, 692:12, 731:2
**placed** [1] - 703:16
**places** [1] - 692:14
**Plaintiff** [2] - 719:5, 719:13
**plaintiff** [6] - 639:10, 684:14, 712:25, 715:1, 715:16, 715:20
**plan** [2] - 657:3, 659:22
**plans** [3] - 630:4, 630:7, 665:20
**plausible** [1] - 654:11
**ploy** [1] - 678:4
**point** [13] - 617:5, 646:22, 647:6, 647:18, 659:23, 672:14, 677:22, 679:19, 721:19, 732:22, 732:23, 733:3, 733:25
**pose** [1] - 735:1
**possession** [14] - 633:21, 644:11, 644:19, 645:3, 645:14, 647:19, 651:8, 652:13, 672:19, 672:22, 672:25, 673:3, 673:11, 734:1
**possibly** [4] - 698:4, 702:22, 703:1, 703:2
**precisely** [1] - 733:14
**prejudice** [1] - 685:6
**preliminary** [4] - 612:19, 696:6, 701:21, 701:23
**prepare** [9] - 687:21, 689:14, 705:4, 705:22, 706:3, 706:4, 706:8, 706:11, 710:5
**prepared** [10] - 686:19, 689:18, 696:8, 705:16, 705:19, 708:6, 708:18, 708:20, 710:9, 724:2
**preparing** [3] - 708:19, 709:17, 710:23
**present** [4] - 637:20, 734:7, 734:10, 736:19
**presented** [2] - 684:11, 684:20
**preservation** [1] - 730:21
**preserve** [1] - 737:17
**presume** [1] - 625:4
**presuming** [1] - 684:17

**pretty** [1] - 667:5
**prevent** [2] - 729:6, 729:8
**previously** [3] - 633:19, 653:25, 675:17
**problem** [5] - 675:5, 728:13, 728:17, 729:1, 729:4
**problems** [1] - 728:20
**procedures** [8] - 682:24, 707:25, 708:14, 708:16, 709:22, 710:2, 710:4, 716:22
**PROCEEDINGS** [1] - 719:9
**proceedings** [2] - 611:1, 721:1
**proceeds** [1] - 674:1
**process** [3] - 680:1, 696:12, 725:24
**produce** [1] - 711:5
**produced** [27] - 682:8, 682:16, 683:15, 687:3, 687:5, 691:15, 694:11, 695:20, 696:8, 699:23, 700:21, 701:7, 703:23, 703:25, 704:1, 705:2, 706:12, 710:21, 711:10, 711:13, 714:22, 715:11, 715:14, 715:19, 715:22, 716:4, 716:11
**production** [4] - 684:4, 685:15, 686:14, 686:17
**professional** [2] - 736:15, 737:4
**properties** [1] - 626:1
**property** [1] - 633:24
**proposing** [1] - 668:2
**prosecutor** [1] - 611:10
**protect** [1] - 729:6
**provide** [5] - 643:1, 643:15, 669:24, 678:14, 678:17
**provided** [8] - 643:4, 643:9, 687:2, 689:2, 689:10, 691:17, 713:4, 722:17
**provider** [1] - 622:7
**provides** [1] - 710:5
**providing** [1] - 701:5
**public** [2] - 681:11, 681:14
**punched** [1] - 736:18
**purchase** [19] - 619:14, 622:17, 623:5, 624:25, 655:20, 656:1, 657:3, 657:5, 657:9, 657:11, 658:21, 660:1, 662:4, 662:5, 664:24, 668:23, 669:12, 669:24, 682:5
**purchased** [1] - 697:8
**purchaser** [1] - 624:15
**purchases** [5] - 687:14, 690:24, 690:25, 701:14, 702:4
**purchasing** [1] - 625:10
**purpose** [8] - 644:18, 644:20, 683:1, 687:8, 687:10, 703:19, 722:14, 725:21
**pursuant** [2] - 682:17, 686:14
**put** [9] - 612:21, 614:2, 622:2, 636:25, 637:11, 675:5, 676:23, 677:24, 736:13

**Q**

**questionable** [1] - 728:5
**questioning** [1] - 629:13
**questions** [17] - 620:21, 622:1, 626:5, 626:19, 652:25, 677:12, 677:14,

677:21, 678:1, 678:22, 680:9, 711:23, 714:12, 716:24, 734:12, 734:18, 735:17
**quick** [3] - 677:15, 683:7, 734:18
**quicker** [1] - 613:23
**quickly** [1] - 633:16
**quite** [2] - 615:23, 642:12
**quote** [1] - 642:2

# R

**raise** [1] - 612:18
**raised** [2] - 638:16, 684:13
**raising** [5] - 692:8, 692:16, 692:17, 692:19, 695:15
**ran** [1] - 668:3
**rapid** [1] - 618:5
**rather** [2] - 613:18, 642:6
**Ravenswood** [1] - 719:20
**Ray** [4] - 722:20, 723:5, 725:7, 728:19
**reach** [2] - 618:16, 713:22
**reached** [4] - 627:2, 638:11, 644:23, 668:17
**reaching** [1] - 667:17
**read** [13] - 636:5, 636:6, 636:9, 641:13, 659:6, 659:11, 659:12, 660:19, 676:1, 686:2, 686:5, 715:18, 727:10
**reading** [3] - 642:6, 710:18, 715:3
**ready** [1] - 683:9
**real** [1] - 712:6
**really** [8] - 640:12, 655:9, 668:24, 709:20, 731:4, 732:20, 732:25, 734:18
**reason** [5] - 611:17, 655:23, 713:3, 713:6, 723:11
**recalling** [2] - 617:8, 721:3
**receivable** [16] - 682:14, 683:22, 683:24, 685:18, 686:19, 687:18, 688:7, 688:10, 691:17, 694:4, 694:12, 695:8, 695:13, 695:21, 695:24
**receivables** [1] - 706:6
**receive** [4] - 639:4, 701:16, 737:8, 737:11
**received** [19] - 612:23, 619:12, 622:16, 623:17, 624:23, 634:17, 635:1, 636:3, 636:11, 639:17, 639:19, 641:2, 652:7, 663:8, 663:9, 687:22, 726:13, 737:9, 737:14
**receiver** [2] - 626:1, 626:2
**receiving** [5] - 624:24, 640:5, 640:25, 641:20, 731:9
**recently** [1] - 648:23
**recognize** [3] - 625:13, 625:17, 654:8
**recollection** [7] - 618:4, 623:16, 624:11, 678:9, 726:12, 731:16, 733:19
**recommended** [1] - 732:21
**record** [12] - 612:21, 613:20, 659:12, 683:13, 684:11, 684:18, 684:19, 685:9, 685:14, 686:5, 686:13, 712:17
**recorded** [2] - 661:24, 687:20
**recording** [1] - 697:12
**records** [60] - 622:6, 625:12, 665:17,

665:24, 666:2, 681:21, 681:24, 682:3, 682:4, 682:5, 687:4, 687:11, 687:22, 688:11, 688:24, 688:25, 689:2, 689:5, 689:12, 689:19, 690:2, 690:9, 694:6, 694:15, 696:10, 696:17, 696:19, 696:20, 696:22, 696:24, 701:14, 710:21, 710:22, 711:1, 711:4, 711:9, 711:17, 712:11, 712:22, 712:23, 713:4, 713:17, 713:24, 714:1, 714:4, 714:6, 714:23, 714:24, 715:9, 715:11, 715:14, 715:19, 715:21, 716:4, 716:11
**RECROSS** [2] - 609:22, 714:15
**RECROSS-EXAMINATION** [2] - 609:22, 714:15
**REDIRECT** [6] - 609:4, 609:12, 609:20, 614:10, 666:18, 712:8
**reference** [1] - 724:7
**referenced** [1] - 640:25
**references** [2] - 636:20, 640:5
**referred** [2] - 693:25, 694:16
**referring** [1] - 637:7
**refers** [3] - 636:18, 636:21, 636:24
**reflect** [4] - 660:7, 688:14, 688:20, 702:8
**reflected** [4] - 688:11, 688:15, 702:11, 706:22
**reflecting** [2] - 684:4, 685:14
**reflects** [2] - 689:21, 702:10
**refused** [4] - 639:15, 652:14, 652:18, 672:6
**regard** [7] - 654:10, 655:2, 657:8, 660:16, 723:12, 730:3, 730:18
**regarding** [12] - 634:18, 636:12, 636:14, 636:19, 645:6, 652:1, 653:8, 696:23, 712:24, 714:25, 715:15, 734:19
**regards** [2] - 617:9, 617:12
**regular** [2] - 679:12, 713:1
**relate** [2] - 687:15, 687:17
**related** [1] - 714:23
**relating** [4] - 674:14, 687:20, 694:15, 697:2
**relationship** [7] - 625:25, 681:21, 681:25, 692:23, 696:5, 696:13, 713:5
**relatively** [1] - 728:18
**release** [7] - 639:6, 668:13, 675:6, 676:17, 676:24, 677:25, 678:11
**released** [2] - 632:25, 633:5
**relevance** [4] - 684:9, 684:16, 703:8, 710:10
**relevant** [3] - 612:8, 662:23, 663:10
**reliance** [1] - 703:16
**relied** [2] - 710:21, 716:5
**rely** [1] - 716:6
**relying** [5] - 701:4, 701:6, 703:6, 703:12, 703:18
**remained** [2] - 638:19, 644:21
**remaining** [1] - 638:4
**remember** [15] - 619:7, 638:17, 640:25, 642:18, 646:24, 654:2, 676:3, 678:1, 724:1, 724:4, 724:6, 724:19, 724:22, 731:3, 731:9

**removal** [1] - 652:2
**rent** [5] - 672:2, 672:6, 672:7, 672:8, 673:2
**repaired** [1] - 665:25
**repay** [1] - 657:23
**repayment** [2] - 656:2, 658:7
**repeat** [5] - 699:17, 700:2, 703:10, 707:12, 710:15
**repeating** [2] - 618:18, 636:15
**replevin** [2] - 639:9, 641:9
**report** [45] - 682:6, 682:14, 683:22, 685:17, 685:18, 689:11, 690:4, 702:15, 703:3, 703:6, 703:13, 704:24, 705:4, 705:8, 705:11, 705:16, 705:19, 705:22, 706:4, 706:5, 706:8, 706:12, 708:6, 708:18, 708:20, 708:24, 709:5, 709:10, 709:14, 709:16, 709:18, 710:5, 710:9, 710:23, 710:24, 711:16, 713:10, 713:16, 713:17, 713:21, 714:1, 714:3, 716:23
**reported** [11] - 687:13, 687:14, 687:16, 688:6, 690:3, 690:6, 695:7, 696:2, 696:3, 697:6, 701:13
**reporter** [1] - 712:4
**Reporter** [2] - 719:23, 719:24
**reporting** [1] - 690:23
**reports** [6] - 682:15, 686:20, 695:23, 708:21, 710:18, 713:14
**repossess** [1] - 650:20
**represent** [5] - 622:6, 622:13, 624:22, 641:6, 737:3
**representation** [1] - 715:21
**representative** [3] - 634:11, 634:12, 640:8
**represented** [2] - 631:24, 640:8
**request** [4] - 642:1, 646:6, 652:21, 715:19
**requested** [7] - 617:10, 710:6, 712:24, 715:1, 715:16, 715:20, 716:2
**required** [1] - 675:18
**reread** [1] - 729:17
**resolve** [1] - 684:20
**resolved** [1] - 638:13
**respect** [8] - 621:12, 635:24, 638:12, 693:14, 711:18, 725:17, 726:23, 730:16
**respond** [4] - 641:22, 643:6, 652:10, 652:21
**responded** [3] - 643:11, 646:8, 646:9
**Responded** [1] - 643:12
**Respondents** [2] - 608:2, 702:20
**respondents** [1] - 711:25
**response** [2] - 638:22, 643:2
**responsible** [1] - 633:20
**rest** [1] - 727:25
**restate** [1] - 729:17
**result** [4] - 668:3, 722:24, 723:20, 735:6
**resume** [3] - 626:11, 736:13, 736:15
**RETURN** [1] - 704:13
**return** [6] - 659:17, 662:3, 702:22, 702:25, 703:1, 704:13

**returns** [3] - 702:8, 702:11, 704:20
**review** [23] - 640:2, 663:3, 663:12, 663:14, 663:15, 663:18, 663:20, 663:21, 682:12, 682:16, 682:21, 683:1, 683:3, 687:11, 707:25, 708:14, 708:18, 708:20, 709:4, 709:14, 709:22, 713:21, 714:3
**reviewed** [4] - 682:3, 687:22, 689:6, 689:12, 694:16, 699:9, 699:11, 699:19, 708:22, 712:11, 713:24
**reviewing** [4] - 635:1, 635:3, 687:8, 687:10
**revised** [1] - 724:3
**Rick** [2] - 640:10, 640:13
**risk** [1] - 730:6
**roof** [6] - 617:12, 630:1, 630:6, 665:21, 665:23, 665:24
**room** [6] - 612:17, 621:15, 637:25, 650:6, 650:12, 730:1
**rooms** [3] - 649:10, 649:11, 649:13
**RPR** [1] - 719:23
**RTV** [3] - 702:20, 703:3, 704:12
**Rule** [1] - 712:18
**ruled** [1] - 680:23
**run** [1] - 626:22
**Russell** [1] - 681:9
**RYLKO** [1] - 719:15

## S

**sad** [1] - 611:24
**sale** [4] - 637:23, 638:9, 646:13, 665:14
**sales** [15] - 687:13, 687:17, 688:6, 688:10, 688:13, 688:14, 688:15, 688:19, 691:1, 696:23, 697:7, 697:9, 697:10, 697:11, 706:5
**sample** [1] - 716:17
**sampling** [1] - 716:15
**sanctions** [1] - 684:14
**save** [1] - 735:9
**saw** [1] - 660:6
**schedule** [1] - 612:8
**schedules** [4] - 611:16, 696:7, 708:19, 709:17
**second** [13] - 618:8, 619:7, 627:17, 627:24, 636:18, 637:10, 652:3, 677:16, 685:6, 685:21, 692:8, 698:9
**seconds** [10] - 616:12, 623:11, 627:2, 627:11, 627:20, 627:24, 627:25, 628:1, 628:5
**section** [2] - 693:9, 693:10
**sections** [1] - 693:8
**secured** [2] - 632:25, 671:18
**see** [25] - 615:12, 616:2, 618:20, 624:20, 627:20, 628:2, 634:20, 634:24, 635:18, 648:17, 649:6, 649:23, 650:6, 650:13, 652:3, 652:15, 672:4, 690:14, 693:11, 694:24, 696:21, 699:21, 702:21, 702:25, 708:23

**seeing** [5] - 631:10, 697:1, 697:24, 704:15, 710:19
**seek** [1] - 611:13
**seeking** [2] - 622:17, 623:1
**seem** [2] - 680:13, 686:22
**selected** [1] - 693:6
**sell** [8] - 645:24, 646:6, 646:9, 646:11, 646:23, 657:21, 663:7, 667:14
**selling** [1] - 666:21
**send** [2] - 635:20, 726:22
**sending** [1] - 637:13
**sense** [1] - 735:9
**sent** [9] - 646:22, 660:17, 682:6, 682:7, 682:9, 724:3, 725:11, 725:16, 727:7
**sentence** [8] - 636:11, 636:18, 637:10, 660:19, 660:20, 661:5, 661:8, 675:13
**sentences** [2] - 636:2, 636:9
**separate** [4] - 618:3, 642:4, 730:17, 733:16
**September** [3] - 683:25, 689:23, 707:11, 707:14
**series** [1] - 616:1
**Serritella** [10] - 621:16, 625:21, 625:22, 631:23, 634:23, 637:21, 638:22, 638:23, 652:22, 663:21
**serve** [2] - 697:9, 701:7
**server** [139] - 619:14, 622:17, 623:2, 623:5, 623:8, 624:15, 624:25, 625:10, 632:4, 632:13, 635:25, 636:19, 638:3, 638:16, 638:19, 638:25, 639:4, 639:18, 642:14, 643:20, 644:2, 645:20, 645:24, 647:8, 648:17, 649:6, 649:17, 649:20, 649:23, 650:3, 650:5, 650:8, 650:12, 650:17, 650:20, 650:22, 651:2, 651:5, 651:8, 651:12, 651:14, 651:16, 651:20, 652:1, 652:14, 652:18, 652:22, 654:1, 654:4, 654:9, 654:17, 654:18, 654:23, 655:5, 656:1, 657:9, 657:12, 658:21, 658:22, 660:1, 664:1, 664:3, 664:4, 664:5, 664:11, 664:17, 664:24, 665:2, 665:4, 666:9, 666:21, 667:18, 668:3, 668:13, 668:16, 668:24, 669:12, 669:16, 669:24, 674:8, 678:11, 678:17, 678:21, 679:3, 680:2, 680:6, 685:4, 697:3, 697:4, 697:8, 697:22, 697:24, 698:2, 698:20, 699:4, 699:9, 699:10, 699:19, 699:22, 699:25, 700:4, 700:14, 700:16, 700:18, 700:19, 700:25, 705:6, 705:17, 705:22, 706:3, 706:7, 706:11, 706:15, 724:7, 724:11, 725:13, 728:6, 728:8, 728:13, 728:16, 728:19, 729:2, 729:5, 729:7, 729:24, 730:2, 730:5, 730:11, 730:12, 730:16, 730:19, 731:21, 732:2, 733:4, 733:8, 733:15, 733:18, 734:24, 735:14
**servers** [7] - 657:21, 723:8, 723:18, 725:18, 725:24, 726:18, 735:6
**service** [1] - 612:3
**sets** [3] - 691:18, 691:20, 695:3
**seven** [1] - 648:11
**several** [3] - 660:22, 682:21, 683:7

**SH** [9] - 614:5, 615:11, 635:8, 660:5, 677:23, 704:6, 712:15, 727:1, 727:2
**Shah** [85] - 613:11, 613:14, 614:8, 614:12, 622:14, 622:20, 622:23, 623:4, 623:8, 623:18, 624:1, 624:16, 624:24, 625:4, 628:8, 628:13, 628:21, 629:9, 630:12, 630:17, 631:10, 631:12, 632:2, 632:12, 632:24, 637:3, 650:23, 651:15, 651:21, 654:13, 655:6, 655:12, 655:17, 655:18, 655:22, 655:25, 657:19, 657:22, 657:25, 658:6, 658:10, 658:14, 658:23, 658:25, 659:3, 659:24, 662:8, 664:1, 664:2, 664:6, 664:9, 664:10, 664:12, 665:2, 665:9, 665:11, 665:17, 665:21, 666:3, 666:9, 666:21, 667:16, 667:20, 668:2, 668:12, 668:18, 669:15, 669:20, 670:14, 670:22, 678:20, 678:22, 679:2, 679:5, 679:10, 679:12, 679:17, 680:5, 724:24, 725:4, 725:9, 727:7, 727:19, 735:4
**SHAH** [2] - 609:4, 614:10
**Shah's** [8] - 631:1, 631:5, 632:24, 659:17, 664:23, 665:7, 668:5, 668:10
**sheet** [1] - 684:6
**sheets** [1] - 682:13
**shook** [1] - 671:7
**Short** [1] - 677:17
**short** [6] - 625:9, 656:8, 659:20, 671:18, 672:15, 712:6
**short-term** [1] - 672:15
**shorter** [1] - 656:16
**shortly** [5] - 619:12, 624:22, 668:18, 721:15, 725:2
**show** [7] - 647:20, 648:2, 688:22, 690:12, 706:21, 707:10, 707:13
**showed** [8] - 647:22, 648:1, 648:13, 649:19, 690:18, 690:19, 695:20, 709:18
**showing** [3] - 649:22, 650:15, 695:14
**shown** [2] - 640:21, 648:16
**shows** [4] - 629:2, 629:5, 694:13, 694:19
**shut** [9] - 725:24, 726:3, 726:8, 726:9, 726:10, 726:18, 727:22, 728:20, 729:21
**side** [3] - 682:5, 682:11, 682:12
**signed** [4] - 659:4, 659:14, 669:17, 669:21
**significant** [1] - 724:18
**similar** [2] - 685:17
**sister's** [1] - 619:25
**sit** [1] - 637:9
**situation** [2] - 667:9, 668:2
**six** [9] - 622:23, 623:8, 631:13, 664:25, 665:3, 665:13, 671:24, 695:22, 696:1
**six-day** [1] - 671:24
**sliding** [9] - 692:7, 692:9, 692:10, 692:11, 692:12, 692:13, 693:25, 694:20
**slightly** [1] - 693:18
**snow** [1] - 717:23
**software** [2] - 655:13, 655:16
**sold** [19] - 638:4, 638:6, 650:22, 651:12, 651:14, 651:16, 651:20, 664:1,

664:2, 664:3, 664:5, 664:8, 665:2, 665:10, 666:9, 666:25, 673:19, 673:22, 673:24

**soldier** [1] - 737:6

**solely** [1] - 715:23

**solution** [1] - 673:17

**someone** [7] - 650:22, 657:21, 657:23, 664:1, 664:2, 664:5, 730:8

**sometime** [10] - 628:11, 630:19, 630:22, 633:12, 645:3, 647:13, 656:21, 658:4, 658:15, 678:9

**sometimes** [2] - 620:2, 634:16

**soon** [1] - 633:10

**sorry** [19] - 612:1, 615:3, 621:18, 627:3, 629:16, 634:18, 645:17, 658:22, 668:6, 668:9, 671:20, 675:21, 677:16, 678:15, 685:23, 687:25, 701:11, 707:8, 730:14

**sort** [5] - 611:24, 628:16, 678:3, 684:18, 721:18

**Sotcoff** [1] - 625:20

**sound** [3] - 630:24, 633:14, 716:19

**sounds** [1] - 633:15

**speaking** [5] - 615:22, 622:25, 623:4, 624:24, 691:6

**special** [2] - 730:18, 733:11

**specific** [1] - 694:15

**specifically** [9] - 634:10, 636:20, 637:7, 642:14, 642:18, 644:1, 653:14, 689:6, 702:16

**speculating** [2] - 704:14, 704:16

**spent** [1] - 713:25

**split** [1] - 673:25

**spoken** [8] - 615:23, 647:10, 670:5, 670:7, 670:11, 670:13, 670:16, 704:2

**spring** [1] - 721:25

**stamp** [1] - 686:14

**stamped** [5] - 683:14, 683:17, 684:3, 685:14, 686:13

**stand** [7] - 614:3, 621:9, 621:11, 680:14, 698:11, 717:7, 738:3

**standpoint** [2] - 701:18, 706:1

**stands** [1] - 704:12

**star** [1] - 737:14

**start** [8] - 613:14, 626:12, 626:14, 647:25, 676:13, 692:6, 695:1, 738:5

**started** [2] - 611:12, 665:1

**starting** [1] - 611:7

**state** [3] - 681:4, 684:25, 685:1

**statement** [6] - 637:10, 672:1, 675:4, 684:7, 725:3, 737:3

**statements** [1] - 682:13

**States** [1] - 619:23

**STATES** [1] - 719:1

**stayed** [1] - 658:15

**staying** [1] - 619:24

**step** [5] - 647:17, 680:13, 725:22, 731:19, 738:1

**Steve** [1] - 634:22

**still** [9] - 627:7, 651:7, 651:8, 665:7, 696:6, 714:17, 717:18, 722:4, 722:6

**stipulate** [1] - 613:19

**store** [2] - 712:24, 714:25

**stored** [2] - 650:6, 737:17

**storing** [1] - 673:4

**storm** [1] - 611:9

**stormy** [1] - 611:11

**Street** [3] - 608:5, 719:24, 720:5

**street** [1] - 611:8

**stricken** [5] - 698:8, 699:1, 699:14, 714:10, 714:11

**strike** [17] - 619:17, 625:3, 629:19, 639:16, 642:17, 643:21, 678:15, 679:10, 679:21, 686:21, 699:2, 699:12, 709:20, 716:14, 722:24, 725:21, 728:12

**stuff** [1] - 738:6

**subject** [2] - 638:3, 698:2

**submission** [1] - 707:3

**subpoena** [8] - 637:13, 638:24, 639:4, 639:11, 639:12, 678:17, 682:17, 686:14

**subpoenaed** [2] - 612:25, 622:7

**subsequent** [2] - 723:20, 724:3, 724:13

**subsequently** [3] - 656:4, 723:18, 728:4

**substance** [1] - 641:4

**succession** [1] - 618:5

**sue** [1] - 650:19

**suggested** [1] - 667:13

**Suite** [5] - 608:5, 719:16, 719:20, 719:24, 720:5

**summaries** [1] - 690:9

**summarize** [2] - 688:10, 693:1

**summary** [20] - 682:14, 687:21, 688:5, 688:6, 688:16, 689:14, 689:18, 689:21, 689:22, 689:25, 690:8, 705:8, 705:11, 705:16, 706:4, 706:5, 706:8, 706:12, 706:23, 710:24

**summation** [1] - 737:3

**support** [1] - 697:11

**suppose** [1] - 664:16

**supposed** [3] - 656:1, 656:2

**SUSAN** [5] - 609:16, 609:18, 609:20, 609:22, 681:2, 697:17, 712:8, 714:15

**Susan** [2] - 680:15, 681:5

**sustained** [15] - 628:19, 640:16, 642:21, 643:8, 648:19, 649:25, 678:25, 679:8, 699:6, 705:9, 709:2, 710:11, 713:19, 714:9, 727:3

**swear** [1] - 614:2

**sworn** [4] - 614:4, 621:20, 680:18, 721:6

**sympathy** [1] - 612:6

**system** [5] - 634:19, 726:8, 726:10, 733:10, 733:13

**systems** [5] - 722:21, 722:22, 722:23, 723:2, 730:23

# T

**tab** [1] - 685:22

**team** [2] - 665:18, 666:4

**techniques** [2] - 692:4, 692:23

**telephone** [7] - 614:12, 620:3, 630:18, 641:24, 660:6, 660:8, 670:13

**temperature** [1] - 649:13

**temperature-controlled** [1] - 649:13

**tenant** [7] - 658:25, 659:2, 659:22, 669:15, 679:16, 679:18, 679:20

**term** [4] - 656:8, 657:22, 672:15, 703:3

**terms** [3] - 633:7, 687:13, 704:5

**test** [1] - 716:23

**testified** [13] - 622:14, 633:19, 643:23, 653:25, 654:10, 663:12, 663:25, 664:6, 666:20, 670:11, 675:17, 732:14, 735:23

**testifying** [1] - 653:23

**testimony** [9] - 611:18, 613:11, 613:18, 626:9, 629:19, 674:24, 686:22, 722:4, 734:8

**THE** [192] - 611:2, 611:6, 611:11, 611:19, 611:21, 612:1, 612:5, 612:9, 612:12, 612:21, 613:1, 613:4, 613:9, 613:13, 613:15, 613:21, 613:23, 614:2, 614:6, 615:1, 615:2, 615:5, 615:6, 617:5, 617:7, 617:8, 620:21, 620:24, 621:1, 621:2, 621:3, 621:4, 621:5, 621:6, 621:7, 621:10, 621:14, 621:19, 622:4, 626:6, 626:8, 626:11, 626:13, 627:18, 628:19, 634:8, 635:9, 635:11, 635:13, 636:4, 636:13, 639:21, 639:22, 640:16, 641:15, 642:6, 642:9, 642:21, 643:4, 643:8, 643:11, 643:13, 644:4, 644:5, 646:11, 646:12, 646:20, 646:22, 648:12, 648:14, 648:19, 649:25, 653:1, 653:3, 653:4, 653:6, 653:12, 653:13, 653:16, 653:17, 656:14, 656:15, 659:8, 659:11, 660:10, 660:12, 660:22, 661:1, 666:16, 668:8, 668:9, 670:20, 670:21, 673:20, 673:21, 675:22, 675:23, 676:1, 676:3, 676:10, 677:13, 677:15, 678:25, 679:8, 679:22, 679:24, 680:11, 680:13, 680:17, 680:19, 680:21, 680:22, 680:25, 683:16, 684:21, 684:24, 685:8, 685:11, 685:21, 685:25, 686:4, 686:6, 686:24, 687:6, 688:1, 697:14, 698:9, 698:11, 699:2, 699:6, 699:12, 699:14, 699:16, 699:17, 702:5, 703:9, 703:10, 704:10, 705:9, 705:12, 707:5, 707:8, 707:16, 707:18, 707:21, 708:1, 709:2, 710:11, 711:19, 711:22, 711:24, 712:2, 712:4, 712:19, 713:19, 714:9, 714:11, 714:19, 715:4, 716:8, 716:19, 717:1, 717:3, 717:5, 717:6, 717:8, 717:12, 717:15, 717:18, 717:22, 718:4, 719:1, 719:10, 721:2, 727:3, 729:13, 730:21, 730:22, 732:10, 734:5, 734:13, 735:1, 735:3, 735:18, 736:9, 736:20, 736:23, 736:25, 737:24, 738:1, 738:2, 738:4

**themselves** [1] - 684:19

**thereabouts** [1] - 734:4

**thereafter** [2] - 668:18, 725:2

**thermostats** [1] - 649:14

**they..** [1] - 660:14

**thinking** [2] - 611:23, 663:1
**thinks** [2] - 611:17, 698:20
**third** [2] - 694:19, 705:20
**thirty** [1] - 638:2
**THOMAS** [2] - 608:4, 720:4
**THOMPSON** [1] - 719:19
**three** [27] - 616:2, 616:7, 616:12, 617:20, 618:4, 618:8, 618:18, 619:7, 624:3, 627:16, 627:23, 628:4, 628:8, 628:13, 628:14, 628:21, 628:22, 628:24, 629:9, 670:6, 693:15, 693:22, 693:24, 694:23, 708:19, 723:20
**three-second** [1] - 619:7
**Thursday** [1] - 612:3
**timing** [1] - 691:10
**Tina** [1] - 639:22
**today** [10] - 611:15, 637:9, 654:6, 654:10, 661:13, 663:12, 668:9, 698:3, 717:24, 738:4
**together** [1] - 706:19
**Tom** [3] - 611:5, 656:10, 656:11
**tomorrow** [7] - 611:21, 612:14, 717:11, 717:21, 718:1, 738:5
**took** [7] - 633:17, 633:21, 634:6, 645:3, 647:18, 662:8, 727:19
**top** [2] - 622:3, 634:21
**total** [7] - 688:22, 689:1, 689:25, 690:17, 690:19, 694:11, 703:17
**totalled** [1] - 690:6
**touch** [1] - 727:23
**town** [2] - 615:24, 617:10
**track** [1] - 696:19
**training** [1] - 721:25
**transaction** [1] - 632:2
**transactions** [1] - 657:9
**TRANSCRIPT** [1] - 719:9
**transfer** [5] - 619:12, 619:14, 624:23, 624:24, 670:17
**transferred** [1] - 671:2
**transfers** [1] - 670:14
**trial** [2] - 611:7, 719:9
**tried** [1] - 737:19
**trouble** [1] - 728:6
**true** [8] - 638:9, 653:25, 654:4, 654:16, 654:17, 670:12, 712:23, 714:24
**try** [5] - 611:17, 634:16, 679:18, 691:11, 722:15
**trying** [10] - 618:16, 623:4, 645:19, 646:7, 661:11, 677:8, 680:5, 722:22, 728:8, 729:3
**turn** [9] - 635:7, 639:24, 652:18, 667:21, 677:9, 678:4, 727:2, 730:4, 734:14
**turned** [1] - 728:20
**turning** [1] - 652:21
**twice** [2] - 648:1, 649:2
**two** [45] - 611:8, 613:7, 615:20, 616:11, 616:18, 616:22, 623:13, 625:17, 627:16, 627:25, 636:2, 636:9, 637:1, 639:10, 641:2, 648:12, 648:21, 650:15, 670:6, 670:9, 670:23, 671:1,

685:3, 688:25, 690:12, 690:20, 690:22, 691:18, 691:20, 692:4, 692:12, 692:14, 692:22, 693:8, 694:9, 695:2, 696:1, 700:12, 710:2, 721:20, 723:22, 724:1, 724:5, 727:18, 735:22
**two-minute** [1] - 615:20
**type** [1] - 617:11
**types** [2] - 692:3, 692:22
**typically** [1] - 714:5

## U

**U.S** [7] - 633:19, 633:23, 634:7, 634:11, 634:13, 634:15, 648:6
**UCB** [1] - 672:19
**UCB's** [1] - 725:14
**ultimate** [1] - 684:12
**ultimately** [2] - 680:2, 725:11
**um-hmm** [1] - 613:9
**unavailable** [1] - 612:4
**under** [1] - 712:18
**underlying** [1] - 655:10
**understood** [4] - 646:7, 646:17, 654:13, 707:7
**unfortunately** [1] - 621:15
**unique** [1] - 733:11
**UNITED** [2] - 719:1, 719:4
**United** [31] - 611:2, 619:23, 636:20, 636:21, 637:2, 637:6, 644:15, 644:19, 644:24, 645:7, 645:13, 671:10, 671:17, 671:22, 672:15, 673:10, 673:25, 674:4, 674:8, 675:6, 675:18, 676:16, 677:22, 677:25, 682:24, 712:25, 715:1, 715:16, 715:18, 715:25, 732:1
**united** [1] - 636:21
**unless** [1] - 666:5
**unlike** [1] - 731:13
**unlocks** [1] - 634:13
**unusual** [3] - 633:3, 642:12, 690:22
**up** [23] - 613:16, 626:9, 626:15, 626:25, 627:7, 627:12, 628:16, 629:17, 638:3, 641:7, 649:10, 655:23, 658:1, 659:22, 664:18, 668:7, 670:20, 671:2, 677:21, 680:17, 680:19, 710:19, 716:4
**useful** [1] - 698:24
**utilized** [1] - 696:18

## V

**v-o-u-c-h-e-r** [1] - 704:13
**vacation** [1] - 721:21
**valor** [1] - 737:11
**variety** [1] - 737:15
**verbatim** [1] - 636:15
**verify** [2] - 664:15, 716:10
**versions** [1] - 724:1
**versus** [3] - 687:14, 695:13, 696:2
**Vietnam** [1] - 737:6
**Vilia** [3] - 612:22, 728:5, 737:19
**VILIA** [1] - 719:14

**Vilia's** [3] - 721:14, 726:5, 729:1
**visit** [2] - 620:1, 670:22
**voice** [10] - 626:20, 626:22, 626:24, 626:25, 627:12, 628:15, 628:24, 629:6, 629:10, 668:7
**VOLUME** [1] - 719:10
**voucher** [1] - 704:13
**vs** [1] - 719:6

## W

**wait** [2] - 680:23, 703:6
**waiting** [1] - 717:18
**walk** [2] - 649:4, 650:2
**walked** [2] - 650:5, 650:12
**warehouse** [86] - 623:15, 626:2, 629:21, 630:2, 630:4, 630:7, 631:15, 631:18, 632:4, 632:25, 633:20, 634:3, 634:5, 634:12, 634:19, 635:25, 638:4, 638:13, 638:19, 640:22, 644:12, 644:16, 644:20, 644:21, 644:24, 645:7, 645:14, 647:19, 647:20, 647:23, 648:1, 648:2, 648:16, 648:21, 648:24, 649:2, 649:4, 649:11, 649:19, 649:22, 650:16, 653:9, 658:25, 659:2, 662:9, 662:17, 665:14, 665:15, 665:17, 665:22, 666:1, 666:7, 666:25, 668:4, 671:11, 671:14, 672:16, 672:20, 673:2, 673:5, 673:11, 674:5, 674:9, 674:15, 674:17, 674:20, 678:23, 680:7, 724:8, 724:11, 725:13, 730:12, 730:16, 730:19, 731:2, 731:17, 731:21, 732:3, 733:4, 733:7, 733:15, 733:18, 734:1, 734:22, 734:23, 735:15
**warning** [1] - 663:9
**Wednesday** [1] - 612:3
**week** [8] - 611:7, 611:14, 611:18, 617:10, 619:21, 626:10, 629:18
**weekend** [2] - 612:2, 612:23
**weight** [1] - 735:2
**WEST** [2] - 686:7, 719:15
**whatsoever** [1] - 731:18
**whereas** [1] - 690:18
**wherein** [4] - 628:8, 651:16, 677:24, 700:13
**whole** [2] - 669:7, 728:9
**wife** [3] - 631:5, 631:7, 721:21
**William** [1] - 634:23
**willing** [2] - 624:15, 662:2
**willingness** [1] - 632:7
**wire** [3] - 619:12, 619:14, 624:23
**wiring** [1] - 669:8
**withdraw** [2] - 716:7, 729:18
**witness** [10] - 611:4, 612:16, 614:3, 621:8, 622:3, 668:6, 680:15, 683:6, 686:22, 721:2, 729:11, 729:13, 732:8, 735:24, 735:25
**Witness** [8] - 614:4, 621:11, 621:20, 680:14, 680:18, 717:7, 721:6, 738:3
**WITNESS** [37] - 615:2, 615:6, 617:8, 621:1, 621:3, 621:5, 621:7, 635:13, 639:22, 642:9, 644:5, 646:12, 646:22,

648:14, 653:3, 653:12, 653:16, 656:15, 660:12, 668:9, 670:21, 673:21, 675:23, 676:3, 680:21, 680:25, 688:1, 699:16, 703:10, 707:8, 707:18, 711:22, 717:6, 730:22, 735:3, 736:23, 738:2

**Wolf** [24] - 682:17, 682:19, 686:13, 686:15, 686:17, 687:3, 687:5, 707:25, 708:1, 708:4, 708:7, 709:25, 710:9, 710:13, 710:16, 710:18, 713:7, 713:9, 713:12, 713:16, 713:21, 716:14, 716:21

**Wolf's** [1] - 688:11

**word** [4] - 660:18, 701:23, 701:24, 735:24

**works** [1] - 640:13

**worried** [1] - 717:23

**worth** [1] - 671:23

**write** [3] - 636:2, 656:8, 656:11

**written** [3] - 658:4, 669:11, 674:7

**wrote** [2] - 655:23, 728:19


## Y


**year** [4] - 688:14, 688:15, 688:20, 706:24

**years** [2] - 682:21, 688:25

**yellow** [2] - 615:13, 622:13

**yes-or-no** [2] - 679:23, 707:17

**yesterday** [1] - 732:14

**yourself** [1] - 737:16

739

1     IN THE UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
2        EASTERN DIVISION

3

4 UNITED CENTRAL BANK,      ) Docket No. 10 C 331
               )
5        Plaintiff,  )
               )
6      vs.      )
               )
7 KANAN FASHIONS, INC., et al.,  ) Chicago, Illinois
               ) February 1, 2011
8       Defendants. ) 10:00 o'clock a.m.

9
      TRIAL TRANSCRIPT OF PROCEEDINGS
10   BEFORE THE HONORABLE MICHAEL T. MASON
         VOLUME 4
11

12 APPEARANCES:

13

14 For the Plaintiff:  BOODELL & DOMANSKIS LLC
         BY: MS. VILIA M. DEDINAS
15         MS. NADA DJORDJEVIC
         MR. DAVID WEST
16         MS. AMY RYLKO
        205 North Michigan Avenue, Suite 4307
17        Chicago, IL  60601
        (312) 938-4070

18

19 For the Defendants: McJESSY, CHING & THOMPSON
         BY: MR. KEVIN McJESSY
20        3759 North Ravenswood, Suite 231
        Chicago, IL  60613
21        (773) 880-1260

22

23
 Court Reporter:    MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24        Official Court Reporter
        219 S. Dearborn Street, Suite 1854-B
25        Chicago, Illinois  60604
        (312) 435-5639

740

APPEARANCES CONTINUED:

For Respondents
Alan Borlack and
Eric Grossman:               HINSHAW & CULBERTSON LLP
                             BY:  MR. THOMAS P. McGARRY
                                  MR. ALAN R. LIPTON
                             222 North LaSalle Street, Suite 300
                             Chicago, IL  60601
                             (312) 704-3000

| | | |
|---|---|---|
| 09:46:41 | 1 | (The following proceedings were had in open court:) |
| 10:06:45 | 2 | THE CLERK:  10 C 331, United Central Bank v. Kanan |
| 10:06:49 | 3 | Fashions, et al. |
| 10:06:50 | 4 | THE COURT:  Good morning, everybody, and thank you |
| 10:06:52 | 5 | for being on time. |
| 10:06:55 | 6 | Call your first witness, please. |
| 10:06:56 | 7 | MS. DEDINAS:  We have rested. |
| 10:06:59 | 8 | THE COURT:  You have rested. |
| 10:07:00 | 9 | MS. DEDINAS:  We are not calling. |
| 10:07:00 | 10 | THE COURT:  So Mr. McJessy? |
| 10:07:02 | 11 | MR. McJESSY:  Sure. |
| 10:07:25 | 12 | (Witness sworn.) |
| 10:07:25 | 13 | - - - |
| 10:07:25 | 14 | STEVEN HOWARD BLUMENTHAL, DIRECT EXAMINATION |
| 10:07:25 | 15 | BY MR. McJESSY: |
| 10:07:28 | 16 | Q.  Sir, can you state your name for the record. |
| 10:07:30 | 17 | A.  Yes.  Steven Howard Blumenthal. |
| 10:07:33 | 18 | Q.  All right.  And you are Mr. Shah's corporate attorney; is |
| 10:07:33 | 19 | that right? |
| 10:07:39 | 20 | A.  Yes. |
| 10:07:39 | 21 | Q.  How long have you been Mr. Shah's corporate attorney? |
| 10:07:42 | 22 | A.  I would say approximately 15 or 16 years. |
| 10:07:47 | 23 | Q.  Okay.  And you represent Mr. Shah individually as well as |
| 10:07:52 | 24 | his corporations? |
| 10:07:54 | 25 | A.  I have, yes. |

10:07:55  1  Q.  And can you describe generally for me what your practice

10:08:00  2  -- you're an attorney; is that right?

10:08:02  3  A.  Yes, I am.

10:08:02  4  Q.  Can you describe for the court what your practice consists

10:08:05  5  of?

10:08:06  6  A.  Primarily, it's -- my practice is real estate and

10:08:11  7  corporate law, representing principally owners, closely-held

10:08:18  8  businesses, or developers of real estate.

10:08:22  9  Q.  All right.

10:08:23  10       THE COURT:  Can you hear, or are you having a hard

10:08:26  11  time?

10:08:26  12       MR. McGARRY:  We are having a hard time.

10:08:27  13       THE COURT:  Speak up, if you would, please.

10:08:27  14  BY MR. McJESSY:

10:08:31  15  Q.  And are you a litigator?

10:08:33  16  A.  No, I am not.

10:08:34  17  Q.  How long have you been practicing?

10:08:35  18  A.  Since 1978.

10:08:37  19  Q.  Okay.  And how many litigation matters have you handled

10:08:42  20  since 1978?

10:08:43  21  A.  I have never handled any litigation matters.

10:08:48  22  Q.  All right.  Strictly --

10:08:49  23  A.  With one exception.

10:08:51  24  Q.  Go ahead.

10:08:51  25  A.  When my wife got a ticket for -- that was the only time I

| | | |
|---|---|---|
| 10:08:56 | 1 | went to court. |
| 10:08:57 | 2 | Q. All right. And what kind of matters have you handled for |
| 10:09:02 | 3 | Mr. Shah? |
| 10:09:02 | 4 | A. General contract matters and financing. Each time the |
| 10:09:15 | 5 | companies -- one of the companies obtained financing, I would |
| 10:09:19 | 6 | handle that. |
| 10:09:19 | 7 | Q. All right. And what companies of Mr. Shah have you |
| 10:09:22 | 8 | represented within the last three years? |
| 10:09:23 | 9 | A. Kanan Fashions, Creative Warehousing. I can't remember |
| 10:09:39 | 10 | all the names. I'm sorry. |
| 10:09:41 | 11 | Q. But those are the ones that you can recall? |
| 10:09:44 | 12 | A. Yes, correct. |
| 10:09:44 | 13 | Q. And now, you said that you do financing work; is that |
| 10:09:44 | 14 | right? |
| 10:09:49 | 15 | A. Yes. |
| 10:09:49 | 16 | Q. What does that work entail? |
| 10:09:50 | 17 | A. Representing -- in this case, it would be representing a |
| 10:09:55 | 18 | borrower, obtaining working capital, lines of credit, that |
| 10:10:01 | 19 | type of thing. For real estate, it's a little bit different. |
| 10:10:05 | 20 | Q. All right. When you say "in this case," do you mean that |
| 10:10:07 | 21 | you've done that sort of work on behalf of Mr. Shah's |
| 10:10:10 | 22 | companies? |
| 10:10:11 | 23 | A. Yes. |
| 10:10:11 | 24 | Q. Okay. And did you do that work on behalf of Kanan |
| 10:10:15 | 25 | Fashions and Creative Warehousing? |

| | | |
|---|---|---|
| 10:10:16 | 1 | A. Yes. |
| 10:10:17 | 2 | Q. Okay. Now, first, did you handle the -- did you handle |
| 10:10:29 | 3 | negotiations for the line of credit between Kanan Fashions and |
| 10:10:34 | 4 | Mutual Bank? |
| 10:10:34 | 5 | A. Yes. |
| 10:10:38 | 6 | Q. Just if you can describe briefly, what was the |
| 10:10:40 | 7 | arrangement, the financing arrangement, between Kanan Fashions |
| 10:10:43 | 8 | and Mutual Bank? |
| 10:10:45 | 9 | MS. DEDINAS: Objection. Relevance. |
| 10:10:46 | 10 | THE COURT: Sustained. |
| 10:10:47 | 11 | BY MR. McJESSY: |
| 10:10:48 | 12 | Q. All right. You handled the financing arrangements between |
| 10:10:53 | 13 | -- strike that. |
| 10:10:53 | 14 | Did you handle the financing arrangements between |
| 10:10:56 | 15 | Creative Warehousing and First Midwest Bank? |
| 10:11:07 | 16 | A. Well, the financing was originally between Creative |
| 10:11:12 | 17 | Warehousing and Mutual Bank. |
| 10:11:14 | 18 | Q. Okay. And that was for the warehouse that was built? |
| 10:11:16 | 19 | A. Yes. |
| 10:11:16 | 20 | Q. And did you handle that financing? |
| 10:11:19 | 21 | A. Yes. |
| 10:11:20 | 22 | Q. And Mutual Bank financed the construction of the |
| 10:11:26 | 23 | warehouse? |
| 10:11:28 | 24 | A. They financed -- well, indirectly, yes. By that, the |
| 10:11:42 | 25 | developer of the warehouse constructed it using the |

| | | |
|---|---|---|
| 10:11:46 | 1 | developer's financing, and then the property was acquired, and |
| 10:11:52 | 2 | Mutual Bank provided the financing to acquire the property |
| 10:11:57 | 3 | once it was built. |
| 10:11:57 | 4 | Q. All right. Now, in August of 2009, did you become |
| 10:12:07 | 5 | involved in negotiating on behalf of Mr. Shah with United |
| 10:12:16 | 6 | Central Bank concerning a dispute over financing? |
| 10:12:19 | 7 | A. Yes. |
| 10:12:19 | 8 | MS. DEDINAS: Objection. Relevance. |
| 10:12:21 | 9 | THE COURT: Sustained. |
| 10:12:27 | 10 | MS. DEDINAS: We move to strike. |
| 10:12:28 | 11 | THE COURT: Yes, that will be stricken. |
| 10:12:30 | 12 | BY MR. McJESSY: |
| 10:12:33 | 13 | Q. You were representing Kanan Fashions and Creative |
| 10:12:37 | 14 | Warehousing in January of 2010? |
| 10:12:40 | 15 | A. Yes. |
| 10:12:41 | 16 | Q. All right. And at that time, were you aware that a |
| 10:12:46 | 17 | lawsuit had been filed for -- filed by United Central Bank |
| 10:12:50 | 18 | against those entities as well as Mr. Shah individually? |
| 10:12:53 | 19 | A. Yes. |
| 10:12:53 | 20 | Q. All right. And did Mr. Shah consult with you about that |
| 10:13:01 | 21 | lawsuit? |
| 10:13:01 | 22 | A. Yes. |
| 10:13:01 | 23 | Q. Did he approach you about handling that lawsuit? |
| 10:13:03 | 24 | A. No. |
| 10:13:04 | 25 | Q. Okay. How is it that -- strike that. |

| | | |
|---|---|---|
| 10:13:13 | 1 | Your firm -- strike that. |
| 10:13:17 | 2 | Neither you nor your firm represented Kanan |
| 10:13:23 | 3 | Fashions -- |
| 10:13:23 | 4 | MR. LIPTON: Objection. Leading. |
| 10:13:24 | 5 | THE COURT: Sustained. |
| 10:13:25 | 6 | MR. McJESSY: Withdraw the question. |
| 10:13:26 | 7 | BY MR. McJESSY: |
| 10:13:26 | 8 | Q. Were you involved at all in representing Kanan Fashions or |
| 10:13:31 | 9 | Creative Warehousing in the lawsuit that was filed by United |
| 10:13:34 | 10 | Central Bank? |
| 10:13:34 | 11 | A. I was not representing Mr. Shah or any of the entities in |
| 10:13:41 | 12 | the lawsuit. |
| 10:13:41 | 13 | Q. All right. Did you become aware of the lawsuit? |
| 10:13:43 | 14 | A. Yes. |
| 10:13:44 | 15 | Q. How did you become aware of it? |
| 10:13:46 | 16 | A. I received a copy of the lawsuit because my firm is |
| 10:13:53 | 17 | registered agent for some of Mr. Shah's entities that are |
| 10:13:57 | 18 | named in the lawsuit, and I was also provided a copy by |
| 10:14:02 | 19 | Mr. Shah. |
| 10:14:02 | 20 | Q. Okay. So was your law firm served with a copy of the |
| 10:14:06 | 21 | complaint? |
| 10:14:07 | 22 | A. Yes. |
| 10:14:07 | 23 | Q. Okay. And did you eventually assist Mr. Shah in finding |
| 10:14:14 | 24 | counsel to represent him and his companies in that lawsuit? |
| 10:14:18 | 25 | A. Well, at the time that Mr. Shah was required to obtain |

| | | |
|---|---|---|
| 10:14:25 | 1 | counsel, I was actually out of town, and so the recommendation |
| 10:14:29 | 2 | for counsel came from another attorney, actually. |
| 10:14:32 | 3 | Q.  Okay. |
| 10:14:33 | 4 | A.  Not in my office. |
| 10:14:34 | 5 | Q.  Okay.  Were you involved at all in counseling with the |
| 10:14:40 | 6 | defendants about who to hire as counsel in the lawsuit? |
| 10:14:43 | 7 | A.  I consulted with Mr. Shah about who to hire, yes. |
| 10:14:51 | 8 | Q.  And what were those consultations? |
| 10:14:53 | 9 | A.  Basically, the recommendation from Scott Schreiber at the |
| 10:15:00 | 10 | time was to use Alan Borlack and his firm, and I discussed |
| 10:15:07 | 11 | that with Mr. Shah in terms of, you know, his -- the |
| 10:15:11 | 12 | experience that I understood from Mr. Schreiber. |
| 10:15:15 | 13 | Q.  All right.  Now, in January of 2010, were you involved in |
| 10:15:21 | 14 | negotiations with First Midwest Bank for a friendly |
| 10:15:25 | 15 | foreclosure on the warehouse? |
| 10:15:27 | 16 | A.  In January of 2010? |
| 10:15:30 | 17 | Q.  Correct. |
| 10:15:31 | 18 |         MS. DEDINAS:  Objection.  Foundation. |
| 10:15:33 | 19 |         THE COURT:  Sustained. |
| 10:15:35 | 20 | BY MR. McJESSY: |
| 10:15:36 | 21 | Q.  Did you have any negotiations with First Midwest Bank |
| 10:15:41 | 22 | regarding the warehouse in January of 2010? |
| 10:15:46 | 23 |         MS. DEDINAS:  Same objection. |
| 10:15:47 | 24 |         THE COURT:  Sustained. |
| 10:15:51 | 25 |         MR. McJESSY:  Judge, I'm trying to lay a foundation. |

| | | |
|---|---|---|
| 10:15:55 | 1 | THE COURT:  Keep trying. |
| 10:15:57 | 2 | MR. McJESSY:  All right. |
| 10:15:57 | 3 | BY MR. McJESSY: |
| 10:16:00 | 4 | Q.  Mr. Blumenthal, were you involved at all in negotiation -- |
| 10:16:03 | 5 | strike that. |
| 10:16:03 | 6 | At any time, did anyone from First Midwest Bank |
| 10:16:09 | 7 | approach you or your law firm about foreclosing on the |
| 10:16:13 | 8 | warehouse that was owned by Creative Warehousing? |
| 10:16:15 | 9 | A.  Yes. |
| 10:16:16 | 10 | Q.  All right.  When did that occur? |
| 10:16:18 | 11 | A.  It was sometime in February 2010. |
| 10:16:24 | 12 | Q.  All right.  And what was the -- what was the nature of the |
| 10:16:29 | 13 | discussions at that time? |
| 10:16:32 | 14 | MS. DEDINAS:  Objection.  Foundation. |
| 10:16:34 | 15 | THE COURT:  No.  He can answer that. |
| 10:16:37 | 16 | THE WITNESS:  Could you repeat the question? |
| 10:16:38 | 17 | BY MR. McJESSY: |
| 10:16:39 | 18 | Q.  Yes.  What was the nature of the discussions regarding the |
| 10:16:42 | 19 | warehouse at that time? |
| 10:16:42 | 20 | A.  Mr. Shah had contacted me after he was called by Dave |
| 10:16:51 | 21 | Clark from First Midwest Bank, and Mr. Clark had told Mr. Shah |
| 10:16:57 | 22 | that the First Midwest Bank now controlled that loan and they |
| 10:17:03 | 23 | were interested in doing a workout of some sort and -- |
| 10:17:09 | 24 | THE COURT:  When was that? |
| 10:17:10 | 25 | THE WITNESS:  In February of 2010. |

| | | |
|---|---|---|
| 10:17:12 | 1 | THE COURT: Don't give narrative answers, please. |
| 10:17:14 | 2 | THE WITNESS: Sorry. |
| 10:17:15 | 3 | BY MR. McJESSY: |
| 10:17:16 | 4 | Q. All right. And did you respond to Mr. Clark directly? |
| 10:17:26 | 5 | A. No, although I did attend -- |
| 10:17:31 | 6 | Q. You became involved in the negotiations, though; is that |
| 10:17:34 | 7 | right? |
| 10:17:34 | 8 | A. Yes. |
| 10:17:34 | 9 | Q. Who was -- did you have a contact that you dealt with at |
| 10:17:38 | 10 | First Midwest Bank? |
| 10:17:39 | 11 | A. First Midwest Bank was represented by William Serritella. |
| 10:17:44 | 12 | Q. Did you have negotiations with him regarding the |
| 10:17:47 | 13 | foreclosure on the warehouse? |
| 10:17:49 | 14 | A. Yes, with one exception. There was one meeting at First |
| 10:17:55 | 15 | Midwest Bank. |
| 10:17:55 | 16 | Q. And who was present at that meeting? |
| 10:17:57 | 17 | A. Mr. Shah, Dave Clark, William Serritella, and somebody |
| 10:18:08 | 18 | else from First Midwest Bank who I don't remember. |
| 10:18:11 | 19 | THE COURT: Again, could you get a time frame for |
| 10:18:15 | 20 | this? |
| 10:18:15 | 21 | BY MR. McJESSY: |
| 10:18:16 | 22 | Q. When did that meeting occur? |
| 10:18:17 | 23 | A. This would have been late February 2010. |
| 10:18:19 | 24 | Q. All right. Now, at this time, were you communicating with |
| 10:18:23 | 25 | anybody at -- strike that. |

10:18:25  1    At this time were you communicating at all with Alan

10:18:29  2  Borlack concerning the foreclosure?

10:18:30  3  A.  Yes.

10:18:32  4  Q.  All right.  And what was the nature of your communications

10:18:36  5  with Mr. Borlack?

10:18:37  6  A.  I advised Mr. Borlack that there was a discussion,

10:18:45  7  negotiation, about a foreclosure -- a deed in lieu of

10:18:50  8  foreclosure for the warehouse and surrendering all rights to

10:18:58  9  the warehouse.

10:18:58  10  Q.  And as part of those negotiations, was it contemplated

10:19:03  11  that the personal guaranties of Mr. Shah and his wife would be

10:19:06  12  released as part of that transaction?

10:19:10  13  A.  Yes.

10:19:10  14  Q.  Okay.  Is that a common sort of agreement in a deed in

10:19:17  15  lieu of foreclosure transaction?

10:19:18  16  A.  Yes, it is.

10:19:19  17  Q.  All right.  And when were your discussions with

10:19:23  18  Mr. Borlack concerning the foreclosure, as you described them?

10:19:29  19      MR. LIPTON:  I'm sorry.  Can I have that question

10:19:31  20  read back, please?

10:19:32  21    (Record read.)

10:19:48  22      THE WITNESS:  It would have been around the same time

10:19:50  23  that the negotiations were taking place.  And I did talk to

10:19:53  24  Mr. Borlack from the conference that we had at First Midwest

10:19:56  25  Bank.

10:19:57  1   BY MR. McJESSY:

10:19:57  2   Q.  Okay.  And this is the conference with Mr. Shah,

10:20:01  3   Mr. Clark, Mr. Serritella, and the other individual from First

10:20:05  4   Midwest Bank whose name you can't recall?

10:20:07  5   A.  Yes.

10:20:07  6   Q.  He was on the phone at that time on a conference call?

10:20:09  7   A.  After the meeting concluded, Mr. Shah and I called Alan

10:20:17  8   Borlack to tell him what took place and what the terms of the

10:20:21  9   agreement were.

10:20:22  10  Q.  Okay.  And what was the purpose -- why were -- strike

10:20:26  11  that.

10:20:27  12       Why were you communicating with Mr. Borlack at this

10:20:30  13  time regarding this matter?

10:20:31  14  A.  Two principal reasons.  Number one, it would impact on the

10:20:41  15  lawsuit that was filed by UCB against Mr. Shah and his

10:20:46  16  entities directly, because some of the indebtedness would no

10:20:51  17  longer be applicable.

10:20:52  18       And the other reason is because of the release of the

10:20:58  19  guaranties and how that may impact the lawsuit as well.

10:21:01  20  Q.  All right.  Now, I'd like you to take a look at -- well,

10:21:13  21  first, I would like to take a step back.

10:21:16  22       Were you aware that there had been an order entered

10:21:20  23  by this court concerning ESI discovery -- strike that.

10:21:26  24       Were you aware in February of 2010, the time period

10:21:31  25  that we're discussing, that there had been an order entered by

10:21:34  1  this court concerning electronically-stored information that

10:21:40  2  may be relevant in this lawsuit?

10:21:41  3  A.  I know that I received a copy of the order.  Did I fully

10:21:52  4  read it and understand it?  Probably not.

10:21:57  5  Q.  Now, you said you know that you received a copy of the

10:22:01  6  order.  When do you recall -- strike that.

10:22:09  7  Do you recall having received a copy of that order in

10:22:12  8  February of 2010?

10:22:14  9  A.  I don't recall when I received it, but I know that

10:22:23  10  Mr. Borlack's practice was to provide copies.

10:22:26  11  Q.  All right.

10:22:27  12  THE COURT:  Copies of what?

10:22:28  13  THE WITNESS:  Of orders in the case.  Sorry.

10:22:34  14  BY MR. McJESSY:

10:22:35  15  Q.  If you could take a look at Exhibit 20 in the binder that

10:22:38  16  you have in front of you.

10:22:40  17  THE COURT:  There's two binders, so you will have to

10:22:46  18  search for it.

10:22:47  19  THE WITNESS:  Okay.

10:22:47  20  BY MR. McJESSY:

10:22:50  21  Q.  And I'd just like to ask you if that is the e-mail and

10:22:54  22  agreement that you were referring to?  And that's an e-mail

10:23:02  23  I'm referring to which is on page 1 dated February 19th, 2010,

10:23:08  24  at 3:00 o'clock p.m.

10:23:14  25  A.  Yes.  Yes.

10:23:17　1　Q.  And the date of that e-mail is February 19th.  Does that

10:23:20　2　sound about -- do you recall having received it on or about

10:23:24　3　that date?

10:23:24　4　A.  I don't recall receiving it specifically, but I assume

10:23:34　5　yes.

10:23:34　6　Q.  Okay.  And I want to be careful here.  You say you assume

10:23:43　7　because you are seeing it there in front of you or you have

10:23:47　8　some independent recollection of seeing it?

10:23:48　9　A.  No, I'm saying I assume because I would routinely receive

10:23:53　10　copies of orders from the case from Mr. Borlack, and there

10:23:58　11　were many orders and e-mails.  So whether I focused on this

10:24:03　12　particular one on that date or around that time, I am not

10:24:07　13　sure.

10:24:07　14　Q.  You don't know.  All right.

10:24:08　15　        And did you -- do you have any recollection of having

10:24:13　16　called or spoken with Mr. Borlack regarding what that order

10:24:17　17　meant?

10:24:18　18　A.  I recall having conversation with Mr. Borlack much later

10:24:26　19　than this about that order and what it meant.

10:24:30　20　Q.  Okay.  Approximately when would that have been?

10:24:32　21　A.  Around the time that the inventory agreement was done,

10:24:48　22　which would have been sometime, I believe, in April, mid or

10:24:56　23　late April.

10:24:57　24　Q.  All right.  Why did you have that conversation -- what

10:25:00　25　prompted that conversation?

10:25:01  1  A.  That had to do with -- there was an agreement reached

10:25:08  2  between the parties in terms of what to do with some remaining

10:25:14  3  inventory at the warehouse, and the issue of the fact that

10:25:20  4  Kanan no longer controlled the warehouse and what to do with

10:25:23  5  things within the warehouse became part of the, you know,

10:25:29  6  attention of everyone.  And in that context, that's when I

10:25:35  7  remember specifically having conversations with Alan about it.

10:25:39  8  Q.  I'm not sure why -- there is an ESI order, an order

10:25:44  9  dealing with electronically-stored information.  Why is it

10:25:50  10  that that order came up in the context of a conversation

10:25:54  11  dealing with inventory?

10:25:55  12  A.  Because part of the inventory data was apparently stored

10:26:09  13  on the server in the warehouse and there was issues, I

10:26:17  14  believe, over some computer or something in the company's

10:26:22  15  offices.

10:26:22  16  Q.  Okay.  And as best you can recall, what was the nature of

10:26:26  17  your discussion with Mr. Borlack at that time regarding the

10:26:29  18  order and the warehouse?

10:26:32  19  A.  That the parties were subject to an order that required

10:26:40  20  preserving electronically-stored data, and that would impact

10:26:48  21  both this computer that was not operational in the company's

10:26:53  22  offices as well as the server that apparently was operational

10:27:00  23  in the warehouse.

10:27:01  24  Q.  What did you tell Mr. Borlack at that time, if anything?

10:27:04  25  A.  I don't recall telling him anything.

10:27:06   1   Q.  All right.  But you recall -- other than that this order
10:27:11   2   was discussed in that context at that time, do you recall
10:27:14   3   anything else about your discussions with Mr. Borlack?
10:27:16   4   A.  There were -- I have to clarify.  There were prior
10:27:29   5   discussions about electronic data, but those discussions
10:27:37   6   focused on an expert to assist in trying to salvage data from
10:27:43   7   the -- I believe the computer system in the company's office.
10:27:48   8   Q.  Okay.  Before we get to those prior conversations, let me
10:27:53   9   ask you a couple more questions about this meeting that you
10:27:56  10   believe may have occurred sometime in April.
10:27:59  11          Now, do you recall where the -- how the meeting took
10:28:04  12   place?  Was it face to face or over the telephone?
10:28:09  13          MR. LIPTON:  I'm sorry.  Which meeting?
10:28:12  14          MR. McJESSY:  The meeting --
10:28:13  15          THE COURT:  The one that we have been discussing.
10:28:26  16          THE WITNESS:  I am not sure if it was face to face or
10:28:28  17   over the phone.
10:28:29  18   BY MR. McJESSY:
10:28:29  19   Q.  Do you recall whether anybody else was party to the
10:28:31  20   conversation?
10:28:31  21   A.  No, I don't believe anybody else was party to that -- the
10:28:37  22   conversation I am recalling, which was around the time of the
10:28:41  23   inventory agreement.
10:28:42  24   Q.  And now I'd like to ask you about the other conversations
10:28:45  25   that you had that you referenced with Mr. Borlack regarding

10:28:49  1   the experts, the computer consultants that were hired.

10:28:59  2         Between February and April, did you have regular
10:29:03  3   communications with Mr. Borlack?

10:29:04  4   A.  I regularly received e-mails from Mr. Borlack, and I had
10:29:13  5   periodic conversations and perhaps one meeting or two meetings
10:29:19  6   during that period of time.

10:29:20  7   Q.  All right.  And you mentioned that you had discussions
10:29:22  8   with him about -- you used the word "experts," the computer
10:29:26  9   experts.  What was the nature of those conversations?

10:29:28  10  A.  Those conversations would have been with Mr. Borlack
10:29:36  11  explaining to Mr. Shah and/or Mr. Joshi about the need to
10:29:43  12  retain experts and to try to preserve this data and make it
10:29:49  13  available to the parties.

10:29:50  14  Q.  Okay.  And by the time of the meeting in April, had you
10:29:56  15  informed Mr. Borlack that the foreclosure on the warehouse had
10:30:00  16  occurred?

10:30:01  17  A.  Yes, I informed Mr. Borlack as soon as the foreclosure did
10:30:07  18  occur in March.

10:30:08  19  Q.  Okay.  Do you remember when the foreclosure occurred?

10:30:11  20  A.  I believe it was March 15th or 16th.

10:30:13  21  Q.  Okay.  And do you recall when Creative Warehousing and
10:30:22  22  Mr. Shah lost access to the warehouse?

10:30:25  23  A.  It was within a week of that time period.

10:30:31  24  Q.  Okay.  And did you make Mr. Borlack aware of that as well?

10:30:34  25  A.  I believe, yes.

10:30:37   1   Q.  Okay.  And do you remember when or how you made him aware

10:30:42   2   of that?

10:30:42   3   A.  I would have talked to Alan Borlack about the fact that we

10:30:51   4   were completed in this transaction, which covered both the

10:30:54   5   deed in lieu of foreclosure as well as the eviction, primarily

10:31:03   6   in the context of how that would impact in terms of the

10:31:09   7   guaranties.

10:31:10   8   Q.  So I'd like to take a step back and have you take a look

10:31:14   9   at Exhibits 22 and 28 in the binders in front of you, if you

10:31:19   10  could.  And those are, for the record, two e-mails, Exhibit 22

10:31:26   11  being an e-mail dated February 24th, 2010, at 2:53 p.m., and

10:31:37   12  Exhibit 28 is an e-mail dated February 26th, 2010, at 10:40

10:31:45   13  a.m.

10:31:50   14         First, e-mail 22 references a teleconference that had

10:31:57   15  occurred on February 24th.  Do you recall that teleconference?

10:32:00   16  A.  Yes.

10:32:04   17  Q.  All right.  And does this e-mail accurately describe to

10:32:09   18  you the subjects that were discussed in that teleconference?

10:32:12   19  A.  Yes.

10:32:15   20  Q.  And the third paragraph of this e-mail refers to a letter

10:32:21   21  that's going to be composed to be sent to United Central Bank.

10:32:24   22  Do you see that?

10:32:25   23  A.  Yes.

10:32:25   24  Q.  Was it your understanding Mr. Borlack was going to put

10:32:32   25  together such a letter?

| | | |
|---|---|---|
| 10:32:32 | 1 | A. Yes. |
| 10:32:33 | 2 | Q. Do you know if that ever occurred? |
| 10:32:34 | 3 | A. I don't know. |
| 10:32:35 | 4 | Q. Okay. Now, at all during this conversation that occurred |
| 10:32:40 | 5 | on February 24th, was there a discussion of the server that |
| 10:32:48 | 6 | was at the warehouse? |
| 10:32:50 | 7 | A. I don't recall that. |
| 10:32:50 | 8 | Q. You don't recall that being part of the conversation? |
| 10:32:52 | 9 | A. That's correct. |
| 10:32:52 | 10 | Q. All right. Going to Exhibit 28 -- and this is another |
| 10:33:14 | 11 | e-mail confirming another telephone call -- do you recall the |
| 10:33:18 | 12 | telephone call that you had on February 26th? |
| 10:33:22 | 13 | A. Yes. |
| 10:33:25 | 14 | Q. All right. And does this e-mail accurately describe what |
| 10:33:29 | 15 | was discussed during that telephone call? |
| 10:33:31 | 16 | A. Yes. |
| 10:33:34 | 17 | Q. All right. And do you know whether during this telephone |
| 10:33:38 | 18 | call the server at the warehouse was discussed? |
| 10:33:44 | 19 | A. I don't recall if the server was discussed or not. |
| 10:33:48 | 20 | Q. All right. So it may have been or it may not have been. |
| 10:33:52 | 21 | You just don't recall either way? |
| 10:33:56 | 22 | A. Correct. |
| 10:33:56 | 23 | Q. Now, Exhibit 22 in paragraph 2, the second sentence in |
| 10:34:01 | 24 | that paragraph refers to the fact that UCB is going to have to |
| 10:34:08 | 25 | be given a choice of either paying warehouse rent or |

1    transferring inventory somewhere else.

2         Do you see that?

3    A.  Yes.

4    Q.  What issue is that addressing?

5    A.  The fact that as part of the transaction, possession and

6    control of the warehouse would be in First Midwest Bank and

7    that they had a use for the building and they were going to

8    need to have whatever remaining inventory was still there and

9    items were still there, to have them moved to a portion for

10   which UCB would pay rent or they would have to be moved.

11   Q.  And for the moment, I am done with that e-mail, so you

12   don't need to look at it further.

13        MR. McJESSY:  Could you read back his answer?

14     (Record read. )

15   BY MR. McJESSY:

16   Q.  So it was your understanding that First Midwest Bank

17   wanted to use the warehouse themselves?

18   A.  They wanted to use a portion of the warehouse themselves.

19   That was my understanding.

20   Q.  And where did you get that understanding?

21   A.  From William -- Bill Serritella.

22   Q.  And you made Mr. Borlack aware of that?

23        MS. DEDINAS:  Objection.  Leading.

24        THE COURT:  No, he can ask that question, and you can

25   answer.

| | | |
|---|---|---|
| 10:36:01 | 1 | THE WITNESS:  I believe I did. |
| 10:36:04 | 2 | BY MR. McJESSY: |
| 10:36:05 | 3 | Q.  All right.  Is it your understanding that's what's being |
| 10:36:07 | 4 | referred to in paragraph 2 of that e-mail, meaning Exhibit 22? |
| 10:36:12 | 5 | A.  Yes. |
| 10:36:18 | 6 | Q.  Now, as part of the friendly foreclosure negotiations, was |
| 10:36:32 | 7 | it a condition of those negotiations that Mr. Shah be given an |
| 10:36:40 | 8 | opportunity to relet the warehouse and to purchase the server |
| 10:36:44 | 9 | that was there? |
| 10:36:45 | 10 | A.  It was a -- it was part of the written agreement to allow |
| 10:37:00 | 11 | Mr. Shah or some other entity to have a right to lease a |
| 10:37:06 | 12 | portion of the warehouse.  The purchase of the server at the |
| 10:37:16 | 13 | time that we concluded the transaction, it was my |
| 10:37:21 | 14 | understanding that First Midwest had reached an agreement to |
| 10:37:26 | 15 | purchase the server and was in turn going to sell the server |
| 10:37:30 | 16 | to Mr. Shah.  But that was not part of the written documents. |
| 10:37:35 | 17 | Q.  All right.  That was -- it wasn't part of the written |
| 10:37:40 | 18 | documents, but it was part of the understanding between the |
| 10:37:42 | 19 | parties? |
| 10:37:43 | 20 | A.  Yes. |
| 10:37:43 | 21 | Q.  And you said that it was your understanding at the time |
| 10:37:47 | 22 | that the parties reached the agreement that First Midwest Bank |
| 10:37:52 | 23 | had reached an agreement with Associated Bank for the purchase |
| 10:37:55 | 24 | of the server.  You just said something to that effect; is |
| 10:37:55 | 25 | that right? |

10:38:00  1   A.  That's correct.

10:38:01  2   Q.  What agreement are you referring to?  I'm trying to put a

10:38:04  3   date on it.

10:38:05  4   A.  This would have been mid March of 2010.  At that time, I

10:38:16  5   was advised by Mr. Serritella that Dave Clark from First

10:38:22  6   Midwest Bank had reached an agreement with Associated Bank to

10:38:26  7   acquire the lease, which included the server.

10:38:32  8   Q.  And so it was your understanding -- so the agreement

10:38:35  9   you're referring to is the friendly foreclosure agreement?

10:38:41  10  A.  Yes, it was at that same time, correct.

10:38:44  11  Q.  And the friendly foreclosure occurred, I take it?

10:38:48  12  A.  It did, yes.

10:38:49  13  Q.  All right.  And if you could take a look at -- well,

10:39:01  14  before I ask you to take a look at the exhibit, did you around

10:39:06  15  -- at or around the time that the friendly foreclosure

10:39:13  16  occurred send an e-mail to Mr. Serritella advising him of the

10:39:18  17  need to preserve the hard drives that were at the warehouse?

10:39:21  18  A.  Yes.

10:39:21  19  Q.  And you have seen that e-mail in your deposition; is that

10:39:21  20  right?

10:39:23  21  A.  Correct.

10:39:24  22  Q.  Do you recall specifically sending that e-mail?

10:39:28  23  A.  Yes.

10:39:29  24  Q.  Why did you send that e-mail?

10:39:31  25  A.  Because I knew that there were items remaining in the

10:39:38  1  warehouse that would be material to the case, and for that

10:39:45  2  reason, I wanted Mr. Serritella to be aware and understand

10:39:50  3  that that would be important to Mr. Shah.

10:39:53  4  Q.  All right.  Did you send -- did Mr. Borlack ask you to

10:39:58  5  send that e-mail?

10:39:59  6  A.  I don't recall if he did or did not.

10:40:03  7  Q.  Okay.  Do you recall whether you had a conversation with

10:40:06  8  Mr. Borlack on the date when you sent that e-mail?

10:40:10  9  A.  Around that time, I had many conversations with

10:40:21  10  Mr. Borlack, so I can't answer you specifically.

10:40:25  11  Q.  All right.  Why don't you take a look at Exhibit 46.

10:40:52  12  Let me know when you have had a chance to look at the

10:40:55  13  e-mail that's on Exhibit 46 on the first page at the top dated

10:40:59  14  March 16, 2010, at 9:20.

10:41:06  15  A.  Okay.

10:41:06  16  Q.  Now, Mr. Borlack isn't copied on that e-mail; is that

10:41:06  17  right?

10:41:10  18  A.  That's correct.

10:41:11  19  Q.  Do you know whether he was blind copied on that e-mail?

10:41:14  20  A.  I don't know if he was or was not.

10:41:17  21  Q.  All right.  Why wasn't he copied on the e-mail?

10:41:21  22  A.  I wish I knew the answer to that.  I don't.

10:41:28  23  Q.  All right.  Now, you copied Dave Clark on this e-mail

10:41:39  24  directly; is that right?

10:41:46  25  A.  I did because I was replying to the e-mail below.

10:41:51  1  Q.  Okay.  This may be a bit leading, but you hit a reply all;
10:41:59  2  is that why Dave Clark is included on that e-mail?
10:42:02  3  A.  That's correct.
10:42:02  4  Q.  All right.  You understood that Dave Clark was actually
10:42:06  5  represented by William Serritella, right?
10:42:11  6  A.  Yes.
10:42:11  7  Q.  And, in fact -- strike that.
10:42:14  8       Now, there is a sentence in the e-mail that begins,
10:42:23  9  Accordingly, until the outside date.
10:42:25  10       Do you see that?
10:42:25  11  A.  Yes.
10:42:26  12  Q.  And it talks about reacquiring the items.  What items is
10:42:30  13  that referring to?
10:42:31  14  A.  That would have been the lease and the items that are
10:42:51  15  covered under the lease.
10:42:53  16  Q.  Now, had you recommended to Mr. Shah that if he was going
10:42:59  17  to acquire the server, he should also acquire the lease?  I'm
10:43:03  18  sorry.  Strike that.
10:43:04  19       Now, you had recommended to Mr. Shah that if he was
10:43:06  20  going to acquire the lease, that he should also acquire the
10:43:10  21  guaranties on the lease?
10:43:12  22  A.  Yes.
10:43:13  23  Q.  Do you remember at that time approximately how much
10:43:18  24  liability there was on the guaranties?
10:43:20  25  A.  It was somewhere in the neighborhood of 350,000, perhaps.

10:43:28  1   Q.  All right.  So was it your understanding at the time that

10:43:31  2   if Mr. Shah acquired the lease, he would still be liable to

10:43:36  3   somebody else on the guaranty for $350,000?

10:43:39  4   A.  I'm not sure if I understand your question.

10:43:47  5   Q.  Well, if Mr. Shah acquired the server itself but did not

10:43:54  6   buy the guaranties, was it your understanding at that time

10:43:57  7   that he could still be held liable on the guaranties for the

10:44:00  8   balance due?

10:44:01  9   A.  Well, if anyone just acquired the server without acquiring

10:44:05  10  the lease and guaranty or the underlying documents, they

10:44:10  11  would -- Mr. Shah would still be liable under his guaranty.

10:44:14  12  Q.  All right.  So it was important that if he was going to

10:44:20  13  acquire the server, that he acquire the guaranty also?

10:44:24  14  A.  Yes.

10:44:24  15  Q.  All right.  Now, did Mr. Shah tell you why he wanted to

10:44:33  16  acquire the server?

10:44:35  17  A.  Well, he did, yes.

10:44:40  18  Q.  What was your understanding of why he wanted to acquire

10:44:43  19  the server?

10:44:43  20  A.  He wanted to acquire the server for three reasons that I

10:44:50  21  can recall.  Number one, he wanted to acquire the server

10:44:56  22  because it was relevant to this case and he understood that.

10:45:01  23        And number two, if and when he or some other entity

10:45:07  24  would lease a portion of the warehouse from First Midwest, the

10:45:14  25  server would be useful in terms of operating out of that

10:45:18  1  facility.

10:45:21  2          And the last reason that I recall would be because he

10:45:24  3  wanted to acquire the lease and his guaranty to eliminate the

10:45:29  4  liability or exposure, I believe.

10:45:32  5  Q.  And at this time with the right to relet the property and

10:45:38  6  the interest in acquiring the server, was it Mr. Shah's intent

10:45:42  7  to commence operations again in some fashion at the warehouse?

10:45:50  8  A.  As far as he communicated to me, he always had that

10:45:58  9  intention at some point to recommence operations at the

10:46:03  10  warehouse.

10:46:03  11  Q.  All right.  Do you know, was Mr. Shah seeking investors at

10:46:11  12  that time to lease the warehouse?

10:46:12  13  A.  That, I don't know.

10:46:14  14  Q.  Do you know whether he was talking with other clothing

10:46:24  15  manufacturers to relet the -- strike that.

10:46:28  16          Do you know whether he was talking with other

10:46:30  17  clothing manufacturers in an effort to relet the warehouse?

10:46:39  18  A.  He mentioned to me that he had some conversations with --

10:46:46  19  I don't know if they were manufacturers or distributors, so to

10:46:49  20  speak, about possibly operating out of the warehouse.

10:46:53  21  Q.  Do you know whether those were overseas manufacturers and

10:46:57  22  distributors?

10:46:57  23  A.  Yes, they were.

10:46:58  24  Q.  Now, I'd like you to take a look at Exhibit 56 and

10:47:26  25  Exhibit 57.  And Exhibit 56, I will tell you before you get

10:47:31 1 there, consists of a March 24th letter from Bill Serritella to

10:47:42 2 Alexander Domanskis and a string of e-mails that appear to be

10:47:47 3 forwarding that correspondence. And I would like you to take

10:47:50 4 a look at all of the documents that are part of Exhibit 56 and

10:47:59 5 then let me know when you have had an opportunity to do that.

10:48:04 6 A. 56, you said?

10:48:05 7 Q. Yes.

10:48:25 8      Just so there is no confusion, the first e-mail on

10:48:28 9 the first page of Exhibit 56 is an e-mail from you to Mehul

10:48:35 10 Shah copied to Alan Borlack dated March 24, 2010, at 2:48

10:48:41 11 p.m..

10:49:02 12 A. Yes, I have read it.

10:49:04 13 Q. Now, your e-mail on the first page, at the top of the

10:49:07 14 first page, appears to be forwarding the letter that's dated

10:49:10 15 March 24th, 2010, to both Mr. Shah, Paresh Joshi, and Alan

10:49:20 16 Borlack, and Scott Schreiber; is that fair?

10:49:23 17 A. Yes.

10:49:23 18 Q. Now, this letter that's dated March 24th, that was sent to

10:49:29 19 you somehow; is that right?

10:49:31 20 A. That's correct.

10:49:31 21 Q. Okay. Does this e-mail string show how it was forwarded

10:49:35 22 to you?

10:49:35 23 A. I don't see that it does, no.

10:49:55 24 Q. All right. It doesn't, does it?

10:49:57 25 A. No.

| | |
|---|---|
| 10:49:57 | 1 |
| 10:50:10 | 2 |
| 10:50:14 | 3 |
| 10:50:17 | 4 |
| 10:50:23 | 5 |
| 10:50:28 | 6 |
| 10:50:31 | 7 |
| 10:50:37 | 8 |
| 10:50:38 | 9 |
| 10:50:40 | 10 |
| 10:50:42 | 11 |
| 10:50:46 | 12 |
| 10:50:52 | 13 |
| 10:50:56 | 14 |
| 10:50:56 | 15 |
| 10:50:59 | 16 |
| 10:51:03 | 17 |
| 10:51:05 | 18 |
| 10:51:05 | 19 |
| 10:51:06 | 20 |
| 10:51:10 | 21 |
| 10:51:13 | 22 |
| 10:51:20 | 23 |
| 10:51:26 | 24 |
| 10:51:30 | 25 |

Q.  And do you know whether your -- your e-mail of March 24th, 2010, although it appears to end directly on the first page and the second page seems to be a completely separate e-mail, your e-mail does seem to have -- under subject, it says, FW, colon, and then it has -- on the re line you can see First Midwest Bank v. Creative Warehousing, et al.  And on the e-mail on the preceding page -- on the subsequent page has the same subject matter.  Do you see that?

A.  Yes.  Yes, I do.

Q.  Do you recall whether you received the e-mail that's on the second page and were actually forwarding that e-mail?

A.  I believe I was blind copied on the e-mail on the second page and then I forwarded, which is reflected on the first page.

Q.  Okay.  So even though -- but it doesn't show anywhere on the second e-mail who was blind copied, you can't tell that from the e-mail, you believe you were a blind copy on that e-mail?

A.  Yes, I do.

Q.  All right.  So blind copy doesn't show up -- do you see where the blind copy shows up anywhere on here?

A.  No.

Q.  Okay.  And then -- so you had -- you received this letter dated -- the letter from -- strike that.

        You had received the letter from William Serritella

10:51:33   1   to Alexander Domanskis dated March 24th; is that right?

10:51:40   2   A.  Yes.

10:51:40   3   Q.  And it looks like because you were forwarding it on the

10:51:42   4   24th, you received it that same day?

10:51:44   5   A.  Yes.

10:51:44   6   Q.  Was Exhibit 57 attached to that letter, do you recall,

10:51:50   7   when you received it?

10:51:50   8   A.  I believe that it was.

10:52:02   9   Q.  Okay.  But you're not sure, I take it?

10:52:09  10   A.  I'm not a hundred percent sure.

10:52:10  11   Q.  All right.  And then you forwarded this letter on to --

10:52:14  12   you copied Alan Borlack on this e-mail where you're forwarding

10:52:18  13   Mr. Domanskis -- Mr. Serritella's March 24th letter; is that

10:52:18  14   right?

10:52:23  15   A.  That is correct.

10:52:24  16   Q.  Why did you do that?

10:52:25  17   A.  Because this was all part of what I had been discussing

10:52:38  18   with Alan and Mr. Shah in the past regarding the fact that

10:52:46  19   First Midwest would need to use the warehouse and it would

10:52:49  20   impact on the case.

10:52:50  21   Q.  Okay.  And, in fact, First Midwest was going to be removed

10:53:01  22   from the warehouse completely; is that right?

10:53:01  23   A.  Yes.

10:53:02  24   Q.  It was going to lose possession and control?

10:53:06  25   A.  Yes.

| | | |
|---|---|---|
| 10:53:07 | 1 | Q. And you say this was part of the discussions you'd been |
| 10:53:09 | 2 | having with Alan Borlack. Were you discussing this with him |
| 10:53:12 | 3 | during the period from the end of February, the e-mails we saw |
| 10:53:16 | 4 | previously, through March 15th when this transaction occurred? |
| 10:53:19 | 5 | A. Yes. |
| 10:53:20 | 6 | Q. Do you recall whether you discussed with Mr. Borlack the |
| 10:53:34 | 7 | fact that Mr. Shah was going to try to negotiate for the |
| 10:53:40 | 8 | purchase of the server? |
| 10:53:41 | 9 | A. I don't recall. |
| 10:53:54 | 10 | MR. McGARRY: May I have the question read back, |
| 10:53:57 | 11 | please? |
| 10:53:57 | 12 | THE COURT: Sure. |
| 10:54:06 | 13 | (Record read.) |
| 10:54:08 | 14 | MR. McGARRY: Thank you, Judge. |
| 10:54:15 | 15 | MR. McJESSY: Let me withdraw that question and ask a |
| 10:54:17 | 16 | slightly different one. |
| 10:54:18 | 17 | BY MR. McJESSY: |
| 10:54:19 | 18 | Q. The negotiations for the server were taking place between |
| 10:54:22 | 19 | First Midwest Bank and Associated Bank; is that right? |
| 10:54:23 | 20 | A. That's correct. |
| 10:54:24 | 21 | Q. Do you know whether you had advised Mr. Borlack that |
| 10:54:27 | 22 | Mr. Shah was attempting to acquire the server? |
| 10:54:29 | 23 | A. I believe that I did. |
| 10:54:36 | 24 | Q. Okay. Why do you believe that you did? |
| 10:54:39 | 25 | A. Because when I had the conversations describing what the |

10:54:46  1  nature of the transaction involved, the fact that First

10:54:54  2  Midwest was going to acquire the lease and guaranty from

10:54:59  3  Associated Bank and then in turn sell it to Mr. Shah would

10:55:03  4  have been part of the transaction.

10:55:05  5  Q.  All right.  Now, there were a number of e-mails that went

10:55:10  6  back and forth regarding the acquisition -- strike that.

10:55:16  7       There were a number -- are you aware that there were

10:55:18  8  a number of e-mails that went back and forth between Mr. Shah

10:55:22  9  and Mr. Clark regarding the acquisition of the server?

10:55:26  10  A.  Yes.

10:55:27  11  Q.  All right.  Did you receive some of those e-mails?

10:55:30  12  A.  I believe -- yes, I did.

10:55:32  13  Q.  All right.  Do you recall whether you forwarded on any of

10:55:36  14  those e-mails to Mr. Borlack?

10:55:37  15  A.  I can't say specifically, no.

10:55:41  16  Q.  You don't recall?

10:55:41  17  A.  I don't recall.

10:55:42  18  Q.  If you did not -- strike that.

10:55:46  19       Would there have been any reason that you would have

10:55:49  20  not forwarded those e-mails on to him?

10:55:50  21  A.  Not that I can think of, no.

10:55:52  22  Q.  All right.  There was no -- you weren't trying to hide

10:55:55  23  those negotiations from Mr. Borlack?

10:55:57  24  A.  No, not at all.

10:55:58  25  Q.  All right.

| | | |
|---|---|---|
| 10:56:05 | 1 | THE COURT: Would you have blind copied him on any of |
| 10:56:07 | 2 | your e-mails? |
| 10:56:08 | 3 | THE WITNESS: Possibly. |
| 10:56:15 | 4 | BY MR. McJESSY: |
| 10:56:26 | 5 | Q. And you did -- I just want to make sure -- did you advise |
| 10:56:30 | 6 | Mr. Borlack after the transaction had closed, meaning the -- |
| 10:56:33 | 7 | strike that. |
| 10:56:34 | 8 | Did you advise Mr. Borlack after the friendly |
| 10:56:38 | 9 | foreclosure had occurred? |
| 10:56:39 | 10 | A. Yes. |
| 10:56:40 | 11 | Q. Okay. And did you do that aside -- how did you do that? |
| 10:56:45 | 12 | A. I know I had conversation and I may have forwarded or |
| 10:56:53 | 13 | copied him on an e-mail, and this e-mail also. |
| 10:57:00 | 14 | Q. All right. |
| 10:57:01 | 15 | THE COURT: When you say "this e-mail." |
| 10:57:02 | 16 | THE WITNESS: This e-mail of March -- |
| 10:57:12 | 17 | BY MR. McJESSY: |
| 10:57:05 | 18 | Q. Why don't you be specific for the record, the exhibit. |
| 10:57:08 | 19 | A. March 24th, 2010, Exhibit 56. |
| 10:57:11 | 20 | THE COURT: Thank you. |
| 10:57:12 | 21 | BY MR. McJESSY: |
| 10:57:57 | 22 | Q. Sir, there was a meeting that occurred on April 23rd at |
| 10:58:04 | 23 | Kanan's Oak Brook office facility, and during the course of |
| 10:58:09 | 24 | that meeting, United Central Bank raised a question that the |
| 10:58:13 | 25 | server was still at the warehouse and had not been brought to |

10:58:17   1   Oak Brook -- to Kanan's Oak Brook offices.  I'll represent to

10:58:22   2   you that there's evidence to that effect.

10:58:24   3        Were you aware of such a meeting?

10:58:26   4   A.  I was aware of a meeting that took place at Kanan's

10:58:36   5   offices regarding the computer system at their offices, and

10:58:42   6   the exact date or time period, I am not a hundred percent

10:58:45   7   sure.

10:58:45   8   Q.  Okay.  When you say you were aware of a meeting that

10:58:49   9   occurred at the Oak Brook office concerning the computer

10:58:53  10   system at their offices, I want to be precise.  Was that a

10:58:59  11   discussion about the computer system that was at the office,

10:59:03  12   the one that was not working properly, or did that include

10:59:08  13   those computers plus the computer at the warehouse, or do you

10:59:11  14   know?

10:59:11  15   A.  I don't know.  All I know is that the purpose -- as I

10:59:20  16   understood it, the purpose of that meeting at the Oak Brook

10:59:23  17   offices with United Central Bank, their attorneys, and Kanan's

10:59:29  18   attorneys was to deal with the computers at their offices.

10:59:35  19   That's all I know.

10:59:37  20   Q.  That's the extent of your knowledge?

10:59:38  21   A.  Yes.

10:59:38  22   Q.  Now, you testified earlier that you thought -- that you

10:59:45  23   thought there had been an agreement at around the time of the

10:59:48  24   closing on the friendly foreclosure, that there had been an

10:59:52  25   agreement reached between First Midwest Bank and Associated

10:59:55   1   Bank regarding the acquisition of the server or the lease.   Do

11:00:01   2   you recall that?

11:00:01   3   A.   Yes.

11:00:01   4   Q.   Did you subsequently become aware that, in fact, there

11:00:04   5   hadn't been an agreement reached at that time between those

11:00:07   6   parties?

11:00:07   7   A.   Yes.

11:00:07   8   Q.   When did you become aware of that?

11:00:09   9   A.   Within two or three weeks of the time of the closing.

11:00:17   10   Q.   All right.   And what -- how did you learn about it?

11:00:20   11   A.   I was advised by both Mr. Shah and Bill Serritella that

11:00:28   12   the understanding -- there wasn't a meeting of the minds

11:00:32   13   necessarily between First Midwest Bank and Associated Bank.

11:00:35   14   Q.   All right.   And are you aware -- do you know whether the

11:00:42   15   parties continued negotiating after that point?

11:00:46   16   A.   Yes.

11:00:46   17   Q.   To reach terms for the acquisition of the server or the

11:00:50   18   lease?

11:00:50   19   A.   Yes, I am aware that they were having subsequent --

11:00:53   20   Q.   How were you aware of that?

11:00:54   21   A.   I was advised both by Mr. Shah as well as Bill Serritella.

11:01:01   22   Q.   All right.   Now, these -- are you aware of how long these

11:01:05   23   negotiations continued?

11:01:06   24   A.   They continued through July, I believe.

11:01:16   25   Q.   All right.   And were you advised of those negotiations?

11:01:22　　1　A.　Yes.

11:01:23　　2　Q.　All right.　Did you at any point make Mr. Borlack aware

11:01:26　　3　that those negotiations were continuing?

11:01:28　　4　A.　I don't know if I specifically made him aware or not.

11:01:34　　5　Q.　All right.　You don't recall?

11:01:35　　6　A.　I don't recall.

11:01:36　　7　Q.　All right.　And are you aware that those negotiations were

11:01:41　　8　continuing up until the time that Mr. Shah learned that the

11:01:45　　9　server had, in fact, been sold to somebody else?

11:01:48　10　A.　Yes.

11:01:50　11　Q.　Were you at all involved in those negotiations?

11:02:00　12　A.　No.

11:02:01　13　Q.　Now, there was a meeting on June 19th that involved Mr.

11:02:16　14　Flesch.　Do you remember that meeting?

11:02:17　15　A.　Not specifically.

11:02:23　16　Q.　Do you remember having a meeting with Mr. Shah,

11:02:26　17　Mr. Borlack, Mr. Flesch to discuss management of this lawsuit?

11:02:31　18　A.　Yes.

11:02:31　19　Q.　Okay.　Do you remember when that meeting occurred?

11:02:35　20　A.　I recall -- I believe there were at least two meetings

11:02:42　21　that occurred.

11:02:42　22　Q.　Do you remember when those meetings occurred?

11:02:44　23　A.　In the time frame of May, June, and sometime over the

11:02:58　24　summer, probably July or early August, perhaps.　I don't know.

11:03:04　25　Q.　Do you recall what the purpose of those two meetings was?

11:03:06  1    A.  To decide if there was a more efficient way to handle the
11:03:15  2    case because the costs were becoming a lot.
11:03:20  3    Q.  Okay.  At either of those meetings, was the warehouse
11:03:28  4    server discussed?
11:03:29  5    A.  Perhaps, but I don't specifically recall.
11:03:44  6              THE COURT:  Who was present?
11:03:46  7    BY MR. McJESSY:
11:03:46  8    Q.  Who was present at the first meeting?
11:03:48  9    A.  It would have been Mr. Shah, Mr. Joshi, Mr. Borlack, Jim
11:03:57  10   Flesch, Don Glickman, and maybe somebody else from
11:04:06  11   Mr. Borlack's office, but I don't recall.
11:04:07  12   Q.  Who was present at the second meeting?
11:04:10  13   A.  Likely would have been the same group.
11:04:14  14   Q.  Same individuals?
11:04:15  15   A.  Yes.
11:04:15  16   Q.  And as best your recollection -- for both meetings, was it
11:04:28  17   essentially the same subject that was discussed, the rising
11:04:33  18   litigation costs?
11:04:33  19   A.  That was the purpose for the meeting, yes, and that was
11:04:36  20   why I was there, yes.
11:04:37  21   Q.  Let me ask you, that was the purpose for the meeting, but
11:04:44  22   were other subjects discussed at the meeting?
11:04:47  23   A.  I suspect they were, but I couldn't -- as I sit here
11:04:51  24   today, I can't tell you what other subjects were specifically
11:04:58  25   discussed.

11:04:58 1    Q.  I just want to ask you one other question about your

11:05:00 2    earlier conversations with Mr. Borlack.  You had mentioned

11:05:02 3    that you had conversations with him concerning -- and correct

11:05:05 4    me if I'm wrong -- but conversations with -- strike that.

11:05:11 5           My understanding is that you had conversations with

11:05:13 6    Mr. Borlack in the time period between February, March, and

11:05:18 7    early April regarding the expert, computer experts that had

11:05:22 8    been hired in this case; is that right?

11:05:25 9    A.  I had -- yes.

11:05:26 10   Q.  What was the nature of those conversations?

11:05:28 11   A.  That there were issues over the fact that the computer

11:05:35 12   system didn't work and that Kanan needed to engage experts to

11:05:43 13   assist in retrieving the data.

11:05:46 14   Q.  Okay.  Now, you were Mr. Shah's corporate attorney.  Why

11:05:50 15   were you part of those conversations?

11:05:54 16   A.  Oftentimes, I would be on a conference call and different

11:06:00 17   subjects would come up and that was one of the subjects that

11:06:04 18   came up.

11:06:04 19   Q.  So there were periodic conference calls, and this lawsuit

11:06:06 20   was discussed as part of those conference calls?

11:06:08 21   A.  Yes.

11:06:09 22   Q.  Sir, in late August, you received an e-mail from Mr. Shah

11:06:36 23   forwarding an e-mail from Mr. Clark advising Mr. Shah that the

11:06:40 24   server had been sold to somebody else.  Do you recall?

11:06:42 25   A.  Yes.

11:06:43    1   Q.  All right.  And if you could take a quick look at Exhibit
11:06:47    2   -- I believe it's 192, if I can read the number on this
11:06:55    3   correctly, and it's an e-mail dated August 30th, 2010, at 9:01
11:07:00    4   a.m.  If you can read that and tell me when you have had the
11:07:13    5   opportunity to read both of the e-mails that are there, both
11:07:18    6   Mr. Shah's at the top, which is the August 30th, 2010, 9:01
11:07:22    7   e-mail and the e-mail below that from Dave Clark addressed to
11:07:26    8   Mr. Shah the same date at 8:57 a.m.
11:07:31    9   A.  Yes, I have read it.
11:07:32   10   Q.  All right.  Did you receive -- or did you speak with Mr.
11:07:40   11   Shah or Mr. Borlack on this date regarding the subject of this
11:07:44   12   e-mail?
11:07:44   13   A.  More than likely, yes.
11:07:51   14           MR. LIPTON:  Objection.
11:07:53   15           THE COURT:  Sustained.
11:07:56   16   BY MR. McJESSY:
11:07:56   17   Q.  I want to be precise, sir.
11:07:58   18           MR. LIPTON:  Move to strike.
11:07:59   19           THE COURT:  It will be stricken.
11:08:00   20   BY MR. McJESSY:
11:08:01   21   Q.  Do you have a specific recollection of having spoken with
11:08:04   22   Mr. Shah or Mr. Borlack on this date regarding this e-mail or
11:08:13   23   the subject matter of this e-mail.
11:08:14   24   A.  I have a specific recollection of a conversation with
11:08:23   25   Mr. Shah and Mr. Borlack.  I don't know if it was exactly on

| | | |
|---|---|---|
| 11:08:25 | 1 | the 30th or not. |
| 11:08:26 | 2 | Q. All right. Well, then I will expand my question. Do you |
| 11:08:30 | 3 | recall having a conversation with Mr. Shah or Mr. Borlack |
| 11:08:34 | 4 | regarding the subject matter of this e-mail either on this |
| 11:08:37 | 5 | date or shortly thereafter? |
| 11:08:39 | 6 | A. Yes, I do. |
| 11:08:40 | 7 | MR. LIPTON: Objection. Compound, complex. |
| 11:08:41 | 8 | THE COURT: He can answer. |
| 11:08:42 | 9 | THE WITNESS: Yes. Sorry. Yes, I do. |
| 11:08:45 | 10 | BY MR. McJESSY: |
| 11:08:45 | 11 | Q. All right. And tell me, who did you speak with and when |
| 11:08:49 | 12 | did you speak with them? |
| 11:08:50 | 13 | A. I recall having a conference call, I believe, with |
| 11:08:59 | 14 | Mr. Shah, Mr. Joshi, and Alan Borlack about the fact that the |
| 11:09:08 | 15 | server had been sold. |
| 11:09:09 | 16 | Q. All right. And did you initiate that call, or were you |
| 11:09:16 | 17 | brought into that call by somebody else? |
| 11:09:18 | 18 | A. I was brought into the call. |
| 11:09:20 | 19 | Q. All right. And do you know why you were brought in? |
| 11:09:23 | 20 | A. No, not specifically. |
| 11:09:28 | 21 | Q. Do you remember who asked you to be part of the call? |
| 11:09:31 | 22 | A. Mr. Shah. |
| 11:09:32 | 23 | Q. Okay. And what was discussed during that call? |
| 11:09:35 | 24 | A. The fact that this would be very damaging to the case and |
| 11:09:44 | 25 | that both Mr. Borlack and Mr. Shah needed to try to find out |

| | | |
|---|---|---|
| 11:09:51 | 1 | the circumstances surrounding the sale. |
| 11:09:54 | 2 | Q.  Now, were you involved at all in trying to find out the |
| 11:09:57 | 3 | circumstances surrounding that sale? |
| 11:09:59 | 4 | A.  I was not, no. |
| 11:10:01 | 5 | Q.  Okay.  Did you take any action to follow up on the nature |
| 11:10:05 | 6 | of this sale -- strike that. |
| 11:10:08 | 7 | Did you take any action to investigate who had |
| 11:10:11 | 8 | acquired the server? |
| 11:10:12 | 9 | A.  I did not. |
| 11:10:13 | 10 | Q.  Do you have personal knowledge of whether Mr. Borlack took |
| 11:10:15 | 11 | action to find out who had purchased the server? |
| 11:10:19 | 12 | A.  Yes, I do. |
| 11:10:19 | 13 | Q.  Okay.  What is your knowledge? |
| 11:10:21 | 14 | A.  I am aware of the fact that Mr. Borlack contacted |
| 11:10:28 | 15 | Mr. Serritella and counsel for Associated Bank to try to |
| 11:10:36 | 16 | determine what happened. |
| 11:10:39 | 17 | Q.  Okay.  Was that done pretty much immediately after August |
| 11:10:43 | 18 | 30th? |
| 11:10:43 | 19 | A.  Shortly thereafter, yes. |
| 11:10:46 | 20 | Q.  All right.  And how are you aware of those efforts? |
| 11:10:50 | 21 | A.  I believe I received an e-mail or was copied on an e-mail |
| 11:10:56 | 22 | that Mr. Borlack sent out to Mr. Serritella and/or the |
| 11:11:04 | 23 | attorney for Associated Bank. |
| 11:11:05 | 24 | Q.  Okay.  Do you know whether Mr. Shah believed that there |
| 11:11:10 | 25 | was information on that server that would be helpful to him in |

11:11:12 1  this case?

11:11:13 2         MR. LIPTON:  Objection.  Foundation.

11:11:14 3         THE COURT:  Sustained.

11:11:15 4  BY MR. McJESSY:

11:11:16 5  Q.  Did Mr. Shah ever convey to you his belief that there was

11:11:21 6  information on the server that would be helpful to his defense

11:11:25 7  of this case?

11:11:26 8  A.  Yes, he did.

11:11:27 9  Q.  And do you remember when you had those conversations with

11:11:31 10  him -- or strike that.

11:11:34 11        Was that in a conversation or was that by e-mail or

11:11:37 12  how was that communicated to you?

11:11:38 13  A.  In conversation.

11:11:39 14  Q.  Okay.  Do you remember when that conversation -- was there

11:11:42 15  more than one conversation?

11:11:43 16  A.  Yes.

11:11:45 17  Q.  Okay.  And when did those conversations occur?

11:11:47 18  A.  There were a number of conversations that occurred after

11:11:51 19  the sale of the server, and in almost every conversation that

11:11:56 20  I can recall, Mr. Shah made a point of the fact that there

11:12:02 21  would be information that would be helpful to him.

11:12:04 22  Q.  Okay.  Do you know -- were you aware that First Midwest

11:12:12 23  Bank had reached -- by the end of July had reached an

11:12:15 24  agreement with Associated Bank with terms to purchase the

11:12:20 25  server, the lease, the guaranty?

11:12:23  1  A.  Was I aware in July?

11:12:27  2  Q.  Were you aware at any time that First Midwest Bank had

11:12:32  3  reached an agreement with Associated Bank on terms by which

11:12:36  4  First Midwest Bank would acquire the server and the guaranties

11:12:40  5  of the lease?

11:12:41  6  A.  Yes, I was aware.

11:12:45  7  Q.  And when did you become aware of that?

11:12:47  8  A.  I believe that was sometime in July when First Midwest --

11:12:52  9  when I was told that they had finally reached an agreement.

11:12:58  10  Q.  And are you aware that Mr. Shah was not able to purchase

11:13:00  11  the server at that time?

11:13:01  12  A.  Mr. Shah -- I was aware of the fact that Mr. Shah was

11:13:09  13  discussing a timing for purchasing with Mr. Clark.

11:13:13  14  Q.  Do you know why Mr. Shah didn't purchase the server from

11:13:17  15  First Midwest Bank at that time?

11:13:18  16  A.  I believe he was out of the country at the time and was

11:13:24  17  making arrangements upon his return.

11:13:25  18  Q.  Making arrangements for what?

11:13:27  19  A.  To purchase from First Midwest the lease and all of the

11:13:34  20  things, including the server.

11:13:35  21  Q.  Okay.  Do you know whether Mr. Shah had the finances in

11:13:39  22  July to acquire the server at the negotiated price?

11:13:47  23  A.  I don't know specifically, no.

11:13:48  24  Q.  You don't know anything about that?

11:13:50  25  A.  No.

| | | |
|---|---|---|
| 11:13:50 | 1 | THE COURT:  How were you aware of this? |
| 11:13:52 | 2 | THE WITNESS:  Of the? |
| 11:13:53 | 3 | THE COURT:  Of this information? |
| 11:13:55 | 4 | THE WITNESS:  I was aware of this information from |
| 11:13:57 | 5 | Mr. Shah. |
| 11:13:58 | 6 | THE COURT:  Anybody else? |
| 11:13:59 | 7 | THE WITNESS:  Perhaps Bill Serritella. |
| 11:14:05 | 8 | THE COURT:  Anybody else? |
| 11:14:06 | 9 | THE WITNESS:  Not on the purchase of the server and |
| 11:14:11 | 10 | the lease, no. |
| 11:14:13 | 11 | BY MR. McJESSY: |
| 11:14:14 | 12 | Q.  Did you make -- did you have any communications with |
| 11:14:17 | 13 | Mr. Borlack at this time relaying any of the information that |
| 11:14:21 | 14 | you had from Mr. Shah or Mr. Serritella? |
| 11:14:24 | 15 | A.  I don't believe that I had any -- no, I don't. |
| 11:14:31 | 16 | Q.  All right.  Not at this time? |
| 11:14:32 | 17 | A.  Not at that time. |
| 11:14:33 | 18 | Q.  When you had your conversation with Mr. Shah and |
| 11:14:46 | 19 | Mr. Borlack in response to this e-mail that's Exhibit 192, do |
| 11:14:53 | 20 | you recall did Mr. Shah sound upset, surprised, to learn that |
| 11:14:56 | 21 | the server had been sold? |
| 11:14:58 | 22 | A.  He was very upset. |
| 11:15:00 | 23 | Q.  What did he say about it? |
| 11:15:09 | 24 | A.  He always -- |
| 11:15:12 | 25 | MR. LIPTON:  Objection.  Hearsay. |

| | | |
|---|---|---|
| 11:15:13 | 1 | THE COURT:  I need to take a break just for one |
| 11:15:16 | 2 | second.  I'm sorry for interrupting.  I'll go back to your |
| 11:15:20 | 3 | objection first. |
| 11:15:21 | 4 | Do you have any idea how much longer you're going to |
| 11:15:23 | 5 | be? |
| 11:15:24 | 6 | MR. McJESSY:  I believe this was my last question, |
| 11:15:26 | 7 | your Honor. |
| 11:15:26 | 8 | THE COURT:  And do you have any idea how much time |
| 11:15:28 | 9 | you're going to be? |
| 11:15:29 | 10 | MR. LIPTON:  We might get into the blizzard. |
| 11:15:32 | 11 | THE COURT:  Really? |
| 11:15:33 | 12 | MR. LIPTON:  I don't know.  It will be long. |
| 11:15:34 | 13 | THE COURT:  The reason I'm asking is I have a |
| 11:15:36 | 14 | settlement conference set this afternoon.  The parties just |
| 11:15:40 | 15 | called and they want to know what time because we e-mailed |
| 11:15:43 | 16 | them yesterday saying that we may have to move it, not |
| 11:15:49 | 17 | day-wise but hour-wise. |
| 11:15:51 | 18 | And then are you going to -- you'll probably have |
| 11:15:54 | 19 | some questions too? |
| 11:15:55 | 20 | MS. DEDINAS:  I'll be very quick. |
| 11:15:57 | 21 | THE COURT:  Okay.  But you're going to be a while, I |
| 11:16:01 | 22 | take it? |
| 11:16:02 | 23 | MR. LIPTON:  I think so. |
| 11:16:02 | 24 | THE COURT:  Okay.  Let's go back to the objection. |
| 11:16:02 | 25 | (Discussion off the record.) |

11:16:31   1    THE COURT:  Regarding whether he sounded upset,

11:17:11   2   surprised.

11:17:11   3    MR. LIPTON:  No, not whether he sounded upset or

11:17:14   4   surprised.  It was whether -- it was exactly what he said to

11:17:18   5   you, it was following that question.

11:17:26   6    (Record read.)

11:17:26   7    MR. LIPTON:  What did he say about it, right.

11:17:28   8    MR. McJESSY:  If I may, your Honor.  It's not

11:17:31   9   hearsay.  It's not being offered --

11:17:32  10    THE COURT:  I agree.  The objection is overruled.  He

11:17:35  11   can answer.

11:17:36  12    THE WITNESS:  I'm sorry.  Can you just repeat it?

11:17:38  13    THE COURT:  Sure.  I don't blame you.

11:18:02  14    (Record read.)

11:18:04  15    THE WITNESS:  Mr. Shah always had an understanding

11:18:10  16   with First Midwest that he was going to buy the lease, which

11:18:15  17   would include the server.  And when Mr. Clark advised him they

11:18:26  18   had taken the action of selling the server, he was very upset

11:18:29  19   because -- for a variety of reasons that he conveyed to me.

11:18:32  20    MR. LIPTON:  Objection.  Nonresponsive.  Move to

11:18:34  21   strike.

11:18:34  22    THE COURT:  That will be stricken.

11:18:37  23   BY MR. McJESSY:

11:18:37  24   Q.  Sir, what did he say to you that led you to believe that

11:18:39  25   he was upset or surprised?

11:18:41  1   A.  He told me that he was very upset and surprised that this

11:18:48  2   occurred because he always had an understanding with First

11:18:54  3   Midwest that they would sell him the server and the lease.

11:18:57  4   Q.  So he felt that they violated that understanding?

11:19:00  5   A.  Yes.

11:19:00  6   Q.  And you said that, although your testimony was stricken,

11:19:06  7   were there a variety of reasons that he believed they were

11:19:08  8   going to sell him the server and the lease?

11:19:10  9   A.  Yes, because I mentioned earlier he always understood that

11:19:19  10  he was going to acquire the lease and the guaranty, which

11:19:24  11  would include the server, for the reasons that his guaranty,

11:19:31  12  the fact that if he operated or someone operated in the

11:19:33  13  warehouse, that would be important, and third is the fact that

11:19:42  14  the data on that server is relevant to this case.

11:19:46  15          MR. McJESSY:  I have no other questions.  Thank you.

11:19:48  16          THE COURT:  Mr. Lipton, do you want to go first since

11:19:52  17  you are going to go brief?

11:19:54  18          MS. DEDINAS:  I am happy to go last.

11:19:56  19          THE COURT:  He wants some more time to look at his

11:19:58  20  notes, I assume.

11:20:01  21          MR. LIPTON:  That's right.

11:20:02  22          THE COURT:  I will give you five minutes.  Okay?

11:20:05  23          MR. LIPTON:  Thank you, Judge.

11:20:06  24          THE COURT:  Sure.  Anybody need to use the facility,

11:20:08  25  now is the time to go.

11:20:11    1    (Short break.)

11:28:12    2            THE COURT:  Are we ready?

11:28:13    3            MR. LIPTON:  Yes, your Honor.

11:28:14    4            THE COURT:  We are going to keep going until we get

11:28:17    5    this thing finished here, hopefully, and then I have a

11:28:20    6    settlement conference right after.

11:28:23    7                            - - -

11:28:23    8            STEVEN HOWARD BLUMENTHAL, CROSS-EXAMINATION

11:28:23    9    BY MR. LIPTON:

11:28:25    10   Q.  Good morning, Mr. Blumenthal.

11:28:26    11   A.  Good morning.

11:28:26    12   Q.  How long did you say that Mr. Shah has been a client of

11:28:32    13   yours?

11:28:33    14   A.  Fifteen or 16 years.

11:28:37    15   Q.  And in that time, you've generated a good amount of income

11:28:41    16   from Mr. Shah -- representing Mr. Shah, haven't you?

11:28:44    17   A.  I have been paid an hourly fee for whatever I did, yes.

11:28:48    18   Q.  Do you have any idea how much you earned from representing

11:28:53    19   Mr. Shah and his entities last year?

11:28:56    20   A.  No, I don't.

11:28:57    21   Q.  Was it in excess of $100,000?

11:29:01    22   A.  2010, are we talking about?

11:29:07    23   Q.  Yes.

11:29:07    24   A.  I don't know.

11:29:09    25   Q.  Was it in excess of half a million dollars?

11:29:11　　1　A.　No.

11:29:12　　2　Q.　$250,000?

11:29:14　　3　A.　I think it was a lot less than that.

11:29:16　　4　Q.　Is it fair to say that he is one of your oldest clients?

11:29:21　　5　　　　　THE COURT:　Age-wise?

11:29:24　　6　　　　　MR. LIPTON:　In terms of life of representation, your

11:29:26　　7　Honor.　I'm sorry for the vagueness of the question.

11:29:30　　8　　　　　THE WITNESS:　He would be one of them.

11:29:32　　9　BY MR. LIPTON:

11:29:32　　10　Q.　Okay.　And so you have had a close relationship with him

11:29:37　　11　over the years; is that right?

11:29:38　　12　A.　Yes.

11:29:38　　13　Q.　When were you -- strike that.

11:29:41　　14　　　　　You're admitted to the Seventh Circuit?

11:29:44　　15　A.　I don't -- I don't think so -- I don't know.

11:29:50　　16　Q.　Are you admitted to the Northern District of Illinois?

11:29:54　　17　A.　Yes.

11:29:55　　18　Q.　How long have you been admitted to the Northern District

11:29:59　　19　of Illinois?

11:29:59　　20　A.　1978.

11:29:59　　21　Q.　Are you aware of the 2006 amendments regarding ESI?

11:30:04　　22　A.　No.

11:30:04　　23　Q.　Now, you learned that Mr. Borlack was hired from a

11:30:17　　24　conversation with Scott Schreiber, correct?

11:30:19　　25　A.　Yes.

| | | |
|---|---|---|
| 11:30:20 | 1 | Q.  And you didn't approve of Mr. Borlack's hiring prior to |
| 11:30:25 | 2 | the fact -- prior to the time that he was hired, did you? |
| 11:30:29 | 3 | A.  I did not, no. |
| 11:30:30 | 4 | Q.  Did you know Mr. Borlack prior to the time he was hired? |
| 11:30:34 | 5 | A.  No. |
| 11:30:34 | 6 | Q.  When did you first meet Mr. Borlack? |
| 11:30:36 | 7 | A.  Sometime in January. |
| 11:30:40 | 8 | Q.  January of -- |
| 11:30:42 | 9 | A.  Of 2010. |
| 11:30:44 | 10 | Q.  And you first learned that there was a federal court |
| 11:30:52 | 11 | preservation order in this case approximately February |
| 11:30:56 | 12 | of 2010? |
| 11:30:58 | 13 | A.  I'm sorry.  The preservation order you're talking about is |
| 11:31:03 | 14 | the ESI discovery, is that -- |
| 11:31:05 | 15 | Q.  The ESI preservation order.  You learned of that in |
| 11:31:08 | 16 | February? |
| 11:31:08 | 17 | A.  I received a copy of that order, correct. |
| 11:31:10 | 18 | Q.  Okay.  Did you ever read it? |
| 11:31:12 | 19 | A.  I don't believe that I read it completely, no. |
| 11:31:16 | 20 | Q.  Well, you have some understanding of what |
| 11:31:25 | 21 | electronically-stored information is, don't you? |
| 11:31:26 | 22 | A.  Now I do. |
| 11:31:27 | 23 | Q.  You didn't before? |
| 11:31:28 | 24 | A.  No, I did not. |
| 11:31:29 | 25 | Q.  And did you learn from -- did you ever discuss the |

11:31:41    1    preservation order with your clients, Mr. Shah and/or

11:31:44    2    Mr. Joshi?

11:31:45    3    A.  I never discussed the order specifically.

11:31:54    4    Q.  Well, did you discuss it generally?

11:31:56    5    A.  I never discussed the order, only the fact of the lease

11:32:05    6    and the server and how they related to the order.

11:32:08    7    Q.  The lease of the server and how that related to the order?

11:32:14    8    A.  The lease, which included the server.

11:32:18    9    Q.  Okay.  And you discussed that with Mr. Shah and Mr. Joshi?

11:32:23   10    A.  I discussed with Mr. Shah and Mr. Joshi the purchase of

11:32:28   11    the lease, which would include the server, yes.

11:32:30   12    Q.  And you discussed that with them in the context of the ESI

11:32:36   13    preservation order, correct?

11:32:37   14    A.  In that context as well as from a business standpoint why

11:32:42   15    it would be useful and helpful to own that.

11:32:46   16    Q.  Useful and helpful to own the server?

11:32:50   17    A.  The lease, which included the server, yes.

11:32:54   18    Q.  Why would it be useful and helpful for Mr. Shah to own the

11:32:59   19    lease and the server?

11:33:01   20    A.  Well, as I explained before, if Mr. Shah acquired the

11:33:07   21    lease and his guaranty, then he would eliminate exposure under

11:33:14   22    his personal guaranty.

11:33:16   23          Also, as I explained, if at any time he or somebody

11:33:22   24    affiliated or related with him operated in the warehouse, that

11:33:27   25    server and computer equipment would be useful for the

11:33:31  1  operations there.

11:33:32  2  Q.  Now, how did that relate to the ESI order that was issued

11:33:40  3  in this court to preserve all electronic discovery?

11:33:44  4  A.  Well, if Mr. Shah owned the lease and the lease covered

11:33:51  5  the server, among other things, then he would control that

11:33:57  6  property.

11:33:57  7  Q.  So the idea was for Mr. Shah to own the property -- that

11:34:07  8  is, the server -- so he could control it and meet the

11:34:13  9  preservation requirements of the ESI order in this court; is

11:34:13  10  that right?

11:34:17  11  A.  That would be one of the things he would have

11:34:19  12  accomplished, yes.

11:34:20  13  Q.  And whose idea was it for him to purchase the server so

11:34:25  14  that he could avoid exposure under the personal guaranty and

11:34:35  15  use it in future operations of the warehouse?

11:34:38  16  A.  His idea.

11:34:39  17  Q.  It wasn't your idea?

11:34:40  18  A.  I won't know how it would function in terms of the

11:34:44  19  warehouse.

11:34:44  20  Q.  But you would know how it would eliminate his exposure on

11:34:50  21  the personal guaranty?

11:34:51  22  A.  Yes.

11:34:51  23  Q.  Wouldn't you?

11:34:52  24  A.  Yes.

11:34:52  25  Q.  Now, you discussed the preservation with Mr. Borlack and

11:35:08   1   he copied you on e-mails regarding the preservation order,

11:35:12   2   correct?

11:35:13   3   A. He copied me on orders and some e-mails regarding that

11:35:23   4   subject.

11:35:23   5   Q. Okay. And you never discussed with him this idea that

11:35:32   6   Mr. Shah was to purchase the computer; is that right?

11:35:40   7   A. I think I discussed -- I think I had a conversation, I

11:35:46   8   participated in a conference call where that was discussed.

11:35:49   9   Q. And that was the conference call with Mr. Shah and who

11:35:54   10   else?

11:35:54   11   A. Mr. Borlack.

11:35:55   12   Q. And when did that occur?

11:35:57   13   A. This would have been sometime late February, early March.

11:36:05   14   Q. Now, there's no written memorialization of that conference

11:36:16   15   call anywhere, is there?

11:36:17   16   A. No.

11:36:17   17   Q. And there's no e-mail either from Mr. Borlack or to you

11:36:22   18   that mentions such a conference call, is there?

11:36:25   19   A. No.

11:36:26   20   Q. Well, this was a pretty important subject, the

11:36:34   21   preservation of electronically-stored information for purposes

11:36:36   22   of this lawsuit, wasn't it?

11:36:38   23   A. I assume, yes.

11:36:39   24   Q. And as a transactional attorney, you're used to

11:36:42   25   memorializing things that are important, aren't you?

| | | |
|---|---|---|
| 11:36:47 | 1 | A.  Yes. |
| 11:36:48 | 2 | Q.  Why didn't you memorialize anything about this |
| 11:36:52 | 3 | conversation about Mr. Shah wanting to purchase his own -- the |
| 11:36:59 | 4 | computer server and the lease? |
| 11:37:01 | 5 | A.  I didn't -- I can't give you a specific answer. |
| 11:37:10 | 6 | Q.  Well, can you give me a general answer? |
| 11:37:12 | 7 | A.  I was not memorializing many conversations that took |
| 11:37:17 | 8 | place. |
| 11:37:18 | 9 | Q.  But this was a conversation about a particularly important |
| 11:37:23 | 10 | subject because it had to do with evidence in this case that |
| 11:37:26 | 11 | one party is saying favors them and the other party is saying |
| 11:37:32 | 12 | favors them, correct? |
| 11:37:33 | 13 | A.  Well, there are many important issues in the case. |
| 11:37:36 | 14 | Q.  Is there anything more important than the evidence in the |
| 11:37:38 | 15 | case? |
| 11:37:38 | 16 | A.  I don't know. |
| 11:37:41 | 17 | Q.  Because you're a transactional attorney, right? |
| 11:37:48 | 18 | So there is no memorialization in writing that you're |
| 11:38:00 | 19 | aware of of the conversation that you, quote, believe, |
| 11:38:06 | 20 | unquote, occurred before the deed in lieu transaction closed, |
| 11:38:09 | 21 | correct? |
| 11:38:10 | 22 | A.  Yes. |
| 11:38:12 | 23 | Q.  You also testified that you, quote, believe, unquote that |
| 11:38:19 | 24 | there may have been other conversations afterwards with |
| 11:38:23 | 25 | Mr. Borlack.  When you say you believe, does that mean that |

| Time | # | |
|---|---|---|
| 11:38:28 | 1 | there's some doubt in your mind? |
| 11:38:30 | 2 | A. No, it means that I can't recall specific times or dates |
| 11:38:36 | 3 | that those conversations took place. |
| 11:38:38 | 4 | Q. But you know that a conversation took place with a |
| 11:38:44 | 5 | particular person? |
| 11:38:45 | 6 | A. I believe -- yes, there were conversations that took place |
| 11:38:51 | 7 | with particular people. |
| 11:38:52 | 8 | Q. You said that there was a second conversation that you had |
| 11:38:59 | 9 | by phone regarding inventory and that you, quote, believed, |
| 11:39:04 | 10 | unquote, that in that conversation, you advised Mr. Borlack |
| 11:39:08 | 11 | that the client had told you what was going on with FMB's |
| 11:39:15 | 12 | negotiations to purchase the server, correct? |
| 11:39:17 | 13 | A. Yes. |
| 11:39:19 | 14 | Q. That conversation is not memorialized in any e-mail or |
| 11:39:25 | 15 | writing, is it? |
| 11:39:26 | 16 | A. I don't know if it is or it is not. |
| 11:39:36 | 17 | Q. Well, Mr. Blumenthal, how many depositions have you given |
| 11:39:39 | 18 | in this case? |
| 11:39:40 | 19 | A. Two. |
| 11:39:40 | 20 | Q. And have you prepared for those depositions? |
| 11:39:42 | 21 | A. By "prepare," you mean review documents? |
| 11:39:47 | 22 | Q. Review documents. |
| 11:39:48 | 23 | A. I reviewed some documents. |
| 11:39:49 | 24 | Q. And did you review your e-mails? |
| 11:39:51 | 25 | A. Yes. |

11:39:52  1  Q.  Did you review your e-mails to Mr. Borlack?

11:39:55  2  A.  Yes.

11:39:55  3  Q.  Did you review your e-mails from Mr. Borlack?

11:39:57  4  A.  Some of the e-mails.

11:40:00  5  Q.  Why didn't you review all of them?

11:40:02  6  A.  There were many e-mails from Mr. Borlack.

11:40:06  7  Q.  What made you select particular e-mails to review and not

11:40:09  8  others?

11:40:09  9  A.  Well, if they were relevant to my deposition, if I thought

11:40:14  10  they were relevant to my deposition.

11:40:15  11  Q.  So you reviewed any e-mails that you were aware of that

11:40:19  12  concerned the server in this case and/or the lease, correct?

11:40:25  13  A.  Yes.

11:40:27  14  Q.  And you did not find any e-mails between you and

11:40:32  15  Mr. Borlack that dealt with the second conversation that you

11:40:35  16  have mentioned concerning the inventory in which you believe

11:40:40  17  that you had a conversation where you were advised by -- where

11:40:45  18  you advised him that your client had told you that FMB was

11:40:49  19  negotiating to purchase the server, correct?

11:40:51  20  A.  That's correct.

11:40:53  21       THE COURT:  Would you -- if you can, try to --

11:40:58  22       MR. LIPTON:  Cut them up?

11:40:59  23       THE COURT:  Yes.  Thank you.

11:41:00  24  BY MR. McJESSY:

11:41:01  25  Q.  So there was a second conversation concerning inventory,

795

| | | |
|---|---|---|
| 11:41:09 | 1 | correct, between you and Mr. Borlack? |
| 11:41:10 | 2 | A.  Yes. |
| 11:41:10 | 3 | Q.  And you believe that you said in that conversation that |
| 11:41:16 | 4 | you advised him that your client had told you about FMB's |
| 11:41:21 | 5 | negotiations to purchase the server, correct? |
| 11:41:23 | 6 | A.  That's correct. |
| 11:41:28 | 7 | Q.  But there's nothing in writing that memorializes the fact |
| 11:41:32 | 8 | that that conversation ever occurred, correct? |
| 11:41:34 | 9 | A.  That's correct. |
| 11:41:38 | 10 | Q.  No e-mails, correct? |
| 11:41:40 | 11 | A.  That's correct. |
| 11:41:40 | 12 | Q.  No letters, correct? |
| 11:41:42 | 13 | A.  That's correct, yes. |
| 11:41:52 | 14 | Q.  In fact, at one of your depositions, besides testifying to |
| 11:41:55 | 15 | those two conversations, didn't you testify that you couldn't |
| 11:41:57 | 16 | recall any further communications between yourself and |
| 11:42:02 | 17 | Mr. Borlack regarding FMB's plan to buy the server? |
| 11:42:07 | 18 | A.  At what point in time? |
| 11:42:13 | 19 | Q.  At all.  Sorry. |
| 11:42:25 | 20 | A.  I need you to repeat the question.  I'm not following. |
| 11:42:27 | 21 | THE COURT:  He won't repeat it.  The court reporter |
| 11:42:29 | 22 | will. |
| 11:42:53 | 23 | (Record read.) |
| 11:42:55 | 24 | THE WITNESS:  I don't recall any further |
| 11:42:56 | 25 | conversations with Mr. Borlack about purchasing the server |

11:43:00  1  after the point in time when the inventory agreement was

11:43:05  2  completed, which would have been sometime in April, I believe.

11:43:09  3  BY MR. LIPTON:

11:43:09  4  Q.  So at your deposition, you testified to the two

11:43:13  5  conversations with Mr. Borlack that we have covered here;

11:43:17  6  isn't that right?

11:43:18  7  A.  Yes.

11:43:19  8  Q.  And you couldn't recall any further conversations with

11:43:23  9  Mr. Borlack or communications with Mr. Borlack concerning

11:43:30  10  FMB's plans to obtain title to the computer, did you?

11:43:33  11  A.  I think I just answered that after the time of the

11:43:41  12  inventory purchase agreement was worked out, I don't recall

11:43:46  13  any conversations with Mr. Borlack --

11:43:47  14  Q.  Well --

11:43:49  15  A.  -- that I had.

11:43:49  16  Q.  Go ahead.

11:43:51  17      Were there more than the two conversations that you

11:43:55  18  have just testified to on my cross-examination?

11:43:58  19  A.  I think I just answered, again, that following the

11:44:05  20  completion of that agreement, which would have been in April

11:44:10  21  sometime, I don't recall that I had any specific conversations

11:44:15  22  with Alan Borlack.

11:44:17  23  Q.  So the question is, the only two communications that you

11:44:20  24  had with Alan Borlack concerning FMB's purchase of the

11:44:25  25  computer were the two conversations that you've just testified

| | | |
|---|---|---|
| 11:44:28 | 1 | to; isn't that right? |
| 11:44:31 | 2 | A.  Yes. |
| 11:44:31 | 3 | Q.  And there was nothing in writing to or from Mr. Borlack |
| 11:44:56 | 4 | regarding this FMB plan to purchase the server, correct? |
| 11:44:59 | 5 | MR. McJESSY:  Objection.  Vagueness.  From him or |
| 11:45:02 | 6 | from anybody else? |
| 11:45:03 | 7 | THE COURT:  That's a good objection. |
| 11:45:05 | 8 | BY MR. LIPTON: |
| 11:45:05 | 9 | Q.  Nothing that you have seen? |
| 11:45:06 | 10 | THE COURT:  From. |
| 11:45:07 | 11 | MR. LIPTON:  Strike that.  Let me start over. |
| 11:45:09 | 12 | THE COURT:  Sure. |
| 11:45:09 | 13 | BY MR. LIPTON: |
| 11:45:10 | 14 | Q.  There was nothing in writing to or from Alan Borlack that |
| 11:45:13 | 15 | you have seen in reviewing all of the documents in this case |
| 11:45:15 | 16 | regarding FMB's plan to purchase the server, correct? |
| 11:45:21 | 17 | MR. McJESSY:  Objection.  Foundation.  There's no |
| 11:45:23 | 18 | testimony that he reviewed all of the documents in this case. |
| 11:45:27 | 19 | MR. LIPTON:  It was all the documents he had seen. |
| 11:45:29 | 20 | THE COURT:  Re-ask the question, and if you cut it up |
| 11:45:31 | 21 | a little.  It's really hard to keep track, at least I would |
| 11:45:34 | 22 | find it hard to keep track. |
| 11:45:35 | 23 | MR. LIPTON:  All right. |
| 11:45:37 | 24 | BY MR. LIPTON: |
| 11:45:37 | 25 | Q.  You testified that you reviewed certain documents that you |

11:45:41  1  believe were relevant to your testimony in this case, correct?

11:45:46  2  A.  That I had.

11:45:47  3  Q.  That you had.  And that's correct?

11:45:51  4  A.  Yes.

11:45:52  5  Q.  And out of all of the documents that you reviewed, you

11:45:55  6  never saw any communications that informed Mr. Borlack or that

11:46:04  7  Mr. Borlack had written regarding FMB's plan to purchase the

11:46:09  8  computer; isn't that right?

11:46:10  9  A.  I don't recall any e-mails.

11:46:20  10  Q.  Do you know why there was nothing in writing to

11:46:22  11  Mr. Borlack about FMB's plan to purchase the computer?

11:46:25  12  A.  No.

11:46:28  13  Q.  Wouldn't that have been an important thing for Mr. Borlack

11:46:44  14  to have known if he was running the litigation and was

11:46:46  15  responsible for ESI in this case?

11:46:48  16  A.  Mr. Borlack was aware of the fact that Kanan and Creative

11:47:01  17  no longer had an interest in the warehouse, and that included

11:47:05  18  the items that were remaining in the warehouse.

11:47:10  19          MR. LIPTON:  Objection.  Nonresponsive.

11:47:11  20          THE COURT:  Sustained.  That will be stricken.

11:47:14  21          MR. LIPTON:  Would you please reread the question.

11:47:25  22    (Record read.)

11:47:27  23          THE COURT:  You know what?  It might be better to go

11:47:29  24  to the previous question too.

11:47:32  25          MR. LIPTON:  Fine.

| | | |
|---|---|---|
| 11:47:32 | 1 | THE COURT:  If you don't mind. |
| 11:47:34 | 2 | Could I ask you to go one question above that and |
| 11:47:37 | 3 | then repeat the one that you just read. |
| 11:47:57 | 4 | (Record read.) |
| 11:47:59 | 5 | BY MR. LIPTON: |
| 11:48:00 | 6 | Q.  Yes or no? |
| 11:48:00 | 7 | A.  Yes. |
| 11:48:01 | 8 | Q.  Then why didn't you inform him of that in writing? |
| 11:48:09 | 9 | A.  I can't answer you -- in writing, I can't answer. |
| 11:48:15 | 10 | Q.  Why can't you answer? |
| 11:48:17 | 11 | A.  Because I don't recall any specific reason why I did or |
| 11:48:21 | 12 | did not. |
| 11:48:22 | 13 | Q.  Well, there were multiple e-mails from Mr. Borlack |
| 11:48:30 | 14 | discussing a number of other issues that you received copies |
| 11:48:33 | 15 | of, correct? |
| 11:48:35 | 16 | A.  Yes. |
| 11:48:35 | 17 | Q.  In fact, there were so many that you couldn't keep track |
| 11:48:39 | 18 | of them, correct? |
| 11:48:40 | 19 | A.  That's correct. |
| 11:48:41 | 20 | Q.  Mr. Borlack writes a lot of e-mails, doesn't he? |
| 11:48:43 | 21 | A.  Yes, he does. |
| 11:48:45 | 22 | Q.  Do you know how many e-mails he sent to you during the |
| 11:48:49 | 23 | course of this litigation? |
| 11:48:50 | 24 | A.  No idea. |
| 11:48:52 | 25 | Q.  If I told you that we have reviewed Mr. Borlack's records |

| | | |
|---|---|---|
| 11:48:55 | 1 | and you have been the recipient, either directly or by copy, |
| 11:49:02 | 2 | of 169 e-mails, would you believe that that was appropriate or |
| 11:49:10 | 3 | a good estimate of the number of e-mails that you received |
| 11:49:13 | 4 | from Mr. Borlack? |
| 11:49:14 | 5 | MR. McJESSY: Objection, your Honor. Assumes facts |
| 11:49:16 | 6 | not in evidence. |
| 11:49:18 | 7 | THE COURT: Sustained. |
| 11:49:26 | 8 | BY MR. LIPTON: |
| 11:49:27 | 9 | Q. Do you know how many e-mails you wrote to Mr. Borlack |
| 11:49:29 | 10 | about this case? |
| 11:49:29 | 11 | A. Not too many. I don't know the exact number. |
| 11:49:33 | 12 | Q. Would 169 sound about right? |
| 11:49:36 | 13 | A. That I wrote? |
| 11:49:38 | 14 | Q. That you wrote. |
| 11:49:39 | 15 | A. I would be surprised, but perhaps. |
| 11:49:42 | 16 | Q. Well, how many do you think you wrote to Mr. Borlack |
| 11:49:45 | 17 | concerning this case? |
| 11:49:46 | 18 | A. Oh, I'm sorry, I misunderstood. Concerning the case |
| 11:49:52 | 19 | generally? |
| 11:49:52 | 20 | Q. Yes. |
| 11:49:53 | 21 | A. One hundred and sixty-nine could be right. |
| 11:49:56 | 22 | Q. And in that -- |
| 11:50:00 | 23 | THE COURT: Could I have a clarification on that, |
| 11:50:02 | 24 | please? Do you mean directly or directly as well as copied? |
| 11:50:06 | 25 | MR. LIPTON: Directly as well as copied. |

| | | |
|---|---|---|
| 11:50:07 | 1 | THE COURT:  Thank you. |
| 11:50:08 | 2 | BY MR. LIPTON: |
| 11:50:11 | 3 | Q.  And in not one of those 169 e-mails, did you ever mention |
| 11:50:18 | 4 | the plan for FMB to purchase the computer and resell it to |
| 11:50:25 | 5 | Mr. Shah?  Did you? |
| 11:50:26 | 6 | A.  Not that I recall, no. |
| 11:50:29 | 7 | Q.  Why not? |
| 11:50:31 | 8 | A.  I can't give you any answer other than what I have stated |
| 11:50:38 | 9 | before. |
| 11:50:39 | 10 | Q.  Well, you understood, didn't you, that Mr. Borlack was |
| 11:50:58 | 11 | lead counsel for the defendants in the UCB litigation? |
| 11:51:03 | 12 | A.  Yes. |
| 11:51:03 | 13 | Q.  And you understood, didn't you, that part of his |
| 11:51:07 | 14 | responsibility was to make sure that the clients met their |
| 11:51:13 | 15 | electronic discovery responsibilities, correct? |
| 11:51:16 | 16 | A.  Yes. |
| 11:51:16 | 17 | Q.  Why wouldn't you tell counsel for defendants you were |
| 11:51:21 | 18 | alerting -- strike that. |
| 11:51:24 | 19 | Why wouldn't you tell counsel for defendants that |
| 11:51:30 | 20 | there was a plan afoot for Mr. Shah to get his own computer |
| 11:51:35 | 21 | back? |
| 11:51:35 | 22 | A.  I did. |
| 11:51:38 | 23 | Q.  All right.  Why didn't you put it in writing? |
| 11:51:41 | 24 | A.  I don't know. |
| 11:51:42 | 25 | Q.  Okay.  Well, can we turn to Exhibit 45, please.  Or is it |

11:51:58  1  46?

11:51:58  2          THE COURT:  46 is his e-mail.

11:52:01  3          MR. LIPTON:  Right.

11:52:01  4          THE COURT:  Do you want 45?

11:52:03  5          MR. LIPTON:  No, 46.

11:52:21  6  BY MR. LIPTON:

11:52:22  7  Q.  Now, do you recall writing Exhibit 46, which is your March

11:52:26  8  2010 e-mail to Mr. Serritella from Mr. Schlifke, Dave Clark,

11:52:32  9  and Mehul Shah?

11:52:33  10  A.  Yes.

11:52:33  11  Q.  What was your purpose in writing this e-mail?

11:52:49  12          MR. McJESSY:  What exhibit are we on?

11:52:52  13          MR. LIPTON:  45.

11:52:54  14          THE COURT:  46.

11:52:55  15          MR. LIPTON:  46.

11:52:57  16          THE WITNESS:  I was calling to Bill Serritella's

11:53:00  17  attention that there were some items that needed to be

11:53:02  18  addressed as part of the deed in lieu and eviction

11:53:09  19  transaction.

11:53:10  20  BY MR. LIPTON:

11:53:11  21  Q.  And what were those items in the e-mail that were part of

11:53:18  22  the deed in lieu and foreclosure that you were concerned about

11:53:22  23  when you wrote this e-mail?

11:53:23  24  A.  Well, one of the things I mention in here is the fact that

11:53:29  25  I wanted to make sure that both UCB and Mr. Shah's side had

| | | |
|---|---|---|
| 11:53:42 | 1 | access to the computer system at the warehouse.  And I also |
| 11:53:48 | 2 | addressed some personal items of Mr. Shah that were still in |
| 11:53:53 | 3 | the warehouse and a copier. |
| 11:53:58 | 4 | Q.  You're a transactional attorney, correct? |
| 11:54:00 | 5 | A.  Yes. |
| 11:54:01 | 6 | Q.  You don't deal with electronic discovery and preservation |
| 11:54:04 | 7 | issues, correct? |
| 11:54:05 | 8 | A.  Not in my daily practice, no. |
| 11:54:09 | 9 | Q.  In fact, you've never dealt with it before this case, |
| 11:54:13 | 10 | correct? |
| 11:54:13 | 11 | A.  Correct.  That's correct. |
| 11:54:14 | 12 | Q.  Well, why were you writing to Mr. Serritella and Mr. Clark |
| 11:54:22 | 13 | and Mr. Shah about preserving electronic information?  Why |
| 11:54:28 | 14 | wasn't counsel, who was responsible, writing about it? |
| 11:54:33 | 15 | A.  Because I was handling the transaction, and that's why. |
| 11:54:38 | 16 | Q.  And you felt that preservation of electronic discovery was |
| 11:54:45 | 17 | important to the transaction? |
| 11:54:46 | 18 | A.  It was important -- it was important for a variety of |
| 11:54:52 | 19 | reasons, yes. |
| 11:54:53 | 20 | Q.  To the transaction? |
| 11:54:53 | 21 | A.  It was an important element of the transaction, yes. |
| 11:55:03 | 22 | Q.  If it was an important element of the transaction, why |
| 11:55:05 | 23 | wasn't it included in any of the papers that handled the |
| 11:55:09 | 24 | transaction? |
| 11:55:09 | 25 | A.  Again, as I stated before, at the time, it was my |

| | | |
|---|---|---|
| 11:55:15 | 1 | understanding that First Midwest had reached an agreement to |
| 11:55:20 | 2 | acquire the lease, which included all of the computer systems |
| 11:55:25 | 3 | and the server. |
| 11:55:26 | 4 | Q.  And you're talking about March 15, 2010? |
| 11:55:32 | 5 | A.  Yes. |
| 11:55:32 | 6 | Q.  Well, the papers were in preparation way before March 15, |
| 11:55:36 | 7 | 2010, weren't they? |
| 11:55:36 | 8 | A.  Yes. |
| 11:55:37 | 9 | Q.  Then why weren't they contemplated -- why wasn't it |
| 11:55:41 | 10 | contemplated in the deed in lieu papers that the electronic |
| 11:55:44 | 11 | discovery be -- or the electronic evidence be preserved if it |
| 11:55:48 | 12 | was important to the transaction? |
| 11:55:50 | 13 | A.  Because First Midwest was going to acquire those items and |
| 11:55:56 | 14 | sell them to Mr. Shah. |
| 11:55:58 | 15 | Q.  And as a transactional attorney, you didn't consider that |
| 11:56:02 | 16 | First Midwest Bank may never acquire those items and may never |
| 11:56:07 | 17 | have the opportunity to sell them to Mr. Shah? |
| 11:56:08 | 18 | A.  At the time, I was advised that they had an understanding |
| 11:56:16 | 19 | and Mr. Shah had a similar understanding with Mr. Clark. |
| 11:56:20 | 20 | Q.  But you weren't advised of that at the time the documents |
| 11:56:24 | 21 | were being prepared, were you? |
| 11:56:25 | 22 | A.  Yes, I was. |
| 11:56:25 | 23 | Q.  How early did the document preparation start? |
| 11:56:28 | 24 | A.  First week or so in March. |
| 11:56:32 | 25 | Q.  So you believed that preserving ESI was important to the |

| | | |
|---|---|---|
| 11:56:57 | 1 | transaction and not to the litigation and that's why you wrote |
| 11:56:59 | 2 | it in the March 16 e-mail? |
| 11:57:02 | 3 | MR. McJESSY:  Objection.  Form, compound. |
| 11:57:04 | 4 | THE COURT:  He can answer the question.  This is the |
| 11:57:05 | 5 | topic that we've been on, and I don't think there is any |
| 11:57:09 | 6 | question about that.  Normally, that would be a good |
| 11:57:11 | 7 | objection. |
| 11:57:12 | 8 | THE WITNESS:  Could you repeat that, please. |
| 11:57:23 | 9 |   (Record read.) |
| 11:57:25 | 10 | THE WITNESS:  I thought it was important to the |
| 11:57:29 | 11 | transaction, as well as the fact that it was relevant and |
| 11:57:34 | 12 | important to the case. |
| 11:57:35 | 13 | BY MR. LIPTON: |
| 11:57:36 | 14 | Q.  To the litigation? |
| 11:57:37 | 15 | A.  Yes. |
| 11:57:37 | 16 | Q.  Then why didn't you copy Mr. Borlack on your March 16 |
| 11:57:43 | 17 | e-mail if it was important to the litigation? |
| 11:57:45 | 18 | A.  I don't know. |
| 11:57:46 | 19 | Q.  Wouldn't it have made sense for you to do that? |
| 11:57:49 | 20 | A.  I don't know.  It depends. |
| 11:57:54 | 21 | Q.  All right.  I'm ready.  What does it depend on? |
| 11:57:58 | 22 | A.  It depends on -- it could have been any number of reasons |
| 11:58:10 | 23 | why he would not have been copied. |
| 11:58:12 | 24 | Q.  Okay.  Give me one.  Could it have been that you were |
| 11:58:19 | 25 | trying to conceal the fact of this transaction from |

11:58:21   1   Mr. Borlack?

11:58:22   2   A.  Absolutely not.

11:58:23   3   Q.  Then what other reason could there have been?

11:58:36   4        I'm waiting.

11:58:36   5   A.  I'm thinking.

11:58:37   6   Q.  I know you are.

11:58:40   7   A.  Well, I would imagine that one reason would have been --

11:58:54   8   Q.  Do you imagine, or is this actually a reason?

11:58:59   9   A.  If you're asking me what I recall at that specific time --

11:59:03  10   Q.  That's right.

11:59:03  11   A.  -- I don't know the answer.

11:59:04  12   Q.  Fine.

11:59:06  13        Now, did you ever advise your clients -- and by that,

11:59:21  14   I mean Mr. Shah or Mr. Joshi -- as to how to handle ESI with

11:59:27  15   regard to the litigation?

11:59:27  16   A.  No.

11:59:29  17   Q.  You never did?

11:59:31  18   A.  No.

11:59:33  19   Q.  Did Mr. Shah ever ask you for advice on how to handle ESI

11:59:40  20   with respect to the litigation?

11:59:41  21   A.  No.

11:59:43  22   Q.  Turn to Exhibit 45, please.  Do you recall -- Exhibit 45

11:59:58  23   is an e-mail dated March 15, 2010, from Mehul Shah to Steve

12:00:07  24   Blumenthal copied to Paresh Joshi.

12:00:14  25        Do you remember receiving this e-mail?

| | | |
|---|---|---|
| 12:00:15 | 1 | A.  Yes. |
| 12:00:16 | 2 | Q.  Did you read this e-mail? |
| 12:00:17 | 3 | A.  Yes. |
| 12:00:18 | 4 | Q.  Let me direct your attention halfway down the paragraph |
| 12:00:23 | 5 | that says, Actually, data belongs to Kanan, and if you advise, |
| 12:00:32 | 6 | Kanan should not have any issue with that. |
| 12:00:38 | 7 | Did you ever advise Mr. Shah that he didn't have to |
| 12:00:43 | 8 | copy the hard drive? |
| 12:00:45 | 9 | A.  No. |
| 12:00:45 | 10 | Q.  Well, take a look at the rest of the e-mail.  In the first |
| 12:00:51 | 11 | sentence, it says -- I'll skip the fluffy stuff -- We should |
| 12:00:57 | 12 | be able to save the hard drive and we do not need to make |
| 12:01:02 | 13 | copy. |
| 12:01:03 | 14 | Do you see where it says that? |
| 12:01:04 | 15 | A.  Yes. |
| 12:01:04 | 16 | Q.  And Mr. Shah was telling you that Dave Clark had advised |
| 12:01:10 | 17 | him that there was no need to make a copy, correct? |
| 12:01:14 | 18 | A.  That's what the e-mail says, yes. |
| 12:01:17 | 19 | Q.  Okay.  Do you believe that's true? |
| 12:01:19 | 20 | A.  Yes. |
| 12:01:19 | 21 | Q.  And then it says, Dave said for UCB whenever we will need |
| 12:01:31 | 22 | the data, we can retrieve it from them. |
| 12:01:34 | 23 | Do you see that? |
| 12:01:35 | 24 | A.  Yes. |
| 12:01:35 | 25 | Q.  That was your understanding, wasn't it? |

12:01:37  1  A.  That's what Mr. Shah's understanding was.

12:01:44  2  Q.  And did you believe that to be true, that you could always

12:01:46  3  retrieve the data from FMB?

12:01:48  4  A.  I don't have any clue whether you can retrieve the data

12:01:56  5  from -- I have no idea.

12:01:58  6  Q.  Okay.  The next sentence says, Actually, data belongs to

12:02:03  7  Kanan, and if you advise, Kanan should not have any issue with

12:02:11  8  that.

12:02:12  9        Did you ever advise Mr. Shah that he didn't have to

12:02:15  10  copy the hard drive?

12:02:17  11  A.  No.

12:02:17  12  Q.  So if you didn't advise him that he didn't have to copy --

12:02:26  13  well, strike that.

12:02:27  14        When you received this e-mail, it was at 4:53 p.m. on

12:02:37  15  March 15, correct, or thereabouts?

12:02:39  16  A.  Yes.

12:02:39  17  Q.  The next thing that you did with regard to this case, the

12:02:44  18  next day at 9:20 a.m., was send out Exhibit 46, correct?

12:02:50  19  A.  I don't know if it was the next thing, but I did this the

12:02:56  20  next day, yes.

12:02:57  21  Q.  Okay.  So you were asking Mr. Serritella to enter into a

12:03:08  22  preservation agreement with regard to the ESI on the server,

12:03:20  23  weren't you?

12:03:20  24  A.  I was looking to confirm an understanding.

12:03:22  25  Q.  Okay.  And it's your testimony that before you sent out

12:03:35   1   the March 16 e-mail, Exhibit 46, you didn't advise your

12:03:39   2   clients not to copy the hard drive?

12:03:41   3   A.  I never advised my clients not to copy the hard drive.

12:03:45   4   Q.  Well, did you understand that Exhibit 45 was asking for

12:03:55   5   your advice on whether or not to copy the hard drive?

12:03:59   6   A.  Well, Exhibit 45 asks for my advice on whether the data

12:04:15   7   belongs to Kanan.

12:04:23   8   Q.  Well, read in context, Exhibit 45 says, We should be able

12:04:29   9   to save the hard drive and we do not need to make a copy.

12:04:33  10   Actually, data belongs to Kanan, and if you advise, Kanan

12:04:36  11   should not have any issue with that.

12:04:39  12        Isn't that right?

12:04:39  13   A.  That's what it says.

12:04:40  14   Q.  So your client was asking you for advice on whether or not

12:04:47  15   they could follow Mr. Clark's advice and not copy the hard

12:04:51  16   drive; isn't that right?

12:04:54  17   A.  He was asking for my advice on whether or not -- I don't

12:05:09  18   know if it's necessarily copy the hard drive, but whether or

12:05:11  19   not to agree with Dave Clark on the accessibility of the hard

12:05:17  20   drive.

12:05:17  21   Q.  And what language do you point to for that conclusion?

12:05:22  22   A.  Dave said for UCB, whenever we will need the data, we can

12:05:29  23   retrieve it from them.

12:05:30  24   Q.  Dave said that he can always retrieve the data?

12:05:40  25   A.  Yes.

12:05:41  1   Q.  And in order for Dave to always have the ability to
12:05:46  2   retrieve the data, then it wasn't necessary for there to be a
12:05:51  3   copy of the hard drive made, was there?
12:05:53  4   A.  One doesn't necessarily follow from the other.
12:05:59  5   Q.  Well, why would access to the hard drive be important if
12:06:03  6   you had a copy?
12:06:04  7   A.  Because it's the original.
12:06:11  8   Q.  A copy is the original?
12:06:12  9   A.  No, no, no.  The server would contain the original data.
12:06:16  10  Q.  Okay.  And a copy would duplicate the original data,
12:06:21  11  correct?
12:06:21  12  A.  Yes.
12:06:23  13  Q.  So, again, why would it be important to have access if you
12:06:33  14  had a copy?
12:06:34  15  A.  Because I believe that the server and the data on the
12:06:41  16  server would be important in the case.
12:06:45  17  Q.  Now -- so did you discuss with your client, Mr. Shah,
12:06:58  18  whether or not to make a copy of the hard drive?
12:07:02  19  A.  I never discussed with Mr. Shah whether to make a copy or
12:07:07  20  not.
12:07:08  21  Q.  Did you ever discuss with Mr. Shah the fact that Dave
12:07:14  22  Clark would always provide access to the hard drive?
12:07:17  23  A.  We did discuss the fact that First Midwest Bank would
12:07:23  24  provide access, yes.
12:07:26  25  Q.  And there was no discussion between you and your client

12:07:33　1　about copying?

12:07:34　2　A.　There was no discussion because he had already indicated

12:07:41　3　that the cost in his mind was expensive.　That's what he said.

12:07:47　4　Q.　And was that a valid reason in your mind for not copying

12:07:51　5　the hard drive?

12:07:51　6　A.　I have no idea whether that's a valid reason or not.　My

12:08:02　7　discussions with Mr. Shah centered on access to the server,

12:08:06　8　the actual machine and the data on that machine.

12:08:08　9　Q.　Okay.　And what was -- strike that.

12:08:20　10　　　　Why was access to the data on the machine important

12:08:24　11　to you again?

12:08:24　12　A.　Well, as I said in my e-mail, it would be important to be

12:08:31　13　able to access the data for the case.

12:08:36　14　Q.　For the litigation?

12:08:38　15　A.　It would be important to access the data for the

12:08:43　16　litigation, yes.

12:08:44　17　Q.　Then I ask you again, why wasn't Mr. Borlack copied on any

12:08:54　18　of these writings?

12:08:56　19　　　　MR. McJESSY:　Objection.　Cumulative.

12:08:57　20　　　　THE COURT:　He can answer.

12:08:58　21　　　　THE WITNESS:　I can't tell you why he was not copied.

12:09:01　22　BY MR. LIPTON:

12:09:02　23　Q.　Okay.　For example, you didn't forward Exhibit 45 to

12:09:06　24　Mr. Borlack, did you?

12:09:07　25　A.　Not that I recall, no.

| | | |
|---|---|---|
| 12:09:15 | 1 | Q. And had you received e-mails from Mr. Borlack or his |
| 12:09:20 | 2 | office indicating that the options for handling ESI was either |
| 12:09:29 | 3 | to get access to it or to copy the hard drive on the server? |
| 12:09:35 | 4 | A. I'm sorry. Can you repeat that? |
| 12:09:43 | 5 | THE COURT: I don't blame you for that. Again, try |
| 12:09:45 | 6 | to cut them down a little bit, if you can. |
| 12:09:48 | 7 | MR. LIPTON: Sorry, your Honor. |
| 12:09:49 | 8 | THE COURT: Would you repeat that, please. |
| 12:10:09 | 9 | (Record read.) |
| 12:10:18 | 10 | BY MR. LIPTON: |
| 12:10:18 | 11 | Q. Let me ask it a different way. Do you recall receiving |
| 12:10:20 | 12 | e-mails from Mr. Borlack's office at any time stating that ESI |
| 12:10:29 | 13 | required -- strike that. |
| 12:10:32 | 14 | Do you recall receiving any e-mails from |
| 12:10:35 | 15 | Mr. Borlack's office suggesting that the data on the server |
| 12:10:44 | 16 | either had to be copied or access to the server had to be |
| 12:10:52 | 17 | obtained? |
| 12:10:53 | 18 | MR. McJESSY: I'm sorry. Can you read that question |
| 12:10:56 | 19 | back? |
| 12:10:57 | 20 | THE COURT: Sure. |
| 12:11:08 | 21 | (Record read.) |
| 12:11:10 | 22 | THE WITNESS: I don't recall any specific e-mails. |
| 12:11:10 | 23 | BY MR. LIPTON: |
| 12:11:14 | 24 | Q. Did your clients tell you that Mr. Borlack's office had |
| 12:11:18 | 25 | told them that they either had to get access to the server or |

12:11:23  1   a copy of the hard drive?

12:11:24  2   A.  I believe, yes.

12:11:35  3   Q.  And what did you tell them about the need to do either or

12:11:39  4   both of those?

12:11:39  5   A.  Again, the only part of that that I was involved in was

12:11:55  6   the access to the server.

12:11:58  7   Q.  Okay.

12:12:02  8           THE COURT:  And that really doesn't answer the

12:12:04  9   question.

12:12:04  10          THE WITNESS:  I'm sorry.

12:12:07  11          MR. LIPTON:  Could you repeat the question, please.

12:12:23  12      (Record read.)

12:12:26  13          THE WITNESS:  The only thing I told them is that they

12:12:30  14  needed to continue to work on acquiring the lease and, you

12:12:38  15  know, make sure that they had access through First Midwest.

12:12:44  16  BY MR. LIPTON:

12:12:45  17  Q.  Why didn't you tell them to just copy the hard drive?

12:12:47  18  A.  Because I don't know what's involved in doing that.

12:12:50  19  Q.  Why didn't you call Mr. Blumenthal -- strike that.

12:12:55  20          Why didn't you call Mr. Borlack -- there's two Bs

12:12:59  21  here -- why didn't you call Mr. Borlack and ask him what was

12:13:02  22  involved?

12:13:03  23  A.  I wasn't involved in the ESI process, so my role and

12:13:14  24  function was to deal with the accessibility of the hard drive.

12:13:25  25  If it needed to be copied, I wouldn't have known and I

12:13:28   1   wouldn't have advised him either way.

12:13:30   2   Q. Let me he approach it from this angle, Mr. Blumenthal.

12:13:33   3   The hard drive essentially contained your clients' books and

12:13:36   4   records with respect to the inventory that was at the

12:13:40   5   warehouse, correct?

12:13:40   6   A. I don't know if that's correct or not.

12:13:48   7   Q. Your clients told you that there was inventory information

12:13:50   8   on the hard drive, correct?

12:13:51   9   A. They told me there was inventory information on the hard

12:13:54   10   drive.

12:13:54   11   Q. So the hard drive contained your clients' books and

12:13:57   12   records with regard to inventory, correct?

12:13:58   13   A. By that, you're assuming that it contains all of their

12:14:02   14   books and records on the inventory, and I don't know that.

12:14:04   15   Q. Whether it contains all of it or not, it contained their

12:14:08   16   books and records in some measure concerning their inventory,

12:14:12   17   correct?

12:14:12   18   A. Yes. Yes.

12:14:13   19   Q. And you wouldn't want anything to happen to your clients'

12:14:19   20   books and records concerning inventory, would you?

12:14:21   21   A. No, I wouldn't want anything to happen to those.

12:14:30   22   Q. And if they couldn't get access to it through a purchase

12:14:34   23   arrangement with FMB or otherwise, they wouldn't have those

12:14:38   24   books and records, would they?

12:14:39   25   A. Maybe yes, maybe no.

12:14:45   1   Q.  All right.  Let's go with maybe yes.  How would they have

12:14:51   2   access to those books and records if they didn't have

12:14:55   3   possession of them through the FMB purchase?

12:14:57   4   A.  Could have acquired them from some other party, could have

12:15:02   5   acquired them from Associated Bank directly.

12:15:03   6   Q.  But it wouldn't have been your clients' inventory records,

12:15:11   7   would it?  Strike that.  Strike that.

12:15:16   8          Did you advise them to acquire the information from

12:15:24   9   Associated Bank directly?

12:15:25  10   A.  I advised Mr. Shah to attempt to acquire the lease and

12:15:34  11   guaranty from Associated Bank.

12:15:36  12   Q.  And what was the backup plan if that was not successful?

12:15:43  13   A.  First Midwest Bank was going to negotiate to acquire the

12:15:46  14   lease and guaranty.

12:15:47  15   Q.  And how -- what if First Midwest Bank didn't give your

12:15:55  16   client access to the server after they acquired it?  Then how

12:16:02  17   would your clients' books and records regarding inventory be

12:16:06  18   protected?

12:16:07  19   A.  Well, again, I am not a litigator, but I assume that

12:16:15  20   through the litigation, there would have been a way through

12:16:18  21   subpoena or something to acquire access to the data.

12:16:23  22   Q.  By whom?

12:16:27  23   A.  By the parties in the litigation.

12:16:32  24   Q.  Wouldn't that involve knowing that there was no access to

12:16:41  25   the data?  You wouldn't issue a subpoena if you had access to

| | | |
|---|---|---|
| 12:16:47 | 1 | the data, would you? |
| 12:16:48 | 2 | A.  Why not? |
| 12:16:50 | 3 | THE COURT:  It's not your turn to ask a question. |
| 12:16:52 | 4 | THE WITNESS:  I'm sorry. |
| 12:16:54 | 5 | BY MR. LIPTON: |
| 12:16:54 | 6 | Q.  If you had access to the data, what would be the need for |
| 12:16:57 | 7 | issuing a subpoena? |
| 12:16:58 | 8 | A.  Well, if all parties had access to the data, perhaps there |
| 12:17:06 | 9 | wouldn't be a need. |
| 12:17:07 | 10 | Q.  All right.  Let's move on to a different topic.  Still on |
| 12:17:30 | 11 | Exhibit 46.  You never got an agreement from FMB that they |
| 12:17:35 | 12 | would preserve your clients' hard drive, did you? |
| 12:17:39 | 13 | A.  Mr. Serritella advised me that they would make the hard |
| 12:17:48 | 14 | drive and the computers that were there available to the |
| 12:17:52 | 15 | parties. |
| 12:17:52 | 16 | Q.  And at some point in time, did your understanding of that |
| 12:17:55 | 17 | change? |
| 12:17:55 | 18 | A.  Yes. |
| 12:17:56 | 19 | Q.  And when was that? |
| 12:17:57 | 20 | A.  Around the time of the inventory. |
| 12:18:01 | 21 | Q.  The inventory was when?  February 13th -- I'm sorry, |
| 12:18:07 | 22 | April 13th? |
| 12:18:07 | 23 | A.  Late April. |
| 12:18:08 | 24 | Q.  All right.  So a month after you sent your March 16 e-mail |
| 12:18:12 | 25 | asking Mr. Serritella for an agreement to preserve, you found |

12:18:17  1   out that there was no longer going to be access granted by FMB

12:18:22  2   without a subpoena or a court order, correct?

12:18:25  3   A.   That's what I was advised, yes.

12:18:26  4   Q.   And you were advised that by your clients, correct?

12:18:29  5   A.   I was advised that by my clients and Mr. Serritella.

12:18:32  6   Q.   And did you follow up on your March 16th request to

12:18:41  7   Mr. Serritella for an agreement to preserve ESI when you knew

12:18:46  8   that it was in FMB's possession and control and they were

12:18:48  9   requesting a subpoena or court order to access it?

12:18:52  10  A.   I was advised -- I'm sorry.  You better repeat the

12:18:56  11  question.

12:18:57  12     (Record read.)

12:19:13  13       THE WITNESS:  My only follow-up was a conversation

12:19:18  14  with Mr. Serritella where he advised me that he and/or

12:19:24  15  Mr. Clark advised the parties in this lawsuit that access

12:19:31  16  would not be granted without a court order or a subpoena, I

12:19:35  17  think.

12:19:35  18  BY MR. LIPTON:

12:19:35  19  Q.   He and Mr. Clark advised the parties to the lawsuit that

12:19:39  20  access would not be granted without a subpoena or a court

12:19:43  21  order; is that right?  Is that what Mr. Serritella told you?

12:19:46  22  A.   Mr. Serritella told me that the parties to the lawsuit

12:19:54  23  were advised that without a court order or a subpoena, they

12:19:58  24  would not have access.

12:20:00  25  Q.   And by --

12:20:00    1          MS. DEDINAS:  Objection.  Hearsay.

12:20:02    2    BY MR. LIPTON:

12:20:03    3    Q.  By "parties to the lawsuit," you mean UCB and Shah and

12:20:13    4    Joshi?

12:20:14    5          THE COURT:  Overruled.

12:20:15    6          THE WITNESS:  The parties to the lawsuit were all the

12:20:17    7    named parties in the lawsuit, but I believe -- well, I

12:20:23    8    shouldn't -- never mind.

12:20:24    9    BY MR. LIPTON:

12:20:31    10   Q.  So an agreement for FMB to preserve -- you never pursued

12:20:36    11   an agreement with FMB to preserve the ESI on the server,

12:20:43    12   correct?

12:20:44    13   A.  I focused on access to the server.

12:20:50    14   Q.  So you never followed up with FMB for an agreement to

12:20:58    15   preserve the ESI on the server, correct?

12:21:03    16   A.  I did not follow up because I am not a party -- I am not

12:21:10    17   an attorney in this lawsuit, correct.

12:21:12    18   Q.  Well, you're giving advice in this lawsuit on ESI through

12:21:20    19   your March 16 e-mail, No. 46, aren't you?

12:21:27    20         MR. McJESSY:  I will object on the grounds that it

12:21:30    21   assumes facts not in evidence.  He is not advising.

12:21:35    22         THE COURT:  He is asking a question.  He can answer.

12:21:37    23         THE WITNESS:  No, I am not advising.  I'm attempting

12:21:40    24   to confirm an understanding that Mr. Shah had with Mr. Clark.

12:21:46    25   BY MR. LIPTON:

12:21:48  1  Q.  Okay.  Well, doesn't your e-mail say, I need to make sure

12:21:52  2  that the hard drive and system are accessible before we

12:21:57  3  re-acquire those items?

12:21:58  4  A.  Yes.

12:21:58  5  Q.  All right.  And that they will be relevant to the UCB

12:22:04  6  litigation and discovery?

12:22:06  7  A.  Yes.

12:22:06  8  Q.  I need the bank to agree that they will preserve the items

12:22:10  9  and allow access to UCB or us in connection with the

12:22:14  10 litigation?

12:22:15  11 A.  Yes.

12:22:15  12 Q.  And you were copying your client on that information,

12:22:17  13 correct?

12:22:18  14 A.  Yes.

12:22:18  15 Q.  And you were also making a demand of FMB, correct?

12:22:23  16 A.  A demand?  I was trying to confirm an understanding about

12:22:27  17 access.

12:22:28  18 Q.  And when they didn't confirm that understanding, you

12:22:31  19 didn't pursue it, did you?

12:22:32  20 A.  No, they did confirm it.

12:22:36  21 Q.  And how did they do that?

12:22:39  22 A.  They -- Mr. Clark -- I was advised by Mr. Shah that

12:22:44  23 Mr. Clark had indicated that the server would be accessible.

12:22:50  24 Q.  All right.  So there were two times when there was

12:22:53  25 information about the server:  The first time was March 16 or

12:22:59  1  thereabouts where you thought that there was going to be a

12:23:01  2  deal where there would be access, and the later one when you

12:23:05  3  learned that the deal fell through and you learned that there

12:23:07  4  wasn't going to be access, correct?

12:23:09  5  A.  There were two times what?

12:23:16  6  Q.  There were two times where the issue of access to the

12:23:21  7  server concerned you.  The first was when you believed around

12:23:26  8  March 15 that there was a deal and that Mr. Clark would

12:23:30  9  provide access to the server, correct?

12:23:32  10  A.  There were two times that I addressed in an e-mail the

12:23:38  11  concern over accessibility.

12:23:40  12  Q.  I am not talking about concern over accessibility.  I'm

12:23:48  13  talking about two times when you were concerned about access

12:23:53  14  to the server, whether it was -- the first time was about

12:24:01  15  March 15 or 16 when you thought that there was going to be

12:24:05  16  clear access because of Mr. Clark's representations, correct?

12:24:09  17  A.  Yes.

12:24:09  18  Q.  And the second time was sometime in April when you learned

12:24:12  19  that all of a sudden a subpoena or court order was going to be

12:24:15  20  required, correct?

12:24:18  21  A.  Yes.

12:24:18  22  Q.  Why at that time when you learned that you no longer had

12:24:24  23  access in April did you not pursue with FMB having an

12:24:31  24  arrangement whereby your clients or UCB would be able to have

12:24:37  25  access?

| | |
|---|---|
| 12:24:37 | 1 |
| 12:24:44 | 2 |
| 12:24:47 | 3 |
| 12:24:53 | 4 |
| 12:24:55 | 5 |
| 12:25:08 | 6 |
| 12:25:13 | 7 |
| 12:25:17 | 8 |
| 12:25:20 | 9 |
| 12:25:25 | 10 |
| 12:25:29 | 11 |
| 12:25:32 | 12 |
| 12:25:55 | 13 |
| 12:25:57 | 14 |
| 12:25:58 | 15 |
| 12:25:58 | 16 |
| 12:26:01 | 17 |
| 12:26:03 | 18 |
| 12:26:04 | 19 |
| 12:26:05 | 20 |
| 12:26:05 | 21 |
| 12:26:06 | 22 |
| 12:26:09 | 23 |
| 12:26:10 | 24 |
| 12:26:14 | 25 |

A.  Because they had already made their position clear that access would not be permitted without a court order.

Q.  And so you didn't even feel it was worthwhile to try and negotiate access; is that right?

A.  Well, there was a negotiation taking place on the subject of the inventory -- the remaining inventory at the warehouse at that same time, and an agreement was ultimately reached between the parties on that inventory.

And at the same time, First Midwest was continuing to try to acquire the server and the lease, which included the server.  So there were other things going on at the same time is what I'm trying to say.

THE COURT:  While you are thinking, do you mind if I ask a question?

MR. LIPTON:  Certainly.

THE COURT:  On this e-mail that you sent out on March 16th, did you ever get a response?

THE WITNESS:  Verbally?

THE COURT:  Any way.

THE WITNESS:  Yes.

THE COURT:  When?

THE WITNESS:  That very day.

THE COURT:  And who was that from?

THE WITNESS:  Bill Serritella.

THE COURT:  And was that in person or over the phone?

822

12:26:17    1      THE WITNESS:  Over the phone.

12:26:18    2      THE COURT:  Okay.

12:26:20    3   BY MR. LIPTON:

12:26:20    4   Q.  And what was that response?

12:26:21    5   A.  He confirmed the fact that First Midwest would make the

12:26:29    6   computer system, which included the server, available.

12:26:31    7   Q.  Was there ever any explanation given to you why there was

12:26:45    8   a change of heart by FMB in April and they were now requiring

12:26:53    9   a court order or subpoena to gain access to the server?

12:26:56   10   A.  I can repeat what I was told by Mr. Serritella, if that's

12:27:11   11   permitted.

12:27:11   12   Q.  Go ahead.

12:27:12   13   A.  He told me that the bank was -- I'm sorry, First Midwest

12:27:18   14   Bank was frustrated by the fact that they had been unable to

12:27:24   15   reach an agreement with UCB, United Central Bank, on the

12:27:32   16   subject of the inventory and its disposal, and because of

12:27:36   17   that, and the fact that they needed to use the warehouse, they

12:27:43   18   were now taking that position.  That's what he told me.

12:27:46   19   Q.  You testified earlier that in February through March of

12:29:01   20   2010, you regularly received e-mails from Mr. Borlack and

12:29:06   21   Mr. Borlack had explained to you that Mr. Shah and Mr. Joshi

12:29:10   22   needed to preserve the data and get it produced, correct, the

12:29:17   23   data on the server?

12:29:18   24   A.  I testified that I regularly received e-mails from

12:29:25   25   Mr. Borlack, yes.

| | | |
|---|---|---|
| 12:29:30 | 1 | Q. Okay. Did you also testify that Mr. Borlack explained to |
| 12:29:36 | 2 | you that Mr. Shah and Mr. Joshi needed to preserve the data on |
| 12:29:39 | 3 | the server and get it produced? |
| 12:29:41 | 4 | A. There were times, and I just can't tell you if it was |
| 12:29:51 | 5 | exactly in that time frame, yes. |
| 12:29:53 | 6 | Q. Of the 169 e-mails that you sent Mr. Borlack, none of them |
| 12:30:14 | 7 | discussed the need to get a subpoena or court order, did they? |
| 12:30:23 | 8 | A. That I sent them, no. |
| 12:30:27 | 9 | Q. And from all the documents that you have reviewed with |
| 12:30:31 | 10 | respect to this case, have you ever seen any document that |
| 12:30:34 | 11 | advised Mr. Borlack or his firm that it was necessary to get a |
| 12:30:40 | 12 | subpoena or a court order in order to access the server? |
| 12:30:44 | 13 | A. No. |
| 12:30:44 | 14 | Q. Now, if we could take a look at Exhibit 22, please. Are |
| 12:31:14 | 15 | you familiar with that e-mail? |
| 12:31:15 | 16 | A. Yes. |
| 12:31:15 | 17 | Q. You testified earlier to it on direct? |
| 12:31:18 | 18 | A. Yes. |
| 12:31:18 | 19 | Q. All right. There's no discussion in that e-mail |
| 12:31:22 | 20 | concerning ESI or the server, is there? |
| 12:31:29 | 21 | A. No. |
| 12:31:35 | 22 | Q. And you said that that e-mail accurately describes the |
| 12:31:41 | 23 | subject matter of the discussions that it covers? |
| 12:31:46 | 24 | A. Yes. |
| 12:31:47 | 25 | Q. Okay. Take a look at Exhibit 28, please. You testified |

12:32:04    1   about Exhibit 28 on direct.  Do you recall that?

12:32:06    2   A.  Yes.

12:32:07    3   Q.  You testified that it was an accurate description of the

12:32:12    4   subject matter of those conversations, correct?

12:32:15    5   A.  Yes.

12:32:18    6   Q.  And there's no discussion in that e-mail concerning ESI or

12:32:25    7   the server, is there?

12:32:26    8   A.  No.

12:32:27    9   Q.  Now, when you were testifying before, I believe you said

12:32:52   10   that Exhibit 46, the March 16 e-mail that you had written to

12:32:58   11   Mr. Serritella concerning preservation of the evidence,

12:33:08   12   concerned items in the warehouse that were material to the

12:33:10   13   case.  And I think what you meant to say was concerned the

12:33:19   14   server in the warehouse which was material to the case; isn't

12:33:21   15   that right?

12:33:21   16   A.  I don't know the question specifically, but it would have

12:33:27   17   been more than just the server.

12:33:28   18   Q.  It would have been the inventory as well?

12:33:30   19   A.  Inventory and anything else that was in there that

12:33:33   20   belonged to one of the parties.

12:33:36   21   Q.  Okay.  Now, you said you don't recall if Mr. Borlack told

12:33:45   22   you to send the March 16th e-mail.  Remember that testimony?

12:33:51   23   A.  Yes.

12:33:51   24   Q.  Why would you think that Mr. Borlack would tell you to

12:33:56   25   send an e-mail concerning the preservation of ESI in a case

825

12:34:01　1　that he was litigating?

12:34:02　2　A.　I am not sure I understand your question.

12:34:10　3　　　　　THE COURT:　I don't either because that's not a

12:34:12　4　question -- if he asked it, it was a question that his counsel

12:34:16　5　asked.

12:34:19　6　BY MR. LIPTON:

12:34:20　7　Q.　Your counsel said you don't recall -- I'm sorry.

12:34:22　8　　　　　MR. McJESSY:　For the record, I am not representing

12:34:24　9　Mr. Blumenthal.

12:34:25　10　　　　　THE COURT:　I'm sorry, you're right.

12:34:28　11　　　　　MR. McJESSY:　I am not his counsel.　He is here as a

12:34:31　12　subpoenaed witness.

12:34:31　13　　　　　THE COURT:　I'm sorry.

12:34:34　14　　　　　MR. LIPTON:　He seemed like his counsel.

12:34:36　15　　　　　THE COURT:　Strike that.　Strike that.

12:34:37　16　BY MR. LIPTON:

12:34:39　17　Q.　You testified that you didn't recall if Mr. Borlack told

12:34:42　18　you to send the March 16th e-mail, correct?

12:34:45　19　A.　Yes.

12:34:47　20　Q.　Mr. Borlack was responsible for electronically-stored

12:34:51　21　information preservation in this litigation, correct?

12:34:57　22　A.　Yes.

12:34:58　23　Q.　Why would he tell you to send an e-mail regarding

12:35:01　24　preservation?　Do you have any idea?

12:35:03　25　A.　I thought I testified that he -- I don't recall him

12:35:13    1    telling me to send it.

12:35:15    2    THE COURT: You did.

12:35:19    3    BY MR. LIPTON:

12:35:20    4    Q. Okay. So you don't believe he told to you send it, do

12:35:24    5    you?

12:35:24    6    A. I already testified that I don't recall --

12:35:30    7    Q. You just don't recall?

12:35:33    8    A. Yes.

12:35:33    9    Q. Okay. I think you also testified that the reason that

12:36:02   10    Mr. Shah's name was included on that e-mail, the March 16

12:36:09   11    e-mail, which is Exhibit 46, is because you must have hit

12:36:12   12    reply to all? Do you recall that?

12:36:15   13    A. No, that's not what I said. What I do recall saying is

12:36:22   14    that Dave Clark was on my reply e-mail because I hit reply

12:36:28   15    all.

12:36:28   16    Q. Okay. And you intentionally added Mr. Shah?

12:36:31   17    A. Yes.

12:36:32   18    Q. Okay. Let me call your attention to Exhibit 56, please.

12:37:21   19    Are you familiar with the e-mail that is in Exhibit 56?

12:37:29   20    A. Yes.

12:37:29   21    Q. It's a March 24, 2010, e-mail copied to Mehul Shah, Paresh

12:37:39   22    Joshi, copied to Alan Borlack and Scott Schreiber, right?

12:37:46   23    A. Yes.

12:37:47   24    Q. And it's regarding the collateral stored at the warehouse?

12:37:49   25    A. Yes.

12:37:49    1   Q.  And it transmits a letter from Mr. Domanskis?

12:37:52    2   A.  No, to Mr. Domanskis.

12:37:55    3   Q.  To Mr. Domanskis.  I'm sorry.

12:37:58    4        From Mr. Serritella?

12:38:02    5   A.  Yes.

12:38:03    6   Q.  Now, why would you copy Mr. Borlack on this e-mail?

12:38:14    7   A.  Because it's relevant to the case.

12:38:28    8   Q.  And how is it relevant to the case?

12:38:30    9   A.  Because Mr. Serritella mentions the fact that -- talks

12:38:36   10   about the clothing that's remaining at the warehouse, among

12:38:41   11   other things, and requiring that it be removed by a date

12:38:49   12   certain.

12:38:49   13   Q.  And that was your primary communication -- area of

12:38:54   14   communication with Mr. Borlack, wasn't it, about the inventory

12:38:56   15   that was stored at the warehouse and resolving the issue of

12:39:00   16   the inventory at the warehouse, what was going to be done with

12:39:03   17   it?

12:39:03   18   A.  My primary at the time I sent this?

12:39:06   19   Q.  No, generally, generally.

12:39:11   20   A.  I'm sorry.

12:39:17   21   Q.  All right.  Let me withdraw the question.

12:39:20   22        A large number of the communications you had with Mr.

12:39:23   23   Borlack had to do with resolving the inventory problem at the

12:39:25   24   warehouse, correct?

12:39:26   25   A.  During this period of time?

| | | |
|---|---|---|
| 12:39:31 | 1 | Q.  Yes. |
| 12:39:32 | 2 | A.  Yes. |
| 12:39:32 | 3 | Q.  All right. |
| 12:39:33 | 4 | A.  And that's in March, March and April. |
| 12:39:36 | 5 | Q.  And April? |
| 12:39:42 | 6 | A.  Yes. |
| 12:39:42 | 7 | Q.  And during the same period of time, there were |
| 12:39:44 | 8 | negotiations going on with FMB to purchase the server so that |
| 12:39:48 | 9 | it could be resold to Mr. Shah, correct? |
| 12:39:51 | 10 | A.  Correct. |
| 12:39:53 | 11 | Q.  And that had to do with the litigation too, correct? |
| 12:39:56 | 12 | A.  The server had to do with the litigation, yes, the data on |
| 12:40:03 | 13 | the server. |
| 12:40:04 | 14 | Q.  Why wasn't Mr. Borlack copied on any e-mails that you |
| 12:40:09 | 15 | generated with respect to that? |
| 12:40:10 | 16 | A.  As I told you before, I can't tell that you. |
| 12:40:12 | 17 | Q.  So you dealt with Mr. Blumenthal -- strike that. |
| 12:40:14 | 18 | You dealt with Mr. Borlack on inventory issues, but |
| 12:40:18 | 19 | you didn't deal with him on ESI issues, correct, in writing? |
| 12:40:25 | 20 | A.  Mr. Borlack asked me to help him on the inventory issue. |
| 12:40:33 | 21 | And, yes, so that's why I communicated with him on that. |
| 12:40:36 | 22 | Q.  Now, Mr. McJessy asked you if you had a reason not to |
| 12:41:03 | 23 | forward Mr. Clark's e-mails concerning the FMB negotiations to |
| 12:41:07 | 24 | purchase the server and lease to Mr. Borlack and whether or |
| 12:41:11 | 25 | not you were trying to hide the negotiations, and you |

12:41:14　1　testified no.  Do you remember that?

12:41:16　2　A.  That I was not trying to hide, yes.

12:41:18　3　Q.  Right.

12:41:19　4　　　　　And you said, I may have bcc'd him, correct?

12:41:24　5　A.  I think I said that I don't recall if I did or did not.

12:41:28　6　Q.  Okay.  Do you have any reason to believe that you bcc'd

12:41:33　7　Mr. Borlack on any of those e-mails?

12:41:39　8　A.  I don't recall, and that's why I said before that I don't

12:41:43　9　recall if I did or didn't.

12:41:44　10　Q.  And so in going through the e-mails that you sent in

12:41:56　11　preparation to testify here today, you didn't see any bcc's of

12:42:00　12　your e-mails to Mr. Borlack concerning sale of the computer to

12:42:06　13　FMB, did you?

12:42:07　14　A.  I did not.

12:42:11　15　Q.  Earlier in your testimony to Mr. McJessy, you testified

12:42:33　16　you didn't know if you advised Mr. Borlack of the further

12:42:36　17　negotiations to purchase the server essentially from April

12:42:42　18　through July, correct?

12:42:43　19　A.  That I don't know if I advised him?

12:42:51　20　Q.  Yes.

12:42:51　21　A.  I don't know if I did or did not.

12:42:53　22　Q.  Okay.  Why wouldn't you have advised him?

12:42:59　23　A.  Well, number one, I wasn't handling any negotiations over

12:43:04　24　the server.

12:43:05　25　Q.  But you were monitoring them, weren't you?

| | |
|---|---|
| 12:43:08 | 1 |
| 12:43:15 | 2 |
| 12:43:19 | 3 |
| 12:43:20 | 4 |
| 12:43:24 | 5 |
| 12:43:30 | 6 |
| 12:43:31 | 7 |
| 12:43:42 | 8 |
| 12:43:43 | 9 |
| 12:43:56 | 10 |
| 12:44:05 | 11 |
| 12:44:09 | 12 |
| 12:44:11 | 13 |
| 12:44:17 | 14 |
| 12:44:21 | 15 |
| 12:44:24 | 16 |
| 12:44:24 | 17 |
| 12:44:27 | 18 |
| 12:44:32 | 19 |
| 12:44:35 | 20 |
| 12:44:39 | 21 |
| 12:44:43 | 22 |
| 12:44:50 | 23 |
| 12:44:52 | 24 |
| 12:44:57 | 25 |

A.  I would receive e-mails from Mr. Shah letting me know certain instances of whether or not there was a deal and how close they were to a deal.

Q.  And you received e-mails from Mr. Clark as well -- I'm sorry, from Mr. Serritella concerning the negotiations as well, weren't you?

A.  After April, are we talking about?

Q.  Yes.

A.  I don't recall if I did.  I don't recall if I did.

Q.  So there were e-mails going between you and Mr. Shah and potentially e-mails going between you and Mr. Clark concerning negotiations for the purchase of the server, but none of those e-mails made their way to Mr. Borlack, did they?

A.  I never communicated with Mr. Clark on the server.

Q.  I'm sorry, I meant Mr. Serritella.  Let me withdraw the question.

      So there were e-mails going back and forth between you and Mr. Shah about negotiations to purchase the server, and there were potentially e-mails between you and Mr. Serritella on the same subject, and none of them, to your knowledge, got forwarded to Mr. Borlack, did they?

A.  Not to my knowledge.

      THE COURT:  Hang on one second.  If you have an objection, because I can't see you, just blurt it out.

      MR. McJESSY:  I usually do stand up, but I wasn't --

| | | |
|---|---|---|
| 12:44:57 | 1 | THE COURT:  Because I can't see you. |
| 12:44:58 | 2 | MR. McJESSY:  I appreciate that. |
| 12:44:59 | 3 | BY MR. LIPTON: |
| 12:45:00 | 4 | Q.  What's the basis of your knowledge that the server |
| 12:45:03 | 5 | contained information concerning the inventory? |
| 12:45:05 | 6 | A.  From what I was told by Mr. Shah and Mr. Joshi. |
| 12:45:11 | 7 | Q.  Okay.  And what did they tell you? |
| 12:45:13 | 8 | A.  That the warehouse system had its own server for the data |
| 12:45:24 | 9 | in terms of tracking inventory. |
| 12:45:26 | 10 | Q.  Okay.  Did they tell you anything beyond that about the |
| 12:45:31 | 11 | information that was on the server? |
| 12:45:32 | 12 | A.  Well, at what point in time are we talking about? |
| 12:45:40 | 13 | Q.  Anytime. |
| 12:45:41 | 14 | A.  Yes. |
| 12:45:42 | 15 | Q.  What did they tell you? |
| 12:45:44 | 16 | A.  They told me that that would be information that would be |
| 12:45:46 | 17 | important for their position in this lawsuit. |
| 12:45:47 | 18 | Q.  Okay.  Did you believe them when they told you that it |
| 12:45:52 | 19 | contained information concerning the inventory? |
| 12:45:55 | 20 | A.  Yes. |
| 12:45:56 | 21 | Q.  Did you believe them when they told you that it would |
| 12:46:01 | 22 | provide information that was important to them in this |
| 12:46:05 | 23 | lawsuit? |
| 12:46:05 | 24 | A.  Yes. |
| 12:46:05 | 25 | Q.  Did you have any reason not to believe what your clients |

| | | |
|---|---|---|
| 12:46:08 | 1 | were telling you at any time? |
| 12:46:09 | 2 | A.  No. |
| 12:46:12 | 3 | Q.  You're still Mr. Shah and Mr. Joshi's lawyer today, |
| 12:46:35 | 4 | correct? |
| 12:46:36 | 5 | A.  I'm not Mr. Joshi's lawyer. |
| 12:46:38 | 6 | Q.  Mr. Shah's lawyer? |
| 12:46:39 | 7 | A.  Yes. |
| 12:46:39 | 8 | Q.  You are the lawyer for Kanan Fashions, to the extent it |
| 12:46:46 | 9 | may or may not exist? |
| 12:46:47 | 10 | A.  In the capacity that I described, yes. |
| 12:46:51 | 11 | Q.  And you're also the lawyer for Creative Warehousing? |
| 12:46:57 | 12 | A.  Yes, in the capacity that I described, yes. |
| 12:47:00 | 13 | MR. LIPTON:  Thank you. |
| 12:47:04 | 14 | THE COURT:  Are you going to be -- I am not trying to |
| 12:47:06 | 15 | rush you.  Do you have many? |
| 12:47:08 | 16 | MS. DEDINAS:  No. |
| 12:47:09 | 17 | THE COURT:  Okay. |
| 12:47:14 | 18 | MS. DEDINAS:  We're hungry. |
| 12:47:17 | 19 | THE COURT:  No, we are not going to break for hunger. |
| 12:47:19 | 20 | We can break for the bathroom if anybody needs to go. |
| 12:47:32 | 21 | MS. DEDINAS:  How long a break should we take? |
| 12:47:39 | 22 | THE COURT:  We will take five minutes. |
| 12:47:40 | 23 | (Short break.) |
| 12:54:24 | 24 | THE COURT:  Are we ready? |
| 12:54:29 | 25 | - - - |

| | | |
|---|---|---|
| 12:54:29 | 1 | STEVEN HOWARD BLUMENTHAL, CROSS-EXAMINATION |
| 12:54:29 | 2 | BY MS. DEDINAS: |
| 12:54:47 | 3 | Q.  Good afternoon, Mr. Blumenthal. |
| 12:54:48 | 4 | A.  Good afternoon. |
| 12:54:49 | 5 | Q.  Mr. Blumenthal, you indicated that you represented Kanan |
| 12:54:55 | 6 | Fashions and Creative Warehousing when they were operating, |
| 12:54:58 | 7 | correct? |
| 12:54:58 | 8 | A.  Correct. |
| 12:54:58 | 9 | Q.  And you don't represent Mr. Joshi? |
| 12:55:01 | 10 | A.  Correct. |
| 12:55:01 | 11 | Q.  Did you represent a company formed by Mr. Joshi? |
| 12:55:06 | 12 | A.  Yes. |
| 12:55:14 | 13 | Q.  What company was that? |
| 12:55:15 | 14 | A.  Raven. |
| 12:55:16 | 15 | Q.  And was Raven related to Kanan Fashions in any way? |
| 12:55:20 | 16 | A.  No. |
| 12:55:22 | 17 | Q.  It was not a procurement company for Kanan Fashions or a |
| 12:55:28 | 18 | fulfillment company? |
| 12:55:29 | 19 | A.  I'd have to explain that what Raven was doing was |
| 12:55:37 | 20 | fulfilling some orders that Kanan was unable to fulfill for |
| 12:55:46 | 21 | one retailer, I think. |
| 12:55:47 | 22 | Q.  So after there was a problem, that your clients had a |
| 12:55:53 | 23 | problem defaulting on their loan with United Central Bank, you |
| 12:55:57 | 24 | assisted Kanan Fashions in figuring out how to complete some |
| 12:56:02 | 25 | of their business obligations; isn't that correct? |

12:56:05  1    MR. McJESSY:  Objection, your Honor.  The question

12:56:07  2  states facts not in evidence, that Kanan defaulted on its loan

12:56:12  3  with Central Bank.

12:56:14  4    THE COURT:  Sustained.

12:56:14  5    MR. McJESSY:  That's actually one of the central

12:56:16  6  issues.

12:56:17  7  BY MS DEDINAS:

12:56:17  8  Q.  Did you advise Kanan Fashions on how to organize another

12:56:21  9  business that could help it fulfill some of its obligations to

12:56:29  10  its customers in light of its financial problems with United

12:56:33  11  Central Bank?

12:56:33  12  A.  I, along with Scott Schreiber, discussed with Mr. Joshi

12:56:46  13  and Mr. Shah the various alternatives and issues with it, yes.

12:56:51  14  Q.  Now, in addition to those companies, do you represent

12:56:55  15  Mr. Shah or Mr. Joshi in any new companies that they have

12:56:59  16  formed, clothing manufacturing or distribution companies that

12:57:05  17  would take the place of Kanan Fashions?

12:57:06  18  A.  No.

12:57:07  19  Q.  Okay.  We've talked a little bit about the eviction that

12:57:13  20  happened here, and I just want to clarify.  This was a

12:57:16  21  voluntary eviction, wasn't it?

12:57:18  22  A.  There was no alternative because --

12:57:23  23    THE COURT:  That's not -- that is not the question.

12:57:25  24    THE WITNESS:  Sorry.  Yes, it was a voluntary

12:57:29  25  eviction.

| | | |
|---|---|---|
| 12:57:29 | 1 | BY MS. DEDINAS: |
| 12:57:30 | 2 | Q. And there was an agreed order of eviction? |
| 12:57:32 | 3 | A. Yes. |
| 12:57:32 | 4 | Q. And, presumably, you could have chosen the date, your |
| 12:57:37 | 5 | clients could have chosen the date for the eviction; is that |
| 12:57:37 | 6 | correct? |
| 12:57:40 | 7 | A. No, that's not correct. |
| 12:57:41 | 8 | Q. Okay. Now, prior to the voluntary eviction, your clients |
| 12:57:51 | 9 | left personal effects at the Creative Warehousing facility; |
| 12:57:53 | 10 | isn't that right? |
| 12:57:55 | 11 | A. Prior to it, did you say? |
| 12:57:58 | 12 | Q. Prior. |
| 12:57:59 | 13 | A. Yes. |
| 12:57:59 | 14 | Q. Prior to the eviction. |
| 12:58:00 | 15 | A. Yes. |
| 12:58:00 | 16 | Q. And what were those items, to your knowledge? |
| 12:58:05 | 17 | A. To my knowledge, there were some boxes of some personal |
| 12:58:11 | 18 | records or personal artifacts or whatever, and there was |
| 12:58:19 | 19 | inventory remaining there, there was -- I mean, everything |
| 12:58:23 | 20 | that you would have in an operating warehouse was still there. |
| 12:58:27 | 21 | Q. Was it your understanding that Kanan Fashions abandoned |
| 12:58:31 | 22 | its inventory at the warehouse? |
| 12:58:33 | 23 | A. It's my understanding that it couldn't afford to move or |
| 12:58:39 | 24 | deal with the inventory at the warehouse. |
| 12:58:41 | 25 | Q. And they couldn't afford to get a liquidator to come in |

| | | |
|---|---|---|
| 12:58:44 | 1 | and purchase it and take it away? |
| 12:58:47 | 2 | A.  They wouldn't necessarily have that right. |
| 12:58:52 | 3 | Q.  So they chose not to do that? |
| 12:58:54 | 4 | A.  Correct. |
| 12:58:55 | 5 | Q.  And do you know whether there were any personal computers |
| 12:59:00 | 6 | left at the warehouse -- |
| 12:59:01 | 7 | A.  I don't. |
| 12:59:01 | 8 | Q.  -- prior to the eviction? |
| 12:59:03 | 9 | A.  I'm sorry.  No, I don't know. |
| 12:59:05 | 10 | Q.  Okay.  At any point prior to the voluntary eviction, did |
| 12:59:12 | 11 | your clients tell you that they can't move anything, like the |
| 12:59:21 | 12 | server, because they had been told by their counsel, |
| 12:59:25 | 13 | Mr. Muschler, to take no action with respect to the server? |
| 12:59:30 | 14 | A.  I'm sorry.  Could you repeat that? |
| 12:59:56 | 15 | (Record read. ) |
| 12:59:58 | 16 | THE WITNESS:  I don't recall being told that. |
| 12:59:59 | 17 | BY MS. DEDINAS: |
| 01:00:00 | 18 | Q.  They never came and asked you anything about -- any advice |
| 01:00:03 | 19 | about that? |
| 01:00:03 | 20 | A.  About advice that Mr. Muschler had given them? |
| 01:00:08 | 21 | Q.  Yes. |
| 01:00:09 | 22 | A.  No. |
| 01:00:09 | 23 | Q.  Now, what written arrangements did you make to ensure that |
| 01:00:14 | 24 | your clients had a right to re-enter the premises and get any |
| 01:00:19 | 25 | possessions that they may have left behind? |

01:00:21   1   A.   In writing there was an e-mail about the access to the

01:00:34   2   server and the other items that are mentioned in that

01:00:38   3   March 16th e-mail.

01:00:41   4           In addition, the agreements with First Midwest gave

01:00:51   5   Mr. Shah or others either related to him or not the right to

01:00:55   6   lease part of the warehouse and occupy it.

01:00:59   7   Q.   But he would have to sign the lease in order to have that

01:01:03   8   right; is that correct?

01:01:04   9   A.   Someone would have to.

01:01:05   10  Q.   Somebody would have to.

01:01:06   11          And, otherwise, in terms of their right to come back

01:01:10   12  to the warehouse and have the right to re-enter, you were

01:01:15   13  relying on e-mails; is that correct?

01:01:17   14  A.   Correct.

01:01:17   15  Q.   Now, you're a transactional attorney, you've testified,

01:01:20   16  right?

01:01:20   17  A.   Yes.

01:01:21   18  Q.   And you have over 30 years of experience in transactional

01:01:23   19  law?

01:01:23   20  A.   Yes.

01:01:24   21  Q.   And one of the key elements of your job is to carefully

01:01:31   22  and thoroughly document your clients' agreements in writing;

01:01:34   23  isn't that correct?

01:01:35   24  A.   Correct.  Correct.

01:01:36   25  Q.   And to get them executed properly, correct?

01:01:40  1   A.  Correct.

01:01:40  2   Q.  And, in fact, transactional attorneys are the ones who

01:01:43  3   make sure that the T's are crossed and the I's are dotted when

01:01:47  4   it comes to that; isn't that right?

01:01:48  5   A.  Normally, yes.

01:01:50  6   Q.  So you normally don't rely on a one-way e-mail transaction

01:01:53  7   to make sure that your clients' interests are protected; isn't

01:01:59  8   that correct?

01:01:59  9   A.  That's correct.

01:01:59  10  Q.  Okay.  Now, this was a deal that had several components to

01:02:05  11  it; isn't that right?

01:02:08  12  A.  Yes.

01:02:08  13  Q.  There was a deed in lieu, right?

01:02:10  14  A.  Yes.

01:02:10  15  Q.  There was an option to lease?

01:02:12  16  A.  Yes.

01:02:12  17  Q.  There was a license for a while to allow First Midwest

01:02:18  18  Bank to have access to the building?

01:02:20  19  A.  Correct.

01:02:21  20  Q.  There was an agreed eviction, right?

01:02:24  21  A.  Yes.

01:02:24  22  Q.  And, in fact, you kept a closing book of all the written

01:02:31  23  transactions here; isn't that right?

01:02:32  24  A.  Yes.

01:02:33  25  Q.  And you mentioned that Mr. Shah always had an

01:02:36　1　understanding that First Midwest Bank -- with First Midwest

01:02:40　2　Bank that he could repurchase the server?

01:02:43　3　A.　Yes.

01:02:43　4　Q.　Do you remember that testimony?

01:02:44　5　A.　Yes.

01:02:44　6　Q.　And that is the only component of this transaction that

01:02:49　7　wasn't documented in writing in the same manner as all the

01:02:54　8　other agreements you reached; isn't that correct?

01:02:57　9　A.　That's correct.

01:02:58　10　Q.　And you knew that this particular component was just as

01:03:02　11　important to your client as the others; isn't that right?

01:03:05　12　A.　Yes.

01:03:06　13　Q.　And there's nothing in writing whatsoever other than a

01:03:10　14　one-way e-mail?

01:03:13　15　A.　That's correct.

01:03:14　16　Q.　And you understand that the reason you need to document

01:03:19　17　things like that in signed, written, executed agreements, is

01:03:24　18　because deals go bad, right?

01:03:27　19　A.　Yes, they do.

01:03:30　20　Q.　Anything can happen, right?

01:03:32　21　A.　That's correct.

01:03:33　22　Q.　Mr. Clark could have been fired, right?

01:03:36　23　A.　Yes.

01:03:37　24　Q.　He could have been hit by a bus, right?

01:03:41　25　　　　　MR. McJESSY:　Objection, your Honor.　Calls for

01:03:43  1  speculation.

01:03:43  2         THE COURT:  No, he can answer that.

01:03:44  3         THE WITNESS:  Yes.

01:03:48  4  BY MS. DEDINAS:

01:03:49  5  Q.  And clients hire you precisely for the reason to

01:03:51  6  anticipate all the things that could go wrong and put them in

01:03:54  7  writing to make sure that their rights are protected; isn't

01:03:57  8  that right?

01:03:57  9  A.  That's correct.

01:03:58  10  Q.  So was it sloppiness on your part, sir, that you failed to

01:04:03  11  document this one understanding that your client had that was

01:04:07  12  so important to him?

01:04:08  13  A.  No.

01:04:10  14  Q.  How do you explain it?

01:04:16  15  A.  The only basis that I can explain it is that the

01:04:23  16  expectation was that First Midwest would be acquiring that

01:04:28  17  lease at the same time that we were completing the deed in

01:04:33  18  lieu and eviction, and that at the time that they acquired it,

01:04:39  19  they were going to sell it to Mr. Shah.

01:04:41  20  Q.  But that didn't happen, right?

01:04:44  21  A.  It did not happen at that time.

01:04:45  22  Q.  And so then you had any number of months to go back and

01:04:50  23  say, gentlemen, there's still a component of this deal that we

01:04:54  24  need to put in writing?

01:04:56  25  A.  Yes.

01:04:57  1   Q.  And you didn't do that, right?

01:04:59  2   A.  I did not.

01:05:00  3   Q.  Okay.  Now, back in February and March, I want to ask you

01:05:07  4   a little bit about your knowledge of your clients' financial

01:05:10  5   condition.  You understood that your clients had not made

01:05:16  6   payments on a very significant loan to United Central Bank;

01:05:16  7   isn't that correct?

01:05:21  8   A.  In February or March?

01:05:23  9   Q.  Of 2010.

01:05:25  10  A.  That's correct.

01:05:25  11  Q.  And, in fact, Kanan Fashions and Creative Warehousing were

01:05:29  12  out of business as a result; isn't that right?

01:05:31  13  A.  That's correct.

01:05:32  14  Q.  And you're aware that they were not able to pay debts as

01:05:36  15  they became due, right?

01:05:39  16  A.  That's -- yes.

01:05:42  17  Q.  And you're aware that Mr. Shah was not getting any income

01:05:46  18  from Kanan Fashions as its employee; isn't that correct?

01:05:51  19  A.  Yes.

01:05:51  20  Q.  In fact, it would be fair to say that Kanan Fashions and

01:05:57  21  Creative Warehousing were insolvent in February or March;

01:06:04  22  isn't that right?

01:06:05  23          MR. McJESSY:  Objection, your Honor.  Relevance.

01:06:06  24          THE COURT:  No, he can answer it.

01:06:08  25          THE WITNESS:  I don't know that I could reach that

01:06:14　1　conclusion.

01:06:15　2　BY MS. DEDINAS:

01:06:16　3　Q.　Would it be fair to say they were in extremely dire

01:06:20　4　financial condition?

01:06:21　5　A.　Yes.

01:06:22　6　Q.　Do you know what a preferential transfer is, sir?

01:06:28　7　A.　Yes.

01:06:28　8　Q.　What is it?

01:06:29　9　A.　It's a transfer -- it's a bankruptcy term of art.

01:06:33　10　Q.　Okay.　And what does it mean?

01:06:34　11　A.　It means a transfer of assets to a party made within a

01:06:43　12　certain period of time.

01:06:46　13　Q.　And what about a fraudulent conveyance?

01:06:49　14　A.　Yes.

01:06:49　15　Q.　What is that?

01:06:51　16　A.　It's a transfer made with the intent to avoid creditors

01:07:00　17　and it's made within a certain period of time.

01:07:02　18　Q.　And do either of these concern a situation where an

01:07:08　19　insolvent party would be paying or preferring one creditor

01:07:11　20　over another?

01:07:12　21　A.　Yes.

01:07:13　22　Q.　So that could be a problem; isn't that right?

01:07:18　23　A.　It could be a problem?

01:07:20　24　Q.　It could be a problem for your clients who are in dire

01:07:23　25　financial situation to prefer and pay off one creditor over

01:07:31    1  another?

01:07:31    2  A.  It could be a problem for the creditor who received the
01:07:37    3  payment.

01:07:38    4          MR. McJESSY:  Judge, I object to this line of
01:07:40    5  questioning on relevance grounds.  I am not sure what this has
01:07:42    6  to do with the server.

01:07:44    7          MS. DEDINAS:  I am trying to get to that.

01:07:46    8          THE COURT:  You get a little bit more.

01:07:48    9          So your objection is overruled at this time.

01:07:51   10          MR. McJESSY:  Thank you, your Honor.

01:07:52   11  BY MS. DEDINAS:

01:07:53   12  Q.  Did you think there was any kind of a problem with putting
01:07:57   13  in writing an agreement whereby Mr. Shah or one of his
01:08:02   14  companies would be agreeing to pay one creditor, Associated
01:08:09   15  Bank, in preference over another creditor, United Central Bank
01:08:15   16  or any of the other creditors that they may have had?

01:08:17   17  A.  It may or may not have been a preference or a fraudulent
01:08:26   18  transfer, but that doesn't necessarily mean that I thought it
01:08:29   19  was a problem to put it in writing.

01:08:30   20  Q.  So you weren't concerned at all about documenting an
01:08:35   21  agreement that would essentially lay it out in black-and-white
01:08:41   22  that your client was preferring one creditor over another?

01:08:45   23  A.  No.

01:08:48   24  Q.  But now the problem could be avoided altogether if
01:08:57   25  somebody unrelated to Mr. Shah or any of his companies paid

01:09:01  1   for the server; isn't that correct?

01:09:02  2        MR. McJESSY:  Objection, your Honor.  States facts

01:09:04  3   not in evidence.

01:09:05  4        THE COURT:  Sustained.  Sustained.

01:09:08  5        MR. McJESSY:  It was never established that it was a

01:09:10  6   problem.

01:09:10  7   BY MS. DEDINAS:

01:09:11  8   Q.  You indicated that it could be a problem, it could be

01:09:14  9   something that you could be concerned about; isn't that right?

01:09:16  10  A.  No, I think what I said is that it could be deemed a

01:09:23  11  fraudulent transfer or a preference, but that wouldn't

01:09:27  12  necessarily cause me a problem from putting it in writing.

01:09:32  13  Q.  Okay.  Now, it wouldn't -- you don't believe it would be

01:09:37  14  deemed a fraudulent conveyance or a preference if somebody

01:09:43  15  unrelated to Mr. Shah or any of his other entities paid for

01:09:48  16  the server and the lease; isn't that right?

01:09:50  17  A.  I'm not sure that I'm following what you're asking me.

01:09:56  18  Q.  Any problem that there could be regarding a fraudulent

01:10:04  19  transfer could be avoided entirely if the party paying for the

01:10:09  20  server and the lease was not Mr. Shah, was not related to

01:10:14  21  Mr. Shah, or associated with him or any of his companies;

01:10:19  22  isn't that right?

01:10:19  23  A.  I don't know if that's right or wrong.  I don't know.

01:10:27  24  Q.  You never gave that any thought?

01:10:29  25  A.  Actually, no.

845

| | | |
|---|---|---|
| 01:10:31 | 1 | Q. Now, you knew because of Mr. -- you indicated that you |
| 01:10:36 | 2 | knew in July that Mr. Shah was not able to purchase the server |
| 01:10:42 | 3 | because he didn't have the money; isn't that right? |
| 01:10:44 | 4 | A. I think what I said was that he was out of the country and |
| 01:10:49 | 5 | making arrangements to purchase it when he returned. |
| 01:10:52 | 6 | Q. And then after he returned, you learned that did he not |
| 01:10:58 | 7 | have the money to buy the server, correct? |
| 01:11:01 | 8 | A. I believe that he indicated that he needed a little extra |
| 01:11:08 | 9 | time to put together the funds. |
| 01:11:10 | 10 | Q. Well, whether he needed a little bit of time or a lot of |
| 01:11:14 | 11 | time, the question is you knew he didn't have the money at |
| 01:11:17 | 12 | that moment, right? |
| 01:11:17 | 13 | A. No, I didn't know that. |
| 01:11:21 | 14 | Q. You didn't know that he didn't have the money? |
| 01:11:23 | 15 | A. No. His understanding with First Midwest was either you |
| 01:11:39 | 16 | could pay it all in cash or First Midwest would finance him |
| 01:11:46 | 17 | for a period of time, so he had alternatives. |
| 01:11:49 | 18 | So whether he had the money or not, I don't know. |
| 01:11:51 | 19 | Q. Now, you indicated also in your testimony that Mr. Shah |
| 01:12:08 | 20 | was having discussions with some foreign clothing |
| 01:12:13 | 21 | manufacturers or distributors to be the lessees of the |
| 01:12:18 | 22 | Creative Warehousing space. Do you recall that? |
| 01:12:21 | 23 | A. Yes. |
| 01:12:21 | 24 | Q. Do you know what time frame he was having these |
| 01:12:23 | 25 | discussions? |

01:12:24  1  A.  It was sometime between March and June or July.

01:12:35  2  Q.  Do you know whether he was also negotiating to have these

01:12:44  3  foreign companies, the proposed lessees, pay for the server or

01:12:49  4  pay for the lease of the server?

01:12:51  5  A.  I don't know.

01:12:51  6  Q.  You never discussed that with him?

01:12:53  7  A.  I did not.

01:12:54  8  Q.  Do you know any of the entities that he was negotiating

01:13:00  9  with?

01:13:00  10  A.  I don't recall the name.  I don't recall the name.

01:13:13  11  Q.  Do you know where the company was located?

01:13:18  12  A.  I believe it was either Hong Kong, it somewhere in the Far

01:13:30  13  East, I believe.

01:13:31  14  Q.  Would the name Fancy Creations ring a bell?

01:13:38  15  A.  That does not ring a bell, I'm sorry.

01:13:40  16  Q.  And do you know whether Mr. Shah traveled to these

01:13:42  17  countries -- to any country to seek a lessee for the Creative

01:13:49  18  Warehousing space?

01:13:49  19  A.  I don't know -- I know he traveled to certain countries,

01:14:00  20  but I don't know if it was to negotiate this arrangement or

01:14:04  21  not.

01:14:04  22  Q.  Do you know if he traveled to Hong Kong?

01:14:06  23  A.  I don't.

01:14:06  24  Q.  Do you know if he traveled to the United Arab Emirates?

01:14:11  25  A.  I don't know that either.

01:14:12  1  Q.  Do you know if he has any clients in the United Arab

01:14:18  2  Emirates -- sorry, business contacts?

01:14:20  3  A.  I don't know.

01:14:22  4        THE COURT:  Do you know where he traveled?

01:14:23  5        THE WITNESS:  I can tell you that I know he traveled

01:14:26  6  to India, and I can tell you he traveled to Italy, and I am

01:14:33  7  trying to recall if there was anything else that I can be

01:14:38  8  specific with.  Perhaps Germany.  Those are the three

01:14:41  9  countries that I know.

01:14:43  10  BY MS. DEDINAS:

01:14:44  11  Q.  Did you ever tell Mr. Borlack about the option that

01:14:56  12  Mr. Shah or one of his entities -- strike that.

01:14:57  13        Did you ever tell Mr. Borlack or anyone at his firm

01:15:00  14  about the lease option in the deal?

01:15:02  15  A.  Yes.

01:15:04  16  Q.  You did.

01:15:06  17        Did you ever indicate to them that your client was

01:15:11  18  interested in starting a new business?

01:15:13  19  A.  I participated in many discussions where Mr. Shah

01:15:20  20  indicated that at some point, he wanted to start a new

01:15:24  21  business, yes.

01:15:26  22  Q.  And did Mr. Shah indicate that he was interested in

01:15:29  23  figuring out a way to start a new business without having the

01:15:35  24  new business be subject to a judgment in this action?

01:15:39  25  A.  No.  In my conversations with Mr. Shah, his intent to

01:15:45   1   start a new business was always with the expectation that at

01:15:49   2   some point, this would be resolved.

01:15:50   3   Q.  Resolved how?

01:15:52   4   A.  Settled or he would prevail.

01:15:55   5   Q.  Okay.  Did you keep -- did you discuss with Mr. Borlack

01:16:04   6   his intentions and plans to start a new business?

01:16:08   7   A.  I never discussed that with Mr. Borlack.  I was party to

01:16:17   8   conversations where Mr. Shah made that fact known.

01:16:20   9   Q.  Now, we've talked a little bit about your March 16th

01:16:32  10   letter, and that's Exhibit 46 if you need to refer to it.  You

01:16:42  11   mentioned in response to the questions from Magistrate Mason

01:16:46  12   that you actually did get a response from Mr. Serritella,

01:16:51  13   something to the effect that the server would be available to

01:16:55  14   your clients if you needed it; is that right?

01:16:59  15   A.  Two-fold.  Number one, that the expectation was they were

01:17:05  16   closing -- that First Midwest would acquire the lease any day

01:17:13  17   from that point and that access to the server would be

01:17:16  18   available, yes.

01:17:17  19   Q.  When you wrote the letter on March 16th, why didn't you

01:17:23  20   prepare a draft agreement for the parties to sign instead of

01:17:29  21   sending an e-mail?

01:17:30  22   A.  Because First Midwest was intending to acquire the server

01:17:39  23   and then sell it to Mr. Shah, and those agreements would all

01:17:45  24   be happening within the next day or two, assuming that they

01:17:48  25   had acquired the server -- the lease.

849

01:17:50    1    Q.  Didn't you want to preserve your clients' right to
01:17:54    2    repurchase the server from First Midwest Bank?
01:17:59    3    A.  I had that understanding and so did -- I had that
01:18:03    4    understanding with Mr. Serritella, and Mr. Shah had that
01:18:10    5    understanding with Mr. Clark.
01:18:11    6    Q.  But isn't documenting understanding the way you make your
01:18:15    7    living?
01:18:15    8    A.  Yes.  Again as I said, the expectation is that -- the
01:18:19    9    expectation was that that transaction would happen imminently
01:18:23   10    and those documents would have been prepared by First Midwest.
01:18:26   11    Q.  And when it didn't happen, you didn't consider at that
01:18:31   12    time writing a letter and enclosing a draft agreement giving
01:18:40   13    your client the right to repurchase if and when First Midwest
01:18:40   14    ever negotiated for the lease of the server from Associated
01:18:42   15    Bank.
01:18:46   16    A.  Well, keeping the time frame in mind, there was like a
01:18:51   17    week or two between the time that the eviction was completed
01:18:56   18    and when the issue on the inventory arose, and, actually, it
01:19:03   19    was happening pretty much concurrently.  And once the issue of
01:19:07   20    the inventory arose, that's when First Midwest made their
01:19:16   21    feelings known about access.
01:19:17   22    Q.  Well, actually, there was a whole period of time from the
01:19:23   23    time that this transaction closed all the way through July
01:19:28   24    when they were negotiating that you did not just draft an
01:19:35   25    agreement and forward it on to First Midwest Bank and say,

01:19:39  1  this is what we want you to sign, it's what we agreed to, and

01:19:43  2  I am putting it in writing?

01:19:44  3  A.  Because First Midwest had advised the parties that that

01:19:47  4  agreement no longer was in effect, that access to the server

01:19:53  5  would be through court order or subpoena.

01:19:56  6  Q.  And you didn't write them back and say, hey, that was not

01:19:59  7  our agreement?

01:20:01  8  A.  They violated the agreement to sell to Mr. Shah.

01:20:08  9  Q.  Afterwards.  I'm asking you before then.

01:20:11  10  A.  I did not, no.

01:20:12  11  Q.  When they came and they said to you, we're going to need a

01:20:14  12  court order, you didn't write them right away and say, that

01:20:17  13  wasn't the deal?

01:20:18  14  A.  I did not.

01:20:18  15  Q.  Why not?

01:20:19  16  A.  Because at that time, I was not -- they were dealing

01:20:23  17  directly with the attorneys and the parties in the lawsuit,

01:20:27  18  and so I wasn't dealing with them at that point in time.

01:20:31  19  Q.  Did you turn to Mr. Borlack and say, hey, we've got a

01:20:35  20  problem, I had this agreement worked out.  Now they're saying

01:20:38  21  I need a court order.  Can you go get a court order because

01:20:42  22  this isn't the deal we had worked out?

01:20:45  23  A.  I did not say that.

01:20:46  24  Q.  Why didn't you do that?

01:20:47  25  A.  I assumed that -- rightly or wrongly, I assumed that it

01:20:53　1　was being addressed through Mr. Borlack or somebody in his

01:20:55　2　office.

01:20:55　3　Q.　But out of 160 e-mails, you never sent him one saying,

01:21:01　4　hey, Alan, I figure you got this one covered, right?

01:21:04　5　A.　Well, First Midwest never communicated directly to me when

01:21:08　6　they advised the parties that they changed their position.

01:21:12　7　That came after the fact, when I called Bill Serritella to

01:21:16　8　find out what was going on.

01:21:17　9　Q.　But at some point you learned about it, right?

01:21:20　10　A.　Yes, after the fact.

01:21:23　11　Q.　And after that, you didn't contact Mr. Borlack and say,

01:21:27　12　we've got a problem?

01:21:28　13　A.　At that point in time, rightly or wrongly, I assumed that

01:21:31　14　since it was being addressed in the litigation, that

01:21:34　15　Mr. Borlack or somebody in his office would handle it.

01:21:36　16　Q.　Now, let me ask you a little about this March 16th letter,

01:21:44　17　which is Exhibit 46.

01:21:46　18　　　　　I know you've said you're not a litigator.

01:21:49　19　A.　Okay.

01:21:49　20　Q.　You've never been a litigator.　So you've never really

01:21:54　21　written a litigation hold letter, correct?

01:22:00　22　A.　No, I don't know what that is.

01:22:01　23　Q.　You don't even know what it is, right?

01:22:03　24　A.　If you explained what it is, I am sure I would understand.

01:22:05　25　Q.　And you understand that if you had to write a litigation

| | | |
|---|---|---|
| 01:22:08 | 1 | hold letter, you would probably want to consult with a |
| 01:22:12 | 2 | litigator and ask them what needs to go into one, correct? |
| 01:22:15 | 3 | A.  Again, assuming I understood what it is, yes.  The answer |
| 01:22:20 | 4 | is yes. |
| 01:22:21 | 5 | Q.  If you had in your mind, I've got to write a litigation |
| 01:22:25 | 6 | hold letter, you'd realize that you needed to ask somebody for |
| 01:22:28 | 7 | some help, right? |
| 01:22:29 | 8 | A.  Yes. |
| 01:22:30 | 9 | Q.  And there might even be some forms that you'd want to look |
| 01:22:33 | 10 | at to make sure you got it right, correct? |
| 01:22:35 | 11 | A.  Yes. |
| 01:22:35 | 12 | Q.  So this wasn't really a litigation hold letter, was it? |
| 01:22:39 | 13 | A.  My March 16th e-mail? |
| 01:22:41 | 14 | Q.  Right. |
| 01:22:42 | 15 | A.  Well, again, I don't know what a litigation hold -- |
| 01:22:45 | 16 | Q.  You never intended it to be one, did you? |
| 01:22:48 | 17 | MR. McJESSY:  Objection. |
| 01:22:49 | 18 | THE WITNESS:  I don't know what it is. |
| 01:22:50 | 19 | MR. McJESSY:  Argumentative. |
| 01:22:51 | 20 | THE COURT:  No, she can ask that question, and you |
| 01:22:53 | 21 | need to answer that. |
| 01:22:54 | 22 | THE WITNESS:  I don't know what it is, so I don't |
| 01:22:56 | 23 | know whether this equates to that or not. |
| 01:22:59 | 24 | BY MS. DEDINAS: |
| 01:23:00 | 25 | Q.  Okay.  Isn't it true that this letter was an attempt by a |

01:23:05　1　transactional attorney, you, to document an agreement?

01:23:12　2　A.　It was confirming an understanding, yes.

01:23:14　3　Q.　How is that different from documenting an agreement?

01:23:18　4　A.　Well, as I said, and you asked and others asked, there was

01:23:23　5　no formal written document that expressed this and other terms

01:23:28　6　that might be related.

01:23:29　7　Q.　So it just wasn't a very good attempt to document an

01:23:33　8　agreement; is that right?

01:23:34　9　A.　Okay.

01:23:34　10　Q.　Okay.　And you were satisfied with the follow-up that you

01:23:43　11　got to your attempt to document this agreement?

01:23:47　12　A.　I was satisfied with what I was told by Bill Serritella,

01:23:52　13　yes.

01:23:52　14　Q.　And so after you got that from Bill Serritella, you never

01:23:59　15　felt any need to document in writing an agreement that you had

01:24:05　16　that your client would have the right to repurchase that

01:24:09　17　server if and when First Midwest Bank negotiated for its

01:24:15　18　repurchase from Associated Bank; is that correct?

01:24:19　19　A.　As you asked me before, that is correct.

01:24:25　20　　　　MS. DEDINAS:　No further questions.

01:24:26　21　　　　THE COURT:　We have some more.　Let me tell all of

01:24:28　22　you we're done at 2:00 o'clock, whether you finish or not.　If

01:24:32　23　you don't finish, I bring you back another day.

01:24:36　24　　　　MR. McJESSY:　All right.

01:24:38　25　　　　THE COURT:　Any questions about that from any of you?

| | | |
|---|---|---|
| 01:24:42 | 1 | Okay. |
| 01:24:42 | 2 | - - - |
| 01:24:42 | 3 | STEVEN HOWARD BLUMENTHAL, REDIRECT EXAMINATION |
| 01:24:42 | 4 | BY MR. McJESSY: |
| 01:24:53 | 5 | Q.  Mr. Blumenthal, you were asked numerous times about an |
| 01:24:55 | 6 | agreement that you believed the parties had with respect to |
| 01:24:58 | 7 | the server.  If you could take a look at Exhibit 49.  This is |
| 01:25:10 | 8 | an e-mail dated Wednesday, March 17th, 2010.  It's from you to |
| 01:25:16 | 9 | Mr. Shah. |
| 01:25:18 | 10 | What I'd like you to focus on is the e-mail directly |
| 01:25:22 | 11 | below that, March 17th, 2010, from William Serritella to |
| 01:25:29 | 12 | Mr. Dieterich that you appear to be forwarding. |
| 01:25:32 | 13 | Do you see that e-mail? |
| 01:25:32 | 14 | A.  Yes. |
| 01:25:33 | 15 | Q.  Now, I'm guessing you're blind copied on this because I |
| 01:25:36 | 16 | don't see your name on the e-mail from Mr. Serritella; is that |
| 01:25:36 | 17 | right? |
| 01:25:39 | 18 | A.  Yes. |
| 01:25:39 | 19 | Q.  Okay.  And if you can focus on the third paragraph of this |
| 01:25:43 | 20 | letter that begins, However, from a legal standpoint. |
| 01:25:45 | 21 | Do you see that? |
| 01:25:46 | 22 | A.  Yes. |
| 01:25:47 | 23 | Q.  Okay.  And that paragraph references an agreement.  Do you |
| 01:25:53 | 24 | see that? |
| 01:25:54 | 25 | A.  Yes. |

01:25:54   1   Q.  Is it your understanding that that was the agreement that

01:25:58   2   the parties had reached?

01:25:59   3   A.  Yes.

01:25:59   4   Q.  Okay.  And in the last paragraph of this e-mail that

01:26:08   5   begins, In closing, let me make one thing perfectly clear, do

01:26:14   6   you see where they are -- where Mr. Serritella is advising

01:26:17   7   Associated Bank that they are refusing to allow their

01:26:22   8   representative -- that is, the representative from Associated

01:26:25   9   Bank -- access to the server?

01:26:26  10   A.  Yes.

01:26:27  11   Q.  Was that consistent with your discussions with

01:26:33  12   Mr. Serritella upon the closing of the friendly foreclosure?

01:26:36  13   A.  Yes.

01:26:36  14   Q.  All right.  Thank you.

01:26:38  15        Now, you were asked a question -- you were asked a

01:26:46  16   question by Ms. Dedinas about Mr. Shah starting up a new

01:26:53  17   business, and you answered that you were party to

01:26:55  18   conversations where Mr. Shah made that known.  Do you remember

01:26:58  19   that answer?

01:26:59  20   A.  Yes.

01:26:59  21   Q.  Who was party to those conversations?  Strike that.

01:27:14  22        When you said that Mr. Shah -- when you said you were

01:27:17  23   party to conversations where Mr. Shah made that known, to whom

01:27:22  24   were you referring that he made it known that he was

01:27:25  25   considering starting up a new business?

01:27:27  1   A.  He made that known to -- those would have been
01:27:37  2   conversations with counsel in the lawsuit.
01:27:41  3   Q.  Does that include Mr. Borlack?
01:27:43  4   A.  Yes.
01:27:43  5   Q.  Now, except for the e-mail where Mr. Borlack forwarded to
01:27:54  6   you a copy of the agreement, take a quick look at Exhibit 20.
01:28:14  7   A.  Okay.
01:28:15  8   Q.  I just want you to turn to the agreement which is the last
01:28:18  9   several pages, but if you'd just turn to the first page of
01:28:23  10  that document.
01:28:23  11          THE COURT:  To the e-mail?
01:28:24  12          MR. McJESSY:  To the actual amended
01:28:27  13  electronically-stored information agreement itself.
01:28:31  14  BY MR. McJESSY:
01:28:31  15  Q.  Do you see that?
01:28:32  16  A.  Yes.
01:28:32  17  Q.  Now, I misspoke earlier and said that this was an order.
01:28:36  18  It's actually an amended electronically-stored information
01:28:39  19  agreement.  Do you see that title?
01:28:40  20  A.  Yes.
01:28:40  21  Q.  Now, this e-mail that you received, which is on the first
01:28:43  22  page of this exhibit, SH 20, forwarding this agreement to you,
01:28:48  23  does it offer any explanation as to what this agreement --
01:28:56  24  what effect this agreement is supposed to have?
01:28:57  25  A.  No.

01:28:58  1  Q.  Does it offer any explanation to you at all?

01:29:01  2  A.  No.

01:29:01  3  Q.  Okay.  It's just an e-mail just forwarding an attachment;

01:29:01  4  is that right?

01:29:08  5  A.  That's correct.

01:29:08  6  Q.  Was Mr. Borlack -- strike that.

01:29:12  7       Was your firm engaged to represent Mr. Shah in this

01:29:16  8  lawsuit?

01:29:16  9  A.  No.

01:29:16  10  Q.  Okay.  Your firm was -- the terms of your engagement with

01:29:23  11  Mr. Shah and the defendants who you testified you represent,

01:29:25  12  do the terms of that engagement include handling litigation

01:29:29  13  matters?

01:29:29  14  A.  It does not.

01:29:30  15  Q.  Whose firm was responsible for representing Mr. Shah in

01:29:33  16  this lawsuit, as far as you know?

01:29:34  17  A.  At the time -- at what time are we speaking of?

01:29:41  18  Q.  In February of 2010.

01:29:43  19  A.  Mr. Borlack's firm was in charge of handling the

01:29:49  20  representation.

01:29:49  21  Q.  All right.  And was that true for March, April, May, June,

01:29:53  22  July as well?

01:29:54  23  A.  At some point, and I don't recall when it was exactly, Mr.

01:30:00  24  Flesch's firm became involved and worked with Mr. Borlack's

01:30:06  25  firm.

01:30:06  1   Q.  And was it your responsibility -- was it your
01:30:09  2   understanding that they were responsible for handling all ESI
01:30:13  3   matters?
01:30:13  4   A.  Yes.
01:30:13  5   Q.  Now, other than this e-mail that we have just looked at,
01:30:16  6   did Mr. Borlack send you any other e-mails regarding what you
01:30:22  7   needed to do with respect to handling electronically-stored
01:30:27  8   information for purposes of discovery in this lawsuit?
01:30:30  9   A.  Not that I recall.
01:30:31  10  Q.  Did he send you a lot of e-mails?
01:30:36  11  A.  He copied me on a lot of e-mails.
01:30:38  12  Q.  Well, he is sending you those then; is that correct?
01:30:41  13  A.  Yes.  Yes.
01:30:41  14  Q.  And did he prepare a lot of e-mails and send those to you
01:30:44  15  as well?
01:30:45  16  A.  I'm not sure what you mean.
01:30:47  17  Q.  Did he actually type e-mails to you besides just
01:30:50  18  forwarding other people's e-mails to you?
01:30:52  19  A.  Yes.  Yes.
01:30:53  20  Q.  And in any of those e-mails, and I'll represent to you I
01:30:56  21  don't have the communications that Mr. Borlack sent because
01:30:59  22  they weren't produced to us, but in any of those
01:31:05  23  communications that he sent to you, did he describe to you
01:31:07  24  what you needed to do in order to comply with this agreement
01:31:10  25  that's attached as part of Exhibit 20?

01:31:12  1  A.  I don't recall.

01:31:14  2  Q.  All right.  Now, he was aware that the foreclosure and

01:31:18  3  eviction on the warehouse had occurred; is that right?

01:31:22  4  A.  Yes.

01:31:22  5  Q.  At any point, did he come forward and ask you about

01:31:26  6  whether the server was still in the warehouse?

01:31:29  7  A.  No.

01:31:29  8  Q.  Did he send you an e-mail to that effect?

01:31:32  9  A.  No.

01:31:33  10  Q.  Did anybody from his firm come forward to you and ask

01:31:37  11  about what was the status of the server that was in the

01:31:38  12  warehouse?

01:31:40  13  A.  No one came to me, no.

01:31:47  14  Q.  Did you ever advise Mr. Borlack that the server had been

01:31:49  15  removed from the warehouse?

01:31:50  16  A.  I didn't know that it was removed until August.

01:31:56  17  Q.  Okay.  At any time from February to July of 2010, did you

01:32:05  18  convey any message to Mr. Borlack or anybody at his firm that

01:32:09  19  the server had been moved from the warehouse?

01:32:11  20  A.  No.

01:32:12  21  Q.  Based on any of your communications with Mr. Borlack, can

01:32:23  22  you think of any communication that you conveyed to him that

01:32:26  23  would have given him reason to believe that the server had

01:32:30  24  been moved from the warehouse?

01:32:31  25  A.  No, I would have never given him reason to believe that.

| | | |
|---|---|---|
| 01:32:34 | 1 | Q. Okay. At any -- did Mr. Borlack or anybody at his firm at |
| 01:32:41 | 2 | any time tell you that you were going to be responsible for |
| 01:32:45 | 3 | handling electronic -- handling -- strike that. |
| 01:32:51 | 4 | Did Mr. Borlack or anybody at his firm at any time |
| 01:32:55 | 5 | convey to you that you, as counsel for Mr. Shah, Creative |
| 01:32:59 | 6 | Warehousing, or Kanan Fashions, were going to be responsible |
| 01:33:03 | 7 | for handling electronically-stored information on behalf of |
| 01:33:06 | 8 | the defendants? |
| 01:33:06 | 9 | A. No. |
| 01:33:07 | 10 | Q. Now, I'd like you to take a quick look at Exhibit 31, and |
| 01:33:33 | 11 | I'd like you to read that. It's an e-mail dated March 3rd, |
| 01:33:37 | 12 | 2010, 3:14 p.m. It's a single e-mail on that page. Read it |
| 01:33:42 | 13 | and let me know when you have had a chance to do so. |
| 01:33:45 | 14 | A. I have read it. |
| 01:33:46 | 15 | Q. Now, you weren't copied on this e-mail; is that correct? |
| 01:33:49 | 16 | A. That's correct. |
| 01:33:49 | 17 | Q. Were you blind copied on this e-mail? |
| 01:33:51 | 18 | A. Not that I recall. |
| 01:33:53 | 19 | Q. Okay. Now, this e-mail -- |
| 01:33:54 | 20 | THE COURT: How would he know? |
| 01:33:56 | 21 | MR. McJESSY: Pardon? |
| 01:33:57 | 22 | THE COURT: How would he know? |
| 01:33:58 | 23 | MR. McJESSY: Well, he would have received it. Then |
| 01:33:59 | 24 | he would know. |
| 01:33:59 | 25 | THE COURT: If he remembers it. |

| | | |
|---|---|---|
| 01:34:00 | 1 | BY MR. McJESSY: |
| 01:34:01 | 2 | Q.  Well, do you recall whether you have received this e-mail? |
| 01:34:03 | 3 | A.  No, that's what I just said.  I don't recall. |
| 01:34:05 | 4 | Q.  All right.  Now, this is an e-mail describing the handling |
| 01:34:09 | 5 | of the computer, server, and related equipment, and it's |
| 01:34:13 | 6 | March 3rd, 2010. |
| 01:34:15 | 7 | Do you have any reason -- strike that. |
| 01:34:19 | 8 | Do you know why you weren't copied on this e-mail? |
| 01:34:23 | 9 | A.  No. |
| 01:34:23 | 10 | Q.  Is this the first time you have seen this e-mail? |
| 01:34:27 | 11 | A.  I may have -- I may have seen this in my deposition, but |
| 01:34:36 | 12 | not before then. |
| 01:34:37 | 13 | Q.  You didn't see it before this matter arose before the |
| 01:34:39 | 14 | court? |
| 01:34:40 | 15 | A.  Not that I recall. |
| 01:34:42 | 16 | Q.  All right.  So if you were going to be responsible for the |
| 01:34:48 | 17 | handling of electronically-stored information, is this the |
| 01:34:51 | 18 | kind of e-mail that you would expect to be copied on? |
| 01:34:53 | 19 | A.  If I were asked to handle that, yes, I would expect to be |
| 01:35:01 | 20 | copied. |
| 01:35:01 | 21 | Q.  Now, you testified that you had advised Mr. Borlack that |
| 01:35:13 | 22 | the foreclosure and eviction had occurred; is that right? |
| 01:35:15 | 23 | A.  Yes. |
| 01:35:16 | 24 | Q.  Okay.  Did you -- and you testified that you did not |
| 01:35:20 | 25 | advise Mr. Borlack to get a subpoena or court order to access |

| | | |
|---|---|---|
| 01:35:23 | 1 | the server once First Midwest Bank took control of the |
| 01:35:28 | 2 | warehouse; is that right? |
| 01:35:29 | 3 | A. I did not, correct. |
| 01:35:30 | 4 | Q. Okay. Did you understand that you had been engaged to |
| 01:35:37 | 5 | provide counsel to Mr. Borlack on how to handle |
| 01:35:42 | 6 | electronically-stored information? |
| 01:35:42 | 7 | A. No, I was not engaged to do that. |
| 01:35:45 | 8 | Q. Okay. And that wasn't your understanding of what your |
| 01:35:48 | 9 | responsibilities were for the defendants? |
| 01:35:49 | 10 | A. That was not my understanding, correct. |
| 01:35:51 | 11 | Q. Now, Mr. Borlack did ask you to assist him in handling |
| 01:36:00 | 12 | the, quote, inventory issue; is that right? |
| 01:36:02 | 13 | A. That's correct. |
| 01:36:03 | 14 | Q. All right. Now, did Mr. Borlack ask you to assist him on |
| 01:36:08 | 15 | managing the ESI discovery? |
| 01:36:10 | 16 | A. No, he did not. |
| 01:36:13 | 17 | THE COURT: And I think that's pretty clear now |
| 01:36:15 | 18 | through all these questions. |
| 01:36:17 | 19 | BY MR. McJESSY: |
| 01:36:26 | 20 | Q. Now, you mentioned the eviction was scheduled for the end |
| 01:36:29 | 21 | of March; is that right? |
| 01:36:30 | 22 | A. Yes. |
| 01:36:31 | 23 | Q. And it was -- it actually wasn't an agreed eviction. I |
| 01:36:34 | 24 | think it's actually called a consent eviction; is that right? |
| 01:36:39 | 25 | Or was it an agreed? Maybe it is agreed. |

| | | |
|---|---|---|
| 01:36:41 | 1 | THE COURT:  I think it is. |
| 01:36:44 | 2 | THE WITNESS:  I think there was an agreed order. |
| 01:36:46 | 3 | BY MR. McJESSY: |
| 01:36:46 | 4 | Q.  All right.  And was there an opportunity to set a |
| 01:36:48 | 5 | different date for the eviction? |
| 01:36:49 | 6 | A.  No. |
| 01:36:50 | 7 | Q.  Why not? |
| 01:36:50 | 8 | A.  First Midwest wanted control and possession of the |
| 01:36:56 | 9 | warehouse and they wanted it immediately, so I didn't have the |
| 01:37:03 | 10 | ability to negotiate and extend the time. |
| 01:37:07 | 11 | Q.  And did the defendants have any good-faith basis for |
| 01:37:10 | 12 | defending the eviction action? |
| 01:37:13 | 13 | A.  No. |
| 01:37:16 | 14 | Q.  Mr. Lipton asked you a number of questions about what you |
| 01:37:42 | 15 | did to protect the information on the hard drive.  Do you |
| 01:37:45 | 16 | remember those questions? |
| 01:37:46 | 17 | A.  Yes. |
| 01:37:46 | 18 | Q.  Okay.  Now, there were some ESI experts that had been |
| 01:37:56 | 19 | hired in this lawsuit.  Are you aware of that? |
| 01:37:58 | 20 | A.  Yes. |
| 01:37:59 | 21 | Q.  Okay.  Were you responsible for giving those ESI experts |
| 01:38:08 | 22 | directions as to what they needed to do? |
| 01:38:12 | 23 | A.  No. |
| 01:38:12 | 24 | Q.  To your knowledge, who was responsible for doing that? |
| 01:38:14 | 25 | A.  Alan Borlack's firm. |

01:38:17   1   Q. Okay. Were you ever given any instructions to deal with

01:38:22   2   the ESI experts?

01:38:23   3   A. No, I was not.

01:38:26   4   Q. Okay. Not at all?

01:38:35   5   A. Not at all.

01:38:36   6   Q. Now, Mr. Borlack was aware that you were handling the

01:38:39   7   eviction and foreclosure matters; is that right?

01:38:41   8   MR. LIPTON: Objection. Calls for speculation.

01:38:43   9   THE COURT: Hang on one second.

01:38:52   10   Sustained.

01:38:53   11   BY MR. McJESSY:

01:39:16   12   Q. Do you recall having a conversation with Mr. Borlack

01:39:22   13   wherein you discussed --

01:39:25   14   THE COURT: When, when, when?

01:39:27   15   MR. McJESSY: Well, first I want to know if any

01:39:29   16   such -- I'm going to ask a question as to whether a

01:39:31   17   conversation on a certain topic occurred.

01:39:34   18   THE COURT: Okay.

01:39:35   19   MR. McJESSY: If it did, I will ask when it occurred.

01:39:38   20   BY MR. McJESSY:

01:39:39   21   Q. Sir, do you recall having a conversation with Mr. Borlack

01:39:44   22   that he was overwhelmed or very busy with this litigation and

01:39:53   23   could no longer handle any issues with respect to the deed in

01:39:57   24   lieu of foreclosure matter?

01:39:58   25   A. Yes.

01:40:03　1　Q.　Okay.　Do you remember when that conversation occurred?

01:40:06　2　A.　It would have been around February, end of February, early

01:40:13　3　March.

01:40:13　4　Q.　What can you remember of that conversation?

01:40:16　5　A.　I can remember discussing who was going to handle the deed

01:40:25　6　in lieu since it impacted on the litigation, and, you know, my

01:40:32　7　role was sort of -- I wasn't the primary attorney, and so it

01:40:39　8　was a question of who was going to handle it.

01:40:42　9　Q.　All right.　And did you take on -- so what was the

01:40:45　10　ultimate -- was there a conclusion reached as a course of

01:40:47　11　those discussions?

01:40:48　12　A.　Yes.　It fell more in my area of expertise, and since he

01:40:53　13　had a lot of other things going on in terms of litigation, it

01:40:59　14　made sense for me to handle it.

01:41:01　15　Q.　So you were going to handle the deed in lieu of

01:41:03　16　foreclosure matter after that?

01:41:04　17　A.　Yes.

01:41:05　18　Q.　And was that in part to take some of the workload off

01:41:08　19　Mr. Borlack?

01:41:09　20　A.　Perhaps in part, yes.

01:41:12　21　Q.　Now, you were asked a question about Mr. Serritella -- you

01:41:21　22　were asked a question as to being advised that First Midwest

01:41:28　23　Bank would no longer agree to provide access to the server

01:41:33　24　that was in the warehouse.　Do you remember those questions?

01:41:36　25　A.　Yes.

01:41:37  1  Q.  And you said that Mr. Serritella had called you and told

01:41:39  2  you that, in fact, First Midwest Bank was no longer going to

01:41:44  3  agree to provide access because it had been unable to reach an

01:41:48  4  agreement on the handling of the inventory, I believe, with

01:41:51  5  United Central Bank; is that right?

01:41:52  6  A.  I think I called Mr. Serritella; but, yes.

01:41:55  7  Q.  Okay.  But that was the substance of the conversation?

01:41:57  8  A.  Yes.

01:41:57  9  Q.  All right.  And you said it was your understanding that

01:42:06  10  Mr. Serritella had advised the parties -- and you used that

01:42:12  11  word in particular -- that the -- that -- strike that.

01:42:16  12      You indicated that Mr. Serritella had relayed to you

01:42:21  13  that he had already told the parties that he would not allow

01:42:23  14  access to the warehouse.  Do you recall that testimony?

01:42:26  15  A.  I do.

01:42:27  16  Q.  Who did you mean when you were referring to "parties"?

01:42:30  17      MR. LIPTON:  Asked and answered.

01:42:33  18      THE COURT:  Sustained.

01:42:34  19  BY MR. McJESSY:

01:42:34  20  Q.  Was it your understanding -- you were then asked a

01:42:36  21  follow-up question as who are the parties in this lawsuit.  Do

01:42:40  22  you remember that question?

01:42:40  23  A.  Yes.

01:42:40  24  Q.  And you identified specifically the defendants in this

01:42:43  25  case, correct?

01:42:44    1    A.  Yes.

01:42:45    2    Q.  Who are the parties -- who are, in fact, the parties in

01:42:49    3    this lawsuit?

01:42:51    4    A.  Yes.

01:42:51    5    Q.  Did you understand that when Mr. Serritella said that the

01:42:53    6    parties had been advised, that that included their attorneys?

01:42:59    7              MR. LIPTON:  Objection.  Foundation.

01:43:05    8              THE COURT:  Sustained.

01:43:05    9              MR. McJESSY:  I'm asking what his understanding was,

01:43:08   10    Judge.

01:43:08   11              THE COURT:  Lay a foundation.

01:43:09   12    BY MR. McJESSY:

01:43:10   13    Q.  Did you have an understanding based on your conversation

01:43:12   14    with Mr. Serritella as to who he meant by parties?

01:43:16   15    A.  Yes.

01:43:21   16    Q.  All right.  What was your understanding?

01:43:24   17    A.  My understanding was that by parties, he meant principals

01:43:33   18    and attorneys.

01:43:34   19              THE COURT:  What was that based on?

01:43:36   20              MR. McJESSY:  That was my next question, your Honor,

01:43:39   21    but I appreciate that.

01:43:40   22              THE WITNESS:  It was based upon the fact that he told

01:43:42   23    me that specifically with respect to United Central Bank,

01:43:47   24    there was either a meeting or a phone conversation with

01:43:52   25    principals from United Central Bank or their attorney or

01:44:01  1   attorneys, and it was based upon that.

01:44:06  2   BY MR. McJESSY:

01:44:06  3   Q.  And any particular reason you also thought it would have

01:44:09  4   applied to defendants' attorneys?

01:44:11  5          MR. LIPTON:  Objection.

01:44:12  6          THE COURT:  No.  He can answer that.

01:44:14  7          MR. LIPTON:  Okay.

01:44:15  8          THE WITNESS:  Yes, because Mr. Serritella had

01:44:20  9   communicated with the attorneys in the lawsuit and that didn't

01:44:29 10   go through me.  That was direct communication.  So I assumed

01:44:36 11   that that included --

01:44:36 12          MR. LIPTON:  Move to strike.

01:44:37 13          THE COURT:  That will be stricken.

01:44:39 14   BY MR. McJESSY:

01:44:44 15   Q.  It was your understanding -- strike that.

01:44:47 16          It was your understanding that Mr. Serritella had

01:44:50 17   spoken about some matters, aside from what we're discussing

01:44:56 18   now, with defendants' attorneys directly; is that correct?

01:45:00 19   A.  That's correct.

01:45:00 20          MS. DEDINAS:  Objection.  Relevance.

01:45:01 21          THE COURT:  Sustained.

01:45:03 22   BY MR. McJESSY:

01:45:18 23   Q.  Was there any reason that you did not convey -- yourself

01:45:23 24   convey directly to Mr. Borlack or the attorneys at his firm

01:45:27 25   what Mr. Serritella had advised you?

01:45:31    1          MS. DEDINAS:  Objection.  Vague.

01:45:33    2          THE COURT:  Just give me one moment.  Let me read

01:45:50    3    over the question.

01:45:35    4      (Brief pause.)

01:45:56    5          THE COURT:  No, he can answer that.  Do you need the

01:45:58    6    question repeated, sir?

01:45:59    7          THE WITNESS:  Yes, please.

01:46:20    8      (Record read.)

01:46:21    9          THE WITNESS:  As I stated before, I assumed, rightly

01:46:23   10    or wrongly, that he was aware and had been advised directly by

01:46:29   11    Bill Serritella or Dave Clark.

01:46:31   12          THE COURT:  And let me give an explanation on this to

01:46:34   13    your objection.  This is not a jury trial, and I am not saying

01:46:39   14    that sarcastically, but it will go to the weight of what he

01:46:42   15    said.  That will be my decision.

01:46:46   16          MS. DEDINAS:  I just didn't understand what the

01:46:48   17    "what" referred to.  Sorry.

01:46:49   18          THE COURT:  A lot of whats.

01:46:51   19    BY MR. McJESSY:

01:46:51   20    Q.  Just to be clear, sir, you understood that my question was

01:46:54   21    referring to the conversation that you had with Mr. Serritella

01:46:56   22    in which he first advised you that First Midwest Bank would no

01:46:59   23    longer agree to provide voluntary access to the defendants --

01:47:06   24    to the server by the defendant; is that right?

01:47:06   25    A.  Yes.

| | | |
|---|---|---|
| 01:47:08 | 1 | MR. McJESSY:  Thank you. |
| 01:47:10 | 2 | THE COURT:  Mr. Lipton? |
| 01:47:12 | 3 | MR. LIPTON:  Very briefly, your Honor. |
| 01:47:15 | 4 | THE COURT:  You can take all 15 minutes if |
| 01:47:18 | 5 | Ms. Dedinas lets you, but we are stopping at 2:00 o'clock.  I |
| 01:47:22 | 6 | have kept these people waiting for -- |
| 01:47:27 | 7 | MR. LIPTON:  We may have to -- |
| 01:47:29 | 8 | THE COURT:  Resume? |
| 01:47:31 | 9 | MR. LIPTON:  -- resume to call Mr. Borlack, but it |
| 01:47:33 | 10 | would probably be very brief. |
| 01:47:36 | 11 | - - - |
| 01:47:36 | 12 | STEVEN HOWARD BLUMENTHAL, RECROSS-EXAMINATION |
| 01:47:36 | 13 | BY MR. LIPTON: |
| 01:47:37 | 14 | Q.  Mr. Blumenthal, did you advise your clients to leave the |
| 01:47:39 | 15 | server behind at the warehouse when they were getting their |
| 01:47:43 | 16 | other personal items out of there? |
| 01:47:44 | 17 | A.  I never discussed leaving the server there or not. |
| 01:47:49 | 18 | Q.  Why -- do you know why the server was left behind at the |
| 01:47:53 | 19 | warehouse when they were getting their other personal items? |
| 01:47:55 | 20 | A.  I can only guess from the e-mails. |
| 01:48:00 | 21 | MR. McJESSY:  Objection, your Honor.  I don't think |
| 01:48:01 | 22 | it was established that -- |
| 01:48:03 | 23 | THE COURT:  Wait, wait, wait just a second here. |
| 01:48:05 | 24 | Now, there is -- let me take a look at this. |
| 01:48:16 | 25 | MR. McJESSY:  He can ask the question without the |

01:48:18 1  precursor to --

01:48:20 2          THE COURT:  Just a second, please.

01:48:27 3          MR. LIPTON:  It was Vilia's direct -- I mean cross.

01:48:45 4          THE COURT:  His response to your question was, I can

01:48:47 5  only guess, and that will be stricken.

01:48:51 6  BY MR. LIPTON:

01:48:53 7  Q.  Can you respond to the question why was the server left

01:48:59 8  behind at the warehouse?  Do you know?

01:49:01 9          MR. McJESSY:  Objection.  Foundation.

01:49:03 10         THE COURT:  If he knows, he can answer that question.

01:49:04 11         THE WITNESS:  I don't know.

01:49:05 12 BY MR. LIPTON:

01:49:06 13 Q.  Did you ever ask your clients why they left the server

01:49:08 14 behind at the warehouse?

01:49:09 15 A.  No.

01:49:16 16 Q.  Why not?

01:49:17 17 A.  Because of the fact that there was an agreement on access

01:49:29 18 to the servers.

01:49:30 19 Q.  But you were willing to let the server remain in the

01:49:37 20 possession, custody, and control of First Midwest Bank even

01:49:40 21 though there was an undocumented agreement?

01:49:43 22 A.  Yes.

01:49:43 23 Q.  And you didn't think that that agreement would fall

01:49:51 24 through, correct?

01:49:52 25 A.  I didn't know if it would or it wouldn't.

01:49:55  1  Q.  And so even if there was an agreement for access, why

01:50:02  2  wouldn't it be superior for them to have actual possession,

01:50:07  3  custody, and control of the servers and move them out of the

01:50:10  4  warehouse?

01:50:10  5  A.  Well, I think I explained that one of the reasons for the

01:50:24  6  desire to acquire the lease which included then the server was

01:50:26  7  the possibility of operating at some point in the future at

01:50:31  8  the warehouse.  So having the server there and all of the

01:50:35  9  other equipment would be beneficial.

01:50:39  10  Q.  But that was at some vague point in time in the future.

01:50:44  11  In the meantime, they had immediate concerns with respect to

01:50:46  12  preserving the ESI in this case, didn't they?

01:50:49  13  A.  Yes.

01:50:50  14  Q.  Then why didn't they just take it at the time they had

01:50:57  15  access to it instead of negotiating for it later to reacquire

01:51:02  16  possession and control?

01:51:03  17          MR. McJESSY:  Objection.

01:51:04  18          THE COURT:  Sustained.

01:51:06  19  BY MR. LIPTON:

01:51:06  20  Q.  Do you know?

01:51:07  21          THE COURT:  Sustained.  That "do you know" will be

01:51:14  22  stricken.

01:51:15  23  BY MR. LIPTON:

01:51:16  24  Q.  Do you know why they didn't take the server with them

01:51:20  25  rather than negotiate for its purchase later on?

873

| | | |
|---|---|---|
| 01:51:26 | 1 | THE COURT: If he knows. |
| 01:51:28 | 2 | THE WITNESS: No, I don't know. |
| 01:51:29 | 3 | BY MR. LIPTON: |
| 01:51:30 | 4 | Q. Did you ever ask your clients that question? |
| 01:51:32 | 5 | A. No. |
| 01:51:32 | 6 | Q. Okay. Now, Mr. McJessy asked you about conversations |
| 01:51:42 | 7 | regarding starting up a new business and whether or not |
| 01:51:45 | 8 | Mr. Borlack was a participant in those conversations? |
| 01:51:49 | 9 | A. Yes. |
| 01:51:50 | 10 | Q. You testified that he was? |
| 01:51:53 | 11 | A. Yes. |
| 01:51:54 | 12 | Q. Are you sure? |
| 01:51:55 | 13 | A. Yes. |
| 01:51:56 | 14 | Q. Well, starting up the new business didn't have anything to |
| 01:52:01 | 15 | do with the litigation that Mr. Borlack was defending, did it? |
| 01:52:04 | 16 | A. It had nothing to do with the litigation. It had to do |
| 01:52:09 | 17 | with the payment of fees. |
| 01:52:13 | 18 | Q. Okay. Well, it wasn't relevant to the litigation, though, |
| 01:52:17 | 19 | was it? |
| 01:52:17 | 20 | A. I don't know if it would be relevant. I wouldn't know. |
| 01:52:27 | 21 | Q. Can you think of any circumstances where it would be? |
| 01:52:29 | 22 | A. Yes. |
| 01:52:30 | 23 | Q. Go ahead. I'm listening. |
| 01:52:33 | 24 | A. Well, as I was asked about preferences and fraudulent |
| 01:52:38 | 25 | transfers, it could be relevant there. |

01:52:40    1    Q.  But you didn't think about that at the time, did you?

01:52:42    2    A.  I didn't think about it at the -- well, I think I answered

01:52:49    3    that I wasn't concerned about that in terms of documenting,

01:52:52    4    but -- so that's one reason.

01:53:00    5    Q.  When did these alleged conversations take place?

01:53:03    6    A.  There were two or three meetings that I attended in the

01:53:09    7    period of March and through June or July that had to do with

01:53:16    8    case management and how to make the management of the case

01:53:20    9    more efficient and cost efficient.  And so it was brought up

01:53:26    10   by Mr. Shah in those meetings.

01:53:28    11   Q.  But you just testified that it wasn't relevant to

01:53:33    12   litigation.  Why would it be brought up in meetings where

01:53:35    13   you're discussing making litigation more efficient?

01:53:38    14   A.  Because one of the things, as part of the efficient --

01:53:43    15   making it more efficient was the cost.

01:53:44    16   Q.  And so this had to do with -- how did the cost of the

01:53:51    17   litigation relate to whether or not Mr. Shah was going to be

01:53:56    18   starting up a new business in the warehouse?

01:53:58    19   A.  Again, to make Mr. Borlack feel confident that he would

01:54:07    20   get paid.

01:54:08    21   Q.  Was Mr. Borlack thinking about -- strike that.

01:54:12    22          So who was present at these meetings?

01:54:17    23   A.  I was present, Mr. Shah, Mr. Joshi, Mr. Borlack, and on at

01:54:30    24   least one or two occasions, Mr. Flesch and Mr. Glickman.

01:54:37    25   Q.  And so the reason for discussing the start-up of the new

01:54:40    1    business, according to your testimony, is so that Mr. Borlack

01:54:46    2    could feel secure that he would have an ability to be paid

01:54:50    3    sometime in the future?

01:54:51    4    A.  I don't know if that's the purpose.  That's the context in

01:54:57    5    which it was.

01:54:58    6    Q.  Was there any discussion that -- at those meetings that

01:55:06    7    this server that was currently in the warehouse would be part

01:55:09    8    of the new business?

01:55:10    9    A.  There was no discussion about the server or the warehouse

01:55:17   10    as part of the business, no.

01:55:19   11    Q.  You also said you had conversations with Mr. Borlack

01:55:35   12    towards the end of February and early July -- I'm sorry,

01:55:42   13    towards the end of February and early March in which he said

01:55:45   14    that he was busy with the litigation and therefore couldn't

01:55:50   15    deal with the deed in lieu transaction; is that right?

01:55:53   16    A.  Yes.

01:55:53   17    Q.  Well, didn't you testify before that the deed in lieu is

01:55:58   18    not part of the litigation but rather it was a transaction,

01:56:04   19    that it was essentially tangential to the litigation?

01:56:11   20    A.  It was very much relevant to the litigation.

01:56:13   21    Q.  Why is that?

01:56:14   22    A.  Because it affects the amount of the indebtedness that's

01:56:17   23    part of the litigation, it affects the personal guaranties in

01:56:20   24    the litigation, so it definitely was relevant.

01:56:22   25    Q.  So from a strategic perspective, the deed in lieu was

01:56:26  1   relevant to the litigation, correct?

01:56:28  2   A.  Potentially, I think, yes.

01:56:34  3   Q.  Okay.  But in terms of the claims and defenses in the

01:56:40  4   litigation, the deed in lieu transaction had nothing to do

01:56:43  5   with the claims and defenses, did it?

01:56:44  6   A.  Well, I think I already said yes, it did, because it

01:56:48  7   affected the guaranties and it affected the amount of the

01:56:52  8   indebtedness that's the subject of the lawsuit.

01:56:54  9   Q.  Well, who had the expectation that Mr. Borlack would be

01:57:00  10  handling both the litigation and the transactional aspects of

01:57:07  11  strategy for the litigation simultaneously?

01:57:11  12          MR. McJESSY:  Objection.  Compound and vague.

01:57:16  13  BY MR. LIPTON:

01:57:16  14  Q.  Did anybody --

01:57:17  15          THE COURT:  Sustained.

01:57:18  16  BY MR. LIPTON:

01:57:19  17  Q.  All right.  Mr. Borlack was already handling the

01:57:22  18  litigation, correct?

01:57:23  19  A.  Yes.

01:57:24  20  Q.  Why was there an expectation that he would take on the

01:57:28  21  additional burden of handling a transaction such as a deed in

01:57:31  22  lieu transaction?

01:57:32  23  A.  Again, I had a conversation with him about whether or not

01:57:38  24  he would handle it because of his role in the litigation.

01:57:42  25  Q.  And when did that conversation take place?

01:57:46  1   A.  As I said, it was the end of February or the first week of
01:57:50  2   March.
01:57:51  3   Q.  And who was present?
01:57:53  4   A.  I think that was a phone conversation.
01:57:54  5   Q.  So it was only you and Mr. Borlack?
01:57:57  6   A.  I think Mr. Shah was probably a participant.
01:58:00  7   Q.  But you don't know?
01:58:01  8   A.  I don't know specifically.
01:58:03  9   Q.  So this is another conversation now that you recall with
01:58:08  10  Mr. Borlack, a third?
01:58:10  11  A.  No.  No.
01:58:11  12  Q.  Is this the same as one of the other two that you
01:58:14  13  previously testified to having?
01:58:15  14  A.  Yes.  Yes.
01:58:17  15  Q.  If you knew -- I think you just testified to Mr. McJessy,
01:58:33  16  that you knew that you weren't responsible for handling ESI in
01:58:37  17  the litigation, correct?
01:58:38  18  A.  Yes.
01:58:38  19  Q.  If you knew that you weren't responsible for handling the
01:58:41  20  ESI litigation, why did you write the 3/16 -- the March 16th
01:58:50  21  e-mail and not let Mr. Borlack do it?
01:58:54  22  A.  I was confirming what I had been advised by Mr. Shah was
01:59:08  23  his understanding with Mr. Clark at First Midwest about the
01:59:10  24  access to the server, among the other things, and that's the
01:59:13  25  reason why I sent the e-mail.

01:59:16 | 1 | Q. Wouldn't it have been important for Mr. Borlack to know

01:59:20 | 2 | the contents of that e-mail if it affected the litigation?

01:59:24 | 3 | A. Yes.

01:59:47 | 4 | Q. Isn't it true that the first time you ever met Mr. Borlack

01:59:51 | 5 | face to face was June 11, 2010?

01:59:53 | 6 | A. I don't know if that's, in fact, the case.

01:59:55 | 7 | Q. Do you have any reason to doubt that date?

01:59:56 | 8 | A. I thought that there was an earlier meeting that I

02:00:00 | 9 | attended, yes.

02:00:01 | 10 | Q. And where would that meeting have been that you thought

02:00:04 | 11 | you attended?

02:00:05 | 12 | A. It would have been either at Mr. Borlack's office or it

02:00:09 | 13 | would have been in Mr. Flesch's office.

02:00:11 | 14 | Q. So you can't even recall where the meeting took place,

02:00:14 | 15 | much less whether Mr. Borlack was present, correct?

02:00:19 | 16 | A. As I sit here today, I cannot recall the exact date of

02:00:25 | 17 | that meeting.

02:00:26 | 18 | Q. UCB never sued on the note for the warehouse, did they?

02:00:36 | 19 | A. I think they did.

02:00:42 | 20 | MR. LIPTON: Nothing further.

02:00:50 | 21 | MR. McJESSY: I have no other questions, Judge.

02:00:52 | 22 | THE WITNESS: Am I done?

02:00:53 | 23 | THE COURT: Yes. At least I think you are. Thank

02:00:57 | 24 | you very much.

02:00:59 | 25 | MR. McJESSY: Judge, just so we're clear, he's done

| | | |
|---|---|---|
| 02:01:03 | 1 | as a witness now because if Mr. Shah were to -- Mr. Shah has |
| 02:01:05 | 2 | not contacted him at all based on the direction of the Court |
| 02:01:09 | 3 | since our last -- I think he was only prohibited from |
| 02:01:12 | 4 | discussing the subject matter of this lawsuit, but Mr. Shah |
| 02:01:16 | 5 | didn't talk to him at all since then.  They can have |
| 02:01:19 | 6 | conversations on matters now. |
| 02:01:20 | 7 | THE COURT:  Well, that's a good question. |
| 02:01:22 | 8 | Mr. Lipton, or Mr. McGarry, either one of you, did |
| 02:01:27 | 9 | you say that you were going to call back Mr. Borlack? |
| 02:01:29 | 10 | MR. McGARRY:  Perhaps yes, your Honor. |
| 02:01:31 | 11 | THE COURT:  So I think we should wait. |
| 02:01:33 | 12 | MR. McJESSY:  Then why don't we leave it. |
| 02:01:33 | 13 | THE COURT:  Leave it, and then ask me that question |
| 02:01:33 | 14 | again. |
| 02:01:36 | 15 | MR. McJESSY:  I'm sorry, not Mr. Borlack, |
| 02:01:38 | 16 | Mr. Blumenthal, if I misspoke. |
| 02:01:39 | 17 | THE COURT:  But I'm not sure where this is going to |
| 02:01:41 | 18 | lead to. |
| 02:01:43 | 19 | MR. McJESSY:  Fair enough. |
| 02:01:44 | 20 | THE COURT:  And we are going to -- we are going to -- |
| 02:01:49 | 21 | we are trying to find out if you are going to be available, |
| 02:01:51 | 22 | first of all.  Thursday morning at 9:45.  Do we have an |
| 02:03:23 | 23 | answer? |
| 02:03:23 | 24 | (Discussion off the record.) |
| 02:03:25 | 25 | THE COURT:  1:00 o'clock Thursday. |

02:03:25 1    MR. McGARRY:  Judge, before we are off the record,
02:03:27 2  I'd like to know if the UCB, the plaintiff has -- or movant
02:03:32 3  has rested as far as putting on their case in chief on the
02:03:35 4  sanctions.
02:03:35 5    THE COURT:  That's the first thing they told me this
02:03:37 6  morning.
02:03:38 7    MR. McGARRY:  I didn't hear that.  Sorry, Judge.
02:03:39 8    THE COURT:  Am I correct?
02:03:41 9    MS. DEDINAS:  Yes.
02:03:42 10    MR. McJESSY:  Judge, formally, we concluded our
02:03:44 11  presentation.
02:03:45 12    THE COURT:  You are resting.
02:03:47 13    MR. McGARRY:  I only intend to call Mr. Borlack for a
02:03:49 14  few questions.
02:03:49 15    THE COURT:  Then we are done.
02:03:51 16    MR. McGARRY:  Yes.
02:03:52 17    MS. DEDINAS:  Your Honor, you had mentioned some
02:03:54 18  post-trial submissions.
02:03:56 19    THE COURT:  Yes.  If you look at my order -- as a
02:03:59 20  matter of fact, I was looking at that the first thing this
02:04:01 21  morning.  You have a week from --
02:04:04 22    MS. DEDINAS:  From the 9th, right?
02:04:05 23    THE COURT:  No, no, not now because we are not going
02:04:08 24  to be in on the 9th.  It will be a week from tomorrow to
02:04:12 25  submit a 15-page or less memo giving me the law as it applies

02:04:18  1  to the facts as you see them.  I don't want a recitation of
02:04:22  2  the facts.
02:04:24  3          In other words, I don't want any of the facts.  I am
02:04:26  4  the finder of the facts.
02:04:30  5          MR. McJESSY:  Judge, it's seven days from Thursday?
02:04:33  6          THE COURT:  Yes.  It will be -- I'm sorry, you're
02:04:35  7  right, seven days from Thursday.  I misspoke.
02:04:39  8          And then what I would like from the respondents,
02:04:43  9  please, I would like a verification by way of affidavit
02:04:50  10 regarding the 169 e-mails to Mr. Borlack, which all I want is
02:04:56  11 confirmation that that was, in fact, the case regarding the
02:05:01  12 e-mails to Mr. Borlack from Mr. Blumenthal.
02:05:07  13         You can get down.  Thank you for your patience.
02:05:10  14   (Witness leaves the stand.)
02:05:10  15         MR. McJESSY:  For what period of time, Judge?
02:05:12  16         THE COURT:  For whatever period of time it was.  They
02:05:14  17 said it was 169.  I want verification of that.  That way you
02:05:18  18 will get it as well as the plaintiffs.  And if you want to
02:05:20  19 leave your stuff here, you can.
          20   (The hearing was adjourned at 2:05 p.m. on February 1, 2011,
          21 until 1:00 p.m. on February 3, 2011.)
          22
          23
          24
          25

## $

**$100,000** [1] - 786:21
**$250,000** [1] - 787:2
**$350,000** [1] - 764:3

## 1

**1** [2] - 752:23, 881:20
**10** [1] - 741:2
**10:40** [1] - 757:12
**11** [1] - 878:5
**13th** [2] - 816:21, 816:22
**15** [8] - 741:22, 804:4, 804:6, 806:23, 808:15, 820:8, 820:15, 870:4
**15-page** [1] - 880:25
**15th** [2] - 756:20, 769:4
**16** [12] - 741:22, 762:14, 786:14, 805:2, 805:16, 809:1, 816:24, 818:19, 819:25, 820:15, 824:10, 826:10
**160** [1] - 851:3
**169** [6] - 800:2, 800:12, 801:3, 823:6, 881:10, 881:17
**16th** [11] - 756:20, 817:6, 821:17, 824:22, 825:18, 837:3, 848:9, 848:19, 851:16, 852:13, 877:20
**17th** [2] - 854:8, 854:11
**192** [2] - 777:2, 782:19
**1978** [3] - 742:18, 742:20, 787:20
**19th** [3] - 752:23, 753:1, 774:13
**1:00** [2] - 879:25, 881:21

## 2

**2** [2] - 758:23, 760:4
**20** [4] - 752:15, 856:6, 856:22, 858:25
**2006** [1] - 787:21
**2009** [1] - 745:4
**2010** [37] - 745:14, 747:13, 747:16, 747:22, 748:11, 748:25, 749:23, 751:24, 752:8, 752:23, 757:11, 757:12, 761:4, 762:14, 766:10, 766:15, 767:2, 771:19, 777:3, 777:6, 786:22, 788:9, 788:12, 802:8, 804:4, 804:7, 806:23, 822:20, 826:21, 841:9, 854:8, 854:11, 857:18, 859:17, 860:12, 861:6, 878:5
**2011** [2] - 881:20, 881:21
**22** [6] - 757:9, 757:10, 757:14, 758:23, 760:4, 823:14
**222** [1] - 740:5
**23rd** [1] - 771:22
**24** [2] - 766:10, 826:21
**24th** [11] - 757:11, 757:15, 758:5, 766:1, 766:15, 766:18, 767:1, 768:1, 768:4, 768:13, 771:19
**26th** [2] - 757:12, 758:12
**28** [5] - 757:9, 757:12, 758:10, 823:25, 824:1
**2:00** [2] - 853:22, 870:5

**2:05** [1] - 881:20
**2:48** [1] - 766:10
**2:53** [1] - 757:11

## 3

**3** [1] - 881:21
**3/16** [1] - 877:20
**30** [1] - 837:18
**300** [1] - 740:5
**30th** [4] - 777:3, 777:6, 778:1, 779:18
**31** [1] - 860:10
**312** [1] - 740:6
**331** [1] - 741:2
**350,000** [1] - 763:25
**3:00** [1] - 752:24
**3:14** [1] - 860:12
**3rd** [2] - 860:11, 861:6

## 4

**45** [9] - 801:25, 802:4, 802:13, 806:22, 809:4, 809:6, 809:8, 811:23
**46** [16] - 762:11, 762:13, 802:1, 802:2, 802:5, 802:7, 802:14, 802:15, 808:18, 809:1, 816:11, 818:19, 824:10, 826:11, 848:10, 851:17
**49** [1] - 854:7
**4:53** [1] - 808:14

## 5

**56** [8] - 765:24, 765:25, 766:4, 766:6, 766:9, 771:19, 826:18, 826:19
**57** [2] - 765:25, 768:6

## 6

**60601** [1] - 740:5

## 7

**704-3000** [1] - 740:6

## 8

**8:57** [1] - 777:8

## 9

**9:01** [2] - 777:3, 777:6
**9:20** [2] - 762:14, 808:18
**9:45** [1] - 879:22
**9th** [2] - 880:22, 880:24

## A

**a.m** [4] - 757:13, 777:4, 777:8, 808:18
**abandoned** [1] - 835:21
**ability** [3] - 810:1, 863:10, 875:2
**able** [7] - 781:10, 807:12, 809:8, 811:13, 820:24, 841:14, 845:2
**absolutely** [1] - 806:2
**access** [58] - 756:22, 803:1, 810:5, 810:13, 810:22, 810:24, 811:7, 811:10, 811:13, 811:15, 812:3, 812:16, 812:25, 813:6, 813:15, 814:22, 815:2, 815:16, 815:21, 815:24, 815:25, 816:6, 816:8, 817:1, 817:9, 817:15, 817:20, 817:24, 818:13, 819:9, 819:17, 820:2, 820:4, 820:6, 820:9, 820:13, 820:16, 820:23, 820:25, 821:2, 821:4, 822:9, 823:12, 837:1, 838:18, 848:17, 849:21, 850:4, 855:9, 861:25, 865:23, 866:3, 866:14, 869:23, 871:17, 872:1, 872:15, 877:24
**accessibility** [4] - 809:19, 813:24, 820:11, 820:12
**accessible** [2] - 819:2, 819:23
**accomplished** [1] - 790:12
**according** [1] - 875:1
**Accordingly** [1] - 763:9
**accurate** [1] - 824:3
**accurately** [3] - 757:17, 758:14, 823:22
**acquire** [30] - 745:2, 761:7, 763:17, 763:20, 764:13, 764:16, 764:18, 764:20, 764:21, 765:3, 769:22, 770:2, 781:4, 781:22, 785:10, 804:2, 804:13, 804:16, 815:8, 815:10, 815:13, 815:21, 819:3, 821:10, 848:16, 848:22, 872:6
**acquired** [11] - 745:1, 764:2, 764:5, 764:9, 779:8, 789:20, 815:4, 815:5, 815:16, 840:18, 848:25
**acquiring** [4] - 764:9, 765:6, 813:14, 840:16
**acquisition** [4] - 770:6, 770:9, 773:1, 773:17
**action** [7] - 779:5, 779:7, 779:11, 784:18, 836:13, 847:24, 863:12
**actual** [3] - 811:8, 856:12, 872:2
**added** [1] - 826:16
**addition** [2] - 834:14, 837:4
**additional** [1] - 876:21
**addressed** [6] - 777:7, 802:18, 803:2, 820:10, 851:1, 851:14
**addressing** [1] - 759:4
**adjourned** [1] - 881:20
**admitted** [3] - 787:14, 787:16, 787:18
**advice** [9] - 806:19, 809:5, 809:6, 809:14, 809:15, 809:17, 818:18, 836:18, 836:20
**advise** [15] - 771:5, 771:8, 806:13, 807:5, 807:7, 808:7, 808:9, 808:12, 809:1, 809:10, 815:8, 834:8, 859:14, 861:25, 870:14

**advised** [41] - 750:6, 761:5, 769:21, 773:11, 773:21, 773:25, 784:17, 793:10, 794:17, 794:18, 795:4, 804:18, 804:20, 807:16, 809:3, 814:1, 815:10, 816:13, 817:3, 817:4, 817:5, 817:10, 817:14, 817:15, 817:19, 817:23, 819:22, 823:11, 829:16, 829:19, 829:22, 850:3, 851:6, 861:21, 865:22, 866:10, 867:6, 868:25, 869:10, 869:22, 877:22

**advising** [5] - 761:16, 776:23, 818:21, 818:23, 855:6

**affected** [3] - 876:7, 878:2

**affects** [2] - 875:22, 875:23

**affidavit** [1] - 881:9

**affiliated** [1] - 789:24

**afford** [2] - 835:23, 835:25

**afoot** [1] - 801:20

**afternoon** [3] - 783:14, 833:3, 833:4

**afterwards** [2] - 792:24, 850:9

**age** [1] - 787:5

**age-wise** [1] - 787:5

**agent** [1] - 746:17

**agree** [6] - 784:10, 809:19, 819:8, 865:23, 866:3, 869:23

**agreed** [7] - 835:2, 838:20, 850:1, 862:23, 862:25, 863:2

**agreeing** [1] - 843:14

**agreement** [63] - 750:14, 751:9, 752:22, 753:21, 754:1, 755:23, 760:10, 760:14, 760:22, 760:23, 761:2, 761:6, 761:8, 761:9, 772:23, 772:25, 773:5, 780:24, 781:3, 781:9, 796:1, 796:12, 796:20, 804:1, 808:22, 816:11, 816:25, 817:7, 818:10, 818:11, 818:14, 821:7, 822:15, 843:13, 843:21, 848:20, 849:12, 849:25, 850:4, 850:7, 850:8, 850:20, 853:1, 853:3, 853:8, 853:11, 853:15, 854:6, 854:23, 855:1, 856:6, 856:8, 856:13, 856:19, 856:22, 856:23, 856:24, 858:24, 866:4, 871:17, 871:21, 871:23, 872:1

**agreements** [5] - 837:4, 837:22, 839:8, 839:17, 848:23

**ahead** [4] - 742:24, 796:16, 822:12, 873:23

**al** [2] - 741:3, 767:6

**Alan** [18] - 740:3, 747:10, 750:1, 751:7, 754:7, 757:3, 766:10, 766:15, 768:12, 768:18, 769:2, 778:14, 796:22, 796:24, 797:14, 826:22, 851:4, 863:25

**ALAN** [1] - 740:4

**alerting** [1] - 801:18

**Alexander** [2] - 766:2, 768:1

**alleged** [1] - 874:5

**allow** [5] - 760:10, 819:9, 838:17, 855:7, 866:13

**almost** [1] - 780:19

**alternative** [1] - 834:22

**alternatives** [2] - 834:13, 845:17

**altogether** [1] - 843:24

**amended** [2] - 856:12, 856:18

**amendments** [1] - 787:21

**amount** [3] - 786:15, 875:22, 876:7

**angle** [1] - 814:2

**answer** [27] - 748:15, 759:13, 759:25, 762:10, 762:22, 778:8, 784:11, 792:5, 792:6, 799:9, 799:10, 801:8, 805:4, 806:11, 811:20, 813:8, 818:22, 840:2, 841:24, 852:3, 852:21, 855:19, 868:6, 869:5, 871:10, 879:23

**answered** [5] - 796:11, 796:19, 855:17, 866:17, 874:2

**answers** [1] - 749:1

**anticipate** [1] - 840:6

**anytime** [1] - 831:13

**appear** [2] - 766:2, 854:12

**APPEARANCES** [1] - 740:1

**applicable** [1] - 751:17

**applied** [1] - 868:4

**applies** [1] - 880:25

**appreciate** [2] - 831:2, 867:21

**approach** [3] - 745:23, 748:7, 814:2

**appropriate** [1] - 800:2

**approve** [1] - 788:1

**April** [23] - 753:22, 753:23, 755:10, 756:2, 756:14, 771:22, 776:7, 796:2, 796:20, 816:22, 816:23, 820:18, 820:23, 822:8, 828:4, 828:5, 829:17, 830:7, 857:21

**Arab** [2] - 846:24, 847:1

**area** [2] - 827:13, 865:12

**argumentative** [1] - 852:19

**arose** [2] - 849:18, 849:20, 861:13

**arrangement** [5] - 744:7, 814:23, 820:24, 846:20

**arrangements** [6] - 744:12, 744:14, 781:17, 781:18, 836:23, 845:5

**art** [1] - 842:9

**artifacts** [1] - 835:18

**aside** [2] - 771:11, 868:17

**aspects** [1] - 876:10

**assets** [1] - 842:11

**assist** [5] - 746:23, 755:6, 776:13, 862:11, 862:14

**assisted** [1] - 833:24

**Associated** [18] - 760:23, 761:6, 769:19, 770:3, 772:25, 773:13, 779:15, 779:23, 780:24, 781:3, 815:5, 815:9, 815:11, 843:14, 849:14, 853:18, 855:7, 855:8

**associated** [1] - 844:21

**assume** [4] - 753:4, 753:6, 753:9, 785:20, 791:23, 815:19

**assumed** [5] - 850:25, 851:13, 868:10, 869:9

**assumes** [2] - 800:5, 818:21

**assuming** [3] - 814:13, 848:24, 852:3

**attached** [2] - 768:6, 858:25

**attachment** [1] - 857:3

**attempt** [4] - 815:10, 852:25, 853:7, 853:11

**attempting** [2] - 769:22, 818:23

**attend** [1] - 749:5

**attended** [3] - 874:6, 878:9, 878:11

**attention** [4] - 754:6, 802:17, 807:4, 826:18

**attorney** [15] - 741:18, 741:21, 742:2, 747:2, 776:14, 779:23, 791:24, 792:17, 803:4, 804:15, 818:17, 837:15, 853:1, 865:7, 867:25

**attorneys** [11] - 772:17, 772:18, 838:2, 850:17, 867:6, 867:18, 868:1, 868:4, 868:9, 868:18, 868:24

**August** [7] - 745:4, 774:24, 776:22, 777:3, 777:6, 779:17, 859:16

**available** [6] - 756:13, 816:14, 822:6, 848:13, 848:18, 879:21

**avoid** [2] - 790:14, 842:16

**avoided** [2] - 843:24, 844:19

**aware** [43] - 745:16, 746:13, 746:15, 751:22, 751:24, 756:24, 757:1, 759:22, 762:2, 770:7, 772:3, 772:4, 772:8, 773:4, 773:8, 773:14, 773:19, 773:20, 773:22, 774:2, 774:4, 774:7, 779:14, 779:20, 780:22, 781:1, 781:2, 781:6, 781:7, 781:10, 781:12, 782:1, 782:4, 787:21, 792:19, 794:11, 798:16, 841:14, 841:17, 859:2, 863:19, 864:6, 869:10

**B**

**backup** [1] - 815:12

**bad** [1] - 839:18

**balance** [1] - 764:8

**Bank** [79] - 741:2, 744:4, 744:8, 744:15, 744:17, 744:22, 745:2, 745:6, 745:17, 746:10, 747:14, 747:21, 748:6, 748:21, 748:22, 749:10, 749:11, 749:15, 749:18, 750:25, 751:4, 757:21, 759:6, 759:16, 760:22, 760:23, 761:6, 767:6, 769:19, 770:3, 771:24, 772:17, 772:25, 773:1, 773:13, 779:15, 779:23, 780:23, 780:24, 781:2, 781:3, 781:4, 781:15, 804:16, 810:23, 815:5, 815:9, 815:11, 815:13, 815:15, 822:14, 822:15, 833:23, 834:3, 834:11, 838:18, 839:1, 839:2, 841:6, 843:15, 849:2, 849:15, 849:25, 853:17, 853:18, 855:7, 855:9, 862:1, 865:23, 866:2, 866:5, 867:23, 867:25, 869:22, 871:20

**bank** [2] - 819:8, 822:13

**bankruptcy** [1] - 842:9

**based** [6] - 859:21, 867:13, 867:19, 867:22, 868:1, 879:2

**basis** [3] - 831:4, 840:15, 863:11

**bathroom** [1] - 832:20

**bcc'd** [2] - 829:4, 829:6

**bcc's** [1] - 829:11

**became** [4] - 749:6, 754:5, 841:15, 857:24

**become** [6] - 745:4, 746:13, 746:15,

773:4, 773:8, 781:7
**becoming** [1] - 775:2
**begins** [3] - 763:8, 854:20, 855:5
**behalf** [4] - 743:21, 743:24, 745:5, 860:7
**behind** [5] - 836:25, 870:15, 870:18, 871:8, 871:14
**belief** [1] - 780:5
**bell** [2] - 846:14, 846:15
**belonged** [1] - 824:20
**belongs** [4] - 807:5, 808:6, 809:7, 809:10
**below** [3] - 762:25, 777:7, 854:11
**beneficial** [1] - 872:9
**best** [2] - 754:16, 775:16
**better** [2] - 798:23, 817:10
**between** [25] - 744:3, 744:7, 744:12, 744:14, 744:16, 754:2, 756:2, 760:18, 769:18, 770:8, 772:25, 773:5, 773:13, 776:6, 794:14, 795:1, 795:16, 810:25, 821:8, 830:10, 830:11, 830:17, 830:19, 846:1, 849:17
**beyond** [1] - 831:10
**Bill** [11] - 759:21, 766:1, 773:11, 773:21, 782:7, 802:16, 821:24, 851:7, 853:12, 853:14, 869:11
**binder** [1] - 752:15
**binders** [2] - 752:17, 757:9
**bit** [8] - 743:19, 763:1, 812:6, 834:19, 841:4, 843:8, 845:10, 848:9
**black** [1] - 843:21
**black-and-white** [1] - 843:21
**blame** [2] - 784:13, 812:5
**blind** [9] - 762:19, 767:12, 767:16, 767:17, 767:20, 767:21, 771:1, 854:15, 860:17
**blizzard** [1] - 783:10
**BLUMENTHAL** [5] - 741:14, 786:8, 833:1, 854:3, 870:12
**Blumenthal** [15] - 741:17, 748:4, 786:10, 793:17, 806:24, 813:19, 814:2, 825:9, 828:17, 833:3, 833:5, 854:5, 870:14, 879:16, 881:12
**blurt** [1] - 830:24
**book** [1] - 838:22
**books** [8] - 814:3, 814:11, 814:14, 814:16, 814:20, 814:24, 815:2, 815:17
**Borlack** [168] - 740:3, 747:10, 750:2, 750:5, 750:6, 750:18, 750:24, 751:8, 751:12, 753:10, 753:16, 753:18, 754:17, 754:24, 755:3, 755:25, 756:3, 756:4, 756:10, 756:15, 756:17, 756:24, 757:3, 757:24, 759:22, 762:4, 762:8, 762:10, 762:16, 766:10, 766:16, 768:12, 769:2, 769:6, 769:21, 770:14, 770:23, 771:6, 771:8, 774:2, 774:17, 775:9, 776:2, 776:6, 777:11, 777:22, 777:25, 778:3, 778:14, 778:25, 779:10, 779:14, 779:22, 782:13, 782:19, 787:23, 788:4, 788:6, 790:25, 791:11, 791:17, 792:25, 793:10, 794:1, 794:3,

794:6, 794:15, 795:1, 795:17, 795:25, 796:5, 796:9, 796:13, 796:22, 796:24, 797:3, 797:14, 798:6, 798:7, 798:11, 798:13, 798:16, 799:13, 799:20, 800:4, 800:9, 800:16, 801:10, 805:16, 806:1, 811:17, 811:24, 812:1, 813:20, 813:21, 822:20, 822:21, 822:25, 823:1, 823:6, 823:11, 824:21, 824:24, 825:17, 825:20, 826:22, 827:6, 827:14, 827:23, 828:14, 828:18, 828:20, 828:24, 829:7, 829:12, 829:16, 830:13, 830:21, 847:11, 847:13, 848:5, 848:7, 850:19, 851:1, 851:11, 851:15, 856:3, 856:5, 857:6, 858:6, 858:21, 859:14, 859:18, 859:21, 860:1, 860:4, 861:21, 861:25, 862:5, 862:11, 862:14, 864:6, 864:12, 864:21, 865:19, 868:24, 870:9, 873:8, 873:15, 874:19, 874:21, 874:23, 875:1, 875:11, 876:9, 876:17, 877:5, 877:10, 877:21, 878:1, 878:4, 878:15, 879:9, 879:15, 880:13, 881:10, 881:12
**Borlack's** [11] - 752:10, 775:11, 788:1, 799:25, 812:12, 812:15, 812:24, 857:19, 857:24, 863:25, 878:12
**borrower** [1] - 743:18
**boxes** [1] - 835:17
**break** [6] - 783:1, 786:1, 832:19, 832:20, 832:21, 832:23
**Brief** [1] - 869:4
**brief** [2] - 785:17, 870:10
**briefly** [2] - 744:6, 870:3
**bring** [1] - 853:23
**Brook** [5] - 771:23, 772:1, 772:9, 772:16
**brought** [6] - 771:25, 778:17, 778:18, 778:19, 874:9, 874:12
**Bs** [1] - 813:20
**building** [2] - 759:7, 838:18
**built** [2] - 744:18, 745:3
**burden** [1] - 876:21
**bus** [1] - 839:24
**business** [19] - 789:14, 833:25, 834:9, 841:12, 847:2, 847:18, 847:21, 847:23, 847:24, 848:1, 848:6, 855:17, 855:25, 873:7, 873:14, 874:18, 875:1, 875:8, 875:10
**businesses** [1] - 742:8
**busy** [2] - 864:22, 875:14
**buy** [4] - 764:6, 784:16, 795:17, 845:7
**BY** [86] - 740:4, 741:15, 742:14, 744:11, 745:12, 746:7, 747:20, 748:3, 748:17, 749:3, 749:21, 751:1, 752:14, 752:20, 755:18, 759:15, 760:2, 769:17, 771:4, 771:17, 771:21, 775:7, 777:16, 777:20, 778:10, 780:4, 782:11, 784:23, 786:9, 787:9, 794:24, 796:3, 797:8, 797:13, 797:24, 799:5, 800:8, 801:2, 802:6, 802:20, 805:13, 811:22, 812:10, 812:23, 813:16, 816:5, 817:18, 818:2, 818:9, 818:25, 822:3, 825:6, 825:16, 826:3, 831:3, 833:2, 834:7, 835:1,

836:17, 840:4, 842:2, 843:11, 844:7, 847:10, 852:24, 854:4, 856:14, 861:1, 862:19, 863:3, 864:11, 864:20, 866:19, 867:12, 868:2, 868:14, 868:22, 869:19, 870:13, 871:6, 871:12, 872:19, 872:23, 873:3, 876:13, 876:16

# C

**cannot** [1] - 878:16
**capacity** [2] - 832:10, 832:12
**capital** [1] - 743:18
**careful** [1] - 753:6
**carefully** [1] - 837:21
**case** [44] - 743:17, 743:20, 752:13, 753:10, 762:1, 764:22, 768:20, 775:2, 776:8, 778:24, 780:1, 780:7, 785:14, 788:11, 792:10, 792:13, 792:15, 793:18, 794:12, 797:15, 797:18, 798:1, 798:15, 800:10, 800:17, 800:18, 803:9, 805:12, 808:17, 810:16, 811:13, 823:10, 824:13, 824:14, 824:25, 827:7, 827:8, 866:25, 872:12, 874:8, 878:6, 880:3, 881:11
**cash** [1] - 845:16
**centered** [1] - 811:7
**Central** [16] - 741:2, 745:6, 745:17, 746:10, 757:21, 771:24, 772:17, 822:15, 833:23, 834:3, 834:11, 841:6, 843:15, 866:5, 867:23, 867:25
**central** [1] - 834:5
**certain** [7] - 797:25, 827:12, 830:2, 842:12, 842:17, 846:19, 864:17
**certainly** [1] - 821:15
**chance** [2] - 762:12, 860:13
**change** [2] - 816:17, 822:8
**changed** [1] - 851:6
**charge** [1] - 857:19
**Chicago** [1] - 740:5
**chief** [1] - 880:3
**choice** [1] - 758:25
**chose** [1] - 836:3
**chosen** [2] - 835:4, 835:5
**Circuit** [1] - 787:14
**circumstances** [3] - 779:1, 779:3, 873:21
**claims** [2] - 876:3, 876:5
**clarification** [1] - 800:23
**clarify** [2] - 755:4, 834:20
**Clark** [34] - 748:21, 749:4, 749:17, 751:3, 761:5, 762:23, 763:2, 763:4, 770:9, 776:23, 777:7, 781:13, 784:17, 802:8, 803:12, 804:19, 807:16, 809:19, 810:22, 817:15, 817:19, 818:24, 819:22, 819:23, 820:8, 826:14, 830:4, 830:11, 830:14, 839:22, 849:5, 869:11, 877:23
**Clark's** [3] - 809:15, 820:16, 828:23
**clear** [6] - 820:16, 821:1, 855:5, 862:17, 869:20, 878:25
**CLERK** [1] - 741:2

**client** [15] - 786:12, 793:11, 794:18, 795:4, 809:14, 810:17, 810:25, 815:16, 819:12, 839:11, 840:11, 843:22, 847:17, 849:13, 853:16

**clients** [25] - 787:4, 789:1, 801:14, 806:13, 809:2, 809:3, 812:24, 814:7, 817:4, 817:5, 820:24, 831:25, 833:22, 835:5, 835:8, 836:11, 836:24, 840:5, 841:5, 842:24, 847:1, 848:14, 870:14, 871:13, 873:4

**clients'** [10] - 814:3, 814:11, 814:19, 815:6, 815:17, 816:12, 837:22, 838:7, 841:4, 849:1

**close** [2] - 787:10, 830:3

**closed** [3] - 771:6, 792:20, 849:23

**closely** [1] - 742:7

**closely-held** [1] - 742:7

**closing** [6] - 772:24, 773:9, 838:22, 848:16, 855:5, 855:12

**clothing** [5] - 765:14, 765:17, 827:10, 834:16, 845:20

**clue** [1] - 808:4

**collateral** [1] - 826:24

**colon** [1] - 767:5

**commence** [1] - 765:7

**common** [1] - 750:14

**communicated** [6] - 765:8, 780:12, 828:21, 830:14, 851:5, 868:9

**communicating** [3] - 749:24, 750:1, 751:12

**communication** [4] - 827:13, 827:14, 859:22, 868:10

**communications** [11] - 750:4, 756:3, 782:12, 795:16, 796:9, 796:23, 798:6, 827:22, 858:21, 858:23, 859:21

**companies** [12] - 743:5, 743:7, 743:22, 746:24, 834:14, 834:15, 834:16, 843:14, 843:25, 844:21, 846:3

**company** [5] - 833:11, 833:13, 833:17, 833:18, 846:11

**company's** [3] - 754:14, 754:21, 755:7

**complaint** [1] - 746:21

**complete** [1] - 833:24

**completed** [3] - 757:4, 796:2, 849:17

**completely** [3] - 767:3, 768:22, 788:19

**completing** [1] - 840:17

**completion** [1] - 796:20

**complex** [1] - 778:7

**comply** [1] - 858:24

**component** [3] - 839:6, 839:10, 840:23

**components** [1] - 838:10

**composed** [1] - 757:21

**compound** [1] - 778:7, 805:3, 876:12

**computer** [25] - 754:14, 754:21, 755:7, 756:1, 756:8, 772:5, 772:9, 772:11, 772:13, 776:7, 776:11, 789:25, 791:6, 792:4, 796:10, 796:25, 798:8, 798:11, 801:4, 801:20, 803:1, 804:2, 822:6, 829:12, 861:5

**computers** [4] - 772:13, 772:18, 816:14, 836:5

**conceal** [1] - 805:25

**concern** [3] - 820:11, 820:12, 842:18

**concerned** [9] - 794:12, 802:22, 820:7, 820:13, 824:12, 824:13, 843:20, 844:9, 874:3

**concerning** [25] - 745:6, 750:2, 750:18, 751:23, 752:1, 772:9, 776:3, 794:16, 794:25, 796:9, 796:24, 800:17, 800:18, 814:16, 814:20, 823:20, 824:6, 824:11, 824:25, 828:23, 829:12, 830:5, 830:11, 831:5, 831:19

**concerns** [1] - 872:11

**concluded** [3] - 751:7, 760:13, 880:10

**conclusion** [3] - 809:21, 842:1, 865:10

**concurrently** [1] - 849:19

**condition** [3] - 760:7, 841:5, 842:4

**conference** [13] - 750:24, 751:2, 751:6, 776:16, 776:19, 776:20, 778:13, 783:14, 786:6, 791:8, 791:9, 791:14, 791:18

**confident** [1] - 874:19

**confirm** [5] - 808:24, 818:24, 819:16, 819:18, 819:20

**confirmation** [1] - 881:11

**confirmed** [1] - 822:5

**confirming** [3] - 758:11, 853:2, 877:22

**confusion** [1] - 766:8

**connection** [1] - 819:9

**consent** [1] - 862:24

**consider** [1] - 804:15, 849:11

**considering** [1] - 855:25

**consistent** [1] - 855:11

**consists** [2] - 742:4, 766:1

**constructed** [1] - 744:25

**construction** [1] - 744:22

**consult** [2] - 745:20, 852:1

**consultants** [1] - 756:1

**consultations** [1] - 747:8

**consulted** [1] - 747:7

**contact** [2] - 749:9, 851:11

**contacted** [3] - 748:20, 779:14, 879:2

**contacts** [1] - 847:2

**contain** [1] - 810:9

**contained** [5] - 814:3, 814:11, 814:15, 831:5, 831:19

**contains** [2] - 814:13, 814:15

**contemplated** [3] - 750:10, 804:9, 804:10

**contents** [1] - 878:2

**context** [8] - 754:6, 754:10, 755:2, 757:6, 789:12, 789:14, 809:8, 875:4

**continue** [1] - 813:14

**CONTINUED** [1] - 740:1

**continued** [3] - 773:15, 773:23, 773:24

**continuing** [3] - 774:3, 774:8, 821:9

**contract** [1] - 743:4

**control** [10] - 759:6, 768:24, 790:5, 790:8, 817:8, 862:1, 863:8, 871:20, 872:3, 872:16

**controlled** [2] - 748:22, 754:4

**conversation** [46] - 753:18, 753:24,

753:25, 754:10, 755:20, 755:22, 758:4, 758:8, 762:7, 771:12, 777:24, 778:3, 780:11, 780:13, 780:14, 780:15, 780:19, 782:18, 787:24, 791:7, 792:3, 792:9, 792:19, 793:4, 793:8, 793:10, 793:14, 794:15, 794:17, 794:25, 795:3, 795:8, 817:13, 864:12, 864:17, 864:21, 865:1, 865:4, 866:7, 867:13, 867:24, 869:21, 876:23, 876:25, 877:4, 877:9

**conversations** [42] - 754:7, 755:8, 755:24, 756:5, 756:9, 756:10, 762:9, 765:18, 769:25, 776:2, 776:3, 776:4, 776:5, 776:10, 776:15, 780:9, 780:17, 780:18, 792:7, 792:24, 793:3, 793:6, 795:15, 795:25, 796:5, 796:8, 796:13, 796:17, 796:21, 796:25, 824:4, 847:25, 848:8, 855:18, 855:21, 855:23, 856:2, 873:6, 873:8, 874:5, 875:11, 879:6

**convey** [5] - 780:5, 859:18, 860:5, 868:23, 868:24

**conveyance** [2] - 842:13, 844:14

**conveyed** [2] - 784:19, 859:22

**copied** [31] - 762:16, 762:19, 762:21, 762:23, 766:10, 767:12, 767:16, 768:12, 771:1, 771:13, 779:21, 791:1, 791:3, 800:24, 800:25, 805:23, 806:24, 811:17, 811:21, 812:16, 813:25, 826:21, 826:22, 828:14, 854:15, 858:11, 860:15, 860:17, 861:8, 861:18, 861:20

**copier** [1] - 803:3

**copies** [4] - 752:10, 752:12, 753:10, 799:14

**copy** [35] - 746:16, 746:18, 746:20, 752:3, 752:5, 752:7, 767:17, 767:20, 767:21, 788:17, 800:1, 805:16, 807:8, 807:13, 807:17, 808:10, 808:12, 809:2, 809:3, 809:5, 809:9, 809:15, 809:18, 810:3, 810:6, 810:8, 810:10, 810:14, 810:18, 810:19, 812:3, 813:1, 813:17, 827:6, 856:6

**copying** [2] - 811:1, 811:4, 819:12

**corporate** [4] - 741:18, 741:21, 742:7, 776:14

**corporations** [1] - 741:24

**correct** [127] - 743:12, 747:17, 758:9, 758:22, 761:1, 761:10, 761:21, 762:18, 763:3, 766:20, 768:15, 769:20, 776:3, 787:24, 788:17, 789:13, 791:2, 792:12, 792:21, 793:12, 794:12, 794:19, 794:20, 795:1, 795:5, 795:6, 795:8, 795:9, 795:10, 795:11, 795:12, 795:13, 797:4, 797:16, 798:1, 798:3, 799:15, 799:18, 799:19, 801:15, 803:4, 803:7, 803:10, 803:11, 807:17, 808:15, 808:18, 810:11, 814:5, 814:6, 814:8, 814:12, 814:17, 817:2, 817:4, 818:12, 818:15, 818:17, 819:13, 819:15, 820:4, 820:9, 820:16, 820:20, 822:22, 824:4, 825:18, 825:21, 827:24, 828:9, 828:10, 828:11, 828:19, 829:4, 829:18, 832:4, 833:7, 833:8, 833:10, 833:25, 835:6,

835:7, 836:4, 837:8, 837:13, 837:14, 837:23, 837:24, 837:25, 838:1, 838:8, 838:9, 838:19, 839:8, 839:9, 839:15, 839:21, 840:9, 841:7, 841:10, 841:13, 841:18, 844:1, 845:7, 851:21, 852:2, 852:10, 853:18, 853:19, 857:5, 858:12, 860:15, 860:16, 862:3, 862:10, 862:13, 866:25, 868:18, 868:19, 871:24, 876:1, 876:18, 877:17, 878:15, 880:8
  **correctly** [1] - 777:3
  **correspondence** [1] - 766:3
  **cost** [4] - 811:3, 874:9, 874:15, 874:16
  **costs** [2] - 775:2, 775:18
  **counsel** [17] - 746:24, 747:1, 747:2, 747:6, 779:15, 801:11, 801:17, 801:19, 803:14, 825:4, 825:7, 825:11, 825:14, 836:12, 856:2, 860:5, 862:5
  **counseling** [1] - 747:5
  **countries** [3] - 846:17, 846:19, 847:9
  **country** [3] - 781:16, 845:4, 846:17
  **couple** [1] - 755:9
  **course** [3] - 771:23, 799:23, 865:10
  **Court** [1] - 879:2
  **court** [25] - 741:1, 742:4, 743:1, 751:23, 752:1, 788:10, 790:3, 790:9, 795:21, 817:2, 817:9, 817:16, 817:20, 817:23, 820:19, 821:2, 822:9, 823:7, 823:12, 850:5, 850:12, 850:21, 861:14, 861:25
  **COURT** [150] - 741:4, 741:8, 741:10, 742:10, 742:13, 744:10, 745:9, 745:11, 746:5, 747:19, 747:24, 748:1, 748:15, 748:24, 749:1, 749:19, 752:12, 752:17, 755:15, 759:24, 769:12, 771:1, 771:15, 771:20, 775:6, 777:15, 777:19, 778:8, 780:3, 782:1, 782:3, 782:6, 782:8, 783:1, 783:8, 783:11, 783:13, 783:21, 783:24, 784:1, 784:10, 784:13, 784:22, 785:16, 785:19, 785:22, 785:24, 786:2, 786:4, 787:5, 794:21, 794:23, 795:21, 797:7, 797:10, 797:12, 797:20, 798:20, 798:23, 799:1, 800:7, 800:23, 801:1, 802:2, 802:4, 802:14, 805:4, 811:20, 812:5, 812:8, 812:20, 813:8, 816:3, 818:5, 818:22, 821:13, 821:16, 821:19, 821:21, 821:23, 821:25, 822:2, 825:3, 825:10, 825:13, 825:15, 826:2, 830:23, 831:1, 832:14, 832:17, 832:19, 832:22, 832:24, 834:4, 834:23, 840:2, 841:24, 843:8, 844:4, 847:4, 852:20, 853:21, 853:25, 856:11, 860:20, 860:22, 860:25, 862:17, 863:1, 864:9, 864:14, 864:18, 866:18, 867:8, 867:11, 867:19, 868:6, 868:13, 868:21, 869:2, 869:5, 869:12, 869:18, 870:2, 870:4, 870:8, 870:23, 871:4, 871:10, 872:18, 872:21, 873:1, 876:15, 878:23, 879:7, 879:11, 879:13, 879:17, 879:20, 879:25, 880:5, 880:8, 880:12, 880:15, 880:19, 880:23, 881:6, 881:16
  **covered** [5] - 757:4, 763:15, 790:4, 796:5, 851:4

  **covers** [1] - 823:23
  **Creations** [1] - 846:14
  **Creative** [18] - 743:9, 743:25, 744:15, 744:16, 745:13, 746:9, 748:8, 756:21, 767:6, 798:16, 832:11, 833:6, 835:9, 841:11, 841:21, 845:22, 846:17, 860:5
  **credit** [2] - 743:18, 744:3
  **creditor** [6] - 842:19, 842:25, 843:2, 843:14, 843:15, 843:22
  **creditors** [2] - 842:16, 843:16
  **CROSS** [2] - 786:8, 833:1
  **cross** [2] - 796:18, 871:3
  **CROSS-EXAMINATION** [2] - 786:8, 833:1
  **cross-examination** [1] - 796:18
  **crossed** [1] - 838:3
  **CULBERTSON** [1] - 740:3
  **cumulative** [1] - 811:19
  **custody** [2] - 871:20, 872:3
  **customers** [1] - 834:10
  **cut** [2] - 794:22, 797:20, 812:6

# D

  **daily** [1] - 803:8
  **damaging** [1] - 778:24
  **data** [35] - 754:12, 754:20, 755:5, 755:6, 756:12, 776:13, 785:14, 807:5, 807:22, 808:3, 808:4, 808:6, 809:6, 809:10, 809:22, 809:24, 810:2, 810:9, 810:10, 810:15, 811:8, 811:10, 811:13, 811:15, 812:15, 815:21, 815:25, 816:1, 816:6, 816:8, 822:22, 822:23, 823:2, 828:12, 831:8
  **date** [17] - 753:1, 753:3, 753:12, 761:3, 762:8, 763:9, 772:6, 777:8, 777:11, 777:22, 778:5, 827:11, 835:4, 835:5, 863:5, 878:7, 878:16
  **dated** [13] - 752:23, 757:11, 757:12, 762:13, 766:10, 766:14, 766:18, 767:24, 768:1, 777:3, 806:23, 854:8, 860:11
  **dates** [1] - 793:2
  **Dave** [17] - 748:20, 749:17, 761:5, 762:23, 763:2, 763:4, 777:7, 802:8, 807:16, 807:21, 809:19, 809:22, 809:24, 810:1, 810:21, 826:14, 869:11
  **day-wise** [1] - 783:17
  **days** [2] - 881:5, 881:7
  **deal** [17] - 772:18, 803:6, 813:24, 820:2, 820:3, 820:8, 828:19, 830:2, 830:3, 835:24, 838:10, 840:23, 847:14, 850:13, 850:22, 864:1, 875:15
  **dealing** [4] - 754:9, 754:11, 850:16, 850:18
  **deals** [1] - 839:18
  **dealt** [5] - 749:9, 794:15, 803:9, 828:17, 828:18
  **debts** [1] - 841:14
  **decide** [1] - 775:1

  **decision** [1] - 869:15
  **DEDINAS** [33] - 741:7, 741:9, 744:9, 745:8, 745:10, 747:18, 747:23, 748:14, 759:23, 783:20, 785:18, 818:1, 832:16, 832:18, 832:21, 833:2, 834:7, 835:1, 836:17, 840:4, 842:2, 843:7, 843:11, 844:7, 847:10, 852:24, 853:20, 868:20, 869:1, 869:16, 880:9, 880:17, 880:22
  **Dedinas** [2] - 855:16, 870:5
  **deed** [17] - 750:7, 750:14, 757:5, 792:20, 802:18, 802:22, 804:10, 838:13, 840:17, 864:23, 865:5, 865:15, 875:15, 875:17, 875:25, 876:4, 876:21
  **deemed** [2] - 844:10, 844:14
  **defaulted** [1] - 834:2
  **defaulting** [1] - 833:23
  **defendant** [1] - 869:24
  **defendants** [10] - 747:6, 801:11, 801:17, 801:19, 857:11, 860:8, 862:9, 863:11, 866:24, 869:23
  **defendants'** [2] - 868:4, 868:18
  **defending** [2] - 863:12, 873:15
  **defense** [1] - 780:6
  **defenses** [2] - 876:3, 876:5
  **definitely** [1] - 875:24
  **demand** [2] - 819:15, 819:16
  **deposition** [5] - 761:19, 794:9, 794:10, 796:4, 861:11
  **depositions** [3] - 793:17, 793:20, 795:14
  **describe** [6] - 742:1, 742:4, 744:6, 757:17, 758:14, 858:23
  **described** [3] - 750:18, 832:10, 832:12
  **describes** [1] - 823:22
  **describing** [2] - 769:25, 861:4
  **description** [1] - 824:3
  **desire** [1] - 872:6
  **determine** [1] - 779:16
  **developer** [1] - 744:25
  **developer's** [1] - 745:1
  **developers** [1] - 742:8
  **Dieterich** [1] - 854:12
  **different** [7] - 743:19, 769:16, 776:16, 812:11, 816:10, 853:3, 863:5
  **dire** [2] - 842:3, 842:24
  **direct** [5] - 807:4, 823:17, 824:1, 868:10, 871:3
  **DIRECT** [1] - 741:14
  **direction** [1] - 879:2
  **directions** [1] - 863:22
  **directly** [16] - 749:4, 751:16, 762:24, 767:2, 800:1, 800:24, 800:25, 815:5, 815:9, 850:17, 851:5, 854:10, 868:18, 868:24, 869:10
  **discovery** [10] - 751:23, 788:14, 790:3, 801:15, 803:6, 803:16, 804:11, 819:6, 858:8, 862:15
  **discuss** [5] - 774:17, 788:25, 789:4, 810:17, 810:21, 810:23, 848:5
  **discussed** [29] - 747:10, 755:2, 757:18, 758:15, 758:18, 758:19, 769:6,

775:4, 775:17, 775:22, 775:25, 776:20, 778:23, 789:3, 789:5, 789:9, 789:10, 789:12, 790:25, 791:5, 791:7, 791:8, 810:19, 823:7, 834:12, 846:6, 848:7, 864:13, 870:17

**discussing** [11] - 751:25, 755:15, 768:17, 769:2, 781:13, 799:14, 865:5, 868:17, 874:13, 874:25, 879:4

**Discussion** [2] - 783:25, 879:24

**discussion** [10] - 750:6, 754:17, 758:5, 772:11, 810:25, 811:2, 823:19, 824:6, 875:6, 875:9

**discussions** [15] - 748:13, 748:18, 750:17, 755:3, 755:5, 756:7, 769:1, 811:7, 823:23, 845:20, 845:25, 847:19, 855:11, 865:11

**disposal** [1] - 822:16

**dispute** [1] - 745:6

**distribution** [1] - 834:16

**distributors** [3] - 765:19, 765:22, 845:21

**District** [2] - 787:16, 787:18

**document** [11] - 804:23, 823:10, 837:22, 839:16, 840:11, 853:1, 853:5, 853:7, 853:11, 853:15, 856:10

**documented** [1] - 839:7

**documenting** [4] - 843:20, 849:6, 853:3, 874:3

**documents** [15] - 760:16, 760:18, 764:10, 766:4, 793:21, 793:22, 793:23, 797:15, 797:18, 797:19, 797:25, 798:5, 804:20, 823:9, 849:10

**dollars** [1] - 786:25

**Domanskis** [6] - 766:2, 768:1, 768:13, 827:1, 827:2, 827:3

**Don** [1] - 775:10

**done** [9] - 743:21, 753:21, 759:11, 779:17, 827:16, 853:22, 878:22, 878:25, 880:15

**dotted** [1] - 838:3

**doubt** [2] - 793:1, 878:7

**down** [3] - 807:4, 812:6, 881:13

**draft** [3] - 848:20, 849:12, 849:24

**drive** [27] - 807:8, 807:12, 808:10, 809:2, 809:3, 809:5, 809:9, 809:16, 809:18, 809:20, 810:3, 810:5, 810:18, 810:22, 811:5, 812:3, 813:1, 813:17, 813:24, 814:3, 814:8, 814:10, 814:11, 816:12, 816:14, 819:2, 863:15

**drives** [1] - 761:17

**due** [2] - 764:8, 841:15

**duplicate** [1] - 810:10

**during** [10] - 756:6, 758:4, 758:15, 758:17, 769:3, 771:23, 778:23, 799:22, 827:25, 828:7

## E

**e-mail** [125] - 752:21, 752:22, 753:1, 757:11, 757:12, 757:14, 757:17, 757:20, 758:11, 758:14, 759:11, 760:4,

761:16, 761:19, 761:22, 761:24, 762:5, 762:8, 762:13, 762:16, 762:19, 762:21, 762:23, 762:25, 763:2, 763:8, 766:8, 766:9, 766:13, 766:21, 767:1, 767:3, 767:4, 767:7, 767:10, 767:11, 767:12, 767:16, 767:17, 767:18, 768:12, 771:13, 771:15, 771:16, 776:22, 776:23, 777:3, 777:7, 777:12, 777:22, 777:23, 778:4, 779:21, 780:11, 782:19, 791:17, 793:14, 802:2, 802:8, 802:11, 802:21, 802:23, 805:2, 805:17, 806:23, 806:25, 807:2, 807:10, 807:18, 808:14, 809:1, 811:12, 816:24, 818:19, 819:1, 820:10, 821:16, 823:15, 823:19, 823:22, 824:6, 824:10, 824:22, 824:25, 825:18, 825:23, 826:10, 826:11, 826:14, 826:19, 826:21, 827:6, 837:1, 837:3, 838:6, 839:14, 848:21, 852:13, 854:8, 854:10, 854:13, 854:16, 855:4, 856:5, 856:11, 856:21, 857:3, 858:5, 859:8, 860:11, 860:12, 860:15, 860:17, 860:19, 861:2, 861:4, 861:8, 861:10, 861:18, 877:21, 877:25, 878:2

**e-mailed** [1] - 783:15

**e-mails** [62] - 753:11, 756:4, 757:10, 766:2, 769:3, 770:5, 770:8, 770:11, 770:14, 770:20, 771:2, 777:5, 791:1, 791:3, 793:24, 794:1, 794:3, 794:4, 794:6, 794:7, 794:11, 794:14, 795:10, 798:9, 799:13, 799:20, 799:22, 800:2, 800:3, 800:9, 801:3, 812:1, 812:12, 812:14, 812:22, 822:20, 822:24, 823:6, 828:14, 828:23, 829:7, 829:10, 829:12, 830:1, 830:4, 830:10, 830:11, 830:13, 830:17, 830:19, 837:13, 851:3, 858:6, 858:10, 858:11, 858:14, 858:17, 858:18, 858:20, 870:20, 881:10, 881:12

**early** [7] - 774:24, 776:7, 791:13, 804:23, 865:2, 875:12, 875:13

**earned** [1] - 786:18

**East** [1] - 846:13

**effect** [6] - 760:24, 772:2, 848:13, 850:4, 856:24, 859:8

**effects** [1] - 835:9

**efficient** [6] - 775:1, 874:9, 874:13, 874:14, 874:15

**effort** [1] - 765:17

**efforts** [1] - 779:20

**either** [20] - 758:21, 758:25, 775:3, 778:4, 791:17, 800:1, 812:2, 812:16, 812:25, 813:3, 814:1, 825:3, 837:5, 842:18, 845:15, 846:12, 846:25, 867:24, 878:12, 879:8

**electronic** [9] - 755:5, 790:3, 801:15, 803:6, 803:13, 803:16, 804:10, 804:11, 860:3

**electronically** [12] - 752:1, 754:9, 754:20, 788:21, 791:21, 825:20, 856:13, 856:18, 858:7, 860:7, 861:17, 862:6

**electronically-stored** [12] - 752:1, 754:9, 754:20, 788:21, 791:21, 825:20,

856:13, 856:18, 858:7, 860:7, 861:17, 862:6

**element** [2] - 803:21, 803:22

**elements** [1] - 837:21

**eliminate** [3] - 765:3, 789:21, 790:20

**Emirates** [2] - 846:24, 847:2

**employee** [1] - 841:18

**enclosing** [1] - 849:12

**end** [8] - 767:2, 769:3, 780:23, 862:20, 865:2, 875:12, 875:13, 877:1

**engage** [1] - 776:12

**engaged** [3] - 857:7, 862:4, 862:7

**engagement** [2] - 857:10, 857:12

**ensure** [1] - 836:23

**entail** [1] - 743:16

**enter** [3] - 808:21, 836:24, 837:12

**entered** [2] - 751:22, 751:25

**entirely** [1] - 844:19

**entities** [8] - 745:18, 746:11, 746:17, 751:16, 786:19, 844:15, 846:8, 847:12

**entity** [2] - 760:11, 764:23

**equates** [1] - 852:23

**equipment** [3] - 789:25, 861:5, 872:9

**Eric** [1] - 740:3

**ESI** [32] - 751:23, 754:8, 787:21, 788:14, 788:15, 789:12, 790:2, 790:9, 798:15, 804:25, 806:14, 806:19, 808:22, 812:2, 812:12, 813:23, 817:7, 818:11, 818:15, 818:18, 823:20, 824:6, 824:25, 828:19, 858:2, 862:15, 863:18, 863:21, 864:2, 872:12, 877:16, 877:20

**essentially** [5] - 775:17, 814:3, 829:17, 843:21, 875:19

**established** [2] - 844:5, 870:22

**estate** [3] - 742:6, 742:8, 743:19

**estimate** [1] - 800:3

**et** [2] - 741:3, 767:6

**eventually** [1] - 746:23

**eviction** [22] - 757:5, 802:18, 834:19, 834:21, 834:25, 835:2, 835:5, 835:8, 835:14, 836:8, 836:10, 838:20, 840:18, 849:17, 859:3, 861:22, 862:20, 862:23, 862:24, 863:5, 863:12, 864:7

**evidence** [9] - 772:2, 792:10, 792:14, 800:6, 804:11, 818:21, 824:11, 834:2, 844:3

**exact** [2] - 772:6, 800:11, 878:16

**exactly** [4] - 777:25, 784:4, 823:5, 857:23

**examination** [1] - 796:18

**EXAMINATION** [5] - 741:14, 786:8, 833:1, 854:3, 870:12

**example** [1] - 811:23

**except** [1] - 856:5

**exception** [2] - 742:23, 749:14

**excess** [2] - 786:21, 786:25

**executed** [2] - 837:25, 839:17

**exhibit** [4] - 761:14, 771:18, 802:12, 856:22

**Exhibit** [41] - 752:15, 757:10, 757:12, 758:10, 758:23, 760:4, 762:1, 762:13,

765:24, 765:25, 766:4, 766:9, 768:6, 771:19, 777:1, 782:19, 801:25, 802:7, 806:22, 808:18, 809:1, 809:4, 809:6, 809:8, 811:23, 816:11, 823:14, 823:25, 824:1, 824:10, 826:11, 826:18, 826:19, 848:10, 851:17, 854:7, 856:6, 858:25, 860:10

**Exhibits** [1] - 757:9
**exist** [1] - 832:9
**expand** [1] - 778:2
**expect** [2] - 861:18, 861:19
**expectation** [7] - 840:16, 848:1, 848:15, 849:8, 849:9, 876:9, 876:20
**expensive** [1] - 811:3
**experience** [2] - 747:12, 837:18
**expert** [2] - 755:6, 776:7
**expertise** [1] - 865:12
**experts** [9] - 756:1, 756:8, 756:9, 756:12, 776:7, 776:12, 863:18, 863:21, 864:2
**explain** [3] - 833:19, 840:14, 840:15
**explained** [5] - 789:20, 789:23, 822:21, 823:1, 851:24, 872:5
**explaining** [1] - 756:11
**explanation** [4] - 822:7, 856:23, 857:1, 869:12
**exposure** [4] - 765:4, 789:21, 790:14, 790:20
**expressed** [1] - 853:5
**extend** [1] - 863:10
**extent** [2] - 772:20, 832:8
**extra** [1] - 845:8
**extremely** [1] - 842:3

## F

**face** [6] - 755:12, 755:16, 878:5
**facility** [4] - 765:1, 771:23, 785:24, 835:9
**fact** [49] - 754:3, 757:3, 758:24, 759:5, 763:7, 768:18, 768:21, 769:7, 770:1, 773:4, 774:9, 776:11, 778:14, 778:24, 779:14, 780:20, 781:12, 785:12, 785:13, 788:2, 789:5, 795:7, 795:14, 798:16, 799:17, 802:24, 803:9, 805:11, 805:25, 810:21, 810:23, 822:5, 822:14, 822:17, 827:9, 838:2, 838:22, 841:11, 841:20, 848:8, 851:7, 851:10, 866:2, 867:2, 867:22, 871:17, 878:6, 880:20, 881:11
**facts** [8] - 800:5, 818:21, 834:2, 844:2, 881:1, 881:2, 881:3, 881:4
**failed** [1] - 840:10
**fair** [5] - 766:16, 787:4, 841:20, 842:3, 879:19
**faith** [1] - 863:11
**fall** [1] - 871:23
**familiar** [2] - 823:15, 826:19
**Fancy** [1] - 846:14
**far** [3] - 765:8, 857:16, 880:3

**Far** [1] - 846:12
**fashion** [1] - 765:7
**Fashions** [20] - 741:3, 743:9, 743:25, 744:3, 744:7, 745:13, 746:3, 746:8, 832:8, 833:6, 833:15, 833:17, 833:24, 834:8, 834:17, 835:21, 841:11, 841:18, 841:20, 860:6
**favors** [2] - 792:11, 792:12
**February** [32] - 748:11, 748:25, 749:23, 751:24, 752:8, 752:23, 753:1, 756:2, 757:11, 757:12, 757:15, 758:5, 758:12, 769:3, 776:6, 788:11, 788:16, 791:13, 816:21, 822:19, 841:3, 841:8, 841:21, 857:18, 859:17, 865:2, 875:12, 875:13, 877:1, 881:20, 881:21
**federal** [1] - 788:10
**fee** [1] - 786:17
**feelings** [1] - 849:21
**fees** [1] - 873:17
**fell** [2] - 820:3, 865:12
**felt** [3] - 785:4, 803:16, 853:15
**few** [1] - 880:14
**fifteen** [1] - 786:14
**figure** [1] - 851:4
**figuring** [2] - 833:24, 847:23
**filed** [4] - 745:17, 746:9, 751:15
**finally** [1] - 781:9
**finance** [1] - 845:16
**financed** [2] - 744:22, 744:24
**finances** [1] - 781:21
**financial** [4] - 834:10, 841:4, 842:4, 842:25
**financing** [11] - 743:4, 743:5, 743:13, 744:7, 744:12, 744:14, 744:16, 744:20, 745:1, 745:2, 745:6
**finder** [1] - 881:4
**fine** [2] - 798:25, 806:12
**finish** [2] - 853:22, 853:23
**finished** [1] - 786:5
**fired** [1] - 839:22
**firm** [20] - 746:1, 746:2, 746:16, 746:20, 747:10, 748:7, 823:11, 847:13, 857:7, 857:10, 857:15, 857:19, 857:24, 857:25, 859:10, 859:18, 860:1, 860:4, 863:25, 868:24
**first** [31] - 741:6, 744:2, 751:21, 757:14, 762:13, 766:8, 766:9, 766:13, 766:14, 767:2, 767:13, 775:8, 783:3, 785:16, 788:6, 788:10, 804:24, 807:10, 819:25, 820:7, 820:14, 856:9, 856:21, 861:10, 864:15, 869:22, 877:1, 878:4, 879:22, 880:5, 880:20
**First** [67] - 744:15, 747:14, 747:21, 748:6, 748:21, 748:22, 749:10, 749:11, 749:14, 749:18, 750:24, 751:3, 759:6, 759:16, 760:14, 760:22, 761:5, 764:24, 767:5, 768:19, 768:21, 769:19, 770:1, 772:25, 773:13, 780:22, 781:2, 781:4, 781:8, 781:15, 781:19, 784:16, 785:2, 804:1, 804:13, 804:16, 810:23, 813:15, 815:13, 815:15, 821:9, 822:5, 822:13,

837:4, 838:17, 839:1, 840:16, 845:15, 845:16, 848:16, 848:22, 849:2, 849:10, 849:13, 849:20, 849:25, 850:3, 851:5, 853:17, 862:1, 863:8, 865:22, 866:2, 869:22, 871:20, 877:23
**five** [2] - 785:22, 832:22
**Flesch** [4] - 774:14, 774:17, 775:10, 874:24
**Flesch's** [1] - 857:24, 878:13
**fluffy** [1] - 807:11
**FMB** [17] - 794:18, 797:4, 801:4, 808:3, 814:23, 815:3, 816:11, 817:1, 818:10, 818:11, 818:14, 819:15, 820:23, 822:8, 828:8, 828:23, 829:13
**FMB's** [6] - 793:11, 795:4, 795:17, 796:10, 796:24, 797:16, 798:7, 798:11, 817:8
**focus** [2] - 854:10, 854:19
**focused** [3] - 753:11, 755:6, 818:13
**fold** [1] - 848:15
**follow** [8] - 779:5, 809:15, 810:4, 817:6, 817:13, 818:16, 853:10, 866:21
**follow-up** [3] - 817:13, 853:10, 866:21
**followed** [1] - 818:14
**following** [5] - 741:1, 784:5, 795:20, 796:19, 844:17
**foreclosing** [1] - 748:7
**foreclosure** [24] - 747:15, 749:13, 750:2, 750:7, 750:8, 750:15, 750:18, 756:15, 756:17, 756:19, 757:5, 760:6, 761:9, 761:11, 761:15, 771:9, 772:24, 802:22, 855:12, 859:2, 861:22, 864:7, 864:24, 865:16
**foreign** [2] - 845:20, 846:3
**form** [1] - 805:3
**formal** [1] - 853:5
**formally** [1] - 880:10
**formed** [2] - 833:11, 834:16
**forms** [1] - 852:9
**forth** [3] - 770:6, 770:8, 830:17
**forward** [5] - 811:23, 828:23, 849:25, 859:5, 859:10
**forwarded** [6] - 766:21, 767:13, 768:11, 770:13, 770:20, 771:12, 830:21, 856:5
**forwarding** [10] - 766:3, 766:14, 767:11, 768:3, 768:12, 776:23, 854:12, 856:22, 857:3, 858:18
**foundation** [8] - 747:18, 747:25, 748:14, 780:2, 797:17, 867:7, 867:11, 871:9
**frame** [5] - 749:19, 774:23, 823:5, 845:24, 849:16
**fraudulent** [6] - 842:13, 843:17, 844:11, 844:14, 844:18, 873:24
**friendly** [8] - 747:14, 760:6, 761:9, 761:11, 761:15, 771:8, 772:24, 855:12
**front** [3] - 752:16, 753:7, 757:9
**frustrated** [1] - 822:14
**fulfill** [2] - 833:20, 834:9
**fulfilling** [1] - 833:20

fulfillment [1] - 833:18
fully [1] - 752:3
function [2] - 790:18, 813:24
funds [1] - 845:9
future [4] - 790:15, 872:7, 872:10, 875:3
FW [1] - 767:4

## G

gain [1] - 822:9
general [2] - 743:4, 792:6
generally [5] - 742:1, 789:4, 800:19, 827:19
generated [2] - 786:15, 828:15
gentlemen [1] - 840:23
Germany [1] - 847:8
given [8] - 758:25, 760:7, 793:17, 822:7, 836:20, 859:23, 859:25, 864:1
Glickman [2] - 775:10, 874:24
good-faith [1] - 863:11
granted [3] - 817:1, 817:16, 817:20
Grossman [1] - 740:3
grounds [2] - 818:20, 843:5
group [1] - 775:13
guaranties [10] - 750:11, 751:19, 757:7, 763:21, 763:24, 764:6, 764:7, 781:4, 875:23, 876:7
guaranty [15] - 764:3, 764:10, 764:11, 764:13, 765:3, 770:2, 780:25, 785:10, 785:11, 789:21, 789:22, 790:14, 790:21, 815:11, 815:14
guess [2] - 870:20, 871:5
guessing [1] - 854:15

## H

half [1] - 786:25
halfway [1] - 807:4
handle [17] - 743:6, 744:2, 744:14, 744:20, 775:1, 806:14, 806:19, 851:15, 861:19, 862:5, 864:23, 865:5, 865:8, 865:14, 865:15, 876:24
handled [5] - 742:19, 742:21, 743:2, 744:12, 803:23
handling [21] - 745:23, 803:15, 812:2, 829:23, 857:12, 857:19, 858:2, 858:7, 860:3, 860:7, 861:4, 861:17, 862:11, 864:6, 866:4, 876:10, 876:17, 876:21, 877:16, 877:19
hang [2] - 830:23, 864:9
happy [1] - 785:18
hard [32] - 742:10, 742:12, 761:17, 797:21, 797:22, 807:8, 807:12, 808:10, 809:2, 809:3, 809:5, 809:9, 809:15, 809:18, 809:19, 810:3, 810:5, 810:18, 810:22, 811:5, 812:3, 813:1, 813:17, 813:24, 814:3, 814:8, 814:9, 814:11, 816:12, 816:13, 819:2, 863:15
hear [2] - 742:10, 880:7

hearing [1] - 881:20
hearsay [3] - 782:25, 784:9, 818:1
heart [1] - 822:8
held [2] - 742:7, 764:7
help [3] - 828:20, 834:9, 852:7
helpful [6] - 779:25, 780:6, 780:21, 789:15, 789:16, 789:18
hide [3] - 770:22, 828:25, 829:2
HINSHAW [1] - 740:3
hire [3] - 747:6, 747:7, 840:5
hired [6] - 756:1, 776:8, 787:23, 788:2, 788:4, 863:19
hiring [1] - 788:1
hit [4] - 763:1, 826:11, 826:14, 839:24
hold [5] - 851:21, 852:1, 852:6, 852:12, 852:15
Hong [2] - 846:12, 846:22
Honor [16] - 783:7, 784:8, 786:3, 787:7, 800:5, 812:7, 834:1, 839:25, 841:23, 843:10, 844:2, 867:20, 870:3, 870:21, 879:10, 880:17
hopefully [1] - 786:5
hour [1] - 783:17
hour-wise [1] - 783:17
hourly [1] - 786:17
HOWARD [5] - 741:14, 786:8, 833:1, 854:3, 870:12
Howard [1] - 741:17
hundred [3] - 768:10, 772:6, 800:21
hunger [1] - 832:19
hungry [1] - 832:18

## I

l's [1] - 838:3
idea [12] - 783:4, 783:8, 786:18, 790:7, 790:13, 790:16, 790:17, 791:5, 799:24, 808:5, 811:6, 825:24
identified [1] - 866:24
IL [1] - 740:5
Illinois [2] - 787:16, 787:19
imagine [2] - 806:7, 806:8
immediate [1] - 872:11
immediately [2] - 779:17, 863:9
imminently [1] - 849:9
impact [5] - 751:14, 751:19, 754:20, 757:6, 768:20
impacted [1] - 865:6
important [30] - 762:3, 764:12, 785:13, 791:20, 791:25, 792:9, 792:13, 792:14, 798:13, 803:17, 803:18, 803:21, 803:22, 804:12, 804:25, 805:10, 805:12, 805:17, 810:5, 810:13, 810:16, 811:10, 811:12, 811:15, 831:17, 831:22, 839:11, 840:12, 878:1
include [6] - 772:12, 784:17, 785:11, 789:11, 856:3, 857:12
included [10] - 761:7, 763:2, 789:8, 789:17, 798:17, 803:23, 804:2, 821:10, 822:6, 826:10, 867:6, 868:11, 872:6

including [1] - 781:20
income [2] - 786:15, 841:17
indebtedness [3] - 751:16, 875:22, 876:8
independent [1] - 753:8
India [1] - 847:6
indicate [2] - 847:17, 847:22
indicated [9] - 811:2, 819:23, 833:5, 844:8, 845:1, 845:8, 845:19, 847:20, 866:12
indicating [1] - 812:2
indirectly [1] - 744:24
individual [1] - 751:3
individually [2] - 741:23, 745:18
individuals [1] - 775:14
inform [1] - 799:8
information [29] - 752:1, 754:9, 779:25, 780:6, 780:21, 782:4, 782:13, 788:21, 791:21, 803:13, 814:7, 814:9, 815:8, 819:12, 819:25, 825:21, 831:5, 831:11, 831:16, 831:19, 831:22, 856:13, 856:18, 858:8, 860:7, 861:17, 862:6, 863:15
informed [3] - 756:15, 756:17, 798:6
initiate [1] - 778:16
insolvent [2] - 841:21, 842:19
instances [1] - 830:2
instead [2] - 848:20, 872:15
instructions [1] - 864:1
intend [1] - 880:13
intended [1] - 852:16
intending [1] - 848:22
intent [3] - 765:6, 842:16, 847:25
intention [1] - 765:9
intentionally [1] - 826:16
intentions [1] - 848:6
interest [2] - 765:6, 798:17
interested [3] - 748:23, 847:18, 847:22
interests [1] - 838:7
interrupting [1] - 783:2
inventory [44] - 753:21, 754:3, 754:11, 754:12, 755:23, 759:1, 759:8, 793:9, 794:16, 794:25, 796:1, 796:12, 814:4, 814:7, 814:9, 814:12, 814:14, 814:16, 814:20, 815:6, 815:17, 816:20, 816:21, 821:6, 821:8, 822:16, 824:18, 824:19, 827:14, 827:16, 827:23, 828:18, 828:20, 831:5, 831:9, 831:19, 835:19, 835:22, 835:24, 849:18, 849:20, 862:12, 866:4
investigate [1] - 779:7
investors [1] - 765:11
involve [1] - 815:24
involved [15] - 745:5, 746:8, 747:5, 747:13, 748:4, 749:6, 770:1, 774:11, 774:13, 779:2, 813:5, 813:18, 813:22, 813:23, 857:24
issue [12] - 754:3, 759:4, 807:6, 808:7, 809:11, 815:25, 820:6, 827:15, 828:20, 849:18, 849:19, 862:12
issued [1] - 790:2

**issues** [10] - 754:13, 776:11, 792:13, 799:14, 803:7, 828:18, 828:19, 834:6, 834:13, 864:23

**issuing** [1] - 816:7

**Italy** [1] - 847:6

**items** [18] - 759:9, 761:25, 763:12, 763:14, 798:18, 802:17, 802:21, 803:2, 804:13, 804:16, 819:3, 819:8, 824:12, 835:16, 837:2, 870:16, 870:19

**itself** [2] - 764:5, 856:13

## J

**January** [6] - 745:14, 747:13, 747:16, 747:22, 788:7, 788:8

**Jim** [1] - 775:9

**job** [1] - 837:21

**Joshi** [19] - 756:11, 766:15, 775:9, 778:14, 789:2, 789:9, 789:10, 806:14, 806:24, 818:4, 822:21, 823:2, 826:22, 831:6, 833:9, 833:11, 834:12, 834:15, 874:23

**Joshi's** [2] - 832:3, 832:5

**Judge** [7] - 769:14, 785:23, 867:10, 878:21, 878:25, 880:7, 881:15

**judge** [5] - 747:25, 843:4, 880:1, 880:10, 881:5

**judgment** [1] - 847:24

**July** [14] - 773:24, 774:24, 780:23, 781:1, 781:8, 781:22, 829:18, 845:2, 846:1, 849:23, 857:22, 859:17, 874:7, 875:12

**June** [6] - 774:13, 774:23, 846:1, 857:21, 874:7, 878:5

**jury** [1] - 869:13

## K

**Kanan** [32] - 741:2, 743:9, 743:24, 744:3, 744:7, 745:13, 746:2, 746:8, 754:4, 776:12, 798:16, 807:5, 807:6, 808:7, 809:7, 809:10, 832:8, 833:5, 833:15, 833:17, 833:20, 833:24, 834:2, 834:8, 834:17, 835:21, 841:11, 841:18, 841:20, 860:6

**Kanan's** [4] - 771:23, 772:1, 772:4, 772:17

**keep** [6] - 748:1, 786:4, 797:21, 797:22, 799:17, 848:5

**keeping** [1] - 849:16

**kept** [2] - 838:22, 870:6

**key** [1] - 837:21

**kind** [3] - 743:2, 843:12, 861:18

**knowing** [1] - 815:24

**knowledge** [10] - 772:20, 779:10, 779:13, 830:21, 830:22, 831:4, 835:16, 835:17, 841:4, 863:24

**known** [8] - 798:14, 813:25, 848:8, 849:21, 855:18, 855:23, 855:24, 856:1

**knows** [2] - 871:10, 873:1

**Kong** [2] - 846:12, 846:22

## L

**language** [1] - 809:21

**large** [1] - 827:22

**LaSalle** [1] - 740:5

**last** [8] - 743:8, 765:2, 783:6, 785:18, 786:19, 855:4, 856:8, 879:3

**late** [5] - 749:23, 753:23, 776:22, 791:13, 816:23

**law** [5] - 742:7, 746:20, 748:7, 837:19, 880:25

**lawsuit** [37] - 745:17, 745:21, 745:23, 746:9, 746:12, 746:13, 746:16, 746:18, 746:24, 747:6, 751:15, 751:19, 752:2, 774:17, 776:19, 791:22, 817:15, 817:19, 817:22, 818:3, 818:6, 818:7, 818:17, 818:18, 831:17, 831:23, 850:17, 856:2, 857:8, 857:16, 858:8, 863:19, 866:21, 867:3, 868:9, 876:8, 879:4

**lawyer** [1] - 832:3, 832:5, 832:6, 832:8, 832:11

**lay** [3] - 747:25, 843:21, 867:11

**lead** [2] - 801:11, 879:18

**leading** [3] - 746:4, 759:23, 763:1

**learn** [3] - 773:10, 782:20, 788:25

**learned** [10] - 774:8, 787:23, 788:10, 788:15, 820:3, 820:18, 820:22, 845:6, 851:9

**lease** [52] - 760:11, 761:7, 763:14, 763:15, 763:17, 763:20, 763:21, 764:2, 764:10, 764:24, 765:3, 765:12, 770:2, 773:1, 773:18, 780:25, 781:5, 781:19, 782:10, 784:16, 785:3, 785:8, 785:10, 789:5, 789:7, 789:8, 789:11, 789:17, 789:19, 789:21, 790:4, 792:4, 794:12, 804:2, 813:14, 815:10, 815:14, 821:10, 828:24, 837:6, 837:7, 838:15, 840:17, 844:16, 844:20, 846:4, 847:14, 848:16, 848:25, 849:14, 872:6

**least** [4] - 774:20, 797:21, 874:24, 878:23

**Leave** [1] - 879:13

**leave** [3] - 870:14, 879:12, 881:19

**leaves** [1] - 881:14

**leaving** [1] - 870:17

**led** [1] - 784:24

**left** [6] - 835:9, 836:6, 836:25, 870:18, 871:7, 871:13

**legal** [1] - 854:20

**less** [3] - 787:3, 878:15, 880:25

**lessee** [1] - 846:17

**lessees** [2] - 845:21, 846:3

**letter** [22] - 757:20, 757:25, 766:1, 766:14, 766:18, 767:23, 767:24, 767:25, 768:6, 768:11, 768:13, 827:1, 848:10, 848:19, 849:12, 851:16, 851:21, 852:1, 852:6, 852:12, 852:25, 854:20

**letters** [1] - 795:12

**letting** [1] - 830:1

**liability** [2] - 763:24, 765:4

**liable** [3] - 764:2, 764:7, 764:11

**license** [1] - 838:17

**lieu** [17] - 750:7, 750:15, 757:5, 792:20, 802:18, 802:22, 804:10, 838:13, 840:18, 864:24, 865:6, 865:15, 875:15, 875:17, 875:25, 876:4, 876:22

**life** [1] - 787:6

**light** [1] - 834:10

**likely** [2] - 775:13, 777:13

**line** [3] - 744:3, 767:5, 843:4

**lines** [1] - 743:18

**Lipton** [4] - 785:16, 863:14, 870:2, 879:8

**LIPTON** [81] - 740:4, 746:4, 750:19, 755:13, 777:14, 777:18, 778:7, 780:2, 782:25, 783:10, 783:12, 783:23, 784:3, 784:7, 784:20, 785:21, 785:23, 786:3, 786:9, 787:6, 787:9, 794:22, 796:3, 797:8, 797:11, 797:13, 797:19, 797:23, 797:24, 798:19, 798:21, 798:25, 799:5, 800:8, 800:25, 801:2, 802:3, 802:5, 802:6, 802:13, 802:15, 802:20, 805:13, 811:22, 812:7, 812:10, 812:23, 813:11, 813:16, 816:5, 817:18, 818:2, 818:9, 818:25, 821:15, 822:3, 825:6, 825:14, 825:16, 826:3, 831:3, 832:13, 864:8, 866:17, 867:7, 868:5, 868:7, 868:12, 870:3, 870:7, 870:9, 870:13, 871:3, 871:6, 871:12, 872:19, 872:23, 873:3, 876:13, 876:16, 878:20

**liquidator** [1] - 835:25

**listening** [1] - 873:23

**litigating** [1] - 825:1

**litigation** [51] - 742:19, 742:21, 775:18, 798:14, 799:23, 801:11, 805:1, 805:14, 805:17, 806:15, 806:20, 811:14, 811:16, 815:20, 815:23, 819:6, 819:10, 825:21, 828:11, 828:12, 851:14, 851:21, 851:25, 852:5, 852:12, 852:15, 857:12, 864:22, 865:6, 865:13, 873:15, 873:16, 873:18, 874:12, 874:13, 874:17, 875:14, 875:18, 875:19, 875:20, 875:23, 875:24, 876:1, 876:4, 876:10, 876:11, 876:18, 876:24, 877:17, 877:20, 878:2

**litigator** [5] - 742:15, 815:19, 851:18, 851:20, 852:2

**living** [1] - 849:7

**LLP** [1] - 740:3

**loan** [4] - 748:22, 833:23, 834:2, 841:6

**located** [1] - 846:11

**look** [21] - 751:20, 752:15, 757:8, 759:12, 761:13, 761:14, 762:11, 762:12, 765:24, 766:4, 777:1, 785:19, 807:10, 823:14, 823:25, 852:9, 854:7, 856:6, 860:10, 870:24, 880:19

**looked** [1] - 858:5

**looking** [2] - 808:24, 880:20

looks [1] - 768:3
lose [1] - 768:24
lost [1] - 756:22

**M**

machine [3] - 811:8, 811:10
Magistrate [1] - 848:11
mail [125] - 752:21, 752:22, 753:1,
757:11, 757:12, 757:14, 757:17,
757:20, 758:11, 758:14, 759:11, 760:4,
761:16, 761:19, 761:22, 761:24, 762:5,
762:8, 762:13, 762:16, 762:19, 762:21,
762:23, 762:25, 763:2, 763:8, 766:8,
766:9, 766:13, 766:21, 767:1, 767:3,
767:4, 767:7, 767:10, 767:11, 767:12,
767:16, 767:17, 767:18, 768:12,
771:13, 771:15, 771:16, 776:22,
776:23, 777:3, 777:7, 777:12, 777:22,
777:23, 778:4, 779:21, 780:11, 782:19,
791:17, 793:14, 802:2, 802:8, 802:11,
802:21, 802:23, 805:2, 805:17, 806:23,
806:25, 807:2, 807:10, 807:18, 808:14,
809:1, 811:12, 816:24, 818:19, 819:1,
820:10, 821:16, 823:15, 823:19,
823:22, 824:6, 824:10, 824:22, 824:25,
825:18, 825:23, 826:10, 826:11,
826:14, 826:19, 826:21, 827:6, 837:1,
837:3, 838:6, 839:14, 848:21, 852:13,
854:8, 854:10, 854:13, 854:16, 855:4,
856:5, 856:11, 856:21, 857:3, 858:5,
859:8, 860:11, 860:12, 860:15, 860:17,
860:19, 861:2, 861:4, 861:8, 861:10,
861:18, 877:21, 877:25, 878:2
mailed [1] - 783:15
mails [62] - 753:11, 756:4, 757:10,
766:2, 769:3, 770:5, 770:8, 770:11,
770:14, 770:20, 771:2, 777:5, 791:1,
791:3, 793:24, 794:1, 794:3, 794:4,
794:6, 794:7, 794:11, 794:14, 795:10,
798:9, 799:13, 799:20, 799:22, 800:2,
800:3, 800:9, 801:3, 812:1, 812:12,
812:14, 812:22, 822:20, 822:24, 823:6,
828:14, 828:23, 829:7, 829:10, 829:12,
830:1, 830:4, 830:10, 830:11, 830:13,
830:17, 830:19, 837:13, 851:3, 858:6,
858:10, 858:11, 858:14, 858:17,
858:18, 858:20, 870:20, 881:10, 881:12
management [3] - 774:17, 874:8
managing [1] - 862:15
manner [1] - 839:7
manufacturers [2] - 765:15, 765:17,
765:19, 765:21, 845:21
manufacturing [1] - 834:16
March [60] - 756:18, 756:20, 761:4,
762:14, 766:1, 766:10, 766:15, 766:18,
767:1, 768:1, 768:13, 769:4, 771:16,
771:19, 776:6, 791:13, 802:7, 804:4,
804:6, 804:24, 805:2, 805:16, 806:23,
808:15, 809:1, 816:24, 817:6, 818:19,
819:25, 820:8, 820:15, 821:17, 822:19,

824:10, 824:22, 825:18, 826:10,
826:21, 828:4, 837:3, 841:3, 841:8,
841:21, 846:1, 848:9, 848:19, 851:16,
852:13, 854:8, 854:11, 857:21, 860:11,
861:6, 862:21, 865:3, 874:7, 875:13,
877:2, 877:20
Mason [1] - 848:11
material [3] - 762:1, 824:12, 824:14
matter [11] - 751:13, 767:8, 777:23,
778:4, 823:23, 824:4, 861:13, 864:24,
865:16, 879:4, 880:20
matters [9] - 742:19, 742:21, 743:2,
743:4, 857:13, 858:3, 864:7, 868:17,
879:6
McGarry [10] - 740:4, 742:12, 769:10,
769:14, 879:8, 879:10, 880:1, 880:7,
880:13, 880:16
mcJESSY [1] - 870:1
McJessy [99] - 741:10, 741:11, 741:15,
742:14, 744:11, 745:12, 746:6, 746:7,
747:20, 747:25, 748:2, 748:3, 748:17,
749:3, 749:21, 751:1, 752:14, 752:20,
755:14, 755:18, 759:13, 759:15, 760:2,
769:15, 769:17, 771:4, 771:17, 771:21,
775:7, 777:16, 777:20, 778:10, 780:4,
782:11, 783:6, 784:8, 784:23, 785:15,
794:24, 797:5, 797:17, 800:5, 802:12,
805:3, 811:19, 812:18, 818:20, 825:8,
825:11, 828:22, 829:15, 830:25, 831:2,
834:1, 834:5, 839:25, 841:23, 843:4,
843:10, 844:2, 844:5, 852:17, 852:19,
853:24, 854:4, 856:12, 856:14, 860:21,
860:23, 861:1, 862:19, 863:3, 864:11,
864:15, 864:19, 864:20, 866:19, 867:9,
867:12, 867:20, 868:2, 868:14, 868:22,
869:19, 870:21, 870:25, 871:9, 872:17,
873:6, 876:12, 877:15, 878:21, 878:25,
879:12, 879:15, 879:19, 880:10, 881:5,
881:15
mean [12] - 743:20, 792:25, 793:21,
800:24, 806:14, 818:3, 835:19, 842:10,
843:18, 858:16, 866:16, 871:3
meaning [2] - 760:4, 771:6
means [2] - 793:2, 842:11
meant [6] - 753:17, 753:19, 824:13,
830:15, 867:14, 867:17
meantime [1] - 872:11
measure [1] - 814:16
meet [2] - 788:6, 790:8
meeting [31] - 749:14, 749:16, 749:22,
751:7, 755:9, 755:11, 755:13, 755:14,
756:5, 756:14, 771:22, 771:24, 772:3,
772:4, 772:8, 772:16, 773:12, 774:13,
774:14, 774:16, 774:19, 775:8, 775:12,
775:19, 775:21, 775:22, 867:24, 878:8,
878:10, 878:14, 878:17
meetings [11] - 756:5, 774:20, 774:22,
774:25, 775:3, 775:16, 874:6, 874:10,
874:12, 874:22, 875:6
Mehul [4] - 766:9, 802:9, 806:23,
826:21
memo [1] - 880:25

memorialization [2] - 791:14, 792:18
memorialize [1] - 792:2
memorialized [1] - 793:14
memorializes [1] - 795:7
memorializing [2] - 791:25, 792:7
mention [2] - 801:3, 802:24
mentioned [10] - 756:7, 765:18, 776:2,
785:9, 794:16, 837:2, 838:25, 848:11,
862:20, 880:17
mentions [2] - 791:18, 827:9
message [1] - 859:18
met [2] - 801:14, 878:4
mid [2] - 753:22, 761:4
Midwest [67] - 744:15, 747:14, 747:21,
748:6, 748:21, 748:22, 749:10, 749:11,
749:15, 749:18, 750:24, 751:4, 759:6,
759:16, 760:14, 760:22, 761:6, 764:24,
767:6, 768:19, 768:21, 769:19, 770:2,
772:25, 773:13, 780:22, 781:2, 781:4,
781:8, 781:15, 781:19, 784:16, 785:3,
804:1, 804:13, 804:16, 810:23, 813:15,
815:13, 815:15, 821:9, 822:5, 822:13,
837:4, 838:17, 839:1, 840:16, 845:15,
845:16, 848:16, 848:22, 849:2, 849:10,
849:13, 849:20, 849:25, 850:3, 851:5,
853:17, 862:1, 863:8, 865:22, 866:2,
869:22, 871:20, 877:23
might [4] - 783:10, 798:23, 852:9,
853:6
million [1] - 786:25
mind [8] - 793:1, 799:1, 811:3, 811:4,
818:8, 821:13, 849:16, 852:5
minds [1] - 773:12
minutes [3] - 785:22, 832:22, 870:4
misspoke [2] - 856:17, 879:16, 881:7
misunderstood [1] - 800:18
moment [3] - 759:11, 845:12, 869:2
money [5] - 845:3, 845:7, 845:11,
845:14, 845:18
monitoring [1] - 829:25
month [1] - 816:24
months [1] - 840:22
morning [6] - 741:4, 786:10, 786:11,
879:22, 880:6, 880:21
movant [1] - 880:2
move [9] - 745:10, 777:18, 783:16,
784:20, 816:10, 835:23, 836:11,
868:12, 872:3
moved [4] - 759:9, 759:10, 859:19,
859:24
MR [185] - 740:4, 740:4, 741:11,
741:15, 742:12, 742:14, 744:11,
745:12, 746:4, 746:6, 746:7, 747:20,
747:25, 748:2, 748:3, 748:17, 749:3,
749:21, 750:19, 751:1, 752:14, 752:20,
755:13, 755:14, 755:18, 759:13,
759:15, 760:2, 769:10, 769:14, 769:15,
769:17, 771:4, 771:17, 771:21, 775:7,
777:14, 777:16, 777:18, 777:20, 778:7,
778:10, 780:2, 780:4, 782:11, 782:25,
783:6, 783:10, 783:12, 783:23, 784:3,

784:7, 784:8, 784:20, 784:23, 785:15, 785:21, 785:23, 786:3, 786:9, 787:6, 787:9, 794:22, 794:24, 796:3, 797:5, 797:8, 797:11, 797:13, 797:17, 797:19, 797:23, 797:24, 798:19, 798:21, 798:25, 799:5, 800:5, 800:8, 800:25, 801:2, 802:3, 802:5, 802:6, 802:12, 802:13, 802:15, 802:20, 805:3, 805:13, 811:19, 811:22, 812:7, 812:10, 812:18, 812:23, 813:11, 813:16, 816:5, 817:18, 818:2, 818:9, 818:20, 818:25, 821:15, 822:3, 825:6, 825:8, 825:11, 825:14, 825:16, 826:3, 830:25, 831:2, 831:3, 832:13, 834:1, 834:5, 839:25, 841:23, 843:4, 843:10, 844:2, 844:5, 852:17, 852:19, 853:24, 854:4, 856:12, 856:14, 860:21, 860:23, 861:1, 862:19, 863:3, 864:8, 864:11, 864:15, 864:19, 864:20, 866:17, 866:19, 867:7, 867:9, 867:12, 867:20, 868:2, 868:5, 868:7, 868:12, 868:14, 868:22, 869:19, 870:1, 870:3, 870:7, 870:9, 870:13, 870:21, 870:25, 871:3, 871:6, 871:9, 871:12, 872:17, 872:19, 872:23, 873:3, 876:12, 876:13, 876:16, 878:20, 878:21, 878:25, 879:10, 879:12, 879:15, 879:19, 880:1, 880:7, 880:10, 880:13, 880:16, 881:5, 881:15

**MS** [33] – 741:7, 741:9, 744:9, 745:8, 745:10, 747:18, 747:23, 748:14, 759:23, 783:20, 785:18, 818:1, 832:16, 832:18, 832:21, 833:2, 834:17, 835:1, 836:17, 840:4, 842:2, 843:7, 843:11, 844:7, 847:10, 852:24, 853:20, 868:20, 869:1, 869:16, 880:9, 880:17, 880:22

**multiple** [1] – 799:13

**Muschler** [2] – 836:13, 836:20

**must** [1] – 826:11

**Mutual** [5] – 744:4, 744:8, 744:17, 744:22, 745:2

**N**

**name** [7] – 741:16, 751:4, 826:10, 846:10, 846:14, 854:16

**named** [2] – 746:18, 818:7

**names** [1] – 743:10

**narrative** [1] – 749:1

**nature** [8] – 748:12, 748:18, 750:4, 754:16, 756:9, 770:1, 776:10, 779:5

**necessarily** [6] – 773:13, 809:18, 810:4, 836:2, 843:8, 844:12

**necessary** [2] – 810:2, 823:11

**need** [27] – 756:11, 759:8, 759:12, 761:17, 768:19, 783:1, 785:24, 795:20, 807:12, 807:17, 807:21, 809:9, 809:22, 813:3, 816:6, 816:9, 819:1, 819:8, 823:7, 839:16, 840:24, 848:10, 850:11, 850:21, 852:21, 853:15, 869:5

**needed** [15] – 776:12, 778:25, 802:17, 813:14, 813:25, 822:17, 822:22, 823:2,

845:8, 845:10, 848:14, 852:6, 858:7, 858:24, 863:22

**needs** [2] – 832:20, 852:2

**negotiate** [6] – 769:7, 815:13, 821:4, 846:20, 863:10, 872:25

**negotiated** [3] – 781:22, 849:14, 853:17

**negotiating** [7] – 745:5, 773:15, 794:19, 846:2, 846:8, 849:24, 872:15

**negotiation** [3] – 748:4, 750:7, 821:5

**negotiations** [26] – 744:3, 747:14, 747:21, 749:6, 749:12, 750:10, 750:23, 760:6, 760:7, 769:18, 770:23, 773:23, 773:25, 774:3, 774:7, 774:11, 793:12, 795:5, 828:8, 828:23, 828:25, 829:17, 829:23, 830:5, 830:12, 830:18

**neighborhood** [1] – 763:25

**never** [30] – 742:21, 789:3, 789:5, 791:5, 798:6, 803:9, 804:16, 806:17, 809:3, 810:19, 816:11, 818:8, 818:10, 818:14, 830:14, 836:18, 844:5, 844:24, 846:6, 848:7, 851:3, 851:5, 851:20, 852:16, 853:14, 859:25, 870:17, 878:18

**new** [14] – 834:15, 847:18, 847:20, 847:23, 847:24, 848:1, 848:6, 855:16, 855:25, 873:7, 873:14, 874:18, 874:25, 875:8

**next** [7] – 808:6, 808:17, 808:18, 808:19, 808:20, 848:24, 867:20

**nine** [1] – 800:21

**none** [3] – 823:6, 830:12, 830:20

**nonresponsive** [2] – 784:20, 798:19

**normally** [2] – 805:6, 838:5, 838:6

**North** [1] – 740:5

**Northern** [2] – 787:16, 787:18

**note** [1] – 878:18

**notes** [1] – 785:20

**nothing** [9] – 795:7, 797:3, 797:9, 797:14, 798:10, 839:13, 873:16, 876:4, 878:20

**number** [17] – 751:14, 764:21, 764:23, 770:5, 770:7, 770:8, 777:2, 780:18, 799:14, 800:3, 800:11, 805:22, 827:22, 829:23, 840:22, 848:15, 863:14

**numerous** [1] – 854:5

**O**

**o'clock** [4] – 752:24, 853:22, 870:5, 879:25

**Oak** [5] – 771:23, 772:1, 772:9, 772:16

**object** [2] – 818:20, 843:4

**objection** [41] – 744:9, 745:8, 746:4, 747:18, 747:23, 748:14, 759:23, 777:14, 778:7, 780:2, 782:25, 783:3, 783:24, 784:10, 784:20, 797:5, 797:7, 797:17, 798:19, 800:5, 805:3, 805:7, 811:19, 818:1, 830:24, 834:1, 839:25, 841:23, 843:9, 844:2, 852:17, 864:8, 867:7, 868:5, 868:20, 869:1, 869:13, 870:21, 871:9, 872:17, 876:12

**obligations** [2] – 833:25, 834:9

**obtain** [2] – 746:25, 796:10

**obtained** [2] – 743:5, 812:17

**obtaining** [1] – 743:18

**occasions** [1] – 874:24

**occupy** [1] – 837:6

**occur** [5] – 748:10, 749:22, 756:18, 780:17, 791:12

**occurred** [24] – 755:10, 756:16, 756:19, 757:15, 758:2, 758:4, 761:11, 761:16, 769:4, 771:9, 771:22, 772:9, 774:19, 774:21, 774:22, 780:18, 785:2, 792:20, 795:8, 859:3, 861:22, 864:17, 864:19, 865:1

**offer** [2] – 856:23, 857:1

**offered** [1] – 784:9

**office** [14] – 747:4, 755:7, 771:23, 772:9, 772:11, 775:11, 812:2, 812:12, 812:15, 812:24, 851:2, 851:15, 878:12, 878:13

**offices** [8] – 754:15, 754:22, 772:1, 772:5, 772:10, 772:17, 772:18

**oftentimes** [1] – 776:16

**oldest** [1] – 787:4

**once** [3] – 745:3, 849:19, 862:1

**one** [59] – 742:23, 743:5, 749:14, 751:14, 753:12, 755:15, 756:5, 764:21, 769:16, 772:12, 776:1, 776:17, 780:15, 783:1, 787:4, 787:8, 790:11, 792:11, 795:14, 799:2, 799:3, 800:21, 801:3, 802:24, 805:24, 806:7, 810:4, 820:2, 824:20, 829:23, 830:23, 833:21, 834:5, 837:21, 838:6, 839:14, 840:11, 842:19, 842:25, 843:13, 843:14, 843:22, 847:12, 848:15, 851:3, 851:4, 852:2, 852:16, 855:5, 859:13, 864:9, 869:2, 872:5, 874:4, 874:14, 874:24, 877:12, 879:8

**one-way** [2] – 838:6, 839:14

**ones** [2] – 743:11, 838:2

**open** [1] – 741:1

**operated** [3] – 785:12, 789:24

**operating** [5] – 764:25, 765:20, 833:6, 835:20, 872:7

**operational** [2] – 754:21, 754:22

**operations** [4] – 765:7, 765:9, 790:1, 790:15

**opportunity** [5] – 760:8, 766:5, 777:5, 804:17, 863:4

**option** [3] – 838:15, 847:11, 847:14

**options** [1] – 812:2

**order** [49] – 751:22, 751:25, 752:3, 752:6, 752:7, 753:16, 753:19, 754:8, 754:10, 754:18, 754:19, 755:1, 788:11, 788:13, 788:15, 788:17, 789:1, 789:3, 789:5, 789:6, 789:7, 789:13, 790:2, 790:9, 791:1, 810:1, 817:2, 817:9, 817:16, 817:21, 817:23, 820:19, 821:2, 822:9, 823:7, 823:12, 835:2, 837:7, 850:5, 850:12, 850:21, 856:17, 858:24, 861:25, 863:2, 880:19

**orders** [5] - 752:13, 753:10, 753:11, 791:3, 833:20

**organize** [1] - 834:8

**original** [4] - 810:7, 810:8, 810:9, 810:10

**originally** [1] - 744:16

**otherwise** [2] - 814:23, 837:11

**outside** [1] - 763:9

**overruled** [3] - 784:10, 818:5, 843:9

**overseas** [1] - 765:21

**overwhelmed** [1] - 864:22

**own** [7] - 789:15, 789:16, 789:18, 790:7, 792:3, 801:20, 831:8

**owned** [2] - 748:8, 790:4

**owners** [1] - 742:7

**P**

**p.m** [6] - 752:24, 757:11, 808:14, 860:12, 881:20, 881:21

**p.m.** [1] - 766:11

**page** [15] - 752:23, 762:13, 766:9, 766:13, 766:14, 767:2, 767:3, 767:7, 767:11, 767:13, 767:14, 856:9, 856:22, 860:12

**pages** [1] - 856:9

**paid** [5] - 786:17, 843:25, 844:15, 874:20, 875:2

**papers** [3] - 803:23, 804:6, 804:10

**paragraph** [8] - 757:20, 758:23, 758:24, 760:4, 807:4, 854:19, 854:23, 855:4

**pardon** [1] - 860:21

**Paresh** [3] - 766:15, 806:24, 826:21

**part** [32] - 750:10, 750:12, 754:5, 754:12, 758:8, 759:5, 760:6, 760:10, 760:16, 760:17, 760:18, 766:4, 768:17, 769:1, 770:4, 776:15, 776:20, 778:21, 801:13, 802:18, 802:21, 813:5, 837:6, 840:10, 858:25, 865:18, 865:20, 874:14, 875:7, 875:10, 875:18, 875:23

**participant** [2] - 873:8, 877:6

**participated** [2] - 791:8, 847:19

**particular** [7] - 753:12, 793:5, 793:7, 794:7, 839:10, 866:11, 868:3

**particularly** [1] - 792:9

**parties** [34] - 754:2, 754:19, 756:13, 760:19, 760:22, 773:6, 773:15, 783:14, 815:23, 816:8, 816:15, 817:15, 817:19, 817:22, 818:3, 818:6, 818:7, 821:8, 824:20, 848:20, 850:3, 850:17, 851:6, 854:6, 855:2, 866:10, 866:13, 866:16, 866:21, 867:2, 867:6, 867:14, 867:17

**party** [13] - 755:19, 755:21, 792:11, 815:4, 818:16, 842:11, 842:19, 844:19, 848:7, 855:17, 855:21, 855:23

**past** [1] - 768:18

**patience** [1] - 881:13

**pause** [1] - 869:4

**pay** [7] - 759:10, 841:14, 842:25,

843:14, 845:16, 846:3, 846:4

**paying** [3] - 758:25, 842:19, 844:19

**payment** [2] - 843:3, 873:17

**payments** [1] - 841:6

**people** [2] - 793:7, 870:6

**people's** [1] - 858:18

**percent** [2] - 768:10, 772:6

**perfectly** [1] - 855:5

**perhaps** [10] - 756:5, 763:25, 774:24, 775:5, 782:7, 800:15, 816:8, 847:8, 865:20, 879:10

**period** [15] - 751:24, 756:6, 756:23, 769:3, 772:6, 776:6, 827:25, 828:7, 842:12, 842:17, 845:17, 849:22, 874:7, 881:15, 881:16

**periodic** [2] - 756:5, 776:19

**permitted** [2] - 821:2, 822:11

**person** [2] - 793:5, 821:25

**personal** [13] - 750:11, 779:10, 789:22, 790:14, 790:21, 803:2, 835:9, 835:17, 835:18, 836:5, 870:16, 870:19, 875:23

**perspective** [1] - 875:25

**phone** [7] - 751:6, 755:17, 793:9, 821:25, 822:1, 867:24, 877:4

**place** [14] - 750:23, 751:8, 755:12, 769:18, 772:4, 792:8, 793:3, 793:4, 793:6, 821:5, 834:17, 874:5, 876:25, 878:14

**plaintiff** [1] - 880:2

**plaintiffs** [1] - 881:18

**plan** [8] - 795:17, 797:4, 797:16, 798:7, 798:11, 801:4, 801:20, 815:12

**plans** [2] - 796:10, 848:6

**plus** [1] - 772:13

**point** [20] - 765:9, 773:15, 774:2, 780:20, 795:18, 796:1, 809:21, 816:16, 831:12, 836:10, 847:20, 848:2, 848:17, 850:18, 851:9, 851:13, 857:23, 859:5, 872:7, 872:10

**portion** [4] - 759:9, 759:18, 760:12, 764:24

**position** [4] - 821:1, 822:18, 831:17, 851:6

**possession** [8] - 759:5, 768:24, 815:3, 817:8, 863:8, 871:20, 872:2, 872:16

**possessions** [1] - 836:25

**possibility** [1] - 872:7

**possibly** [2] - 765:20, 771:3

**post** [1] - 880:18

**post-trial** [1] - 880:18

**potentially** [3] - 830:11, 830:19, 876:2

**practice** [5] - 742:1, 742:4, 742:6, 752:10, 803:8

**practicing** [1] - 742:17

**preceding** [1] - 767:7

**precise** [2] - 772:10, 777:17

**precisely** [1] - 840:5

**precursor** [1] - 871:1

**prefer** [1] - 842:25

**preference** [4] - 843:15, 843:17, 844:11, 844:14

**preferences** [1] - 873:24

**preferential** [1] - 842:6

**preferring** [2] - 842:19, 843:22

**premises** [1] - 836:24

**preparation** [3] - 804:6, 804:23, 829:11

**prepare** [3] - 793:21, 848:20, 858:14

**prepared** [2] - 793:20, 804:21, 849:10

**present** [8] - 749:16, 775:6, 775:8, 775:12, 874:22, 874:23, 877:3, 878:15

**presentation** [1] - 880:11

**preservation** [16] - 788:11, 788:13, 788:15, 789:1, 789:13, 790:9, 790:25, 791:1, 791:21, 803:6, 803:16, 808:22, 824:11, 824:25, 825:21, 825:24

**preserve** [13] - 756:12, 761:17, 790:3, 816:12, 816:25, 817:7, 818:10, 818:11, 818:15, 819:8, 822:22, 823:2, 849:1

**preserved** [1] - 804:11

**preserving** [4] - 754:20, 803:13, 804:25, 872:12

**presumably** [1] - 835:4

**pretty** [4] - 779:17, 791:20, 849:19, 862:17

**prevail** [1] - 848:4

**previous** [1] - 798:24

**previously** [2] - 769:4, 877:13

**price** [1] - 781:22

**primarily** [2] - 742:6, 757:5

**primary** [3] - 827:13, 827:18, 865:7

**principal** [1] - 751:14

**principally** [1] - 742:7

**principals** [2] - 867:17, 867:25

**problem** [16] - 827:23, 833:22, 833:23, 842:22, 842:23, 842:24, 843:2, 843:12, 843:19, 843:24, 844:6, 844:8, 844:12, 844:18, 850:20, 851:12

**problems** [1] - 834:10

**proceedings** [1] - 741:1

**process** [1] - 813:23

**procurement** [1] - 833:17

**produced** [3] - 822:22, 823:3, 858:22

**prohibited** [1] - 879:3

**prompted** [1] - 753:25

**properly** [2] - 772:12, 837:25

**property** [5] - 745:1, 745:2, 765:5, 790:6, 790:7

**proposed** [1] - 846:3

**protect** [1] - 863:15

**protected** [3] - 815:18, 838:7, 840:7

**provide** [9] - 752:10, 810:22, 810:24, 820:9, 831:22, 862:5, 865:23, 866:3, 869:23

**provided** [2] - 745:2, 746:18

**purchase** [35] - 760:8, 760:12, 760:15, 760:23, 769:8, 780:24, 781:10, 781:14, 781:19, 782:9, 789:10, 790:13, 791:6, 792:3, 793:12, 794:19, 795:5, 796:12, 796:24, 797:4, 797:16, 798:7, 798:11, 801:4, 814:22, 815:3, 828:8, 828:24, 829:17, 830:12, 830:18, 836:1, 845:2,

845:5, 872:25
**purchased** [1] - 779:11
**purchasing** [2] - 781:13, 795:25
**purpose** [8] - 751:10, 772:15, 772:16, 774:25, 775:19, 775:21, 802:11, 875:4
**purposes** [2] - 791:21, 858:8
**pursue** [2] - 819:19, 820:23
**pursued** [1] - 818:10
**put** [7] - 757:24, 761:2, 801:23, 840:6, 840:24, 843:19, 845:9
**putting** [4] - 843:12, 844:12, 850:2, 880:3

## Q

**questioning** [1] - 843:5
**questions** [12] - 755:9, 783:19, 785:15, 848:11, 853:20, 853:25, 862:18, 863:14, 863:16, 865:24, 878:21, 880:14
**quick** [4] - 777:1, 783:20, 856:6, 860:10
**quote** [2] - 792:19, 792:23, 793:9, 862:12

## R

**raised** [1] - 771:24
**rather** [2] - 872:25, 875:18
**Raven** [3] - 833:14, 833:15, 833:19
**re** [5] - 767:5, 797:20, 819:3, 836:24, 837:12
**re-acquire** [1] - 819:3
**re-ask** [1] - 797:20
**re-enter** [2] - 836:24, 837:12
**reach** [4] - 773:17, 822:15, 841:25, 866:3
**reached** [16] - 754:1, 760:14, 760:22, 760:23, 761:6, 772:25, 773:5, 780:23, 781:3, 781:9, 804:1, 821:7, 839:8, 855:2, 865:10
**reacquire** [1] - 872:15
**reacquiring** [1] - 763:12
**read** [34] - 750:20, 750:21, 752:4, 759:13, 759:14, 766:12, 769:10, 769:13, 777:2, 777:4, 777:5, 777:9, 784:6, 784:14, 788:18, 788:19, 795:23, 798:22, 799:3, 799:4, 805:9, 807:2, 809:8, 812:9, 812:18, 812:21, 813:12, 817:12, 836:15, 860:11, 860:12, 860:14, 869:2, 869:8
**ready** [3] - 786:2, 805:21, 832:24
**real** [3] - 742:6, 742:8, 743:19
**realize** [1] - 852:6
**really** [5] - 783:11, 797:21, 813:8, 851:20, 852:12
**reason** [26] - 751:18, 762:2, 765:2, 770:19, 783:13, 799:11, 806:3, 806:7, 806:8, 811:4, 811:6, 826:9, 828:22, 829:6, 831:25, 839:16, 840:5, 859:23,

859:25, 861:7, 868:3, 868:23, 874:4, 874:25, 877:25, 878:7
**reasons** [8] - 751:14, 764:20, 784:19, 785:7, 785:11, 803:19, 805:22, 872:5
**recalling** [1] - 755:22
**receive** [4] - 753:9, 770:11, 777:10, 830:1
**received** [26] - 746:16, 752:3, 752:5, 752:7, 752:9, 753:2, 756:4, 767:10, 767:23, 767:25, 768:4, 768:7, 776:22, 779:21, 788:17, 799:14, 800:3, 808:14, 812:1, 822:20, 822:24, 830:4, 843:2, 856:21, 860:23, 861:2
**receiving** [4] - 753:4, 806:25, 812:11, 812:14
**recipient** [1] - 800:1
**recitation** [1] - 881:1
**recollection** [5] - 753:8, 753:15, 775:16, 777:21, 777:24
**recommence** [1] - 765:9
**recommendation** [2] - 747:1, 747:9
**recommended** [2] - 763:16, 763:19
**Record** [2] - 750:21, 784:6
**record** [24] - 741:16, 757:10, 759:14, 769:13, 771:18, 783:25, 784:14, 795:23, 798:22, 799:4, 805:9, 812:9, 812:21, 813:12, 817:12, 825:8, 836:15, 869:8, 879:24, 880:1
**records** [11] - 799:25, 814:4, 814:12, 814:14, 814:16, 814:20, 814:24, 815:2, 815:6, 815:17, 835:18
**RECROSS** [1] - 870:12
**RECROSS-EXAMINATION** [1] - 870:12
**REDIRECT** [1] - 854:3
**refer** [1] - 848:10
**referenced** [1] - 755:25
**references** [2] - 757:14, 854:23
**referred** [2] - 760:4, 869:17
**referring** [8] - 752:22, 752:23, 761:2, 761:9, 763:13, 855:24, 866:16, 869:21
**refers** [2] - 757:20, 758:24
**reflected** [1] - 767:13
**refusing** [1] - 855:7
**regard** [4] - 806:15, 808:17, 808:22, 814:12
**regarding** [33] - 747:22, 748:18, 749:12, 751:13, 753:16, 754:17, 755:25, 768:18, 770:6, 770:9, 772:5, 773:1, 776:7, 777:11, 777:22, 778:4, 784:1, 787:21, 791:1, 791:3, 793:9, 795:17, 797:4, 797:16, 798:7, 815:17, 825:23, 826:24, 844:18, 858:6, 873:7, 881:10, 881:11
**registered** [1] - 746:17
**regular** [1] - 756:2
**regularly** [3] - 756:4, 822:20, 822:24
**relate** [2] - 790:2, 874:17
**related** [8] - 789:6, 789:7, 789:24, 833:15, 837:5, 844:20, 853:6, 861:5
**relationship** [1] - 787:10

**relayed** [1] - 866:12
**relaying** [1] - 782:13
**release** [1] - 751:18
**released** [1] - 750:12
**relet** [4] - 760:8, 765:15, 765:15, 765:17
**relevance** [5] - 744:9, 745:8, 841:23, 843:5, 868:20
**relevant** [17] - 752:2, 764:22, 785:14, 794:9, 794:10, 798:1, 805:11, 819:5, 827:7, 827:8, 873:18, 873:20, 873:25, 874:11, 875:20, 875:24, 876:1
**rely** [2] - 838:6
**relying** [1] - 837:13
**remain** [1] - 871:19
**remaining** [7] - 754:2, 759:8, 761:25, 798:18, 821:6, 827:10, 835:19
**remember** [24] - 743:9, 749:18, 754:7, 756:19, 757:1, 763:23, 774:14, 774:16, 774:19, 774:22, 778:21, 780:9, 780:14, 806:25, 824:22, 829:1, 839:4, 855:18, 863:16, 865:1, 865:4, 865:5, 865:24, 866:22
**remembers** [1] - 860:25
**removed** [4] - 768:21, 827:11, 859:15, 859:16
**rent** [2] - 758:25, 759:10
**repeat** [12] - 748:16, 784:12, 795:20, 795:21, 799:3, 805:8, 812:4, 812:8, 813:11, 817:10, 822:10, 836:14
**repeated** [1] - 869:6
**reply** [4] - 763:1, 826:12, 826:14
**replying** [1] - 762:25
**reporter** [1] - 795:21
**represent** [9] - 741:23, 746:24, 772:1, 833:9, 833:11, 834:14, 857:7, 857:11, 858:20
**representation** [2] - 787:6, 857:20
**representations** [1] - 820:16
**representative** [2] - 855:8
**representative** [5] - 743:8, 746:2, 749:11, 763:5, 833:5
**representing** [10] - 742:7, 743:17, 745:13, 746:8, 746:11, 786:16, 786:18, 825:8, 857:15
**repurchase** [5] - 839:2, 849:2, 849:13, 853:16, 853:18
**request** [1] - 817:6
**requesting** [1] - 817:9
**required** [4] - 746:25, 754:19, 812:13, 820:20
**requirements** [1] - 790:9
**requiring** [2] - 822:8, 827:11
**reread** [1] - 798:21
**resell** [1] - 801:4
**resold** [1] - 828:9
**resolved** [2] - 848:2, 848:3
**resolving** [2] - 827:15, 827:23
**respect** [10] - 806:20, 814:4, 823:10, 828:15, 836:13, 854:6, 858:7, 864:23, 867:23, 872:11
**respond** [2] - 749:4, 871:7

**respondents** [1] - 881:8
**Respondents** [1] - 740:2
**response** [6] - 782:19, 821:17, 822:4, 848:11, 848:12, 871:4
**responsibilities** [2] - 801:15, 862:9
**responsibility** [2] - 801:14, 858:1
**responsible** [12] - 798:15, 803:14, 825:20, 857:15, 858:2, 860:2, 860:6, 861:16, 863:21, 863:24, 877:16, 877:19
**rest** [1] - 807:10
**rested** [3] - 741:7, 741:8, 880:3
**resting** [1] - 880:12
**result** [1] - 841:12
**resume** [2] - 870:8, 870:9
**retailer** [1] - 833:21
**retain** [1] - 756:12
**retrieve** [6] - 807:22, 808:3, 808:4, 809:23, 809:24, 810:2
**retrieving** [1] - 776:13
**return** [1] - 781:17
**returned** [2] - 845:5, 845:6
**review** [7] - 793:21, 793:22, 793:24, 794:1, 794:3, 794:5, 794:7
**reviewed** [7] - 793:23, 794:11, 797:18, 797:25, 798:5, 799:25, 823:9
**reviewing** [1] - 797:15
**rightly** [1] - 850:25, 851:13, 869:9
**rights** [2] - 750:8, 840:7
**ring** [2] - 846:14, 846:15
**rising** [1] - 775:17
**role** [3] - 813:23, 865:7, 876:24
**routinely** [1] - 753:9
**running** [1] - 798:14
**rush** [1] - 832:15

**S**

**sale** [5] - 779:1, 779:3, 779:6, 780:19, 829:12
**salvage** [1] - 755:6
**sanctions** [1] - 880:4
**sarcastically** [1] - 869:14
**satisfied** [2] - 853:10, 853:12
**save** [2] - 807:12, 809:9
**saw** [2] - 769:3, 798:6
**scheduled** [1] - 862:20
**Schlifke** [1] - 802:8
**Schreiber** [6] - 747:9, 747:12, 766:16, 787:24, 826:22, 834:12
**Scott** [5] - 747:9, 766:16, 787:24, 826:22, 834:12
**search** [1] - 752:18
**second** [15] - 758:23, 767:3, 767:11, 767:12, 767:16, 775:12, 783:2, 793:8, 794:15, 794:25, 820:18, 830:23, 864:9, 870:23, 871:2
**secure** [1] - 875:2
**see** [21] - 757:22, 759:2, 763:10, 766:23, 767:5, 767:8, 767:20, 807:14, 807:23, 829:11, 830:24, 831:1, 854:13,

**854:16, 854:21, 854:24, 855:6, 856:15, 856:19, 861:13, 881:1
**seeing** [2] - 753:7, 753:8
**seek** [1] - 846:17
**seeking** [1] - 765:11
**seem** [1] - 767:4
**select** [1] - 794:7
**sell** [9] - 760:15, 770:3, 785:3, 785:8, 804:14, 804:17, 840:19, 848:23, 850:8
**selling** [1] - 784:18
**send** [15] - 761:16, 761:24, 762:4, 762:5, 808:18, 824:22, 824:25, 825:18, 825:23, 826:1, 826:4, 858:6, 858:10, 858:14, 859:8
**sending** [3] - 761:22, 848:21, 858:12
**sense** [2] - 805:19, 865:14
**sent** [16] - 757:21, 762:8, 766:18, 779:22, 799:22, 808:25, 816:24, 821:16, 823:6, 823:8, 827:18, 829:10, 851:3, 858:21, 858:23, 877:25
**sentence** [4] - 758:23, 763:8, 807:11, 808:6
**separate** [1] - 767:3
**Serritella** [55] - 749:11, 749:17, 751:3, 759:21, 761:5, 761:16, 762:2, 763:5, 766:1, 767:25, 773:11, 773:21, 779:15, 779:22, 782:7, 782:14, 802:8, 803:12, 808:21, 816:13, 816:25, 817:5, 817:7, 817:14, 817:21, 817:22, 821:24, 822:10, 824:11, 827:4, 827:9, 830:5, 830:15, 830:20, 848:12, 849:4, 851:7, 853:12, 853:14, 854:11, 854:16, 855:6, 855:12, 865:21, 866:1, 866:6, 866:10, 866:12, 867:5, 867:14, 868:8, 868:16, 868:25, 869:11, 869:21
**Serritella's** [2] - 768:13, 802:16
**served** [1] - 746:20
**server** [157] - 754:13, 754:22, 758:5, 758:18, 758:19, 760:8, 760:12, 760:15, 760:24, 761:7, 763:17, 764:5, 764:9, 764:13, 764:16, 764:19, 764:20, 764:21, 764:25, 765:6, 769:8, 769:18, 769:22, 770:9, 771:25, 773:1, 773:17, 774:9, 775:4, 776:24, 778:15, 779:8, 779:11, 779:25, 780:6, 780:19, 780:25, 781:4, 781:11, 781:14, 781:20, 781:22, 782:9, 782:21, 784:17, 784:18, 785:3, 785:8, 785:11, 785:14, 789:6, 789:7, 789:8, 789:11, 789:16, 789:17, 789:19, 789:25, 790:5, 790:8, 790:13, 792:4, 793:12, 794:12, 794:19, 795:5, 795:17, 795:25, 797:4, 797:16, 804:3, 808:22, 810:9, 810:15, 810:16, 811:7, 812:3, 812:15, 812:16, 812:25, 813:6, 815:16, 818:11, 818:13, 818:15, 819:23, 819:25, 820:7, 820:9, 820:14, 821:10, 821:11, 822:6, 822:9, 822:23, 823:3, 823:12, 823:20, 824:7, 824:14, 824:17, 828:8, 828:12, 828:13, 828:24, 829:17, 829:24, 830:12, 830:14, 830:18, 831:4, 831:8, 831:11, 836:12, 836:13, 837:2, 839:2, 843:6, 844:1, 844:16, 844:20,

**845:2, 845:7, 846:3, 846:4, 848:13, 848:17, 848:22, 848:25, 849:2, 849:14, 850:4, 853:17, 854:7, 855:9, 859:6, 859:11, 859:14, 859:19, 859:23, 861:5, 862:1, 865:23, 869:24, 870:15, 870:17, 870:18, 871:7, 871:13, 871:19, 872:6, 872:8, 872:24, 875:7, 875:9, 877:24
**servers** [1] - 871:18, 872:3
**set** [2] - 783:14, 863:4
**settled** [1] - 848:4
**settlement** [2] - 783:14, 786:6
**seven** [2] - 881:5, 881:7
**Seventh** [1] - 787:14
**several** [2] - 838:10, 856:9
**SH** [1] - 856:22
**Shah** [152] - 741:23, 743:3, 743:7, 745:5, 745:18, 745:20, 746:11, 746:19, 746:23, 746:25, 747:7, 747:11, 748:20, 748:21, 749:17, 750:11, 751:2, 751:7, 751:15, 756:11, 756:22, 760:7, 760:11, 760:16, 762:3, 763:16, 763:19, 764:2, 764:5, 764:11, 764:15, 765:11, 766:10, 766:15, 768:18, 769:7, 769:22, 770:3, 770:8, 773:11, 773:21, 774:8, 774:16, 775:9, 776:22, 776:23, 777:8, 777:11, 777:22, 777:25, 778:3, 778:14, 778:22, 778:25, 779:24, 780:5, 780:20, 781:10, 781:12, 781:14, 781:21, 782:5, 782:14, 782:18, 782:20, 784:15, 786:12, 786:16, 786:19, 789:1, 789:9, 789:10, 789:18, 789:20, 790:4, 790:7, 791:6, 791:9, 792:3, 801:5, 801:20, 802:9, 803:2, 803:13, 804:14, 804:17, 804:19, 806:14, 806:19, 806:23, 807:7, 807:16, 808:9, 810:17, 810:19, 810:21, 811:7, 815:10, 818:3, 818:24, 819:22, 822:21, 823:2, 826:16, 826:21, 828:9, 830:1, 830:10, 830:18, 831:6, 832:3, 834:13, 834:15, 837:5, 838:25, 840:19, 841:17, 843:13, 843:25, 844:15, 844:20, 844:21, 845:2, 845:19, 846:16, 847:12, 847:19, 847:22, 847:25, 848:8, 848:23, 849:4, 850:8, 854:9, 855:16, 855:18, 855:22, 855:23, 857:7, 857:11, 857:15, 860:5, 874:10, 874:17, 874:23, 877:6, 877:22, 879:1, 879:4
**Shah's** [11] - 741:18, 741:21, 743:21, 746:17, 765:6, 776:14, 777:6, 802:25, 808:1, 826:10, 832:6
**Short** [2] - 786:1, 832:23
**shortly** [2] - 778:5, 779:19
**show** [3] - 766:21, 767:15, 767:20
**shows** [1] - 767:21
**side** [1] - 802:25
**sign** [3] - 837:7, 848:20, 850:1
**signed** [1] - 839:17
**significant** [1] - 841:6
**similar** [1] - 804:19
**simultaneously** [1] - 876:11
**single** [1] - 860:12
**sit** [2] - 775:23, 878:16

**situation** [2] - 842:18, 842:25
**sixty** [1] - 800:21
**sixty-nine** [1] - 800:21
**skip** [1] - 807:11
**slightly** [1] - 769:16
**sloppiness** [1] - 840:10
**sold** [4] - 774:9, 776:24, 778:15, 782:21
**someone** [2] - 785:12, 837:9
**sometime** [12] - 748:11, 753:22, 755:10, 774:23, 781:8, 788:7, 791:13, 796:2, 796:21, 820:18, 846:1, 875:3
**somewhere** [2] - 759:1, 763:25, 846:12
**soon** [1] - 756:17
**sorry** [38] - 743:10, 749:2, 750:19, 752:13, 755:13, 763:18, 778:9, 783:2, 784:12, 787:7, 788:13, 795:19, 800:18, 812:4, 812:7, 812:18, 813:10, 816:4, 816:21, 817:10, 822:13, 825:7, 825:10, 825:13, 827:3, 827:20, 830:5, 830:15, 834:24, 836:9, 836:14, 845:15, 847:2, 869:17, 875:12, 879:15, 880:7, 881:6
**sort** [4] - 743:21, 748:23, 750:14, 865:7
**sound** [3] - 753:2, 782:20, 800:12
**sounded** [2] - 784:1, 784:3
**space** [2] - 845:22, 846:18
**speaking** [1] - 857:17
**specific** [10] - 771:18, 777:21, 777:24, 792:5, 793:2, 796:21, 799:11, 806:9, 812:22, 847:8
**specifically** [16] - 753:4, 754:7, 761:22, 762:10, 770:15, 774:4, 774:15, 775:5, 775:24, 778:20, 781:23, 789:3, 824:16, 866:24, 867:23, 877:8
**speculation** [2] - 840:1, 864:8
**spoken** [3] - 753:16, 777:21, 868:17
**stand** [2] - 830:25, 881:14
**standpoint** [2] - 789:14, 854:20
**start** [7] - 797:11, 804:23, 847:20, 847:23, 848:1, 848:6, 874:25
**start-up** [1] - 874:25
**starting** [6] - 847:18, 855:16, 855:25, 873:7, 873:14, 874:18
**state** [1] - 741:16
**states** [2] - 834:2, 844:2
**stating** [1] - 812:12
**status** [1] - 859:11
**step** [2] - 751:21, 757:8
**Steve** [1] - 806:23
**STEVEN** [5] - 741:14, 786:8, 833:1, 854:3, 870:12
**Steven** [1] - 741:17
**still** [12] - 759:8, 759:9, 764:2, 764:7, 764:11, 771:25, 803:2, 816:10, 832:3, 835:20, 840:23, 859:6
**stopping** [1] - 870:5
**stored** [15] - 752:1, 754:9, 754:12, 754:20, 788:21, 791:21, 825:20, 826:24, 827:15, 856:13, 856:18, 858:7,

860:7, 861:17, 862:6
**strategic** [1] - 875:25
**strategy** [1] - 876:11
**Street** [1] - 740:5
**stricken** [8] - 745:11, 777:19, 784:22, 785:6, 798:20, 868:13, 871:5, 872:22
**strictly** [1] - 742:22
**strike** [42] - 744:13, 745:10, 745:25, 746:1, 748:5, 749:25, 751:10, 751:23, 752:6, 763:7, 763:18, 765:15, 767:24, 770:6, 770:18, 771:7, 776:4, 777:18, 779:6, 780:10, 784:21, 787:13, 797:11, 801:18, 808:13, 811:9, 812:13, 813:19, 815:7, 825:15, 828:17, 847:12, 855:21, 857:6, 860:3, 861:7, 866:11, 868:12, 868:15, 874:21
**string** [2] - 766:2, 766:21
**stuff** [2] - 807:11, 881:19
**subject** [18] - 754:19, 767:4, 767:8, 775:17, 777:11, 777:23, 778:4, 791:4, 791:20, 792:10, 821:5, 822:16, 823:23, 824:4, 830:20, 847:24, 876:8, 879:4
**subjects** [5] - 757:18, 775:22, 775:24, 776:17
**submissions** [1] - 880:18
**submit** [1] - 880:25
**subpoena** [14] - 815:21, 815:25, 816:7, 817:2, 817:9, 817:16, 817:20, 817:23, 820:19, 822:9, 823:7, 823:12, 850:5, 861:25
**subpoenaed** [1] - 825:12
**subsequent** [2] - 767:7, 773:19
**subsequently** [1] - 773:4
**substance** [1] - 866:7
**successful** [1] - 815:12
**sudden** [1] - 820:19
**sued** [1] - 878:18
**suggesting** [1] - 812:15
**Suite** [1] - 740:5
**summer** [1] - 774:24
**superior** [1] - 872:2
**supposed** [1] - 856:24
**surprised** [6] - 782:20, 784:2, 784:4, 784:25, 785:1, 800:15
**surrendering** [1] - 750:8
**surrounding** [2] - 779:1, 779:3
**suspect** [1] - 775:23
**Sustained** [1] - 867:8
**sustained** [18] - 744:10, 745:9, 746:5, 747:19, 747:24, 777:15, 780:3, 798:20, 800:7, 834:4, 844:4, 864:10, 866:18, 868:21, 872:18, 872:21, 876:15
**sworn** [1] - 741:12
**system** [9] - 755:7, 772:5, 772:10, 772:11, 776:12, 803:1, 819:2, 822:6, 831:8
**systems** [1] - 804:2

## T

**T's** [1] - 838:3
**talks** [2] - 763:12, 827:9
**tangential** [1] - 875:19
**teleconference** [3] - 757:14, 757:15, 757:18
**telephone** [5] - 755:12, 758:11, 758:12, 758:15, 758:17
**term** [1] - 842:9
**terms** [18] - 747:11, 751:8, 754:2, 757:6, 764:25, 773:17, 780:24, 781:3, 787:6, 790:18, 831:9, 837:11, 853:5, 857:10, 857:12, 865:13, 874:3, 876:3
**testified** [25] - 772:22, 792:23, 796:4, 796:18, 796:25, 797:25, 822:19, 822:24, 823:17, 823:25, 824:3, 825:17, 825:25, 826:6, 826:9, 829:1, 829:15, 837:15, 857:11, 861:21, 861:24, 873:10, 874:11, 877:13, 877:15
**testify** [4] - 795:15, 823:1, 829:11, 875:17
**testifying** [1] - 795:14, 824:9
**testimony** [10] - 785:6, 797:18, 798:1, 808:25, 824:22, 829:15, 839:4, 845:19, 866:14, 875:1
**THE** [201] - 741:2, 741:4, 741:8, 741:10, 742:10, 742:13, 744:10, 745:9, 745:11, 746:5, 747:19, 747:24, 748:1, 748:15, 748:16, 748:24, 748:25, 749:1, 749:2, 749:19, 750:22, 752:12, 752:13, 752:17, 752:19, 755:15, 755:16, 759:24, 760:1, 769:12, 771:1, 771:3, 771:15, 771:16, 771:20, 775:6, 777:15, 777:19, 778:8, 778:9, 780:3, 782:1, 782:2, 782:3, 782:4, 782:6, 782:7, 782:8, 782:9, 783:1, 783:8, 783:11, 783:13, 783:21, 783:24, 784:1, 784:10, 784:12, 784:13, 784:15, 784:22, 785:16, 785:19, 785:22, 785:24, 786:2, 786:4, 787:5, 787:8, 794:21, 794:23, 795:21, 795:24, 797:7, 797:10, 797:12, 797:20, 798:20, 798:23, 799:1, 800:7, 800:23, 801:1, 802:2, 802:4, 802:14, 802:16, 805:4, 805:8, 805:10, 811:20, 811:21, 812:5, 812:8, 812:20, 812:22, 813:8, 813:10, 813:13, 816:3, 816:4, 817:13, 818:5, 818:6, 818:22, 818:23, 821:13, 821:16, 821:18, 821:19, 821:20, 821:21, 821:22, 821:23, 821:24, 821:25, 822:1, 822:2, 825:3, 825:10, 825:13, 825:15, 826:2, 830:23, 831:1, 832:14, 832:17, 832:19, 832:22, 832:24, 834:4, 834:23, 834:24, 836:16, 840:2, 840:3, 841:24, 841:25, 843:8, 844:4, 847:4, 847:5, 852:18, 852:20, 852:22, 853:21, 853:25, 856:11, 860:20, 860:22, 860:25, 862:17, 863:1, 863:2, 864:9, 864:14, 864:18, 866:18, 867:8, 867:11, 867:19, 867:22, 868:6, 868:8, 868:13, 868:21, 869:2, 869:5,

869:7, 869:9, 869:12, 869:18, 870:2, 870:4, 870:8, 870:23, 871:2, 871:4, 871:10, 871:11, 872:18, 872:21, 873:1, 873:2, 876:15, 878:22, 878:23, 879:7, 879:11, 879:13, 879:17, 879:20, 879:25, 880:5, 880:8, 880:12, 880:15, 880:19, 880:23, 881:6, 881:16

**themselves** [2] - 759:17, 759:18
**thereabouts** [2] - 808:15, 820:1
**thereafter** [2] - 778:5, 779:19
**therefore** [1] - 875:14
**thinking** [4] - 806:5, 821:13, 874:21
**third** [4] - 757:20, 785:13, 854:19, 877:10
**THOMAS** [1] - 740:4
**thoroughly** [1] - 837:22
**three** [5] - 743:8, 764:20, 773:9, 847:8, 874:6
**Thursday** [4] - 879:22, 879:25, 881:5, 881:7
**ticket** [1] - 742:25
**timing** [1] - 781:13
**title** [2] - 796:10, 856:19
**today** [4] - 775:24, 829:11, 832:3, 878:16
**together** [2] - 757:25, 845:9
**tomorrow** [1] - 880:24
**took** [10] - 751:8, 755:11, 772:4, 779:10, 792:7, 793:3, 793:4, 793:6, 862:1, 878:14
**top** [3] - 762:13, 766:13, 777:6
**topic** [3] - 805:5, 816:10, 864:17
**towards** [2] - 875:12, 875:13
**town** [1] - 747:1
**track** [3] - 797:21, 797:22, 799:17
**tracking** [1] - 831:9
**transaction** [30] - 750:12, 750:15, 757:4, 759:5, 760:13, 769:4, 770:1, 770:4, 771:6, 792:20, 802:19, 803:15, 803:17, 803:20, 803:21, 803:22, 803:24, 804:12, 805:1, 805:11, 805:25, 838:6, 839:6, 849:9, 849:23, 875:15, 875:18, 876:4, 876:21, 876:22
**transactional** [9] - 791:24, 792:17, 803:4, 804:15, 837:15, 837:18, 838:2, 853:1, 876:10
**transactions** [1] - 838:23
**transfer** [7] - 842:6, 842:9, 842:11, 842:16, 843:18, 844:11, 844:19
**transferring** [1] - 759:1
**transfers** [1] - 873:25
**transmits** [1] - 827:1
**traveled** [7] - 846:16, 846:19, 846:22, 846:24, 847:4, 847:5, 847:6
**trial** [2] - 869:13, 880:18
**true** [5] - 807:19, 808:2, 852:25, 857:21, 878:4
**try** [8] - 756:12, 769:7, 778:25, 779:15, 794:21, 812:5, 821:3, 821:10
**trying** [15] - 747:25, 748:1, 755:6, 761:2, 770:22, 779:2, 805:25, 819:16,

821:12, 828:25, 829:2, 832:14, 843:7, 847:7, 879:21
**turn** [8] - 760:15, 770:3, 801:25, 806:22, 816:3, 850:19, 856:8, 856:9
**two** [26] - 751:14, 752:17, 756:5, 757:10, 764:23, 773:9, 774:20, 774:25, 793:19, 795:15, 796:4, 796:17, 796:23, 796:25, 813:20, 819:24, 820:5, 820:6, 820:10, 820:13, 848:15, 848:24, 849:17, 874:6, 874:24, 877:12
**two-fold** [1] - 848:15
**type** [2] - 743:19, 858:17

## U

**uCB** [1] - 878:18
**UCB** [13] - 751:15, 758:24, 759:10, 801:11, 802:25, 807:21, 809:22, 818:3, 819:5, 819:9, 820:24, 822:15, 880:2
**ultimate** [1] - 865:10
**ultimately** [1] - 821:7
**unable** [3] - 822:14, 833:20, 866:3
**under** [5] - 763:15, 764:11, 767:4, 789:21, 790:14
**underlying** [1] - 764:10
**understood** [10] - 747:12, 763:4, 764:22, 772:16, 785:9, 801:10, 801:13, 841:5, 852:3, 869:20
**undocumented** [1] - 871:21
**United** [17] - 741:2, 745:5, 745:17, 746:9, 757:21, 771:24, 772:17, 822:15, 833:23, 834:10, 841:6, 843:15, 846:24, 847:1, 866:5, 867:23, 867:25
**unquote** [3] - 792:20, 792:23, 793:10
**unrelated** [2] - 843:25, 844:15
**up** [25] - 742:13, 754:10, 767:20, 767:21, 774:8, 776:17, 776:18, 779:5, 794:22, 797:20, 817:6, 817:13, 818:14, 818:16, 830:25, 853:10, 855:16, 855:25, 866:21, 873:7, 873:14, 874:9, 874:12, 874:18, 874:25
**upset** [7] - 782:20, 782:22, 784:1, 784:3, 784:18, 784:25, 785:1
**useful** [5] - 764:25, 789:15, 789:16, 789:18, 789:25

## V

**vague** [3] - 869:1, 872:10, 876:12
**vagueness** [2] - 787:7, 797:5
**valid** [2] - 811:4, 811:6
**variety** [3] - 784:19, 785:7, 803:18
**various** [1] - 834:13
**verbally** [1] - 821:18
**verification** [2] - 881:9, 881:17
**Vilia's** [1] - 871:3
**violated** [2] - 785:4, 850:8
**voluntary** [5] - 834:21, 834:24, 835:8, 836:10, 869:23

## W

**wait** [2] - 870:23, 879:11
**waiting** [2] - 806:4, 870:6
**wants** [1] - 785:19
**warehouse** [84] - 744:18, 744:23, 744:25, 747:15, 747:22, 748:8, 748:19, 749:13, 750:8, 750:9, 754:3, 754:4, 754:5, 754:13, 754:18, 754:23, 756:15, 756:22, 758:6, 758:18, 758:25, 759:6, 759:17, 759:18, 760:8, 760:12, 761:17, 762:1, 764:24, 765:7, 765:10, 765:12, 765:17, 765:20, 768:19, 768:22, 771:25, 772:13, 775:3, 785:13, 789:24, 790:15, 790:19, 798:17, 798:18, 803:1, 803:3, 814:5, 821:6, 822:17, 824:12, 824:14, 826:24, 827:10, 827:15, 827:16, 827:24, 831:8, 835:20, 835:22, 835:24, 836:6, 837:6, 837:12, 859:3, 859:6, 859:12, 859:15, 859:19, 859:24, 862:2, 863:9, 865:24, 866:14, 870:15, 870:19, 871:8, 871:14, 872:4, 872:8, 874:18, 875:7, 875:9, 878:18
**Warehousing** [17] - 743:9, 743:25, 744:15, 744:17, 745:14, 746:9, 748:8, 756:21, 767:6, 832:11, 833:6, 835:9, 841:11, 841:21, 845:22, 846:18, 860:6
**Wednesday** [1] - 854:8
**week** [6] - 756:23, 804:24, 849:17, 877:1, 880:21, 880:24
**weeks** [1] - 773:9
**weight** [1] - 869:14
**whatsoever** [1] - 839:13
**whereby** [2] - 820:24, 843:13
**wherein** [1] - 864:13
**white** [1] - 843:21
**whole** [1] - 849:22
**wife** [2] - 742:25, 750:11
**William** [6] - 749:11, 749:17, 759:21, 763:5, 767:25, 854:11
**willing** [1] - 871:19
**wise** [3] - 783:17, 787:5
**wish** [1] - 762:22
**withdraw** [4] - 746:6, 769:15, 827:21, 830:15
**witness** [3] - 741:6, 825:12, 879:1
**WITNESS** [50] - 748:16, 748:25, 749:2, 750:22, 752:13, 752:19, 755:16, 760:1, 771:3, 771:16, 778:9, 782:2, 782:4, 782:7, 782:9, 784:12, 784:15, 787:8, 795:24, 802:16, 805:8, 805:10, 811:21, 812:22, 813:10, 813:13, 816:4, 817:13, 818:6, 818:23, 821:18, 821:20, 821:22, 821:24, 822:1, 834:24, 836:16, 840:3, 841:25, 847:5, 852:18, 852:22, 863:2, 867:22, 868:8, 869:7, 869:9, 871:11, 873:2, 878:22
**Witness** [2] - 741:12, 881:14
**word** [2] - 756:8, 866:11
**words** [1] - 881:3

**workload** [1] - 865:18
**workout** [1] - 748:23
**worthwhile** [1] - 821:3
**write** [5] - 850:6, 850:12, 851:25, 852:5, 877:20
**writes** [1] - 799:20
**writing** [26] - 792:18, 793:15, 795:7, 797:3, 797:14, 798:10, 799:8, 799:9, 801:23, 802:7, 802:11, 803:12, 803:14, 828:19, 837:1, 837:22, 839:7, 839:13, 840:7, 840:24, 843:13, 843:19, 844:12, 849:12, 850:2, 853:15
**writings** [1] - 811:18
**written** [11] - 760:10, 760:16, 760:17, 791:14, 798:7, 824:10, 836:23, 838:22, 839:17, 851:21, 853:5
**wrongly** [3] - 850:25, 851:13, 869:10
**wrote** [7] - 800:9, 800:13, 800:14, 800:16, 802:23, 805:1, 848:19

## Y

**year** [1] - 786:19
**years** [5] - 741:22, 743:8, 786:14, 787:11, 837:18
**yesterday** [1] - 783:16
**yourself** [2] - 795:16, 868:23

882

1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

4  UNITED CENTRAL BANK,             )  Docket No. 10 C 331
                            )
5                 Plaintiff,  )
                            )
6           vs.             )
                            )
7  KANAN FASHIONS, INC., et al.,  )  Chicago, Illinois
                            )  February 3, 2011
8               Defendants.  )  1:00 o'clock p.m.

9

10           TRIAL TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE MICHAEL T. MASON
                   VOLUME 5

11

12  APPEARANCES:

13

14  For the Plaintiff:     BOODELL & DOMANSKIS LLC
                     BY:  MS. VILIA M. DEDINAS
                        MS. NADA DJORDJEVIC
15                    MR. DAVID WEST
                     205 North Michigan Avenue, Suite 4307
16                  Chicago, IL  60601
                     (312) 938-4070
17

18

19  For the Defendants:    McJESSY, CHING & THOMPSON
                     BY:  MR. KEVIN McJESSY
20                  3759 North Ravenswood, Suite 231
                     Chicago, IL  60613
21                  (773) 880-1260

22

23  Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                     Official Court Reporter
24                  219 S. Dearborn Street, Suite 1854-B
                     Chicago, Illinois  60604
25                  (312) 435-5639

1    APPEARANCES CONTINUED:

2

3    For Respondents
     Alan Borlack and
     Eric Grossman:              HINSHAW & CULBERTSON LLP

4                                BY:  MR. THOMAS P. McGARRY
                                      MR. ALAN R. LIPTON

5                                222 North LaSalle Street, Suite 300
                                 Chicago, IL  60601

6                                (312) 704-3000

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                I N D E X

2
     DESCRIPTION                                              PAGE
3

4
     ALAN BORLACK, DIRECT EXAMINATION                          885
5    BY MR. McGARRY:

6
     ALAN BORLACK, CROSS-EXAMINATION                           916
7    BY MR. McJESSY:

8
     ALAN BORLACK, CROSS-EXAMINATION                           936
9    BY MS. DEDINAS:

10
     ALAN BORLACK, REDIRECT EXAMINATION                        938
11   BY MR. McGARRY:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:46:41 | 1 | (The following proceedings were had in open court:) |
| 01:00:31 | 2 | THE CLERK:  10 C 331, United Central Bank v. Kanan |
| 01:03:05 | 3 | Fashions, et al. |
| 01:03:14 | 4 | MR. McGARRY:  May I call the witness, your Honor? |
| 01:03:19 | 5 | THE COURT:  Yes. |
| 01:03:32 | 6 | MR. McGARRY:  Recalling Alan Borlack. |
| 01:03:37 | 7 | (Witness sworn.) |
| 01:03:37 | 8 | - - - |
| 01:03:37 | 9 | ALAN BORLACK, DIRECT EXAMINATION |
| 01:03:37 | 10 | BY MR. McGARRY: |
| 01:03:40 | 11 | Q.  For the record, it's Tom McGarry. |
| 01:03:43 | 12 | Good morning, Mr. Borlack.  Are you feeling okay? |
| 01:03:45 | 13 | A.  A little under the weather. |
| 01:03:47 | 14 | Q.  All right.  I marked your C.V. as Exhibit 237.  We are not |
| 01:03:59 | 15 | going to dwell on it, but I just want to make sure that you |
| 01:04:02 | 16 | can tell the court that is an accurate curriculum vitae for |
| 01:04:06 | 17 | you as a professional career as a lawyer? |
| 01:04:11 | 18 | A.  Yes.  It has a number of things, yes. |
| 01:04:14 | 19 | Q.  And how long have you been practicing? |
| 01:04:17 | 20 | A.  Well, I graduated from law school in 1972, and I took the |
| 01:04:23 | 21 | bar that summer, and I believe I was admitted to the state bar |
| 01:04:30 | 22 | in fall of that year, of '72.  So what does that make it? |
| 01:04:36 | 23 | Q.  39 years, sir? |
| 01:04:38 | 24 | A.  39 years, yeah. |
| 01:04:39 | 25 | Q.  And we heard some testimony from Mr. Blumenthal, so I am |

01:04:43  1   going to now orient you to that business.  And the Court had

01:04:48  2   suggested that we actually requested an affidavit, but I'd

01:04:52  3   like to cover that with you here under oath, if you could.

01:04:55  4                THE COURT:  Is this about the e-mails?

01:04:56  5                MR. McGARRY:  Yes, your Honor.

01:04:57  6   BY MR. McGARRY:

01:04:58  7   Q.  How many e-mails did you receive from Blumenthal?

01:05:01  8   A.  169, either directly to me or I was a copied recipient.

01:05:06  9   Q.  How do you know that, sir?

01:05:07  10  A.  I counted it.  The computer will do a count if you put in

01:05:14  11  the name of from.  I put in Steven H. Blumenthal, in fact, I

01:05:18  12  did it with you and Eric Grossman present and the number

01:05:22  13  was 169.

01:05:22  14  Q.  Any of those e-mails have any information regarding

01:05:30  15  Mr. Shah's plan to purchase his own server from the warehouse?

01:05:35  16  A.  No.  No.

01:05:36  17  Q.  Now, from the time you got in the case, January 18th,

01:05:41  18  until you were discharged on September 25th about --

01:05:45  19  A.  That was when we filed that motion to withdraw, on the

01:05:48  20  24th.

01:05:49  21  Q.  From January until September 2010, how many e-mails did

01:05:54  22  you get from Mr. Joshi?

01:05:55  23  A.  670.

01:05:57  24  Q.  And how many e-mails did you get from Mr. Shah?

01:06:03  25  A.  248.

01:06:05   1   Q.  And so if we were to add the 169 e-mails from

01:06:15   2   Mr. Blumenthal to the 670 from Mr. Joshi and the 248 from

01:06:23   3   Mr. Shah, would we have a sum of over 1,000 e-mails?

01:06:27   4   A.  It sounds that way to me.

01:06:28   5   Q.  And in those 1,000 e-mails, were you ever advised of

01:06:35   6   Mr. Shah's plan to buy his own server?

01:06:37   7   A.  Only on August 25, when Mr. Shah forwarded to Eric, who

01:06:42   8   then forwarded it to me, an e-mail chain in which Mr. Shah had

01:06:47   9   sent an August 9, 2010, e-mail to Dave Clark.  That had an

01:06:54   10  e-mail trail that had two June 28 e-mails between Clark and

01:07:00   11  Shah.

01:07:00   12      And before that, there was a June 4 e-mail from

01:07:06   13  Ms. Jacobs of Associated Bank I think to Bill Serritella, and

01:07:11   14  then Serritella e-mailed to Clark.  And so that was the first

01:07:15   15  time I got any e-mails about this.

01:07:17   16  Q.  Let's take a look at SH 189 just to see if -- is that the

01:07:22   17  e-mail you're referring to?

01:07:29   18      Can I ask you a question while you're looking for it?

01:07:32   19  A.  Sure.

01:07:32   20  Q.  Did you ever receive a blind carbon copy of any e-mails

01:07:37   21  from either Mr. Blumenthal, Mr. Shah, or Mr. Joshi?

01:07:39   22  A.  Never from Mr. Blumenthal, never from Mr. Joshi, one time

01:07:43   23  from Mr. Shah.  That was his August 28, 2010, e-mail to Dave

01:07:49   24  Clark written the day after the court entered its August 27

01:07:54   25  order.  That was the first time I was copied on any e-mails to

| | | |
|---|---|---|
| 01:07:57 | 1 | Dave Clark, albeit as a blind carbon copy. |
| 01:08:01 | 2 | Q. All right. That's what I was putting you in touch with |
| 01:08:08 | 3 | was SH 189. Is that the e-mail that you were -- the one |
| 01:08:12 | 4 | e-mail that you were bcc'd on? |
| 01:08:13 | 5 | A. Yes. Yes. As you can see, there's no Borlack there. |
| 01:08:17 | 6 | Q. Do you know why Mr. Shah blind carboned you on that |
| 01:08:26 | 7 | e-mail? |
| 01:08:26 | 8 | A. No, I don't know why he did that. I have no knowledge why |
| 01:08:31 | 9 | he did that. |
| 01:08:31 | 10 | Q. Did you review the production in this case to see e-mails |
| 01:08:43 | 11 | among Mr. Shah, Mr. Clark, Mr. Blumenthal, Tina Jacobs, or |
| 01:08:49 | 12 | others regarding the transaction to purchase the server? |
| 01:08:52 | 13 | A. I surely have. |
| 01:08:53 | 14 | Q. Do you know how many e-mails did you see that the subject |
| 01:08:56 | 15 | matter was the purchase of the server? |
| 01:08:58 | 16 | A. Yeah, in Exhibit -- to our submission, Exhibit 12, |
| 01:09:03 | 17 | corrected Exhibit 12, there was I think 48. We then added |
| 01:09:06 | 18 | additional ones to the court, and I would estimate probably 65 |
| 01:09:10 | 19 | to 70. |
| 01:09:11 | 20 | Q. Were you copied or blind carboned on any of those e-mails, |
| 01:09:16 | 21 | sir? |
| 01:09:16 | 22 | A. No. |
| 01:09:17 | 23 | THE COURT: Could I get a clarification on that? You |
| 01:09:23 | 24 | said in their submission, Exhibit 12. Do you mean the joint |
| 01:09:27 | 25 | exhibit or your original exhibit? |

01:09:30   1         MR. McGARRY:  May I have the witness clarify that,

01:09:34   2   Judge?

01:09:34   3         THE COURT:  Sure.

01:09:35   4         THE WITNESS:  I mean respondents' submission to the

01:09:38   5   Court on December 8, 2010.

01:09:40   6         THE COURT:  Okay.

01:09:41   7   BY MR. McGARRY:

01:09:42   8   Q.  Why were you not copied on those e-mails?

01:09:43   9   A.  They didn't want me to see it.

01:09:46   10        MR. McJESSY:  Objection.  Foundation.

01:09:48   11        THE COURT:  No, he can answer that.

01:09:51   12  BY MR. McGARRY:

01:09:56   13  Q.  Did you personally advise Mr. Blumenthal regarding the

01:10:00   14  litigation hold in this case?

01:10:01   15  A.  Yes, I did.  He was a carbon recipient of four e-mails

01:10:07   16  which reflected litigation holds.  The first e-mail was dated

01:10:11   17  January 21, 2010 --

01:10:15   18  Q.  All right.  Let me just -- I'll stop you right there.

01:10:18   19        Is that SH No. 6, sir?

01:10:25   20  A.  Yes.

01:10:26   21  Q.  All right.  Continue.

01:10:28   22  A.  The next one was on February 18, 2010.

01:10:37   23  Q.  Now, that was SH 17, sir, would you take a look?

01:10:41   24        And that's the red-lined draft --

01:10:43   25  A.  Yes.

| | | |
|---|---|---|
| 01:10:44 | 1 | Q. -- to Ms. Dedinas? |
| 01:10:46 | 2 | A. That was Dave's red-lined revised ESI agreement sent to |
| 01:10:50 | 3 | Vilia, and so that was the first one that they got. And, |
| 01:10:54 | 4 | again, Blumenthal is always carbon copied. |
| 01:10:58 | 5 | Q. Did you also on February 19th provide Mr. Blumenthal with |
| 01:11:01 | 6 | any information regarding the litigation hold? |
| 01:11:03 | 7 | A. I did, twice. |
| 01:11:04 | 8 | Q. Okay. Would you refer, please, to SH 18 and 20. |
| 01:11:23 | 9 | A. 20 is -- I believe 20 is the second February 19 e-mail -- |
| 01:11:34 | 10 | Q. All right. |
| 01:11:35 | 11 | A. -- to -- of the amended February 19 ESI agreement. |
| 01:11:41 | 12 | Q. ESI agreement. |
| 01:11:42 | 13 | A. Yes. |
| 01:11:42 | 14 | Q. Okay. How about SH 18? Was that also a communication |
| 01:11:46 | 15 | with Mr. Blumenthal advising him regarding the red-lined draft |
| 01:11:50 | 16 | of the amended ESI agreement? |
| 01:11:53 | 17 | A. Well, unfortunately, 18 is only the ESI agreement too. |
| 01:11:59 | 18 | I think you mean Exhibit 19. |
| 01:11:59 | 19 | Q. 19? |
| 01:12:02 | 20 | A. Yes. |
| 01:12:02 | 21 | THE COURT: 18 is the amended ESI agreement. |
| 01:12:06 | 22 | THE WITNESS: This -- |
| 01:12:08 | 23 | BY MR. McGARRY: |
| 01:12:08 | 24 | Q. Go ahead. Tell the judge what 19 is then. |
| 01:12:11 | 25 | A. 19 is my first e-mail. That enclosed -- we had an |

01:12:15  1  inadvertent omission, which Vilia agreed with us, so we had to

01:12:19  2  amend the ESI agreement.  It had nothing -- we had to amend

01:12:22  3  it.

01:12:23  4  So I sent, first thing, the enclosed amended ESI

01:12:27  5  agreement but in clean.  So, in other words, this would have

01:12:30  6  been the red-lined agreement that I think we got from Vilia.

01:12:34  7  So that was the first time I sent that.

01:12:36  8  Then later that day, I sent the one you have just

01:12:38  9  noted in clean, so it didn't even have any red lining.

01:12:42  10  Q.  Why did you include Mr. Blumenthal in your communications

01:12:45  11  regarding ESI?

01:12:46  12  A.  Well, Mr. Blumenthal was, you know, an important advisor

01:12:52  13  of Mr. Shah.  I also included, I think, Scott Schreiber, I

01:12:57  14  think, as well.

01:12:57  15  Q.  Would it be fair to say you kept Mr. Blumenthal in the

01:13:01  16  loop on the ESI?

01:13:01  17  A.  Well, no, I don't think we did.  I don't think that Eric's

01:13:07  18  e-mails included him.

01:13:10  19  Q.  But he was kept in the loop regarding the litigation

01:13:14  20  holds?

01:13:14  21  A.  Oh, yes, although Dave Muschler's e-mail of March 3 I

01:13:20  22  don't believe went to him.

01:13:21  23  Q.  Let's take a look at the -- referring to SH 17 through 20,

01:13:30  24  the litigation hold aspect.  I'd like you to focus on the key

01:13:35  25  provision, if you will, in your opinion regarding the

01:13:39　1　litigation hold.

01:13:43　2　　　　　THE COURT:  Which one are you referring to?

01:13:44　3　　　　　MR. McGARRY:  Well, I think, if I could see -- it's

01:13:49　4　No. 17 or 20.

01:13:59　5　　　　　THE WITNESS:  I will use 20.  Is that what you want

01:14:01　6　me to use?

01:14:02　7　BY MR. McGARRY:

01:14:02　8　Q.  Exhibit 20 has the ESI agreement, does it not?

01:14:05　9　A.  Yes, it does.

01:14:05　10　Q.  What was the key provision with respect to the litigation

01:14:08　11　hold?

01:14:08　12　A.  The key provision was in paragraph 3, and it never

01:14:12　13　changed.  It was the same on February 18 and the same on

01:14:15　14　February 19.

01:14:16　15　　　　　And it says in paragraph 3, The parties had discussed

01:14:25　16　the efforts taken by Kanan Fashions and Creative Warehousing

01:14:29　17　to identify and preserve ESI.  Kanan Fashions and Creative

01:14:34　18　Warehousing have represented that this systems (sic) are not

01:14:37　19　operational, that only two individuals have current access to

01:14:40　20　the computer servers, and each has been instructed to preserve

01:14:45　21　relevant and discoverable ESI within their possession,

01:14:49　22　custody, and control.

01:14:52　23　　　　　I think that's the key language that I am thinking of

01:14:56　24　for a litigation hold.  You might find some other stuff in

01:14:58　25　there.

01:14:59  1   Q.  Did you feel that -- by this statement to Mr. Shah and

01:15:03  2   Mr. Joshi and Mr. Blumenthal were able to understand this?

01:15:06  3   A.  Sure.

01:15:07  4   Q.  When did you first meet Mr. Blumenthal face to face?

01:15:13  5   A.  June 11, 2010.

01:15:15  6   Q.  I think Mr. Blumenthal gave some testimony that he may

01:15:21  7   have met you earlier, say March, April, May, that period?

01:15:26  8   A.  No.  The first time I met him was at a meeting on June 11,

01:15:30  9   2010.  And I remember saying to him, Steve, we finally met

01:15:35  10  after all this time.  It had been almost six months.  And I

01:15:38  11  remember specifically saying that to him because I had never

01:15:41  12  met him before.

01:15:42  13  Q.  Just coming back a little bit on Mr. Blumenthal's

01:15:45  14  testimony here two days ago, did you ever attend a meeting

01:15:50  15  with Mr. Blumenthal and Jim Flesch at Don Glickman's office?

01:15:54  16  A.  No.

01:15:55  17  Q.  If he said -- if he puts you at a meeting there, is he

01:16:00  18  wrong?

01:16:00  19  A.  He would be wrong.

01:16:01  20  Q.  How did you learn about what's been called in this case

01:16:04  21  the friendly foreclosure or the deed in lieu transaction?

01:16:07  22  A.  Mehul Shah and Steven Blumenthal together called me on

01:16:13  23  February 24 and then again on February 26 to advise me that

01:16:21  24  this was expected to happen.  That was the first time I

01:16:24  25  learned about it, and it was in two phone calls from them to

01:16:28  1   me.

01:16:28  2   Q.  Did you document those phone calls --

01:16:30  3   A.  I did.

01:16:30  4   Q.  -- in e-mails?

01:16:32  5   A.  By e-mails.

01:16:32  6   Q.  Could you refer to SH 22 and 28, please, and answer the

01:16:37  7   question whether those document those telephone calls.

01:16:50  8   A.  Yes.

01:16:51  9   Q.  All right.  The subject matter of your phone calls are

01:16:54  10  memorialized in those e-mails, correct?

01:16:56  11  A.  Yes.

01:16:56  12  Q.  What did they tell you about, if anything, regarding the

01:17:04  13  note financing the warehouse?

01:17:05  14  A.  This was going to result in the extinction of a note, of

01:17:18  15  course, for the warehouse.  That was an $8.3 million note, as

01:17:22  16  I recall.  And also it was going to extinguish certain

01:17:27  17  guaranties of Mehul Shah and Varsha Shah that were, in fact, a

01:17:34  18  subject of the litigation.  And they wanted me to do something

01:17:38  19  legally to get -- once that assignment was completed, to get

01:17:45  20  Varsha and Mehul off those guaranties, which we did by way of

01:17:50  21  an April 12, 2010, motion to add affirmative defenses, which

01:17:58  22  were granted by the court.

01:18:00  23  Q.  Was that document 63, sir?

01:18:02  24  A.  63.  And there were five affirmative defenses.  The two

01:18:07  25  pertinent ones here were 3 and 4.

| | | |
|---|---|---|
| 01:18:09 | 1 | THE COURT:  Do you mean exhibit -- |
| 01:18:10 | 2 | MR. McGARRY:  No, your Honor, that was document 63. |
| 01:18:12 | 3 | THE COURT:  Okay. |
| 01:18:14 | 4 | MR. McGARRY:  I'm not going to burden the court with |
| 01:18:16 | 5 | pleadings that are already in evidence.  If I refer to a |
| 01:18:19 | 6 | pleading, I will let you know. |
| 01:18:21 | 7 | THE COURT:  Thank you. |
| 01:18:22 | 8 | MR. McGARRY:  But we can get copies if anybody needs |
| 01:18:24 | 9 | them. |
| 01:18:24 | 10 | THE COURT:  No, I've got all of them. |
| 01:18:26 | 11 | BY MR. McGARRY: |
| 01:18:27 | 12 | Q.  Now, just orienting again to the period of the phone calls |
| 01:18:31 | 13 | in February 24 and 28th with Mr. Blumenthal, in those two |
| 01:18:36 | 14 | calls, did Mr. Blumenthal or Mr. Shah tell you that Mr. Shah |
| 01:18:40 | 15 | was negotiating with Dave Clark to purchase his server in the |
| 01:18:45 | 16 | warehouse? |
| 01:18:46 | 17 | A.  I'm sorry.  I was thinking of the last question.  Would |
| 01:18:48 | 18 | you read that again? |
| 01:18:49 | 19 | MR. McGARRY:  I could state it again, Judge. |
| 01:18:49 | 20 | BY MR. McGARRY: |
| 01:18:54 | 21 | Q.  In those two phone calls in February, late February, you |
| 01:18:57 | 22 | just testified to? |
| 01:18:58 | 23 | A.  Yes, yes. |
| 01:18:58 | 24 | Q.  Did Mr. Blumenthal tell you that Mr. Shah was negotiating |
| 01:19:01 | 25 | to buy his server? |

01:19:02　1　A.　Absolutely not.

01:19:03　2　Q.　In the course of this litigation, have you learned that

01:19:08　3　that actually was going on at that very time?

01:19:11　4　A.　Yes.　Yes.

01:19:12　5　Q.　Now, I think you said this, but the $8.3 million note that

01:19:20　6　you just referred to was not a note sued upon by UCB in the

01:19:27　7　complaint, right?

01:19:28　8　A.　That's right.

01:19:28　9　Q.　But the purpose of their communication with you was to

01:19:32　10　have you take legal action, as you just said, and you did that

01:19:35　11　in the form of the affirmative defense?

01:19:37　12　A.　Right.

01:19:37　13　Q.　And that affirmative defense, you had Mr. Grossman prepare

01:19:41　14　that?

01:19:41　15　A.　Well, we both worked on it together.　Eric did the

01:19:44　16　research because, you see, we were -- we were trying to get

01:19:49　17　extinguished not only the April 12, 2006, guaranty that was

01:19:54　18　the subject of the assignment, but certain 2004 guaranties

01:20:00　19　that were not.　And the legal theory was that the 2004

01:20:04　20　guaranties had been superseded and replaced by the April 12,

01:20:09　21　2006, guaranties, and, therefore, they were also extinguished.

01:20:15　22　Q.　So did your clients and their transactional lawyer want

01:20:20　23　you to -- well, what did they want from you as a result of

01:20:23　24　those communications?

01:20:24　25　A.　To take action in the litigation to get them off those

01:20:29   1    guaranties, to get them extinguished.

01:20:31   2    Q. Did their telling you about the foreclosure in your mind

01:20:33   3    have anything to do with ESI?

01:20:35   4    A. Nothing.

01:20:35   5    Q. Now, again, just orienting a bit back to Mr. Blumenthal's

01:20:45   6    testimony on Tuesday, did Mr. Blumenthal ever ask you to

01:20:53   7    handle the deed in lieu of foreclosure?

01:20:55   8    A. Absolutely not.

01:20:56   9    Q. And if he says otherwise, is he incorrect?

01:20:59  10    A. He's incorrect.

01:21:00  11    Q. What, if anything, did Mr. Blumenthal or Mr. Shah tell you

01:21:06  12    about the deed in lieu of foreclosure at that time?

01:21:09  13    A. Well, that was pretty much what I knew. It was also -- I

01:21:14  14    mean, the inventory came up. And I summarized the inventory

01:21:19  15    issue as now the inventory, if it was going to be staying at

01:21:24  16    First Midwest Bank, then UCB would have to pay for it because

01:21:30  17    my clients couldn't afford to, they didn't own the warehouse

01:21:33  18    anymore.

01:21:33  19        Or now, if that was not the case, then Kanan would

01:21:38  20    have to move the inventory somewhere else. That was the

01:21:43  21    only -- the only other thing mentioned.

01:21:46  22    Q. What, if anything, did you have to do with the mechanics

01:21:49  23    of prosecuting the deed in lieu or the foreclosure?

01:21:53  24    A. Nothing.

01:21:53  25    Q. Did Mr. Blumenthal discuss with you the mechanics of the

01:21:58  1  foreclosure?

01:21:58  2  A. No, he did not.

01:21:59  3  Q. Were you asked to give any advice regarding the deed in

01:22:03  4  lieu of foreclosure?

01:22:03  5  A. No, I was not.

01:22:04  6  Q. Did you say to Mr. Blumenthal, I'm too busy to handle the

01:22:08  7  deed in lieu of foreclosure?

01:22:09  8  A. No, I did not.

01:22:10  9  Q. And if Mr. Blumenthal says otherwise, he would be

01:22:14  10  incorrect?

01:22:15  11  A. He would be.

01:22:15  12  Q. What do you remember next?

01:22:17  13  A. The next thing I remember is the March 24, 2010, letter

01:22:25  14  from Serritella to Domanskis -- pardon me, I'm mispronouncing

01:22:33  15  the gentleman's name, Al. And that was the first time I

01:22:37  16  learned that there was an eviction.

01:22:39  17  The letter stated that that day, March 24, I believe

01:22:42  18  it says that an eviction order had been entered and was

01:22:46  19  enclosed. Steve Blumenthal e-mailed that to me and I think to

01:22:51  20  Mehul too, but he did not enclose any eviction order.

01:22:56  21  Q. With respect -- backing up for a second. With respect to

01:23:00  22  the deed in lieu of foreclosure, once the closing took place,

01:23:03  23  did Mr. Shah send you a book of the agreements?

01:23:06  24  A. Yes, he did. On March 17, he sent me I think the whole

01:23:09  25  book.

01:23:09   1   Q.  Well, describe those.

01:23:11   2   A.  It was very lengthy.  It was about -- as I recall, about

01:23:15   3   eight different agreements that were in it.

01:23:18   4   Q.  Did you take time to read those agreements?

01:23:21   5   A.  No, I did not.  It was very lengthy, very legalese.

01:23:24   6   Q.  Did you believe they affected the litigation?

01:23:29   7   A.  No.  Outside of the assignment.

01:23:34   8   Q.  Did Mr. Blumenthal ever discuss with you an option to

01:23:37   9   lease the warehouse?

01:23:39  10   A.  Mr. Blumenthal?

01:23:41  11   Q.  Yes.

01:23:41  12   A.  No.  No.

01:23:42  13   Q.  If he testified otherwise, would that be incorrect?

01:23:46  14   A.  It would be.

01:23:47  15   Q.  Now, how did you find out about the eviction?

01:23:51  16   A.  That March 24 letter from Serritella.

01:23:54  17   Q.  Did you know at that time that your clients were going to

01:23:59  18   leave behind that warehouse server?

01:24:00  19   A.  I had absolutely no knowledge of that or expectation.

01:24:05  20   Q.  Did your clients call you and ask you for advice on what

01:24:09  21   to do with this?

01:24:10  22   A.  They did not.

01:24:11  23   Q.  Did you ask Mr. Blumenthal to do the inventory agreement?

01:24:18  24   A.  Yes, I did.

01:24:19  25   Q.  And why?

01:24:20    1    A.  Can I explain?  Yes.

01:24:22    2           On April 7, I received an e-mail from Vilia in which

01:24:26    3    she said, they had finally decided -- that is, UCB -- to work

01:24:31    4    out a deal with FMB for the storage of the inventory and then

01:24:39    5    a UCC sale.

01:24:40    6           So according to this e-mail, you know, FMB and UCB

01:24:47    7    was going to be on the same plane here, and now we, of course,

01:24:51    8    had to be in on it too because we had an interest in that

01:24:55    9    inventory.

01:24:57   10           Now, before that, Serritella's March 24 letter says

01:25:01   11    something to the effect that Kanan, he doesn't say who, he

01:25:05   12    says, I think Kanan has advised that they have no interest in

01:25:10   13    the clothing.

01:25:10   14    Q.  Is that SH 59, please?

01:25:13   15    A.  Let's find it.

01:25:25   16           May I read the sentence in question?

01:25:28   17    Q.  Direct us to the sentence that you're referring to,

01:25:31   18    please.  Wait until the judge has the book open because not

01:25:34   19    everyone has the page open.

01:25:36   20           THE COURT:  Okay.

01:25:36   21           MR. McGARRY:  Thank you.

01:25:37   22           THE WITNESS:  It's on page 2.  I believe the first

01:25:41   23    sentence, maybe the second:  I believe that you know that

01:25:45   24    Kanan has used the property to among other things store its

01:25:49   25    inventory of clothing, the clothing.  Kanan has advised First

01:25:54　1　Midwest that it has no interest in the clothing and that First

01:26:00　2　Midwest can dispose of it.

01:26:01　3　　　　Well, I knew that wasn't me, Kanan wasn't Borlack

01:26:06　4　talking, because I never said any such thing, nor did I have

01:26:10　5　any understanding that did have -- why they would have no

01:26:13　6　interest.

01:26:13　7　　　　So I e-mailed Blumenthal and I said, do you have any

01:26:17　8　knowledge of this?  And he said, we never said that, he

01:26:20　9　responded back.  He said, what we told them is we couldn't

01:26:23　10　afford to store the clothing, and that was -- that was

01:26:29　11　different.

01:26:30　12　　　　And eventually I think on -- I think April 2nd, I

01:26:36　13　responded to Vilia's March 29 letter and I said that was the

01:26:40　14　case.  I disavowed this idea that they were just going to

01:26:45　15　abandon the inventory and they had no interest in it.

01:26:49　16　　　　So it was obvious to me that Steve Blumenthal was

01:26:52　17　dealing with this stuff.  I mean, he had apparently made the

01:26:55　18　statement, although his e-mail said, we never said that, we.

01:26:59　19　He didn't say I.

01:27:01　20　　　　But it was Serritella.  I mean, Mr. Shah isn't

01:27:03　21　talking to Mr. Serritella, I presume.  So I presume, you know,

01:27:07　22　that Blumenthal was already up on this.

01:27:09　23　　　　Now, on April 9, I e-mailed back Steve and I had too

01:27:14　24　many things going on, and it seemed to me this is something

01:27:16　25　that Blumenthal can handle, he had been handling this, it

01:27:20  1   seemed to be part of the foreclosure, so I asked him if he

01:27:23  2   would get involved and if he would shepherd the negotiations

01:27:27  3   from Kanan's point of view.  He did.  But I remained involved.

01:27:33  4   I mean, Steve would send me drafts and stuff, I would make

01:27:37  5   some comments and so forth.  So we really worked on it

01:27:40  6   together, although Steve was the driving force.

01:27:42  7          The agreement was finally finalized, I believe, on

01:27:46  8   May 17.  That was the last change to the agreement made by

01:27:52  9   Steve Blumenthal.  And I believe we then had a final

01:27:55  10  agreement, and we received signed copies the following day.

01:27:55  11  BY MR. McGARRY:

01:27:59  12  Q.  And the agreement was to deal with the inventory?

01:28:01  13  A.  Inventory, how to dispose of it.  It was going to be sold

01:28:05  14  in which there would be how do we deal with the various

01:28:08  15  interests of the parties, and I wanted to make sure Kanan had

01:28:12  16  an interest.

01:28:13  17  Q.  Did Mr. Blumenthal ever disclose to you that Mr. Shah had

01:28:17  18  also planned to leave the server behind?

01:28:19  19  A.  Never.

01:28:20  20  Q.  Have you at any time had any discussions with

01:28:31  21  Mr. Blumenthal regarding any plan or negotiations for FMB to

01:28:34  22  purchase the server?

01:28:35  23  A.  No.

01:28:35  24  Q.  When was the first time you learned about those plans?

01:28:40  25  A.  August 5, 2010.

| | | |
|---|---|---|
| 01:28:45 | 1 | Q.  What happened on August 5? |
| 01:28:46 | 2 | A.  Mr. Shah called to discuss my August 4 letter to him, and |
| 01:28:52 | 3 | I asked Eric to come into my office and be on the phone so he |
| 01:28:56 | 4 | could hear this too, handling ESI as he was.  And that's when |
| 01:29:00 | 5 | Mr. Shah told us that Associated Bank had made an offer of I |
| 01:29:08 | 6 | think it was 300,000-something, and I couldn't remember the |
| 01:29:12 | 7 | figure, I don't think, and that -- but finally, now, they were |
| 01:29:14 | 8 | down to 60 or 65,000.  And that was okay with Shah.  I mean, |
| 01:29:18 | 9 | he would take that deal, and he would call Clark that day. |
| 01:29:21 | 10 | Q.  Did you memorialize your conversations on August 5th with |
| 01:29:24 | 11 | an e-mail? |
| 01:29:25 | 12 | A.  I did. |
| 01:29:26 | 13 | Q.  Please take a look at SH 71 and SH 187. |
| 01:29:41 | 14 | A.  SH 71 is not correct. |
| 01:29:44 | 15 | Q.  Oh, I'm sorry. |
| 01:29:44 | 16 | MS. DEDINAS:  171? |
| 01:29:53 | 17 | MR. McGARRY:  Is it 171? |
| 01:29:53 | 18 | THE WITNESS:  Oh, 171. |
| 01:29:53 | 19 | BY MR. McGARRY: |
| 01:29:53 | 20 | Q.  This is August, August 5th, or thereafter.  You were |
| 01:29:56 | 21 | talking about August 5th and August 25th -- |
| 01:29:59 | 22 | A.  Here it is, yes. |
| 01:30:00 | 23 | Q.  Do you have it? |
| 01:30:04 | 24 | A.  I do, I have it. |
| 01:30:05 | 25 | Q.  Explain -- tell the judge what exhibit you're looking at. |

01:30:08   1    A.  I'm looking at Exhibit SH 171.

01:30:11   2    Q.  171.

01:30:12   3        What was the point of that memorandum?

01:30:14   4    A.  Well, it was that, you know, confirm that there was a deal

01:30:19   5    here.  The only thing is he said he needed time to get the

01:30:23   6    money, and he was going to call Dave Clark that day.

01:30:25   7    Q.  So is this the first time you learned that your client had

01:30:29   8    been negotiating to purchase his own server?

01:30:33   9    A.  Yes.

01:30:33   10    Q.  And then take a look at 187, please.  You memorialized a

01:30:44   11    further phone call with Mr. Shah?

01:30:53   12    A.  Well, it doesn't memorialize a phone call.  It doesn't

01:31:01   13    memorialize a phone call.  This was as a result of a phone

01:31:05   14    call that Mr. Shah made to me, and I think Eric was on the

01:31:11   15    phone too, in which he told us -- and he was in a dither.  He

01:31:17   16    sounded like he was in a dither and very upset.  He tells us

01:31:21   17    for the first time that on August 9, he had sent an e-mail

01:31:24   18    from Clark that was going to, you know, get this deal closed.

01:31:29   19    And he says, Mr. Clark has never responded.  Now, that was --

01:31:35   20    this was August 25.  That was 16 days.  And we thought, well,

01:31:39   21    could he be on vacation?

01:31:40   22        And Mr. Shah said something like, well, I tried

01:31:44   23    leaving him a voice mail, and something, I tried calling one

01:31:48   24    time and I got -- all I got was the operator, and something

01:31:54   25    like that.

01:31:55   1          And so I said, I want to see the e-mail.  And so he
01:32:00   2   forwarded to Eric and, as I have mentioned, with an e-mail
01:32:05   3   trail here, and Eric sent it to me.
01:32:07   4          This was August 25, the day before the August 26
01:32:10   5   hearing before the judge.
01:32:11   6   Q.  What did he tell you had occurred on August 9th, that he
01:32:14   7   just learned on August 9th?
01:32:15   8   A.  What he told me is that he had made, in effect, an offer
01:32:19   9   to close this deal on August 9.
01:32:21  10   Q.  And he waited 16 days to let you know that?
01:32:25  11   A.  Absolutely.
01:32:25  12   Q.  And --
01:32:28  13   A.  I never saw the August 9 e-mail.
01:32:30  14   Q.  And he didn't tell you that until the day before the
01:32:32  15   status hearing?
01:32:33  16   A.  Correct.
01:32:33  17   Q.  Now, back -- let me orient you back to Mr. Blumenthal's
01:32:43  18   testimony.
01:32:47  19          Did Mr. Shah ever tell you he was going into a new
01:32:51  20   business?
01:32:51  21   A.  Never said that to me.  I mean, we talked about -- you
01:32:55  22   know, the issue that I had with Mr. Shah was he was well
01:32:58  23   behind in our bills.  And, you know, he would assure me I
01:33:03  24   would get paid.  But he never told me he was going into a new
01:33:07  25   business.  I knew he was in Romoney (phonetic).

01:33:10   1   And I didn't know what else he did.  I didn't know
01:33:13   2   what else he was doing.  But he didn't talk to me about a new
01:33:16   3   business.
01:33:16   4   Q.  Just to touch back on this meeting on June 11, the first
01:33:31   5   time you met Mr. Blumenthal --
01:33:32   6   A.  Right.
01:33:33   7   Q.  -- was the subject discussed that your firm wasn't being
01:33:37   8   paid bills?
01:33:38   9   A.  Well, that, and really, the subject was:  Is there a way
01:33:41  10   we could be more efficient in a way.  You know, we were
01:33:45  11   getting nailed, my firm; Jim Flesch and Don Glickman had their
01:33:52  12   own separate arrangements; and I remember Mr. Shah asking
01:33:57  13   right away, is there a way we can streamline this?  And I
01:34:01  14   shook my head and I said, no, there's no way we can streamline
01:34:05  15   this.
01:34:06  16   We have got a huge piece of litigation, and, you
01:34:10  17   know, we're trying to handle it, Eric and I, and using Flesch
01:34:14  18   and Glickman too.  And I had to be careful with Flesch and
01:34:20  19   Glickman.  They weren't chumps like me.  They were not going
01:34:23  20   to let Mr. Shah get ahead of them.  They were additional
01:34:27  21   counsel, not lead counsel, so I had to be careful what I got
01:34:31  22   Flesch into before I lost Flesch and Glickman too.
01:34:34  23   And we discussed was there anything we could do.  And
01:34:36  24   there really wasn't.  I was very -- you know, look it, we try
01:34:37  25   and be efficient, but there's nothing I can think of that

01:34:39  1   would make a serious --

01:34:42  2   Q.  I just want to clear one thing up.

01:34:45  3   A.  Yes.

01:34:45  4   Q.  There was a comment by Mr. Blumenthal, and it was raised

01:34:48  5   in a question, Mr. McJessy's question, a discussion of

01:34:51  6   excessive billing.

01:34:52  7        Was there any conversation regarding your bills being

01:34:56  8   excessive?

01:34:56  9   A.  Absolutely not.  Nobody made a suggestion of that at all.

01:34:59  10  Q.  Now, in the course of this case, have you learned that

01:35:05  11  there were a number of e-mails from Mr. Blumenthal regarding

01:35:09  12  the subject of the server that were not forwarded or copied to

01:35:13  13  you?

01:35:13  14  A.  A number of e-mails from Mr. Shah?

01:35:15  15  Q.  No, Mr. Blumenthal.

01:35:16  16  A.  Oh, from Mr. Blumenthal.

01:35:18  17  Q.  Yes.

01:35:18  18  A.  Absolutely.  Absolutely.

01:35:19  19  Q.  How many?

01:35:20  20  A.  You know, they're all intermingled with the corrected

01:35:26  21  Exhibit 12 to our submission and the additional submission we

01:35:30  22  made.  And I couldn't say, but there are many.  And I can

01:35:33  23  almost -- if you want me to, I can remember a few.

01:35:36  24  Q.  Can you tell me -- can you tell me, is it in a range

01:35:40  25  between 50 and 60, sir?

01:35:42  1   A.  Of Blumenthal?

01:35:42  2   Q.  Yes.

01:35:43  3   A.  I couldn't say that because they are all intermingled.

01:35:46  4   But there are many, many.

01:35:47  5   Q.  Well, is it fair to say you were kept out of the loop on

01:35:51  6   the purchase of that server?

01:35:52  7   A.  It was more than fair to say that.  That was the truth.

01:35:55  8   Q.  Why is it more than fair?

01:35:56  9   A.  I would have to violate the Court's motion -- order in

01:36:00  10  limine in order to answer that.

01:36:01  11  Q.  Other than that, is there anything else?

01:36:03  12          Back up.  Let me start the question over.

01:36:03  13  A.  Well --

01:36:07  14  Q.  I want you to be able to express what occurred to you

01:36:11  15  here.

01:36:11  16          Were you deceived?

01:36:12  17  A.  Yes, I was.

01:36:14  18          MR. McJESSY:  Objection.

01:36:15  19          THE COURT:  Sustained.

01:36:15  20  BY MR. McGARRY:

01:36:16  21  Q.  How do you know you were deceived?

01:36:17  22          THE COURT:  Sustained.

01:36:18  23          MR. McGARRY:  I'm sorry.

01:36:20  24  BY MR. McGARRY:

01:36:20  25  Q.  In what way were you deceived, sir?

01:36:23  1    MR. McJESSY:  Objection, your Honor.

01:36:25  2    THE COURT:  Sustained.

01:36:26  3  BY MR. McGARRY:

01:36:36  4  Q.  Would you please take a look at Exhibit 239.  I don't know

01:36:41  5  if this made it in the book.  Were you able to --

01:36:44  6    THE COURT:  It did.

01:36:52  7    MR. McGARRY:  If you look in the pocket.

01:36:54  8    MR. McJESSY:  What exhibit are we looking at?

01:36:57  9    THE COURT:  239.

01:37:01  10    MS. DEDINAS:  We have it.

01:37:01  11  BY MR. McGARRY:

01:37:03  12  Q.  Now, I'm showing -- take a look at that, which is an

01:37:06  13  exchange of e-mails between Mr. Blumenthal, Edward Shapiro,

01:37:10  14  who is at Much Shelist.  Do you see that?

01:37:15  15  A.  Yes, I do.

01:37:16  16  Q.  Did you ever see this e-mail until after (sic) discovery?

01:37:19  17  A.  No.  The first time I saw it was when Mr. Blumenthal

01:37:22  18  produced it in discovery.

01:37:23  19  Q.  Did you ever meet or talk with Ed Shapiro?

01:37:25  20  A.  No, I never did.

01:37:27  21  Q.  Do you know who he is?

01:37:28  22  A.  Yes, I do.

01:37:30  23  Q.  How do you know who he is?

01:37:30  24  A.  I looked him up on the Much Shelist website.

01:37:35  25  Q.  And what is his position at Much Shelist?

01:37:38    1   A.  He is the chair of their litigation and dispute practice

01:37:41    2   group.

01:37:42    3   Q.  And is he a person that you know from looking at the

01:37:44    4   evidence in this case that Mr. Blumenthal has consulted?

01:37:48    5          MR. McJESSY:  Objection.  Foundation.

01:37:49    6          THE COURT:  Sustained.

01:37:50    7   BY MR. McGARRY:

01:37:54    8   Q.  Would you please look at your September 2, 2010, e-mail to

01:37:57    9   Mr. Shah in Exhibits 199 and 200.

01:38:13   10          What was going on -- what, if anything, was going on

01:38:15   11   September 2nd that caused you to e-mail Mr. Shah?

01:38:18   12   A.  You're asking me 199?

01:38:21   13   Q.  199.

01:38:25   14   A.  Once I learned this news on August 30 --

01:38:28   15   Q.  What news?  Be clear.

01:38:30   16   A.  The news that Clark had purportedly sold the server, I got

01:38:37   17   in contact with Tina Jacobs of Associated Bank.  Now, how did

01:38:41   18   I know Tina Jacobs?  She was in the e-mail trail of the e-mail

01:38:46   19   that Mr. Shah had forwarded to Eric on August 25.  So that's

01:38:50   20   how I knew how to try and e-mail her.

01:38:54   21          And so I e-mailed her to try and find out what she

01:38:58   22   knew of what happened here.

01:38:59   23   Q.  So on September 2nd, you wrote Mehul, Please see the

01:39:03   24   e-mail trail between Ms. Jacobs and myself and advise your

01:39:07   25   knowledge of the assignment.

01:39:08  1  A.  Yes, this assignment.

01:39:10  2  Q.  Did Mr. Shah respond to you regarding his knowledge of the

01:39:13  3  assignment?

01:39:13  4  A.  Yes, he did.

01:39:14  5  Q.  When did he respond?

01:39:15  6  A.  He responded to me that day.

01:39:16  7  Q.  And would that be in SH 200?

01:39:20  8  A.  It would be.

01:39:20  9  Q.  All right.  Could you direct the court to his response?

01:39:26  10  A.  Yes.  He says, Alan, only time we came to know of this

01:39:30  11  assignment is when we received the e-mail from Dave Clark on

01:39:35  12  August 30, 10 -- I assume that meant 2010 -- which was

01:39:40  13  forwarded to you, Mehul, sent from my iPhone.

01:39:45  14  Q.  Now, please take a look at Exhibits 143 and 144, if you

01:39:52  15  will, please.

01:39:53  16         THE COURT:  One more time.  I'm sorry.

01:39:55  17         MR. McGARRY:  143, 144.

01:39:57  18         THE COURT:  Thank you.

01:39:57  19  BY MR. McGARRY:

01:40:07  20  Q.  Now, the statement that Mr. Shah made to you that the

01:40:09  21  first time he learned was from Dave Clark on August 30, is

01:40:15  22  that statement true or false?

01:40:16  23  A.  That was false.

01:40:17  24  Q.  And how do you know, sir?

01:40:19  25  A.  Looking at Exhibits 143 and 144, Mr. Shah was advised by

01:40:24  1   Mr. Clark of the assignment on July 15, 2010, in two separate
01:40:30  2   e-mails.
01:40:30  3   Q.  All right.  Take them one at a time and just orient the
01:40:35  4   judge to what you're referring to, please.
01:40:37  5   A.  Okay.  The first e-mail is SH 143 at 10:22 a.m.  Mr. Clark
01:40:45  6   writes to Shah, Mehul, the final terms on the assignment have
01:40:50  7   been worked out.  I should see the marked-up assignment today.
01:40:54  8   I just told the attorney that he can tell Associated we will
01:40:59  9   close early next week.  I will need you to sign a note or
01:41:02  10  something before I can disburse the funds.
01:41:04  11  Q.  That's 143, sir?
01:41:06  12  A.  It is.
01:41:07  13  Q.  144, what's the situation with that?
01:41:09  14  A.  This is Clark's next e-mail at 10:58 a.m.  Mehul, this is
01:41:14  15  the assignment, and it has been sent to Associated for final
01:41:19  16  approval.  When the lease is assigned, the guaranties come
01:41:23  17  with.
01:41:24  18  Q.  Do you feel that Mr. Shah misled you, sir?
01:41:28  19  A.  I do.
01:41:32  20       MR. McJESSY:  Withdrawn.
01:41:35  21  BY MR. McGARRY:
01:41:35  22  Q.  Now, take a look at, if you will, SH 205, sir.  This is
01:41:43  23  your September 7, 2010, e-mail to Mr. Shah.
01:41:47  24  A.  Yes.
01:41:47  25  Q.  Did you have a phone call with Mr. Shah prior to that?

01:41:50  1   A.  I did.

01:41:50  2   Q.  And what is the Exhibit 205?

01:41:54  3   A.  It's an e-mail that confirmed my telephone call.  I asked

01:41:59  4   him whether he had any other e-mails with Dave Clark about

01:42:03  5   this other than the August 25 e-mail thread that he had

01:42:08  6   forwarded on August 25.  And he said no.

01:42:12  7   Q.  Why -- go ahead.

01:42:14  8   A.  So then I e-mailed to confirm that, and I believe I added

01:42:17  9   -- I'm not sure that I mention anybody else, but I added, you

01:42:21  10  know, I'd like you to do the search anyway even though you

01:42:24  11  think that you don't.  Do a search, and also look for anybody

01:42:28  12  else involved:  Serritella, First Midwest Bank, Associated

01:42:33  13  Bank, or anyone else concerning the warehouse server.

01:42:36  14  Q.  And why did you send that e-mail, sir?

01:42:40  15  A.  I was trying to find out what happened here.

01:42:42  16  Q.  Did Mr. Shah respond to you?

01:42:46  17  A.  No, he did not.

01:42:47  18  Q.  And what have you found out since?

01:42:54  19          MS. DEDINAS:  Your Honor, I object.  This is well

01:42:57  20  beyond the scope of the issues that came up with

01:43:01  21  Mr. Blumenthal, and counsel has already had an opportunity to

01:43:04  22  put Mr. Borlack on in his case in chief.

01:43:07  23          THE COURT:  Sustained.

01:43:08  24          MR. McGARRY:  Your Honor, I didn't call him in my

01:43:10  25  case.  I only did cross, as I stated, cross regarding the

01:43:18   1   examination by counsel.

01:43:20   2         THE COURT:  Hang on a second.  What do you have to

01:43:26   3   say?

01:43:27   4         MR. McJESSY:  Well, Judge, I was going to make the

01:43:29   5   same point, that we had agreed with the court that we would

01:43:31   6   present crosses and direct at the time that the witness

01:43:35   7   testifies.  As the Court remembers, I had asked to present

01:43:38   8   Mr. Shah separately as well, but the Court indicated that

01:43:40   9   based on the prior ruling at the commencement of this hearing,

01:43:43   10   that wasn't going to be the case.

01:43:44   11         THE COURT:  Hang on one second.

01:43:46   12         MR. McJESSY:  Sure.

01:43:48   13     (Brief pause.)

01:44:08   14         THE COURT:  I did just review this this morning, as a

01:44:10   15   matter of fact.

01:44:30   16         Mr. McGarry, I'll hear from you first, and then I

01:44:34   17   will hear from you, Mr. McJessy.

01:44:35   18         MR. McGARRY:  I believe, Judge, that I did not make

01:44:37   19   an election to finish my client.  I believe I reserved the

01:44:41   20   right to call him, that's my belief, in my case in chief.

01:44:47   21   That's why I asked the Court if the plaintiff had rested.

01:44:49   22         THE COURT:  Well, I thought you asked the Court if he

01:44:52   23   had rested so you could put on a rebuttal.

01:44:58   24         MR. McGARRY:  Well, you know what, Judge?  I am so

01:45:01   25   much at the end of my outline here, I don't want to make a big

01:45:04    1   fuss of this.  I can withdraw that question.

01:45:06    2           THE COURT:  Okay.

01:45:06    3           MR. McGARRY:  I will be happy to do that just for the

01:45:09    4   sake of moving along.

01:45:10    5           THE COURT:  And then will you withdraw your

01:45:14    6   objection?

01:45:15    7           MR. McJESSY:  Yes.

01:45:15    8           THE COURT:  Okay.

01:45:17    9           MR. McJESSY:  Nothing to object to if the question is

01:45:22   10   withdrawn.

01:45:23   11   BY MR. McGARRY:

01:45:27   12   Q.  Did you have any idea that Mr. Blumenthal was involved in

01:45:32   13   giving advice or counseling Mr. Shah or his companies with

01:45:36   14   respect to their negotiations to repurchase their own server?

01:45:40   15   A.  No, I did not.

01:45:41   16   Q.  Did anyone ever -- anyone ever suggest to you that you

01:45:52   17   needed a court order or subpoena in order to get access to the

01:45:55   18   warehouse server?

01:45:56   19   A.  No.

01:45:56   20   Q.  Do you feel that you and your firm acted in good faith in

01:46:02   21   preserving ESI in this case?

01:46:03   22   A.  Yes.

01:46:05   23           MR. McGARRY:  I have nothing further, Judge.

01:46:06   24           THE COURT:  Thank you very much.

01:46:09   25           Any questions?

| | | |
|---|---|---|
| 01:46:26 | 1 | - - - |
| 01:46:26 | 2 | ALAN BORLACK, CROSS-EXAMINATION |
| 01:46:26 | 3 | BY MR. McJESSY: |
| 01:46:27 | 4 | Q.  Mr. Borlack, I would like to pick up sort of where you |
| 01:46:31 | 5 | were at the end there.  Do you recall the August 9th e-mail |
| 01:46:34 | 6 | that's dated -- or that's Exhibit SH 200 -- I'm sorry, it's |
| 01:46:41 | 7 | the September 2nd e-mail that your counsel had asked you |
| 01:46:44 | 8 | about. |
| 01:46:44 | 9 | A.  Can you give me the exhibit number? |
| 01:46:46 | 10 | Q.  SH 200. |
| 01:46:50 | 11 | A.  Yeah. |
| 01:46:50 | 12 | Q.  Now, your counsel had asked you questions about whether |
| 01:46:55 | 13 | this was the first time that you had learned about the |
| 01:46:59 | 14 | negotiations over the sale of the server; is that right? |
| 01:47:02 | 15 | A.  No, that's not right. |
| 01:47:03 | 16 | Q.  All right.  What was it your understanding that this |
| 01:47:05 | 17 | e-mail was advising you? |
| 01:47:06 | 18 | A.  From Ms. Jacobs? |
| 01:47:09 | 19 | Q.  Yes. |
| 01:47:10 | 20 | A.  Ms. Jacobs was advising me that the assignment of the |
| 01:47:14 | 21 | lease to First Midwest Bank was dated July 15, 2010. |
| 01:47:19 | 22 | Q.  Okay.  The e-mail at the top is from Mehul Shah to you? |
| 01:47:23 | 23 | A.  It is. |
| 01:47:23 | 24 | Q.  And it says, The only time we came to know of this |
| 01:47:27 | 25 | assignment is when we received the e-mail from Dave Clark on |

01:47:30　1　August 30th, 10 -- that's a typo -- which was forwarded to

01:47:34　2　you.

01:47:42　3　　　　When did you -- is this when you first learned of the

01:47:45　4　assignment?

01:47:46　5　A.  Yes, I believe so.

01:47:52　6　Q.  Now, you mentioned that you had felt that Mr. Shah --

01:47:57　7　A.  No, actually, the August -- I mean, there had to be from

01:48:01　8　the August 30 e-mail from Clark, I guess that had to be

01:48:07　9　assumed that First Midwest Bank had got it.

01:48:09　10　Q.  So you believe you learned about the assignment at least

01:48:11　11　as of August 30th; is that right?

01:48:14　12　A.  It certainly was implied, yeah.

01:48:15　13　Q.  Okay.  And then counsel asked you if you felt you had been

01:48:19　14　deceived because you believed that Mr. Shah had learned of the

01:48:21　15　assignment prior to that in July of 2010; is that right?

01:48:25　16　A.  That's right.

01:48:25　17　Q.  Okay.  And in support of that, you referred to two e-mails

01:48:30　18　which are Exhibits 143 and 144.

01:48:35　19　A.  Yeah.

01:48:35　20　Q.  Do you recall those e-mails?

01:48:36　21　A.  I will in a second.

01:48:43　22　　　　Yeah.

01:48:44　23　Q.  Now, you attended Mr. Clark's deposition; is that right?

01:48:50　24　A.  Yes.

01:48:50　25　　　　THE COURT:  Which one?

01:48:51  1  BY MR. McJESSY:

01:48:52  2  Q.  You attended both of Mr. Clark's depositions?

01:48:54  3  A.  I did.

01:48:55  4  Q.  And do you recall him testifying that you believe Mr. Shah

01:48:59  5  hadn't -- strike that.

01:48:59  6       Do you recall him testifying that he believed

01:49:02  7  Mr. Shah had not received either of these e-mails?

01:49:06  8       MR. McGARRY:  Objection to Mr. Clark's conclusions.

01:49:08  9       THE WITNESS:  No, that's not correct.

01:49:10  10       THE COURT:  Sustained.  Sustained.

01:49:11  11       THE WITNESS:  Sorry.

01:49:12  12  BY MR. McJESSY:

01:49:13  13  Q.  Do you know whether Mr. Shah did receive either of these

01:49:16  14  two e-mails?

01:49:17  15  A.  I believe he did.

01:49:18  16  Q.  Why do you believe that?

01:49:18  17  A.  There was never -- the e-mails are from -- from Clark to

01:49:24  18  him, and I believe Mr. Shah testified at his deposition he

01:49:28  19  received them.

01:49:29  20  Q.  You don't recall Mr. Shah, in fact, testifying he did not

01:49:31  21  receive these e-mails?

01:49:32  22  A.  No, you're thinking of the July 22, July 23 e-mails from

01:49:36  23  Clark to Shah, not these.

01:49:39  24  Q.  You don't recall that -- you recall the testimony

01:49:42  25  differently; is that right?

01:49:43   1   A.  I recall what I just said I recalled.

01:49:46   2   Q.  And do you recall that these e-mails that were an effort

01:49:50   3   by Mr. Clark -- strike that.

01:49:53   4        Do you remember that these e-mails -- it doesn't

01:49:55   5   show -- strike that.

01:49:56   6        It doesn't show an e-mail address on either of these

01:49:59   7   e-mails; is that correct?

01:50:01   8   A.  We are looking at 143 and 144, right?

01:50:04   9   Q.  Correct.

01:50:05   10  A.  That's true.  That's the way Dave Clark produced them.

01:50:07   11  Q.  All right.  And do you recall that these e-mails were sent

01:50:11   12  to a different -- not to a Kanan e-mail account but to a

01:50:15   13  personal e-mail account?

01:50:16   14  A.  No, that -- what you're thinking of, the July 22 and

01:50:20   15  July 23 e-mails from Clark to Shah, not this.

01:50:23   16  Q.  Now, sir, at the commencement of your testimony, you

01:50:45   17  testified about a number of e-mails that you received; is that

01:50:49   18  right?  Do you recall the testimony of having received 169

01:50:52   19  e-mails?

01:50:53   20  A.  From Blumenthal.

01:50:55   21  Q.  Correct.

01:50:55   22        What e-mail program do you use?

01:50:58   23  A.  Eudora.

01:51:01   24  Q.  You don't use Outlook?

01:51:04   25  A.  No, I don't think we do.  Eric would know better than I.

01:51:08  1   I have to say I'm not very conversant with this, but I know we

01:51:13  2   used Eudora.

01:51:14  3   Q.  And it's your testimony that it has some search feature

01:51:18  4   that you can search by typing in the name of the person from

01:51:23  5   whom you received e-mails?

01:51:24  6   A.  Exactly, search.

01:51:25  7   Q.  And it will --

01:51:26  8   A.  From.

01:51:26  9   Q.  It will bring up a number of e-mails that that person sent

01:51:30  10  to you?

01:51:30  11  A.  It will bring up all the e-mails that that person sent to

01:51:33  12  you, at least for the period of time covered by the -- you

01:51:38  13  know, the computer.

01:51:38  14  Q.  Okay.  What time period did you search for?

01:51:44  15  A.  We didn't put in a time search.  I think the first e-mail

01:51:48  16  from Blumenthal was June 19 in which he advised that he would

01:51:51  17  be available to seek --

01:51:52  18  Q.  I just asked the time period.

01:51:54  19  A.  June 19 to September 24.

01:51:56  20  Q.  All right.  And -- June 19th through September 24th.

01:52:01  21  A.  Right.

01:52:02  22  Q.  So June 19th of what year, sir?

01:52:06  23  A.  I'm sorry, did I say June?  I meant January, I apologize.

01:52:12  24  January 19 of 2010 to September 24.

01:52:14  25  Q.  Do you know how many e-mails you received from

01:52:17  1  Mr. Blumenthal from January 19th to, say, April 23rd of 2010?

01:52:25  2  A.  No, I don't.

01:52:28  3  Q.  You didn't look at that?

01:52:29  4  A.  No --

01:52:31  5          THE COURT:  If he didn't look at it, what difference

01:52:34  6  does it make?

01:52:36  7  BY MR. McJESSY:

01:52:37  8  Q.  Are you aware that the defendants requested copies of your

01:52:39  9  e-mail communications in this matter?

01:52:43  10  A.  I know there was some correspondence you had with my

01:52:49  11  counsel on that.

01:52:50  12  Q.  And are you aware that your counsel on your behalf refused

01:52:55  13  to produce any of those e-mails?

01:52:57  14  A.  Yes.  It was just about a week before trial.

01:53:02  15          THE COURT:  No.

01:53:03  16          THE WITNESS:  Sorry.

01:53:03  17  BY MR. McJESSY:

01:53:04  18  Q.  When you do the searches on your e-mail account as you

01:53:09  19  described them on this Eudora system, does it actually bring

01:53:13  20  up the e-mails that are responsive to your inquiry?

01:53:18  21  A.  Sure, there's -- it's a list.  It's a list.  And at the

01:53:23  22  bottom of the list, it says the total number.

01:53:25  23  Q.  All right.  So to find the e-mails responsive from

01:53:29  24  Mr. Blumenthal or from Mr. Shah or Mr. Joshi, all you have to

01:53:33  25  do is type in your name and it immediately brings up a full

01:53:36    1   list of the e-mails from those individuals?

01:53:38    2   A.  Type in their name, yes.

01:53:40    3   Q.  Strike that.  Type in their name and it immediately brings

01:53:43    4   up a list of the e-mails?

01:53:43    5   A.  That's right, yeah.

01:53:44    6   Q.  And then if you wanted to, you could simply print them

01:53:48    7   out; is that right?

01:53:50    8   A.  I could.

01:53:51    9   Q.  Is there a reason you didn't make those e-mails available

01:53:53   10   to the defendants in this matter?

01:53:54   11   A.  You'd have to speak with my counsel.

01:53:57   12   Q.  Now, sir, I have reviewed the response as you testified

01:54:02   13   you did from -- well, strike that.

01:54:05   14          Did you review the response from Mr. Blumenthal to

01:54:13   15   the subpoena that was issued in this matter?

01:54:15   16   A.  The response, you mean the documents?

01:54:18   17   Q.  Correct.

01:54:18   18   A.  He produced, if I recall, almost 1500 documents, and I

01:54:22   19   tried to go through as many as I could.  I think I went

01:54:25   20   through them all.  There were quite a few.  He was far more

01:54:29   21   than anybody else.

01:54:30   22   Q.  And I don't recall seeing as many as 169 e-mails from

01:54:34   23   Mr. Blumenthal in that production.

01:54:36   24   A.  His production was limited to certain subject matters in

01:54:39   25   which he often went well beyond.

| | | |
|---|---|---|
| 01:54:41 | 1 | Q.  So you believe you may have received e-mails from him on |
| 01:54:44 | 2 | subject matters other than what were requested by the |
| 01:54:47 | 3 | subpoena? |
| 01:54:47 | 4 | A.  I'm confused by your question. |
| 01:54:49 | 5 | Q.  Well -- |
| 01:54:50 | 6 | A.  Oh, yes, I'm sure -- did he not -- no, by no means did he |
| 01:54:54 | 7 | produce all the e-mails between he and I. |
| 01:54:58 | 8 | Q.  Sir, if you could turn to Exhibit 6, which your counsel |
| 01:55:05 | 9 | had asked you about. |
| 01:55:22 | 10 | A.  Yes. |
| 01:55:22 | 11 | Q.  In that e-mail, what are you asking Mr. Blumenthal to do? |
| 01:55:28 | 12 | And I'm referring specifically -- |
| 01:55:31 | 13 | A.  I am not asking Blumenthal himself to do anything. |
| 01:55:33 | 14 | Q.  All right. |
| 01:55:37 | 15 | A.  I am advising him. |
| 01:55:38 | 16 | Q.  So you're not looking for any response from him in that |
| 01:55:42 | 17 | e-mail; is that right? |
| 01:55:43 | 18 | A.  That's correct.  I would not have expected one. |
| 01:55:46 | 19 | Q.  And what are you advising him? |
| 01:55:48 | 20 | A.  I'm advising him of the duty of his clients to preserve |
| 01:55:53 | 21 | ESI. |
| 01:55:53 | 22 | Q.  Okay.  And where does it say that? |
| 01:55:56 | 23 | A.  It says, By the way, Mehul and Paresh, this goes without |
| 01:56:02 | 24 | saying, but it is important as a matter of litigation rules |
| 01:56:05 | 25 | and procedure that no e-mails related to UCB Mutual Bank or |

01:56:10　1　the controversy be deleted from any computers.  This applies

01:56:15　2　not only to e-mails in particular but any kind of data in any

01:56:20　3　format.

01:56:20　4　Q.  All right.  And you're doing that because it's your job as

01:56:23　5　the defendants' attorney to handle ESI matters; is that right?

01:56:27　6　A.  At that time, yes --

01:56:28　7　Q.  Okay.

01:56:29　8　A.  -- because Eric and Dave weren't yet in the case.  The

01:56:33　9　case is only a few days old.

01:56:34　10　Q.  All right.  And then when they did become involved, it

01:56:38　11　became your obligation and their obligation to handle the ESI

01:56:41　12　matters in this lawsuit; is that right?

01:56:43　13　A.  Well, of course, yes.

01:56:44　14　Q.  And you're not telling Mr. -- you're not assigning to

01:56:48　15　Mr. Blumenthal the task of handling ESI matters, you're just

01:56:54　16　advising him that nothing should be deleted or destroyed?

01:57:00　17　A.  That's right.  Same thing with Mr. Schreiber.  Same thing.

01:57:02　18　Q.  If you could turn to Exhibit 17.

01:57:10　19　　　　　In Exhibit 17, did you ask Mr. Blumenthal to do

01:57:12　20　anything?

01:57:13　21　A.  No, I did not.

01:57:14　22　Q.  What did you tell him to do?

01:57:15　23　A.  I just advised him, this is the order, this is what we've

01:57:19　24　agreed to, that's all just, you know -- this is what we have

01:57:24　25　agreed to.  This is what is a filed document or will be a

01:57:30  1  filed document in court.

01:57:31  2  Q.  Okay.

01:57:32  3  A.  No more than advice.

01:57:33  4  Q.  Does it say anything about this will be a document filed

01:57:37  5  in court?

01:57:37  6  A.  The first one says, Attachments, ESI agreement, 2/18/10,

01:57:46  7  please see Dave's red-lined revised ESI agreement sent to

01:57:49  8  Dedinas.

01:57:50  9           THE COURT:  I guess the answer is no.

01:57:52 10  BY MR. McJESSY:

01:57:53 11  Q.  That doesn't say anything about being filed in court; is

01:57:53 12  that right?

01:57:56 13  A.  I think it's implied.

01:57:57 14  Q.  You think it's implied?

01:57:58 15  A.  Yeah.  It doesn't say it will be filed, but it says ESI

01:58:02 16  agreement.

01:58:03 17           I guess it doesn't say being filed in court, that's

01:58:05 18  true.

01:58:06 19  Q.  In fact, you're just basically forwarding him the

01:58:11 20  document?

01:58:11 21  A.  May I correct that?

01:58:12 22  Q.  Yes.

01:58:13 23  A.  The agreement has the caption on it.  Doesn't that

01:58:19 24  indicate -- and, in fact --

01:58:21 25  Q.  Sir, my question was:  Did you tell him in your e-mail

01:58:24   1   that this would be filed in court?

01:58:26   2   A.  Not in my e-mail, per se.

01:58:28   3   Q.  Okay.  And if you could turn to Exhibit 19.

01:58:37   4   A.  Yes.

01:58:38   5   Q.  Now, this is your e-mail, it does tell him that the

01:58:41   6   agreement has been filed in court; is that right?

01:58:43   7   A.  That's right.

01:58:43   8   Q.  Okay.  Do you ask him to do anything with the agreement?

01:58:46   9   A.  No, I don't.

01:58:47   10  Q.  All right.  Do you ask him to take any action in response

01:58:54   11  to the agreement?

01:58:54   12  A.  No, I don't.

01:58:55   13  Q.  Do you give him any instructions as to what the agreement

01:58:58   14  means?

01:58:58   15  A.  No.

01:58:59   16  Q.  If you would turn to Exhibit 20.  Now, in this e-mail,

01:59:15   17  this also forwards a copy of the agreement; is that right?

01:59:27   18  A.  Yes, it does.

01:59:27   19  Q.  Okay.  And in this e-mail, do you provide any instructions

01:59:31   20  to any of the parties as to what the agreement means?

01:59:34   21  A.  No, I don't.

01:59:35   22  Q.  Do you ask them to take any action in response to the

01:59:37   23  agreement?

01:59:38   24  A.  No.

01:59:38   25  Q.  You're just forwarding the agreement to them; is that

| | | |
|---|---|---|
| 01:59:41 | 1 | right? |
| 01:59:41 | 2 | A.  Yeah, read it. |
| 01:59:42 | 3 | Q.  Do you tell them -- |
| 01:59:46 | 4 | A.  Be advised. |
| 01:59:47 | 5 | Q.  Does this e-mail say, read the agreement? |
| 01:59:49 | 6 | A.  Of course not, it doesn't say that. |
| 01:59:51 | 7 | Q.  Now, you mentioned that -- your first meeting with |
| 02:00:05 | 8 | Mr. Blumenthal, did that occur at the time that Mr. Glickman |
| 02:00:10 | 9 | and Mr. Flesch were hired? |
| 02:00:12 | 10 | A.  Yes. |
| 02:00:12 | 11 | Q.  And do you recall that they were hired, in fact, in May? |
| 02:00:15 | 12 | A.  That sounds about right.  I mean, I can't be sure without |
| 02:00:20 | 13 | seeing, but it sounds about right, yeah. |
| 02:00:23 | 14 | Q.  So then you would have met with Mr. Blumenthal the first |
| 02:00:25 | 15 | time in May; is that right? |
| 02:00:26 | 16 | A.  No, that's not correct. |
| 02:00:28 | 17 | Q.  I'm sorry.  You met with Mr. Blumenthal when Mr. Glickman |
| 02:00:32 | 18 | and Mr. Flesch were hired; is that right? |
| 02:00:34 | 19 | A.  No, that's not correct. |
| 02:00:35 | 20 | Q.  When did you first -- |
| 02:00:37 | 21 | A.  We met with him on June 11 -- |
| 02:00:38 | 22 | MR. McGARRY:  Your Honor, I'm sorry.  The question |
| 02:00:41 | 23 | isn't completed. |
| 02:00:42 | 24 | THE COURT:  Let him finish. |
| 02:00:44 | 25 | THE WITNESS:  Okay. |

928

| | | |
|---|---|---|
| 02:00:50 | 1 | THE COURT:  Do you want it read back? |
| 02:00:53 | 2 | MR. McJESSY:  I would actually like to go back two |
| 02:00:55 | 3 | questions and have it read back, if you would. |
| 02:00:55 | 4 | THE COURT:  Sure. |
| 02:00:56 | 5 | (Record read.) |
| 02:01:36 | 6 | THE WITNESS:  I meant by that at or about.  I didn't |
| 02:01:39 | 7 | mean at the same time.  It was in the same kind of time frame, |
| 02:01:42 | 8 | not that it happened at the same time.  At or about, you know, |
| 02:01:46 | 9 | around that time. |
| 02:01:48 | 10 | BY MR. McJESSY: |
| 02:02:04 | 11 | Q.  Your counsel asked you some questions about having |
| 02:02:07 | 12 | received Mr. Serritella's May 24th, 2010, letter.  Do you |
| 02:02:13 | 13 | recall those questions? |
| 02:02:13 | 14 | A.  I think I do. |
| 02:02:15 | 15 | Q.  Okay.  And you did receive that letter and you did read |
| 02:02:24 | 16 | it; is that right? |
| 02:02:26 | 17 | A.  Yes. |
| 02:02:26 | 18 | MR. McGARRY:  Your Honor, may I have an exhibit |
| 02:02:28 | 19 | attached to that or reference? |
| 02:02:32 | 20 | MR. McJESSY:  I'm not going to ask him questions |
| 02:02:42 | 21 | about the letter. |
| 02:02:46 | 22 | THE COURT:  Wait a second.  It was a May 24th letter? |
| 02:02:50 | 23 | MS. DEDINAS:  March. |
| 02:02:51 | 24 | THE COURT:  March 24th. |
| 02:02:55 | 25 | MS. DEDINAS:  59. |

02:02:56  1     MR. McJESSY:  Exhibit 59.

02:03:02  2  BY MR. McJESSY:

02:03:13  3  Q.  You received that letter, sir, that's been marked as

02:03:16  4  Exhibit 59?

02:03:17  5  A.  I received it from Steve Blumenthal without any

02:03:20  6  attachment.

02:03:20  7  Q.  All right.  And you read it when you received it?

02:03:22  8  A.  At or about the time.

02:03:24  9  Q.  Okay.  Now, you recall giving your prior testimony that

02:03:33 10  you were aware of the e-mail that had been sent to Mr. Shah

02:03:36 11  and Mr. Joshi on March 3rd of 2010 advising them that nothing

02:03:44 12  should be done with or to any of the computers, servers, or

02:03:48 13  related equipment, and it also said that you are not to take

02:03:51 14  any action.  Do you remember that?

02:03:53 15  A.  May I see the document?

02:03:56 16  Q.  Sure.  It's Exhibit 31.

02:03:58 17     MR. McGARRY:  Your Honor, I want to state an

02:04:00 18  objection because now he's cutting back into his prior

02:04:03 19  testimony.  That was the predicate of the question.

02:04:05 20     MR. McJESSY:  Judge, this is addressing one of the

02:04:08 21  issues he presented.

02:04:09 22     THE COURT:  And I think it is too, and I am going to

02:04:12 23  let him ask that question.

02:04:14 24     THE WITNESS:  Yes.  I see it.  I don't know if you

02:04:18 25  read everything in there, but you read some of it.

02:04:21  1  BY MR. McJESSY:

02:04:22  2  Q.  Correct.

02:04:22  3        Do you remember receiving -- you remember that

02:04:24  4  e-mail?

02:04:24  5  A.  I remember David Muschler sending the e-mail, and I got a

02:04:32  6  copy.

02:04:32  7  Q.  Now, counsel had asked you some questions, and you said

02:04:34  8  that you didn't think the foreclosure had anything to do with

02:04:37  9  ESI.  Do you remember?

02:04:38  10  A.  As it was explained to me.

02:04:39  11  Q.  Okay.

02:04:41  12  A.  In February.

02:04:41  13  Q.  All right.  You knew that the server included ESI; is that

02:04:41  14  right?

02:04:48  15  A.  Yeah, I was eventually made aware of that.

02:04:51  16  Q.  And you knew as of February 26th that the server was in

02:04:58  17  the warehouse; is that right?

02:04:59  18  A.  No.  You know something?  I said this before.  I'm not

02:05:02  19  sure I knew that, because the Butterfield Road -- it was

02:05:09  20  always given an address, and I'm not sure that I ever

02:05:12  21  connected, at least at that time, the warehouse with that

02:05:14  22  address.  I can't say I was.

02:05:15  23  Q.  All right.  Did you bother to ask whether there was a

02:05:23  24  server in the warehouse?

02:05:25  25  A.  No, I didn't.

02:05:26   1   Q.  Why not?

02:05:27   2   A.  I wasn't handling the ESI.  David Muschler was handling

02:05:34   3   the ESI.  It never even occurred to me.

02:05:37   4   Q.  Just so I'm clear then, sir, as of February -- or, I'm

02:06:01   5   sorry, as of March 24th when you received the letter from

02:06:08   6   Mr. Serritella to Mr. Domanskis advising that Kanan and

02:06:14   7   Creative Warehousing had been evicted from the warehouse, at

02:06:19   8   that time, did you not know there was a server at the

02:06:22   9   warehouse?

02:06:22  10   A.  That's correct.

02:06:23  11   Q.  Now, you mentioned after the closing had occurred, you

02:06:42  12   received the closing book; is that right?

02:06:44  13   A.  Yeah.

02:06:44  14   Q.  Okay.  And did you read it?

02:06:46  15   A.  No, I didn't.

02:06:46  16   Q.  Was it sent to you by e-mail, or was it a tangible copy?

02:06:56  17   A.  It was e-mailed.

02:06:56  18   Q.  Why didn't you read it?

02:07:00  19   A.  I didn't think it had anything that I needed to look at.

02:07:04  20   Blumenthal was handling this.  There wasn't any reason why I

02:07:07  21   should go through I think about eight, you know, dense legal

02:07:12  22   agreements.  It just didn't seem to me that there was anything

02:07:15  23   for me to be concerned about.

02:07:17  24   Q.  Without --

02:07:18  25   A.  Other than maybe the assignment.  The assignment was in

02:07:20  1  there.

02:07:21  2  Q.  Without looking at that, how would you know that?

02:07:23  3  A.  Well, I guess I wouldn't know that unless I did, but I --

02:07:27  4  you know, there was nothing there that said to me that I

02:07:30  5  should look at anything.

02:07:31  6      It came from Mehul Shah, not from Blumenthal, as I

02:07:34  7  recall.

02:07:34  8  Q.  So you received it and nobody told you to look at it so

02:07:39  9  you didn't?

02:07:39  10  A.  I didn't think -- not only did nobody tell me not (sic) to

02:07:43  11  look at it, I didn't think there was any reason for me to

02:07:45  12  spend time on it.

02:07:46  13  Q.  Did you ask Mr. Blumenthal if there might be information

02:07:53  14  there that you should be aware of?

02:07:56  15  A.  No.

02:07:57  16  Q.  Why not?

02:07:57  17  A.  Because he never told me there's information I should be

02:08:00  18  aware of.  He's handling the matter.  Presumably, he'll tell

02:08:04  19  me.

02:08:04  20  Q.  Presumably, if it's important, he'll tell you; is that

02:08:09  21  your response?

02:08:10  22  A.  That's right.  That's what I relied on, exactly, that he

02:08:14  23  would tell me.

02:08:15  24  Q.  Now, you testified that you were concerned about the

02:08:42  25  inventory that was in the warehouse; is that right?  That was

| | | |
|---|---|---|
| 02:08:47 | 1 | an issue that was of concern to you? |
| 02:08:49 | 2 | A.  That was an issue that -- yes, that I dealt with, yes. |
| 02:08:52 | 3 | Q.  Thank you.  You were dealing. |
| 02:08:55 | 4 | When you were the -- when you were dealing with the |
| 02:08:58 | 5 | inventory, did you bother to ask about whether there were any |
| 02:09:04 | 6 | computers or servers in the warehouse? |
| 02:09:07 | 7 | A.  No. |
| 02:09:07 | 8 | Q.  But the server and computers and other ESI was at least as |
| 02:09:14 | 9 | important to you as the inventory; isn't that right? |
| 02:09:16 | 10 | A.  No, actually, Dave Muschler and Eric Grossman were |
| 02:09:22 | 11 | handling ESI.  I had enough to do.  I mean, that was not where |
| 02:09:25 | 12 | I was focused.  I couldn't do everything. |
| 02:09:29 | 13 | Q.  So at that time as to you, that wasn't that important |
| 02:09:41 | 14 | because you believed somebody else was handling it? |
| 02:09:47 | 15 | A.  I wasn't thinking about it.  It wasn't an issue of |
| 02:09:50 | 16 | importance.  I wasn't thinking about it.  That there were |
| 02:09:52 | 17 | computers left behind never even occurred to me. |
| 02:09:54 | 18 | Q.  Now, you knew sometime around April 23rd that the |
| 02:10:00 | 19 | computers were in the warehouse; is that right? |
| 02:10:02 | 20 | A.  Yeah, eventually -- that's -- sometime after April 23rd, I |
| 02:10:05 | 21 | was informed. |
| 02:10:06 | 22 | Q.  But close to April 23rd; is that right? |
| 02:10:08 | 23 | A.  Yeah, I would think so.  I would think so. |
| 02:10:10 | 24 | Q.  So at that time, you knew that the warehouse belonged to |
| 02:10:16 | 25 | First Midwest Bank; is that right? |

02:10:18　　1　A.　I knew of that beforehand.

02:10:20　　2　Q.　And at that time, you knew that Kanan/Creative Warehousing

02:10:28　　3　had been evicted from the warehouse; is that right?

02:10:30　　4　A.　Yes.

02:10:30　　5　Q.　And your firm followed up with defendants about the server

02:10:35　　6　after April 23rd; is that right?

02:10:37　　7　A.　Yes.　That's correct.

02:10:38　　8　Q.　And the defendant -- in fact, your firm followed up with

02:10:43　　9　e-mails in May, June, and July; is that right?

02:10:50　 10　A.　April too.

02:10:52　 11　　　　　MR. McGARRY:　Your Honor, this is beyond the scope of

02:10:53　 12　my examination.　Objection.

02:10:56　 13　　　　　THE COURT:　Overruled.

02:11:09　 14　BY MR. McJESSY:

02:11:10　 15　Q.　And during that period of time, you were told, meaning

02:11:11　 16　your firm -- well, strike that.

02:11:12　 17　　　　　During that time, Mr. Joshi had responded that we're

02:11:15　 18　working on it.　Do you know that or do you not know that?

02:11:17　 19　A.　I recall that from his e-mails.　I recall seeing that.

02:11:22　 20　Q.　And did you receive those e-mails around the time you sent

02:11:24　 21　them?

02:11:24　 22　A.　I assume so.　I mean, along with many other e-mails.

02:11:26　 23　Q.　So your counsel had asked you about e-mails in August that

02:11:33　 24　you had received and learning that the server was being

02:11:40　 25　negotiated for.　Do you recall those questions?

02:11:43   1   A.  Right.  Right.

02:11:44   2   Q.  But at least prior to August -- in fact, in April, May,

02:11:49   3   June, and July -- you did know the server was at the

02:11:54   4   warehouse?

02:11:54   5   A.  Yes.

02:11:55   6   Q.  And you did know that the defendants did not have

02:11:59   7   possession or control of the warehouse?

02:12:01   8   A.  Yes.  Yes.

02:12:03   9   Q.  And you did know that the defendants had, by their

02:12:07   10  responses, not told you that they were able to get it?

02:12:12   11  A.  Yes, not yet.

02:12:14   12  Q.  When they said that they were working on it, what did you

02:12:23   13  think that meant?

02:12:23   14  A.  I thought that meant that Mehul and Dave Clark, you know,

02:12:27   15  had to work something out.  I didn't know.  But I just -- I

02:12:30   16  was thinking this is Dave Clark, it's Mehul Shah's buddy.

02:12:34   17  Q.  So you knew they were trying to work something out?

02:12:36   18  A.  Something was going on.

02:12:37   19  Q.  Did you ever ask what they were trying to work out?

02:12:39   20  A.  No, I didn't.

02:12:40   21  Q.  Did you ever call Mr. Joshi and ask him?

02:12:43   22  A.  I didn't.

02:12:44   23  Q.  Did you ever call Mr. Shah and ask him?

02:12:47   24  A.  No, I did not.

02:12:48   25  Q.  You talked to them repeatedly about billing matters during

| | | |
|--|--|--|
| 02:12:52 | 1 | this period of time; is that right? |
| 02:12:53 | 2 | A.  No, that's not true.  Not repeatedly.  Not at all. |
| 02:12:57 | 3 | Q.  You didn't talk to them at all? |
| 02:12:58 | 4 | A.  On and off, but not repeatedly. |
| 02:13:01 | 5 | Q.  Did you talk to them during this period of time? |
| 02:13:02 | 6 | A.  Of course I did. |
| 02:13:07 | 7 | Q.  And was this an important issue at this time? |
| 02:13:11 | 8 | A.  Yes, it was an important issue, but one that I was focused |
| 02:13:18 | 9 | on.  Eric was handling that. |
| 02:13:27 | 10 | MR. McJESSY:  Just a minute, your Honor. |
| 02:13:28 | 11 | THE COURT:  Sure. |
| 02:13:29 | 12 | (Brief pause.) |
| 02:13:48 | 13 | MR. McJESSY:  I have no other questions. |
| 02:13:50 | 14 | THE COURT:  Ms. Dedinas? |
| 02:13:53 | 15 | MS. DEDINAS:  Just one question. |
| 02:13:55 | 16 | - - - |
| 02:13:55 | 17 | ALAN BORLACK, CROSS-EXAMINATION |
| 02:13:55 | 18 | BY MS. DEDINAS: |
| 02:14:02 | 19 | Q.  Mr. Borlack, you testified you didn't connect the 1103 |
| 02:14:06 | 20 | Butterfield Road address with the warehouse, right? |
| 02:14:08 | 21 | A.  Not in my mind, no, I did not. |
| 02:14:10 | 22 | Q.  Do you recall this litigation started with a motion for a |
| 02:14:13 | 23 | TRO? |
| 02:14:14 | 24 | A.  Yeah, I do. |
| 02:14:15 | 25 | Q.  And do you recall that the allegations by the bank were |

02:14:18  1  that there were cash sales of inventory occurring from the

02:14:22  2  warehouse?

02:14:23  3  A.  No, I don't, not from the warehouse.

02:14:30  4      Maybe I did.  It sounds right, but I'd have to see

02:14:36  5  that.  I remember the cash sales.  Actually, it was the

02:14:39  6  church, I thought, no.  It was -- the precipitating factor in

02:14:43  7  the motion for the TRO was that Kanan was selling inventory

02:14:49  8  through a church.

02:14:50  9  Q.  From the warehouse, correct?

02:14:51  10  A.  You know, I can't remember that.  I remember the church,

02:14:55  11  but maybe -- you know, I don't dispute -- I don't know.  I

02:14:59  12  can't recall that.

02:14:59  13      THE COURT:  You raised that issue in a status before

02:15:02  14  this court.

02:15:04  15      MS. DEDINAS:  Correct.

02:15:05  16  BY MS. DEDINAS:

02:15:06  17  Q.  Now, do you recall whether the address of the warehouse

02:15:10  18  was provided in the TRO papers?

02:15:12  19  A.  It may have been.  It didn't connect with me.  I'm not

02:15:16  20  telling you anything more than it didn't connect with me.

02:15:19  21  Q.  So even though -- but you did read the papers at the time

02:15:23  22  you got them, right?

02:15:24  23  A.  Sure.

02:15:24  24  Q.  You're just saying that perhaps you didn't retain that

02:15:27  25  knowledge later on?

02:15:28  1  A.  Yes, exactly.  Yes.

02:15:29  2          MS. DEDINAS:  I have no further questions.

02:15:31  3          MR. McGARRY:  Your Honor, just a few, please?

02:15:33  4          THE COURT:  Sure.

02:15:34  5                          - - -

02:15:34  6          ALAN BORLACK, REDIRECT EXAMINATION

02:15:34  7  BY MR. McGARRY:

02:15:43  8  Q.  Would you please open your book to SH 145, Exhibit 145.

02:16:01  9  A.  Okay.

02:16:02  10  Q.  Now, we're going to have to do a little shifting because I

02:16:06  11  want you to compare this to Exhibit 143.  If you need to just

02:16:10  12  take it out of the book or have it -- take a look at the two

02:16:13  13  exhibits.

02:16:14  14  A.  Okay.

02:16:14  15  Q.  Now, you got them?

02:16:16  16  A.  I got them.

02:16:16  17  Q.  All right.  Now, Mr. McJessy asked you whether or not

02:16:27  18  Mehul Shah received Exhibit 143.  Do you see that?

02:16:31  19  A.  Yes.

02:16:35  20  Q.  And he said you were implying that he did, right?

02:16:38  21  A.  Yes.

02:16:38  22  Q.  Take a look at 145.

02:16:40  23  A.  Okay.

02:16:42  24  Q.  What is Exhibit 145?

02:16:44  25  A.  It's from -- an e-mail from Mehul Shah to Steve Blumenthal

| | | |
|---|---|---|
| 02:16:51 | 1 | and Paresh Joshi, subject, forward, Associated Bank. |
| 02:16:55 | 2 | Q. And what e-mail is he forwarding in that e-mail? |
| 02:16:58 | 3 | A. He is forwarding in that e-mail 143. |
| 02:17:03 | 4 | Q. I appreciate that you stated -- you took my advice on |
| 02:17:21 | 5 | production in this case, right, production of e-mails? |
| 02:17:24 | 6 | A. Yes, I did. |
| 02:17:25 | 7 | Q. But isn't it true that you authorized me, sir, to offer to |
| 02:17:32 | 8 | help Mr. McJessy if he gave me specific e-mails or information |
| 02:17:37 | 9 | that he needed for his defense? |
| 02:17:38 | 10 | A. I remember something like that. |
| 02:17:49 | 11 | MR. McGARRY: I have nothing further, your Honor. |
| 02:17:52 | 12 | MR. McJESSY: I have nothing further, your Honor. |
| 02:17:54 | 13 | MS. DEDINAS: Nothing further. |
| 02:17:55 | 14 | THE COURT: Okay. You can step down. |
| 02:18:20 | 15 | (Witness leaves the stand.) |
| 02:18:20 | 16 | MR. McGARRY: Your Honor, we have no further |
| 02:18:21 | 17 | witnesses for the respondent. |
| 02:18:22 | 18 | THE COURT: Thank you very much. |
| 02:18:25 | 19 | I have a question that I'd like to ask beyond this |
| 02:18:28 | 20 | now about these e-mails that you first brought up Tuesday, |
| 02:18:37 | 21 | Mr. McJessy. What is this about? |
| 02:18:41 | 22 | MR. McJESSY: Judge, we had asked for -- I had asked |
| 02:18:44 | 23 | for actually my client's file in this matter, the file that I |
| 02:18:48 | 24 | received from the firm of Jim Roche. They did send me their |
| 02:18:53 | 25 | files as the court had directed to do. It contains very few |

02:18:58    1    documents.  It contains none of the documents that have been

02:19:01    2    produced in this case.  It includes very -- only the

02:19:05    3    communications that apparently occurred between the parties

02:19:10    4    after Mr. Roche came into the matter.

02:19:14    5            And I did receive the subpoena responses of First

02:19:20    6    Midwest Bank, Mr. Blumenthal, and I believe one or two other

02:19:23    7    entities that the plaintiffs had subpoenaed, but I received

02:19:29    8    apparently none of the pleadings or correspondence or other

02:19:34    9    documents --

02:19:35   10            THE COURT:  All I am talking about are the e-mails.

02:19:40   11            MR. McJESSY:  Correct.  I had asked for all of the

02:19:42   12    e-mail communications between the parties during -- from, you

02:19:45   13    know, January through I can't remember if I had an end date on

02:19:48   14    it, but basically I was looking for the e-mails and

02:19:51   15    communications from January to August.

02:19:53   16            THE COURT:  Beyond what was submitted to the court?

02:19:56   17            MR. McJESSY:  Yes, because I don't believe everything

02:19:58   18    was submitted to the court, but I don't know that without

02:20:01   19    having looked at it.

02:20:02   20            The response that I received from Mr. McGarry was, if

02:20:06   21    I know of a specific e-mail that I want, they will produce it

02:20:10   22    to me, but that was it.

02:20:14   23            THE COURT:  Okay.  Anything else?

02:20:17   24            MR. McGARRY:  May I address that, your Honor?

02:20:19   25            THE COURT:  You don't need to as far as I'm

02:20:21   1   concerned, unless you want to.

02:20:23   2          MR. McGARRY:  But I think our conversation was

02:20:25   3   broader.  He wanted the whole file, and, you know, I --

02:20:27   4          THE COURT:  That's your -- the lawyer for the

02:20:30   5   respondents.  I understand.

02:20:32   6          MR. McGARRY:  But I will say, just as an officer of

02:20:34   7   the court, I offered to Kelly Kachmarik some assistance as

02:20:39   8   well, and I let her know that I felt her production was

02:20:42   9   incomplete because I knew it was, and I offered actually to

02:20:44  10   help her, and I never got a response.  I never got a request

02:20:49  11   from the defendants.

02:20:49  12          THE COURT:  And I have no problem with this.  I just

02:20:52  13   didn't understand what he was getting at.  That's why I asked

02:20:54  14   that question.

02:20:55  15          MR. McJESSY:  That's what it was, your Honor, my

02:20:56  16   request for the communications.

02:20:58  17          THE COURT:  Thank you.  Thank you all.

02:21:00  18          MS. DEDINAS:  Your Honor, I have one question.

02:21:02  19          THE COURT:  Sure.

02:21:03  20          MS. DEDINAS:  About the briefs that we are going to

02:21:05  21   be submitting.  I seem to have a recollection that perhaps

02:21:10  22   Mr. McGarry had mentioned that they wanted to address a new

02:21:15  23   legal issue of what standard would apply, a heightened

02:21:21  24   standard that would apply to attorneys or something like that.

02:21:23  25   Let me just finish.

02:21:24   1      It occurs to me that if there's going to be new law

02:21:27   2   that hadn't been raised before, I don't want the briefs to be

02:21:33   3   two ships passing in the night not addressing each other, so I

02:21:37   4   thought I would raise that and see if that's what's going to

02:21:40   5   be happening, if we should maybe stagger the briefs to address

02:21:44   6   them.

02:21:44   7      THE COURT:  I'd rather not.

02:21:46   8      MR. McGARRY:  I thought the Court had basically

02:21:48   9   instructed me -- you were gracious to give me the right to do

02:21:51  10   it and then I thought took it away because we were going to do

02:21:56  11   simultaneous findings of fact or conclusions of law, so I

02:21:59  12   didn't have any expectation at this point of being entitled to

02:22:02  13   file anything.

02:22:03  14      THE COURT:  That was my understanding.  Good for you

02:22:05  15   to know.

02:22:06  16      MS. DEDINAS:  I just want to make sure.

02:22:07  17      THE COURT:  Okay.  Good-bye and good luck, everybody.

02:22:11  18      MR. McGARRY:  Thank you, Judge.

02:22:13  19      MR. LIPTON:  Thank you, Judge.

02:22:15  20      MR. McJESSY:  Thank you.

02:22:15  21      MS. DEDINAS:  Thank you.

02:22:30  22      MR. McJESSY:  Judge, we had left at the end of the

02:22:33  23   last hearing Mr. Shah's ability to talk to Mr. Blumenthal.

02:22:36  24      THE COURT:  Now I have no problem with that at all.

02:22:38  25      MR. McJESSY:  That's all I wanted.

02:22:40   1          THE COURT:  Sure.

2      (Which were all the proceedings had in the above-entitled

3   cause on the day and date aforesaid.)

4      I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.
5

6   _____          _____
   Carolyn R. Cox                      Date
   Official Court Reporter
7   Northern District of Illinois

8   /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'72** [1] - 885:22

**/**

**/s/Carolyn** [1] - 943:8

**1**

**1,000** [2] - 887:3, 887:5
**10** [3] - 885:2, 911:12, 917:1
**10:22** [1] - 912:5
**10:58** [1] - 912:14
**11** [4] - 893:5, 893:8, 906:4, 927:21
**1103** [1] - 936:19
**12** [7] - 888:16, 888:17, 888:24, 894:21, 896:17, 896:20, 907:21
**143** [10] - 911:14, 911:17, 911:25, 912:5, 912:11, 917:18, 919:8, 938:11, 938:18, 939:3
**144** [6] - 911:14, 911:17, 911:25, 912:13, 917:18, 919:8
**145** [4] - 938:8, 938:22, 938:24
**15** [2] - 912:1, 916:21
**1500** [1] - 922:18
**16** [2] - 904:20, 905:10
**169** [5] - 886:8, 886:13, 887:1, 919:18, 922:22
**17** [7] - 889:23, 891:23, 892:4, 898:24, 902:8, 924:18, 924:19
**171** [5] - 903:16, 903:17, 903:18, 904:1, 904:2
**18** [6] - 889:22, 890:8, 890:14, 890:17, 890:21, 892:13
**187** [2] - 903:13, 904:10
**189** [2] - 887:16, 888:3
**18th** [1] - 886:17
**19** [11] - 890:9, 890:11, 890:18, 890:19, 890:24, 890:25, 892:14, 920:16, 920:19, 920:24, 920:22, 921:1
**1972** [1] - 885:20
**199** [3] - 910:9, 910:12, 910:13
**19th** [4] - 890:5, 920:20, 920:22, 921:1

**2**

**2** [2] - 900:22, 910:8
**2/18/10** [1] - 925:6
**20** [8] - 890:8, 890:9, 891:23, 892:4, 892:5, 892:8, 926:16
**200** [4] - 910:9, 911:7, 916:6, 916:10
**2004** [2] - 896:18, 896:19
**2006** [2] - 896:17, 896:21
**2010** [21] - 886:21, 887:9, 887:23, 889:5, 889:17, 889:22, 893:5, 893:9, 894:21, 898:13, 902:25, 910:8, 911:12, 912:1, 912:23, 916:21, 917:15, 920:24,

921:1, 928:12, 929:11
**205** [2] - 912:22, 913:2
**21** [1] - 889:17
**22** [3] - 894:6, 918:22, 919:14
**222** [1] - 883:5
**23** [2] - 918:22, 919:15
**237** [1] - 885:14
**239** [2] - 909:4, 909:9
**23rd** [5] - 921:1, 933:18, 933:20, 933:22, 934:6
**24** [8] - 893:23, 895:13, 898:13, 898:17, 899:16, 900:10, 920:19, 920:24
**248** [2] - 886:25, 887:2
**24th** [6] - 886:20, 920:20, 928:12, 928:22, 928:24, 931:5
**25** [6] - 887:7, 904:20, 905:4, 910:19, 913:5, 913:6
**25th** [2] - 886:18, 903:21
**26** [2] - 893:23, 905:4
**26th** [1] - 930:16
**27** [1] - 887:24
**28** [3] - 887:10, 887:23, 894:6
**28th** [1] - 895:13
**29** [1] - 901:13
**2nd** [4] - 901:12, 910:11, 910:23, 916:7

**3**

**3** [4] - 891:21, 892:12, 892:15, 894:25
**30** [4] - 910:14, 911:12, 911:21, 917:8
**300** [1] - 883:6
**300,000-something** [1] - 903:6
**30th** [2] - 917:1, 917:11
**31** [1] - 929:16
**312** [1] - 883:6
**331** [1] - 887:10
**39** [2] - 885:23, 885:24
**3rd** [1] - 929:11

**4**

**4** [3] - 887:12, 894:25, 903:2
**48** [1] - 888:17

**5**

**5** [2] - 902:25, 903:1
**50** [1] - 907:25
**59** [4] - 900:14, 928:25, 929:1, 929:4
**5th** [3] - 903:10, 903:20, 903:21

**6**

**6** [2] - 889:19, 923:8
**60** [2] - 903:8, 907:25
**60601** [1] - 883:5
**63** [3] - 894:23, 894:24, 895:2
**65** [1] - 888:18

**65,000** [1] - 903:8
**670** [2] - 886:23, 887:2

**7**

**7** [2] - 900:2, 912:23
**70** [1] - 888:19
**704-3000** [1] - 883:6
**71** [2] - 903:13, 903:14

**8**

**8** [1] - 889:5
**8.3** [2] - 894:15, 896:5
**885** [1] - 884:4

**9**

**9** [5] - 887:9, 901:23, 904:17, 905:9, 905:13
**916** [1] - 884:6
**936** [1] - 884:8
**938** [1] - 884:10
**9th** [3] - 905:6, 905:7, 916:5

**A**

**a.m** [2] - 912:5, 912:14
**abandon** [1] - 901:15
**ability** [1] - 942:23
**able** [4] - 893:2, 908:14, 909:5, 935:10
**above-entitled** [2] - 943:2, 943:4
**absolutely** [7] - 896:1, 897:8, 899:19, 905:11, 907:9, 907:18
**access** [2] - 892:19, 915:17
**according** [1] - 900:6
**account** [3] - 919:12, 919:13, 921:18
**accurate** [1] - 885:16
**acted** [1] - 915:20
**action** [5] - 896:10, 896:25, 926:10, 926:22, 929:14
**add** [2] - 887:1, 894:21
**added** [3] - 888:17, 913:8, 913:9
**additional** [3] - 888:18, 906:20, 907:21
**address** [8] - 919:6, 930:20, 930:22, 936:20, 937:17, 940:24, 941:22, 942:5
**addressing** [2] - 929:20, 942:3
**admitted** [1] - 885:21
**advice** [5] - 898:3, 899:20, 915:13, 925:3, 939:4
**advise** [3] - 889:13, 893:23, 910:24
**advised** [7] - 887:5, 900:12, 900:25, 911:25, 920:16, 924:23, 927:4
**advising** [9] - 890:15, 916:17, 916:20, 923:15, 923:19, 923:20, 924:16, 929:11, 931:6
**advisor** [1] - 891:12
**affected** [1] - 899:6

**affidavit** [1] - 886:2
**afford** [2] - 897:17, 901:10
**aforesaid** [1] - 943:3
**ago** [1] - 893:14
**agreed** [4] - 891:1, 914:5, 924:24, 924:25
**agreement** [28] - 890:2, 890:11, 890:12, 890:16, 890:17, 890:21, 891:2, 891:5, 891:6, 892:8, 899:23, 902:7, 902:8, 902:10, 902:12, 925:6, 925:7, 925:16, 925:23, 926:6, 926:8, 926:11, 926:13, 926:17, 926:20, 926:23, 926:25, 927:5
**agreements** [4] - 898:23, 899:3, 899:4, 931:22
**ahead** [3] - 890:24, 906:20, 913:7
**al** [1] - 885:3
**AI** [1] - 898:15
**Alan** [3] - 883:3, 885:6, 911:10
**ALAN** [9] - 884:4, 884:4, 884:6, 884:8, 884:10, 885:9, 916:2, 936:17, 938:6
**albeit** [1] - 888:17
**allegations** [1] - 936:25
**almost** [3] - 893:10, 907:23, 922:18
**amend** [2] - 891:2
**amended** [4] - 890:11, 890:16, 890:21, 891:4
**answer** [4] - 889:11, 894:6, 908:10, 925:9
**anyway** [1] - 913:10
**apologize** [1] - 920:23
**APPEARANCES** [1] - 883:1
**applies** [1] - 924:1
**apply** [2] - 941:23, 941:24
**appreciate** [1] - 939:4
**approval** [1] - 912:16
**April** [14] - 893:7, 894:21, 896:17, 896:20, 900:2, 901:12, 901:23, 921:1, 933:18, 933:20, 933:22, 934:6, 934:10, 935:2
**arrangements** [1] - 906:12
**aspect** [1] - 891:24
**assigned** [1] - 912:16
**assigning** [1] - 924:14
**assignment** [18] - 894:19, 896:18, 899:7, 910:25, 911:1, 911:3, 911:11, 912:1, 912:6, 912:7, 912:15, 916:20, 916:25, 917:4, 917:10, 917:15, 931:25
**assistance** [1] - 941:7
**Associated** [7] - 887:13, 903:5, 910:17, 912:8, 912:15, 913:12, 939:1
**assume** [2] - 911:12, 934:22
**assumed** [1] - 917:9
**assure** [1] - 905:23
**attached** [1] - 928:19
**attachment** [1] - 929:6
**Attachments** [1] - 925:6
**attend** [1] - 893:14
**attended** [2] - 917:23, 918:2
**attorney** [2] - 912:8, 924:5
**attorneys** [1] - 941:24

**August** [34] - 887:7, 887:9, 887:23, 887:24, 902:25, 903:1, 903:2, 903:10, 903:20, 903:21, 904:17, 904:20, 905:4, 905:6, 905:7, 905:9, 905:13, 910:14, 910:19, 911:12, 911:21, 913:5, 913:6, 916:5, 917:1, 917:7, 917:8, 917:11, 934:23, 935:2, 940:15
**authorized** [1] - 939:7
**available** [2] - 920:17, 922:9
**aware** [6] - 921:8, 921:12, 929:10, 930:15, 932:14, 932:18

## B

**backing** [1] - 898:21
**Bank** [13] - 885:2, 887:13, 897:16, 903:5, 910:17, 913:12, 913:13, 916:21, 917:9, 923:25, 933:25, 939:1, 940:6
**bank** [1] - 936:25
**bar** [2] - 885:21
**based** [1] - 914:9
**bcc'd** [1] - 888:4
**became** [1] - 924:11
**become** [1] - 924:10
**beforehand** [1] - 934:1
**behalf** [1] - 921:12
**behind** [4] - 899:18, 902:18, 905:23, 933:17
**belief** [1] - 914:20
**belonged** [1] - 933:24
**better** [1] - 919:25
**between** [7] - 887:10, 907:25, 909:13, 910:24, 923:7, 940:3, 940:12
**beyond** [5] - 913:20, 922:25, 934:11, 939:19, 940:16
**big** [1] - 914:25
**Bill** [1] - 887:13
**billing** [1] - 907:6, 935:25
**bills** [3] - 905:23, 906:8, 907:7
**bit** [2] - 893:13, 897:5
**blind** [4] - 887:20, 888:1, 888:6, 888:20
**Blumenthal** [69] - 885:25, 886:7, 886:11, 887:2, 887:21, 887:22, 888:11, 889:13, 890:4, 890:5, 890:15, 891:10, 891:12, 891:15, 893:2, 893:4, 893:6, 893:15, 893:22, 895:13, 895:14, 895:24, 897:6, 897:11, 897:25, 898:6, 898:9, 898:19, 899:8, 899:10, 899:23, 901:7, 901:16, 901:22, 901:25, 902:9, 902:17, 902:21, 906:5, 907:4, 907:11, 907:15, 907:16, 908:1, 909:13, 909:17, 910:4, 913:21, 915:12, 919:20, 920:16, 921:1, 921:24, 922:14, 922:23, 923:11, 923:13, 924:15, 924:19, 927:8, 927:14, 927:17, 929:5, 931:20, 932:6, 932:13, 938:25, 940:6, 942:23
**Blumenthal's** [3] - 893:13, 897:5, 905:17
**book** [7] - 898:23, 898:25, 900:18, 909:5, 931:12, 938:8, 938:12

**Borlack** [1] - 883:3, 885:6, 885:12, 888:5, 901:3, 913:22, 916:4, 936:19
**BORLACK** [8] - 884:4, 884:6, 884:8, 884:10, 885:9, 916:2, 936:17, 938:6
**bother** [2] - 930:23, 933:5
**bottom** [1] - 921:22
**Brief** [2] - 914:13, 936:12
**briefs** [3] - 941:20, 942:2, 942:5
**bring** [3] - 920:9, 920:11, 921:19
**brings** [2] - 921:25, 922:3
**broader** [1] - 941:3
**brought** [1] - 939:20
**buddy** [1] - 935:16
**burden** [1] - 895:4
**business** [4] - 886:1, 905:20, 905:25, 906:3
**busy** [1] - 898:6
**Butterfield** [2] - 930:19, 936:20
**buy** [2] - 887:6, 895:25
**BY** [36] - 883:4, 884:5, 884:7, 884:9, 884:11, 885:10, 886:6, 889:7, 889:12, 890:23, 892:7, 895:11, 895:20, 902:11, 903:19, 908:20, 908:24, 909:3, 909:11, 910:7, 911:19, 912:21, 915:11, 916:3, 918:1, 918:12, 921:7, 921:17, 925:10, 928:10, 929:2, 930:1, 934:14, 936:18, 937:16, 938:7
**bye** [1] - 942:17

## C

**C.V** [1] - 885:14
**caption** [1] - 925:23
**carbon** [4] - 887:20, 888:1, 889:15, 890:4
**carboned** [2] - 888:6, 888:20
**career** [1] - 885:17
**careful** [2] - 906:18, 906:21
**Carolyn** [1] - 943:6
**case** [17] - 886:17, 888:10, 889:14, 893:20, 897:19, 901:14, 907:10, 910:4, 913:22, 913:25, 914:10, 914:20, 915:21, 924:8, 924:9, 939:5, 940:2
**cash** [2] - 937:1, 937:5
**caused** [1] - 910:11
**Central** [1] - 885:2
**certain** [3] - 894:16, 896:18, 922:24
**certainly** [1] - 917:12
**certify** [1] - 943:4
**chain** [1] - 887:8
**chair** [1] - 910:1
**change** [1] - 902:8
**changed** [1] - 892:13
**Chicago** [1] - 883:5
**chief** [2] - 913:22, 914:20
**chumps** [1] - 906:19
**church** [3] - 937:6, 937:8, 937:10
**clarification** [1] - 888:23
**clarify** [1] - 889:1
**Clark** [26] - 887:9, 887:10, 887:14,

887:24, 888:1, 888:11, 895:15, 903:9, 904:6, 904:18, 904:19, 910:16, 911:11, 911:21, 912:1, 912:5, 913:4, 916:25, 917:8, 918:17, 918:23, 919:3, 919:10, 919:15, 935:14, 935:16

**Clark's** [4] - 912:14, 917:23, 918:2, 918:8

**clean** [2] - 891:5, 891:9

**clear** [3] - 907:2, 910:15, 931:4

**CLERK** [1] - 885:2

**client** [2] - 904:7, 914:19

**client's** [1] - 939:23

**clients** [5] - 896:22, 897:17, 899:17, 899:20, 923:20

**close** [3] - 905:9, 912:9, 933:22

**closed** [1] - 904:18

**closing** [3] - 898:22, 931:11, 931:12

**clothing** [5] - 900:13, 900:25, 901:1, 901:10

**coming** [1] - 893:13

**commencement** [2] - 914:9, 919:16

**comment** [1] - 907:4

**comments** [1] - 902:5

**communication** [2] - 890:14, 896:9

**communications** [7] - 891:10, 896:24, 921:9, 940:3, 940:12, 940:15, 941:16

**companies** [1] - 915:13

**compare** [1] - 938:11

**complaint** [1] - 896:7

**completed** [2] - 894:19, 927:23

**computer** [3] - 886:10, 892:20, 920:13

**computers** [6] - 924:1, 929:12, 933:6, 933:8, 933:17, 933:19

**concern** [1] - 933:1

**concerned** [3] - 931:23, 932:24, 941:1

**concerning** [1] - 913:13

**conclusions** [2] - 918:8, 942:11

**confirm** [2] - 904:4, 913:8

**confirmed** [1] - 913:3

**confused** [1] - 923:4

**connect** [3] - 936:19, 937:19, 937:20

**connected** [1] - 930:21

**consulted** [1] - 910:4

**contact** [1] - 910:17

**contains** [2] - 939:25, 940:1

**continue** [1] - 889:21

**CONTINUED** [1] - 883:1

**control** [2] - 892:22, 935:7

**controversy** [1] - 924:1

**conversant** [1] - 920:1

**conversation** [2] - 907:7, 941:2

**conversations** [1] - 903:10

**copied** [6] - 886:8, 887:25, 888:20, 889:8, 890:4, 907:12

**copies** [1] - 921:8

**copy** [5] - 887:20, 888:1, 926:17, 930:6, 931:16

**correct** [19] - 894:10, 903:14, 905:16, 918:9, 919:7, 919:9, 919:21, 922:17, 923:18, 925:21, 927:16, 927:19, 930:2, 931:10, 934:7, 937:9, 937:15, 940:11,

943:4

**corrected** [2] - 888:17, 907:20

**correspondence** [2] - 921:10, 940:8

**counsel** [14] - 906:21, 913:21, 914:1, 916:7, 916:12, 917:13, 921:11, 921:12, 922:11, 923:8, 928:11, 930:7, 934:23

**counseling** [1] - 915:13

**count** [1] - 886:10

**counted** [1] - 886:10

**course** [7] - 894:15, 896:2, 900:7, 907:10, 924:13, 927:6, 936:6

**court** [20] - 885:1, 885:16, 887:24, 888:18, 894:22, 895:4, 911:9, 914:5, 915:17, 925:1, 925:5, 925:11, 925:17, 926:1, 926:6, 937:14, 939:25, 940:16, 940:18, 941:7

**Court** [8] - 886:1, 889:5, 914:7, 914:8, 914:21, 914:22, 942:8, 943:6

**COURT** [61] - 885:5, 886:4, 888:23, 889:3, 889:6, 889:11, 890:21, 892:2, 895:1, 895:3, 895:7, 895:10, 900:20, 908:19, 908:22, 909:2, 909:6, 909:9, 910:6, 911:16, 911:18, 913:23, 914:2, 914:11, 914:14, 914:22, 915:2, 915:5, 915:8, 915:24, 917:25, 918:10, 921:15, 921:15, 925:9, 927:24, 928:1, 928:4, 928:22, 928:24, 929:22, 934:13, 936:11, 936:14, 937:13, 938:4, 939:14, 939:18, 940:10, 940:16, 940:23, 940:25, 941:4, 941:12, 941:17, 941:19, 942:7, 942:14, 942:17, 942:24, 943:1

**Court's** [1] - 908:9

**cover** [1] - 886:3

**covered** [1] - 920:12

**Cox** [2] - 943:6, 943:8

**Creative** [3] - 892:16, 892:17, 931:7

**CROSS** [4] - 884:6, 884:8, 916:2, 936:17

**cross** [2] - 913:25

**CROSS-EXAMINATION** [4] - 884:6, 884:8, 916:2, 936:17

**crosses** [1] - 914:6

**CRR** [1] - 943:8

**CSR** [1] - 943:8

**CULBERTSON** [1] - 883:3

**current** [1] - 892:19

**curriculum** [1] - 885:16

**custody** [1] - 892:22

**cutting** [1] - 929:18

## D

**data** [1] - 924:2

**date** [2] - 940:13, 943:3

**Date** [1] - 943:6

**dated** [3] - 889:16, 916:6, 916:21

**Dave** [15] - 887:9, 887:23, 888:1, 891:21, 895:15, 904:6, 911:11, 911:21, 913:4, 916:25, 919:10, 924:8, 933:10, 935:14, 935:16

**Dave's** [2] - 890:2, 925:7

**David** [2] - 930:5, 931:2

**days** [4] - 893:14, 904:20, 905:10, 924:9

**deal** [7] - 900:4, 902:12, 902:14, 903:9, 904:4, 904:18, 905:9

**dealing** [3] - 901:17, 933:3, 933:4

**dealt** [1] - 933:2

**deceived** [4] - 908:16, 908:21, 908:25, 917:14

**December** [1] - 889:5

**decided** [1] - 900:3

**DEDINAS** [16] - 884:9, 903:16, 909:10, 913:19, 928:23, 928:25, 936:15, 936:18, 937:15, 937:16, 938:2, 939:13, 941:18, 941:20, 942:16, 942:21

**Dedinas** [3] - 890:1, 925:8, 936:14

**deed** [7] - 893:21, 897:7, 897:12, 897:23, 898:3, 898:7, 898:22

**defendant** [1] - 934:8

**defendants** [6] - 921:8, 922:10, 934:5, 935:6, 935:9, 941:11

**defendants'** [1] - 924:5

**defense** [3] - 896:11, 896:13, 939:9

**defenses** [2] - 894:21, 894:24

**deleted** [2] - 924:1, 924:16

**dense** [1] - 931:21

**deposition** [2] - 917:23, 918:18

**depositions** [1] - 918:2

**describe** [1] - 899:1

**described** [1] - 921:19

**DESCRIPTION** [1] - 884:2

**destroyed** [1] - 924:16

**difference** [1] - 921:5

**different** [3] - 899:3, 901:11, 919:12

**differently** [1] - 918:25

**DIRECT** [2] - 884:4, 885:9

**direct** [2] - 900:17, 911:9, 914:6

**directed** [1] - 939:25

**directly** [1] - 886:8

**disavowed** [1] - 901:14

**disburse** [1] - 912:10

**discharged** [1] - 886:18

**disclose** [1] - 902:17

**discoverable** [1] - 892:21

**discovery** [2] - 909:16, 909:18

**discuss** [3] - 897:25, 899:8, 903:2

**discussed** [3] - 892:15, 906:7, 906:23

**discussion** [1] - 907:5

**discussions** [1] - 902:20

**dispose** [2] - 901:2, 902:13

**dispute** [2] - 910:1, 937:11

**District** [1] - 943:7

**dither** [2] - 904:15, 904:16

**document** [9] - 894:2, 894:7, 894:23, 895:2, 924:25, 925:1, 925:4, 925:20, 929:15

**documents** [5] - 922:16, 922:18, 940:1, 940:9

**Domanskis** [2] - 898:14, 931:6

**Don** [2] - 893:15, 906:11

**done** [1] - 929:12
**down** [2] - 903:8, 939:14
**draft** [2] - 889:24, 890:15
**drafts** [1] - 902:4
**driving** [1] - 902:6
**during** [5] - 934:15, 934:17, 935:25, 936:5, 940:12
**duty** [1] - 923:20
**dwell** [1] - 885:15

## E

**e-mail** [66] - 887:8, 887:9, 887:10, 887:12, 887:17, 887:23, 888:3, 888:4, 888:7, 889:16, 890:9, 890:25, 891:21, 900:2, 900:6, 901:18, 903:11, 904:17, 905:1, 905:2, 905:13, 909:16, 910:8, 910:11, 910:18, 910:20, 910:24, 911:11, 912:5, 912:14, 912:23, 913:3, 913:5, 913:14, 916:5, 916:7, 916:17, 916:22, 916:25, 917:8, 919:6, 919:12, 919:13, 919:22, 920:15, 921:9, 921:18, 923:11, 923:17, 925:25, 926:2, 926:5, 926:16, 926:19, 927:5, 929:10, 930:4, 930:5, 931:16, 938:25, 939:2, 939:3, 940:12, 940:21
**e-mailed** [7] - 887:14, 898:19, 901:7, 901:23, 910:21, 913:8, 931:17
**e-mails** [65] - 886:4, 886:7, 886:14, 886:21, 886:24, 887:1, 887:3, 887:5, 887:10, 887:15, 887:20, 887:25, 888:10, 888:14, 888:20, 889:8, 889:15, 891:18, 894:4, 894:5, 894:10, 907:11, 907:14, 909:13, 912:2, 913:4, 917:17, 917:20, 918:7, 918:14, 918:17, 918:21, 918:22, 919:2, 919:4, 919:7, 919:11, 919:15, 919:17, 919:19, 920:5, 920:9, 920:11, 920:25, 921:13, 921:20, 921:23, 922:1, 922:4, 922:9, 922:22, 923:1, 923:7, 923:25, 924:2, 934:9, 934:19, 934:20, 934:22, 934:23, 939:5, 939:8, 939:20, 940:10, 940:14
**early** [1] - 912:9
**Ed** [1] - 909:19
**Edward** [1] - 909:13
**effect** [2] - 900:11, 905:8
**efficient** [2] - 906:10, 906:25
**effort** [1] - 919:2
**efforts** [1] - 892:16
**eight** [2] - 899:3, 931:21
**either** [5] - 886:8, 887:21, 918:7, 918:13, 919:6
**election** [1] - 914:19
**enclose** [1] - 898:20
**enclosed** [3] - 890:25, 891:4, 898:19
**end** [4] - 914:25, 916:5, 940:13, 942:22
**entered** [2] - 887:24, 898:18
**entities** [1] - 940:7
**entitled** [3] - 942:12, 943:2, 943:4
**equipment** [1] - 929:13
**Eric** [14] - 883:3, 886:12, 887:7,

896:15, 903:3, 904:14, 905:2, 905:3, 906:17, 910:19, 919:25, 924:8, 933:10, 936:9
**Eric's** [1] - 891:17
**ESI** [29] - 890:2, 890:11, 890:12, 890:16, 890:17, 890:21, 891:2, 891:4, 891:11, 891:16, 892:8, 892:17, 892:21, 897:3, 903:4, 915:21, 923:21, 924:5, 924:11, 924:15, 925:6, 925:7, 925:15, 930:9, 930:13, 931:2, 931:3, 933:8, 933:11
**estimate** [1] - 888:18
**et** [1] - 885:3
**Eudora** [3] - 919:23, 920:2, 921:19
**eventually** [3] - 901:12, 930:15, 933:20
**evicted** [2] - 931:7, 934:3
**eviction** [4] - 898:16, 898:18, 898:20, 899:15
**evidence** [2] - 895:5, 910:4
**exactly** [3] - 920:6, 932:22, 938:1
**EXAMINATION** [8] - 884:4, 884:6, 884:8, 884:10, 885:9, 916:2, 936:17, 938:6
**examination** [2] - 914:1, 934:12
**excessive** [2] - 907:6, 907:8
**exchange** [1] - 909:13
**Exhibit** [24] - 885:14, 888:16, 888:17, 888:24, 890:18, 892:8, 904:1, 907:21, 909:4, 913:2, 916:6, 923:8, 924:18, 924:19, 926:3, 926:16, 929:1, 929:4, 929:16, 938:8, 938:11, 938:18, 938:24
**exhibit** [7] - 888:25, 895:1, 903:25, 909:8, 916:9, 928:18
**Exhibits** [4] - 910:9, 911:14, 911:25, 917:18
**exhibits** [1] - 938:13
**expectation** [2] - 899:19, 942:12
**expected** [2] - 893:24, 923:18
**explain** [2] - 900:1, 903:25
**explained** [1] - 930:10
**express** [1] - 908:14
**extinction** [1] - 894:14
**extinguish** [1] - 894:16
**extinguished** [3] - 896:17, 896:21, 897:1

## F

**face** [2] - 893:4
**fact** [10] - 886:11, 894:17, 914:15, 918:20, 925:19, 925:24, 927:11, 934:8, 935:2, 942:11
**factor** [1] - 937:6
**fair** [4] - 891:15, 908:5, 908:7, 908:8
**faith** [1] - 915:20
**fall** [1] - 885:22
**false** [2] - 911:22, 911:23
**far** [2] - 922:20, 940:25
**Fashions** [3] - 885:3, 892:16, 892:17
**FCRR** [1] - 943:8

**feature** [1] - 920:3
**February** [14] - 889:22, 890:5, 890:9, 890:11, 892:13, 892:14, 893:23, 895:13, 895:21, 930:12, 930:16, 931:4
**felt** [3] - 917:6, 917:13, 941:8
**few** [5] - 907:23, 922:20, 924:9, 938:3, 939:25
**figure** [1] - 903:7
**file** [4] - 939:23, 941:3, 942:13
**filed** [9] - 886:19, 924:25, 925:1, 925:4, 925:11, 925:15, 925:17, 926:1, 926:6
**files** [1] - 939:25
**final** [2] - 902:9, 912:6, 912:15
**finalized** [1] - 902:7
**finally** [4] - 893:9, 900:3, 902:7, 903:7
**financing** [1] - 894:13
**findings** [1] - 942:11
**finish** [3] - 914:19, 927:24, 941:25
**firm** [7] - 906:7, 906:11, 915:20, 934:5, 934:8, 934:16, 939:24
**first** [28] - 887:14, 887:25, 889:16, 890:3, 890:25, 891:4, 891:7, 893:4, 893:8, 893:24, 898:15, 900:22, 902:24, 904:7, 904:17, 906:4, 909:17, 911:21, 912:5, 914:16, 916:13, 917:3, 920:15, 925:6, 927:7, 927:14, 927:20, 939:20
**First** [5] - 897:16, 900:25, 901:1, 913:12, 916:21, 917:9, 933:25, 940:5
**five** [1] - 894:24
**Flesch** [3] - 893:15, 906:11, 906:17, 906:18, 906:22, 927:9, 927:18
**FMB** [3] - 900:4, 900:6, 902:21
**focus** [1] - 891:24
**focused** [2] - 933:12, 936:8
**followed** [2] - 934:5, 934:8
**following** [2] - 885:1, 902:10
**force** [1] - 902:6
**foreclosure** [11] - 893:21, 897:2, 897:7, 897:12, 897:23, 898:1, 898:4, 898:7, 898:22, 902:1, 930:8
**foregoing** [1] - 943:4
**form** [1] - 896:11
**format** [1] - 924:3
**forth** [1] - 902:5
**forward** [1] - 939:1
**forwarded** [8] - 887:7, 887:8, 905:2, 907:12, 910:19, 911:13, 913:6, 917:1
**forwarding** [4] - 925:19, 926:25, 939:2, 939:3
**forwards** [1] - 926:17
**foundation** [2] - 889:10, 910:5
**four** [1] - 889:15
**frame** [1] - 928:7
**friendly** [1] - 893:21
**full** [1] - 921:25
**funds** [1] - 912:10
**fuss** [1] - 915:1

## G

**gentleman's** [1] - 898:15
**given** [1] - 930:20
**Glickman** [4] - 906:11, 906:18, 906:19, 906:22, 927:8, 927:17
**Glickman's** [1] - 893:15
**good-bye** [1] - 942:17
**gracious** [1] - 942:9
**graduated** [1] - 885:20
**granted** [1] - 894:22
**Grossman** [4] - 883:3, 886:12, 896:13, 933:10
**group** [1] - 910:2
**guaranties** [7] - 894:17, 894:20, 896:18, 896:20, 896:21, 897:1, 912:16
**guaranty** [1] - 896:17
**guess** [4] - 917:8, 925:9, 925:17, 932:3

## H

**handle** [6] - 897:7, 898:6, 901:25, 906:17, 924:5, 924:11
**handling** [10] - 901:25, 903:4, 924:15, 931:2, 931:20, 932:18, 933:11, 933:14, 936:9
**hang** [2] - 914:2, 914:11
**happy** [1] - 915:3
**head** [1] - 906:14
**hear** [3] - 903:4, 914:16, 914:17
**heard** [1] - 885:25
**hearing** [4] - 905:5, 905:15, 914:9, 942:23
**heightened** [1] - 941:23
**help** [2] - 939:8, 941:10
**himself** [1] - 923:13
**HINSHAW** [1] - 883:3
**hired** [3] - 927:9, 927:11, 927:18
**hold** [6] - 889:14, 890:6, 891:24, 892:1, 892:11, 892:24
**holds** [2] - 889:16, 891:20
**Honor** [18] - 885:4, 886:5, 895:2, 909:1, 913:19, 913:24, 927:22, 928:18, 929:17, 934:11, 936:10, 938:3, 939:11, 939:12, 939:16, 940:24, 941:15, 941:18
**huge** [1] - 906:16

## I

**idea** [2] - 901:14, 915:12
**identify** [1] - 892:17
**IL** [1] - 883:5
**Illinois** [1] - 943:7
**immediately** [2] - 921:25, 922:3
**implied** [3] - 917:12, 925:13, 925:14
**implying** [1] - 938:20
**importance** [1] - 933:16
**important** [7] - 891:12, 923:24, 932:20, 933:9, 933:13, 936:7, 936:8

**inadvertent** [1] - 891:1
**include** [1] - 891:10
**included** [3] - 891:13, 891:18, 930:13
**includes** [1] - 940:2
**incomplete** [1] - 941:9
**incorrect** [4] - 897:9, 897:10, 898:10, 899:13
**indicate** [1] - 925:24
**indicated** [1] - 914:8
**individuals** [2] - 892:19, 922:1
**information** [5] - 886:14, 890:6, 932:13, 932:17, 939:8
**informed** [1] - 933:21
**inquiry** [1] - 921:20
**instructed** [2] - 892:20, 942:9
**instructions** [2] - 926:13, 926:19
**interest** [6] - 900:8, 900:12, 901:1, 901:6, 901:15, 902:16
**interests** [1] - 902:15
**intermingled** [2] - 907:20, 908:3
**inventory** [16] - 897:14, 897:15, 897:20, 899:23, 900:4, 900:9, 900:25, 901:15, 902:12, 902:13, 932:25, 933:5, 933:9, 937:1, 937:7
**involved** [5] - 902:2, 902:3, 913:12, 915:12, 924:10
**iPhone** [1] - 911:13
**issue** [9] - 897:15, 905:22, 933:1, 933:2, 933:15, 936:7, 936:8, 937:13, 941:23
**issued** [1] - 922:15
**issues** [2] - 913:20, 929:21

## J

**Jacobs** [7] - 887:13, 888:11, 910:17, 910:18, 910:24, 916:18, 916:20
**January** [8] - 886:17, 886:21, 889:17, 920:23, 920:24, 921:1, 940:13, 940:15
**Jim** [3] - 893:15, 906:11, 939:24
**job** [1] - 924:4
**joint** [1] - 888:24
**Joshi** [10] - 886:22, 887:2, 887:21, 887:22, 893:2, 921:24, 929:11, 934:17, 935:21, 939:1
**judge** [8] - 890:24, 900:18, 903:25, 905:5, 912:4, 929:20, 939:22, 942:22
**Judge** [8] - 889:2, 895:19, 914:4, 914:18, 914:24, 915:23, 942:18, 942:19
**July** [9] - 912:1, 916:21, 917:15, 918:22, 919:14, 919:15, 934:9, 935:3
**June** [13] - 887:10, 887:12, 893:5, 893:8, 906:4, 920:16, 920:19, 920:20, 920:22, 920:23, 927:21, 934:9, 935:3

## K

**Kachmarik** [1] - 941:7
**Kanan** [13] - 885:2, 892:16, 892:17, 897:19, 900:11, 900:12, 900:24,

900:25, 901:3, 902:15, 919:12, 931:6, 937:7
**Kanan's** [1] - 902:3
**Kanan/Creative** [1] - 934:2
**Kelly** [1] - 941:7
**kept** [3] - 891:15, 891:19, 908:5
**key** [4] - 891:24, 892:10, 892:12, 892:23
**kind** [2] - 924:2, 928:7
**knowledge** [6] - 888:8, 899:19, 901:8, 910:25, 911:2, 937:25

## L

**language** [1] - 892:23
**LaSalle** [1] - 883:5
**last** [3] - 895:17, 902:8, 942:23
**late** [1] - 895:21
**law** [3] - 885:20, 942:1, 942:11
**lawsuit** [1] - 924:12
**lawyer** [3] - 885:17, 896:22, 941:4
**lead** [1] - 906:21
**learn** [1] - 893:20
**learned** [13] - 893:25, 896:2, 898:16, 902:24, 904:7, 905:7, 907:10, 910:14, 911:21, 916:13, 917:3, 917:10, 917:14
**learning** [1] - 934:24
**lease** [3] - 899:9, 912:16, 916:21
**least** [5] - 917:10, 920:12, 930:21, 933:8, 935:2
**leave** [2] - 899:18, 902:18
**leaves** [1] - 939:15
**leaving** [1] - 904:23
**left** [2] - 933:17, 942:22
**legal** [4] - 896:10, 896:19, 931:21, 941:23
**legalese** [1] - 899:5
**legally** [1] - 894:19
**lengthy** [2] - 899:2, 899:5
**letter** [12] - 898:13, 898:17, 899:16, 900:10, 901:13, 903:2, 928:12, 928:15, 928:21, 928:22, 929:3, 931:5
**lieu** [1] - 893:21, 897:7, 897:12, 897:23, 898:4, 898:7, 898:22
**limine** [1] - 908:10
**limited** [1] - 922:24
**lined** [5] - 889:24, 890:2, 890:15, 891:6, 925:7
**lining** [1] - 891:9
**LIPTON** [1] - 883:4, 942:19
**list** [5] - 921:21, 921:22, 922:1, 922:4
**litigation** [16] - 889:14, 889:16, 890:6, 891:19, 891:24, 892:1, 892:10, 892:24, 894:18, 896:2, 896:25, 899:6, 906:16, 910:1, 923:24, 936:22
**LLP** [1] - 883:3
**look** [21] - 887:16, 889:23, 891:23, 903:13, 904:10, 906:24, 909:4, 909:7, 909:12, 910:8, 911:14, 912:22, 913:11, 921:3, 921:5, 931:19, 932:5, 932:8,

932:11, 938:12, 938:22
**looked** [2] - 909:24, 940:19
**looking** [10] - 887:18, 903:25, 904:1, 909:8, 910:3, 911:25, 919:8, 923:16, 932:2, 940:14
**loop** [3] - 891:16, 891:19, 908:5
**lost** [1] - 906:22
**luck** [1] - 942:17

## M

**mail** [67] - 887:8, 887:9, 887:10, 887:12, 887:17, 887:23, 888:3, 888:4, 888:7, 889:16, 890:9, 890:25, 891:21, 900:2, 900:6, 901:18, 903:11, 904:17, 904:23, 905:1, 905:2, 905:13, 909:16, 910:8, 910:11, 910:18, 910:20, 910:24, 911:11, 912:5, 912:14, 912:23, 913:3, 913:5, 913:14, 916:5, 916:7, 916:17, 916:22, 916:25, 917:8, 919:6, 919:12, 919:13, 919:22, 920:15, 921:9, 921:18, 923:11, 923:17, 925:25, 926:2, 926:5, 926:16, 926:19, 927:5, 929:10, 930:4, 930:5, 931:16, 938:25, 939:2, 939:3, 940:12, 940:21
**mailed** [7] - 887:14, 898:19, 901:7, 901:23, 910:21, 913:8, 931:17
**mails** [65] - 886:4, 886:7, 886:14, 886:21, 886:24, 887:1, 887:3, 887:5, 887:10, 887:15, 887:20, 887:25, 888:10, 888:14, 888:20, 889:8, 889:15, 891:18, 894:4, 894:5, 894:10, 907:11, 907:14, 909:13, 912:2, 913:4, 917:17, 917:20, 918:7, 918:14, 918:17, 918:21, 918:22, 919:2, 919:4, 919:7, 919:11, 919:15, 919:17, 919:19, 920:5, 920:9, 920:11, 920:25, 921:13, 921:20, 921:23, 922:1, 922:4, 922:9, 922:22, 923:1, 923:7, 923:25, 924:2, 934:9, 934:19, 934:20, 934:23, 939:5, 939:8, 939:20, 940:10, 940:14
**March** [12] - 891:21, 893:7, 898:13, 898:17, 898:24, 899:16, 900:10, 901:13, 928:23, 928:24, 929:11, 931:5
**marked** [3] - 885:14, 912:7, 929:3
**marked-up** [1] - 912:7
**matter** [11] - 888:15, 894:9, 914:15, 921:9, 922:10, 922:15, 923:24, 932:18, 939:23, 940:4, 943:4
**matters** [6] - 922:24, 923:2, 924:5, 924:12, 924:15, 935:25
**McGarry** [58] - 883:4, 884:5, 884:11, 885:4, 885:6, 885:10, 885:11, 886:5, 886:6, 889:1, 889:7, 889:12, 890:23, 892:3, 892:7, 895:2, 895:4, 895:8, 895:11, 895:19, 895:20, 900:21, 902:11, 903:17, 903:19, 908:20, 908:23, 908:24, 909:3, 909:7, 909:11, 910:7, 911:17, 911:19, 912:21, 913:24, 914:16, 914:18, 914:24, 915:3, 915:11, 915:23, 918:8, 927:22, 928:18, 929:17,

934:11, 938:3, 938:7, 939:11, 939:16, 940:20, 940:24, 941:2, 941:6, 941:22, 942:8, 942:18
**McJessy** [39] - 884:7, 889:10, 908:18, 909:1, 909:8, 910:5, 912:20, 914:4, 914:12, 914:17, 915:7, 915:9, 916:3, 918:1, 918:12, 921:7, 921:17, 925:10, 928:2, 928:10, 928:20, 929:1, 929:2, 929:20, 930:1, 934:11, 934:14, 936:10, 936:13, 938:17, 939:8, 939:12, 939:21, 939:22, 940:11, 940:17, 941:15, 942:20, 942:22, 942:25
**McJessy's** [1] - 907:5
**mean** [16] - 888:24, 889:4, 890:18, 895:1, 897:14, 901:17, 901:20, 902:4, 903:8, 905:21, 917:7, 922:16, 927:12, 928:7, 933:11, 934:22
**meaning** [1] - 934:15
**means** [3] - 923:6, 926:14, 926:20
**meant** [5] - 911:12, 920:23, 928:6, 935:13, 935:14
**mechanics** [2] - 897:22, 897:25
**meet** [2] - 893:4, 909:19
**meeting** [5] - 893:8, 893:14, 893:17, 906:4, 927:7
**Mehul** [15] - 893:22, 894:17, 894:20, 898:20, 910:23, 911:13, 912:6, 912:14, 916:22, 923:23, 932:6, 935:14, 935:16, 938:18, 938:25
**memorandum** [1] - 904:3
**memorialize** [3] - 903:10, 904:12, 904:13
**memorialized** [2] - 894:10, 904:10
**mention** [1] - 913:9
**mentioned** [6] - 897:21, 905:2, 917:6, 927:7, 931:11, 941:22
**met** [8] - 893:7, 893:8, 893:9, 893:12, 906:5, 927:14, 927:17, 927:21
**Midwest** [8] - 897:16, 901:1, 901:2, 913:12, 916:21, 917:9, 933:25, 940:6
**might** [2] - 892:24, 932:13
**million** [2] - 894:15, 896:5
**mind** [2] - 897:2, 936:21
**minute** [1] - 936:10
**misled** [1] - 912:18
**mispronouncing** [1] - 898:14
**money** [1] - 904:6
**months** [1] - 893:10
**morning** [2] - 885:12, 914:14
**motion** [5] - 886:19, 894:21, 908:9, 936:22, 937:7
**move** [1] - 897:20
**moving** [1] - 915:4
**MR** [91] - 883:4, 883:4, 884:5, 884:7, 884:11, 885:4, 885:6, 885:10, 886:5, 886:6, 889:1, 889:7, 889:10, 889:12, 890:23, 892:3, 892:7, 895:2, 895:4, 895:8, 895:11, 895:19, 895:20, 900:21, 902:11, 903:17, 903:19, 908:18, 908:20, 908:23, 908:24, 909:1, 909:3, 909:7, 909:8, 909:11, 910:5, 910:7,

911:17, 911:19, 912:20, 912:21, 913:24, 914:4, 914:12, 914:16, 914:24, 915:3, 915:7, 915:9, 915:11, 915:23, 916:3, 918:1, 918:8, 918:12, 921:7, 921:17, 925:10, 927:22, 928:2, 928:18, 929:1, 929:2, 929:17, 929:20, 930:1, 934:11, 934:14, 934:16, 936:10, 936:13, 938:3, 938:7, 939:11, 939:12, 939:16, 939:22, 940:11, 940:17, 940:24, 941:2, 941:6, 941:15, 942:8, 942:18, 942:19, 942:20, 942:22, 942:25
**MS** [16] - 884:9, 903:16, 909:10, 913:19, 928:23, 928:25, 936:15, 936:18, 937:15, 937:16, 938:2, 939:13, 941:18, 941:20, 942:16, 942:21
**Muschler** [3] - 930:5, 931:2, 933:10
**Muschler's** [1] - 891:21
**Mutual** [1] - 923:25

## N

**nailed** [1] - 906:11
**name** [6] - 886:11, 898:15, 920:4, 921:25, 922:2, 922:3
**need** [3] - 912:9, 938:11, 940:25
**needed** [4] - 904:5, 915:17, 931:19, 939:9
**needs** [1] - 895:8
**negotiated** [1] - 934:25
**negotiating** [3] - 895:15, 895:24, 904:8
**negotiations** [4] - 902:2, 902:21, 915:14, 916:14
**never** [19] - 887:22, 892:12, 893:11, 901:4, 901:8, 901:18, 902:19, 904:19, 905:13, 905:21, 905:24, 909:20, 918:17, 931:3, 932:17, 933:17, 941:10
**new** [5] - 905:19, 905:24, 906:2, 941:22, 942:1
**news** [3] - 910:14, 910:15, 910:16
**next** [5] - 889:22, 898:12, 898:13, 912:9, 912:14
**night** [1] - 942:3
**nobody** [3] - 907:9, 932:8, 932:10
**none** [2] - 940:1, 940:8
**North** [1] - 883:5
**Northern** [1] - 943:7
**note** [6] - 894:13, 894:14, 894:15, 896:5, 896:6, 912:9
**noted** [1] - 891:9
**nothing** [12] - 891:2, 897:4, 897:24, 906:25, 915:9, 915:23, 924:16, 929:11, 932:4, 939:11, 939:12, 939:13
**number** [8] - 885:18, 886:12, 907:11, 907:14, 916:9, 919:17, 920:9, 921:22

## O

**oath** [1] - 886:3
**object** [2] - 913:19, 915:9
**objection** [8] - 889:10, 908:18, 909:1,

910:5, 915:6, 918:8, 929:18, 934:12
**obligation** [2] - 924:11
**obvious** [1] - 901:16
**occur** [1] - 927:8
**occurred** [6] - 905:6, 908:14, 931:3, 931:11, 933:17, 940:3
**occurring** [1] - 937:1
**occurs** [1] - 942:1
**offer** [3] - 903:5, 905:8, 939:7
**offered** [2] - 941:7, 941:9
**office** - 893:15, 903:3
**officer** [1] - 941:6
**Official** [1] - 943:6
**often** [1] - 922:25
**old** [1] - 924:9
**omission** [1] - 891:1
**once** [3] - 894:19, 898:22, 910:14
**one** [19] - 887:22, 888:3, 889:22, 890:3, 891:8, 892:2, 904:23, 907:2, 911:16, 912:3, 914:11, 917:25, 923:18, 925:6, 929:20, 936:8, 936:15, 940:6, 941:18
**ones** [2] - 888:18, 894:25
**open** [4] - 885:1, 900:18, 900:19, 938:8
**operational** [1] - 892:19
**operator** [1] - 904:24
**opinion** [1] - 891:25
**opportunity** [1] - 913:21
**option** [1] - 899:8
**order** [8] - 887:25, 898:18, 898:20, 908:9, 908:10, 915:17, 924:23
**orient** [3] - 886:1, 905:17, 912:3
**orienting** [2] - 895:12, 897:5
**original** [1] - 888:25
**otherwise** [3] - 897:9, 898:9, 899:13
**outline** [1] - 914:25
**Outlook** [1] - 919:24
**outside** [1] - 899:7
**overruled** [1] - 934:13
**own** [6] - 886:15, 887:6, 897:17, 904:8, 906:12, 915:14

**P**

**PAGE** [1] - 884:2
**page** [2] - 900:19, 900:22
**paid** [2] - 905:24, 906:8
**papers** [2] - 937:18, 937:21
**paragraph** [2] - 892:12, 892:15
**pardon** [1] - 898:14
**Paresh** [2] - 923:23, 939:1
**part** [1] - 902:1
**particular** [1] - 924:2
**parties** [5] - 892:15, 902:15, 926:20, 940:3, 940:12
**passing** [1] - 942:3
**pause** [2] - 914:13, 936:12
**pay** [1] - 897:16
**per** [1] - 926:2

**perhaps** [2] - 937:24, 941:21
**period** [8] - 893:7, 895:12, 920:12, 920:14, 920:18, 934:15, 936:1, 936:5
**person** [4] - 910:3, 920:4, 920:9, 920:11
**personal** [1] - 919:13
**personally** [1] - 889:13
**pertinent** [1] - 894:25
**phone** [12] - 893:25, 894:2, 894:9, 895:12, 895:21, 903:3, 904:11, 904:12, 904:13, 904:15, 912:25
**phonetic** [1] - 905:25
**pick** [1] - 916:4
**piece** [1] - 906:16
**place** [1] - 898:22
**plaintiff** [1] - 914:21
**plaintiffs** [1] - 940:7
**plan** [3] - 886:15, 887:6, 902:21
**plane** [1] - 900:7
**planned** [1] - 902:18
**plans** [1] - 902:24
**pleading** [1] - 895:6
**pleadings** [2] - 895:5, 940:8
**pocket** [1] - 909:7
**point** [4] - 902:3, 904:3, 914:5, 942:12
**position** [1] - 909:25
**possession** [2] - 892:21, 935:7
**practice** [1] - 910:1
**practicing** [1] - 885:19
**precipitating** [1] - 937:6
**predicate** [1] - 929:19
**prepare** [1] - 896:13
**present** [3] - 886:12, 914:6, 914:7
**presented** [1] - 929:21
**preserve** [3] - 892:17, 892:20, 923:20
**preserving** [1] - 915:21
**presumably** [2] - 932:18, 932:20
**presume** [2] - 901:21
**pretty** [1] - 897:13
**print** [1] - 922:6
**problem** [2] - 941:12, 942:24
**procedure** [1] - 923:25
**proceedings** [3] - 885:1, 943:2, 943:4
**produce** [3] - 921:13, 923:7, 940:21
**produced** [4] - 909:18, 919:10, 922:18, 940:2
**production** [6] - 888:10, 922:23, 922:24, 939:5, 941:8
**professional** [1] - 885:17
**program** [1] - 919:22
**property** [1] - 900:24
**prosecuting** [1] - 897:23
**provide** [2] - 890:5, 926:19
**provided** [1] - 937:18
**provision** [3] - 891:25, 892:10, 892:12
**purchase** [7] - 886:15, 888:12, 888:15, 895:15, 902:22, 904:8, 908:6
**purportedly** [1] - 910:16
**purpose** [1] - 896:9
**put** [5] - 886:10, 886:11, 913:22, 914:23, 920:15

**puts** [1] - 893:17
**putting** [1] - 888:2

**Q**

**questions** [10] - 915:25, 916:12, 928:3, 928:11, 928:13, 928:20, 930:7, 934:25, 936:13, 938:2
**quite** [1] - 922:20

**R**

**raise** [1] - 942:4
**raised** [3] - 907:4, 937:13, 942:2
**range** [1] - 907:24
**rather** [1] - 942:7
**read** [15] - 895:18, 899:4, 900:16, 927:2, 927:5, 928:1, 928:3, 928:5, 928:15, 929:7, 929:25, 931:14, 931:18, 937:21
**really** [3] - 902:5, 906:9, 906:24
**reason** [2] - 922:9, 931:20, 932:11
**rebuttal** [1] - 914:23
**recalled** [1] - 919:1
**recalling** [1] - 885:6
**receive** [7] - 886:7, 887:20, 918:13, 918:21, 928:15, 934:20, 940:5
**received** [23] - 900:2, 902:10, 911:11, 916:25, 918:7, 918:19, 919:17, 919:18, 920:5, 920:25, 923:1, 928:12, 929:3, 929:5, 929:7, 931:5, 931:12, 932:8, 934:24, 938:18, 939:24, 940:7, 940:20
**receiving** [1] - 930:3
**recipient** [2] - 886:8, 889:15
**recollection** [1] - 941:21
**record** [3] - 885:11, 928:5, 943:4
**red** [6] - 889:24, 890:2, 890:15, 891:6, 891:9, 925:7
**red-lined** [5] - 889:24, 890:2, 890:15, 891:6, 925:7
**REDIRECT** [2] - 884:10, 938:6
**refer** [3] - 890:8, 894:6, 895:5
**reference** [1] - 928:19
**referred** [2] - 896:6, 917:17
**referring** [6] - 887:17, 891:23, 892:2, 900:17, 912:4, 923:12
**reflected** [1] - 889:16
**refused** [1] - 921:12
**regarding** [15] - 886:14, 888:12, 889:13, 890:6, 890:15, 891:11, 891:19, 891:25, 894:12, 898:3, 902:21, 907:7, 907:11, 911:2, 913:25
**related** [2] - 923:25, 929:13
**relevant** [1] - 892:21
**relied** [1] - 932:22
**remained** [1] - 902:3
**remember** [18] - 893:9, 893:11, 898:12, 898:13, 903:6, 906:12, 907:23, 919:4, 929:14, 930:3, 930:5, 930:9, 937:5, 937:10, 939:10, 940:13

**remembers** [1] - 914:7
**repeatedly** [3] - 935:25, 936:2, 936:4
**replaced** [1] - 896:20
**Reporter** [1] - 943:6
**represented** [1] - 892:18
**repurchase** [1] - 915:14
**request** [2] - 941:10, 941:16
**requested** [3] - 886:2, 921:8, 923:2
**research** [1] - 896:16
**reserved** [1] - 914:19
**respect** [4] - 892:10, 898:21, 915:14
**respond** [3] - 911:2, 911:5, 913:16
**responded** [5] - 901:9, 901:13, 904:19, 911:6, 934:17
**respondent** [1] - 939:17
**Respondents** [1] - 883:2
**respondents** [1] - 941:5
**respondents'** [1] - 889:4
**response** [10] - 911:9, 922:12, 922:14, 922:16, 923:16, 926:10, 926:22, 932:21, 940:20, 941:10
**responses** [2] - 935:10, 940:5
**responsive** [2] - 921:20, 921:23
**rested** [2] - 914:21, 914:23
**result** [3] - 894:14, 896:23, 904:13
**retain** [1] - 937:24
**review** [3] - 888:10, 914:14, 922:14
**reviewed** [1] - 922:12
**revised** [2] - 890:2, 925:7
**Road** [2] - 930:19, 936:20
**Roche** [2] - 939:24, 940:4
**Romoney** [1] - 905:25
**RPR** [1] - 943:8
**rules** [1] - 923:24
**ruling** [1] - 914:9

## S

**sake** [1] - 915:4
**sale** [2] - 900:5, 916:14
**sales** [2] - 937:1, 937:5
**saw** [2] - 905:13, 909:17
**school** [1] - 885:20
**Schreiber** [2] - 891:13, 924:17
**scope** [2] - 913:20, 934:11
**Scott** [1] - 891:13
**se** [1] - 926:2
**search** [7] - 913:10, 913:11, 920:3, 920:4, 920:6, 920:14, 920:15
**searches** [1] - 921:18
**second** [7] - 890:9, 898:21, 900:23, 914:2, 914:11, 917:21, 928:22
**see** [18] - 887:16, 888:5, 888:10, 888:14, 889:9, 892:3, 896:16, 905:1, 909:14, 909:16, 910:23, 912:7, 925:7, 929:15, 929:24, 937:4, 938:18, 942:4
**seeing** [3] - 922:22, 927:13, 934:19
**seek** [1] - 920:17
**seem** [2] - 931:22, 941:21
**selling** [1] - 937:7

**send** [4] - 898:23, 902:4, 913:14, 939:24
**sending** [1] - 930:5
**sent** [17] - 887:9, 890:2, 891:4, 891:7, 891:8, 898:24, 904:17, 905:3, 911:13, 912:15, 919:11, 920:9, 920:11, 925:7, 929:10, 931:16, 934:20
**sentence** [3] - 900:16, 900:17, 900:23
**separate** [2] - 906:12, 912:1
**separately** [1] - 914:8
**September** [10] - 886:18, 886:21, 910:8, 910:11, 910:23, 912:23, 916:7, 920:19, 920:20, 920:24
**serious** [1] - 907:1
**Serritella** [8] - 887:13, 887:14, 898:14, 899:16, 901:20, 901:21, 913:12, 931:6
**Serritella's** [2] - 900:10, 928:12
**server** [25] - 886:15, 887:6, 888:12, 888:15, 895:15, 895:25, 899:18, 902:18, 902:22, 904:8, 907:12, 908:6, 910:16, 913:13, 915:14, 915:18, 916:14, 930:13, 930:16, 930:24, 931:8, 933:8, 934:5, 934:24, 935:3
**servers** [3] - 892:20, 929:12, 933:6
**SH** [19] - 887:16, 888:3, 889:19, 889:23, 890:8, 890:14, 891:23, 894:6, 900:14, 903:13, 903:14, 904:1, 911:7, 912:5, 912:22, 916:6, 916:10, 938:8
**Shah** [61] - 886:24, 887:3, 887:7, 887:8, 887:11, 887:21, 887:23, 888:6, 888:11, 891:13, 893:1, 893:22, 894:17, 895:14, 895:24, 897:11, 898:23, 901:20, 902:17, 903:2, 903:5, 903:8, 904:11, 904:14, 904:22, 905:19, 905:22, 906:12, 906:20, 907:14, 910:9, 910:11, 910:19, 911:2, 911:20, 911:25, 912:6, 912:18, 912:23, 912:25, 913:16, 914:8, 915:13, 916:22, 917:6, 917:14, 918:4, 918:7, 918:13, 918:18, 918:20, 918:23, 919:15, 921:24, 929:10, 932:6, 935:23, 938:18, 938:25
**Shah's** [4] - 886:15, 887:6, 935:16, 942:23
**Shapiro** [2] - 909:13, 909:19
**Shelist** [3] - 909:14, 909:24, 909:25
**shepherd** [1] - 902:2
**shifting** [1] - 938:10
**ships** [1] - 942:3
**shook** [1] - 906:14
**show** [2] - 919:5, 919:6
**showing** [1] - 909:12
**sic** [3] - 892:18, 909:16, 932:10
**sign** [1] - 912:9
**signed** [1] - 902:10
**simply** [1] - 922:6
**simultaneous** [1] - 942:11
**situation** [1] - 912:13
**six** [1] - 893:10
**sold** [2] - 902:13, 910:16
**sometime** [2] - 933:18, 933:20
**somewhere** [1] - 897:20

**sorry** [11] - 895:17, 903:15, 908:23, 911:16, 916:6, 918:11, 920:23, 921:16, 927:17, 927:22, 931:5
**sort** [1] - 916:4
**sounded** [1] - 904:16
**sounds** [4] - 887:4, 927:12, 927:13, 937:4
**specific** [2] - 939:8, 940:21
**specifically** [2] - 893:11, 923:12
**spend** [1] - 932:12
**stagger** [1] - 942:5
**stand** [1] - 939:15
**standard** [2] - 941:23, 941:24
**start** [1] - 908:12
**started** [1] - 936:22
**state** [3] - 885:21, 895:19, 929:17
**statement** [4] - 893:1, 901:18, 911:20, 911:22
**status** [2] - 905:15, 937:13
**staying** [1] - 897:15
**step** [1] - 939:14
**Steve** [9] - 893:9, 898:19, 901:16, 901:23, 902:4, 902:6, 902:9, 929:5, 938:25
**Steven** [2] - 886:11, 893:22
**stop** [1] - 889:18
**storage** [1] - 900:4
**store** [2] - 900:24, 901:10
**streamline** [2] - 906:13, 906:14
**Street** [1] - 883:5
**strike** [6] - 918:5, 919:3, 919:5, 922:3, 922:13, 934:16
**stuff** [3] - 892:24, 901:17, 902:4
**subject** [10] - 888:14, 894:9, 894:18, 896:18, 906:7, 906:9, 907:12, 922:24, 923:2, 939:1
**submission** [5] - 888:16, 888:24, 889:4, 907:21
**submitted** [2] - 940:16, 940:18
**submitting** [1] - 941:21
**subpoena** [4] - 915:17, 922:15, 923:3, 940:5
**subpoenaed** [1] - 940:7
**sued** [1] - 896:6
**suggest** [1] - 915:16
**suggested** [1] - 886:2
**suggestion** [1] - 907:9
**Suite** [1] - 883:5
**sum** [1] - 887:3
**summarized** [1] - 897:14
**summer** [1] - 885:21
**superseded** [1] - 896:20
**support** [1] - 917:17
**surely** [1] - 888:13
**sustained** [7] - 908:19, 908:22, 909:2, 910:6, 913:23, 918:10
**sworn** [1] - 885:7
**system** [1] - 921:19
**systems** [1] - 892:18

## T

tangible [1] - 931:16
task [1] - 924:15
telephone [2] - 894:7, 913:3
terms [1] - 912:6
testified [7] - 895:22, 899:13, 918:18, 919:17, 922:12, 932:24, 936:19
testifies [1] - 914:7
testifying [3] - 918:4, 918:6, 918:20
testimony [11] - 885:25, 893:6, 893:14, 897:6, 905:18, 918:24, 919:16, 919:18, 920:3, 929:9, 929:19
THE [73] - 885:2, 885:5, 886:4, 888:23, 889:3, 889:4, 889:6, 889:11, 890:21, 890:22, 892:2, 892:5, 895:1, 895:3, 895:7, 895:10, 900:20, 900:22, 903:18, 908:19, 908:22, 909:2, 909:6, 909:9, 910:6, 911:16, 911:18, 913:23, 914:2, 914:11, 914:14, 914:22, 915:2, 915:5, 915:8, 915:24, 917:25, 918:9, 918:10, 918:11, 921:5, 921:15, 921:16, 925:9, 927:24, 927:25, 928:1, 928:4, 928:6, 928:22, 928:24, 929:22, 929:24, 934:13, 936:11, 936:14, 937:13, 938:4, 939:14, 939:18, 940:10, 940:16, 940:23, 940:25, 941:4, 941:12, 941:17, 941:19, 942:7, 942:14, 942:17, 942:24, 943:1
theory [1] - 896:19
thereafter [1] - 903:20
therefore [1] - 896:21
thinking [7] - 892:23, 895:17, 918:22, 919:14, 933:15, 933:16, 935:16
THOMAS [1] - 883:4
thread [1] - 913:5
Tina [3] - 888:11, 910:17, 910:18
today [1] - 912:7
together [3] - 893:22, 896:15, 902:6
Tom [1] - 885:11
took [4] - 885:20, 898:22, 939:4, 942:10
top [1] - 916:22
total [1] - 921:22
touch [2] - 888:2, 906:4
trail [4] - 887:10, 905:3, 910:18, 910:24
transaction [2] - 888:12, 893:21
transactional [1] - 896:22
transcript [1] - 943:4
trial [1] - 921:14
tried [3] - 904:22, 904:23, 922:19
TRO [3] - 936:23, 937:7, 937:18
true [5] - 911:22, 919:10, 925:18, 936:2, 939:7
truth [1] - 908:7
try [3] - 906:24, 910:20, 910:21
trying [5] - 896:16, 906:17, 913:15, 935:17, 935:19
Tuesday [2] - 897:6, 939:20

turn [4] - 923:8, 924:18, 926:3, 926:16
twice [1] - 890:7
two [14] - 887:10, 892:19, 893:14, 893:25, 894:24, 895:13, 895:21, 912:1, 917:17, 918:14, 928:2, 938:12, 940:6, 942:3
type [3] - 921:25, 922:2, 922:3
typing [1] - 920:4
typo [1] - 917:1

## U

UCB [5] - 896:6, 897:16, 900:3, 900:6, 923:25
UCC [1] - 900:5
under [2] - 885:13, 886:3
unfortunately [1] - 890:17
United [1] - 885:2
unless [2] - 932:3, 941:1
up [17] - 897:14, 898:21, 901:22, 907:2, 908:12, 909:24, 912:7, 913:20, 916:4, 920:9, 920:11, 921:20, 921:25, 922:4, 934:5, 934:8, 939:20
upset [1] - 904:16

## V

vacation [1] - 904:21
various [1] - 902:14
Varsha [2] - 894:17, 894:20
view [1] - 902:3
Vilia [4] - 890:3, 891:1, 891:6, 900:2
Vilia's [1] - 901:13
violate [1] - 908:9
vitae [1] - 885:16
voice [1] - 904:23

## W

wait [2] - 900:18, 928:22
waited [1] - 905:10
warehouse [26] - 886:15, 894:13, 894:15, 895:16, 897:17, 899:9, 899:18, 913:13, 915:18, 930:17, 930:21, 930:24, 931:7, 931:9, 932:25, 933:6, 933:19, 933:24, 934:3, 935:4, 935:7, 936:20, 937:2, 937:3, 937:9, 937:17
Warehousing [4] - 892:16, 892:18, 931:7, 934:2
weather [1] - 885:13
website [1] - 909:24
week [2] - 912:9, 921:14
whole [2] - 898:24, 941:3
withdraw [3] - 886:19, 915:1, 915:5
withdrawn [2] - 912:20, 915:10
witness [3] - 885:4, 889:1, 914:6
WITNESS [11] - 889:4, 890:22, 892:5, 900:22, 903:18, 918:9, 918:11, 921:16, 927:25, 928:6, 929:24

Witness [2] - 885:7, 939:15
witnesses [1] - 939:17
words [1] - 891:5
writes [1] - 912:6
written [1] - 887:24
wrote [1] - 910:23

## Y

year [2] - 885:22, 920:22
years [2] - 885:23, 885:24