1    **TRANSCRIBED FROM DIGITAL RECORDING**

2              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
3                       EASTERN DIVISION

4    UNITED CENTRAL BANK              ) Docket No. 10 C 00331
                                      )
5         Plaintiff,                  )
                                      ) Chicago, Illinois
6              vs.                    ) August 30, 2012
                                      ) 8:55:20 o'clock a.m.
7    KANAN FASHIONS, INC., et al.,    )
                                      )
8         Defendants.                 )

9              TRANSCRIPT OF PROCEEDINGS - Status
           BEFORE MAGISTRATE JUDGE MICHAEL T. MASON
10
     APPEARANCES:
11   For the Plaintiff:       BOODELL & DOMANSKIS LLC
                              BY:  MS. VILIA MARGARET DEDINAS
12                            353 North Clark Street
                              Suite 1800
13                            Chicago, Illinois  60654

14
     For the Defendants:      McJESSY CHING & THOMPSON LLC
15     *via telephone*        BY:  MR. KEVIN PATRICK McJESSY
                              3759 North Ravenswood
16                            Suite 231
                              Chicago, Illinois  60613
17

18

19
                  LAURA LaCIEN, CSR, RMR, FCRR, CRR
20                     Official Court Reporter
                219 South Dearborn Street, Suite 1902
21                    Chicago, Illinois  60604
                          (312) 408-5032
22

23      **PLEASE NOTIFY OF CORRECT SPEAKER IDENTIFICATION**
     NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES PORTIONS
24   UNINTELLIGIBLE AND INAUDIBLE.

25

1    (The following digitally recorded proceedings were had in

2 open court:)

3         COURTROOM DEPUTY:  10 C 331, United Central Bank

4 versus Kanan Fashions, et al.

5         MS. DEDINAS:  Good morning, your Honor.  Vilia

6 Dedinas --

7         THE COURT:  We're going to get Mr. McJessy --

8         COURTROOM DEPUTY:  He's on the --

9         MS. DEDINAS:  He's on the line.

10         THE COURT:  Oh.  He is on line, okay.  Fine.  Good.

11 Good morning.

12         MS. DEDINAS:  Vilia Dedinas on behalf of the

13 plaintiff United Central Bank.

14         THE COURT:  Okay.  And on the phone?

15         MR. McJESSY:  Good morning, your Honor.  Kevin

16 McJessy on behalf of the Kanan defendant.

17         THE COURT:  Good morning.  Let me ask you a couple

18 of quick questions here.

19         MR. McJESSY:  Sure.

20         THE COURT:  You filed this motion late last night

21 and we got it and I've reviewed it but how did this

22 information come to light?

23         MS. DEDINAS:  Nada Djordjevic picked up a phone

24 message on her -- on our office answering machine on Monday

25 from a gentleman named Eric Perkins.

1          THE COURT:  Okay.

2          MS. DEDINAS:  He was calling her because he said he

3  has some data that -- this is the message that he left --

4          THE COURT:  Yes.

5          MS. DEDINAS:  -- that he had some data that related

6  to the Kanan -- our lawsuit involving Kanan Fashions that we

7  might be interested in.  Nada was in meetings with the

8  Yousiah (phonetic) people that day and I returned the call

9  later that afternoon.

10          So I spoke to him.  And I also found out in

11  conference with Mr. McJessy last night after we were filing

12  this motion that apparently Mr. Perkins had also called

13  Mr. McJessy that day --

14          THE COURT:  Of course.

15          MS. DEDINAS:  -- which I had kind of asked about but

16  didn't get that impression at all so I'm sure he could tell

17  you about his conversation.

18          THE COURT:  Do you want to tell me about your

19  conversation, Mr. McJessy?

20          MR. McJESSY:  Yes, sir.  I -- I received a notice

21  from my office that a Mr. Perkins had called and I'm guessing

22  it must have been on Monday.  I'm out of town.  I'm actually

23  in New York.

24          THE COURT:  Right.

25          MR. McJESSY:  And I got a message that Mr. Perkins

1  had called and he had information -- sort of a cryptic

2  message.  He had information that would be helpful to our

3  case and -- regarding computer software or computer servers,

4  I don't recall which, and would I give him a call back.

5           So I immediately called him back and he told me that

6  he had material -- he had read some of the pleadings in the

7  case.  He was aware of the motion for sanctions.  He told me

8  he had information that would be very helpful to me, to

9  address that.  And if I would send him some money, he would

10 make copies of whatever he had and he would send it to me.

11          And I asked him what he had and he was very cryptic

12 but he said that he had copied some information in -- he

13 thought it was late 2009, some information, computer

14 information and some video information and he would provide

15 that to me.  And I asked him again what it was and he wasn't

16 specific.

17          I told him that there were court or -- I didn't want

18 to -- I couldn't remember what the court orders in this case

19 specifically provide but I told him that there were court

20 orders out there that provided that all Kanan data had to be

21 preserved; and if he destroyed any of it, he very well may be

22 violating a court order and he's under notice now from me

23 that the court orders exist, that he better not do anything

24 with the information, whatever it is that he has.

25          I also told him that I would go ahead and issue a

1    subpoena to him because I didn't want to risk the information

2    get lost or destroyed.  I told him that if he read the

3    motion, there were issues about that in the past.  At that

4    point, he told me he thought that would be a really bad idea

5    because he had spoken to counsel for United Central Bank and

6    they were offering to pay him for whatever it was he had and

7    he thought that would be a really bad thing of me to have a

8    subpoena issued for the materials that he had.  I told him

9    that I understood that but I thought it was best that I do

10   that.

11          Anyway, I didn't have an objection to paying him the

12   reasonable cost of copying whatever it was he had but I still

13   was going to issue a subpoena.  That was pretty much the end

14   of our conversation.

15          I sent him an e-mail basically -- I got his e-mail

16   address, sent him an e-mail basically advising him that I was

17   (unintelligible/cutting out) materials had to be preserved.

18   If the bank were to call, please preserve all data relative

19   to Kanan Fashion.  There were court orders in place requiring

20   the preservation of data and materials.  I understand you

21   will provide information and the costs of (unintelligible)

22   data.  Please do not do anything that would alter the

23   original material.

24          THE COURT:  You're cutting out on us now.

25          MR. McJESSY:  That's what I sent him from my phone.

1   And then he responded to me with an e-mail that said thank

2   you for your e-mail, I hope you are enjoying your trip, to

3   back up the CCR data and forensic (unintelligible) --

4                THE COURT:  You know, Mr. McJessy --

5                MR. McJESSY:  -- data.

6                THE COURT:  You know, Mr. McJessy, we're not getting

7   any of this.  You're cutting out on us.

8                MR. McJESSY:  Oh, I'm sorry, your Honor.  All right.

9                THE COURT:  Do you have anything you want to say?

10               MR. McJESSY:  Well, anyway, he told me --

11               THE COURT:  Mr. McJessy --

12               MR. McJESSY:  Yes?

13               THE COURT:  -- you can just stop now.  Your

14  conversation is no good.  You keep cutting out on us.

15               MR. McJESSY:  I'm sorry.  All right.

16               THE COURT:  Do you have anything that you want to

17  add?  You want a protective order, I'm going to give you a

18  protective order.

19               MS. DEDINAS:  You know, and I'd like to -- I spoke

20  to Mr. McJessy about that.  He did agree that a protective

21  order should issue.  I'm -- I guess I would also like to ask

22  for leave to file an expedited subpoena so that we can --

23               THE COURT:  You know, you're going to have to do

24  that because he's in Kenosha, right?

25               MS. DEDINAS:  Right.

1        THE COURT:  So I won't have any jurisdiction over

2  there so you're going to have to go into court in Wisconsin

3  in order to get that and the question is, where is it,

4  Milwaukee or Madison, I don't know.

5        MS. DEDINAS:  It's actually in Kenosha.  Oh, which

6  court.

7        THE COURT:  Well, where you're going to get the

8  subpoena power from.

9        MR. McJESSY:  Judge, Judge --

10       THE COURT:  Yes?

11       MR. McJESSY:  We have already issued subpoenas to

12  him.

13       THE COURT:  Through where?

14       MR. McJESSY:  I had another attorney in my office do

15  it.  I can't -- I don't know where it came out of.

16       MS. DEDINAS:  It's -- it came out of the Eastern

17  District of Wisconsin.

18       THE COURT:  Okay.  The Eastern District I believe is

19  Milwaukee.

20       MS. DEDINAS:  But I don't -- I think what he -- I

21  don't know what the procedure was.  He actually had it --

22       THE COURT:  Served?

23       MS. DEDINAS:  -- filed here.  I don't know what

24  actions he took with the court up there.

25       THE COURT:  Yeah.  Did you take -- did you or

1   whoever did this take actions with the court in Milwaukee?

2           MR. McJESSY:  No.  We just issued it in accordance

3   with the rules out of that district.

4           THE COURT:  Out of that district?

5           MR. McJESSY:  Correct.

6           THE COURT:  Through the Milwaukee district we're

7   talking about?

8           MR. McJESSY:  If Ms. Dedinas says that that was the

9   district, yes.  I know it was out of Wisconsin.

10           THE COURT:  Okay.

11           MS. DEDINAS:  That -- I just don't know the

12   procedure.  He -- I saw that it said Eastern District of

13   Wisconsin on the subpoena --

14           THE COURT:  Uh-huh.

15           MS. DEDINAS -- and it referred to the case pending

16   here but I --

17           THE COURT:  Yes.

18           MS. DEDINAS:  -- but it was filed with the ECF

19   system here.  I don't know if --

20           THE COURT:  It was filed here?

21           MS. DEDINAS:  In the ECF system in this case --

22           THE COURT:  Okay.

23           MS. DEDINAS:  -- so I don't know if a separate

24   subpoena was actually -- any action was taken with the court

25   in the Eastern District of Wisconsin.

1    THE COURT:  Yeah, because they would be the one who

2  would enforce it; not this court here.  I would have no

3  jurisdiction over Wisconsin.

4    MS. DEDINAS:  Right.  No.  My concern, your Honor --

5  and I'll just let the court know that at the time when I

6  first -- I talked to him several times.

7    THE COURT:  Who are you talking about?

8    MS. DEDINAS:  To Mr. Perkins.

9    THE COURT:  Okay.

10    MS. DEDINAS:  At first when he told me he had this

11  data, he didn't have a time frame on it and I didn't know if

12  it was going to be relevant data at all and I was interested

13  in having my IT guys go up and make a forensic image of it.

14    THE COURT:  Sure.

15    MS. DEDINAS:  Then I looked at -- he sent me a copy

16  of this eBay page and I saw the whole system was bidding at

17  $200 so I -- and my IT people told me that, you know, there

18  could be an issue, that you have to have proprietary software

19  to view the data, which of course then costs us a lot of

20  money.  So they said, well, why don't you just buy the whole

21  system with the data because he needs some cash, for $200,

22  that's less than any expert will take.

23    So I raised that possibility with him because I had

24  said to him, look, you know, maybe you could make a forensic

25  image of the data, you're an IT specialist, you would certify

1  that it's a correct copy, you know, or maybe that would be

2  cheaper than us sending -- either party sending up --

3  somebody up there and then I raised the possibility of

4  purchasing that, which he liked very much.  But then he told

5  me that he didn't think the $200 was a fair price for it

6  because --

7            THE COURT:  Of course.

8            MS. DEDINAS:  -- he said that the eBay auction price

9  goes up at the last minute --

10            THE COURT:  Sure.

11            MS. DEDINAS:  -- so it would be a lot more.  So we

12  actually didn't agree on that but I asked him to give me an

13  idea of what it would cost.

14            When I asked him about the proprietary -- whether

15  proprietary software would be required, he said he didn't

16  know.  So I said well, why don't we set up a time where I

17  could just come and look at it; and if it's something that's

18  valuable, then we can preserve the data.  And if it's not,

19  you know, then Mr. McJessy can preserve it if he wants but I

20  may not be interested in spending the money.  So that was

21  sort of where we left it and I didn't realize --

22            THE COURT:  Was that yesterday?

23            MS. DEDINAS:  I think yesterday morning we had

24  talked about that and we had tentatively set up a time in --

25            THE COURT:  For tomorrow.

1    MS. DEDINAS:  Actually I was mistaken about that.

2    September 7th.  And since then, Mr. McJessy has pointed out

3    to me that this gentleman has some convictions for assault

4    and has a hunting license so I'm a little reluctant to

5    proceed with this plan and I think that perhaps a subpoena in

6    short order would be more effective.

7    THE COURT:  In regards to the subpoena, didn't I --

8    did I come across something where it said it was the wrong

9    address or something?

10    MS. DEDINAS:  He told me -- Mr. Perkins -- I advised

11    Mr. Perkins on Tuesday that a subpoena had been issued by

12    Mr. McJessy.  He claimed to be surprised by that.  I told him

13    where it had been issued to and said he'd -- I asked him if

14    he'd like me to send him a copy of it.  He declined my offer.

15    I don't know whether he asked or I told him but somehow the

16    address came up and I told him what address it had been

17    issued to and he said that's not his address, that's where he

18    gets pizza deliveries so he wasn't going to get served there

19    and he would be hiring a lawyer to object to the subpoena

20    because he didn't want to have to bring all that equipment to

21    Chicago so I have some concerns that he's not going to get

22    served by Mr. McJessy's subpoena.

23    THE COURT:  And was your subpoena mailed, do you

24    know, Mr. McJessy?

25    MR. McJESSY:  No.  No, your Honor.  I placed it with

1   a process server immediately for immediate service.

2              THE COURT:  And did he get it?

3              MR. McJESSY:  No.  As Ms. Dedinas advised me, the

4   address that we had turned out to be non-existent.  It

5   doesn't exist.

6              MS. DEDINAS:  Is that an address, Kevin, that you

7   got off of Lexis?

8              MR. McJESSY:  It is the address that comes back to

9   the telephone numbers that he left for me.  But the process

10  server advised me this morning or advised my office this

11  morning that they now have his correct address and they will

12  attempt service again today.

13             THE COURT:  Okay.

14             MR. McJESSY:  And, Ms. Vilia, also don't forget Ray

15  Fugiel.  We want him included in the protective order as

16  well.

17             THE COURT:  Right.  And was he ever sub -- was he

18  ever deposed?

19             MS. DEDINAS:  No.  I will --

20             THE COURT:  Because of the health issue?

21             MS. DEDINAS:  -- confess that --

22             Well, yeah.  He has told us he had serious health

23  issues.  We issued a subpoena for him a long time ago and

24  made numerous attempts to serve him and even stake out his

25  property and spent a lot of money and got nowhere, although

1   we can re-double those efforts.

2            THE COURT:  Where is he?

3            MS. DEDINAS:  We don't even know if he's alive at

4   this point.

5            THE COURT:  Oh, is that right?

6            MS. DEDINAS:  I don't -- I just don't know.

7            THE COURT:  Do you know, Mr. McJessy?

8            MR. McJESSY:  Yeah.  We have issued a subpoena for

9   him as well.  I did that also immediately after getting the

10  telephone call because Mr. Perkins told me that it was Ray

11  Fugiel who he had been dealing with so I issued the same

12  subpoena to preserve any information to Ray Fugiel.  I'm told

13  that he is at the address or at least the address I'm told

14  that we have for him is the address that United Central Bank

15  had.

16           THE COURT:  And where is that?

17           MS. DEDINAS:  Schaumburg maybe.

18           THE COURT:  Here.

19           MR. McJESSY:  Somewhere about two hours from here in

20  Illinois -- two hours from Chicago in Illinois out by DeKalb.

21  I can't remember the city.  I don't know it offhand.

22           THE COURT:  Sugar Grove.

23           MS. DEDINAS:  Yeah.  That sounds right.

24           MR. McJESSY:  Sure.  It's it.

25           THE COURT:  All right.  Has he been served yet?

1    MR. McJESSY:  As of this morning, I didn't have a

2  response.  The process server responsible for that area with

3  the agency we placed it with hasn't gotten back to the head

4  office, or whatever, so both are out for service and

5  hopefully we'll have service today.

6    THE COURT:  All right.

7    MR. McJESSY:  One other point, your Honor,

8  apparently Mr. Perkins owned a company called Cyber Click.

9    THE COURT:  That's what's in the motion here, yeah.

10    MR. McJESSY:  Right, which is -- I didn't realize

11  that until after we ran a Lexis report on him.  But we had

12  subpoenaed -- we issued a subpoena to the company that

13  acquired Cyber Click for information months ago and they

14  provided a very scant amount of information just because they

15  couldn't locate anything.  But we were aware if Cyber Click

16  had done the work for Kanan Fashion on install -- they're the

17  ones who actually installed the software on the warehouse

18  server.  They installed the Windows server software on that

19  server and installed it and I understand had remote access to

20  the server for a period of time.

21    But, you know, Cyber Click had been sold to this

22  company in Canada and they didn't retain any documentation

23  apparently except for one or two -- one or two pages which

24  were provided to Ms. Dedinas.  I didn't realize Mr. Perkins

25  was affiliated with that company until Monday or Tuesday

1   when --

2           THE COURT:  What's the name of the company?

3           MR. McJESSY:  Cyber Click, the company --

4           THE COURT:  No, no.  The Canadian company.

5           MR. McJESSY:  I don't remember.  It's on the

6   subpoena that was issued and I think the subpoena was filed

7   also with the court but I don't remember the name.  But

8   very un -- oh, Herbevek Group.

9           THE COURT:  Spell it, please.

10          MR. McJESSY:  H-e-r-b-e-v-e-k.  Herbevek Group.

11          THE COURT:  Spell it one more time.

12          MR. McJESSY:  I think it's H-e-r-b-e-v-e-k Group.

13          THE COURT:  Okay.

14          MR. McJESSY:  And they had counsel who helped us

15  get -- look for documents from that company, counsel out of

16  New York.

17          THE COURT:  What do you want to do besides a

18  protective order?

19          MR. McJESSY:  What?

20          THE COURT:  I'm talking to opposing counsel right

21  now.  Have you got a protective order prepared?

22          MS. DEDINAS:  I don't.  I think just an order

23  stating that he's to not destroy or alter any evidence in

24  this case.  I mean, alternatively, we could consider an order

25  requiring him to place the equipment within the court's

1  protection.

2           THE COURT:  My question to you is -- to both of you

3  is, do I have jurisdiction to do that on somebody up in

4  Wisconsin?

5           MR. McJESSY:  You know, your Honor, we had discussed

6  that yesterday and my reaction was that the court had no

7  jurisdiction until he is served with some sort of court

8  process which is why I got the subpoenaed issued.  I hadn't

9  thought about the fact that even if he's served with a

10  subpoena, because it's a subpoena issued out of Wisconsin,

11  you might not have jurisdiction.

12          I guess what I would suggest is that you do enter a

13  protective order ordering that he is prohibited from, you

14  know, altering or destroying any Kanan Fashion --

15          THE COURT:  Or disposing of --

16          MR. McJESSY:  -- data, equipment, material.  And if

17  that order were not enforceable, he could always challenge

18  it.  And alternatively, if he gets served with the subpoena,

19  we could file a joint motion for heaven's sakes -- I mean, I

20  agree with it -- in -- with confident as well but, you know,

21  leave it to him to challenge if he thinks he doesn't have

22  a -- that this court wouldn't have the jurisdiction.  It

23  wouldn't be a duly issued subpoena and anybody with notice of

24  a court order can't violate a court order.

25          THE COURT:  I'll be happy to enter a protective

 1   order, if you will, today but I don't know --

 2         MR. McJESSY:  The one thing Ms. Dedinas and I

 3   discussed yesterday, your Honor, was I don't have any

 4   objection to the entry of the protective order and, in fact,

 5   I think it should be against both individuals but I do object

 6   to any award of fees or costs.  We don't know anything at

 7   this point.

 8         THE COURT:  And I agree with you.  At this point, we

 9   don't know anything and I'm not going to order you to pay any

10   fees at this time.

11         MR. McJESSY:  Fair enough.

12         THE COURT:  That will be at a different point as far

13   as I'm concerned.

14         MR. McJESSY:  Okay.

15         THE COURT:  Now I want to advise you that this is

16   the long weekend coming up here.  Okay.  On Monday -- I'm

17   sorry.  On Monday, we're closed and Tuesday and Wednesday I'm

18   not going to be here.  Wednesday I may but I kind of doubt it

19   so be aware of that.

20         MS. DEDINAS:  Okay.  Well, one thing that -- I did

21   consider the jurisdiction issue and wasn't quite sure how to

22   address it.  One option that I had considered was to file an

23   action against him for a TRO in Wisconsin that would bring

24   him within a court's jurisdiction and get an order.  I think

25   that maybe that's the best way to proceed and --

1          THE COURT:  And this could all be a bunch of

2    bologna, too.

3          MS. DEDINAS:  Well, he says he --

4          THE COURT:  But I understand what you're saying.

5          MS. DEDINAS:  I know that he was the consultant for

6    Cyber.  He owns Cyber Clicks.  I do know that Cyber Clicks

7    was the consultant for Kanan Fashions.  In fact, Eric

8    Grossman who represented them before in June of 2010 when

9    Mr. -- when he was corresponding with Mr. Joshi (phonetic)

10   and said you know that there's a southside consultant and you

11   don't know who it is, he wrote him back a month later saying

12   the name of your consultant was Cyber Clicks so they've known

13   that for a couple of years so that seems to check out.  He

14   has told me some other things about the goings-on at the

15   warehouse --

16         THE COURT:  Mr. Perkins?

17         MS. DEDINAS:  -- Mr. Perkins so I do want to take

18   his deposition to find out --

19         THE COURT:  I don't blame you.

20         MS. DEDINAS:  And the way he describes that he

21   obtained this stuff, certainly it would be hard to make that

22   up if he really, in fact, has this equipment and it has data

23   on it.  So, you know, I don't --

24         THE COURT:  You might --

25         MS. DEDINAS:  -- know.

1          THE COURT:  I'm not trying to tell you what to do or

2     anything but I'm not so sure that's a bad idea that you have

3     about doing a TRO up there just to get jurisdiction and then

4     you -- I would think that both sides would want to depose him

5     as well as Fugiel.

6          Now if your motion is correct here, it says that

7     Perkins provided Fugiel -- if that's the way you say his

8     name, I'm not sure -- with backup copy and Perkins then wiped

9     the data off the servers so somebody's got a copy or a copy

10    was made of what was on the servers back in 2009 or 2010 and

11    maybe Fugiel got it or knows where it is.

12         MS. DEDINAS:  And I asked Mr. McJessy to check with

13    his computer consultant because our understanding -- first of

14    all, I asked what -- I asked Perkins to provide me with the

15    serial or identification numbers of those four servers --

16         THE COURT:  Sure.

17         MS. DEDINAS:  -- so that we could determine if they

18    are the four servers that contain the ESI that the defendants

19    are working off of so that may just be -- they could just be

20    four different servers and -- but, on the other hand, it

21    could be -- I know there was some concern about these servers

22    being old and one of them had malfunctioned, it's possible

23    that early in the litigation, they made a copy of the servers

24    and that what the defendants are running right now through

25    their ESI searches is from that backup.

1          THE COURT:  And Perkins told you, am I correct in

2    saying this, that he made a copy of the back -- he made a

3    backup copy before he wiped these servers --

4          MS. DEDINAS:  Yes.

5          THE COURT:  -- clean?

6          MS. DEDINAS:  That was the reason that the servers

7    were brought to him.  That was the whole point of the

8    engagement was for him to make backup copies of these servers

9    and that he got the warehouse surveillance system as

10   additional equipment that he could have in lieu of payment

11   for his services.

12         THE COURT:  And who directed him to do that, was it

13   Fugiel?

14         MS. DEDINAS:  He told me that he initially got a

15   phone call from Mehul Shah who told him that we need your

16   services but we can't afford to pay you so we can make this

17   arrangement.  He told me that Fugiel then contacted him and

18   brought up -- personally brought up the servers and the

19   equipment and was there for the copying.  And I asked him to

20   check to see what time frame it was because he told me that

21   his original -- he sold Cyber Clicks in 2008 and then that's

22   when -- you know, the time frame he had worked for Kanan.  He

23   came back and he told me that his contacts -- because he has

24   e-mail and he's checking his e-mail about his contacts with

25   Kanan and with Fugiel, he said that that was in January of

1   2010.

2           THE COURT:  Okay.  What do you want us to put in the

3   order?

4           MS. DEDINAS:  I would like you to put in the order

5   that the -- that the equipment and the data is relevant to a

6   pending lawsuit, that its loss could possibly cause

7   irretrievable harm to the parties and that Mr. Perkins is

8   directed to not take any actions to do anything with respect

9   to the data, access it or with the equipment, dispose of it,

10  wipe it, and I think that that kind of an order would give us

11  more leverage if we were to go in for a TRO to show the judge

12  that there is good cause for the entry of the order.

13          THE COURT:  Well, what about Mr. Fugiel?

14          MS. DEDINAS:  Same thing.

15          THE COURT:  Okay.  You want two separate protective

16  orders?

17          MR. McJESSY:  I would think that would be better

18  because there's an issue about --

19          THE COURT:  I do, too, because you got two different

20  jurisdictions.

21          MR. McJESSY:  -- enforceability of one.

22          THE COURT:  Yeah.

23          MS. DEDINAS:  And I guess also I'd like leave to

24  have an expedited subpoena to Mr. Perkins which would include

25  his deposition and hopefully Mr. McJessy and I can confer on

1    what day next week we could do that.

2           THE COURT:  Again --

3           MR. McJESSY:  This is the expedited subpoena or take

4    the deposition?

5           THE COURT:  Did you hear that?

6           MS. DEDINAS:  Well, it would be a subpoena that

7    would -- that has an expedited response date.

8           THE COURT:  But I didn't think --

9           MR. McJESSY:  Oh, okay.  That's what I wasn't sure

10   about.

11          MS. DEDINAS:  We don't think you had jurisdiction to

12   issue that.

13          THE COURT:  Correct; I don't.  I can't do a subpoena

14   for out of the district so that's why I think your

15   suggestion --

16          MS. DEDINAS:  So we'll file that.

17          THE COURT:  -- about doing a TRO up in Wisconsin is

18   probably the best thing but we'll get this -- these orders

19   entered today so you can at least have that to go up there.

20          And, Mr. McJessy, you're in agreement with that; is

21   that correct?

22          MR. McJESSY:  Yes, your Honor.  And I think it would

23   also be a good idea if both orders were to recite that a copy

24   of the order must be personally served on either Mr. Perkins

25   or Mr. Fugiel, you know, whichever order -- the order should

1   specify that.

2           THE COURT:  Well, if we don't know where he is, how

3   are we going to do that?  And I'm not trying to be sarcastic.

4   We don't have an exact address and it appears that you don't

5   either.

6           MR. McJESSY:  I'm just thinking of typically I know

7   a rule to show cause order isn't enforceable unless it's

8   personally served on the individual and I just thought that

9   might make it more clearer.  I do believe now we do have good

10  addresses for both people and we do have subpoenas already

11  out for both of them so I don't have an objection to United

12  Central Bank also issuing a subpoena but, you know, we

13  already do have one out.  I hope to have them both served

14  today.  I had hoped --

15          THE COURT:  And I --

16          MR. McJESSY:  Go ahead.

17          THE COURT:  With all due respect, I don't think you

18  should have the language in there about personally served on

19  them for that reason because you don't know if you've got the

20  correct address or not.

21          MR. McJESSY:  Fair enough.

22          THE COURT:  You know, you can -- we'll get you

23  copies of this thing or have your firm pull it off -- it can

24  be served electronically or you can get it electronically and

25  hand it to him when you serve him with the subpoena.

1    MR. McJESSY:  We'll -- Yes.  I'll certainly do that.

2 As soon as it's entered, if the subpoenas have not already

3 been served, I will get a copy to the process server

4 immediately.

5    THE COURT:  Okay.  So we'll enter that as soon as we

6 can.  And is there anything else?

7    MS. DEDINAS:  No.

8    THE COURT:  Keep it mind what I said about next

9 week, that I won't be available those two days.  Okay?

10    MS. DEDINAS:  Okay.

11    THE COURT:  Mr. McJessy, thank you.

12    MR. McJESSY:  Thank you for accommodating me, your

13 Honor.

14    THE COURT:  Sure.  Sure.  Okay.

15    MS. DEDINAS:  Thanks.

16    THE COURT:  Sure.  Very interesting.  Pardon me?

17    COURTROOM DEPUTY:  (Unintelligible) transcript.

18    THE COURT:  Oh, do you want a transcript of this?

19    MS. DEDINAS:  Sure.

20    MR. McJESSY:  I think I would, your Honor; yes.

21    THE COURT:  Then give the Court a copy, would you

22 please?

23    MR. McJESSY:  Very good.

24    THE COURT:  Thank you.

25    MS. DEDINAS:  Okay.  Thank you.

1           THE COURT:  All right.  Thanks.  This is going to be

2   very interesting.

3       (Which concluded the proceedings in the above-entitled

4   matter.)

5                       C E R T I F I C A T E

6           I hereby certify that the foregoing is a

7   transcription of proceedings transcribed from digital

8   proceedings held before the Honorable Michael T. Mason on

9   August 30, 2012.

10

11  /s/Laura LaCien

12  _____          September 27, 2012
    Laura LaCien                                    Date
13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25